# EXHIBIT 21

## DECLARATION OF GIL VAZQUEZ
### *Altschuler v. Chubb National Ins. Co.* CV-21-00119-TUC-DCB

1.    I, Gil Vazquez, declare under penalty of perjury that the following is true and correct, to the best of my knowledge.

2.    I am the Executive Director and President of the Keith Haring Foundation ("Foundation") and authorized to make this declaration.

3.    The Foundation is a not for profit corporation established on or about 1989 and has been responsible for, among other things, various charitable activities for underprivileged children and persons with AIDS, the preservation, publication and licensing of Keith Haring's artwork, maintenance of his archives, journals, catalogs, and publications, and over the years has maintained documentation regarding the sales of Keith Haring's artwork.

4.    My duties as Director and President of the Foundation include overseeing the grant-making and other projects and activities carried out by the Foundation in furtherance of its charitable purposes, annual budget, expenditures, revenues and finances, hiring firing of Foundation staff, outside professional advisors and consultants, the maintenance and disposition of the Foundation's archive and records, arrangements for the sale of artworks, the licensing program and public relations and promotion.

5.    The Foundation has been advised that Mr. Altschuler claims Keith Haring sold him a set of "Andy Mouse" prints sometime between 1989 – 1990 in Phoenix, Arizona.

6.    After a diligent search of its files and archived records, the Foundation concludes there is no information or documentation of any direct-from-artist sale of "Andy Mouse" prints to Mr. Altschuler, including any Artist's Proofs.

7.    The Foundation also has no information or documentation of any direct-from-artist sale of "Andy Mouse" prints generally.

8.    The Foundation also conducted a diligent search of its files and archived

records and found no evidence Keith Haring visited Phoenix, Arizona in 1989 or 1990.

9.      Keith Haring's only known visit to Phoenix, Arizona occurred in 1986 as part of a drawing workshop and mural collaboration. The Foundation's files regarding this visit contain no information or documentation regarding any sale of Andy Mouse prints.

Executed on this _27th_ day of _____July_____, 2022.

GIL VAZQUEZ,
Executive Director and President of
The Keith Haring Foundation

# EXHIBIT 22

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ARIZONA
3    ------------------------------------------X
     DOUGLAS ALTSCHULER,
4
                              PLAINTIFF,
5
6          -against-        Case No.:
                            CV-21-00119-TUC-DCB
7
8    CHUBB NATIONAL INSURANCE COMPANY, AN
     INDIANA CORPORATION,
9
                              DEFENDANT.
10   ------------------------------------------X
11              DATE: June 8, 2023
12              TIME: 1:16 P.M. EST
13
14          VIDEOTAPED VIRTUAL DEPOSITION of
15    a non-party witness, GIL VAZQUEZ, taken by
16    the Defendant, pursuant to a Subpoena and
17    to the Federal Rules of Civil Procedure,
18    held at the above date and time, before
19    Anna Khodachnik, a Notary Public of the
20    State of New York.
21
22
23
24
25      Job No. CS5939362

1                    G. VAZQUEZ

2          Q.    And in 1989 and 1990 you can't

3    recall a single instance where he said hey,

4    I am traveling to Phoenix, correct?

5          A.    Correct.

6          Q.    You also have taken the

7    opportunity to look back through his

8    journal and his personal notes or memoirs

9    and noted he had a number of trips in 1989

10   and 1990, but Arizona was not included

11   anywhere in terms of those trips, true?

12         A.    True.

13         Q.    You were able to find that he

14   had traveled to Arizona one time in the mid

15   1980s, correct?

16         A.    Correct.

17         Q.    Paragraph 5 of Exhibit 1 says

18   the foundation has been advised that Mr.

19   Altschuler claims Keith Haring sold him a

20   set of Andy Mouse prints sometime between

21   1989, 1990 in Phoenix, Arizona.  Do you see

22   that?

23         A.    I do.

24         Q.    You have looked through the

25   journal entries, you've looked through his

1                    G. VAZQUEZ

2      met on travel, true?

3           A.    Occasionally, yes.

4           Q.    If in 1989 and 1990 or early

5      1990, and I understand that he passed in

6      February of 1990, if he had taken a trip,

7      you likely would have known about it?

8           A.    Likely, yes.

9           Q.    Because of your closeness and

10     the communication that you shared with one

11     another, you would also have known if he

12     had done any art transactions or sales of

13     his art, fair?

14          A.    No.

15          Q.    My understanding is that you

16     are in the role as director of The Haring

17     Foundation, is that correct?

18          A.    Currently, yes.

19          Q.    And how long have you been in

20     that position?

21          A.    I have been in that position

22     for a year and a half.

23          Q.    Were you there when it was

24     originally founded?

25          A.    Yes, I was.

1              G. VAZQUEZ

2        A.    Yes.

3        Q.    That you knew his travel habits

4    and his personal habits related to his

5    artwork, what it meant to him, is that

6    fair?

7        A.    Could you rephrase -- I'm

8    sorry, could you restate the question?

9        Q.    Sure.  Generally speaking, you

10   knew his travel habits, travel

11   arrangements, you knew if he was going

12   somewhere or coming back?

13       A.    Generally.

14       Q.    In the time that you knew

15   Keith, are you aware of any instance where

16   he sold a piece of art to someone for cash

17   on the spot?

18       A.    I have no recollection of any

19   such thing happening.

20       Q.    But you are aware that he would

21   give his artwork away to people that he

22   cared about, is that fair?

23       A.    Yes.

24       Q.    Give me one minute.  We may be

25   close to done.

1                    G. VAZQUEZ

2       EXAMINATION BY

3       MR. SULLIVAN:

4            Q.    You are aware that in 1989,

5       Keith traveled to Europe on a couple of

6       occasions, correct?

7            A.    Correct.

8            Q.    You are aware that he traveled

9       to Pasadena, California, correct?

10           A.    Correct.

11           Q.    And you were aware that he went

12      to Atlanta, Georgia because you were with

13      him, correct?

14           A.    Correct.

15           Q.    During any of those travels or

16      any of the time that you spent together

17      with him in 1989, did he ever mention that

18      he had just come back or just gone to

19      Phoenix, Arizona?

20           A.    I have no recollection of a

21      trip to Phoenix.

22           Q.    And I know this is difficult,

23      but during that time, he was in the

24      advanced stages of AIDS, correct?

25           A.    He was sick, yes.

```
 1                   G. VAZQUEZ
 2          MR. MOON:  Object to form.
 3     A.    Not necessarily.
 4     Q.    Are you aware of whether or not
 5  Keith sold any of his artwork personally in
 6  1989 or 1990?
 7     A.    I don't have any recollection.
 8     Q.    Would you agree with me that it
 9  was not his custom or habit to personally
10  sell -- I understand he may give away
11  artwork, but not personally sell artwork in
12  1989 or 1990?
13          MR. MOON:  Object to form.
14     A.    That is correct.
15     Q.    In reading his journal entries,
16  he would write things about -- he didn't
17  like the business side of it.  He didn't
18  like the money transaction side of it.  Is
19  that consistent with what you observed?
20     A.    Yes.
21     Q.    And it was more of his generous
22  spirit to complete a piece of art or finish
23  a painting or drawings and give it to
24  someone that he cared about, fair?
25     A.    Occasionally, yes.
```

```
 1              G. VAZQUEZ
 2        Q.    He required medical care and
 3    people to take care of him, correct?
 4        A.    Not -- no.
 5        Q.    Would he travel on his own, by
 6    himself?
 7        A.    Yes.
 8        Q.    When you said Anna could look
 9    for the records, you are aware that she did
10    look for records and found nothing showing
11    that Keith sold anything to Mr. Altschuler
12    in 1989 or 1990, true?
13        A.    True.
14        Q.    When you say an AP set is not
15    part of the edition, I just want to make it
16    clear.  I've had kind of the same
17    understanding as Lawrence, with respect to
18    art.  I have a philosophy and no real
19    training in art.  But my understanding is,
20    you have the numbered edition and that
21    could be one to ten or in this instance,
22    one to thirty and each of those numbers
23    represent a discrete set within that
24    numbered edition, true?
25        A.    True.
```

```
 1                    G. VAZQUEZ
 2        Q.     And then the AP set, artist
 3    proof set, is outside of and not part of
 4    the numbered edition, is that true?
 5        A.     Correct.
 6             MR. SULLIVAN:  Gil, I really
 7        thank you for your time and I
 8        appreciate your testimony and
 9        listening to our questions.
10        Sometimes they are not super artful,
11        so thank you.  I hope you have a
12        great rest of you day.
13        A.     Thank you.  Like wise.
14             THE STENOGRAPHER:  Mr. Moon and
15        Counsel for the witness, are you
16        ordering a copy?
17             MR. SULLIVAN:  So, I'm counsel
18        for Chubb.  We are ordering a copy.
19        We also agreed to buy a copy for The
20        Haring Foundation and to allow him to
21        review it, review the deposition,
22        make any changes that he needs and
23        return it to us.  So to the extent
24        that affects how you are doing your
25        order, I just want to make sure that
```

# EXHIBIT 23

Page 1

```
 1
 2      ------------------------------------------------x
 3      EXAMINATION UNDER OATH
 4
 5      Insured Name:  Douglas H. Altschuler & Zoe J Werner
        Policy Number: 1380845205
 6      Claim Number:  0920200001456
        Date of Loss:  12/23/2019
 7      Writing Co:    Chubb National Insurance Company
        Our File:      0768.41493
 8
 9      Insured Name:  Douglas H. Altschuler & Zoe J. Werner
        Policy Number: 1380845205
10      Claim Number:  040520024846
        Date of Loss:  6/19/2020
11      Writing Co.:   Chubb National Insurance Company
        Our File:      0768.42484
12
13      ------------------------------------------------x
14      267 East 82nd Street
15      New York, New York 10028
16      October 6, 2020
17      10:00 a.m.
18
19          EXAMINATION UNDER OATH OF DOUGLAS ALTSCHULER,
20      appearing via Zoom at the above-mentioned time and
21      place before ANNMARIE OAKLEY, appearing via Zoom a
22      Notary Public of the State of New York.
23
24
25      Job No. CS4282162
```

CHUBB-Altschuler/ROLEX & ART 000081

092020001456

Page 2

1

2                    A P P E A R A N C E S

3

     CALFEE HALTER & GRISWOLD LLP
4    Attorneys for Claimant
                   1405 E. 6th Street
5                  Cleveland, Ohio 44114

6

     BY:        ANTHONY F. STRINGER, ESQ.
7               appearing via Zoom

8

     RUBIN FIORELLA FRIEDMAN MERCANTE LLP
9    Attorneys for Respondent
                   630 Third Avenue, 3rd Floor
10                 New York, New York 10017

11

     BY:        CHARLES RUBIN, ESQ.
12              appearing via Zoom

13

14   Also present:  Fred White, Chubb investigator,

15   appearing via Zoom.

16

17                     *           *           *

18

19

20

21

22

23

24

25

800-567-8658                                      973-410-4098

CHUBB-Altschuler/ROLEX & ART 000082
092020001456

Page 3

5                     S T I P U L A T I O N S

6              IT IS HEREBY STIPULATED, by and between

7      the attorneys for the respective parties hereto,

8      that:

9              All rights provided by the C.P.L.R, and

10     Part 221 of the Uniform Rules for the Conduct of

11     Depositions, including the right to object to any

12     question, except as to form, or to move to strike

13     any testimony at this examination is reserved; and

14     in addition, the failure to object to any question

15     or to move to strike any testimony at this

16     examination shall not be a bar or waiver to make

17     such motion at, and is reserved to, the trial of

18     this action.

19              This deposition may be sworn to by the

20     witness being examined before a Notary Public other

21     than the Notary Public before whom this examination

22     was begun, but the failure to do so or to return the

23     original of this deposition to counsel, shall not be

24     deemed a waiver of the rights provided by Rule 3116,

25     C.P.L.R., and shall be controlled thereby.

Veritext Legal Solutions

CHUBB-Altschuler/ROLEX & ART 000083
092020001456

Page 4

1

2          The filing of the original of this

3    deposition is waived.

4          IT IS FURTHER STIPULATED, a copy of this

5    examination shall be furnished to the attorney for

6    the witness being examined without charge.

7                    *          *          *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHUBB-Altschuler/ROLEX & ART 000084

092020001456

Page 5

1

2    D O U G L A S  A L T S C H U L E R, having first

3    been duly sworn by a Notary Public of the State of

4    New York, was examined and testified as follows:

5    EXAMINATION BY MR. RUBIN:

6         Q    Would you state your name for the record,

7    please.

8         A    Douglas Altschuler.

9         Q    Would you state your address for the

10   record, please.

11        A.    34 Talmage Lane, East Hampton, New York

12   11937.

13        MR. RUBIN:  Mr. Altschuler, this

14   examination is not to be taken as an admission or

15   denial of liability of the claim.  It is a procedure

16   provided for by the terms of the policy of insurance

17   issued by Chubb.  The questions you will be asked

18   are considered by Chubb to be relevant and material

19   to its investigation of the claim.  Should you fail

20   to answer any of the questions or answer any of them

21   falsely in part or in full it may well jeopardize

22   the claim.

23        We will provide you with a copy of the

24   transcript of the examination.  We will request at

25   that time that you sign the transcript before a

CHUBB-Altschuler/ROLEX & ART 000085

092020001456

D. ALTSCHULER

1

2  notary public and return it to us.  At the end of

3  the examination you will be permitted to make a

4  statement in support of your claim should you so

5  desire.

6          I trust, Anthony, that you want us to send

7  the transcript directly to you.

8          MR. STRINGER:  Yes, please.  And, Charles,

9  I assume Mr. Altschuler will have the ability to

10 make corrections in the transcript if things are not

11 transcribed accurately?

12         MR. RUBIN:  There will be an errata sheet,

13 so the answer is yes and that will be in my

14 transmittal.  The way we do it now is we used to

15 send hard copies of the transcript but what we're

16 going to do is send you a copy electronically and

17 you will return back to us the signature page with

18 the notary and the errata sheet if you have any

19 changes.

20         MR. STRINGER:  All right.

21     Q     Mr. Altschuler, are you married, sir?

22     A     Yes.

23     Q     And could you tell us your wife's name.

24     A     Zoe Werner.

25     Q     Did you have any children, sir?

CHUBB-Altschuler/ROLEX & ART 000086
092020001456

```
 1                    D. ALTSCHULER
 2        A    I do.
 3        Q    Could you give us the names and ages,
 4   please.
 5        A    ████ Altschuler, age eight.
 6        Q    And you are a resident of the State of New
 7   York?
 8        A    I am not.
 9        Q    Of what state are you a resident?
10        A    Arizona.
11        Q    How long have you been a resident of the
12   state of Arizona?
13        A    I don't know, for quite some time.
14        Q    Are you employed, sir?
15        A    I am not.
16        Q    When were you last employed?
17        A    Oh, 2009- 2010, sometime around there.
18        Q    And in what capacity were you employed at
19   that time?
20        A    I was the CEO of a company.
21        Q    What was the name of that company?
22        A    Let's see.  I believe the name of it was
23   Mesh Therapeutics.
24        Q    Are you familiar, sir, with NuPulseCV
25   Inc.?
```

CHUBB-Altschuler/ROLEX & ART 000087

092020001456

Page 8

D. ALTSCHULER

1

2    A    I am.

3    Q    Are you connected with that corporation?

4    A    I was the cofounder of that company.

5    Q    Are you presently connected with that

6    corporation?

7    A    Yes.  I am presently connected with it.

8    Q    In what capacity?

9    A    I advise and follow the company and give

10   them advice and consult with them.

11   Q    Are you a stockholder?

12   A    I am.

13   Q    What percentage of shares do you own, if

14   you know?

15   A    I don't know.

16   Q    Is it more than 50%?

17   A    It is not.

18   Q    Are you a director of the corporation?

19   A    I am.

20   Q    Are you also a CEO of the corporation?

21   A    I have the title CEO but I don't run the

22   company.  I haven't been to the company.  It's not

23   my day-to-day responsibility.

24   Q    Are there other stockholders?

25   A    Yes.

Page 9

1                        D. ALTSCHULER

2          Q    Do you know how many other stockholders

3     there are?

4          A    I do not.

5          Q    Are there any records that you can review

6     and be able to provide an answer to that question at

7     some later point in time if I left a blank in the

8     transcript?

9     INSERT_____

10         A    I could have somebody do it.  An attorney

11    could do it.

12         Q    I appreciate it.  Do you know if there are

13    more than five stockholders of that corporation?

14         A    I believe that is correct, sir.

15         Q    And when was the last time that you had

16    active involvement with respect to that corporation?

17         A    I mean I talk to the folks frequently but

18    day-to-day I don't run the company.

19              MR. RUBIN:  Could we put on the screen the

20    EUO document, please.  And, Anthony, I will give you

21    copies of all the exhibits that are marked during

22    the course of this examination.

23              MR. STRINGER:  Yes, thank you.

24              CONCIERGE:  Do you want this marked as

25    Exhibit 1.

CHUBB-Altschuler/ROLEX & ART 000089
092020001456

1              D. ALTSCHULER

2         MR. RUBIN:  Exhibit A preferably.

3         (Deposition Notice regarding

4         silkscreens was introduced as

5         Exhibit A.)

6     Q    Did you and Zoe Werner receive that letter

7 at some point in time?  We can scroll down further

8 down more if you need to see more.

9     A    I believe so.  It looks somewhat familiar.

10    Q    And would it be fair to that you received

11 that letter within a period of let's say ten days of

12 March 10, 2020.

13    A    Impossible to say.

14    Q    When you received that letter did you

15 share it with Zoe Werner?

16    A    Did I share it with her?

17    Q    Yes.

18    A    I don't believe so.  She may have seen it,

19 she may have not have.  I don't know.

20    Q    Did you at any time discuss the contents

21 of that letter with her?

22    A    I did not.

23    Q    Now the address on that letter is 167 East

24 82nd Street, New York, New York.  Is that a condo?

25    A    It is.

D. ALTSCHULER

1

2      Q     In whose name is that condo?

3      A     The condo is in the name of an LLC.

4      Q     And who are the shareholders or owners of

5   the LLC?

6      A     I have to check with an attorney but I

7   believe it is Zoe Werner and perhaps my attorney or

8   perhaps just Zoe.  I don't know.

9      Q     If I left a blank in the transcript would

10   you be able to fill that in?

11      A     Yes.

12   INSERT_____

13      Q     Thank you, sir.  Now your claim involves

14   some silkscreens, is that correct, sir?

15      A     Yes.

16      Q     Commonly referred to as I understand Andy

17   Mouse, is that also correct?

18      A     Yes.

19      Q     And could you tell me, sir, when did you

20   acquire the silkscreens that are the subject of your

21   claim?

22      A     I acquired two sets.  One set was acquired

23   I believe -- and let me add a comment to my answer

24   that you're asking me to go back several decades so

25   I can only give you what, today, is my best

CHUBB-Altschuler/ROLEX & ART 000091

092020001456

1                    D. ALTSCHULER

2    recollection and I believe --

3         Q    Mr. Altschuler my question was:  When did

4    you acquire the silkscreens that are the subject of

5    your claim?

6         A    Sir, would you like me to answer the

7    question?

8         Q    Yes.

9         A    Okay.  You are asking me to go back

10   multiple decades and my response to you before you

11   interrupted me is:  I had two sets of silkscreens.

12   One I believe was purchased in or around 1987.  The

13   second set was acquired a year or so after that one

14   or two years after that.

15        Q    Now, the silkscreens that are the subject

16   of your claim when were they acquired?

17        A    I believe that set -- again, sir, I had

18   two sets.  I believe the set which is the subject of

19   the claim were purchased in 1987.

20        Q    And from whom did you purchase those

21   silkscreens?

22        A    I believe the name of the gallery was the

23   B1 Gallery.

24        Q    And where was the B1 Gallery located?

25        A    In Santa Monica, California.

CHUBB-Altschuler/ROLEX & ART 000092

092020001456

D. ALTSCHULER

1

2  Q    Do you know who the owner of that gallery

3  was?

4  A    My understanding was that a gentleman

5  named Mr. Robert Berman was the owner of the

6  gallery.

7  Q    And the ones that you purchase from

8  Mr. Berman, those are the subject of your claim to

9  Chubb; is that correct?

10  A    I believe.  I can't say with 100%

11  certainty but I believe as I think through this I

12  believe that those are the ones that are the subject

13  of that claim.

14  Q    And how much did the silkscreens that you

15  purchased in 1987 from the B1 Gallery cost?

16  A    I believe there were $5,000.

17  Q    And how did you pay for these silkscreens?

18  A    I believe I paid for it on an American

19  Express card.

20  Q    Do you have any way at this point in time

21  of getting access to that payment through American

22  Express?

23  A    I do not.

24  Q    And did you go to the gallery to purchase

25  these silkscreens?

CHUBB-Altschuler/ROLEX & ART 000093

092020001456

Page 14

D. ALTSCHULER

A    I am not understanding your question, sir.

Q    How did it come about this transaction
that you purchased it?  Explain it to us.  How did
you find out about the silkscreens?

A    I was in Santa Monica for the evening and
having dinner and after dinner I walked across the
street, was walking down the street, walked by the
gallery, went in the gallery saw the silkscreens and
I purchased them.

Q    Do you have any proof of purchase of those
silkscreens?

A    I do recall within the last year of seeing
a receipt somewhere.  I believe my recollection it
was a pink receipt and as I mentioned I put them on
my AMEX card.  There is a photograph of one of the
four that you do have.

Q    Well, we requested photographs and
receipts.  Where are they today?

A    Where is what, sir?  I'm sorry.

Q    We requested the production of any
receipts regarding the purchase of silkscreens.  We
requested photographs and as of this date they have
not been provided.  Do you still have photographs
and/or receipts?

D. ALTSCHULER

1

2      A    I do not have a receipt for the purchase,

3  sir.  I do have one photograph which was taken of

4  one of the four prints.

5      Q    When was that photograph taken?

6      A    Impossible to say.  Somewhere after the

7  purchase.  I don't know.  Maybe -- I just simply

8  don't know.  Again, you're asking me to go back

9  multiple decades in time.

10     Q    Yes.  You mentioned that earlier.  I

11  appreciate that.  Who took the photograph?

12     A    I don't know.

13     Q    And the photograph is currently in your

14  possession?

15     A    It is.

16     Q    Again, we requested production of that

17  photograph and that it be produced as promptly as

18  possible.

19     A    I will ask my attorney to provide it to

20  you.

21     Q    Now, the silkscreens that you purchased

22  from the B1 Gallery did you take them with you?  How

23  did you get possession of them?

24     A    I did not take them with me.

25     Q    And how did you get possession of them?

CHUBB-Altschuler/ROLEX & ART 000095

092020001456

D. ALTSCHULER

1
2    A    They were shipped to my parents home in

3    Tucson, Arizona.

4    Q    Did you live in your parents' home in

5    Tucson, Arizona at that time?

6    A    I did not live there full time but I had

7    accommodations there and kept a fair amount of my

8    personal property there and visited there

9    frequently.

10    Q    Did you keep any other fine arts or

11    artwork there?

12    A    I did.

13    Q    And was that artwork removed from the

14    house prior to the time of the loss of these

15    silkscreens?

16    A    Some was, some was not.

17    Q    Were there still fine arts in the house at

18    the time of the loss of these silkscreens?

19    A    Yes.

20    Q    And what happened to those silkscreens?

21    Are they still there now?

22    A    I'm sorry.  I don't understand your

23    question.

24    Q    Excuse me.  The other fine arts my

25    apology, are they still in the house in Arizona now?

CHUBB-Altschuler/ROLEX & ART 000096

092020001456

D. ALTSCHULER

1

2    A    I don't know.  They have not been located.

3    I don't know where they are or whether they were

4    taken.  I don't have any information about that.

5    Q    Do you have a description of those other

6    fine arts?

7    A    I can give you a general description, yes.

8    Q    Has any claim been made to any insurance

9    company for those fine arts?

10   A    No.

11   Q    Are you planning to make any claim to any

12   insurance company on account of those additional

13   fine arts?

14   A    I am not.

15   Q    Is there a reason that you are not

16   claiming the additional fine arts?

17   A    They were not insured.

18   Q    And had will no form of blanket coverage,

19   is that correct, sir?

20   A    I don't know.  I don't understand the

21   intricacies of insurance policies.  I would have to

22   ask my broker whether there was some blanket

23   coverage.

24   Q    You said they were shipped to the house in

25   Arizona, where were you primarily residing at that

CHUBB-Altschuler/ROLEX & ART 000097
092020001456

Page 18

                            D. ALTSCHULER

1

2   time?

3       A    1987 I believe -- and I mention it again

4   you're asking me to go back multiple decades.  I had

5   a residence in Phoenix, Arizona.  I had a residence

6   in Tucson and a residence in Reno Nevada.

7       Q    What prompted you to have those shipped to

8   the Arizona address as opposed to any of the other

9   places?

10      A    Everything that I purchased was always

11  sent to Tucson address because the other locations

12  were not always occupied by me and the Tucson

13  address was occupied 24/7 by either my parents or a

14  housekeeper or some one would always be at the house

15  to accept a delivery.

16      Q    And were you present when the silkscreens

17  were packaged in the crate or box?

18      A    I was not.

19      Q    Do you know how they were packaged?

20      A    The silkscreens came with a box which was

21  part of a set of silkscreens.  It was a unique box

22  which was a attached to four silkscreens.  Those

23  silkscreens, that box was then placed in another

24  corrugated cardboard-type box/container which had

25  protection on the corners and that's how it was

CHUBB-Altschuler/ROLEX & ART 000098
092020001456

Page 19

D. ALTSCHULER

1

2    shipped.

3          Q    Were you present when they placed the

4    silkscreens in the cardboard box?

5          A    I was not.

6          Q    And the box was then brought to the house

7    in Arizona; correct?

8          A    Yes.

9          Q    Do you know how it was done?  Was it hand

10   delivered?  Was it shipped?  Do you know?

11         A    You're asking me to go back multiple

12   decades and I was not involved in the shipping.  I

13   don't know.

14         Q    Were you present when it arrived in

15   Arizona at the house?

16         A    I think you just asked me that question

17   and I said no.

18         Q    At the time that it was actually brought

19   to the house.

20         A    I was not.

21         Q    Do you know who received the shipment?

22         A    I would assume it was my mother, my father

23   or whoever was working at the house at the time.

24         Q    Did anyone tell you that a shipment had

25   arrived?

CHUBB-Altschuler/ROLEX & ART 000099
092020001456

Page 20

D. ALTSCHULER

1

2     A     Yes.

3     Q     Who was that, sir?

4     A     I don't have specific memory.  This was in

5     1987, sir, but it would have most likely have been

6     my mother.

7     Q     And as I understand your mother and father

8     are deceased, is that correct, sir?

9     A     That is correct.

10    Q     And when this crate, if you will, arrived

11    at the house in Arizona do you know where it was

12    placed?

13    A     Immediately on arrival I don't know.

14    Q     Did you know at any time where it was

15    placed?

16    A     Yes, I do.

17    Q     Where was it placed, sir?

18    A     It was -- when I arrived at the house for

19    the first time and saw the box/crate I placed it in

20    the dining room of the home.

21    Q     Did you take it out of the crate?

22    A     I did not take them out of the crate.  I

23    opened up -- it was more of a box than a crate.  I

24    opened it up and looked in and sealed it back up.

25    So, no, I did not take them out.

CHUBB-Altschuler/ROLEX & ART 0000100

092020001456

1                    D. ALTSCHULER

2       Q    Do you recall providing some responses to

3  questions to your attorney?

4       A    I do.

5       Q    I didn't hear you, sir.

6       A    I do, sir.

7       Q    And we received a document from your

8  attorney dated -- actually not dated but it says on

9  the top responses to Chubb's request for

10  information.  Do you recall that document?

11       A    I do.

12            MR. RUBIN:  Could we put on the screen,

13  please, and take this off the screen, number 8, and

14  mark that as company's Exhibit B.

15            (Responses were introduced as

16            Exhibit B.)

17            MR. RUBIN:  That's it.  Could you go to

18  number 8, please.

19       Q    Do you recall the response that you

20  provided and that your attorney was kind enough to

21  send to us?  The question was:  "The name, address

22  and telephone number of each person that had

23  knowledge that the silkscreens were in the premises.

24  Response:  Douglas Altschuler and his parents were

25  the only people that had knowledge that the

CHUBB-Altschuler/ROLEX & ART 0000101

092020001456

D. ALTSCHULER

1
2   silkscreens were being stored at his parents' home
3   in Tucson.  The silkscreens were delivered in a
4   crate and remained in the crate.  To the best of Mr.
5   Altschuler's knowledge the crate was never opened."
6   Was that response, sir, that you gave and that was
7   previously provided to us true?
8       A    It was.
9       Q    Well, you told us that you did open the
10  crate a few moments ago.
11      A    First of all I believe I tried to
12  characterize it more of a box than a crate.  The
13  only crate aspect of it were the corners.  So I
14  opened it up.  I did see that the silkscreens were
15  in there and they were never taken out or removed so
16  that's my response to you.
17      Q    So it's different when you said to the
18  best of Mr. Altschuler's knowledge the crate was
19  never opened.  I mean, the crate was the terminology
20  that you used in your response, sir.
21      A    Sir, I'm giving you my best testimony
22  right now.  I opened it up.  I looked to see that
23  they were in there.  I closed it.  If you want to
24  argue about semantics of whether it was opened or
25  closed or whether they were taken out, you know, I'm

CHUBB-Altschuler/ROLEX & ART 0000102

092020001456

D. ALTSCHULER

1
just giving you the best testimony that I can now

2
that you're asking me the question.

3
    Q    Appreciate that, sir.  Thank you.  And

4
when you say you opened it up did you open up the

5
entire carton or crate?

6
    A    No.  No.  No.  So we're clear and the next

7
time you ask me this at trial were crystal clear.  I

8
opened this very careful with a knife so the

9
box/crate, or whatever you want to call it, could be

10
easily or readily closed, no dust or anything could

11
get in there.  And I looked to see what was inside

12
this shipping box/crate.  I determined that the

13
original box of the silkscreens were in there and

14
very carefully closed it, so again no dust or

15
anything can get in.  So in that sense I think my

16
answers are completely 100% percent consistent with

17
my response number 8 which was previously provided

18
to you.

19
    Q    Did you actually see the silkscreens

20
themselves when you did this?

21
    A    I did not.

22
    Q    And you said you have a photograph.  When

23
was that photograph taken?  Was it -- at what point

24
in time?

25

CHUBB-Altschuler/ROLEX & ART 0000103

092020001456

1          D. ALTSCHULER

2          A    You asked me that question a few minutes

3    ago, sir, and I will stand on that response.  I told

4    you sometime after the purchase but I don't remember

5    when, within a year, six months.  You're asking me

6    to go back multiple decades here, sir.

7          Q    Did you take this photograph before the

8    crate arrived at the Arizona house?

9          A    Yes.

10          Q    But you don't recall where that photograph

11    was taken?

12          A    So if you recall a few moments ago I told

13    you I had two sets.  I don't know which set

14    ultimately was photographed, whether it was this set

15    or a subsequent set that I bought.  I simply do not

16    have a clear memory of it and I choose not to

17    speculate but a photograph of one of my two sets of

18    the silkscreens was taken.  I don't know whether it

19    was this set, I don't know whether it was the other

20    set.  I just simply don't know.

21          Q    And you said you placed, I believe, this

22    crate after you resealed it in the dining room, is

23    that correct, sir?

24          A    Yes.

25          Q    Where in the dining room did you place it?

CHUBB-Altschuler/ROLEX & ART 0000104

092020001456

1          D. ALTSCHULER

2          A      Behind a, I would call it for the lack of

3    a better word, a credenza or a china piece of

4    furniture that holds some China plate ware.

5          Q      And did you have a storage facility for

6    fine arts at that time?

7          A      At that time I did not.

8          Q      Did you at some later date have a storage

9    facility for fine arts?

10         A      I did.

11         Q      Can you tell us when you acquired this

12   storage facility?

13         A      I don't know when.

14         Q      Approximately, sir, to the best of your

15   recollection, please.

16         A      I could be off by years.  I think maybe

17   ten years ago.

18         Q      Now, the crate with the silkscreens that

19   was placed behind the credenza did it remain there

20   or was it moved.

21         A      It did.  It did remain there.  I moved it

22   in November of 2019.

23         Q      And between 1987 and 2019 it remained

24   behind the credenza?

25         A      Yes, sir, it did.

CHUBB-Altschuler/ROLEX & ART 0000105

092020001456

1                    D. ALTSCHULER

2        Q    Who knew about the silkscreens in that

3    box, other than yourself of course?

4        A    My mom perhaps.  My dad, I'm not sure

5    whether he did or didn't know.  I had quite a few

6    things sent to the home over a long period of time.

7    He may have been aware of it, he may not.  I had, as

8    I say, numerous crates and boxes and bunch of stuff

9    sent there.

10       Q    And what prompted you to move it in

11   November of 2019?

12       A    Because I intended to have it picked up

13   and shipped to a storage facility.

14       Q    And did you make arrangements to have it

15   shipped at that time?

16       A    I started to and then was distracted by

17   some other things going on.

18       Q    And where did you place it in November of

19   2019, this crate?

20       A    In the living room.

21       Q    Where in the living room?

22       A    It was underneath a couch and sticking out

23   a little bit from the couch.

24       Q    Was anyone aware of this crate under the

25   couch in the house other than your parents and

1                    D. ALTSCHULER

2    yourself?

3         A    I have no idea.

4         Q    Who else had access to the house?

5         A    The caretaker for my mom, handyman that

6    came to do work at the house, my sister and my

7    brother.

8         Q    Do you know the name of the handyman?

9         A    I don't remember offhand.  I'm very, very,

10   poor with remembering names but I mean -- oh,

11   Michael was his name.

12        Q    Do you have any way of getting us his full

13   name and contact information?

14        A    I think I may have his number.  Sure.

15        Q    We request that you provide it.  We can

16   leave a blank in the transcript.

17   INSERT_____

18        Q    Now, you said it was placed under a couch;

19   is that correct?

20        A    Yes, sir.

21        Q    How high was the bottom of this couch to

22   the floor, if you can tell us?

23        A    I couldn't tell.

24        Q    How thick was the crate that you put under

25   the couch?

Page 28

D. ALTSCHULER

1
2      A     It was able to fit under the couch.

3      Q     Was it more than two inches or the three

4   inches, what's your best relation.

5      A     Two or three inches, it's a pure guess.  I

6   just don't know.

7      Q     Now, you said you were there in November,

8   what was the purpose of you being there in November

9   of 2019?

10     A     I was visiting my mom.

11     Q     Did you fly out to Arizona from New York?

12     A     I believe I did.

13     Q     Would you be able to provide us with some

14  sort of itinerary reflecting that trip?

15     A     I should have.

16     Q     You can get that from AMEX or whatever

17  credit card company that you used?

18     A     Yes.

19     Q     And when you went out there in November of

20  2019 was the crate still there?

21     A     It was.

22     Q     And you left Arizona at some point in time

23  and returned to New York?

24     A     I believe I returned to New York.  I may

25  have gone to Los Angeles but I don't remember my

D. ALTSCHULER

exact itinerary.

Q    Do you recall being in the house in
October of 2019?

A    That's possible as opposed to November.
Again, I don't have the exact memory.  It could have
been October.  If you believe it was October then it
was October.

Q    I don't have a belief one way or the
other.  I'm just trying to get clarification as to
the exact date but your itinerary would be able to
clarify that for us.

A    It was October or November.  Whatever the
itinerary says that should be the most accurate.

Q    And when you were out there either in
October or November did you see any family members?

A    I saw my mom.  I don't remember whether I
saw anyone else.

Q    You mentioned a housekeeper; correct?  Was
that Veronica?

A    No.  Her name is Virginia.

Q    Virginia.  Sorry.  Did you see Virginia
when you were at the house in October of November?

A    Yes, I did.

Q    Did Virginia or anyone else ever ask you

CHUBB-Altschuler/ROLEX & ART 0000109

092020001456

1                        D. ALTSCHULER

2    what was in the crate?

3         A    No.

4         Q    So nobody knew what was in the crate other

5    than you and I think you mentioned your parents; is

6    that correct?

7         A    I believe that is correct.

8         Q    Now, you have a sister that lives out in

9    Arizona.  I believe her name is Janet?

10        A    Yes.

11        Q    Did Janet have access to the house?

12        A    I believe she did, yes.

13        Q    In all the years between the time the

14   crate was first brought to the house and the date

15   that you have alleged the loss occurred did you ever

16   mention to her the crate and what was in it?

17        A    I absolutely did not.

18        Q    And did you have any other siblings that

19   live out in that area?

20        A    I do not.

21        Q    Did you mention to any of your siblings

22   about the art that was in the house in Arizona?

23        A    I absolutely did not.

24        Q    Was there a reason that you did not

25   mention it to any family members?

CHUBB-Altschuler/ROLEX & ART 0000110

092020001456

D. ALTSCHULER

1

2      A    For starters I have very little

3  conversations with either my brother or sister.  I

4  maybe talked to them a few times over the past

5  decade or so and, number one, and number two, I

6  would have no reason to share that information with

7  them.

8      Q    So there's no one living today other than

9  yourself, of course, that has knowledge that this

10  crate was in the house in Arizona, correct, sir?

11      A    Other than your client, Chubb.

12      Q    Well, Chubb I don't believe was in your

13  house in Arizona so I can't verify that they -- I'm

14  talking actually saw it there.

15      A    In terms of actually seeing it there,

16  again, unless something else comes to mind that is

17  correct.

18      Q    Do you have any document reflecting proof

19  of ownership of the silkscreens which are the

20  subject of your claim?

21      A    Document which shows that I own it, you

22  mean similar to what someone would have if they had

23  title to a car?

24      Q    Anything, sir.

25      A    Not in my possession.

1                      D. ALTSCHULER

2         Q    When you first acquired the silkscreens

3    did you insure them?

4         A    I don't recall.  Again, not to be

5    repetitive but you're asking me to go back multiple

6    decades.  At some point I did insure them.

7         Q    Do you recall the first time you insured

8    them?

9         A    I'm guessing.  You know, I don't even want

10   to guess because I don't know.  My first record of

11   what I have is when I go back on my iPhone where I

12   have emails.  Prior to that I had no electronic

13   copies of correspondence with insurance companies

14   and I done have any paper documents.  I believe in

15   2009 I had some correspondence concerning the art

16   and other things that I had insured but it may have

17   been before that.  I simply don't know.

18        Q    The silkscreens that are the subject of

19   your claim with Chubb were they ever appraised, sir?

20        A    Yes.

21        Q    By whom?

22        A    Throughout the period of time they were

23   appraised by a number of people I believe.

24        Q    Who appraised it last to the best of your

25   recollection, sir?

D. ALTSCHULER

1

2      A    I don't remember the person's name but the

3  appraisal has been provided to Chubb on a couple of

4  occasions, and on one or two occasions and prior

5  examinations by Chubb I was questioned about it.

6      Q    Does the name Dina Brown sound familiar?

7      A    Yes, it does.

8      Q    Is that to the best of your recollection,

9  sir, the person that last appraised the silkscreens

10 which are the subject of your claim?

11     A    Yes, sir.

12     Q    And it was her appraisal which was

13 submitted by you to Chubb to increase the coverage

14 for the silkscreens from 250,000 to 1.5 million, is

15 that correct, sir?

16     A    Well, I submitted the appraisal.  It was

17 Chubb that suggest to me that it should be

18 increased.

19     Q    And it was based on the appraisal, is that

20 correct, sir?

21     A    That is correct.

22     Q    Now you told us about a second set of

23 silkscreens that you purchased, tell us about that

24 sir.

25     A    I purchased a second set from Mr. Haring.

Page 34

D. ALTSCHULER

Q     And when did you purchase this second set?

A     Sometime after the purchase of the first set, within the next year or two.

Q     How did this come about?  Did you meet him personally?

A     I met him personally on a number of occasions, yes.

Q     And where did these meetings take place? In Arizona?  New York?  Some other place?

A     I met him in New York a couple of times. I was introduced to him by a -- I wouldn't call it a friend but an acquaintance of mine who introduced us.  I saw him around at a couple of parties and events and I then saw him in Phoenix.

Q     You say you saw him at parties and events, do you recall anyone else that was at any of these parties or events that can verify that you met Keith Haring and were present at these events?

A     In New York?

Q     Any place, sir.

A     Again, I am going to be repetitive but I think it's worth mentioned you're asking me to go back 1985- 1986- 1987, sir.  I mean, I can't remember.  But in Phoenix, I believe when I saw him

CHUBB-Altschuler/ROLEX & ART 0000114

092020001456

D. ALTSCHULER

1
2  in Phoenix I was with a woman who I was dating at
3  the time.  I believe she was at one of those
4  meetings that I had.
5       Q     Did the lady that you were dating at that
6  time have a gallery to your knowledge?
7       A     She did not.
8       Q     Do you recall the name of this lady?
9       A     Her name was Lisa McCullom.  (phonetic)
10      Q     Do you have any contact information for
11 her at this point in time?
12      A     I don't believe I have seen, talked to her
13 or heard from her in, let's see, 30-plus years.
14      Q     By the way, did you ever tell your wife
15 that you had these silkscreens in Arizona that were
16 insured for 1.5 million prior to the date of loss,
17 of course?
18      A     I did not.
19      Q     Is your wife aware of any of your fine
20 arts?  Did you discuss it with her at all?
21      A     Every once in a while I will show her
22 something that I purchased.  You know, other than
23 that we never had a discussion about any of it.
24      Q     By the way, is there a reason that you
25 kept these silkscreens in the crate all these years

CHUBB-Altschuler/ROLEX & ART 0000115

092020001456

1                    D. ALTSCHULER

2    as opposed to hanging them or displaying them?

3         A    I very rarely hang or display any of my

4    art.

5         Q    Do you do it just for investment purposes?

6         A    No.

7         Q    What other purpose then?

8         A    I am an interested collector and interest

9    in the history of art and certain artists.

10        Q    Now, you mentioned you had various

11   meetings with Keith Haring, do you recall the year

12   as best as you can?  And I know the qualification so

13   you don't have to keep saying it?

14        A    I saw him in New York.  I met him in New

15   York a few times.  I sat in the lobby of the place

16   that I was living in New York.  I believe we had a

17   drink there.  I saw him a few times in New York,

18   again, galleries, events.  I saw him in Phoenix.  I

19   introduced him to my brother at the time.  They

20   really got along.  So it was just we'd run into each

21   other and, you know, there was just no set time or

22   reason that we would run into each other.  When I

23   knew he came to Phoenix I make it a point of trying

24   to see him when I went to Phoenix or could get

25   there.

CHUBB-Altschuler/ROLEX & ART 0000116

092020001456

1                    D. ALTSCHULER

2        Q    What I'm trying to get is as close a date

3   as I can.  You said the first set was acquired

4   around 1987, the ones that are involved in your

5   claim.  And the ones that you acquired from Keith

6   Haring was that a year later, two years later?

7        A    As I mentioned, sir, I'm doing the best

8   that I can.  It was within a year or two.

9        Q    And what prompted you to buy a second set

10  since you already owned a set?

11       A    I really liked it.  When I initially

12  bought it I didn't believe there was going to be a

13  scarcity of them.  I determined there was and I went

14  back to B1 and I don't think they had anymore sets

15  and I also thought it would be very historically

16  interesting and cool to actually buy something

17  directly from the artist and I bought that and

18  another piece.

19       Q    What other piece did you buy, sir?

20       A    I bought a piece, I believe the title was

21  Silence Equals Death.

22       Q    And do you still have that piece?

23       A    I do not.

24       Q    What happened to that piece?

25       A    I gave that piece to my brother as a gift.

CHUBB-Altschuler/ROLEX & ART 0000117

092020001456

Page 38

1          D. ALTSCHULER

2    Q    Do you know if your brother still has it?

3    A    My brother passed away.

4    Q    What was the name of this brother?

5    A    Richard Altschuler.

6    Q    When your brother passed do you know what

7    happened to that piece?

8    A    I have no idea.  I tried to find out.  I

9    don't know.

10    Q    Did you have this transaction with Keith

11    Haring directly to purchase these silkscreens, the

12    second set.

13         MR. STRINGER:  Charles, just

14    for-the-record it's Haring, H-a-r-i-n-g.

15         MR. RUBIN:  Is this a question there,

16    Anthony?

17         MR. STRINGER:  I just want to make sure we

18    get the name correct.

19         MR. RUBIN:  If it's not coming out clearly

20    I apologize but it's Haring.  Was that clearer,

21    Anthony?

22         MR. STRINGER:  Yes.

23    Q    Was this an in-person transaction

24    Mr. Altschuler?

25    A    Yes, it was.

D. ALTSCHULER

 2    Q    And where did it take place?

 3    A    This transaction took place in Phoenix.

 4    Q    Okay.  And did you pay -- how did you pay

 5  for those silkscreens?

 6    A    In cash.

 7    Q    And do you recall how much you paid for

 8  them?

 9    A    Somewhere between 10 and 12,000.  I don't

10  know.  It was 10,000 or 12,000.

11    Q    And did you get a receipt or any document

12  to prove that you acquired these silkscreens from,

13  Mr. Haring?

14    A    I did not.

15    Q    Do you have any form of proof of ownership

16  of this second set of silkscreens?

17    A    I do not.

18    Q    Is there any person that you're aware of

19  other than yourself and Mr. Haring, who's deceased,

20  that has knowledge that you purchased the second set

21  of silkscreens?

22    A    Yes.

23    Q    Who is that, sir?

24    A    I traded this set for some other art.

25    Q    Now, is there a reason, sir, that you

CHUBB-Altschuler/ROLEX & ART 0000119

092020001456

1            D. ALTSCHULER

2    traded this set that you purchased directly from

3    Mr. Haring as opposed to the other set that you

4    purchased from a gallery?

5         A    As I sit here today I can't think of any.

6    At the time there may have been a specific or

7    strategic reason.

8         Q    Okay.  Now you acquired this second set,

9    where did you have them sent to?

10        A    Arizona.

11        Q    Did you bring them there yourself or

12    shipped?

13        A    They were shipped.

14        Q    And were they shipped similar to the other

15    set that you acquired from the gallery?

16        A    I don't understand your question, sir.

17        Q    How were they packaged?

18        A    They were likewise packaged in a container

19    or box.  I don't have a specific recollection of how

20    they were packaged and, again, I think they were

21    sent to Arizona it's possible.  Again, my memory is

22    not 100% clear on that.  I think they were.  It's

23    possible they may have been shipped to Phoenix.  I

24    just simply don't remember.

25        Q    Okay.  So you don't know sitting here

CHUBB-Altschuler/ROLEX & ART 0000120

092020001456

1                          D. ALTSCHULER

2    today where they were delivered to; is that correct?

3          A    That is correct.  They may have gone to

4    Tucson.  They may have gone to Phoenix.

5          Q    Now, you said you traded the set; is that

6    correct?

7          A    Yes.

8          Q    When?

9          A    Early 90s or 90 or maybe 2000, I just

10   don't remember.  Maybe because -- I think closer

11   to -- I think closer to 2000.

12         Q    And who did you -- with whom did you trade

13   this set?

14         A    It was done through an intermediary.

15         Q    Do you know who received the set?

16         A    I don't.

17         Q    Who was the intermediary?

18         A    Gentleman named Jim Corcoran.

19         Q    And what did you trade for?  What did you

20   receive?

21         A    Another piece or two other pieces of art.

22         Q    Can you tell us what that other piece or

23   two pieces are or were.

24         A    Art by an artist named Ed Ruscha.

25         Q    Do you still have those pieces?

CHUBB-Altschuler/ROLEX & ART 0000121

092020001456

Page 42

D. ALTSCHULER

1

2      A    I don't know.  I would have to check to

3  see whether I have those or traded those.

4      Q    Now, Jim Corcoran didn't he do appraisals

5  for you from time-to-time?

6      A    He did not.  His assistant did.

7      Q    Through his gallery?

8      A    Yes.

9      Q    And is there any record, sir, that you can

10 provide to us reflecting this trade?

11     A    I doubt it.  It's possible but I don't

12 have anything.

13     Q    Were the silkscreens delivered to Jim

14 Corcoran for the trade?

15     A    I don't recall how he got them but at some

16 point he received them.  Yeah.  They were delivered

17 to him in some way.

18     Q    Do you know if Jim Corcoran still

19 maintains a place of business?

20     A    I don't know.  I think he's retired.  I'm

21 not sure.

22     Q    In order for this trade to take place the

23 silkscreens had to be brought to some location, do

24 you know where it was?

25     A    I do not.

CHUBB-Altschuler/ROLEX & ART 0000122

092020001456

D. ALTSCHULER

1

2    Q    Do you know what state?

3    A    I do not.

4    Q    But Mr. Corcoran if he can be located he

5  can verify this trade, is that correct, sir?

6    A    If he recalls the trade.

7    Q    Can you tell us, sir, the date that this

8  loss occurred?

9    A    I can't tell you the exact date, no.

10    Q    Can you give us the approximate date that

11  the lose occurred?

12    A    Some time between the last time I saw them

13  in Tucson and when I visited there sometime in

14  December 2019.

15    Q    And when you visited them this December of

16  2019 you determined the silkscreens were missing?

17    A    That is correct.

18    Q    And when you determined the silkscreens

19  were missing did you immediately contact the police?

20    A    I did not.

21    Q    Did you contact anyone to advise that the

22  silkscreens were missing?

23    A    I did some investigation to try to figure

24  out if they were moved somewhere or what happened.

25  I had a lot of things on my mind and this was quite

CHUBB-Altschuler/ROLEX & ART 0000123

092020001456

D. ALTSCHULER

1

2  a shock to me that they weren't there.

3      Q    Tell us what you did.

4      A    I went to go visit my mom.  Her caretaker

5  was there.  I through a translator spoke to the

6  caretaker to ask her if she had seen them and that's

7  what I did.

8      Q    And what did she say?

9      A    She said she didn't and later on in the

10  day I went back to the home with her and we looked

11  around.  I showed her where I believe the

12  silkscreens were.  When I initially asked her about

13  this through the translator she indicated that a few

14  days prior, to the best of my understanding and this

15  is a little bit vague, she arrived at the house and

16  the door was open, the alarm was going off and she

17  informed me of that incident.

18      Q    Did she inform you that your sister,

19  Janet, was aware of the alarm going off?

20      A    She didn't but I subsequently spoke to a

21  relative of hers who explained that situation, yes.

22      Q    You spoke to a relative of who, the

23  housekeeper?

24      A    I spoke to a relative of the housekeeper

25  he explained that --

CHUBB-Altschuler/ROLEX & ART 0000124

092020001456

D. ALTSCHULER

1

2          (The witness's connection was

3          interrupted.  Please, see page

4          45 lines 18 to 25.)

5      Q    To your knowledge did Janet or anyone else

6   notify the police?

7      A    I don't know.

8      Q    Now, describe for us in general terms the

9   house where this loss occurred.  And for-the-record,

10  could you put the street address on-the-record.

11         MR. STRINGER:  Douglas, do you need to

12  take a five-minute break?  Is this a good time to

13  take a short break.

14         THE WITNESS:  Sure.

15         MR. STRINGER:  Can we do that, Charles.

16  Just take five minutes?

17         MR. RUBIN:  You got it, Anthony.

18         (A break was taken.)

19         COURT REPORTER:  Mr. Rubin, the witness's

20  internet connection was interrupted during one of

21  his prior answers.  May I ask the question again?

22         MR. RUBIN:  Sure.

23      Q    You spoke to a relative of who, the

24  housekeeper?

25      A    The answer to that question is, yes, I

D. ALTSCHULER

2  spoke to a relative of the housekeeper.  I believe

3  it is her brother or brother-in-law.

4      Q    Let's go back to the current question that

5  we didn't get an answer to.

6          (The last question prior to

7          the break was read by the

8          court reporter.)

9      A    You want my to describe the house?

10     Q    First of all, what is the house address

11  where the silkscreen are located?

12     A    6330 Camino De Santa Valera, Tucson

13  Arizona.

14     Q    Okay.  Now, one thing I didn't quite

15  understand from your prior testimony, what was the

16  purpose of moving the silkscreens from the dining

17  room to under the couch in the living room?

18     A    Just getting them ready to be moved and

19  looking at the condition of the box and, you know,

20  just putting it out there, you know, to remind me.

21  There was, you know, no particular purpose.  I think

22  I needed to take the measurements of it.  It needed

23  to be laid out so the shipping company would know

24  what the dimensions were and I did notify the

25  storage facility of what the dimensions were.

Page 47

1                    D. ALTSCHULER

2        Q    But you never got that far.  You never

3    notified the shipping company; right?

4        A    I called them.  I didn't schedule a pick

5    up because they weren't going to be in the area

6    around that time.  So it didn't go passed that.

7        Q    Now, describe for us in general terms the

8    house.

9        A    It's a U-shaped house, with a front door,

10   to the right is the living room and then adjacent is

11   the dining room and it's built around a courtyard.

12       Q    And how many rooms in this house?

13       A    Gosh, I don't know.  I think five bedrooms

14   and, you know, a living room, dining room, kitchen

15   and some bathrooms.

16       Q    Did the house have a security system of

17   any type?

18       A    It did.

19       Q    Can you tell us what type of system was in

20   the house.

21       A    You mean who -- what the brand was or --

22       Q    Either way.  You can start with the

23   company and then the type.

24       A    I don't know the type.  I mean, I'm not --

25   I don't know much about alarm systems.  My

D. ALTSCHULER

1  recollection is it said Honeywell on the pad.

2      Q    There was no surveillance.  There was just

3  an alarm system of some form?

4      A    Yes.  I don't know whether they put up

5  surveillance.  I know they had cameras.  Whether it

6  was installed or not I don't know.  I don't think it

7  was.

8      Q    And if an alarm was activated who would be

9  notified?

10     A    My understanding is the police.

11     Q    Anyone else?

12     A    And I think the alarm company.

13     Q    How about any relatives or anybody else?

14     A    That I don't know.

15     Q    Do you know whether the police were ever

16 notified of an alarm activation at the house prior

17 to the date of the alleged loss?

18     A    I want to make sure I understand the

19 question.  Did the alarm ever go off prior to that?

20     Q    Within the period of, let's say, two

21 months.

22     A    You know I don't know, sir.  I don't know.

23     Q    Did it ever come to your attention that

24 your sister, Janet, was aware of an alarm

CHUBB-Altschuler/ROLEX & ART 0000128

092020001456

1                    D. ALTSCHULER

2    activation?

3        A    I'm not 100% understanding your question.

4    She was aware of an alarm which went off, according

5    to Virginia, and her relative they told me, yes, she

6    was made aware of it.

7        Q    And did anyone ever indicate to you what

8    they thought caused the alarm to go off?

9        A    I don't know.  I wasn't told what it was

10   that caused the alarm to go off.  I would assume a

11   door, a window opening or something would trigger

12   the alarm.

13       Q    Did anyone ever indicate to you, sir, at

14   any time that wind would cause the front door to

15   open?

16       A    I can't say definitively no but I just

17   don't specifically recall.

18       Q    Did that ever happen while you were at the

19   house?

20       A    That wind caused the alarm to go off?

21       Q    No.  The wind caused the front door to

22   open.

23       A    Never but the front door was rarely,

24   rarely to opened.  It was a rare occasion for the

25   front door to be open.  It was locked and they did

CHUBB-Altschuler/ROLEX & ART 0000129

092020001456

D. ALTSCHULER

not open the front door because there were some bats
living in the rafters by the front door so we were
all pretty careful to be cautious about opening that
front door.  It was closed pretty tightly.

    Q    Do you know if anyone has made a
determination whether there was any forced entry to
the house?

    A    I don't know that, sir.

    Q    By the way, I think you mentioned that
your brother also met Keith Haring with you on
occasion?

    A    He did.

    Q    Which brother is this?

    A    Richard.

    Q    Do you have another brother as well?

    A    I do.

    Q    Did he ever meet Keith Haring, I believe,
your other brother, Eric?

    A    Never.

    Q    Okay.  So you learned that the silkscreens
are missing at some point in time in December; is
that correct?

    A    That is correct.

    Q    When, sir, did you first notify the police

CHUBB-Altschuler/ROLEX & ART 0000130
092020001456

Page 51

D. ALTSCHULER

1

2  that this valuable artwork was missing?

3      A    I don't have an exact date but I contacted

4  the police I believe in early January to find out

5  specifically whether there was an incident where the

6  alarm went off and the door was open.

7      Q    And did they respond to that question?

8      A    They did.

9      Q    What did they tell you?

10     A    I believe it's in the police report which

11  I provided, or whatever it's called the police

12  response, that they did respond to an alarm.

13     Q    Who did you provide this to?  Because I

14  did request it and I don't recall receiving that.

15     A    I provided it to your assistant there

16  Mr. White.

17     Q    Okay.  And do you recall when you provided

18  this to Mr. White?

19     A    I don't remember exactly but sometime

20  shortly after or during his examination of me, sir.

21     Q    Did you ever actually read the police

22  report for the incident and the information that you

23  provided to the police?

24     A    I did.

25          MR. RUBIN:  Could we pull up Exhibit 7,

CHUBB-Altschuler/ROLEX & ART 0000131

092020001456

1                    D. ALTSCHULER

2    please, on the screen.

3              CONCIERGE:  Yes.  One moment.

4              (Police Report was introduced

5              as Exhibit C.)

6              MR. RUBIN:  Could you scroll through that

7    document for Mr. Altschuler, please.

8         Q    Do you recognize that document, sir?

9         A    It's not exactly on my screen here.

10             MR. RUBIN:  Let's go back to the first

11    page and give him a fair opportunity to take a look

12    at it.

13        A    Yes.  I do recognize it.

14        Q    Is this a copy of the police report that

15    you provided to Mr. White?

16        A    What I provided to him, sir, was something

17    different.  I provided him -- it was just an email I

18    received from the Pima County Sheriff's Department

19    which I think referenced my call to them concerning

20    trying to determine whether the alarm went off and

21    the door was opened and trying to understand some

22    details around that.

23             MR. RUBIN:  Okay.  Let's take a look at

24    the report itself.  Let's mark it as company's

25    Exhibit C.

CHUBB-Altschuler/ROLEX & ART 0000132

092020001456

Page 53

1                    D. ALTSCHULER

2           CONCIERGE:  Okay.

3           MR. RUBIN:  Let's go to page 3, please.

4      Q    The second paragraph where it says, "He

5  told me he kept a crate," read that paragraph, sir.

6      A    Did you want me to read it out loud?

7      Q    No, to yourself.

8      A    Yes.

9      Q    Is that statement that you gave to the

10 police, that paragraph true?

11     A    I think it was there more than 15 years.

12 Hold on.  I think specifically the artwork was kept

13 primarily in the dining room not the living room but

14 I think the substance of it is correct, other than

15 those details.

16     Q    So your recollection is you said dining

17 room and not living room?

18     A    I don't remember.  I actually don't

19 remember exactly what I said.

20     Q    Go down to the paragraph and read the

21 paragraph, "He stated the four pieces," do you see

22 that, sir?

23     A    Yes.

24     Q    Please, read that to yourself.

25     A    Yes.

Page 54

1                         D. ALTSCHULER

2          Q     Is the information that is in the report

3     that is indicated came from you true in that

4     paragraph?

5          A     I mean this is summary of what I said.  I

6     believe the gentleman I was speaking to wanted a

7     certificate of authenticity, wanted to know if they

8     were insured, wanted to know what the numbers were.

9     He was asking me a number of questions.  I recall he

10    was on the internet looking this up and that's the

11    only thing I remember.

12         Q     Now you mentioned a certificate of

13    authenticity, did you ever attempt to locate a

14    certificate of authenticity?

15         A     I never received a certificate of

16    authenticity.  I don't think on any purchase of art

17    I ever made in my life I have received a certificate

18    of authenticity.

19         Q     The next paragraph says, take a quick

20    look, do you have that there?  "He stated he

21    purchased," is that statement correct that you

22    provided the police?

23         A     So I just want to make one comment, when

24    you're asking me questions I did not make these

25    statements.  This is a summary of what I -- I think

1                              D. ALTSCHULER

2       the gentleman asked me questions.  I would not have

3       said I bought this in '87 and both artists are dead

4       so I think this was in response to questions that he

5       asked me but again the substance of this is correct.

6              Q    Did you or did you not say that you

7       purchased the art in 1987 and paid $5,000?  Did you

8       tell that to the police?

9              A    I think I did.  I don't have any reason to

10      doubt that.

11             Q    Do you also recall telling the police that

12      when you purchased them in 1987 both artists were

13      still alive?

14             A    I would seriously, seriously -- again, I

15      can't remember that conversation but it just

16      wouldn't seem natural or I wouldn't get into that

17      level of detail with a Pima County sheriff's agent

18      talking about whether artists were dead or alive.

19      It's not something that I would mention.  Again I

20      don't remember the conversation but it just seems

21      odd and out of context.  Perhaps if I was asked if

22      they were alive or dead I would have responded

23      accordingly but it seems odd that I would have just

24      simply volunteered that information.  It's not

25      relevant to anything.

CHUBB-Altschuler/ROLEX & ART 0000135

092020001456

Page 56

D. ALTSCHULER

1

2       Q     Going back for a moment, sir, you

3   indicated that you had one photograph.

4       A     Yes.

5       Q     Would that be a photograph of one of the

6   silkscreens within the series of four?

7       A     Yes, sir.

8       Q     Do you recall which picture was depicted

9   in that photograph, of which silkscreen?

10      A     I have no idea.

11      Q     Now, there's a little dialogue in the

12  report about when asked why you didn't promptly call

13  the police, can you tell us today why you didn't

14  immediately call the police?

15      A     Calling the police and making a police

16  report is a, you know, sort of, you know, important

17  step, an important process.  I wanted to make 100%

18  sure that this art was missing.  They were gone or

19  stolen or whatever.  I wanted to make that absolute

20  determination.

21      Q     Well, you went to the house and they were

22  missing.  You made that determination on, what,

23  December 23, 2019?

24      A     I made the determination that I could not

25  locate them at the house.

CHUBB-Altschuler/ROLEX & ART 0000136

092020001456

D. ALTSCHULER

1

2      Q     And if they were not in the house, sir,

3      where else would they be?

4      A     I don't know.

5      Q     I'm trying to understand the premise of

6      the delay.

7      A     Someone could have taken them.  My sister

8      could have removed them from the house.  I simply do

9      not know.

10     Q     Did you contact your sister to see if she

11     removed them from the house?

12     A     We tried and that was unsuccessful in my

13     attempt to get a straight answer from her.

14     Q     Did you call her?  Did you see her in

15     person?

16     A     I did not see her in person.

17     Q     Did you call her directly?

18     A     I did.

19     Q     And she would not respond to your

20     question?

21     A     She was not forthcoming in responding to

22     my question; that is correct.

23     Q     Is there a reason she would not be

24     forthcoming in response to a simple questions?

25     A     You would have to ask her that question,

CHUBB-Altschuler/ROLEX & ART 0000137

092020001456

D. ALTSCHULER

sir.  As I mentioned I have very little contact with

my sister and have had very little contact with her

over the last several decades.  The only reason we

had any contact at all in or around this time was

because of my mother's illness.

    Q    Did you contact anyone else to see if they

had any knowledge about the missing artwork?

    A    I did not.

    Q    How about the handyman that you mentioned?

    A    Michael, no.

    Q    Were you aware of an alarm activation on

December 18, 2019?

    A    If that's the alarm activation where

Virginia was -- if that was the alarm activation

that Virginia was speaking of where she contacted my

sister and was told to mind her own business then

the answer is yes.  If it was a different or

separate alarm activation I don't know.  I don't

know specific dates.  I just know there was an alarm

activation, my understanding is, a few days prior to

my visit.

    Q    How were you told about the alarm

activation?

    A    Virginia told me.

Page 59

1                           D. ALTSCHULER

2          Q    Do you know whether anyone ever notified

3     the police, other than yourself, about any missing

4     property as a result of that alarm activation of

5     December 18, 2019?

6          A    I do not know, sir.

7          Q    Did you have other valuables in the house

8     as of December 2019?

9          A    I did.

10         Q    Were any other valuables missing?

11         A    My valuables?

12         Q    Yes.

13         A    Yes.  There is a -- if the answer to this

14    is qualified, if and I do not know whether my Rolex

15    watch was located in the house or not or whether it

16    was in a safety deposit box, in the event it was in

17    the house then, yes, that would be also something

18    that was missing, along with some other artwork.

19         Q    What other artwork was missing?

20         A    Would you like the names of the artwork?

21         Q    If you can recall.

22         A    Yeah.  To the best of my recollection a

23    painting by Jack Pearson (phonetic) called

24    Valentine's Day.

25         Q    Was that on the walls?  Was that in a

Page 60

D. ALTSCHULER

package?  How was that in the house?

    A    That was -- I don't know exactly where it was located.  I believe it was the back of the home, in the back of the home in a closet.  I believe it was in the back of the home in a closet.

    Q    What other fine arts, sir?

    A    A piece by an artist Jim Dine called Yellow Robe.

    Q    Anything else that you can recall?

    A    A David Hockney print entitled Celia.

    Q    Anything else?

    A    Nothing that comes to mind but, you know, I'm still trying to figure out what else is missing.

    Q    Did you ever notify the police about these other items of fine art that you have testified were missing?

    A    I did not.

    Q    These other pieces, how were they stored?  You told us about the first one with Jack Pearson, were they packaged or were they -- how were they kept in the house?

    A    The Jack Pearson was in a frame but wrapped in brown paper.  The Jim Dine was in a, I call it, a gallery sleeve and wrapped in brown paper

CHUBB-Altschuler/ROLEX & ART 0000140

092020001456

Page 61

D. ALTSCHULER

1

2   and the Celia, David Hockney was framed and wrapped

3   in brown paper.

4       Q    Where were they located?

5       A    Again, sir, I believe, and I'm not 100%

6   sure, they were located in the back of the house in

7   a closet.

8       Q    Do you know the value of any of these

9   three pieces?

10      A    I can find out.  I don't know offhand.  I

11  would have to do a little bit of research on them.

12      Q    Do you recall how much you paid for these

13  pieces?

14      A    I believe I paid 5 or 7,500 for the

15  Pearson and again I could be wildly off on these

16  numbers.  I don't recall how much I paid for the Jim

17  Dine, I purchased that directly from the Los Angeles

18  County Museum of Art.  And for the Celia,  Hockney,

19  again we're going back decades, I paid 12,500.

20      Q    And none of those items were insured at

21  the time of loss?

22      A    They weren't insured at the time of the

23  loss.

24      Q    Is there anything else that you recall

25  missing other than these three paintings and the

CHUBB-Altschuler/ROLEX & ART 0000141

092020001456

Page 62

1              D. ALTSCHULER

2    Rolex?

3         A    Not that I can recall at this time.

4         Q    Did you ever report to the police the

5    missing Rolex?

6         A    I did not.

7         Q    Is there a reason, sir, that you never

8    notified the police about the missing Rolex?

9         A    There is.

10        Q    Tell us, please.

11        A    So I do not know whether that was stolen

12   or whether it was misplaced.  I don't know the

13   whereabouts of it.  I'm trying to get information

14   through my counsel, who in turn speaks to my brother

15   and sister's counsel to find out if they made a

16   diligent search, if it was in the safety deposit

17   box, if it was located in the house.  I want to make

18   sure that they're not in possession of it.  Again,

19   as I mentioned I want to be careful before I make an

20   accusation that the watch was stolen.  I want to

21   make sure it's not in the possession of my brother

22   or sister.

23             MR. RUBIN:  We can take the police report

24   off, please.  Thank you.

25        Q    During all of the years that the

CHUBB-Altschuler/ROLEX & ART 0000142
092020001456

1                     D. ALTSCHULER

2    silkscreens were in the house would I be correct

3    that you only checked once at the very beginning the

4    contents of that crate?

5          A    In other words, are you asking if that was

6    the only time that I opened the top of the box to

7    see if the other box was in it?

8          Q    I will accept that.

9          A    Yeah.  I just want to be able to respond

10   to you, sir.  Excuse me.  I can't remember over

11   multiple decades whether I ever opened it up again

12   or kept it sealed.

13              MR. RUBIN:  Could we put on the screen

14   number two.

15              (2008 Appraisal was introduced

16              as Exhibit D.)

17         Q    Mr. Altschuler, do you recall ever seeing

18   this document before?

19         A    I mean, I have seen many, many, many of

20   these appraisals.  Yes.

21         Q    Was this an appraisal that was provided to

22   you at some point in time?

23         A    Yes.

24         Q    And would that have been around July 15,

25   2008?

CHUBB-Altschuler/ROLEX & ART 0000143

092020001456

Page 64

1                    D. ALTSCHULER

2      A    If that's the date on there, yes, sir.

3           MR. RUBIN:  And could we scroll through

4    the second page of that document, please.

5      Q    I do not see on this document the

6    silkscreens.  Is there a reason to your knowledge

7    that for insurance purposes at that time the

8    silkscreens were not on this document?

9      A    All of this art was art which was

10   purchased from Mr. Corcoran and this was provided by

11   his assistant.  So they would just be most

12   knowledgeable or exclusively knowledgeable of pieces

13   that they sold to me.  They did not sell me the Andy

14   Mouse, and that's not really art that they

15   understand or really have any knowledge of the

16   prices.  The art on here is art that they sold me

17   that they deal in and are intimately of how much

18   these pieces were because they deal with them every

19   single day.

20           MR. RUBIN:  Can we put on the screen,

21   please, the next Corcoran.  It should be number

22   three.

23           (2010 Corcoran Appraisal was

24           introduced as Exhibit E.)

25      Q    Do you recall, sir, seeing this document

CHUBB-Altschuler/ROLEX & ART 0000144
092020001456

Page 65

1                    D. ALTSCHULER

2   before?

3          A    Again, you know, I have seen many, many,

4   many, perhaps dozens of theses appraisals.

5          Q    So this was an appraisal that you had

6   commissioned, is that correct, sir?

7          A    Well, periodically every few months, every

8   six months.  There was no set time.  I would ask

9   Mr. Corcoran's associate to, you know, kindly update

10  what I have so I knew what I had and give me an

11  appraisal on the items that I had.

12         Q    And this one was done on October 18, 2010;

13  correct?

14         A    If that's the date or there.  I see it on

15  the top, yes.

16         Q    And you received this appraisal at some

17  point in time; is that correct?

18         A    Yes.

19              MR. RUBIN:  Could we scroll to the second

20  page.

21         Q    Did he appraise on this appraisal the

22  silkscreens which are the subject of your claim?

23         A    Yes.

24         Q    And could you tell us how much he

25  appraised them at.

CHUBB-Altschuler/ROLEX & ART 0000145

092020001456

Page 66

D. ALTSCHULER

A    250, and I can tell you that was an estimate because they had no idea what they were worth.  It wasn't something that they dealt with but they appraised them for 250.

Q    Is that your opinion or their opinion that it was an estimate?

A    Both.

Q    Well, it says on the first page values for insurance purposes.

A    Right.  In or around that time I submitted this or something to my insurance company at the time, I don't know if it was Chubb or AIG, and there was some discussion in emails as to what these were worth and the discussion was somewhere along the lines of I have no idea what these things are worth. It's a somewhat esoteric piece and I think at the time Corcoran and his colleague sent me a note saying, you now, they're worth about this and the insurance company said we can't accept something where it's vague.  So I think they just put down 250.

Q    Do you have any writing confirming that note, that you're talking about, in your possession still?

D. ALTSCHULER

1

2    A     I do.

3    Q     Could you provide that to us.

4    A     I will, yes.

5    Q     And when was that note generated?

6    A     It was an old email I think.  Again, I

7    don't know whether it was involving AIG or Chubb.

8    It was a discussion around how we ultimately, you

9    know, understand what the value is and whether they

10   were thinking about what each one of these costs or

11   whether the full set.  I don't -- I will give you

12   whatever I have.

13   Q     Would I be correct, sir, that you insured

14   the silkscreens that are the subject of your claim

15   back in 2010 for the sum of $250,000?

16   A     I believe -- I mean if they accepted this

17   and it was on my policy, yes, that is correct.

18         MR. RUBIN:  Could we mark this document as

19   I believe Company's Exhibit E.

20   Q     Now, you insured the silkscreens which are

21   the subject of the claim with an insurance company

22   or insurance companies prior to Chubb, is that

23   correct, sir?

24   A     Yes, sir, that is correct.

25   Q     And do you recall the name of the

Page 68

1                          D. ALTSCHULER

2    insurance company?

3         A    I believe it was AIG.

4         Q    And was that one of their subsidiaries

5    Chartis?  Does that sound familiar?

6         A    It does not.

7         Q    And do you recall, sir, how much you

8    insured the silkscreens with Chartis or AIG?

9         A    I do not.

10             MR. RUBIN:  Would we put on the screen

11   five.

12             (Chartis policy was introduced

13             as Exhibit 8.)

14        Q    Does that, sir, look like the Declaration

15   Page for the policy from Chartis, which I understand

16   is an AIG subsidiary?

17        A    I don't know what a Declaration Page is

18   but, I mean, I'm looking at the document.

19        Q    It's generally referred to as the first

20   page of your policy.

21        A    Okay.

22             MR. RUBIN:  Could we scroll down to number

23   162.

24        Q    You will see 162 on the top left.  Do you

25   see that on this policy, which has a policy period

CHUBB-Altschuler/ROLEX & ART 0000148

092020001456

Page 69

D. ALTSCHULER

1

2    of July 18, 2010 to July 18, 2011, that you insured

3    Andy Warhol, Andy Mouse, four pieces for $250,000?

4        A    Yes.

5        Q    And that of course is the same silkscreens

6    which are the subject of your claim with Chubb, is

7    that correct, sir?

8        A    Yes.

9        MR. RUBIN:  Could we mark the Chartis

10    policy as the next exhibit, please.

11        Q    What happened with the AIG or Chartis

12    policy?  Did you change companies or did something

13    else happen?

14        A    I changed companies?  Yeah.  I don't know

15    whether I changed companies or whether AIG canceled

16    the policy.  I don't recall.

17        Q    And after AIG canceled the policy do you

18    recall with what company you insured your valuables?

19        MR. STRINGER:  Objection.  I don't think

20    he testified that the policy was canceled.  He

21    wasn't sure what happened with the policy.

22        Q    Okay.  After the policy with Chartis/AIG

23    terminated what company did you insure with?

24        A    I believe Chubb.  I mean if there was an

25    interim insurance company I don't recall.

D. ALTSCHULER

1

2    Q    Does Axa sound familiar?

3    A    It doesn't.

4         MR. RUBIN:  Could we put on the screen

5    six.

6         (Axa policy was introduced as

7         Exhibit G.)

8    Q    Have you ever seen this document before,

9    sir?

10   A    I don't -- I mean, I can't recall.

11   Q    It appears to be a policy with a term of

12   October 4, 2011 to October 4, 2012.  Is it your

13   understanding that there was some insurance company

14   after AIG/Chartis but before Chubb?

15   A    You know, sir, I have absolutely no

16   recollection of this but the document appears to

17   show that there was insurance so I don't think

18   that's in dispute or -- I had insurance with them, I

19   had it.

20   Q    Do you know what happened to that Axa

21   policy?

22   A    I don't.  I don't even remember having the

23   policy.

24   Q    Now, at some time, sir, you insured your

25   property with Chubb.  Do you recall the first year

CHUBB-Altschuler/ROLEX & ART 0000150

092020001456

Page 71

D. ALTSCHULER

2  that you started insuring your property with Chubb?

3      A    I did not.

4      Q    And would it be fair to say that it would

5  be within a relatively short period of time after

6  the Axa policy was terminated?

7      A    I have no idea.

8      Q    When you first insured with Chubb did you

9  include the silkscreens that are the subject of your

10  claim?

11      A    I don't recall.

12      Q    Do you have any recollection, sir, of how

13  much you initially insured with Chubb, the

14  silkscreens?

15      A    I do not.

16      Q    Do you recall, sir, at any time increasing

17  the coverage for the silkscreens that are the

18  subject of your claim?

19      A    I do.

20      Q    If I told you that from my review of

21  records you initially insured the silkscreens for

22  $250,000, would you accept that?

23      A    Yes, I would.

24      Q    And at some point in time you increased

25  the insurance; correct?

Page 72

D. ALTSCHULER

1

2   A    Yes.

3   Q    Do you recall the date on which you

4   increased the insurance?

5   A    I do not.

6   Q    And these are the same silkscreens which

7   are the subject of the claim?

8   A    Correct.

9   Q    And you owned these silkscreens at the

10  time that you first insured them with Chubb; is that

11  correct?

12  A    Yes.

13  Q    And you owned these silkscreens at the

14  time that you increased the coverage with Chubb; is

15  that correct?

16  A    Yes, sir.

17  Q    And just for continuity, you owned these

18  silkscreens at the time of the loss, which occurred

19  sometime in December of 2019, is that correct, sir?

20  A    Yes.

21  Q    Do you recall who your broker was at the

22  time you increased the coverage?

23  A    I don't.

24  Q    Does Crystal and Company sound familiar?

25  A    Yes.

Page 73

D. ALTSCHULER

1

2     Q     Do you still utilize Crystal and Company

3     as your brokerage company?

4     A     I do not.

5     Q     When did that change?

6     A     In the last couple of years.

7     Q     What prompted that change?

8     A     I didn't find the service to be

9     particularly great.  I would have trouble receiving

10    my bills sometimes.  They go to the wrong address.

11    And always a little big of confusion between me and

12    the broker.  Just not getting great service.

13    Q     And what did you tell them at the time

14    that you increased the coverage?  As I understand it

15    you were utilizing Crystal at the time that the

16    increase occurred.

17    A     I'm sorry.

18    Q     Let me rephrase that.  It's my

19    understanding that you increased the coverage for

20    the silkscreens which are the subject of your claim

21    on August 2, 2018, does that sound about right?

22    A     Yes, sir.

23    Q     And what did you tell Crystal and Company

24    at that time?

25    A     I'm not sure I told them anything.  I

Page 74

D. ALTSCHULER

1

2    think I just sent them the appraisal and, you know,

3    obviously the value had gone up.  I sent them the

4    appraisal and I think they responded in an email.  I

5    don't think there was any discussion.  It was just

6    one of many e-mails I sent back and forth and I

7    think they said something to the effect that we

8    should increase coverage and I think I probably said

9    yes and that was the end of it.

10        Q    Do you ever recall receiving a

11   confirmation of insurance for the change?

12        A    I don't understand what that term is, sir.

13        Q    All right.  Let's do it a different way.

14   Let's put on the screen Exhibit 4.  Take a look

15   through that document, sir.

16             (Confirmation of Insurance was

17             introduced as Exhibit H.)

18        A    Yes.

19        Q    Is that the confirmation of insurance

20   change increasing the coverage?

21        A    I mean that what that document appears to

22   be.  I have no recollection of ever receiving this

23   but yes.

24        Q    Does that document accurately set forth

25   the change?

Veritext Legal Solutions

CHUBB-Altschuler/ROLEX & ART 0000154

092020001456

Page 75

D. ALTSCHULER

1
2     A    I believe it does, yes.

3          MR. RUBIN:  Could we mark this as the next

4     exhibit, please.

5     Q    And attached to this confirmation of

6     insurance is the appraisal, correct, sir?

7          MR. RUBIN:  And scroll down for the

8     witness.

9          CONCIERGE:  How far down?

10         MR. RUBIN:  Go to the appraisal.

11    Q    Now, Mr. Altschuler, this appraisal from

12    Dina Brown, this is the appraisal for the

13    silkscreens which are the subject of your claim; is

14    that correct?

15    A    Yes, sir.

16    Q    And it's dated July 25, 2018.

17    A    Yes.

18    Q    And, again, I don't mean to be repetitive

19    but just for clarity, you owned the silkscreens

20    which are the subject of the appraisal at that time?

21    A    Yes, sir.

22         MR. RUBIN:  Anthony, I don't know if you

23    want to take a form of lunch break or anything?

24         MR. STRINGER:  It's up to Douglas.

25         THE WITNESS:  I would like to see if we

D. ALTSCHULER

1  can get through this.  I'm sort of wearing down.

2      Q    We have quite a bit more to cover so I

3  just want to make sure you're up for the task.

4      A    You know, when I am no longer able to

5  testify and get too tired I will let you know, sir.

6      Q    Appreciate that, sir.  And if you need a

7  break feel free to let us know.

8          Now, how did you come in contact with Dina

9  Brown?

10     A    I came in contact with I believe it's her

11 mother initially.

12     Q    Okay.  And what is her mother's name?

13     A    I don't know.

14     Q    Did do know whether the mother has a

15 gallery or?

16     A    Yes, she does.

17     Q    Did you ever do business with her mother?

18     A    I believe I have.

19     Q    What type of business did you do with her

20 mother?

21     A    I just don't remember.  I recall making a

22 purchase or something a number of years ago but I

23 have talked to her over the years and she's an

24 expert on Warhol and these types of, this type of

Page 77

D. ALTSCHULER

1
2  art.  This is what she deals in.

3          Q     And the mother referred you to Dina

4  Brown?

5          A     She did.

6          Q     Well, if the mother is an expert why

7  didn't you use her to do the appraisal?

8          A     Well, first of all, let's try to get the

9  facts correct here.  So I had conversation with the

10 mom which was prompted by me receiving an email from

11 her and called her and was just talking to her

12 generally about art and, you know, I'm always

13 interested in trying to see if I can buy extra sets

14 of Andy Mouse and there was another Warhol set that

15 I was particularly interested in acquiring.  During

16 this conversation she, you know, to the best of my

17 recollection I didn't think much of the conversation

18 at the time so there was no reason for me to

19 remember specific details.  She brought to my

20 attention the Andy Mouse set had become incredibly

21 expensive.  It's gone up quite a bit in value.

22         Q     What told you that?

23         A     The mother.  I said, I think my current

24 insurance appraisal on it is something like 250 and

25 she said that would be correct if you were trying to

CHUBB-Altschuler/ROLEX & ART 0000157

092020001456

Page 78

D. ALTSCHULER

1  
2  sell one piece but the set is worth quite a bit

3  more.  I said should I get that appraised or what do

4  you think I should do and she said I can refer you

5  to my daughter who's a certified appraiser and I

6  said okay and we talked about some other things.  I

7  told her what I was interested in finding and that

8  was the sum and substance of the conversation.

9       Q    Did you ever tell the mother anything

10  further about your silkscreens?

11       A    Yeah.  I told her the story of me buying

12  them at the B1 Gallery and, you know, it's amazing I

13  paid $5,000 for them and I bought a second set

14  directly from Mr. Keith Haring and, you know, we

15  sort of reminisced about the artist and Warhol and

16  what was happening in the art market.  Just one of

17  many conversation I have with frequency with art

18  dealers and artists about art.

19       Q    Does the name Elaine Fine Arts sound

20  familiar to you?

21       A    Yes.  Yes, that's it.

22       Q    That's what, sir?

23       A    That's the name of the woman, I think, I

24  spoke with, the mom.

25       Q    And do you recall her last name?

1                    D. ALTSCHULER

2        A    I do not.

3        Q    I will try to pronounce it.  Efstathiou,

4    E-s-s-t-a-t-h-i-o-u, does that sound familiar, sir?

5        A    It doesn't.  It does not mean that's not

6    her last name.

7        Q    How many communication did you have with

8    Elaine regarding the silkscreens?

9        A    Over what period of time.

10       Q    At or about the time you decided to get a

11   new appraisal.

12       A    I can only recall one.  It's possible

13   there was more than one.

14       Q    And the sum and substance?

15       A    Again, just want to be accurate here.  Can

16   the court reporter read your last comment, sir.

17       Q    My last question?

18       A    Yes.

19            (The requested portion was

20            read by the court reporter.)

21       A    I just want to be correct, I did not call

22   her to get an appraisal.

23       Q    I understand that.  But what was the sum

24   and substance of your communication with her that

25   led you to get another appraisal?

Page 80

1                          D. ALTSCHULER

2          A    I just testified to that.

3          Q    Well, I wasn't quite clear on that.

4          A    We were talking about the Andy Mouse set,

5     we were talking about other sets.  I asked her does

6     she ever see them come up for sale, how much are

7     they, I would always love to have, you know, an

8     extra one of these, you know, something to the

9     effect of -- and again I'm summarizing.  This wasn't

10    relevant or an important conversation at the time,

11    something to the effect of they're hard to find,

12    they're, you know, they have gone up in value and I

13    think, you know, she said it would be over a million

14    dollars or something like that and I said that has

15    gone up and I think I should get an appraisal or

16    something do you know somebody that could do it.

17    Again, very vague.

18         Q    You had transactions with Elaine, isn't

19    that correct, through her gallery?

20         A    I don't have any memory of it but she

21    seems to remember so there could have been in the

22    past.

23         Q    But you were aware, sir, that she did

24    appraisals.

25         A    I was not.  I had no idea she did

Page 81

1                    D. ALTSCHULER

2      appraisals.

3          Q    Well, she told you the value of the

4      silkscreens went up.  Did she tell you the basis of

5      her view on that?

6          A    No, sir.  I think there's some confusion

7      here.  That the awareness by Elaine that the prices

8      have gone up versus someone who can do an actual

9      appraisal -- you know, for example, I'm aware that

10     some things have gone way up in value, some things

11     way down in value.  If you were to ask me about

12     certain pieces of art or watches or cars or things

13     that I'm familiar with I can say, well, it's gone

14     way up or down.  I certainly wouldn't be in a

15     position to do an appraisal.

16         Q    Thank you, sir.  Did you know one way or

17     the other whether Elaine did appraisals?

18         A    I had at the time and today, as I'm

19     testifying before you, have no idea whether she does

20     appraisals.

21         Q    And she never appraised any items of art

22     for you?

23         A    That is correct.  Not that I can recall.

24     If you were to pull out an appraisal with my name

25     for a piece of mine and show it to me I would say

CHUBB-Altschuler/ROLEX & ART 0000161

092020001456

1                    D. ALTSCHULER

2  perhaps she did but I just don't have any memory of

3  it.

4       Q    She was located where?  In Torrance,

5  California, is that correct, sir?

6       A    I don't know.  I know it was somewhere in

7  Los Angeles.  I thought it was West Hollywood but I

8  could be wrong.

9       Q    Now has Elaine or Elaine Fine Arts ever

10  acted as an art broker either selling or attempting

11  to sell items that you own?

12       A    She has not.

13       Q    Did you give her any specific details,

14  Elaine, on the silk screens other than the fact that

15  you had the four silkscreens?

16       A    I did.

17       Q    What specifically did you tell her?

18       A    Untouched, in a box or crate located in

19  Arizona where they have been sitting since 1987.

20       Q    Did you tell her anything else?

21       A    Not that I can recall.

22       Q    Okay.  And so after this communication

23  with Elaine how did you come in contact with Dina

24  Brown?

25       A    I think an introduction was made.  Again,

D. ALTSCHULER

1

2   I don't remember the details.  It wasn't -- it just

3   didn't seem significant at the time.

4        Q    And was this an in-person introduction or

5   telephone or what?

6        A    I believe it was telephone.

7        Q    Did you ever meet in person with Dina

8   Brown?

9        A    I have not.

10        Q    But you obviously had discussions with her

11   regarding the items that she was going to appraise

12   for you?

13        A    That is correct.

14        Q    Did you ever show her any photographs?

15        A    I did not.  I couldn't locate the

16   photograph which I subsequently located at the time,

17   so no.

18        Q    Did you tell Dina Brown where the artwork

19   was located?

20        A    I don't recall.

21        Q    Do you know where Dina Brown maintained a

22   place of business?

23        A    I don't know.

24        Q    Do you know what state?

25        A    I think it's California.

Page 84

D. ALTSCHULER

Q    Because the appraisal doesn't seem to have
an address so I was curious where she was located.
All your communications with Dina Brown were by
telephone?

A    I believe that's correct.  I mean, I can
check my emails but there could be an email but I
believe they were by phone.

Q    And if there are any such emails we would
request that you provide them to us.

Now, you have the appraisal there.  It's
part of the Exhibit H.  Tell us what you told Dina
Brown about the artwork that she was going to
appraise for you.

A    It was in a -- this is for people in the
business who know this art.  I told her it was Andy
Mouse.  I did not know the number.  I thought it
could about a number three or could be an artist
proof.  Condition is always a critical, critical
issue with these things, especially since they're
decades old and it's highly unusual for someone to
have an untouched pristine set.  So I think that was
what I conveyed.

Q    Now, since you owned the artwork at the
time you commissioned Dina Brown, is there a reason

Page 85

1                            D. ALTSCHULER

2     that you did not have her actually inspect the

3     actual artwork?

4          A    Well, she didn't have possession of the

5     artwork, number one.  And number two, there would be

6     no reason.  This was not a unique piece as some of

7     the other pieces that I bought from the Jim Corcoran

8     Gallery were.  They would have to be uniquely

9     identified and determined what the piece was.  This

10    was a known quantity.

11              You know, if I called Dina Brown or her

12    mom and said, "I got a pristine set of endangered

13    species what are they worth?  Could you give me an

14    appraisal on it?"  Since it's a known quantity and

15    pristine condition and not a unique piece, not a

16    unique Warhol or unique Eric there was no necessity

17    to see them.  But specifically to your question as

18    to why she didn't see them, they were located in

19    Arizona and she was not located in Arizona.  Just

20    like -- I'm sorry.  Go on.

21         Q    Are there any appraisers of art in Arizona

22    that you're aware of qualified to appraise such

23    items?

24         A    I have no idea.  I couldn't tell you

25    whether there are or aren't.  I generally try to

1                    D. ALTSCHULER

2    deal with people who are particularly expert on

3    knowing particular pieces of art.  If you ask me to

4    guess this is simply a guess given the art market in

5    Arizona I would think not.  So I think it would be

6    quite different to locate someone in Arizona or for

7    that matter there are probably very few people in

8    the world that have any idea what certain Warhol or

9    Haring silkscreens are worth.  It's sort of an

10   esoteric market.

11            MR. RUBIN:  Go to page 2 of the appraisal,

12   please.

13        Q    The second paragraph, sir, says, "This

14   appraiser has made the extraordinary assumption that

15   all information and documentation eg artwork

16   description, photographs, provenance provided by the

17   client is accurate correct and genuine."

18        A    I don't see anything on my screen.  My

19   screen is just blank.

20            MR. RUBIN:  We gotta get it back up.

21        Q    It says, "This appraiser has made

22   extraordinary assumption that all information and

23   documentation eg artwork, description, photographs,

24   provenance provided by the client is accurate

25   correct and genuine."  What artwork description did

CHUBB-Altschuler/ROLEX & ART 0000166
092020001456

1                          D. ALTSCHULER

2    you give her?

3         A    Sir, I just testified to that.  Do you

4    want me to testify again.

5         Q    To the actual description of artwork, yes,

6    please.

7         A    I told her I had a set of Andy Mouse

8    prints in the box, pristine condition.

9         Q    And says, "photographs" do you recall

10   showing her a photograph?

11        A    I don't.  I mean, it's possible.  I just

12   don't remember having had the photograph at the

13   particular time of the print up but, again,

14   everybody who deals in this particular series and

15   Warhol knows what this looks like and as I mentioned

16   condition is critical.  The price varies

17   dramatically depending on the condition and I

18   stressed to her pristine condition in the box.

19        Q    And therefore anything that she said in

20   the appraisal about the condition was based solely

21   on your statements to her; correct?

22        A    Yes, sir, that is correct.

23        Q    And what did you tell her with respect to

24   the provenance?

25        A    I told her where I purchased it from.

Page 88

D. ALTSCHULER

1

2      Q      What did you tell her?

3      A      I purchased it from the B1 Gallery.

4      Q      And anything she put in this appraisal had

5      to come from you, is that correct, sir, in terms of

6      description, edition, etc.?

7      A      I don't understand the question.  I

8      provided her information.  Where else she got

9      information from or what research she did in giving

10     the appraisal I couldn't speak to that.

11     Q      In terms of description all of that came

12     from you?  There was no other party that assisted in

13     giving her information about the silkscreens that's

14     the subject of your claim?

15     A      About my specific silkscreens or this

16     series in general?

17     Q      The specific silkscreens that are the

18     subject of your claim.

19     A      Yes.  That is correct.

20            MR. RUBIN:  Let's go to page four.

21     Q      Did you tell her the artist Keith Haring?

22     A      Excuse me.

23     Q      Did you tell her the artist was Keith

24     Haring.

25     A      I told her it was the Andy Mouse set.  She

Page 89

D. ALTSCHULER

1
2    was familiar with Andy Mouse.

3       Q    And did you tell her the title was Andy
4    Mouse suite of four?

5       A    I can't remember.

6       Q    Did you tell her the year, 1986?

7       A    I can't remember.

8       Q    Did you tell her the sheet size, 38 by
9    38 inches?

10      A    I can't remember but I would doubt that I
11   gave that kind of detail.  That's just not something
12   that I catalog in my mind.

13      Q    How did it get on the appraisal if you did
14   not give it to her?

15      A    Well, sir, this is a well known set of 30
16   prints plus artist proof for people who trade in
17   this art it's well cataloged as to what the size is,
18   what the edition is.  I mean there's just to doubt
19   as to what the size is and all the information
20   surrounding it.  It's well known.

21      Q    Okay.  And edition number, 3 of 30.  You
22   told her that.  Isn't that true, sir?

23      A    I said to her I thought it was 3 of 30 but
24   I was not 100% positive.  I said I don't know
25   whether it's 3 of 30 or an AP.

CHUBB-Altschuler/ROLEX & ART 0000169

092020001456

D. ALTSCHULER

1

2     Q   Isn't it important, sir, for an appraiser

3  to know what it was, the edition number?

4     A   Irrelevant to an appraisal.

5     Q   On this document it says, 3 of 30.  Is

6  that true or false?

7     A   What it says here?

8     Q   Yes.

9     A   Of course.  It's 3 of 30.

10     Q   And then it goes down and says, "Framed:

11  No." Obviously the only way that she knew it was not

12  framed was from you, is that correct, sir?

13     A   Yes.

14     Q   And then it says "Signed:  Yes" and

15  "3/30."  Again, she says 3/30.  Is that accurate,

16  sir?

17     A   Is it accurate that it says 3/30 on this

18  appraisal, yes.

19     Q   Is it accurate that what she appraised

20  was 3/30?

21     A   Yes.  I just testified to that, sir.

22     Q   So is was edition 3 of 30 that she

23  appraised; correct?

24     A   Yes.

25     Q   And then it says down on the lower,

CHUBB-Altschuler/ROLEX & ART 0000170

092020001456

1          D. ALTSCHULER

2     "Provenance:  Purchased from B-2 Gallery, Santa

3     Monica, California" is that true?

4          A     Is it true what it says on here, yes.

5          Q     And is that where you purchases it from?

6          A     I think the name of the gallery was B1

7     Gallery.  I may have said B-2 but my memory for

8     names is not great so it's possible I called it B-2.

9               MR. RUBIN:  Could you scroll up a little

10    bit, please.

11         Q     The pictures there, where did they come

12    from?

13         A     I do not know.

14         Q     Now, in order to give her appropriate

15    information I assume you had several communications

16    with her; is that correct?

17         A     I believe so.  Again, I don't have

18    specific recollection.  It was not, you know,

19    something which seemed important at the time.

20         Q     And these were direct communications with

21    Dina Brown; is that correct?

22         A     I don't know whether it was Dina or the

23    mom.

24         Q     Did you have any direct communication with

25    Dina Brown?

CHUBB-Altschuler/ROLEX & ART 0000171

092020001456

1          D. ALTSCHULER

2          A    Sir, I don't specifically recall but again

3     I'm doing the best I can.  I can only tell you what

4     I recall.

5          Q    Did you have a single communication with

6     Dina Brown?

7          A    I don't recall.  I may have.  I may not

8     have.  I may have given the information to the

9     mother.  I may have talked to Dina Brown.  I don't

10    recall.

11         Q    Now, the appraisal was based on your

12    description of the silkscreens; correct?

13         A    The description that I gave was they were

14    in a box in pristine condition and I, again, most

15    likely mentioned that I believe they were an edition

16    of 3 of 30, otherwise it is a known quantity for

17    people who deal in this art.

18         Q    I understand that, sir, and the only way

19    that she would be able to put 3 of 30 is if you told

20    her that, isn't that true, sir?

21         A    Yes.

22         Q    And as I understand your prior testimony

23    you had some dialogue with Dina Brown's mother who

24    referred to you to Dina and then Dina and you had

25    some form of communication regarding the appraisal

CHUBB-Altschuler/ROLEX & ART 0000172

092020001456

1                      D. ALTSCHULER

2    that she was going to do for you; is that correct?

3          A     Sir, you asked me that.  I believe what I

4    just testified to was I do not have any independent

5    recollection of having a conversation with Dina.  I

6    may have, I may not have.  You know, you can ask her

7    what her recollection is.  So I don't specifically

8    recall.  I provided the information to one or the

9    other, either the mom or Dina.  There was not much

10   information to provide because, again, they deal in

11   art and they know exactly what it is.  The sole

12   issue for them is the condition.  Everything else is

13   standard.

14         Q     Elaine, she never saw the silkscreens,

15   true?

16         A     Mine?

17         Q     Yes.  The ones that are involved in your

18   claim.

19         A     No.

20         Q     And in order for somebody to be put on the

21   appraisal 3 of 30 it had to have been told to either

22   Elaine or Dina, isn't that also true?

23         A     Yes.  You asked me that three or four

24   times now.

25         Q     And you're not disputing that that is an

Page 94

D. ALTSCHULER

2    accurate description of the silkscreens, 3 of 30?

3        A    So were clear on-the-record so, again, at

4    trial --

5        Q    Sir, there's no trial.  We're not in a

6    litigation at this point.  We're just trying to get

7    the facts of the claim.

8        A    At a later date when you ask me about this

9    I want this record to be crystal clear.  So I will

10   say it again, sir.

11       Q    You don't have to.  You've already said

12   it.

13           MR. STRINGER:  Go ahead, Douglas.  He

14   asked a question let him answer the question,

15   Charles.

16       A    I said to, I forgot the mother's name, the

17   mom or Dina that I believe it was 3 of 30.  I wasn't

18   100% sure.  I said it's possible.  It could also be

19   an AP.  I said I'm not sure.  I have not seen them

20   since the time of purchase.  However, there was no

21   discussion about this because whether the number is

22   one, sir, or the number is 30 or anything in between

23   it's completely irrelevant to the value which one

24   would put on an appraisal.  The only relevance is

25   the condition of the art which I described in great

Page 95

D. ALTSCHULER

1

2    detail.

3        Q    It's also relevant to the actual

4    silkscreen that was appraised, isn't that true?

5        A    I don't understand your question, sir.

6        Q    The 3 of 30 is relevant to the silkscreen

7    that you have insured with Chubb, isn't that true?

8        A    I'm not trying to be evasive.  I really

9    don't understand your question.  It's irrelevant in

10   terms of the value of the art what number is

11   attached to it.

12       Q    I accept that.  I hear you.  But it's

13   relevant to knowing what precise piece was

14   appraised, isn't that true?

15       A    Again, I don't understand it.  This is a

16   series, 30 sets of 4 plus the artist proof and I

17   don't think it has any relevance what number it is

18   that you have.  So, again, I just don't understand

19   your question.

20       Q    Well, sir, if we go back to the first page

21   of this exhibit --

22            MR. RUBIN:  Can you scroll up, please.

23       Q    Do you see the amend value, sir?

24       A    Yes.

25       Q    And there's a specific description of the

D. ALTSCHULER

1

2     item, and I quote, "Andy Warhol and Keith Haring,

3     Andy Mouse 1986 colored silkscreens editions of 3/30

4     38 38X38" is that what they insured for you, sir?

5          A    Yes.  What I'm seeing is whether the

6     number was --

7          Q    That's all I wanted to --

8          A    Yes.  Okay.

9          Q    And that's what they relied upon when they

10    increased the insurance, isn't that true, sir?

11              MR. STRINGER:  Objection.  Go ahead.

12         A    That's 100% incorrect.

13         Q    They didn't rely upon that at all in being

14    able to know specifically what items they were

15    insuring, is that your testimony?

16         A    Sir, you're asking me what your client

17    relied on.  How could I possibly answer that

18    question, sir?

19         Q    They relied upon your description or the

20    description set forth in this document, would that

21    be fair?

22         A    That's fair.

23              MR. RUBIN:  Okay.  Go back to the first

24    page of Exhibit H.

25         Q    Your testimony was a little bit confusing

CHUBB-Altschuler/ROLEX & ART 0000176

092020001456

1                        D. ALTSCHULER

2    as to what person you had communications with

3    regarding the appraisal.  My recollection is

4    initially you said you had the communication with

5    Dina Brown after being referred to her by her

6    mother, is that correct or is that incorrect?

7         A    I testified, sir, that I was not sure

8    whether I spoke with Dina or I spoke with the mom.

9    I just don't remember.  The only thing I remember is

10   I provided the information which was requested at

11   the time and, you know, I've had conversations with

12   Dina so I can't remember at what time or when they

13   were but I just simply don't know.

14        Q    But you did have some communications with

15   Dina; is that correct?

16        A    I have talked to Dina, yes.

17        Q    On more than one occasion?

18        A    I don't recall.  I think so but again,

19   sir, I'm not sure.

20        Q    And irrespective of whether it was Dina or

21   her mother the information that was put on the

22   appraisal in terms of edition number, size,

23   condition it all came from you; is that correct?

24        A    That is correct.

25        Q    And it is accurate; is that correct?

CHUBB-Altschuler/ROLEX & ART 0000177
092020001456

1                    D. ALTSCHULER

2        A    Is the information that I provided to them

3    accurate?

4        Q    As reflected on the appraisal, yes.

5        A    I provided them accurate information.  As

6    I mentioned again so we're very clear, I said I did

7    not know 100% whether it was number 3.  I thought it

8    was but I wasn't 100% sure.  It could have been 3.

9    It could have been an AP but, you know, that is what

10    I told them.

11        Q    Would you agree, sir, looking at the

12    exhibit that's on the screen that Chubb insured

13    edition 3 of 30?

14        A    Correct.

15        MR. RUBIN:  Okay.  You can take that off

16    the screen now.

17        Q    Did you ever do any further business with

18    Dina Brown?

19        A    I have not.

20        Q    So this was your one and only transaction

21    with her, the appraisal; correct?

22        A    It was.  Given the fact that this is the

23    only piece of art that Dina or her mom would have

24    specific knowledge about.  The other art which I

25    have I have other experts that can provide

CHUBB-Altschuler/ROLEX & ART 0000178

092020001456

Page 99

1                        D. ALTSCHULER

2    appraisals.

3          Q    What did Dina Brown tell you her expertise

4    was with respect to that particular art, which is

5    the subject of your claim?

6          A    Again, sir, there's an assumption in there

7    that I had a communication with her about this and

8    as I just testified I wasn't sure if I did or did

9    not.  The information conveyed either to Dina or

10   Dina's mom was what I had.  They weren't intimately

11   familiar with Andy Mouse and other works of art by

12   Haring and Warhol.  Very few galleries have that

13   subject matter expertise.

14         Q    Now, did Dina Brown charge you for the

15   appraisal?

16         A    I don't believe so.  I think the mom said,

17   please -- you know, again, this is my recollection

18   that I offered to pay and I think the mom said,

19   Please, come to us if and when you ever want to buy

20   or sell and give us your business." and I said, "Of

21   course.  You have been very kind."

22         Q    And did you ever go to them to buy and

23   sell after this appraisal was done?

24         A    I did not visit them in person.

25         Q    Did you ever buy or sell anything through

CHUBB-Altschuler/ROLEX & ART 0000179

092020001456

Page 100

D. ALTSCHULER

them after this appraisal was done?

    A    I did not.

    Q    But you have sold other artworks since the appraisal was done, is that correct, sir?

    A    I don't understand your question.  Have I sold other art other than with these two people?

    Q    Yes.  Subsequent to the appraisal.

    A    Subsequent to the time this piece was appraised have I sold other art?

    Q    Yes.

    A    Yes, I have.

    Q    But you elected not to go to Dina Brown or her mother for that purpose.

    A    The type of art that I sold was not something that they dealt in and different artists deal in different types of art but if there was a piece of art that I wanted to buy or sell if they were connected with and I told them to be on the look out for a particular piece for me, I absolutely would go to them and do business with them.

    MR. RUBIN:  Can we go to Exhibit B, please.  Put that on the screen.

    Q    All of the information that's set forth on the response to Chubb request for information was

Page 101

D. ALTSCHULER

1

2    provided by you, is that correct, Mr. Altschuler?

3         A    That is correct.

4         Q    And are all of the responses that you

5    provided accurate?

6              MR. STRINGER:  Let me say that those

7    responses were based on the information available to

8    Mr. Altschuler at the time.  Certainly his testimony

9    today should be the testimony that Chubb relies upon

10   in terms of its investigation of the claim.  So he's

11   going to stand behind his testimony given today

12   under oath.  This was prepared by his counsel,

13   again, based on information that was available at

14   the time.  This is not a sworn statement.  It's not

15   a verified statement by Mr. Altschuler.  It was just

16   my attempt to try and respond to the request on his

17   behalf.

18             MR. RUBIN:  Thank you.  I appreciate that.

19        Q    Let's go through it.  Item one, sir,

20   "Proof of ownership of the silkscreens." is the

21   response true?

22        A    So if we're talking about the silkscreens

23   which are the subject of this litigation, this

24   proceeding, those were the ones which I purchased

25   from the B1 Gallery and I came into possession of

CHUBB-Altschuler/ROLEX & ART 0000181

092020001456

1          D. ALTSCHULER

2    that information about six or eight weeks ago.

3          Q    So the response to number one is not

4    accurate; is that correct?

5          A    The response to number one at the time was

6    true and accurate as I learned new facts I have the

7    obligation, which I'm testifying to today, to bring

8    you up-to-date and testify truthfully.

9          Q    But you never amended the Responses prior

10   to today is your testimony; is that correct?

11         A    I had no understanding --

12         MR. STRINGER:  Wait a second.  He's

13   testifying you under oath today.

14         MR. RUBIN:  We appreciate that but we

15   know exactly what he's doing here today.  What I'm

16   trying to get at is he never, through you or in any

17   other form amended the response to item 1.

18         MR. STRINGER:  I'm not sure he had any

19   obligation to amend the response to number 1.  He's

20   here today to answer questions under oath.

21         THE WITNESS:  That was my belief and

22   understanding and accordingly that was the

23   appropriate answer.

24         Q    What was the basis of your response at

25   that time?

CHUBB-Altschuler/ROLEX & ART 0000182

092020001456

D. ALTSCHULER

1

2       A     That was my understanding.  I've mentioned

3   to you on several occasions, sir, you're asking me

4   to go back multiple decades in time and try to

5   remember very, very, very obscure facts.  At the

6   time that I answered these questions with the

7   assistance of my counsel that was my best

8   recollection.  Since that time I have come into

9   possession of new facts which would amend that

10  response.

11      Q     Well, when did these new facts come into

12  your possession, sir?

13      A     I just mentioned within the last probably

14  four to six weeks.

15      Q     And from what source did these new facts

16  come to your attention?

17      A     A conversation with an individual.

18      Q     Who is this individual?

19      A     Mr. Robert Berman.

20      Q     And what did this discussion -- tell us

21  this discussion with Robert Berman.

22      A     After many months of attempting to locate

23  Mr. Berman and with a lot of instance and help from

24  outside people I was able to locate him and had a

25  conversation with him about my silkscreens.

CHUBB-Altschuler/ROLEX & ART 0000183
092020001456

1        D. ALTSCHULER

2        Q    And tell us the sum and substance of that

3   communication.

4        A    I asked him if he remembered me and we

5   talked for a few minutes and he remembered me

6   purchasing the silkscreens from him, remembered the

7   evening that I came into his gallery, remembered me

8   being a client of his subsequent to that and

9   remembered a telephone call he received about, I

10  don't know, 20 or some odd years ago from someone

11  asking if he had a box of the Andy Mouse silkscreens

12  because they had the silkscreens but did not have

13  the original box and at that point in time it became

14  apparent to me that the silkscreens in question I

15  believed were the silkscreens that I purchase from

16  Mr. Berman.

17       Q    Did he have any records at the time that

18  you had this communication to give you detailed

19  information?

20       A    He was going to look for his records.  His

21  gallery was closed due to COVID and he had, you

22  know, multiple, multiple boxes of records.  He did

23  not know whether he retained any records from 1987,

24  again, from multiple decades ago, sir.

25       Q    Did he indicate that he would provide you

CHUBB-Altschuler/ROLEX & ART 0000184

092020001456

1                          D. ALTSCHULER

2     a receipt or any documentation if he could locate

3     it?

4           A     He did.

5           Q     And you have not heard from him since in

6     that regard?

7           A     I don't understand your question.  I have

8     herd from him multiple times since but he has not

9     been able to locate a receipt from 1987.

10          Q     Was he able to give you any specific

11    information on the silkscreens such as the edition

12    number?

13          A     He didn't recall.

14          Q     Go to question 6 or response 6.  Is the

15    response to 6 true?

16          A     Yes.  That's true.

17          Q     And when it says was based on your

18    description of the silkscreens, again, was that to

19    Dina, the mother or both?

20          A     As I testified, sir, I don't recall.

21          Q     Is the response to number 8 true?

22          A     I'm sorry, number 8?

23          Q     Yes.

24          A     So, sir, I just have a question to your

25    question.  So when you're asking me is it true I

CHUBB-Altschuler/ROLEX & ART 0000185

092020001456

D. ALTSCHULER

1
have at all times to your many inquiries that I've

2
had from Chubb and I think this is the third or

3
fourth, fifth recorded statement and written

4
responses, I have always provided truthful

5
information which at the time that I provided it was

6
based on the facts that I know.  So I'm a little

7
concerned that you're suggesting my answer are not

8
true.

9
        Q    Can I have an answer to my question, sir?

10
        MR. STRINGER:  For-the-record we've

11
already talked through number 8.

12
        THE WITNESS:  Yeah.  We answered this,

13
sir, multiple times.

14
        Q    Is the response to number 8 true?

15
        A    Yes.

16
        Q    And the response to number 9, is that

17
true?

18
        A    Yes.

19
        Q    Now did your parents maintain any

20
insurance on the premises at the time of the loss?

21
        A    I believe they did.

22
        Q    Do you know what type of insurance they

23
maintained?

24
        A    I have no idea.

CHUBB-Altschuler/ROLEX & ART 0000186
092020001456

D. ALTSCHULER

1

2      Q     Do you know who has possession of the

3   policy or information regarding the policy

4   maintained by your parents at the time that the loss

5   occurred on the house?

6      A     I have no idea.

7      Q     Who, if you know, dealt with the insurance

8   coverage for the house?

9      A     My mother.

10      Q     How about after her death?

11      A     I have no idea.

12      Q     Go to response 13.  It says "Records

13   reflecting all communications with local Arizona

14   police with respect to the theft of the

15   silkscreens." and it says, "Response:  See

16   attached." but there was nothing attached other than

17   the Dina Brown --

18            MR. STRINGER:  You know, Charles,

19   Mr. Altschuler testified earlier that he sent the

20   communications to Fred White earlier in the year so

21   Chubb has the communications that Mr. Altschuler

22   had.

23      Q     I don't know what communications are

24   referred to in this response.  I'm trying to find

25   out if there are responses because I'm unaware of

CHUBB-Altschuler/ROLEX & ART 0000187

092020001456

1           D. ALTSCHULER

2    them.

3           MR. STRINGER:  Douglas, you can confirm

4    this, it's my understanding that the communications

5    referred to here were provided to Mr. White earlier

6    in the year by Mr. Altschuler.  Is that right,

7    Douglas?

8           THE WITNESS:  That is correct.

9      Q    Well, what does "see attached" mean?

10   That's what I'm trying find out.

11          MR. STRINGER:  I'm not under oath.  I'm

12   the one who prepared this.  You want to ask me

13   questions under oath?  I prepared this.

14          MR. RUBIN:  I'm asking Mr. Altschuler.

15   I'm not asking you.  He provided the responses to

16   you.

17          MR. STRINGER:  I was the one that wrote

18   the words, "see attached" in response to 13.  And

19   it's referring to the communications that

20   Mr. Altschuler had previously provided to Mr. White.

21   And to the extent we had these communications,

22   Charles, they have been provided to my

23   understanding.

24     Q    Did other family members, to your

25   knowledge, have any valuable property in the

CHUBB-Altschuler/ROLEX & ART 0000188

092020001456

D. ALTSCHULER

2    premises at the time of the loss?

3        A    I believe my brother may have had some art

4    there.  I don't know.

5        Q    Do you know whether any of your family

6    members have made any claims to any insurance

7    company on account of lost items?

8        A    I have absolutely no idea.

9            MR. RUBIN:  You can take that off the

10   screen.  Could we put on 9, please.

11       Q    Do you see that document, sir,

12   Mr. Altschuler?

13               (Sworn Proof of Loss was

14               introduced as Exhibit I.)

15       A    Yes, I do.

16       Q    Do you recall completing this document,

17   the Sworn Proof of Loss?

18       A    I don't but my signature is on it.  I

19   assume that I did.

20       Q    Is your wife's signature also on this

21   document?

22       A    I don't see any signatures.

23           MR. RUBIN:  Keep scrolling down, please.

24       A    Yes.

25       Q    Did you sign this document at the same

CHUBB-Altschuler/ROLEX & ART 0000189

092020001456

1                    D. ALTSCHULER

2      time as your wife or at different times?

3           A    At the same time.

4           Q    Now, on item 1 --

5                MR. RUBIN:  Go back to page one.  And

6      let's mark this as the next exhibit, Company Exhibit

7      I.  I think we're up to I.

8           Q    It says time and origin approximately the

9      18th or 19th day of December.  I'm just trying to

10     get clarification because we had several different

11     dates.  Is that your understand as to the date when

12     the loss occurred?

13          A    I have absolutely no idea.

14          Q    Question or number 2, is that response to

15     that true?

16          A    Yes.  I mean, it was either owned by, you

17     know, my wife or an LLC or something but it was

18     nobody else had any interest in this.

19          Q    This is referring to the fine art that is

20     the silkscreen that's the subject of your claim.

21     I'm a little confused.

22          A    Yes, but at some point I think the

23     personal interest may have been transferred to an

24     LLC.  We notified our broker and Chubb of this so

25     whether it was before or after the transfer to an

CHUBB-Altschuler/ROLEX & ART 0000190

092020001456

D. ALTSCHULER

1

2  LLC, I just want to have an accurate testimony that

3  it was either me, my wife, could have been my wife

4  or our family LLC that had title to this or LLC is

5  an additional named insured on the policy.

6      Q    And this would be referring to the

7  silkscreens which were added to the policy pursuant

8  to the amend value that we previously discussed on

9  the Confirmation of Insurance change?

10     A    That is correct.

11     Q    And the 1.5 million came from the

12 appraisal of Dina Brown; is that correct?

13     A    Yes.

14     Q    Did your wife have any communications with

15 Dina Brown or Elaine relative to the fine arts?

16     A    No.

17          MR. RUBIN:  We can take this off the

18 screen.  I need five minutes, guys and gals.

19          (A break was taken.)

20     Q    By the way, did you ever tell Dina Brown

21 or Elaine that you had a prior appraisal for the

22 silkscreens which are the subject of the claim?

23     A    Yes.

24     Q    And did you show them the appraisal?

25     A    No.  I told them what it was.

CHUBB-Altschuler/ROLEX & ART 0000191

092020001456

Page 112

D. ALTSCHULER

1

2   Q    Have you filed your 2019 U.S. Income Tax

3   return as of yet?

4   A    I believe, I think it was filed last week.

5   Q    Would you be kind enough to provide a copy

6   to us as we requested from the beginning.

7   A    It was just filed, sir.  I don't know

8   whether it was or not.  I signed a bunch of things

9   I'll see if that was one of things that was filed.

10   Q    But you will provide your 2019 tax return

11   to us, is that correct, sir?

12   A    Under the confidentiality agreement, yes.

13   Q    It's all there, yes, sir.  Did you have a

14   checking account as of the date of the loss of the

15   silkscreens?

16   A    I did not.

17   Q    Did you have a savings account at the time

18   of loss of the silkscreens?

19   A    I did not.

20   Q    Did you have any credit cards at the time

21   of loss of the silkscreens?

22   A    Yes, I did.

23   Q    What credit cards did you have?

24   A    Visa, Mastercard, I'm not sure which one,

25   and an American Express.

CHUBB-Altschuler/ROLEX & ART 0000192
092020001456

Page 113

D. ALTSCHULER

2    Q    That's it?  Two?

3    A    Correct.

4    Q    We have asked for copies of the credit

5    card and other debt statements as of the date of the

6    loss.  Can we have those, sir?

7    A    No.

8    Q    Is there a reason that you're refusing to

9    provide that?  You have a confidentiality agreement.

10    A    I will let my attorney argue it.  I'm

11    certain it will be argued in front of a judge.

12    That's a tremendous invasion of privacy.  It has no

13    relevance to what we're trying to determine here.

14    It wasn't a prerequisite.  Chubb didn't tell me I

15    would have to provide my credit card statements at

16    the time that they insured me.  If they had I

17    wouldn't have gotten insurance with them.  So you're

18    not getting those.  We'll argue it in front of a

19    judge and If a judge asks me to turn it over I will

20    follow the order of the Court.

21    Q    We're not in a litigation and as I also

22    said before we believe all records that have been

23    requested are relevant to the investigation of the

24    claim.  So the bottom line is you refuse to provide

25    the credit card statements as of the date of the

Page 114

D. ALTSCHULER

1

2    loss; correct?

3        A    That is correct.

4        Q    How much credit card debt did you have as

5    of the date of the loss?

6        A    I have no idea but if you give me a minute

7    I can tell you.  Do you want me to check?

8        Q    I asked the question if you can give me

9    the answer, fine.

10        A    Hold on.  I just need to go to a different

11    screen here.  What are you defining the date of

12    loss?

13        Q    Let's go for December of 2019.

14        A    December of 2019, I will see if I have it.

15    I only can go back to March but I can reasonably

16    easily let you know what my AMEX statement was then

17    and I have a general idea what my Visa card

18    statement is because it's always about the same.

19        Q    Well, can you give us an approximation of

20    your credit card debt as of the date of the loss?

21        A    Yes.  I think I have a running balance

22    which I try to keep exactly 30,000 on my Visa or

23    Master Card, whatever it is.  If it goes down a

24    little bit I try to spend a little more.  If it goes

25    up I pay it down.  I try to keep it that monthly at

CHUBB-Altschuler/ROLEX & ART 0000194
092020001456

Page 115

D. ALTSCHULER

30,000 and my AMEX for December, you know, I was
traveling.  I don't know but probably in the 60,000-
70,000 range.  Again, I'm happy to give you the
exact number.

Q    When your credit card statements come in
each month did you pay them in full or pay in
installment?

A    AMEX gets paid in full every month.

Q    How about the other credit card?

A    No.  As I mentioned I intentionally
maintain that balance.  Each month I try to keep it
almost exactly between 30- 35,000 every month.

MR. RUBIN:  Could we put on the screen the
Net Worth Calculator, item 11.

(Net Worth Calculator was

introduced as Exhibit J.)

Q    Now, on this document that your attorney
was kind enough to provide to us, and we'll mark
this as the next exhibit, it indicates credit card
debt of $425,336.

A    What was the date of this?

Q    Well, the document says July 22, 2020.  I
don't know the date because you have refused to give
us the actual statements.  Is that a correct sum,

CHUBB-Altschuler/ROLEX & ART 0000195

092020001456

1                      D. ALTSCHULER

2    sir?

3          A    As of that date?

4          Q    Yes, sir.

5          A    Yeah.  That was correct as of that date.

6          Q    And how about going back to the date of

7    loss, December of 2019, you're going to give us the

8    exact number at that time?

9          A    Yeah.  Yeah.  I can give you the exact

10   number.  I mean, I'm happy to do it during this

11   deposition or just leave a blank and we'll give it

12   to you.  Like I said, I know December I usually

13   travel and buy Christmas gifts or whatever so

14   probably in the 70 or 80,000 range for AMEX and as I

15   mentioned 30 to 35,000 on my other card, which I try

16   to maintain.

17         Q    Again, it's Chubb's position that the

18   actual statements is what they want to see, so I

19   just want to make that clear.

20         A    You have made it clear.

21         Q    Thank you, sir.  Let's going to assets.

22   It says "home" what home is referred to there?

23         A    I didn't prepare this but, let's see, I

24   think that home would be probably the New York

25   condo.

                            D. ALTSCHULER

1

2      Q    Where did the value of 2.6 million come

3  from?  Who determined that?

4      A    An appraiser.

5      Q    What's the name of the appraiser?

6      A    I have no idea, the Wells Fargo appraiser.

7      Q    Is that in terms of a mortgage?

8      A    A refinancing.

9      Q    When did you refinance, sir?

10     A    Sometime before the end of the year I

11  think.

12     Q    Okay.  At the end of which year, just so

13  we're clear?

14     A    2019.

15     Q    Now, did you own any other real estate

16  other than the condo in New York at 26?

17     A    I believe the LLC owns the property that

18  we currently reside in, the Talmage Lane.

19     Q    Is there a reason that you did not include

20  that in the value of homes, of assets?

21     A    Again, I did not prepare this so -- I

22  think it's right here, "real estate other than home"

23  or maybe this number down here 3.1 is the New York

24  place and the other is Talmage Lane.  There's two

25  properties, one is 31 and the other is 26.

Page 118

D. ALTSCHULER

2   Q    And the mortgage loan referred to on the
3   right-hand side is that for the condo?

4   A    Let's see.  That is for -- trying to
5   think.  I think that's for Talmage Lane.

6   Q    How much is the mortgage on the condo?

7   A    You know, I would have to check.  If you
8   want to leave a blank I will fill it in.  I think
9   it's around the similar number.  Maybe a couple of
10  hundred thousand more or less, right in that
11  ballpark.

12  Q    Well, I wanted to get testimony today as
13  opposed to fill ins.  You mentioned that you --

14  A    It's pretty -- if you want I will give a
15  high number so it's favorable to you and your
16  client.

17  Q    I want an accurate number.  I don't want a
18  high or low.

19  A    I'm telling you I don't know what my
20  mortgage is.  It's somewhere between I would say 1.9
21  and 2, maybe 2.1.

22  Q    And that's for the condo?

23  A    Correct.

24  Q    And when you refinanced, sir, did you
25  refinance for the same amount of the prior mortgage

D. ALTSCHULER

2    or did you refinance it for a higher amount?

3        A    I refinanced it for a lower amount.

4        Q    Did you refinance at any time the real

5    estate other than home, the 3.1 million?

6        A    Both the Talmage Lane and the city

7    property were both refinanced before the end of the

8    year.

9        Q    Were they refinanced both for a lower

10   amount than the prior mortgage or not?

11       A    I believe so.

12       Q    We would like to know what they were

13   refinanced for.  Now, where did the value of 3.1

14   million come from?

15       A    Appraisal from Wells Fargo.

16       Q    Do you have that appraisal?

17       A    I do not.

18       Q    Do you have access to getting that

19   appraisal?

20       A    I do not.

21       Q    They didn't provide you with a copy of the

22   appraisal at the time that you refinanced?

23       A    I have absolutely no idea.  I get reams of

24   paper from them in this process and it goes directly

25   from the mailbox into the garbage.  I never look.

CHUBB-Altschuler/ROLEX & ART 0000199

092020001456

D. ALTSCHULER

2    It's not anything that I care about.

3        Q    Were you earning income during 2019?

4        A    Was I earning income?

5        Q    Yes.

6        A    I was not.

7        Q    Now, in the net worth calculator it

8    indicates jewelery, where did that sum come from?

9        A    Came from appraisals and recent purchases

10   of jewelry.

11       Q    Do you have these appraisals?

12       A    I don't but I can get them.  I have the

13   invoices.

14       Q    We would appreciate that.

15       A    Mm-hmm.

16       Q    The artwork, where did that sum come from?

17       A    That came from appraisals of the artwork.

18       Q    Which appraisals are you referring to,

19   sir, current, old, combined?

20       A    The appraisals which have been provided to

21   your clients.

22       Q    Are you referring to the ones that have

23   been marked as exhibits today?

24       A    Correct.

25       Q    Any additional appraisals that we're not

D. ALTSCHULER

1

2      aware of?

3          A     Not that I know of.

4          Q     Furniture, antiques, 6 million, where did

5      that sum come from?

6          A     An appraisal.

7          Q     Did somebody appraise all of your

8      furniture and antiques?

9          A     They did a number of years ago, not

10     recently.

11         Q     Do you still have that appraisal?

12         A     I can look.

13         Q     We request that you provide it.

14               Now is it checking account 60,000.  Whose

15     checking account was what?

16         A     Probably was Zoe's checking account.  I'm

17     not sure.

18         Q     Is there a reason, sir, that you don't

19     have a checking account or a savings account?

20         A     There is a reason, yes.

21         Q     And what is that reason?

22         A     That involves communications between our

23     family attorney and myself is how they set things up

24     so, you know, I can't go into all those details

25     because those are privileged.  We have a family

CHUBB-Altschuler/ROLEX & ART 0000201

092020001456

Page 122

1                    D. ALTSCHULER

2    checking account, which you have been provided

3    information on.

4        Q    Which family checking account are you

5    referring to that we have been provided information

6    on?

7        A    The Schwab account.

8        Q    You have this net worth calculator,

9    $18,863,414.  Is that investment property that is in

10   your name, that is yours or somebody elses?

11       A    Those are in trusts.

12            MR. RUBIN:  Could we put up Exhibit 13.

13            (Schwab account-Zoe Werner was

14            introduced as Exhibit K.)

15       Q    Could you tell us, sir, what is this

16   account.  Who is this for?

17       A    It is for my wife, Zoe.

18       Q    Is it a trust account?

19       A    I believe it is.  I think that's what TTEE

20   stands for.

21       Q    Therefore, this is not something for which

22   you have access to, is that correct, you personally?

23       A    No.  That's not correct.

24       Q    Then how do you have access to this if

25   it's a trust for Zoe?

CHUBB-Altschuler/ROLEX & ART 0000202

092020001456

1                  D. ALTSCHULER

2        A    Well, Zoe's money is my money and my money

3   is Zoe's money and somewhat fungible.  The

4   particular legal entity in which the money is held

5   is for particular reasons based on advice we

6   received from our family attorney.

7        Q    Okay.  And therefore the basis of your

8   access to this money would be through your wife; is

9   that correct?

10       A    That is correct.

11            MR. RUBIN:  Could we mark this as the next

12  exit, please.

13            CONCIERGE:  Yes, Exhibit K.

14       Q    And the amount in this account, just

15  for-the-record, as of the indicated date would be

16  $212,816.55, is that correct, sir?

17       A    Whatever it says.  I have, sir, absolutely

18  no idea how much is in that account.  I couldn't

19  tell you.  If you're reading that number from the

20  account then I would agree that's the number.  I

21  have no way of independently verifying that now.

22       Q    I will represent to you I'm reading it

23  from page three.  And you will accept that as

24  accurate?

25       A    Sure.

CHUBB-Altschuler/ROLEX & ART 0000203
092020001456

Page 124

1                    D. ALTSCHULER

2              MR. RUBIN:  Let's go to Exhibit 14.  Take

3    this one off and put 14 on.

4              (Schwab-Zoe Werner was

5              introduced as Exhibit L.)

6         Q    And is this another trust account for the

7    benefit of Zoe?

8         A    Yes.  That is correct.

9         Q    And your personal access to any money in

10   that account would be if Zoe elected to give to you

11   funds; is that correct?

12        A    That is correct.

13        Q    And reading from page three the indicated

14   ending balance as of December 1 through 31, 2019 is

15   400,056.32.  Would you accept that as accurate?

16        A    If that's what you're reading, yes.

17             MR. RUBIN:  Did we mark that as the next

18   exhibit?

19             CONCIERGE:  That will be L.

20             MR. RUBIN:  Could we go to 15, please.

21             (Schwab-Zoe Werner was

22             introduced as Exhibit L.)

23        Q    This account, is this a Seth IRA for the

24   benefit of Zoe Werner?

25        A    Yes.

CHUBB-Altschuler/ROLEX & ART 0000204

092020001456

Page 125

D. ALTSCHULER

1
 

2    Q   And therefore you do not have any direct

3  access to this account, is that correct, sir?

4    A   Correct.

5       MR. RUBIN:  Can we go to 16, please.

6       (Schwab-Zoe Werner was

7       introduced as Exhibit M.)

8    Q   For whose benefit is this particular

9  account, sir?

10    A   I'm trying to look at it.  For my son.

11    Q   Is this a trust account, sir?

12    A   It's a custodial account.

13    Q   Do you have any access to the funds in

14  this account or is it solely for the benefit of your

15  son at some appropriate date?

16    A   I have access to the funds in that account

17  through Zoe.

18    Q   And looking at page three it looks like

19  the ending balance as of December 1 through 31, 2019

20  is 254,714.52.  Do you accept that as true?

21    A   Correct.

22    Q   Sir, what is the Gerald and Phyllis

23  Altschuler Trust?

24    A   It's a trust my parents established.

25    Q   And is that referred to by the Corbin

CHUBB-Altschuler/ROLEX & ART 0000205

092020001456

Page 126

1                           D. ALTSCHULER

2      Holdings or something else?

3            A     Two separate entities.

4            Q     Okay.  Because I didn't see any documents

5      on the Gerald and Phyllis Altschuler Trust.  Do you

6      know how much was in the trust as of the date of the

7      loss?

8            A     I don't.  It was in the low millions I

9      think.

10           Q     Do you have a document that you could

11     provide to us to show us the amount because

12     apparently it was within the total here.  I could be

13     wrong.

14           A     I don't have it.  I have a general

15     understanding of what it was but I don't have a

16     precise number.

17           Q     Is it still in existence?

18           A     It is.

19           Q     And do you receive money on account of

20     that trust?

21           A     I will, yes.

22           Q     And have you been receiving money on

23     account of that trust previously?

24           A     Previously I have.

25           Q     And is that something that you would

1          D. ALTSCHULER

2    receive on a monthly basis?

3          A    As needed.

4          Q    Are there other beneficiaries of that

5    trust that would share with you equally?

6          A    I don't know if they were shared equally

7    but they shared in, they shared.

8          Q    And would there be seven other people or a

9    different number?

10         A    Seven.

11         Q    And how would they share, if not equally?

12         A    Prior to my mom and dad passing away money

13   was distributed at the discretion of my mother and

14   father.  Now that my mother and father have deceased

15   the distribution will be 1/7th each, as Janet has

16   told you.

17         Q    Have you been receiving approximately

18   1/7th of $2,000 a month on account of that trust?

19         A    No.

20         Q    What have you received in the last year

21   and a half on account of that trust, if anything?

22         A    I can't give you the exact numbers.  A

23   couple of hundred thousands, something in that

24   range.

25              MR. RUBIN:  Now let's go to item 15 and

CHUBB-Altschuler/ROLEX & ART 0000207

092020001456

D. ALTSCHULER

1

2   put it on the screen, please.

3              (Schwab-Corbin Holdings was

4              introduced as Exhibit O.)

5        Q    Now, what is this Corbin Holdings, sir?

6        A    I guess I don't understand your question.

7   What is Corbin Holdings?

8        Q    Is this a company or an LLC that you have

9   an interest in?

10       A    It is an LLC.

11       Q    And do you have an interest in that LLC?

12       A    I do not.

13       Q    Who does?

14       A    Zoe does.

15       Q    Do you have access to the funds that are

16   in this account?

17       A    Through Zoe.

18       Q    Only if she elected to give you something

19   from this account; is that correct?

20       A    Correct.

21            MR. RUBIN:  Could we mark this as the next

22   exhibit.

23            CONCIERGE:  This will be O.

24       Q    And referring to page three of this

25   document it says ending balance as of December 1

Page 129

1                        D. ALTSCHULER

2    through 31, 2019 it says 233,965.49.  Is that

3    correct, sir?

4        A    Like my previous testimony I don't know.

5    Whatever number you're reading I assume you're

6    reading it correctly and that seems accurate.

7            MR. RUBIN:  Let's go to Exhibit 18.  Can

8    we mark this is the next exhibit.

9            (Schwab-NuPulseCV was

10           introduced as Exhibit P.)

11       Q    We talked very, very briefly about NUPulse

12   in the beginning.  Is this basically a venture

13   capital situation, sir?

14       A    I don't understand your question.

15       Q    Are you a stockholder of NuPulseCV Inc?

16       A    I am not.

17       Q    Do you know who the stockholders are?

18       A    You asked me that question, sir.  I do not

19   know who all the stockholder are.  I know a couple

20   of stockholders.

21       Q    Do you have access to the funds in this

22   account?

23       A    I don't have access directly.  My interest

24   is owned through a trust.

25       Q    What trust is that, sir?

Page 130

D. ALTSCHULER

1

2       A     I don't know the name of it.  I think the

3   Douglas H. Altschuler GST Trust for the benefit of

4   ███████ Altschuler, I think, or just maybe the Douglas

5   H. Altschuler GST Trust.

6       Q     Is that with Charles Schwab as well?

7       A     I don't know.

8       Q     We call for the production of that trust

9   agreement and the statement for that trust.

10      A     There's no statement.  We can -- I can see

11  if we can get the trust agreement for you but

12  there's no statement.

13      Q     What was your interest, dollar wise, in

14  NuPulse as of the date of this statement, December 1

15  to 31, 2019?

16      A     This statement was prepared by our family

17  CFO.  It was based on the ownership my trust had in

18  NuPulseCV stock.  That ownership was matched to the

19  most recent valuation of NuPulse.  There were a

20  couple valuations and I asked the family CFO to take

21  the lower of the two valuations to be more

22  conservative in the value of the NuPulseCV and

23  that's how the number was arrived at.

24      Q     Well, I'm looking at the statement and it

25  says ending balance as of December 1 to 31, 2019

D. ALTSCHULER

1

2    $11,129,984.43.  Sound about right?

3        A    At that time, yes.

4        Q    And what is your dollar interest in that

5    amount?

6        A    I would have to find out what percent my

7    trust owns of NuPulseCV hypothetically and we do not

8    accept these numbers.  I'm just giving it to you as

9    an illustration that if I own 10% of the company it

10   was $10 million and there my interest would be worth

11   $1 million.

12       Q    I appreciate that.  We're trying to find

13   out what was your percentage of that company.

14       A    I've indicated I don't know offhand.  I

15   think it was somewhere between 10 and 15%.

16       Q    Did you put on your net worth statement

17   your interest or the full interest of the account as

18   of the date, July 22, 2020?

19       A    I don't understand your question.

20       Q    Well, you have knowledged that you have

21   only a certain percentage of that corporation;

22   correct?

23       A    There is a corporation incorporated in the

24   state of Delaware called NuPulseCV.  That company

25   holds multiple assets.  One of the assets it holds

CHUBB-Altschuler/ROLEX & ART 0000211

092020001456

1                      D. ALTSCHULER

2    is that account at Schwab.  There are numerous other

3    assets.  I have an interest through a trust in

4    NuPulseCV and that's what's on the financial

5    statement.

6        Q     Would you agree that your interest would

7    be less than what's shown on this statement?

8        A     What are you asking me?

9        Q     Would you agree that your dollar interest

10   in NuPulse is less than the amount that's shown as

11   the ending balance on this statement?

12       THE WITNESS:  Anthony, do you understand

13   what he's asking?

14       MR. STRINGER:  He's referring to the net

15   worth statements and maybe if you can direct him,

16   Charles to what you're refer together in the

17   statement.

18       A     Are you asking me is the net worth

19   statement accurate?

20       Q     No.  Your interest in NuPulseCV, I'm

21   trying to find out your dollar interest, the value

22   of your interest as of the date of the loss, whether

23   it be through trust or anything else?

24       A     Let me explain it, again.

25       Q     You don't have to explain it again.  I'm

CHUBB-Altschuler/ROLEX & ART 0000212

092020001456

1                         D. ALTSCHULER

2      just looking for a dollar amount.

3           A    I don't know what the dollar number is,

4      sir.  I had somebody prepare this and I was giving

5      you the metrics under which it was prepared.

6           Q    Well, was the total amount that's set

7      forth as the ending balance on NuPulseCV included in

8      the total of that 18,863,414?

9           A    I can only explain it as follows:  I own

10     through a trust a certain percent of NuPulse.

11     NuPulse, as I just mentioned, has many assets, one

12     of those is the account, part of the value of what I

13     own is reflected in the account, part of the value

14     is reflected in the value of the company, as the

15     company was recently valued in the last six or nine

16     months, whenever the most recent 409-A valuation of

17     the company was performed.

18          Q    So you can't give me an answer to the

19     question as posed?

20          A    I don't understand your question.  I have

21     answered to the best of my recollection three

22     different ways.  So if you suggest I'm not answering

23     your question I think it's disingenuous and quite

24     unfair, sir.

25          Q    I'm trying to work off the documents that

CHUBB-Altschuler/ROLEX & ART 0000213

092020001456

Page 134

                    D. ALTSCHULER

1

2    your counsel and you have been kind enough to give

3    me to get clarification.

4            MR. RUBIN:  Did we mark this statement as

5    an exhibit yet.

6            CONCIERGE:  This will be P as in Paul.

7        Q    Does NuPulse pulse have any debt, sir?

8        A    I am certain it does, yes.

9        Q    Do you know how much the debt was as of

10   the date of the silkscreen claim?

11       A    Does it have any debt?  I don't believe it

12   has any -- you know, that's a good question.  I have

13   to ask corporate counsel for NuPulse.  It's

14   possible.  I think there are a couple of notes

15   outstanding.

16       Q    Do you know the number the dollar value of

17   those notes?

18       A    I don't.  It's de minimis.

19       Q    Can you agree to provide that number to us

20   or documents confirming what it was as of the date

21   of the loss?

22       A    Yes.  I will also provide you with the

23   value of the company, the 409-A valuation of the

24   company.

25       Q    Looking at this statement it appears that

CHUBB-Altschuler/ROLEX & ART 0000214

092020001456

D. ALTSCHULER

2  everything seems to be invested in U.S. T bills, is

3  that correct, sir?

4       A    That is correct.

5       Q    Who made that determination?

6       A    I did.

7       Q    Did anyone else assist in that

8  determination?

9       A    No.

10           MR. RUBIN:  Let's go to item 12, please.

11           (2018 Tax Return was

12           introduced as Exhibit Q.)

13           MR. RUBIN:  Can we go to page two.

14       Q    The tax return for 2018 indicates wages,

15  salary, tips, item one, 276,598.  Was that for you

16  or was that for your wife?

17       A    I'm sure it was for my wife.

18       Q    Did you have any income either directly or

19  through one of your trust or accounts on this tax

20  return?

21       A    I don't know, sir.  I had no participation

22  in it and when it comes time to sign it I have the

23  family CFO send a signature page and I rely on her

24  but I do not believe so.

25       Q    There's an indication on this tax return,

Page 136

1           D. ALTSCHULER

2    Schedule One, business income $790,976.  Is that

3    business income attributed to any business that you

4    have or your wife?

5           A     It's my wife's business income.

6           Q     Okay.  So what about real estate

7    royalties, is that for your wife as well?

8           A     I believe that's for the LLC.

9           MR. RUBIN:  Can we mark the tax return as

10   the next exhibit.

11          CONCIERGE:  Yes.  That will be Q.

12          MR. RUBIN:  Put on the screen number 19.

13          (Family Settlement Trust was

14          introduced as Exhibit R.)

15          MR. RUBIN:  Could we go to page six.

16          Q     By the way, sir, are you familiar with

17   this document, "Family Settlement Agreement"?

18          A     I am.

19          Q     This one is not dated but are you a

20   signatory to this document?

21          A     At some point I signed some version of it.

22          Q     Do you know whether, and it may take a few

23   moments to take a scan through, this is a copy of

24   the Family Settlement Agreement that you signed?

25          A     I have no idea.  As with all these things

Page 137

D. ALTSCHULER

1  
2  I have an attorney sent me the signature page and I
3  sign it.
4      Q    Well, it says on this document, "Money
5  owed by Douglas to Eric.  Douglas hereby
6  acknowledges and agrees that he owes Eric a debt of
7  $100,000."  Did you ow Eric, your brother, a debt of
8  $100,000?
9      A    I have no recollection of owing it to him
10 but my attorney advised me just to pay him.  It was
11 just to get this thing resolved.  He somehow thinks
12 I did.  I have no recollection of it.  So in an
13 attempt just to resolve this I paid it but he
14 actually claimed I owed him 200 and I paid him 100
15 and I said I have no recollection of every owing you
16 money.  It was just an attempt to settle the estate.
17     Q    Okay.  And therefore that part of the
18 document that's before us is something that you
19 agreed that you owed your brother $100,000 and you
20 agreed to pay him?
21     A    No.  What I agreed was to pay him $100,000
22 to get this settled and if he wants to characterize
23 it as money owed to him or a debt so be it.
24     Q    Well, the document says, "Douglas hereby
25 acknowledges and agrees he owes Eric a debt of

CHUBB-Altschuler/ROLEX & ART 0000217

092020001456

D. ALTSCHULER

2  $100,000."

3        A    Yes.

4        Q    Did you agree to that when you sign the

5  final version if this is not the final version?

6        A    I agreed to it.  I think subsequently it

7  was discovered he actually owed me some money but we

8  netted it out, but yes.

9        Q    Is there any other document, sir, that

10 reflects this netting it out or an amendment to this

11 document?

12       A    There is a final document somewhere, yes.

13       Q    We request production of that final

14 document so that we can determine what the debt is

15 and the offset.

16       A    Okay.

17            MR. RUBIN:  And could we mark this Family

18 Settlement Agreement as the next exhibit, Exhibit R.

19 Could you go to page five.  Could you scroll down a

20 little bit more.

21       Q    Do you see a reference to a Rolex there,

22 sir?

23       A    I do.

24       Q    I'm not trying to jump the gun into the

25 other claim but is that the Rolex that's the subject

Page 139

                        D. ALTSCHULER

1

2    of your claim to Chubb?

3         A    It is.

4         Q    And did you own that Rolex at the time

5    this document was executed?

6         A    I did.

7              MR. RUBIN:  Can we go to page two of

8    Exhibit A.

9              MR. STRINGER:  I have to ask where did you

10   obtain these documents because quite frankly this

11   area is very deeply personal to Mr. Altschuler and

12   his family members and it relates the settlement of

13   an estate, a family estate, so I'm not sure why

14   we're getting into this area.  We surely did not

15   provide these documents to Chubb and the fact that

16   Mr. Altschuler has to sit here and field questions

17   regarding how his family estate was settled we think

18   we're getting into an area that's very a private

19   area and quite frankly not relevant to the claim.

20             MR. RUBIN:  We disagree.

21             THE WITNESS:  So I'm wearing out.

22             MR. STRINGER:  Where did you get the

23   documents?

24             THE WITNESS:  He got them from my sister

25   I'm wearing out.  If you have claims about the

D. ALTSCHULER

1
2   silkscreens or claims about the watch, sir, I'm
3   ready, willing and able to answer them.  I am in
4   very, very poor health and if you would like me to
5   answer questions about the claim I'm ready otherwise
6   we're going to have a bring this to an end because
7   I'm wearing out.
8              MR. RUBIN:  I will be happy to stop any
9   time you feel that you're not well enough to
10  continue on today.  I appreciate that, sir, and
11  we'll accommodate that.  But we haven't even started
12  the Rolex claim.  I just have one question relating
13  to this document and I request that we go to page
14  two of what is Exhibit A.
15             CONCIERGE:  Is this correct?  This is page
16  two.
17             MR. RUBIN:  It says Exhibit A, Inventory
18  of Trust Assets.
19       Q    Do you see, sir, in this document it says
20  trust property, Rolex.  Is the Rolex owned by the
21  trust or is the Rolex owned by you, sir?
22       A    The Rolex is owned by me.  This is not
23  trust property.
24       Q    Is there a reason to your knowledge, sir,
25  why it is listed as trust property on this document?

D. ALTSCHULER

1

2      A      I suggest you continue your conversations

3  with Janet and her counsel.  They can perhaps

4  explain it.  I have a receipt for the watch.  You

5  have been provided with that receipt.  I have an

6  invoice dated back from 2007 or 2008.

7      Q      You're way beyond the scope of the

8  question.  It has something to do with the trust

9  because it's listed as trust property.  Is it trust

10  property or not trust property?

11      A      I'm going to answer the question again.

12  It is not trust property.  Your question assumes

13  that because somebody wrote the word Rolex and

14  assumed it was trust property that abinitio makes it

15  trust property.  You know that's not the case.  I

16  could sent you a document which says it's not trust

17  property.  You cannot change the character of

18  property by simply writing down the name of the

19  property and calling it trust property.  It was and

20  at all times remains my personal property.

21      Q      Thank you, sir, but without that

22  elaboration we have no way of knowing based on just

23  looking at this document.

24      A      Again, all of this will be sorted out in

25  court.

CHUBB-Altschuler/ROLEX & ART 0000221

092020001456

Page 142

1                      D. ALTSCHULER

2        Q    You keep referring to court, sir.  I'm not

3   in litigation with you, sir, nor is Chubb.  You can

4   do whatever you feel is appropriate at any time you

5   feel it's appropriate.  Right now we're just trying

6   to get the clarification of issues on the claim

7   itself.

8        A    You asked and I answered the question.  It

9   is not trust property nor has it ever been trust

10  property.

11       Q    Thank you, sir.

12       A    That also assumes that Rolex, which is

13  listed there is a referral to the Rolex that's part

14  of this claim.  That's also an incorrect assumption.

15  There are multiple Rolexes, which are part of the

16  estate.

17       Q    Well, I asked you that earlier when we

18  discussed the Rolex that was in there and I thought

19  you said it was but we'll cover that in a different

20  form.

21       A    No, sir.  So this record is becoming

22  muddled.  The Rolex reference before was my Rolex.

23  It's a reference to them taking a look in the house

24  to see if the Rolex was there.  This Rolex we don't

25  know whether it was a reference to that Rolex in the

Page 143

1        D. ALTSCHULER

2    prior paragraph or, sir, whether it's a reference to

3    multiple, multiple Rolexes which are part of the

4    estate.

5        Q    Thank you, sir.  Sir, in the Chartis

6    policy --

7            MR. RUBIN:  You can take this off the

8    screen.

9        Q    In the Chartis policy or AIG policy you

10   had well over 170 items scheduled.  In the Chubb

11   policy you have relatively a much lessor amount.  Is

12   this because the items have been sold since the time

13   of the AIG policy or Chartis policy?

14       A    No.  It's because I chose not to insure

15   the items in my storage facility at that time.  I'm

16   in the process of insuring them now.

17       Q    Were is this storage facility?

18       A    There are two storage facilities.  One

19   located in Delaware and one located in New Jersey.

20       Q    Do you have more specifics on that, the

21   name of the storage facility and addresses?

22       A    I don't.

23       Q    Do you have an inventory of what you have

24   stored in these two storage facilities?

25       A    I do.

D. ALTSCHULER

1

2      Q    We would like the names and addresses of

3  those storage facilities, and if you have an

4  inventory of what you have stored in there that you

5  provide that as well.  Would you be agreeable in

6  doing that?

7      A    I will discuss it with my counsel.

8          MR. STRINGER:  We're going on 3:00.  I

9  need to use the restroom.  Let's take five minutes.

10  Thank you.

11          (A break was taken.)

12          MR. RUBIN:  Could we put back up for just

13  a moment Exhibit R, the Family Settlement Agreement

14  and go to page four.

15      Q    Mr. Altschuler, can you explain to us what

16  is meant by the offset in the subdivision 4C?

17      A    Just an attempt to get the trust settled.

18  It's the offset.  They wanted additional monies from

19  me my wife and we just wanted to avoid litigation.

20  We may or may not avoid it but at the time when we

21  agreed to it it was our understanding that it would

22  get resolved and settled so we wouldn't have to deal

23  with it so we paid them the money.

24          MR. RUBIN:  Can we put on the screen

25  number 20.

CHUBB-Altschuler/ROLEX & ART 0000224

092020001456

Page 145

1              D. ALTSCHULER

2         (USAA statements were

3         introduced as Exhibit S.)

4    Q    Mr. Altschuler, have you seen these

5    documents before?

6    A    Never.

7    Q    Did you know whether your wife had a bank

8    account at USAA federal savings?

9    A    I mean if she sent this to you through our

10   attorney I would assume she did.  I have no idea.

11   Q    Well, the reason I'm trying to cover them

12   now because it covers the date of loss of the

13   silkscreen claim.  So you have no knowledge as to

14   these accounts?  This is something that we have to

15   deal with your wife; is that correct?

16   A    Well, I mean I know she has an account.

17   If it's with USAA -- I'm not sure what you're asking

18   me.  Are you asking me does she have a checking

19   account?

20   Q    You have no knowledge as to how much she

21   has in these accounts other than what she may tell

22   you or what you read from statements; is that

23   correct?

24   A    I've never seen a statement before and

25   she's never told me before.  I couldn't tell you

Page 146

D. ALTSCHULER

1

2    what she has in the accounts.

3              MR. RUBIN:  Can we mark these two

4    statements as the next exhibit, please.

5              CONCIERGE:  S as in Sam.

6         Q    Do you have any additional investments or

7    other accounts that we have not seen or discussed as

8    of today?

9         A    I may have an account.  I would have to

10   check.  I may still have an active account in

11   California at one of the banks with a small amount

12   of money in there.

13        Q    If so we will appreciate if copies any

14   such account statements covering the period when the

15   silkscreen loss occurred.

16             Are you aware of any other debts, sir,

17   other than what we covered so far today?

18        A    Other than what we discussed, two

19   mortgages and a Visa statement, no.

20        Q    Well, and your brother?

21        A    I don't acknowledge that as a debt, but

22   yes.

23        Q    Do you know whether your wife has any

24   debts other than reflected on any mortgage

25   statements?

CHUBB-Altschuler/ROLEX & ART 0000226

092020001456

Page 147

D. ALTSCHULER

1

2      A      I do not believe she owes any money to

3   anyone.

4      Q      Now, have you had any prior claims,

5   Mr. Altschuler?

6      A      What type of claims, sir?

7      Q      Any kind.

8          MR. STRINGER:  You are you referring to

9   insurance claims?

10         MR. RUBIN:  Yes, sir.

11     A      Mr. White spent a considerable amount of

12  time with me reading a number of claims to me, some

13  of which were mine and some of which were not mine

14  and he can provide you with that information.

15     Q      Sir, we need it as sworn testimony so I --

16     A      I can't even remember the stuff he came up

17  with so he can -- you know, you're in touch with him

18  during this deposition and you can ask him for those

19  claims.  I can't remember what they were.

20     Q      As I said I wish I can do it in that form

21  but we need it in the form of sworn testimony.

22     A      You want to ask me about claims I'm happy

23  to answer them.

24     Q      Do you recall a prior claim of October 25,

25  2013 involving a Rolex?

CHUBB-Altschuler/ROLEX & ART 0000227

092020001456

1                    D. ALTSCHULER

2          A    Yes, I do.  As I indicated to Mr. White I

3    can't remember getting paid but, you know, I

4    refreshed my memory and contacted Chubb and they

5    told me both a claim was made and was paid.  Neither

6    my wife or I have any recollection of ever getting

7    paid on that but we take Chubb's word that it was

8    paid.

9          Q    Do you have any recollection of the type

10   of Rolex that was involved?

11         A    It was a stainless steel watch that my

12   wife bought when she moved to New York.

13         Q    Was it your wife's watch?

14         A    It was my wife's watch.

15         Q    Was it a lady's watch or a man's watch?

16         A    It was a man's watch.

17         Q    Do you recall a break in in your apartment

18   at 535 West 23rd Street and a claim submitted to

19   AIG?

20         A    I recall that I was informed of a break

21   in.  I was in Europe at the time.  I was called by

22   the housekeeper who informed me that it was a break

23   in.  I don't know whether I told them to call the

24   police or they called the police and, yes, I recall

25   that.

1          D. ALTSCHULER

2     Q     And did you submit a claim to AIG for

3  which you were paid?

4          THE WITNESS:  Hold on one second.  I think

5  AMEX here.  What was my statement balance at the end

6  of December?  I cannot hear you.  Thank you.  I did

7  want to get that information for you during the

8  deposition.  The balance was $114,00.50.

9     Q     What was the outstanding balance as of

10  December 2019?

11     A     Yes.

12     Q     Going back to prior losses.  Again, on the

13  AIG one the break in, do you have any recollection

14  of getting paid?

15     A     I don't but if I was paid, I mean, I

16  would -- I just don't remember.

17     Q     Do you recall a loss on May 13, 2008 a

18  break in of schedule jewelry and a claim submitted

19  to AIG?

20     A     May 2008 I do not.  Was that the break in

21  for the watches?  If that's the same one, yes,

22  that's what I just testified to.

23     Q     I can't answer that.  That's why I asked.

24     A     Yeah.

25     Q     As of December 2019 were you involved in

CHUBB-Altschuler/ROLEX & ART 0000229

092020001456

Page 150

D. ALTSCHULER

1

2    any lawsuits either as a plaintiff or a defendant?

3        A    No.

4        Q    Are you presently involved in any lawsuit?

5        A    No.

6        Q    You have no lawsuits pending right now

7    against your jeweler?

8        A    No, I do not.

9            MR. RUBIN:  Anthony, we're about at that

10    point and I don't want to start the Rolex and stop

11    in the middle.

12            THE WITNESS:  Why don't we just finish the

13    Rolex.

14            MR. RUBIN:  It's going to take quite a

15    while, sir.

16            THE WITNESS:  Let's get going with it.

17            (A break was taken.)

18            MR. RUBIN:  Could we mark that letter as

19    the next Company exhibit, please.  Should be T.

20            (Deposition Notice-Rolex was

21            introduced as Exhibit T.)

22        Q    Mr. Altschuler, did you and your wife

23    receive this letter at some point in time?

24        A    Yes.

25        Q    Would it be fair to say that you received

1                    D. ALTSCHULER

2     it on or about the date of the letter, July 21,

3     2020?

4          A     Yep.  Yes.

5          Q     Did you discuss the contents of that

6     letter with your wife when it was received?

7          A     I did not.

8          Q     Have you since discussed the contents of

9     this letter with your wife?

10         A     I have not.

11         Q     Does she have any knowledge that you have

12    submitted a claim for a lost Rolex watch?

13         A     She does.

14         Q     And when did she learn that for the first

15    time?

16         A     I do not know.

17         Q     Now, could you tell us, sir, when did you

18    purchase the Rolex watch?

19         A     I don't have the information in front of

20    me.  I provided it to Chubb on several occasions.

21    You have the invoice of when it was originally

22    purchased.  I think 2007- 2008 but it was provided

23    to the first person who examined me.  It was provide

24    to Mr. White and I think provided again to you.  I'm

25    not sure so whatever document you have.

1          D. ALTSCHULER

2          Q      Could you describe for us the Rolex that

3     you claiming with Chubb.

4          A      Can I describe it to you?

5          Q      Yes?

6          A      It's a, I believe, it's a stainless steel

7     sports watch I think but I'm not 100% sure.  It's

8     model 2623 and it has says Rolex on it with the

9     white face.

10         Q      Are you sure it's 6263?

11         A      I'm not.  It could about 6263.  It could

12    be 6265.  I don't know.

13         Q      Is it a mans watch or a ladies watch?

14         A      It is a mans watch.  If I was shown the

15    invoice I could tell you which watch it was.

16         Q      Where did you acquire this watch from?

17         A      A gentleman in Beverly Hills, California

18    who has a company.  I think it's called the Dream

19    Collection or something like that.

20         Q      Do you remember the name of the person who

21    you dealt with?

22         A      Bruno.

23         Q      Do you have a last name for Bruno?

24         A      I do not.

25         Q      And do you know how much you paid for this

Page 153

1                         D. ALTSCHULER

2      watch?

3          A     Whatever the invoice says I believe and

4      I'm guessing 50,000 but the invoice would reflect

5      the amount that I paid.

6                MR. RUBIN:  Can we put on the screen

7      number two from this batch.

8                (Dream Collection invoice was

9                introduced as Exhibit U.)

10         Q     Do you recognize that document, sir?

11         A     I need a moment.  I need to focus my eyes.

12     I do recognize the document, yes.

13         Q     What does it represent, sir?

14         A     An invoice of watches that I purchased

15     from Bruno.

16         Q     And which is the watch that is the subject

17     of your claim with Chubb?

18         A     The one which is the subject of my claim

19     is, let's see, vintage 18 carat gold that was not

20     it, vintage Daytona.  It could be the second one.

21     It is definitely the second watch.

22         Q     The vintage Daytona, the one for 50,000?

23         A     That is correct.

24         Q     And did you, in fact, pay $50,000 for that

25     watch?

Page 154

1                    D. ALTSCHULER

2         A    In fact, I did.

3         Q    Now, I notice that there's a total balance

4    of 184,000.

5         A    Yes.

6         Q    Did you pay for that at one time?

7         A    I'm sorry.  You're asking me if I paid for

8    the watch?

9         Q    At one time, this invoice.

10        A    Yeah.  All of those watches were paid for.

11        Q    Did you pay for this invoice, $184,000 at

12   one time?

13        A    You mean was it a single payment?

14        Q    Yes.

15        A    I believe so.  I have absolutely no

16   memory.  When it this from?

17        Q    March 18, 2008.

18        A    Yeah.  I have no idea.  I would assume

19   that I did.

20        Q    Do you remember if there was any sales tax

21   that you had to pay, because it's not reflected on

22   this document?

23        A    No sales tax.

24        Q    Was there a reason that no sales tax was

25   added to this invoice?

1                    D. ALTSCHULER

2          A      Yeah.   The sale did not occur in the state

3    of California.   The watches were sent out of state.

4          Q      And they were sent to where, sir?

5          A      To New York.

6          Q      To the 535 West 23rd Street address

7    indicated on this invoice?

8          A      Yes.

9          Q      And how did you pay for this invoice?

10         A      I have absolutely no memory.   Typically

11   these guys like wire transfers.   My assumption, but

12   again this is a pure assumption, is that money was

13   wired to them.

14         Q      Did you view the watches at their place of

15   business in California or did you -- how did this

16   transaction come about?

17         A      I viewed them in California, yes.

18         Q      So you went actually to their shop; is

19   that correct?

20         A      Yes.

21         Q      Now, do you sell watches as well, sir?

22         A      Rarely.   Rarely do I sell watches.

23   Recently I sold a number of watches but it's

24   typically not my business to buy and sell watches.

25   These were not bought with the intent of selling

1                          D. ALTSCHULER

2       them.

3                  MR. RUBIN:  Did we mark the Dream

4       Collection invoice?  Is that U?

5                  CONCIERGE:  Correct.  It would be U.

6                  MR. RUBIN:  Could we put on the screen 5.

7       Can we mark that as the next exhibit, please, V.

8                  (Wire transfer was introduced

9                  as Exhibit V.)

10          Q     Your attorney was kind enough to provide

11      this document to us.  Unfortunately it doesn't give

12      us much information.  Do you know what this document

13      represent, sir?

14          A     Wiring information for the Dream

15      Collection.

16          Q     And do you know how much the wire transfer

17      was for?

18          A     I have no independent recollection but

19      looking at the invoice of 184 I would assume that's

20      how much I sent them.

21          Q     Do you have any proof or payment for that

22      invoice that could be provided to us?

23          A     I do not and I don't save my wire

24      transfers.  He would not have sent the watches

25      unless they were paid for.

Page 157

1                    D. ALTSCHULER

2        Q     Now, when you first got this watch, sir,

3   it was shipped to you in New York; correct?

4        A     Yes.

5        Q     And that was in 2008.  Is that also

6   correct?

7        A     Correct.

8        Q     And did the watch stay in New York until

9   the date of loss?

10       A     For the most part it stayed in New York.

11  Occasionally -- I don't wear watches very often but

12  occasionally I do and I wore it occasionally on a

13  few occasions when I traveled.

14       Q     And did you wear it on a trip anywhere or,

15  as indicated, did you take it out of New York at

16  some point in time?

17       A     On multiple occasions I took it out of New

18  York.

19       Q     And when was the last time that you

20  actually saw this watch?

21       A     May 22, 2010.

22       Q     What were the circumstances, sir?

23       A     It was the date of my wedding and my mom

24  brought it to me for my wedding.

25       Q     She had the watch at that point in time?

1                    D. ALTSCHULER

2          A     Yes.

3          Q     When did she get possession of the watch?

4          A     She had possession of it a year or two

5    earlier.  I don't know the exact time.  I was

6    visiting my parents and then I was going to go on a

7    subsequent ski trip and I was sitting in the den

8    with them, with my mom and dad, talking about the

9    trip and I think my dad said something to the effect

10   like don't take it with you, it's going to be

11   stolen, leave it here and we'll keep an eye on it.

12         Q     So did you see the watch again after May

13   22, 2010?

14         A     I did not.

15         Q     Did the watch stay with your parents after

16   May 22, 2010?

17         A     That's my assumption and I have no reason

18   to believe otherwise.

19         Q     You never took possession of the watch

20   again after that date; is that correct?

21         A     That is correct.

22         Q     Did anyone know that you had this watch

23   other than your parents?

24         A     I don't know.  My dad was a watch buff and

25   he liked to wear watches.  Unless he had it on an

CHUBB-Altschuler/ROLEX & ART 0000238

092020001456

D. ALTSCHULER

1

2  someone saw it I don't know.  I left a number of my

3  watches with my dad and he would wear odd and

4  assorted watches over the various years.

5       Q     And where was this watch last?  What

6  location?

7       A     I'm sorry.  I don't understand your

8  question, sir.

9       Q     May 22, 2010 where was the watch left with

10 your parents?  What location?

11      A     I left it with my mom at my wedding in Los

12 Angeles.

13      Q     And to your knowledge did your mother

14 bring the watch back with her someplace?

15      A     She absolutely did.

16      Q     Where did she bring it to, if you know?

17      A     Back to Tucson.

18      Q     And did anyone other than your mother know

19 that she had possession of the watch after May 22,

20 2010?

21      A     My mom, my dad and again I don't know if

22 anybody else knew, if they saw my dad wearing the

23 watch.

24      Q     Did you wear it at the wedding itself?

25      A     I was thinking about that and I don't

CHUBB-Altschuler/ROLEX & ART 0000239

092020001456

Page 160

1                      D. ALTSCHULER

2    remember.  I don't think so.  I don't believe I wore

3    it at the wedding.

4          Q     Do you have any photographs of the watch?

5          A     Not that I know of.  I mean, I don't

6    typically photograph watches.

7          Q     Do you have any photographs of you wearing

8    the watch on some occasion?

9          A     No.  As I mentioned I rarely, rarely wear

10   a watch.

11               MR. RUBIN:  We can take off this exhibit.

12   Thank you.

13         Q     It's my understanding, correct, that you

14   personally never saw the watch again after May 22,

15   2010?

16         A     I have tried to think about that and I

17   don't know whether on my subsequent visits to Tucson

18   my dad was wearing it.  As I said he had a number of

19   my watches and it is possible I saw it on his wrist.

20   I just don't remember.

21         Q     Did the watch stay with your parents at

22   some location since May 22, 2010 until the date you

23   claim the loss occurred?

24         A     Yes.  I assume my mother had it in the

25   house or my dad was wearing it or she had it in her

CHUBB-Altschuler/ROLEX & ART 0000240

092020001456

1      D. ALTSCHULER

2 lockbox.  I asked her to put it in the safety

3 deposit box.  So it was in one of those locations.

4    Q And what, sir, are you claiming is the

5 date of loss for the Rolex?

6    A I don't know what the date of loss is.  I

7 don't know.  I mean my attorney can answer that

8 question.

9    Q Well, do you have a date that you claim

10 that this watch was lost?

11    A During the family discussions through the

12 attorneys I requested the watch from the safety

13 deposit box or where ever it might have been and it

14 was not provided to me but the claim that they

15 didn't have the watch that occurred sometime, I

16 believe, in February so.

17    Q Of what year?

18    A February 2020.

19    Q Because we have -- well, so February of

20 2020 is when somebody told you the watch was not

21 where it was supposed to be, whether it be a safe or

22 vault?

23    A Yes.

24    Q And who is that that told you that?

25    A My attorney.

CHUBB-Altschuler/ROLEX & ART 0000241

092020001456

Page 162

1                    D. ALTSCHULER

2        Q    Anthony or some different attorney?

3        A    A different attorney.

4        Q    The name of that attorney, please.

5        A    Ed Laber, L-a-b-e-r.

6        Q    And tell us how he came to learn that the

7    watch was not where it was supposed to be?

8        A    I don't know if -- I wouldn't characterize

9    it that way.  I would just say that he inquired of

10   the attorney for my brother and sister, please, look

11   for the watch and he was informed by their attorney

12   that they don't have the watch.

13       Q    Did anyone tell you what was done to

14   determine that the watch was missing?

15       A    Nobody told me.

16       Q    Now.  We have a date of loss or either

17   reporting or date of loss of June 19, 2020.

18       A    Yes.

19       Q    What date does that represent to you?

20       A    I believe that was probably the date that

21   we ultimately decided we were going to make a claim.

22       Q    And that was after the discussion that you

23   had with your attorney going back to February of the

24   same year; is that correct?

25       A    That was after the discussion I had with

CHUBB-Altschuler/ROLEX & ART 0000242

092020001456

```
 1                    D. ALTSCHULER
 2    multiple attorneys as to, and my insurance broker,
 3    as to whether I should make a claim.
 4         Q    Was there a reason though that you were
 5    debating on making a claim?
 6         A    Yes, there was.
 7         Q    What was the reason that you were
 8    debating?
 9         A    I had a pending claim which was met with
10    tremendous hostility, refusal to pay, intrusive
11    document requests, intrusive examinations and quite
12    candidly I didn't think it was worth making another
13    claim.  It just wasn't worth the incredible
14    aggravation that I was being put through.
15         Q    You're referring to the silkscreen claim;
16    correct?
17         A    That is correct.
18         Q    Is that the only reason you deferred
19    making a claim?
20         A    Yes.
21         Q    Did you ever contact the police with
22    respect to the loss of the Rolex --
23         A    I did not.
24         Q    -- so they check serial numbers and
25    things?
```

Page 164

1                           D. ALTSCHULER

2          A    I did not.

3          Q    Is there a reason, sir, that you never

4    contacted the police?

5          A    There was no specific reason.  I suspect

6    that if my sister or brother have the watch and I

7    contact the police and they're discovered with the

8    watch I would not want to have a situation like

9    that.  I wouldn't want to have a situation where the

10   watch was ultimately discovered in the house.  I

11   don't know what happened to the watch and, you know,

12   when someone either takes a Rolex or steals a Rolex

13   and wants to sell a Rolex I don't think there's much

14   that the police can do.

15         Q    Was your mother holding any other jewelry

16   of yours other than the Rolex?

17         A    Yes, she was.

18         Q    What other jewelry was she holding?

19         A    A Cartier tank watch, some rings, a little

20   watch that my grandfather gave me, odd and assorted

21   jewelry, some native American jewelry, which she was

22   holding in the safety deposit box.

23         Q    Has that jewelery been located?

24         A    I have requested it.  I have not heard or

25   seen anything about it.

D. ALTSCHULER

1

2      Q     When you say you requested it, requested

3    it of whom?

4      A     I requested it -- I made a request through

5    my attorney to contact the attorney for my brother

6    and sister.

7      Q     And to date no response or did they give a

8    response?

9      A     They will look for it.

10      Q     And when did this request to look for it

11    come about?  Back in February?

12      A     I don't know if it was February.  It could

13    have been February, March, I don't know.

14      Q     To date have they come back with a

15    response with respect to that jewelry?

16      A     One or two items but not the complete set

17    of items.

18      Q     Did they find some of the jewelry?

19      A     I don't know whether they found or

20    indicated they would look for it.  I don't know the

21    details.

22      Q     Have you received any jewelry back that

23    you claim was in your mother's possession?

24      A     Absolutely nothing.

25      Q     Now, I think you mentioned a safe deposit

CHUBB-Altschuler/ROLEX & ART 0000245

092020001456

1                    D. ALTSCHULER

2     box.  Did your mother have a safe deposit box in any

3     bank?

4          A     She did.

5          Q     Do you know the name of the bank?

6          A     I don't.  My sister when you speak with

7     her again you can ask her.  She'll give you the

8     name.  She knows it.

9          Q     Just so I understand, sir, I've never

10    spoken to your sister.

11         A     Okay.  Or Fred or whoever is talking to

12    her.

13         Q     Do you know who had access to that safe

14    deposit box?

15         A     I do not.

16         Q     And did your parents have a safe at home?

17         A     They had a lock box.  I'm not sure.  I

18    wouldn't characterize it as a safe but they did have

19    a lock box.

20         Q     Can you give me the name of anyone other

21    than your parents who may have seen the watch

22    between May 22, 2010 and June 19, 2020?

23         A     Possible.  I can give you the names of a

24    couple people but I don't know the whole spectrum of

25    people that would have visited my parents or seen

CHUBB-Altschuler/ROLEX & ART 0000246

092020001456

Page 167

1    D. ALTSCHULER

2    them.  It could have been my siblings.  I would be

3    highly doubtful if my sister would have the ability

4    to recognize if my dad was wearing a watch or if he

5    was what the watch was.  Potentially my nephew.  I

6    don't know.  It would be hard for me to say.  That

7    assumes he ever did wear it.  He may never have worn

8    it, you know, more than just putting it on his wrist

9    here and there very occasionally.  He typically wore

10   one watch.

11       Q    Based upon what you have testified to so

12   far would it be fair to say that you do not know

13   when this watch became missing between May 22, 2010

14   and June 19, 2020?

15       A    I would have to think about that --

16       Q    Please do.

17       A    -- to recall whether I ever saw my dad

18   with the watch on or -- yeah.  I simply don't know.

19   I mean I can't.  I don't have any recollection of

20   seeing it.

21       Q    So would it be fair to say that the loss

22   of this watch could have occurred any time during

23   that time period that I just mentioned, namely May

24   22, 2010 until June 19, 2020, or actually February

25   of 2020 based upon your testimony?

D. ALTSCHULER

1

2      A    I find that to be highly unlikely as my

3  mom was scrupulous and careful with safeguarding

4  things.  So I would assume it was either in her lock

5  box or in the safety deposit box and in fact at some

6  point on my telephone calls that I had with her I

7  did confirm that she had the watch.  So I didn't see

8  it but it was confirmed to me.

9      Q    When was the last time you had a telephone

10  conversation with your mother prior to her death

11  when you discussed this watch?

12      A    I don't remember.

13      Q    Was it within a year?  As I understand

14  your mother was sick towards the end.

15      A    Was it within a year?  Give me a moment to

16  think about this.  It very well could have been

17  within the year, yes.

18      Q    Did your mother have any physical or

19  mental issues towards the ends of her life?

20      A    Physical or mental issues?  Can you be

21  more specific.

22      Q    Dementia?  Amnesia?

23      A    Those are two difficult morbidities.  I

24  think after she fell her memory was not good.  She

25  was forgetful.  Probably no more forgetful than I am

CHUBB-Altschuler/ROLEX & ART 0000248

092020001456

Page 169

1                    D. ALTSCHULER

2      but.

3          Q    When did she fall, sir?

4          A    Sometime in October 2019.

5          Q    Okay.  Would I be correct that you do not

6      have any personal knowledge as to when the watch

7      became missing between May 22, 2010 and June 19,

8      2020?

9          A    No.  That's incorrect.

10         Q    What is the extent of your personal

11     knowledge as to when it became missing?

12         A    I had a conversation with my mom within

13     the last year prior to her passing about the watch.

14         Q    And what was the sum and substance of this

15     communication that you had with your mother?

16         A    I don't recall the specific details but we

17     were discussing, she knew she was ill and we were

18     discussing arrangements and who would administer the

19     trust and what we should do with specific property

20     and cars and etc, etc.

21         Q    Did she discuss with you the other

22     jewelry?

23         A    She did.

24         Q    What did she say with respect to the other

25     jewelry?

CHUBB-Altschuler/ROLEX & ART 0000249

092020001456

1                    D. ALTSCHULER

2        A    That she was going to have it divided up

3   between the siblings.

4        Q    I'm referring to your jewelry that she was

5   holding.

6        A    No.  My jewelry, no.  It was always

7   understood that it was my jewelry and when she

8   passed away and the safety deposit box was emptied I

9   would get it.

10       Q    Did she indicate to you where she kept

11  your watch?

12       A    She did not.  She did not say whether it

13  was in her lock box or the safety deposit box.  I

14  believe my recollection is correct and again I had

15  many, many conversations with my mom and I would

16  have no reason -- this conversation would not have

17  any specific meaning to me at the time.  I am fairly

18  certain that she indicated that it was in the safety

19  deposit box.

20       Q    Do you know when the safe deposit box was

21  opened and it was determined that it was not in that

22  safe deposit box?

23       A    I do not know.

24       Q    Your sister, Janet, had access to the box?

25       A    I don't know.

CHUBB-Altschuler/ROLEX & ART 0000250

092020001456

Page 171

1                    D. ALTSCHULER

2          Q     Do you know if anyone other than your

3    mother who had access to that box?

4          A     No.  You asked me.  I don't know who had

5    access to the box, sir.

6          Q     Is there an executor of the estate of your

7    mother?

8          A     Yes.

9          Q     Who is that, sir?

10         A     That is my brother.

11         Q     Eric?

12         A     Yes.

13         Q     Did you ever discuss with Eric directly or

14   counsel the opening of the box, the safe deposit

15   box, upon your mother's death?

16         A     No.  Specifically about opening the box,

17   no.

18         Q     About the contents of the box.

19         A     Other than his attorney told my attorney

20   that the insurance company contacted him and asked

21   for some kind or Declaration, other than that no.

22         Q     Declaration about what, the watch?

23         A     Yes.

24         Q     Can you give us a specific date on which

25   you claim the watch was missing?

Page 172

1                    D. ALTSCHULER
2        A    Sometime in February or March of 2020.
3        Q    And that was based on the discussion that
4    you had through your attorneys with your brother,
5    Eric?
6        A    Correct.
7        Q    Now you initially insured this watch with
8    Chubb for $50,000; is that correct?
9        A    That is correct.
10       Q    And did there come a point in time when
11   you increased the insurance for the watch?
12       A    Yes.
13       Q    Do you recall when you did that?
14       A    I was visiting Bruno in Los Angeles and we
15   were talking about watches and investments and how
16   much these things have gone up and he provided
17   appraisals for the watches.  I sent those in to the
18   insurance company.  There was some errors with
19   serial numbers.  They sorted it out between me and
20   the insurance company and Bruno and I think the
21   values were changed at that point.
22       Q    And do you know who did the actual
23   appraisal for the watch?
24       A    Bruno.
25       Q    You're certain about that?

Page 173

1                          D. ALTSCHULER

2          A     100%.

3          Q     Did he do this in person or did he do this

4     by exchange of emails?

5          A     I was sitting in his office at his desk

6     and he did it.

7          Q     Okay.  And did you have the watch with you

8     at that time when he did this appraisal?

9          A     I didn't.

10         Q     So he based it upon what?  The receipt?

11         A     He based it upon, he's a watch dealer.

12    That's all.  He does, you know, what the cost, what

13    he could buy it for and what he could sell it for

14    and what the market was.  I'm assuming.  You can ask

15    him how he came up with numbers.  That's just an

16    assumption on my part.

17         Q     Did anyone, to your knowledge, assist

18    Bruno in this appraisal, increasing the value of the

19    watch?

20         A     I was sitting in his office.  I didn't see

21    anybody else there.

22              MR. RUBIN:  Could we put on the screen,

23    please, 3.

24              CONCIERGE:  The appraisal?

25              MR. RUBIN:  Yes, ma'am.

Page 174

1                    D. ALTSCHULER

2            (Appraisal was introduced as

3            Exhibit W.)

4        Q    Is this the appraisal that you have told

5    us Bruno prepared for you?

6        A    I believe this is the appraisal, yes.

7            MR. RUBIN:  Could we mark that as the next

8    exhibit, W.

9        Q    Now, do you recall ever telling anyone

10   that you thought the watch was not worth $120,000?

11       A    Yes, multiple people.

12       Q    And could you tell us what was the basis

13   of your telling these multiple people that the watch

14   was not worth a $120,000?

15       A    Well, one of them was your investigator,

16   your private detective Mr. White, and this was based

17   on somebody ultimately taking a look at my

18   collection of watches and telling me that the

19   watches were not of the quality that Bruno

20   represented them to be.

21       Q    Was the Rolex new or was it used?

22       A    All of these are vintage watches.

23       Q    And who was this person who told you this

24   about the Rolex involved in your claim?

25       A    His name was Jeffrey.

CHUBB-Altschuler/ROLEX & ART 0000254

092020001456

Page 175

1                           D. ALTSCHULER

2           Q     His full name, please.

3           A     I don't know Jeffrey's last name.  I could

4      find it out and provide it to you.

5           Q     And where is Jeffrey located?

6           A     I believe he lives in New York and Tokyo.

7      I'm not sure where he's living right now.

8           Q     Is he affiliated with any business?

9           A     No.  He's just a watch collector.

10          Q     How did you come about to meet this

11     Jeffrey?

12          A     I met him through a gentleman that I

13     subsequently purchased a number of watches from and

14     he had Jeffrey look at my existing collection and

15     that's how I came to meet him.

16          Q     And he never looked at the Rolex which a

17     involved in this claim, it was rather based upon

18     description; is that right?

19          A     Who?  Jeffrey?

20          Q     Yes.

21          A     He looked at a number of them and a number

22     of them weren't as Bruno represented.  You know, so

23     this watch could have been perfect as Bruno

24     represented, which was the case with one or two of

25     my watches, or less than perfect as the case was

Page 176

1                    D. ALTSCHULER

2    with some of my other watches in the collection.

3        Q    Did he tell what you he believed the value

4    of the Rolex involved in your claim was?

5        A    He did not.  I mean he has no idea.

6        Q    You mentioned multiple people.  Who else

7    did you speak to about the value of the Rolex?

8        A    An attorney.

9        Q    And when was this, sir?

10       A    I don't know.  Sometime in the past six

11   months.

12       Q    Is this a California attorney?

13       A    One attorney -- I spoke to two attorneys,

14   one in California, one in Arizona.

15       Q    By the way before I forget, I want the

16   full name of Jeffrey and his contact information as

17   well.

18            And I previously asked it but I'm going to

19   ask it again, has any lawsuit been commenced against

20   Bruno and/or his company?

21       A    I stand on my prior answer.

22       Q    Has any letter gone to Bruno or his

23   company threatening lawsuit?

24       A    Yes.

25       Q    And when was that done, sir?

1          D. ALTSCHULER

2          A    In the last six months probably, two or

3    three months ago.

4          Q    And did that include the value of the

5    Rolex involved in the claim?

6          A    It included all the watches that I

7    purchased from him.

8          Q    What is the basis of your contention

9    against Bruno regarding the Rolex involved in your

10   claim?

11         A    Bruno charged the highest prices for

12   vintage watches in the world and held the watches

13   out to be absolutely perfect.  Vintage watches are

14   on the spectrum of going from perfect to less than

15   perfect.  I paid for perfect watches.  These were

16   less than perfect, and that was the basis.

17         Q    And would you be agreeable to providing us

18   with a copy of this letter that was sent to Bruno?

19         A    Yes.

20         Q    And was Bruno given a time period to

21   respond to this letter?

22         A    Yes.

23         Q    Were you seeking a return of money as a

24   result of the issuance of that letter?

25         A    Yes.

CHUBB-Altschuler/ROLEX & ART 0000257

092020001456

1             D. ALTSCHULER

2       Q     And has Bruno and/or his company

3   responded?

4       A     Yes.

5       Q     And what was their response?

6       A     Get lost.

7       Q     Okay.

8       A     I can give you the visual but I don't want

9   it to be suggested that I'm giving you the finger

10  but that's exactly what it was.

11      Q     It was not in writing through attorneys?

12      A     It was.

13      Q     Would you be agreeable to providing that

14  as well?

15      A     Yes.

16      Q     What is your contention the value of the

17  Rolex is that you're claiming he over charged or

18  overvalued?

19      A     I have no idea, you know, whether it was

20  worth 50, whether it was worth 90 or what.  You know

21  the value of these watches have increased

22  dramatically over the years.  So even if it wasn't a

23  perfect watch at the time those watches have gone up

24  tremendously.

25      Q     Was any determination ever made that the

1                    D. ALTSCHULER

2    watch was not perfect as represented to you by

3    Bruno?

4        A    I didn't have an opportunity to have it

5    examined.  It could have been one of the perfect

6    watches that he sold me.  It could have been the one

7    that was less than perfect.

8              MR. RUBIN:  The appraisal is W; is that

9    correct?

10             CONCIERGE:  Yes.

11             MR. RUBIN:  Can you put up number four on

12   the screen, please.

13             (Rolex warranty was introduced

14             as Exhibit Y.)

15       Q    Do you recognize this document, sir?

16       A    Not specifically but it appears to be a

17   warranty card for the watch.

18       Q    And Chubb had asked you to provide the

19   front and back of the warranty card.

20       A    Yes.

21       Q    And you said that you had the front but

22   you could not get the back of it because the

23   warranty card was with somebody; is that correct?

24       A    I subsequently sent the back.

25       Q    I didn't hear that, sir.

D. ALTSCHULER

1

2      A     I subsequently sent the back of it.  I'm

3  happy to send it to you again.

4      Q     I have no record of that being received.

5      A     I believe it was given to your private

6  detective, Mr. White.

7      Q     I don't think that's accurate, but the

8  bottom line is would you agree to provide to us the

9  back?

10      A     Yes.

11      Q     Now, who did you give that warranty card

12  to?

13      A     To the gentleman who was revamping my

14  watch collection.

15      Q     And what is the name of this person who

16  was revamping your watch collection?

17      A     I will give you his name but he has no

18  interest in getting involved in this.  His name is

19  Eric Wind, W-i-n-d.

20      Q     And where does Eric Wind maintain a place

21  of business?

22      A     I believe in Palm Beach, Florida.

23      Q     Would you provide for us contact

24  information for him?

25      A     I will ask him if that's okay.

CHUBB-Altschuler/ROLEX & ART 0000260

092020001456

Page 181

1                    D. ALTSCHULER

2        Q    Well, we're requesting it of you.  Will

3    you agree to provide us contact information for Mr.

4    Wind?

5        A    I can't do that unless I have his

6    permission.

7        Q    Well, we have made the request.  And could

8    you tell us, sir, why would he have your warranty

9    card for the Rolex that's involved in the claim?

10       A    I sent him my collection of watches that I

11   decided to sell instead of pursuing a lawsuit

12   against Bruno it wasn't worth the time and trouble

13   and nonsense of going through trying to sue this guy

14   and I just sent him all of my collection and as part

15   of that collection I think it was in a container,

16   part of that collection was the box and warranty for

17   the missing watch.

18       Q    When did you send him this material, sir,

19   and watches?

20       A    I don't know sometime in the last six

21   months.

22       Q    And could you tell us what prompted you to

23   sell these watches?

24       A    I decided I wanted to have a new

25   collection of pristine watches.  I thought my

1              D. ALTSCHULER

2    collection was pristine and unfortunately it turned

3    out not to be so I gave Mr. Wind all of the watches,

4    asked him if he would be kind enough to sell them

5    for me, there was some discussion there and he was

6    kind enough to do so and I embarked on building a

7    collection which I had envisioned I started in 2008.

8         Q    Now, has Mr. Wind been able to sell these

9    watches for you?

10        A    All of them have been sold.

11        Q    Now, I believe you previously told Mr.

12   White that you replaced the watch that's involved in

13   your claim, is that true?

14        A    That is true.

15        Q    When did you replace it?

16        A    Within the last six months.

17        Q    From who did you replace it?

18        A    Mr. Wind sold me a replacement watch.

19        Q    And was it very similar to the one that

20   your claiming with Chubb?

21        A    It was the same model.

22        Q    And could you tell us, sir, how much did

23   you pay for it?

24        A    I believe I paid 85,000 for it.

25        Q    Do you have records reflecting the

CHUBB-Altschuler/ROLEX & ART 0000262
092020001456

1            D. ALTSCHULER

2   purchase of this replacement watch?

3       A    I do.

4       Q    Would you agree to provide that to us?

5       A    I will.

6            MR. RUBIN:  Did we mark the warranty card

7   as an Exhibit?

8            CONCIERGE:  Yes, X.

9       Q    Is my understanding correct that you are

10  not going to pursue any lawsuit against Bruno?

11      A    That is correct.

12      Q    And what is the amount of your claim to

13  Chubb with respect to the Rolex?

14      A    I mean, I would be happy to be reimbursed

15  for what it cost me to purchase the watch.

16      Q    Your talking about 85,000?

17      A    Yes.  That's correct.

18      Q    And not what you insured it for; is that

19  correct?

20      A    That is correct.

21      Q    Now, you increased the insurance for the

22  watch in March of 2018, is that correct, sir?

23      A    I don't know.  I mean you would have

24  better information on that than I would.  I have no

25  idea what the date was.

CHUBB-Altschuler/ROLEX & ART 0000263

092020001456

D. ALTSCHULER

2    Q    Would you be able to get us the address

3  for the safe deposit box that your mother

4  maintained?

5    A    I could try.  Mr. White or the private

6  detective who's talking to my sister could probably

7  do it but I will make an effort to do it.

8    Q    Did you ever have the Rolex serviced?

9    A    Never.

10    Q    Now we asked for your 2019 tax return and

11  we assume that will be forthcoming as soon as it's

12  filed.  Could you tell us, sir, did you earn any

13  income during 2019?

14    A    I did not.

15    Q    How about this year to date?

16    A    I did not.  I have not.

17    Q    You have provided to us some statements

18  but they go to the date of the silkscreen loss and

19  not the date of the Rolex watch.  We request the

20  statements for any bank accounts, whether your name,

21  your wife's name, Schwab or any other accounts

22  consistent with the date of loss for the Rolex.

23  Will you agree to apply provide us with that?

24    A    I will speak to my attorney.

25    Q    As of the date of the Rolex claim do you

CHUBB-Altschuler/ROLEX & ART 0000264

092020001456

D. ALTSCHULER

1
2   have any debts?

3       A    Whatever my AMEX bill is today, and as I

4   mentioned previously, I maintain a running balance.

5   I try to keep it between 30 and 35,000 on my Visa

6   for credit reasons.

7       Q    Well, we request copies of you credit card

8   statements covering the month that you claim the

9   loss occurred for the Rolex.

10      A    The credit card, other than the American

11  Express is paid in full every month, sir.  The

12  balance is zero at the end of the month.

13      Q    But you had a Visa account as well.

14      A    Right and I indicated to you that I

15  intentionally keep it at a certain balance.

16      Q    Well, again we would like to see the

17  statements themselves as the best evidence and again

18  make that request.

19      A    You're not getting them, sir.

20          MR. STRINGER:  I would suggest that

21  Mr. Altschuler's testimony under oath is the best

22  evidence.

23          MR. RUBIN:  I'm not going to argue with

24  you, Anthony.  I think the best evidence are thea

25  document themselves.

1              D. ALTSCHULER

2         MR. STRINGER:  We disagree on what the

3    best evidence is in this case.

4         MR. RUBIN:  Well, the best evidence is the

5    written documents showing what the statements

6    reflect and that's what we want to see and we want

7    to see the investment account statements as of the

8    date of the Rolex loss.

9         THE WITNESS:  We'll argue it in court.

10        MR. STRINGER:  I do want to reiterate the

11   testimony on the credit card that he pays off his

12   AMEX on a monthly basis.  He keeps a zero balance on

13   the AMEX, and he testified he intentionally keeps a

14   30 to $35,000 balance for credit purposes on the

15   Visa.

16        MR. RUBIN:  Unfortunately you nor I have

17   personal knowledge of that.  The bank statements are

18   the best evidence and that's what we want to see.

19             Two-minute break.

20             (A break was taken.)

21   Q    Fred checked and he said there was an

22   email in July of this year and that you agreed to

23   provide the back of the warranty card but that never

24   was sent to him.  So we again --

25   A    I will send it as soon as we complete the

1                    D. ALTSCHULER

2     deposition.

3               MR. RUBIN:  Okay.  Could we put on the

4     screen number seven.

5               (Sworn Proof of Loss was

6               introduced as Exhibit Y.)

7          Q    Do you recognize that document, sir?

8          A    Yes.

9          Q    And is that a document that was sworn to

10    by both you and your wife?

11         A    Yes.

12              MR. RUBIN:  Could we mark this as the next

13    exhibit, please.

14              CONCIERGE:  Yes.  It will be Y.

15         Q    Now, when the company asked for a specific

16    time and origin you did not give a specific date, is

17    that correct, sir?

18         A    A time and origin of what?

19         Q    When the Rolex became missing.

20         A    I mean whose document is this?  Did you

21    prepare it or did I prepare it or my attorney.  I'm

22    not sure what I'm looking at.

23              MR. STRINGER:  Douglas, this is the Sworn

24    Proof of Loss that I prepared and you reviewed and

25    signed.

1          D. ALTSCHULER

2          THE WITNESS:  Yes.

3          MR. STRINGER:  This was from us.

4     A    Yes.

5     Q    And you did not provide a specific date on

6  which the Rolex became missing, is that correct,

7  sir?

8     A    If you say so.  I didn't have an

9  opportunity to look through the whole document, but

10 yes, that is correct.

11    Q    Take a look at item 1.

12    A    Mm-hmm.  Yes.

13    Q    And instead of giving a date and time of

14 the loss you put, "To the best of my knowledge she

15 kept the watch in a safety deposit box."

16    A    Yes.

17    Q    "Earlier this year I learned that the

18 Rolex was missing from the box.  The Rolex may have

19 been in the home lock box."  Now, that doesn't

20 indicate to us when the actual loss occurred.  Can

21 you, with any degree of specificity, tell us when

22 the actual loss occurred?

23    A    I became aware of the loss sometime in

24 February or March of 2020.

25    Q    But you do not know when the watch

CHUBB-Altschuler/ROLEX & ART 0000268
092020001456

D. ALTSCHULER

2   actually became missing; is that correct?

3        A    That is correct.

4        Q    I have gone as far as I can today.  I'm

5   not officially closing the examination because there

6   are some records that we have requested and will be

7   forthcoming and we may have question about them and

8   I will provide you, Anthony, a list of open items as

9   soon as I get the transcript on this examination.

10  Mr. Altschuler, if you would like you can make a

11  statement as this time.

12       A    I have nothing to say.

13           MR. STRINGER:  We're going to reserve that

14  right, Charles, to make a statement at that time.

15       Q    Well, this is the time to make the

16  statement if you want to make it.  There's no

17  reserving the right.  It's an offer that doesn't

18  have to be made but I have made it.

19           MR. STRINGER:  Douglas, do you have

20  anything to add beyond your testimony here today?

21           THE WITNESS:  I do not.

22           MR. RUBIN:  Thank you, Anthony.  I will

23  get in touch with you over the next few days

24  regarding a date for Zoe and I will get to you a

25  list as soon as I can of the open documents and you

CHUBB-Altschuler/ROLEX & ART 0000269

092020001456

Page 190

D. ALTSCHULER

1
2  can either agree to produce them or not and we'll

3  take it up further at that time that point in time.

4  I thank you, Mr. Altschuler, and everybody else.

5            THE WITNESS:  Thank you, sir.

6            MR. RUBIN:  And you're very welcome.

7            THE WITNESS:  And thank you to the court

8  reporter.

9            MR. STRINGER:  Charles, I will receive a

10  copy of the transcript and the exhibits?

11            MR. RUBIN:  What's happening today is they

12  don't give us the hard copies because it's done by

13  Zoom.  They give us, you know, the copy.  They will

14  electronically send it to us and that's why I said

15  earlier on that he can review it, sign and send back

16  the signatory page with the notary and there will be

17  an errata sheet if there are corrections that have

18  to be made.

19           (TIME NOTED:  4:30 p.m.)

20           JURAT ON THE NEXT PAGE.

21

22

23

24

25

CHUBB-Altschuler/ROLEX & ART 0000270

092020001456

Page 191

1                              D. ALTSCHULER

2

3

4

5

6

7

                              _____

8                                      DOUGLAS ALTSCHULER

9

10      Subscribed and sworn to before me

11      this _____ day of _____, 20___.

12

13      _____

              NOTARY PUBLIC

14

15

16

17

18

19

20

21

22

23

24

25

CHUBB-Altschuler/ROLEX & ART 0000271

092020001456

Page 192

```
 1                      D. ALTSCHULER

 2                   I N D E X

 3     EXAMINATION BY                          PAGE

 4     Mr. Rubin                                 5

 5

 6                   E X H I B I T S

 7     EXHIBIT        DESCRIPTION              PAGE
```

```
 8     Exhibit A    Dep. Notice-Silk Screens    10

 9     Exhibit B    Responses                    21

10     Exhibit C    Police report                52

11     Exhibit D    Appraisal-2008               63

12     Exhibit E    Appraisal-2010               64

13     Exhibit F    Chartis policy               68

14     Exhibit G    Axa policy                   70

15     Exhibit H    Confirmation of Insurance    74

16     Exhibit I    Sworn Proof of Loss         110

17     Exhibit J    Net worth calculator        115

18     Exhibit K    Schwab statement-Z. Werner  122

19     Exhibit L    Schwab statement-Z. Werner  124

20     Exhibit M    Schwab statement-Z. Werner  125

21     Exhibit N    Schwab statement-Z. Werner  125

22     Exhibit O    Schwab statement-Corbin     128

23     Exhibit P    Schwab statement-NuPulse    129

24     Exhibit Q    2018 tax return             135

25     Exhibit R    Family Settlement Agreemt.  136
```

CHUBB-Altschuler/ROLEX & ART 0000272

092020001456

1            D. ALTSCHULER

2        I N D E X   C O N T I N U E D

3      E X H I B I T S   C O N T I N U E D

4    EXHIBIT      DESCRIPTION              PAGE

5    Exhibit S   USAA statements          145

6    Exhibit T   Deposition Notice-Rolex  150

7    Exhibit U   Dream Collection-Invoice 153

8    Exhibit V   Wire transfer            156

9    Exhibit W   Appraisal                173

10   Exhibit X   Rolex warranty-front pg. 179

11   Exhibit Y   Sworn Proof of Loss      187

12   Exhibits retained by THE COURT REPORTER.

13

14              R E Q U E S T S

15   DESCRIPTION            PAGE      LINE

16   Photo                   15        15

17   Travel receipt          23        15

18   proof of 250K appraisal 66        25

19   D. Brown emails         84         9

20   2019 tax return        112         9

21   Amount of refinance    119        16

22   Appraisals-jewelry     120        15

23   Appraisals-furniture   121        17

24   Trust agreemt. & statement 130     9

25   Docs for NuPulse or $ value 134    20

Page 194

1              D. ALTSCHULER

2          I N D E X   C O N T I N U E D

3        R E Q U E S T S   C O N T I N U E D

4    DESCRIPTION                    PAGE      LINE

5    Final document                 138       14

6    Storage facility info          144        4

7    Other statements               146       15

8    Jeffrey-name & address         176       17

9    Letter to Bruno                177       19

10   Letter from Bruno              178       15

11   Back of warranty card          180        9

12   Eric Wind-name & address       181        4

13   Receipt for watch              183        6

14   Address-safe deposit box       184        4

15   Statements                     184       19

16   Credit card statements         185       19

17   Investment a/c statements      186        6

18

19              I N S E R T S

20   DESCRIPTION                    PAGE      LINE

21   number of stockholders           9        8

22   Shareholders or owners of LLC   11       11

23

24

25

CHUBB-Altschuler/ROLEX & ART 0000274

092020001456

Page 195

1                              D. ALTSCHULER

2                     C E R T I F I C A T E

3

4          I, ANNMARIE OAKLEY, a Shorthand Reporter

5    and Notary Public within and for the State of

6    New York, do hereby certify:

7          THAT DOUGLAS ALTSCHULER, the witness whose

8    deposition is herein before set forth, was duly

9    sworn by me, and that such deposition is a true

10   record of the testimony given by such witness.

11         I further certify that I am not related to

12   any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15   IN WITNESS THEREOF, I have hereunto set my hand this

16   6th day of October, 2020.

17

18                     ANNMARIE OAKLEY

19

20

21

22

23

24

25

CHUBB-Altschuler/ROLEX & ART 0000275

092020001456

Page 196

```
 1                    ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS
 2                   800-567-8658
      ASSIGNMENT NO. CS4282162
 3    CASE NAME: Altschuler v. EUO
      DATE OF DEPOSITION: 10/6/2020
 4    WITNESS' NAME: Douglas Altschuler
 5
      PAGE/LINE(S)/     CHANGE          REASON
 6    _____/_____/_____/_____
      _____/_____/_____/_____
 7    _____/_____/_____/_____
      _____/_____/_____/_____
 8    _____/_____/_____/_____
      _____/_____/_____/_____
 9    _____/_____/_____/_____
      _____/_____/_____/_____
10    _____/_____/_____/_____
      _____/_____/_____/_____
11    _____/_____/_____/_____
      _____/_____/_____/_____
12    _____/_____/_____/_____
      _____/_____/_____/_____
13    _____/_____/_____/_____
      _____/_____/_____/_____
14    _____/_____/_____/_____
      _____/_____/_____/_____
15    _____/_____/_____/_____
      _____/_____/_____/_____
16    _____/_____/_____/_____
      _____/_____/_____/_____
17    _____/_____/_____/_____
      _____/_____/_____/_____
18    _____/_____/_____/_____
      _____/_____/_____/_____
19    _____/_____/_____/_____
20                _____
                  Douglas Altschuler
21    (Notary not required in California)
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____, 2020.
23
      _____
24       NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```

CHUBB-Altschuler/ROLEX & ART 0000276

092020001456

**[& - 2019]**                                           Page 1

**&**

**&**   1:5,9 2:3 193:24
   194:8,12

**0**

**040520024846**
   1:10
**0768.41493**   1:7
**0768.42484**   1:11
**0920200001456**
   1:6

**1**

**1**   9:25 102:17,19
   110:4 124:14
   125:19 128:25
   130:14,25 131:11
   188:11
**1.5**   33:14 35:16
   111:11
**1.9**   118:20
**1/7th**   127:15,18
**10**   10:12 39:9
   131:9,10,15 192:8
**10,000**   39:10
**10/6/2020**   196:3
**100**   13:10 23:17
   40:22 49:3 56:17
   61:5 89:24 94:18
   96:12 98:7,8
   137:14 152:7
   173:2
**100,000**   137:7,8,19
   137:21 138:2
**10017**   2:10
**10028**   1:15
**10:00**   1:17
**11**   115:15 194:22
   194:22
**11,129,984.43.**
   131:2

**110**   192:16
**112**   193:20
**114,00.50.**   149:8
**115**   192:17
**119**   193:21
**11937**   ˋ5:12
**12**   135:10
**12,000**   39:9,10
**12,500**   61:19
**12/23/2019**   1:6
**120**   193:22
**120,000**   174:10,14
**121**   193:23
**122**   192:18
**12258**   195:18
**124**   192:19
**125**   192:20,21
**128**   192:22
**129**   192:23
**13**   107:12 108:18
   122:12 149:17
**130**   193:24
**134**   193:25
**135**   192:24
**136**   192:25
**138**   194:5
**1380845205**   1:5,9
**14**   124:2,3 194:5
**1405**   2:4
**144**   194:6
**145**   193:5
**146**   194:7
**15**   53:11 63:24
   124:20 127:25
   131:15 193:16,16
   193:17,22 194:7
   194:10
**150**   193:6
**153**   193:7
**156**   193:8

**16**   125:5 193:21
**162**   68:23,24
**167**   10:23
**17**   193:23 194:8
**170**   143:10
**173**   193:9
**176**   194:8
**177**   194:9
**178**   194:10
**179**   193:10
**18**   45:4 58:13 59:5
   65:12 69:2,2
   129:7 153:19
   154:17
**18,863,414**   122:9
   133:8
**180**   194:11
**181**   194:12
**183**   194:13
**184**   156:19 194:14
   194:15
**184,000**   154:4,11
**185**   194:16
**186**   194:17
**187**   193:11
**18th**   110:9
**19**   136:12 162:17
   166:22 167:14,24
   169:7 194:9,15,16
**1985**   34:24
**1986**   34:24 89:6
   96:3
**1987**   12:12,19
   13:15 18:3 20:5
   25:23 34:24 37:4
   55:7,12 82:19
   104:23 105:9
**19th**   110:9

**2**

**2**   73:21 86:11 91:2
   91:7,8 110:14
   118:21
**2,000**   127:18
**2.1.**   118:21
**2.6**   117:2
**20**   104:10 144:25
   191:11 193:25
**200**   137:14
**2000**   41:9,11
**2007**   141:6 151:22
**2008**   63:15,25
   141:6 149:17,20
   151:22 154:17
   157:5 182:7
   192:11
**2009**   7:17 32:15
**2010**   7:17 64:23
   65:12 67:15 69:2
   157:21 158:13,16
   159:9,20 160:15
   160:22 166:22
   167:13,24 169:7
   192:12
**2011**   69:2 70:12
**2012**   70:12
**2013**   147:25
**2018**   73:21 75:16
   135:11,14 183:22
   192:24
**2019**   25:22,23
   26:11,19 28:9,20
   29:4 43:14,16
   56:23 58:13 59:5
   59:8 72:19 112:2
   112:10 114:13,14
   116:7 117:14
   120:3 124:14
   125:19 129:2
   130:15,25 149:10

CHUBB-Altschuler/ROLEX & ART 0000277

092020001456

**[2019 - accommodate]**

149:25 169:4
184:10,13 193:20
**2020** 1:16 10:12
115:23 131:18
151:3 161:18,20
162:17 166:22
167:14,24,25
169:8 172:2
188:24 195:16
196:22
**21** 151:2 192:9
**212,816.55** 123:16
**22** 115:23 131:18
157:21 158:13,16
159:9,19 160:14
160:22 166:22
167:13,24 169:7
**221** 3:10
**23** 56:23 193:17
**233,965.49.** 129:2
**23rd** 148:18 155:6
**24/7** 18:13
**25** 45:4 75:16
147:24 193:18
**250** 66:2,5,22
77:24
**250,000** 33:14
67:15 69:3 71:22
**250k** 193:18
**254,714.52.** 125:20
**26** 117:16,25
**2623** 152:8
**267** 1:14
**276,598** 135:15

**3**

**3** 53:3 89:21,23,25
90:5,9,22 92:16,19
93:21 94:2,17
95:6 98:7,8,13
173:23

**3.1** 117:23 119:5
119:13
**3/30** 90:15,15,17
90:20 96:3
**30** 35:13 89:15,21
89:23,25 90:5,9,22
92:16,19 93:21
94:2,17,22 95:6,16
98:13 115:13
116:15 185:5
186:14
**30,000** 114:22
115:2
**31** 117:25 124:14
125:19 129:2
130:15,25
**3116** 3:24
**34** 5:11
**35,000** 115:13
116:15 185:5
186:14
**38** 89:8,9 96:4
**38x38** 96:4
**3:00** 144:8
**3rd** 2:9

**4**

**4** 70:12,12 74:14
95:16 194:6,12,14
**400,056.32.** 124:15
**409** 133:16 134:23
**425,336** 115:21
**44114** 2:5
**45** 45:4
**4:30** 190:19
**4c** 144:16

**5**

**5** 61:14 156:6
192:4
**5,000** 13:16 55:7
78:13

**50** 8:16 178:20
**50,000** 153:4,22,24
172:8
**52** 192:10
**535** 148:18 155:6

**6**

**6** 1:16 105:14,14
105:15 121:4
194:13,17
**6/19/2020** 1:10
**60,000** 115:3
121:14
**6263** 152:10,11
**6265** 152:12
**63** 192:11
**630** 2:9
**6330** 46:12
**64** 192:12
**66** 193:18
**68** 192:13
**6th** 2:4 195:16

**7**

**7** 51:25
**7,500** 61:14
**70** 116:14 192:14
**70,000** 115:4
**74** 192:15
**790,976** 136:2

**8**

**8** 21:13,18 23:18
68:13 105:21,22
106:12,15 194:21
**80,000** 116:14
**800-567-8658**
196:2
**82nd** 1:14 10:24
**84** 193:19
**85,000** 182:24
183:16

**87** 55:3

**9**

**9** 106:17 109:10
193:19,20,24
194:11,21
**90** 41:9 178:20
**90s** 41:9

**a**

**a.m.** 1:17
**ability** 6:9 167:3
**abinitio** 141:14
**able** 9:6 11:10
28:2,13 29:11
63:9 76:5 92:19
96:14 103:24
105:9,10 140:3
182:8 184:2
**absolute** 56:19
**absolutely** 30:17
30:23 70:15
100:20 109:8
110:13 119:23
123:17 154:15
155:10 159:15
165:24 177:13
**accept** 18:15 63:8
66:20 71:22 95:12
123:23 124:15
125:20 131:8
**accepted** 67:16
**access** 13:21 27:4
30:11 119:18
122:22,24 123:8
124:9 125:3,13,16
128:15 129:21,23
166:13 170:24
171:3,5
**accommodate**
140:11

CHUBB-Altschuler/ROLEX & ART 0000278

092020001456

**accommodations**
16:7
**account** 17:12
109:7 112:14,17
121:14,15,16,19
121:19 122:2,4,7
122:13,16,18
123:14,18,20
124:6,10,23 125:3
125:9,11,12,14,16
126:19,23 127:18
127:21 128:16,19
129:22 131:17
132:2 133:12,13
145:8,16,19 146:9
146:10,14 185:13
186:7
**accounts** 135:19
145:14,21 146:2,7
184:20,21
**accurate** 29:14
79:15 86:17,24
90:15,17,19 94:2
97:25 98:3,5
101:5 102:4,6
111:2 118:17
123:24 124:15
129:6 132:19
180:7
**accurately** 6:11
74:24
**accusation** 62:20
**acknowledge**
146:21
**acknowledges**
137:6,25
**acquaintance**
34:13
**acquire** 11:20 12:4
152:16

**acquired** 11:22,22
12:13,16 25:11
32:2 37:3,5 39:12
40:8,15
**acquiring** 77:15
**acted** 82:10
**action** 3:18 195:12
**activated** 48:9
**activation** 48:17
49:2 58:12,14,15
58:19,21,24 59:4
**active** 9:16 146:10
**actual** 81:8 85:3
87:5 95:3 115:25
116:18 172:22
188:20,22
**add** 11:23 189:20
**added** 111:7
154:25
**addition** 3:14
**additional** 17:12
17:16 111:5
120:25 144:18
146:6
**address** 5:9 10:23
18:8,11,13 21:21
45:10 46:10 73:10
84:3 155:6 184:2
194:8,12,14
**addresses** 143:21
144:2
**adjacent** 47:10
**administer** 169:18
**admission** 5:14
**advice** 8:10 123:5
**advise** 8:9 43:21
**advised** 137:10
**affiliated** 175:8
**age** 7:5
**agent** 55:17

**ages** 7:3
**aggravation**
163:14
**ago** 22:10 24:3,12
25:17 76:23 102:2
104:10,24 121:9
177:3
**agree** 98:11
123:20 132:6,9
134:19 138:4
180:8 181:3 183:4
184:23 190:2
**agreeable** 144:5
177:17 178:13
**agreed** 137:19,20
137:21 138:6
144:21 186:22
**agreement** 112:12
113:9 130:9,11
136:17,24 138:18
144:13
**agreemt** 192:25
193:24
**agrees** 137:6,25
**ahead** 94:13 96:11
**aig** 66:13 67:7
68:3,8,16 69:11,15
69:17,22 70:14
143:9,13 148:19
149:2,13,19
**alarm** 44:16,19
47:25 48:4,9,13,17
48:20,25 49:4,8,10
49:12,20 51:6,12
52:20 58:12,14,15
58:19,20,23 59:4
**alive** 55:13,18,22
**alleged** 30:15
48:18
**altschuler** 1:5,9,19
5:8,13 6:1,9,21

7:1,5 8:1 9:1 10:1
11:1 12:1,3 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1,24 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1,5,24 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1,7 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1,17
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1,11
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1,2,8,15
102:1 103:1 104:1
105:1 106:1 107:1
107:19,21 108:1,6
108:14,20 109:1
109:12 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1

[altschuler - argue]

123:1 124:1 125:1
125:23 126:1,5
127:1 128:1 129:1
130:1,3,4,5 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1,11,16
140:1 141:1 142:1
143:1 144:1,15
145:1,4 146:1
147:1,5 148:1
149:1 150:1,22
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
189:10 190:1,4
191:1,8 192:1
193:1 194:1 195:1
195:7 196:3,4,20
**altschuler's**  22:5
22:18 185:21
**amazing**  78:12
**amend**  95:23
102:19 103:9
111:8
**amended**  102:9,17
**amendment**
138:10
**american**  13:18,21
112:25 164:21
185:10

**amex**  14:16 28:16
114:16 115:2,9
116:14 149:5
185:3 186:12,13
**amnesia**  168:22
**amount**  16:7
118:25 119:2,3,10
123:14 126:11
131:5 132:10
133:2,6 143:11
146:11 147:11
153:5 183:12
193:21
**andy**  11:16 64:13
69:3,3 77:14,20
80:4 84:16 87:7
88:25 89:2,3 96:2
96:3 99:11 104:11
**angeles**  28:25
61:17 82:7 159:12
172:14
**annmarie**  1:21
195:4,18
**answer**  5:20,20
6:13 9:6 11:23
12:6 45:25 46:5
57:13 58:18 59:13
94:14 96:17
102:20,23 106:8
106:10 114:9
133:18 140:3,5
141:11 147:23
149:23 161:7
176:21
**answered**  103:6
106:13 133:21
142:8
**answering**  133:22
**answers**  23:17
45:21

**anthony**  2:6 6:6
9:20 38:16,21
45:17 75:22
132:12 150:9
162:2 185:24
189:8,22
**antiques**  121:4,8
**anybody**  48:14
159:22 173:21
**anymore**  37:14
**ap**  89:25 94:19
98:9
**apartment**  148:17
**apologize**  38:20
**apology**  16:25
**apparent**  104:14
**apparently**  126:12
**appearing**  1:20,21
2:7,12,15
**appears**  70:11,16
74:21 134:25
179:16
**apply**  184:23
**appraisal**  33:3,12
33:16,19 63:15,21
64:23 65:5,11,16
65:21 74:2,4 75:6
75:10,11,12,20
77:7,24 79:11,22
79:25 80:15 81:9
81:15,24 84:2,11
85:14 86:11 87:20
88:4,10 89:13
90:4,18 92:11,25
93:21 94:24 97:3
97:22 98:4,21
99:15,23 100:2,5,8
111:12,21,24
119:15,16,19,22
121:6,11 172:23
173:8,18,24 174:2

174:4,6 179:8
192:11,12 193:9
193:18
**appraisals**  42:4
63:20 65:4 80:24
81:2,17,20 99:2
120:9,11,17,18,20
120:25 172:17
193:22,23
**appraise**  65:21
83:11 84:14 85:22
121:7
**appraised**  32:19
32:23,24 33:9
65:25 66:5 78:3
81:21 90:19,23
95:4,14 100:10
**appraiser**  78:5
86:14,21 90:2
117:4,5,6
**appraisers**  85:21
**appreciate**  9:12
15:11 23:4 76:7
101:18 102:14
120:14 131:12
140:10 146:13
**appropriate**  91:14
102:23 125:15
142:4,5
**approximate**
43:10
**approximately**
25:14 110:8
127:17
**approximation**
114:19
**area**  30:19 47:5
139:11,14,18,19
**argue**  22:24
113:10,18 185:23
186:9

CHUBB-Altschuler/ROLEX & ART 0000280
092020001456

[argued - back]

**argued**  113:11
**arizona**  7:10,12
  16:3,5,25 17:25
  18:5,8 19:7,15
  20:11 24:8 28:11
  28:22 30:9,22
  31:10,13 34:10
  35:15 40:10,21
  46:13 82:19 85:19
  85:19,21 86:5,6
  107:13 176:14
**arrangements**
  26:14 169:18
**arrival**  20:13
**arrived**  19:14,25
  20:10,18 24:8
  44:15 130:23
**art**  30:22 32:15
  36:4,9 39:24
  41:21,24 54:16
  55:7 56:18 60:16
  61:18 64:9,9,14,16
  64:16 77:2,12
  78:16,17,18 81:12
  81:21 82:10 84:16
  85:21 86:3,4
  89:17 92:17 93:11
  94:25 95:10 98:23
  98:24 99:4,11
  100:7,10,15,17,18
  109:3 110:19
**artist**  37:17 41:24
  60:8 78:15 84:18
  88:21,23 89:16
  95:16
**artists**  36:9 55:3
  55:12,18 78:18
  100:16
**arts**  16:10,17,24
  17:6,9,13,16 25:6
  25:9 35:20 60:7

78:19 82:9 111:15
**artwork**  16:11,13
  51:2 53:12 58:8
  59:18,19,20 83:18
  84:13,24 85:3,5
  86:15,23,25 87:5
  120:16,17
**artworks**  100:4
**asked**  5:17 19:16
  24:2 44:12 55:2,5
  55:21 56:12 80:5
  93:3,23 94:14
  104:4 113:4 114:8
  129:18 130:20
  142:8,17 149:23
  161:2 171:4,20
  176:18 179:18
  182:4 184:10
  187:15
**asking**  11:24 12:9
  15:8 18:4 19:11
  23:3 24:5 32:5
  34:23 54:9,24
  63:5 96:16 103:3
  104:11 105:25
  108:14,15 132:8
  132:13,18 145:17
  145:18 154:7
**asks**  113:19
**aspect**  22:13
**assets**  116:21
  117:20 131:25,25
  132:3 133:11
  140:18
**assignment**  196:2
**assist**  135:7
  173:17
**assistance**  103:7
**assistant**  42:6
  51:15 64:11

**assisted**  88:12
**associate**  65:9
**assorted**  159:4
  164:20
**assume**  6:9 19:22
  49:10 91:15
  109:19 129:5
  145:10 154:18
  156:19 160:24
  168:4 184:11
**assumed**  141:14
**assumes**  141:12
  142:12 167:7
**assuming**  173:14
**assumption**  86:14
  86:22 99:6 142:14
  155:11,12 158:17
  173:16
**attached**  18:22
  75:5 95:11 107:16
  107:16 108:9,18
**attempt**  54:13
  57:13 101:16
  137:13,16 144:17
**attempting**  82:10
  103:22
**attention**  48:24
  77:20 103:16
**attorney**  4:5 9:10
  11:6,7 15:19 21:3
  21:8,20 113:10
  115:18 121:23
  123:6 137:2,10
  145:10 156:10
  161:7,25 162:2,3,4
  162:10,11,23
  165:5,5 171:19,19
  176:8,12,13
  184:24 187:21
**attorneys**  2:4,9
  3:7 161:12 163:2

172:4 176:13
  178:11
**attributed**  136:3
**august**  73:21
**authenticity**  54:7
  54:13,14,16,18
**available**  101:7,13
**avenue**  2:9
**avoid**  144:19,20
**aware**  26:7,24
  35:19 39:18 44:19
  48:25 49:4,6
  58:12 80:23 81:9
  85:22 121:2
  146:16 188:23
**awareness**  81:7
**axa**  70:2,6,20 71:6
  192:14

|   b   |
|-------|

**b**  21:14,16 91:2,7
  91:8 100:22 162:5
  192:6,9 193:3
**b1**  12:23,24 13:15
  15:22 37:14 78:12
  88:3 91:6 101:25
**back**  6:17 11:24
  12:9 15:8 18:4
  19:11 20:24 24:6
  32:5,11 34:24
  37:14 44:10 46:4
  52:10 56:2 60:4,5
  60:6 61:6,19
  67:15 74:6 86:20
  95:20 96:23 103:4
  110:5 114:15
  116:6 141:6
  144:12 149:12
  159:14,17 162:23
  165:11,14,22
  179:19,22,24
  180:2,9 186:23

CHUBB-Altschuler/ROLEX & ART 0000281
092020001456

[back - bruno]

190:15 194:11
**balance** 114:21
115:12 124:14
125:19 128:25
130:25 132:11
133:7 149:5,8,9
154:3 185:4,12,15
186:12,14
**ballpark** 118:11
**bank** 145:7 166:3
166:5 184:20
186:17
**banks** 146:11
**bar** 3:16
**based** 33:19 87:20
92:11 101:7,13
105:17 106:7
123:5 130:17
141:22 167:11,25
172:3 173:10,11
174:16 175:17
**basically** 129:12
**basis** 81:4 102:24
123:7 127:2
174:12 177:8,16
186:12
**batch** 153:7
**bathrooms** 47:15
**bats** 50:2
**beach** 180:22
**becoming** 142:21
**bedrooms** 47:13
**beginning** 63:3
112:6 129:12
**begun** 3:22
**behalf** 101:17
**belief** 29:9 102:21
**believe** 7:22 9:14
10:9,18 11:7,23
12:2,12,17,18,22
13:10,11,12,16,18

14:14 18:3 22:11
24:21 28:12,24
29:7 30:7,9,12
31:12 32:14,23
34:25 35:3,12
36:16 37:12,20
44:11 46:2 50:18
51:4,10 54:6 60:4
60:5 61:5,14
67:16,19 68:3
69:24 75:2 76:11
76:19 83:6 84:6,8
91:17 92:15 93:3
94:17 99:16
106:22 109:3
112:4 113:22
117:17 119:11
122:19 134:11
135:24 136:8
147:2 152:6 153:3
154:15 158:18
160:2 161:16
162:20 170:14
174:6 175:6 180:5
180:22 182:11,24
**believed** 104:15
176:3
**beneficiaries**
127:4
**benefit** 124:7,24
125:8,14 130:3
**berman** 13:5,8
103:19,21,23
104:16
**best** 11:25 22:4,18
22:21 23:2 25:14
28:4 32:24 33:8
36:12 37:7 44:14
59:22 77:16 92:3
103:7 133:21
185:17,21,24

186:3,4,18 188:14
**better** 25:3 183:24
**beverly** 152:17
**beyond** 141:7
189:20
**big** 73:11
**bill** 185:3
**bills** 73:10 135:2
**bit** 26:23 44:15
61:11 76:3 77:21
78:2 91:10 96:25
114:24 138:20
**blank** 9:7 11:9
27:16 86:19
116:11 118:8
**blanket** 17:18,22
**blood** 195:12
**bottom** 27:21
113:24 180:8
**bought** 24:15
37:12,17,20 55:3
78:13 85:7 148:12
155:25
**box** 18:17,20,21
18:23,24 19:4,6
20:19,23 22:12
23:10,13,14 26:3
40:19 46:19 59:16
62:17 63:6,7
82:18 87:8,18
92:14 104:11,13
161:3,13 164:22
166:2,2,14,17,19
168:5,5 170:8,13
170:13,19,20,22
170:24 171:3,5,14
171:15,16,18
181:16 184:3
188:15,18,19
194:14

**boxes** 26:8 104:22
**brand** 47:21
**break** 45:12,13,18
46:7 75:23 76:8
111:19 144:11
148:17,20,22
149:13,18,20
150:17 186:19,20
**briefly** 129:11
**bring** 40:11 102:7
140:6 159:14,16
**broker** 17:22
72:21 73:12 82:10
110:24 163:2
**brokerage** 73:3
**brother** 27:7 31:3
36:19 37:25 38:2
38:3,4,6 46:3,3
50:11,14,16,19
62:14,21 109:3
137:7,19 146:20
162:10 164:6
165:5 171:10
172:4
**brought** 19:6,18
30:14 42:23 77:19
157:24
**brown** 33:6 60:24
60:25 61:3 75:12
76:10 77:4 82:24
83:8,18,21 84:4,13
84:25 85:11 91:21
91:25 92:6,9 97:5
98:18 99:3,14
100:13 107:17
111:12,15,20
193:19
**brown's** 92:23
**bruno** 152:22,23
153:15 172:14,20
172:24 173:18

CHUBB-Altschuler/ROLEX & ART 0000282

092020001456

174:5,19 175:22
175:23 176:20,22
177:9,11,18,20
178:2 179:3
181:12 183:10
194:9,10
buff 158:24
building 182:6
built 47:11
bunch 26:8 112:8
business 42:19
58:17 76:18,20
83:22 84:16 98:17
99:20 100:21
136:2,3,3,5 155:15
155:24 175:8
180:21
buy 37:9,16,19
77:13 99:19,22,25
100:18 116:13
155:24 173:13
buying 78:11

c

c 2:2 5:2 52:5,25
192:10 193:2,3
194:2,3,17 195:2,2
c.p.l.r 3:9
c.p.l.r. 3:25
calculator 115:15
115:16 120:7
122:8 192:17
calfee 2:3
california 12:25
82:5 83:25 91:3
146:11 152:17
155:3,15,17
176:12,14 196:21
call 23:10 25:2
34:12 52:19 56:12
56:14 57:14,17
60:25 79:21 104:9

130:8 148:23
called 47:4 51:11
59:23 60:8 77:11
85:11 91:8 131:24
148:21,24 152:18
calling 56:15
141:19
calls 168:6
cameras 48:6
camino 46:12
canceled 69:15,17
69:20
candidly 163:12
capacity 7:18 8:8
capital 129:13
car 31:23
carat 153:19
card 13:19 14:16
28:17 113:5,15,25
114:4,17,20,23
115:6,10,20
116:15 179:17,19
179:23 180:11
181:9 183:6 185:7
185:10 186:11,23
194:11,16
cardboard 18:24
19:4
cards 112:20,23
care 120:2
careful 23:9 50:4
62:19 168:3
carefully 23:15
caretaker 27:5
44:4,6
cars 81:12 169:20
cartier 164:19
carton 23:6
case 141:15
175:24,25 186:3
196:3

cash 39:6
catalog 89:12
cataloged 89:17
cause 49:14
caused 49:8,10,20
49:21
cautious 50:4
celia 60:11 61:2,18
ceo 7:20 8:20,21
certain 36:9 81:12
86:8 113:11
131:21 133:10
134:8 170:18
172:25 185:15
certainly 81:14
101:8
certainty 13:11
certificate 54:7,12
54:14,15,17
certified 78:5
certify 195:6,11
cfo 130:17,20
135:23
change 69:12 73:5
73:7 74:11,20,25
111:9 141:17
196:5
changed 69:14,15
172:21
changes 6:19
character 141:17
characterize 22:12
137:22 162:8
166:18
charge 4:6 99:14
charged 177:11
178:17
charles 2:11 6:8
38:13 45:15 94:15
107:18 108:22
130:6 132:16

189:14 190:9
chartis 68:5,8,12
68:15 69:9,11,22
70:14 143:5,9,13
192:13
check 11:6 42:2
84:7 114:7 118:7
146:10 163:24
checked 63:3
186:21
checking 112:14
121:14,15,16,19
122:2,4 145:18
children 6:25
china 25:3,4
choose 24:16
chose 143:14
christmas 116:13
chubb 1:7,11 2:14
5:17,18 13:9
31:11,12 32:19
33:3,5,13,17 66:13
67:7,22 69:6,24
70:14,25 71:2,8,13
72:10,14 95:7
98:12 100:25
101:9 106:3
107:21 110:24
113:14 139:2,15
142:3 143:10
148:4 151:20
152:3 153:17
172:8 179:18
182:20 183:13
chubb's 21:9
116:17 148:7
circumstances
157:22
city 119:6
claim 1:6,10 5:15
5:19,22 6:4 11:13

CHUBB-Altschuler/ROLEX & ART 0000283

092020001456

**[claim - connection]**

11:21 12:5,16,19
13:8,13 17:8,11
31:20 32:19 33:10
37:5 65:22 67:14
67:21 69:6 71:10
71:18 72:7 73:20
75:13 88:14,18
93:18 94:7 99:5
101:10 110:20
111:22 113:24
134:10 138:25
139:2,19 140:5,12
142:6,14 145:13
147:24 148:5,18
149:2,18 151:12
153:17,18 160:23
161:9,14 162:21
163:3,5,9,13,15,19
165:23 171:25
174:24 175:17
176:4 177:5,10
181:9 182:13
183:12 184:25
185:8
**claimant** 2:4
**claimed** 137:14
**claiming** 17:16
152:3 161:4
178:17 182:20
**claims** 109:6
139:25 140:2
147:4,6,9,12,19,22
**clarification** 29:10
110:10 134:3
142:6
**clarify** 29:12
**clarity** 75:19
**clear** 23:7,8 24:16
40:22 80:3 94:3,9
98:6 116:19,20
117:13

**clearer** 38:20
**clearly** 38:19
**cleveland** 2:5
**client** 31:11 86:17
86:24 96:16 104:8
118:16
**clients** 120:21
**close** 37:2
**closed** 22:23,25
23:11,15 50:5
104:21
**closer** 41:10,11
**closet** 60:5,6 61:7
**closing** 189:5
**cofounder** 8:4
**colleague** 66:18
**collection** 152:19
153:8 156:4,15
174:18 175:14
176:2 180:14,16
181:10,14,15,16
181:25 182:2,7
193:7
**collector** 36:8
175:9
**colored** 96:3
**combined** 120:19
**come** 14:3 34:5
48:24 76:9 80:6
82:23 88:5 91:11
99:19 103:8,11,16
115:6 117:2
119:14 120:8,16
121:5 155:16
165:11,14 172:10
175:10
**comes** 31:16 60:13
135:22
**coming** 38:19
**commenced**
176:19

**comment** 11:23
54:23 79:16
**commission**
196:25
**commissioned**
65:6 84:25
**commonly** 11:16
**communication**
79:7,24 82:22
91:24 92:5,25
97:4 99:7 104:3
104:18 169:15
**communications**
84:4 91:15,20
97:2,14 107:13,20
107:21,23 108:4
108:19,21 111:14
121:22
**companies** 32:13
67:22 69:12,14,15
**company** 1:7,11
7:20,21 8:4,9,22
8:22 9:18 17:9,12
28:17 46:23 47:3
47:23 48:13 66:12
66:20 67:21 68:2
69:18,23,25 70:13
72:24 73:2,3,23
109:7 110:6 128:8
131:9,13,24
133:14,15,17
134:23,24 150:19
152:18 171:20
172:18,20 176:20
176:23 178:2
187:15
**company's** 21:14
52:24 67:19
**complete** 165:16
186:25

**completely** 23:17
94:23
**completing** 109:16
**concerned** 106:8
**concerning** 32:15
52:19
**concierge** 9:24
52:3 53:2 75:9
123:13 124:19
128:23 134:6
136:11 140:15
146:5 156:5
173:24 179:10
183:8 187:14
**condition** 46:19
84:19 85:15 87:8
87:16,17,18,20
92:14 93:12 94:25
97:23
**condo** 10:24 11:2
11:3 116:25
117:16 118:3,6,22
**conduct** 3:10
**confidentiality**
112:12 113:9
**confirm** 108:3
168:7
**confirmation**
74:11,16,19 75:5
111:9 192:15
**confirmed** 168:8
**confirming** 66:23
134:20
**confused** 110:21
**confusing** 96:25
**confusion** 73:11
81:6
**connected** 8:3,5,7
100:19
**connection** 45:2
45:20

CHUBB-Altschuler/ROLEX & ART 0000284
092020001456

conservative
130:22
considerable
147:11
considered 5:18
consistent 23:17
184:22
consult 8:10
contact 27:13
35:10 43:19,21
57:10 58:2,3,5,7
76:9,11 82:23
163:21 164:7
165:5 176:16
180:23 181:3
contacted 51:3
58:16 148:4 164:4
171:20
container 18:24
40:18 181:15
contention 177:8
178:16
contents 10:20
63:4 151:5,8
171:18
context 55:21
continue 140:10
141:2
continuity 72:17
controlled 3:25
conversation
55:15,20 77:9,16
77:17 78:8,17
80:10 93:5 103:17
103:25 168:10
169:12 170:16
conversations
31:3 97:11 141:2
170:15
conveyed 84:23
99:9

cool 37:16
copies 6:15 9:21
32:13 113:4
146:13 185:7
190:12
copy 4:4 5:23 6:16
52:14 112:5
119:21 136:23
177:18 190:10,13
corbin 125:25
128:3,5,7 192:22
corcoran 41:18
42:4,14,18 43:4
64:10,21,23 66:18
85:7
corcoran's 65:9
corners 18:25
22:13
corporate 134:13
corporation 8:3,6
8:18,20 9:13,16
131:21,23
correct 9:14 11:14
11:17 13:9 17:19
19:7 20:8,9 24:23
27:19 29:19 30:6
30:7 31:10,17
33:15,20,21 38:18
41:2,3,6 43:5,17
50:23,24 53:14
54:21 55:5 57:22
63:2 65:6,13,17
67:13,17,23,24
69:7 71:25 72:8
72:11,15,19 75:6
75:14 77:9,25
79:21 80:19 81:23
82:5 83:13 84:6
86:17,25 87:21,22
88:5,19 90:12,23
91:16,21 92:12

93:2 97:6,15,23,24
97:25 98:14,21
100:5 101:2,3
102:4,10 108:8
111:10,12 112:11
113:3 114:2,3
115:25 116:5
118:23 120:24
122:22,23 123:9
123:10,16 124:8
124:11,12 125:3,4
125:21 128:19,20
129:3 131:22
135:3,4 140:15
145:15,23 153:23
155:19 156:5
157:3,6,7 158:20
158:21 160:13
162:24 163:16,17
169:5 170:14
172:6,8,9 179:9,23
183:9,11,17,19,20
183:22 187:17
188:6,10 189:2,3
corrections 6:10
190:17
correctly 129:6
correspondence
32:13,15
corrugated 18:24
cost 13:15 173:12
183:15
costs 67:10
couch 26:22,23,25
27:18,21,25 28:2
46:17
counsel 3:23 62:14
62:15 101:12
103:7 134:2,13
141:3 144:7
171:14

county 52:18
55:17 61:18
couple 33:3 34:11
34:14 73:6 118:9
127:23 129:19
130:20 134:14
166:24
course 9:22 26:3
31:9 35:17 69:5
90:9 99:21
court 45:19 46:8
79:16,20 113:20
141:25 142:2
186:9 190:7
193:12
courtyard 47:11
cover 76:3 142:19
145:11
coverage 17:18,23
33:13 71:17 72:14
72:22 73:14,19
74:8,20 107:8
covered 146:17
covering 146:14
185:8
covers 145:12
covid 104:21
crate 18:17 20:10
20:19,21,22,23
22:4,4,5,10,12,13
22:18,19 23:6,10
23:13 24:8,22
25:18 26:19,24
27:24 28:20 30:2
30:4,14,16 31:10
35:25 53:5 63:4
82:18
crates 26:8
credenza 25:3,19
25:24

CHUBB-Altschuler/ROLEX & ART 0000285

092020001456

**credit** 28:17
112:20,23 113:4
113:15,25 114:4
114:20 115:6,10
115:20 185:6,7,10
186:11,14 194:16
**critical** 84:19,19
87:16
**crystal** 23:8 72:24
73:2,15,23 94:9
**cs4282162** 1:25
196:2
**curious** 84:3
**current** 46:4 77:23
120:19
**currently** 15:13
117:18
**custodial** 125:12

**d**

**d** 5:2 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1,16
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1

73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
180:19 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1,2,11

193:1,2,2,3,19
194:1,2,2,3 195:1
**dad** 26:4 127:12
158:8,9,24 159:3
159:21,22 160:18
160:25 167:4,17
**date** 1:6,10 14:23
25:8 29:11 30:14
35:16 37:2 43:7,9
43:10 48:18 51:3
64:2 65:14 72:3
94:8 102:8 110:11
112:14 113:5,25
114:5,11,20
115:22,24 116:3,5
116:6 123:15
125:15 126:6
130:14 131:18
132:22 134:10,20
145:12 151:2
157:9,23 158:20
160:22 161:5,6,9
162:16,17,19,20
165:7,14 171:24
183:25 184:15,18
184:19,22,25
186:8 187:16
188:5,13 189:24
196:3
**dated** 21:8,8 75:16
136:19 141:6
**dates** 58:20 110:11
**dating** 35:2,5
**daughter** 78:5
**david** 60:11 61:2
**day** 8:23,23 9:18
9:18 44:10 59:24
64:19 110:9
191:11 195:16
196:22

**days** 10:11 44:14
58:21 189:23
**daytona** 153:20,22
**de** 46:12 134:18
**dead** 55:3,18,22
**deal** 64:17,18 86:2
92:17 93:10
100:17 144:22
145:15
**dealer** 173:11
**dealers** 78:18
**deals** 77:2 87:14
**dealt** 66:4 100:16
107:7 152:21
**death** 37:21
107:10 168:10
171:15
**debating** 163:5,8
**debt** 113:5 114:4
114:20 115:21
134:7,9,11 137:6,7
137:23,25 138:14
146:21
**debts** 146:16,24
185:2
**decade** 31:5
**decades** 11:24
12:10 15:9 18:4
19:12 24:6 32:6
58:4 61:19 63:11
84:21 103:4
104:24
**deceased** 20:8
39:19 127:14
**december** 43:14
43:15 50:22 56:23
58:13 59:5,8
72:19 110:9
114:13,14 115:2
116:7,12 124:14
125:19 128:25

CHUBB-Altschuler/ROLEX & ART 0000286
092020001456

[december - documentation]

130:14,25 149:6
149:10,25
decided 79:10
162:21 181:11,24
declaration 68:14
68:17 171:21,22
deemed 3:24
deeply 139:11
defendant 150:2
deferred 163:18
defining 114:11
definitely 153:21
definitively 49:16
degree 188:21
delaware 131:24
143:19
delay 57:6
delivered 19:10
22:3 41:2 42:13
42:16
delivery 18:15
dementia 168:22
den 158:7
denial 5:15
dep 192:8
department 52:18
depending 87:17
depicted 56:8
deposit 59:16
62:16 161:3,13
164:22 165:25
166:2,14 168:5
170:8,13,19,20,22
171:14 184:3
188:15 194:14
deposition 3:19,23
4:3 10:3 116:11
147:18 149:8
150:20 187:2
193:6 195:8,9
196:3

depositions 3:11
describe 45:8 46:9
47:7 152:2,4
described 94:25
description 17:5,7
86:16,23,25 87:5
88:6,11 92:12,13
94:2 95:25 96:19
96:20 105:18
175:18 192:7
193:4,15 194:4,20
desire 6:5
desk 173:5
detail 55:17 89:11
95:2
detailed 104:18
details 52:22
53:15 77:19 82:13
83:2 121:24
165:21 169:16
detective 174:16
180:6 184:6
determination
50:7 56:20,22,24
135:5,8 178:25
determine 52:20
113:13 138:14
162:14
determined 23:13
37:13 43:16,18
85:9 117:3 170:21
dialogue 56:11
92:23
different 22:17
52:17 58:18 74:13
86:6 100:16,17
110:2,10 114:10
127:9 133:22
142:19 162:2,3
difficult 168:23

diligent 62:16
dimensions 46:24
46:25
dina 33:6 75:12
76:9 77:3 82:23
83:7,18,21 84:4,12
84:25 85:11 91:21
91:22,25 92:6,9,23
92:24,24 93:5,9,22
94:17 97:5,8,12,15
97:16,20 98:18,23
99:3,9,14 100:13
105:19 107:17
111:12,15,20
dina's 99:10
dine 60:8,24 61:17
dining 20:20 24:22
24:25 46:16 47:11
47:14 53:13,16
dinner 14:7,7
direct 91:20,24
125:2 132:15
directly 6:7 37:17
38:11 40:2 57:17
61:17 78:14
119:24 129:23
135:18 171:13
director 8:18
disagree 139:20
186:2
discovered 138:7
164:7,10
discretion 127:13
discuss 10:20
35:20 144:7 151:5
169:21 171:13
discussed 111:8
142:18 146:7,18
151:8 168:11
discussing 169:17
169:18

discussion 35:23
66:14,15 67:8
74:5 94:21 103:20
103:21 162:22,25
172:3 182:5
discussions 83:10
161:11
disingenuous
133:23
display 36:3
displaying 36:2
dispute 70:18
disputing 93:25
distracted 26:16
distributed 127:13
distribution
127:15
divided 170:2
docs 193:25
document 9:20
21:7,10 31:18,21
39:11 52:7,8
63:18 64:4,5,8,25
67:18 68:18 70:8
70:16 74:15,21,24
90:5 96:20 109:11
109:16,21,25
115:18,23 126:10
128:25 136:17,20
137:4,18,24 138:9
138:11,12,14
139:5 140:13,19
140:25 141:16,23
151:25 153:10,12
154:22 156:11,12
163:11 179:15
185:25 187:7,9,20
188:9 194:5
documentation
86:15,23 105:2

**[documents - exhibit]**                                                Page 12

documents 32:14
126:4 133:25
134:20 139:10,15
139:23 145:5
186:5 189:25
doing 37:7 92:3
102:15 144:6
dollar 130:13
131:4 132:9,21
133:2,3 134:16
dollars 80:14
door 44:16 47:9
49:11,14,21,23,25
50:2,3,5 51:6
52:21
doubt 42:11 55:10
89:10,18
doubtful 167:3
douglas 1:5,9,19
5:8 21:24 45:11
75:24 94:13 108:3
108:7 130:3,4
137:5,5,24 187:23
189:19 191:8
195:7 196:4,20
dozens 65:4
dramatically
87:17 178:22
dream 152:18
153:8 156:3,14
193:7
drink 36:17
due 104:21
duly 5:3 195:8
dust 23:11,15

**e**

e 2:2,2,4 5:2 64:24
67:19 74:6 79:4
162:5 192:2,6,12
193:2,2,3,3,14,14
194:2,2,3,3,3,19

195:2,2
earlier 15:10
107:19,20 108:5
142:17 158:5
188:17 190:15
early 41:9 51:4
earn 184:12
earning 120:3,4
easily 23:11
114:16
east 1:14 5:11
10:23
ed 41:24 162:5
edition 88:6 89:18
89:21 90:3,22
92:15 97:22 98:13
105:11
editions 96:3
effect 74:7 80:9,11
158:9
effort 184:7
efstathiou 79:3
eight 7:5 102:2
either 18:13 29:15
31:3 47:22 82:10
93:9,21 99:9
110:16 111:3
135:18 150:2
162:16 164:12
168:4 190:2
elaboration
141:22
elaine 78:19 79:8
80:18 81:7,17
82:9,9,14,23 93:14
93:22 111:15,21
elected 100:13
124:10 128:18
electronic 32:12
electronically 6:16
190:14

elses 122:10
email 52:17 67:6
74:4 77:10 84:7
186:22
emails 32:12 66:14
84:7,9 173:4
193:19
embarked 182:6
employed 7:14,16
7:18
emptied 170:8
endangered 85:12
ends 168:19
entire 23:6
entities 126:3
entitled 60:11
entity 123:4
entry 50:7
envisioned 182:7
equally 127:5,6,11
equals 37:21
eric 50:19 85:16
137:5,6,7,25
171:11,13 172:5
180:19,20 194:12
errata 6:12,18
190:17 196:1
errors 172:18
esoteric 66:17
86:10
especially 84:20
esq 2:6,11
established 125:24
estate 117:15,22
119:5 136:6
137:16 139:13,13
139:17 142:16
143:4 171:6
estimate 66:3,7
euo 9:20 196:3

europe 148:21
evasive 95:8
evening 14:6
104:7
event 59:16
events 34:15,16,18
34:19 36:18
everybody 87:14
190:4
evidence 185:17
185:22,24 186:3,4
186:18
exact 29:2,6,11
43:9 51:3 115:5
116:8,9 127:22
158:5
exactly 51:19 52:9
53:19 60:3 93:11
102:15 114:22
115:13 178:10
examination 1:3
1:19 3:13,16,21
4:5 5:5,14,24 6:3
9:22 51:20 189:5
189:9 192:3
examinations 33:5
163:11
examined 3:20 4:6
5:4 151:23 179:5
example 81:9
exchange 173:4
exclusively 64:12
excuse 16:24
63:10 88:22
executed 139:5
executor 171:6
exhibit 9:25 10:2,5
21:14,16 51:25
52:5,25 63:16
64:24 67:19 68:13
69:10 70:7 74:14

CHUBB-Altschuler/ROLEX & ART 0000288
092020001456

[exhibit - forth]                                                      Page 13

74:17 75:4 84:12
95:21 96:24 98:12
100:22 109:14
110:6,6 115:17,20
122:12,14 123:13
124:2,5,18,22
125:7 128:4,22
129:7,8,10 134:5
135:12 136:10,14
138:18,18 139:8
140:14,17 144:13
145:3 146:4
150:19,21 153:9
156:7,9 160:11
174:3,8 179:14
183:7 187:6,13
192:7,8,9,10,11,12
192:13,14,15,16
192:17,18,19,20
192:21,22,23,24
192:25 193:4,5,6,7
193:8,9,10,11
**exhibits** 9:21
120:23 190:10
193:12
**existence** 126:17
**existing** 175:14
**exit** 123:12
**expensive** 77:21
**expert** 76:25 77:6
86:2
**expertise** 99:3,13
**experts** 98:25
**expires** 196:25
**explain** 14:4
132:24,25 133:9
141:4 144:15
**explained** 44:21
44:25
**express** 13:19,22
112:25 185:11

**extent** 108:21
169:10
**extra** 77:13 80:8
**extraordinary**
86:14,22
**eye** 158:11
**eyes** 153:11

**f**

**f** 2:6 192:13 195:2
**face** 152:9
**facilities** 143:18
143:24 144:3
**facility** 25:5,9,12
26:13 46:25
143:15,17,21
194:6
**fact** 82:14 98:22
139:15 153:24
154:2 168:5
**facts** 77:9 94:7
102:6 103:5,9,11
103:15 106:7
**fail** 5:19
**failure** 3:14,22
**fair** 10:10 16:7
52:11 71:4 96:21
96:22 150:25
167:12,21
**fairly** 170:17
**fall** 169:3
**false** 90:6
**falsely** 5:21
**familiar** 7:24 10:9
33:6 68:5 70:2
72:24 78:20 79:4
81:13 89:2 99:11
136:16
**family** 29:16 30:25
108:24 109:5
111:4 121:23,25
122:4 123:6

130:16,20 135:23
136:13,17,24
138:17 139:12,13
139:17 144:13
161:11 192:25
**far** 47:2 75:9
146:17 167:12
189:4
**fargo** 117:6
119:15
**father** 19:22 20:7
127:14,14
**favorable** 118:15
**february** 161:16
161:18,19 162:23
165:11,12,13
167:24 172:2
188:24
**federal** 145:8
**feel** 76:8 140:9
142:4,5
**fell** 168:24
**field** 139:16
**fifth** 106:4
**figure** 43:23 60:14
**file** 1:7,11
**filed** 112:2,4,7,9
184:12
**filing** 4:2
**fill** 11:10 118:8,13
**final** 138:5,5,12,13
194:5
**financial** 132:4
**find** 14:5 38:8 51:4
61:10 62:15 73:8
80:11 107:24
108:10 131:6,12
132:21 165:18
168:2 175:4
**finding** 78:7

**fine** 16:10,17,24
17:6,9,13,16 25:6
25:9 35:19 60:7
60:16 78:19 82:9
110:19 111:15
114:9
**finger** 178:9
**finish** 150:12
**fiorella** 2:8
**first** 5:2 20:19
22:11 30:14 32:2
32:7,10 34:3 37:3
46:10 50:25 52:10
60:20 66:9 68:19
70:25 71:8 72:10
77:8 95:20 96:23
151:14,23 157:2
**fit** 28:2
**five** 9:13 45:12,16
47:13 68:11
111:18 138:19
144:9
**floor** 2:9 27:22
**florida** 180:22
**fly** 28:11
**focus** 153:11
**folks** 9:17
**follow** 8:9 113:20
**follows** 5:4 133:9
**forced** 50:7
**forget** 176:15
**forgetful** 168:25
168:25
**forgot** 94:16
**form** 3:12 17:18
39:15 48:4 75:23
92:25 102:17
142:20 147:20,21
**forth** 74:6,24
96:20 100:24
133:7 195:8

CHUBB-Altschuler/ROLEX & ART 0000289
092020001456

**forthcoming** 57:21
  57:24 184:11
  189:7
**found** 165:19
**four** 14:17 15:4
  18:22 53:21 56:6
  69:3 82:15 88:20
  89:4 93:23 103:14
  144:14 179:11
**fourth** 106:4
**frame** 60:23
**framed** 61:2 90:10
  90:12
**frankly** 139:10,19
**fred** 2:14 107:20
  166:11 186:21
**free** 76:8
**frequency** 78:17
**frequently** 9:17
  16:9
**friedman** 2:8
**friend** 34:13
**front** 47:9 49:14
  49:21,23,25 50:2,3
  50:5 113:11,18
  151:19 179:19,21
  193:10
**full** 5:21 16:6
  27:12 67:11 115:7
  115:9 131:17
  175:2 176:16
  185:11
**funds** 124:11
  125:13,16 128:15
  129:21
**fungible** 123:3
**furnished** 4:5
**furniture** 25:4
  121:4,8 193:23
**further** 4:4 10:7
  78:10 98:17 190:3

195:11

**g**

**g** 5:2 38:14 70:7
  192:14
**galleries** 36:18
  99:12
**gallery** 12:22,23
  12:24 13:2,6,15,24
  14:9,9 15:22 35:6
  40:4,15 42:7
  60:25 76:16 78:12
  80:19 85:8 88:3
  91:2,6,7 101:25
  104:7,21
**gals** 111:18
**garbage** 119:25
**general** 17:7 45:8
  47:7 88:16 114:17
  126:14
**generally** 68:19
  77:12 85:25
**generated** 67:5
**gentleman** 13:4
  41:18 54:6 55:2
  152:17 175:12
  180:13
**genuine** 86:17,25
**gerald** 125:22
  126:5
**getting** 13:21
  27:12 46:18 73:12
  113:18 119:18
  139:14,18 148:3,6
  149:14 180:18
  185:19
**gift** 37:25
**gifts** 116:13
**give** 7:3 8:9 9:20
  11:25 17:7 43:10
  52:11 65:10 67:11
  82:13 85:13 87:2

89:14 91:14 99:20
  104:18 105:10
  114:6,8,19 115:4
  115:24 116:7,9,11
  118:14 124:10
  127:22 128:18
  133:18 134:2
  156:11 165:7
  166:7,20,23
  168:15 171:24
  178:8 180:11,17
  187:16 190:12,13
**given** 86:4 92:8
  98:22 101:11
  177:20 180:5
  195:10
**giving** 22:21 23:2
  88:9,13 131:8
  133:4 178:9
  188:13
**go** 11:24 12:9
  13:24 15:8 18:4
  19:11 21:17 24:6
  32:5,11 34:23
  44:4 46:4 47:6
  48:20 49:8,10,20
  52:10 53:3,20
  73:10 75:10 85:20
  86:11 88:20 94:13
  95:20 96:11,23
  99:22 100:13,21
  100:22 101:19
  103:4 105:14
  107:12 110:5
  114:10,13,15
  121:24 124:2,20
  125:5 127:25
  129:7 135:10,13
  136:15 138:19
  139:7 140:13
  144:14 158:6

184:18
**goes** 90:10 114:23
  114:24 119:24
**going** 6:16 26:17
  34:22 37:12 44:16
  44:19 47:5 56:2
  61:19 83:11 84:13
  93:2 101:11
  104:20 116:6,7,21
  140:6 141:11
  144:8 149:12
  150:14,16 158:6
  158:10 162:21,23
  170:2 176:18
  177:14 181:13
  183:10 185:23
  189:13
**gold** 153:19
**good** 45:12 134:12
  168:24
**gosh** 47:13
**gotta** 86:20
**gotten** 113:17
**grandfather**
  164:20
**great** 73:9,12 91:8
  94:25
**griswold** 2:3
**gst** 130:3,5
**guess** 28:5 32:10
  86:4,4 128:6
**guessing** 32:9
  153:4
**gun** 138:24
**guy** 181:13
**guys** 111:18
  155:11

**h**

**h** 1:5,9 5:2 38:14
  74:17 79:4 84:12
  96:24 130:3,5

CHUBB-Altschuler/ROLEX & ART 0000290

092020001456

[h - individual]

192:6,15 193:3
**half** 127:21
**halter** 2:3
**hampton** 5:11
**hand** 19:9 118:3
  195:15
**handyman** 27:5,8
  58:10
**hang** 36:3
**hanging** 36:2
**happen** 49:18
  69:13
**happened** 16:20
  37:24 38:7 43:24
  69:11,21 70:20
  164:11
**happening** 78:16
  190:11
**happy** 115:4
  116:10 140:8
  147:22 180:3
  183:14
**hard** 6:15 80:11
  167:6 190:12
**haring** 33:25
  34:19 36:11 37:6
  38:11,14,20 39:13
  39:19 40:3 50:11
  50:18 78:14 86:9
  88:21,24 96:2
  99:12
**health** 140:4
**hear** 21:5 95:12
  149:6 179:25
**heard** 35:13 105:5
  164:24
**held** 123:4 177:12
**help** 103:23
  ▇▇▇▇ 7:5 130:4
**herd** 105:8

**hereto** 3:7
**hereunto** 195:15
**high** 27:21 118:15
  118:18
**higher** 119:2
**highest** 177:11
**highly** 84:21 167:3
  168:2
**hills** 152:17
**historically** 37:15
**history** 36:9
**hmm** 120:15
  188:12
**hockney** 60:11
  61:2,18
**hold** 53:12 114:10
  149:4
**holding** 164:15,18
  164:22 170:5
**holdings** 126:2
  128:3,5,7
**holds** 25:4 131:25
  131:25
**hollywood** 82:7
**home** 16:2,4 20:20
  22:2 26:6 44:10
  60:4,5,6 116:22,22
  116:24 117:22
  119:5 166:16
  188:19
**homes** 117:20
**honeywell** 48:2
**hostility** 163:10
**house** 16:14,17,25
  17:24 18:14 19:6
  19:15,19,23 20:11
  20:18 24:8 26:25
  27:4,6 29:3,23
  30:11,14,22 31:10
  31:13 44:15 45:9
  46:9,10 47:8,9,12

47:16,20 48:17
  49:19 50:8 56:21
  56:25 57:2,8,11
  59:7,15,17 60:2,22
  61:6 62:17 63:2
  107:5,8 142:23
  160:25 164:10
**housekeeper**
  18:14 29:19 44:23
  44:24 45:24 46:2
  148:22
**hundred** 118:10
  127:23
**hypothetically**
  131:7

**i**

**idea** 27:3 38:8
  56:10 66:3,16
  71:7 80:25 81:19
  85:24 86:8 106:25
  107:6,11 109:8
  110:13 114:6,17
  117:6 119:23
  123:18 136:25
  145:10 154:18
  176:5 178:19
  183:25
**identified** 85:9
**illness** 58:6
**illustration** 131:9
**immediately** 20:13
  43:19 56:14
**important** 56:16
  56:17 80:10 90:2
  91:19
**impossible** 10:13
  15:6
**inches** 28:3,4,5
  89:9
**incident** 44:17
  51:5,22

**include** 71:9
  117:19 177:4
**included** 133:7
  177:6
**including** 3:11
**income** 112:2
  120:3,4 135:18
  136:2,3,5 184:13
**incorporated**
  131:23
**incorrect** 96:12
  97:6 142:14 169:9
**increase** 33:13
  73:16 74:8
**increased** 33:18
  71:24 72:4,14,22
  73:14,19 96:10
  172:11 178:21
  183:21
**increasing** 71:16
  74:20 173:18
**incredible** 163:13
**incredibly** 77:20
**independent** 93:4
  156:18
**independently**
  123:21
**indicate** 49:7,13
  104:25 170:10
  188:20
**indicated** 44:13
  54:3 56:3 123:15
  124:13 131:14
  148:2 155:7
  157:15 165:20
  170:18 185:14
**indicates** 115:20
  120:8 135:14
**indication** 135:25
**individual** 103:17
  103:18

CHUBB-Altschuler/ROLEX & ART 0000291

092020001456

[info - jack]

**info** 194:6
**inform** 44:18
**information** 17:4
  21:10 27:13 31:6
  35:10 51:22 54:2
  55:24 62:13 86:15
  86:22 88:8,9,13
  89:19 91:15 92:8
  93:8,10 97:10,21
  98:2,5 99:9
  100:24,25 101:7
  101:13 102:2
  104:19 105:11
  106:6 107:3 122:3
  122:5 147:14
  149:7 151:19
  156:12,14 176:16
  180:24 181:3
  183:24
**informed** 44:17
  148:20,22 162:11
**initially** 37:11
  44:12 71:13,21
  76:12 97:4 172:7
**inquired** 162:9
**inquiries** 106:2
**ins** 118:13
**insert** 9:9 11:12
  27:17
**inside** 23:12
**inspect** 85:2
**installed** 48:7
**installment** 115:8
**instance** 103:23
**insurance** 1:7,11
  5:16 17:8,12,21
  32:13 64:7 66:10
  66:12,20 67:21,22
  68:2 69:25 70:13
  70:17,18 71:25
  72:4 74:11,16,19

75:6 77:24 96:10
  106:21,23 107:7
  109:6 111:9
  113:17 147:9
  163:2 171:20
  172:11,18,20
  183:21 192:15
**insure** 32:3,6
  69:23 143:14
**insured** 1:5,9
  17:17 32:7,16
  35:16 54:8 61:20
  61:22 67:13,20
  68:8 69:2,18
  70:24 71:8,13,21
  72:10 95:7 96:4
  98:12 111:5
  113:16 172:7
  183:18
**insuring** 71:2
  96:15 143:16
**intended** 26:12
**intent** 155:25
**intentionally**
  115:11 185:15
  186:13
**interest** 36:8
  110:18,23 128:9
  128:11 129:23
  130:13 131:4,10
  131:17,17 132:3,6
  132:9,20,21,22
  180:18
**interested** 36:8
  77:13,15 78:7
  195:13
**interesting** 37:16
**interim** 69:25
**intermediary**
  41:14,17

**internet** 45:20
  54:10
**interrupted** 12:11
  45:3,20
**intimately** 64:17
  99:10
**intricacies** 17:21
**introduced** 10:4
  21:15 34:12,13
  36:19 52:4 63:15
  64:24 68:12 70:6
  74:17 109:14
  115:17 122:14
  124:5,22 125:7
  128:4 129:10
  135:12 136:14
  145:3 150:21
  153:9 156:8 174:2
  179:13 187:6
**introduction**
  82:25 83:4
**intrusive** 163:10
  163:11
**invasion** 113:12
**inventory** 140:17
  143:23 144:4
**invested** 135:2
**investigation** 5:19
  43:23 101:10
  113:23
**investigator** 2:14
  174:15
**investment** 36:5
  122:9 186:7
  194:17
**investments** 146:6
  172:15
**invoice** 141:6
  151:21 152:15
  153:3,4,8,14 154:9
  154:11,25 155:7,9

156:4,19,22 193:7
**invoices** 120:13
**involved** 19:12
  37:4 93:17 148:10
  149:25 150:4
  174:24 175:17
  176:4 177:5,9
  180:18 181:9
  182:12
**involvement** 9:16
**involves** 11:13
  121:22
**involving** 67:7
  147:25
**iphone** 32:11
**ira** 124:23
**irrelevant** 90:4
  94:23 95:9
**irrespective** 97:20
**issuance** 177:24
**issue** 84:20 93:12
**issued** 5:17
**issues** 142:6
  168:19,20
**item** 96:2 101:19
  102:17 110:4
  115:15 127:25
  135:10,15 188:11
**items** 60:16 61:20
  65:11 81:21 82:11
  83:11 85:23 96:14
  109:7 143:10,12
  143:15 165:16,17
  189:8
**itinerary** 28:14
  29:2,11,14

**j**

**j** 1:5,9 115:17
  192:17
**jack** 59:23 60:20
  60:23

CHUBB-Altschuler/ROLEX & ART 0000292

092020001456

**janet** 30:9,11
44:19 45:5 48:25
127:15 141:3
170:24
**january** 51:4
**jeffrey** 174:25
175:5,11,14,19
176:16 194:8
**jeffrey's** 175:3
**jeopardize** 5:21
**jersey** 143:19
**jeweler** 150:7
**jewelery** 120:8
164:23
**jewelry** 120:10
149:18 164:15,18
164:21,21 165:15
165:18,22 169:22
169:25 170:4,6,7
193:22
**jim** 41:18 42:4,13
42:18 60:8,24
61:16 85:7
**job** 1:25
**judge** 113:11,19
113:19
**july** 63:24 69:2,2
75:16 115:23
131:18 151:2
186:22
**jump** 138:24
**june** 162:17
166:22 167:14,24
169:7
**jurat** 190:20

**k**

**k** 122:14 123:13
192:18
**keep** 16:10 36:13
109:23 114:22,25
115:12 142:2

**158:11 185:5,15
keeps** 186:12,13
**keith** 34:18 36:11
37:5 38:10 50:11
50:18 78:14 88:21
88:23 96:2
**kept** 16:7 35:25
53:5,12 60:22
63:12 170:10
188:15
**kind** 21:20 89:11
99:21 112:5
115:19 134:2
147:7 156:10
171:21 182:4,6
**kindly** 65:9
**kitchen** 47:14
**knew** 26:2 30:4
36:23 65:10 90:11
159:22 169:17
**knife** 23:9
**know** 7:13 8:14,15
9:2,12 10:19 11:8
13:2 15:7,8,12
17:2,3,20 18:19
19:9,10,13,21
20:11,13,14 22:25
24:13,18,19,20
25:13 26:5 27:8
28:6 32:9,10,17
35:22 36:12,21
38:2,6,9 39:10
40:25 41:15 42:2
42:18,20,24 43:2
45:7 46:19,20,21
46:23 47:13,14,24
47:25 48:5,6,7,15
48:16,23,23,23
49:9 50:6,9 54:7,8
56:16,16 57:4,9
58:19,20,20 59:2,6

59:14 60:3,13
61:8,10 62:11,12
65:3,9 66:13 67:7
67:9 68:17 69:14
70:15,20 74:2
75:22 76:5,6,8,14
76:15 77:12,16
78:12,14 80:7,8,12
80:13,16 81:9,16
82:6,6 83:21,23,24
84:16,17 85:11
89:24 90:3 91:13
91:18,22 93:6,11
96:14 97:11,13
98:7,9 99:17
102:15 104:10,22
104:23 106:7,23
107:2,7,18,23
109:4,5 110:17
112:7 114:16
115:2,3,24 116:12
118:7,19 119:12
121:3,24 126:6
127:6 129:4,17,19
129:19 130:2,7
131:14 133:3
134:9,12,16
135:21 136:22
141:15 142:25
145:7,16 146:23
147:17 148:3,23
151:16 152:12,25
156:12,16 158:5
158:22,24 159:2
159:16,18,21
160:5,17 161:6,7
162:8 164:11,11
165:12,13,19,20
166:5,13,24 167:6
167:8,12,18
170:20,23,25

171:2,4 172:22
173:12 175:3,22
176:10 178:19,20
181:20 183:23
188:25 190:13
**knowing** 86:3
95:13 141:22
**knowledge** 21:23
21:25 22:5,18
31:9 35:6 39:20
45:5 58:8 64:6,15
98:24 108:25
140:24 145:13,20
151:11 159:13
169:6,11 173:17
186:17 188:14
**knowledgeable**
64:12,12
**knowledged**
131:20
**known** 85:10,14
89:15,20 92:16
**knows** 87:15 166:8

**l**

**l** 3:5 5:2,2,2 124:5
124:19,22 162:5
192:19
**laber** 162:5
**lack** 25:2
**ladies** 152:13
**lady** 35:5,8
**lady's** 148:15
**laid** 46:23
**lane** 5:11 117:18
117:24 118:5
119:6
**law** 46:3
**lawsuit** 150:4
176:19,23 181:11
183:10

CHUBB-Altschuler/ROLEX & ART 0000293
092020001456

**[lawsuits - market]**

**lawsuits** 150:2,6
**learn** 151:14 162:6
**learned** 50:21
 102:6 188:17
**leave** 27:16 116:11
 118:8 158:11
**led** 79:25
**left** 9:7 11:9 28:22
 68:24 159:2,9,11
**legal** 123:4 196:1
**lessor** 143:11
**letter** 10:6,11,14
 10:21,23 150:18
 150:23 151:2,6,9
 176:22 177:18,21
 177:24 194:9,10
**level** 55:17
**liability** 5:15
**life** 54:17 168:19
**liked** 37:11 158:25
**likewise** 40:18
**line** 113:24 180:8
 193:15 194:4,20
 196:5
**lines** 45:4 66:16
**lisa** 35:9
**list** 189:8,25
**listed** 140:25
 141:9 142:13
**litigation** 94:6
 101:23 113:21
 142:3 144:19
**little** 26:23 31:2
 44:15 56:11 58:2
 58:3 61:11 73:11
 91:9 96:25 106:7
 110:21 114:24,24
 138:20 164:19
**live** 16:4,6 30:19
**lives** 30:8 175:6

**living** 26:20,21
 31:8 36:16 46:17
 47:10,14 50:3
 53:13,17 175:7
**llc** 11:3,5 110:17
 110:24 111:2,4,4
 117:17 128:8,10
 128:11 136:8
 194:22
**llp** 2:3,8
**loan** 118:2
**lobby** 36:15
**local** 107:13
**locate** 54:13 56:25
 83:15 86:6 103:22
 103:24 105:2,9
**located** 12:24 17:2
 43:4 46:11 59:15
 60:4 61:4,6 62:17
 82:4,18 83:16,19
 84:3 85:18,19
 143:19,19 164:23
 175:5
**location** 42:23
 159:6,10 160:22
**locations** 18:11
 161:3
**lock** 166:17,19
 168:4 170:13
 188:19
**lockbox** 161:2
**locked** 49:25
**long** 7:11 26:6
**longer** 76:5
**look** 52:11,23
 54:20 68:14 74:14
 100:20 104:20
 119:25 121:12
 125:10 142:23
 162:10 165:9,10
 165:20 174:17

 175:14 188:9,11
**looked** 20:24
 22:22 23:12 44:10
 175:16,21
**looking** 46:19
 54:10 68:18 98:11
 125:18 130:24
 133:2 134:25
 141:23 156:19
 187:22
**looks** 10:9 87:15
 125:18
**los** 28:25 61:17
 82:7 159:11
 172:14
**lose** 43:11
**loss** 1:6,10 16:14
 16:18 30:15 35:16
 43:8 45:9 48:18
 61:21,23 72:18
 106:21 107:4
 109:2,13,17
 110:12 112:14,18
 112:21 113:6
 114:2,5,12,20
 116:7 126:7
 132:22 134:21
 145:12 146:15
 149:17 157:9
 160:23 161:5,6
 162:16,17 163:22
 167:21 184:18,22
 185:9 186:8 187:5
 187:24 188:14,20
 188:22,23 192:16
 193:11
**losses** 149:12
**lost** 109:7 151:12
 161:10 178:6
**lot** 43:25 103:23

**loud** 53:6
**love** 80:7
**low** 118:18 126:8
**lower** 90:25 119:3
 119:9 130:21
**lunch** 75:23

**m**

**m** 125:7 192:20
**ma'am** 173:25
**mailbox** 119:25
**mails** 74:6
**maintain** 106:20
 115:12 116:16
 180:20 185:4
**maintained** 83:21
 106:24 107:4
 184:4
**maintains** 42:19
**making** 56:15
 76:22 163:5,12,19
**man's** 148:15,16
**mans** 152:13,14
**march** 10:12
 114:15 154:17
 165:13 172:2
 183:22 188:24
**mark** 21:14 52:24
 67:18 69:9 75:3
 110:6 115:19
 123:11 124:17
 128:21 129:8
 134:4 136:9
 138:17 146:3
 150:18 156:3,7
 174:7 183:6
 187:12
**marked** 9:21,24
 120:23
**market** 78:16 86:4
 86:10 173:14

marriage  195:13
married  6:21
master  114:23
mastercard
  112:24
matched  130:18
material  5:18
  181:18
matter  86:7 99:13
  195:14
mccullom  35:9
mean  9:17 22:19
  27:10 31:22 34:24
  47:21,24 54:5
  63:19 67:16 68:18
  69:24 70:10 74:21
  75:18 79:5 84:6
  87:11 89:18 108:9
  110:16 116:10
  145:9,16 149:15
  154:13 160:5
  161:7 167:19
  176:5 183:14,23
  187:20
meaning  170:17
meant  144:16
measurements
  46:22
meet  34:5 50:18
  83:7 175:10,15
meetings  34:9
  35:4 36:11
members  29:16
  30:25 108:24
  109:6 139:12
memory  20:4
  24:16 29:6 40:21
  80:20 82:2 91:7
  148:4 154:16
  155:10 168:24

mental  168:19,20
mention  18:3
  30:16,21,25 55:19
mentioned  1:20
  14:15 15:10 29:19
  30:5 34:23 36:10
  37:7 50:10 54:12
  58:2,10 62:19
  87:15 92:15 98:6
  103:2,13 115:11
  116:15 118:13
  133:11 160:9
  165:25 167:23
  176:6 185:4
mercante  2:8
mesh  7:23
met  34:7,11,18
  36:14 50:11 163:9
  175:12
metrics  133:5
michael  27:11
  58:11
middle  150:11
million  33:14
  35:16 80:13
  111:11 117:2
  119:5,14 121:4
  131:10,11
millions  126:8
mind  31:16 43:25
  58:17 60:13 89:12
mine  34:13 81:25
  93:16 147:13,13
minimis  134:18
minute  45:12
  114:6 186:19
minutes  24:2
  45:16 104:5
  111:18 144:9
misplaced  62:12

missing  43:16,19
  43:22 50:22 51:2
  56:18,22 58:8
  59:3,10,18,19
  60:14,17 61:25
  62:5,8 162:14
  167:13 169:7,11
  171:25 181:17
  187:19 188:6,18
  189:2
mm  120:15 188:12
model  152:8
  182:21
mom  26:4 27:5
  28:10 29:17 44:4
  77:10 78:24 85:12
  91:23 93:9 94:17
  97:8 98:23 99:10
  99:16,18 127:12
  157:23 158:8
  159:11,21 168:3
  169:12 170:15
moment  52:3 56:2
  144:13 153:11
  168:15
moments  22:10
  24:12 136:23
money  123:2,2,2,3
  123:4,8 124:9
  126:19,22 127:12
  137:4,16,23 138:7
  144:23 146:12
  147:2 155:12
  177:23
monica  12:25 14:6
  91:3
monies  144:18
month  115:7,9,12
  115:13 127:18
  185:8,11,12

monthly  114:25
  127:2 186:12
months  24:5 48:22
  65:7,8 103:22
  133:16 176:11
  177:2,3 181:21
  182:16
morbidities
  168:23
mortgage  117:7
  118:2,6,20,25
  119:10 146:24
mortgages  146:19
mother  19:22 20:6
  20:7 76:12,15,18
  76:21 77:3,6,23
  78:9 92:9,23 97:6
  97:21 100:14
  105:19 107:9
  127:13,14 159:13
  159:18 160:24
  164:15 166:2
  168:10,14,18
  169:15 171:3,7
  184:3
mother's  58:6
  76:13 94:16
  165:23 171:15
motion  3:17
mouse  11:17 64:14
  69:3 77:14,20
  80:4 84:17 87:7
  88:25 89:2,4 96:3
  99:11 104:11
move  3:12,15
  26:10
moved  25:20,21
  43:24 46:18
  148:12
moving  46:16

CHUBB-Altschuler/ROLEX & ART 0000295
092020001456

muddled 142:22
multiple 12:10
  15:9 18:4 19:11
  24:6 32:5 63:11
  103:4 104:22,22
  104:24 105:8
  106:14 131:25
  142:15 143:3,3
  157:17 163:2
  174:11,13 176:6
museum 61:18

**n**

n 2:2 3:5 38:14
  180:19 192:2,21
  193:2,2,2,3,3
  194:2,2,2,3,3,19
name 1:5,9 5:6
  6:23 7:21,22 11:2
  11:3 12:22 21:21
  27:8,11,13 29:21
  30:9 33:2,6 35:8,9
  38:4,18 67:25
  76:13 78:19,23,25
  79:6 81:24 91:6
  94:16 117:5
  122:10 130:2
  141:18 143:21
  152:20,23 162:4
  166:5,8,20 174:25
  175:2,3 176:16
  180:15,17,18
  184:20,21 194:8
  194:12 196:3,4
named 13:5 41:18
  41:24 111:5
names 7:3 27:10
  59:20 91:8 144:2
  166:23
national 1:7,11
native 164:21

natural 55:16
necessity 85:16
need 10:8 45:11
  76:7 111:18
  114:10 144:9
  147:15,21 153:11
  153:11
needed 46:22,22
  127:3
neither 148:5
nephew 167:5
net 115:15,16
  120:7 122:8
  131:16 132:14,18
  192:17
netted 138:8
netting 138:10
nevada 18:6
never 22:5,15,19
  35:23 47:2,2
  49:23 50:20 54:15
  62:7 81:21 93:14
  102:9,16 119:25
  145:6,24,25
  158:19 160:14
  164:3 166:9 167:7
  175:16 184:9
  186:23
new 1:15,15,22
  2:10,10 5:4,11 7:6
  10:24,24 28:11,23
  28:24 34:10,11,20
  36:14,14,16,17
  79:11 102:6 103:9
  103:11,15 116:24
  117:16,23 143:19
  148:12 155:5
  157:3,8,10,15,17
  174:21 175:6
  181:24 195:6

nine 133:15
nonsense 181:13
notary 1:22 3:20
  3:21 5:3 6:2,18
  190:16 191:13
  195:5 196:21,24
note 66:18,24 67:5
noted 190:19
notes 134:14,17
notice 10:3 150:20
  154:3 192:8 193:6
notified 47:3
  48:10,17 59:2
  62:8 110:24
notify 45:6 46:24
  50:25 60:15
november 25:22
  26:11,18 28:7,8,19
  29:5,13,16,23
number 1:5,6,9,10
  21:13,18,22 23:18
  27:14 31:5,5
  32:23 34:7 54:9
  63:14 64:21 68:22
  76:23 84:17,18
  85:5,5 89:21 90:3
  94:21,22 95:10,17
  96:6 97:22 98:7
  102:3,5,19 105:12
  105:21,22 106:12
  106:15,17 110:14
  115:5 116:8,10
  117:23 118:9,15
  118:17 121:9
  123:19,20 126:16
  127:9 129:5
  130:23 133:3
  134:16,19 136:12
  144:25 147:12
  153:7 155:23
  159:2 160:18

175:13,21,21
  179:11 187:4
  194:21
numbers 54:8
  61:16 127:22
  131:8 163:24
  172:19 173:15
numerous 26:8
  132:2
nupulse 129:11
  130:14,19 132:10
  133:10,11 134:7
  134:13 192:23
  193:25
nupulsecv 7:24
  129:9,15 130:18
  130:22 131:7,24
  132:4,20 133:7

**o**

o 3:5 5:2 79:4
  128:4,23 192:22
  193:2,3 194:2,3
oakley 1:21 195:4
  195:18
oath 1:3,19 101:12
  102:13,20 108:11
  108:13 185:21
object 3:11,14
objection 69:19
  96:11
obligation 102:7
  102:19
obscure 103:5
obtain 139:10
obviously 74:3
  83:10 90:11
occasion 49:24
  50:12 97:17 160:8
occasionally
  157:11,12,12
  167:9

CHUBB-Altschuler/ROLEX & ART 0000296

092020001456

occasions  33:4,4
34:8 103:3 151:20
157:13,17
occupied  18:12,13
occur  155:2
occurred  30:15
43:8,11 45:9
72:18 73:16 107:5
110:12 146:15
160:23 161:15
167:22 185:9
188:20,22
october  1:16 29:4
29:7,7,8,13,16,23
65:12 70:12,12
147:24 169:4
195:16
odd  55:21,23
104:10 159:3
164:20
offer  189:17
offered  99:18
offhand  27:9
61:10 131:14
office  173:5,20
officially  189:5
offset  138:15
144:16,18
oh  7:17 27:10
ohio  2:5
okay  12:9 39:4
40:8,25 46:14
50:21 51:17 52:23
53:2 68:21 69:22
76:13 78:6 82:22
89:21 96:8,23
98:15 117:12
123:7 126:4 136:6
137:17 138:16
166:11 169:5
173:7 178:7

180:25 187:3
old  67:6 84:21
120:19
once  35:21 63:3
ones  13:7,12 37:4
37:5 93:17 101:24
120:22
open  22:9 23:5
44:16 49:15,22,25
50:2 51:6 189:8
189:25
opened  20:23,24
22:5,14,19,22,24
23:5,9 49:24
52:21 63:6,11
170:21
opening  49:11
50:4 171:14,16
opinion  66:6,6
opportunity  52:11
179:4 188:9
opposed  18:8 29:5
36:2 40:3 118:13
order  42:22 91:14
93:20 113:20
origin  110:8
187:16,18
original  3:23 4:2
23:14 104:13
originally  151:21
outcome  195:14
outside  103:24
outstanding
134:15 149:9
overvalued  178:18
ow  137:7
owed  137:5,14,19
137:23 138:7
owes  137:6,25
147:2

owing  137:9,15
owned  37:10 72:9
72:13,17 75:19
84:24 110:16
129:24 140:20,21
140:22
owner  13:2,5
owners  11:4
194:22
ownership  31:19
39:15 101:20
130:17,18
owns  117:17 131:7

**p**

p  2:2,2 3:5 129:10
134:6 192:23
p.m.  190:19
package  60:2
packaged  18:17
18:19 40:17,18,20
60:21
pad  48:2
page  6:17 45:3
52:11 53:3 64:4
65:20 66:9 68:15
68:17,20 86:11
88:20 95:20 96:24
110:5 123:23
124:13 125:18
128:24 135:13,23
136:15 137:2
138:19 139:7
140:13,15 144:14
190:16,20 192:3,7
193:4,15 194:4,20
196:5
paid  13:18 39:7
55:7 61:12,14,16
61:19 78:13 115:9
137:13,14 144:23
148:3,5,7,8 149:3

149:14,15 152:25
153:5 154:7,10
156:25 177:15
182:24 185:11
painting  59:23
paintings  61:25
palm  180:22
paper  32:14 60:24
60:25 61:3 119:24
paragraph  53:4,5
53:10,20,21 54:4
54:19 86:13 143:2
parents  16:2,4
18:13 21:24 22:2
26:25 30:5 106:20
107:4 125:24
158:6,15,23
159:10 160:21
166:16,21,25
part  3:10 5:21
18:21 84:12
133:12,13 137:17
142:13,15 143:3
157:10 173:16
181:14,16
participation
135:21
particular  46:21
86:3 87:13,14
99:4 100:20 123:4
123:5 125:8
particularly  73:9
77:15 86:2
parties  3:7 34:14
34:16,18 195:12
party  88:12
passed  38:3,6 47:6
170:8
passing  127:12
169:13

CHUBB-Altschuler/ROLEX & ART 0000297

092020001456

paul 134:6
pay 13:17 39:4,4
99:18 114:25
115:7,7 137:10,20
137:21 153:24
154:6,11,21 155:9
163:10 182:23
payment 13:21
154:13 156:21
pays 186:11
pearson 59:23
60:20,23 61:15
pending 150:6
163:9
people 21:25
32:23 84:15 86:2
86:7 89:16 92:17
100:7 103:24
127:8 166:24,25
174:11,13 176:6
percent 23:17
131:6 133:10
percentage 8:13
131:13,21
perfect 175:23,25
177:13,14,15,15
177:16 178:23
179:2,5,7
performed 133:17
period 10:11 26:6
32:22 48:21 68:25
71:5 79:9 146:14
167:23 177:20
periodically 65:7
permission 181:6
permitted 6:3
person 21:22 33:9
38:23 39:18 57:15
57:16 83:4,7 97:2
99:24 151:23
152:20 173:3

174:23 180:15
person's 33:2
personal 16:8
110:23 124:9
139:11 141:20
169:6,10 186:17
personally 34:6,7
122:22 160:14
pg 193:10
phoenix 18:5
34:15,25 35:2
36:18,23,24 39:3
40:23 41:4
phone 84:8
phonetic 35:9
59:23
photo 193:16
photograph 14:16
15:3,5,11,13,17
23:23,24 24:7,10
24:17 56:3,5,9
83:16 87:10,12
160:6
photographed
24:14
photographs
14:18,23,24 83:14
86:16,23 87:9
160:4,7
phyllis 125:22
126:5
physical 168:18,20
pick 47:4
picked 26:12
picture 56:8
pictures 91:11
piece 25:3 37:18
37:19,20,22,24,25
38:7 41:21,22
60:8 66:17 78:2
81:25 85:6,9,15

95:13 98:23 100:9
100:18,20
pieces 41:21,23,25
53:21 60:19 61:9
61:13 64:12,18
69:3 81:12 85:7
86:3
pima 52:18 55:17
pink 14:15
place 1:21 24:25
26:18 34:9,10,21
36:15 39:2,3
42:19,22 83:22
117:24 155:14
180:20
placed 18:23 19:3
20:12,15,17,19
24:21 25:19 27:18
places 18:9
plaintiff 150:2
planning 17:11
plate 25:4
please 5:7,10 6:8
7:4 9:20 21:13,18
25:15 45:3 52:2,7
53:3,24 62:10,24
64:4,21 69:10
75:4 86:12 87:6
91:10 95:22 99:17
99:19 100:23
109:10,23 123:12
124:20 125:5
128:2 135:10
146:4 150:19
156:7 162:4,10
167:16 173:23
175:2 179:12
187:13
plus 35:13 89:16
95:16

point 9:7 10:7
13:20 23:24 28:22
32:6 35:11 36:23
42:16 50:22 63:22
65:17 71:24 94:6
104:13 110:22
136:21 150:10,23
157:16,25 168:6
172:10,21 190:3
police 43:19 45:6
48:11,16 50:25
51:4,10,11,21,23
52:4,14 53:10
54:22 55:8,11
56:13,14,15,15
59:3 60:15 62:4,8
62:23 107:14
148:24,24 163:21
164:4,7,14 192:10
policies 17:21
policy 1:5,9 5:16
67:17 68:12,15,20
68:25,25 69:10,12
69:16,17,20,21,22
70:6,11,21,23 71:6
107:3,3 111:5,7
143:6,9,9,11,13,13
192:13,14
poor 27:10 140:4
portion 79:19
posed 133:19
position 81:15
116:17
positive 89:24
possession 15:14
15:23,25 31:25
62:18,21 66:24
85:4 101:25 103:9
103:12 107:2
158:3,4,19 159:19
165:23

CHUBB-Altschuler/ROLEX & ART 0000298

092020001456

[possible - purpose]

possible  15:18
  29:5 40:21,23
  42:11 79:12 87:11
  91:8 94:18 134:14
  160:19 166:23
possibly  96:17
potentially  167:5
precise  95:13
  126:16
preferably  10:2
premise  57:5
premises  21:23
  106:21 109:2
prepare  116:23
  117:21 133:4
  187:21,21
prepared  101:12
  108:12,13 130:16
  133:5 174:5
  187:24
prerequisite
  113:14
present  2:14 18:16
  19:3,14 34:19
presently  8:5,7
  150:4
pretty  50:4,5
  118:14
previous  129:4
previously  22:7
  23:18 108:20
  111:8 126:23,24
  176:18 182:11
  185:4
price  87:16
prices  64:16 81:7
  177:11
primarily  17:25
  53:13
print  60:11 87:13

prints  15:4 87:8
  89:16
prior  16:14 32:12
  33:4 35:16 44:14
  45:21 46:6,15
  48:17,20 58:21
  67:22 92:22 102:9
  111:21 118:25
  119:10 127:12
  143:2 147:4,24
  149:12 168:10
  169:13 176:21
pristine  84:22
  85:12,15 87:8,18
  92:14 181:25
  182:2
privacy  113:12
private  139:18
  174:16 180:5
  184:5
privileged  121:25
probably  74:8
  86:7 103:13 115:3
  116:14,24 121:16
  162:20 168:25
  177:2 184:6
procedure  5:15
proceeding  101:24
process  56:17
  119:24 143:16
produce  190:2
produced  15:17
production  14:21
  15:16 130:8
  138:13
prompted  18:7
  26:10 37:9 73:7
  77:10 181:22
promptly  15:17
  56:12

pronounce  79:3
proof  14:11 31:18
  39:15 84:19 89:16
  95:16 101:20
  109:13,17 156:21
  187:5,24 192:16
  193:11,18
properties  117:25
property  16:8
  59:4 70:25 71:2
  108:25 117:17
  119:7 122:9
  140:20,23,25
  141:9,10,10,12,14
  141:15,17,18,19
  141:19,20 142:9
  142:10 169:19
protection  18:25
prove  39:12
provenance  86:16
  86:24 87:24 91:2
provide  5:23 9:6
  15:19 27:15 28:13
  42:10 51:13 67:3
  84:10 93:10 98:25
  104:25 112:5,10
  113:9,15,24
  115:19 119:21
  121:13 126:11
  134:19,22 139:15
  144:5 147:14
  151:23 156:10
  175:4 179:18
  180:8,23 181:3
  183:4 184:23
  186:23 188:5
  189:8
provided  3:9,24
  5:16 14:24 21:20
  22:7 23:18 33:3
  51:11,15,17,23

52:15,16,17 54:22
  63:21 64:10 86:16
  86:24 88:8 93:8
  97:10 98:2,5
  101:2,5 106:5,6
  108:5,15,20,22
  120:20 122:2,5
  141:5 151:20,22
  151:24 156:22
  161:14 172:16
  184:17
providing  21:2
  177:17 178:13
public  1:22 3:20
  3:21 5:3 6:2
  191:13 195:5
  196:24
pull  51:25 81:24
pulse  134:7
purchase  12:20
  13:7,24 14:11,22
  15:2,7 24:4 34:2,3
  38:11 54:16 76:23
  94:20 104:15
  151:18 183:2,15
purchased  12:12
  12:19 13:15 14:4
  14:10 15:21 18:10
  33:23,25 35:22
  39:20 40:2,4
  54:21 55:7,12
  61:17 64:10 87:25
  88:3 91:2 101:24
  151:22 153:14
  175:13 177:7
purchases  91:5
  120:9
purchasing  104:6
pure  28:5 155:12
purpose  28:8 36:7
  46:16,21 100:14

CHUBB-Altschuler/ROLEX & ART 0000299

092020001456

**purposes** 36:5
64:7 66:10 186:14
**pursuant** 111:7
**pursue** 183:10
**pursuing** 181:11
**put** 9:19 14:15
21:12 27:24 45:10
48:5 63:13 64:20
66:21 68:10 70:4
74:14 88:4 92:19
93:20 94:24 97:21
100:23 109:10
115:14 122:12
124:3 128:2
131:16 136:12
144:12,24 153:6
156:6 161:2
163:14 173:22
179:11 187:3
188:14
**putting** 46:20
167:8

**q**

**qualification**
36:12
**qualified** 59:14
85:22
**quality** 174:19
**quantity** 85:10,14
92:16
**question** 3:12,14
9:6 12:3,7 14:2
16:23 19:16 21:21
23:3 24:2 38:15
40:16 45:21,25
46:4,6 48:20 49:3
51:7 57:20,22,25
79:17 85:17 88:7
94:14,14 95:5,9,19
96:18 100:6
104:14 105:7,14

105:24,25 106:10
110:14 114:8
128:6 129:14,18
131:19 133:19,20
133:23 134:12
140:12 141:8,11
141:12 142:8
159:8 161:8 189:7
**questioned** 33:5
**questions** 5:17,20
21:3 54:9,24 55:2
55:4 57:24 102:20
103:6 108:13
139:16 140:5
**quick** 54:19
**quite** 7:13 26:5
43:25 46:14 76:3
77:21 78:2 80:3
86:6 133:23
139:10,19 150:14
163:11
**quote** 96:2

**r**

**r** 2:2 5:2 38:14
136:14 138:18
144:13 162:5
192:25 193:14
194:3,19 195:2
**rafters** 50:3
**range** 115:4
116:14 127:24
**rare** 49:24
**rarely** 36:3 49:23
49:24 155:22,22
160:9,9
**read** 46:7 51:21
53:5,6,20,24 79:16
79:20 145:22
**readily** 23:11
**reading** 123:19,22
124:13,16 129:5,6

147:12
**ready** 46:18 140:3
140:5
**real** 117:15,22
119:4 136:6
**really** 36:20 37:11
64:14,15 95:8
**reams** 119:23
**reason** 17:15
30:24 31:6 35:24
36:22 39:25 40:7
55:9 57:23 58:4
62:7 64:6 77:18
84:25 85:6 113:8
117:19 121:18,20
121:21 140:24
145:11 154:24
158:17 163:4,7,18
164:3,5 170:16
196:5
**reasonably** 114:15
**reasons** 123:5
185:6
**recall** 14:13 21:2
21:10,19 24:10,12
29:3 32:4,7 34:17
35:8 36:11 39:7
42:15 49:17 51:14
51:17 54:9 55:11
56:8 59:21 60:10
61:12,16,24 62:3
63:17 64:25 67:25
68:7 69:16,18,25
70:10,25 71:11,16
72:3,21 74:10
76:22 78:25 79:12
81:23 82:21 83:20
87:9 92:2,4,7,10
93:8 97:18 105:13
105:20 109:16
147:24 148:17,20

148:24 149:17
167:17 169:16
172:13 174:9
**recalls** 43:6
**receipt** 14:14,15
15:2 39:11 105:2
105:9 141:4,5
173:10 193:17
194:13
**receipts** 14:19,22
14:25
**receive** 10:6 41:20
126:19 127:2
150:23 190:9
**received** 10:10,14
19:21 21:7 41:15
42:16 52:18 54:15
54:17 65:16 104:9
123:6 127:20
150:25 151:6
165:22 180:4
**receiving** 51:14
73:9 74:10,22
77:10 126:22
127:17
**recognize** 52:8,13
153:10,12 167:4
179:15 187:7
**recollection** 12:2
14:14 25:15 32:25
33:8 40:19 48:2
53:16 59:22 70:16
71:12 74:22 77:17
91:18 93:5,7 97:3
99:17 103:8
133:21 137:9,12
137:15 148:6,9
149:13 156:18
167:19 170:14
**record** 5:6,10
32:10 38:14 42:9

CHUBB-Altschuler/ROLEX & ART 0000300

092020001456

**[record - respondent]**

45:9,10 94:3,9
106:11 123:15
142:21 180:4
195:10
**recorded** 106:4
**records** 9:5 71:21
104:17,20,22,23
107:12 113:22
182:25 189:6
**refer** 78:4 132:16
**reference** 138:21
142:22,23,25
143:2
**referenced** 52:19
**referral** 142:13
**referred** 11:16
68:19 77:3 92:24
97:5 107:24 108:5
116:22 118:2
125:25
**referring** 108:19
110:19 111:6
120:18,22 122:5
128:24 132:14
142:2 147:8
163:15 170:4
**refinance** 117:9
118:25 119:2,4
193:21
**refinanced** 118:24
119:3,7,9,13,22
**refinancing** 117:8
**reflect** 153:4 186:6
**reflected** 98:4
133:13,14 146:24
154:21
**reflecting** 28:14
31:18 42:10
107:13 182:25
**reflects** 138:10

**refreshed** 148:4
**refusal** 163:10
**refuse** 113:24
**refused** 115:24
**refusing** 113:8
**regard** 105:6
**regarding** 10:3
14:22 79:8 83:11
92:25 97:3 107:3
139:17 177:9
189:24
**reimbursed**
183:14
**reiterate** 186:10
**related** 195:11
**relates** 139:12
**relating** 140:12
**relation** 28:4
**relative** 44:21,22
44:24 45:23 46:2
49:5 111:15
**relatively** 71:5
143:11
**relatives** 48:14
**relevance** 94:24
95:17 113:13
**relevant** 5:18
55:25 80:10 95:3
95:6,13 113:23
139:19
**relied** 96:9,17,19
**relies** 101:9
**rely** 96:13 135:23
**remain** 25:19,21
**remained** 22:4
25:23
**remains** 141:20
**remember** 24:4
27:9 28:25 29:17
33:2 34:25 40:24
41:10 51:19 53:18

53:19 54:11 55:15
55:20 63:10 70:22
76:22 77:19 80:21
83:2 87:12 89:5,7
89:10 97:9,9,12
103:5 147:16,19
148:3 149:16
152:20 154:20
160:2,20 168:12
**remembered**
104:4,5,6,7,9
**remembering**
27:10
**remind** 46:20
**reminisced** 78:15
**removed** 16:13
22:15 57:8,11
**reno** 18:6
**repetitive** 32:5
34:22 75:18
**rephrase** 73:18
**replace** 182:15,17
**replaced** 182:12
**replacement**
182:18 183:2
**report** 51:10,22
52:4,14,24 54:2
56:12,16 62:4,23
192:10
**reporter** 45:19
46:8 79:16,20
190:8 193:12
195:4
**reporting** 162:17
**represent** 123:22
153:13 156:13
162:19
**represented**
174:20 175:22,24
179:2

**request** 5:24 21:9
27:15 51:14 84:10
100:25 101:16
121:13 138:13
140:13 165:4,10
181:7 184:19
185:7,18
**requested** 14:18
14:21,23 15:16
79:19 97:10 112:6
113:23 161:12
164:24 165:2,2,4
189:6
**requesting** 181:2
**requests** 163:11
**required** 196:21
**resealed** 24:22
**research** 61:11
88:9
**reserve** 189:13
**reserved** 3:13,17
**reserving** 189:17
**reside** 117:18
**residence** 18:5,5,6
**resident** 7:6,9,11
**residing** 17:25
**resolve** 137:13
**resolved** 137:11
144:22
**respect** 9:16 87:23
99:4 107:14
163:22 165:15
169:24 183:13
**respective** 3:7
**respond** 51:7,12
57:19 63:9 101:16
177:21
**responded** 55:22
74:4 178:3
**respondent** 2:9

CHUBB-Altschuler/ROLEX & ART 0000301

092020001456

**responding** 57:21
**response** 12:10
  21:19,24 22:6,16
  22:20 23:18 24:3
  51:12 55:4 57:24
  100:25 101:21
  102:3,5,17,19,24
  103:10 105:14,15
  105:21 106:15,17
  107:12,15,24
  108:18 110:14
  165:7,8,15 178:5
**responses** 21:2,9
  21:15 101:4,7
  102:9 106:5
  107:25 108:15
  192:9
**responsibility**
  8:23
**restroom** 144:9
**result** 59:4 177:24
**retained** 104:23
  193:12
**retired** 42:20
**return** 3:22 6:2,17
  112:3,10 135:11
  135:14,20,25
  136:9 177:23
  184:10 192:24
  193:20
**returned** 28:23,24
**revamping** 180:13
  180:16
**review** 9:5 71:20
  190:15
**reviewed** 187:24
**richard** 38:5 50:15
**right** 3:11 6:20
  22:22 47:3,10
  66:11 73:21 74:13
  108:6 117:22

118:3,10 131:2
  142:5 150:6 175:7
  175:18 185:14
  189:14,17
**rights** 3:9,24
**rings** 164:19
**robe** 60:9
**robert** 13:5 103:19
  103:21
**rolex** 59:14 62:2,5
  62:8 138:21,25
  139:4 140:12,20
  140:20,21,22
  141:13 142:12,13
  142:18,22,22,24
  142:24,25 147:25
  148:10 150:10,13
  150:20 151:12,18
  152:2,8 161:5
  163:22 164:12,12
  164:13,16 174:21
  174:24 175:16
  176:4,7 177:5,9
  178:17 179:13
  181:9 183:13
  184:8,19,22,25
  185:9 186:8
  187:19 188:6,18
  188:18 193:6,10
**rolexes** 142:15
  143:3
**room** 20:20 24:22
  24:25 26:20,21
  46:17,17 47:10,11
  47:14,14 53:13,13
  53:17,17
**rooms** 47:12
**royalties** 136:7
**rubin** 2:8,11 5:5
  5:13 6:12 9:19
  10:2 21:12,17

38:15,19 45:17,19
  45:22 51:25 52:6
  52:10,23 53:3
  62:23 63:13 64:3
  64:20 65:19 67:18
  68:10,22 69:9
  70:4 75:3,7,10,22
  86:11,20 88:20
  91:9 95:22 96:23
  98:15 100:22
  101:18 102:14
  108:14 109:9,23
  110:5 111:17
  115:14 122:12
  123:11 124:2,17
  124:20 125:5
  127:25 128:21
  129:7 134:4
  135:10,13 136:9
  136:12,15 138:17
  139:7,20 140:8,17
  143:7 144:12,24
  146:3 147:10
  150:9,14,18 153:6
  156:3,6 160:11
  173:22,25 174:7
  179:8,11 183:6
  185:23 186:4,16
  187:3,12 189:22
  190:6,11 192:4
**rule** 3:24
**rules** 3:10
**run** 8:21 9:18
  36:20,22
**running** 114:21
  185:4
**ruscha** 41:24

| s |
| --- |

**s** 2:2 3:5,5 5:2,2
  79:4,4 145:3
  146:5 192:6 193:3

193:5,14,14 194:3
  194:3,19,19 196:5
**safe** 161:21 165:25
  166:2,13,16,18
  170:20,22 171:14
  184:3 194:14
**safeguarding**
  168:3
**safety** 59:16 62:16
  161:2,12 164:22
  168:5 170:8,13,18
  188:15
**salary** 135:15
**sale** 80:6 155:2
**sales** 154:20,23,24
**sam** 146:5
**santa** 12:25 14:6
  46:12 91:2
**sat** 36:15
**save** 156:23
**savings** 112:17
  121:19 145:8
**saw** 14:9 20:19
  29:17,18 31:14
  34:14,15,16,25
  36:14,17,18 43:12
  93:14 157:20
  159:2,22 160:14
  160:19 167:17
**saying** 36:13 66:19
**says** 21:8 29:14
  53:4 54:19 66:9
  86:13,21 87:9
  90:5,7,10,14,15,17
  90:25 91:4 105:17
  107:12,15 110:8
  115:23 116:22
  123:17 128:25
  129:2 130:25
  137:4,24 140:17
  140:19 141:16

CHUBB-Altschuler/ROLEX & ART 0000302

092020001456

152:8 153:3
**scan** 136:23
**scarcity** 37:13
**schedule** 47:4
  136:2 149:18
**scheduled** 143:10
**schwab** 122:7,13
  124:4,21 125:6
  128:3 129:9 130:6
  132:2 184:21
  192:18,19,20,21
  192:22,23
**scope** 141:7
**screen** 9:19 21:12
  21:13 52:2,9
  63:13 64:20 68:10
  70:4 74:14 86:18
  86:19 98:12,16
  100:23 109:10
  111:18 114:11
  115:14 128:2
  136:12 143:8
  144:24 153:6
  156:6 173:22
  179:12 187:4
**screens** 82:14
  192:8
**scroll** 10:7 52:6
  64:3 65:19 68:22
  75:7 91:9 95:22
  138:19
**scrolling** 109:23
**scrupulous** 168:3
**sealed** 20:24 63:12
**search** 62:16
**second** 12:13
  33:22,25 34:2
  37:9 38:12 39:16
  39:20 40:8 53:4
  64:4 65:19 78:13
  86:13 102:12

149:4 153:20,21
**security** 47:16
**see** 7:22 10:8
  22:14,22 23:12,20
  29:16,22 35:13
  36:24 42:3 45:3
  53:21 57:10,14,16
  58:7 63:7 64:5
  65:14 68:24,25
  75:25 77:13 80:6
  85:17,18 86:18
  95:23 107:15
  108:9,18 109:11
  109:22 112:9
  114:14 116:18,23
  118:4 126:4
  130:10 138:21
  140:19 142:24
  153:19 158:12
  168:7 173:20
  185:16 186:6,7,18
**seeing** 14:13 31:15
  63:17 64:25 96:5
  167:20
**seeking** 177:23
**seen** 10:18 35:12
  44:6 63:19 65:3
  70:8 94:19 145:4
  145:24 146:7
  164:25 166:21,25
**sell** 64:13 78:2
  82:11 99:20,23,25
  100:18 155:21,22
  155:24 164:13
  173:13 181:11,23
  182:4,8
**selling** 82:10
  155:25
**semantics** 22:24
**send** 6:6,15,16
  21:21 135:23

180:3 181:18
  186:25 190:14,15
**sense** 23:16
**sent** 18:11 26:6,9
  40:9,21 66:18
  74:2,3,6 107:19
  137:2 141:16
  145:9 155:3,4
  156:20,24 172:17
  177:18 179:24
  180:2 181:10,14
  186:24
**separate** 58:19
  126:3
**serial** 163:24
  172:19
**series** 56:6 87:14
  88:16 95:16
**seriously** 55:14,14
**service** 73:8,12
**serviced** 184:8
**set** 11:22 12:13,17
  12:18 18:21 24:13
  24:14,15,19,20
  33:22,25 34:2,4
  36:21 37:3,9,10
  38:12 39:16,20,24
  40:2,3,8,15 41:5
  41:13,15 65:8
  67:11 74:24 77:14
  77:20 78:2,13
  80:4 84:22 85:12
  87:7 88:25 89:15
  96:20 100:24
  121:23 133:6
  165:16 195:8,15
**seth** 124:23
**sets** 11:22 12:11
  12:18 24:13,17
  37:14 77:13 80:5
  95:16

**settle** 137:16
**settled** 137:22
  139:17 144:17,22
**settlement** 136:13
  136:17,24 138:18
  139:12 144:13
  192:25
**seven** 127:8,10
  187:4
**shaped** 47:9
**share** 10:15,16
  31:6 127:5,11
**shared** 127:6,7,7
**shareholders** 11:4
  194:22
**shares** 8:13
**she'll** 166:7
**sheet** 6:12,18 89:8
  190:17 196:1
**sheriff's** 52:18
  55:17
**shipment** 19:21,24
**shipped** 16:2
  17:24 18:7 19:2
  19:10 26:13,15
  40:12,13,14,23
  157:3
**shipping** 19:12
  23:13 46:23 47:3
**shock** 44:2
**shop** 155:18
**short** 45:13 71:5
**shorthand** 195:4
**shortly** 51:20
**show** 35:21 70:17
  81:25 83:14
  111:24 126:11
**showed** 44:11
**showing** 87:10
  186:5

**shown** 132:7,10
  152:14
**shows** 31:21
**siblings** 30:18,21
  167:2 170:3
**sick** 168:14
**side** 118:3
**sign** 5:25 109:25
  135:22 137:3
  138:4 190:15
**signatory** 136:20
  190:16
**signature** 6:17
  109:18,20 135:23
  137:2 195:18
**signatures** 109:22
**signed** 90:14 112:8
  136:21,24 187:25
**significant** 83:3
**silence** 37:21
**silk** 82:14 192:8
**silkscreen** 46:11
  56:9 95:4,6
  110:20 134:10
  145:13 146:15
  163:15 184:18
**silkscreens** 10:4
  11:14,20 12:4,11
  12:15,21 13:14,17
  13:25 14:5,9,12,22
  15:21 16:15,18,20
  18:16,20,21,22,23
  19:4 21:23 22:2,3
  22:14 23:14,20
  24:18 25:18 26:2
  31:19 32:2,18
  33:9,14,23 35:15
  35:25 38:11 39:5
  39:12,16,21 42:13
  42:23 43:16,18,22
  44:12 46:16 50:21

56:6 63:2 64:6,8
  65:22 67:14,20
  68:8 69:5 71:9,14
  71:17,21 72:6,9,13
  72:18 73:20 75:13
  75:19 78:10 79:8
  81:4 82:15 86:9
  88:13,15,17 92:12
  93:14 94:2 96:3
  101:20,22 103:25
  104:6,11,12,14,15
  105:11,18 107:15
  111:7,22 112:15
  112:18,21 140:2
**similar** 31:22
  40:14 118:9
  182:19
**simple** 57:24
**simply** 15:7 24:15
  24:20 32:17 40:24
  55:24 57:8 86:4
  97:13 141:18
  167:18
**single** 64:19 92:5
  154:13
**sir** 6:21,25 7:14,24
  9:14 11:13,14,19
  12:6,17 14:2,20
  15:3 17:19 20:3,5
  20:8,17 21:5,6
  22:6,20,21 23:4
  24:3,6,23 25:14,25
  27:20 31:10,24
  32:19,25 33:9,11
  33:15,20,24 34:21
  34:24 37:7,19
  39:23,25 40:16
  42:9 43:5,7 48:23
  49:13 50:9,25
  51:20 52:8,16
  53:5,22 56:2,7

57:2 58:2 59:6
  60:7 61:5 62:7
  63:10 64:2,25
  65:6 67:13,23,24
  68:7,14 69:7 70:9
  70:15,24 71:12,16
  72:16,19 73:22
  74:12,15 75:6,15
  75:21 76:6,7
  78:22 79:4,16
  80:23 81:6,16
  82:5 86:13 87:3
  87:22 88:5 89:15
  89:22 90:2,12,16
  90:21 92:2,18,20
  93:3 94:5,10,22
  95:5,20,23 96:4,10
  96:16,18 97:7,19
  98:11 99:6 100:5
  101:19 103:3,12
  104:24 105:20,24
  106:10,14 109:11
  112:7,11,13 113:6
  116:2,4,21 117:9
  118:24 120:19
  121:18 122:15
  123:16,17 125:3,9
  125:11,22 128:5
  129:3,13,18,25
  133:4,24 134:7
  135:3,21 136:16
  138:9,22 140:2,10
  140:19,21,24
  141:21 142:2,3,11
  142:21 143:2,5,5
  146:16 147:6,10
  147:15 150:15
  151:17 153:10,13
  155:4,21 156:13
  157:2,22 159:8
  161:4 164:3 166:9

169:3 171:5,9
  176:9,25 179:15
  179:25 181:8,18
  182:22 183:22
  184:12 185:11,19
  187:7,17 188:7
  190:5
**sister** 27:6 30:8
  31:3 44:18 48:25
  57:7,10 58:3,17
  62:22 139:24
  162:10 164:6
  165:6 166:6,10
  167:3 170:24
  184:6
**sister's** 62:15
**sit** 40:5 139:16
**sitting** 40:25 82:19
  158:7 173:5,20
**situation** 44:21
  129:13 164:8,9
**six** 24:5 65:8 70:5
  102:2 103:14
  133:15 136:15
  176:10 177:2
  181:20 182:16
**size** 89:8,17,19
  97:22
**ski** 158:7
**sleeve** 60:25
**small** 146:11
**sold** 64:13,16
  100:4,7,10,15
  143:12 155:23
  179:6 182:10,18
**sole** 93:11
**solely** 87:20
  125:14
**solutions** 196:1
**somebody** 9:10
  80:16 93:20 121:7

CHUBB-Altschuler/ROLEX & ART 0000304
092020001456

122:10 133:4
141:13 161:20
174:17 179:23
**someplace** 159:14
**somewhat** 10:9
66:17 123:3
**son** 125:10,15
**soon** 184:11
186:25 189:9,25
**sorry** 14:20 16:22
29:22 73:17 85:20
105:22 154:7
159:7
**sort** 28:14 56:16
76:2 78:15 86:9
**sorted** 141:24
172:19
**sound** 33:6 68:5
70:2 72:24 73:21
78:19 79:4 131:2
**source** 103:15
**speak** 88:10 166:6
176:7 184:24
**speaking** 54:6
58:16
**speaks** 62:14
**species** 85:13
**specific** 20:4 40:6
40:19 58:20 77:19
82:13 88:15,17
91:18 95:25 98:24
105:10 164:5
168:21 169:16,19
170:17 171:24
187:15,16 188:5
**specifically** 49:17
51:5 53:12 82:17
85:17 92:2 93:7
96:14 171:16
179:16

**specificity** 188:21
**specifics** 143:20
**spectrum** 166:24
177:14
**speculate** 24:17
**spend** 114:24
**spent** 147:11
**spoke** 44:5,20,22
44:24 45:23 46:2
78:24 97:8,8
176:13
**spoken** 166:10
**sports** 152:7
**stainless** 148:11
152:6
**stand** 24:3 101:11
176:21
**standard** 93:13
**stands** 122:20
**start** 47:22 150:10
**started** 26:16 71:2
140:11 182:7
**starters** 31:2
**state** 1:22 5:3,6,9
7:6,9,12 43:2
83:24 131:24
155:2,3 195:5
**stated** 53:21 54:20
**statement** 6:4 53:9
54:21 101:14,15
106:4 114:16,18
130:9,10,12,14,16
130:24 131:16
132:5,7,11,17,19
134:4,25 145:24
146:19 149:5
189:11,14,16
192:18,19,20,21
192:22,23 193:24
**statements** 54:25
87:21 113:5,15,25

115:6,25 116:18
132:15 145:2,22
146:4,14,25
184:17,20 185:8
185:17 186:5,7,17
193:5 194:7,15,16
194:17
**stay** 157:8 158:15
160:21
**stayed** 157:10
**steals** 164:12
**steel** 148:11 152:6
**step** 56:17
**sticking** 26:22
**stipulated** 3:6 4:4
**stock** 130:18
**stockholder** 8:11
129:15,19
**stockholders** 8:24
9:2,13 129:17,20
194:21
**stolen** 56:19 62:11
62:20 158:11
**stop** 140:8 150:10
**storage** 25:5,8,12
26:13 46:25
143:15,17,18,21
143:24 144:3
194:6
**stored** 22:2 60:19
143:24 144:4
**story** 78:11
**straight** 57:13
**strategic** 40:7
**street** 1:14 2:4
10:24 14:8,8
45:10 148:18
155:6
**stressed** 87:18
**strike** 3:12,15

**stringer** 2:6 6:8,20
9:23 38:13,17,22
45:11,15 69:19
75:24 94:13 96:11
101:6 102:12,18
106:11 107:18
108:3,11,17
132:14 139:9,22
144:8 147:8
185:20 186:2,10
187:23 188:3
189:13,19 190:9
**stuff** 26:8 147:16
**subdivision**
144:16
**subject** 11:20 12:4
12:15,18 13:8,12
31:20 32:18 33:10
65:22 67:14,21
69:6 71:9,18 72:7
73:20 75:13,20
88:14,18 99:5,13
101:23 110:20
111:22 138:25
153:16,18
**submit** 149:2
**submitted** 33:13
33:16 66:11
148:18 149:18
151:12
**subscribed** 191:10
196:21
**subsequent** 24:15
100:8,9 104:8
158:7 160:17
**subsequently**
44:20 83:16 138:6
175:13 179:24
180:2
**subsidiaries** 68:4

CHUBB-Altschuler/ROLEX & ART 0000305

092020001456

| | | | |
|---|---|---|---|
| **subsidiary** 68:16 | **sworn** 3:19 5:3 | **talking** 31:14 | 174:18 |
| **substance** 53:14 | 101:14 109:13,17 | 55:18 66:24 77:11 | **ten** 10:11 25:17 |
| 55:5 78:8 79:14 | 147:15,21 187:5,9 | 80:4,5 101:22 | **term** 70:11 74:12 |
| 79:24 104:2 | 187:23 191:10 | 158:8 166:11 | **terminated** 69:23 |
| 169:14 | 192:16 193:11 | 172:15 183:16 | 71:6 |
| **sue** 181:13 | 195:9 196:21 | 184:6 | **terminology** 22:19 |
| **suggest** 33:17 | **system** 47:16,19 | **talmage** 5:11 | **terms** 5:16 31:15 |
| 133:22 141:2 | 48:4 | 117:18,24 118:5 | 45:8 47:7 88:5,11 |
| 185:20 | **systems** 47:25 | 119:6 | 95:10 97:22 |
| **suggested** 178:9 | | **tank** 164:19 | 101:10 117:7 |
| **suggesting** 106:8 | **t** | **task** 76:4 | **testified** 5:4 60:16 |
| **suite** 89:4 | **t** 3:5,5 5:2 79:4,4 | **tax** 112:2,10 | 69:20 80:2 87:3 |
| **sum** 67:15 78:8 | 135:2 150:19,21 | 135:11,14,19,25 | 90:21 93:4 97:7 |
| 79:14,23 104:2 | 192:6 193:2,3,3,6 | 136:9 154:20,23 | 99:8 105:20 |
| 115:25 120:8,16 | 193:14 194:2,3,3 | 154:24 184:10 | 107:19 149:22 |
| 121:5 169:14 | 194:19 195:2,2 | 192:24 193:20 | 167:11 186:13 |
| **summarizing** 80:9 | **take** 15:22,24 | **telephone** 21:22 | **testify** 76:6 87:4 |
| **summary** 54:5,25 | 20:21,22,25 21:13 | 83:5,6 84:5 104:9 | 102:8 |
| **support** 6:4 | 24:7 34:9 39:2 | 168:6,9 | **testifying** 81:19 |
| **supposed** 161:21 | 42:22 45:12,13,16 | **tell** 6:23 11:19 | 102:7,13 |
| 162:7 | 46:22 52:11,23 | 19:24 25:11 27:22 | **testimony** 3:13,15 |
| **sure** 26:4 27:14 | 54:19 62:23 74:14 | 27:23 33:23 35:14 | 22:21 23:2 46:15 |
| 38:17 42:21 45:14 | 75:23 98:15 109:9 | 41:22 43:7,9 44:3 | 92:22 96:15,25 |
| 45:22 48:19 56:18 | 111:17 124:2 | 47:19 51:9 55:8 | 101:8,9,11 102:10 |
| 61:6 62:18,21 | 130:20 136:22,23 | 56:13 62:10 65:24 | 111:2 118:12 |
| 69:21 73:25 76:4 | 143:7 144:9 148:7 | 66:2 73:13,23 | 129:4 147:15,21 |
| 94:18,19 97:7,19 | 150:14 157:15 | 78:9 81:4 82:17 | 167:25 185:21 |
| 98:8 99:8 102:18 | 158:10 160:11 | 82:20 83:18 84:12 | 186:11 189:20 |
| 112:24 121:17 | 188:11 190:3 | 85:24 87:23 88:2 | 195:10 |
| 123:25 135:17 | **taken** 5:14 15:3,5 | 88:21,23 89:3,6,8 | **thank** 9:23 11:13 |
| 139:13 145:17 | 17:4 22:15,25 | 92:3 99:3 103:20 | 23:4 62:24 81:16 |
| 151:25 152:7,10 | 23:24 24:11,18 | 104:2 111:20 | 101:18 116:21 |
| 166:17 175:7 | 45:18 57:7 111:19 | 113:14 114:7 | 141:21 142:11 |
| 187:22 | 144:11 150:17 | 122:15 123:19 | 143:5 144:10 |
| **surely** 139:14 | 186:20 | 145:21,25 151:17 | 149:6 160:12 |
| **surrounding** | **takes** 164:12 | 152:15 162:6,13 | 189:22 190:4,5,7 |
| 89:20 | **talk** 9:17 | 174:12 176:3 | **thea** 185:24 |
| **surveillance** 48:3 | **talked** 31:4 35:12 | 181:8,22 182:22 | **theft** 107:14 |
| 48:6 | 76:24 78:6 92:9 | 184:12 188:21 | **therapeutics** 7:23 |
| **suspect** 164:5 | 97:16 104:5 | **telling** 55:11 | **thereof** 195:15 |
| | 106:12 129:11 | 118:19 174:9,13 | |

CHUBB-Altschuler/ROLEX & ART 0000306

092020001456

[theses - transferred]                                                    Page 31

**theses** 65:4
**thick** 27:24
**thing** 46:14 54:11
97:9 137:11
**things** 6:10 26:6
26:17 32:16 43:25
66:16 78:6 81:10
81:10,12 84:20
112:8,9 121:23
136:25 163:25
168:4 172:16
**think** 13:11 19:16
23:16 25:16 27:14
30:5 34:23 37:14
40:5,20,22 41:10
41:11 42:20 46:21
47:13 48:7,13
50:10 52:19 53:11
53:12,14 54:16,25
55:4,9 66:17,21
67:6 69:19 70:17
74:2,4,5,7,8 77:17
77:23 78:4,23
80:13,15 81:6
82:25 83:25 84:22
86:5,5 91:6 95:17
97:18 99:16,18
106:3 110:7,22
112:4 114:21
116:24 117:11,22
118:5,5,8 122:19
126:9 130:2,4
131:15 133:23
134:14 138:6
139:17 149:4
151:22,24 152:7
152:18 158:9
160:2,16 163:12
164:13 165:25
167:15 168:16,24
172:20 180:7

181:15 185:24
**thinking** 67:10
159:25
**thinks** 137:11
**third** 2:9 106:3
**thought** 37:15
49:8 82:7 84:17
89:23 98:7 142:18
174:10 181:25
**thousand** 118:10
**thousands** 127:23
**threatening**
176:23
**three** 28:3,5 61:9
61:25 64:22 84:18
93:23 123:23
124:13 125:18
128:24 133:21
177:3
**tightly** 50:5
**time** 1:20 5:25
7:13,19 9:7,15
10:7,20 13:20
15:9 16:5,6,14,18
18:2 19:18,23
20:14,19 23:8,25
25:6,7 26:6,15
28:22 30:13 32:7
32:22 35:3,6,11
36:19,21 40:6
42:5,5 43:12,12
45:12 47:6 49:14
50:22 58:5 61:21
61:22 62:3 63:6
63:22 64:7 65:8
65:17 66:11,13,18
70:24 71:5,16,24
72:10,14,18,22
73:13,15,24 75:20
77:18 79:9,10
80:10 81:18 83:3

83:16 84:25 87:13
91:19 94:20 97:11
97:12 100:9 101:8
101:14 102:5,25
103:4,6,8 104:13
104:17 106:6,21
107:4 109:2 110:2
110:3,8 112:17,20
113:16 116:8
119:4,22 131:3
135:22 139:4
140:9 142:4
143:12,15 144:20
147:12 148:21
150:23 151:15
154:6,9,12 157:16
157:19,25 158:5
167:22,23 168:9
170:17 172:10
173:8 177:20
178:23 181:12
187:16,18 188:13
189:11,14,15
190:3,3,19
**times** 31:4 34:11
36:15,17 93:24
105:8 106:2,14
110:2 141:20
**tips** 135:15
**tired** 76:6
**title** 8:21 31:23
37:20 89:3 111:4
**today** 11:25 14:19
31:8 40:5 41:2
56:13 81:18 101:9
101:11 102:7,10
102:13,15,20
118:12 120:23
140:10 146:8,17
185:3 189:4,20
190:11

**tokyo** 175:6
**told** 22:9 24:3,12
33:22 49:5,9 53:5
58:17,23,25 60:20
71:20 73:25 77:22
78:7,11 81:3
84:12,16 87:7,25
88:25 89:22 92:19
93:21 98:10
100:19 111:25
127:16 145:25
148:5,23 161:20
161:24 162:15
171:19 174:4,23
182:11
**top** 21:9 63:6
65:15 68:24
**torrance** 82:4
**total** 126:12 133:6
133:8 154:3
**touch** 147:17
189:23
**trade** 41:12,19
42:10,14,22 43:5,6
89:16
**traded** 39:24 40:2
41:5 42:3
**transaction** 14:3
38:10,23 39:3
98:20 155:16
**transactions** 80:18
**transcribed** 6:11
**transcript** 5:24,25
6:7,10,15 9:8 11:9
27:16 189:9
190:10
**transfer** 110:25
156:8,16 193:8
**transferred**
110:23

CHUBB-Altschuler/ROLEX & ART 0000307

092020001456

**transfers** 155:11
156:24
**translator** 44:5,13
**transmittal** 6:14
**travel** 116:13
193:17
**traveled** 157:13
**traveling** 115:3
**tremendous**
113:12 163:10
**tremendously**
178:24
**trial** 3:17 23:8
94:4,5
**tried** 22:11 38:8
57:12 160:16
**trigger** 49:11
**trip** 28:14 157:14
158:7,9
**trouble** 73:9
181:12
**true** 22:7 53:10
54:3 89:22 90:6
91:3,4 92:20
93:15,22 95:4,7,14
96:10 101:21
102:6 105:15,16
105:21,25 106:9
106:15,18 110:15
125:20 182:13,14
195:9
**trust** 6:6 122:18
122:25 124:6
125:11,23,24
126:5,6,20,23
127:5,18,21
129:24,25 130:3,5
130:8,9,11,17
131:7 132:3,23
133:10 135:19
136:13 140:18,20

140:21,23,25
141:8,9,9,10,12,14
141:15,16,19
142:9,9 144:17
169:19 193:24
**trusts** 122:11
**truthful** 106:5
**truthfully** 102:8
**try** 43:23 77:8
79:3 85:25 101:16
103:4 114:22,24
114:25 115:12
116:15 184:5
185:5
**trying** 29:10 36:23
37:2 52:20,21
57:5 60:14 62:13
77:13,25 94:6
95:8 102:16
107:24 108:10
110:9 113:13
118:4 125:10
131:12 132:21
133:25 138:24
142:5 145:11
181:13
**ttee** 122:19
**tucson** 16:3,5 18:6
18:11,12 22:3
41:4 43:13 46:12
159:17 160:17
**turn** 62:14 113:19
**turned** 182:2
**two** 11:22 12:11
12:14,18 24:13,17
28:3,5 31:5 33:4
34:4 37:6,8 41:21
41:23 48:21 63:14
85:5 100:7 113:2
117:24 126:3
130:21 135:13

139:7 140:14,16
143:18,24 146:3
146:18 153:7
158:4 165:16
168:23 175:24
176:13 177:2
186:19
**type** 18:24 47:17
47:19,23,24 76:20
76:25 100:15
106:23 147:6
148:9
**types** 76:25 100:17
**typically** 155:10
155:24 160:6
167:9

**u**

**u** 3:5 5:2,2 47:9
79:4 153:9 156:4
156:5 193:2,3,7,14
194:2,3,3
**u.s.** 112:2 135:2
**ultimately** 24:14
67:8 162:21
164:10 174:17
**unaware** 107:25
**underneath** 26:22
**understand** 11:16
16:22 17:20 20:7
40:16 46:15 48:19
52:21 57:5 64:15
67:9 68:15 73:14
74:12 79:23 88:7
92:18,22 95:5,9,15
95:18 100:6 105:7
110:11 128:6
129:14 131:19
132:12 133:20
159:7 166:9
168:13

**understanding**
13:4 14:2 44:14
48:11 49:3 58:21
70:13 73:19
102:11,22 103:2
108:4,23 126:15
144:21 160:13
183:9
**understood** 170:7
**unfair** 133:24
**unfortunately**
156:11 182:2
186:16
**uniform** 3:10
**unique** 18:21 85:6
85:15,16,16
**uniquely** 85:8
**unsuccessful**
57:12
**untouched** 82:18
84:22
**unusual** 84:21
**update** 65:9
**usaa** 145:2,8,17
193:5
**use** 77:7 144:9
**usually** 116:12
**utilize** 73:2
**utilizing** 73:15

**v**

**v** 156:7,9 193:8
196:3
**vague** 44:15 66:21
80:17
**valentine's** 59:24
**valera** 46:12
**valuable** 51:2
108:25
**valuables** 59:7,10
59:11 69:18

CHUBB-Altschuler/ROLEX & ART 0000308
092020001456

**valuation** 130:19
133:16 134:23
**valuations** 130:20
130:21
**value** 61:8 67:9
74:3 77:21 80:12
81:3,10,11 94:23
95:10,23 111:8
117:2,20 119:13
130:22 132:21
133:12,13,14
134:16,23 173:18
176:3,7 177:4
178:16,21 193:25
**valued** 133:15
**values** 66:9 172:21
**varies** 87:16
**various** 36:10
159:4
**vault** 161:22
**venture** 129:12
**verified** 101:15
**verify** 31:13 34:18
43:5
**verifying** 123:21
**veritext** 196:1
**veronica** 29:20
**version** 136:21
138:5,5
**versus** 81:8
**view** 81:5 155:14
**viewed** 155:17
**vintage** 153:19,20
153:22 174:22
177:12,13
**virginia** 29:21,22
29:22,25 49:5
58:15,16,25
**visa** 112:24 114:17
114:22 146:19
185:5,13 186:15

**visit** 44:4 58:22
99:24
**visited** 16:8 43:13
43:15 166:25
**visiting** 28:10
158:6 172:14
**visits** 160:17
**visual** 178:8
**volunteered** 55:24

**w**

**w** 174:3,8 179:8
180:19 193:9
**wages** 135:14
**wait** 102:12
**waived** 4:3
**waiver** 3:16,24
**walked** 14:7,8
**walking** 14:8
**walls** 59:25
**want** 6:6 9:24
22:23 23:10 32:9
38:17 46:9 48:19
53:6 54:23 62:17
62:19,20 63:9
75:23 76:4 79:15
79:21 87:4 94:9
99:19 108:12
111:2 114:7
116:18,19 118:8
118:14,17,17
147:22 149:7
150:10 164:8,9
176:15 178:8
186:6,6,10,18
189:16
**wanted** 54:6,7,8
56:17,19 96:7
100:18 118:12
144:18,19 181:24
**wants** 137:22
164:13

**ware** 25:4
**warhol** 69:3 76:25
77:14 78:15 85:16
86:8 87:15 96:2
99:12
**warranty** 179:13
179:17,19,23
180:11 181:8,16
183:6 186:23
193:10 194:11
**watch** 59:15 62:20
140:2 141:4
148:11,13,14,15
148:15,16 151:12
151:18 152:7,13
152:13,14,15,16
153:2,16,21,25
154:8 157:2,8,20
157:25 158:3,12
158:15,19,22,24
159:5,9,14,19,23
160:4,8,10,14,21
161:10,12,15,20
162:7,11,12,14
164:6,8,10,11,19
164:20 166:21
167:4,5,10,13,18
167:22 168:7,11
169:6,13 170:11
171:22,25 172:7
172:11,23 173:7
173:11,19 174:10
174:13 175:9,23
178:23 179:2,17
180:14,16 181:17
182:12,18 183:2
183:15,22 184:19
188:15,25 194:13
**watches** 81:12
149:21 153:14
154:10 155:3,14

155:21,22,23,24
156:24 157:11
158:25 159:3,4
160:6,19 172:15
172:17 174:18,19
174:22 175:13,25
176:2 177:6,12,12
177:13,15 178:21
178:23 179:6
181:10,19,23,25
182:3,9
**way** 6:14 13:20
27:12 29:9 35:14
35:24 42:17 47:22
50:10 74:13 81:10
81:11,14,16 90:11
92:18 111:20
123:21 136:16
141:7,22 162:9
176:15 195:13
**ways** 133:22
**we've** 106:11
**wear** 157:11,14
158:25 159:3,24
160:9 167:7
**wearing** 76:2
139:21,25 140:7
159:22 160:7,18
160:25 167:4
**wedding** 157:23
157:24 159:11,24
160:3
**week** 112:4
**weeks** 102:2
103:14
**welcome** 190:6
**wells** 117:6 119:15
**went** 14:9 28:19
36:24 37:13 44:4
44:10 49:4 51:6
52:20 56:21 81:4

CHUBB-Altschuler/ROLEX & ART 0000309

092020001456

**[went - zoom]**

155:18
**werner**  1:5,9 6:24
10:6,15 11:7
122:13 124:4,21
124:24 125:6
192:18,19,20,21
**west**  82:7 148:18
155:6
**whereabouts**
62:13
**white**  2:14 51:16
51:18 52:15
107:20 108:5,20
147:11 148:2
151:24 152:9
174:16 180:6
182:12 184:5
**wife**  35:14,19
110:2,17 111:3,3
111:14 122:17
123:8 135:16,17
136:4,7 144:19
145:7,15 146:23
148:6,12 150:22
151:6,9 187:10
**wife's**  6:23 109:20
136:5 148:13,14
184:21
**wildly**  61:15
**willing**  140:3
**wind**  49:14,20,21
180:19,20 181:4
182:3,8,18 194:12
**window**  49:11
**wire**  155:11 156:8
156:16,23 193:8
**wired**  155:13
**wiring**  156:14
**wise**  130:13
**wish**  147:20

**witness**  3:20 4:6
45:14 75:8,25
102:21 106:13
108:8 132:12
139:21,24 149:4
150:12,16 186:9
188:2 189:21
190:5,7 195:7,10
195:15 196:4
**witness's**  45:2,19
**woman**  35:2 78:23
**word**  25:3 141:13
148:7
**words**  63:5 108:18
**wore**  157:12 160:2
167:9
**work**  27:6 133:25
**working**  19:23
**works**  99:11
**world**  86:8 177:12
**worn**  167:7
**worth**  34:23 66:4
66:15,16,19 78:2
85:13 86:9 115:15
115:16 120:7
122:8 131:10,16
132:15,18 163:12
163:13 174:10,14
178:20,20 181:12
192:17
**wrapped**  60:24,25
61:2
**wrist**  160:19 167:8
**writing**  1:7,11
66:23 141:18
178:11
**written**  106:4
186:5
**wrong**  73:10 82:8
126:13

**wrote**  108:17
141:13

**x**

**x**  1:2,13 183:8
192:2,6 193:2,3,10
194:2

**y**

**y**  179:14 187:6,14
193:11
**yeah**  42:16 59:22
63:9 69:14 78:11
106:13 116:5,9,9
149:24 154:10,18
155:2 167:18
**year**  12:13 14:13
24:5 34:4 36:11
37:6,8 70:25 89:6
107:20 108:6
117:10,12 119:8
127:20 158:4
161:17 162:24
168:13,15,17
169:13 184:15
186:22 188:17
**years**  12:14 25:16
25:17 30:13 35:13
35:25 37:6 53:11
62:25 73:6 76:23
76:24 104:10
121:9 159:4
178:22
**yellow**  60:9
**yep**  151:4
**york**  1:15,15,22
2:10,10 5:4,11 7:7
10:24,24 28:11,23
28:24 34:10,11,20
36:14,15,16,17
116:24 117:16,23
148:12 155:5

157:3,8,10,15,18
175:6 195:6

**z**

**z**  192:18,19,20,21
**zero**  185:12
186:12
**zoe**  1:5,9 6:24 10:6
10:15 11:7,8
122:13,17,25
124:4,7,10,21,24
125:6,17 128:14
128:17 189:24
**zoe's**  121:16 123:2
123:3
**zoom**  1:20,21 2:7
2:12,15 190:13

CHUBB-Altschuler/ROLEX & ART 0000310

092020001456

Page 11

D. ALTSCHULER

1

2    Q    In whose name is that condo?

3    A    The condo is in the name of an LLC.

4    Q    And who are the shareholders or owners of

5    the LLC?

6    A    I have to check with an attorney but I

7    believe it is Zoe Werner and perhaps my attorney or

8    perhaps just Zoe.  I don't know.

9    Q    If I left a blank in the transcript would

10   you be able to fill that in?

11   A    Yes.

12   INSERT_____

13   Q    Thank you, sir.  Now your claim involves

14   some silkscreens, is that correct, sir?

15   A    Yes.

16   Q    Commonly referred to as I understand Andy

17   Mouse, is that also correct?

18   A    Yes.

19   Q    And could you tell me, sir, when did you

20   acquire the silkscreens that are the subject of your

21   claim?

22   A    I acquired two sets.  One set was acquired

23   I believe -- and let me add a comment to my answer

24   that you're asking me to go back several decades so

25   I can only give you what, today, is my best

CHUBB-Altschuler/ROLEX & ART 000091

092020001456

D. ALTSCHULER

1
2   recollection and I believe --
3         Q    Mr. Altschuler my question was:  When did
4   you acquire the silkscreens that are the subject of
5   your claim?
6         A    Sir, would you like me to answer the
7   question?
8         Q    Yes.
9         A    Okay.  You are asking me to go back
10  multiple decades and my response to you before you
11  interrupted me is:  I had two sets of silkscreens.
12  One I believe was purchased in or around 1987.  The
13  second set was acquired a year or so after that one
14  or two years after that.
15        Q    Now, the silkscreens that are the subject
16  of your claim when were they acquired?
17        A    I believe that set -- again, sir, I had
18  two sets.  I believe the set which is the subject of
19  the claim were purchased in 1987.
20        Q    And from whom did you purchase those
21  silkscreens?
22        A    I believe the name of the gallery was the
23  B1 Gallery.
24        Q    And where was the B1 Gallery located?
25        A    In Santa Monica, California.

Page 39

D. ALTSCHULER

1

2    Q    And where did it take place?

3    A    This transaction took place in Phoenix.

4    Q    Okay.  And did you pay -- how did you pay

5    for those silkscreens?

6    A    In cash.

7    Q    And do you recall how much you paid for

8    them?

9    A    Somewhere between 10 and 12,000.  I don't

10   know.  It was 10,000 or 12,000.

11   Q    And did you get a receipt or any document

12   to prove that you acquired these silkscreens from,

13   Mr. Haring?

14   A    I did not.

15   Q    Do you have any form of proof of ownership

16   of this second set of silkscreens?

17   A    I do not.

18   Q    Is there any person that you're aware of

19   other than yourself and Mr. Haring, who's deceased,

20   that has knowledge that you purchased the second set

21   of silkscreens?

22   A    Yes.

23   Q    Who is that, sir?

24   A    I traded this set for some other art.

25   Q    Now, is there a reason, sir, that you

D. ALTSCHULER

2  traded this set that you purchased directly from

3  Mr. Haring as opposed to the other set that you

4  purchased from a gallery?

5      A    As I sit here today I can't think of any.

6  At the time there may have been a specific or

7  strategic reason.

8      Q    Okay.  Now you acquired this second set,

9  where did you have them sent to?

10     A    Arizona.

11     Q    Did you bring them there yourself or

12  shipped?

13     A    They were shipped.

14     Q    And were they shipped similar to the other

15  set that you acquired from the gallery?

16     A    I don't understand your question, sir.

17     Q    How were they packaged?

18     A    They were likewise packaged in a container

19  or box.  I don't have a specific recollection of how

20  they were packaged and, again, I think they were

21  sent to Arizona it's possible.  Again, my memory is

22  not 100% clear on that.  I think they were.  It's

23  possible they may have been shipped to Phoenix.  I

24  just simply don't remember.

25     Q    Okay.  So you don't know sitting here

CHUBB-Altschuler/ROLEX & ART 0000120
092020001456

Page 39

D. ALTSCHULER

1

2      Q      And where did it take place?

3      A      This transaction took place in Phoenix.

4      Q      Okay.  And did you pay -- how did you pay

5  for those silkscreens?

6      A      In cash.

7      Q      And do you recall how much you paid for

8  them?

9      A      Somewhere between 10 and 12,000.  I don't

10  know.  It was 10,000 or 12,000.

11      Q      And did you get a receipt or any document

12  to prove that you acquired these silkscreens from,

13  Mr. Haring?

14      A      I did not.

15      Q      Do you have any form of proof of ownership

16  of this second set of silkscreens?

17      A      I do not.

18      Q      Is there any person that you're aware of

19  other than yourself and Mr. Haring, who's deceased,

20  that has knowledge that you purchased the second set

21  of silkscreens?

22      A      Yes.

23      Q      Who is that, sir?

24      A      I traded this set for some other art.

25      Q      Now, is there a reason, sir, that you

CHUBB-Altschuler/ROLEX & ART 0000119

092020001456

D. ALTSCHULER

traded this set that you purchased directly from

Mr. Haring as opposed to the other set that you

purchased from a gallery?

    A   As I sit here today I can't think of any.

At the time there may have been a specific or

strategic reason.

    Q   Okay.  Now you acquired this second set,

where did you have them sent to?

    A   Arizona.

    Q   Did you bring them there yourself or

shipped?

    A   They were shipped.

    Q   And were they shipped similar to the other

set that you acquired from the gallery?

    A   I don't understand your question, sir.

    Q   How were they packaged?

    A   They were likewise packaged in a container

or box.  I don't have a specific recollection of how

they were packaged and, again, I think they were

sent to Arizona it's possible.  Again, my memory is

not 100% clear on that.  I think they were.  It's

possible they may have been shipped to Phoenix.  I

just simply don't remember.

    Q   Okay.  So you don't know sitting here

CHUBB-Altschuler/ROLEX & ART 0000120

092020001456

# EXHIBIT 24

Page 197

1
2    -------------------------------------------x
3    IN THE MATTER OF THE CLAIM OF:
4
             DOUGLAS ALTSCHULER
5
6
     Chubb National Insurance Company
7
     Claim No./Loss #1:   0920200001456
8    Date of Loss:        12/23/19
     Claim No./Loss #2:   040520024846
9    Date of Loss:        6/19/20
10   -------------------------------------------x
                          Via Web Conference
11
                          September 29, 2021
12                        11:03 A.M.
13
14
15        CONTINUED EXAMINATION UNDER OATH
16   of DOUGLAS ALTSCHULER, taken by the attorney
17   for Chubb National Insurance Company,
18   pursuant to the terms and conditions of the
19   insurance policy and held via web conference
20   at the above-mentioned time and date before
21   a Shorthand Reporter and Notary Public
22   within and for the State of New York.
23
24
25   Job No. CS4802814

CHUBB-Altschuler/ROLEX & ART 00002479

092020001456

Page 198

```
1
2  A P P E A R A N C E S :
3  -All Appearances Via Web Conference-
4
5
      POLI MOON & ZANE, PLLC
6  Attorneys for DOUGLAS ALTSCHULER
      2999 North 44th Street, Suite 325
7    Phoenix, Arizona 85018
8  BY:  JEFFREY ZANE, ESQ.
9
10
      RUBIN FIORELLA FRIEDMAN & MERCANTE, LLP
11 Attorneys for CHUBB NATIONAL INSURANCE COMPANY
      630 Third Avenue, 3rd floor
12    New York, New York 10017
13 BY:  CHARLES T. RUBIN, ESQ.
      File No. 0768.41493
14        0768.42484
15
16 ALSO PRESENT:
17   Fred White, Chubb Insurance Investigator
18   Bill Craddock, Veritext Web Conference Concierge
19
            oOo
20
21
22
23
24
25
```

Page 199

```
1
2        COURT REPORTER:  Before I swear in
3   the witness, I will ask Counsel to
4   stipulate and agree to the following:
5        First, this deposition is being
6   conducted remotely by videoconference
7   and it is acknowledged that the court
8   reporter, the witness, and counsel are
9   all in separate locations participating
10  via a web conference meeting platform
11  conducted through the court reporting
12  agency.
13       Second, it is stipulated that this
14  videoconference will not be recorded in
15  any manner, and any recording without
16  the written consent of all parties shall
17  be considered unauthorized and in
18  violation of law, and shall not be used
19  for any purpose in this litigation or
20  otherwise.
21       Lastly, I will ask each Counsel to
22  individually stipulate that the court
23  reporter may swear in the witness even
24  though the court reporter is not
25  physically in the presence of the
```

Page 200

```
1
2   witness at this time, and that Counsel
3   have no objection to that, nor will
4   there be an objection at a future date.
5        Could Counsel please state that on
6   the record individually?
7        MR. RUBIN:  That's fine with us.
8        MR. ZANE:  That's fine with us
9   too.
10       COURT REPORTER:  Counselor, can
11  you please represent that to the best of
12  your knowledge and belief, the witness
13  appearing today via web conference is in
14  fact Douglas Altschuler?
15       MR. ZANE:  Yes, he is.
16       COURT REPORTER:  Now I will swear
17  in the witness.
18            oOo
19  D O U G L A S   A L T S C H U L E R ,  having
20  been first duly sworn by a Notary Public
21  within and for the State of New York,
22  stated his address as 4729 East Sunrise
23  Drive, #104, Tucson, Arizona 85718, was
24  examined and testified under oath as
25  follows:
```

Page 201

```
1        Douglas Altschuler
2  EXAMINATION BY MR. RUBIN:
3        MR. RUBIN:  Could we please put on
4   the screen exhibit number 1.
5        (Whereupon a screen share is
6   initiated of the document.)
7   Q    Mr. Altschuler, what I have on the
8  screen is what has been advised by Chubb is a
9  copy of the policy of insurance involved in
10  your claim.
11       MR. RUBIN:  Can we mark this as
12  Company Exhibit Z.
13       (Policy of insurance document is
14  marked as Company Exhibit Z for
15  identification, as of this date.)
16       MR. RUBIN:  Can we please scroll
17  down to where it says "Itemized
18  Articles, Page 1, Effective date
19  8/1/19."  There's no page number on it
20  that I see.  You just have to go down,
21  and you'll see on the top it says,
22  "Effective date 8/1/19."  Unfortunately,
23  they're not numbered.
24  Q    Can you look at item 10, sir?
25       MR. RUBIN:  And could you scroll
```

2 (Pages 198 - 201)

CHUBB-Altschuler/ROLEX & ART 00002480

092020001456

Page 202

```
 1              Douglas Altschuler
 2     to the next page, so he gets the
 3     complete description.
 4          (Whereupon Company Exhibit Z is
 5     scrolled down.)
 6     Q   Mr. Altschuler, is that the Rolex
 7  that is being claimed?
 8     A   I believe so.  I'm not 100 percent
 9  sure, but I believe so.  Again, I have
10  to -- 6265?  [Perusing document.]  I believe it
11  is.
12     Q   Thank you, sir.
13         MR. RUBIN:  Please go down to
14     where it says "Fine Arts."  Could you
15     scroll to where it says "Fine Arts"?  It
16     should be on that same page.
17          (Whereupon Exhibit Z is scrolled
18     down for the witness.)
19     Q   Sir, is item 2 the silkscreens
20  that are being claimed?
21     A   I believe that's correct.
22         MR. RUBIN: Let's go to "Coverage
23     Update" and scroll down.  It's toward
24     the end.  It says "Coverage Update,
25     Page 1, Effective date 11/21/19."
```

Page 203

```
 1              Douglas Altschuler
 2          (Whereupon Exhibit Z is scrolled
 3     down for the witness.)
 4     Q   Mr. Altschuler, would I be correct
 5  that you changed item 10 -- the Rolex -- from
 6  $50,000 to $120,000, and that was done
 7  effective November 21, 2019?  We can't hear
 8  you, Mr. Altschuler.
 9     A   I have no independent recollection
10  of when it was done, but I do know that there
11  was a change in value, and I submitted
12  appraisals to Chubb, and then Chubb had some
13  questions about serial numbers and they
14  contacted the fellow who did the appraisal
15  directly, and resolved it to make sure that the
16  right appraisals went with the right watch.
17  And it was increased in value, that's correct.
18     Q   Who at Chubb had these
19  communications with you, if you know, sir?
20     A   I don't know off the top of my
21  head.  It could be -- I mean, I have the email
22  documentation of it.  Somebody "Gallagher," I
23  don't know.
24     Q   You mean, your former broker?
25     A   That's correct.
```

Page 204

```
 1              Douglas Altschuler
 2     Q   And there was some written
 3  exchange of communications?
 4     A   That is correct.
 5     Q   Who was the exchange between?
 6     A   It was -- I believe it was -- the
 7  emails are the best evidence of this, but I
 8  believe it was me, the broker, and the
 9  gentleman who gave the appraisal.
10     Q   Do you still have those email
11  exchanges?
12     A   I believe I do.
13  *RQ     MR. RUBIN:  Would you be kind
14     enough to provide those to us?
15         THE WITNESS:  I'll provide them to
16     my attorney.
17         MR. RUBIN:  Mr. Zane, will you be
18     kind enough to provide those to us?
19         MR. ZANE:  Surely.
20     Q   Do you know what the sum and
21  substance of the email exchanges was,
22  Mr. Altschuler?
23     A   I don't.  On a super, super, super
24  high level, I think they wanted to match up the
25  serial numbers with the prior serial numbers of
```

Page 205

```
 1              Douglas Altschuler
 2  the watch they had, to make sure they were
 3  increasing the value or insuring the proper
 4  watch.
 5     Q   Would I be correct that the
 6  changed value to $120,000 was based upon an
 7  appraisal provided to you; is that correct,
 8  sir?
 9     A   Yes.  You examined me about this
10  extensively the last time.
11     Q   I appreciate that, but I want to
12  appropriately lead in and give you a
13  foundation.  And that would be from Dream
14  International?
15     A   I believe it's called the "Dream
16  Collection."
17     Q   Okay, thank you.
18         MR. RUBIN:  You can take that off
19     the screen now.
20     Q   There's been a bit of confusion,
21  sir, as to which set of silkscreens is involved
22  in the claim, and I want to see if we can
23  clarify these inconsistencies.
24         MR. RUBIN:  Can we please put
25     number 7 on the screen.
```

3 (Pages 202 - 205)

CHUBB-Altschuler/ROLEX & ART 00002481

092020001456

Page 206

1         Douglas Altschuler
2         (Whereupon a screen share is
3    initiated of a document previously
4    marked as Exhibit C.)
5    Q    Let's go to the next page. This
6 is a copy of the police report that was
7 previously marked as Exhibit C. In the report,
8 the police indicate that you stated you
9 purchased the art in 1987. Do you recall
10 telling that to the police, Mr. Altschuler?
11    A    I do not.
12    Q    Do you dispute the accuracy of
13 what is set forth in the report of what you may
14 have said at that time?
15    A    I would have to read the report.
16 I do not remember telling them I purchased it
17 in 1987. But I believe I did purchase them in
18 1987 -- one set -- and then a subsequent set a
19 couple of years later.
20    Q    Did anyone else speak to the
21 police on your behalf?
22    A    Not that I know of.
23    Q    So if this information is in the
24 report, is it fair to assume that it was
25 provided by you?

Page 207

1         Douglas Altschuler
2    A    I think that's a fair assumption.
3    Q    Okay, thank you, sir. Did you
4 ever tell the police that you had also
5 purchased a second set of silkscreens?
6    A    I did not.
7    Q    Is there a reason that you did not
8 tell the police that you purchased a second set
9 of silkscreens?
10    A    Yes. I explained the context in
11 which I spoke with the police, and the original
12 context was to determine -- not specifically to
13 report the theft or loss of the silkscreens,
14 but it was to determine if they had a call
15 about the alarm going off and the door being
16 ajar.
17    Q    Thank you, sir.
18         MR. RUBIN: We can take this off
19 the screen now.
20    Q    Do you recall, sir, that you gave
21 a recorded statement to Chubb through
22 Mr. White?
23    A    I do.
24    Q    And we provided a copy of that
25 statement to your attorneys. Did you have a

Page 208

1         Douglas Altschuler
2 chance to review that statement?
3    A    I wasn't aware that a copy was
4 provided to my attorneys. So you're saying a
5 written copy?
6    Q    A transcribed copy.
7    A    I've never seen that.
8         MR. RUBIN: You do acknowledge,
9    Mr. Zane, that we did provide it to your
10    firm as requested?
11         MR. ZANE: Yes.
12         MR. RUBIN: Thank you.
13    Q    Do you recall telling Mr. White
14 during that statement that you bought two sets?
15    A    I do.
16    Q    Do you recall telling Mr. White
17 during that statement which set you were
18 claiming?
19    A    I don't recall that.
20    Q    Well, I can read from it, or you
21 can accept what I'm saying, either way. I can
22 do it either way, whatever you prefer. But the
23 way I understand it, and the way the transcript
24 reads, you said that the claim was on the set
25 that you purchased from Keith Haring. Do you

Page 209

1         Douglas Altschuler
2 recall that?
3    A    I don't.
4    Q    Okay. Well, let's do this. I'm
5 going to read from part of the transcript of
6 that recorded statement, page 16:
7         "Question: How long have you
8 owned the four paintings?
9         "Answer: I had two sets. One set
10 I bought in 1987 -- 1987. And I believe the
11 second set I bought -- I mean, you're really
12 going back a long time now -- sometime about
13 two years later.
14         "Question: So in 1989?
15         "Answer: Roughly '89 or '90."
16    Now page 18:
17         "Question: Okay. And then the
18 current set that you -- you had up until it
19 went missing, was that the one from 1987 or the
20 one from 1989?
21         "Answer: The one from, let's call
22 it '89, '90, because I don't know what year.
23         "Question: Okay.
24         "Answer: It was the second set.
25         "Question: So this is the second

4 (Pages 206 - 209)

CHUBB-Altschuler/ROLEX & ART 00002482

092020001456

Page 210

1            Douglas Altschuler
2  set; okay?
3            "Answer:  Yes.
4       Page 18:
5            "Question:  Okay, what happened to
6  the other set?
7            "Answer:  I traded that set for
8  some other art, and it was around 2000.
9            "Question:  Around 2000? ___
10           "Answer:  Yes.
11           "Question.  Okay.  Do you still
12  have the art that you traded for?
13           "Answer:  I have to check.  I
14  don't know.  I don't know if I have it, or
15  whether I then subsequently traded that.  I can
16  answer -- I can answer that question, but I
17  don't have that answer now.
18           "Question:  Okay.  You can find
19  out?
20           "Answer:  Yes, sir.
21           "Question:  And where was the
22  second set purchased, the second one" -- excuse
23  me -- "Answer" -- "Question."
24           MR. ZANE:  Let me just interrupt,
25       because you're skipping around the

Page 211

1            Douglas Altschuler
2       transcription, without noting that for
3       the record.
4            MR. RUBIN:  I went to page 18.
5       A    I understand the sum and
6  substance.  What is the question that you have
7  for me, sir?
8       Q    I'm going to get to it.  Just
9  wait.
10           "Question:  And where was the
11  second set purchased?
12           "Answer:  The second one?
13           "Question:  The second one, in
14  1989.
15           "Answer:  That came directly from
16  Keith Haring.
17           "Question:  Okay, you purchased it
18  directly from him?
19           "Answer:  Yes, I did."
20           Now can you explain, sir, why you
21  told Fred White that the claim involved the set
22  that you purchased from Keith Haring, when you
23  previously told us during your first session of
24  the Examination Under Oath that you purchased
25  it from B1 Gallery?

Page 212

1            Douglas Altschuler
2       A    Mr. Rubin, you questioned me
3  extensively about this issue during your first
4  go-around with me, your first EUO deposition,
5  and I explained this to you.  So now I'm going
6  to explain it to you a second time, okay?  You
7  can go back to the transcript.  You're going
8  back and forth on this with me, but I'll
9  explain it to you again. I'll give you the
10  courtesy of doing that.
11      Q    I would appreciate it if you would
12  just kindly answer the question.
13           MR. ZANE:  I think that he is.
14      A    I'm trying to, sir, okay?  I'm
15  trying to explain this to you.
16           Mr. White sat with me and asked me
17  about events that occurred -- as I indicated
18  the first time -- several decades ago, number
19  one.  And number two, it was about a week after
20  the death of my mom -- that's when Chubb
21  insisted on scheduling that recorded meeting
22  with me.
23           As I explained to you in my first
24  EUO, the events which happened decades earlier,
25  which I did not have a specific recollection on

Page 213

1            Douglas Altschuler
2  which set was traded, the details of that
3  became a little clearer as I started to talk to
4  people -- as I explained to you the first time
5  around -- and as I was able to learn of facts
6  which I didn't know at the time I spoke to your
7  colleague, Mr. White.  And it's laid out
8  extensively in that first EUO.
9       Q    So would I be correct, sir, that
10  the information that you provided during the
11  recorded statement was not correct, based upon
12  events that you learned thereafter?
13      A    No, I would not characterize it as
14  that, Mr. Rubin.  I know you like to
15  cross-examine me to make me look like I'm not
16  telling you the truth, and I won't accept that,
17  sir, okay?
18      Q    We're trying to find out the
19  truth, sir.
20      A    Sir, I ask that you allow me to
21  answer the question without interrupting me.
22           The facts that I gave you when I
23  provided written responses the first time, the
24  facts that I provided to Mr. White, the facts
25  that I provided during my first EUO, and every

5 (Pages 210 - 213)

CHUBB-Altschuler/ROLEX & ART 00002483

092020001456

Page 214

Douglas Altschuler

1 single time anyone from Chubb has asked me a
2 question, I have given them the best
3 information that I have available to me at that
4 time. As new facts are discovered, as I learn
5 new things -- which I am doing my best to do,
6 because these things took place decades
7 earlier -- I provide you with the best
8 information, as I'm doing now, sir.
9     Q    Then what came to your attention
10 that caused you to correct what was said to
11 Mr. White?
12     A    Again, we went over this
13 extensively in my first EUO. But again, you
14 insisted on taking a second EUO, and I will
15 answer this question again.
16     Q    Thank you.
17     A    You're looking for inconsistencies
18 between the first and the second, and things
19 that I said to Mr. White.
20         I will do my best, given the facts
21 that I know today, to explain this once again
22 to you. I spoke to Mr. Robert Berman, and my
23 understanding is that Mr. Berman was contacted
24 by someone who had bought or traded some art

*Note: line numbers above are 1-24, plus:*

1 single time anyone from Chubb has asked me a
2 question, I have given them the best
3 information that I have available to me at that
4 time. As new facts are discovered, as I learn
5 new things -- which I am doing my best to do,
6 because these things took place decades
7 earlier -- I provide you with the best
8 information, as I'm doing now, sir.
9    Q    Then what came to your attention
10 that caused you to correct what was said to
11 Mr. White?
12    A    Again, we went over this
13 extensively in my first EUO. But again, you
14 insisted on taking a second EUO, and I will
15 answer this question again.
16    Q    Thank you.
17    A    You're looking for inconsistencies
18 between the first and the second, and things
19 that I said to Mr. White.
20        I will do my best, given the facts
21 that I know today, to explain this once again
22 to you. I spoke to Mr. Robert Berman, and my
23 understanding is that Mr. Berman was contacted
24 by someone who had bought or traded some art

Page 216

Douglas Altschuler

1
2    A    I believe that to be the case.
3    Q    When did you have this
4 communication with Mr. Berman where this
5 clarification came about?
6    A    Within the last couple of years.
7 I mean, this claim from Chubb is now moving
8 onto its second year. Time is really passing.
9 We've been dealing with each other now almost
10 two years, and these events took place decades
11 ago. So I had multiple conversations with
12 Mr. Berman. I don't know. I mean, whatever I
13 testified to at my first EUO, I had probably a
14 better recollection then, because it was closer
15 to the time that I had my conversation with
16 Mr. Berman.
17    Q    Did you at any time advise your
18 former attorney of these communications that
19 you had with Mr. Berman?
20    A    I may have. I certainly advised
21 you, sir, during my EUO.
22    Q    I'm not worried about me. I'm
23 asking if you advised your former attorney.
24    A    I don't remember. But I would
25 have no reason to believe I didn't.

Page 215

Douglas Altschuler

1
2 which he had for one of my sets of Andy Mouse.
3 This individual contacted Mr. Berman, because
4 Mr. Berman was known to deal in this set of
5 art, and they asked Mr. Berman if he happened
6 to have an original box that the art came in.
7 When I spoke to Mr. Berman, Mr. Berman and I
8 started talking about various purchases I made,
9 and it was during one of the multiple
10 conversations I had with him where he brought
11 to my attention, he said: Ah, now I understand
12 why this gentleman was asking me for a box,
13 because he had a set of prints and he didn't
14 have the original box that Mr. Haring and
15 Mr. Warhol designed for the prints, and I was
16 trying to locate a box for him.
17        Those facts, sir, would suggest to
18 me -- I'm not 100 percent positive, but they
19 would be strongly suggestive of the fact that
20 the set that I traded for the art, as I
21 explained to you previously, was the set that I
22 purchased from Keith Haring.
23    Q    Therefore, the set that you are
24 claiming to the insurance company is the set
25 that you purchased from B1?

Page 217

Douglas Altschuler

1
2    MR. RUBIN: Can we put on the
3 screen number 2, please; this was
4 previously marked as Exhibit B.
5        (Whereupon a screen share is
6 initiated of the exhibit.)
7    MR. RUBIN: And by the way, sir,
8 anytime you need a break, please let us
9 know.
10    Q    These were responses to questions
11 about the silkscreens involved in the claim
12 that was provided by your former attorney. In
13 these written responses, again, you indicated
14 that the silkscreens involved in the claim were
15 purchased from Keith Haring directly, and that
16 they were delivered to your home or your
17 parents in Tucson -- as it says here, either
18 been driven down from Phoenix, or sent to
19 Tucson by Keith Haring. Was that true, sir?
20 Is that true?
21    A    This exact question was asked in
22 my first EUO. You and Mr. Stringer had the
23 conversation about this. He explained to you
24 that, at the time, that was my best and most
25 accurate answer. I then explained that,

6 (Pages 214 - 217)

800-567-8658                                                        973-410-4098

CHUBB-Altschuler/ROLEX & ART 00002484

092020001456

Page 218

Douglas Altschuler

1 subsequent to that, I had a conversation with
2 Mr. Berman. We had this precise conversation
3 before, over this precise issue.
4     Q     I was under the impression that
5 you had imparted to or told your prior attorney
6 about the discussion with Mr. Berman, per your
7 testimony a few minutes ago, beforehand --
8 before this was done?
9     A     I'm completely, absolutely, one
10 hundred percent lost. I have no idea what
11 you're asking me.
12     MR. ZANE: I have no idea either.
13     MR. RUBIN: Excuse me?
14     MR. ZANE: I don't understand the
15 question either.
16     Q     Did you tell your former attorney
17 about your communication with Mr. Berman before
18 you prepared this document and submitted it to
19 Chubb?
20     MR. ZANE: Objection.
21 Attorney-client privilege. Don't
22 answer.
23     MR. RUBIN: It's what?
24     MR. ZANE: Never mind, go ahead.

Page 218

1         Douglas Altschuler
2 subsequent to that, I had a conversation with
3 Mr. Berman. We had this precise conversation
4 before, over this precise issue.
5     Q     I was under the impression that
6 you had imparted to or told your prior attorney
7 about the discussion with Mr. Berman, per your
8 testimony a few minutes ago, beforehand --
9 before this was done?
10     A     I'm completely, absolutely, one
11 hundred percent lost. I have no idea what
12 you're asking me.
13     MR. ZANE: I have no idea either.
14     MR. RUBIN: Excuse me?
15     MR. ZANE: I don't understand the
16 question either.
17     Q     Did you tell your former attorney
18 about your communication with Mr. Berman before
19 you prepared this document and submitted it to
20 Chubb?
21     MR. ZANE: Objection.
22 Attorney-client privilege. Don't
23 answer.
24     MR. RUBIN: It's what?
25     MR. ZANE: Never mind, go ahead.

Page 219

1         Douglas Altschuler
2     It's attorney-client. That's
3 confidential information, but go ahead.
4     A     I mean, obviously not. And that
5 was explained to you in the first EUO,
6 Mr. Rubin, that we subsequently discovered
7 facts. I testified to this. You had back and
8 forth with both me and Mr. Stringer on this,
9 and we explained just the same thing we're
10 explaining now -- that, at the time, that's
11 what we knew. And now, when I was testifying
12 in my first EUO, I had new information. I also
13 explained to you that I couldn't locate
14 Mr. Berman. This was during the height of
15 Covid. We covered this in excruciating detail.
16     Q     Well, you also told us that you
17 traded in one set; correct, sir?
18     A     That is correct.
19     Q     And that was a set that you
20 purchased from Keith Haring; is that correct,
21 sir?
22     A     As I'm telling you, I believe this
23 is correct. I'm trying to put the pieces to
24 the puzzle together. The two sets are fungible
25 and interchangeable. Whether it's one set or

Page 220

1         Douglas Altschuler
2 another set, the fact of the matter is they
3 were both pristine sets of Andy Mouse.
4     Q     By the way, you owned both sets at
5 one time, at the same time; did you not?
6     A     Yes.
7     Q     Did you ever insure two sets at
8 any one time?
9     A     I don't know.
10     Q     Now you told us that you traded
11 the set through, I believe, Mr. James Corcoran;
12 is that correct?
13     A     Yes.
14     Q     Have you been able to locate a
15 single document or record to confirm that
16 trade?
17     A     Number one, I haven't looked for
18 any specific documents. But I mean, I just
19 don't even remember getting a document. I've
20 done business with Mr. Corcoran before, and
21 it's typically done on the phone or with a
22 handshake. I don't have a lot of documentation
23 for my business done with Mr. Corcoran.
24     Q     Well, a consultant interviewed
25 Mr. Corcoran and Mr. Corcoran said that he did

Page 221

1         Douglas Altschuler
2 not trade any set of Andy Mouse silkscreens for
3 you. Can you explain that?
4     A     That is not correct. I did trade
5 it.
6     Q     Can you explain why Mr. Corcoran
7 denies that; that he said he did not trade any
8 set for you?
9     A     Well, that's what your consultant
10 is telling you. I will tell you that I did
11 trade it. I did trade two pieces of art for
12 that, so that's simply not correct.
13     Q     But you do not have any document
14 that you can provide to us to confirm that
15 trade; is that also correct?
16     A     I don't, but I could try and
17 contact Mr. Corcoran.
18     MR. RUBIN: You can take this off
19 the screen now, please.
20     Q     We previously discussed an
21 appraisal that Mr. Corcoran did for the Andy
22 Mouse in the amount of $250,000. It was dated
23 October 18, 2010. And you indicated during
24 your prior Examination Under Oath that that was
25 not really a true valuation -- that it was an

7 (Pages 218 - 221)

CHUBB-Altschuler/ROLEX & ART 00002485

092020001456

Page 222

1            Douglas Altschuler
2 estimate.  And you said you might have some
3 documents confirming that you had some sort of
4 exchange with Mr. Corcoran on that.  Were you
5 able to locate any such exchange or
6 communications?
7       A    It was between me and
8 Mr. Corcoran's assistant.  Mr. Corcoran did not
9 appraise this.  His assistant did, and my
10 insurance company at the time.
11       Q    The consultant who interviewed
12 Mr. Corcoran indicated that he stood by his
13 valuation of $250,000, and that it was not some
14 sort of estimate as you had previously
15 suggested.  Can you explain why Mr. Corcoran
16 would say that?
17       A    Well, again, I don't quite
18 understand your question.  You're asking me to
19 agree with what you're telling me your
20 consultant said.  I can tell you, number one,
21 Mr. Corcoran did not appraise those pieces of
22 art.  He doesn't know anything about those
23 pieces of art, in terms of what the value was
24 at the time of the appraisal.  It was done by
25 his assistant.  I have the email exchange

Page 223

1            Douglas Altschuler
2 between me, the insurance company, and his
3 assistant, where she says it's approximately
4 this amount -- number one.  And number two,
5 that particular type of art -- the prints --
6 it's not the kind of art that they deal in.  So
7 she went on the internet -- I spoke to her, and
8 she went on the internet and was looking at it.
9       Q    When you say "she," who are you
10 referring to, sir?
11       A    Tracy Lew.  L-E-W.
12       Q    And she worked with Mr. Corcoran?
13       A    That's correct.
14       Q    When did this occur?  Back in
15 2010?
16       A    I'm sorry, when did what occur?
17       Q    This communication that you had
18 with her; did this occur in 2010?
19       A    I don't know when it occurred, but
20 it could have been 2010.  Whenever the original
21 appraisal was done.
22       Q    The appraisal, as I mentioned, was
23 dated October 18, 2010.
24       A    Okay.
25       Q    Is it at that time that you had

Page 224

1            Douglas Altschuler
2 communications with the assistant?
3       A    Well, I've talked to Tracy many
4 times -- many.  Hundreds of times.  So I can't
5 tell you when it was, but we had discussions
6 about it.  She was not familiar with that
7 particular art.  She went on the internet.
8 That's why she said it's approximate.  And then
9 the other issue which we subsequently discussed
10 is she wasn't completely familiar with the fact
11 that there were four pieces.  So when she put
12 "250" down, we subsequently discussed was that
13 for one piece, or was that for all four pieces.
14       Q    Can you give us an approximate
15 year where you had this communication with
16 Tracy?
17       A    It would be impossible.  I
18 couldn't begin to do it.
19       Q    Was it within a few years of 2010
20 when this appraisal was done?
21       A    It could have been, yes.
22       Q    Do you recall asking Jim Corcoran
23 or Tracy to provide an additional appraisal for
24 you?
25       A    Periodically, whether it was every

Page 225

1            Douglas Altschuler
2 six months or every year, they would do
3 appraisals for all the art I purchased from
4 them.  As I've explained to you, I did not
5 purchase the Andy Mouse from them.  So they had
6 to go onto the internet to understand what that
7 price was, because they didn't deal in that
8 particular art.  All the other art on there was
9 art which I purchased from them, so they knew
10 the value of it.
11       Q    Can you give us a point in time
12 when, based upon these communications, they
13 became aware of the true value of the
14 silkscreens?
15       A    I don't understand your question.
16       Q    You indicated that she went on the
17 internet, that she needed more information.
18 She thought it was one, and you told her there
19 were actually four; a series.  I'm just
20 recapping what I understood you said, and I'm
21 trying to find out approximately when these
22 communications occurred, so that they knew what
23 they were appraising.
24       A    In 2010 -- let's take your date,
25 but it could be 2010, 2011, whenever it was

8 (Pages 222 - 225)

CHUBB-Altschuler/ROLEX & ART 00002486

092020001456

Page 226

Douglas Altschuler

1  that that appraisal was provided to the
2  insurance company, and she put approximately
3  250, and they wouldn't accept the appraisal
4  because of the word "approximate." I think she
5  took out the word "approximate" and put "250"
6  in there. And I think we just accepted -- I
7  accepted that it was 250, and we kept it at
8  that. Later on when I discovered that the
9  value was actually much higher, I had a
10 discussion with Tracy and I said, "You know,
11 I'm wondering when you looked at this whether
12 it was 250 per print, or whether you saw 250
13 for all of them, and the price just really went
14 up?" We just had that discussion. It was
15 never -- we never brought it to a conclusion,
16 because I had another appraisal done on it by
17 someone who dealt in this particular art.
18     Q     And these communications with
19 Tracy, can you give us a point in time when
20 they were completed -- where she was more
21 informed as to the value of these silkscreens?
22     A     Again, I would have ten, fifteen,
23 twenty conversations a year, or sometimes more
24 with Tracy. So I can't tell you specifically
25

Page 227

Douglas Altschuler

1  when that particular conversation took place.
2  I would --
3     Q     Did you have -- I'm sorry, go
4  ahead.
5     A     I would assume it was sometime
6  after I got the appraisal from Dina and her
7  mom.
8     MR. RUBIN:  Could we please put on
9  the screen, number 4.
10    (Whereupon a screen share is
11    initiated of the document.)
12    MR. CRADDOCK:  Counsel, are we
13    marking this as AA?
14    MR. RUBIN:  Yes, we are.
15    (Document is marked as Company
16    Exhibit AA for identification, as of
17    this date.)
18    Q     By the way, sir, did you have any
19 knowledge that the silkscreens were more
20 valuable than $250,000, prior to 2017?
21    A     Can you ask me that question
22 again?
23    MR. RUBIN:  Please read it back.
24    (The record is read back by the
25

Page 228

Douglas Altschuler

1  reporter as follows.)
2     THE REPORTER:  "QUESTION:  By the
3     way, sir, did you have any knowledge
4     that the silkscreens were more valuable
5     than $250,000, prior to 2017?"
6     A     I don't believe so.
7     Q     On January 6, 2017, another
8  appraisal, which is on the screen, was provided
9  to Chubb.  On page three, if you go to the last
10 page of this appraisal, it also appraised the
11 Andy Warhol and Keith Haring silkscreens for
12 $250,000.
13     Sir, between 2010 and 2017,
14 nothing came to your attention in any of your
15 communications with Tracy about the valuation
16 of the silkscreens being too low?
17     A     No.  As I've indicated, this is
18 not art that Jim or Tracy typically dealt with.
19 They were doing this as a courtesy.  They went
20 onto the internet and they were looking at
21 valuations.
22     MR. RUBIN:  Can we put up
23     Exhibit 6, please.  Can you scroll that
24     for Mr. Altschuler?
25

Page 229

Douglas Altschuler

1     MR. CRADDOCK:  Will this be BB?
2     MR. RUBIN:  Yes, it will.
3     (Document is marked as Company
4     Exhibit BB for identification, as of
5     this date.)
6     (Whereupon a screen share is
7     initiated of Company Exhibit BB.)
8     MR. RUBIN:  Can you scroll that
9     for Mr. Altschuler, please.
10    Q     Mr. Altschuler, it says here --
11 and it's from your email to Janine Butler of
12 August 2, 2018 -- "Candidly, I knew the value
13 was higher, but I was surprised myself."
14    A     Mm-hmm.
15    Q     When did you have knowledge that
16 it was higher?
17    A     I don't know.
18    Q     There was a point in time where
19 your broker at that time was confused as to
20 what you were trying to increase the value of;
21 is that correct, sir?
22    A     I don't understand your question.
23    Q     Through this email chain, it
24 indicates that the broker was trying to figure
25

9 (Pages 226 - 229)

CHUBB-Altschuler/ROLEX & ART 00002487

092020001456

Page 230

Douglas Altschuler

1  out what the Dina Brown appraisal related to.
2  Do you recall that, sir, by reviewing that
3  thread?
4  A     I can't read anything here.
5  Q     We can make it bigger for you.
6  A     It's not a question of making it
7  bigger. Let me read the thread. I'm not
8  following your question. It's hard for me, I
9  can't scroll through the whole email here.
10  Q     Okay, well, let's see if I can
11  help you.
12  On page four, from Janine Butler:
13  "Hello, Mr. Altschuler. Thank you for the
14  attached appraisal" -- referring to the Dina
15  Brown appraisal -- "I'm having trouble matching
16  the piece with the ones currently listed on
17  your policy. Please see attached schedule of
18  your items and advise which item number the
19  appraisal is referencing." And you provided an
20  answer: "It is item number 2." Is that what
21  you told her back then?
22  A     Well, I have no independent
23  recollection of what the conversation was, but
24  if that's what the email says, yes.

Page 231

Douglas Altschuler

1  Q     And item 2 would be what I showed
2  you before on the policy, the Andy Warhol
3  silkscreens; is that correct, sir?
4  A     I believe that's correct.
5  Q     And that was the silkscreens
6  identified by Dina Brown in her appraisal; is
7  that correct, sir?
8  A     I don't know. I'm just not
9  following your train of thought or your
10  questioning.
11  Q     I'm not asking you to do that.
12  I'm just asking you to answer the question.
13  Don't worry what's in my mind. But I
14  appreciate that, sir.
15  A     I'm sorry for my colloquial
16  comment. I don't understand your question,
17  sir.
18  MR. RUBIN: Please read back the
19  question.
20  (Whereupon the record is read back
21  by the reporter as follows.)
22  THE REPORTER: "QUESTION: And
23  that was the silkscreens identified by
24  Dina Brown in her appraisal; is that

Page 232

Douglas Altschuler

1  correct, sir?"
2  A     I guess I'm just losing the
3  context of these questions. I'm still not sure
4  what you're asking me. I mean, I guess this
5  email exchange is the best evidence of what was
6  said between me and Ms. Butler.
7  Q     I understand that, but that was
8  not my question. My question was: Item 2, per
9  the exchange and thread of emails, refers to
10  the silkscreens which were appraised by Dina
11  Brown and set forth in her appraisal; is that
12  correct, sir?
13  A     Yes.
14  Q     When you previously testified, you
15  were not certain whether you had communications
16  with Dina Brown before she did the appraisal.
17  Sitting here today, do you recall having any
18  conversations with Dina Brown before she did
19  the appraisal for you?
20  A     You know, I don't. We went back
21  and forth on this -- whether it was the mom,
22  whether it was Dina.
23  Q     Do you recall having a single
24  conversation with the person who appraised your

Page 233

Douglas Altschuler

1  silkscreens?
2  A     Yes.
3  Q     And that would have been Dina
4  Brown; correct?
5  A     That's correct. I've had many
6  conversations with Dina -- not many, but three
7  or four.
8  Q     I'm talking about before the
9  appraisal was done, not after.
10  A     Right. You've asked me that many
11  times, and I've testified, sir, that I just
12  don't remember.
13  Q     But you do recall at least one
14  conversation with Dina Brown before she did the
15  appraisal?
16  A     No, sir, that's not what I'm
17  saying. You're asking me the same question
18  over and over, and I'm trying to tell you I
19  don't recall whether I had a conversation with
20  Dina prior to her doing the appraisal, or if
21  the discussion was with the mom. I just don't
22  remember.
23  Q     Okay. I accept that, sir.
24  Would it surprise you that the

10 (Pages 230 - 233)

CHUBB-Altschuler/ROLEX & ART 00002488

092020001456

Page 234

Douglas Altschuler

1  person who appraised your property has
2  indicated to a consultant for the company that
3  she did not have any conversations with you
4  about the artwork that she appraised --
5      A    I'm sorry?
6      Q    -- prior to the time it was done?
7      A    You're asking me would it surprise
8  me?
9      Q    Yes.
10     A    Well, it wouldn't surprise me,
11 because I just testified I don't remember
12 whether my conversations were with Dina Brown
13 or the mom.  So, no, it wouldn't surprise me.
14     Q    Well, if all the conversations
15 were with the mom, why didn't you have the mom
16 prepare the appraisal?
17     A    Again, sir, we went over this
18 extensively in my first EUO.  When I spoke to
19 the mom -- and again, this is my best
20 recollection -- it could have been the mom, I
21 could have had a conversation with Dina.  I
22 don't remember.  If you're telling me Dina is
23 saying I didn't, I'll accept what you're
24 saying.  I don't know whether I did or didn't.

Page 235

Douglas Altschuler

1  That's my testimony.
2      But to answer your question, the
3  mom, based on my numerous conversations with
4  her, indicated that Dina -- who I believe is
5  the daughter -- was a certified appraiser.
6  That's my best recollection as I sit here and
7  testify today.  So it would make sense then for
8  Dina to do the appraisals.  I don't know if the
9  mom was a certified appraiser.
10     Q    Did you ever ask her?
11     A    No, I didn't ask her.
12     Q    The information that's set forth
13 on the appraisal was provided by you to Elaine,
14 the mom; is that correct?
15     A    Well, sir, again, I want the
16 record to be clear, as I'm sure you do as well.
17 I don't recall whether I had the conversation
18 with the mom or Dina.  I provided information,
19 I believe to the mom.  Is it possible I spoke
20 to Dina and provided that to her before?  It's
21 possible.  I certainly had the conversation
22 with her after the appraisal.  But, yes,
23 information was provided to the mom or to Dina
24 or to both of them which would enable someone

Page 236

Douglas Altschuler

1  who deals in this particular art to provide an
2  appraisal.
3      Q    Chubb had a consultant who spoke
4  with Elaine -- the mother -- and she
5  acknowledged that she had discussions with you,
6  sir.  And she indicated that it was you who
7  told her the "edition 3 of 30" that was put on
8  the appraisal.  Do you deny that, sir?
9      A    So again, we had multiple,
10 multiple discussions or you elicited my
11 testimony in the EUO -- my first EUO -- and as
12 I said to her and as I said to you many times,
13 multiple times, and to your investigators and
14 everybody else who has asked me:  I believe I
15 had edition 3 out of 30, and I would have
16 conveyed that information to Elaine or Dina or
17 anybody.
18     I also explained to you that,
19 whether it was 3 out of 30, or 30 out of 30,
20 the number itself was irrelevant to the value
21 and the appraisal.
22     Q    I can only suggest to you, sir,
23 that Chubb has insured edition 3 of 30 --
24     A    Okay.

Page 237

Douglas Altschuler

1      Q    -- and not some other edition.
2      MR. ZANE:  Is that a question?
3      Q    Did you ever tell Elaine that you
4  had purchased at one time another set of
5  silkscreens from Keith Haring?
6      A    I don't remember.  I very well may
7  have.  We had a lot of conversations and we
8  both shared a love and an interest for art.  I
9  may have.
10     Q    Did you ever exchange any emails
11 with her, or was all of this done through
12 telephone communications?
13     A    I've had telephone conversations,
14 and I am fairly certain I had email exchanges
15 with her as well.
16     Q    Well, we had asked previously for
17 these email exchanges.  And the only one that
18 we've received so far is the thread, which is
19 really not an email exchange with Elaine.
20 *RQ    MR. RUBIN:  Would you be kind
21     enough to search your records and
22     provide these email exchanges to us?
23     THE WITNESS:  Sure.  If I have any
24     email exchanges -- and I believe there

11 (Pages 234 - 237)

CHUBB-Altschuler/ROLEX & ART 00002489

092020001456

Page 238

Douglas Altschuler

1  probably is one or two, but I'm not 100
2  percent sure -- whatever I have, I will
3  provide to my attorney.
4        MR. RUBIN:  And just so that the
5  record is clear, we did ask for these
6  records previously, Mr. Altschuler.
7        THE WITNESS:  You didn't ask me.
8        MR. RUBIN:  They were asked for in
9  writing from your attorneys.
10       MR. ZANE:  Charles, whenever
11  you're done with the line of
12  questioning, we've been going for an
13  hour, would this be a good time to take
14  a break?
15       MR. RUBIN:  If you need a break,
16  you got it.
17       MR. ZANE:  Outstanding.
18       MR. RUBIN:  How long would you
19  like to take, Jeff?
20       MR. ZANE:  Like five minutes.
21       MR. RUBIN:  Sure.
22       (Whereupon a five-minute recess is
23  taken.)
24            oOo

Page 239

Douglas Altschuler

1 *RQ     MR. RUBIN:  Mr. Altschuler, the
2  Keith Haring Foundation preserves all of
3  the artist's personal and business
4  paperwork.  Would you be willing to sign
5  a release allowing Chubb's
6  representative to contact the Foundation
7  regarding your purchase, directly from
8  the artist, of the silkscreens?
9        THE WITNESS:  I believe that
10  request was made some time ago.
11       MR. RUBIN:  No, it was not.  It
12  was made to certain museums, but not to
13  the Foundation itself.
14       THE WITNESS:  That's not my
15  understanding.  I'm almost 100 percent
16  sure it was made to the Foundation, but
17  be that as it may.
18       MR. RUBIN:  No, it was a few
19  others, Sotheby's and a few others, but
20  not to the actual Foundation.  Would you
21  be willing to do that?
22       THE WITNESS:  I absolutely would
23  be willing to do it.  But I will tell
24  you that I was asked would I allow the

Page 240

Douglas Altschuler

1  Foundation to look into this, and I said
2  of course.
3        MR. RUBIN:  Asked by who?
4        THE WITNESS:  By my attorney, who
5  said it was your request.
6        MR. RUBIN:  I have the actual
7  request, but I'll check that out, and if
8  it's not in that form, I'll provide a
9  form for your attorney to have you sign.
10       THE WITNESS:  Okay.
11   Q     You said that you've had numerous
12  conversations with Dina Brown.  In these
13  conversations after the appraisal was done, did
14  she ever indicate anything to you about her
15  checking the provenance of these silkscreens
16  and what she determined?
17   A     I don't understand your question,
18  sir.
19   Q     With respect to the edition 3 of
20  30 that's set forth on the appraisal, did Dina
21  Brown ever indicate to you that she did some
22  research and found that some of those
23  silkscreens had been sold prior to the time of
24  your loss?

Page 241

Douglas Altschuler

1   A     She did not.
2   Q     Did you do any such research to
3  determine whether any of the silkscreens --
4  edition 3 of 30 -- were sold prior to the time
5  of the loss?
6   A     I'm trying to comprehend the
7  question -- no.
8   Q     You previously indicated that you
9  displayed a set of the silkscreens; is that
10  correct, sir?
11   A     I don't believe I testified I
12  displayed a set.  I may have had one
13  temporarily framed to take a picture of it for
14  some reason.  Again, this is going back decades
15  and decades.  But as I sit here today, my
16  recollection is that they were never all
17  framed.
18   Q     Would this be one of the
19  silkscreens that's involved in your claim?
20   A     I don't know.
21   Q     If it's not one of the silkscreens
22  involved in your claim, which silkscreen would
23  it be?
24   A     Well, we've discussed that there

12 (Pages 238 - 241)

CHUBB-Altschuler/ROLEX & ART 00002490

092020001456

Douglas Altschuler

1  were two sets, and I recall having one of the
2  set of four framed in a temporary frame to take
3  a picture of it, I believe, for Keith --
4  Mr. Keith Haring.
5      Q    And where was it displayed?
6      A    It was displayed at a museum in
7  Phoenix.
8      Q    Do you recall the year it was
9  displayed?
10     A    I don't.
11     Q    Do you recall how it got to the
12 museum?
13     A    I don't.
14     Q    Do you know where it was before it
15 was displayed in the museum?
16     A    I don't have any independent
17 memory, but I would assume it was at my
18 parents' house.
19     Q    Well, you previously told us that
20 the 1987 silkscreen was displayed in Phoenix.
21 You said that during your recorded statement,
22 on page 24.
23     A    I don't recall.
24     Q    Was that statement true, sir, when

Douglas Altschuler

1  you made it?
2      A    As I mentioned a few minutes ago,
3  anytime I make a statement to Chubb or any of
4  your representatives, the statement is always
5  true.  As I also testified, as these facts
6  which occurred decades ago unfold, my memory
7  becomes refreshed as a result of finding things
8  out.  So "I don't know" is the answer.
9          MR. RUBIN:  Can we put on the
10     screen, number 8, please, and mark it as
11     the next exhibit, CC.
12         (Color photograph is marked as
13     Company Exhibit CC for identification,
14     as of this date.)
15         (Whereupon a screen share is
16     initiated of Exhibit CC.)
17     Q    By the way, sir, you previously
18 told us that the silkscreens you acquired from
19 Mr. Berman in 1987 were delivered directly to
20 your parents home in Tucson, and that they
21 remained there until the time of the loss; is
22 that true, sir?
23     A    That's my best memory, yes.
24     Q    You also previously said the

Douglas Altschuler

1  silkscreens that you purchased from Mr. Haring
2  were delivered by him or transported by him to
3  your parents' house as well; is that true?
4      A    Yes.
5      Q    Once a set from Mr. Haring was
6  transported to your parents' house, were they
7  ever removed from the box by you or anyone on
8  your behalf?
9      A    Well, when the prints from
10 Mr. Haring were purchased, I don't know whether
11 they were sent to the museum in Phoenix or they
12 were sent directly to my parents' home.  I just
13 don't have any memory of that.
14     Q    You previously told us they were
15 sent to your parents' home, and also in your
16 written responses to questions.
17     A    Eventually they were at my
18 parents' home, yes.  What I'm saying is, I
19 don't know whether they went to the museum, and
20 the museum sent them.  I just don't remember.
21     Q    When you say "the museum sent
22 them," what are you referring to, sir?
23     A    The museum where this print is
24 displayed.

Douglas Altschuler

1      Q    Was it displayed for the public at
2  the museum?
3      A    No, it was not.
4      Q    Do you have any recollection one
5  way or another, sir, of whether the silkscreens
6  that were delivered to your parents' home by
7  Keith Haring went to the museum -- one of them?
8      A    I just don't remember.
9      Q    How about the one that you
10 purchased from B1 -- Mr. Berman?
11     A    Likewise, sir, I just don't
12 remember.
13     Q    So it could be one or the other;
14 is that correct, sir?  Or it would have to be
15 one or the other; is that correct?
16     A    That's correct.
17     Q    Can you tell us what is depicted
18 in this photo, sir?
19     A    It appears to be a woman leaning
20 on a desk with what appears to be one of the --
21 one of the four Harings.  Whether it was one of
22 mine, whether it was a poster, I don't know.  I
23 mean, it's a depiction of one of the four Andy
24 Mouses.  I believe it's from the set of four.

13 (Pages 242 - 245)

CHUBB-Altschuler/ROLEX & ART 00002491

092020001456

Page 246

Douglas Altschuler

1
2 There were some others done outside of that
3 set.
4    Q    You're going well beyond the scope
5 of the question, sir.
6    A    You asked me.
7    Q    You can tell us what's depicted,
8 and then that's it.
9         Do you know whether this
10 silkscreen that is shown in this photograph
11 came from the set that you purchased from Keith
12 Haring, or from the set that you purchased from
13 B1?
14    A    Well, I just testified, sir, that
15 I don't know.
16    Q    Okay.  And is it framed?
17    A    What's depicted in that picture,
18 the object on the wall, is framed.  Yes.
19         MR. RUBIN:  Excuse me for one
20 second.
21         (A brief pause is taken.
22         Whereupon a discussion is held off the
23         record.)
24         MR. RUBIN:  Sorry about that.
25    Q    Can you identify the lady in that

Page 247

Douglas Altschuler

1
2 photograph?
3    A    Yes.
4    Q    Who is that lady?
5    A    That is a lady who was a
6 girlfriend of mine.
7    Q    Previously?
8    A    Previous, yes.  I said "was."
9    Q    Can you tell us when this
10 photograph was taken?
11    A    I cannot.
12    Q    This is Lisa MacCollum -- is that
13 who it is?
14    A    Correct.
15    Q    As I understand it, it's spelled
16 M-A-C-C-O-L-L-U-M.  Is that your understanding,
17 Mr. Altschuler?
18    A    I take your word for the spelling.
19    Q    Were you ever in her office?
20    A    I was.
21    Q    Do you know whether she shared the
22 office with anybody?
23    A    I have absolutely no idea.
24    Q    Do you know where the other
25 silkscreens were located at the time that this

Page 248

Douglas Altschuler

1
2 particular one was displayed in her office?
3    A    Sir, so we're clear on this
4 testimony, I don't know what that is on the
5 wall -- whether that was one of mine, whether
6 that was a poster reproduction, whether that's
7 even part of the set, I just don't have any
8 independent recollection.
9    Q    Maybe we can help you there.  A
10 representative of Chubb spoke to Lisa MacCollum
11 and asked her about the photograph and the
12 silkscreen depicted there, and she recalled
13 only one single print that was provided to her.
14 Do you disagree with that?
15    A    I have no independent memory.
16    Q    She said that you initially wanted
17 to ship the silkscreen to her apartment, but
18 she didn't want to be responsible for it.  Do
19 you recall that, sir?
20    A    I don't.
21    Q    Do you have any recollection
22 sitting here today of why you would want to
23 send it to her apartment, as opposed to her
24 office in the museum?
25    A    I have absolutely no recollection

Page 249

Douglas Altschuler

1
2 of any of that conversation or discussion.  I
3 couldn't even guess as to any of it.  I mean,
4 it's completely, absolutely vague to me.
5    Q    Could you tell us how long it was
6 at the museum?
7    A    I could not.
8    Q    Could you tell us where this
9 particular silkscreen was, prior to the time it
10 was put in the museum?
11    A    Sir, again, I just want to have
12 the most accurate record.  I don't know if that
13 is a silkscreen.  I don't know.  I have no
14 independent memory of this photo, of what that
15 depicts.  I just don't know.
16    Q    Lisa MacCollum was asked what
17 happened to the silkscreen and she indicated,
18 "It was eventually taken to his mother's house
19 in Tucson."  Do you recall that, sir?
20    A    I don't.
21    Q    Do you know with regard to this
22 silkscreen whether a record was made with the
23 registrar at the museum?
24    A    I don't even know what the
25 registrar at the museum is.  I don't know.

14 (Pages 246 - 249)

CHUBB-Altschuler/ROLEX & ART 00002492

092020001456

Page 250

```
 1              Douglas Altschuler
 2      Q   Did you and Lisa frequently visit
 3 your parents in Tucson?
 4      A   Yes.  Let me be clear:  I'm not
 5 sure what your definition of "frequently" is.
 6      Q   Weekends and holidays.
 7      A   She did visit my parents' house on
 8 a number of occasions.
 9      Q   You previously told Chubb that you
10 had a photograph of one of the silkscreens
11 involved in the claim.  Is this the photograph
12 that you were referring to?
13      A   Yes.  I think I said I had a
14 photograph depicting what appeared to be a
15 silkscreen -- I think it was, but again, I'm
16 not 100 percent sure if that's one of the four,
17 if that's one of my four.  I just don't know.
18      Q   If you look closely at the bottom
19 of the silkscreen, just above the frame it
20 looks like there's some writing there.  Can you
21 see that?
22      A   I cannot.
23      Q   Do you know who took this
24 photograph?
25      A   I do not.
```

Page 252

```
 1              Douglas Altschuler
 2          (Whereupon a screen share is
 3      initiated of Exhibit DD.)
 4      Q   Are you familiar with the Artnet
 5 Price Database, Mr. Altschuler?
 6      A   I've heard of it.
 7      Q   What is your understanding of that
 8 database?
 9      A   I don't have an understanding.  I
10 just have heard of it.
11      Q   Well, it's my understanding that
12 they did a search and determined that three of
13 the edition 3 of 30 were sold on the market
14 prior to the time of your loss.
15          MR. RUBIN:  Could we scroll this
16      so that Mr. Altschuler can review the
17      entire document.
18          (Whereupon Exhibit DD is
19      scrolled.)
20      A   I can't see it.
21      Q   When you say that you can't see
22 it, why is that?
23      A   It's just too small.  I mean I can
24 see it, I cannot read it.
25      Q   Is that better?
```

Page 251

```
 1              Douglas Altschuler
 2      Q   Do you know where the original
 3 photograph is?
 4      A   I have it somewhere.
 5 *RQ       MR. RUBIN:  We would like to see
 6      the original photograph, as opposed to a
 7      photocopy of it.
 8          THE WITNESS:  Right.  If I can
 9      locate it, I will provide it to my
10      counsel.
11      Q   And you have no recollection of
12 what happened to this silkscreen after it was
13 displayed in Lisa's office?
14      A   Again, on the assumption that it
15 is the silkscreen, the answer is:  I do not.
16      Q   Are you aware, sir, that three of
17 the silkscreens of edition 3 of 30 were sold on
18 the market prior to the time of your loss?
19      A   I was not.
20          MR. RUBIN:  Could we put on the
21      screen, number 9, please, and mark it as
22      DD.
23          (Document is marked as Company
24      Exhibit DD for identification, as of
25      this date.)
```

Page 253

```
 1              Douglas Altschuler
 2      A   Yes.
 3          MR. RUBIN:  All right, start at
 4      the beginning for Mr. Altschuler, and
 5      let him review the entire document.
 6      Take your time, sir.
 7          MR. CRADDOCK:  Sir, you can let me
 8      know when to scroll.
 9          THE WITNESS:  Okay.  Please
10      scroll.
11          (Whereupon Exhibit DD is scrolled
12      down for the witness.)
13      A   Yes, I'm finished looking at this.
14      Q   Would you agree, sir, based upon
15 this document, that three of the edition 3 of
16 30 were sold in the market prior to the time
17 that you submitted a claim to Chubb?
18      A   It appears so, yes.
19      Q   The photograph that was previously
20 marked as an exhibit, the silkscreen shown in
21 that photograph coincidentally happens to be
22 one of the four that has not been determined to
23 have been sold on the market.
24      A   Okay.
25      Q   Can you explain that, sir?
```

15 (Pages 250 - 253)

CHUBB-Altschuler/ROLEX & ART 00002493

092020001456

Page 254

1　Douglas Altschuler
2　A　I have no explanation, no.
3　Q　In your view, sir, the value of a
4　series of four have greater value than selling
5　the silkscreens individually?
6　A　I explained that in great detail
7　to Mr. White.
8　Q　You're under oath here today.
9　What would be the answer to the question?
10　A　You're asking me personally? I
11　would never break up a set and sell these
12　individually. I was emphatic with Mr. White
13　that whoever would do that doesn't understand
14　the value of having a full set. You would
15　never want to break them up unless there were
16　some extenuating circumstances.
17　Q　So therefore you would agree that
18　the value of a set would be much more valuable
19　than individual silkscreens --
20　A　That's correct.
21　Q　-- of the set?
22　A　Correct.
23　Q　You indicated to us previously
24　that you sell things at auctions; is that true?
25　A　I indicated to you previously that

Page 255

1　Douglas Altschuler
2　I have, through a representative, sold things
3　at auctions. I've never done it directly.
4　Q　You do it through a third party;
5　is that correct?
6　A　That's correct.
7　Q　Can you tell us the name or the
8　names of the third parties that you have sold
9　artwork through?
10　A　Tracy Lew.
11　Q　Anyone else?
12　A　Not that I can recall sitting
13　here. And now that I'm thinking about it, I
14　did sell one piece directly at Sotheby's in
15　London once.
16　Q　One piece of what, sir?
17　A　One piece of art.
18　Q　Directly, you're saying?
19　A　Yes, that was directly.
20　Q　Do you have the current contact
21　information for Tracy Lew?
22　A　I don't have it with me. I could
23　find it.
24　*RQ　MR. RUBIN: Would you agree to
25　provide that for us?

Page 256

1　Douglas Altschuler
2　THE WITNESS: Yes.
3　Q　You indicated that you had
4　communications with Dina Brown after the
5　appraisal was done; is that correct?
6　A　Yes.
7　Q　Do you recall the sum and
8　substance of any of these communications?
9　A　We talked about her mom, we talked
10　about the art market, various individual pieces
11　of art that she was telling me about.
12　Q　And she never indicated to you,
13　either prior to the appraisal, through her
14　mother or directly or in any form -- or
15　after -- that she had done some research and
16　determined that three of the silkscreens that
17　she appraised had been sold in the market, but
18　she thought they had been somehow reacquired?
19　She never indicated that to you?
20　A　No.
21　Q　Do you ever recall telling Dina
22　Brown in any of your communications that you
23　are an important collector, and how much art
24　you had?
25　A　That's not a statement that I

Page 257

1　Douglas Altschuler
2　would ever make.
3　Q　And if Dina Brown said that to a
4　consultant for the company, that would be
5　false; is that correct?
6　A　I can't opine on that. I don't
7　know what she did or didn't say to anybody.
8　Q　Since the time we last met and
9　today, have you been able to locate, in any
10　form, any receipt from the purchase from
11　B1 Gallery -- Mr. Berman?
12　A　I have not.
13　Q　I do recall somewhere that you
14　indicated that you had a pink document or
15　something. Have you made a search to determine
16　whether that document still exists?
17　A　That was in Tucson, and as I
18　previously testified, I do remember coming
19　across it when I was going through my things.
20　I do remember seeing the pink slip from the
21　gallery.
22　Q　I understand you had some
23　communications with Mr. Berman after the claim
24　was submitted; correct?
25　A　Yes.

16 (Pages 254 - 257)

CHUBB-Altschuler/ROLEX & ART 00002494

092020001456

Page 258

1          Douglas Altschuler
2     Q    And that's where some of the
3  clarification, if you will, came about as to
4  what set you were claiming; is that correct?
5     A    It provided me with some facts to
6  try to piece together the puzzle of which set
7  it was.
8     Q    As of today, has Mr. Berman been
9  able to locate any document confirming the
10 transaction with you?
11    A    I haven't asked him recently.
12    Q    Did you tell him that you had two
13 sets of silkscreens?
14    A    Yes.
15    Q    Did you tell him that you
16 purchased a second set at some point in time?
17    A    Yes.
18    Q    Did you tell him from whom you
19 purchased that second set?
20    A    Yes.
21    Q    What did you tell him?
22    A    I told him I purchased a second
23 set from Mr. Haring.
24    Q    As I understand it, Mr. Berman was
25 under the impression that you purchased a

Page 259

1          Douglas Altschuler
2  second set from Mr. Corcoran.  That would be
3  incorrect; is that true, sir?
4     A    I don't understand your question.
5     Q    Mr. Berman was under the
6  impression, from what I understand, that you
7  purchased the second set from Mr. Corcoran.
8  Would that be inaccurate?
9     A    I'm trying to understand your
10 question.  I don't know what your discussions
11 were with Mr. Berman and I don't know what
12 Mr. Berman assumed.  I told him Mr. Berman that I
13 purchased the set from Mr. Haring.
14         MR. RUBIN:  Put on the screen
15 number 10.
16         (Whereupon a screen share is
17         initiated of the document.)
18         MR. RUBIN:  Off the record.
19         (Whereupon a discussion is held
20         off the record.)
21         (Document is marked as Company
22         Exhibit EE for identification, as of
23         this date.)
24    Q    Do you recall seeing that document
25 prior to today, sir?

Page 260

1          Douglas Altschuler
2     A    I can't read it.  It's too small.
3     Q    We'll make it bigger for you.
4     A    I think -- and again, I'm not
5  100 percent sure -- that we provided this to
6  you.
7     Q    I don't dispute that.  Do you
8  recall when you had this communication with
9  Mr. Berman, pursuant to which this letter was
10 requested?
11    A    I do not.
12    Q    The letter is dated August 3,
13 2020.  Would it be at or about that time?
14    A    It would be at or prior to that
15 time, I assume.  That's my answer.
16    Q    Was Lisa MacCollum with you when
17 you purchased the silkscreens from Mr. Berman?
18    A    I'm fairly certain she was.
19 Again, it's going back a long time, but I'm
20 fairly certain she was.
21    Q    Just for clarification, would I be
22 correct that based upon your prior testimony
23 and information you provided to the company,
24 the silkscreens that you're claiming were in a
25 box in your parents' home stayed in your

Page 261

1          Douglas Altschuler
2  parents' home for approximately 30 years until
3  you determined the loss?
4     A    That is essentially correct, yes.
5     Q    And at no time were any of the
6  silkscreens that were in that box -- none of
7  them were removed at any time for any purpose?
8     A    As I sit here today and give you
9  my best recollection, I don't believe they
10 were.  I don't have any recollection that they
11 were removed.  But that's, again, my testimony
12 today, based on trying to go back decades in
13 time.
14    Q    You previously told us that you
15 saw the crate and the box, and you opened the
16 crate and you saw that it had a box in it, and
17 you did not open it any further, and it stayed
18 there all these years; is that not correct?
19    A    Again, you're asking me to go back
20 to 1987, 1988, whenever I purchased these and
21 had them shipped.  I don't recall removing them
22 from the house.  I don't recall taking them
23 out.  But is it possible it happened over
24 decades of time -- that I took it out, or
25 looked at it, or laid it out on the table?  I

17 (Pages 258 - 261)

CHUBB-Altschuler/ROLEX & ART 00002495
092020001456

Page 262

```
1              Douglas Altschuler
2  just don't remember.
3       Q     That's contrary to what you
4  previously testified to.  That's why I'm trying
5  to get some clarification here.  You previously
6  told us they remained sealed all those years.
7  Was that true or not true when you testified?
8       A     Sir, I will mention again:  Every
9  time I testify, I testify truthfully.  This has
10 now gone on almost two years.  It's given me an
11 opportunity to think.  I don't have any
12 recollection of taking them out of the box.  Is
13 it possible that it happened?  Yes.
14            MR. ZANE:  I'm going to object.
15      You're misconstruing.  I'm looking at
16      the EUO transcript where he says, "I
17      can't remember over multiple decades
18      whether I ever opened it up again or
19      kept it sealed."  I mean, your
20      characterization is inaccurate.
21            MR. RUBIN:  I'm talking about his
22      prior testimony.
23            MR. ZANE:  Yes, that's what I'm
24      looking at.  He testified that he did
25      not open that box, that it remained
```

Page 263

```
1              Douglas Altschuler
2  sealed all those years.  I just read it
3  to you.  I recited to you page 63 of his
4  EUO transcript.
5            MR. RUBIN:  What page do you have?
6            MR. ZANE:  Sixty-three.
7            MR. RUBIN:  Sixty-three, you said?
8            MR. ZANE:  Correct.  Lines nine
9      through twelve.
10           MR. RUBIN:  But that's referring
11      to when he opened it up that one little
12      time to check whether the box was there,
13      if you go back five pages.
14           MR. ZANE:  You said that he kept
15      it sealed, and you told him before that
16      it was sealed for 30 years, and he just
17      said that he can't remember if he opened
18      it up again after that.
19           MR. RUBIN:  Let's see if we can
20      clarify through his testimony today.
21           MR. ZANE:  Okay.
22      Q     When the box was delivered to your
23 house in Tucson, as I understand your prior
24 testimony, it came in a crate and there was a
25 special box within that crate; is that true,
```

Page 264

```
1              Douglas Altschuler
2  sir?
3       A     As I described it, I wouldn't
4  describe it as a "crate" as one would see, you
5  know, like a big wooden crate.  It was more of
6  a corrugated type box with metal or plastic
7  corners so that the corners of the box wouldn't
8  get damaged, and within that was another box
9  tightly fit in there.
10      Q     I believe you previously indicated
11 that you opened the outer box, if you will, but
12 you did not open the inner box.  Is that true
13 or not true?
14      A     As I sit here today, that's not my
15 recollection.  I would have opened to see that
16 the art was in there.
17           MR. RUBIN:  Give me a moment,
18      please.  Let's take a few minutes.
19           (A recess is taken from 12:52 P.M.
20      to 1:00 P.M.)
21              oOo
22      Q     I'm looking at page 23 of the
23 transcript of the first session, and I'm
24 reading:
25           "Question:  Appreciate that, sir.
```

Page 265

```
1              Douglas Altschuler
2  Thank you.  And when you say you opened it up,
3  did you open up the entire carton or crate?
4           "Answer:  No.  No.  No.  So we're
5  clear, and the next time you ask me at trial
6  we're crystal clear:  I opened this very
7  carefully with a knife so that the box, slash,
8  crate, or whatever you want to call it, would
9  be easily or readily closed, no dust or
10 anything could get in there.  And I looked to
11 see what was inside this shipping box, slash,
12 crate.  I determined that the original box of
13 the silkscreens were in there, and very
14 carefully closed it so, again, no dust or
15 anything can get in.  So in that sense I think
16 my answers are completely 100 percent
17 consistent with my response number 8, which was
18 previously provided to you.
19           "Question:  Did you actually see
20 the silkscreens themselves when you did this?
21           "Answer:  I did not."
22      So, sir, you told us previously
23 that when they were delivered, you told us this
24 procedure of what you did:  You opened up this
25 crate, but you did not open the inner box to
```

18 (Pages 262 - 265)

CHUBB-Altschuler/ROLEX & ART 00002496
092020001456

Page 266

Douglas Altschuler

1  see the actual silkscreens.  Are you telling us
2  now that you may have at some later date
3  exposed the silkscreens to dust, etc., by
4  opening that inner box?
5
6      A    Well, to answer your question as
7  you've asked it, the answer is no.
8      Q    Do you have any recollection
9  whatsoever of ever opening that inner box up --
10  after it was delivered to your parents' home,
11  until the time you claimed the loss occurred?
12     A    Yes.
13     Q    When did that occur?
14     A    I do not know.  You're asking me
15  to go back a period of over 30 years.
16     Q    Do you recall the purpose of
17  opening up the box again?
18     A    I don't.
19     Q    Did you remove anything from the
20  box when you opened it?
21     A    Not that I can remember.
22     Q    We had asked you for a photograph
23  of one of the silkscreens involved in the
24  claim, and the only photograph that you
25  provided to us was the one that we shared with

Page 267

Douglas Altschuler

1
2  you earlier today.  Are there any other
3  photographs?
4      A    Not that I'm aware of.
5      Q    The silkscreen that was in the
6  photograph had some kind of frame on it.  Do
7  you know who put that frame on it?
8      A    You asked me that, sir, and I said
9  I don't know.  I also want to be clear that I
10  have not identified that as a silkscreen.
11     Q    Well, in your prior testimony you
12  implied that, so we are clarifying it as of
13  today.
14     A    And to be clear, I don't know what
15  that is a picture of.  I'm not expert enough or
16  familiar enough with the full set to know
17  whether that was part of the set, whether that
18  was part of the series that he did.  I don't
19  know what that is a picture of.
20     Q    Well, did you have a series of
21  what he did as well?
22     A    I had the set of four called "Andy
23  Mouse."  I didn't have anything outside of the
24  set of Andy Mouse.
25     Q    What was the point of giving this

Page 268

Douglas Altschuler

1
2  silkscreen to Lisa to put in her office?
3      A    I don't understand that question.
4      Q    What was the reason that you gave
5  the silkscreen to Lisa MacCollum to put in her
6  office?
7      A    Sir, I want to be clear.  I don't
8  have any independent recollection of me giving
9  that to her, me having that framed, or what in
10  particular that was.  I just don't remember.
11     Q    Were you ever in her office and
12  saw that silkscreen on the wall as depicted?
13     A    I was in her office many, many
14  times.
15     Q    And did you see the silkscreen as
16  shown in that photograph?
17     A    I have absolutely no recollection
18  sitting here today of actually ever being in
19  her office, but I'm sure I was on many, many,
20  many occasions.  And I have no independent
21  recollection sitting here of seeing what is
22  depicted in that photograph on the wall.
23     Q    You indicated that you were
24  concerned about dust when you were opening that
25  outer crate.  What was your concern?  Explain

Page 269

Douglas Altschuler

1
2  that to me so I understand it.
3      A    You always want to maintain any
4  art in the most pristine condition and keep it
5  away from sunlight and dust and dirt and
6  particles.
7      Q    Is that the reason that you did
8  not open the inner box at that time?
9      A    I believe I'm testifying that at
10  some time I did open the inner box.
11     Q    But you don't recall when?
12     A    That's correct.
13     Q    And you don't recall the purpose?
14     A    That's correct.
15     Q    Do you recall removing and taking
16  any single silkscreen out of the box on that
17  occasion?
18     A    I don't.  I may have.  I may not
19  have.  I just do not recall.
20     Q    Is it possible that one of the
21  silkscreens that was in the crate was displayed
22  in the photo?
23     A    It is possible.
24     Q    The silkscreens that Keith Haring
25  had transported to your parents' home, do you

19 (Pages 266 - 269)

CHUBB-Altschuler/ROLEX & ART 00002497

092020001456

Page 270

Douglas Altschuler

1 recall ever opening up that box crate?
2     A    Well, to be clear, sir, I think I
3 testified a few minutes ago that I don't know
4 whether they were transported to my parents'
5 home or transported to the museum.
6     Q    When you say "the museum," what
7 museum are you referring to?
8     A    The museum that we've been
9 discussing for the last couple of hours.
10     Q    Is that the Heard Museum?
11     A    Correct.
12     Q    Okay, let's switch gears a little
13 bit and talk about your Rolex, your recorded
14 statement with Fred White referring to the
15 Rolex claim. I'm going to get the exact
16 wording. I'm going to read some of the
17 recorded-statement testimony that you provided
18 at that time. Page six:
19         "Question: Okay, and then I'm
20 sorry, I think you said you were gonna be
21 traveling, so your mom took the watch back to
22 Tucson after the wedding. Would that be
23 correct?
24         "Answer: Yes.

Page 271

Douglas Altschuler

1         "Question: Okay, and did you ever
2 have any correspondence with your mom after
3 that point about the watch?
4         "Answer: I may have. I asked
5 her -- I don't remember, or I -- do you have my
6 watch, or do you know did you put it away, or
7 something like that. I don't -- not being -- I
8 just don't remember."
9     Q    Was that answer that you provided
10 to Mr. White at that time true?
11     A    Sir, I will reiterate for you that
12 every time I make a statement to Chubb, or for
13 that matter, to anyone, the statement at the
14 time I make it is true.
15     Q    Did something happen to cause your
16 memory to change after you provided that
17 statement to Mr. White?
18     A    As I testified to a few minutes
19 ago, sir, that statement was taken at Chubb's
20 insistence about a week after my mom passed
21 away. I did my best to provide clear
22 testimony. As time goes by and I start
23 thinking about things, I may remember
24 something, I may in fact forget something. At

Page 272

Douglas Altschuler

1 the time I made the statement to Mr. White, the
2 statement was true and correct. Likewise, when
3 I had my EUO taken I gave the best testimony
4 that I could at the time, which was truthful.
5     Q    Mr. White did not know that your
6 mother had passed until he got to see you that
7 day and take the statement; isn't that true?
8     A    I don't know what Mr. White did or
9 did not know.
10     Q    Well, you told him that day that
11 your mother had passed. That's when he found
12 out; isn't that true?
13     A    Sir, let me be clear. I don't
14 know what Mr. White knew and did not know. You
15 have unlimited resources. You have people who
16 are talking to my family. You are deeply
17 involved in conversations with my family,
18 obtained documents from my family. So what
19 Chubb did and did not know as a result of their
20 deep involvement and talking with my family, I
21 cannot tell you. I don't know what Mr. White
22 knew or did not know.
23     Q    Do you recall ever telling anyone
24 at Chubb prior to the time of your recorded

Page 273

Douglas Altschuler

1 statement that your mother had passed?
2     A    I don't.
3     Q    You never contacted the police
4 about the Rolex; is that correct?
5     A    Yes, we discussed this extensively
6 in my first EUO.
7     Q    Since the time of your first EUO,
8 have you contacted the police to inform them
9 about the loss of the Rolex?
10     A    I have not.
11     Q    Since the time of your first
12 session of your EUO, did you speak to any
13 family members directly about the loss of the
14 Rolex?
15     A    I have not.
16     Q    More specifically, either your
17 brother or your sister?
18     A    I have not.
19     Q    Were you concerned at any time
20 that either your brother or sister had
21 possession of the Rolex?
22     A    I would not say I was concerned.
23 I had no idea whether they had the Rolex or
24 not.

20 (Pages 270 - 273)

CHUBB-Altschuler/ROLEX & ART 00002498

092020001456

Page 274

```
1              Douglas Altschuler
2      Q    And the only way you found out
3  about the Rolex being missing was through your
4  attorney?
5      A    That is correct.
6      Q    You increased the value of the
7  Rolex from $50,000 to $120,000, as we discussed
8  earlier -- effective, based upon the policy,
9  11/21/19.  Would I be correct that that was
10  based upon an appraisal?
11      A    That is correct.
12          MR. RUBIN:  Could we put 14 on the
13  screen and mark it as the next exhibit.
14          MR. CRADDOCK:  Counsel, it has a
15  previously marked sticker.  Do you want
16  to mark it for this deposition?
17          MR. RUBIN:  No, if it was
18  previously marked as "Exhibit W" during
19  the first session.
20          (Whereupon a screen share is
21  initiated of previously marked
22  Exhibit W.)
23      Q    Is that the appraisal, sir,
24  pursuant to which you increased the value?
25      A    I need it to be enlarged.  I'm
```

Page 275

```
1              Douglas Altschuler
2  unable to read it.
3      Q    Okay, it was enlarged for you.
4      A    I'm still having difficulty
5  reading it.
6          MR. RUBIN:  Enlarge it a bit more,
7  please.
8          (Whereupon previously marked
9  Exhibit W is magnified on the screen
10  share.)
11      A    I believe that's correct, sir.
12      Q    And just for the record, that
13  document is dated August 22, 2018.
14          MR. RUBIN:  Can we now put up on
15  the screen, number 19, and let's mark
16  that as the next exhibit, FF.
17          (Document is marked as Company
18  Exhibit FF for identification, as of
19  this date.)
20          (Whereupon a screen share is
21  initiated of Exhibit FF.)
22      Q    Mr. Altschuler, do you recall
23  seeing this letter?
24      A    I need it to be enlarged.  I'm
25  unable to read it on my screen.
```

Page 276

```
1              Douglas Altschuler
2          MR. RUBIN:  Okay, let's enlarge
3  it.
4          (Whereupon the screen share of
5  Exhibit FF is magnified for the
6  witness.)
7      A    Can you go back to the top, so I
8  can see who sent this letter?  [Perusing
9  document.]  Yes, I recall this.
10      Q    Was this a letter that your
11  attorneys wrote to Bruno Derval at
12  International Dream Collection Inc., on your
13  behalf?
14      A    That is correct.
15      Q    And did you read the letter prior
16  to the time that it was sent to Bruno Derval
17  and International Dream Collection Inc.?
18      A    I don't remember reading it, but I
19  would assume that I read it.
20      Q    You determined that the Rolex was
21  missing in February of 2020; is that correct?
22      A    That is correct.
23      Q    And the source of your learning
24  that was what, sir?  Just so that the record is
25  clear.
```

Page 277

```
1              Douglas Altschuler
2      A    I had requested the watch be
3  returned to me -- through my counsel -- and I
4  was told it could not be located.
5      Q    In this letter from Browne George
6  Ross, the reference to watches included the
7  Rolex that is involved in your claim; is that
8  correct, sir?
9      A    I'm not reading the letter, but I
10  would assume it was, because it was one of the
11  watches that I bought from Bruno.
12      Q    As I understand, you wanted to
13  return the watches, at a minimum -- and get
14  your money back, plus.  Isn't that true, sir?
15      A    That's correct.
16      Q    Can you explain to us, sir, how
17  you were going to get back the watch that was
18  stolen in February, as this letter is written
19  at the end of March?  It's dated March 31,
20  2020.
21      A    I haven't read the letter, but
22  whether it was a request to return all watches,
23  or some of the watches, I don't know.  If that
24  watch is included in there, obviously that was
25  an oversight.
```

CHUBB-Altschuler/ROLEX & ART 00002499

092020001456

Page 278

```
1              Douglas Altschuler
2      Q   Well, it says here on the first
3  page, "As a result, Mr. Altschuler hereby
4  demands that you immediately agree to
5  (i) accept Mr. Altschuler's return of the
6  watches."
7      A   Mm-hmm, yes.
8      Q   So the reference to the watch
9  that's being claimed would be incorrect, as set
10 forth in this letter?
11     A   That is true.
12         MR. RUBIN:  Could we go to page
13     three now, and can you enlarge the
14     second full paragraph for
15     Mr. Altschuler.
16         (Whereupon the screen share of the
17     document marked as Exhibit FF is
18     magnified.)
19     Q   Can you see that, sir?
20     A   I'm reading it, yes.
21     Q   It says there:  "It was then that
22 Mr. Altschuler first had reason to doubt the
23 veracity of your appraisals."
24         What date was that that your
25 attorney was referring to there?  Because it
```

Page 279

```
1              Douglas Altschuler
2  seems to suggest that it goes back to August of
3  2018.
4      A   I don't know what the dates were.
5  I just know the sequence of events which caused
6  me to have concern that the watches were not as
7  represented.
8      Q   And when did you first have that
9  concern?
10     A   I first had that concern when I
11 purchased the last watch which I purchased from
12 Bruno and picked it up at a hotel in New York.
13 He wasn't there.  He had left it for me at the
14 front desk.  I picked that watch up, and
15 coincidentally was walking back to an apartment
16 in New York City and went into a watch store to
17 look at another watch, and happened to show the
18 watch which I had just picked up at the hotel
19 to the fellow who owned the store.  And he
20 said, "Oh, that looks great, let me see it."
21 And he started examining it under a loupe, and
22 told me that the watch did not appear to be as
23 was represented to me.
24         That was the first time that I had
25 reason to doubt that there was an issue with
```

Page 280

```
1              Douglas Altschuler
2  the watch.
3      Q   That was Bruno who said that to
4  you?
5      A   No.  Bruno was the gentleman that
6  sold me the watch.
7      Q   And who was it that made that
8  statement to you?
9      A   Michael Ashton.
10     Q   When did this occur?
11     A   I would have to go back and see if
12 I could somehow reconstruct this through
13 looking at texts or emails.  I don't know,
14 sitting here today, when exactly that occurred.
15     Q   Who is Michael Ashton?  Tell us
16 about him.
17     A   He's a fellow that owns a watch
18 store in New York City.
19     Q   Do you know the name of the watch
20 store?
21     A   "Michael Ashton."
22     Q   Do you know where they're located?
23     A   On Madison Avenue in New York
24 City.
25     Q   Let's go to the next paragraph in
```

Page 281

```
1              Douglas Altschuler
2  the letter, please.  Was that paragraph, sir,
3  based upon what Mr. Ashton told you?
4      A   No.
5      Q   What was it based upon?
6      A   Let me read this.  [Perusing
7  document.]  This was based on something that a
8  gentleman named Jeffrey told me.
9      Q   Jeffrey Wind?
10     A   I don't know Jeffrey's last name.
11     Q   Well, how did it come about?
12 Where did you speak to this "Jeffrey"?
13     A   At the apartment on 82nd Street in
14 New York.
15     Q   And how did this meeting come
16 about?
17     A   I had been in contact with a
18 gentleman named Mr. Eric Wind, and mentioned
19 the fact that I had purchased a watch from
20 Bruno -- excuse me, a number of watches from
21 Bruno -- and that I happened to stop on my way
22 to the apartment and stopped in to ask Michael
23 Ashton a question about another watch, and
24 Michael Ashton saw the box and said, "Hey,
25 what's in there?  That looks cool," and looked
```

22 (Pages 278 - 281)

CHUBB-Altschuler/ROLEX & ART 00002500

092020001456

Page 282

```
 1              Douglas Altschuler
 2  at it and had a question about it.
 3          I relayed all of this to Mr. Wind,
 4  and Mr. Wind said, "Off the record, Bruno has a
 5  reputation of selling sub-quality, subpar
 6  watches.  Maybe you lucked out and got some
 7  good ones.  I have no idea.  Why don't I have
 8  my friend Jeffrey take a look at it when he's
 9  in the city?  He frequently comes into the
10  city."  And he gave me Jeffrey's contact info.
11  I set up a time for Jeffrey to come over, have
12  lunch, and take a look at the watches.
13      Q     Would you be able to obtain for us
14  this contact information and the last name for
15  Jeffrey?
16      A     I can try.
17      Q     Do you have an approximate period
18  when this meeting took place?
19      A     I remember it was prior to Covid.
20      Q     It says here that "an independent
21  expert confirmed that the watches you sold were
22  worth approximately 50 to 75 percent less than
23  the prices you charged."
24          And that would, of course, include
25  the watch which is the subject of your claim;
```

Page 283

```
 1              Douglas Altschuler
 2  is that true?
 3      A     That's absolutely not true.
 4      Q     What was that referring to then?
 5      A     Again, we had this discussion in
 6  my first EUO.  Because Jeffrey was unable to
 7  look at the watch in question that we're
 8  discussing here, he couldn't opine, as I've
 9  previously testified, as to whether it was a
10  good watch in good condition or whether it was
11  like some of the other watches -- which was, a
12  watch that was not as represented, and not in
13  great condition.  He couldn't opine because he
14  couldn't see the watch.
15      Q     But it was referred to in the
16  letter that you wrote to Bruno.
17      A     First of all, I did not write the
18  letter.  The letter is the letter.  The
19  document speaks for itself.  Jeffrey did not
20  look at the watch in question.
21      Q     Did anyone ever look at the watch
22  in question to determine its true value --
23  other than of course Bruno, or his company?
24      A     As far as I know, no.
25      Q     Did you determine that there was a
```

Page 284

```
 1              Douglas Altschuler
 2  problem with Bruno, in determining the models
 3  and serial numbers of the various watches?
 4      A     I don't understand your question,
 5  sir.
 6      Q     In this letter it says:  "It was
 7  then that Mr. Altschuler first had reason to
 8  doubt the veracity of your appraisals, given
 9  that your correspondence and paperwork confused
10  which watches even had serial numbers, and
11  which serial number was associated with which
12  watch."
13          Was there a problem by Bruno in
14  properly identifying the watches that you
15  purchased, by serial number or otherwise -- as
16  is stated in this letter that your attorney
17  wrote on your behalf?
18      A     I don't know what he was trying to
19  say in that letter.  I do recall that one of
20  the watches had a serial number which had been
21  scratched off -- or due to wear, it was not
22  visible.
23      Q     At the time you wrote this letter,
24  was it your understanding that the watch that
25  was insured with Chubb was valued at $120,000,
```

Page 285

```
 1              Douglas Altschuler
 2  or did you believe it was overvalued at that
 3  time?
 4      A     As I've testified now in my first
 5  EUO, and just a couple of minutes ago, I have
 6  no idea what that watch was worth, what its
 7  true value was, because I did not know whether
 8  it was a perfect watch as represented when I
 9  purchased it with box and papers -- or whether,
10  had I had the opportunity hypothetically,
11  whether someone would say, "You know, this is
12  just not a good watch.  The dial has been
13  replaced, or something's been done to it.  It's
14  not worth $120,000."
15      Q     As I recall your prior testimony,
16  you indicated that you were aware that the
17  watch was not worth $120,000; isn't that true,
18  sir?
19      A     One hundred percent incorrect.
20      Q     At the time your attorney wrote
21  this letter to Bruno, were you aware of any of
22  the watches having the value as appraised?
23      A     I would have to reconcile the
24  appraisals with what they were sold for, but
25  it's my general understanding that the watches
```

23 (Pages 282 - 285)

CHUBB-Altschuler/ROLEX & ART 00002501

092020001456

Douglas Altschuler

2 were not worth what they were appraised at.
3    Q    And your general understanding was
4 based upon what, sir -- the communication with
5 whom?
6    A    My interaction with Jeffrey, who
7 looked at the watches and said that some of
8 them are just not good, and some of them are
9 probably okay -- based on that.
10    Q    How would your attorney know that
11 there was an issue with serial numbers, if you
12 did not say that to him, as set forth in the
13 this letter?
14    A    I think what my attorney was
15 referring to there -- and I emphasize
16 "think" -- is a number of emails I sent to him,
17 which I testified to at the beginning of my
18 deposition which went back and forth between
19 me, my broker, and Bruno, trying to reconcile
20 the serial numbers with particular watches --
21 which my understanding was it was ultimately
22 reconciled.
23    Q    Is there any writing that you
24 could provide to us that shows this
25 reconciliation?

Douglas Altschuler

2    A    I can look at my emails. I'm
3 assuming it was reconciled, because Chubb went
4 ahead and insured the watches. Whatever I
5 have, I will provide to my attorney.
6    Q    Was it your understanding as of
7 March 31, 2020 that the watch involved in your
8 claim was worth $120,000?
9    A    Sir, I will testify again that I
10 don't know what that watch was worth, whether
11 it was worth 120 or a lesser amount.
12    Q    Well --
13    A    I --
14    Q    -- didn't you replace that watch,
15 sir?
16    A    That's exactly what I was just
17 going to say when you interrupted me.
18    Q    I thought you had finished. I
19 didn't interrupt you, sir.
20    A    I subsequently replaced that watch
21 for $85,000 and informed Chubb that I replaced
22 it for $85,000, and I would accept $85,000 as
23 my claim -- versus the $120,000, to which it
24 was insured -- as a bona fide attempt at good
25 faith, to show that I was able to replace it at

Douglas Altschuler

2 a lower amount.
3    Q    So you would agree that the
4 replacement value of the watch was $85,000 --
5 what you told us you paid for it -- is that
6 correct?
7    A    No, that's not correct at all.
8    Q    Then what was the value of it at
9 the time you replaced it?
10    A    Sir, each of these vintage watches
11 is distinct. You could have a vintage model
12 6265 Rolex Daytona that's worth $35,000, and
13 you could have one that's worth $350,000. It
14 all depends on the specific watch. The watch
15 that -- may I finish? The watch that Bruno
16 sold me was unable to be examined by Jeffrey or
17 Eric or anybody else, so I don't know what that
18 watch was worth.
19    When I spoke to Eric and told him
20 about my desire to replace the watch, he found
21 what he thought was a good watch. I don't know
22 whether it had box and papers. It may have, it
23 may not have. That changes the value of the
24 watch quite a bit. He found what he thought
25 was a nice representative model of 6265 for

Douglas Altschuler

2 $85,000. That has no reflection at all as to
3 the value of the watch which is the subject of
4 this claim.
5    MR. RUBIN: Can we put up 18,
6 please. This was provided to us by your
7 attorney. We will mark that as the next
8 exhibit.
9    (Document entitled "Responses to
10 Chubb's Supplemental Requests for
11 Information" is marked as Company
12 Exhibit GG for identification, as of
13 this date.)
14    (Whereupon a screen share is
15 initiated of Exhibit GG.)
16    Q    Could we go to page four, where it
17 says "x," and it says: "Records reflecting the
18 replacement of the Rolex, including the
19 warranty card, receipt, and canceled check or
20 other proof of payment."
21    And the response was: "See
22 invoice from Wind Vintage LLC, Rolex Silver
23 'Big Red' Daytona 6263, case 8'844'511,
24 $85,000." That is the replacement watch;
25 correct, sir?

24 (Pages 286 - 289)

CHUBB-Altschuler/ROLEX & ART 00002502

092020001456

Page 290

Douglas Altschuler

1
2    A    That is a watch that I bought to
3  replace the watch which is the subject of this
4  claim.
5        MR. RUBIN:  Let's put on the
6    screen number 17, and mark it.
7        (Invoice on the letterhead of Wind
8    Vintage, LLC is marked as Company
9    Exhibit HH for identification, as of
10    this date.)
11        (Whereupon a screen share is
12    initiated of Exhibit HH.)
13        MR. RUBIN:  Can you make it a
14    little bigger for Mr. Altschuler?
15        (Whereupon the screen share of
16    Company Exhibit HH is magnified.)
17    Q    Can you see that, sir?
18    A    Yes.
19    Q    The Rolex Silver "Big Red" Daytona
20  6263, case 8'844'511 -- is that the replacement
21  Rolex?
22    A    That is the Rolex which I
23  purchased, yes.  The answer is yes.
24    Q    But that has a different number
25  than the one that was insured under the policy.

Page 291

Douglas Altschuler

1
2  This has a "6263" number.  The one on the
3  policy has a "6265" number.  Can you explain
4  that for us?
5    A    I can't.  I mean, again, maybe I
6  replaced it with a 6263.  Maybe it was replaced
7  with a 6265.  I don't know.
8    Q    But there is another 6263 that was
9  put on the policy as well.  Are you sure we
10  know which watch is involved in the claim?
11    A    Whatever the -- let me back up.
12  Whatever the watch which was insured, which
13  Bruno appraised initially -- I'm sorry, which I
14  provided the receipt for initially, and then
15  which was subsequently appraised, is the watch
16  which was insured.
17    Q    I appreciate that, sir, but there
18  is a Daytona 6263 that's also insured under the
19  policy at a different value.  I can go back to
20  the policy if you'd like.  I'm trying to find
21  out: Are you certain which watch is the one
22  that's actually missing?
23    A    I believe it was the 6265, but
24  I'll look at all the documents and try to
25  reconcile it.  It was either a 6263 or a 6265.

Page 292

Douglas Altschuler

1
2  The original invoice was sent, which Chubb has.
3  And the subsequent appraisal of that watch was
4  sent, which Chubb has.
5        So whatever nomenclature was
6  attached to that watch, whether it was "6263,"
7  or "6265," which is a slight variation between
8  one or the other, I don't know.  But it was
9  clear which watch was insured.  There was never
10  any discussion of that or --
11    Q    I'm trying to clarify it based
12  upon the records that you have provided to us.
13  I'm not privy to your communications with the
14  broker, and there is a distinction between the
15  "6265" and the "6263."
16    A    Yes.
17    Q    That's what I'm trying to clarify
18  through you.
19    A    Okay.
20        MR. RUBIN:  Can we put 21 on the
21    screen, please.  Go to the next page and
22    make it as big as you possibly can for
23    Mr. Altschuler.
24        MR. CRADDOCK:  I think we'll need
25    to look at the left side or the right

Page 293

Douglas Altschuler

1
2  side first.
3        MR. RUBIN:  Go to the left side
4    first.
5        (Document entitled "Vintage
6    Watches, Various Rolex Appraisals" is
7    marked as Company Exhibit II for
8    identification, as of this date.)
9        (Whereupon a screen share is
10    initiated of Exhibit II.)
11    Q    Is that big enough for you to
12  read, Mr. Altschuler?
13    A    It is.
14    Q    This was updated on July 6, 2020.
15  What is this document?  Is this a document of
16  the watches that Mr. Wind sold for you?
17    A    That's correct.
18    Q    One of them is the Rolex Silver
19  "Big Red" Daytona 6265 steel?
20    A    Yes.
21    Q    Which seems to be the same Rolex
22  as involved in your claim?
23    A    One of the watches -- first of
24  all, I sent him all the watches which I had,
25  which I purchased from Bruno.  One of the

25 (Pages 290 - 293)

CHUBB-Altschuler/ROLEX & ART 00002503

092020001456

Douglas Altschuler

1  watches which I purchased from Bruno wasn't
2  there.  Instead what was there was a punchcard
3  warranty, which has been provided to Chubb.
4  Whatever the punchcard warranty indicated --
5  whether it was the "6265," or whether it was
6  the "6263" -- is the watch which is the subject
7  of my claim.
8     Q    Again, there are two different
9  watches and there are two different items on
10 the policy, sir, so it's important that we get
11 this clarification.
12    A    I can't give you any more
13 information than I have now.  I'll state it
14 again.  Whatever the punchcard warranty which
15 was inadvertently sent to Mr. Wind -- whatever
16 that punchcard warranty matched up with, that
17 is the watch which is the subject of the claim.
18 I can't --
19    Q    I'm sorry, are you finished?
20    A    Yes.
21    Q    I'm reading from the schedule,
22 item 10: "Rolex Daytona.  Reference number
23 6265.  Serial number 5582584.  Vintage Daytona
24 Chronograph.  Stainless steel case and

Douglas Altschuler

1  bracelet, white dial, complete with original
2  punch papers."
3     And the one set forth on the
4  schedule, that you sold, is also a "Silver
5  Daytona 6275, switched bezels, box and punch
6  papers, looked real."  Do you know what the
7  "looked real" means?
8     A    I mean, as the phrase states, it
9  looks real.  It doesn't look like there was any
10 problem with it.
11    Q    Can you explain, sir, how this
12 appears to be the same watch that you are
13 claiming, but it was sold prior to the date of
14 loss?
15    A    I don't have -- let me be very
16 clear and restate this, because you're trying
17 to suggest that there's something nefarious
18 here.
19    Q    Not true, sir.  I'm trying to get
20 clarification of what is inconsistent here.
21    A    One of the watches which I
22 purchased from Bruno, and I cannot tell you if
23 it was a 6263 or a 6265 -- the evidence of
24 which is what's on the warranty card, which has

Douglas Altschuler

1  been provided to Chubb -- is missing.  And
2  that's the watch I'm making the claim on.
3  That's the best testimony I can give you.
4     Every watch which was purchased
5  from Bruno, with the exception of the watch
6  which was missing, was sent to Eric for sale.
7  There was no watch which matched up with the
8  warranty card.  In fact, he brought that to my
9  attention.  He said, "Oh, there's a warranty
10 card here that doesn't match up to any of the
11 watches."  And I said, "Yes, that watch is
12 missing."
13    Q    Do you know which watch the "6265"
14 that's referred to on the schedule is?
15    A    I do not.  Again, the broker had a
16 direct conversation with Bruno and had email
17 correspondence with Bruno to make sure that the
18 watches and the serial numbers matched up, so
19 that the correct watch -- watches -- were
20 insured.
21    Q    There is also an indication that a
22 Black "Big Red" Daytona 6263 steel -- it says
23 "fake bezel switching to service bezel" -- was
24 on hold.  Do you know what that meant, sir?

Douglas Altschuler

1     A    Yes.  When he was attempting to
2  sell it, someone said "I will buy it."  But a
3  sale is not consummated until the funds are
4  wired to Mr. Wind.
5     Q    And whatever watches were sold, as
6  set forth on this document -- withdrawn.
7        MR. ZANE:  Whenever you're done
8     with your line of questioning, we're at
9     three hours.  Maybe a break is in order
10    pretty soon.
11       MR. RUBIN:  I can stop if you'd
12    like, Jeff.
13       MR. ZANE:  Okay.
14       MR. RUBIN:  How long would you
15    like?
16       MR. ZANE:  Probably at least ten
17    minutes.
18       MR. RUBIN:  Okay.  Let's take ten
19    minutes.
20       (Whereupon a short recess is
21    taken.)
22             oOo
23    Q    Mr. Altschuler, between the time
24 of the letter your attorney sent to Bruno and

26 (Pages 294 - 297)

CHUBB-Altschuler/ROLEX & ART 00002504

092020001456

Page 298

Douglas Altschuler

1
2  his company on March 31, 2020, and the date
3  that you discovered the Rolex was missing, did
4  you ever notify Chubb or the broker that the
5  value for the Rolex may not have been correct
6  as set forth on the policy?
7      A   No, because I would have no reason
8  to know whether the value was or was not
9  correct, sir.
10     Q   Not even the basis of the letter
11 that your attorney wrote, indicating "50 to 75
12 percent" -- that wouldn't apply to all watches
13 that you acquired from Bruno?
14     A   I will testify again for the third
15 or fourth time, sir, that the watch which went
16 missing was not able to be inspected. Let me
17 again state that it could have been a perfect
18 watch, in perfect condition, with the box and
19 papers -- and we know it had the box and
20 papers, because you have the papers. So I have
21 no idea of knowing what the value was. But to
22 cut to the quick of what you're suggesting, I
23 went above and beyond my responsibility to
24 Chubb by telling them, "Hey, you insured a
25 watch for $120,000. I was actually able to

Page 299

Douglas Altschuler

1
2  replace that watch for $85,000" -- not the same
3  watch, but a watch which I was satisfied with.
4  At the time -- and this no longer applies now,
5  because things have changed for the last two
6  years -- at the time, I even made the offer to
7  accept the lower value, and not the $120,000.
8          So to answer your question, did I
9  inform them that my attorney wrote a letter
10 about other watches which were not the subject
11 of a claim to Chubb? No. Why would I?
12     Q   But that offer you're talking
13 about, sir, was made afterwards. I'm talking
14 about a different period of time, of whether
15 you notified Chubb that the value may have been
16 inflated -- not afterwards.
17     A   I disagree with the premise of
18 your question, and your suggestion that the
19 value was inflated. We do not know, nor was it
20 relevant for me to inform Chubb of the lawyer's
21 letter. I had nothing to hide. It was turned
22 over to you voluntarily. You were unaware of
23 it, and I made you aware of it, and --
24     Q   And that letter does not omit --
25     A   Why don't you let me --

Page 300

Douglas Altschuler

1
2      Q   You're going well beyond the scope
3  of the questions. You know that, sir.
4          And that letter does not omit the
5  watch that is the subject of the claim, does
6  it? It doesn't have a footnote or anything
7  indicating that that watch was not included;
8  does it?
9      A   It does not.
10     Q   Switching gears for a moment, sir,
11 and going back to the silkscreens. You said
12 you recalled putting a frame on one of the
13 silkscreens -- is that correct, or something
14 similar?
15     A   I did not testify to that.
16     Q   Did you put a frame on any
17 silkscreen that you're aware of?
18     A   What I testified to, sir, is I
19 don't have any independent recollection of
20 putting a frame on any silkscreen. I may have.
21 I may have not. I don't remember.
22     Q   But the one that's shown in the
23 photograph does appear to have some frame on
24 it, does it not?
25     A   The picture, or however you want

Page 301

Douglas Altschuler

1
2  to describe what's in the photograph, has a
3  frame on it. I was very clear that I don't
4  know what that represents. I have --
5      Q   Do you know who put that frame on
6  it?
7      A   You interrupted me. But the
8  answer to your question is no.
9      Q   I'm sorry, I thought you had
10 finished your answer. If you have more to say,
11 please do it.
12     A   I don't.
13         MR. RUBIN: Could we put up on the
14 screen, number 24, and mark it as the
15 next exhibit.
16         (Copy of 2019 tax return document
17 is marked as Company Exhibit JJ for
18 identification, as of this date.)
19         (Whereupon a screen share is
20 initiated of Exhibit JJ.)
21         MR. RUBIN: Can you scroll down at
22 least the first page for Mr. Altschuler,
23 so that he can see the first page.
24     A   I don't see anything other than
25 just people on the screen, sir.

27 (Pages 298 - 301)

CHUBB-Altschuler/ROLEX & ART 00002505

092020001456

Page 302

Douglas Altschuler

2  Q   You can't see the first page of
3  the 2019 tax return?
4  A   No, sir, I can't.
5  Q   Has something happened with
6  whatever machine you're working from?  Because
7  we see it.
8       MR. RUBIN:  Do you see that, Jeff?
9       MR. ZANE:  I do.
10      MR. CRADDOCK:  Sir, you might try
11      turning your phone sideways to
12      landscape.
13  A   I just see the four participants
14  here.  Is there a way for me to look at the
15  document?
16  Q   We're not doing anything
17  differently than we were doing before, sir,
18  that I'm aware of.
19  A   I'm just reporting to you what I'm
20  seeing, okay?  I don't see anything other than
21  the participants.  If there's something I
22  should do, or a way to see a document, just
23  tell me.
24  Q   I don't know what happened since
25  we showed you prior documents.

Page 303

Douglas Altschuler

2  A   Oh, I see it now.
3  Q   You got it now?
4  A   Yes.
5       MR. RUBIN:  Could you show
6  Mr. Altschuler the first page?
7  A   Now it's gone again.
8  Q   Then it's something, I think, with
9  your machine.
10  A   That could be.  Could you maybe
11  just ask me a question?
12  Q   Well, we'll try it.  What I have
13  on the screen is --
14      MR. RUBIN:  It's off the screen
15  now.  Bill, can we put it back on?
16      MR. CRADDOCK:  It seemed that when
17  I reshared it, he was able to see it, so
18  I'm trying that again.
19      MR. RUBIN:  Okay, thanks.
20      (Whereupon a screen share is
21      reshared of Exhibit JJ.)
22  A   I see it now.  I see the top part
23  of the document.
24      MR. RUBIN:  Could you scroll so
25      that he can see that entire page?  Go

Page 304

Douglas Altschuler

2  back to the top.
3  Q   Is that, sir, a copy of the first
4  page of your 2019 U.S. income tax return?
5  A   If you represent that that's what
6  it is, I take your word for it.
7  Q   I can only represent that that was
8  provided to us by your attorneys.
9  A   Then it is.
10  Q   Is any of the income reflected on
11  that tax return, to your knowledge, attributed
12  to you, or is it all income attributed to Zoe
13  Werner?
14  A   Sir, whatever is stated on
15  there -- I mean, the document is the most
16  accurate reflection on where the income comes
17  from.
18  Q   Well, did you earn any income
19  during 2019 that you're aware of?
20  A   Whatever income I earned is in
21  the -- in that tax return.
22  Q   Well, I asked you a question.  Are
23  you aware, sir, of earning any income during
24  2019?
25  A   I did have some income, yes.

Page 305

Douglas Altschuler

2  Q   And what was the source of that
3  income?
4  A   Social Security.  I may have had
5  some dividend interest or something.  I don't
6  know.
7  Q   Anything else that you can think
8  of, sir?
9  A   Not as I'm sitting here.
10  Q   How about 2020?  Has that return
11  been filed as yet?
12  A   That return has not been filed.
13  Q   Do you know, sir, whether you
14  earned any income during 2020?
15  A   It would be similar to 2019.
16  Q   So if we used 2019 as an example,
17  that would be a fair estimate of your 2020
18  income?
19  A   Yes.
20  Q   For you, and of course Zoe Werner?
21  A   Yes.
22      MR. RUBIN:  You can take this off
23  the screen now.
24  Q   Now I want to clarify something to
25  make sure that we're on the same page.  In

28 (Pages 302 - 305)

CHUBB-Altschuler/ROLEX & ART 00002506

092020001456

Page 306

Douglas Altschuler

2 terms of credit card and credit card debt, it's
3 my understanding from your prior testimony and
4 information provided that you did not pay one
5 particular credit card in full each month.  Is
6 my understanding correct?
7     A    Incorrect.
8     Q    Did you pay all of your credit
9 cards in full each month when the bills
10 arrived?
11    A    No, I did not.
12    Q    What did you do then instead?
13    A    I have two credit cards.  There's
14 an American Express which is paid in full each
15 month.  And I don't know whether it's a Visa or
16 Mastercard -- I can't recall off the top of my
17 head -- that I intentionally maintain a balance
18 on.
19    Q    When you say "intentionally
20 maintain," that means that you do not pay the
21 full amount, you always maintain a certain
22 amount each month?
23    A    Yes.
24    Q    And you would pay interest on that
25 amount -- whatever it is -- because it wasn't

Page 307

Douglas Altschuler

2 being paid currently?
3     A    Yes.
4     Q    And as I recall, that was
5 approximately $30,000 each month?
6     A    Yes -- I mean, I've given you the
7 documents.  Whatever that amount was on there.
8     Q    Well, actually, we don't have a
9 document for that particular credit card.  We
10 have it for a different credit card, but not
11 for one showing any balance of $30,000 that was
12 carried over.
13 *RQ    MR. RUBIN:  Would you be kind
14     enough to have that provided to us,
15     just for the months of the loss?
16     THE WITNESS:  I will need to speak
17 with my attorney.
18     MR. ZANE:  My understanding is
19 that you have that.
20     THE WITNESS:  Yes, I turned that
21 in.
22     MR. RUBIN:  Jeff, the ones that
23 you provided, the credit cards -- and I
24 can put them on the screen -- it's not a
25 Visa.  I have a Bank of America.

Page 308

Douglas Altschuler

2     MR. ZANE:  I think BOA is the Visa
3 credit card.
4     MR. RUBIN:  Pardon?
5     MR. ZANE:  Bank of America is the
6 Visa credit card.
7     MR. RUBIN:  But the one that you
8 provided to me doesn't show any
9 carryover balance of $30,000 -- that's
10 the point I'm getting at.
11    MR. ZANE:  I see, okay.
12    MR. RUBIN:  I'm trying to clarify
13 that with his testimony.
14    Q    Are you certain, sir, that each
15 month there was a carryover of about $30,000
16 between the months of the losses?
17    A    Yes.
18    Q    Can you tell us the purpose of
19 carrying over this monthly amount of $30,000
20 and paying interest each month?
21    A    The purpose of it?
22    Q    Yes.
23    A    I was told some time ago that if
24 you pay all of your credit cards off, and
25 you're not showing that you can buy and pay

Page 309

Douglas Altschuler

2 responsibly over time and not have any late
3 payments, it hurts your credit score.  And in
4 fact, I've determined that that actually is
5 correct.
6     Q    Okay.  Now, you've provided a list
7 of expenses with the household and family
8 expenses.  Were those paid by income from you,
9 or from Zoe?
10    A    One and the same.
11    MR. RUBIN:  Can we put on the
12 screen, number 25.
13    (Bank of America statement is
14    marked as Company Exhibit KK for
15    identification, as of this date.)
16    (Whereupon a screen share is
17    initiated of Exhibit KK.)
18    Q    That's Bank of America.  Is that
19 the Visa account, Mr. Altschuler?
20    A    Uh, I guess.  I think it's a
21 Mastercard.
22    Q    Mastercard, I'm sorry, yes.  Is
23 that the one you told us you carried-over
24 $30,000 each month on?
25    A    That's correct.  There are two

29 (Pages 306 - 309)

CHUBB-Altschuler/ROLEX & ART 00002507

092020001456

Page 310

1          Douglas Altschuler
2 cards -- one for me, and there's someone who
3 has an additional card.  This could be her
4 balance.
5          MR. RUBIN:  To my knowledge, we
6     have not received any other one; is that
7     correct, Jeff?
8          MR. ZANE:  I'm following up on
9     that.  Let me work on that while we're
10    working here.  My understanding is that
11    you've received a different one than
12    that.  I'll see what I can do here.
13         THE WITNESS:  It did take some
14    time and effort to get those.  It was
15    not easy to get, but I did get them, and
16    for some reason neither you nor my
17    counsel has them.  If you don't have
18    them, we're happy to provide those to
19    you again.
20         MR. RUBIN:  There are also some
21    additional Bank of America -- let's put
22    on 32.
23         (Document entitled "Bank of
24    America Statement" is marked as Company
25    Exhibit LL for identification, as of

Page 311

1          Douglas Altschuler
2     this date.)
3          (Whereupon a screen share is
4     initiated of Exhibit LL.)
5          MR. RUBIN:  Go to the next page.
6          THE WITNESS:  Well, there you go.
7          MR. ZANE:  That's what I believed
8     you had been sent.
9          THE WITNESS:  Yes, that's the
10    document.
11    Q    But it doesn't reflect, as I'm
12 reading it, any carryover of $30,000.  It only
13 indicates a past due amount of $891.  So I'm
14 trying to reconcile where this $30,000 is
15 reflected.
16    A    Sir, I think my prior testimony
17 was that I tried to keep a balance between 30
18 and 35.  Maybe this month it went up and then I
19 paid it back down to 30 or 35.  But, yes, this
20 is the sum and substance of what I'm explaining
21 to you -- that I keep a balance.
22    Q    Unless I'm misreading it, it
23 doesn't indicate that you kept any balance of
24 $30,000, or anything close to that, from the
25 prior statement.

Page 312

1          Douglas Altschuler
2          MR. ZANE:  The $47,000.
3          THE WITNESS:  Right.
4          MR. ZANE:  It says the previous
5     balance is $47,000.
6          MR. RUBIN:  Gotcha, okay.
7    Q    So you carried over $47,891.08
8 from the prior month?
9    A    Yes.
10   Q    Was there any cash liquidity issue
11 that prevented you from paying this in full at
12 that time?
13   A    No, sir, there was not.
14         MR. RUBIN:  Can we put up 34,
15    please, and mark it as the next exhibit.
16         (Document entitled "Douglas H.
17    Altschuler GST Exempt Trust Agreement"
18    is marked as Company Exhibit MM for
19    identification, as of this date.)
20         (Whereupon a screen share is
21    initiated of Exhibit MM.)
22   Q    Did this trust generate income to
23 you, sir?
24   A    Let me see which trust this is.
25 [Perusing document.]  I don't believe so.

Page 313

1          Douglas Altschuler
2          MR. RUBIN:  Thank you.  You can
3     take that off.  Can we go back to the
4     last exhibit, please, and put that up.
5          (Whereupon a screen share is
6     initiated of Company Exhibit LL.)
7    Q    It says a previous balance of
8 $47,891.08.  It gives you a new balance on the
9 right of $49,279.41.  And it says the current
10 payment due is $892 and the past due amount is
11 $891.  I'm still trying to reconcile that, sir,
12 with a carryover balance of $30,000 or more.
13   A    I will state it once again.  If
14 you were to look at the totality of my
15 statements, for the most part they're between
16 $28,000 and $35,000.  Perhaps this month -- I
17 have no independent recollection, and if you
18 can show me the page of what was charged,
19 perhaps that month I spent a little bit more
20 and made a larger payment.  The fact is, my
21 testimony has been consistent that my American
22 Express is paid in full each month and I
23 intentionally maintain a balance -- whether
24 it's $30,000, or slightly higher than that --
25 but the fact is, I maintain a balance and pay

30 (Pages 310 - 313)

CHUBB-Altschuler/ROLEX & ART 00002508

092020001456

Page 314

1            Douglas Altschuler
2  my credit card on time so that I have an
3  increased credit rating for my FICO score.
4       Q    But that carryover is not
5  reflected on this particular statement; is that
6  true?
7       A    That is not true.
8       MR. ZANE:  I thought we just
9  covered that.  That's the $47,000.
10      THE WITNESS:  Right.
11      MR. RUBIN:  It says that the past
12  due amount is $891.
13      MR. ZANE:  What's that got to do
14  with anything?
15      A    Occasionally, and if you look at
16  the next statement, you will see that a fee
17  charged for this was removed, because they had
18  received the payment and they actually made a
19  mistake.  However, I don't have that in front
20  of me.  I can ask them and I can get it.  The
21  payment was made and I would guess, knowing my
22  payment patterns, that I probably paid $3,000
23  to $5,000 to bring the balance down.  But it
24  does show a previous balance, a carryover
25  balance.

Page 315

1            Douglas Altschuler
2       MR. RUBIN:  Can we put on the
3  screen, 31, and mark it as the next
4  exhibit.
5       (Document entitled "Estimated
6  Monthly Expenses" is marked as Company
7  Exhibit NN for identification, as of
8  this date.)
9       (Whereupon a screen share is
10  initiated of Exhibit NN.)
11      MR. RUBIN:  Go to the next page.
12      Q    Can you see that, Mr. Altschuler?
13      A    Yes, sir.
14      Q    Do you know who prepared this
15  document?
16      A    I provided information to my
17  counsel.  I believe they physically prepared
18  it.
19      Q    Does this include, to your
20  knowledge, all of your monthly expenses?
21      A    Yes, I think it's an accurate
22  document that captures my recurring monthly
23  expenses.
24      Q    What about school for your son?
25  Does he go to private school?

Page 316

1            Douglas Altschuler
2       A    Whether my son attends public or
3  private school, his tuition has been taken care
4  of and paid for.
5       Q    Is that reflected in these
6  estimated expenses?
7       A    No, because it's already been
8  taken care of.
9       Q    Okay, so you don't have to pay
10  that at this point in time?
11      A    Yes, sir, that's correct.
12      Q    And is insurance taken into
13  account in your estimated expenses?
14      A    That's included in my mortgage
15  payments.  They include my insurance payment.
16      Q    Are you talking about insurance on
17  your homeowners' and your fine arts, and
18  everything else -- that's within that?
19      A    No, that's just on the property.
20      Q    Is other insurance taken into
21  account in these estimated expenses?
22      A    I don't see it, no.
23      Q    Do you know what the
24  "Miscellaneous" refers to?
25      A    I mean, walking down the street

Page 317

1            Douglas Altschuler
2  and buying a slice of pizza, buying a toy in
3  the toy store.
4       Q    For your son, of course?
5       A    For anybody, yes.
6       Q    The "Repairs/General Maintenance,"
7  is that for both homes -- the one in the city,
8  and the one on the island?
9       A    Yes, that's correct.
10      Q    It includes things like gardening,
11  things of that nature?
12      A    Yes, it does.
13      Q    Okay.
14      MR. RUBIN:  You can take that off
15  the screen.  Give me two minutes.  We
16  may be finished.  I just want to check.
17      MR. ZANE:  Okay.
18      (A brief recess is taken.)
19            oOo
20      MR. RUBIN:  Put up on the screen
21  number 11, and go to the second page.
22  Mark this as the next exhibit, please.
23      (Document is marked as Company
24  Exhibit OO for identification, as of
25  this date.)

31 (Pages 314 - 317)

CHUBB-Altschuler/ROLEX & ART 00002509

092020001456

Page 318

```
 1          Douglas Altschuler
 2      MR. RUBIN:  What exhibit is this?
 3      MR. CRADDOCK:  Exhibit OO.
 4      MR. RUBIN:  OO?
 5      MR. CRADDOCK:  Yes.
 6      (Whereupon a screen share is
 7  initiated of Exhibit OO.)
 8   Q    Mr. Altschuler, can you read
 9  paragraph 11, please.
10   A    I can't.  I need the gentleman to
11  scroll it up for me, please.
12      (Whereupon Exhibit OO on screen
13  share is scrolled up for the witness.)
14   Q    Can you see it now?
15   A    I can read part of it:  "In
16  February 2020, Mr. Altschuler discovered a
17  stainless steel ladies'" -- and I can't read
18  the rest of it, I'm sorry.
19   Q    How about if I read it for you?
20   A    Okay.
21   Q    "In February 2020, Mr. Altschuler
22  discovered a stainless steel ladies' Rolex
23  watch belonging to Ms. Werner was also missing
24  and presumed stolen from the residence, Loss
25  Number 2, and duly reported the loss."
```

Page 319

```
 1          Douglas Altschuler
 2      Is that statement correct, as set
 3  forth in this complaint that was filed?
 4   A    I think there was some factual
 5  information or wires crossed when I was talking
 6  to my counsel about this.  The watch that is
 7  the subject of the claim is my watch -- not my
 8  wife's watch.
 9   Q    It was not a ladies' Rolex; is
10  that correct?
11   A    No.  To the best of my knowledge,
12  neither I nor my wife have ever owned a ladies'
13  Rolex.
14      MR. RUBIN:  Okay, thank you.  I
15  have nothing further at this point.
16      Jeff, I hope you can get those few
17  remaining documents to us as promptly as
18  possible.  We'll send the transcripts
19  directly to you as quickly as we can, so
20  we can complete this portion and Chubb
21  can take a position with respect to the
22  claim.
23      MR. ZANE:  Thank you.
24      (Time noted:  2:46 P.M.)
25
```

Page 320

```
 1
 2
        A C K N O W L E D G M E N T
 3
 4
 5  STATE OF          )
 6                    :  ss
    COUNTY OF            }
 7
 8
 9
10      I, DOUGLAS ALTSCHULER, hereby certify
11  that I have read the transcript of my testimony
12  taken under oath in my deposition of
13  September 29, 2021; that the transcript is a
14  true, complete and correct record of my
15  testimony, and that the answers on the record
16  as given by me are true and correct.
17
18      _____
            DOUGLAS ALTSCHULER
19
20
21  Signed and Subscribed to
22  before me, this _____ day
23  of _____, 2021
24
25  Notary Public, State of
```

Page 321

```
 1
        I N D E X
 2   WITNESS                    PAGE
 3  DOUGLAS ALTSCHULER
 4      Examination by:
            MR. RUBIN          5
 5
            oOo
 6
 7      EXHIBITS
    COMPANY   DESCRIPTION        PAGE
 8  EXHIBIT
 9   NOTE:  ALL EXHIBITS ARE IN PDF FORMAT
10  Z    Policy of insurance with cover
         letter from Chubb dated January 21,
11       2021, referencing policy
         13808452-05 of Mr. Altscluler
12       and Ms. Werner          201
13  AA   Document from James Corcoran
         Gallery entitled "Values for
14       insurance purposes"      227
15  BB   Email chain containing emails
         exchanged between Mr. Altschuler
16       and Janine Butler        229
17  CC   Color photograph         243
18  DD   Printout of Artnet Price Database 251
19  EE   Document on letterhead of Robert
         Berman Gallery, dated August 3,
20       2020                     259
21  FF   Letter from Browne George Ross
         law firm to Bruno Derval of
22       International Dream Collection,
         Inc., dated March 31, 2020    275
23
    GG   Responses to Chubb's Supplemental
24       Requests for Information     289
25       INDEX CONTINUES...
```

32 (Pages 318 - 321)

CHUBB-Altschuler/ROLEX & ART 00002510

092020001456

Page 322

```
1
2               I N D E X
                -continued-
3
           EXHIBITS
4  COMPANY   DESCRIPTION      PAGE
   EXHIBIT
5  HH     Invoice from Wind Vintage, LLC
          dated November 3, 2020        290
6
   II     Document entitled "Vintage
7         Watches, Various Rolex
          Appraisals"                   293
8
   JJ     2019 U.S. income tax return,
9         form 1040                     301
10 KK     Bank of America credit card
          statement                     309
11
   LL     Document entitled "Bank of
12        America Statements"           310
13 MM     Douglas H. Altschuler GST
          Exempt Trust Agreement        312
14
   NN     Document entitled "Estimated
15        Monthly Expenses"             315
16 OO     Arizona Superior Court Pima
          County complaint, Altschuler
17        and Werner Vs. Chubb National
          Insurance Company             317
18
                   oOo
19
20    DOCUMENTS AND/OR INFORMATION REQUESTED
      DESCRIPTION               PAGE
21  Provide email exchanges between insurance
      broker, Mr. Altschuler, and the appraiser
22  referencing change in appraisal of Rolex
      listed in item 10 of the policy from $50,000
23  to $120,000, effective November 21, 2019   204
24
25       INDEX CONTINUES...
```

Page 323

```
1
2               I N D E X
                -continued-
3
4
      DOCUMENTS AND/OR INFORMATION REQUESTED
5   DESCRIPTION                 PAGE
      Provide copies of email exchanges between
6   Mr. Altschuler and "Elaine," as described
      herein                       237
7
      Request that Mr. Altschuler sign a release
8   authorizing Chubb representative to contact
      the Keith Haring Foundation regarding the
9   purchase of silkscreens directly from the
      artist                       239
10
      Provide original of the color photo
11  marked herein as Exhibit CC    251
12  Provide current contact information for
      Tracy Lew                    255
13
      Request credit card statements showing
14  a monthly carryover balance of approximately
      $30,000 during the period of time between the
15  months of the losses, as described herein   307
16                 oOo
17
18
19
20
21
22
23
24
25
```

Page 324

```
1
2  STATE OF NEW YORK   )
                       ) ss:
3  COUNTY OF           )
4
5
6      I, M. EDER, a Shorthand Reporter and
7  Notary Public within and for the State of New
8  York, do hereby certify:
9      That DOUGLAS ALTSCHULER, the witness
10 whose examination is hereinbefore set forth,
11 was duly sworn by me and that this transcript
12 of such examination is a true record of the
13 testimony given by such witness.
14     I further certify that I am not
15 related to any of the parties to this action by
16 blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my hand this 4th day of October, 2021.
20
21
22          <%10926,Signature%>
23              M. EDER
24
25
```

Page 325

```
1      ERRATA SHEET
          VERITEXT CORPORATE SERVICES
2            800-567-8658
      ASSIGNMENT NO. CS4802814
3  CASE NAME: Altschuler v. EUO
      DATE OF DEPOSITION: 9/29/2021
4  WITNESS' NAME: Douglas Altschuler
5
      PAGE/LINE(S)/ CHANGE      REASON
6   _____/_____/_____/_____
7   _____/_____/_____/_____
8   _____/_____/_____/_____
9   _____/_____/_____/_____
10  _____/_____/_____/_____
11  _____/_____/_____/_____
12  _____/_____/_____/_____
13  _____/_____/_____/_____
14  _____/_____/_____/_____
15  _____/_____/_____/_____
16  _____/_____/_____/_____
17  _____/_____/_____/_____
18  _____/_____/_____/_____
19  _____/_____/_____/_____
20  _____
          Douglas Altschuler
21
      SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS____DAY
      OF_____, 2021.
23
24  _____ NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____
```

Veritext Legal Solutions

800-567-8658                                    973-410-4098

CHUBB-Altschuler/ROLEX & ART 00002511

092020001456

1

2    STATE OF NEW YORK    )
                          )    ss:
3    COUNTY OF            )

4

5

6           I, M. EDER, a Shorthand Reporter and

7    Notary Public within and for the State of New

8    York, do hereby certify:

9           That DOUGLAS ALTSCHULER, the witness

10   whose examination is hereinbefore set forth,

11   was duly sworn by me and that this transcript

12   of such examination is a true record of the

13   testimony given by such witness.

14           I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage and that I am in no way

17   interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand this 4th day of October, 2021.

20

21

22   _____

23                M. EDER

24

25

CHUBB-Altschuler/ROLEX & ART 00002512

092020001456

[& - 50,000]

| **&** |
| --- |
| **&**  198:5,10 |

| **0** |
| --- |
| **040520024846** 197:8 |
| **0768.41493**  198:13 |
| **0768.42484**  198:14 |
| **0920200001456** 197:7 |

| **1** |
| --- |
| **1**  197:7 201:4,18 202:25 |
| **10**  201:24 203:5 259:15 294:23 322:22 |
| **100**  202:8 215:18 238:2 239:16 250:16 260:5 265:16 |
| **10017**  198:12 |
| **104**  200:23 |
| **1040**  322:9 |
| **10926**  324:22 |
| **11**  317:21 318:9 |
| **11/21/19**  202:25 274:9 |
| **11:03**  197:12 |
| **12/23/19**  197:8 |
| **120**  287:11 |
| **120,000**  203:6 205:6 274:7 284:25 285:14,17 287:8,23 298:25 299:7 322:23 |
| **12:52**  264:19 |
| **13808452-05** 321:11 |
| **14**  274:12 |
| **16**  209:6 |

| **17**  290:6 |
| --- |
| **18**  209:16 210:4 211:4 221:23 223:23 289:5 |
| **19**  275:15 |
| **1987**  206:9,17,18 209:10,10,19 242:21 243:20 261:20 |
| **1988**  261:20 |
| **1989**  209:14,20 211:14 |
| **1:00**  264:20 |

| **2** |
| --- |
| **2**  197:8 202:19 217:3 229:13 230:21 231:2 232:9 318:25 |
| **2000**  210:8,9 |
| **201**  321:12 |
| **2010**  221:23 223:15,18,20,23 224:19 225:24,25 228:14 |
| **2011**  225:25 |
| **2017**  227:21 228:6 228:8,14 |
| **2018**  229:13 275:13 279:3 |
| **2019**  203:7 301:16 302:3 304:4,19,24 305:15,16 322:8 322:23 |
| **2020**  260:13 276:21 277:20 287:7 293:14 298:2 305:10,14 305:17 318:16,21 321:20,22 322:5 |
| **2021**  197:11 320:13,23 321:11 |

| 324:19 325:22 |
| --- |
| **204**  322:23 |
| **21**  203:7 292:20 321:10 322:23 |
| **22**  275:13 |
| **227**  321:14 |
| **229**  321:16 |
| **23**  264:22 |
| **237**  323:6 |
| **239**  323:9 |
| **24**  242:23 301:14 |
| **243**  321:17 |
| **25**  309:12 |
| **250**  224:12 226:4,6 226:8,13,13 |
| **250,000**  221:22 222:13 227:21 228:6,13 |
| **251**  321:18 323:11 |
| **255**  323:12 |
| **259**  321:20 |
| **275**  321:22 |
| **28,000**  313:16 |
| **289**  321:24 |
| **29**  197:11 320:13 |
| **290**  322:5 |
| **293**  322:7 |
| **2999**  198:6 |
| **2:46**  319:24 |

| **3** |
| --- |
| **3**  236:8,16,20,24 240:20 241:5 251:17 252:13 253:15 260:12 321:19 322:5 |
| **3,000**  314:22 |
| **30**  236:8,16,20,20 236:20,24 240:21 241:5 251:17 252:13 253:16 261:2 263:16 |

| 266:15 311:17,19 |
| --- |
| **30,000**  307:5,11 308:9,15,19 309:24 311:12,14 311:24 313:12,24 323:14 |
| **301**  322:9 |
| **307**  323:15 |
| **309**  322:10 |
| **31**  277:19 287:7 298:2 315:3 321:22 |
| **310**  322:12 |
| **312**  322:13 |
| **315**  322:15 |
| **317**  322:17 |
| **32**  310:22 |
| **325**  198:6 |
| **34**  312:14 |
| **35**  311:18,19 |
| **35,000**  288:12 313:16 |
| **350,000**  288:13 |
| **3rd**  198:11 |

| **4** |
| --- |
| **4**  227:10 |
| **44th**  198:6 |
| **47,000**  312:2,5 314:9 |
| **47,891.08**  312:7 |
| **47,891.08.**  313:8 |
| **4729**  200:22 |
| **49,279.41.**  313:9 |
| **4th**  324:19 |

| **5** |
| --- |
| **5**  321:4 |
| **5,000**  314:23 |
| **50**  282:22 298:11 |
| **50,000**  203:6 274:7 322:22 |

CHUBB-Altschuler/ROLEX & ART 00002513

092020001456

[5582584 - altschuler]

| | |
|---|---|
| **5582584** 294:24 | **9** |
| **6** | **9** 251:21 |
| **6** 228:8,24 293:14 | **9/29/2021** 325:3 |
| **6/19/20** 197:9 | **90** 209:15,22 |
| **6263** 289:23 | **a** |
| 290:20 291:2,6,8 | **a.m.** 197:12 |
| 291:18,25 292:6 | **aa** 227:14,17 |
| 292:15 294:7 | 321:13 |
| 295:24 296:23 | **able** 213:5 220:14 |
| **6265** 202:10 | 222:5 257:9 258:9 |
| 288:12,25 291:3,7 | 282:13 287:25 |
| 291:23,25 292:7 | 298:16,25 303:17 |
| 292:15 293:19 | **absolutely** 218:10 |
| 294:6,24 295:24 | 239:23 247:23 |
| 296:14 | 248:25 249:4 |
| **6275** 295:6 | 268:17 283:3 |
| **63** 263:3 | **accept** 208:21 |
| **630** 198:11 | 213:16 226:4 |
| **7** | 233:24 234:24 |
| **7** 205:25 | 278:5 287:22 |
| **75** 282:22 298:11 | 299:7 |
| **8** | **accepted** 226:7,8 |
| **8** 243:11 265:17 | **account** 309:19 |
| **8'844'511** 289:23 | 316:13,21 |
| 290:20 | **accuracy** 206:12 |
| **8/1/19** 201:19,22 | **accurate** 217:25 |
| **800-567-8658** | 249:12 304:16 |
| 325:2 | 315:21 |
| **82nd** 281:13 | **acknowledge** |
| **85,000** 287:21,22 | 208:8 |
| 287:22 288:4 | **acknowledged** |
| 289:2,24 299:2 | 199:7 236:6 |
| **85018** 198:7 | **acquired** 243:19 |
| **85718** 200:23 | 298:13 |
| **89** 209:15,22 | **action** 324:15 |
| **891** 311:13 313:11 | **actual** 239:21 |
| 314:12 | 240:7 266:2 |
| **892** 313:10 | **additional** 224:23 |
| | 310:3,21 |

| | |
|---|---|
| **address** 200:22 | 234:1 235:1 236:1 |
| **advise** 216:17 | 237:1 238:1,7 |
| 230:19 | 239:1,2 240:1 |
| **advised** 201:8 | 241:1 242:1 243:1 |
| 216:20,23 | 244:1 245:1 246:1 |
| **agency** 199:12 | 247:1,17 248:1 |
| **ago** 212:18 216:11 | 249:1 250:1 251:1 |
| 218:8 239:11 | 252:1,5,16 253:1,4 |
| 243:3,7 270:4 | 254:1 255:1 256:1 |
| 271:20 285:5 | 257:1 258:1 259:1 |
| 308:23 | 260:1 261:1 262:1 |
| **agree** 199:4 | 263:1 264:1 265:1 |
| 222:19 253:14 | 266:1 267:1 268:1 |
| 254:17 255:24 | 269:1 270:1 271:1 |
| 278:4 288:3 | 272:1 273:1 274:1 |
| **agreement** 312:17 | 275:1,22 276:1 |
| 322:13 | 277:1 278:1,3,15 |
| **ah** 215:11 | 278:22 279:1 |
| **ahead** 218:25 | 280:1 281:1 282:1 |
| 219:3 227:5 287:4 | 283:1 284:1,7 |
| **ajar** 207:16 | 285:1 286:1 287:1 |
| **alarm** 207:15 | 288:1 289:1 290:1 |
| **allow** 213:20 | 290:14 291:1 |
| 239:25 | 292:1,23 293:1,12 |
| **allowing** 239:6 | 294:1 295:1 296:1 |
| **altschuler** 197:4 | 297:1,24 298:1 |
| 197:16 198:6 | 299:1 300:1 301:1 |
| 200:14 201:1,7 | 301:22 302:1 |
| 202:1,6 203:1,4,8 | 303:1,6 304:1 |
| 204:1,22 205:1 | 305:1 306:1 307:1 |
| 206:1,10 207:1 | 308:1 309:1,19 |
| 208:1 209:1 210:1 | 310:1 311:1 312:1 |
| 211:1 212:1 213:1 | 312:17 313:1 |
| 214:1 215:1 216:1 | 314:1 315:1,12 |
| 217:1 218:1 219:1 | 316:1 317:1 318:1 |
| 220:1 221:1 222:1 | 318:8,16,21 319:1 |
| 223:1 224:1 225:1 | 320:10,18 321:3 |
| 226:1 227:1 228:1 | 321:11,15 322:13 |
| 228:25 229:1,10 | 322:16,21 323:6,7 |
| 229:11 230:1,14 | 324:9 325:3,4,20 |
| 231:1 232:1 233:1 | |

CHUBB-Altschuler/ROLEX & ART 00002514

092020001456

| | | | |
|---|---|---|---|
| **altschuler's** 278:5 | 281:13,22 | 264:25 291:17 | 248:11 249:16 |
| **america** 307:25 | **appear** 279:22 | **appropriately** | 258:11 266:7,22 |
| 308:5 309:13,18 | 300:23 | 205:12 | 267:8 271:5 |
| 310:21,24 322:10 | **appearances** | **approximate** | 304:22 |
| 322:12 | 198:3 | 224:8,14 226:5,6 | **asking** 215:12 |
| **american** 306:14 | **appeared** 250:14 | 282:17 | 216:23 218:12 |
| 313:21 | **appearing** 200:13 | **approximately** | 222:18 224:22 |
| **amount** 221:22 | **appears** 245:20,21 | 223:3 225:21 | 231:12,13 232:5 |
| 223:4 287:11 | 253:18 295:13 | 226:3 261:2 | 233:18 234:8 |
| 288:2 306:21,22 | **applies** 299:4 | 282:22 307:5 | 254:10 261:19 |
| 306:25 307:7 | **apply** 298:12 | 323:14 | 266:14 |
| 308:19 311:13 | **appraisal** 203:14 | **arizona** 198:7 | **assignment** 325:2 |
| 313:10 314:12 | 204:9 205:7 | 200:23 322:16 | **assistant** 222:8,9 |
| **andy** 215:2 220:3 | 221:21 222:24 | **arrived** 306:10 | 222:25 223:3 |
| 221:2,21 225:5 | 223:21,22 224:20 | **art** 206:9 210:8,12 | 224:2 |
| 228:12 231:3 | 224:23 226:2,4,17 | 214:25 215:5,6,20 | **associated** 284:11 |
| 245:24 267:22,24 | 227:7 228:9,11 | 221:11 222:22,23 | **assume** 206:24 |
| **answer** 209:9,15 | 230:2,15,16,20 | 223:5,6 224:7 | 227:6 242:18 |
| 209:21,24 210:3,7 | 231:7,25 232:12 | 225:3,8,8,9 226:18 | 260:15 276:19 |
| 210:10,13,16,16 | 232:17,20 233:10 | 228:19 236:2 | 277:10 |
| 210:17,20,23 | 233:16,21 234:17 | 237:9 255:17 | **assumed** 259:12 |
| 211:12,15,19 | 235:14,23 236:3,9 | 256:10,11,23 | **assuming** 287:3 |
| 212:12 213:21 | 236:22 240:14,21 | 264:16 269:4 | **assumption** 207:2 |
| 214:16 217:25 | 256:5,13 274:10 | **articles** 201:18 | 251:14 |
| 218:23 230:21 | 274:23 292:3 | **artist** 239:9 323:9 | **attached** 230:15 |
| 231:13 235:3 | 322:22 | **artist's** 239:4 | 230:18 292:6 |
| 243:9 251:15 | **appraisals** 203:12 | **artnet** 252:4 | **attempt** 287:24 |
| 254:9 260:15 | 203:16 225:3 | 321:18 | **attempting** 297:2 |
| 265:4,21 266:6,7 | 235:9 278:23 | **arts** 202:14,15 | **attends** 316:2 |
| 270:25 271:5,10 | 284:8 285:24 | 316:17 | **attention** 214:10 |
| 290:23 299:8 | 293:6 322:7 | **artwork** 234:5 | 215:11 228:15 |
| 301:8,10 | **appraise** 222:9,21 | 255:9 | 296:10 |
| **answers** 265:16 | **appraised** 228:11 | **ashton** 280:9,15 | **attorney** 197:16 |
| 320:15 | 232:11,25 234:2,5 | 280:21 281:3,23 | 204:16 216:18,23 |
| **anybody** 236:18 | 256:17 285:22 | 281:24 | 217:12 218:6,17 |
| 247:22 257:7 | 286:2 291:13,15 | **asked** 212:16 | 218:22 219:2 |
| 288:17 317:5 | **appraiser** 235:6 | 214:2 215:5 | 238:4 240:5,10 |
| **anytime** 217:8 | 235:10 322:21 | 217:21 233:11 | 274:4 278:25 |
| 243:4 | **appraising** 225:23 | 236:15 237:17 | 284:16 285:20 |
| **apartment** 248:17 | **appreciate** 205:11 | 238:9 239:25 | 286:10,14 287:5 |
| 248:23 279:15 | 212:11 231:15 | 240:4 246:6 | 289:7 297:25 |

CHUBB-Altschuler/ROLEX & ART 00002515

092020001456

298:11 299:9 307:17

**attorneys** 198:6,11 207:25 208:4 238:10 276:11 304:8

**attributed** 304:11 304:12

**auctions** 254:24 255:3

**august** 229:13 260:12 275:13 279:2 321:19

**authorizing** 323:8

**available** 214:4

**avenue** 198:11 280:23

**aware** 208:3 225:13 251:16 267:4 285:16,21 299:23 300:17 302:18 304:19,23

**b**

**b** 217:4

**b1** 211:25 215:25 245:11 246:13 257:11

**back** 209:12 212:7 212:8 219:7 223:14 227:24,25 230:22 231:19,21 232:21 241:15 260:19 261:12,19 263:13 266:15 270:22 276:7 277:14,17 279:2 279:15 280:11 286:18 291:11,19 300:11 303:15 304:2 311:19 313:3

**balance** 306:17 307:11 308:9 310:4 311:17,21 311:23 312:5 313:7,8,12,23,25 314:23,24,25 323:14

**bank** 307:25 308:5 309:13,18 310:21 310:23 322:10,11

**based** 205:6 213:11 225:12 235:4 253:14 260:22 261:12 274:8,10 281:3,5,7 286:4,9 292:11

**basis** 298:10

**bb** 229:2,5,8 321:15

**beginning** 253:4 286:17

**behalf** 206:21 244:9 276:13 284:17

**belief** 200:12

**believe** 202:8,9,10 202:21 204:6,8,12 205:15 206:17 209:10 216:2,25 219:22 220:11 228:7 231:5 235:5 235:20 236:15 237:25 239:10 241:12 242:4 245:25 261:9 264:10 269:9 275:11 285:2 291:23 312:25 315:17

**believed** 311:7

**belonging** 318:23

**berman** 214:23,24 215:3,4,5,7,7 216:4,12,16,19 218:3,7,18 219:14 243:20 245:11 257:11,23 258:8 258:24 259:5,11 259:12,12 260:9 260:17 321:19

**best** 200:11 204:7 214:3,6,8,21 217:24 232:6 234:20 235:7 243:24 261:9 271:22 272:4 296:4 319:11

**better** 216:14 252:25

**beyond** 246:4 298:23 300:2

**bezel** 296:24,24

**bezels** 295:6

**big** 264:5 289:23 290:19 292:22 293:11,19 296:23

**bigger** 230:6,8 260:3 290:14

**bill** 198:18 303:15

**bills** 306:9

**bit** 205:20 270:14 275:6 288:24 313:19

**black** 296:23

**blood** 324:16

**boa** 308:2

**bona** 287:24

**bottom** 250:18

**bought** 208:14 209:10,11 214:25 277:11 290:2

**box** 215:6,12,14 215:16 244:8 260:25 261:6,15 261:16 262:12,25 263:12,22,25 264:6,7,8,11,12 265:7,11,12,25 266:5,9,17,20 269:8,10,16 270:2 281:24 285:9 288:22 295:6 298:18,19

**bracelet** 295:2

**break** 217:8 238:15,16 254:11 254:15 297:10

**brief** 246:21 317:18

**bring** 314:23

**broker** 203:24 204:8 229:20,25 286:19 292:14 296:16 298:4 322:21

**brother** 273:18,21

**brought** 215:10 226:16 296:9

**brown** 230:2,16 231:7,25 232:12 232:17,19 233:5 233:15 234:13 240:13,22 256:4 256:22 257:3

**browne** 277:5 321:21

**bruno** 276:11,16 277:11 279:12 280:3,5 281:20,21 282:4 283:16,23 284:2,13 285:21 286:19 288:15

CHUBB-Altschuler/ROLEX & ART 00002516

092020001456

[bruno - comment]

291:13 293:25
294:2 295:23
296:6,17,18
297:25 298:13
321:21
**business** 220:20
220:23 239:4
**butler** 229:12
230:13 232:7
321:16
**buy** 297:3 308:25
**buying** 317:2,2

**c**

**c** 198:2 200:19
206:4,7 247:16,16
320:2
**call** 207:14 209:21
265:8
**called** 205:15
267:22
**canceled** 289:19
**candidly** 229:13
**captures** 315:22
**card** 289:19
295:25 296:9,11
306:2,2,5 307:9,10
308:3,6 310:3
314:2 322:10
323:13
**cards** 306:9,13
307:23 308:24
310:2
**care** 316:3,8
**carefully** 265:7,14
**carried** 307:12
309:23 312:7
**carrying** 308:19
**carryover** 308:9
308:15 311:12
313:12 314:4,24
323:14

**carton** 265:3
**case** 216:2 289:23
290:20 294:25
325:3
**cash** 312:10
**cause** 271:16
**caused** 214:11
279:5
**cc** 243:12,14,17
321:17 323:11
**certain** 232:16
237:15 239:13
260:18,20 291:21
306:21 308:14
**certainly** 216:20
235:22
**certified** 235:6,10
**certify** 320:10
324:8,14
**chain** 229:24
321:15
**chance** 208:2
**change** 203:11
271:17 322:22
325:5
**changed** 203:5
205:6 299:5
**changes** 288:23
**characterization**
262:20
**characterize**
213:13
**charged** 282:23
313:18 314:17
**charles** 198:13
238:11
**check** 210:13
240:8 263:12
289:19 317:16
**checking** 240:16

**chronograph**
294:25
**chubb** 197:6,17
198:11,17 201:8
203:12,12,18
207:21 212:20
214:2 216:7
218:20 228:10
236:4,24 243:4
248:10 250:9
253:17 271:13
272:20,25 284:25
287:3,21 292:2,4
294:4 296:2 298:4
298:24 299:11,15
299:20 319:20
321:10 322:17
323:8
**chubb's** 239:6
271:20 289:10
321:23
**circumstances**
254:16
**city** 279:16 280:18
280:24 282:9,10
317:7
**claim** 197:3,7,8
201:10 205:22
208:24 211:21
216:7 217:11,14
241:20,23 250:11
253:17 257:23
266:24 270:16
277:7 282:25
287:8,23 289:4
290:4 291:10
293:22 294:8,18
296:3 299:11
300:5 319:7,22
**claimed** 202:7,20
266:11 278:9

**claiming** 208:18
215:24 258:4
260:24 295:14
**clarification** 216:5
258:3 260:21
262:5 294:12
295:21
**clarify** 205:23
263:20 292:11,17
305:24 308:12
**clarifying** 267:12
**clear** 235:17 238:6
248:3 250:4 265:5
265:6 267:9,14
268:7 270:3
271:22 272:14
276:25 292:9
295:17 301:3
**clearer** 213:3
**client** 218:22
219:2
**close** 311:24
**closed** 265:9,14
**closely** 250:18
**closer** 216:14
**coincidentally**
253:21 279:15
**colleague** 213:7
**collection** 205:16
276:12,17 321:22
**collector** 256:23
**colloquial** 231:16
**color** 243:13
321:17 323:10
**come** 281:11,15
282:11
**comes** 282:9
304:16
**coming** 257:18
**comment** 231:17

CHUBB-Altschuler/ROLEX & ART 00002517

092020001456

**commission**
325:25
**communication**
216:4 218:18
223:17 224:15
260:8 286:4
**communications**
203:19 204:3
216:18 222:6
224:2 225:12,22
226:19 228:16
232:16 237:13
256:4,8,22 257:23
292:13
**company** 197:6,17
198:11 201:12,14
202:4 215:24
222:10 223:2
226:3 227:16
229:4,8 234:3
243:14 251:23
257:4 259:21
260:23 275:17
283:23 289:11
290:8,16 293:7
298:2 301:17
309:14 310:24
312:18 313:6
315:6 317:23
321:7 322:4,17
**complaint** 319:3
322:16
**complete** 202:3
295:2 319:20
320:14
**completed** 226:21
**completely** 218:10
224:10 249:4
265:16
**comprehend**
241:7

**concern** 268:25
279:6,9,10
**concerned** 268:24
273:20,23
**concierge** 198:18
**conclusion** 226:16
**condition** 269:4
283:10,13 298:18
**conditions** 197:18
**conducted** 199:6
199:11
**conference** 197:10
197:19 198:3,18
199:10 200:13
**confidential** 219:3
**confirm** 220:15
221:14
**confirmed** 282:21
**confirming** 222:3
258:9
**confused** 229:20
284:9
**confusion** 205:20
**consent** 199:16
**considered** 199:17
**consistent** 265:17
313:21
**consultant** 220:24
221:9 222:11,20
234:3 236:4 257:4
**consummated**
297:4
**contact** 221:17
239:7 255:20
281:17 282:10,14
323:8,12
**contacted** 203:14
214:24 215:3
273:4,9
**containing** 321:15

**context** 207:10,12
232:4
**continued** 197:15
322:2 323:2
**continues** 321:25
322:25
**contrary** 262:3
**conversation**
216:15 217:23
218:2,3 227:2
230:24 232:25
233:15,20 234:22
235:18,22 249:2
296:17
**conversations**
215:10 216:11
226:24 232:19
233:7 234:4,13,15
235:4 237:8,14
240:13,14 272:18
**conveyed** 236:17
**cool** 281:25
**copies** 323:5
**copy** 201:9 206:6
207:24 208:3,5,6
301:16 304:3
**corcoran** 220:11
220:20,23,25,25
221:6,17,21 222:4
222:8,12,15,21
223:12 224:22
259:2,7 321:13
**corcoran's** 222:8
**corners** 264:7,7
**corporate** 325:1
**correct** 202:21
203:4,17,25 204:4
205:5,7 213:9,11
214:11 219:17,18
219:20,23 220:12
221:4,12,15

223:13 229:22
231:4,5,8 232:2,13
233:5,6 235:15
241:11 245:15,16
245:17 247:14
254:20,22 255:5,6
256:5 257:5,24
258:4 260:22
261:4,18 263:8
269:12,14 270:12
270:24 272:3
273:5 274:5,9,11
275:11 276:14,21
276:22 277:8,15
288:6,7 289:25
293:17 296:20
298:5,9 300:13
306:6 309:5,25
310:7 316:11
317:9 319:2,10
320:14,16
**correspondence**
271:3 284:9
296:18
**corrugated** 264:6
**counsel** 199:3,8,21
200:2,5 227:13
251:10 274:14
277:3 310:17
315:17 319:6
**counselor** 200:10
**county** 320:6
322:16 324:3
**couple** 206:19
216:6 270:10
285:5
**course** 240:3
282:24 283:23
305:20 317:4
**court** 199:2,7,11
199:22,24 200:10

CHUBB-Altschuler/ROLEX & ART 00002518
092020001456

[court - discovered]                                                    Page 7

| | | | |
|---|---|---|---|
| 200:16 322:16 | database 252:5,8 | death 212:20 | detail 219:15 |
| **courtesy** 212:10 | 321:18 | debt 306:2 | 254:6 |
| 228:20 | date 197:8,9,20 | decades 212:18,24 | details 213:2 |
| cover 321:10 | 200:4 201:15,18 | 214:7 216:10 | determine 207:12 |
| coverage 202:22 | 201:22 202:25 | 241:15,16 243:7 | 207:14 241:4 |
| 202:24 | 225:24 227:18 | 261:12,24 262:17 | 257:15 283:22,25 |
| covered 219:15 | 229:6 243:15 | deep 272:21 | determined |
| 314:9 | 251:25 259:23 | deeply 272:17 | 240:17 252:12 |
| covid 219:15 | 266:3 275:19 | definition 250:5 | 253:22 256:16 |
| 282:19 | 278:24 289:13 | delivered 217:16 | 261:3 265:12 |
| craddock 198:18 | 290:10 293:8 | 243:20 244:3 | 276:20 309:4 |
| 227:13 229:2 | 295:14 298:2 | 245:7 263:22 | determining 284:2 |
| 253:7 274:14 | 301:18 309:15 | 265:23 266:10 | dial 285:12 295:2 |
| 292:24 302:10 | 311:2 312:19 | demands 278:4 | different 290:24 |
| 303:16 318:3,5 | 315:8 317:25 | denies 221:7 | 291:19 294:9,10 |
| crate 261:15,16 | 325:3 | deny 236:9 | 299:14 307:10 |
| 263:24,25 264:4,5 | dated 221:22 | depends 288:14 | 310:11 |
| 265:3,8,12,25 | 223:23 260:12 | depicted 245:18 | differently 302:17 |
| 268:25 269:21 | 275:13 277:19 | 246:7,17 248:12 | difficulty 275:4 |
| 270:2 | 321:10,19,22 | 268:12,22 | dina 227:7 230:2 |
| credit 306:2,2,5,8 | 322:5 | depicting 250:14 | 230:15 231:7,25 |
| 306:13 307:9,10 | dates 279:4 | depiction 245:24 | 232:11,17,19,23 |
| 307:23 308:3,6,24 | daughter 235:6 | depicts 249:15 | 233:4,7,15,21 |
| 309:3 314:2,3 | day 272:8,11 | deposition 199:5 | 234:13,22,23 |
| 322:10 323:13 | 320:22 324:19 | 212:4 274:16 | 235:5,9,19,21,24 |
| cross 213:15 | 325:22 | 286:18 320:12 | 236:17 240:13,21 |
| crossed 319:5 | daytona 288:12 | 325:3 | 256:4,21 257:3 |
| crystal 265:6 | 289:23 290:19 | derval 276:11,16 | direct 296:17 |
| cs4802814 197:25 | 291:18 293:19 | 321:21 | directly 203:15 |
| 325:2 | 294:23,24 295:6 | describe 264:4 | 211:15,18 217:15 |
| current 209:18 | 296:23 | 301:2 | 239:8 243:20 |
| 255:20 313:9 | dd 251:22,24 | described 264:3 | 244:13 255:3,14 |
| 323:12 | 252:3,18 253:11 | 323:6,15 | 255:18,19 256:14 |
| currently 230:17 | 321:18 | description 202:3 | 273:14 319:19 |
| 307:2 | deal 215:4 223:6 | 321:7 322:4,20 | 323:9 |
| cut 298:22 | 225:7 | 323:5 | dirt 269:5 |
| | dealing 216:9 | designed 215:15 | disagree 248:14 |
| **d** | deals 236:2 | desire 288:20 | 299:17 |
| d 200:19 320:2 | dealt 226:18 | desk 245:21 | discovered 214:5 |
| 321:2 322:2 323:2 | 228:19 | 279:14 | 219:6 226:9 298:3 |
| damaged 264:8 | | | 318:16,22 |

CHUBB-Altschuler/ROLEX & ART 00002519

092020001456

| | | | |
|---|---|---|---|
| **discussed** 221:20 | 322:6,11,14 | 276:1 277:1 278:1 | **east** 200:22 |
| 224:9,12 241:25 | **documentation** | 279:1 280:1 281:1 | **easy** 310:15 |
| 273:6 274:7 | 203:22 220:22 | 282:1 283:1 284:1 | **eder** 324:6,23 |
| **discussing** 270:10 | **documents** 220:18 | 285:1 286:1 287:1 | **edition** 236:8,16 |
| 283:8 | 222:3 272:19 | 288:1 289:1 290:1 | 236:24 237:2 |
| **discussion** 218:7 | 291:24 302:25 | 291:1 292:1 293:1 | 240:20 241:5 |
| 226:11,15 233:22 | 307:7 319:17 | 294:1 295:1 296:1 | 251:17 252:13 |
| 246:22 249:2 | 322:20 323:4 | 297:1 298:1 299:1 | 253:15 |
| 259:19 283:5 | **doing** 212:10 | 300:1 301:1 302:1 | **ee** 259:22 321:19 |
| 292:10 | 214:6,9 228:20 | 303:1 304:1 305:1 | **effective** 201:18 |
| **discussions** 224:5 | 233:21 302:16,17 | 306:1 307:1 308:1 | 201:22 202:25 |
| 236:6,11 259:10 | **door** 207:15 | 309:1 310:1 311:1 | 203:7 274:8 |
| **displayed** 241:10 | **doubt** 278:22 | 312:1,16 313:1 | 322:23 |
| 241:13 242:6,7,10 | 279:25 284:8 | 314:1 315:1 316:1 | **effort** 310:14 |
| 242:16,21 244:25 | **douglas** 197:4,16 | 317:1 318:1 319:1 | **either** 208:21,22 |
| 245:2 248:2 | 198:6 200:14 | 320:10,18 321:3 | 217:17 218:13,16 |
| 251:13 269:21 | 201:1 202:1 203:1 | 322:13 324:9 | 256:13 273:17,21 |
| **dispute** 206:12 | 204:1 205:1 206:1 | 325:4,20 | 291:25 |
| 260:7 | 207:1 208:1 209:1 | **dream** 205:13,15 | **elaine** 235:14 |
| **distinct** 288:11 | 210:1 211:1 212:1 | 276:12,17 321:22 | 236:5,17 237:4,20 |
| **distinction** 292:14 | 213:1 214:1 215:1 | **drive** 200:23 | 323:6 |
| **dividend** 305:5 | 216:1 217:1 218:1 | **driven** 217:18 | **elicited** 236:11 |
| **document** 201:6 | 219:1 220:1 221:1 | **due** 284:21 311:13 | **email** 203:21 |
| 201:13 202:10 | 222:1 223:1 224:1 | 313:10,10 314:12 | 204:10,21 222:25 |
| 206:3 218:19 | 225:1 226:1 227:1 | **duly** 200:20 | 229:12,24 230:10 |
| 220:15,19 221:13 | 228:1 229:1 230:1 | 318:25 324:11 | 230:25 232:6 |
| 227:12,16 229:4 | 231:1 232:1 233:1 | **dust** 265:9,14 | 237:15,18,20,23 |
| 251:23 252:17 | 234:1 235:1 236:1 | 266:4 268:24 | 237:25 296:17 |
| 253:5,15 257:14 | 237:1 238:1 239:1 | 269:5 | 321:15 322:21 |
| 257:16 258:9 | 240:1 241:1 242:1 | | 323:5 |
| 259:17,21,24 | 243:1 244:1 245:1 | **e** | **emails** 204:7 |
| 275:13,17 276:9 | 246:1 247:1 248:1 | **e** 198:2,2 200:19 | 232:10 237:11 |
| 278:17 281:7 | 249:1 250:1 251:1 | 223:11 320:2,2 | 280:13 286:16 |
| 283:19 289:9 | 252:1 253:1 254:1 | 321:2 322:2 323:2 | 287:2 321:15 |
| 293:5,15,15 297:7 | 255:1 256:1 257:1 | **earlier** 212:24 | **emphasize** 286:15 |
| 301:16 302:15,22 | 258:1 259:1 260:1 | 214:6 267:2 274:8 | **emphatic** 254:12 |
| 303:23 304:15 | 261:1 262:1 263:1 | **earn** 304:18 | **enable** 235:25 |
| 307:9 310:23 | 264:1 265:1 266:1 | **earned** 304:20 | **enlarge** 275:6 |
| 311:10 312:16,25 | 267:1 268:1 269:1 | 305:14 | 276:2 278:13 |
| 315:5,15,22 | 270:1 271:1 272:1 | **earning** 304:23 | **enlarged** 274:25 |
| 317:23 321:13,19 | 273:1 274:1 275:1 | **easily** 265:9 | 275:3,24 |

CHUBB-Altschuler/ROLEX & ART 00002520

092020001456

**[entire - finish]**

| | | | |
|---|---|---|---|
| **entire** 252:17 253:5 265:3 303:25 | **321**:4 324:10,12 **examine** 213:15 **examined** 200:24 | 317:24 318:2,3,7 318:12 321:8 322:4 323:11 | **facts** 213:5,22,24 213:24 214:5,21 215:17 219:7 |
| **entitled** 289:9 293:5 310:23 312:16 315:5 321:13 322:6,11 322:14 | 205:9 288:16 **examining** 279:21 **example** 305:16 **exception** 296:6 **exchange** 204:3,5 | **exhibits** 321:7,9 322:3 **exists** 257:16 **expenses** 309:7,8 315:6,20,23 316:6 316:13,21 322:15 | 243:6 258:5 **factual** 319:4 **fair** 206:24 207:2 305:17 **fairly** 237:15 260:18,20 |
| **eric** 281:18 288:17 288:19 296:7 **errata** 325:1 **esq** 198:8,13 **essentially** 261:4 | 222:4,5,25 232:6 232:10 237:11,20 **exchanged** 321:15 **exchanges** 204:11 204:21 237:15,18 | **expert** 267:15 282:21 **expires** 325:25 **explain** 211:20 212:6,9,15 214:22 | **faith** 287:25 **fake** 296:24 **false** 257:5 **familiar** 224:6,10 252:4 267:16 |
| **estimate** 222:2,14 305:17 **estimated** 315:5 316:6,13,21 322:14 | 237:23,25 322:21 323:5 **excruciating** 219:15 **excuse** 210:22 | 221:3,6 222:15 253:25 268:25 277:16 291:3 295:12 **explained** 207:10 | **family** 272:17,18 272:19,21 273:14 309:7 **far** 237:19 283:24 **february** 276:21 |
| **euo** 212:4,24 213:8 213:25 214:14,15 216:13,21 217:22 219:5,12 234:19 236:12,12 262:16 | 218:14 246:19 281:20 **exempt** 312:17 322:13 **exhibit** 201:4,12 201:14 202:4,17 | 212:5,23 213:4 215:21 217:23,25 219:5,9,13 225:4 236:19 254:6 **explaining** 219:10 | 277:18 318:16,21 **fee** 314:16 **fellow** 203:14 279:19 280:17 **ff** 275:16,18,21 276:5 278:17 |
| 263:4 272:4 273:7 273:8,13 283:6 285:5 325:3 **events** 212:17,24 213:12 216:10 279:5 | 203:2 206:4,7 217:4,6 227:17 228:24 229:5,8 243:12,14,17 251:24 252:3,18 | 311:20 **explanation** 254:2 **exposed** 266:4 **express** 306:14 313:22 **extensively** 205:10 | 321:21 **fico** 314:3 **fide** 287:24 **fifteen** 226:23 **figure** 229:25 **file** 198:13 |
| **eventually** 244:18 249:18 **everybody** 236:15 **evidence** 204:7 232:6 295:24 **exact** 217:21 | 253:11,20 259:22 274:13,18,22 275:9,16,18,21 276:5 278:17 289:8,12,15 290:9 | 212:3 213:8 214:14 234:19 273:6 **extenuating** 254:16 | **filed** 305:11,12 319:3 **find** 210:18 213:18 225:21 255:23 291:20 **finding** 243:8 |
| 270:16 **exactly** 280:14 287:16 **examination** 197:15 201:2 211:24 221:24 | 290:12,16 293:7 293:10 301:15,17 301:20 303:21 309:14,17 310:25 311:4 312:15,18 312:21 313:4,6 315:4,7,10 317:22 | **f** | **fine** 200:7,8 202:14,15 316:17 **finish** 288:15 |
| | | **fact** 200:14 215:19 220:2 224:10 271:25 281:19 296:9 309:4 313:20,25 | |

CHUBB-Altschuler/ROLEX & ART 00002521

092020001456

[finished - happened]

**finished** 253:13 287:18 294:20 301:10 317:16
**fiorella** 198:10
**firm** 208:10 321:21
**first** 199:5 200:20 211:23 212:3,4,18 212:23 213:4,8,23 213:25 214:14,19 216:13 217:22 219:5,12 234:19 236:12 264:23 273:7,8,12 274:19 278:2,22 279:8,10 279:24 283:6,17 284:7 285:4 293:2 293:4,23 301:22 301:23 302:2 303:6 304:3
**fit** 264:9
**five** 238:21,23 263:13
**floor** 198:11
**following** 199:4 230:9 231:10 310:8
**follows** 200:25 228:2 231:22
**footnote** 300:6
**forget** 271:25
**form** 240:9,10 256:14 257:10 322:9
**format** 321:9
**former** 203:24 216:18,23 217:12 218:17
**forth** 206:13 212:8 219:8 232:12,22 235:13 240:21

**found** 278:10 286:12,18 295:4 297:7 298:6 319:3 324:10
**found** 240:23 272:12 274:2 288:20,24
**foundation** 205:13 239:3,7,14,17,21 240:2 323:8
**four** 209:8 224:11 224:13 225:19 230:13 233:8 242:3 245:22,24 245:25 250:16,17 253:22 254:4 267:22 289:16 302:13
**fourth** 298:15
**frame** 242:3 250:19 267:6,7 300:12,16,20,23 301:3,5
**framed** 241:14,18 242:3 246:16,18 268:9
**fred** 198:17 211:21 270:15
**frequently** 250:2,5 282:9
**friedman** 198:10
**friend** 282:8
**front** 279:14 314:19
**full** 254:14 267:16 278:14 306:5,9,14 306:21 312:11 313:22
**funds** 297:4
**fungible** 219:24
**further** 261:17 319:15 324:14

**future** 200:4

**g**

**g** 200:19 320:2
**gallagher** 203:22
**gallery** 211:25 257:11,21 321:13 321:19
**gardening** 317:10
**gears** 270:13 300:10
**general** 285:25 286:3 317:6
**generate** 312:22
**gentleman** 204:9 215:12 280:5 281:8,18 318:10
**george** 277:5 321:21
**getting** 220:19 308:10
**gg** 289:12,15 321:23
**girlfriend** 247:6
**give** 205:12 212:9 224:14 225:11 226:20 261:8 264:17 294:13 296:4 317:15
**given** 214:3,21 262:10 284:8 307:6 320:16 324:13
**gives** 313:8
**giving** 267:25 268:8
**go** 201:20 202:13 202:22 206:5 212:4,7 218:25 219:3 225:6 227:4 228:10 261:12,19 263:13 266:15

**goes** 276:7 278:12 280:11,25 289:16 291:19 292:21 293:3 303:25 311:5,6 313:3 315:11,25 317:21
**goes** 271:23 279:2
**going** 207:15 209:5,12 211:8 212:5,7 238:13 241:15 246:4 257:19 260:19 262:14 270:16,17 277:17 287:17 300:2,11
**gonna** 270:21
**good** 238:14 282:7 283:10,10 285:12 286:8 287:24 288:21
**gotcha** 312:6
**great** 254:6 279:20 283:13
**greater** 254:4
**gst** 312:17 322:13
**guess** 232:3,5 249:3 309:20 314:21

**h**

**h** 200:19 312:16 322:13
**hand** 324:19
**handshake** 220:22
**happen** 271:16
**happened** 210:5 212:24 215:5 249:17 251:12 261:23 262:13 279:17 281:21 302:5,24

CHUBB-Altschuler/ROLEX & ART 00002522

092020001456

happens 253:21
happy 310:18
hard 230:9
haring 208:25
  211:16,22 215:14
  215:22 217:15,19
  219:20 228:12
  237:6 239:3 242:5
  244:2,6,11 245:8
  246:12 258:23
  259:13 269:24
  323:8
harings 245:22
head 203:21
  306:17
hear 203:7
heard 252:6,10
  270:11
height 219:14
held 197:19
  246:22 259:19
hello 230:14
help 230:12 248:9
hereinbefore
  324:10
hereunto 324:18
hey 281:24 298:24
hh 290:9,12,16
  322:5
hide 299:21
high 204:24
higher 226:10
  229:14,17 313:24
hmm 229:15 278:7
hold 296:25
holidays 250:6
home 217:16
  243:21 244:13,16
  244:19 245:7
  260:25 261:2
  266:10 269:25

270:6
homeowners
  316:17
homes 317:7
hope 319:16
hotel 279:12,18
hour 238:14
hours 270:10
  297:10
house 242:19
  244:4,7 249:18
  250:7 261:22
  263:23
household 309:7
hundred 218:11
  285:19
hundreds 224:4
hurts 309:3
hypothetically
  285:10

i

idea 218:11,13
  247:23 273:24
  282:7 285:6
  298:21
identification
  201:15 227:17
  229:5 243:14
  251:24 259:22
  275:18 289:12
  290:9 293:8
  301:18 309:15
  310:25 312:19
  315:7 317:24
identified 231:7
  231:24 267:10
identify 246:25
identifying 284:14
ii 293:7,10 322:6
immediately 278:4

imparted 218:6
implied 267:12
important 256:23
  294:11
impossible 224:17
impression 218:5
  258:25 259:6
inaccurate 259:8
  262:20
inadvertently
  294:16
include 282:24
  315:19 316:15
included 277:6,24
  300:7 316:14
includes 317:10
including 289:18
income 304:4,10
  304:12,16,18,20
  304:23,25 305:3
  305:14,18 309:8
  312:22 322:8
inconsistencies
  205:23 214:18
inconsistent
  295:21
incorrect 259:3
  278:9 285:19
  306:7
increase 229:21
increased 203:17
  274:6,24 314:3
increasing 205:3
independent 203:9
  230:23 242:17
  248:8,15 249:14
  268:8,20 282:20
  300:19 313:17
index 321:25
  322:25

indicate 206:8
  240:15,22 311:23
indicated 212:17
  217:13 221:23
  222:12 225:16
  228:18 234:3
  235:5 236:7 241:9
  249:17 254:23,25
  256:3,12,19
  257:14 264:10
  268:23 285:16
  294:5
indicates 229:25
  311:13
indicating 298:11
  300:7
indication 296:22
individual 215:3
  254:19 256:10
individually
  199:22 200:6
  254:5,12
inflated 299:16,19
info 282:10
inform 273:9
  299:9,20
information
  206:23 213:10
  214:4,9 219:3,12
  225:17 235:13,19
  235:24 236:17
  255:21 260:23
  282:14 289:11
  294:14 306:4
  315:16 319:5
  321:24 322:20
  323:4,12
informed 226:22
  287:21
initially 248:16
  291:13,14

CHUBB-Altschuler/ROLEX & ART 00002523

092020001456

**initiated** 201:6
206:3 217:6
227:12 229:8
243:17 252:3
259:17 274:21
275:21 289:15
290:12 293:10
301:20 309:17
311:4 312:21
313:6 315:10
318:7
**inner** 264:12
265:25 266:5,9
269:8,10
**inside** 265:11
**insisted** 212:21
214:15
**insistence** 271:21
**inspected** 298:16
**insurance** 197:6
197:17,19 198:11
198:17 201:9,13
215:24 222:10
223:2 226:3
316:12,15,16,20
321:10,14 322:17
322:21
**insure** 220:7
**insured** 236:24
284:25 287:4,24
290:25 291:12,16
291:18 292:9
296:21 298:24
**insuring** 205:3
**intentionally**
306:17,19 313:23
**interaction** 286:6
**interchangeable**
219:25
**interest** 237:9
305:5 306:24

308:20
**interested** 324:17
**international**
205:14 276:12,17
321:22
**internet** 223:7,8
224:7 225:6,17
228:21
**interrupt** 210:24
287:19
**interrupted**
287:17 301:7
**interrupting**
213:21
**interviewed**
220:24 222:11
**investigator**
198:17
**investigators**
236:14
**invoice** 289:22
290:7 292:2 322:5
**involved** 201:9
205:21 211:21
217:11,14 241:20
241:23 250:11
266:23 272:18
277:7 287:7
291:10 293:22
**involvement**
272:21
**irrelevant** 236:21
**island** 317:8
**issue** 212:3 218:4
224:9 279:25
286:11 312:10
**item** 201:24
202:19 203:5
230:19,21 231:2
232:9 294:23
322:22

**itemized** 201:17
**items** 230:19
294:10

### j

**james** 220:11
321:13
**janine** 229:12
230:13 321:16
**january** 228:8
321:10
**jeff** 238:20 297:13
302:8 307:22
310:7 319:16
**jeffrey** 198:8
281:8,9,12 282:8
282:11,15 283:6
283:19 286:6
288:16
**jeffrey's** 281:10
282:10
**jim** 224:22 228:19
**jj** 301:17,20
303:21 322:8
**job** 197:25
**july** 293:14

### k

**k** 320:2
**keep** 269:4 311:17
311:21
**keith** 208:25
211:16,22 215:22
217:15,19 219:20
228:12 237:6
239:3 242:4,5
245:8 246:11
269:24 323:8
**kept** 226:8 262:19
263:14 311:23
**kind** 204:13,18
223:6 237:21

267:6 307:13
**kindly** 212:12
**kk** 309:14,17
322:10
**knew** 219:11
225:9,22 229:13
272:15,23
**knife** 265:7
**know** 203:10,19
203:20,23 204:20
206:22 209:22
210:14,14 213:6
213:14 214:22
216:12 217:9
220:9 222:22
223:19 226:11
229:18 231:9
232:21 234:25
235:9 241:21
242:15 243:9
244:11,20 245:23
246:9,15 247:21
247:24 248:4
249:12,13,15,21
249:24,25 250:17
250:23 251:2
253:8 257:7
259:10,11 264:5
266:14 267:7,9,14
267:16,19 270:4
271:7 272:6,9,10
272:15,15,20,22
272:23 277:23
279:4,5 280:13,19
280:22 281:10
283:24 284:18
285:7,11 286:10
287:10 288:17,21
291:7,10 292:8
295:7 296:14,25
298:8,19 299:19

CHUBB-Altschuler/ROLEX & ART 00002524

092020001456

300:3 301:4,5 302:24 305:6,13 306:15 315:14 316:23
**knowing** 298:21 314:21
**knowledge** 200:12 227:20 228:4 229:16 304:11 310:5 315:20 319:11
**known** 215:4

**l**

**l** 200:19,19,19 223:11 247:16,16 320:2
**ladies** 318:17,22 319:9,12
**lady** 246:25 247:4 247:5
**laid** 213:7 261:25
**landscape** 302:12
**larger** 313:20
**lastly** 199:21
**late** 309:2
**law** 199:18 321:21
**lawyer's** 299:20
**lead** 205:12
**leaning** 245:20
**learn** 213:5 214:5
**learned** 213:12
**learning** 276:23
**left** 279:13 292:25 293:3
**lesser** 287:11
**letter** 260:9,12 275:23 276:8,10 276:15 277:5,9,18 277:21 278:10 281:2 283:16,18 283:18,18 284:6

284:16,19,23 285:21 286:13 297:25 298:10 299:9,21,24 300:4 321:10,21
**letterhead** 290:7 321:19
**level** 204:24
**lew** 223:11 255:10 255:21 323:12
**likewise** 245:12 272:3
**line** 238:12 297:9 325:5
**lines** 263:8
**liquidity** 312:10
**lisa** 247:12 248:10 249:16 250:2 260:16 268:2,5
**lisa's** 251:13
**list** 309:6
**listed** 230:17 322:22
**litigation** 199:19
**little** 213:3 263:11 270:13 290:14 313:19
**llc** 289:22 290:8 322:5
**llp** 198:10
**locate** 215:16 219:13 220:14 222:5 251:9 257:9 258:9
**located** 247:25 277:4 280:22
**locations** 199:9
**london** 255:15
**long** 209:7,12 238:19 249:5 260:19 297:15

**longer** 299:4
**look** 201:24 213:15 240:2 250:18 279:17 282:8,12 283:7,20 283:21 287:2 291:24 292:25 295:10 302:14 313:14 314:15
**looked** 220:17 226:12 261:25 265:10 281:25 286:7 295:7,8
**looking** 214:18 223:8 228:21 253:13 262:15,24 264:22 280:13
**looks** 250:20 279:20 281:25 295:10
**losing** 232:3
**loss** 197:7,8,8,9 207:13 240:25 241:6 243:22 251:18 252:14 261:3 266:11 273:10,14 295:15 307:15 318:24,25
**losses** 308:16 323:15
**lost** 218:11
**lot** 220:22 237:8
**loupe** 279:21
**love** 237:9
**low** 228:17
**lower** 288:2 299:7
**lucked** 282:6
**lunch** 282:12

**m**

**m** 247:16,16 320:2 324:6,23
**maccollum** 247:12 248:10 249:16 260:16 268:5
**machine** 302:6 303:9
**madison** 280:23
**magnified** 275:9 276:5 278:18 290:16
**maintain** 269:3 306:17,20,21 313:23,25
**maintenance** 317:6
**making** 230:7 296:3
**manner** 199:15
**march** 277:19,19 287:7 298:2 321:22
**mark** 201:11 243:11 251:21 274:13,16 275:15 289:7 290:6 301:14 312:15 315:3 317:22
**marked** 201:14 206:4,7 217:4 227:16 229:4 243:13 251:23 253:20 259:21 274:15,18,21 275:8,17 278:17 289:11 290:8 293:7 301:17 309:14 310:24 312:18 315:6 317:23 323:11

CHUBB-Altschuler/ROLEX & ART 00002525
092020001456

[market - number]                                                                 Page 14

**market** 251:18
252:13 253:16,23
256:10,17
**marking** 227:14
**marriage** 324:16
**mastercard**
306:16 309:21,22
**match** 204:24
296:11
**matched** 294:17
296:8,19
**matching** 230:16
**matter** 197:3
220:2 271:14
324:17
**mean** 203:21,24
209:11 216:7,12
219:4 220:18
232:5 245:24
249:3 252:23
262:19 291:5
295:9 304:15
307:6 316:25
**means** 295:8
306:20
**meant** 296:25
**meeting** 199:10
212:21 281:15
282:18
**members** 273:14
**memory** 242:18
243:7,24 244:14
248:15 249:14
271:17
**mention** 262:8
**mentioned** 197:20
223:22 243:3
281:18
**mercante** 198:10
**met** 257:8

**metal** 264:6
**michael** 280:9,15
280:21 281:22,24
**mind** 218:25
231:14
**mine** 245:23 247:6
248:5
**minimum** 277:13
**minute** 238:23
**minutes** 218:8
238:21 243:3
264:18 270:4
271:19 285:5
297:18,20 317:15
**miscellaneous**
316:24
**misconstruing**
262:15
**misreading** 311:22
**missing** 209:19
274:3 276:21
291:22 296:2,7,13
298:3,16 318:23
**mistake** 314:19
**mm** 229:15 278:7
312:18,21 322:13
**model** 288:11,25
**models** 284:2
**mom** 212:20 227:8
232:22 233:22
234:14,16,16,20
234:21 235:4,10
235:15,19,20,24
256:9 270:22
271:3,21
**moment** 264:17
300:10
**money** 277:14
**month** 306:5,9,15
306:22 307:5
308:15,20 309:24

311:18 312:8
313:16,19,22
**monthly** 308:19
315:6,20,22
322:15 323:14
**months** 225:2
307:15 308:16
323:15
**moon** 198:5
**mortgage** 316:14
**mother** 236:5
256:14 272:7,12
273:2
**mother's** 249:18
**mouse** 215:2 220:3
221:2,22 225:5
267:23,24
**mouses** 245:25
**moving** 216:7
**multiple** 215:9
216:11 236:10,11
236:14 262:17
**museum** 242:7,13
242:16 244:12,20
244:21,22,24
245:3,8 248:24
249:6,10,23,25
270:6,7,8,9,11
**museums** 239:13

**n**

**n** 198:2 320:2,2
321:2 322:2 323:2
**name** 255:7
280:19 281:10
282:14 325:3,4
**named** 281:8,18
**names** 255:8
**national** 197:6,17
198:11 322:17
**nature** 317:11

**need** 217:8 238:16
274:25 275:24
292:24 307:16
318:10
**needed** 225:17
**nefarious** 295:18
**neither** 310:16
319:12
**never** 208:7
218:25 226:16,16
241:17 254:11,15
255:3 256:12,19
273:4 292:9
**new** 197:22 198:12
198:12 200:21
214:5,6 219:12
279:12,16 280:18
280:23 281:14
313:8 324:2,7
**nice** 288:25
**nine** 263:8
**nn** 315:7,10
322:14
**nomenclature**
292:5
**north** 198:6
**notary** 197:21
200:20 320:25
324:7 325:24
**note** 321:9
**noted** 319:24
**notified** 299:15
**notify** 298:4
**noting** 211:2
**november** 203:7
322:5,23
**number** 201:4,19
205:25 212:18,19
217:3 220:17
222:20 223:4,4
227:10 230:19,21

CHUBB-Altschuler/ROLEX & ART 00002526
092020001456

| | | | |
|---|---|---|---|
| 236:21 243:11 | 243:7 266:11 | **opened** 261:15 | 263:3,5 264:22 |
| 250:8 251:21 | 280:14 | 262:18 263:11,17 | 270:19 278:3,12 |
| 259:15 265:17 | **october** 221:23 | 264:11,15 265:2,6 | 289:16 292:21 |
| 275:15 281:20 | 223:23 324:19 | 265:24 266:20 | 301:22,23 302:2 |
| 284:11,15,20 | **offer** 299:6,12 | **opening** 266:5,9 | 303:6,25 304:4 |
| 286:16 290:6,24 | **office** 247:19,22 | 266:17 268:24 | 305:25 311:5 |
| 291:2,3 294:23,24 | 248:2,24 251:13 | 270:2 | 313:18 315:11 |
| 301:14 309:12 | 268:2,6,11,13,19 | **opine** 257:6 283:8 | 317:21 321:2,7 |
| 317:21 318:25 | **oh** 279:20 296:10 | 283:13 | 322:4,20 323:5 |
| **numbered** 201:23 | 303:2 | **opportunity** | 325:5 |
| **numbers** 203:13 | **okay** 205:17 207:3 | 262:11 285:10 | **pages** 263:13 |
| 204:25,25 284:3 | 209:4,17,23 210:2 | **opposed** 248:23 | **paid** 288:5 306:14 |
| 284:10 286:11,20 | 210:5,11,18 | 251:6 | 307:2 309:8 |
| 296:19 | 211:17 212:6,14 | **order** 297:10 | 311:19 313:22 |
| **numerous** 235:4 | 213:17 223:24 | **original** 207:11 | 314:22 316:4 |
| 240:12 | 230:11 233:24 | 215:6,14 223:20 | **paintings** 209:8 |
| | 236:25 240:11 | 251:2,6 265:12 | **papers** 285:9 |
| **o** | 246:16 253:9,24 | 292:2 295:2 | 288:22 295:3,7 |
| **o** 200:19 247:16 | 263:21 270:13,20 | 323:10 | 298:19,20,20 |
| 320:2 | 271:2 275:3 276:2 | **outcome** 324:17 | **paperwork** 239:5 |
| **oath** 197:15 | 286:9 292:19 | **outer** 264:11 | 284:9 |
| 200:24 211:24 | 297:14,19 302:20 | 268:25 | **paragraph** 278:14 |
| 221:24 254:8 | 303:19 308:11 | **outside** 246:2 | 280:25 281:2 |
| 320:12 | 309:6 312:6 316:9 | 267:23 | 318:9 |
| **object** 246:18 | 317:13,17 318:20 | **outstanding** | **pardon** 308:4 |
| 262:14 | 319:14 | 238:18 | **parents** 217:17 |
| **objection** 200:3,4 | **omit** 299:24 300:4 | **oversight** 277:25 | 242:19 243:21 |
| 218:21 | **once** 214:22 244:6 | **overvalued** 285:2 | 244:4,7,13,16,19 |
| **obtain** 282:13 | 255:15 313:13 | **owned** 209:8 | 245:7 250:3,7 |
| **obtained** 272:19 | **ones** 230:17 282:7 | 220:4 279:19 | 260:25 261:2 |
| **obviously** 219:4 | 307:22 | 319:12 | 266:10 269:25 |
| 277:24 | **oo** 317:24 318:3,4 | **owns** 280:17 | 270:5 |
| **occasion** 269:17 | 318:7,12 322:16 | | **part** 209:5 248:7 |
| **occasionally** | **ooo** 198:19 200:18 | **p** | 267:17,18 303:22 |
| 314:15 | 238:25 264:21 | **p** 198:2,2 | 313:15 318:15 |
| **occasions** 250:8 | 297:23 317:19 | **p.m.** 264:19,20 | **participants** |
| 268:20 | 321:5 322:18 | 319:24 | 302:13,21 |
| **occur** 223:14,16 | 323:16 | **page** 201:18,19 | **participating** |
| 223:18 266:13 | **open** 261:17 | 202:2,16,25 206:5 | 199:9 |
| 280:10 | 262:25 264:12 | 209:6,16 210:4 | **particles** 269:6 |
| **occurred** 212:17 | 265:3,25 269:8,10 | 211:4 228:10,11 | |
| 223:19 225:22 | | 230:13 242:23 | |

CHUBB-Altschuler/ROLEX & ART 00002527

092020001456

particular 223:5
224:7 225:8
226:18 227:2
236:2 248:2 249:9
268:10 286:20
306:5 307:9 314:5
parties 199:16
255:8 324:15
party 255:4
passed 271:21
272:7,12 273:2
passing 216:8
patterns 314:22
pause 246:21
pay 306:4,8,20,24
308:24,25 313:25
316:9
paying 308:20
312:11
payment 289:20
313:10,20 314:18
314:21,22 316:15
payments 309:3
316:15
pdf 321:9
people 213:4
272:16 301:25
percent 202:8
215:18 218:11
238:3 239:16
250:16 260:5
265:16 282:22
285:19 298:12
perfect 285:8
298:17,18
period 266:15
282:17 299:14
323:14
periodically
224:25

person 232:25
234:2
personal 239:4
personally 254:10
perusing 202:10
276:8 281:6
312:25
phoenix 198:7
217:18 242:8,21
244:12
phone 220:21
302:11
photo 245:19
249:14 269:22
323:10
photocopy 251:7
photograph
243:13 246:10
247:2,10 248:11
250:10,11,14,24
251:3,6 253:19,21
266:22,24 267:6
268:16,22 300:23
301:2 321:17
photographs
267:3
phrase 295:9
physically 199:25
315:17
picked 279:12,14
279:18
picture 241:14
242:4 246:17
267:15,19 300:25
piece 224:13
230:17 255:14,16
255:17 258:6
pieces 219:23
221:11 222:21,23
224:11,13 256:10

pima 322:16
pink 257:14,20
pizza 317:2
place 214:7 216:10
227:2 282:18
plastic 264:6
platform 199:10
please 200:5,11
201:3,16 202:13
205:24 217:3,8
221:19 227:9,24
228:24 229:10
230:18 231:19
243:11 251:21
253:9 264:18
275:7 281:2 289:6
292:21 301:11
312:15 313:4
317:22 318:9,11
pllc 198:5
plus 277:14
point 225:11
226:20 229:19
258:16 267:25
271:4 308:10
316:10 319:15
poli 198:5
police 206:6,8,10
206:21 207:4,8,11
273:4,9
policy 197:19
201:9,13 230:18
231:3 274:8
290:25 291:3,9,19
291:20 294:11
298:6 321:10,11
322:22
portion 319:20
position 319:21
positive 215:18

possession 273:22
possible 235:20,22
261:23 262:13
269:20,23 319:18
possibly 292:22
poster 245:23
248:6
precise 218:3,4
prefer 208:22
premise 299:17
prepare 234:17
prepared 218:19
315:14,17
presence 199:25
present 198:16
preserves 239:3
presumed 318:24
pretty 297:11
prevented 312:11
previous 247:8
312:4 313:7
314:24
previously 206:3,7
211:23 215:21
217:4 221:20
222:14 232:15
237:17 238:7
241:9 242:20
243:18,25 244:15
247:7 250:9
253:19 254:23,25
257:18 261:14
262:4,5 264:10
265:18,22 274:15
274:18,21 275:8
283:9
price 225:7 226:14
252:5 321:18
prices 282:23
print 226:13
244:24 248:13

CHUBB-Altschuler/ROLEX & ART 00002528
092020001456

[printout - read]

**printout** 321:18
**prints** 215:13,15
223:5 244:10
**prior** 204:25 218:6
221:24 227:21
228:6 233:21
234:7 240:24
241:5 249:9
251:18 252:14
253:16 256:13
259:25 260:14,22
262:22 263:23
267:11 272:25
276:15 282:19
285:15 295:14
302:25 306:3
311:16,25 312:8
**pristine** 220:3
269:4
**private** 315:25
316:3
**privilege** 218:22
**privy** 292:13
**probably** 216:13
238:2 286:9
297:17 314:22
**problem** 284:2,13
295:11
**procedure** 265:24
**promptly** 319:17
**proof** 289:20
**proper** 205:3
**properly** 284:14
**property** 234:2
316:19
**provenance**
240:16
**provide** 204:14,15
204:18 208:9
214:8 221:14
224:23 236:2

237:23 238:4
240:9 251:9
255:25 271:22
286:24 287:5
310:18 322:21
323:5,10,12
**provided** 205:7
206:25 207:24
208:4 213:10,23
213:24,25 217:12
226:2 228:9
230:20 235:14,19
235:21,24 248:13
258:5 260:5,23
265:18 266:25
270:18 271:10,17
289:6 291:14
292:12 294:4
296:2 304:8 306:4
307:14,23 308:8
309:6 315:16
**public** 197:21
200:20 245:2
316:2 320:25
324:7 325:24
**punch** 295:3,6
**punchcard** 294:3
294:5,15,17
**purchase** 206:17
225:5 239:8
257:10 323:9
**purchased** 206:9
206:16 207:5,8
208:25 210:22
211:11,17,22,24
215:22,25 217:15
219:20 225:3,9
237:5 244:2,11
245:11 246:11,12
258:16,19,22,25
259:7,13 260:17

261:20 279:11,11
281:19 284:15
285:9 290:23
293:25 294:2
295:23 296:5
**purchases** 215:8
**purpose** 199:19
261:7 266:16
269:13 308:18,21
**purposes** 321:14
**pursuant** 197:18
260:9 274:24
**put** 201:3 205:24
217:2 219:23
224:11 226:3,6
227:9 228:23
236:8 243:10
249:10 251:20
259:14 267:7
268:2,5 271:7
274:12 275:14
289:5 290:5 291:9
292:20 300:16
301:5,13 303:15
307:24 309:11
310:21 312:14
313:4 315:2
317:20
**putting** 300:12,20
**puzzle** 219:24
258:6

**q**

**quality** 282:5
**question** 209:7,14
209:17,23,25
210:5,9,11,16,18
210:21,23 211:6
211:10,13,17
212:12 213:21
214:3,16 217:21
218:16 222:18

225:15 227:22
228:3 229:23
230:7,9 231:13,17
231:20,23 232:9,9
233:18 235:3
237:3 240:18
241:8 246:5 254:9
259:4,10 264:25
265:19 266:6
268:3 270:20
271:2 281:23
282:2 283:7,20,22
284:4 299:8,18
301:8 303:11
304:22
**questioned** 212:2
**questioning**
231:11 238:13
297:9
**questions** 203:13
217:10 232:4
244:17 300:3
**quick** 298:22
**quickly** 319:19
**quite** 222:17
288:24

**r**

**r** 198:2 200:19
**rating** 314:3
**reacquired** 256:18
**read** 206:15
208:20 209:5
227:24,25 230:5,8
231:19,21 252:24
260:2 263:2
270:17 275:2,25
276:15,19 277:21
281:6 293:12
318:8,15,17,19
320:11

CHUBB-Altschuler/ROLEX & ART 00002529

092020001456

[readily - representatives]                                         Page 18

| | | | |
|---|---|---|---|
| **readily** 265:9 | **recess** 238:23 | **red** 289:23 290:19 | 233:13,23 234:12 |
| **reading** 264:24 | 264:19 297:21 | 293:19 296:23 | 234:23 237:7 |
| 275:5 276:18 | 317:18 | **reference** 277:6 | 244:21 245:9,13 |
| 277:9 278:20 | **recited** 263:3 | 278:8 294:23 | 257:18,20 262:2 |
| 294:22 311:12 | **recollection** 203:9 | **referencing** | 262:17 263:17 |
| **reads** 208:24 | 212:25 216:14 | 230:20 321:11 | 266:21 268:10 |
| **real** 295:7,8,10 | 230:24 234:21 | 322:22 | 271:6,9,24 276:18 |
| **really** 209:11 | 235:7 241:17 | **referred** 283:15 | 282:19 300:21 |
| 216:8 221:25 | 245:5 248:8,21,25 | 296:15 | **remotely** 199:6 |
| 226:14 237:20 | 251:11 261:9,10 | **referring** 223:10 | **remove** 266:19 |
| **reason** 207:7 | 262:12 264:15 | 230:15 244:23 | **removed** 244:8 |
| 216:25 241:15 | 266:8 268:8,17,21 | 250:12 263:10 | 261:7,11 314:17 |
| 268:4 269:7 | 300:19 313:17 | 270:8,15 278:25 | **removing** 261:21 |
| 278:22 279:25 | **reconcile** 285:23 | 283:4 286:15 | 269:15 |
| 284:7 298:7 | 286:19 291:25 | **refers** 232:10 | **repairs** 317:6 |
| 310:16 325:5 | 311:14 313:11 | 316:24 | **replace** 287:14,25 |
| **recall** 206:9 | **reconciled** 286:22 | **reflect** 311:11 | 288:20 290:3 |
| 207:20 208:13,16 | 287:3 | **reflected** 304:10 | 299:2 |
| 208:19 209:2 | **reconciliation** | 311:15 314:5 | **replaced** 285:13 |
| 224:22 230:3 | 286:25 | 316:5 | 287:20,21 288:9 |
| 232:18,24 233:14 | **reconstruct** | **reflecting** 289:17 | 291:6,6 |
| 233:20 235:18 | 280:12 | **reflection** 289:2 | **replacement** 288:4 |
| 242:2,9,12,24 | **record** 200:6 | 304:16 | 289:18,24 290:20 |
| 248:19 249:19 | 211:3 220:15 | **refreshed** 243:8 | **report** 206:6,7,13 |
| 255:12 256:7,21 | 227:25 231:21 | **regard** 249:21 | 206:15,24 207:13 |
| 257:13 259:24 | 235:17 238:6 | **regarding** 239:8 | **reported** 318:25 |
| 260:8 261:21,22 | 246:23 249:12,22 | 323:8 | **reporter** 197:21 |
| 266:16 269:11,13 | 259:18,20 275:12 | **registrar** 249:23 | 199:2,8,23,24 |
| 269:15,19 270:2 | 276:24 282:4 | 249:25 | 200:10,16 228:2,3 |
| 272:24 275:22 | 320:14,15 324:12 | **reiterate** 271:12 | 231:22,23 324:6 |
| 276:9 284:19 | **recorded** 199:14 | **related** 230:2 | **reporting** 199:11 |
| 285:15 306:16 | 207:21 209:6 | 324:15 | 302:19 |
| 307:4 | 212:21 213:11 | **relayed** 282:3 | **represent** 200:11 |
| **recalled** 248:12 | 242:22 270:14,18 | **release** 239:6 | 304:5,7 |
| 300:12 | 272:25 | 323:7 | **representative** |
| **recapping** 225:20 | **recording** 199:15 | **relevant** 299:20 | 239:7 248:10 |
| **receipt** 257:10 | **records** 237:22 | **remained** 243:22 | 255:2 288:25 |
| 289:19 291:14 | 238:7 289:17 | 262:6,25 | 323:8 |
| **received** 237:19 | 292:12 | **remaining** 319:17 | **representatives** |
| 310:6,11 314:18 | **recurring** 315:22 | **remember** 206:16 | 243:5 |
| | | 216:24 220:19 | |

CHUBB-Altschuler/ROLEX & ART 00002530

092020001456

[represented - sealed]                                                                 Page 19

**represented**  279:7
  279:23 283:12
  285:8
**represents**  301:4
**reproduction**
  248:6
**reputation**  282:5
**request**  239:11
  240:6,8 277:22
  323:7,13
**requested**  208:10
  260:10 277:2
  322:20 323:4
**requests**  289:10
  321:24
**research**  240:23
  241:3 256:15
**reshared**  303:17
  303:21
**residence**  318:24
**resolved**  203:15
**resources**  272:16
**respect**  240:20
  319:21
**response**  265:17
  289:21
**responses**  213:23
  217:10,13 244:17
  289:9 321:23
**responsibility**
  298:23
**responsible**
  248:18
**responsibly**  309:2
**rest**  318:18
**restate**  295:17
**result**  243:8
  272:20 278:3
**return**  277:13,22
  278:5 301:16
  302:3 304:4,11,21

305:10,12 322:8
**returned**  277:3
**review**  208:2
  252:16 253:5
**reviewing**  230:3
**right**  203:16,16
  233:11 251:8
  253:3 292:25
  312:3 313:9
  314:10
**robert**  214:23
  321:19
**rolex**  202:6 203:5
  270:14,16 273:5
  273:10,15,22,24
  274:3,7 276:20
  277:7 288:12
  289:18,22 290:19
  290:21,22 293:6
  293:18,21 294:23
  298:3,5 318:22
  319:9,13 322:7,22
**ross**  277:6 321:21
**roughly**  209:15
**rq**  204:13 237:21
  239:2 251:5
  255:24 307:13
**rubin**  198:10,13
  200:7 201:2,3,11
  201:16,25 202:13
  202:22 204:13,17
  205:18,24 207:18
  208:8,12 211:4
  212:2 213:14
  217:2,7 218:14,24
  219:6 221:18
  227:9,15,24
  228:23 229:3,9
  231:19 237:21
  238:5,9,16,19,22
  239:2,12,19 240:4

240:7 243:10
  246:19,24 251:5
  251:20 252:15
  253:3 255:24
  259:14,18 262:21
  263:5,7,10,19
  264:17 274:12,17
  275:6,14 276:2
  278:12 289:5
  290:5,13 292:20
  293:3 297:12,15
  297:19 301:13,21
  302:8 303:5,14,19
  303:24 305:22
  307:13,22 308:4,7
  308:12 309:11
  310:5,20 311:5
  312:6,14 313:2
  314:11 315:2,11
  317:14,20 318:2,4
  319:14 321:4

**s**

**s**  198:2 200:19,19
  325:5
**sale**  296:7 297:4
**sat**  212:16
**satisfied**  299:3
**saw**  226:13 261:15
  261:16 268:12
  281:24
**saying**  208:4,21
  233:18 234:24,25
  244:19 255:18
**says**  201:17,21
  202:14,15,24
  217:17 223:3
  229:11 230:25
  262:16 278:2,21
  282:20 284:6
  289:17,17 296:23
  312:4 313:7,9

314:11
**schedule**  230:18
  294:22 295:5
  296:15
**scheduling**  212:21
**school**  315:24,25
  316:3
**scope**  246:4 300:2
**score**  309:3 314:3
**scratched**  284:21
**screen**  201:4,5,8
  205:19,25 206:2
  207:19 217:3,5
  221:19 227:10,11
  228:9 229:7
  243:11,16 251:21
  252:2 259:14,16
  274:13,20 275:9
  275:15,20,25
  276:4 278:16
  289:14 290:6,11
  290:15 292:21
  293:9 301:14,19
  301:25 303:13,14
  303:20 305:23
  307:24 309:12,16
  311:3 312:20
  313:5 315:3,9
  317:15,20 318:6
  318:12
**scroll**  201:16,25
  202:15,23 228:24
  229:9 230:10
  252:15 253:8,10
  301:21 303:24
  318:11
**scrolled**  202:5,17
  203:2 252:19
  253:11 318:13
**sealed**  262:6,19
  263:2,15,16

CHUBB-Altschuler/ROLEX & ART 00002531
092020001456

[search - single]                                                    Page 20

**search** 237:22
252:12 257:15
**second** 199:13
207:5,8 209:11,24
209:25 210:22,22
211:11,12,13
212:6 214:15,19
216:8 246:20
258:16,19,22
259:2,7 278:14
317:21
**security** 305:4
**see** 201:20,21
205:22 230:11,18
250:21 251:5
252:20,21,24
263:19 264:4,15
265:11,19 266:2
268:15 272:7
276:8 278:19
279:20 280:11
283:14 289:21
290:17 301:23,24
302:2,7,8,13,20,22
303:2,17,22,22,25
308:11 310:12
312:24 314:16
315:12 316:22
318:14
**seeing** 257:20
259:24 268:21
275:23 302:20
**seen** 208:7
**sell** 254:11,24
255:14 297:3
**selling** 254:4 282:5
**send** 248:23
319:18
**sense** 235:8 265:15
**sent** 217:18 244:12
244:13,16,21,22

276:8,16 286:16
292:2,4 293:24
294:16 296:7
297:25 311:8
**separate** 199:9
**september** 197:11
320:13
**sequence** 279:5
**serial** 203:13
204:25,25 284:3
284:10,11,15,20
286:11,20 294:24
296:19
**series** 225:19
254:4 267:18,20
**service** 296:24
**services** 325:1
**session** 211:23
264:23 273:13
274:19
**set** 205:21 206:13
206:18,18 207:5,8
208:17,24 209:9
209:11,18,24
210:2,6,7,22
211:11,21 213:2
215:4,13,20,21,23
215:24 219:17,19
219:25 220:2,11
221:2,8 232:12
235:13 237:5
240:21 241:10,13
242:3 244:6
245:25 246:3,11
246:12 248:7
254:11,14,18,21
258:4,6,16,19,23
259:2,7,13 267:16
267:17,22,24
278:9 282:11
286:12 295:4

297:7 298:6 319:2
324:10,19
**sets** 208:14 209:9
215:2 219:24
220:3,4,7 242:2
258:13
**share** 201:5 206:2
217:5 227:11
229:7 243:16
252:2 259:16
274:20 275:10,20
276:4 278:16
289:14 290:11,15
293:9 301:19
303:20 309:16
311:3 312:20
313:5 315:9 318:6
318:13
**shared** 237:9
247:21 266:25
**sheet** 325:1
**ship** 248:17
**shipped** 261:21
**shipping** 265:11
**short** 297:21
**shorthand** 197:21
324:6
**show** 279:17
287:25 303:5
308:8 313:18
314:24
**showed** 231:2
302:25
**showing** 307:11
308:25 323:13
**shown** 246:10
253:20 268:16
300:22
**shows** 286:24
**side** 292:25 293:2
293:3

**sideways** 302:11
**sign** 239:5 240:10
323:7
**signature** 324:22
**signed** 320:21
**silkscreen** 241:23
242:21 246:10
248:12,17 249:9
249:13,17,22
250:15,19 251:12
251:15 253:20
267:5,10 268:2,5
268:12,15 269:16
300:17,20
**silkscreens** 202:19
205:21 207:5,9,13
217:11,14 221:2
225:14 226:22
227:20 228:5,12
228:17 231:4,6,24
232:11 233:2
237:6 239:9
240:16,24 241:4
241:10,20,22
243:19 244:2
245:6 247:25
250:10 251:17
254:5,19 256:16
258:13 260:17,24
261:6 265:13,20
266:2,4,23 269:21
269:24 300:11,13
323:9
**silver** 289:22
290:19 293:18
295:5
**similar** 300:14
305:15
**simply** 221:12
**single** 214:2
220:15 232:24

CHUBB-Altschuler/ROLEX & ART 00002532

092020001456

[single - submitted]                                                    Page 21

248:13 269:16
**sir**  201:24 202:12
202:19 203:19
205:8,21 207:3,17
207:20 210:20
211:7,20 212:14
213:9,17,19,20
214:9 215:17
216:21 217:7,19
219:17,21 223:10
227:19 228:4,14
229:22 230:3
231:4,8,15,18
232:2,13 233:12
233:17,24 234:18
235:16 236:7,9,23
240:19 241:11
242:25 243:18,23
244:23 245:6,12
245:15,19 246:5
246:14 248:3,19
249:11,19 251:16
253:6,7,14,25
254:3 255:16
259:3,25 262:8
264:2,25 265:22
267:8 268:7 270:3
271:12,20 272:14
274:23 275:11
276:24 277:8,14
277:16 278:19
281:2 284:5
285:18 286:4
287:9,15,19
288:10 289:25
290:17 291:17
294:11 295:12,20
296:25 298:9,15
299:13 300:3,10
300:18 301:25
302:4,10,17 304:3

304:14,23 305:8
305:13 308:14
311:16 312:13,23
313:11 315:13
316:11
**sister**  273:18,21
**sit**  235:7 241:16
261:8 264:14
**sitting**  232:18
248:22 255:12
268:18,21 280:14
305:9
**six**  225:2 270:19
**sixty**  263:6,7
**skipping**  210:25
**slash**  265:7,11
**slice**  317:2
**slight**  292:7
**slightly**  313:24
**slip**  257:20
**small**  252:23
260:2
**social**  305:4
**sold**  240:24 241:5
251:17 252:13
253:16,23 255:2,8
256:17 280:6
282:21 285:24
288:16 293:16
295:5,14 297:6
**somebody**  203:22
**something's**
285:13
**son**  315:24 316:2
317:4
**soon**  297:11
**sorry**  223:16
227:4 231:16
234:6 246:24
270:21 291:13
294:20 301:9

309:22 318:18
**sort**  222:3,14
**sotheby's**  239:20
255:14
**source**  276:23
305:2
**speak**  206:20
273:13 281:12
307:16
**speaks**  283:19
**special**  263:25
**specific**  212:25
220:18 288:14
**specifically**  207:12
226:25 273:17
**spelled**  247:15
**spelling**  247:18
**spent**  313:19
**spoke**  207:11
213:6 214:23
215:7 223:7
234:19 235:20
236:4 248:10
288:19
**ss**  320:6 324:2
**stainless**  294:25
318:17,22
**start**  253:3 271:23
**started**  213:3
215:8 279:21
**state**  197:22 200:5
200:21 294:14
298:17 313:13
320:5,25 324:2,7
**stated**  200:22
206:8 284:16
304:14
**statement**  207:21
207:25 208:2,14
208:17 209:6
213:11 242:22,25

243:4,5 256:25
270:15,18 271:13
271:14,18,20
272:2,3,8 273:2
280:8 309:13
310:24 311:25
314:5,16 319:2
322:10
**statements**  313:15
322:12 323:13
**states**  295:9
**stayed**  260:25
261:17
**steel**  293:19
294:25 296:23
318:17,22
**sticker**  274:15
**stipulate**  199:4,22
**stipulated**  199:13
**stolen**  277:18
318:24
**stood**  222:12
**stop**  281:21
297:12
**stopped**  281:22
**store**  279:16,19
280:18,20 317:3
**street**  198:6
281:13 316:25
**stringer**  217:22
219:8
**strongly**  215:19
**sub**  282:5
**subject**  282:25
289:3 290:3 294:7
294:18 299:10
300:5 319:7
**submitted**  203:11
218:19 253:17
257:24

CHUBB-Altschuler/ROLEX & ART 00002533

092020001456

**subpar** 282:5
**subscribed** 320:21
  325:21
**subsequent** 206:18
  218:2 292:3
**subsequently**
  210:15 219:6
  224:9,12 287:20
  291:15
**substance** 204:21
  211:6 256:8
  311:20
**suggest** 215:17
  236:23 279:2
  295:18
**suggested** 222:15
**suggesting** 298:22
**suggestion** 299:18
**suggestive** 215:19
**suite** 198:6
**sum** 204:20 211:5
  256:7 311:20
**sunlight** 269:5
**sunrise** 200:22
**super** 204:23,23
  204:23
**superior** 322:16
**supplemental**
  289:10 321:23
**sure** 202:9 203:15
  205:2 232:4
  235:17 237:24
  238:3,22 239:17
  250:5,16 260:5
  268:19 291:9
  296:18 305:25
**surely** 204:19
**surprise** 233:25
  234:8,11,14
**surprised** 229:14

**swear** 199:2,23
  200:16
**switch** 270:13
**switched** 295:6
**switching** 296:24
  300:10
**sworn** 200:20
  324:11 325:21

**t**

**t** 198:13 200:19
  320:2
**table** 261:25
**take** 205:18
  207:18 221:18
  225:24 238:14,20
  241:14 242:3
  247:18 253:6
  264:18 272:8
  282:8,12 297:19
  304:6 305:22
  310:13 313:3
  317:14 319:21
**taken** 197:16
  238:24 246:21
  247:10 249:18
  264:19 271:20
  272:4 297:22
  316:3,8,12,20
  317:18 320:12
**talk** 213:3 270:14
**talked** 224:3 256:9
  256:9
**talking** 215:8
  233:9 262:21
  272:17,21 299:12
  299:13 316:16
  319:5
**tax** 301:16 302:3
  304:4,11,21 322:8
**telephone** 237:13
  237:14

**tell** 207:4,8 218:17
  221:10 222:20
  224:5 226:25
  233:19 237:4
  239:24 245:18
  246:7 247:9 249:5
  249:8 255:7
  258:12,15,18,21
  272:22 280:15
  295:23 302:23
  308:18
**telling** 206:10,16
  208:13,16 213:16
  219:22 221:10
  222:19 234:23
  256:11,21 266:2
  272:24 298:24
**temporarily**
  241:14
**temporary** 242:3
**ten** 226:23 297:17
  297:19
**terms** 197:18
  222:23 306:2
**testified** 200:24
  216:13 219:7
  232:15 233:12
  234:12 241:12
  243:6 246:14
  257:18 262:4,7,24
  270:4 271:19
  283:9 285:4
  286:17 300:18
**testify** 235:8 262:9
  262:9 287:9
  298:14 300:15
**testifying** 219:11
  269:9
**testimony** 218:8
  235:2 236:12
  248:4 260:22

  261:11 262:22
  263:20,24 267:11
  270:18 271:23
  272:4 285:15
  296:4 306:3
  308:13 311:16
  313:21 320:11,15
  324:13
**texts** 280:13
**thank** 202:12
  205:17 207:3,17
  208:12 214:17
  230:14 265:2
  313:2 319:14,23
**thanks** 303:19
**theft** 207:13
**thing** 219:9
**things** 214:6,7,19
  243:8 254:24
  255:2 257:19
  271:24 299:5
  317:10,11
**think** 204:24
  207:2 212:13
  226:5,7 250:13,15
  260:4 262:11
  265:15 270:3,21
  286:14,16 292:24
  303:8 305:7 308:2
  309:20 311:16
  315:21 319:4
**thinking** 255:13
  271:24
**third** 198:11 255:4
  255:8 298:14
**thought** 225:18
  231:10 256:18
  287:18 288:21,24
  301:9 314:8
**thread** 230:4,8
  232:10 237:19

CHUBB-Altschuler/ROLEX & ART 00002534

092020001456

**three** 228:10 233:7 251:16 252:12 253:15 256:16 263:6,7 278:13 297:10
**tightly** 264:9
**time** 197:20 200:2 205:10 206:14 209:12 212:6,18 213:4,6,23 214:2,5 216:8,15,17 217:24 219:10 220:5,5,8 222:10 222:24 223:25 225:11 226:20 229:19,20 234:7 237:5 238:14 239:11 240:24 241:5 243:22 247:25 249:9 251:18 252:14 253:6,16 257:8 258:16 260:13,15 260:19 261:5,7,13 261:24 262:9 263:12 265:5 266:11 269:8,10 270:19 271:11,13 271:15,23 272:2,5 272:25 273:8,12 273:20 276:16 279:24 282:11 284:23 285:3,20 288:9 297:24 298:15 299:4,6,14 308:23 309:2 310:14 312:12 314:2 316:10 319:24 323:14
**times** 224:4,4 233:12 236:13,14

268:14
**today** 200:13 214:22 232:18 235:8 241:16 248:22 254:8 257:9 258:8 259:25 261:8,12 263:20 264:14 267:2,13 268:18 280:14
**told** 211:21,23 218:6 219:16 220:10 225:18 230:22 236:8 242:20 243:19 244:15 250:9 258:22 259:12 261:14 262:6 263:15 265:22,23 272:11 277:4 279:22 281:3,8 288:5,19 308:23 309:23
**top** 201:21 203:20 276:7 303:22 304:2 306:16
**totality** 313:14
**toy** 317:2,3
**tracy** 223:11 224:3 224:16,23 226:11 226:20,25 228:16 228:19 255:10,21 323:12
**trade** 220:16 221:2,4,7,11,11,15
**traded** 210:7,12 210:15 213:2 214:25 215:20 219:17 220:10
**train** 231:10

**transaction** 258:10
**transcribed** 208:6
**transcript** 208:23 209:5 212:7 262:16 263:4 264:23 320:11,13 324:11
**transcription** 211:2
**transcripts** 319:18
**transported** 244:3 244:7 269:25 270:5,6
**traveling** 270:22
**trial** 265:5
**tried** 311:17
**trouble** 230:16
**true** 217:19,20 221:25 225:13 242:25 243:6,23 244:4 254:24 259:3 262:7,7 263:25 264:12,13 271:11,15 272:3,8 272:13 277:14 278:11 283:2,3,22 285:7,17 295:20 314:6,7 320:14,16 324:12
**trust** 312:17,22,24 322:13
**truth** 213:16,19
**truthful** 272:5
**truthfully** 262:9
**try** 221:16 258:6 282:16 291:24 302:10 303:12
**trying** 212:14,15 213:18 215:16 219:23 225:21

229:21,25 233:19 241:7 259:9 261:12 262:4 284:18 286:19 291:20 292:11,17 295:17,20 303:18 308:12 311:14 313:11
**tucson** 200:23 217:17,19 243:21 249:19 250:3 257:17 263:23 270:23
**tuition** 316:3
**turned** 299:21 307:20
**turning** 302:11
**twelve** 263:9
**twenty** 226:24
**two** 208:14 209:9 209:13 212:19 216:10 219:24 220:7 221:11 223:4 238:2 242:2 258:12 262:10 294:9,10 299:5 306:13 309:25 317:15
**type** 223:5 264:6
**typically** 220:21 228:19

| u |
| --- |

**u** 200:19,19 247:16
**u.s.** 304:4 322:8
**uh** 309:20
**ultimately** 286:21
**unable** 275:2,25 283:6 288:16
**unauthorized** 199:17

CHUBB-Altschuler/ROLEX & ART 00002535
092020001456

**unaware** 299:22
**understand**
 208:23 211:5
 215:11 218:15
 222:18 225:6,15
 229:23 231:17
 232:8 240:18
 247:15 254:13
 257:22 258:24
 259:4,6,9 263:23
 268:3 269:2
 277:12 284:4
**understanding**
 214:24 239:16
 247:16 252:7,9,11
 284:24 285:25
 286:3,21 287:6
 306:3,6 307:18
 310:10
**understood**
 225:20
**unfold** 243:7
**unfortunately**
 201:22
**unlimited** 272:16
**update** 202:23,24
**updated** 293:14

**v**

**v** 325:3
**vague** 249:4
**valuable** 227:21
 228:5 254:18
**valuation** 221:25
 222:13 228:16
**valuations** 228:22
**value** 203:11,17
 205:3,6 222:23
 225:10,13 226:10
 226:22 229:13,21
 236:21 254:3,4,14
 254:18 274:6,24

 283:22 285:7,22
 288:4,8,23 289:3
 291:19 298:5,8,21
 299:7,15,19
**valued** 284:25
**values** 321:13
**variation** 292:7
**various** 215:8
 256:10 284:3
 293:6 322:7
**veracity** 278:23
 284:8
**veritext** 198:18
 325:1
**versus** 287:23
**videoconference**
 199:6,14
**view** 254:3
**vintage** 288:10,11
 289:22 290:8
 293:5 294:24
 322:5,6
**violation** 199:18
**visa** 306:15 307:25
 308:2,6 309:19
**visible** 284:22
**visit** 250:2,7
**voluntarily** 299:22
**vs** 322:17

**w**

**w** 223:11 274:18
 274:22 275:9
 320:2
**wait** 211:9
**walking** 279:15
 316:25
**wall** 246:18 248:5
 268:12,22
**want** 205:11,22
 235:16 248:18,22
 249:11 254:15

 265:8 267:9 268:7
 269:3 274:15
 300:25 305:24
 317:16
**wanted** 204:24
 248:16 277:12
**warhol** 215:15
 228:12 231:3
**warranty** 289:19
 294:4,5,15,17
 295:25 296:9,10
**watch** 203:16
 205:2,4 270:22
 271:4,7 277:2,17
 277:24 278:8
 279:11,14,16,17
 279:18,22 280:2,6
 280:17,19 281:19
 281:23 282:25
 283:7,10,12,14,20
 283:21 284:12,24
 285:6,8,12,17
 287:7,10,14,20
 288:4,14,14,15,18
 288:20,21,24
 289:3,24 290:2,3
 291:10,12,15,21
 292:3,6,9 294:7,18
 295:13 296:3,5,6,8
 296:12,14,20
 298:15,18,25
 299:2,3,3 300:5,7
 318:23 319:6,7,8
**watches** 277:6,11
 277:13,22,23
 278:6 279:6
 281:20 282:6,12
 282:21 283:11
 284:3,10,14,20
 285:22,25 286:7
 286:20 287:4

 288:10 293:6,16
 293:23,24 294:2
 294:10 295:22
 296:12,19,20
 297:6 298:12
 299:10 322:7
**way** 208:21,22,23
 208:23 217:7
 220:4 227:19
 228:4 243:18
 245:6 274:2
 281:21 302:14,22
 324:16
**we've** 216:9
 237:19 238:13
 241:25 270:9
**wear** 284:21
**web** 197:10,19
 198:3,18 199:10
 200:13
**wedding** 270:23
**week** 212:19
 271:21
**weekends** 250:6
**went** 203:16
 209:19 211:4
 214:13 223:7,8
 224:7 225:16
 226:14 228:20
 232:21 234:18
 244:20 245:8
 279:16 286:18
 287:3 298:15,23
 311:18
**werner** 304:13
 305:20 318:23
 321:12 322:17
**whatsoever** 266:9
**whereof** 324:18
**white** 198:17
 207:22 208:13,16

CHUBB-Altschuler/ROLEX & ART 00002536

092020001456

211:21 212:16
213:7,24 214:12
214:20 254:7,12
270:15 271:11,18
272:2,6,9,15,22
295:2
**wife** 319:12
**wife's** 319:8
**willing** 239:5,22
239:24
**wind** 281:9,18
282:3,4 289:22
290:7 293:16
294:16 297:5
322:5
**wired** 297:5
**wires** 319:5
**withdrawn** 297:7
**witness** 199:3,8,23
200:2,12,17
202:18 203:3
204:15 237:24
238:8 239:10,15
239:23 240:5,11
251:8 253:9,12
256:2 276:6
307:16,20 310:13
311:6,9 312:3
314:10 318:13
321:2 324:9,13,18
325:4
**woman** 245:20
**wondering** 226:12
**wooden** 264:5
**word** 226:5,6
247:18 304:6
**wording** 270:17
**work** 310:9
**worked** 223:12
**working** 302:6
310:10

**worried** 216:22
**worry** 231:14
**worth** 282:22
285:6,14,17 286:2
287:8,10,11
288:12,13,18
**write** 283:17
**writing** 238:10
250:20 286:23
**written** 199:16
204:2 208:5
213:23 217:13
244:17 277:18
**wrote** 276:11
283:16 284:17,23
285:20 298:11
299:9

**x**

**x** 197:2,10 289:17
321:2 322:2 323:2

**y**

**year** 209:22 216:8
224:15 225:2
226:24 242:9
**years** 206:19
209:13 216:6,10
224:19 261:2,18
262:6,10 263:2,16
266:15 299:6
**york** 197:22
198:12,12 200:21
279:12,16 280:18
280:23 281:14
324:2,8

**z**

**z** 201:12,14 202:4
202:17 203:2
321:10
**zane** 198:5,8 200:8
200:15 204:17,19

208:9,11 210:24
212:13 218:13,15
218:21,25 237:3
238:11,18,21
262:14,23 263:6,8
263:14,21 297:8
297:14,17 302:9
307:18 308:2,5,11
310:8 311:7 312:2
312:4 314:8,13
317:17 319:23
**zoe** 304:12 305:20
309:9

CHUBB-Altschuler/ROLEX & ART 00002537
092020001456

Page 274

```
1              Douglas Altschuler
2     Q    And the only way you found out
3  about the Rolex being missing was through your
4  attorney?
5     A    That is correct.
6     Q    You increased the value of the
7  Rolex from $50,000 to $120,000, as we discussed
8  earlier -- effective, based upon the policy,
9  11/21/19.  Would I be correct that that was
10 based upon an appraisal?
11    A    That is correct.
12       MR. RUBIN:  Could we put 14 on the
13    screen and mark it as the next exhibit.
14       MR. CRADDOCK:  Counsel, it has a
15    previously marked sticker.  Do you want
16    to mark it to this deposition?
17       MR. RUBIN:  No, if it was
18    previously marked as "Exhibit W" during
19    the first session.
20       (Whereupon a screen share is
21    initiated of previously marked
22    Exhibit W.)
23    Q    Is that the appraisal, sir,
24 pursuant to which you increased the value?
25    A    I need it to be enlarged.  I'm
```

Page 275

```
1              Douglas Altschuler
2  unable to read it.
3     Q    Okay, it was enlarged for you.
4     A    I'm still having difficulty
5  reading it.
6       MR. RUBIN:  Enlarge it a bit more,
7    please.
8       (Whereupon previously marked
9    Exhibit W is magnified on the screen
10   share.)
11    A    I believe that's correct, sir.
12    Q    And just for the record, that
13 document is dated August 22, 2018.
14       MR. RUBIN:  Can we now put up on
15    the screen, number 19, and let's mark
16    that as the next exhibit, FF.
17       (Document is marked as Company
18    Exhibit FF for identification, as of
19    this date.)
20       (Whereupon a screen share is
21    initiated of Exhibit FF.)
22    Q    Mr. Altschuler, do you recall
23 seeing this letter?
24    A    I need it to be enlarged.  I'm
25 unable to read it on my screen.
```

Page 276

```
1              Douglas Altschuler
2       MR. RUBIN:  Okay, let's enlarge
3    it.
4       (Whereupon the screen share of
5    Exhibit FF is magnified for the
6    witness.)
7     A    Can you go back to the top, so I
8  can see who sent this letter?  [Perusing
9  document.]  Yes, I recall this.
10    Q    Was this a letter that your
11 attorneys wrote to Bruno Derval at
12 International Dream Collection Inc., on your
13 behalf?
14    A    That is correct.
15    Q    And did you read the letter prior
16 to the time that it was sent to Bruno Derval
17 and International Dream Collection Inc.?
18    A    I don't remember reading it, but I
19 would assume that I read it.
20    Q    You determined that the Rolex was
21 missing in February of 2020; is that correct?
22    A    That is correct.
23    Q    And the source of your learning
24 that was what, sir?  Just so that the record is
25 clear.
```

Page 277

```
1              Douglas Altschuler
2     A    I had requested the watch be
3  returned to me -- through my counsel -- and I
4  was told it could not be located.
5     Q    In this letter from Browne George
6  Ross, the reference to watches included the
7  Rolex that is involved in your claim; is that
8  correct, sir?
9     A    I'm not reading the letter, but I
10 would assume it was, because it was one of the
11 watches that I bought from Bruno.
12    Q    As I understand, you wanted to
13 return the watches, at a minimum -- and get
14 your money back, plus.  Isn't that true, sir?
15    A    That's correct.
16    Q    Can you explain to us, sir, how
17 you were going to get back the watch that was
18 stolen in February, as this letter is written
19 at the end of March?  It's dated March 31,
20 2020.
21    A    I haven't read the letter, but
22 whether it was a request to return all watches,
23 or some of the watches, I don't know.  If that
24 watch is included in there, obviously that was
25 an oversight.
```

CHUBB-Altschuler/ROLEX & ART 00002499

092020001456

Page 278

```
 1              Douglas Altschuler
 2      Q    Well, it says here on the first
 3  page, "As a result, Mr. Altschuler hereby
 4  demands that you immediately agree to
 5  (i) accept Mr. Altschuler's return of the
 6  watches."
 7      A    Mm-hmm, yes.
 8      Q    So the reference to the watch
 9  that's being claimed would be incorrect, as set
10  forth in this letter?
11      A    That is true.
12          MR. RUBIN:  Could we go to page
13      three now, and can you enlarge the
14      second full paragraph for
15      Mr. Altschuler.
16          (Whereupon the screen share of the
17      document marked as Exhibit FF is
18      magnified.)
19      Q    Can you see that, sir?
20      A    I'm reading it, yes.
21      Q    It says there:  "It was then that
22  Mr. Altschuler first had reason to doubt the
23  veracity of your appraisals."
24          What date was that that your
25  attorney was referring to there?  Because it
```

Page 279

```
 1              Douglas Altschuler
 2  seems to suggest that it goes back to August of
 3  2018.
 4      A    I don't know what the dates were.
 5  I just know the sequence of events which caused
 6  me to have concern that the watches were not as
 7  represented.
 8      Q    And when did you first have that
 9  concern?
10      A    I first had that concern when I
11  purchased the last watch which I purchased from
12  Bruno and picked it up at a hotel in New York.
13  He wasn't there.  He had left it for me at the
14  front desk.  I picked that watch up, and
15  coincidentally was walking back to an apartment
16  in New York City and went into a watch store to
17  look at another watch, and happened to show the
18  watch which I had just picked up at the hotel
19  to the fellow who owned the store.  And he
20  said, "Oh, that looks great, let me see it."
21  And he started examining it under a loupe, and
22  told me that the watch did not appear to be as
23  was represented to me.
24          That was the first time that I had
25  reason to doubt that there was an issue with
```

Page 280

```
 1              Douglas Altschuler
 2  the watch.
 3      Q    That was Bruno who said that to
 4  you?
 5      A    No.  Bruno was the gentleman that
 6  sold me the watch.
 7      Q    And who was it that made that
 8  statement to you?
 9      A    Michael Ashton.
10      Q    When did this occur?
11      A    I would have to go back and see if
12  I could somehow reconstruct this through
13  looking at texts or emails.  I don't know,
14  sitting here today, when exactly that occurred.
15      Q    Who is Michael Ashton?  Tell us
16  about him.
17      A    He's a fellow that owns a watch
18  store in New York City.
19      Q    Do you know the name of the watch
20  store?
21      A    "Michael Ashton."
22      Q    Do you know where they're located?
23      A    On Madison Avenue in New York
24  City.
25      Q    Let's go to the next paragraph in
```

Page 281

```
 1              Douglas Altschuler
 2  the letter, please.  Was that paragraph, sir,
 3  based upon what Mr. Ashton told you?
 4      A    No.
 5      Q    What was it based upon?
 6      A    Let me read this.  [Perusing
 7  document.]  This was based on something that a
 8  gentleman named Jeffrey told me.
 9      Q    Jeffrey Wind?
10      A    I don't know Jeffrey's last name.
11      Q    Well, how did it come about?
12  Where did you speak to this "Jeffrey"?
13      A    At the apartment on 82nd Street in
14  New York.
15      Q    And how did this meeting come
16  about?
17      A    I had been in contact with a
18  gentleman named Mr. Eric Wind, and mentioned
19  the fact that I had purchased a watch from
20  Bruno -- excuse me, a number of watches from
21  Bruno -- and that I happened to stop on my way
22  to the apartment and stopped in to ask Michael
23  Ashton a question about another watch, and
24  Michael Ashton saw the box and said, "Hey,
25  what's in there?  That looks cool," and looked
```

22 (Pages 278 - 281)

CHUBB-Altschuler/ROLEX & ART 00002500

092020001456

Page 282

```
1              Douglas Altschuler
2  at it and had a question about it.
3        I relayed all of this to Mr. Wind,
4  and Mr. Wind said, "Off the record, Bruno has a
5  reputation of selling sub-quality, subpar
6  watches.  Maybe you lucked out and got some
7  good ones.  I have no idea.  Why don't I have
8  my friend Jeffrey take a look at it when he's
9  in the city?  He frequently comes into the
10  city."  And he gave me Jeffrey's contact info.
11  I set up a time for Jeffrey to come over, have
12  lunch, and take a look at the watches.
13      Q   Would you be able to obtain for us
14  this contact information and the last name for
15  Jeffrey?
16      A   I can try.
17      Q   Do you have an approximate period
18  when this meeting took place?
19      A   I remember it was prior to Covid.
20      Q   It says here that "an independent
21  expert confirmed that the watches you sold were
22  worth approximately 50 to 75 percent less than
23  the prices you charged."
24        And that would, of course, include
25  the watch which is the subject of your claim;
```

Page 283

```
1              Douglas Altschuler
2  is that true?
3      A   That's absolutely not true.
4      Q   What was that referring to then?
5      A   Again, we had this discussion in
6  my first EUO.  Because Jeffrey was unable to
7  look at the watch in question that we're
8  discussing here, he couldn't opine, as I've
9  previously testified, as to whether it was a
10  good watch in good condition or whether it was
11  like some of the other watches -- which was, a
12  watch that was not as represented, and not in
13  great condition.  He couldn't opine because he
14  couldn't see the watch.
15      Q   But it was referred to in the
16  letter that you wrote to Bruno.
17      A   First of all, I did not write the
18  letter.  The letter is the letter.  The
19  document speaks for itself.  Jeffrey did not
20  look at the watch in question.
21      Q   Did anyone ever look at the watch
22  in question to determine its true value --
23  other than of course Bruno, or his company?
24      A   As far as I know, no.
25      Q   Did you determine that there was a
```

Page 284

```
1              Douglas Altschuler
2  problem with Bruno, in determining the models
3  and serial numbers of the various watches?
4      A   I don't understand your question,
5  sir.
6      Q   In this letter it says:  "It was
7  then that Mr. Altschuler first had reason to
8  doubt the veracity of your appraisals, given
9  that your correspondence and paperwork confused
10  which watches even had serial numbers, and
11  which serial number was associated with which
12  watch."
13        Was there a problem by Bruno in
14  properly identifying the watches that you
15  purchased, by serial number or otherwise -- as
16  is stated in this letter that your attorney
17  wrote on your behalf?
18      A   I don't know what he was trying to
19  say in that letter.  I do recall that one of
20  the watches had a serial number which had been
21  scratched off -- or due to wear, it was not
22  visible.
23      Q   At the time you wrote this letter,
24  was it your understanding that the watch that
25  was insured with Chubb was valued at $120,000,
```

Page 285

```
1              Douglas Altschuler
2  or did you believe it was overvalued at that
3  time?
4      A   As I've testified now in my first
5  EUO, and just a couple of minutes ago, I have
6  no idea what that watch was worth, what its
7  true value was, because I did not know whether
8  it was a perfect watch as represented when I
9  purchased it with box and papers -- or whether,
10  had I had the opportunity hypothetically,
11  whether someone would say, "You know, this is
12  just not a good watch.  The dial has been
13  replaced, or something's been done to it.  It's
14  not worth $120,000."
15      Q   As I recall your prior testimony,
16  you indicated that you were aware that the
17  watch was not worth $120,000; isn't that true,
18  sir?
19      A   One hundred percent incorrect.
20      Q   At the time your attorney wrote
21  this letter to Bruno, were you aware of any of
22  the watches having the value as appraised?
23      A   I would have to reconcile the
24  appraisals with what they were sold for, but
25  it's my general understanding that the watches
```

23 (Pages 282 - 285)

CHUBB-Altschuler/ROLEX & ART 00002501

092020001456

# EXHIBIT 25



Company
Exhibit
CC

ALTSCHULER 000269



# Exhibit
# Separator

ALTSCHULER 000270

Artnet                                                                                                                3/13/20, 10:26 AM

artnet price database

Company
Exhibit
DD



34                                    **Keith Haring**

                    Title              Andy Mouse #2
                    Description        Farbsiebdruck auf Papier; 95,5 x 95,5 cmSigniert
                                       links unten: Andy Warhol Datiert, sig
                    Medium             color silkscreen
                    Year of Work       1986
                    Size               Height 38 in.; Width 38 in. / Height 96.5 cm.; Width
                                       96.5 cm.
                    Edition            3/30
                    Misc.              Signed
                    Sale of            im Kinsky: Tuesday, March 25, 2014 [Lot 00260]
                                       99. Zeitgenössische Kunst
                    Estimate           20,000 - 40,000 EUR
                                       (27,559 - 55,119 USD)
                    Sold For           32,000 EUR Hammer
                                       (44,095 USD)



39                                    **Keith Haring**

                    Title              Andy mouse
                    Medium             screenprint in colors on board
                    Year of Work       1986
                    Size               Height 35.1 in.; Width 35.6 in. / Height 89.2 cm.;
                                       Width 90.3 cm.
                    Edition            3/30
                    Cat. Rais.         Littmann
                    Misc.              Signed
                    Sale of            Sotheby's London: Tuesday, April 1, 2008 [Lot
                                       00435]
                                       Old Master, Modern and Contemporary Prints,
                                       including Henri Matisse: Master Printmaker, Works
                                       from a Private European Collection and Andy Warhol
                                       & The Pop Generation
                    Estimate           10,000 - 15,000 GBP
                                       (19,829 - 29,744 USD)
                    Sold For           24,500 GBP Premium
                                       (48,582 USD)



46                                    **Keith Haring**

                    Title              Andy mouse (collab. w/Andy Warhol)
                    Medium             screenprint in colors on board
                    Year of Work       1986
                    Size               Height 38 in.; Width 38 in. / Height 96.5 cm.; Width
                                       96.5 cm.
                    Edition            3/30
                    Misc.              Signed

ALTSCHULER 000271

| | |
|---|---|
| Sale of | Sotheby's New York: Saturday, April 29, 2006 [Lot 00422] Prints |
| Estimate | 20,000 - 30,000 USD |
| Sold For | 45,000 USD Premium |

ALTSCHULER 000272

price database



| 47 | | **Keith Haring** |
|----|----|----|
| | Title | Andy mouse (collab. w/Andy Warhol) |
| | Medium | screenprint in colors on board |
| | Year of Work | 1986 |
| | Size | Height 38 in.; Width 38 in. / Height 96.5 cm.; Width 96.5 cm. |
| | Edition | 3/30 |
| | Misc. | Signed |
| | Sale of | Sotheby's New York: Saturday, April 29, 2006 [Lot 00423] Prints |
| | Estimate | 20,000 - 30,000 USD |
| | Sold For | 45,000 USD Premium |



| 54 | | **Keith Haring** |
|----|----|----|
| | Title | Andy Mouse |
| | Medium | Serigraphy |
| | Year of Work | 1986 |
| | Size | Height 38 in.; Width 38 in. / Height 96.5 cm.; Width 96.5 cm. |
| | Edition | 3/30 |
| | Misc. | Signed |
| | Sale of | Sotheby's Amsterdam: Tuesday, May 14, 1996 [Lot 00151] Modern and Contemporary Prints |
| | Estimate | 10,000 - 15,000 GLDR (5,829 - 8,744 USD) |
| | Sold For | 11,800 GLDR Premium (6,879 USD) |

ALTSCHULER 000273