**POLI, MOON & ZANE, PLLC**
Michael N. Poli (State Bar No. 006431)
MPoli@pmzlaw.com
Jeff G. Zane (State Bar No. 024172)
jzane@pmzlaw.com
2999 North 44th Street, Suite 325
Phoenix, Arizona 85018
Telephone: (602) 857-8180
Facsimile: (602) 857-7333

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas Altschuler,<br><br>   Plaintiff,<br>v.<br><br>Chubb National Insurance Company, an Indiana corporation,<br><br>   Defendant. | No. CV-21-00119-TUC-DCB<br><br>**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY** |

Pursuant to L.R.Civ. 56.1(a), Plaintiff Douglas Altschuler submits the following statement of facts in support of his motion for partial summary.

1. When Chubb issued its December 15, 2021, denial letter. Chubb described in detail how supposed misrepresentations were the exclusive basis for its refusal to pay Mr. Altschuler's Art Claim:

> Based upon Chubb National's investigation of the claims, the examination under oath testimony of the insureds and the records/information provided by the insureds to date, **Chubb National's position with respect to the claims is set forth below**.
>
> Chubb National hereby denies the silkscreens claim on the following grounds:
>
> a. That the insureds have **intentionally concealed or misrepresented material facts** with respect to the claim in that, without limitation, they represented that they owned and had possession of the insured silkscreens at the time of the alleged loss;

  b.  That the insureds **misrepresented the amount** of the silkscreens claim; and

  c.  That the insureds have **intentionally concealed or misrepresented material facts** with respect to the procurement of coverage for the silkscreens in that, without limitation, they misrepresented that they owned and had possession of the insured silkscreens at the time the policy was issued/renewed.

Exhibit 1 at 4 (emphasis added).

  2.  PSOF 2, Chubb's claims handling expert Debbie Smith in her deposition transcript, Exhibit 2 at 169:6-14:

  I don't see any evidence where the insured is intentionally lying or misrepresenting anything on the claim.

  3.  Chubb denied Mr. Altschuler's claim in a December 15, 2021 letter (the "Denial Letter") on the basis that Mr. Altschuler "intentionally concealed or misrepresented material facts." Exhibit 1, denial letter at 4.

  4.  Chubb's own claims handling expert, Debbie Smith, disputes Chubb's conclusion. In her deposition, conducted on November 11, 2022, Ms. Smith stated that, after a careful review of the entire claim record, "I do not see anything where I believe he intentionally misrepresented." Exhibit 2, Debbie Smith deposition transcript, at 179:11-12.

  5.  Mr. Altschuler is an art collector, who is known to gallery owners and artists alike. Exhibit 5, Robert Berman letter; Exhibit 8, Lisa McCollum interview notes. He purchases various pieces that catch his interest, which he then stores and rarely displays. Id. His art collection is extensive, and much of it is insured. Exhibit 20, 2008 AIG policy with renewals and updates through 2011.

  6.  One evening in 1987, Mr. Altschuler visited the B1 Gallery in Santa Monica with his girlfriend at the time, Lisa McCollum, and purchased a set of four screen prints entitled "Andy Mouse" (the "1987 Screen Prints") for $5,000. Exhibit 6, Berman letter; Exhibit 3, recorded statement at pp. 16-23; Exhibit 4, 2020 EUO at 12-15; Exhibit 8, McCollum notes; Exhibit 19, Berman deposition at 13:8-14:23; 43:10-44:21.

7. The Andy Mouse series was created by Keith Haring, but in the style of (and in collaboration with) Andy Warhol, and were signed by both artists. The art was shipped directly to Mr. Altschuler's parents' house in Tucson, Arizona, a safe and dry storage location where Mr. Altschuler sent all his art and other items for over twenty years as he traveled and moved for work. Exhibit 4, EUO at 15-18; Exhibit 19, Berman transcript at 46:15-47:1.

8. According to Mr. Berman, art collectors frequently store art without displaying their collections, which are more valuable when not removed from the original box. Exhibit 19, Berman transcript at 68:12-21; *see also id*. at 21:17-22:2; 24:14-25.

9. Soon after that, Mr. Altschuler met Keith Haring in Phoenix. He knew Mr. Haring personally from the New York art world and socialized with him on occasion. Mr. Altschuler expressed his genuine love for the Screen Prints, and asked Mr. Haring if he had additional screen prints from that set. Mr. Haring told him that he did, and Mr. Altschuler purchased another set for $10,000 (the "1989 Screen Prints")(collectively, the 1987 and 1989 print sets are the "Screen Prints"). Exhibit 3, recorded statement at pp. 16-23; Exhibit 4, 2020 EUO at 33-41.

10. As Mr. Altschuler stated to Chubb at the inception of the claim, he does not recall if either of the Screen Prints he purchased were an "edition of 30" (a limited edition of 30 prints) or an "artists' proof" (or "AP") that Mr. Haring would have kept for his own use or sale. Exhibit 13, claims log at 0002159 ("I believe the edition which is subject to the claim is 3/30. It may have abo been an AP"); Exhibit 4 at 89 ("I said to her I thought it was 3 of 30 but I was not 100% positive. I said I don' t know whether it's 3 of 30 or an AP.").

11. As Chubb's provenance consultant concedes, this information has no effect on the value of the Screen Prints, and was therefore not significant to an afficionado such as Mr. Altschuler. Exhibit 9, John Chvostal opinion of value at 00597 ("during the course of my research, I found no evidence that an item's numerical place within an edition sequence (i.e. a high or low serial number) nor its association with a particular edition

3

1   group (i.e. works from the numbered series vs. printer's proof) affects its market value.");
2   Exhibit 30, 45:4-10.

3       12.    As with the 1986 Screen Prints, Mr. Altschuler stored the 1988 Screen
4   Prints in Arizona. Exhibit 4, at 40-41.

5       13.    In 2001, Mr. Altschuler traded one of the Screen Prints for a piece from a
6   different artist through the James Corcoran Gallery, from which he periodically purchased
7   art. Exhibit 3, recorded statement at 18; Exhibit 4, EUO at 41-43; Exhibit 7, Corcoran
8   emails and receipt re exchange.

9       14.    Mr. Altschuler informed Chubb about this trade at the beginning of the
10  Claim. Exhibit 3, recorded statement at 18-20.

11      15.    The Screen Prints appreciated sufficiently from the $5,000 purchase price to
12  merit insurance, and Mr. Altschuler added the Screen Print to his AIG property policy in
13  2008. His insurance agent requested proof of the Screen Print's value, and Mr. Altschuler
14  obtained and sent over an Artnet description of recent sales (the "2008 Valuation").
15  Exhibit 21, 2008 Artnet valuation; Exhibit 26, email string; Exhibit 31.

16      16.    The 2008 Valuation contained information about prior sales, which included
17  edition 3 of 30 to different parties. Mr. Altschuler insured the Screen Print at the 2008
18  Valuation amount of $250,000. Id. He ultimately changed carriers to Chubb, and placed it
19  on the Chubb policy (the "Policy") in 2016. Exhibit 13, Chubb claims log at 02426;
20  Exhibit 14, Chubb Policy at 00028; Exhibit 32.

21      17.    Mr. Altschuler has periodically obtained appraisals of certain works from
22  his gallery. Exhibit 12, AIG Policy from 2011 obtained by Chubb during investigation;
23  Exhibit 20, 2008 AIG policy with renewals through 2011.

24      18.    Mr. Altschuler obtained an appraisal in 2018 from a gallery owned by
25  Elaine Efstathiou. He described the piece to her, telling her that he was uncertain about
26  whether it was an AP or a numbered edition. Because that information is irrelevant as to
27  value, he guessed at "3/30" and Ms. Efstathiou's daughter (Dina Brown) prepared a
28

standard "desktop" valuation for the Screen Print in the amount of $1.5 million. Exhibit 30, Brown transcript at 45:4-10; 46:5-13; 50:11-16; Exhibit 4 at 89.

19. Mr. Altschuler submitted Ms. Brown's valuation to his insurance agent to increase his coverage, as he had with AIG in 2008. Exhibit 28, email string; Exhibit 29 Brown valuation.

20. In December 2019, while visiting his parents, Mr. Altschuler recognized that his Screen Print was missing (he had seen it during his last visit). Exhibit 4, 2020 EUO transcript at 43:10-14. He filed an insurance claim on January 19, 2020 (the "Art Claim"). PSOF 19, Exhibit 13 at 02434.

21. Chubb immediately directed his claim to its Special Investigations Unit ("SIU"). SIU retained an investigator for the claim within minutes of receiving it, and initiated a campaign seemingly calculated only to deny coverage. Exhibit 13, at 02345; 02327; 02441; 02350.[1]

22. Over the next two years, Chubb retained an attorney, an investigator, and a provenance expert. It conducted phone interviews, a recorded statement and two examinations under oath, and constantly demanded financial and other documents. Exhibit 13, claims log at 02343-4; Exhibit 4, 2020 EUO; Exhibit 23, 2021 EUO.

23. Ms. McCollum, with whom he had parted ways in 1995, confirmed that he purchased a Screen Print from the B1 Gallery around 1986. Exhibit 8.

24. Robert Berman, B1 Gallery's owner, wrote a letter to Chubb confirming that Mr. Altschuler had purchased the Screen Print from him. Exhibit 5.

25. AIG confirmed that Mr. Altschuler had insured his Screen Print with them, for $250,000, beginning in 2008. Exhibit 13, claim notes at 00803.

26. Chubb obtained an appraisal of the Screen Print, which confirmed its value at $1,500,000. Exhibit 13 at 02145 (claim log entry by SIU, "Rvwd report rcvd from

---

[1] Several months later, Mr. Altschuler also submitted a claim for a missing Rolex watch, which is not the subject of this summary judgment motion.

Gurrs Johns; same confirms replacement cost value for the claimed is $ 1,500,000 at time of the loss.").

27. Mr. Altschuler did not suffer from financial problems, which would typically motivate a policyholder to risk prison time for insurance fraud. Exhibit 13 at 02210-02215; Exhibit 15, 01411-01412.

28. Mr. Altschuler's claim should have been paid at this point. Chubb's SIU manager, Daniel Jaeger, admitted that, when Chubb fails to prove fraud, the claim should be paid:

> A: If SIU conducts an investigation, and even though there are stillsuspicions -- but there's no evidence that rises to the level of fraud, then the claim would be paid.
>
> Q: Okay. So you agree with the statement, based on your training and experience, including 28 years in SIU, namely if SIU cannot prove fraud, even though the claim still seems suspicious, the claim should be paid; is that right?
>
> [Form objection]
>
> A: Again, Mr. Poli, if there are indicators of suspicion and an investigation is conducted and the investigation concludes that even though there's still suspicion, there's not fraud – or provable fraud, the claim will be paid.··So to that extent, I agree with you.

Exhibit 22, at 46:6-23.

> Q: [E]arly in this deposition, when we discussed it, you agreed with the language in my expert's rebuttal report, which I believe came from the [Associate In Claims] coursework, that if suspicions cannot be proven with hard evidence, even if the suspicions still remain, the SIU team is supposed to pay the claim; would you agree with that?
>
> A: I would agree with that[.]

*Id.*, at 219:19-220:4. See also Exhibit 27, Skipton report at 5 ("The Associates in Claims course entitled Property Claim Practices states ··Claims are paid when the SIU investigation proves that the claim is legitimate. or when SIU believes it cannot prove fraud, even though the claim still seems suspicious.").

29. For example, in describing the basis for its decision to scrutinize Mr. Altschuler's art claim, Chubb's SIU pointed to the increase in its appraised value from $250,000 to $1.5 million. Exhibit 13, claim notes at 02426.

6

30. It obtained a second opinion from Chubb's own appraiser, Gurr Johns, which confirmed the $1.5 million valuation. Exhibit 13, claim notes at 02145; Exhibit 18.

31. Unhappy with the results, Chubb disregarded this information, and obtained another valuation, which determined the value to be $1 million, based on a prior sale of an identical piece in less than perfect condition. Exhibit 9, Chvostal OOV; Exhibit 13 at 01871.

32. Mr. Altschuler had told neither AIG nor Chubb that the Screen Print was a specific edition number, because he did not know. Exhibit 13 at 02157-02160; Exhibit 4, EUO at 89:23-25.

33. This "3/30" number only appears on an appraisal he obtained from Dina Brown, although he only spoke to Ms. Brown's mother. As Mr. Altschuler described to Chubb during his first examination under oath:

> I said to, I forgot the mother's name, the mom or Dina [Brown] that I believe it was 3 of 30. I wasn't 100% sure. It could it's possible. It could also be an AP. I said I'm not sure. I have not seen them since the time of purchase. However, there was no discussion about this because whether the number is one, sir, or the number is 30 or anything in between it's completely irrelevant to the value which one would put on an appraisal.

Exhibit 4 at 94:16-24; *see also* Exhibit 23, 2021 EUO at 236:4-22.

34. In John Chvostal's provenance report, prepared at the investigation's conclusion on November 8, 2021, he provided five "opinions," none of which describes evidence of any misrepresentation by Mr. Altschuler that was not predicated on the inaccurate idea that Mr. Altschuler had asserted his ownership of 3/30. Exhibit 24, Chvostal report at 4-6.

35. Chubb's Denial Letter cited the Policy's Fraud and Concealment provision: "We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss." Exhibit 14 at 000073.

36. A May 19, 2008 email between Mr. Altschuler and the James Corcoran Gallery, in which Mr. Altschuler writes "Do you have any idea what the set of Andy

Mouse 4piece Harring/Wharol [sic] is worth? I sold one to Jim a few years ago, and have one set left." Exhibit 25.

37. An August 6, 2008 email exchange between Mr. Altschuler and his insurance agent, in which the agent requests a formal appraisal for the Screen Print, and the August 6, 2008 valuation letter from James Corcoran Gallery, valuing the Screen Print at $250,000. Exhibit 26.

38. Information provided by the James Corcoran Gallery pursuant to a subpoena, including valuation information about the Screen Print that had been sent to Mr. Altschuler in 2008, and clearly indicates that "3/30" had been broken into four pieces and sold separately. Exhibit 21.

39. Multiple appraisals performed by the James Corcoran Gallery appraisal of various pieces of art Mr. Altschuler owned. Exhibit 11.

40. Mr. Altschuler's finances were such that, as a matter of common sense, he would not risk jail time for insurance fraud. Exhibit 15 at 01411-01412.

41. Chubb selected Debbie Smith as its claims handling expert in this matter, and she certainly has the experience for this role. Ms. Smith retired from State Farm after 33 years, in which she supervised ten team managers, each of which in turn managed eight to ten adjusters. Exhibit 2 at 33:15-34:7.

42. In that capacity, Ms. Smith described what she agreed to be the fundamental principles of claims handling – a fair and prompt investigation:

> I've always believed that it is imperative that we do a prompt, balanced, fair investigation and look at all the facts and all the information that is provided to us.

Exhibit 2 at 64:1-4.

> I always trained my claim representatives and team managers to be objective of insurances, to always try to find coverage under any loss that comes into us to do the investigation. Unfortunately, sometimes we have to say no, but our priority goal was always to try to find coverage.

*Id.* at 64:18-23.

Ms. Smith provided opinions with regard to Chubb's handling of the Claim that were based on her careful review of the entire claims file:

> Q: [Y]ou've gone through this entire claims file, right, Ms. Smith?
>
> A: Correct.

*Id.* at 103:14-16

> Q: And the opinions and the testimony you've given today is based on your entire involvement in this project, including reviewing in detail the thousands of pages in that claims file, right, based in part on that?
>
> A: Yes. I reviewed all the pages that I -- thousands of pages of documents that I was given, the claim file and the reports.

*Id.* at 181:19-25.

43. Ms. Smith could not identify any motive for Mr. Altschuler to risk prison time over insurance fraud. To the contrary, she stated that "I would say that based on the financial documents I reviewed, they are -- have been blessed tremendously and they appear to be very affluent." Exhibit 2 at 79:22-25. *See also id.* at 105:4-5: "In this particular case, **I don't think anybody believes the insured had a motive**." (emphasis added).

44. Based on her review of Chubb's complete claim file, Ms. Smith concluded that Chubb had found no evidence that Mr. Altschuler intentionally concealed or misrepresented any material fact with respect to the insurance claim. To the contrary, she offered her opinion that "**I don't believe that the insured is lying**." Exhibit 2 at 142:20 (emphasis added). Ms. Smith elaborated on her opinion, confirming that she identified no evidence that Mr. Altschuler had intentionally concealed or misrepresented facts to Chubb:

> I don't believe anybody thinks that the insured had a motive to present a claim saying that he had something that he didn't have. I don't think there was a motive involved at all. A lot of your questions are centered around what motive would the insured have to present a claim that could potentially be to insurance fraud and criminal behavior that could go to jail and on and on. **I'm saying in my professional opinion, I don't think anybody believes that the insured had a motive here to commit insurance fraud.**

Exhibit 2 at 106:10-19 (emphasis added).

> Q: You also don't see any evidence in the claims file that the insured intentionally concealed or misrepresented his ownership or possession of the art? You don't see any evidence like that in the claims file, either, correct?
>
> [Form objection]
>
> Ms. Smith: **I don't see any evidence where the insured is intentionally lying or misrepresenting anything on the claim.**

*Id.* at 169:6-14 (emphasis added).

> Q: You see nothing in this record and in your work on this to support the idea that Mr. Altschuler intentionally misrepresented the value of the art claim? You see nothing to support that, correct?
>
> [Form objection]
>
> Ms. Smith: **I do not see anything where I believe he intentionally misrepresented.**
>
> Q: The value of the art claim?
>
> [Form Objection]
>
> Ms. Smith: The claim.

*Id.* at 179:5-15 (emphasis added).

> Ms. Smith: I don't believe that I saw anything in the claim file where the insured is intentionally misrepresenting any part of the claim.
>
> Q: Including -- and we're talking about the art claim. Including, but not limited to the amount of the art claim, correct?
>
> [Form objection]
>
> Ms. Smith: **Yeah. My answer was any part of the claim. That would include the whole claim.**

*Id.* at 180, lines 12-22 (emphasis added).

45. Chubb predicated its denial on its accusation that Mr. Altschuler supposedly concealed or misrepresented material facts. Mr. Jaeger wrote in Chubb's claims file, "On 12/14/21, these claims were discussed with Sr. Claims Leadership and authority was granted to deny the claim for the Keith Haring silkscreens **based on violation of the Concealment or fraud provision of the policy**." Exhibit 13, 000036 (emphasis added).

46. Chubb's SIU claims manager at the time, Karen Moore had handled the case since it was first reported, she had assigned multiple investigative personnel, and she worked on the claim in Chubb's SIU since the inception. Ms. Moore participated in the decision to deny the Art Claim. Exhibit 13, at 000070, 02441.

47. Ms. Moore agreed that the denial decision was based on stated during her deposition that Chubb denied the Art Claim based on its supposed determination that Mr. Altschuler had misrepresented material facts.

> Q: [T]he denial letter and the coverage position makes clear that you do believe there was potential concealment or fraud in this claim; correct?
>
> A: Agreed.
>
> Q: And that was the basis for the denial in part?
>
> [Form Objection]
>
> Q: And that was the basis for the denial -- [Form Objection] -- Karen?
>
> A: It was outlined in the denial letter, but, yes, those were some of the reasons in which the claim was denied.
>
> Q: And what were the other reasons?
>
> A: The claim -- that he made misrepresentations regarding the ownership. He obtained an appraisal for an item that he didn't have and submitted that, representing that he did have the item and that the value was as submitted. And he concealed that he had sold the item.
>
> Q: Well, those are all part of the fraud -- those are all a part of concealment or fraud; correct?
>
> A: Yes, as stated in the denial letter. I was representing I agreed with the denial letter.
>
> Q: Okay. And that was the basis for the denial, of course?
>
> A: Yes.

Exhibit 16 at 161:4-162:10.

48. Justin Skipton, Mr. Altschuler's claim handling expert, also concluded that Chubb had failed to find any evidence to support a coverage denial based on fraud:

> It is my opinion that Chubb National Insurance failed to prove any intentionally concealed or misrepresented material facts with respect to the

implied allegation that the Insured did not own or possess the subject art work at the time of loss or when he procured the property.

Exhibit 27, Skipton report at 8.

RESPECTFULLY SUBMITTED this 21st day of July 2023.

**POLI, MOON & ZANE, PLLC**

By  /s/ Michael N. Poli
Michael N. Poli
Jeff G. Zane
2999 North 44th Street, Suite 325
Phoenix, Arizona 85018
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Sullivan
Jonathan Y. Yu
BROENING OBERG WOODS & WILSON, P.C.
2800 N. Central Avenue, Suite 1600
Phoenix, Ariona 85004
rts@bowwlaw.com
jyy@bowwlaw.com
*Attorneys for Defendant*

　　　　　　　　/s/ Linda Gundelach