# Exhibit 12

**File Note Title:**SIU-email from Mark Recht
**Create Date:**9/18/2020 1:44 PM
**Author:**FRED WHITE
**File Note Text:**
**The below email was sent via Zix Message Center, and it was password protected. I was not able to attach the email.**


**NOTE:**

**The Warhol/Haring prints are #170 on the schedule, and were insured for $250,000.**


Fred,


Attached is what we were able to find for this client which includes the 2010-11 renewal through Chartis/AIG which was the last term before it was moved to Chubb.  In addition we have include the only appraisal we have on file for the named gallery dated 7/18/2008.


Thanks,


Mark


---

**Mark  Recht**
Alliant Private Client

**\*Important claims and payment information due to COVID-19\***

**Claims:** Any notice of claims should be sent to your account manager directly.

**Payments:** Due to the potential delay in mailing services, please contact your Account Executive on how to remit payment to your insurance carrier and/or Alliant Insurance Services.

32 Old Slip
New York , NY 10005

D   212-504-1877
O   800-221-5830
F   212-952-0896

alliantprivateclient.com

---

# PRIVATE CLIENT GROUP

**CHARTIS** 

Chartis Property Casualty Co
Name of Issuing Company

Renewal Declarations Page

## Private Collections Declarations Page

Your Declarations Page shows at a glance the coverage you have and your premium. Your Declarations Page is part of your policy. Please read your policy carefully, including your Declarations Page and any attached Endorsements, for a description of your coverage .

**Policy Number:**
PCG 0005596761

**Policy Period:** 07/18/2010  - 07/18/2011
At 12:01 A.M. standard time at your mailing address shown below

**Name of Insured and Mailing Address:**

Douglas Altschuler
535 West 23rd Street
Apt SPH 2N
New York, NY 10011

**Agency Name, Address, Phone # & Code:**

Frank Crystal & Co Inc.-NYC
Financial Square
32 Old Slip, 17th Floor
New York, NY 10005

(212) 344-2444                    0050055

## YOU WILL BE BILLED SEPARATELY FOR ANY PREMIUM DUE.

The kind of losses that are covered and any special limits or deductibles that apply are explained in detail in your Policy.

### Summary of Coverage

| Class | Scheduled Items Amount of Coverage | Blanket Items Amount of Coverage | Blanket Items Single Article Limit | Premium |
|---|---|---|---|---|
| JEWELRY | $174,956 | | | $2,798.00 |
| JEWELRY | | $50,000 | $50,000 | $1,625.00 |
| FINE ARTS | $5,585,252 | | | $6,702.00 |
| COLLECTIBLES | $33,208 | | | $133.00 |

**Total Premium:**                    $11,258.00

**ENDORSEMENTS ATTACHED TO THIS POLICY:**
PCP (03/06), PCP-NY-CPCC (12/09), PCG-GLBA (03/06), PCP-AENY (03/06)

PCP-DEC (10/04)

CHUBB-Altschuler/ROLEX & ART 0000885
092020001456

# Schedule of Items

Endorsement Effective Date : 07/18/10                    Policy Number: PCG 0005596761

## JEWELRY

| Item Description | Amount Insured |
|---|---|
| 1  LADIES DIAMOND ENGAGEMENT RING.  EMERALD CUT DIAMOND WEIGHING 6.83CTS, COLOR J, CLARITY VS1, ON PLATINUM SETTING. | $174,956 |

**TOTAL JEWELRY AMOUNT COVERED** $174,956

## FINE ARTS

| Item Description | Amount Insured |
|---|---|
| 1  LELEU-STYLE SCONES (12:$3500/PAIR)(OPHIR GALLERY) | $21,000 |
| 2  CHANDELIER - RITA BUCHEIT (VIENNA SECESSION) | $16,000 |
| 3  CAGAN CHAIR (CHARLES BROWN) | $13,500 |
| 4  HAND BLOWN GLASS VASE (FUGA-VERTICAL RODS) | $10,200 |
| 5  DINING CHAIRS (6) | $10,000 |
| 6  DINING TABLE | $7,500 |
| 7  HAND BLOWN GLASS VASE (NASON-SILVER FOIL) | $7,225 |
| 8  ENGLISH CHEST (T. ANTORINO) | $7,000 |
| 9  CHINESE RUG | $7,000 |
| 10  HAND-BLOWN VASE (FUGA-SCATTERED MURRHINES) | $6,375 |
| 11  HAND BLOWN GLASS VASE (RADI-GOLD FOIL) | $6,375 |
| 12  HAND BLOWN GLASS VASE (RADI-SILVER FOIL) | $6,375 |
| 13  GLASS VASE (SPRINGER-APPLIED COILS) | $4,000 |
| 14  HANS WEGNER CHINA CHAIRS (2:$2000) | $4,000 |
| 15  FRENCH CLOCK FACE (T. ANTORINO) | $4,000 |
| 16  PAIR OF MIRRORS (T. ANTORIO) | $4,000 |
| 17  LEATHER ARMY CHAIR | $3,800 |
| 18  GLASS VASE (SEGUSO-APPLIED ELEPHANTS) | $3,500 |
| 19  MUSIC STAND - (GALERIE DE BEYRIE) | $3,500 |
| 20  FINN JUHL ARMCHAIRS (2:$1500) | $3,000 |
| 21  PAIR OF STEEL PEDESTALS (T. ANTORINO) | $3,000 |
| 22  ALUMINUM LAMPS (T. ANTORINO) | $2,500 |
| 23  LEATHER CLUB CHAIR | $2,400 |
| 24  HANS WEGNER SOFA | $1,800 |
| 25  FRENCH SCONCE | $1,480 |
| 26  HAND BLOWN GLASS VASE (SEGUSO-GOLD FOIL) | $1,000 |
| 27  CLASS LAMP - MID CENTURY CZECH | $600 |
| 28  LAMP | $295 |
| 29  STAINLESS STEEL SCULPTURE BY JOHN MCCRACKEN: "ALPHA 5", 1988 | $125,000 |
| 30  STAINLESS STEEL SCULPTURE BY JOHN MCCRACKEN, "ALPHA 6", 1988. | $125,000 |

## Schedule of Items

Endorsement Effective Date : 07/18/10                    Policy Number: PCG 0005596761

| | | |
|---|---|---|
| 31 | CHARLES ARNOLDI. UNTITLED (DIPTYCH), 1980. ACRYLIC & FLASH ON CANVAS. 84 x 50 INCHES. | $120,000 |
| 32 | BILLY AL BENGSTON. "HONOLULU WATERCOLOR". 1979. WATERCOLOR ON PAPER. 29 x 29 INCHES. | $20,000 |
| 33 | BILLY AL BENGSTON "SONOYTA DRACULA". 1972. ACRYLIC ON CANVAS. 8 x 8 FEET | $300,000 |
| 34 | JOE GOODE. "TAKAKKAW". 1989. OIL ON WOOD. 90 x 21 INCHES. | $45,000 |
| 35 | BILLY AL BENGSTON "EARP". 1961. OIL ON BOARD. 12x12 INCHES. | $75,000 |
| 36 | DINING TABLE BY RON WEBER, AMERICAN 1960'S - DINING TABLE 60. | $7,500 |
| 37 | 6 "PLUNGING NECKLINE" DINING CHAIRS BY PAUL FRANKEL, AMERICAN. DINING CHAIRS 50 | $10,000 |
| 38 | HANDBLOWN GLASS VASE BY ANSOLO FUGA FOR A. VE.M- FUGA60 | $12,000 |
| 39 | HANDBLOWN GLASS VASE BY ANSOLO FUGA FOR A. VE. M- FUGA60 | $7,500 |
| 40 | HANDBLOWN GLASS VASE BY ALDO NASON -NASON3 | $8,500 |
| 41 | HANDBLOWN GLASS VASE BY GIULLO RADI (GOLD FOIL) - RADI2 | $7,500 |
| 42 | HANDBLOWN GLASS VASE BY GIULIO RADI (SILVER FOIL) - RADI2 | $7,500 |
| 43 | GLASS VASE WITH HANDBLOWN APPLLES ELEPHANTS BY SEGUSO-SEGUSO9 | $3,500 |
| 44 | HANDBLOWN GLASS VASE BY KARL SPRINGER- SEGUSO10 | $4,000 |
| 45 | HANDBLOWN GLASS VASE BY SEGUSO-GLASS-C | $1,000 |
| 46 | "SHEAF-OF-WHEAT" SIDE TABLE BY EDWARD WORMLEY-ENDTABLE39 | $3,500 |
| 47 | LARGE LANTERN CHANDELIER BY FONTANA ARTE- CHANDELIER76 | $7,500 |
| 48 | SET OF 4 CANDLE HOLDERS BY KARL SPRINGER- ACCESSORY C | $3,500 |
| 49 | 6 BAR STOOLS IN MOLDED ACRYLIC, AMERICAN 1970'S | $6,000 |
| 50 | CHANDELIER WITH SUSPENDED CAST GLASS TUBES, MURANO ITALY 1960'S | $3,500 |
| 51 | LARGE WALL-HUNG MIRROR, BY KARL SPRINGER- MIRROR64 | $10,000 |
| 52 | 4 DOOR COMMODE, FRENCH 1960'S-SIDEBOARD71 | $15,000 |
| 53 | SOFA NO. 5136 BY EDWARD WORMLEY, AMERICAN 1950'S - SOFA38 | $10,000 |
| 54 | SECTIONAL SOFA, AMERICAN 1940'S- SOFA39 | $7,000 |
| 55 | SIDE TABLE BY KARL SPRINGER- ENDTABLE66 | $6,000 |
| 56 | PAIR OF THEBES BENCHES BY EDWARD WORMLEY, AMERICAN 1950'S- BENCHES2 | $5,100 |
| 57 | BOX WITH LID BY KARL SPRINGER, AMERICAN 1980'S- ACCESSORY51 | $2,125 |
| 58 | PAIR OF CAPRICORN LOUNGES BY VLADIMIR KAGAN, AMERICAN 1960'S - OUTDOORSET2 | $4,250 |
| 59 | HANDBLOWN GLASS VASE FROM "ANSE VOLANTE" BY GIORGIO FERRO- AVERN6 | $3,000 |
| 60 | HANDBLOWN GLASS VASE BY ANSOLO FUGA FOR AVEM, 1950-60'S - AVERN7 | $7,500 |
| 61 | HANDBLOWN GLASS VASE - BLUE AND WHITE BANDS AND GOLD FOIL BY ANSOLO FUGA -AVERN7 | $7,500 |
| 62 | HANDBLOWN GLASS VASE- BLACK AND BLUE BANDS BY ANSOLO FUGA- FUGA18 | $6,000 |
| 63 | CYLINDRICAL VASE BY ROSEANNA TOSO, C.1960- FATELLITOSO1 | $10,000 |
| 64 | HANDBLOWN GLASS VASE BY ERMANO TOSO, FATELLITOSO2 | $10,000 |
| 65 | "MILLEPUNTI" VASE BY FRATELLI TOSO- FRATELLITOSO3 | $10,000 |
| 66 | PAIR OF VASE, 1 RED AND 1 BLUE BY FRATELLI TOSO -FRATELLITOSO3 | $12,000 |
| 67 | WALL-MOUNTED MIRROR BY KARL SPRINGER, AMERICAN 1980'S- MIRROR72 | $2,200 |
| 68 | PAIR OF LOUNGE CHAIRS IN BLACK LEATHER FROM THE GERMAN EMBASSY IN LONDON-LOUNGECHAIR62 | $10,000 |
| 69 | 1960'S COLLECTION OF 10 PIECES OF GLASS BY VITTORIO FERRO- GLASS57 | $20,000 |

CHUBB-Altschuler/ROLEX & ART 0000887

## Schedule of Items

Endorsement Effective Date : 07/18/10                                    Policy Number: PCG 0005596761

| 70 | SCULPTURAL COFFEE TABLE BY DAVID WYDER, C. 1960- COFFEETABLE12 | $6,000 |
|----|----|----|
| 71 | PAIR OF BENCHES ON CASTERS -OTTOMANS2 | $3,500 |
| 72 | STARBURST CHANDELIER, AMERICAN 1950'S - CHANDELIER88 | $6,000 |
| 73 | LOUNGE CHAIR NO. 1427A BY HARVEY PROBBER- LOUNGECHAIR42 | $3,500 |
| 74 | LOW CHEST OF DRAWERS BY DAVID WYDER- CHESTOFDRAWERS74 | $5,000 |
| 75 | FLOOR LAMP WITH 5 HANGING SHADES, ITALIAN 1950'S -FLOORLAMP58 | $6,000 |
| 76 | LARGE 3-TIER CHANDELIER WITH SUSPENDED ENCLOSED TEXTURED GLASS - CHANDELIER85 | $6,500 |
| 77 | CHANDELIER WITH SUSPENDED CAST GLASS TUBES- MAZZEGA- CHANDELIER82 | $3,500 |
| 78 | PAIR OF LOUNGE CHAIRS IN STEEL BY ARNE NORELL, SWEDEN- LOUNGECHAIR39 | $8,500 |
| 79 | LARGE CERAMIC TABLE LAMP BY SAN PAOLO- TABLELAMP12 | $3,500 |
| 80 | TELEPHONE TABLE BY KARL SPRINGER, 1980'S - OCCASIONALTABLE34 | $3,500 |
| 81 | TIBETAN RUG/BROWNS AND GRAYS - RUG10 | $6,000 |
| 82 | LARGE WALL-HUNG MIRROR WITH FRAME BY KARL SPRINGER - MIRROR67 | $10,000 |
| 83 | PAIR OF OCCASIONAL TABLES IN TEAK BY BROWN SALTMAN- OCCASIONALTABLES1 | $3,500 |
| 84 | TALL CHEST IN MAHOGANY WITH 2 DOORS BY HARVEY PROBBER- FURNITURE-C | $5,500 |
| 85 | NEPALESE RUG - GREEN AND GOLD- RUG11 | $5,000 |
| 86 | OPEN-SIDED TABLE WITH CERAMIC TOP BY VLADIMIR KAGAN- ENDTABLE65 | $4,000 |
| 87 | PAIR OF BEDSIDE TABLES IN OLIVE BURL WITH SINGLE DRAWER - NIGHTSTANDS36 | $3,500 |
| 88 | PAIR OF HAND-BLOWN GLASS TABLE LAMPS, BLACK GLASS BY FRATELLI TOSO-TABLELAMPS140 | $6,000 |
| 89 | HAND BLOWN GLASS BY ANSOLO FUGA- FUGA60- 20 PIECES | $130,000 |
| 90 | HAND BLOWN GLASS FROM "ANSE VOLANTE" - 20 PIECES- AVERN6 | $60,000 |
| 91 | LARGE HAND BLOWN GLASS VASE, BROWN - FRATELLITOSO5 | $15,000 |
| 92 | HIGH BACK CLUB CHAIR WITH MAHOGANY BASE- LOUNGECHAIR45 | $3,500 |
| 93 | 4 POSTER BED IN POLISHED CHROME- BED1 | $4,000 |
| 94 | DAYBED WITH BASE IN WALNUT BY PAUL TUTTLE- DAYBED8 | $7,500 |
| 95 | CEILING MOUNTED FIXTURE WITH GLASS TUBES - CHANDELIER92 | $3,500 |
| 96 | ABSTRACT LIMESTONE SCULPTURE BY NAOMI FEINBERG- ART-C | $5,000 |
| 97 | PAIR OF CHROME COFFEE TABLES WITH BRASS ACCENTS BY WILL RIZZO - COFFEETABLE117 | $7,500 |
| 98 | FRENCH 1960'S "HALF ROUND MOLDING MIRROR" IN HIPPO DESIGN BY KARL SPRINGER-MIRROR81 | $15,000 |
| 99 | HAND-BLOWN GLASS BIRD BY ALESSANDRO PIANON -GLASS59 | $3,500 |
| 100 | MAGAZINE TREE MODEL NO. 4765 IN BIRCH TRUNK BY EDWARD WORMLEY- MAGAZINETABLE3 | $6,000 |
| 101 | TELEPHONE TABLE IN BLACK LACQUER WITH TOPS COVERED IN SHAGREEN BY KARL SPRINGER | $4,500 |
| 102 | HAMMERED METAL BOX SCULPTURE BY HERVE WAHLEN - ART-C | $6,000 |
| 103 | CAST BRONZE SCULPTURE WITH WOOD BASE STAMPED LAMDOWSKI FONDEUR -ART -C | $6,000 |
| 104 | CHEST OF DRAWERS NO. 5272A WITH 12 DRAWERS IN MAHOGANY -CHESTOFDRAWERS76 | $12,000 |
| 105 | CHAN COFFEE TABLE IN PEWTER AND BRONZE BY PHILIP AND KELVIN LAVERNE-FURNITURE-C | $8,500 |
| 106 | CLEAN LINE SOFA NO. 1129 WITH BOXY SIDE BOLSTERS AND MAHOGANY BASE BY HARVEY PRODDER- SOFA47 | $8,500 |
| 107 | 2 HAND-BLOWN GLASS ASTRALE BOTTLE DIMPLED WITH STOPPER BY ANSOLO FUGA- FUGA60 | $17,000 |
| 108 | HAND-BLOWN GLASS ASTRALE PLATES AND GOBLETS BY ANSOLO FUGA- FUGA60 | $8,000 |

# Schedule of Items

Endorsement Effective Date : 07/18/10                    Policy Number: PCG 0005596761

| | | |
|---|---|---:|
| 109 | PAIR OF FULLY UPHOLSTERED BENCHES IN THE MANNER OF DAVID HICKS- BENCHES4 | $4,000 |
| 110 | BENCH UPHOLSTERED AND COVERED IN LEATHER BY KARL SPRINGER- BENCH46 | $4,000 |
| 111 | ELEGANT CHANDELIER IN BRUSHES NICKEL BY TOMMI PARZINGER- CHANDELIER94 | $15,000 |
| 112 | TABLE SERVICE FOR 12 BY WARD BENNETT- ACCESSORY-C | $800 |
| 113 | TABLE SERVICE FOR 12 ASSORTED CUT GLASS STEMWARE BY ROSENTHAL- ACCESSORY-C | $3,500 |
| 114 | SET OF ETCHED GLASSWARE WITH PITCHER, 1960- ACCESSORY-C | $800 |
| 115 | STERLING SILVER FLATWARE SERVICE FOR 12 BY JENS QUITSGAARD FOR DANSK- ACCESSORY-C | $10,000 |
| 116 | PAIR OF THICK MOLDED ACRYLIC "Z" LOUNGE CHAIRS BY KARL SPRINGER - LOUNGECHAIR65 | $8,000 |
| 117 | CLASSIC CHAISE NO. 1708 IN EBONIZED WALNUT BY T H ROBSJOHN-GIBBINGS FOR WIDDICOMB - CHAISE6 | $7,500 |
| 118 | JONATHAN BOROFSKY "FOOTPRINTS". 1986. PAIR. 2 SCREENPRINTS, EACH 69"x47". EACH EDITIONS OF 35, EACH #11/35. GEMINI ID NO. JB86-5165L AND 5165R | $10,000 |
| 119 | SAM FRANCIS. "SPECK". 1971. 5-COLOR LITHOGRAPH, 34"x46 1/4". EDITION OF 42, AP IV. GEMINI ID NO. SF71-410 | $16,000 |
| 120 | SAM FRANCIS. "UNTITLED". 1986. 36-COLOR SCREENPRINT, 84"x60 1/4". EDITION OF 56.GEMINI ID NO. SF86-5169 | $30,000 |
| 121 | ELLSWORTH KELLY. "CONCORDE IV (STATE)". 1982. 1-COLOR AQUATINT, 34 1/2"x25 7/8".EDITION OF 18, #10/18 FRAMED. GEMINI ID NO FK81-3061A | $6,500 |
| 122 | ELLSWORTH KELLY "COLORED PAPER IMAGE IX (FOUR GREYS WITH BLACK II)". 1976. COLORED AND PRESSED PAPER PULP. 46 1/2"x32 1/2". EDITION OF 10. PUBLISHED BY TYLER GRAPHICS. | $20,000 |
| 123 | ELLSWORTH KELLY. "MOMA PRINT". 1994. 1-COLOR LITHOGRAPH. 25 3/4x30". EDITION OF30, #12/30. GEMINI ID NO FK94-1374 | $8,000 |
| 124 | ROY LICHTENSTEIN "MODERN ROOM". 1991. LITHOGRAPH/WOODCUT/SCREENPRINT. 56"x80 3/4". EDITION OF 60, #31/60. GEMINI ID NO. RL90-1225 | $80,000 |
| 125 | KEN PRICE "MING". 1999. FIRED AND PAINTED CLAY. 7x8 1/2 x5 1/4. EDITION OF 25, 314. GEMINI ID NO. KP98-2184 | $9,000 |
| 126 | KEN PRICE "BOLIVAR". 1999. FIRED AND PAINTED CLAY. 7 1/4x8x6. EDITION OF 25, #7.GEMINI ID NO. KP98-2183 | $9,000 |
| 127 | ROBERT RAUSCHENBERG "SLING-SHOTS LIT #8". 1985. WOODEN LIGHTBOX ASSEMBLAGE WITHLITHOGRAPHY AND SCREENPRINTING ON MOVEABLE MYLARS AND SAILCLOTH. 84 1/2" x 56 1/4" x 12 1/2". EDITION OF 25, #16. GEMINI ID NO. RR84-1114 | $110,000 |
| 128 | ED RUSCHA "MIRACLE". 1999. 1-COLOR LITHOGRAPH. 23 1/2 x 32 1/4". EDITION OF 60,#25. GEMINI ID NO. ER99-1438. | $9,000 |
| 129 | VLADIMIR WEISBERG,1978 OIL ON CANVAS,"COMPOSITION WHITE FUGUE",INITIALS AND DATEIN UPPER RIGHT CORNER | $60,000 |
| 130 | ANDREI GENNADIEV,1980 OIL ON CANVAS,"THE TARGET", SIGNATURE ON BACK OF CANVAS | $50,000 |
| 131 | ANDREI GENNADIEV,1980 OIL ON CANVAS, "THE WINNER", INITIALS IN LOWER RIGHT CORNER | $60,000 |
| 132 | J.M.F. CHAIR COVERED IN A PYTHON WITH UPHOLSTERED SEAT DESIGNED BY KARL SPRINGER, AMERICA 1980'S. | $5,000 |
| 133 | LARGE PAINTING ON BOARD TITLED "BEYOND THE DREAMS A NIGHTMARE" BY JOSEPH DEMARAIS, 1968 (SIGNED AND DATED). | $6,000 |
| 134 | CHANDELIER IN METAL WITH 5 GLASS SHADES, ITALIAN 1960'S. | $3,500 |
| 135 | EXCEPTIONAL LIDDED BOX WITH EXTERIOR IN STONE AND INTERIOR IN SHAGREEN WITH ELABORATE BRASS WORK BY KARL SPRINGER, AMERICAN 1970'S (SIGNED ON BOTTOM). | $5,000 |

## Schedule of Items

Endorsement Effective Date : 07/18/10                                      Policy Number: PCG 0005596761

| | | |
|---|---|---|
| 136 | "CHAN" COFFEE TABLE IN PEWTER AND BRONZE WITH STYLIZED BAMBOO LEGS DESIGNED BY PHILLIP AND KEVIN. | $6,000 |
| 137 | LAVERNE, AMERICAN 1970'S (SIGNED) SET OF 3 HAND-THROWN CERAMIC VESSELS WITH PRIMITIVE DECORATION BY C.A.S. VIETRI, ITALY, 1950'S. | $5,000 |
| 138 | HANG CHANDELIER IN GUEST BEDROOM. | $912 |
| 139 | RUG FOR OFFICE. | $1,125 |
| 140 | SIDEBOARD IN WALNUT WITH INSET ROSEWOOD PULLS DESIGNED BY EDWARD WORMLEY FOR DUNBAR, AMERICAN 1960'S (SIGNED). | $7,500 |
| 141 | CHEST OF DRAWERS NO. 5272A WITH 12 DRAWERS IN MAHOGANY, PULLS IN LAMINATED WALNUT, AND LEGS IN ROSEWOOD DESIGNED BY EDWARD WORMLEY FOR DUNBAR, 1940'S (SIGNED). | $12,000 |
| 142 | CONSOLE TABLE IN BRASS WITH MAHOGANY DRAWER AND MILK GLASS TOP IN THE MANNER OF PAUL MCCOBB, AMERICAN 1950'S. | $3,500 |
| 143 | HAND-BLOWN GLASS VASE WITH ATTACHED RED SOMMERSO PIASTRE DESIGNED BY ANZOLO FUGAFOR A.V.E.M., 1960'S. | $9,000 |
| 144 | HAND-BLOWN GLASS DESIGNED VASE WITH 2 NECKS AND STACKED RINGS DESIGNED BY ANZOLOFUGA FOR A.V.E.M., MURANO ITALY, 1960'S. | $6,000 |
| 145 | BRONZE SCULPTURE OF 2 GLADIATORS BY GIUSEPPE TARANTIO, ITALIAN 1950'S (EXHIBITEDAT THE 1958 BIENNALE - SEE ATTACHED PAPERS). | $6,000 |
| 146 | "SCULPTURE DESK LAMP" IN POLISHED CHROME DESIGNED BY KARL SPRINGER, AMERICAN 1980'S (SIGNED ON SIDE). | $3,000 |
| 147 | RECLINING CHAIR WITH OTTOMAN ON SCULPTURAL TEAK BASES BY DUX, SWEDISH 1960'S. | $2,975 |
| 148 | SET OF 8 ASTRALE PLATES DESIGNED BY ANZOLO FUGA FOR A.V.E.M., 1960'S. | $6,000 |
| 149 | HAND-BLOWN GLASS "RADICI" VASE, SOMMERSO WITH YELLOW "ROOTS", DESIGNED BY ANZOLOFUGA FOR A.V.E.M., MURANO ITALY, CA. 1961. | $15,000 |
| 150 | HAND-BLOWN GLASS VASE WITH BLUE AND YELLOW SOMMERSO SEGMENTS DESIGNED BY ANZOLO FUGA FOR A.V.E.M., MURANO ITALY, CA. 1961. | $15,000 |
| 151 | "RAGA AEGIS" IN PINK ALABASTER MOUNTED ON A WALNUT BASE BY ENID SCHWARZBAUM, AMERICAN 1960'S. | $1,530 |
| 152 | "OPEN FORUM III" IN WHITE AND GRAY ALABASTER MOUNTED ON A WOOD BASE BY ENID SCHWARZBAUM, AMERICAN 1960'S. | $1,530 |
| 153 | "FLYING FISH" IN WHITE AND GRAY ALABASTER ON A WALNUT BASE BY ENID SCHWARZBAUM, AMERICAN 1960'S. | $1,530 |
| 154 | JOHN MCCRACKEN IXIT 2005 POLYESTER RESIN, FIBERGLASS & PLYWOOD 28-1/4 X 15 X 9-1/4 INCHES | $120,000 |
| 155 | PAIR OF RARE WOOD GRAIN PLASTER TABLES BY JOHN DICKINSON, AMERICAN 1970'S (BOTH ARE SIGNED JOHN DICKINSON SAN FRAN ON BOTTOMS) HAND-BLOWN GLASS CHARGER, INCALMO FROM THE "MURRINE INCATENATE" SERIES DESIGNED BY ANZOLO FUGA FOR A.V.E.M., 1959(PAGE 136 IN BOOK) | $38,000 |
| 156 | "TELEPHONE TABLE" WITH SURFACES COVERED IN IGUANA SKIN DESIGNED BY KARL SPRINGERAMERICAN 1977 (SIGNED "KARL SPRINGER 1977" ON BOTTOM | $4,250 |
| 157 | "HALF ROUND MOLDING MIRROR" COVERED IN PYTHON DESIGNED BY KARL SPRINGER, AMERICAN 1980'S | $10,000 |
| 158 | LARGE STYLIZED TORSO IN GLAZIERITE BY ROBERTO ESTEVEZ FOR KARL SPRINGER AMERICAN1980'S | $15,000 |
| 159 | "TELEPHONE TABLE" COVERED IN BROWN PONY SKIN BY KARL SPRINGER AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 160 | "TELEPHONE TABLE" COVERED IN RED PONY SKIN BY KARL SPRINGER, AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 161 | "TELEPHONE TABLE" COVERED IN ERNU FOOT DESIGNED BY KARL SPRINGER AMERICAN | $3,900 |

## Schedule of Items

**Endorsement Effective Date :** 07/18/10                    **Policy Number:** PCG 0005596761

1980'S

| | | |
|---|---|---|
| 162 | HOCKNEY | $28,000 |
| 163 | MY DINE | $10,000 |
| 164 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $35,000 |
| 165 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 166 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 167 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 168 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 169 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 170 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 171 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 172 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 173 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 174 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 175 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 176 | JOHN MCLAUGHLIN '#15-1958', 1958.  OIL ON CANVAAS 60 X 38 INCHES | $175,000 |
| 177 | PETER ALEXANDER, UNTITLED (WEDGE), 1968-69, POLYESTER RESIN, 64" X 7" X 7". | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED** $5,585,252

### COLLECTIBLES

| | Item Description | Amount Insured |
|---|---|---|
| 1 | SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 | 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 | 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 | 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 | 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 | 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 | 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 | 18 LEATHERBOUND VOLUMES. | $700 |
| 9 | 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 | 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 | 28 LEATHERBOUND VOLUMES. | $800 |
| 12 | 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 | 3 LEATHERBOUND VOLUMES. | $500 |
| 14 | 24 LEATHERBOUND VOLUMES. | $1,100 |
| 15 | 2 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $1,100 |

## Schedule of Items

**Endorsement Effective Date :** 07/18/10                                    **Policy Number:** PCG 0005596761

| | | |
|---|---|---:|
| 16 | 3 SHELVES OF ASSORTED VOLUMES. | $1,200 |
| 17 | 19 LEATHERBOUND VOLUMES. | $1,200 |
| 18 | 2 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $500 |
| 19 | 2 SHELVES OF ASSORTED BOOKS. | $1,200 |
| 20 | COLLECTION OF BOOKS FOR LIBRARY. | $20,108 |

**TOTAL COLLECTIBLES AMOUNT COVERED**   $33,208

CHUBB-Altschuler/ROLEX & ART 0000892

092020001456

# Exhibit 13

From: Jaeger, Daniel
Sent: Wednesday, December 15, 2021 11:45 AM
To: Karen Moore (kamoore@chubb.com) <kamoore@chubb.com>
Cc: White, Fred E <fwhite@chubb.com>
Subject: 092020001456 (DOL: 12/23/19) and 040520024846 (DOL: 6/19/20)-Altschuler
Importance: High


Karen,


On 12/14/21, these claims were discussed with Sr. Claims Leadership and authority was granted to deny the claim for the Keith Haring silkscreens based on violation of the Concealment or fraud provision of the policy. Authority was also granted to deny the claim for the missing Rolex watch based on late notice and the insured's failure to prove the loss occurred during the policy term. Attached is a proposed letter for your review. If you have no changes, you are authorized to issue the letter to the insured's attorney via email and regular mail. No one should be copied on the letter.


As you know, this claim is in litigation in Arizona. Please provide me with a copy of the as-issued letter and I will send it to litigation counsel. You can send a copy of the letter by email to Terry Rubin for his file.


The insured's policy was canceled effective 12/20/20 so there is no need to alert Underwriting to this denial.


Let me know if you have any questions.


Thanks,

Dan


<http://www.chubb.com/common/images/CHUBB_Logo_DarkBlue.png>


Daniel I. Jaeger, CPCU, AIC

Vice President-Property SIU Claims Manager

North America Property Claims

150 Allen Road, Suite 101, Basking Ridge, NJ 07920
O 908-903-3099 <tel:908-903-3099> M 215-859-3549 <tel:908-903-3099>
E djaeger@chubb.com <mailto:djaeger@chubb.com>

**File Note Title:**KM to DJ
**Create Date:**12/9/2021 7:35 PM
**Author:**KAREN MOORE
**File Note Text:**
Dan,

Lisa, Fred and I have reviewed the opinion letter from EUO counsel and are in agreement w/ recommendation to deny as outlined. If you agree, a draft denial letter is also included for review/approval.

Please review and advise.

Thank you,
Karen

CHUBB-Altschuler/ROLEX & ART 000070

092020001456

**File Note Title:**Chubb policy search
**Create Date:**9/25/2020 11:03 AM
**Author:**KAREN MOORE
**File Note Text:**
Rvwd prior policies, under policy 1380845202, the Andy Mouse was first added to the VAF portion of the policy effective 9/23/2014, and remained on that policy until 6/1/2016, when it was moved to the current -05 policy that this claim is being made under.

CHUBB-Altschuler/ROLEX & ART 0000803

092020001456

**File Note Title:**SIU-Net Worth Summary
**Create Date:**7/24/2020 2:28 PM
**Author:**FRED WHITE
**File Note Text:**
Net Worth Summary Attached.


Fred

CHUBB-Altschuler/ROLEX & ART 00001411

092020001456

# Net Worth Calculator

7/22/2020

**Estimated Net Worth:** $35,290,245

| Assets | | |
| --- | --- | --- |
| **Personal Items** | | **Estimated Value** |
| Home | $ | 2,600,000 |
| Vehicles | | – |
| Jewelry | | 1,040,000 |
| Artwork | | 5,656,000 |
| Furniture/Antiques | | 6,000,000 |
| Electronics | | – |
| Other | | – |
| Other | | – |
| **Cash or Cash Equivalent** | | |
| Checking account | $ | 60,000 |
| Savings account | | – |
| Certificates of deposit | | – |
| Money market account | | – |
| Life insurance (cash value) | | 1,000,000 |
| Other (Charles Schwab LLC Account) | | 624,605 |
| **Investments** | | |
| Retirement account | $ | 710,468 |
| Bonds | | – |
| Mutual funds | | – |
| Individual stock shares | | – |
| Real estate other than home | | 3,100,000 |
| Other: Gerald & Phyllis Altschuler Trust; NuPulseCV Inc.; Trust Investments; Corbin Holdings & CS Corbin Holdings LLC Investments; Wetmore Land. | | 18,863,414 |
| **Assets Total** | $ | 39,654,487 |

| Liabilities | | |
| --- | --- | --- |
| **Loan Balances** | | **Estimated Value** |
| Mortgage loan | $ | 1,715,009 |
| Home equity loan | | – |
| Car loans | | – |
| Real estate loans | | 2,224,198 |
| Student loans | | – |
| Other loans | | – |
| **Other Outstanding Debt** | | |
| Credit card debt | $ | 425,036 |
| Other debt | | – |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Liabilities Total** | $ | 4,364,243 |

CHUBB-Altschuler/ROLEX & ART 00001412
092020001456

**File Note Title:**Genl Cor - Manager direction
**Create Date:**5/8/2020 4:07 PM
**Author:**KAREN MOORE
**File Note Text:**
File Note Created By: Karen A. Moore
Date File Note Created: 5/08/2020 4:07:43 PM
Date Email Received From Sender: 5/08/2020 3:32:23 PM
Email Sent From: djaeger@chubb.com
Email Sent To: Moore,Karen A
Email Copied To: White,Fred E; Clark,George R; Charles Rubin
Subject: FW: [EXTERNAL] Re: Claim 092020001456-Douglas Altschuler DOL: 12/23/19

Hi Karen,


Per our discussion, we are going to retain John Chvostal to assist us with some additional provenance investigation on the claimed artwork. When you can, please send him the following:


1. The VAC schedule.

2. The Gurr Johns reports.

3. The complete Dina Brown Appraisal.

4. The Police Report.

5. The R/S statement transcript of Douglas Altschuler.


Thanks,

Dan


<http://www.chubb.com/common/images/CHUBB_Logo_DarkBlue.png>


Daniel I. Jaeger, CPCU, AIC

Vice President-Property SIU Claims Manager

North America Property Claims

150 Allen Road, Suite 101, Basking Ridge, NJ 07920
O 908-903-3099 <tel:908-903-3099> M 215-859-3549 <tel:908-903-3099>
E djaeger@chubb.com <mailto:djaeger@chubb.com>

**File Note Title:**Rvwd Gurr Johns Report
**Create Date:**3/3/2020 10:05 AM
**Author:**KAREN MOORE
**File Note Text:**
Rvwd report rcvd from Gurrs Johns; same confirms replacement cost value for the claimed is $1,500,000 at time of the loss.

Discussed report w/ SIU manager Dan Jaeger and SIU investigator Fred White; Dan has requested we ask Gurr Johns to follow up w/ the appraiser to obtain any background knowledge she has related to the claimed item (subject of any sales -all or in-part, when obtained, etc.) as well as a full provenance of the claimed item.

Fred will reach out to Gurr Johns (rep: Jessica Wessel) to request the additional work noted above and discuss the scope of the additional assignment in detail.

CHUBB-Altschuler/ROLEX & ART 00002145

092020001456

**File Note Title:**Genl Cor – SIU-email from insured re prior policy
**Create Date:**2/28/2020 1:54 PM
**Author:**FRED WHITE
**File Note Text:**
File Note Created By: Fred E. White
Date File Note Created: 2/28/2020 1:53:48 PM
Date Email Received From Sender: 2/28/2020 1:52:00 PM
Email Sent From: fwhite@chubb.com
Email Sent To: Douglas Altschuler
Subject: RE: [EXTERNAL] Re: Claim# 092020001456 Insured: Douglas Altschuler

Douglas,

Thanks for your response, and I'll advise on any additional requests I may have as my investigation continues forward.

From: Douglas Altschuler [mailto:douglas.altschuler@gmail.com]
Sent: Tuesday, February 25, 2020 2:23 PM
To: White, Fred E <fwhite@chubb.com>
Subject: Re: [EXTERNAL] Re: Claim# 092020001456 Insured: Douglas Altschuler

The policy was with AIG. I have no policy number. This was many years ago John Wilshire at Crystal and Company was my broker at the time. This goes back 10 or more years ago.

I don't have an invoice. If the person who did the appraisal has an invoice you have my authority to get it from her or if she needs my ok obviously I will give it. I searched and I simply have no record of an invoice. It may be the case I wasn't charged.

Thank you, Douglas

On Feb 25, 2020 at 11:04 AM, <Fred E White <mailto:fwhite@chubb.com> > wrote:

Hello Douglas,

When I took a statement from Zoe on Friday 2/21/20, you were present and advised that the policy prior to the Chubb policy for the claimed art was in fact AIG. I am following up on my request for an AIG policy number, Thank you

In addition, you advised that you did not have an invoice for the Dina Brown appraisal dated 7/25/18

Again, Thanks

From: Douglas Altschuler [mailto:douglas.altschuler@gmail.com]
Sent: Friday, February 14, 2020 10:09 AM
To: White, Fred E <fwhite@chubb.com <mailto:fwhite@chubb.com> >
Subject: Re: [EXTERNAL] Re: Claim# 092020001456 Insured: Douglas Altschuler


I need to check but I think AIG.


AP is artist proof




On Feb 14, 2020 at 9:41 AM, <Fred E White <mailto:fwhite@chubb.com> > wrote:

Douglas,

Thank you for your response. Can you kindly tell me who the insurance company was prior to the Chubb Policy from 6/1/16?


"I believe the edition which is subject to the claim is 3/30. It may have also been an AP." I do not know what an AP is.




Thanks




From: Douglas Altschuler [mailto:douglas.altschuler@gmail.com]
Sent: Thursday, February 13, 2020 4:59 PM
To: White, Fred E <fwhite@chubb.com <mailto:fwhite@chubb.com> >
Subject: [EXTERNAL] Re: Claim# 092020001456 Insured: Douglas Altschuler

CHUBB-Altschuler/ROLEX & ART 00002158
092020001456

Mr. White,

I am responding to your email below. I do not have any contact info for either Sylvia or Virginia. Below I will provide Janet's contact info and she may be able to connect you with Virginia.

The stolen art was insured prior to 6/1/2016

I will attempt to locate the invoice for the appraisal. If it exists I am certain I can find it. Offhand, I don't recall receiving an invoice. I don't recall receiving an invoice for any of my appraisals.

I believe the edition which is subject to the claim is 3/30. It may have also been an AP.

Janet can be reached at 520-247-1789.

Kindly let me know what other information you need.

Douglas

On Feb 11, 2020 at 3:51 PM, <Fred E White <mailto:fwhite@chubb.com> > wrote:

Douglas,

Thank you for taking the time to meet w/ me last week, and during your statement I requested the following:

* Please provide a contact number/ contact info for Virginia

* If able, please provide a contact number for Sylvia

CHUBB-Altschuler/ROLEX & ART 00002159

092020001456

* Please advise if the missing/stolen art was insured w/ another insurance carrier prior to this policy which went into effect on 6/1/2016

* Please provide the invoice for the July 25th 2018 appraisal

* Please advise if you have a Credit Report from the last 30 days, otherwise I will use the authorization you signed to obtain a TransUnion Credit Report

* Of the 1 to 30 editions of the set of four prints, can you tell me which edition is the subject of this claim

* Please provide a contact number for your sister Janet Altschuler

Again, Thank you in advance for all you're assistance.

<http://www.chubb.com/common/images/CHUBB_Logo_Green.png>

Fred E White
Senior SIU Investigator, SCLA, Special Investigations Unit
600 Independence Parkway , Chesapeake, Va 23327, United States
O 516-745-8425 M 914-325-4102 F 800-664-5358
E fwhite@chubb.com <mailto:fwhite@chubb.com>

<http://www.chubb.com/common/images/Chubb_Insured_green.png>

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public

**File Note Title:**SIU-R/S Summary Continued
**Create Date:**2/11/2020 10:07 AM
**Author:**FRED WHITE
**File Note Text:**
Re his finances,

Have you experienced any financial problems in the last 12 months?No
Do you have any revolving credit accounts other than credit cards?No
Are all these accounts up to date?NA
Are any of these accounts in collections?NA
Have you ever had a home that has been the subject of a foreclosure action?NA
Have you ever had an account closed at the lender's request?NA
Do you have any credit cards?Yes 2
Do you carry any balances on your credit cards?yes, around 30k, 2nd card has 100k per month expenses that are paid each month.
How many credit cards carry balances?1
What is the total of the balances carried on all your credit cards? 30k
Have you ever been late on your payments?None he recalls, but maybe
Do you have any credit cards/accounts that are in collections?No
Have you ever had a credit account that has been charged off?No
Do you have any liens or judgments against you?No
Have you ever filed for bankruptcy? No
Recent/Large Medical bills/expenses?No
Recent application(s) for credit?Mortgage Refi two months ago
Other items financed?No
      Student loans?No
      Big purchases?couple100k, art purchase in last month
Have you borrowed any money recently?No
Are your Federal IRS Taxes paid and up to date?Yes
    Any back local, state or IRS Taxes?No
How would you describe your current financial situation?Fine

Have you been late paying your mortgage within the past 3 years (if applicable)?No

Are you now, or have you ever sought, to have your mortgage loan modified?No

Do you have any installment debt, i.e. auto loans or leases, etc?No

If so, are they up to date and have there been any late payments in the past 3 years?

Do you have any unsecured loans (ties in with question 21, which could be explained that we are asking whether you have borrowed money from family or friends as opposed to a financial institution)?No

Do you owe any money to a legal service provider (attorney)?No

Re the couple 100k art purchase, he said it was purchased in Ca, and he doesn't recall the artists name.

I asked Douglas the amt of income on his last tax rtn, and he said I was getting a little too personal. I explained duties after a loss, and then he told me it was approx. 1 million. He said his net worth is approx. north of 20 million dollars.

CHUBB-Altschuler/ROLEX & ART 00002210

092020001456

**File Note Title:**SIU-R/S Summary Continued
**Create Date:**2/11/2020 10:07 AM
**Author:**FRED WHITE
**File Note Text:**
Re his finances,

Have you experienced any financial problems in the last 12 months?No
Do you have any revolving credit accounts other than credit cards?No
Are all these accounts up to date?NA
Are any of these accounts in collections?NA
Have you ever had a home that has been the subject of a foreclosure action?NA
Have you ever had an account closed at the lender's request?NA
Do you have any credit cards?Yes 2
Do you carry any balances on your credit cards?yes, around 30k, 2nd card has 100k per month expenses that are paid each month.
How many credit cards carry balances?1
What is the total of the balances carried on all your credit cards? 30k
Have you ever been late on your payments?None he recalls, but maybe
Do you have any credit cards/accounts that are in collections?No
Have you ever had a credit account that has been charged off?No
Do you have any liens or judgments against you?No
Have you ever filed for bankruptcy? No
Recent/Large Medical bills/expenses?No
Recent application(s) for credit?Mortgage Refi two months ago
Other items financed?No
    Student loans?No
    Big purchases?couple100k, art purchase in last month
Have you borrowed any money recently?No
Are your Federal IRS Taxes paid and up to date?Yes
   Any back local, state or IRS Taxes?No
How would you describe your current financial situation?Fine

Have you been late paying your mortgage within the past 3 years (if applicable)?No

Are you now, or have you ever sought, to have your mortgage loan modified?No

Do you have any installment debt, i.e. auto loans or leases, etc?No

If so, are they up to date and have there been any late payments in the past 3 years?

Do you have any unsecured loans (ties in with question 21, which could be explained that we are asking whether you have borrowed money from family or friends as opposed to a financial institution)?No

Do you owe any money to a legal service provider (attorney)?No

Re the couple 100k art purchase, he said it was purchased in Ca, and he doesn't recall the artists name.

I asked Douglas the amt of income on his last tax rtn, and he said I was getting a little too personal. I explained duties after a loss, and then he told me it was approx. 1 million. He said his net worth is approx. north of 20 million dollars.

CHUBB-Altschuler/ROLEX & ART 00002210

092020001456

I asked Douglas to sign the credit autho, and he said he'd sign but asked that I give him some time to see if he has a credit report that he can send me. I said I would wait.

I told Douglas I would need to take a statement from his wife Zoe, and he said to go ahead and email her and set up same. He added that she works for Getty Images "downtown", and its just a little weird for me to go in there. He reminded me that she doesn't know much about this. He said if he dies, she has no idea where any of the bank accounts or any valuables are.

Douglas said this whole thing is bizarre to him, and I asked if he suspected anyone in a possible theft. He said his Mother had a home health aide named Sylvia. She worked for Mrs Altschulter about 12 or 15 years ago. Sylvia became friends w/ the Altschulter's and she borrowed 10k from them. Sylvia never paid the money back. He said his father blamed himself, and did not try to get the money back. He said a few things from the house had gone missing while Sylvia was working there. He said a pitch basket, which had considerable valuable, was one item that disappeared. Jewelry had also gone missing, but his mother said it was her mistake for leaving the jewelry out. He said about a year ago, his mother called him and said someone is in the house and the alarm is going off. He said it was Sylvia. He said he didn't want to accuse Sylvia, but he thinks she did steal the jewelry about 12 or 15 years ago. He said it's not so much that he suspects Sylvia of stealing the art work, but he has no idea how it went missing. I asked if he told this to the police, and he said no because he only called to see if his house was broken into. He said he explained to the officer (no name) that his art work was missing, and was told the police would look into it. He said he called the police several times after that call, but did not get a rtn call.


According to Douglas, his parents were not social people, and they hardly ever had visitors.

I asked if he had any contact info for Sylvia, and he said no, but Virginia may know how to contact her.

Douglas broke down sobbing at this point and said his Mother was a true saint, and said God delivered Virginia to his Mother because she took great care of his Mom.

I asked why he had the prints shipped to his Mother's house in 1990, and he said that was a good question. He said he used to do a lot of traveling at that time, so he kept a lot of stuff at his parent's house, and he knew his parents were always at their house. For that reason, he felt it was a safe place to keep valuables.

Douglas was appearing as if he was going to be ill, and I concluded the statement.


For additional details, this statement can be reviewed in Calibrus.


Fred

Fred

CHUBB-Altschuler/ROLEX & ART 00002211

092020001456

**File Note Title:**SIu-R/S SummaryD.Altschuler
**Create Date:**2/11/2020 10:06 AM
**Author:**FRED WHITE
**File Note Text:**

On 2/4/2020, I met w/ our insured as scheduled and took his recorded statement. He provided all his particulars, and answered all of my questions to the best of his ability.

Douglas stated that he recalled speaking to an Az police detective last month, but he didn't know the detective's name. Douglas said he is currently not employed. He has resided at 167 E 82nd Street, NYC, for the past 3 or 4 years. Prior to that he lived at an Apartment in NYC on 66th Street. He didn't recall the exact address. Both of those apartments were/are rentals, and he said he owns no real estate. Douglas told me he does not actually rent or own his current residence, as he lives w/ his wife. He said he doesn't know the exact details re her ownership, and he thinks it's under an LLC. He said he thinks the apartment value is around 2 or 3 million. Douglas asked me if I was w/ Chubb, and I said yes. He said to ask them about the value of the apartment.

I reminded Douglas that he told me he was retired, and I asked what his profession was before retirement. He said he was CEO of a company called Milamed or Minamed or Mesh, he didn't recall exactly what the name of the company was. He said he work for them for approximately 2 years. I asked if he was ever licensed to practice law, and he said yes. He said he was licensed in Az, Ca, Nv, and maybe Wash DC. He said he was never licensed in NY. I asked what type of law he practiced, and he said Litigation and corporate law. I asked if he was ever a prosecutor or defense attny, and he said both. I asked if he ever worked for a DA's Office and he said yes. He said there was something in Santa Monica, but that was all he could recall.

Douglas said he has been married to Zoe Werner for the past 9 years, and she is his first and only spouse. He has no safe deposit box, and there is no safe in his current apartment. I asked if anyone else resides in his apartment, and he said his son ████ Altschuler, age █ He said he has not contacted a public adjuster or an attny re his claim.

I advised Douglas that I had called and left a message for the Detective assigned, Det Brophy, but he has not yet rtn'd my call. I further advised that I had spoken to an employee of the Pima Cnty Sheriff's Office, James Russell who told me that the department did receive a call from Douglas on 1/8/20 advising that a break in had occurred at the loss location sometime between October 21st, 2019, and December 23rd, 2019, and you reported that some art work was missing from the home. Douglas said he did not know when the break in occurred, but he added that he must have said that if it's in the report. I asked where the art work was in the house, and he said he last saw the claimed works in October of 2019. They were in the living room in a box in acloset, and nothing else was in the box. They were never framed and displayed. I asked if the 4 missing works of art measure 38" by 38", and he said he thinks that was the correct size, but added that he hasn't measured them in 30 years. I asked if they were ever framed together, and he said they were never

framed. He said his mother left the loss location in October of 2019 because she slipped and fell and broke her hip, and was placed in a nursing facility. I said I'd like to interview his Mother, and he said that would be very difficult as she has passed away. He said she had just passed a few days ago. His Mother's name was Phyllis Altschuler. Douglas became visibly upset, and I asked if he would like to stop the statement, and he said no adding that he wanted to give me all the information I needed.

I told Douglas that he indicted the housekeeper had been to the loss location on 12/18/19 and found the front door open, and the alarm sounding. Her name is Virginia, and he said he was told that's what she said from an interpreter as Virgina speaks only Spanish. I asked for a contact number for Virginia, and he said he'd see if he could get one. He said he has requested that Virgina remain employed even after the passing of his Mom, and he said he made that request to his sister Janet Altschuler. I asked if she was the executor of his Mothers estate, and he said she was not. He told me he did not know who the executor of the Estate is and he will have to research that. I asked if anyone else resided in the house in Az, and he said no. He said Virginia was more of a home health aide and she was there 6 days a week. Douglas said his sister resides in Tucson, Az, but not at the loss location. He also has a brother named Eric Altschuler who resides in Pittsburgh Pa.

I asked if anything else was missing and he said "good question" as he doesn't know. I asked if the home was ransacked and asked if he discovered the loss, and he said he did discover the loss. Douglas told me that on 12/23/19, he was at the house in Az as he had gone to visit his Mother at the facility, for her birthday. He was planning on moving his stuff out of the house, to include the missing art work which he was going to ship to his storage area in NY. He went to check the carton that the works were in to see if it was suitable for shipping, and that's when he realized they were missing. He next went to the facility where his mother was, and asked Virgina, who was present, if she recalled seeing the carton w/ the art work, and Virgina told him that the door was open and alarm sounded a few days earlier when Virginia had gone to check on the house. Through the interpreter, he learned that Virginia had contacted the Police on or about 12/18/19 to report the aforementioned.

I told Douglas that Pima County Sheriff's Office Operator James Russell ID#8037, said he had no record of the call from 12/18/19, and Douglas said that is what he was told, that she had called. He added that when he called on 1/8/20, he was told that there had been a call on 12/18/19 re the alarm sounding. I told him that I would f/u w/ Det Brophy re the sequence of calls regard this loss.

I again asked if anything else was missing, and he said his brother had said he was missing art work, but his sister later located Eric's artwork on the walls. He said his brother and sister are not missing anything, but Douglas wants to go back to the house and check again to ensure he has no other items that are missing. I asked when he planned on checking the house, and he said he didn't know.

Douglas said he has no other insurance that would cover this loss, and his Mother also was insured w/ Chubb. I asked if the art work was ever the subject of a prior claim, and he said no. I asked how long he owned the prints, and he said he had two sets. One he had purchased in 1987, and the second set was purchased around 1989. I asked him to clarify two sets, and he said he had two sets of four prints each. He said he traded one of the sets for other art work around the year 2000. I asked if he still had the art he traded for, and he said he wasn't sure. He said the set that is being claimed was the set purchased in 1989. I asked where he got the set that's being claimed, and he said directly from Keith Haring. He said he was w/ Keith

CHUBB-Altschuler/ROUX/ART 0002213

092020001456

in Phoenix in 1989 when he made the purchase. I asked if he had any documents from the 1989 purchase, and he said he'd have to look. He said he may have one receipt, but he'd have to check. He said he Met Keith in 1989, and they sort of hit it off. He then made the purchase. He said he paid around 10k. The other set was purchased in a gallery in Santa Monica, Ca named B1 Gallery, he believes. I asked if he has paperwork from that transaction, and he said he doesn't think so. I asked if there was provenance from the gallery purchase in 1987, and he said he didn't think so. He said he never question the authenticity of either of the sets, and he never owned any forgeries. He said he recalled showing a picture of his gallery purchase to Keith.

I told Douglas that he had said the claimed art had been at his Mother house for about 15 or 20 years, and he said he thinks it was there longer than that, more like 30 years. He said since 1990, or 1989 when he purchased them. He said he purchased the art because he loved it, but he did expect it to retain its value.

I told Douglas that the set from 1989, which is the subject of the loss, was added to his Chubb policy in 2016 and he said he thinks it was before that. I asked if it was insured w/ another carrier before that time and he said he didn't know. He added that he thinks it was always w/ Chubb.

I asked Douglas who else would know that the missing prints were there, and he said his parents. I asked if he ever checked on the prints, and he said all the time. He said his Father had passed away in September of 2017.

Re the Dina Brown Art appraisal, he said the name doesn't resonate, but she did the appraisal. I said the prints were insured on 6/1/16 for 250k, and the value was increased to 1.5 million effective on 8/2/18 based on the aforementioned appraisal done sight unseen. He said he only vaguely recalled the appraisal because he had been talking to Dina's mother about other art. I asked why the appraisal was done, and he said he had mentioned what he had to Dina, and she had told him the value had gone up significantly, so he asked for an appraisal. He added that he doesn't remember if he asked for the appraisal, or if she recommended it. I asked if Dina requested a photo of his work, and he said she didn't. I asked if he had a receipt for the appraisal, and he said he would check. He then said it was Chubb that asked if he would like to increase the coverage, as Douglas had provided the new appraisal.

I asked if Dina's mother had sold him some art, and he said he doesn't recall. Re the appraisal, he said he gave her whatever info she asked for. I told him that Dina said one of his prints had sold at auction for 200k, and he said he never sold that print in 2019. He became irate, and said the whole idea is to keep the set together, because that is where the value is, and he's never sold anything at an auction house. He added that he didn't want to sound like an "arrogant and entitled asshole", but he would never need the 200k. He then got up and paced the floor several times and then sat down again. I asked if he wanted to take a break, and he said no but he wanted to stretch as he has back issues.

Re civil filings, I asked about the civil court filing from 7/3/2003, and he said he has no knowledge of that action.

Re 7/9/11, civil filing from NY, and he said it was related to criminal who resided in France and attempted to extort money from him. The case was dismissed and reported to the authorities.

Re prior loses, I asked about the 10/25/13 loss of a watch, and he said he recalled the loss. He said he had a coat on and had his hands in his pockets and somehow the watch must have fallen off. He reported the loss to the police. He said he didn't recall making a claim for the watch. He said it was his wife's watch, but she was wearing it

Re prior loses, I asked about the 10/25/13 loss of a watch, and he said he recalled the loss. He said he had a coat on and had his hands in his pockets and somehow the watch must have fallen off. He reported the loss to the police. He said he didn't recall making a claim for the watch. He said it was his wife's watch, but he was wearing it.

Re the 5/13/08 AIG claim, he said there was a break in and he reported it to the police. He was in Paris meeting a man at the time of the loss when his watch was stolen. He recalled the man in Paris set him up and had a friend steal his watch at that time. He said the man from Paris had sent him a photo w/ him wearing the watch w/ his middle finger extended. I asked if a suspect was ever apprehended, and he said no.

I asked about the Allstate claim from 2000, theft of exercise equipment, and he said he didn't recall a claim. He said he's not an exercise guy, and he never had exercise equipment. He said he never had Allstate.

Re the 7/10/2000 claim for damage to a bed. He recalled that loss and it was a purchase protection claim. The bed was delivered damaged.

Re the 4/17/1993 fire claim, Douglas said he had no recollection of that loss.

Douglas said he had no idea if he ever had a policy non renewed or canceled.

CHUBB-Altschuler/ROLEX & ART 00002215

092020001456

**File Note Title:**Status - SIU email to insured
**Create Date:**1/24/2020 1:42 PM
**Author:**KAREN MOORE
**File Note Text:**
File Note Created By: Karen A. Moore
Date File Note Created: 1/24/2020 1:42:34 PM
Date Email Received From Sender: 1/24/2020 1:42:00 PM
Email Sent From: kamoore@chubb.com
Email Sent To: 'douglas.altschuler@gmail.com'
Email Copied To: White,Fred E
Subject: Altschuler-Claim 092020001456-Chubb National Insurance Company

Good Afternoon Mr. Altschuler,

Your claim for missing artwork has been reassigned to me for handling to conclusion. My contact information is noted below for your records.

Our investigator, Fred White, copied on this email, has also been assigned to assist with the claim investigation; Mr. White will be contacting you to schedule an in-person statement to review the loss in further detail and complete any follow up needed to move forward with the claim.

Please feel free to contact me with any questions in this matter throughout the claim process.

Thank you,


Karen Moore
Claims Specialist, Special Investigations Unit
PO Box 4700, Chesapeake, VA 23327-4700, USA
O 757.222.4463 F 800.664.5358
E kamoore@chubb.com mailto:kamoore@chubb.com

**File Note Title:** SIU-Initial File Review
**Create Date:** 1/24/2020 10:38 AM
**Author:** FRED WHITE
**File Note Text:**
**Facts of Loss:**

Insured claims a work of art was stolen from his Mother's residence in Arizona.

**Property Claimed and Applicable Coverage (Note Original Effective Date):**

2 N 1500000 ANDY WARHOL AND KEITH HARING ANDY MOUSE, 1986 COLOR SILKSCREENS EDITION OF 30 38 X 38 INCHES

VAF COVERAGE UNDER POLICY 1380845203 EFFECTIVE 6/1/2016, ITEM WAS SCHEDULED FOR $250,000 AT THAT TIME, INCREASED TO $1,500,000 EFFECTIVE 8/2/2018.

ORIGINAL EFFECTIVE DATE (This Policy): 08/01/19

**Police Report Filed (Note if it has not been filed and whether policy requires it):**

Yes, copy pending

**Review any Documentation Received from Insured:**

None received to date

**Review Database Searches (Lexis Nexis and ISO + Prior Chubb Claims):**

Lexis for Douglas Altschuler: Two liens noted from 2014 and 2006. One criminal filing noted, same is listed as Minor/traffic related.

Lexis for Zoe Werner: No unfavorable information noted, however she is listed on the 2014 filing from Mr. Altschuler's Lexis Report.

ISO search for Douglas Altschuler: (Same attached to 1/24/20 note): Multiple prior theft and/or mysterious disappearance claims w/ Chubb and other carriers.

ISO Match for Zoe Warner: (Settlement Amt. was nominal)

Date of Loss: 03/15/2014

Type of Policy: Property Other

Property Stolen: Other

Location of Loss: 200 E 62ND ST APT 18B

NEW YORK NY 10065

Loss Description: THE INSURED WAS WEARING A WATCH AND THE PIN CAME O

ISO Received: 04/01/2014

Company: AMERICAN BANKERS INS CO OF FL (ASSURANT - (800) 358-0600

Claim Number: 00101517418

Policy Number: RIN159242701

*Paid: 1,000*

Involved Party: Insured

Name: WERNER,ZOE,J

CHUBB-Altschuler/ROLEX & ART 00002343
092020001456

Address: 200 E 62ND ST APT 18B

NEW YORK, NY 10065

Coverage/Loss: Property / Theft

(Closed)

Settlement: 1,000

## Initial Investigative Plan:

- Contact the insured's for an interview/recorded statement; and request relevant records including a copy of the police report filed in connection with this loss
- Review the insured's prior claim history for similar / relevant information.
- Review the insured's transcript of the statement provided to ECSC.
- Obtain the insured's credit report as required.
- Interview persons who may have relevant information.
- Interview the investigating police officer assigned.
- As needed, contact the insured's agent for any relevant information.
- Conduct further investigation as required.
- Request documents from Underwriter.
- File a report with recommendation.

-

CHUBB-Altschuler/ROLEX & ART 00002344

092020001456

**File Note Title:** DM Review
**Create Date:** 1/24/2020 9:22 AM
**Author:** MICHAEL CANAVAN
**File Note Text:**
Placed file on my dd based on $1.5M exposure.

- Claim will be added to $250K Log
- LLN will be issued
- Claim being reassigned to SIU for further investigation

cc: Melissa / Larry **-** FYI on this theft loss to a $1.5M Warhol.

CHUBB-Altschuler/ROLEX & ART 00002345

092020001456

**File Note Title:** SIU Review
**Create Date:** 1/24/2020 8:53 AM
**Author:** KAREN MOORE
**File Note Text:**
SIU review of VAF loss over $100k completed, results attached.

Claim is for presumed theft of VAF Fine Art item #2=$1,500,000.

The item was added to the VAF policy effective 6/1/2016 for $250,000 and value was increased to $1,500,000 effective 8/2/2018. The claimed item is the most expensive item on the VAF schedule.

The insured advised in his recorded statement that the artwork was stored at his mothers home in AZ and had been for 15 years; was it insured w/ another carrier before being added to the Chubb policy in 2016?

ISO reflects prior theft and mysterious disappearance claims, unknown if any for fine art.

Based upon above, I agree the claim would benefit from investigation. Accepting to SIU for handling, assigning Fred White as SIU investigator based upon NY location.

**File Note Title:**CLAIMED ITEM
**Create Date:**1/24/2020 8:06 AM
**Author:**KAREN MOORE
**File Note Text:**

2 N 1500000 ANDY WARHOL AND KEITH HARING ANDY MOUSE, 1986 COLOR SILKSCREENS
EDITION OF 30 38 X 38 INCHES

**ITEM ADDED TO VAF COVERAGE UNDER POLICY 1380845203 EFFECTIVE 6/1/2016, ITEM WAS
SCHEDULED FOR $250,000 AT THAT TIME, INCREASED TO $1,500,000 EFFECTIVE 8/2/2018.

**MOST EXPENSIVE ITEM ON THE VAF FINE ART SCHEDULE.

**File Note Title:**R/S - Scope
**Create Date:**1/23/2020 3:15 PM
**Author:**KIMBERLY BATTS
**File Note Text:**
**start of recording**

-confirmed insd's name and address as showing on policy
-marital status: married, spouse: Zoe Werner
-occupation: retired

-insd adv on 12/23/19 he traveled to his mother's home in AZ because
his mother had been moved out to a nursing facility and he was attempting
to get the house in order and move some items into storage
-he noticed a painting he owned and kept at the house was no where to be found
-he contacted his mother's caretaker who adv she arrived at the home on either 12/17/19 or 12/18/19 to check on things
and found the front door open and alarm going off
-police department came and took burglary report
-insd has a copy of the police report that he can forward
-no known suspects or arrests
-insd's mother moved out of the home in October '19 and caretaker had been coming back periodically to check on
things
-item missing is Scheduled Fine Art item #2, insured value of $1,500,000
-when asked insd why item being kept at mother's home he replied it has been there for about 15 years and could not
answer why, it just was

**end of recording**

-confirmed cvrg for stolen fine art item under Scheduled cvrg of $1,500,000 with no deductible
-adv insd to submit copy of police report for review
-expl once rcvd will submit to mgmnt team for further review and to determine next steps
-emailed Welcome Letter to insd
-insd u/s all

CHUBB-Altschuler/ROLEX & ART 00002434

092020001456

**File Note Title:**SIU Note
**Create Date:**1/21/2020 12:46 PM
**Author:**KAREN MOORE
**File Note Text:**
VAF loss over $100k; please submit SIU referral for review after scope obtained.

# Exhibit 14

Debbie Smith - 11/11/22

# Exhibit 1

Jennifer Smith, RPR, CR. No. 50180



**CHUBB**

**Name and address of Insured:**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Policy no:** 13808452-05
**Effective date:** 8/1/19
**Issued by:** Chubb National Insurance Company
a stock insurance company
Incorporated in Indiana
**Policy period:** 8/1/19 to 8/1/20

**If you have any questions, please contact:**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH 44114
216.658.7100

Dear Valued Client,

On behalf of our entire team, thank you for renewing your protection with Chubb. We're looking forward to continuing to say yes and do more across every step of your experience.

In this mailing, you'll find a copy of your new policy to review. If you have any questions, we're here to help, and encourage you to reach out to your agent or our Customer Care Team at 1.866.324.8222.

If you haven't already, don't forget to register for our Client Portal at www.chubb.com/registernow. You can also download our mobile app at the AppStore or on Google Play. With our client portal and mobile app you can take advantage of our online services like viewing your policy, billing or claims information, making a payment, enrolling in autopay, paperless billing, paperless policy and email or text notification services from home or on the go. Be sure to have your policy or billing statement handy to complete the simple registration process.

## About Your Policy

As you take a look at your policy, we've included ways to help you find the information you need faster:

- On your **Coverage Summary,** you'll see who is named as an insured, as well as your insured property, coverage limits, and the deductibles and additional features you've selected.
- The **Table of Contents** will tell you which coverage forms apply to your policy.
- The **Introduction, Policy Terms,** and **Policy Information Notice** also include common insurance terminology with straightforward definitions to make it easier to read your policy.

In each chapter, you'll also find descriptions of the different examples and scenarios your policy is designed to protect, and how your protection applies depending on where you live. You'll also see more detail on your deductibles, how what we pay is decided if you have a claim, and an explanation of any exclusions (i.e., any specific cases that aren't covered under your policy).

*Continued on the next page*

© Chubb.2016. All rights reserved.    Form no. Q9200000    *Reference Copy*

ALTSCHULER 000001

## Getting More from Your Policy

We want to help you get the most out of your protection with Chubb, like taking advantage of potential premium credits or our complimentary services.

Please **review, complete, and mail** the following forms:
- **ePolicy Information and Enrollment Form**

Please **review these documents for a detailed overview** of your premium:
- **Premium Summary and Privacy Notice**
- **Premium Discount Summary**

Thank you again for choosing Chubb!


Fran O'Brien
Division President, North America Personal Risk Services

Any questions? We're here to help. Our **Customer Care Team** is just a call away at **1.866.324.8222.** If you have a claim, you can reach our **Claim Service Center** directly at **1.800.252.4670.**

www.chubb.com     email: customercare@chubb.com

Chubb is the marketing name used to refer to subsidiaries of Chubb Limited providing insurance and related services. For a list of these subsidiaries, please visit our website at www.chubb.com. Insurance provided by U.S. based Chubb underwriting companies. All products may not be available in all states. Coverage is subject to the language of the policies as actually issued. Surplus lines insurance sold only through licensed surplus lines producers. Chubb Personal Risk Services, P.O. Box 1600, Whitehouse Station, NJ 08889-1600.

© Chubb.2016. All rights reserved.     Form no. Q8200000     *Reference Copy*



**CHUBB**

**Name and address of Insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Effective Date**  8/1/19
**Policy no.**  13808452-05
**Issued by**  Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period**  8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH  44114
216.658.7100

Dear Valued Client:

From your home, autos and the things you care about most to the people you love and your financial well being, you have a lot to protect. And for that you want a particular kind of protection and level of service that comes from decades of experience insuring individuals, families and their valuable possessions. Not just coverage. Craftsmanship.

**As part of our service commitment, we are proud to offer our Customer Portal.** It allows you to pay your bills online and gives you secure online access to your policy, bill, inspection, and claim information as well as other online services. Chubb utilizes security and encryption technology to ensure the privacy of your online information.

To take advantage of our online services, you will first need to establish an account and register your policies online. Please have a copy of your current policy or billing statement handy to complete the easy two step process.

**To register your policies online:**

1. Please have a copy of your current policy or billing statement handy.

2. Go to www.chubb.com/customerportal and select the "Register Now" link.

3. Complete the easy two-step process.

**Green, Save Time, Save Space - Go Paperless!** Chubb also offers Paperless Policy delivery of your policy documents and/or your bill, and the ability to electronically sign policy forms. Once you've registered your policy, simply select the "Enroll now" link next to "Make your Chubb policy paperless" on the "Account Summary" page of your Chubb Customer Portal account.

**We are here to help.** If you need assistance, please contact Chubb's Customer Care Team at 1.866.324.8222 from 8am to 8pm ET, Monday through Friday and 10am to 3pm ET on Saturdays. If you have questions or concerns about your coverage, your agent or broker is your best source of advice and guidance.

© Chubb.2016.  All rights reserved.    Form no. Q6600010

*Reference Copy*

ALTSCHULER 000003

At Chubb, you're more than a claim. You're our client.

Customer Care Team
Chubb Personal Risk Services
1.866.324.8222 (1.866.eChubb2)

www.chubb.com     email: customercare@chubb.com

Chubb is the marketing name used to refer to subsidiaries of Chubb Limited providing insurance and related services. For a list of these subsidiaries, please visit our website at www.chubb.com. Insurance provided by U.S. based Chubb underwriting companies. All products may not be available in all states. Coverage is subject to the language of the policies as actually issued. Surplus lines insurance sold only through licensed surplus lines producers. Chubb Personal Risk Services, P.O. Box 1600, Whitehouse Station, NJ 08889-1600.

© Chubb.2016. All rights reserved.     Form no. Q8600010

*Reference Copy*

ALTSCHULER 000004



**Premium Summary**
**Renewal**

CHUBB°

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Page** 1
**Effective Date** 8/1/19
**Policy no.** 13808452-05
**Policy period** 8/1/19 to 8/1/20
**Producer name** ACRISURE LLC DBA
BRITTON-GALLAGHER & ASSOCIATES

We are pleased to enclose your Chubb Masterpiece Policy, which includes an annual premium **savings of $1,979** as listed below.

This chart shows at a glance what coverages you have and the related premiums.

|  | Property covered | Coverage | Premium |
|---|---|---|---|
| **Homes and Contents** | CONDOMINIUM AT 167 EAST 82ND ST UNIT 4B NEW YORK, NY | CONTENTS, LIABILITY, ADDITIONS AND ALTERATIONS | $ 3,597.00 |
|  | HOUSE AT 34 TALMAGE LANE EAST HAMPTON, NY | LIABILITY | $ 60.00 |
| **Valuable Articles** | JEWELRY, FINE ARTS, SILVERWARE | VALUABLE ARTICLES | $ 11,386.00 |
| **Total Premium** |  |  | $ 15,043.00 |

Your policy includes a Coverage Summary and policy provisions that explain your coverage in more detail.

**Chubb Masterpiece provides many different credits for home, valuable articles, automobile and excess liability coverages. We recommend that you contact your agent or broker for an annual review to ensure that your coverages, policy limits and available credits are accurate and meet your personal insurance needs.**

**Your policy provides the following annual premium credits for the coverages listed below:**

Your homeowners premium was reduced by $505 as a result of one or more credits.

In addition, your policy premium was reduced by $1,474 for the Condominium Preference[sm] Coverage credit.

**You will receive a separate Personal Insurance Statement that will outline the schedule of premium amounts and the due dates. If an endorsement during the policy period changes the amount of premium due, you will receive a revised Personal Insurance Statement.**

If you choose one of our convenient installment plans, your payments will be slightly higher than the premium shown above because of the small service charge.

© Chubb.2016. All rights reserved.     Form no. Q0700000     (R/W)

*Reference Copy*

ALTSCHULER 000005

*Premium Summary*
*Renewal*



**Page** 2
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

We appreciate your continued business. Since 1882, personal service and comprehensive coverages have been the hallmarks of the Chubb Group of Insurance Companies.

Thank you for insuring through Chubb.

© Chubb.2016. All rights reserved.    Form no. Q0700000    (R/W)

*Reference Copy*

ALTSCHULER 000006



*Masterpiece*®

CHUBB

## CHUBB GROUP U.S. PRIVACY NOTICE

| FACTS | WHAT DOES THE CHUBB GROUP DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Insurance companies choose how they share your personal information. Federal and state law gives consumers the right to limit some but not all sharing. Federal and state law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and payment history<br>• insurance claim history and medical information<br>• account transactions and credit scores<br><br>When you are no longer our customer, we continue to share information about you as described in this notice. |
| **How?** | All insurance companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons insurance companies can share their customers' personal information; the reasons the Chubb Group chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Chubb share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | YES | NO |
| **For our marketing purposes -** to offer our products and services to you | YES | NO |
| **For joint marketing with other financial companies** | YES | NO |
| **For our affiliates' everyday business purposes -** information about your transactions and experiences | YES | NO |
| **For our affiliates' everyday business purposes -** information about your creditworthiness | NO | We don't share |
| **For our affiliates to market to you** | NO | We don't share |
| **For nonaffiliates to market to you** | NO | We don't share |
| **Questions?** | Call 1-800-258-2930 or go to https://www2.Chubb.com/us-en/privacy.aspx | |

© Chubb 2016. All rights reserved.    Form no. 0799999 (Rev. 10-16)          *Reference Copy*

ALTSCHULER 000007

Page 2

| | |
|---|---|
| **Who is providing this notice?** | The Chubb Group. A list of these companies is located at the end of this document. |

**What we do**

| | |
|---|---|
| **How does Chubb Group protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.<br><br>We restrict access to personal information to our employees, affiliates' employees, or others who need to know that information to service the account or to conduct our normal business operations. |
| **How does Chubb Group collect my personal information?** | We collect your personal information, for example, when you<br><br>&bull; apply for insurance or pay insurance premiums<br>&bull; file an insurance claim or provide account information<br>&bull; give us your contact information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br><br>&bull; sharing for affiliates' everyday business purposes - information about your creditworthiness<br>&bull; affiliates from using your information to market to you<br>&bull; sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |

**Definitions**

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>&bull; Our affiliates include those with a Chubb name and other companies, such as Westchester Fire Insurance Company and Great Northern Insurance Company. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>&bull; Chubb does not share nonaffiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>&bull; Our joint marketing partners include categories of companies such as banks. |

© Chubb 2016. All rights reserved.   Form no. 0799999 (Rev. 10-16)

*Reference Copy*

ALTSCHULER 000008

# CHUBB

| Page 3 |

## Other important information

**For Insurance Customers in AZ, CA, CT, GA, IL, MA, ME, MN, MT, NV, NC, NJ, OH, OR, and VA only:** Under state law, under certain circumstances, you have the right to see the personal information about you that we have on file. To see your information, write Chubb Group Attention: Privacy Inquiries, 202 Hall's Mill Road, P.O. Box 1600, Whitehouse Station, NJ 08889-1600. Chubb may charge a reasonable fee to cover the costs of providing this information. If you think any of the information is not accurate, you may write us. We will let you know what actions we take. If you do not agree with our actions, you may send us a statement. If you want a full description of privacy rights that we will protect in accordance with the law in your home state, please contact us and we will provide it. We may disclose information to certain third parties, such as law enforcement officers, without your permission.

**For Nevada residents only:** We may contact our existing customers by telephone to offer additional insurance products that we believe may be of interest to you. Under state law, you have the right to opt out of these calls by adding your name to our internal do-not-call list. To opt out of these calls, or for more information about your opt out rights, please contact our customer service department. You can reach us by calling 1-800-258-2930, emailing us at privacyinquiries@Chubb.com, or writing to Chubb Group, Attention: Privacy Inquiries, 202 Hall's Mill Road, P.O. Box 1600, Whitehouse Station, NJ 08889-1600. You are being provided this notice under Nevada state law. In addition to contacting Chubb, Nevada residents can contact the Nevada Attorney General for more information about your opt out rights by calling 775-684-1100, emailing bcpinfo@ag.state.nv.us, or by writing to: Office of the Attorney General, Nevada Department of Justice, Bureau of Consumer Protection: 100 North Carson Street, Carson City, NV 89701.

**For Vermont residents only:** Under state law, we will not share information about your creditworthiness within our corporate family except with your authorization or consent, but we may share information about our transactions or experiences with you within our corporate family without your consent.

## Chubb Group Companies Providing This Notice

This notice is being provided by the following Chubb Group companies to their customers located in the United States: ACE American Insurance Company, ACE Capital Title Reinsurance Company, ACE Fire Underwriters Insurance Company, ACE Insurance Company of the Midwest, ACE Life Insurance Company, ACE Property and Casualty Insurance Company, Agri General Insurance Company, Atlantic Employers Insurance Company, Bankers Standard Fire and Marine Company, Bankers Standard Insurance Company, Century Indemnity Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Chubb Insurance Company of New Jersey, Chubb Lloyds Insurance Company of Texas, Chubb National Insurance Company, Executive Risk Indemnity Inc., Executive Risk Specialty Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Illinois Union Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, Pacific Employers Insurance Company, Pacific Indemnity Company, Penn Millers Insurance Company, Texas Pacific Indemnity Company, Vigilant Insurance Company, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company.

*Reference Copy*

ALTSCHULER 000009



**Premium Discount Summary**

**Name and address of insured:**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

Page: 1
Policy no: 13808452-05
Policy period: 8/1/19 to 8/1/20

We know that you've worked hard for what you own and want to protect it. We also know that saving money is important to you. You can take advantage of a variety of discounts offered by Chubb. Here is a list of some of the discounts you're already receiving.

**You have the power to reduce your premiums.**
Your insurance cost could have been **$17,022** but you took action and received **$1,979** in discounts. Your premium was reduced to $15,043.

| Overview | Your Discount |
|---|---|
| **Homes and Contents** | That's a homeowner savings of **$1,979**. |

Condominium at:
167 EAST 82ND ST UNIT 4B, NEW YORK, NY
- $1,474 for having Condominium Preference℠ Coverage
- 7% for fire resistive construction
- 5.8% for being a long-time customer combined with your loss history
- 5% for having a residential sprinkler system and alarms within your building

Please note: This document may not reflect all of the discounts you are receiving on your Chubb insurance policy. To review all of the discounts available from Chubb, please contact your agent or broker, as he or she is always your best source of information and advice.

© Chubb.2016. All rights reserved.    Form no. Q9300000

*Reference Copy*

ALTSCHULER 000010



**New Optional Coverage Available**

CHUBB°

*We recently introduced a new coverage option to help insure your home equipment and want to let you know about it.*

**Policy no.** 13808452-05
**Policy period** 8/1/19 to 8/1/20

Dear Valued Client:

As a supplement to your *Masterpiece*® Homeowners policy, a new optional coverage-**Masterpiece Equipment Breakdown**-can bring added peace of mind. While your Homeowners policy covers a wide array of perils, such as damage caused by a fire or a falling tree, it doesn't cover some common types of problems that can occur to the equipment in your home.

While Equipment Breakdown isn't intended to cover "wear and tear" issues that occur on older equipment over time, it can provide coverage for "out of the blue" sudden and accidental breakdown. For example, if a compressor fails, and your built-in refrigerator must be replaced, the claim can be thousands of dollars. In most cases, Equipment Breakdown coverage pays for the full cost to repair or replace damaged equipment (whichever is less), without depreciation.

Equipment Breakdown coverage can be purchased if you have a Masterpiece Homeowners, Condominium, or Cooperative policy. It can be purchased for each of your homes individually, and coverage applies to all structures on the premises such as guesthouses or barns. It's a simple, affordable way to protect your equipment investment.

You have choice and control when purchasing Masterpiece Equipment Breakdown coverage. You can choose the amount of coverage that makes the most sense for your household, and you can also choose between *Essential* or *Enhanced* policy terms.

- *Essential* **Equipment Breakdown** covers breakdown of residential equipment that is permanently installed to service the home. This includes heating and cooling systems, appliances, water heaters, swimming pool equipment, well pumps, permanently installed generators and transfer switches, and permanently installed home automation and security systems. It also covers elevators, except for select components that may be underground. Essential coverage can be purchased up to a $250,000 limit.
- *Enhanced* **Equipment Breakdown** covers the same as *Essential,* but if you have a Masterpiece Contents policy, coverage is extended to include residential equipment that is not permanently installed. This could include small countertop appliances, computers, portable humidifiers and more. *Enhanced* coverage can be purchased up to a $500,000 limit.

Learn More To add *Enhanced* or *Essential* Equipment Breakdown coverage to your Masterpiece suite of coverages, please contact your agent or broker.

www.chubb.com    email: customercare@chubb.com

Chubb is the marketing name used to refer to subsidiaries of Chubb Limited providing insurance and related services. For a list of these subsidiaries, please visit our website at www.chubb.com. Insurance provided by U.S. based Chubb underwriting companies. All products may not be available in all states. Coverage is subject to the language of the policies as actually issued. Surplus lines insurance sold only through licensed surplus lines producers. Chubb Personal Risk Services, P.O. Box 1600, Whitehouse Station, NJ 08889-1600.

© Chubb.2016.  All rights  reserved.        Form no. Q8420012

*Reference Copy*

ALTSCHULER 000011



**CHUBB**

**Name and address of Insured**
DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Effective Date**  8/1/19
**Policy no.**  13808452-05
**Issued by**  Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period**  8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH  44114
216.658.7100

## IMPORTANT NOTICE

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

© Chubb.2016.  All rights  reserved.     Form no. Q8600020

*Reference Copy*

ALTSCHULER 000012



**Third Party Designation**

CHUBB

**Name and address of Insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Effective Date** 8/1/19
**Policy no.** 13808452-05
**Issued by**
Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period** 8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH  44114
216.658.7100

### IMPORTANT NOTICE TO ALL INSUREDS, INCLUDING SENIOR CITIZENS
### THIRD PARTY DESIGNATION NOTIFICATION

State law permits named insureds to designate a third party (called a "Designee")  to whom we will send a duplicate copy of certain notices (such as policy cancellation or nonrenewal notices to the extent specified by state law), that we issue to you for your policy number shown above. **Please note:** Naming of a "Designee" is **NOT** necessary if you do not want anyone else receiving policy notices.

**If you are naming a "Designee", please complete this form according to the following instructions:**
1.  Print the "Designee's"  name and address;
2.  Sign and date this form; and
3.  Have your "Designee"  sign and date it.

The types of duplicate policy notices your "Designee"  will receive are listed on the back of this form.

### Request To Designate a Third Party
### for Receipt of Duplicate Policy Notices

I designate the following person to receive a copy of any notice, according to state law, that you might send me for the policy number shown above, such as policy cancellation or nonrenewal notices.

Name of "Designee"  (print): _____

Street (print): _____

City (print): _____  State: _____  Zip: _____

_____          _____
Signature of Insured                                                              Date

**I accept the designation above. I understand my designation as a third party shall not constitute acceptance of any liability on my part or the insurer for services provided to the insured. If I decide to terminate my designation, I must provide written notice to both the insured and the insurer.**

_____          _____
Signature of Third Party "Designee"                                     Date

**To return your completed "Request to Designate a Third Party", please see the "Return Instructions" on the back of this form. Please return this entire form.**

© Chubb.2016.  All rights  reserved.     Form no.  Q6499805

*Reference Copy*

ALTSCHULER 000013

**What types of policy notices will the "Designee" receive for this policy?**
- For **California** policies, duplicates of notices of cancellation, nonrenewal, expiration, lapse, or termination for nonpayment of premium.
- For **Connecticut** policies, duplicates of notices of cancellation or nonrenewal.
- For **New Jersey** or **New York** policies, duplicates of notices of cancellation, nonrenewal, or conditional renewal.

**Return Instructions:** If you are designating a third party as "Designee", please return your completed "Request to Designate a Third Party" to us using one of these methods:

*For New Jersey and New York policies: state law requires that you return your completed request by certified mail, return receipt requested.*

**Mail to:**
Chubb Personal Risk Services Operations
Attention: MP Processing
PO Box 1600
Whitehouse Station, NJ 08889-1600

*For all other states, the following options are also available for return:*

**Email:** myforms@chubb.com
**Subject Line:** (include your policy number)

(This email address cannot respond to inquiries.)

OR

**Fax:** 1-888-684-2200

- The third party designation will become effective no later than ten (10) business days after we receive the completed form signed by both you and your "Designee".

- You may terminate the third party designation at any time by sending written notification to us. The policy number must be included in your request.

- This designation will remain in effect for the policy until you or your "Designee" requests a change to the Third Party Designation.

- Keep a copy of the completed form for your records.

© Chubb.2016. All rights reserved.    Form no. Q6499805

*Reference Copy*

ALTSCHULER 000014



**Homeowners Consumer Disclosure for New York**

CHUBB

**Name and address of Insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Effective Date**  8/1/19
**Policy no.**  13808452-05
**Issued by**  Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period**  8/1/19 to 8/1/20

## CONSUMER DISCLOSURE STATEMENT - NEW YORK HOMEOWNERS RENEWAL

In connection with this insurance, we previously used a credit report or obtained or used a credit-based insurance score based on information contained in that report. We may obtain or use credit information again provided, however, that upon renewal such information may only be used to reduce premiums. An insurance score uses information from your credit report to help predict how often you are likely to file claims and how expensive those claims will be. Typical items from a credit report that could affect a score include, but are not limited to, the following: payment history, number of revolving accounts, number of new accounts, the presence of collection accounts, bankruptcies and foreclosures. The information used to develop the insurance score comes from LexisNexis.

If you have any questions regarding this disclosure please contact:

Chubb Personal Risk Services
Attention: Consumer Report Unit
PO Box 1600
Whitehouse Station, NJ 08889-1600
866-324-8222

© Chubb.2016.  All rights reserved.       Form no. 6498131        *Reference Copy*

ALTSCHULER 000015



**CHUBB**

*In order to continually provide some of the finest insurance products available, we sometimes make changes to our state contracts. Below is a convenient summary of current changes for your state.*

Policy no. 13808452-05
Policy period 8/1/19 to 8/1/20

---

Dear Valued Client:

We are pleased to enclose the renewal of your *Masterpiece*® policy. Please be aware that it contains the following changes to your Introduction page:

- We added the definition of "Spouse" which means a partner in marriage or a domestic partner registered under state law and who lives with you.

- We reinforced our intent that a student under the age of 25 in your care, temporarily away at school, who is a resident of the household is considered a "family member".

If you have New York homeowner, personal liability or excess liability coverages on your policy, we have also included a summary of changes explaining some important changes to those coverages with an edition date of November 20, 2017 or later. The goal of all such changes is to provide you with greater value over time by controlling the cost of your insurance, affording new or enhanced coverages that better meet your needs and expectations, and reinforcing the intent of certain policy language.

We recommend that you take some time to review your policy carefully, as it alone fully describes the coverages you have purchased. If you have any questions or need assistance, your agent or broker is always the best source of information and advice.

Thank you for insuring with Chubb. We appreciate your business.

www.chubb.com     email: customercare@chubb.com

Chubb is the marketing name used to refer to subsidiaries of Chubb Limited providing insurance and related services. For a list of these subsidiaries, please visit our website at www.chubb.com. Insurance provided by U.S. based Chubb underwriting companies. All products may not be available in all states. Coverage is subject to the language of the policies as actually issued. Surplus lines insurance sold only through licensed surplus lines producers. Chubb Personal Risk Services, P.O. Box 1600, Whitehouse Station, NJ 08889-1600.

© Chubb.2016. All rights reserved.      Form no. Q6413101

*Reference Copy*

ALTSCHULER 000016

**CHUBB**

**Summary of Coverage Changes**
**New York**
**Condominium Preference℠ Coverage, Cooperative Preference℠ Coverage**
**Deluxe Condominium Coverage, Standard Condominium Coverage,**
**Deluxe Cooperative Coverage, Standard Cooperative Coverage,**
**Deluxe Renters Coverage, Standard Renters Coverage**
**Edition Date of November 20, 2017**

The following is not your actual insurance policy, but rather a summary description of the changes to *Masterpiece*® condominium, cooperative and renters coverages provided for your convenience. Please read the terms, conditions and exclusions of your *Masterpiece* policy for the precise coverage afforded. Not all coverage changes listed below may apply to you. Some coverage changes do not apply to all condominium, cooperative and renters coverages we offer. Only descriptions of coverage changes that apply to the condominium, cooperative or renters coverages listed above are noted. Your payment of the renewal premium indicates acceptance of these changes.

**Special limits**
We added text indicating an act or any series of similar acts committed by one or more persons is one loss. We expanded the category of legal tender to include unrecoverable scrip, smart cards, prepaid value cards and debit cards, and gift certificates. We also added text to indicate that the special limit for securities includes your incurred expenses to research, replace, or restore the covered items.

In addition, for Standard Condominium, Cooperative, and Renters Coverages only, we now include "other personal articles" in the category of plated ware which aligns the property under this special limit category with our Deluxe Coverage forms.

**Definition of "Business"**
We added a definition of "business" to apply in lieu of the "business" definition in your Introduction page for this part of your policy. "Business" now includes any activity intended to realize a benefit or financial gain on a full-time, part-time or occasional basis.

**Additional living expenses**
We made several revisions to the three provisions of this Extra Coverage.
Under *Extra living expenses and Fair rental value:*
- Coverage is now provided from the date of loss ending with the earliest of the amount of time required to restore the unit; the amount of time to permanently settle elsewhere (applicable to Extra living expenses only); or up to two years from the date of loss, or a later date if agreed to by us.
- We added a condition that you have up to 180 days from date of loss or a later date if agreed to by us to inform us of your decision to replace, repair, rebuild or permanently relocate. If you do not inform us, coverage will cease 30 days thereafter.

Under *Forced evacuation expenses:*
- Coverage is now provided if you evacuate due to a reasonable threat of a loss covered under the policy, or if forced to evacuate by a civil authority as a direct result of a covered peril.
- If we determine after the threat of loss is over that there is no covered loss making your unit uninhabitable, coverage for forced evacuation expenses will cease, unless a civil authority prohibits you from use of your unit due to a covered peril.
- Coverage is provided for up to 30 consecutive days.

© Chubb.2016. All rights reserved.     Form no.  Q6413104

*Reference Copy*

ALTSCHULER 000017

**Landscaping**
We revised this Extra Coverage to specify that coverage is not applicable to naturally occurring or native grown vegetation, including but not limited to brush, woodlands, forests, grasslands, wetlands, mangroves, and to vineyards, sod farms, tree farms, orchards, and crops grown or used primarily for business purposes. We reinforced our intent that we may agree to a date beyond 180 days from the date of loss for you to begin to repair or replace the damaged property for coverage to apply.

**Business property**
We broadened this Extra Coverage to include portable devices such as smartphones, electronic reading devices, tablets, handheld computers and other similar devices. We reinforced our intent that we will pay the necessary, reasonable cost incurred by you using the most cost-effective medium for replacing business data.

**Electronic data restoration**
We broadened this Extra Coverage by:
- increasing the limit *from $5,000 to $10,000;*
- including non-recoverable ebooks, software, application software, music and movie files;
- expanding the Electronic data processing property definition to include portable devices such as smartphones, tablets, and other similar devices; and
- removing the application of the home and contents deductible from this coverage.

Additionally, for Condominium and Cooperative Preference Coverages only, the limit is increased *from $10,000 to $20,000.*

**Account funds**
We broadened this Extra Coverage by increasing the coverage limit *from $1,500 to $10,000* and adding credit line to the definition of Account funds. The definition of unauthorized use is changed to only preclude removal of funds by your spouse or family member. We introduced text indicating an act or any series of similar acts committed by one or more persons is one loss and also reinforced our intent that this coverage is only for personal accounts.

**Rebuilding to code**
We revised this Extra Coverage by reinforcing our intent that costs you incur to conform to any law and ordinance that is not a direct result of the covered loss are not included.

**Water detection expense.** *(Applicable to Condominium and Cooperative Preference, Deluxe Condominium and Cooperative Coverages)*
We broadened this Extra Coverage by including coverage, up to $5,000 for the cost of a water leak detection and control system.

**The Perils of Freezing, Falling objects, and Wind or hail.** *(Applicable to Standard Condominium, Cooperative and Renters Coverages)*
We revised text to reinforce our intent that we cover physical loss caused by these perils to contents or other covered property.

**Loss by animals.** *(Applicable to Condominium and Cooperative preference, Deluxe Condominium, Cooperative, and Renters Coverages)*
We revised this Exclusion to reinforce our intent that we exclude loss caused by any animal owned or kept by you. We expanded this exclusion to apply to loss caused by bats and mollusks, and to loss caused by nesting or infestation, discharge or release of waste products or secretions by any animal.

© Chubb.2016. All rights reserved.    Form no.  Q6413104

*Reference Copy*

ALTSCHULER 000018

CHUBB

**Surface water**
We revised this Exclusion to reinforce our intent that loss caused by these additional types of surface water is excluded:
- accumulation of rainwater on the ground, wave action including tidal wave and tsunami, tides, seiche, and spray or surge from any of these even if driven by wind;
- escape, overflow, discharge or release, for any reason, of water or water borne material from a canal, dam, reservoir, levee, dike, seawall, or any other boundary or containment.

We reinforced that a drain outside of or on the exterior of a fully enclosed structure includes gutters, rainwater pipes, downspouts and underground drainage systems. We now insure ensuing covered loss only due to fire, explosion, or theft.

Additionally, for Deluxe Condominium, Cooperative and Renters Coverages and Condominium and Cooperative Preference Coverages, we reinforced our intent that we do not cover surface water damage to contents stored out of your unit elsewhere in the condominium, cooperative or rental building or complex.

**Ground water**
We revised this Exclusion to indicate we now insure ensuing covered loss only due to fire, explosion, or theft.

Additionally, for Deluxe Condominium, Cooperative and Renters Coverages, and Condominium and Cooperative Preference Coverages, we reinforced our intent that we do not cover ground water damage to contents stored out of your unit elsewhere in the condominium, cooperative or rental building or complex.

**Earth movement** *(Applicable to Standard Condominium, Cooperative and Renters Coverages)*
We revised this Exclusion to exclude loss caused by any expansion, contracting, sinking, rising, settling, or shifting of the earth, soil, or land. This exclusion applies whether or not the earth, soil, or land is combined or mixed with water or any other liquid or natural or man-made material.

© Chubb.2016. All rights reserved.    Form no. Q6413104

*Reference Copy*

ALTSCHULER 000019

CHUBB

**Summary of Coverage Changes**
**New York**
**Personal Liability Coverage**
**Edition Date of November 20, 2017**

The following is not your actual insurance policy, but rather a summary description of the changes to *Masterpiece* Personal Liability Coverage provided for your convenience. Please read the terms, conditions and exclusions of your *Masterpiece* policy for the precise coverage afforded. Your payment of the renewal premium indicates acceptance of these changes.

**Definition of "You"**
We added a definition of "you" to apply in lieu of the definition of "you" in your Introduction page for this part of your policy. We enhanced the definition of "you" to include a personal asset protection entity and its partners, members or trustees but only with respect to their legal responsibility for the ownership, maintenance or use of:
- residences including contents and property insured under a personal articles floater or similar policy,
- vacant land and cemetery or burial vaults, or
- a vehicle or watercraft owned or rented by the personal asset protection entity;
covered under your personal liability coverage.

The personal asset protection entity is also included in the definition of "you" with respect to Employment practices liability coverage if purchased and Workers' compensation.

**Definition of "Occurrence"**
We revised the definition of "occurrence" to reinforce our intent regarding what is considered an offense and that the offense must be first committed within the policy period.

**Definition of "Business"**
We added a definition of "business" to apply in lieu of the "business" definition in your Introduction page for this part of your policy. "Business" now includes any activity intended to realize a benefit or financial gain on a full-time, part-time or occasional basis.

**Definition of "Personal asset protection entity"**
We added the definition of "personal asset protection entity", to mean a legal entity that owns or manages residence premises, property of such residences, articles of value, vacant land and cemetery plots or burial vaults.

**Definition of "Unregistered vehicle"**
We expanded the definition of "unregistered vehicle" to include the use of unregistered vehicles used solely to service a residence premises, where previously the use was only on the residence premises.

**Medical payments to others**
We broadened this Extra Coverage by increasing the coverage limit **from $25,000 to $50,000.**

**Damaged property**
We broadened this Extra Coverage by increasing the coverage limit *from $15,000 to $25,000.*

**Kidnap expenses**
We revised this Extra Coverage to reinforce our intent that a kidnap and ransom occurrence does not include the wrongful detention of a covered person or a family member solely on your property.

© Chubb.2016. All rights reserved.      Form no. Q6413106

*Reference Copy*

ALTSCHULER 000020

**Credit cards, forgery, and counterfeiting**
We revised this Extra Coverage to reinforce our intent that coverage is applicable only to personal credit cards, debit cards, and bank cards. The definition of "unauthorized use" is changed to only preclude use by your spouse or family member. We introduced text indicating an act or series of similar acts committed by one or more persons is one loss.

**Rented or borrowed vehicles**
We broadened this Extra Coverage to cover damages a personal asset protection entity is legally obligated to pay from an occurrence arising from the use of a vehicle rented by this entity. This coverage applies if the amount of liability coverage is at least $1 million and the entity does not have coverage for rented vehicles under an excess or umbrella policy and does not own a private passenger vehicle.

**Motorized land vehicles**
We broadened the coverage grant in this Exclusion to cover toys designed for a child's use, not subject to motor vehicle registration, that do not exceed 15 miles per hour. This does not include motorized bicycles and scooters, or mopeds. We also made editorial updates for better readability.

**Aircraft**
We revised this exclusion to exclude damages arising from the ownership, maintenance or use of a drone or similar unmanned device:

- while being operated in a restricted airspace as determined by the Federal Aviation Administration or other governmental agency, whether on a local, state or federal level, including any temporary flight restrictions; or
- to any aircraft, including any resulting damages, whether the drone makes contact with the aircraft or not.

**Large watercraft**
We revised this Exclusion to reinforce our intent that this exclusion applies to large watercraft rented by, furnished to, or made available to a covered person for longer than 30 consecutive days. We reinforced that we cover watercraft being stored, even if not listed in your Coverage Summary.

**Employees**
We added the exclusion, Employees, to exclude damages arising out of acts of employees of a personal asset protection entity except those acts in the course of their employment for the maintenance or use of covered property.

**Failure to act**
We added the exclusion, Failure to act, to exclude damages arising out of acts, errors, decisions, or failure to act by a partner, member or trustees of a personal asset protection entity, other than with respect to damages arising out of owned residences, vacant land, cemetery plots, burial vaults, or a vehicle or watercraft owned or rented by a personal asset protection entity as covered under personal liability coverage.

**Damage to property in your care**
We revised this Exclusion by removing text which applied the exclusion to property of others damaged in your care if you were required by contract to provide insurance. We also reinforced that this exclusion does not apply to damage to other people's property caused by you as provided in the Extra Coverage, Damaged Property.

**Molestation, misconduct or abuse**
We added the exclusion, Molestation, misconduct or abuse, to exclude damages arising out of any actual, alleged or threatened sexual molestation; sexual misconduct or harassment; or abuse. The exclusion does not apply to Employment practices liability coverage.

© Chubb.2016.  All rights  reserved.      Form no.  Q6413106

*Reference Copy*

CHUBB

**Business pursuits**
We revised this Exclusion to reinforce our intent that business activities or business property in which a covered person has ownership or interest is not covered. Under "incidental business at home", the coverage grant is only available if the incidental business activity is conducted by you. In addition, the gross revenue threshold of $15,000 now applies to your management of your personal investments. Under "incidental business property", we broadened the coverage grant to cover an other interested party for rental properties.

© Chubb.2016.  All rights reserved.      Form no.  Q6413106

*Reference Copy*

ALTSCHULER 000022



**Masterpiece**®

CHUBB·

**Coverage Summary
Renewal**

**Name and address of Insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Page** 1
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Issued by** Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period** 8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH  44114
216.658.7100

This Coverage Summary is part of your policy. **PLEASE READ YOUR POLICY CAREFULLY, INCLUDING
THIS COVERAGE SUMMARY, FOR A COMPLETE DESCRIPTION OF YOUR COVERAGES.**

## Homes and Contents

Your policy provides coverage against physical loss if your home or its contents are damaged, destroyed, or
lost. The kinds of losses that are covered, and any special limits that apply, are explained in detail in the
policy.

| Address | Dwelling | Contents |
|---|---|---|
| CONDOMINIUM AT<br>167 EAST 82ND ST UNIT 4B<br>NEW YORK, NY | | $488,000<br>PREFERENCE<br>COVERAGE |
| | | REPLACEMENT COST |

The base deductible for each occurrence is  $2,500. We will waive the base deductible for covered losses of
more than $50,000 except for covered losses subject to any special deductibles. Special deductibles include
the vacant house deductible, water backup deductible, wind or hail deductible, and earthquake deductible.

### Additional coverages  or conditions

**Additions and alterations**
You have up to  $1,008,500 of Additions and alterations coverage for your residence at
167 EAST 82ND ST UNIT 4B, NEW YORK, NY.

**Additions and alterations extended replacement cost payment basis**
Extended replacement cost applies to your additions and alterations for your residence at
167 EAST 82ND ST UNIT 4B, NEW YORK, NY.
Under Condominium Preference  Coverage, Extra Coverages, the Extra Coverage, **Additions and
alterations** is deleted and replaced with the following for this residence:
Additions and alterations
We cover your building additions, alterations, fixtures, improvements, installations, or items of real property
that are part of your unit as defined in the Master Deed. This includes breakage of glass or safety glazing
material in the building, or a storm door or window. We also cover any other structure on the condominium

*Reference Copy*

ALTSCHULER 000023

*Coverage Summary*
*Renewal*

**Page** 2
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

## Homes and Contents

(Continued)

property that is owned by you or available for your exclusive use and which you are required to insure.

The payment basis for these items is extended replacement cost. This means that for a covered loss to these items, we will pay the reconstruction cost. If the reconstruction cost exceeds the amount of coverage for Additions and alterations as shown in the Coverage Summary, we will pay up to 50% more than this amount of coverage, if necessary, for the reconstruction cost. Extended replacement cost is provided on the condition that you maintain at least the amount of additions and alterations coverage for your unit as agreed to, including any adjustments by us based on appraisals, revaluations and annual adjustments for inflation.

This extended replacement cost payment basis is subject to the following limitations:
- If you have a covered partial loss to your additions and alterations and do not begin to repair, replace, or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost, less depreciation.
- If you do not repair, replace or rebuild your additions or alterations at the same location, we will pay the reconstruction cost of your additions or alterations up to the amount of coverage for Additions and alterations as shown in the Coverage Summary.
- If at any time during any policy period of this coverage you are constructing or renovating additions or alterations to your unit, which will equal or exceed the lesser of 10% of the amount of coverage for additions and alterations for your CONDOMINIUM unit shown in the Coverage Summary at the time of a covered loss or $500,000, your payment basis will be conditional replacement cost. Conditional replacement cost will remain your payment basis until construction is completed.
  **Your duty:** It is your duty to notify your agent or broker at the beginning of, throughout, and at the completion of construction so that the amount of coverage for your additions and alterations can be adjusted to maintain an appropriate amount of coverage based on the construction cost information you provide. This is to reduce the possibility of being underinsured.

If the payment basis is conditional replacement cost, our payment will be the proportion of the covered loss to your additions or alterations determined by dividing the amount of coverage for your additions and alterations by 80% of the amount required to rebuild all of your additions or alterations. However, our payment will not exceed the lesser of:
- the reconstruction cost; or
- the amount of coverage for your additions and alterations.

If the payment basis is conditional replacement cost and you have a partial loss to your additions or alterations, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, our payment will be the lesser of the following:
- the reconstruction cost less depreciation; or
- the proportion of the covered loss to your additions or alterations determined by dividing the amount of coverage for your additions and alterations by 80% of the amount required to rebuild all of your additions or alterations.

However, our payment will not exceed the lesser of:
- the reconstruction cost; or
- the amount of coverage for your additions and alterations.

© Chubb.2016.  All rights reserved.    Form no.  Q0802000    (R/W)

*Reference Copy*

ALTSCHULER 000024

*Coverage Summary*
*Renewal*



**Page 3**
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

## Homes and Contents

(Continued)

"Reconstruction cost" means the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location, your additions or alterations, using like design, and materials and workmanship of comparable kind and quality. "Reconstruction cost" does not include any amount required for:

• conforming to any law or ordinance that regulates the repair, replacement, rebuilding, or demolition of your additions and alterations; or
• removing the debris of a covered loss or the property that caused a covered loss.

**Important notice regarding mold remediation expense limit**

You have the standard $20,000 mold remediation expense limit as described in your policy for the residence at 167 EAST 82ND ST UNIT 4B, NEW YORK, NY. To increase the limit for mold remediation expenses, you must contact your agent or broker shown at the top of this Coverage Summary prior to the effective date of this renewal. The request will be subject to underwriting acceptance.

## Valuable Articles

This policy provides you with coverage against physical loss if your valuable articles are lost, damaged, or destroyed. The kinds of losses that are covered, and any special limits that apply, are explained in detail in the policy.

### Blanket coverage

We will pay up to the amount shown in the following chart for each category of valuable articles. However, the most we will pay for any one article is the blanket limit per item shown for that category.

### Itemized articles

The amount of coverage for your valuable articles is shown in the following chart. A list of your itemized valuable articles, and the specific coverage amounts, can be found at the end of the Coverage Summary.

| Class | Amount of blanket coverage | | Blanket limit per item | | Amount of itemized coverage | |
|---|---|---|---|---|---|---|
| JEWELRY | NO COVERAGE | | NO COVERAGE | | $ | 296,000 |
| FINE ARTS | $ | 50,000 | $ | 50,000 | $ | 5,586,000 |
| SILVERWARE | $ | 25,000 | NO ITEM LIMIT | | NO COVERAGE | |

**There is no deductible for this coverage.**

*Reference Copy*

ALTSCHULER 000025

*Coverage Summary*
*Renewal*

**Page** 4
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

## *Liability*

Amount of liability coverage: **$5,000,000.**

This is the total amount of your liability coverage. It applies to all property for which you have liability coverage, as shown in the following chart.

Your liability coverage covers damages for which you are legally responsible. For each occurrence, we will pay up to the amount of your liability coverage, as explained in your policy.

However, when you have **excess** liability only, we will pay for a covered loss **only** after the loss exceeds the required primary underlying insurance shown in your policy. This applies whether you have other liability coverage provided under a separate policy with us or by another insurance company.

| **Home** | CONDOMINIUM AT<br>167 EAST 82ND ST UNIT 4B<br>NEW YORK, NY | PERSONAL LIABILITY |
| --- | --- | --- |
| | HOUSE AT<br>34 TALMAGE LANE<br>EAST HAMPTON, NY | PERSONAL LIABILITY |

As the duly authorized representative of the company my signature validates this policy.

Paul N. Morrissette
Authorized representative

© Chubb.2016.  All rights reserved.      Form no.  Q0802000      (R/W)

*Reference Copy*

ALTSCHULER 000026



**Itemized Articles**

**Name and address of insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Page** 1
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Issued by** Chubb National Insurance Company
a stock insurance company
incorporated in Indiana .
**Policy period** 8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH  44114
216.658.7100

| Class | No. | Description | | Value |
|-------|-----|-------------|---|-------|
| Jewelry | 3 | ROLEX GMT REF NO: 1675 SERIAL NO: 4,079,294 CIRCA: 1974 VINTAGE GMT WITH PUMPKIN MARKERS. INCLUDES PAPERS | $ | 36,750 |
| | 4 | ROLEX SUBMARINER REF NO: 5513 SERIAL NO: 1,208,181 CIRCA: 1965 VINTAGE SUBMARINER FEATURES A GILT LACQUER DIAL WITH STRETCH RIVET BAND | $ | 36,750 |
| | 5 | ROLEX STEVE MCQUEEN STAINLESS STEEL EXPLORER REFERENCE NO:1655 SERIAL NO: 7431998 SECOND GENERATION STEVE MCQUEEN EXPLORER II. COMPLETE WITH ORIGINAL BOX, PUNCH PAPERS, AND ADDITIONAL DOCUMENTATION | $ | 35,000 |
| | 7 | VINTAGE ROLEX GMT REFERENCE NO: 1675 SERIAL NO: 7431998 VINTAGE GMT, WITH GILT TRAIN RAIL DIAL, AND POINTED CROWN GUARDS. STAINLESS STEEL CASE, MOUNTED ON LEATHER BAND WITH ROLEX STEEL BUCKLE. | $ | 15,000 |
| | 9 | ROLEX DAYTONA REFERENCE NO: 6265 SERIAL NO: 5442996 VINTAGE DAYTONA CHRONOGRAPH, IN 18KT YELLOW GOLD, WITH A BLACK DIAL, MOUNTED ON 18KT GOLD BRACELET, COMPLETE WITH ORIGINAL PUNCH PAPERS. ADDITIONAL ROLEX 6263 BLACK AND GOLD BEZEL INCLUDED. | $ | 85,000 |
| | 10 | ROLEX DAYTONA REFERENCE NO: 6265 SERIAL NO: 5582584 VINTAGE DAYTONA CHRONOGRAPH, STAINLESS STEEL CASE AND | | |

Reference Copy

ALTSCHULER 000027

*Itemized Articles*

**Page 2**
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

| Class | No. | Description | Value |
|---|---|---|---|
| **Jewelry** (continued) | | BRACELET, WHITE DIAL, COMPLETE WITH ORIGINAL PUNCH PAPERS. | $ 50,000 |
| | 11 | ROLEX ZENITH DAYTONA REFERENCE NO: 16520 SERIAL NO: 7431998 ZENITH MOVEMENT DAYTONA CHRONOGRAPH, STAINLESS STEEL CASE AND BRACELET, WHITE DIAL, A-SERIAL NUMBER, COMPLETE WITH ORIGINAL ROLEX PAPERS. | $ 15,000 |
| | 12 | ROLEX DAYTONA WHITE CERAMIC DIAL. REF NO: 116500LN, SERIAL NO: 374183Y0. | $ 22,500 |
| **Fine Arts** | 1 | JOHN MCCRACKEN ALPAH 6, 1988 STAINLESS STEEL 18.9 X 14.96 X 9.84 INCHES | $ 150,000 |
| | 2 | ANDY WARHOL AND KEITH HARING ANDY MOUSE, 1986 COLOR SILKSCREENS EDITION OF 30 38 X 38 INCHES | $ 1,500,000 |
| | 3 | PETER ALEXANDER UNTITLED (WEDGE), 1968-69 POLYESTER RESIN 64 X 7 X 7 INCHES | $ 250,000 |
| | 4 | CHARLES ARNOLDI UNTITLED (DIPTYCH), 1980 ACRYLIC & FLASHE ON CANVAS 84 X 150 INCHES | $ 200,000 |
| | 5 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $ 45,000 |
| | 6 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE & CHROME 12-1/2 X 12-1/2 X 12-1/2 INCHES | $ 150,000 |
| | 7 | BILLY AL BENGSTON HONOLULU WATERCOLOR, 1979 WATERCOLOR ON PAPER 29 X 29 INCHES | $ 25,000 |
| | 8 | BILLY AL BENGSTON SONOYTA DRACULA, 1972 ACRYLIC ON CANVAS 8 X 8 FEET | $ 150,000 |
| | 9 | VIJA CELMINS UNTITLED (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #3/20 20-1/4 X 29-1/4 INCHES | $ 200,000 |
| | 10 | JOSEPH CORNELL UNTITLED (WINDOW FACADE), CIRCA 1953-56 PAINTED WOOD, MIRROR, NEWSPRINT BOX CONSTRUCTION 18-1/8 X 11-7/8 | |

© Chubb.2016. All rights reserved.    Form no. Q1200000    (R/W-RL)

*Reference Copy*

*Itemized Articles*

CHUBB

**Page 3**
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Name** DOUGLAS ALTSCHULER & ZOE WERNER

| Class | No. | Description | Value |
|---|---|---|---|
| **Fine Arts** (continued) | | X 4-7/8 INCHES | $ 400,000 |
| | 11 | FRANCOIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71-5/8 X 41 INCHES | $ 1,000,000 |
| | 12 | ALFRED LESLIE UNTITLED, 1960 MIXED MEDIA COLLAGE 28 X 22 INCHES | $ 100,000 |
| | 13 | JOHN MCCRACKEN IXIT, 2005 POLYESTER RESIN, FIBERGLAS & PLYWOOD 28-1/4 X 15 X 9-1/4 INCHES | $ 150,000 |
| | 14 | KEN PRICE DESIGN FOR BILLBOARD, 1981 GRAPHITE, COLORED PENCIL, GOUACHE & WASH ON BOARD 20 X 36 INCHES | $ 50,000 |
| | 15 | KEN PRICE JELLED, 2001 ACRYLIC ON CERAMIC 6-1/2 X 10-1/4 X 7-1/2 INCHES | $ 100,000 |
| | 16 | KEN PRICE UNTITLED, 1977 LITHOGRAPH EDITION #15/20 30 X 22 INCHES | $ 4,000 |
| | 17 | KEN PRICE HERMIT CRAB CUP, 1972 LITHOGRAPH EDITION AP 28 X 22 INCHES | $ 4,000 |
| | 18 | KEN PRICE JIVAROLAND FROG CUP, 1968 LITHOGRAPH EDITION BAT 22 X 16-7/8 INCHES | $ 4,000 |
| | 19 | KEN PRICE JAPANESE TREE FROG CUP, 1968 LITHOGRAPH EDITION #12/20 25-1/4 X 17-1/2 INCHES | $ 4,000 |
| | 20 | ROBERT RAUSCHENBERG PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000 VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE 85.5 X 60.5 INCHES | $ 900,000 |
| | 21 | JOSEPH CORNELL UNTITLED (BLUE SAND TRAY), 1954 WOOD, SAND, CLOCK SPRING & BALL BEARING UNDER GLASS 10.5 X 7.5 X 1.5 INCHES | $ 200,000 |

*Reference Copy*

ALTSCHULER 000029



## CHUBB

**Additional Interests Summary**

**Name and address of Insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Page** 1
**Effective date** 8/1/19
**Policy no.** 13808452-05
**Issued by** Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period** 8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH 44114
216.658.7100

This Summary lists the Additional Interests you have requested to be shown on your policy. We notify each Additional Interest separately. Regardless of the number of Additional Interests shown on your policy, the amount of coverage for any one occurrence does not increase.

## Mortgagee

This section shows the Mortgagee(s) for your home(s) shown below.

| Address | Mortgagee |
|---|---|
| CONDOMINIUM AT 167 EAST 82ND ST UNIT 4B NEW YORK, NY | FIRST NIAGARA BANK N.A. ISAOA PO BOX 790790 SAN ANTONIO, TX 78279-0790 Loan Number 1508130307 |
| CONDOMINIUM AT 167 EAST 82ND ST UNIT 4B NEW YORK, NY | KEYBANK NATIONAL ASSOCIATION ISAOA, ATTN: INSURANCE ADMIN 11501 OUTLOOK ST. SUITE 300 OVERLAND PARK, KS 66211 Loan Number 5049000020110709 |

© Chubb.2016. All rights reserved.    Form no. Q6010000    (R/W-RL)

*Reference Copy*

ALTSCHULER 000030



**Table of Contents**

**Name and address of insured**

DOUGLAS ALTSCHULER & ZOE WERNER
167 EAST 82ND ST UNIT 4B
NEW YORK, NY 10028

**Effective date** 8/1/19
**Policy no.** 13808452-05
**Issued by** Chubb National Insurance Company
a stock insurance company
incorporated in Indiana
**Policy period** 8/1/19 to 8/1/20

**If you have any questions, please contact**
ACRISURE LLC DBA BRITTON-GALLAGHER &
ASSOCIATES
1375 EAST 9TH ST FL 30
CLEVELAND, OH 44114
216.658.7100

This table of contents lists your policy provisions. Please attach this table of contents to your policy so you have a current list of your coverages at all times.

## Contents

| Chapter | Edition Date | State | Page |
|---|---|---|---|
| Introduction | | | A-1 |
| Condominium Preference[SM] Coverage | 11/17 | N Y | G2-1 |
| Valuable Articles Coverage | 01/13 | N Y | N-1 |
| Personal Liability Coverage | 11/17 | N Y | T-1 |
| Policy Terms | 11/17 | N Y | Y-1 |
| Policy Information Notice | 11/17 | N Y | |

© Chubb.2016. All rights reserved.    Form No.Q0903000

Reference Copy

 *Introduction*

This is your Chubb Masterpiece Policy. Together with your Coverage Summary, it explains your coverages and other conditions of your insurance in detail.

This policy is a contract between you and us. **READ YOUR POLICY CAREFULLY** and keep it in a safe place.

## Agreement

We agree to provide the insurance described in this policy in return for your premium and compliance with the policy conditions.

## Definitions

In this policy, we use words in their plain English meaning. Words with special meanings are defined in the part of the policy where they are used. The few defined terms used throughout the policy are defined here:

**You** means the person named in the Coverage Summary, and a spouse who lives with that person.

For your New York coverages, the following definition of **Spouse** is added:
**Spouse** means a partner in marriage or a domestic partner registered under state law and who lives with you.

**We** and **us** mean the insurance company named in the Coverage Summary.

**Family member** means your relative who lives with you, or any other person under 25 in your care or your relative's care who lives with you, or a student under 25 in your care temporarily away at school who is a resident of your household.

**Policy** means your entire Masterpiece Policy, including the Coverage Summary and any Mortgagee's Coverage Summary.

**Coverage Summary** means the most recent Coverage Summary we issued to you, including any subsequent Coverage Updates.

**Occurrence** means a loss or accident to which this insurance applies occurring within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

**Business** means any employment, trade, occupation, profession, or farm operation including the raising or care of animals.

© Chubb.2016. All rights reserved. Form no. 0200000

ALTSCHULER 000032

Reference Copy



**Condominium Preference** ℠ **Coverage**

This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your contents anywhere in the world unless stated otherwise or an exclusion applies.

"Contents" means personal property you or a family member owns or possesses.

## Payment for a Loss

### Amount of coverage

The amount of coverage for contents at each condominium unit for each occurrence is shown in the Coverage Summary. At the time of a covered loss, the amount of coverage for contents at your condominium unit will be adjusted to include any increase in the United States Consumer Price Index calculated from the beginning of the policy period.

If this policy is renewed, the amount of coverage for your contents may be changed by us based on annual adjustments for inflation. To reduce the possibility of being underinsured, you should periodically review your amount of coverage for contents and request an increase if you feel the amount of coverage is insufficient.

For a covered loss to contents, the amount of coverage depends on where the loss occurs:

**At a covered condominium.** If the covered loss takes place at a listed condominium unit covered by this policy, we will pay up to the amount of contents coverage for that condominium unit, for each occurrence.

**Away from your residences.** If the covered loss takes place away from any residence you own or live at, for each occurrence we will choose the single listed location on which the payment is to be made, based upon the most favorable combination of the following:
- amount of contents coverage
- payment basis
- type of contents coverage
Regardless of the number of policies providing you with contents coverage, payment will be made based only on this chosen location and will not be made under more than one policy.

**At your residence not listed in this policy or other policies.** If the covered loss takes place at a residence you own or live at that does not have contents, condominium, cooperative or renters coverage listed in this or any other policy issued by a direct or indirect subsidiary of Chubb Limited, we will pay up to 10% of the highest amount of contents coverage in this policy, for each occurrence. However, contents in a newly acquired principal residence is not subject to this limitation for the 60 days immediately after you begin to move your contents there.

We will choose the single listed location on which the payment is to be made, based upon the most favorable combination of the following:
- amount of contents coverage
- payment basis
- type of contents coverage
Regardless of the number of policies providing you with contents coverage, payment will be made based only on this chosen location and will not be made under more than one policy.

© Chubb.2016. All rights reserved. Form no. 2350031                    9/13/11 6:40:00
ALTSCHULER 000033

*Reference Copy*

*Condominium Preference* SM
*Coverage*

---

## *Payment for a Loss*
(continued)

### Deductibles

A deductible is that amount we will subtract from the amount of a covered loss in determining the amount we will pay. Either the base deductible listed in the Coverage Summary or one or more of the special deductibles applies to each occurrence, unless stated otherwise.

**Special deductibles.** If more than one special deductible applies to a covered loss (other than the construction special deductible), the special deductible with the greatest dollar amount applies to the covered loss.

If the construction deductible applies to a covered loss, and one or more other special deductibles also apply, the dollar amount of the construction deductible will be combined with the greatest dollar amount of any other applicable special deductible, and the total amount of **both** deductibles will be applied to the covered loss.

**Construction deductible.** In lieu of the base deductible, a 5% construction special deductible applies to each occurrence if at any time during the policy period you are constructing additions, alterations, or renovations to your condominium unit which will equal or exceed the lesser of 10% of the amount of coverage for additions and alterations for your condominium unit shown in the Coverage Summary at the time of a covered loss or $500,000, and you or your agent did not notify us of these additions, alterations, or renovations, and the covered loss commenced at such condominium unit.

This construction special deductible applies to your contents and extra coverages. The dollar amount of this deductible is equal to 5% of the combined amount of coverage for your contents and additions and alterations as shown in the Coverage Summary at the time of a covered loss.

If the dollar amount of the base deductible is greater than the dollar amount of the construction special deductible, the dollar amount of the construction special deductible is increased to the dollar amount of the base deductible. This construction special deductible applies in addition to the greatest of any other special deductible that applies to the covered loss.

### Payment basis

Your Coverage Summary indicates the payment basis for contents.

**Replacement cost.** If the payment basis is replacement cost, we will pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

However, for contents which are obsolete or unusable for the purpose for which they were originally intended because of their age or condition, the payment basis will be actual cash value.

**Actual cash value.** If the payment basis is actual cash value, we will pay the cost to replace the contents less depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

---

© Chubb.2016. All rights reserved. Form no. 2350031
ALTSCHULER 000034

*Reference Copy*

**Condominium Preference** SM
**Coverage**

CHUBB'

---

## Payment for a Loss
(continued)

**Pairs, sets, and parts.** For a covered loss to a pair or set, or to part of a larger unit, we will pay whichever is least:
- the cost to repair the damaged property to its condition before the loss;
- the cost to replace it; or
- the cost to make up the difference between its market value before and after the loss.

However, if you agree to surrender the undamaged article(s) of the pair, set, or parts to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set, or parts.

### Special limits
For a covered loss to each category of contents listed below, we will not pay more than the amount shown. For any one occurrence, payment will be under the category providing you with the most coverage. These special limits do not increase the amount of coverage on your contents or on any item covered elsewhere in this policy.

All loss resulting from any act or any series of similar or related acts:
- committed by any one person or group of persons acting in concert; or
- in which any person or group of persons is involved or implicated,
is considered to be one loss.

Legal tender, bank notes, stored value cards, bullion, gold, silver, platinum, tokens, unrecoverable scrip, smart cards, prepaid value cards, prepaid debit cards, or gift certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,000

Securities, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports or tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000
This special limit includes the necessary, reasonable expense incurred if you research, replace or restore these items after a covered loss, using the most cost-effective method available.

However, when this property is located in a bank vault or bank safe deposit box, your full contents coverage away from your residences will apply for a covered loss.

Trailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Watercraft, including their furnishings, equipment, and outboard motors . . . . . . . . . . . . . $10,000

Golf carts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Jewelry, watches or precious and semi-precious stones, whether set or unset, that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Furs that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

---

© Chubb.2016. All rights reserved. Form no. 2350031
**New York** Condominium Preference Coverage
8/13/17 9xd09

ALTSCHULER 000035

Reference Copy

*Condominium Preference* ℠
*Coverage*

## Payment for a Loss
(continued)

Plated ware, silverware, goldware, pewterware, tableware, trays, trophies, and
other household and personal articles, other than jewelry, that consist principally
of sterling silver, gold, or pewter that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . . $10,000

Collectible stamps, coins, and medals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000
However, when this property is located in a bank vault or bank safe deposit box, your full
contents coverage away from your residences will apply for a covered loss.

Guns that are lost, misplaced, or stolen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Grave markers or mausoleums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000

### Mold remediation expense limit
For a covered loss to your condominium unit shown in the Coverage Summary, we will not pay
more than $20,000, plus any additional amount shown in the Coverage Summary for mold
remediation expenses at this location for each occurrence for all increased costs that are mold
remediation expenses described below. This mold remediation expense limit does not increase the
amount of coverage for your condominium unit.

This mold remediation expense limit does not apply to mold resulting from a covered loss caused by
fire or lightning. Therefore, for a covered loss caused by fire or lightning, the increased costs that
are mold remediation expenses described below are covered as part of such covered loss up to the
amount of coverage for your condominium unit.

"Mold remediation" means the reasonable and necessary costs for:
• testing the indoor air quality of your condominium unit for mold;
• testing the surfaces and materials of your additions and alterations or contents for mold;
• developing a mold remediation plan;
• implementing that mold remediation plan including the clean up, removal, containment, treatment, or
disposal of mold;
• removing debris of covered property containing mold beyond that which is required to remove
debris of the covered property physically damaged by a covered loss; and
• repairing or replacing covered property containing mold beyond that which is required to repair or
replace the covered property physically damaged by a covered loss.

Mold remediation expenses also includes the temporary relocation expenses you incur, made
necessary by mold remediation. For each occurrence, we will pay up to 20% of the mold
remediation expense limit. There is no deductible for temporary relocation expenses.

"Temporary relocation expenses" means:
• the reasonable increase in your normal living expenses that is necessary to maintain your
household's usual standard of living for the reasonable amount of time required to complete mold
remediation; and
• the fair rental value of that part of your condominium unit rented or held for rental, for the
reasonable amount of time required to complete mold remediation, during the period of time it is
usually rented.

© Chubb.2016. All rights reserved. Form no. 2350031    9/13/17 9:40:09

*Reference Copy*

ALTSCHULER 000036

### Condominium Preference ℠ Coverage



---

### Payment for a Loss
(continued)

"Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

We will not make any additional payments for mold remediation expenses or temporary relocation expenses under any other part of this Condominium Coverage.

---

### Condominium Preference Coverage

In Condominium Preference Coverage, a "covered loss" includes **all risk** of physical loss to your contents or other property covered under this part of your Masterpiece Policy, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

In lieu of the definition for "business" in the Introduction, the following definition of "business" applies: "Business" means any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time or occasional basis.

---

### Extra Coverages

In addition to covering the physical loss to your contents, we also provide other related coverages. These coverages are in addition to the amount of coverage for your condominium unit unless stated otherwise or an exclusion applies. All deductibles apply to Extra Coverages unless stated otherwise. Exclusions to these coverages are described in **Exclusions**.

Extra Coverages only apply to additions and alterations for your condominium unit if an amount of coverage greater than zero is shown in the Coverage Summary for such additions and alterations.

#### Additions and alterations

This coverage is in effect only if an amount of coverage greater than zero is shown in the Coverage Summary for your Additions and alterations.

We cover your building additions, alterations, fixtures, improvements, installations or items of real property that are part of your unit as defined in the Master Deed. This includes breakage of glass or safety glazing material in the building, or a storm door or window. We also cover any other structure on the condominium property that is:
- owned by you; or
- available for your exclusive use and which you are required to insure.

For a covered loss to these items, we will pay up to the amount of coverage shown in the Coverage Summary for Additions and alterations. The same payment basis applies to Additions and alterations as to contents.

---

ALTSCHULER 000037

*Reference Copy*

*Condominium Preference* SM
*Coverage*

---

## Extra Coverages
(continued)

However, if you have a covered partial loss to Additions and alterations and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation.

### Unit assessments

We cover your share of an assessment charged against you by your condominium association. But the assessment must be a result of an occurrence that would be covered under:

- this policy to property owned collectively by all unit owners; or
- personal liability coverage if personal liability coverage is shown in the Coverage Summary or under any other personal insurance policy issued by a direct or indirect subsidiary of Chubb Limited providing you with personal liability coverage.

We will pay up to $100,000, or any greater amount shown in the Coverage Summary, for any one occurrence, regardless of the number of assessments. But we will not pay more than $10,000, or any greater amount shown in the Coverage Summary, in any one occurrence for assessments that result from a deductible in your condominium association's insurance.

There is no deductible for this coverage.

### Additional living expenses

Under certain conditions when your condominium unit cannot be lived in because of a covered loss to your condominium unit or, if applicable, its contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value, and forced evacuation expenses as described below. If Limited additional living expenses coverage is shown in the Coverage Summary, this is the maximum amount we will pay for these expenses. There is no deductible for this coverage.

**Extra living expenses.** If a covered loss makes your condominium unit uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:

- the reasonable amount of time required to restore your condominium unit to a habitable condition;
- the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
- the reasonable amount of time required to restore the condominium unit to the condition it was in prior to the covered loss if you are constructing additions, alterations, or renovations to your condominium unit at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
- up to two years from the date of loss, or a later date if agreed to by us.

However, you must inform us of your decision whether you intend to restore the condominium unit, or to permanently relocate, within 180 days from the date of loss, or a later date if agreed to by us. If you do not inform us of your decision by this date, the extra living expenses will cease in 30 days.

This period of time is not limited by the expiration of this policy.

---

© Chubb.2016. All rights reserved. Form no. 2350031

ALTSCHULER 000038

*Reference Copy*

*Condominium Preference* ℠
*Coverage*



---

## Extra Coverages
(continued)

**Fair rental value.** If a covered loss makes a part of your condominium unit which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition. We will cover the fair rental value for a period of time commencing with the date of loss and ending with the earliest of the following:

- the reasonable amount of time required to restore your condominium unit to a habitable condition; or
- up to two years from the date of loss, or a later date if agreed to by us.

However, you must inform us of your decision if you intend to restore the condominium unit, within 180 days from the date of loss, or a later date if agreed to by us. If you do not inform us of your decision by this date, the coverage for fair rental value will cease in 30 days.

This period of time is not limited by the expiration of this policy.

**Forced evacuation expenses.** If you evacuate your condominium unit due to a reasonable threat of a loss covered under this policy, or you are forced to evacuate by a civil authority as a direct result of a covered peril, we cover the reasonable increase in your normal living expenses incurred by you that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We also cover any loss in fair rental value if your condominium unit is usually held for rental, but we do not cover any loss of rents due to cancellation of a lease or agreement. However, if we determine after the threat of loss is over that there is no covered loss to your condominium unit that makes it uninhabitable, this extra coverage will cease, unless a civil authority prohibits you from use of your condominium unit due to a peril covered under this policy.

We cover these forced evacuation expenses for up to 30 consecutive days, even if the policy period ends during that time.

## Landscaping
We cover trees, shrubs, plants, and lawns, which are on the grounds of your condominium unit, against certain kinds of perils. These are fire, lightning, explosion, civil disturbance, vandalism, malicious mischief, theft, and loss caused by a vehicle or aircraft.

We will pay:
- up to a total of 10% of the amount of contents coverage for the condominium unit at which the loss occurs, unless a greater percentage is shown in the Coverage Summary; and
- not more than $10,000 for any one tree, shrub, or plant, unless a greater amount is shown in the Coverage Summary.

This extra coverage does not apply to naturally occurring or native grown vegetation, including but not limited to brush, woodlands, forests, grasslands, wetlands or mangroves. We also do not cover vineyards, sod farms, tree farms, orchards, and crops grown or used primarily for business purposes.

This extra coverage applies only if you begin to repair or replace the lost or damaged property within 180 days of the date of loss, or a later date if agreed to by us.

ALTSCHULER 000039

*Reference Copy*

*Condominium  Preference* ℠
*Coverage*

---

### Extra Coverages
(continued)

### Tree removal
Unless covered elsewhere under this policy, we will pay the reasonable expenses you incur up to a total of $1,500 for each occurrence to remove trees fallen due to wind, hail, sleet or the weight of ice or snow. These payments apply only to fallen trees at a location shown in the Coverage Summary.

### Business property
We will pay up to $25,000, unless a greater amount is shown in the Coverage Summary, for a covered loss to business property you own or possess. The same payment basis applies to business property as to contents, except that we will pay the necessary, reasonable cost incurred using the most cost-effective medium for replacing or recreating business data contained in books, records and software.

"Business property" means:
- furniture, supplies, equipment, inventory;
- books, records; and
- electronic data processing property,
  used to conduct your business.

"Electronic data processing property" means:
- electronic data processing equipment, and their accessories;
- portable devices such as smartphones, electronic reading devices, tablets, handheld computers or similar devices;
- software; and
- data stored on software.

"Business property" does not include any drones or similar unmanned device, whether used in whole or in part in a business.

### Electronic data restoration
We cover your personal data and electronic contents, stored on your personal computer or electronic data processing property which you own or possess. We will pay up to $20,000 for the necessary, reasonable expense incurred using the most cost-effective method for replacing or recreating that personal data and electronic contents as a result of a covered loss or the introduction of a computer worm, virus, or other malware. There is no deductible for this coverage.

"Electronic contents" means non-recoverable purchased eBooks, software, application software (apps), music and movie files.

"Electronic data processing property" means:
- electronic data processing equipment, and their accessories;
- portable devices such as smartphones, electronic reading devices, tablets, handheld computers or similar devices;
- software; and
- data stored on software.

---

© Chubb.2016. All rights reserved. Form no. 2350031    9/13/17 8:40:05
ALTSCHULER 000040
*Reference Copy*

*Condominium Preference* <sup>SM</sup>
*Coverage*



---

## Extra Coverages
(continued)

### Account funds
We will pay up to a total of $10,000 for the loss of your personal account funds from a financial institution due to the unauthorized use of your personal bankcard, debit card or account numbers, including unauthorized electronic fund transfers. This coverage is afforded only if there has been compliance with the terms for using the account.

All loss resulting from any act or any series of similar or related acts:
- committed by any one person or group of persons acting in concert; or
- in which any person or group of persons is involved or implicated,

is considered to be one loss, even if a series of similar or related acts occurs over multiple policy periods.

"Account funds" means funds from any personal account or credit line that you or a family member may access.

"Unauthorized use" means removal of funds from your personal financial institution account without permission from you or a family member. "Unauthorized use" does not mean the removal of funds from your personal financial institution account by your spouse or family member.

### Fire or police department charges
If a fire or police department is called to protect your condominium unit against a covered loss, we will pay up to $2,500 for any charges imposed by law or assumed by written agreement. There is no deductible for this coverage.

### Lock replacement
If the keys or remote unlocking devices to your condominium unit, or to the garage door or electronic gate used solely for your unit, are lost or stolen, we will pay the cost to re-key or replace the locks or remote unlocking devices, whichever is less, up to $2,500. There is no deductible for this coverage.

### Debris removal
Unless covered elsewhere under this policy, we cover the reasonable expenses you incur made necessary by a covered loss to demolish damaged covered property, if necessary, and remove debris of the covered loss including the property that caused a covered loss.

### Temporary precautionary repairs
After a covered loss, we cover the reasonable expenses you incur for necessary temporary precautionary repairs made solely to protect your condominium unit against further covered damage. These payments do not increase the amount of coverage for your condominium unit.

### Construction materials
We cover the materials and supplies owned by you on the grounds of your condominium unit for use in its construction, alteration, and repair. These payments apply only to a covered loss, and they do not increase the amount of coverage for your condominium unit.

© Chubb.2016. All rights reserved. Form no. 2350031
9/13/17 9:40:08
ALTSCHULER 000041
*Reference Copy*

*Condominium Preference* SM
*Coverage*

### Extra Coverages
(continued)

### Food spoilage
We cover food or wine while contained in a refrigerator or freezer which spoils due to changes or extremes of temperature caused by:
- off premises power interruption;
- interruption of premises power supply; or
- mechanical or electrical breakdown of refrigeration equipment.

This coverage applies only to spoilage which occurs at any residence you own or live at. This payment does not increase the amount of coverage for your contents. For a covered loss to wine, we will not pay more than $5,000. Our payment is subject to a $250 deductible, which is waived if there is another loss:
- from the same occurrence;
- covered under any part of this policy; and
- which is subject to a deductible.

### Breakage of fragile articles
We will pay up to $50,000 for loss to fragile articles resulting from breakage. Fragile articles include any type of eyeglass, crystal, china, porcelains, figurines, statues, sculpture, mirrors, bric-a-brac and similar items. Fragile articles do not include jewelry, watches, bronzes, cameras, and photographic lenses.

However, for breakage of fragile articles resulting from the perils named below, we will pay up to the amount of coverage for contents shown in your Coverage Summary. These perils are:
- fire, lightning, explosion, or smoke (except industrial or agricultural smoke);
- wind or hail;
- riot including any kind of civil commotion;
- vandalism including malicious mischief;
- earth movement, earthquake;
- collapse or the imminent danger of collapse of a building or part of a building;
- aircraft or vehicles;
- water;
- theft or attempted theft; or
- the sudden and accidental tearing apart, cracking, burning, or bulging of a plumbing, heating, or air conditioning system or household appliance.

These payments do not increase the amount of coverage for your contents.

### Endangered property
Covered contents removed from your condominium unit because the condominium unit is endangered by a covered peril are covered against any peril for up to 90 days. These payments do not increase the amount of coverage for your condominium unit.

### Rebuilding to code
After a covered loss to covered property, we cover the necessary cost of conforming to any law or ordinance that requires or regulates:
- the repair, replacement, or rebuilding of the damaged portion of your additions and alterations made necessary by the covered loss;

© Chubb.2016. All rights reserved. Form no. 2350031
*Reference Copy*
9/13/18  11:40:05

ALTSCHULER 000042

***Condominium Preference*** SM
***Coverage***



---

## *Extra Coverages*
(continued)

- the demolition, replacement, or rebuilding of the undamaged portion of your additions and alterations necessary to complete the repair, replacement, or rebuilding of the damaged portion of your additions and alterations; or
- the demolition of the undamaged portion of your additions and alterations when your condominium unit must be totally demolished.

However, we will not pay the cost you incur to conform to any law or ordinance that is not a direct result of the covered loss.

### Water detection expense
We will reimburse you up to $5,000 for the reasonable cost and installation of a water leak detection and control system following a covered water damage loss to your condominium unit shown in the Coverage Summary or to other property in your unit covered under this policy. This extra coverage applies only if:

- the amount of the covered water damage loss to covered property is $10,000 or more prior to the application of any applicable deductible;
- the covered water damage loss is caused by a leak or break in a plumbing, heating, or air conditioning system, which is part of your condominium unit as defined in the Master Deed; and
- the installation of a water leak detection and control system was the first time such a system was installed for your condominium unit, which had the covered water damage loss.

These payments do not increase the amount of coverage for your condominium unit.

"Water leak detection and control system" means a system for your condominium unit that monitors:

- areas containing plumbing devices, appliances, and other outlets for a water leak and if detected, closes the main water supply line pertaining to your condominium unit; or
- unusual water flow patterns or unexpected interior water overflow and if detected, closes the main water supply line pertaining to your condominium unit.

There is no deductible for this expense.

---

## *Conditions*

The following condition, applicable to Condominium Preference Coverage, is in addition to the General Conditions, Property Conditions and Special Conditions described under Policy Terms.

### Condominium Preference Coverage
If you have Condominium Preference Coverage, your eligibility for this coverage will cease if you decrease any of the required minimum amount(s) of coverage or if any of the following coverages are deleted, cancelled, or nonrenewed:

- Personal Liability Coverage and/or Excess Liability Coverage, and
- Valuable Articles Coverage.

Your eligibility for Condominium Preference Coverage will cease as of the deletion, cancellation or nonrenewal date or the date that the required minimum amount(s) of coverage have been decreased.

---

© Chubb.2016. All rights reserved. Form no. 2350031     9/13/17 3:40:08

*Reference Copy*

ALTSCHULER 000043

**Condominium  Preference** <sup>SM</sup>
**Coverage**

## Conditions
(continued)

If your eligibility for Condominium Preference Coverage ceases during the policy period, we agree to continue coverage under Deluxe Condominium Coverage for the remainder of the policy period.

## Exclusions

These exclusions apply to your Condominium Preference Coverage, including the Extra Coverages, unless stated otherwise.

The words "caused by" mean any loss that is contributed to, made worse by, or in any way results from that peril.

**Gradual or sudden loss.** We do not cover any loss caused by wear and tear, gradual deterioration, rust, mold, rot or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Contamination.** We do not cover any loss caused by contamination, pollution, smog, or industrial or agricultural smoke.

**Loss by animals.** We do not cover any loss caused by:
• bats, birds, insects, rodents, mollusks;
• animals owned or kept by you or a family member; or
• nesting or infestation, discharge or release of waste products or secretions by any animals.
However, we do cover loss to glass that is part of a building, storm door, or storm window, and ensuing covered loss unless another exclusion applies.

**Structural movement.** We do not cover any loss to additions and alterations of your condominium unit caused by the settling, cracking, shrinking, bulging, or expansion of bulkheads, pavements, patios, landings, steps, footings, foundations, walls, floors, roofs, or ceilings except loss to glass that is part of a building, storm door, or storm window. But we do insure ensuing covered loss unless another exclusion applies.

**Special rules for escaping water.** If any of the causes of loss previously described (gradual or sudden loss, contamination, loss by animals, or structural movement) cause water to escape from a household appliance, swimming pool, or plumbing, heating, or air conditioning system, we cover the loss to covered property caused by the water. We also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. But we do not cover loss to the system or appliance itself.

**Freezing water.** We do not cover any loss caused by water freezing in a plumbing, heating, or air conditioning system, or household appliance if your condominium unit is vacant, unoccupied, or being constructed, unless you used reasonable care to maintain heat in your unit or shut off and drained the water system or appliance. But we do insure ensuing covered loss unless another exclusion applies.

11/20/17
© Chubb.2016.  All rights reserved. Form no. 2350031

**New York** Condominium Preference Coverage    *Page G2-12*
9/13/17 18:40:05

ALTSCHULER 000044

*Reference Copy*

***Condominium Preference*** SM
***Coverage***



## Exclusions
(continued)

**Surface water.** We do not cover any loss caused by:
- flood, accumulation of rainwater on the ground, surface water, wave action, including tidal wave and tsunami, tides, tidal water, seiche, overflow of water from a body of water, spray or surge from any of these, even if driven by wind;
- water borne material from any of the above, including when any such waters or water borne material enters and backs up or discharges from or overflows from any sewer or drain, located outside of or on the exterior of a fully enclosed structure, including gutters, rainwater pipes, downspouts, or underground drainage systems;
- run off of water or water borne material from a paved surface, driveway, walkway, patio, or other similar surface; or
- escape, overflow, discharge or release, for any reason, of water or water borne material from a canal, dam, reservoir, levee, dike, seawall, or any other boundary or containment.

However, we do insure ensuing covered loss due to fire, explosion, or theft. We also cover surface water damage to contents away from any residence you own or live at, except contents stored in your condominium building or condominium complex, unless another exclusion applies.

**Ground water.** We do not cover any loss caused by water or water borne material in the ground, or by its pressure, leakage, or seepage. But we do insure ensuing covered loss due to fire, explosion, or theft unless another exclusion applies. We also cover ground water damage to contents away from any residence you own or live at, except contents stored in your condominium building or condominium complex, unless another exclusion applies.

**Damage to outside structures.** We do not cover any loss caused by freezing, thawing, or the pressure or weight of water, ice, or snow, whether driven by wind or not to any:
- fence, arbor, pavement, patio, landing or step;
- septic system, swimming pool or hot tub including their installed equipment;
- footing, foundation, wall, or any other structure or device, that supports all or part of your condominium unit;
- retaining wall or bulkhead; or
- pier, wharf, dock or bridge.
However, we do insure ensuing covered loss unless another exclusion applies.

**Computer error.** We do not cover any cost to correct a malfunction, error, or deficiency in programming or instructions to a computer or in the computer itself.

**Business property.** We do not cover any loss to business property other than as provided under Extra Coverages.

**Tenant property.** We do not cover any loss to property of roomers, boarders, or other tenants. But we do cover personal property of your guests, domestic workers or relatives while it is on any residence premises shown in the Coverage Summary where you or a family member live, or any other residence you do not own that you or a family member occupy.

**Motorized land vehicles.** We do not cover any loss to a motorized land vehicle. But we do cover motorized land vehicles used solely on and to service a residence premises shown in the Coverage Summary. We also cover motorized land vehicles used to assist the disabled that are not designed for or required to be registered for use on public roads. This exclusion does not apply to golf carts.

© Chubb.2016.  All rights reserved. Form no. 2350031
*Reference Copy*
9/13/17 8:40:09
ALTSCHULER 000045

***Condominium Preference*** SM
***Coverage***

## *Exclusions*
(continued)

**Special exclusions for golf carts.** We do not cover any loss arising out of the ownership or operation of a golf cart when it is:
- subject to motor vehicle registration;
- used to carry people or property for a fee, or rented to others;
- used for any business purpose except if you or a family member is using the golf cart on a golfing facility while entertaining business clients;
- used during instruction, practice, preparation for, or participation in any competitive, prearranged or organized racing, speed contest, rally, gymkhana, sports event, stunting activity, or timed event of any kind; or
- used on a racetrack, test track or other similar course.
We do not cover any loss to a golf cart caused by:
- overheating, or electrical or structural breakdown or failure; or
- repairing, refinishing, renovating, or being worked on, but we do insure ensuing covered loss due to fire or explosion.

**Theft of certain electronic equipment from a motorized land vehicle.** We do not cover any theft or attempted theft of:
- sound or visual reproducing, receiving, displaying and transmitting equipment;
- data processing equipment;
- global positioning systems;
- scanning monitors, radar and laser detectors; or
- any other similar equipment, including their accessories and antennas
from a motorized land vehicle if the equipment is permanently installed or removable from a housing unit permanently installed in the vehicle.

**Repairs and renovations.** We do not cover loss caused by repairing, refinishing, or renovating contents except jewelry, watches, and furs.

**Watercraft accidents.** We do not cover any loss to watercraft, including its trailer, furnishings, equipment and outboard motor, caused by the sinking, swamping, stranding, capsizing, upset or collision of that watercraft or its trailer. But we do cover loss caused by the collision of that watercraft with a land vehicle unless another exclusion applies.

**Dampness or temperature.** We do not cover loss caused by air dampness, water vapor or temperature extremes unless the direct cause of loss is rain, snow, sleet or hail. This exclusion does not apply to the Extra Coverage for Food spoilage.

**Confiscation.** We do not cover any loss caused by the confiscation, destruction, or seizure of property by or under the order of any government or public authority. But if the confiscation, destruction or seizure of property was ordered by any government or public authority to prevent the spread of fire, we do provide coverage if the loss caused by fire would be covered under this part of your policy.

**Breakage of fragile articles.** We do not cover breakage of fragile articles, other than as provided under Extra Coverages. Fragile articles include any type of eyeglasses, crystal, china, porcelains, figurines, statues, sculptures, mirrors, bric-a-brac and similar items. Fragile articles do not include jewelry, watches, bronzes, cameras, and photographic lenses.

© Chubb.2016. All rights reserved. Form no. 2350031
ALTSCHULER 000046
9/13/17 9:40:09
*Reference Copy*

***Condominium Preference*** SM
***Coverage***



## Exclusions
(continued)

**Personal property insured with other companies.** We do not cover loss to personal property separately described and insured with a specific value or insured on a blanket basis under a personal articles floater policy or similar policy not issued by a direct or indirect subsidiary of Chubb Limited.

**Loss to animals.** We do not cover any loss to animals, birds, or fish.

**Aircraft.** We do not cover any loss to an aircraft or aircraft parts. "Aircraft" means any device used or designed for flight, except drones or similar unmanned device not used or designed to carry people or cargo.

**Intentional acts.** We do not cover any loss caused intentionally by a person named in the Coverage Summary, that person's spouse, a family member or a person who lives with you. We also do not cover any loss caused intentionally by a person directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you. But we do provide coverage for you or a family member who is not directly or indirectly responsible for causing the intentional loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Misappropriation.** We do not cover any loss caused by the taking or other misappropriation by or directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you. This exclusion does not apply to the taking or other misappropriation by your domestic workers, guests or tenants, unless the misappropriation was directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you.

**Faulty planning, construction, or maintenance.** We do not cover any loss caused by the faulty acts, errors, or omissions of you or any other person in planning, construction, or maintenance. It does not matter whether the faulty acts, errors, or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property, and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

**Neglect.** We do not cover any loss caused by your failure to use all reasonable means to protect property before, at, or after the time of a loss.

**Acts of war.** We do not cover any loss caused by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by a military force or personnel, any action taken in hindering or defending against any of these, the destruction or seizure of property for a military purpose, or any consequences of any of these acts regardless of any other direct or indirect cause or event, whether covered or not, contributing in any sequence to the loss. If any act that is within this exclusion involves nuclear reaction, radiation, or radioactive contamination, this Acts of war exclusion supercedes the Nuclear or radiation hazard exclusion.

© Chubb.2016. All rights reserved. Form no. 2350031    9/13/17 9:40:00

ALTSCHULER 000047

*Reference Copy*

*Condominium Preference* ℠
*Coverage*

## Exclusions
(continued)

**Nuclear or radiation hazard.** We do not cover any loss caused by nuclear reaction, radiation, or radioactive contamination, whether controlled or uncontrolled, or any consequence of any of these, regardless of any other direct or indirect cause or event, whether covered or not, contributing in any sequence to the loss. But we do insure ensuing covered loss due to fire resulting from a nuclear reaction unless another exclusion applies.

© Chubb.2016.  All rights  reserved.  Form no. 2350031                                            9/13/17 9:40:09

*Reference Copy*

ALTSCHULER 000048



**Valuable Articles Coverage**

This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your valuable articles anywhere in the world unless stated otherwise or an exclusion applies.

"Valuable articles" means personal property you or a family member owns or possesses for which an amount of coverage is shown in the **Valuable Articles** section of your Coverage Summary.

## Payment for a Loss

### Amount of coverage

The amount of coverage for each category of valuable articles, and for each itemized article, is shown in your Coverage Summary.

To help you maintain an appropriate amount of coverage, if itemized jewelry is shown in your Coverage Summary, we increase the amount of coverage for each article of itemized jewelry annually by 5% based on industry trends for jewelry values plus, if you request, an additional percentage amount.

### Itemized articles

For a covered loss to an article listed in your schedule of itemized articles, we will pay as follows:

**Total loss.** If an itemized article is totally destroyed or lost, we will pay the amount of itemized coverage for that article. However, if the market value of the itemized article immediately before the loss exceeds the amount of itemized coverage for that article, we will pay its market value immediately before the loss, up to 150% of the amount of itemized coverage for that article, but not more than the Maximum amount of coverage.

**Partial loss.** If an itemized article is partially lost or damaged, you may choose either of the following:
- If you choose to restore the article, we will pay the costs to restore the article to its condition immediately before the loss up to the amount of itemized coverage for that article. If the article cannot be restored to its condition immediately before the loss, we will pay any loss of market value plus the restoration costs up to 150% of the amount of itemized coverage for that article.
- If you choose not to restore the article, we will pay any loss of market value, up to 150% of the amount of itemized coverage for that article.
However, the most we will pay in any one loss is the Maximum amount of coverage.

The loss of market value is determined as follows:
- If the amount of itemized coverage for the article is less than the market value immediately before the loss, we will apply the percentage change to the market value immediately before the loss.
- If the amount of itemized coverage for the article is equal to or greater than the market value immediately before the loss, we will apply the percentage change to the amount of itemized coverage for that article.

"Percentage change" means the change in market value resulting from the covered loss, after restoration if any, expressed as a percentage.

**Maximum amount of coverage.** The maximum amount we will pay for a covered loss to one or more itemized articles in any one category of valuable articles is the amount of itemized coverage shown in the Coverage Summary for the applicable category of valuable articles.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400031 5/85    12/03/12 6:23:52
*Reference Copy*
ALTSCHULER 000049

## Valuable Articles Coverage

---

## Payment for a Loss
(continued)

**In-vault jewelry.** Itemized jewelry described in the Coverage Summary as "in-vault" must be kept in a bank vault. There is no coverage for these items while they are out of a vault, unless we agree in advance to cover them.

### Blanket coverage

For a covered loss to valuable articles with blanket coverage, we will pay the amount required to repair or replace the property, whichever is less, without deduction for depreciation. If the restored value is less than the market value immediately prior to the loss, we will pay the difference. But we will not pay more than the amount of blanket coverage for that category. And we will not pay more than the blanket limit per item for loss to any one article as shown in the Coverage Summary.

The following valuable articles are eligible for blanket coverage:

**Jewelry.** An article of personal adornment containing gemstones, silver, gold, platinum, or other precious metals or alloys.

**Furs.** Garments made of, trimmed in, or consisting principally of fur.

**Fine arts.** Private collections of paintings, etchings, pictures, tapestries, art glass windows, other bona fide works of art (for example, statues, antiques, rare books and manuscripts, porcelains, rare glass, crystal), and items of historical value or artistic merit.

**Silverware.** Sterling silver, gold, or pewter: plated ware, tableware, trays, trophies, and similar household articles other than jewelry.

**Stamps and coins.** Stamps and/or coins contained in an individually owned stamp and/or coin collection and not owned by dealers or auctioneers. This includes other philatelic property, including books, pages and mountings; and other numismatic property including coin albums, containers, frames, cards and display cabinets used with your collection.

**Musical instruments.** Musical instruments and equipment.

**Cameras.** Cameras, projection machines, films, and related equipment.

**Collectibles.** Private collections of rare, unique or novel items of personal interest (for example, dolls, banks, guns, model trains, wine) including memorabilia.

### Pairs, sets, and parts

If the covered loss is to part of a pair or set, or larger unit listed in your schedule of itemized articles, you may choose either of the following:
- If you do not surrender the undamaged article(s) of the pair, set or unit, we will pay the covered loss as a partial loss for the damaged article(s) of the pair, set or unit as previously described under **Itemized articles.**
- If you agree to surrender the undamaged article(s) of the pair, set or unit to us, we will pay the covered loss as a total loss for that pair, set or unit as previously described under **Itemized articles.**

© Copyright 1985 by Chubb & Son Inc. Form no. 3400031 5/85

*Reference Copy*

12/03/13 2:28:39
ALTSCHULER 000050

*Valuable Articles
Coverage*



## Payment for a Loss
(continued)

If the covered loss is to part of a pair or set, or larger unit with blanket coverage we will pay whichever is least:
- the cost to repair the damaged property to its condition before the loss;
- the cost to replace it; or
- the difference between its market value immediately before and after the loss.

If you agree to surrender the undamaged article(s) of the pair, set or unit to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set or unit, as a total loss, subject to the applicable blanket limit per item and amount of blanket coverage for that valuable articles category.

"Replacement cost" means the amount required to repair or replace the pair, set, or unit, whichever is less.

### Our option
When we pay for a total loss, we may keep all or part of the damaged property.

### Recoveries
If we pay for a covered loss to property and we recover that property, we agree to offer you an opportunity to buy it back. We will offer it to you at no higher an amount than we paid to you for that property.

## Valuable Articles Coverage

In Valuable Articles Coverage, a "covered loss" includes **all risk** of physical loss to valuable articles unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions.**

## Extra Coverages

In addition to covering the physical loss to your valuable articles, we also provide other related coverages. These coverages are in addition to the amount of coverage for your valuable articles unless stated otherwise or an exclusion applies. Exclusions to these coverages are described in **Exclusions.**

### Newly acquired valuable articles
For some categories of valuable articles, we automatically cover newly acquired articles that you own if you already have itemized articles shown on the Coverage Summary in that category. The amount of coverage for these articles is described below.

ALTSCHULER 000051

*Reference Copy*

*Valuable Articles*
*Coverage*

## Extra Coverages
(continued)

**Fine arts.** We cover your newly acquired fine arts for 25% of your total itemized coverage for fine arts. But you must request coverage for the newly acquired fine arts within 90 days after you acquire them, and pay the additional premium from the date acquired. We reserve the right not to insure the newly acquired articles after the 90th day.

**Jewelry.** We cover your newly acquired jewelry for 25% of your total itemized coverage for jewelry. But you must request coverage for the newly acquired jewelry within 90 days after you acquire them, and pay the additional premium from the date acquired. We reserve the right not to insure the newly acquired articles after the 90th day.

**Furs, cameras, musical instruments, and collectibles.** We cover your newly acquired furs, cameras, musical instruments, and collectibles for 25% of your total itemized coverage in the same category. But you must request coverage for these newly acquired articles within 90 days after you acquire them, and pay the additional premium from the date acquired. We reserve the right not to insure the newly acquired articles after the 90th day.

**Fine art on loan or consignment.**
If an amount of coverage for itemized fine arts is shown in your Coverage Summary, we will pay up to 25% of your total itemized coverage for fine arts, but not more than $1,000,000, for a loss that would be covered under this policy to fine art on loan or consignment to you from a gallery or dealer for up to seven days. This is the most we will pay regardless of the number of fine art articles on loan or consignment involved in the occurrence or the number of policies providing you with coverage for fine arts issued by a direct or indirect subsidiary of the Chubb Corporation. The market value, retail value, or the value on the written sale agreement, whichever is less, of the fine art article(s) on the day you take possession is the amount of coverage for a fine art article at the time of a covered loss.

## Works in progress
This extra coverage applies only if an amount of coverage for fine art, either blanket or itemized, is shown in your Coverage Summary.

We cover uncompleted works of art by an artist commissioned by you that are damaged or destroyed by a peril that would be covered under this policy prior to completion or which cannot be completed by the artist due to the artist's death. We will pay for the costs you incurred for the materials or supplies for the artist and the contracted costs for labor up to $100,000 but not more than the amount of non recoverable deposits or the full commission price if prepaid. This is the most we will pay regardless of the number of policies providing you with coverage for fine art issued by a direct or indirect subsidiary of the Chubb Corporation.

## Jewelry works in progress
If an amount of coverage for itemized or blanket jewelry is shown in your Coverage Summary, we cover uncompleted articles of jewelry by a jeweler or designer commissioned by you that are stolen, or damaged or destroyed by a peril that would be covered under this policy, or which cannot be completed by the jeweler or designer due to the death or insolvency of the jeweler or the designer.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400031 5/85

*Reference Copy*

ALTSCHULER 000052

*Valuable Articles*
*Coverage*



---

## Extra Coverages
(continued)

We will pay the costs you incurred for the materials or supplies (whether supplied by you or the jeweler or designer, and only if nonrecoverable from the jeweler or designer), the contracted costs for labor, and nonrecoverable deposits, up to $100,000 in any one occurrence. This is the most we will pay regardless of the number of jewelry articles involved in the occurrence or the number of policies providing you with coverage for jewelry issued by a direct or indirect subsidiary of the Chubb Corporation.

### Jewelry on loan or consignment

If an amount of coverage for itemized jewelry is shown in your Coverage Summary, we will pay up to 25% of your total itemized coverage for jewelry, but not more than $100,000, for a loss that would be covered under this policy for jewelry articles on loan, on consignment or rented to you from a jeweler for up to seven days. This is the most we will pay regardless of the number of jewelry articles involved in the occurrence or the number of policies providing you with coverage for jewelry issued by a direct or indirect subsidiary of the Chubb Corporation. The retail value of the jewelry article(s) on the day you take possession is the amount of coverage for a jewelry article at the time of a covered loss.

---

## Exclusions

These exclusions apply to your Valuable Articles Coverage, including the Extra Coverages, unless stated otherwise.

The words "caused by" mean any loss that is contributed to, made worse by, or in any way results from that peril.

**Musical and photographic articles used for profit.** We do not cover any loss to musical instruments, cameras, or related equipment used for profit, except in an incidental business activity that does not have gross revenues in excess of $15,000 or more in any year and conforms to local, state and federal laws.

**Intentional acts.** We do not cover any loss caused intentionally by a person named in the Coverage Summary, that person's spouse, a family member or a person who lives with you. We also do not cover any loss caused intentionally by a person directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you. But we do provide coverage for you or a family member who is not directly or indirectly responsible for causing the intentional loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Misappropriation.** We do not cover any loss caused by the taking or other misappropriation by or directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you. This exclusion does not apply to the taking or other misappropriation by your domestic workers, guests or tenants, unless the misappropriation was directed by a person named in the Coverage Summary, that person's spouse, a family member, or a person who lives with you.

---

© Copyright 1985 by Chubb & Son Inc. Form no. 3400031 5/85

*Reference Copy*

12/03/21 L2953

A. TSCHULER 000053

**Valuable Articles
Coverage**

## Exclusions
(continued)

**Gradual or sudden loss.** We do not cover any loss caused by wear and tear, gradual deterioration, rust, rot, warping, insects or vermin. We also do not cover any loss caused by inherent vice, latent defect, or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Confiscation.** We do not cover any loss caused by the confiscation, destruction, or seizure of property by or under the order of any government or public authority. But if the confiscation, destruction or seizure of property was ordered by any government or public authority to prevent the spread of fire, we do provide coverage if the loss caused by fire would be covered under this part of your policy.

**Computer error.** We do not cover any loss caused by an error in computer programming or instructions to the computer.

**Acts of war.** We do not cover any loss caused by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by a military force or personnel, any action taken in hindering or defending against any of these, the destruction or seizure of property for a military purpose, or any consequences of any of these acts regardless of any other direct or indirect cause or event, whether covered or not, contributing in any sequence to the loss. If any act that is within this exclusion involves nuclear reaction, radiation, or radioactive contamination, this Acts of war exclusion supercedes the Nuclear or radiation hazard exclusion.

**Nuclear or radiation hazard.** We do not cover any loss caused by nuclear reaction, radiation, or radioactive contamination, whether controlled or uncontrolled, or any consequence of any of these, regardless of any other direct or indirect cause or event, whether covered or not, contributing in any sequence to the loss. But we do insure ensuing covered loss due to fire resulting from a nuclear reaction unless another exclusion applies.

**Special exclusions for fine arts.** We do not cover any loss to fine arts caused by repairing, restoring, or retouching. We also do not cover any loss to fine arts while exhibited at a national or international art fair or exposition, unless we agree in advance to cover the fine arts.

**Special exclusions for stamps and coins.** We do not cover any loss to stamps or coins caused by:
- fading, creasing, denting, scratching, tearing, thinning, color transfer, dampness, or temperature extremes; or
- handling or being worked on.

We also do not cover the disappearance of an individual stamp, coin, or other item that is insured as part of a collection unless it is mounted in a volume and the page is also lost.

*Valuable Articles*
*Coverage*



---

## Exclusions
(continued)

**Special exclusions for collectibles.** We do not cover any loss to collectibles caused by:

- fading, creasing, denting, scratching, tearing, thinning, color transfer, dampness, change in temperature, or temperature extremes;
- repairing, restoring, retouching or being worked on; or
- use other than as a collectible.

  However, we do cover loss to wine caused by change in temperature or temperature extremes due to loss of utility service or premises power supply, or mechanical or electrical breakdown of climate control equipment.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400031 6/85          12/03/12 1:23:52

*Reference Copy*
ALTSCHULER 000055



**Personal Liability Coverage**

This part of your Masterpiece Policy provides you with personal liability coverage for which you or a family member may be legally responsible anywhere in the world unless stated otherwise or an exclusion applies.

## Payment for a Loss

### Amount of coverage
The amount of coverage for liability is shown in the Coverage Summary. We will pay on your behalf up to that amount for covered damages from any one occurrence, regardless of how many claims, homes, vehicles, watercraft or people are involved in the occurrence.

Any costs we pay for legal expenses (see **Defense coverages**) are in addition to the amount of coverage.

## Personal Liability Coverage

We cover damages a covered person is legally obligated to pay for personal injury or property damage which takes place anytime during the policy period and are caused by an occurrence, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

In lieu of the definition for "you" in the Introduction, the following definition of "you" applies:
"You" means:
- the person named in the Coverage Summary, and a spouse who lives with that person;
- a personal asset protection entity and its partners, members or trustees but only with respect to:
  - their legal responsibility for the ownership, maintenance, or use of a residence premises, contents of such residences other than business property, property insured under a personal articles floater policy or similar policy issued by a direct or indirect subsidiary of Chubb Limited, vacant land, and an individual or family cemetery plot or burial vault;
  - their legal responsibility for the ownership, maintenance, or use of a vehicle or watercraft owned or rented by the personal asset protection entity covered under this part of your Masterpiece policy;
  - Workers' compensation; and
  - Employment practices liability coverage, if this coverage is shown in the Coverage Summary.

In lieu of the definition for "occurrence" in the Introduction, the following definition of "occurrence" applies:
"Occurrence" means:
- an accident which begins within the policy period resulting in bodily injury, shock, mental anguish, mental injury, or property damage; or
- an offense first committed within the policy period resulting in:
  - false arrest, false imprisonment, or wrongful detention;
  - wrongful entry or eviction;
  - malicious prosecution or humiliation; or
  - libel, slander, defamation of character, or invasion of privacy,
to which this insurance applies. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

11/20/17
© Chubb.2016. All rights reserved. Form no. 4610031

**New York** Personal Liability Coverage    *Page T-1*
9/12/17 11:00:07

ALTSCHULER 000056

*Reference Copy*

**Personal Liability
Coverage**

## Personal Liability Coverage
(continued)

In lieu of the definition for "business" in the Introduction, the following definition of "business" applies:

"Business" means any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time or occasional basis.

A "covered person" means:
- you or a family member;
- any person using a vehicle or watercraft covered under this part of your Masterpiece policy with permission from you or a family member with respect to their legal responsibility arising out of its use;
- any person or organization with respect to their legal responsibility for covered acts or omissions of you or a family member; or
- any combination of the above.

"Personal asset protection entity" means a legal entity that owns or manages residence premises, property of such residences, articles of value such as jewelry, fine art, silverware or collectibles, vacant land, or individual or family cemetery plots or burial vaults.

"Damages" means the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing.

"Personal injury" means the following injuries, and resulting death:
- bodily injury;
- shock, mental anguish, or mental injury;
- false arrest, false imprisonment, or wrongful detention;
- wrongful entry or eviction;
- malicious prosecution or humiliation; and
- libel, slander, defamation of character, or invasion of privacy.

"Bodily injury" means physical bodily harm, including sickness or disease that results from it, and required care, loss of services and resulting death.

"Property damage" means physical injury to or destruction of tangible property, and the resulting loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments.

"Registered vehicle" means any motorized land vehicle not described in "unregistered vehicle".

"Unregistered vehicle" means:
- any motorized land vehicle not designed for or required to be registered for use on public roads;
- any motorized land vehicle which is in dead storage at your residence;
- any motorized land vehicle used solely to service a residence premises shown in the Coverage Summary;
- any motorized land vehicle used to assist the disabled that is not designed for or required to be registered for use on public roads; or
- golf carts.

© Chubb.2016. All rights reserved. Form no. 4610031    ALTSCHULER 000057

*Reference Copy*

**Personal Liability
Coverage**



---

## Personal Liability Coverage
(continued)

"Disparate impact discrimination" means a violation of applicable disparate impact discrimination law protecting any residential staff based on his or her race, color, religion, creed, age, sex, disability, national origin or other status from disparities among or between individuals or groups based on numerical or other statistical profiles, sufficient to support a finding of discrimination, according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

"Disparate treatment discrimination" means your or a family member's vicarious liability for a discriminatory act by any residential staff, your spouse who lives with you, or other family member, based on his or her race, color, religion, creed, age, sex, disability, national origin or other status according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico, even though you or a family member:
- played no active role in the commission of the act;
- did nothing whatever to aid or encourage its commission; and
- may have done all that was possible to prevent it.

"Employment practices crisis" means:
- an allegation of, or your discovery of, a wrongful employment act committed against any residential staff that is reasonably likely to result in a civil action against you or a family member; or
- a threat by any residential staff to disclose publicly that you or a family member committed or allegedly committed a wrongful employment act.

"Reputation management firm" means:
- a professional public relations consulting firm;
- a professional security consulting firm; or
- a professional media management consulting firm.

"Residential staff" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed regularly to work 15 or more hours per week.
Residential staff includes a temporary worker. Residential staff does not include an independent contractor or any covered person.

"Temporary worker" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed to work 15 or more hours per week to substitute for any residential staff on leave or to meet seasonal or short-term workload demands for 30 consecutive days or longer during a 6 month period.
Temporary worker does not include an independent contractor or any covered person.

© Chubb.2016.  All rights  reserved.  Form no. 4610031                                                        9/12/17  11008.01

ALTSCHULER 000058

*Reference Copy*

*Personal Liability
Coverage*

---

## *Personal Liability Coverage*
(continued)

"Wrongful employment act" means any disparate impact discrimination, disparate treatment discrimination, sexual harassment, or wrongful termination of any residential staff actually or allegedly committed or attempted by you or a family member, while acting in the capacity as an employer, that violates applicable employment law of any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico. "Sexual harassment" as it relates solely to a wrongful employment act means unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that:
• is made a condition of employment of any residential staff;
• is used as a basis for employment decisions;
• interferes with performance of any residential staff's duties; or
• creates an intimidating, hostile, or offensive working environment; and
• you or a family member:
    • played no active role in the commission of the act;
    • did nothing whatever to aid or encourage its commission; and
    • may have done all that was possible to prevent it.

"Wrongful termination" means:
• the actual or constructive termination of employment of any residential staff by you or a family member in violation of applicable employment law; or
• breach of duty and care when you or a family member terminates an employment relationship with any residential staff.

### Workers' Compensation and Employer's Liability Coverages

Workers' Compensation and Employer's Liability Coverage are subject to all the provisions listed below and the following provisions of the policy as contained in Policy Terms:

### General Conditions
• Policy period;
• Renewals;
• Transfer of rights;
• Concealment or fraud;
• Application of coverage;
• Assignment;
• Policy changes;
• In case of death;
• Liberalization; and
• Conforming to state law.

### Special Conditions
• Nonrenewal;
• Conditional renewal;
• Your cancellation; and
• Our cancellation.

---

ALTSCHULER 000059

*Personal Liability
Coverage*



---

## Personal Liability Coverage
(continued)

In addition, the Employer's Liability Coverage is subject to the following provisions as contained in Policy Terms:
- General Conditions, Bankruptcy or insolvency;
- Liability, Your duties after a loss; and
- Special Conditions, Legal action against us.

The following definition applies to Workers' Compensation and Employer's Liability Coverage:
A "covered residence employee" means any person employed by you at a residence shown in the Coverage Summary who is both employed less than 40 hours per week and also defined under the New York Workers' Compensation Law as an employee for whom Workers' Compensation benefits must be provided.

### Workers' Compensation
We cover only benefits which the New York Workers' Compensation Law requires you or a family member to provide for a covered residence employee. This coverage does not apply to bodily injury arising out of the business pursuits of you or a family member.

We provide Workers' Compensation coverage solely to comply with the mandated coverage for personal liability insurance under New York Workers' Compensation Law and New York Insurance Law. We do not provide voluntary or elective Workers' Compensation coverage.

As between a covered residence employee and us, notice to or knowledge of the occurrence of the injury on your part will be deemed notice or knowledge on our part.

Jurisdiction over you, for the purpose of the law imposing liability for compensation, be jurisdiction over the company.

### Employer's Liability
We cover all damages you or a family member are legally obligated to pay because of bodily injury to a covered residence employee. The injury must be caused by an accident or a disease, and it must arise from and during the worker's employment for you or a family member. This coverage applies only:
- to bodily injury occurring during the policy period;
- if the bodily injury is a disease, caused by or aggravated by the conditions of the worker's employment by you or a family member;
- if the last day that the worker was exposed to the hazard causing the injury by disease was during the policy period.

This coverage applies in the United States, its territories and possessions, Canada, or temporarily elsewhere if the covered residence employee is a citizen or resident of the United States or Canada.

We may not limit our liability to pay damages for which we become legally liable to pay because of bodily injury to covered residence employees, if the bodily injury arises out of and in the course of employment that is subject to and is compensable under the New York Workers' Compensation Law.

© Chubb.2016.  All rights reserved.  Form no. 4610031                                9/12/1... ...
*Reference Copy*
ALTSCHULER 000060

*Personal Liability*
*Coverage*

## Personal Liability Coverage
(continued)

If a loss covered by this insurance is also covered by other insurance, we will not pay more than our share of benefits and costs. The shares of all applicable insurance will be equal until the loss is paid. However, if a loss covered by this insurance is also covered by insurance written to cover business employees of you or a family member who is a sole proprietor, this insurance is primary.

Employer's liability coverage does not apply to bodily injury arising out of the business pursuits of you or a family member. Nor does it apply to:
- liability assumed under any contract or agreement;
- any obligation under a workers' compensation, unemployment, disability benefits, or similar law;
- punitive or exemplary damage because of bodily injury to a worker who is employed illegally with the knowledge of you or a family member;
- bodily injury intentionally caused or aggravated by an insured;
- damages arising out of the unlawful discharge or coercion of, or unlawful discrimination against a covered residence employee.

### Defense coverages
We will defend a covered person against any suit seeking covered damages for personal injury or property damage or for covered damages under Employment practices liability, if Employment practices liability coverage is shown in the Coverage Summary. We provide this defense at our own expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion.

As part of our investigation, defense, negotiation, or settlement, we will pay:
- all premiums on appeal bonds required in any suit we defend;
- all premiums on bonds to release attachments for any amount up to the amount of coverage (but we are not obligated to apply for or furnish any bond);
- all expenses incurred by us;
- all costs taxed against a covered person;
- all interest accruing after a judgement is entered in a suit we defend on only that part of the judgement we are responsible for paying. We will not pay interest accruing after we have paid the judgement up to the amount of coverage;
- all prejudgement interest awarded against a covered person on that part of the judgement we pay or offer to pay. We will not pay any prejudgement interest based on that period of time after we make an offer to pay the amount of coverage;
- all earnings lost by each covered person at our request, up to $50,000;
- other reasonable expenses incurred by a covered person at our request; and
- the cost of bail bonds required of a covered person because of a covered loss.

In jurisdictions where we may be prevented by local law from carrying out these Defense Coverages, we will pay only those defense expenses that we agree in writing to pay and that are incurred by you.

These Defense coverages are limited for Employment practices liability as follows:
Our duty to defend you or a family member and our obligation to pay defense expenses ends when we have exhausted the amount of coverage per occurrence for Employment practices liability shown in the Coverage Summary by paying for covered damages from any one occurrence, or exhausted the maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary by paying for covered damages.

© Chubb.2016. All rights reserved. Form no. 4610031    9/12/17
*Reference Copy*
ALTSCHULER 000061

*Personal Liability Coverage*



---

## Extra Coverages

In addition to covering damages and defense costs, we also provide other related coverages. These coverages are in addition to the amount of coverage for damages and defense costs unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions.**

### Medical payments to others
We will pay the necessary medical expenses, up to a total of $50,000 for each person, for personal injury to anyone **except** you or a family member. These expenses must be incurred or medically ascertained within three years of an accident that:
- occurs at a residence covered under this part of your Masterpiece policy, to a person with permission from you or a family member to be there;
- arises from a condition at a residence covered under this part of your Masterpiece policy, or at the steps, driveways or sidewalks immediately adjoining this residence;
- was caused by the activities of a covered person;
- was caused by a domestic employee or any residential employee in the course of his or her employment by a covered person;
- was caused by a person employed by you for farm work in the course of his or her employment; or
- was caused by an animal owned by or in the care of a covered person.

"Medical expenses" includes reasonable charges for first aid, medical, funeral, surgical, x-ray, dental, ambulance, hospital, rehabilitation, professional nursing services, and prosthetic devices.

### Damaged property
We cover the replacement cost of other people's property, up to $25,000, for each occurrence, if the property was damaged or destroyed by a covered person.

"Replacement cost" is the amount required to repair or replace other people's property, whichever is less.

### Kidnap expenses
We will pay, up to a maximum of $100,000, for kidnap expenses a covered person incurs solely and directly as a result of a kidnap and ransom occurrence.

"Kidnap and ransom occurrence" means the actual or alleged wrongful taking of:
- you;
- one or more family members; or
- one or more covered relatives while visiting or legally traveling with you or a family member; from anywhere in the world except those places listed on the United States State Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence. The occurrence must include a demand for ransom payment which would be paid by you or a family member in exchange for the release of the kidnapped person(s). However, a kidnap and ransom occurrence does not mean the actual or alleged wrongful detention of a covered person or a family member solely on your property.

"Kidnap expenses" means the reasonable costs for:
- a professional negotiator;
- a professional security consultant;
- professional security guard services;
- a professional public relations consultant;

© Chubb.2016. All rights reserved. Form no. 4610031    9/12/17 11:05:07

ALTSCHULER 000062

*Reference Copy*

*Personal Liability*
*Coverage*

## Extra Coverages
(continued)

- travel, meals, lodging and phone expenses incurred by you or a family member;
- advertising, communications and recording equipment;
- related medical, cosmetic, psychiatric and dental expenses incurred by a kidnapped person within 12 months from that person's release;
- attorneys fees;
- a professional forensic analyst;
- earnings lost by you or a family member.

  However, "kidnap expenses" does not include expenses incurred due to any kidnap and ransom occurrence caused by:
- you or a family member;
- a covered relative;
- any guardian or former guardian of you or a family member;
- any person unrelated to you or a family member who lives with you or has ever lived with you for 6 or more months, other than a domestic employee, residential staff, or a person employed by you for farm work; or
- a civil authority,

  or any person acting on behalf of any of the above, whether acting alone or in collusion with others.

"Covered relative" means the following relatives of the person named in the Coverage Summary, or a spouse who lives with that person, or any family member:
- children, their children or other descendants of theirs;
- parents, grandparents or other ancestors of theirs; or
- siblings, their children or other descendants of theirs, who do not live with you, including spouses of all of the above. Parents, grandparents and other ancestors include adoptive parents, stepparents and stepgrandparents.

### Identity fraud
We will pay for a covered person's identity fraud expenses, up to a maximum of $100,000, for each identity fraud occurrence.

"Identity fraud" means the act of knowingly transferring or using, without lawful authority, a covered person's means of identity which constitutes a violation of federal law or a crime under any applicable state or local law.

"Identity fraud occurrence" means any act or series of acts of identity fraud by a person or group commencing in the policy period.

"Identity fraud expenses" means:
- the costs for notarizing affidavits or similar documents for law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- the costs for sending certified mail to law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- the loan application fees for re-applying for loan(s) due to the rejection of the original application because the lender received incorrect credit information;
- the telephone expenses for calls to businesses, law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- earnings lost by a covered person as a result of time off from work to complete fraud affidavits, meet with law enforcement agencies, credit agencies, merchants, or legal counsel;
- the reasonable attorney fees incurred with prior notice to us for:

*11/20/17*
© Chubb.2016. All rights reserved. Form no. 4610031

**New York** Personal Liability Coverage    *Page T-8*
9/12/17 4:05:07

ALTSCHULER 000063

*Reference Copy*

*Personal Liability*
*Coverage*



---

## Extra Coverages
(continued)

- the defense of a covered person against any suit(s) by businesses or their collection agencies;
- the removal of any criminal or civil judgements wrongly entered against a covered person;
- any challenge to the information in a covered person's consumer credit report; and
- the reasonable fees incurred with prior notice to us by an identity fraud mitigation entity to:
  - provide services for the activities described above;
  - restore accounts or credit standing with financial institutions or similar credit grantors and credit agencies; and
  - monitor for up to one year the effectiveness of the fraud mitigation and to detect additional identity fraud activity after the first identity fraud occurrence.

However, such monitoring must begin no later than one year after you first report an identity fraud occurrence to us.

However, "identity fraud expenses" does not include expenses incurred due to any fraudulent, dishonest or criminal act by a covered person or any person acting with a covered person, or by any authorized representative of a covered person, whether acting alone or in collusion with others.

"Identity fraud mitigation entity" means a company that principally provides professional, specialized services to counter identity fraud for individuals or groups of individuals, or a financial institution that provides similar services.

In addition to the duties described in Policy Terms, Liability Conditions, Your duties after a loss, a covered person shall notify an applicable law enforcement agency.

## Credit cards, forgery, and counterfeiting
We cover up to a total of $10,000 for:
- the legal obligation of you or a family member resulting from:
  - loss or theft of a credit card, bankcard, debit card or their account numbers issued to you or a family member for personal use, provided that all the terms for using the card are complied with;
  - loss caused by theft or unauthorized use of a credit card, bankcard, debit card or their account numbers issued to you or a family member for personal use when used electronically, including use on the Internet, provided that all the terms for using the card are complied with;
- loss to you or a family member caused by:
  - forgery or alteration of checks or negotiable instruments; or
  - acceptance in good faith of any counterfeit paper currency.

"Unauthorized use" means use of your personal credit card, bankcard, debit card or their account numbers without permission from you or a family member.
"Unauthorized use" does not mean use of your personal credit card, bankcard, debit card or their account numbers by your spouse or family member.

All loss resulting from any act or any series of similar or related acts:
- committed by any one person or group of persons acting in concert; or
- in which any person or group of persons is involved or implicated,
  is considered to be one loss, even if a series of similar or related acts occurs over multiple policy periods.

© Chubb.2016. All rights reserved. Form no. 4610031    9/12/11 Page T-9

*Reference Copy*
ALTSCHULER 000064

*Personal Liability Coverage*

## Extra Coverages
(continued)

We provide Defense coverages for any claim or suit seeking covered damages against you or a family member for loss, theft, or unauthorized use of a credit card, bankcard, debit card or their account numbers. We have the option to defend a claim or suit against you or a family member for forgery or counterfeiting. Our obligation to defend any suit seeking covered damages ends when our payment under this coverage equals $10,000.

In the event of a claim or suit seeking covered damages, you or a family member shall comply with the duties described in Policy Terms, Property Conditions, Your duties after a loss and Policy Terms, Liability Conditions, Your duties after a loss. In addition, you or a family member shall notify the credit card service company or the issuing bank.

### Rented or borrowed vehicles
We cover damages a covered person is legally obligated to pay for personal injury and property damage caused by an occurrence during the policy period resulting from a covered person's use of a vehicle:
- rented by; or
- borrowed, furnished to or made available to
you or a family member, if the limit of liability shown in the Coverage Summary is $1 million or more, provided the rental or loan does not exceed 30 days.

We will provide this coverage in excess of any underlying insurance that applies to these damages. If no underlying coverage exists, we will pay total damages up to the limit of liability shown in the Coverage Summary.

This Extra Coverage is not provided when:
- you have coverage provided by an excess or umbrella policy with us or another company;
- you or a family member own a private passenger vehicle, a pickup truck, panel truck or van.
  However, we will provide this coverage for a vehicle rented by a personal asset protection entity if:
    - the personal asset protection entity does not have coverage for the rented vehicle provided by an excess or umbrella policy with us or another company;
    - the personal asset protection entity does not own a private passenger vehicle, pickup truck, panel truck or van.

### Employment practices liability coverage
If Employment practices liability coverage is shown in the Coverage Summary, we provide coverage for Employment practices liability and Reputational injury.

This coverage applies only if on the effective date of any policy period, the number of residential staff does not exceed twelve. However, if after the effective date of any policy period you or a family member employs more than twelve residential staff, we will cover, through the remainder of the policy period, only those twelve residential staff with the longest period of uninterrupted employment in chronological order of hiring at the time of the Employment practices liability coverage occurrence. This condition does not apply to your or a family member's employment of a temporary worker to substitute for any residential staff on leave, performing the same duties for the same or fewer number of hours. It is your duty to advise us as soon as reasonably possible if you or a family member employs more than twelve residential staff at any time during the policy period in order to reduce the possibility of being underinsured.

© Chubb.2016. All rights reserved. Form no. 4610031
ALTSCHULER 000065
*Reference Copy*

*Personal Liability Coverage*



## *Extra Coverages*
(continued)

**Employment practices liability.** We cover damages you or a family member is legally obligated to pay any residential staff for a wrongful employment act caused by an occurrence when the claim is made or the suit is brought in the United States of America, its territories or possessions, or Puerto Rico, unless stated otherwise or an exclusion applies.

**Amount of coverage for Employment practices liability.** The maximum amount of coverage for Employment practices liability available for any one occurrence is the amount of coverage for Employment practices liability shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Deductible.** A deductible is that amount we will subtract from the amount of covered damages we pay. The deductible shown in the Coverage Summary for Employment practices liability applies to each Employment practices liability occurrence, unless stated otherwise.

**Reputational injury.** We cover the reasonable and necessary fees or expenses that you incur for services provided by a reputation management firm to minimize potential injury to the reputation of you or a family member solely as a result of an employment practices crisis caused by an occurrence if:
- the employment practices crisis is reported to us as soon as reasonably possible but not later than 30 days after the employment practices crisis begins; and
- you obtain approval of the reputation management firm from us before incurring any fees or expenses,

unless stated otherwise or an exclusion applies. There is no deductible for this coverage.

**Amount of coverage for Reputational injury.** The maximum amount of coverage for Reputational injury available for any one occurrence is the amount of coverage for Reputational injury shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Reputational injury shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Condition for Employment practices liability coverage.** The following condition applicable to Employment practices liability coverage is in addition to the General Conditions, Liability Conditions, and Special Conditions described under Policy Terms.

If on the effective date of any policy period the number of residential staff exceeds twelve, your eligibility for Employment practices liability coverage will cease as of that date. If Employment practices liability coverage has been provided, it will be cancelled or nonrenewed at the earliest date allowed by law and an appropriate notice of cancellation or nonrenewal will be issued.

© Chubb.2016. All rights reserved. Form no. 4610031                                          9/12/11 4610101
ALTSCHULER 000066

*Reference Copy*

*Personal Liability*
*Coverage*

## Exclusions

These exclusions apply to this part of your Masterpiece Policy, unless stated otherwise.

**Motorized land vehicles.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any motorized land vehicle or any trailers or any watercraft being towed by or carried on any registered vehicle. This exclusion does not apply to unregistered vehicles. However, we do not cover unregistered vehicles designed for recreational purposes off public roads owned by you or a family member if the occurrence takes place off:
• your residence premises;
• the premises where you are temporarily residing or renting for other than business use; or
• vacant land owned by you or rented to you;
    except for:
• a toy designed for a child's use that is not subject to motor vehicle registration and is built or modified after manufacture, not to exceed 15 miles per hour on level ground, and is not a motorized bicycle, scooter, or moped;
• a golf cart when used:
    • on a golfing facility;
    • to cross roads at designated points in the golfing facility; or
    • on roads of your private residential community with the authority of the property owners association.

This exclusion does not apply to the Extra Coverage, Rented or borrowed vehicles.

**Aircraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any aircraft, except a non-owned aircraft chartered with a professional crew by you or on your behalf. "Aircraft" means any device used or designed for flight, except drones or similar unmanned device not used or designed to carry people or cargo.

However, with respect to the ownership, maintenance or use of any drones or similar unmanned device, we do not cover any damages:
• while such drone or similar unmanned device is being operated in a restricted airspace as determined by the Federal Aviation Administration or other governmental agency, whether on a local, state or federal level, including any temporary flight restrictions; or
• to any aircraft, including any resulting damages. This exclusion applies whether such drone or similar unmanned device makes contact with the aircraft or not.

**Large watercraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any watercraft 26 feet or longer or with more than 50 engine rated horsepower owned or controlled, directly or indirectly, by a covered person, or which is rented by, furnished to, or made available to a covered person for longer than 30 consecutive days. We do cover watercraft being stored even if not listed in the Coverage Summary, unless another exclusion applies.

**Hovercraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading or towing of any hovercraft. We do not cover any property damages to hovercraft rented to, owned by, or in the care, custody or control of a covered person.

**Personal Liability Coverage**



---

## Exclusions
(continued)

**Motorized land vehicle racing or track usage.** We do not cover any damages arising out of the ownership, maintenance or use of any motorized land vehicle:
- during any instruction, practice, preparation for, or participation in, any competitive, prearranged or organized racing, speed contest, rally, gymkhana, sports event, stunting activity, or timed event of any kind; or
- on a racetrack, test track or other course of any kind.

**Watercraft racing or track usage.** We do not cover any damages arising out of the ownership, maintenance or use of any watercraft during any instruction, practice, preparation for, or participation in, any competitive, prearranged or organized racing, speed contest, rally, sports event, stunting activity or timed event of any kind. This exclusion does not apply to sailboat racing even if the sailboat is equipped with an auxiliary motor.

**Unemployment compensation or disability.** We do not cover any damages for personal injury for which a covered person may be legally obligated to pay under any unemployment compensation, disability benefits, or similar law.

**Employees.** We do not cover any damages arising out of acts of employees of a personal asset protection entity except acts in the course of their employment for the maintenance or use of covered property.

**Failure to act.** We do not cover any damages arising out of any act, error, decision, or failure to act or decide by any partner, member or trustee of a personal asset protection entity covered under this policy, other than with respect to damages arising out of the ownership, maintenance, or use of:
- a residence premises, vacant land, and an individual or family cemetery plot or burial vault;
- a vehicle or watercraft owned or rented by the personal asset protection entity covered under this part of your Masterpiece policy.

**Director's liability.** We do not cover any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization.
However, we do cover such damages if you or a family member is:
- an officer or member of a board of directors of a homeowner, condominium or cooperative association; or
- not compensated as an officer or member of a board of directors of a not-for-profit corporation or organization,
unless another exclusion applies.

**Damage to covered person's property.** We do not cover any person for property damage to property owned by any covered person.

**Damage to property in your care.** We do not cover any person for property damage to property of others rented to, occupied by, used by, or in the care of any covered person. But we do cover such damages for loss caused by fire, smoke, or explosion unless another exclusion applies. This exclusion does not apply to property damage:
- to a motorized land vehicle rented to a covered person if the Extra Coverage, Rented or borrowed vehicles applies, or
- as provided under the Extra Coverage, Damaged property.

ALTSCHULER 000068

*Reference Copy*

*Personal Liability*
*Coverage*

## Exclusions
(continued)

**Wrongful employment act.** We do not cover any damages arising out of a wrongful employment act. This exclusion does not apply to Employment practices liability coverage if Employment practices liability coverage is shown in the Coverage Summary.

**Discrimination.** We do not cover any damages arising out of discrimination due to age, race, color, sex, creed, national origin, or any other discrimination.

**Intentional acts.** We do not cover any damages arising out of a willful, malicious, fraudulent or dishonest act or any act intended by any covered person to cause personal injury or property damage. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Molestation, misconduct or abuse.** We do not cover any damages arising out of any actual, alleged or threatened:
• sexual molestation;
• sexual misconduct or harassment; or
• abuse.

**Nonpermissive use.** We do not cover any person who uses a motorized land vehicle or watercraft without permission from you or a family member.

**Business pursuits.** We do not cover any damages arising out of business activities or business property in which a covered person has ownership or other interest or is conducted by or on behalf of a covered person or others.

However, we do cover damages arising out of volunteer work for an organized charitable, religious or community group, an incidental business away from home, incidental business at home, incidental business property, incidental farming, or residence premises conditional business liability, unless another exclusion applies.

"Incidental business away from home" is a self-employed sales activity, or a self-employed business activity normally undertaken by persons under the age of 18 such as newspaper delivery, babysitting, caddying, and lawn care. Either of these activities must:
• not yield gross revenues in excess of $15,000 in any year;
• have no employees subject to any workers' compensation, disability benefits, unemployment compensation, or other similar laws; and
• conform to local, state, and federal laws.

"Incidental business at home" is a business activity, other than farming, conducted by you in whole or in part on your residence premises which must:
• not yield gross revenues in excess of $15,000 in any year;
• have no employees subject to any workers' compensation, disability benefits, unemployment compensation or other similar laws; and
• conform to local, state, and federal laws.

© Chubb.2016. All rights reserved. Form no. 4610031
9/12/17  *London*
*Reference Copy*

ALTSCHULER 000069

**Personal Liability
Coverage**



---

## Exclusions
(continued)

"Incidental business property" is limited to the rental or holding for rental, to be used as a residence, of a condominium or cooperative unit owned by a covered person, an apartment unit rented by a covered person, a one or two family dwelling owned by a covered person, or a three or four family dwelling owned by a covered person and occupied by you. We provide this coverage only for premises listed in the Coverage Summary unless the rental or holding for rental is for:
- a residence of yours that is occasionally rented and that is used exclusively as a residence; or
- part of a residence of yours by one or two roomers or boarders; or
- part of a residence of yours as an office, school, studio, or private garage.

"Incidental farming" is a farming activity which meets all of the following requirements:
- is incidental to your use of the premises as your residence;
- does not involve employment of others for more than 1,500 hours of farm work during the policy period;
- does not produce more than $25,000 in gross annual revenue from agricultural operations;
- and with respect to the raising or care of animals:
  - does not produce more than $50,000 in gross annual revenues;
  - does not involve more than 25 sales transactions during the policy period;
  - does not involve the sale of more than 50 animals during the policy period.

"Residence premises conditional business liability" is limited to business or professional activities when legally conducted by you or a family member at your residence shown in the Coverage Summary. If there is no other valid and collectible insurance, we provide coverage only for personal injury or property damage arising out of the physical condition of that residence if:
- you do not have any employees involved in your business or professional activities who are subject to any workers' compensation, disability benefits, unemployment compensation, or other similar laws; or, if you are a doctor or dentist, you do not have more than two employees subject to such laws; and
- you are a home day care provider whose annual gross revenues from this activity do not exceed $5,000.

We do not cover damages or consequences resulting from business or professional care or services performed or not performed.

**The following exclusion, Contamination, applies only to "incidental farming" as described under the exclusion, Business pursuits.**

**Contamination.** We do not cover any actual or alleged damages arising out of the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover any cost or expense arising out of any request, demand or order to:
- extract pollutants from land or water;
- remove, restore or replace polluted or contaminated land or water; or
- test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of pollutants.

ALTSCHULER 000070

*Reference Copy*

*Personal Liability Coverage*

## Exclusions
(continued)

However, this exclusion does not apply if the discharge, dispersal, seepage, migration, release or escape is sudden and accidental. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke (except smoke from a hostile fire), vapor, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Pursuit or holding of public office.** We do not cover any damages arising out of a covered person's pursuit or holding of an elected public office. But we do cover such damages for you or a family member if:
- the annual compensation of the office, whether accepted or not, does not exceed $20,000; and
- the hours required to perform the duties of the office do not exceed an annual average of 20 hours of work per week during the policy period.

**Financial guarantees.** We do not cover any damages for any covered person's financial guarantee of the financial performance of any covered person, other individual or organization.

**Professional services.** We do not cover any damages for any covered person's performing or failure to perform professional services, or for professional services for which any covered person is legally responsible or licensed.

**Acts of war.** We do not cover any damages caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Contractual liability.** We do not cover any assessments charged against a covered person as a member of a homeowners, condominium or cooperative association. We also do not cover any damages arising from contracts or agreements made in connection with any covered person's business. Nor do we cover any liability for unwritten contracts, or contracts in which the liability of others is assumed after a covered loss.

**Covered person's or dependent's personal injury.** We do not cover any damages for personal injury for any covered person or their dependents where the ultimate beneficiary is the offending party or defendant. We also do not cover any damages for personal injury for which you or a family member can be held legally liable, in any way, to a spouse, a family member, a person who lives with you, or a person named in the Coverage Summary. We also do not cover any damages for personal injury for which a spouse, a family member, a person who lives with you, or a person named in the Coverage Summary can be held legally liable, in any way, to you or a family member.

However, we do cover damages for bodily injury arising out of the use of a motorized land vehicle for which you or a family member can be held legally liable to a spouse, a family member, or a person named in the Coverage Summary, or for which a spouse, a family member, or any other person named in the Coverage Summary can be held legally liable to you or a family member to the extent that coverage is provided under this part of your Masterpiece policy.

**Liability for dependent care.** We do not cover any damages for personal injury for which a covered person's only legal liability is by virtue of a contract or other responsibility for a dependent's care.

*Reference Copy*
ALTSCHULER 000071

**Personal Liability Coverage**



---

## Exclusions
(continued)

**Illness.** We do not cover personal injury or property damage resulting from any illness, sickness or disease transmitted intentionally or unintentionally by a covered person to anyone, or any consequence resulting from that illness, sickness or disease. We also do not cover any damages for personal injury resulting from the fear of contracting any illness, sickness or disease, or any consequence resulting from the fear of contracting any illness, sickness or disease.

**Liability for the acts of others.** We do not cover any person for damages arising from:
• any entrustment of property;
• the failure to supervise or the negligent supervision of any person; or
• any parental or ownership liability.
This exclusion applies only to damages arising out of the ownership, maintenance or use of any motorized land vehicle, watercraft 26 feet or longer or with more than 50 engine rated horsepower, aircraft, or hovercraft.
This exclusion does not apply to:
• the Extra Coverage, Rented or borrowed vehicles; or
• any other coverage provided under an exclusion in this part of your policy.

**Nuclear or radiation hazard.** We do not cover any damages caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.

**The following exclusion, Special exclusions, applies solely to Employment practices liability coverage.**

**Special exclusions.** We do not cover the following:
• matters which may be deemed uninsurable according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico under which the policy is construed;
• occurrences arising out of the breach of an actual or implied written or oral agreement related to employment;
• costs incurred to comply with any order, grant, or agreement to provide non-monetary relief; or
• occurrences arising out of any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by the Consolidated Omnibus Budget Reconciliation Act, Employment Retirement Income Security Act of 1974, Fair Labor Standards Act (except the Equal Pay Act), state wage payment and collection laws, Federal Insurance Contributions Act, Immigration Reform and Control Act of 1986, National Labor Relations Act, Occupational Safety and Health Act, Social Security Act, Workers' Adjustment and Retraining Notification Act, including any amendments to these laws, promulgated rules, or regulations or any provisions of any similar federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

© Chubb.2016. All rights reserved. Form no. 4810031      9/12/18 Edition

*Reference Copy*

ALTSCHULER 000072



**Policy
Terms**

This part of your Masterpiece Policy explains the conditions that apply to your policy.

## General Conditions

These conditions apply to your policy in general, and to each coverage in it.

### Policy period
The effective dates of your policy are shown in the Coverage Summary. Those dates begin at 12:01 a.m. standard time at the mailing address shown. Each renewal period shall be for a similar term.

All coverages on this policy apply only to occurrences that take place while this policy is in effect.

### Renewals
We or our agent may offer to renew this policy, at the premiums and under the policy provisions in effect at the date of renewal. We can do this by mailing you a bill for the premium to the address shown in the Coverage Summary, along with any changes in the policy provisions or amounts of coverage. You may accept our offer by paying the premium as billed.

### Transfer of rights
If we make a payment under this policy, we will assume any recovery rights a covered person has in connection with that loss, to the extent we have paid for the loss.

All of your rights of recovery will become our rights to the extent of any payment we make under this policy. A covered person will do everything necessary to secure such rights, and do nothing after a loss to prejudice such rights. However, you may waive any rights of recovery from another person or organization for a covered loss in writing before the loss occurs.

### Concealment or fraud
We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss. This condition does not apply to Vehicle Liability Coverage.

### Application of coverage
The amount of coverage applies separately to each covered person, but does not increase the amount of coverage for any one occurrence.

### Duplicate coverages
If a loss is covered under more than one part of this policy, we will pay you under the part giving you the most coverage, but not under more than one part. However, when both Valuable Articles Coverage and contents coverage are shown in the Coverage Summary, and a loss is covered under both parts, your amount of coverage will equal the combined total of both contents and Valuable Articles Coverage subject to the Contents Special limits and policy provisions. In no event will we make duplicate payments.

© Chubb.2016. All rights reserved. Form no. 7000031
*Reference Copy*
ALTSCHULER 000073

*Policy*
*Terms*

## General Conditions
(continued)

### Assignment
You cannot transfer your interest in this policy to anyone else unless we agree in writing to the transfer.

### Policy changes
This policy can be changed only by a written amendment we issue.

### Vehicle premium
If you have vehicle coverage, the premium for the vehicle coverage is based on information we have received from you, your agent, or other sources. If the information is incorrect or incomplete, or changes during the policy period, you must inform us or your agent of any changes as soon as possible regarding:
- your vehicle, including its use;
- the covered persons who regularly use your vehicle, including newly licensed family members; or
- the location where your vehicle is principally garaged.

We may decrease or increase your premium during the policy period based on the corrected, completed, or changed information and we reserve our rights to cancel or to decline to renew this policy in accordance with the policy cancellation provisions under the Special Conditions section of the Policy Terms.

### Bankruptcy or insolvency
We will meet all our obligations under this policy regardless of whether you, your estate, or anyone else or his or her estate becomes bankrupt or insolvent.

### In case of death
In the event of your death, we cover your legal representative or any person having proper temporary custody of your property until a legal representative is appointed and qualified, but only with respect to your premises and other property covered under the policy at the time of death. We will also cover any member of your household who is a covered person at the time of death.

### Liberalization
We may extend or broaden the coverage provided by this policy. If we do this during the policy period or within 60 days before it begins, without increasing the premium, then the extended or broadened coverage will apply to occurrences after the effective date of the extended or broadened coverage.

### Conforming to state law
If any provision of this policy conflicts with the laws of the state you live in, this policy is amended to conform to those laws.

### Conforming to trade sanction laws
This policy does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

ALTSCHULER 000074

*Policy
Terms*



---

## *Liability Conditions*

These conditions apply to all liability coverages in this policy.

### Other insurance

**Vehicles and UM/Supplementary UM/UIM:** When other liability insurance applies to covered damages, we will pay our share. Our share is the proportion that the amount of coverage under this policy bears to the total of all applicable amounts of coverage. However, for non-owned motorized land vehicles, this insurance is excess over any other insurance, except that written specifically to cover excess over the amount of coverage in this policy.

**Personal and Excess:** This insurance is excess over any other insurance except that written specifically to cover excess over the amount of coverage that applies in this policy.

**Additional liability protection.** If you have Masterpiece Personal Liability Coverage or Masterpiece Vehicle Liability Coverage, you are eligible to apply for excess liability protection. The additional protection covers your house, vehicle(s) and other personal exposures under our Masterpiece Excess Liability Coverage. Acceptance is subject to our approval.

When you no longer have at least one of either Masterpiece Personal Liability Coverage or Masterpiece Vehicle Liability Coverage, your eligibility for Masterpiece Excess Liability Coverage will cease as of the cancellation or nonrenewal date. If Masterpiece Excess Liability Coverage has been provided, it will be cancelled or nonrenewed at the earliest date allowed by law and an appropriate notice of cancellation or nonrenewal will be issued.

### Your duties after a loss

In case of an accident or occurrence, the covered person shall perform the following duties that apply:

**Notification.** You must notify us or your agent as soon as reasonably possible. Failure to give notice to us shall not invalidate any claim made by you, the injured person, or any other claimant unless the failure to provide such timely notice has prejudiced us. However, no claim made by you, the injured person or other claimant will be invalid if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as reasonably possible thereafter.

With respect to personal injury or wrongful death, if we deny coverage or do not admit liability because you, the injured person, or other claimant fails to give notice as soon as possible then you, the injured person, or other claimant may bring an action against us provided the sole question is whether the denial of coverage or non admission of liability is based on the failure to provide timely notice. However, you, the injured person, or other claimant may not bring an action within 60 days after coverage is denied or liability not admitted unless we or you:
- initiate an action to declare the rights of the parties under this contract; and
- name the injured person or other claimant as a party to such action.

*Reference Copy*

*Policy*
*Terms*

## *Liability Conditions*
(continued)

The burden of proving prejudice for failure to provide timely notice shall be on:
- us if notice was provided within two years of the time required under this policy; or
- you, the injured person or other claimant if notice was provided more than two years after the time required under this policy.

An irrebuttable presumption of prejudice will apply if, prior to providing notice:
- your liability has been determined by a court of competent jurisdiction or by binding arbitration; or
- you have entered into any settlement or other compromise.

**Assistance.** You must provide us with all available information. This includes any suit papers or other documents which help us in the event that we defend you.

**Cooperation.** You must cooperate with us fully in any legal defense. This may include any association by us with the covered person in defense of a claim reasonably likely to involve us.

**Examination.** A person making a claim under any liability or vehicle coverages in this policy must:
- submit as often as we reasonably require:
  - to physical exams by physicians we select, which we will pay for; and
  - to examination under oath and subscribe the same; and
- authorize us to obtain:
  - medical reports; and
  - other pertinent records.

### Appeals
If a covered person, or any primary insurer, does not appeal a judgement for covered damages, we may choose to do so. We will then become responsible for all expenses, taxable costs, and interest arising out of the appeal. However, the amount of coverage for damages will not be increased.

## *Property Conditions*

These conditions apply to all coverage for damage to property and all coverages for damage to vehicles in this policy.

### Other insurance
When other property insurance applies to a covered loss, we will pay only the portion of the loss that the amount of coverage under this policy bears to the total amount of insurance covering the loss, except as follows:

**Condominiums and Cooperatives:** If there is other insurance in the name of the condominium or cooperative association covering the same property covered by us, our coverage shall be in excess of the other insurance.

**Valuable articles:** If there is other insurance in the name of a consignor, gallery, auction house or museum, covering the same property covered by us, our coverage shall be in excess of a loss covered under the other insurance.

ALTSCHULER 000076

*Reference Copy*

*Policy*
*Terms*



---

## Property Conditions
(continued)

### Your duties after a loss
If you have a loss this policy may cover, you must perform these duties:

**Notification.** You must notify us or your agent of your loss as soon as possible.

**Protect property.** You must take all reasonable means that are necessary to protect property from further loss or damage.

**Prepare an inventory.** You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

**Display property.** You must show us the damaged property when we ask.

**Examination under oath.** We have the right to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

**Proof of loss.** You must submit to us, within 60 days after we request, your signed, sworn proof of loss which documents, to the best of your knowledge and belief:
- the time and cause of loss;
- interest of the insured and all others in the property involved and all liens on the property;
- other insurance which may cover the loss;
- changes in title or occupancy of the property during the term of the policy;
- specifications of any damaged buildings and estimates for their repair;
- receipts for additional living expenses incurred and records supporting any fair rental value loss; and
- evidence or affidavit supporting a claim under the Credit Cards, Bank Cards, Fund Transfer Cards, Forgery and Counterfeit Money Coverage, stating the amount and cause of loss.

### Insurable interest
We will not pay for any loss to property in which you or a family member does not have an insurable interest at the time of the loss.

If more than one person has an insurable interest in covered property, we will not pay for an amount greater than your interest, up to the amount of coverage that applies.

### Abandoning property
You cannot abandon any property to us unless we agree to accept it, or to a third party unless we agree.

### Carrier and bailees
We will not make any payments under this policy to the benefit of any carrier or other bailee of damaged or lost property.

© Chubb.2016.  All rights reserved.  Form no. 7000031

8/16 PL-11-10
*Reference Copy*
ALTSCHULER 000077

*Policy*
*Terms*

## Property Conditions
(continued)

### Fire losses

If there is a fire loss to your home, we are required by New York law to first pay a portion of the claim to tax districts that have issued a certificate of lien. If your tax district is eligible to receive a portion of the payment for your loss, any payment we make to you for fire losses will be reduced by the amount paid to the tax district.

## Special Conditions

In the event of conflict with any other conditions of your policy, these conditions supersede.

### Legal action against us

You agree not to bring legal action against us unless you have first complied with all conditions of this policy. Except for vehicle coverage, you also agree to bring any action against us within two years after a loss occurs.

For liability, you also agree not to bring any action against us until the amount of damages you are legally obligated to pay has been determined by final judgement or by a written agreement between you, us and the claimant. No person or organization has any right under this policy to bring us into any action to determine the liability of a covered person.

### Appraisals

If you and we fail to agree on the amount of loss, either one can demand that the amount of loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire. The appraisers shall then set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us. However, we do not waive our rights under this policy by agreeing to an appraisal.

### Mortgagee or loss payee

If a mortgagee or loss payee is named in this policy, loss or damage, if any, on buildings under this policy, shall be payable to the aforesaid as mortgagee or loss payee as interest may appear, and this insurance, as to the interest of the mortgagee or loss payee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy, provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee or loss payee shall, on demand, pay the same.

© Chubb.2016.  All rights  reserved. Form  no. 7000031                8/16 NA n-11-re
ALTSCHULER 000078

*Reference  Copy*

*Policy
Terms*



---

### Special Conditions
(continued)

Provided, also that the mortgagee or loss payee shall notify this company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee or loss payee and, unless permitted by this policy, it shall be noted thereon and the mortgagee or loss payee shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise this policy shall be null and void.

This company reserves the right to cancel this policy at any time as provided by its terms, but in case this policy shall continue in force for the benefit only of the mortgagee or loss payee for 10 days after notice to the mortgagee or loss payee of such cancellation and shall then cease, and this company shall have the right, on like notice, to cancel this agreement.

Whenever this company shall pay the mortgagee or loss payee any sum for loss or damage under this policy and shall claim that, as to the mortgagor or owner, nonliability therefore existed, this company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may, at its option, pay to the mortgagee or loss payee the whole principal due or to grow due on the mortgage with interest, and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee or loss payee to recover the full amount of said mortgagee's or loss payee's claim.

Loss or damage, if any, under this policy shall be payable to the aforesaid mortgagee or loss payee as interest may appear under all present or future mortgages, in order of precedence of such mortgages, in accordance with the terms of this standard mortgage clause, it being understood that no notice of increase or decrease in any mortgagee's interest is required.

### Nonrenewal

If we decline to renew all or part of this policy, we will mail such nonrenewal to your last mailing address shown in the policy at least 45 days, but not more than 60 days, before the policy ends and we will obtain a certificate of mailing. A copy of the notice will also be sent to the last known mortgagee or lienholder named in this policy at the last mailing address shown in the policy. The reasons for nonrenewal will accompany the notice.

During the first three years after the original effective date of the policy (or for vehicle coverage, the first year) we may decline to renew this policy only on grounds for which we could cancel it. If we voluntarily renew this policy at the end of this period, the three year (or one year) period will begin again on the effective date of the renewal.

### Vehicle coverage only:

If we decide not to renew or continue this policy, we will mail notice to your last mailing address shown in the policy. If the policy period is other than one year, we have the right not to renew or continue if only at each anniversary of its original effective date.

### Conditional renewal

If we have the right to cancel or refuse to renew this policy, we may instead of cancelling or nonrenewing, condition continuation by a change of limits or elimination of any coverage which is not required by law. If we condition the renewal, we will mail such notice to your last mailing address shown in the policy at least 45 days but not more than 60 days before the policy ends.

© Chubb.2016. All rights reserved. Form no. 7000031

*Reference Copy*

ALTSCHULER 000079

*Policy*
*Terms*

## Special Conditions
(continued)

Our right not to renew applies to each coverage or limit in this policy.

### Your cancellation
You may cancel this policy or any part of it at any time by returning it to us or notifying us in writing of the future date that the cancellation is to take effect.

### Our cancellation
We may cancel this policy or any part of it, subject to the following conditions. Our right to cancel applies to each coverage or limit in this policy.

**Within 60 days.** When this policy or any part of it has been in effect for less than 60 days, we may cancel with 30 days notice for any reason.

**Nonpayment of premium.** We may cancel this policy or any part of it with 15 days notice if you fail to pay the premium by the due date, regardless of whether the premium is payable to us, to our agent, or under any finance or credit plan.

**Conviction of a crime.** We may cancel any part of this policy, except vehicle coverage, with 30 days notice if you were convicted of a crime increasing the hazard we assumed.

**Misrepresentation.** We may cancel this policy or any part of it with 30 days notice if the coverage was obtained through material misrepresentation, fraudulent statements, or omissions of a fact that is relevant to a claim or to the acceptance of the risk or to the hazard we assumed.

**Willful or reckless acts.** We may cancel this policy or any part of it with 30 days notice if there have been willful or reckless acts or omissions increasing the hazard we assumed.

**Property changes.** We may cancel this policy or any part of it with 30 days notice if physical changes occur in the property after the policy was issued or after the last renewal date, making the property uninsurable.

**Violations.** We may cancel this policy or any part of it with 30 days notice if the superintendent of insurance determines that continuing the policy would violate Chapter 28 of the Laws of New York.

**Vehicle coverage only:**
**Driver's license suspension.** We may cancel any vehicle coverage in this policy with 30 days notice if your driver's license or that of any other driver who lives with you, and customarily uses your car, has been suspended or revoked during the policy period. This does not apply to a suspension issued under Section 510(b)(1) of the vehicle and traffic law or one or more administrative suspensions from the same incident which terminate prior to the effective date of the cancellation.

© Chubb.2016. All rights reserved. Form no. 7000031    8/16 Y-3 1

*Reference Copy*

ALTSCHULER 000080

*Policy*
*Terms*



---

### *Special Conditions*
(continued)

### Procedure

To cancel this policy or any part of it, we must notify you in writing. This notice will be mailed to you at the last mailing address shown in the policy and we will obtain a certificate of mailing. This notice will include the date the cancellation is to take effect and the reasons for cancellation.

### Refund

In the event of cancellation by you or by us, we will refund any unearned premium on the effective date of cancellation, or as soon as possible afterwards. The unearned premium will be computed pro rata for the unexpired term for each part of the policy. For cancellations during the policy term, we will retain a minimum of $50.

© Chubb.2018. All rights reserved. Form no. 7000031    8/16/17  12:17h:
ALTSCHULER 000081
*Reference Copy*

### *Signatures*

**CHUBB**

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

PACIFIC INDEMNITY COMPANY
CHUBB INDEMNITY INSURANCE COMPANMY
FEDERAL INSURANCE COMPANY
VIGILANT INSURANCE COMPANY

*President*

*Secretary*

CHUBB INSURANCE COMPANY OF NEW JERSEY
CHUBB NATIONAL INSURANCE COMPANY
GREAT NORTHERN INSURANCE COMPANY

*President*

*Secretary*

EXECUTIVE RISK INDEMNITY INC.

*President*

*Secretary*

06/27/16
© Copyright 1985 by Chubb & Son Inc. Form no. 7200031 5/85

**New York** Signatures
6/14/16 8:21:02

*Reference Copy*

ALTSCHULER 000082



**Policy Information Notice**

**IMPORTANT NOTICE**

You have certain rights to review and correct or amend information in your file with the producer or the insurer. If you want to know more about this and how information may be disclosed without your prior authorization, please write to:

Chubb Personal Risk Services
Attention: Policy Information
202 Hall's Mill Road
PO Box 1600
Whitehouse Station, NJ 08889-1600

Please include your policy number, policy period, and the name and address of your agent or broker.

If you need to report a claim and have been unable to contact your producer or local Chubb Office, you can call this telephone number for further assistance.

1-800-252-4670

**THIRD PARTY DESIGNATION NOTIFICATION**

New York law permits a named insured age sixty-five or older to designate a third party (called a "Designee") to whom we will send a duplicate copy of notices of cancellation, nonrenewal, or conditional renewal issued to you for your policies.

If you want to add a "Designee" as your Third Party Designation for this policy, please contact your agent or broker.

© Chubb.2016. All rights reserved. Form no. 7500031
**New York** Policy Information Notice

8/18/17 9:41:12

ALTSCHULER 000083

*Reference Copy*

# Exhibit 15

**File Note Title:**SIU-Net Worth Summary
**Create Date:**7/24/2020 2:28 PM
**Author:**FRED WHITE
**File Note Text:**
Net Worth Summary Attached.


Fred

## Net Worth Calculator

7/22/2020

**Estimated Net Worth:** $35,290,245

| Assets | | |
|---|---|---|
| **Personal Items** | | **Estimated Value** |
| Home | $ | 2,600,000 |
| Vehicles | | – |
| Jewelry | | 1,040,000 |
| Artwork | | 5,656,000 |
| Furniture/Antiques | | 6,000,000 |
| Electronics | | – |
| Other | | – |
| Other | | – |
| **Cash or Cash Equivalent** | | |
| Checking account | $ | 60,000 |
| Savings account | | – |
| Certificates of deposit | | – |
| Money market account | | – |
| Life insurance (cash value) | | 1,000,000 |
| Other (Charles Schwab LLC Account) | | 624,605 |
| **Investments** | | |
| Retirement account | $ | 710,468 |
| Bonds | | – |
| Mutual funds | | – |
| Individual stock shares | | – |
| Real estate other than home | | 3,100,000 |
| Other: Gerald & Phyllis Altschuler Trust; NuPulseCV Inc.; Trust Investments; Corbin Holdings & CS Corbin Holdings LLC Investments; Wetmore Land. | | 18,863,414 |
| **Assets Total** | $ | 39,654,487 |

| Liabilities | | |
|---|---|---|
| **Loan Balances** | | **Estimated Value** |
| Mortgage loan | $ | 1,715,009 |
| Home equity loan | | – |
| Car loans | | – |
| Real estate loans | | 2,224,198 |
| Student loans | | – |
| Other loans | | – |
| **Other Outstanding Debt** | | |
| Credit card debt | $ | 425,036 |
| Other debt | | – |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Liabilities Total** | $ | 4,364,243 |

CHUBB-Altschuler/ROLEX & ART 00001412
092020001456

# Exhibit 16

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Douglas Altschuler,         ) No. CV-21-00119-TUC-DCB
                         )
        Plaintiff,     )
                         )
v.                     )
                         )
                         )
Chubb National Insurance )
Company, an Indiana     )
corporation,          )
                         )
        Defendant.     )
                         )


VIDEOTAPED REMOTE DEPOSITION OF KAREN MOORE

February 23, 2023

Phoenix, Arizona











Reported by:
Alisa Smith, AZ CR
AZ Certified Reporter No. 50712

KAREN MOORE   FEBRUARY 23, 2023

```
 1              VIDEOTAPED REMOTE DEPOSITION OF KAREN MOORE

 2    was taken on February 23, 2023, commencing at

 3    10:33 a.m., via Zoom with all parties appearing

 4    remotely, before Alisa Smith, a Certified Reporter of

 5    the State of Arizona.

 6

 7                              *  *  *

 8    COUNSEL APPEARING:

 9    For Plaintiff:

10              By:  Jeff G. Zane
                POLL, MOON & ZANE, PLLC
11              2999 North 44th Street
                Suite 325
12              Phoenix, Arizona 85018
                jzane@pmzlaw.com
13
      For Defendant:
14
                By:  Robert T. Sullivan
15              BROENING OBERG WOODS & WILSON, P.C.
                2800 North Central Avenue
16              Suite 1600
                Phoenix, Arizona 85004
17              rts@bowwlaw.com

18    Also present:  Judy Thompson, Videographer

19

20

21

22

23

24

25
```

KAREN MOORE    FEBRUARY 23, 2023

```
 1                    I N D E X

 2   WITNESS                                    PAGE

 3   KAREN MOORE

 4      Examination by Mr. Zane                    5

 5

 6                   *  *  *  *  *

 7               EXHIBITS MARKED

 8
     EXHIBIT     DESCRIPTION                     PAGE
 9

10   Exhibit 29  Claims log compilation           19

11   Exhibit 30  Chvostal's Provenance Opinions   65

12   Exhibit 31  Chvostal's Provenance Report and 115

13               Preliminary EUO Questions

14   Exhibit 32  Transcript of Deborah Smith's   157

15               deposition

16

17

18

19

20

21

22

23

24

25
```

KAREN MOORE  FEBRUARY 23, 2023

1           THE VIDEOGRAPHER:  This is the

2    videotaped deposition of Karen Moore by Zoom

3    videoconference, taken by the plaintiff in

4    Case No. CV-21-00119-TUC-DCB, styled Douglas

5    Altschuler versus Chubb National Insurance Company,

6    filed in the United States District Court, District

7    of Arizona.

8           Today is February 23rd, 2023, at

9    10:33 a.m.  Alisa Smith is the certified shorthand

10   reporter with DLV Reporting, 313 North Gilbert Road,

11   Gilbert, Arizona.  Judy Thompson is the legal-video

12   specialist with Legal-Video Specialists, 3033 North

13   Central Avenue, Phoenix, Arizona.

14           Counsel may state their name, firm, and

15   whom they represent, beginning with the plaintiff's

16   counsel, please.

17           MR. ZANE:  Jeff Zane representing

18   plaintiff from Poli, Moon & Zane.

19           MR. SULLIVAN:  Robert Sullivan,

20   Broening Oberg Woods & Wilson on behalf of Defendant

21   Chubb.

22           THE VIDEOGRAPHER:  Thank you.  You may

23   swear the witness.

24   ///

25   ///

KAREN MOORE  FEBRUARY 23, 2023

```
 1                      KAREN MOORE,
 2   the witness herein, having been first duly sworn by
 3   the Certified Court Reporter, was examined and
 4   testified as follows:
 5               MR. ZANE:  So that froze a little bit
 6   on my side.  Was that just me?
 7               MR. SULLIVAN:  I believe so.
 8               MR. ZANE:  All right.  Well, more tech
 9   issues.  Hopefully that's just one time.  Good,
10   good.  That's a rousing start.
11                      EXAMINATION
12   BY MR. ZANE:
13      Q.   Good morning or afternoon, if you're on the
14   East Coast, Karen.  I appreciate your time here.
15           May I call you Karen?
16      A.   Yes.
17      Q.   Okay.  Can you please just state your name
18   for the record?
19      A.   Karen Moore.
20      Q.   All right.  And I understand you have been
21   deposed before but not frequently.  Is that true?
22      A.   Correct.
23      Q.   Okay.  Well, I'll just go over a couple of
24   the ground rules of depositions.  They're basic,
25   pretty simple.  First is that we can't speak over
```

KAREN MOORE   FEBRUARY 23, 2023

1   each other.  We have one court reporter, and I

2   endeavor mightily to make sure she doesn't strangle

3   me.  So she can only do one at a time, so one will

4   speak.

5         Typically, I'll ask a question, Bobby might

6   object, and then you can provide your answer.

7       A.   Okay.

8       Q.   Second is that, look, I -- you're going to

9   learn very quickly that I ask a lot of lousy

10  questions.  If you don't understand what I'm asking,

11  then that's absolutely fine.  I'm very accustomed to

12  it.  Just ask me, and I'll rephrase it.

13      A.   Okay.

14      Q.   Otherwise, I'll take that you understand

15  whatever point it is I'm trying to convey.

16      A.   Okay.

17      Q.   We can take breaks whenever you want.  I

18  mean, this process is already -- it is what it is

19  already.  No point in making it more difficult.  So

20  if you feel the need for a break, I just ask that

21  you answer -- if I've got a question pending, just

22  answer the question, and then after that, if you

23  need a break, absolutely no problem.

24      A.   Okay.  Thank you.

25      Q.   Sure.  Of course.

KAREN MOORE  FEBRUARY 23, 2023

1          And we're going to need a -- respond with

2    words.  You know, if you kind of nod your head or

3    kind of say, "Yeah," I'll know what you mean, but

4    the court reporter is trying to write everything

5    down, so we have to respond in English words, "yes"

6    or "no," that sort of thing.

7       A.    Understood.

8       Q.    And the last is that you're under oath.  You

9    swear to tell the truth, the whole truth, just like

10   you're -- nothing but the truth just like in a

11   courtroom.

12          Does that make sense?

13      A.    Yes.

14      Q.    Great.

15          What, if anything, did you do to prepare for

16   your deposition today?

17          And I'll preface this if you spoke with your

18   attorney, it's okay to tell me when and for how long

19   but not about anything you discussed.

20      A.    I did speak with the attorney for a little

21   while, and I also reviewed a copy of the redacted

22   file that he sent over.

23      Q.    Okay.  When did you speak with your

24   attorney?  Again, just when.

25      A.    Yesterday.

1    Q.   Oh, okay.

2         About how long?

3    A.   A few hours.

4    Q.   What documents did you review, because you

5    already mentioned the redacted file?

6    A.   It would have been the documentation that

7    was within the redacted file.  I don't remember

8    everything specifically.  The denial letter, that

9    was one of the things that I did review.

10   Q.   Okay.  I guess we'll just go briefly into

11   your background.  Let me start with your education.

12        I guess, where did -- did you go to

13   undergrad?

14   A.   Yes.

15   Q.   Okay.  Where?

16   A.   Bryant & Stratton.

17   Q.   Okay.  What degree did you get from there?

18   A.   A business management with a minor in

19   criminal justice.

20   Q.   What year did you graduate?

21   A.   Early 2000s.  I don't remember the exact

22   year.

23   Q.   Fair enough.

24        What did you do after graduation?

25   A.   I've been working with Chubb since 2001, so

1    I was attending school and working at Chubb at the

2    time.

3        Q.    What was your position during undergrad?

4        A.    At that time when I started school, I was a

5    property adjuster, and while I was in school, I

6    transitioned into the role of a special

7    investigations unit examiner.

8        Q.    Okay.  Go ahead.

9        A.    And at the end of this claim, I transitioned

10   into the supervisor role.

11       Q.    Okay.  I was going to ask, when you -- your

12   training, what training did you receive while you

13   were in undergrad for the property adjuster work?

14       A.    Well, the two were separate.  The schooling

15   was on my own.  It wasn't for Chubb.  The property

16   adjuster training that I received was with Chubb.

17   We went over estimating, how to take a scope of

18   loss, you know, to include details, read coverage,

19   take statements from insureds to gather that

20   information, things of that nature.

21       Q.    Okay.  When you -- upon graduation, did you

22   immediately move into the special investigations

23   unit?

24       A.    I had not graduated at the time that I had

25   transitioned into the role.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Okay.  So was that your senior year of

2  undergrad?

3    A.   I don't recall the exact year.  It was so

4  long ago.  It was sometime at that time.  I had gone

5  to school for business and then gone back to

6  complete the degree with a minor in criminal

7  justice.

8    Q.   Okay.  That's maybe where I'm getting

9  sideways.

10       So right after high school, did you --

11  you --

12    A.   I did not go to college right away.

13    Q.   Oh, okay.  Good deal.  Yeah.

14       What -- so what did you do between high

15  school and college?

16    A.   I worked various jobs and took care of my

17  child.

18    Q.   Okay.  And so it looks like you decided to

19  enroll in college around '96, '97?

20    A.   Actually, no.  I graduated in -- I graduated

21  high school in '96, I believe it was --

22    Q.   Okay.

23    A.   -- and then I'm trying to recall when I

24  started in college.  It was early -- early 2000s, so

25  I believe I would have graduated by 2005.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.    Okay.

2    A.    There was a -- you know, there was a period

3 of time where I did not go to college --

4    Q.    Okay.

5    A.    -- and where I was going part-time as well.

6    Q.    Oh, okay.

7          What was your employment during that time?

8    A.    I started Chubb in 2001, so I believe I was

9 already at Chubb or I may have started -- prior to

10 Chubb, I was with GEICO, so I may have been at GEICO

11 when I started college, actually.

12    Q.    Did you start working at GEICO right out of

13 high school?

14    A.    I did not.  For about two years after

15 graduating from high school, I worked as a pharmacy

16 technician, then going to GEICO, and from GEICO to

17 Chubb.

18    Q.    Okay.  And what was your role at GEICO?

19    A.    I was a customer service representative.

20    Q.    And so when you began at Chubb, that was

21 probably during your undergrad, you said?

22    A.    I believe I had already started, yes.

23    Q.    Okay.  How long did you serve as a property

24 adjuster for Chubb?

25    A.    I believe it was about six years.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.    Six years, okay.

2         So thereabouts or until right about '06,

3    '07.  Is that fair?

4    A.    Yes.

5    Q.    Okay.  And what prompted your move into

6    special investigations unit?

7         And I'm probably going to just say "SIU"

8    because that's a mouthful.

9    A.    Okay.  I just wanted to make sure for the

10   record that it was clear what that referred to.

11   Q.    I appreciate that, yeah.

12   A.    I transitioned into SIU.  There was an

13   opening.  I was looking to advance and try to get,

14   you know, some different skills and some new work,

15   and that job came open, and I was asked if I was

16   interested in it.  I was, and it became that.

17   Q.    And what training did you have or, I guess,

18   did you need any additional training for SIU from

19   Chubb or --

20   A.    I did some side-by-side training with the

21   girl who was vacating the position and also worked

22   with the supervisor and the manager at the time.

23   Q.    Okay.

24   A.    You know, took some courses online, but

25   there was no specific guidelines or training.  It

KAREN MOORE  FEBRUARY 23, 2023

1   was more on-the-job.

2       Q.   Okay.  Have you been provided any sort of

3   training on insurance claims handling in Arizona

4   specifically?

5       A.   Training for all states at some point as

6   part of our handling of claims.  I don't recall the

7   specific training for Arizona, but I am -- I am

8   licensed to handle all states.

9       Q.   Okay.  We'll kind of just start with maybe

10  some rules of the road to make sure we're all

11  speaking the same language about claims handling.

12          Would you agree that the insurance company

13  has a duty to handle a claim in a prompt, thorough,

14  and fair manner?

15      A.   Yes.

16      Q.   Would you agree that an objective of an

17  insurance company during a claim investigation is

18  trying to find coverage?

19      A.   Yes.  Our job is to gather the facts about

20  the claim to determine if there is coverage.

21      Q.   Let me know if you agree with me.

22          It's often said that there's a duty of equal

23  consideration in that a carrier should consider its

24  own interests as equal to those of the insured.

25          Would you agree with that?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   I agree that it requires all parties to

2  cooperate fully in order to get to the outcome, yes.

3    Q.   Okay.  But I guess that's a different --

4  that's different than my question, which is that an

5  insurance carrier should give equal consideration to

6  its own interests and to those of its insureds.  It

7  should not place its own interests above those of

8  the insured.

9        Would you agree with that?

10   A.   I agree with that.

11   Q.   Okay.  Let me see here.

12        Well, for SIU, could you describe in your

13  own words, what -- what is the function of SIU

14  within Chubb?

15            MR. SULLIVAN:  Object to the form and

16  foundation.

17            You can answer, Karen.

18            THE WITNESS:  Okay.  The objective is

19  to have a second set of eyes on the file, if you

20  will, to provide if there are any concerns there.

21            If the claim requires additional

22  investigation beyond a normal desk adjustment

23  process, we would look deeper at the background of

24  the claim, any prior claims, things of that nature,

25  to determine if it requires that additional

KAREN MOORE   FEBRUARY 23, 2023

1   investigation.

2   BY MR. ZANE:

3     Q.   Would you agree that what we call the rules

4   of the road, or the prompt, thorough, and fair

5   investigation and equal consideration, that those

6   concepts apply to SIU as well as to claim -- Chubb's

7   traditional claims handling?

8     A.   Yes.

9     Q.   Okay.  You know what?  Let's get right to

10  it.  Let's just go to the claims log, and I'll bring

11  up exhibit --

12            MR. ZANE:  Do you have the exhibits,

13  Alisa?

14            I'm just to bring up a compilation of

15  initial claims log.

16  BY MR. ZANE:

17    Q.   While she's doing that, I can ask you,

18  Karen, you're familiar with the concept of a claims

19  log in your work?

20    A.   What does that refer to, I guess?

21            We don't refer to it as a "claims log."

22  You're meaning notations regarding the claim?

23    Q.   Yeah.  I think that's probably another

24  description.  Sometimes they're called claim notes,

25  notations within the claim.

KAREN MOORE  FEBRUARY 23, 2023

1   A.   Yeah.  I'm familiar with claim notes,

2  correct.

3   Q.   Okay.  And what is the function of the --

4  I'm going to call them the claims log just because,

5  you know, if I try to do it any other way, I'm going

6  to get it backwards, but I'm referring to what you

7  call the notation you just referred to.

8             MR. SULLIVAN:  Hey --

9  BY MR. ZANE:

10   Q.   What is the purpose of a claims log?

11             MR. SULLIVAN:  Hey, Jeff.  I don't want

12  to object to form and foundation on all of these.

13  Can we just have an agreement that you're asking

14  about her personal knowledge, and she's not the

15  30(b)(6) speaking on behalf of Chubb?

16             MR. ZANE:  Absolutely, yeah.

17             MR. SULLIVAN:  Great.  Thank you.

18             MR. ZANE:  Sure.  Of course.

19             THE WITNESS:  Okay.  And what was the

20  question again?  I'm sorry.

21  BY MR. ZANE:

22   Q.   Yeah.  No problem.

23             What's the function of a claims log?

24   A.   It documents the work, the investigation,

25  things that have taken place in the claim file.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Have you heard the phrase that, "If it's not
2    entered into the claims log, it didn't happen"?
3    A.   I have heard that.
4    Q.   Okay.  Is that something with which you
5    agree?
6    A.   Yes.
7    Q.   Okay.  And when you're handling a claim, is
8    it your personal habit to review entries made by
9    other Chubb personnel into the claims log?
10   A.   Yes.
11   Q.   Okay.  So is it fair to say that if it's in
12   the claims log on the claim in which you're working,
13   you've probably seen it?
14   A.   Most likely, yes.
15   Q.   Okay.  And here -- now is the point where I
16   really am going to goof things up because I'm going
17   to try to bring up an exhibit.
18            MR. ZANE:  How should I do this, Alisa?
19   Should I bring it up on my computer with a share
20   screen?
21            THE COURT REPORTER:  That's how I would
22   do it.
23            MR. ZANE:  Can y'all see this?
24            THE WITNESS:  No.
25            MR. ZANE:  Here we go.

1      How about now?

2      THE WITNESS:  Yes.

3      MR. ZANE:  Oh, splendid.  Okay.

4      Okay.  This is marked Exhibit -- I

5  think we're up to Exhibit 26.  I think we're doing

6  it consecutively.

7      Bobby, does that sound right to you?

8      MR. SULLIVAN:  That does sound right.

9  Do you want me to confirm for you?

10      MR. ZANE:  If you don't mind.

11      MR. SULLIVAN:  Yeah.  Let me check real

12  quick.  It will just take a second.

13      MR. ZANE:  Sure.

14      MR. SULLIVAN:  It will take just a

15  second.  Now I'm showing my ineptitude with respect

16  to technology.  Just one second.

17      MR. ZANE:  I don't want to get into a

18  battle here, but my ineptitude way overwhelms yours.

19      MR. SULLIVAN:  I yield.

20      I have 21 would be the next exhibit.

21      MR. ZANE:  I thought there was some

22  during Dina Brown.

23      MR. SULLIVAN:  Oh, you know, I wasn't

24  there for Dina, so let me look.  Sorry.

25      MR. ZANE:  Yeah.  And I am trying to

KAREN MOORE  FEBRUARY 23, 2023

1  find it somewhere in our convoluted system.

2  MR. SULLIVAN:  I have it here.

3  MR. ZANE:  Okay.

4  MR. SULLIVAN:  I have Dina Brown 28 was

5  the opinion by John --

6  MR. ZANE:  Okay.  So we're at 29?

7  MR. SULLIVAN:  Yeah.

8  MR. ZANE:  Okay.  Great.

9  (Whereupon, Exhibit No. 29 was marked

10  for identification.)

11  BY MR. ZANE:

12  Q.  Okay.  This -- Exhibit 29, it's basically a

13  compilation of some of the claims log, and at the

14  bottom, you can kind of see there, it was produced,

15  disclosed by Chubb.

16  A.  Okay.

17  Q.  And these are Bates numbers at the bottom.

18  It's kind of hard for me to put it totally on the

19  screen, but this is just how we keep track of

20  documents in litigation is we give them --

21  everything we disclose, we give it a number.

22  MR. SULLIVAN:  And just for the record

23  that these are hand-selected -- or selected portions

24  of the claims file or the claim log --

25  MR. ZANE:  Yes.

KAREN MOORE  FEBRUARY 23, 2023

1      MR. SULLIVAN:  -- and the highlighting

2  is done by your office; correct?

3      MR. ZANE:  Needless to say, yes, that's

4  correct.

5      MR. SULLIVAN:  Thank you.

6      MR. ZANE:  Uh-huh.

7  BY MR. ZANE:

8  Q.  So the first one, it's dated

9  January 21st, 2020.  Author is Karen Moore.

10      Do you have any recollection of this?

11  A.  Yes.

12  Q.  Okay.  Could you explain to me just so I can

13  be certain what "VAF" means, you know, really what

14  this means?

15  A.  It means there's a valuable articles floater

16  policy in place and that a loss has occurred over

17  $100,000 which requires SIU's review on the file

18  regardless of the circumstances.

19  Q.  Okay.  And what does -- valuable art [sic]

20  floater, you said, what does that mean?

21  A.  It means an item is individually itemized or

22  scheduled on their policy with a description and a

23  value --

24  Q.  Okay.

25  A.  -- and insured for that amount.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Okay.  I'm moving to the second page of

2    Exhibit 29, and it's an entry by Kimberly Batts.

3         Do you know who that is?

4    A.   Yes.

5    Q.   Okay.  Who is she?

6    A.   She's an adjuster in the property

7    department.

8    Q.   Okay.  And this says, "start of recording."

9         What would that indicate?

10   A.   That would have indicated that she was

11   taking a recorded statement on the loss.

12   Q.   Okay.  And this is something you would have

13   reviewed?

14   A.   Yes.

15   Q.   Okay.  And I'm going to move to page 3,

16   another entry by Kimberly Batts dated January 23rd,

17   and the highlighted portion, it says, "2 N" --

18   basically "1.5 million Andy Warhol and Keith

19   Haring."

20        What does that mean?

21   A.   That is a coverage note, so it's giving you

22   the item number as it's listed on the policy on the

23   valuable articles floater, the value that it's

24   listed on the policy for, and the description that's

25   listed on the policy.

1    Q.   Okay.  And it says below it, "Edition of

2   30."

3        Do you know where she would have gotten that

4   from?

5    A.   All of that --

6            MR. SULLIVAN:  Foundation.

7            THE WITNESS:  Go ahead.

8            MR. SULLIVAN:  Go ahead.

9            THE WITNESS:  All of that information

10   would have been on the policy description from that

11   coverage note.

12   BY MR. ZANE:

13    Q.   Okay.  I'm moving now to page 4 with another

14   entry from you, January 23rd.  It says, "SIU review

15   in process for VAF loss of 1.5 million; in the

16   meantime, please move forward" -- and then on the

17   screen, I can't see -- "with LLN, notification to

18   ARI/Artive and add item to $250,000 log based on

19   value."

20        Could you -- first of all, this -- actually,

21   I'll just cut to the chase.

22        Can you explain, what does this mean?

23    A.   That means the review was in process by SIU.

24   I had addressed her to proceed with the

25   notifications that are required for a large loss.

KAREN MOORE  FEBRUARY 23, 2023

1  That's what the LLN means, large loss notification,

2  notification to ARI/Artive would have been the art

3  registry database for an item that was missing that

4  was considered an art item, so that's a requirement

5  as well, so I was directing her to do that.

6       And then the 250K log is just logging a

7  valued claim that's over 250,000, so just basic

8  direction and to let her know that our review was in

9  progress in SIU.

10  Q.   Okay.  And when you say it's a note -- large

11  loss notification, what does that entail?

12  A.   There's a form within the system just

13  putting in the coverage amounts and values, and I

14  believe it goes to members of senior management,

15  just notifying them that there's a loss out there of

16  this size.

17  Q.   And what does -- a notification to

18  ARI/Artive, what does that entail?

19  A.   That -- there's a database that they have

20  that we can go in and enter the item that's being

21  claimed into that database.  In the event that it

22  turns up, they would notify us.

23  Q.   And you said that you were letting her know.

24       Is this -- is that Kimberly Batts you're

25  speaking about?

KAREN MOORE  FEBRUARY 23, 2023

1    A.    Correct, yes.  The file was still with

2  Kimberly at that point.

3    Q.    Okay.  I'm going to move to page 6 of

4  Exhibit 1, and this is January 24th, the following

5  day.  It says the -- "Item added to VAF coverage

6  under policy," and then it provides the policy

7  number, "effective June 1st, 2016, item was

8  scheduled for 250,000 at that time, increased to

9  1.5 million effective August 2nd, 2018."

10    What is the significance of that?

11    A.    As part of my review, I make a note as to,

12  again, the item that's being claimed from the

13  policy, and then I look at the policy a little

14  deeper than the adjuster did to determine when that

15  item was added to the policy, if there had been any

16  recent changes in coverage, and also where it falls

17  in line with value on the policy.

18    Q.    Okay.  And by that, you mean the following

19  note, the "Most expensive item on the VAF fine art

20  schedule"?

21    A.    Correct.

22    Q.    What -- I guess, when you look at this

23  information, why are you looking for this

24  information?  I mean, what significance does it have

25  that it's the most expensive item or that coverage

1   was increased?

2     A.   Those are things that we look at to

3   determine if the claim requires additional

4   investigation if there was a recent change to the

5   policy.  I always make a notational, so if it's the

6   most expensive item on the policy.  It's just part

7   of my review, letting them know how that item value

8   falls in line with the other policy coverages.

9     Q.   And what difference does it make if it's the

10   most expensive item?

11     A.   It doesn't necessarily make a difference.

12   Again, it's just letting them know where it falls in

13   line with the policy coverages that we have in

14   place.  If there's other items and they're of lower

15   value or if -- you know, what the range of value is,

16   I guess.

17     Q.   But, theoretically, if the value -- or,

18   sorry.  Strike that.

19        If the coverage was increased for an item,

20   it could be suspicious, but it could be perfectly

21   reasonable if the value of the item increased as

22   well.  Is that true?

23          MR. SULLIVAN:  Object to the form and

24   foundation.

25          I apologize for stepping on your

KAREN MOORE  FEBRUARY 23, 2023

1   question, Jeff.

2              MR. ZANE:  Oh, yeah.  No worries.

3              THE WITNESS:  Can you repeat the

4   question?  I'm sorry.  I lost it trying to follow.

5   BY MR. ZANE:

6      Q.   No problem at all.

7      A.   Sorry.

8      Q.   So something like this could be viewed as

9   suspicious, but it could be perfectly innocent.  For

10  example, would you agree that if an item was

11  increased in value -- I guess I -- let me strike

12  that.  Now I've goofed it up.

13             It could be innocent, and it could be

14  suspicious.  For example, if the coverage for an

15  item was increased and it turns out that the value

16  of that item also increased, then I think that would

17  be fairly innocent.  Would you agree?

18             MR. SULLIVAN:  Object to the form and

19  foundation.

20             You can answer.

21             THE WITNESS:  I wouldn't say that it's

22  suspicious.  We're not looking at it to be

23  suspicious.  We're wanting to know, "Okay.  Why was

24  this item recently increased, and what relativity to

25  when the claim is being made."

1          So agree that it could be a very

2   innocent thing.  People make changes to their policy

3   all the time.  It's just something that we want to

4   look further into.

5   BY MR. ZANE:

6       Q.   Okay.  I'm moving to page 8 of Exhibit 29.

7   It is an email from you to Joe Figurski on

8   January 24th, 2020.

9          It's my understanding Joe Figurski worked in

10  Chubb's underwriting.  Is that right?

11      A.   That looks correct from the title of my

12  note, which is "Request to underwriter."

13      Q.   Fair enough.

14          And what were you hoping to learn from Joe?

15      A.   I can't see the note because we're blocking

16  it, but whatever the note is asking him -- if you

17  can read it to me, I can verify what it --

18      Q.   Oh, sure.  Can you see my screen?

19      A.   I can see the screen, but the visual of us

20  on the side is blocking part of the screen.

21      Q.   Yeah.  That goofed me up too, so what I had

22  to do was I went to there -- in that little box

23  there, and I clicked a flat line on the far left,

24  and now I don't see anybody.

25      A.   Let me see.  Okay.  We're at the top now, so

KAREN MOORE  FEBRUARY 23, 2023

1  I can see it.

2     Q.   Okay.

3     A.   Let me read this.

4          Okay.  So I was requesting a copy of the

5  appraisal on file for the new value.

6     Q.   Okay.  And what was the purpose of this

7  request?

8          I mean -- sorry.

9          What was the purpose of obtaining the

10  appraisal?

11     A.   That would be part of our normal claims

12  process, especially when there was a recent change

13  of increase of value, we would want to see the

14  appraisal for the item.

15     Q.   I'm moving to page No. 9, another entry the

16  same date from you.  "Attached Lexis for Douglas

17  Altschuler, liens noted from 2014 and 2006.  One

18  criminal filing noted, same is traffic related."

19          There's an attachment to this, and -- well,

20  first going up to this, is there anything in

21  particular -- you know, what interest -- what is the

22  significance of this information to your

23  investigation?

24     A.   That's part of the background that SIU would

25  complete when reviewing it.  It would determine if

KAREN MOORE  FEBRUARY 23, 2023

1 the insured has any public records information that

2 is of interest.  So if there were liens, judgments,

3 lawsuits, criminal filings, things of that nature,

4 or if there were no -- no items of that nature.

5     Q.   You mentioned you're looking for items that

6 might be of interest.

7          Why would it be of interest?

8     A.   It's just finding out if they have any

9 financial liens, if there's any judgments noted, if

10 there's any criminal filings, so anything outside of

11 a normal, clean background, if you will.

12     Q.   I mean, is it fair to say that if you run

13 this search and you come up with a lot of fraud

14 claims, that's probably of interest to Chubb's SIU?

15     A.   We would want to know if there are financial

16 concerns that are exhibited in the databases.

17     Q.   Okay.  And why would you want to know that?

18     A.   To determine if they have any potential to

19 submit a claim that would not be truthful possibly.

20     Q.   A motive.  Is that fair?

21     A.   Potentially, yes.

22     Q.   I'm going to look down.  Apparently, this

23 was the attachment to your email with information

24 about -- I'm going to go to page -- I can't tell

25 what page this is anymore.  Let me see here.  Okay.

KAREN MOORE  FEBRUARY 23, 2023

1  Fourteen -- there we go.  Page 16 of Exhibit 29

2  where they describe liens.

3       And one -- the 2014 lien, is there any

4  information about the first -- the lien for the

5  Civil Court of the City of New York, you know, is

6  there anything about this lien that's of interest?

7  A.   I just look to see if there are any liens or

8  judgments and what year they're filed in, which was,

9  I believe, similar to the notation I had made, that

10  there was one in 2014 involving our named insured,

11  as well as one in 2006.

12  Q.   Okay.  And moving down to the 2006 lien, it

13  appears this was, approximately, 14 years prior to

14  the claim.

15       Would you agree, the mechanic's lien?

16  A.   Yes.  It was from 2006, so -- what? --

17  however many years between that and the loss

18  reporting date, yes.

19  Q.   Does -- how far back would a lien go and

20  still be of interest to you?

21       I guess my question is -- go ahead.

22  A.   Go ahead.

23  Q.   If it's a 1986 lien, would that be of

24  interest to you?

25  A.   I would make notation of it.  It may not be

1  of immediate interest, if you will, because it's

2  older, but I would make notation of any liens or

3  judgments regardless and note what the year was.

4     Q.   As an SIU investigator or SIU adjuster on

5  this claim, do you give input, reach any conclusion

6  about either of these liens?

7     A.   I do not.  I just note whether they are

8  present or not.

9     Q.   Okay.  I guess, what is the purpose for --

10  you note them to see if they're of interest, but who

11  evaluates it once you note them?

12          I mean, what is the purpose of --

13     A.   The SIU investigator.

14     Q.   I'm sorry.  The SIU investigator, okay.

15          So you're drawing information to provide to

16  an SIU investigator?

17     A.   Correct.  I'm providing a background to

18  determine if SIU is further needed at this point.

19     Q.   Would these liens influence your decision

20  whether an SIU investigator is needed?

21     A.   They would be a factor in totality with all

22  the other information that I review.

23     Q.   Would that be -- would either of these

24  liens -- specifically, did either of these, were

25  they a factor in favor of obtaining an SIU

KAREN MOORE   FEBRUARY 23, 2023

1   investigator?

2       A.   They were of interest that there were

3   judgments present, but they were not specifically

4   recent, and, again, they're not the sole reason that

5   we would look at a claim further.

6       Q.   Of course.

7            But were these -- did these liens play any

8   role whatsoever in your decision to bring in an SIU

9   investigator?

10      A.   These, not specifically.  They were of

11  interest again because they are present, but they're

12  not the major factor here that we would have

13  accepted the claim for.

14      Q.   Okay.  Were they a factor at all?

15      A.   I would say there had to be a percentage

16  that noted that they were present.  I take that into

17  account, but, again, they were not of a major

18  concern to me at this point.

19      Q.   Okay.  So I guess what I'm hearing is that

20  they were not a major -- or they were not the

21  primary motivating factor to bring in SIU, but they

22  were a factor.

23           Is that what you're saying?

24      A.   They would be a factor because they are

25  present.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Okay.  So -- well, I guess this already

2  happened, so it's not theoretical.  They were a

3  factor, although not a major one.

4         Is that what you're saying?

5    A.   I would say that's accurate.

6    Q.   Okay.  Okay.  With regard to the criminal

7  records -- this is page 20 of Exhibit 29.

8         It looks like the criminal record is a

9  traffic -- or minor infraction ticket for Ventura

10  County, California.  It's the same series of

11  questions.

12        Was this a factor in your decision to bring

13  in an SIU investigator?

14   A.   This was not, no, because it was a traffic

15  infraction.

16   Q.   Okay.  I'm going to go to page 42, and it's

17  the same day, January 24th, probably about 20

18  minutes after the last email, it looks like -- or,

19  sorry -- the last file note.

20        It says, "Completed ISO search for Douglas

21  Altschuler, attached same.  Multiple prior theft or

22  mysterious disappearance claims with Chubb and other

23  carriers."

24        Do you remember entering that into the

25  record?

KAREN MOORE  FEBRUARY 23, 2023

1    A.    Yes.

2    Q.    Okay.  Can you explain the "multiple prior

3  theft or mysterious disappearance claims with Chubb

4  and other carriers"?  What is the analysis you went

5  through for that?

6    A.    I would have looked at any matches that went

7  back to the insured to see if there were, as it

8  states, prior theft or disappearance-type losses,

9  which this claim is, because that would show a

10  history of prior similar losses.

11    Q.    Okay.  And looking here, it looks like the

12  first entry No. 1 is a salvage claim.  It says

13  that -- the "Record Type:  Salvage claim."  It

14  appears to be a 2009 Chrysler Town & Country.

15        Did you -- do you remember reviewing this

16  entry on to the -- this match on the ISO?

17    A.    I would have reviewed that, yes, because I

18  completed that report and would have reviewed each

19  one.

20    Q.    Okay.  Was this entry a factor in your

21  decision?

22    A.    No.

23    Q.    No, okay.

24        No. 2 -- the No. 2 is a property/casualty

25  claim from 2013, seven years prior.  Under the Loss

KAREN MOORE  FEBRUARY 23, 2023

1  Description, which is highlighted on page 43 of
2  Exhibit 29, "Insured was wearing Rolex when it fell
3  off wrist A."  It seems to be cut short.
4        Was this a factor in your decision to
5  request SIU investigation?
6  A.   Yes.
7  Q.   And is this -- it's because of the
8  similarity or -- I guess I'll let you describe why.
9  A.   As I had stated, because it's a prior theft
10  or disappearance-type loss.
11  Q.   Okay.  Match No. 3 is -- on page 44 is
12  Property/Casualty Claim.  It says, "Break-in at
13  insured's apartment," in 2008.
14        Was this a factor involving SIU
15  investigation?
16  A.   Yes.
17  Q.   Okay.  For the same reason?
18  A.   For the same reason.
19  Q.   Okay.  And this seems to be the same claim
20  twice.
21        Would you agree 3 and 4 are identical?
22  A.   Can you scroll back to the prior one?
23  Q.   Here is -- we'll take a good look at this
24  one.  The date of loss seems to be the same, 5/13,
25  "Break-in and theft of scheduled jewelry"?

1    A.    It does appear to be the same date of loss

2  with the same general description, but the claim

3  numbers are different.

4    Q.    Right.

5         It looks like --

6    A.    So that could indicate that there's possibly

7  more than one claim.

8    Q.    Okay.  It says, "Type of Policy:  Personal

9  Property Homeowners," and here it's "Personal inland

10  marine."

11    A.    So that would have meant, like, a valuable

12  articles and a homeowners, most likely.  In our

13  terms at Chubb, that's what that would have meant.

14    Q.    Okay.  Do you recall investigating to find

15  out whether this is just a duplicate match?

16    A.    That would be up to the investigator.

17    Q.    Okay.  Match No. 5 is water damage to home

18  in 2006.

19         Would this have been a factor?

20    A.    No, I don't believe so.

21    Q.    Okay.  Match No. 6 is a property claim,

22  vandalism and malicious mischief, from 2000 in, it

23  looks like, Santa Monica, California.

24         Is this something you factored into your

25  decision to bring in SIU investigation?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   I don't believe so.  Not on this one, no.

2    Q.   Okay.  And another 2000 claim which says

3  theft, sports equipment, in Santa Monica.

4         Is this something that you would have

5  factored -- that factored into your decision to take

6  it to SIU investigation?

7    A.   Yes.

8    Q.   Okay.  Because it's a theft?

9    A.   Correct.

10   Q.   No. 8 is a 1996, another theft -- a theft

11  claim, and I take it this is something that would

12  have factored into your decision to call in SIU

13  investigation?

14   A.   Yes.

15   Q.   Okay.  And it looks like this may be another

16  duplicate potentially.

17        Would you -- but if it's a duplicate or not,

18  this is for SIU to figure out?

19   A.   It would be for the investigator to confirm

20  that as part of his investigation --

21   Q.   Okay.

22   A.   -- his or her.  In this case, it was --

23   Q.   And from the 1993 property claim with a

24  fire, cause of loss is cigarette in Beverly Hills,

25  would this have factored into your decision --

1   A.   No.

2   Q.   -- to bring SIU?

3        Okay.  I'm going to go to page 49 of

4  Exhibit 29.  It's the same day, just about the same

5  time.  "SIU review of VAF loss over 100,000

6  completed, results attached."

7        Do you remember writing this up?

8   A.   Yes.

9   Q.   Okay.  It says -- at very bottom paragraph,

10 it says, "Based on above" -- "upon above, I agree

11 the claim would benefit from investigation.

12 Accepting to SIU for handling, assigning Fred White

13 as SIU investigator based upon New York location."

14        You know -- and before that, there are four

15 paragraphs mentioning different reasons that it

16 might benefit from investigation.

17        If you can -- I'm not going to read all

18 those into the record, but if you can take a look at

19 those, and were there any additional in addition to

20 those four?

21  A.   That would have been the information I had

22 at that point, and that's my synopsis or general

23 summary for why it was taking the claim.

24  Q.   Okay.  And just to go through, the first one

25 is the "Claim is for presumed theft of VAF fine art

1  item, 1.5 million."

2      What would -- would that -- I guess, what is

3  the significance of that to an investigation -- to

4  creating the need for investigation?

5      A.   That's not necessarily the reason for the

6  investigation.  It's noting the size of the loss and

7  what's being claimed and what type of loss it is.

8  That would factor in because it's a presumed theft,

9  and I speak to the prior thefts and disappearance

10  claims that were located in our ISO search, so that

11  is the wording that correlates the two.

12      Q.   Okay.  And the second paragraph covers what

13  we've already discussed, that it was recently

14  increased in value, and it's the most expensive

15  item.

16      And you stated that those are just reasons

17  to take a closer look at it.  Is that fair?

18      A.   Yes.

19      Q.   Okay.  And the third is, "The insured

20  advised in his recorded statement the article was

21  stored at his mother's home in Arizona and had been

22  for 15 years.  Was it insured with another carrier

23  before being added to the Chubb policy in 2016?"

24      I guess it's a question.  For whom was the

25  question directed?

1    A.   That would be a notation that the

2  investigator would review upon acceptance of the

3  claim and to look into as part of the claim

4  investigation.  Either myself or the investigator

5  could look further into that.

6    Q.   Okay.  So you handed -- so "assigning to

7  Fred White," why did you assign it to Fred White?

8    A.   Fred handles New York claims.

9    Q.   Okay.  And what is Fred White's role within

10  Chubb?

11    A.   He's the SIU investigator.

12    Q.   Okay.  And what is an SIU investigator's

13  role?

14          MR. SULLIVAN:  Form and foundation.

15          You can answer.

16          THE WITNESS:  It's to review the claim

17  in further detail, gather additional details related

18  to the loss, the claim history, and assist us in

19  making a determination of coverage for the claim.

20  BY MR. ZANE:

21    Q.   Okay.  And in assisting you to make a

22  coverage determination, is this assistance limited

23  to providing information, or is he part of the

24  determination process?

25          MR. SULLIVAN:  Form and foundation.

KAREN MOORE  FEBRUARY 23, 2023

```
1            THE WITNESS:  He would assist in
2  gathering the information.  The ultimate claim
3  decision is made by the SIU manager --
4  BY MR. ZANE:
5     Q.   Okay.
6     A.   -- after our investigation is completed.
7     Q.   To whom does Fred White report, if you know?
8     A.   At the time, he reported to -- actually
9  still reports to Dan Jaeger.
10    Q.   Dan Jaeger, okay.
11         Do you also report to Dan Jaeger?
12    A.   I do.
13    Q.   Okay.  Do you know who Sally Short is?
14    A.   She's supervisor in the property department.
15  She is Kimberly Batts' supervisor.
16    Q.   Okay.  And page 56 of Exhibit 29 is a
17  January 24th, 2020, entry into the -- I guess file
18  note it's called -- and she seems to provide an
19  instruction to you.  It says, "Karen, Suggest
20  reaching out to Gurr Johns to secure market value
21  appraisal for this item."
22         Do you see that?
23    A.   I do.
24    Q.   Okay.  Is this typical for an art claim?
25    A.   Yes.
```

KAREN MOORE   FEBRUARY 23, 2023

1    Q.    Okay.  And who is Gurr Johns?

2    A.    Gurr Johns is one of the experts that we use

3  for art-type losses.

4    Q.    Okay.  And it looks to me like you're going

5  to request a current market value appraisal for this

6  item.

7          That seems reasonable?

8    A.    Yes.

9    Q.    Okay.  And a few minutes later, there's a

10  file note from you to Mr. Altschuler.

11          Is this your first interaction with

12  Mr. Altschuler?

13    A.    Yes.  That would be -- if you can scroll up

14  just a little bit.

15    Q.    Yes.

16    A.    I believe, yes, by the title of that, that's

17  my initial contact email to the insured --

18    Q.    Okay.

19    A.    -- explaining to him that it was reassigned

20  from Kimberly to myself and that we have assigned

21  Fred White, the investigator, to assist with the

22  claim investigation.  So it's giving him both of our

23  contact information and letting him know the next

24  steps.

25    Q.    At this point, what is Sally -- what is the

1  role of Sally Short and Kimberly Batts in this

2  claim?

3             MR. SULLIVAN:  Form and foundation.

4             You can answer.

5             THE WITNESS:  Once the claim is

6  reassigned to SIU, they are no longer involved in

7  the claim.

8  BY MR. ZANE:

9    Q.   Okay.  And I have it -- on page 60 of

10  Exhibit 29, it's a file note on January 27th of

11  2020.  And it says, "Discussed with Fred.  Chvostal

12  is not being used.  Mike Markey following up with

13  the appraiser who completed the appraisal on behalf

14  of the insured for the claimed item.  We will

15  proceed with assigning a fine arts expert for the

16  market value portion."

17            First, who is Mike Markey?

18    A.   Mike Markey is a investigator with Chubb as

19  well out of the -- one of our -- our West Coast

20  territory.

21    Q.   Okay.

22    A.   So he would have handled Arizona if the --

23  you know, if the investigation was there.

24    Q.   That makes sense.

25            It says, "Chvostal is not being used."

KAREN MOORE  FEBRUARY 23, 2023

1          What is -- that seems to have come after

2     your discussion with Fred.  What -- first of all,

3     who is Chvostal?

4     A.    His name is John Chvostal, and he is also an

5     art expert that we would utilize, and at that point,

6     it had been determined that we would use Gurr Johns

7     per Sally Short's suggestion to obtain the market

8     value.

9     Q.    Okay.  It says, "We will proceed with

10    assigning a fine arts expert for the market value

11    portion."

12         Is that another reference to retaining Gurr

13    Johns?

14    A.    Yes.

15    Q.    Okay.  Page 64 of Exhibit 29 is a

16    January 28th, 2020, file note by Fred White, and it

17    appears to discuss -- can you -- I'll give you a

18    minute to look at it.

19         It appears to discuss a prior insurance

20    claim.

21         Would you agree with that?

22    A.    Yes.

23    Q.    Okay.  And I guess my question is, how old

24    is too old for a prior claim to be relevant to your

25    investigation?

KAREN MOORE   FEBRUARY 23, 2023

1          MR. SULLIVAN:  Object to the form.

2          You can answer.

3          THE WITNESS:  If there are prior

4   similar claims of theft or disappearance, then we

5   would look into them.  There's not a set time limit

6   or time frame.

7   BY MR. ZANE:

8      Q.   Okay.  So it could be 30 years old.  It

9   would still be part of the investigation.  Is that

10  fair?

11     A.   If it would show up in our ISO search, then

12  yes.

13     Q.   Okay.  On page 66 of Exhibit 29, a file note

14  the same day from you, and you received a call from

15  subro counsel.

16          What is the purpose of involving subrogation

17  in this claim?

18     A.   It's a requirement on theft or disappearance

19  losses over $100,000.  We would involve them knowing

20  that up front while the investigation is still

21  developing so they can follow along to determine if

22  there's any possible subrogation in the matter.

23     Q.   Page 67 is an entry -- a file note from

24  February 7th, by Fred White, of 2020, Credit Report

25  Attached.  It says, "No negatives listed on report.

KAREN MOORE  FEBRUARY 23, 2023

1   Debt is listed as approximately 2.3 million."

2          At the very bottom, he mentions, "5

3   inquiries were made regarding the insured's credit

4   history between June 21st, 2018, and

5   December 13th, 2019."

6          Do you see all that?

7      A.   I do see that, yes.

8      Q.   Define credit inquiries.

9          What is the significance of that to your

10  investigation?

11     A.   I didn't make that notation, so you would

12  have to ask Fred.

13     Q.   Because my understanding was that Fred White

14  is providing information for you-all.  And by

15  "you-all," I mean the adjuster.

16     A.   He's the investigator.  He would notate this

17  as part of his investigation as far as what the

18  results of the credit report are.

19     Q.   Okay.

20     A.   His specific reason for including that, I

21  don't -- I don't know that.

22     Q.   I guess --

23     A.   I could make a guess, but I don't know his

24  specific reasoning.

25     Q.   Right.

KAREN MOORE  FEBRUARY 23, 2023

1    You would have to ask Fred for why Fred

2  entered that?

3    A.    Correct.

4    Q.    Yeah.  And I guess I just want to go back to

5  the roles of -- everybody has here.

6    So is Fred's role, does it go beyond

7  information gathering?  Once he gathers

8  information -- for example, these five inquiries --

9  what does he do with that information?

10    A.    He would make a notation of all his

11  investigation, the credit report being part of it,

12  and then summarize everything in his report and send

13  it to myself as the examiner and the supervisor or

14  manager on the file.

15    And he could make a recommendation as well

16  if he can at that point complete the investigation

17  so we can confirm coverage or if additional

18  investigation is required as part of the examination

19  under oath or EUO process.

20    Q.    Well, if Fred White is in an

21  information-gathering role and he gathers

22  information and provides it to you in this file

23  note, is it fair to say he's providing this for you

24  or for Dan Jaeger to evaluate?

25    A.    Yes.  Myself, the supervisor, or the manager

KAREN MOORE   FEBRUARY 23, 2023

1  that would be involved with the claim would all be

2  reviewing this information.

3    Q.   What would be the significance of inquiries

4  on his credit -- on Mr. Altschuler's credit history?

5    A.   Again, Fred wrote that note, so you would

6  have to specifically verify why he would note that.

7  In this case, he's summarizing the results of the

8  credit report.

9    Q.   But, I guess, aside from his -- from Fred's

10  motivation of including it, when you read that and

11  you see there are five inquiries because, you know,

12  again, you're the evaluator of the information he

13  finds, would that information have any significance

14  to you with regard to the claim?

15          MR. SULLIVAN:  Object to the form.

16  Foundation.  Move to strike counsel's statements.

17          You can answer.

18          THE WITNESS:  I would look at this

19  information, and I would look at the total debt load

20  that's listed on the credit report, and the five

21  inquiries that are notated between the time frame

22  listed could indicate the insured is looking to

23  obtain new credit.

24  BY MR. ZANE:

25    Q.   And as with many of these things, you would

1  agree with me that it could -- there could be a

2  perfectly innocent explanation for the five

3  inquiries or it could indicate that he's seeking new

4  credit.

5       Would you agree with that?

6   A.   Correct.  It could be either of those

7  reasons.

8   Q.   Number -- page 68 of Exhibit 29 is called an

9  Executive Summary.

10      First of all, have you seen this before?

11  A.   I have.  That is the large loss notice that

12  we spoke about that I had given instruction to

13  prepare.  That is that form.

14  Q.   Okay.

15      MR. SULLIVAN:  Jeff, do you want to

16  finish this line of questioning and then take a

17  short break, or do you want to take a break now?

18  I'm fine either way.

19      MR. ZANE:  I'll just ask about this,

20  and then we'll take a break.  How about that?

21      MR. SULLIVAN:  Great.  Great.  Thanks.

22      MR. ZANE:  Thanks.

23  BY MR. ZANE:

24  Q.   So do you know -- do you have any idea who

25  actually prepared this?

KAREN MOORE  FEBRUARY 23, 2023

1    A.    I believe that would be either Kimberly

2  Batts or Sally Short.

3              MR. ZANE:  We can go ahead and take

4  that break.

5              THE VIDEOGRAPHER:  The time is

6  11:27 a.m.  We are going off the record, ending

7  Media No. 1.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  My name is Judy

10  Thompson with Legal Video Specialists, Phoenix,

11  Arizona.  This begins Media No. 2 of the videotaped

12  deposition of Karen Moore.  The time is

13  11:35 p.m. -- a.m., and we are now back on record.

14  BY MR. ZANE:

15    Q.    Okay.  I have moved to page 73 of

16  Exhibit 29.  It's a February 11th entry by Fred

17  White.

18            And do you remember seeing this?

19    A.    I would have seen that, yes.

20    Q.    And it appears to be -- let me know if you

21  agree with me -- notes conveyed by Fred White after

22  an interview with Douglas Altschuler.

23            Does that seem correct?

24    A.    Yes.  That's a portion of his recorded

25  statement summary after he met with the insured.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Okay.  And I focused in -- as you notice, I

2   focused on the -- somewhere down there.  The

3   highlighted portion, it says, "Mortgage refi two

4   months ago," and it would seem that that would

5   explain the five credit inquiries.

6          Would you agree with that?

7               MR. SULLIVAN:  Form and foundation.

8               THE WITNESS:  It's possible.  It's

9   possible.  I can't speak to what they were for.  I'm

10   not sure, but it's definitely a possibility.

11   BY MR. ZANE:

12    Q.   What more information would you have

13   required from Fred White in order to evaluate the

14   five credit inquiries?

15    A.   That would be why he's asking the insured as

16   part of the recorded statement.  Actually, he would

17   have obtained the credit report after, but it would

18   indicate that there was some inquiries for a

19   purpose -- potentially a mortgage or another type of

20   large purchase that he would have needed credit for.

21    Q.   Okay.  So, again, this -- but this -- did

22   this address the five credit inquiries in your mind

23   in any way?

24               MR. SULLIVAN:  Form and foundation.

25               THE WITNESS:  The five credit inquiries

1  came after this statement was obtained, so he would

2  not have known about the five inquiries at that

3  time.  This is a general summary of his financial

4  questions that he asked the insured.

5  BY MR. ZANE:

6    Q.   I guess, what do you mean by "it would have

7  come before"?

8         It looked to me -- I mean, my understanding

9  is that you had pulled a credit -- a credit report

10  had been pulled by Fred White indicating five credit

11  inquiries, and then my understanding is that he

12  asked him about them, and he said he had his

13  mortgage refinanced two months ago.

14         Is that the order of events that you

15  understand?

16              MR. SULLIVAN:  Form.

17              THE WITNESS:  No.

18              The way that it works, the insured

19  would meet with Fred.  They would take the recorded

20  statement.  At the recorded statement, usually after

21  the recorded statement and after these questions

22  that you're reading the summary of now, we would ask

23  the insured to complete a financial authorization to

24  allow us to obtain a credit report.  And then the

25  credit report would be obtained.

1           So these questions that you're reading

2  a summary of now about the mortgage refi and other

3  things were asked prior to the credit report being

4  received.

5  BY MR. ZANE:

6     Q.   Okay.  But it's fair to say the credit --

7  that Fred White informed you about the credit

8  inquiries before he entered this file note.  Is that

9  fair?

10          MR. SULLIVAN:  Object to the form.

11          You can answer.

12          THE WITNESS:  I wouldn't say that I was

13  informed of them prior.  He may have entered the

14  notes all at the same time.  The summary notes and

15  the credit report are usually and most likely

16  entered at the same time.  Not always but most

17  likely.

18  BY MR. ZANE:

19     Q.   Okay.  Let's double-check.  Let's see.  I'll

20  go back to page 67, and it looks like the date in

21  which Fred White made note of the five credit

22  inquiries is on page 67 of Exhibit 29, and he

23  created that on February 7th, whereas these notes

24  were entered on February 11th.

25     A.   Okay.  So --

1    Q.   Do you agree?

2    A.    -- they would have been entered at different

3  times, but, again, the recorded statement was

4  obtained prior to the credit report, so I may or may

5  not have seen the notes at that point.  They were

6  entered into the file clearly because of the dates,

7  but I may not have read it at that point.  I'm not

8  sure.

9    Q.   But regardless of when you read it, if, in

10 fact, Douglas Altschuler obtained a mortgage

11 refinance two months prior, on its face, that would

12 be a pretty good explanation for the five credit

13 inquiries.  Would you agree?

14   A.   It's a possibility that that could be the

15 reason, yes.

16   Q.   Below that --

17   A.   There could also be other reasons.

18   Q.   Okay.  What are some of those other reasons?

19   A.   If he was looking to purchase a car or buy

20 another home, obtain another credit card.  It could

21 be any number of reasons that people look to obtain

22 credit.

23   Q.   Okay.  Below that, the second highlighted

24 portion says, "Big purchases?  A couple 100,000 art

25 purchases in last month."

1    Do you see that there?

2    A.   Yes.

3    Q.   What -- I guess, what -- did you draw any

4    conclusions or -- scratch that.

5    How did that information factor into your

6    investigation?

7    A.   I would review it as a part of the summary

8    of the recorded statement that he obtained as well

9    as the financials in that the insured had recently

10   spent at least a couple of hundred thousand on

11   larger purchases of art as noted.

12   Q.   And on its face at any rate, it seems to

13   indicate that Douglas Altschuler spends a lot of

14   money on art.  Would you agree?

15             MR. SULLIVAN:  Form.  Foundation.

16             THE WITNESS:  He did indicate

17   throughout the claim investigation that he has

18   purchased a lot of art throughout the years and

19   spent a lot of money on it, so I think that's

20   reasonable, yes.

21   BY MR. ZANE:

22   Q.   Okay.  And this is unfortunately a rather

23   lengthy list, but I'm going to -- this is -- I'm

24   still on page 73 of Exhibit 29.  I understand it

25   can't be comprehensive in this format, but looking

KAREN MOORE  FEBRUARY 23, 2023

1  at the list, does anything -- any of these questions

2  and answers jump out at you as potentially a red

3  flag?

4          MR. SULLIVAN:  Object to the form and

5  foundation.

6          You can answer.

7          THE WITNESS:  They're standard

8  financial questions to get an idea of, you know,

9  where the insured is in his financial health at the

10  time.  Let me look over them.

11  BY MR. ZANE:

12     Q.   Take your time.

13     A.   The ones you've highlighted, like I said,

14  are of interest.  Everything else seems to be

15  answered "no."  There were -- there were not any

16  issues.

17     Q.   I've scrolled down, so I'll let you have

18  more time to take a look at those.

19     A.   Looking -- looking at this, the insured's

20  answers were basically, no, there were no financial

21  issues.

22     Q.   Okay.

23     A.   That's what I would take from reading this.

24     Q.   Okay.  And I'm on page 85 of Exhibit 29.

25  It's a February 28th, 2020, file note from Fred

KAREN MOORE  FEBRUARY 23, 2023

1  White.  He's recommending that the insureds be

2  scheduled for examination under oath based on the

3  following.  Then he mentioned some factors.

4        And is this -- the first is, "The version of

5  events given by the insured to explain this loss is

6  highly suspect."

7        What was your understanding of what he was

8  conveying to you at that time?

9               MR. SULLIVAN:  Form and foundation.

10              THE WITNESS:  Again, you would have to

11  ask Fred specifically his mindset.  I had read the

12  recorded statement summary, as well as the initial

13  statement and scope provided regarding the loss

14  facts.

15              The insured was indicating that there

16  was a theft of a highly valuable piece of art from

17  his mother's home in Arizona with no forced entry,

18  and nothing else was missing.

19  BY MR. ZANE:

20    Q.  So did you agree with Fred White as that's a

21  potential reason for scheduling an examination under

22  oath?

23    A.  Yes.

24    Q.  The second indicates, "Insured indicated the

25  home health aide was present at one time with law

KAREN MOORE  FEBRUARY 23, 2023

1  enforcement officers, but this has been contradicted

2  by his sister Janet."

3          Was this something with which you agreed as

4  a reason to schedule an EUO?

5      A.   I agree, yes.  Definitely it caused

6  additional questions that we would want addressed at

7  an examination under oath.

8      Q.   And I could run through all of them.

9          Are there any of these reasons with which

10  you disagreed as a -- as a reason for scheduling an

11  EUO?

12              MR. SULLIVAN:  Form and foundation.

13              THE WITNESS:  Let me look over them.

14  BY MR. ZANE:

15      Q.   Surely.

16      A.   I do not disagree with any of those reasons.

17      Q.   Okay.  And the fourth one down says, "The

18  value of the art increased significantly

19  approximately 16 months prior to the loss."

20          Why would that be a reason to schedule an

21  examination under oath?

22      A.   We would look into why the value was

23  increased and why, you know, there was an increase

24  just prior to a loss or within a relatively short

25  time prior to a loss occurring.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   All right.  I'm actually done with this

2    exhibit, and I will move to -- let's see if I can do

3    this all right.  Let's see if I -- yeah, I did it

4    right, I think.

5                MR. ZANE:  Can you-all see it?

6                MR. SULLIVAN:  Yes.

7                MR. ZANE:  I'm going to start

8    celebrating too early there.

9    BY MR. ZANE:

10   Q.   This was previously introduced as

11   Exhibit No. 5.  This is really a continuation of

12   compilation selections and -- that are highlighted

13   from the -- from what I call the claims file.

14            And this is -- page 1 is a file note that

15   you wrote on March 3rd, and it starts, "Reviewed

16   report received from Gurr Johns; same confirms

17   replacement cost value for the claimed is

18   1.5 million at the time of the loss."

19            Do you remember making this entry?

20   A.   Yes.

21   Q.   Okay.  Now, I mean, it seems that Gurr Johns

22   confirms the appraised value that Douglas Altschuler

23   gave to Chubb.

24            Would you agree with that?

25                MR. SULLIVAN:  Object to the form.

KAREN MOORE  FEBRUARY 23, 2023

1              You can answer.

2              THE WITNESS:  Yes.

3    BY MR. ZANE:

4    Q.    The second paragraph, you mention that you

5    discussed Gurr Johns' report with Dan Jaeger and

6    Fred White, and Dan asked, you know, essentially for

7    follow-up information.

8              Did he explain the purpose of obtaining more

9    information after they already confirmed the

10   appraisal value?

11   A.    Yes.  We would want to look into the

12   background of the item further -- how it was

13   obtained, whether the appraiser had seen it in

14   person, how they came to this value.  As noted

15   there, we're looking for a full provenance on the

16   item.

17   Q.    And can you just describe, what is a

18   provenance?

19   A.    It's a background, a history of the item, so

20   when it was purchased, when it was sold, who the

21   artist was, how many of the item there were.  Just

22   giving a real full detailed background on the piece

23   that's being claimed.

24   Q.    Okay.  I'm going to go to page 39 of

25   deposition Exhibit 5, and it is a May 8th entry that

1  you authored -- no.  Sorry.  You entered it, but it

2  was authored apparently from Dan Jaeger, sent to

3  you.

4       Does that look right?

5   A.   Yes.

6   Q.   Okay.  Also, this Charles Rubin appears on

7  the copy.

8       Who is Charles Rubin?

9   A.   That is our counsel for examination under

10 oath.

11  Q.   Okay.  And what is his specific role within

12 an SIU claim?

13            MR. SULLIVAN:  Form and foundation.

14            You can answer.

15            THE WITNESS:  We would -- we would hire

16 him to handle the examination under oath of the

17 claim and coordinate that.

18 BY MR. ZANE:

19  Q.   Is he retained simply to conduct it, or does

20 he have any other investigative role in the claim?

21            MR. SULLIVAN:  Form and foundation.

22            THE WITNESS:  He does not investigate

23 the claim in any form or fashion.  He can provide us

24 legal advice on anything that he sees that we may

25 wish to investigate further, but that would be our

1  choice on to -- you know, whether we felt that was

2  necessary as part of the investigation or not.

3  BY MR. ZANE:

4    Q.   What role does Rubin play in a determination

5  of whether to accept or deny a claim?

6    A.   He has no, I guess, choice in that matter.

7  He can make an opinion, which he does.  He gives us

8  his legal opinion and a summary of all the

9  information that was obtained as part of the

10  investigation and the examination under oath.  That

11  would include a recommendation, and then Chubb would

12  take all of that information in its totality and

13  review it and make a coverage decision at that time.

14    Q.   Does anyone on SIU's investigation team

15  report to Rubin?

16         MR. SULLIVAN:  Object to the form and

17  foundation.

18         You can answer.

19         THE WITNESS:  I don't understand what

20  you mean, do we report to him?

21  BY MR. ZANE:

22    Q.   Sure.  No.  That's fair, and I'm glad you

23  said that.

24         Does Rubin give instructions to anyone as

25  part of this claim?

1          MR. SULLIVAN:  Form.  Foundation.

2          THE WITNESS:  Like I said, he --

3          MR. SULLIVAN:  Go ahead.

4          THE WITNESS:  I'm sorry.

5          MR. SULLIVAN:  That's all right.

6          THE WITNESS:  He may give advice.  As

7   part of his review, he may give us legal advice, or

8   he can suggest additional investigation to us.

9   Again, that would be up to Chubb whether we complete

10  that or not.  He does not make any decisions here or

11  have the final say-so in what is done.

12  BY MR. ZANE:

13     Q.   Okay.  Can he assign tasks during the

14  investigation?

15          MR. SULLIVAN:  Form and foundation.

16          You can answer.

17          THE WITNESS:  Do we assign Mr. Rubin

18  any tasks?

19  BY MR. ZANE:

20     Q.   Does Mr. Rubin assign anyone else tasks?

21     A.   No.  He could ask us for additional

22  information if it's not clear to him in our file

23  that we sent to him, but no.

24     Q.   Okay.  And in this note, I think Dan writes

25  to you that per discussion, we're going to retain

KAREN MOORE  FEBRUARY 23, 2023

1    John Chvostal to assist us with some additional

2    provenance investigation on the claimed artwork, and

3    he provides you a list of information to send to

4    him.

5         Do you see that?

6    A.    I do.

7    Q.    Do you -- so is my understanding, is it

8    correct to say that John Chvostal was retained for

9    provenance; correct?

10   A.    Correct.

11   Q.    Is this a task that Gurr Johns typically

12   provides as well?

13   A.    Gurr Johns is more of a valuation expert.

14   They can do some provenance work, but if we're

15   looking for a full deep dive, if you will, we would

16   ask Mr. Chvostal or he is one of the experts that we

17   could ask.

18   Q.    Okay.

19        MR. ZANE:  I'm going to dip over to

20   what I'll enter as -- I believe this has not yet

21   been entered, so I'm going to enter it as

22   Exhibit No. 30.  This is John Chvostal -- I'm going

23   to call it his provenance report -- from June 20th

24   of 2020.

25   ///

KAREN MOORE  FEBRUARY 23, 2023

1                (Whereupon, Exhibit No. 30 was marked

2    for identification.)

3    BY MR. ZANE:

4        Q.    And can you see it on the screen?

5        A.    Yes.

6        Q.    Oh, splendid.

7              Okay.  Did you -- do you remember having

8    reviewed this?

9        A.    I would have reviewed it, yes.

10       Q.    Okay.  And I am going to go to page 15 of

11   this report, and you take a look at it.  He entitled

12   it "Preliminary E.U.O. Questions."

13             Could you say that one more time?  Chvostal?

14       A.    Chvostal, yes.

15       Q.    Chvostal.  Where Chvostal provides questions

16   for the EUO.

17             Is this -- is this something he typically

18   does in the claims with which you work on with him?

19       A.    When he does the background, if he sees

20   additional questions that he may need additional

21   information for, then, yes, he would give us some

22   questions to follow up with our insured so that he

23   would be able to complete his work.

24       Q.    Okay.  And how often do you work with

25   Chvostal?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   If the need arises in a claim that we have

2  with him.  I wouldn't say it's daily because I don't

3  see art claims all the time, but we can involve him

4  when necessary.  I know who he is.  I can't give you

5  specifically how many times I've worked with him.

6  At least a handful.

7    Q.   Okay.  Over the last year, say, have you

8  worked with him?

9    A.   I believe I may have worked with him on

10  another matter within the last year.

11    Q.   Okay.  Maybe once or twice a year.  Would

12  that seem about right?

13    A.   It's possible.  I mean, I could go a couple

14  of years without working with him if I don't get

15  that type of claim, so it just depends on the type

16  of claim that I would receive.

17    Q.   Do you involve Mr. Chvostal for most of the

18  art claims -- the fine art claims that come into

19  Chubb SIU?

20    A.   No.  Only when we -- we need, like, a

21  further provenance or research on the art item

22  because we're not art experts.

23    Q.   Okay.  Are there other experts who you may

24  use for provenance, or is Chvostal really kind of

25  your go-to guy for provenance?

KAREN MOORE  FEBRUARY 23, 2023

1    A.    There are some other experts.  I cannot name

2  any off the top of my head.  There's, you know, a

3  list we have of experts that we can utilize, and in

4  this particular case, Dan Jaeger recommended that we

5  use Chvostal, so that's why he was engaged.

6    Q.    Oh, it was Dan Jaeger's call?

7    A.    Yes.  He did recommend to use Mr. Chvostal

8  in this case.

9    Q.    Okay.  I'm going to return to deposition

10  Exhibit 5.  I'm going to page 47 of deposition

11  Exhibit No. 5.  It's a July 14, 2020, file note.  It

12  looks like you created it.  It's an email that you

13  sent to Rubin.

14        I take it although he's Charles Rubin, he

15  goes by "Terry."  Is that right?

16    A.    Correct.

17    Q.    Okay.  And it looks like you were forwarding

18  a conversation you had had with Ann Marinaccio of

19  Chubb, and I gather that she -- she's in Chubb's

20  underwriting department.

21        Would you agree with that?

22    A.    Yes.  That's what it says.

23    Q.    Okay.  And scrolling down a little bit,

24  there's an email from 8:07 a.m.  "Can you confirm

25  that prior to the update, underwriting had no

KAREN MOORE  FEBRUARY 23, 2023

1  information that the item was 3 of 30?"

2       And she responds, "See the attached -- "See

3  attached the original fine art appraisal received in

4  2017.  The item is located on page 5 and noted as

5  'edition of 30.'"

6       Do you remember that email exchange?

7  A.   Yes.

8  Q.   Okay.  Would you agree that after receiving

9  this email from Ann, that it appeared that Chubb

10  insured the art without knowing what number of 30

11  the art was?

12            MR. SULLIVAN:  Object to the form and

13  foundation.

14            THE WITNESS:  It appears based on what

15  the underwriter lists here that prior to the updated

16  appraisal that increased the value, it only stated

17  "edition of 30," but it did not specifically state

18  what edition.

19  BY MR. ZANE:

20  Q.   I'm now moving to July 15, which is page 58

21  of Exhibit 5.  It's another file note by Fred White,

22  and I'll let you take a look at -- I'll just let you

23  review this email quickly -- this file note quickly.

24  A.   Okay.

25  Q.   It seems in this file note, Fred White is

KAREN MOORE  FEBRUARY 23, 2023

1  telling SIU adjusters that the art was previously

2  insured by AIG.

3        Would you agree with that?

4     A.   That is --

5             MR. SULLIVAN:  Form.

6             THE WITNESS:  -- what -- this note is

7  indicating that Fred White reached out to the agent

8  on the policy to ask about prior insurance, and it

9  does -- she did indicate that he had an AIG prior

10 policy to Chubb.

11 BY MR. ZANE:

12    Q.   Okay.  And that this art specifically was

13 covered under that policy?

14    A.   That's what it states, yes.

15    Q.   Okay.  And also you can see in the note --

16 I'm going to move my mouse right in the middle of

17 the paragraph -- "edition of 30."  It's not a

18 numbered -- they don't indicate what number it is in

19 this on page 58 either?

20    A.   That's what it states, correct.

21    Q.   And I guess Fred asked -- specifically asked

22 if it is 3 of 30 edition, and she said, "No."

23    A.   Correct.

24    Q.   Okay.  It also -- it also states that Fred

25 asked if she had any appraisals, and she said she

KAREN MOORE  FEBRUARY 23, 2023

1   had one from 2012 from a James Corcoran Gallery.

2           Do you have any reason to dispute any of

3   that?

4       A.   I do not.

5               MR. SULLIVAN:  Form and foundation.

6               You can answer.

7               THE WITNESS:  I do not.

8   BY MR. ZANE:

9       Q.   Okay.  I'm going to move to page 62 of

10  Exhibit 5, which is a July 24th entry from Fred

11  White.  Says, "Net Worth Summary Attached," and the

12  subsequent page is a net worth calculator.

13          And what is the purpose of obtaining a net

14  worth summary in your investigation?

15      A.   This appears to be a document that the

16  insured would have provided to support his financial

17  picture, giving us his -- his debt versus his

18  assets.  So that's what I'm looking at.

19          This is something it looks like was prepared

20  by the insured or for the insured, but I don't

21  necessarily see this as part of every claim.  This

22  is not something specific that we ask for in this

23  format.

24      Q.   At face value anyway, it would -- this --

25  page 63 would suggest that he has 39,645,487 [sic]

1  in assets and 4,364,243 in liabilities, and a net

2  worth of around 35 million.

3        Again, at face value, that's what this

4  indicates?

5              MR. SULLIVAN:  Form.  Foundation.

6              You can answer.

7              THE WITNESS:  It does indicate that,

8  yes.  Looking at it, I mean, it shows he has a lot

9  of debt and not a lot of, you know, cash or liquid,

10  you know, assets on hand.

11  BY MR. ZANE:

12    Q.   Okay.  So how would this information factor

13  into your decision whether to approve or deny the

14  claim?

15    A.   Again, we look at everything in totality

16  when we look at a claim and make a determination to

17  deny.  You know, this is -- is one factor of it.

18  It's looking and trying to get an idea of his

19  financial picture.

20        And I would say looking at this, again, it

21  indicates that he has a lot of assets but that not

22  necessarily all of them are liquid.  Only a small

23  portion are liquid that he would really have on

24  hand, and his debt load is very high.  I mean, his

25  mortgage amount is high.  His credit card debt is

1  high.  He has a lot of loans in place.

2       So that could indicate that he may need some

3  money, but, again, this is -- we never look at just

4  one thing.  It's a totality of everything that we

5  look at as part of our claim investigation before a

6  decision is made for coverage or to deny.

7    Q.   Okay.  I'm now on page 72 of Exhibit 5.

8  It's an August 19th, 2020, email from Rubin -- no.

9  It's from -- oh, Chvostal to Rubin, Dan, and it

10  looks like -- potentially not to you, but it's

11  entered into the claims log.  I guess let's see

12  here.  I guess it was copied to you at one point.

13       Do you remember having seen -- I'll let you

14  take a look at it before you answer.

15       Do you remember having seen this email?

16    A.   I don't see my name on that particular email

17  in that section.  Let's see.  If I was copied on it,

18  I would have seen it at some point then, yes.

19    Q.   Okay.  That's fair.

20       Chvostal says at one point -- I guess he,

21  you know, makes -- describes some things here, but

22  evidently -- and I'm gathering, and I'm going three

23  paragraphs down.  Actually, the second paragraph, "I

24  did receive an email from the Robert Berman

25  Gallery."

1       Do you see that?

2    A.   I do.

3    Q.   Okay.  And at the end, the second

4  highlighted portion, "In light of the insured's

5  statements regarding the provenance of the 1987 set,

6  the email supports the possibility that that set

7  could have been purchased in Santa Monica in or

8  around 1987."

9    A.   I see that.

10   Q.   Okay.  And, again, this -- this indicates --

11  isn't it obvious?

12       This indicates that Chvostal somehow

13  communicated with Berman, and Berman -- what Berman

14  told him supports what Altschuler had told Chubb?

15            MR. SULLIVAN:  Object to the form and

16  foundation.

17            You can answer.

18  BY MR. ZANE:

19   Q.   I mean, that seems --

20   A.   I can review it to see specifically what it

21  says.

22   Q.   Okay.  I'll give you a moment.

23   A.   It indicates that, yes, the set could have

24  been purchased in or around 1987, as the insured

25  stated.

KAREN MOORE  FEBRUARY 23, 2023

1   Q.   Okay.  And what is the purpose of

2   communicating with Robert Berman as part of your

3   investigation?

4            MR. SULLIVAN:  Form and foundation.

5            MR. ZANE:  Sure.  I mean, it -- I'll

6   rephrase it.

7   BY MR. ZANE:

8   Q.   The purpose of communicating with Robert

9   Berman is to see if he supports the narrative that

10  Altschuler supplied to Chubb.  Is that right?

11           MR. SULLIVAN:  Form and foundation.

12           You can answer.

13           THE WITNESS:  The purpose would be to

14  verify the information provided by our insured, yes.

15  BY MR. ZANE:

16  Q.   And it seems here that, in fact, Berman did

17  verify that information.  Would you agree?

18           MR. SULLIVAN:  Form.  Foundation.

19           THE WITNESS:  It does appear initially

20  that it could have been purchased, as he stated, in

21  1987 as indicated by the insured.

22  BY MR. ZANE:

23  Q.   Okay.  I'm on page 205 of deposition 5, and

24  it's a file note from Fred White.  It says, "The

25  Warhol/Haring prints are No. 170 on the schedule and

KAREN MOORE  FEBRUARY 23, 2023

1   were insured for $250,000."

2        Do you see that?

3   A.   I do see that.

4   Q.   Okay.  And moving down, at one point or

5   another, he provides the schedule of items, and 170

6   does appear to be -- as Fred White stated, there's

7   the Andy Warhol Andy Mouse item.

8        So at this point, it's fair to say that you

9   know that AIG insured this specific piece of art?

10               MR. SULLIVAN:  Form.

11               THE WITNESS:  I do see that it was

12   listed on that policy.

13   BY MR. ZANE:

14   Q.   Okay.  Going to page 214, it's a

15   September 22nd, 2020, note, file note, it was from

16   Dan Jaeger to you and to Fred White for FYU [sic]

17   and the file.

18        And it appears that Chvostal prepared

19   questions -- EOU [sic] questions for Rubin -- would

20   you agree -- you know, based upon the email?

21               MR. SULLIVAN:  Form and foundation.

22               You can answer.

23               THE WITNESS:  Yes.  Per this email,

24   that is what it states.

25   ///

KAREN MOORE  FEBRUARY 23, 2023

1  BY MR. ZANE:

2    Q.   Okay.  And the questions are attached

3  beginning on page 216 of Exhibit 5, and, I guess,

4  what's interesting to me -- what was Mr. Chvostal's

5  role again?  Because it's -- how does the condition

6  of the -- the state of the house when he visited it

7  on September 3rd as is indicated on the bottom of

8  page 217 have to do with provenance?

9              MR. SULLIVAN:  Form.  Foundation.

10              You can answer.

11              THE WITNESS:  It would appear that

12  there's a possible contradiction of information

13  here, in Mr. Chvostal's review, so as part of his

14  review for the provenance, he's indicating that

15  there was a difference of information and that we

16  may wish to ask further about that.

17  BY MR. ZANE:

18    Q.   Is that -- do you typically ask a provenance

19  expert to provide you with questions about, for

20  example, the state of the house when the client --

21  when the insured [sic] visited it?

22          This seems to go beyond the scope of a

23  provenance.  Would you agree?

24              MR. SULLIVAN:  Object to the form.

25              THE WITNESS:  I do not agree with that.

1    I think, you know, each claim is handled on its own

2    merits, and in this case, we were asking him to

3    complete a provenance investigation, and because the

4    item was stored in the home, there was no forced

5    entry, I would assume he was looking to get further

6    background of information that had not been provided

7    at that point or was not clear to him so he could

8    complete his report.

9            So if he doesn't have all of the

10   information he needs to complete his report or facts

11   that may factor into that report, it would not be

12   unusual for him to provide additional questions.

13   BY MR. ZANE:

14   Q.   Okay.  So you would expect that as part of

15   his report -- strike that.

16           This question here I'm focusing on just

17   right above -- it's on page 218 above the title

18   Clarifying the Acquisition of the Subject Items from

19   Haring, one of the questions, "If you maintained a

20   location suitable for art storage, why did you keep

21   the Harings at your mother's home," could you

22   explain again the relevance of that to a provenance?

23           MR. SULLIVAN:  Object to the form.

24   Foundation.  Asked and answered.

25           You can answer again.

KAREN MOORE  FEBRUARY 23, 2023

1            THE WITNESS:  As I stated previously, I

2    mean, I think that's relevant given where the item

3    that's being claimed was located at the time and

4    given how long the insured was stating it was there,

5    trying to get a full background on the item, its

6    purchase, where it had been stored.  These are

7    questions that Mr. Chvostal needed answered in order

8    to complete his report.

9    BY MR. ZANE:

10   Q.   I guess, what is your definition again of

11   what a provenance report -- what a provenance is?

12            MR. SULLIVAN:  Object to the form.

13            You can answer.

14            THE WITNESS:  It gets the full

15   background on the item, as I stated previously.  You

16   know, its purchase, the valuation, the artist,

17   things of that nature.

18            This particular item was of a high

19   value, and it was stored at his mother's home, I

20   believe he stated under a couch in a box, for many

21   years.  So that is of interest to us.

22            And we're trying to figure out why it

23   wouldn't have been stored somewhere else, or if it

24   was, trying to gather that information so he could

25   complete his report.

KAREN MOORE  FEBRUARY 23, 2023

1   BY MR. ZANE:

2     Q.   Does a provenance expert typically opine as

3   to why an item of art was stored the way it was?

4               MR. SULLIVAN:  Object to the form and

5   foundation.

6               THE WITNESS:  I would say he could ask

7   questions about it to try to gather a background

8   again and give us a complete picture on where the

9   item has been, what has happened to it, its full

10  background, so I don't feel that's unusual.

11  BY MR. ZANE:

12    Q.   Was it -- how many other provenance experts

13  have you worked with?

14    A.   I can't state off the top of my head.  There

15  have been others.  I can't tell you how many or even

16  when that was.  I've worked with Chubb for 22 years

17  now.

18    Q.   Okay.  Do you ask other provenance experts

19  to report upon the motivation for various forms of

20  storing art?

21              MR. SULLIVAN:  Object to the form and

22  foundation.

23              You can answer.

24              THE WITNESS:  I don't think we asked

25  him for motivation.  Again, we're looking for a full

1  background on the item, and all of our experts or

2  anyone we retain in the course of the investigation,

3  whether it's an attorney, an expert, we would ask

4  them, "If you see anything additional that should be

5  asked in order for you to help with this

6  investigation, please point that out to us," or "If

7  you need additional information that's not already

8  within our reports and investigation, let us know."

9  BY MR. ZANE:

10  Q.  Okay.  So there are not clear boundaries to

11  Chvostal's role here in that if he feels -- here,

12  for example, offering questions to the -- to be used

13  during an EUO might be helpful, he feels free to

14  provide them and you accept them?

15          MR. SULLIVAN:  Object to the form and

16  foundation.

17          You can answer.

18          THE WITNESS:  We can take into

19  consideration.  That's not necessarily his role to

20  give us those questions, and it's ultimately Chubb's

21  choice whether or not to ask those questions, so

22  he's not directing anything here.  He's giving

23  suggestions, and we review them and incorporate any

24  part of that we feel would be useful to our

25  investigation.

KAREN MOORE  FEBRUARY 23, 2023

1  BY MR. ZANE:

2    Q.   Okay.  I'm on page 227, and this is a

3  September 25th file note from -- that you wrote, and

4  this says, "Reviewed prior policies under" -- it

5  gives the policy number.  "The Andy Mouse was first

6  added to the VAF portion of the policy effective

7  September 23rd, 2014, and remained on that policy

8  until June 1st, 2016, when it was moved to the

9  current '05 policy that this claim is being made

10  under."

11        Now, at this point, you've confirmed that

12  Douglas Altschuler insured this -- insured this art

13  under his AIG policy?

14            MR. SULLIVAN:  Object to the form and

15  foundation.

16            You can answer.

17            THE WITNESS:  Were you finished with

18  the question?

19  BY MR. ZANE:

20    Q.   Yes.  Yeah, I am.

21        At this point, you know that he had insured

22  it under AIG?

23            MR. SULLIVAN:  Form and foundation.

24            You can answer.

25            THE WITNESS:  We do see that there was

1    prior policies for this item.

2    BY MR. ZANE:

3        Q.    Okay.  And what role would that play in your

4    determination -- your coverage determination?

5        A.    It's part of the investigation to determine

6    how long the item had been insured, with whom, and

7    at what values and descriptions throughout its life

8    cycle having had insurance coverage.

9        Q.    And here he had insured it with AIG for the

10   same amount that he opened up insurance with Chubb;

11   right?

12                    MR. SULLIVAN:  Form.

13                    You can answer.

14                    THE WITNESS:  I would have to look back

15   at that policy document.  I don't remember if it was

16   the same value or not.

17   BY MR. ZANE:

18       Q.    We've established that it was -- he insured

19   it initially with Chubb for $250,000 and is that --

20   can we agree on that?

21       A.    I believe it was on this policy initially

22   for 250,000, yes.

23       Q.    Let's see if I can -- let me see if I can

24   find it.  Here we go.

25                    And let's go -- I'm going back to the

KAREN MOORE  FEBRUARY 23, 2023

1  beginning.  So this is the AIG policy that we spoke

2  about earlier that was provided -- that placed into

3  the system by Fred White --

4  A.  Okay, yeah.

5  Q.  -- on page 205, and page 212, there it is

6  for 250,000.

7  Do you see that there?

8  A.  (Nonverbal response.)

9  Q.  And so I guess my question is that it would

10  seem that this would be information that would

11  support acceptance of the claim in that he has

12  insured it for years at the same value with a

13  different insurance company.  Would you agree?

14  MR. SULLIVAN:  Object to the form.

15  Foundation.

16  You can answer.

17  THE WITNESS:  It was listed on prior

18  policies for some years prior to the claim being

19  submitted.  That appears correct, yes.

20  BY MR. ZANE:

21  Q.  Yes.

22  I guess my question is a little bit

23  different in that, that's information that tends to

24  support the claim; correct?

25  MR. SULLIVAN:  Object to the form.

1        You can answer.

2            THE WITNESS:  I wouldn't say it

3   necessarily supports the claim.  It supports that

4   the item was listed on the Chubb policy for some

5   years, as well as with a prior carrier.

6   BY MR. ZANE:

7     Q.   Well, what is the purpose of obtaining

8   information about the AIG policy, then?

9     A.   Again, it's to try to verify the length of

10  coverage on an item, whether it was with Chubb or

11  with another carrier.

12    Q.   And you were able to verify it, and so

13  that -- it's obvious, that speaks in favor of

14  Altschuler's claim; right?

15            MR. SULLIVAN:  Object to the form of

16  the question.

17            THE WITNESS:  That is just a portion of

18  the claim investigation.

19  BY MR. ZANE:

20    Q.   Well, sure.  It's not the entire claim, but

21  this particular piece of evidence supports it.

22            I mean, maybe there's plenty of other pieces

23  that work against it, but this particular piece of

24  evidence tends to support his claim?

25            MR. SULLIVAN:  Object to the form.

KAREN MOORE  FEBRUARY 23, 2023

1    THE WITNESS:  It tends to support that

2 he had insurance on the item, yes.

3 BY MR. ZANE:

4    Q.   Okay.  What is the significance of him

5 having had prior insurance on the item?

6    MR. SULLIVAN:  Form.  Foundation.

7    You can answer.

8    THE WITNESS:  It's showing that he did

9 have a history of having insurance coverage on this

10 particular item.

11 BY MR. ZANE:

12    Q.   And what is -- the history of insurance item

13 on the coverage, what is the significance of that?

14    MR. SULLIVAN:  Form.

15    THE WITNESS:  Again, it determines

16 whether or not he had prior coverage on the policy

17 prior to this policy and prior to the claim

18 occurring, just to get a history of the item.

19 BY MR. ZANE:

20    Q.   Well, we went in a little bit of a circle

21 here, but it's fairly clear that the fact that he

22 insured it under another company, it's not

23 dispositive, but it is something that tends to

24 support his claim with Chubb?

25    MR. SULLIVAN:  Object to the form.

KAREN MOORE  FEBRUARY 23, 2023

1   Asked and answered.

2                    You can answer one more time.

3                    THE WITNESS:  I mean, I don't feel like

4   we're going in a circle, but you've asked me that

5   same question, and I've told you it supports that he

6   had insurance.  I won't say it supports the claim.

7   It supports that he had insurance on that item.

8   BY MR. ZANE:

9       Q.   Okay.  So, again, why did you -- why was it

10  important to you to find out whether he had

11  insurance on the item before?

12                   MR. SULLIVAN:  Form and foundation.

13                   You can answer this one more time too.

14                   THE WITNESS:  Again, we look to

15  determine what the history is.  Was it just added to

16  the Chubb policy only, or had he had a history of

17  having insurance coverage for the item?

18  BY MR. ZANE:

19      Q.   But if he had added it to the Chubb policy

20  only, I mean, that would have made it a little bit

21  more suspicious.  Do you agree?

22                   MR. SULLIVAN:  Form.

23                   THE WITNESS:  Not necessarily.  Again,

24  it's just trying to determine the history of the

25  item.

KAREN MOORE  FEBRUARY 23, 2023

```
1    BY MR. ZANE:
2        Q.   But, again, what is the purpose of
3    determining the history of the item?
4                    MR. SULLIVAN:  Form.  Asked and
5    answered.
6                    You can answer again.
7                    THE WITNESS:  All right.  I hate to
8    keep repeating myself.  I feel like I'm not maybe
9    understanding you.
10   BY MR. ZANE:
11       Q.   Well, I'm just -- if you're looking to find
12   out whether he insured it with another insurance
13   company, and it seems obvious to me that the fact
14   that he had specifically tends to indicate that --
15   you know, it tends to be a mark in favor of his
16   claim, of his credibility.
17                   MR. SULLIVAN:  Object to the form of
18   the question.  Object to foundation.  Move to strike
19   counsel's comments.
20                   Is there a question?
21   BY MR. ZANE:
22       Q.   Agree?
23                   MR. SULLIVAN:  You can answer.  Same
24   objections.
25                   THE WITNESS:  I can't say it supports
```

1  the claim.  It supports that he had insurance

2  coverage for the item in which he is claiming, but

3  we had not completed our claim investigation, so at

4  that point, it wouldn't be fair to say whether or

5  not it supports his claim.  It supports that he had

6  a prior insurance policy for that item in which he

7  was claiming.

8  BY MR. ZANE:

9     Q.   Yeah.  We all agree with that.

10         I guess my question is the second part of

11  that, just what -- you know, who cares if he had

12  insurance before and why?

13             MR. SULLIVAN:  Unless there's a new

14  question, I mean, we need to move on.

15             MR. ZANE:  Yeah, yeah.

16  BY MR. ZANE:

17     Q.   I mean, I guess, going to the big picture, a

18  lot of -- I mean, investigation -- Douglas

19  Altschuler made a bunch of statements to you --

20  correct? -- about his finances and about his

21  ownership of the art.  Is that fair?

22     A.   He made statements to Chubb, yes.  Not to me

23  personally.  To Chubb.

24     Q.   Fair.  Right, to Chubb.

25         And Chubb retained an investigator to

1   verify -- in part to verify those statements.  Is

2   that fair?

3       A.   Correct.

4       Q.   Okay.  And if part of Chubb's investigation,

5   to the extent his statements are verified by Chubb,

6   that tends to support his claim.

7                MR. SULLIVAN:  Form.

8   BY MR. ZANE:

9       Q.   Would you agree?

10                MR. SULLIVAN:  You can answer.

11                THE WITNESS:  All of the statements

12   that he made had not been verified at this point,

13   and throughout the claim, there was differing

14   information that the insured provided to us.

15   BY MR. ZANE:

16       Q.   Correct.

17           But I'm not asking -- I'm just asking, you

18   know, big picture, to the extent you are able to

19   verify Douglas' statements, that tends to support

20   his claim --

21                MR. SULLIVAN:  Form.

22   BY MR. ZANE:

23       Q.   -- correct?

24                MR. SULLIVAN:  Form.

25                THE WITNESS:  If all of his statements

1    are verified, then, yes, it would support his claim.

2    You're asking me about one portion of it.

3    BY MR. ZANE:

4        Q.   Oh, no, no, no.  I'm asking big picture now.

5               MR. SULLIVAN:  Let her finish answering

6    the question.

7    BY MR. ZANE:

8        Q.   Fair enough.

9        A.   If you can re-ask the question to make sure

10   I'm clear on what you're asking, please.

11       Q.   No problem.  And I'm talking big picture

12   here.  I'm -- not this particular thing here.

13       A.   Okay.

14       Q.   Douglas Altschuler made statements to Chubb

15   about his -- the provenance of the art and his

16   finances and other things.  Chubb launched an

17   investigation to investigate and to verify those

18   statements that he made.

19             To the extent that Chubb is able to verify

20   and confirm his statements, that tends to work in

21   favor of his insurance claim?

22             MR. SULLIVAN:  Form.  Foundation.

23             You can answer.

24             THE WITNESS:  If all of his statements,

25   big picture as you are stating, are verifiable, then

1  I would agree with you, yes, that they would support

2  the claim.  But all of the information was not

3  verifiable, and some of it differed and actually

4  contradicted what he told us during the claim

5  investigation.

6  BY MR. ZANE:

7    Q.   I understand that that's Chubb's position.

8  Mine is just, I'm trying to ask -- which I think is

9  a fairly obvious question, that if you're verifying

10 somebody's information, and to the extent you can

11 verify it and confirm it, then that tends to support

12 the claim generally speaking.

13            MR. SULLIVAN:  The question has been

14 answered.  I know you don't like the answer.  I'm

15 willing to provide you an explanation on why -- why

16 certain questions could be answered and confirmed

17 and yet it not help satisfy the claim, but I'm

18 assuming you don't want me to do that on the record.

19            MR. ZANE:  Not today.  Thanks.

20            MR. SULLIVAN:  Okay.  Then we're going

21 to move on from this line of questioning.

22            MR. ZANE:  Yeah.  I think I've probably

23 beaten this one to death.

24 BY MR. ZANE:

25   Q.   Okay.  So if you to my opinion can't answer

KAREN MOORE   FEBRUARY 23, 2023

1  that question --

2              MR. ZANE:  Actually, I think we're at a

3  break.

4              MR. SULLIVAN:  Great.

5              MR. ZANE:  Yeah.

6              THE VIDEOGRAPHER:  The time is

7  12:27 p.m.  We are going off the record, ending

8  Media No. 2.

9              (Recess taken.).

10             THE VIDEOGRAPHER:  My name is Judy

11 Thompson with Legal Video Specialists, Phoenix,

12 Arizona.  This begins Media No. 3 of the videotaped

13 deposition of Karen Moore.  The time is 12:37 p.m.

14 We are now back on record.

15 BY MR. ZANE:

16   Q.   I'm still on deposition Exhibit 5.  I'm on

17 page 236, and it's a letter dated October 15th,

18 2020, from Rubin.  Now, I'll avow that the entire

19 letter is blacked out, so whether I think that's

20 appropriate or not, and I don't, I won't ask any

21 questions about it.

22        However, did you receive this rather lengthy

23 letter in I presume its non-blacked out form?

24   A.   Not knowing what it is under the black, I'm

25 assuming I did.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.    Okay.  Well, it does seem that a few days

2    after the letter -- or actually the same date as the

3    letter, October 15th -- there's more of that

4    blackout -- there's an email from you to Rubin, and

5    it says, "Good Morning, Everyone.  Please respond

6    with your availability for a conference call to

7    discuss additional field investigation that remains

8    outstanding and needs to be completed."

9          Do you remember that?

10    A.    If it's my note, then I would have made it,

11    yes.

12    Q.    Okay.

13    A.    Specifically, not necessarily, but I'm sure

14    I did if my name is attached.

15    Q.    Fair enough.

16          And this is, for the record, page 262 of

17    Exhibit 5.

18          In your recollection, do you recall as of

19    October 15th, 2020, what additional information did

20    you require from an additional field investigation?

21    A.    I don't remember off the top of my head.  I

22    assume I would have looked at whatever documents

23    were there and determined that there may be

24    additional investigation needed.  And that's why we

25    would roundtable it or conference it, if you will,

1  to determine what else could be needed but what the

2  status is of what had been completed to date, and

3  from there, what was needed.

4      Q.   Was Dan Jaeger a part of that conversation?

5      A.   I would have to look at who was invited to

6  the call per the email.  I see his name on there, so

7  it appears that, yes, he would have been part of

8  that call.

9      Q.   Okay.  So do you have any recollection of

10 what was discussed, I mean, in terms of who

11 determined what was needed as part of the

12 investigation at this point?

13     A.   Dan would have the final say-so because he's

14 the manager on the -- on the file, on the claim.  So

15 he would have dictated, you know, what -- what the

16 next steps were.  We could have all had input or

17 thoughts on where we were with the claim, but Dan

18 would have ultimately guided where to go from there.

19     Q.   Do you recall what your input was at this

20 point of the claim?

21     A.   I do not.

22     Q.   I'm going to go to page 271.  This is a file

23 note from Fred White on October 28th, 2020.

24          The first line says the name Lisa MacCollum.

25          Do you recall that name as part of this

1  claim investigation?

2    A.   I do recall seeing the name.  I believe it

3  was an ex-girlfriend possibly of the insured.

4    Q.   Yeah.  It looks like that's the case.  Fred

5  White writes that she dated Douglas -- I'm reading

6  from the latter part of the first line.  "She dated

7  Douglas Altschuler from approximately 1987 to 1995."

8  So it looks like until about 25 years prior to the

9  claim.

10       I'm going to go down to the -- let's see.

11  Actually, right after that -- I'm sorry -- the

12  highlighted portion of the top of the first

13  paragraph, email on page 271, "She recalled that

14  there were in Santa Monica, California together

15  sometime around 1987 when Douglas saw a Keith

16  Haier" -- I'm assuming it was Haring -- work of art

17  in a B1 gallery, and he went inside and purchased

18  same."

19       So it looks -- is it a reasonable conclusion

20  that Lisa MacCollum is verifying Douglas

21  Altschuler's statement in this respect?

22            MR. SULLIVAN:  Object to the form.

23            THE WITNESS:  That he purchased --

24  sorry.  Go ahead.

25            MR. SULLIVAN:  You're good.

1           THE WITNESS:  That he purchased a Keith

2    Haring work of art in that time frame?

3    BY MR. ZANE:

4       Q.    Correct.

5       A.    Yes.

6       Q.    Okay.  And I'm going to do down to the third

7    paragraph in the beginning of the highlighted

8    portion there as well.  And, "She added she never

9    thought anything of it because Douglas would often

10   purchase works of art and never display them.  She

11   said she found that very odd, but Douglas just

12   thought it was 'cool' to own various expensive works

13   of art."

14          Again, that tends to verify Douglas

15   Altschuler's statement to Chubb?

16          MR. SULLIVAN:  Object to the form of

17   the question.

18          THE WITNESS:  She's stating that he did

19   not regularly display the items --

20   BY MR. ZANE:

21      Q.    Um-hmm.

22      A.    -- so, yes.

23      Q.    This is on page 278 of Exhibit 5.  It's

24   entitled "Subject of conversation with Robert Berman

25   regarding Keith Haring's Andy Mouse Screenprints, 3

KAREN MOORE  FEBRUARY 23, 2023

1  of 30."

2          Do you have any idea why Chvostal writes "3

3  of 30" there?

4      A.    I don't.

5      Q.    Okay.

6      A.    You would have to ask Mr. Chvostal.

7      Q.    Sure.

8          In the highlighted portion toward the bottom

9  of the page -- and this is written by Chvostal -- he

10  writes, "I asked if the insured had mentioned him

11  owning a second set.  He responded that

12  Mr. Altschuler did say he had a second set.  When I

13  asked if he had any idea where Mr. Altschuler had

14  purchased the second set, Mr. Berman immediately

15  replies he thought it was purchased from

16  Mr. Corcoran."

17          So, again, that tends to confirm

18  Mr. Altschuler's story -- would you agree? -- or his

19  statement?

20              MR. SULLIVAN:  Object to the form of

21  the question.

22              You can answer.

23              THE WITNESS:  It confirms that someone

24  else stated that they had been told he had a second

25  set, yes.

1  BY MR. ZANE:

2    Q.   I'm going to page 284 of Exhibit 5, and the

3  Subject:  Opinion of Value -- four screenprints,

4  John Chvostal.

5       Why did Chubb request a second appraisal in

6  this matter, because if you remember, the Gurr Johns

7  had already provided an appraisal in this matter.

8       Do you remember that?

9    A.   I do remember that.

10   Q.   Okay.  And here we have Chvostal later that

11  year providing another one.

12       In your experience, do you typically request

13  multiple appraisals on the same item?

14   A.   As part of our claim investigation on this

15  particular claim, it was determined that the

16  appraiser, Dina Brown, had not physically seen the

17  items that were the subject of the appraisal, and

18  there had been conflicting information about that,

19  whether the insured had actually talked to

20  Ms. Brown, whether she had seen the items, whether

21  there was a prior appraisal or not.

22       So her appraisal was based on a valuation of

23  something she had not seen, had not evaluated to

24  confirm if it was an authentic item.  So in that

25  case, yes, I would say it would be normal for us to

KAREN MOORE  FEBRUARY 23, 2023

1   verify the value of the claimed item as part of the

2   provenance and history investigation that we had

3   completed here.

4       Q.   So I guess what about the Gurr Johns'

5   appraisal?  How did that factor into your

6   consideration about the appraisals?

7       A.   The Gurr John [sic] appraisal was provided

8   to us initially and was just an appraisal.  At that

9   point, we did not have the full background on the

10  provenance or were we aware of the fact that Dina

11  Brown had not seen the item.

12          Mr. Altschuler had provided conflicting

13  information related to whether or not he actually

14  spoke to Ms. Brown, how that appraisal came about

15  with her.  So there was differing factors, and we

16  wanted a full opinion as far -- again, as the

17  provenance and based on the information we had

18  available at that time, further information from

19  Mr. Chvostal as an expert based on his research and

20  information he had located.

21      Q.   Okay.  You mentioned Dina Brown again.  I

22  was asking about the Gurr Johns' appraisal?

23      A.   Right.  I'm saying at the time we received

24  the Gurr John [sic] appraisal, we did not have the

25  full background on Dina Brown and the information

KAREN MOORE  FEBRUARY 23, 2023

1  that she used to prepare her appraisal.

2       So we developed more information through our

3  investigation that would cause us to ask for another

4  appraisal or a full in-depth provenance and

5  appraisal as part of that process based on the new

6  information we had.

7  Q.   Does Dina Brown work for Gurr Johns?

8  A.   Not to my knowledge, no.

9  Q.   Okay.  I guess I'm trying to distinguish the

10  Gurr Johns' appraisal from the Dina Brown appraisal

11  in my question, and I guess you're conflating them.

12       Is it fair to say they were treating them as

13  the same?

14            MR. SULLIVAN:  Object to the form of

15  the question.  Mischaracterizes her testimony.

16            You can answer.

17            THE WITNESS:  I'm not saying that

18  they're the same, no.  I'm saying that the Gurr

19  Johns' appraisal was completed initially early on in

20  the claim before we had a full background regarding

21  the item at hand and the work that Dina Brown had

22  done in relation to her appraisal because new

23  information was provided, so we requested a second

24  analysis of it.

25  ///

KAREN MOORE  FEBRUARY 23, 2023

BY MR. ZANE:

Q.   I guess there's some -- genuine confusion here is that -- are you saying that Gurrs John Brown [sic] -- or the Gurrs John [sic] appraisal is the Dina Brown appraisal, that they're one and the same?

MR. SULLIVAN:  Object to the form of the question.  Misstates her testimony.

You can answer.

THE WITNESS:  No, that's not what I'm saying.

BY MR. ZANE:

Q.   Okay.  Because I guess I -- what prompted you to obtain the second -- let's set Dina Brown aside.  I understand your thoughts about the Dina Brown appraisal.

What prompted you to get a second appraisal after having received one from Gurrs Johns?

MR. SULLIVAN:  Object to the form of the question.  I'm -- respectfully, you can't set aside the Dina Brown appraisal and ask that question.  It simply is --

MR. ZANE:  I guess my question is, why can't I?

MR. SULLIVAN:  Okay.  That's fair.

1    That's a fair question.

2                    THE WITNESS:  It's part of my -- my

3    answer and response as to why a second appraisal was

4    requested.  The Dina Brown appraisal was presented

5    to Chubb as the basis for the value of the item that

6    was being claimed as a part of this loss.

7    BY MR. ZANE:

8        Q.   Okay.

9        A.   Gurr Johns initially evaluated that

10   information, but at the time Gurr Johns' analysis

11   was completed, we had not completed our

12   investigation or obtained the information regarding

13   the provenance.  So based on all of the information

14   we uncovered as part of our investigation, we needed

15   to obtain a value with all of the facts and

16   information.

17       Q.   Okay.  So there were three appraisals here

18   in this matter so far.

19            There's one from Dina Brown; right?

20       A.   Correct.

21       Q.   There's a second from Gurrs Johns; correct?

22       A.   Correct.

23       Q.   And there's a third right now from John

24   Chvostal.

25            And the first appraisal Chubb did not

KAREN MOORE  FEBRUARY 23, 2023

1  procure.  I get it.  Chubb did procure an appraisal

2  from Gurrs Johns, which it appears to be replacing

3  with an appraisal from John Chvostal.

4         What -- and I guess I'm asking why the Gurrs

5  Johns' report needed to be replaced, not why the

6  Dina Brown report needed to be replaced.

7             MR. SULLIVAN:  Object to the form of

8  the question.  Move to strike counsel's statements.

9             You can answer.

10            THE WITNESS:  The report from Gurr

11  Johns wasn't being replaced.  Again, based on

12  information covered -- uncovered throughout the

13  investigation, we did ask Mr. Chvostal to review the

14  provenance and the appraisals provided to date and

15  all of the information uncovered as part of the

16  information to confirm if the valuation was in line.

17  BY MR. ZANE:

18    Q.   But hadn't Gurrs Johns already provided an

19  appraisal?

20            MR. SULLIVAN:  Object to the form of

21  the question.  Asked and answered.

22            You can answer one more time.

23            THE WITNESS:  Gurr Johns had provided

24  an appraisal at the beginning of the claim prior to

25  our investigation and additional information that we

1  uncovered as part of the investigation.

2  BY MR. ZANE:

3    Q.   Okay.  To be honest, I really don't know the

4  relevance.  I guess I don't know what that means,

5  but I'll ask another question here.

6          What information was uncovered that affected

7  the value of a Andy Mouse series print in 2020?

8                MR. SULLIVAN:  Object to the form of

9  the question.  Foundation.

10               You can answer.

11               THE WITNESS:  The information that we

12  uncovered, there were some records related to sales

13  of the item that was being claimed by -- that the

14  item had been sold between the time the insured

15  obtained the item and the time that it was claimed

16  with Chubb.

17               So there's a question of how Dina Brown

18  could provide an appraisal for an item that the

19  insured did not have in his possession, and so as

20  part of the provenance and the information uncovered

21  related to the sales, we did ask for an additional

22  appraisal as part of the analysis of the provenance.

23  BY MR. ZANE:

24    Q.   Why can we not -- why can we not discuss

25  Gurr Johns without discussing Dina Brown?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   I'm explaining to you how they all relate to

2  one another, and --

3    Q.   I understand --

4    A.   -- what the thought process was in retaining

5  these people in the order in which they were

6  retained.

7    Q.   Okay.  And I guess what I'm saying is, after

8  obtaining -- again, I'm not discussing Dina Brown at

9  all.

10       After obtaining an appraisal from Gurr

11  Johns, what deficiency did you notice in the Gurr

12  Johns' appraisal that prompted you to request a

13  second appraisal?

14            MR. SULLIVAN:  I object to the form of

15  the question.  It's been asked and answered.  At

16  this time, I'm compelled to make a record.

17            Provenance is the history relating to

18  the piece of art.  The initial appraisal submitted

19  by the insured reportedly by Dina Brown was found to

20  be in error and obtained through misrepresentations.

21            The second appraisal done initially as

22  part of the claims handling was dependent in part on

23  the provenance of the appraisal created by

24  Ms. Brown.  When that was found to be faulty and

25  there are inconsistencies with respect to the

1   history of the item, a new appraisal was done.

2   MR. ZANE:  I guess -- I mean, I

3   appreciate that.  I do -- you know, going forward, I

4   do need -- this is the kind of thing that I needed

5   Karen to say, and I was looking -- I was asking her

6   directly to explain that.

7   MR. SULLIVAN:  She was -- she answered

8   it that way.

9   MR. ZANE:  She did not.

10   MR. SULLIVAN:  You asked her four times

11   and --

12   MR. ZANE:  She did not answer it, and

13   she dodged it each time by talking about Dina Brown.

14   MR. SULLIVAN:  That's simply not true.

15   Simply not true.

16   MR. ZANE:  So I'm going to strike the

17   testimony from counsel, of course.

18   BY MR. ZANE:

19   Q.   How -- how is the appraisal -- appraised

20   value of an item related to its provenance --

21   MR. SULLIVAN:  Form and foundation.

22   BY MR. ZANE:

23   Q.   -- in your understanding?

24   MR. SULLIVAN:  Form and foundation.

25   THE WITNESS:  The appraisal and the

1    provenance are separate.

2    BY MR. ZANE:

3        Q.   Well, if they're separate and new

4    information came up about the provenance, what

5    effect does that have on the appraisal?

6        A.   Because we would --

7                 MR. SULLIVAN:  Form and foundation.

8                 Go ahead.

9                 THE WITNESS:  We would then look to

10   verify if the appraisal was in line that was

11   initially presented to us based upon the information

12   we uncovered regarding the sales.

13   BY MR. ZANE:

14       Q.   Well, earlier you said that there's --

15   additional provenance information required you to

16   obtain a new appraisal, and I'm just trying to find

17   out how provenance information would require you to

18   obtain a new appraisal.

19                 MR. SULLIVAN:  Form.  Mischaracterizes

20   her testimony.

21                 You can answer.

22                 THE WITNESS:  As I tried to explain --

23   and I guess maybe I'm just not doing a good job to

24   your satisfaction, and I apologize -- the

25   information that we obtained regarding the history

1   of the item requires us to further verify the

2   appraisal information.

3            The appraisal presented by Dina Brown

4   was faulty.  That's what Gurr Johns looked at when

5   they did their initial assessment.  And because we

6   found that her appraisal had been completed under

7   certain circumstances that we were not aware of at

8   that time, we did ask for another appraisal to be

9   completed.

10  BY MR. ZANE:

11    Q.   Okay.  And I'm going to stick with this

12  opinion, I guess this appraisal provided by

13  Chvostal, and he has some valuation opinions -- I'm

14  on page 287 -- and he has a table of public sales

15  and sets of Andy Mouse prints.

16           At the bottom of the page, he has a sale

17  date of November 11th, 2001, and it looks like it

18  sold for $52,500.

19           Do you see that?

20    A.   Yes.

21    Q.   Okay.  Now, I mean, is my understanding of

22  that -- and correct me if I'm -- to your

23  understanding if it's wrong, is that, you know, that

24  is more or less an indicator of market value at the

25  time in John Chvostal's opinion.

KAREN MOORE  FEBRUARY 23, 2023

1   Is that how you interpreted it?

2          MR. SULLIVAN:  Object to form and

3   foundation.

4          You can answer.

5          THE WITNESS:  The records that he was

6   providing was showing values that sales had been

7   completed at of similar items.

8   BY MR. ZANE:

9   Q.   Okay.  And one of them was in 2001, was

10  52,500; correct?

11  A.   Correct.

12  Q.   And the next page, 288, there's another sale

13  a month later for $56,400; right?

14  A.   Correct.

15  Q.   And those two together, I mean, it's

16  obvious.  They indicate that in Chvostal's opinion,

17  the value of them was worth, you know, right around

18  $50,000 or so if they were in the same condition.

19  Is that fair?

20  A.   Those are the values he indicated that they

21  sold for at the time based on, yes, their condition

22  and what was sold.

23  Q.   Okay.  And the third sale is September of

24  2010 on page 288.  It's two thousand seven dollars

25  eight hundred seventy [sic] -- $207,870.  It had

1  appreciated -- according to this, it seems to have

2  appreciated a little bit in that nine-year period.

3  Would you agree?

4      A.    The value did jump between those sales

5  periods, yes.

6      Q.    It seems to have taken another jump after

7  that in April of 2015.  It sold for $629,000.

8          Do you see that?

9      A.    I do see that.

10     Q.    Does -- looking at that, does that make the

11 Thomas Altschuler's [sic] increase in the insured

12 value of his art seem more reasonable?

13             MR. SULLIVAN:  Form.

14             THE WITNESS:  I'm not an art expert, so

15 I can't state that.

16 BY MR. ZANE:

17     Q.    But if a similar item sold for 629,000,

18 would you expect him to keep the insured value at

19 250,000?

20             MR. SULLIVAN:  Form and foundation.

21             You can answer.

22             THE WITNESS:  Not necessarily.  I mean,

23 I think it's reasonable that any insured looks at

24 any item on their policy and, you know, has it

25 re-appraised or looks at the value over time.  But

KAREN MOORE  FEBRUARY 23, 2023

1  they're all, you know, individually based on the

2  specific item and the condition and other factors.

3  BY MR. ZANE:

4    Q.   Of course.

5         It looks like three years after that, one

6  sold for $967,000.  Again, it seems to be

7  appreciating.  We can both -- it seems to be

8  appreciating.  We as both non-art experts can draw

9  that reasonable conclusion from Mr. Chvostal's work?

10   A.   The sale amounts did go up as noted in the

11  report.  Yes, I do agree with that.

12   Q.   Yeah.

13        We've got his conclusion at the end, which

14  is at the bottom of page 289.  "Therefore, I

15  estimate the replacement value of the subject

16  property would have been no more than 836,000

17  hammer/base in December of 2019 or 1,064,800

18  including estimated premiums."

19        Do you see that there?

20   A.   Yes.

21   Q.   Okay.  Was that your understanding of

22  Mr. Chvostal's opinion of the appraised value of the

23  art at the time?

24        MR. SULLIVAN:  Object to the form and

25  foundation.

```
 1              You can answer.
 2              THE WITNESS:  He noted the estimation
 3   of the values that he saw that would be in line for
 4   that type of item, yes.
 5   BY MR. ZANE:
 6     Q.   But clearly at this point, it appears to be
 7   reasonable to increase the insurance value from
 8   $250,000; right?
 9              MR. SULLIVAN:  Object to the form.
10              You can answer.
11              THE WITNESS:  If he owned the item,
12   then I would say it did make sense for him to obtain
13   a new appraisal and determine the value and increase
14   it if necessary, yes.
15   BY MR. ZANE:
16     Q.   And I'm going to go to the next page, 290.
17   This is something you entered on to the system, but
18   it looks like it came from an email from Rubin on
19   November 23rd of 2020.  And I'll just cut to the
20   attachment.
21              Do you remember this letter from Robert
22   Berman Gallery?
23     A.   No, not off the top of my head, but if it
24   was attached to the documentation, it would have
25   been in the file, and I would have seen it, yes.
```

KAREN MOORE  FEBRUARY 23, 2023

1    Q.    Okay.  This says on the third paragraph,

2    "The item Mr. Altschuler purchased was a complete

3    suite or works containing four very high quality

4    silkscreens of a limited edition of 30."

5         Do you see that at the top of the third

6    paragraph?

7    A.    I do.

8    Q.    So I interpret this as the guy who sold

9    Mr. Altschuler the art is writing to Chubb and

10   saying that I sold him this art.

11        Is that how you interpret this letter?

12             MR. SULLIVAN:  Object to the form of

13   the question.

14             You can answer.

15             THE WITNESS:  This letter would state

16   that the item was sold to the insured at some point,

17   yes.

18   BY MR. ZANE:

19   Q.    That tends to verify what Mr. Altschuler

20   told Chubb about his ownership of the art.  Would

21   you agree?

22             MR. SULLIVAN:  Object to the form of

23   the question.

24             THE WITNESS:  It verifies that this

25   person is saying he purchased the item at one time.

1  It doesn't verify what happened to the item after

2  that sale.

3  BY MR. ZANE:

4     Q.   On the second paragraph on page 292, it

5  says, "Mr. Altschuler continued to be a client of

6  our gallery for the next several years, purchasing

7  works by Victor Hayden and other established and

8  emerging artists."

9        Do you see that?

10    A.   I do.

11    Q.   And you remember earlier where Mr. --

12  Mr. Altschuler had indicated he's a frequent

13  purchaser of artworks?

14    A.   Yes.

15    Q.   And this seems to support that statement as

16  well.  Would you agree?

17    A.   It does indicate that he purchased art many

18  times, yes, over the years.

19    Q.   I'm going to move off of this, and I'm going

20  to bring up -- this is the provenance opinion.

21        MR. ZANE:  And now, Bobby, I'm not

22  going to lie to you.  My memory serves, and I think

23  this might have been entered as an exhibit in Dina

24  Brown, but I can't remember which one -- which

25  exhibit number it was.

1          MR. SULLIVAN:  Okay.  I don't know

2    because I didn't do Dina, so . . .

3          MR. ZANE:  Yeah.  Make this --

4          MR. SULLIVAN:  Thirty?

5          MR. ZANE:  I think it's -- let's make

6    it 31, although I suspect it was Exhibit 29 for the

7    other one.

8          MR. SULLIVAN:  Okay.  No objection.

9          (Whereupon, Exhibit No. 31 was marked

10   for identification.)

11   BY MR. ZANE:

12   Q.    This is provenance opinions again for

13   document date 8 November 2021 from Chvostal.

14          Do you remember having reviewed this?

15   A.    I would have at some point, yes.

16   Q.    Okay.  But do you remember doing so?

17   A.    If it's in the claim file, I would have.

18   This specific report, I can't say.  I can look at it

19   and say, yes, but if it's in our claim file, I would

20   have reviewed it.

21   Q.    That's fair.

22          And I'm going to page 4 of this document.  I

23   guess it's Exhibit 31.  And it says, "Opinions

24   Regarding the Provenance and Identity of the Claimed

25   Property."  And he has a series of opinions.  I just

KAREN MOORE  FEBRUARY 23, 2023

1  want to run through those.

2       His first is that "I am 100 percent the

3  insureds did not own and could not have owned the

4  complete set of Andy Mouse prints by Keith Haring

5  bearing the edition number 3/30, which is uniquely

6  described in the 2018 Dina Brown appraisal document,

7  at the time of the claimed loss event."

8       Do you see that there?

9    A.    I do.

10   Q.    Okay.  Did you understand that was one of

11  Chvostal's conclusions?

12   A.    Yes.

13   Q.    Okay.  And now this is specific to the

14  number -- again, this is what I'm going to call this

15  the edition number issue whether it's 3 of 30 or

16  it's not 3 of 30.

17       So if Douglas Altschuler is not claiming to

18  have owned 3 of 30 but just some number of 30, this

19  is less relevant; right?

20            MR. SULLIVAN:  Object to the form of

21  the question.

22            THE WITNESS:  I don't think that it was

23  because the item listed on the policy was "edition

24  of 30."  This is what the insured initially had told

25  us he was claiming, and then throughout the claim,

KAREN MOORE  FEBRUARY 23, 2023

```
1   he told us of a second set of prints that he had
2   purchased of the same item, but there was never any
3   supporting documentation for that second set of
4   prints.  And as part of our investigation, it was
5   determined that the item he did purchase had been
6   sold prior to the claimed loss with Chubb.
7   BY MR. ZANE:
8      Q.   Did Douglas Altschuler -- strike that.
9           Remember -- and I can pick up the dockets,
10  if you would like, but when you had an email
11  exchange with Ann, she confirmed -- Ann from
12  underwriting -- she confirmed that Douglas
13  Altschuler did not name an edition number 3/30 when
14  he initiated coverage under the Chubb policy for
15  this art.
16          Do you remember that?
17          MR. SULLIVAN:  Object to the form.
18  Misstates the file.
19          You can answer.
20          THE WITNESS:  The file does state that
21  it was "edition of 30" on the appraisal that had
22  been documented, and if I remember correctly without
23  looking at the file, I believe that's the way it was
24  listed on the claim -- on the coverage, rather.
25  ///
```

KAREN MOORE  FEBRUARY 23, 2023

1    BY MR. ZANE:

2      Q.   Do you know who told Chubb -- strike that.

3           Do you know who told Chubb it was Edition

4    No. 3 of 30?

5                MR. SULLIVAN:  Object to the form.

6    BY MR. ZANE:

7      Q.   If you don't, that's fair.

8      A.   I'm not sure.

9      Q.   Okay.  So if Douglas Altschuler did not tell

10   Chubb it was 3 of 30, then Opinion No. 1 is much

11   less relevant?

12               MR. SULLIVAN:  Objection to the form of

13   the question.  Assumes facts not in evidence.

14               You can answer.

15               THE WITNESS:  I believe that at one

16   point during the claim, the insured did indicate

17   that it was 3 of 30 but, then he changed his

18   testimony or the information he provided, saying he

19   wasn't certain if it was an edition or the artist

20   prints that he had purchased separately.  He wasn't

21   clear any longer.

22   BY MR. ZANE:

23     Q.   Okay.  So to put it more neutrally, the

24   relevance of Opinion 1 really depends on whether

25   Douglas Altschuler is claiming the loss of 3 of 30

KAREN MOORE  FEBRUARY 23, 2023

1   instead of an edition number; correct?

2                  MR. SULLIVAN:  Object to the form of

3   the question.

4                  You can answer.

5                  THE WITNESS:  The way the item was

6   listed on the policy as being "edition of 30" and

7   not the artist's print, the insured indicated that

8   that -- it was the item that was being claimed, that

9   because that was the item listed on the policy,

10  that's what he was making a claim for.

11  BY MR. ZANE:

12      Q.   In Opinion No. 1 here, all he's saying here

13  is that he is certain that he could not have owned

14  edition number 3 of 30; right?

15      A.   At the time of the claim.

16      Q.   Right.

17      A.   Not that he never owned it, but at the time

18  of the claim.

19      Q.   Right.  Fair.  Okay.

20                  But he's saying that he -- at the time of

21  the claim, he's certain that Douglas Altschuler did

22  not own 3 of 30; right?

23      A.   That's what I believe I just stated, at the

24  time of the claim.

25      Q.   I'm just cleaning it up, but, yeah, that's

1  right.  We agree on that.

2         So that's only relevant if Douglas

3  Altschuler says that he owns 3 of 30; right?

4                   MR. SULLIVAN:  Object to the form of

5  the question.  It's been asked and answered.

6                   And you can answer.  Last time.

7                   THE WITNESS:  That is the item that the

8  insured specified was being claimed.  The edition of

9  30 on the policy, that is the item listed on the

10  policy for which a claim was being made.  And the

11  only other item he owned was the artist prints,

12  which didn't have the edition, according to

13  Mr. Altschuler, so that's -- the edition of 30 was

14  the claimed item.

15  BY MR. ZANE:

16    Q.  Okay.  I'm not sure honestly if you agree or

17  disagree with me there.

18         So this statement here -- let's put it a

19  different way.

20    A.  Okay.

21    Q.  Opinion No. 1 has nothing to do with edition

22  number 1 of 30; right?

23    A.  No, it does not.

24    Q.  It has nothing to do with number 2 of 30;

25  correct?

KAREN MOORE  FEBRUARY 23, 2023

1    A.    It's related to edition 3 of 30.

2    Q.    Right.

3          So if we're not talking about edition 3 of

4    30, that's not relevant; right?

5          MR. SULLIVAN:  Object to the form of

6    the question.  Assumes facts not in evidence.

7          You can answer.

8          THE WITNESS:  The insured indicated he

9    was claiming the edition of 30 in which he only

10   owned one edition of 30, according to his testimony.

11   And then he brought into evidence that he had a

12   second set, which would not have been an edition of

13   30 and which was not listed on the policy.  So he's

14   making a claim for the edition of 30 of the Andy

15   Mouse prints.

16   BY MR. ZANE:

17   Q.    That has nothing to do with my question with

18   all due respect, so I guess I'll have to go through

19   every number.

20         Does that have anything to do with 4 of 30,

21   Opinion No. 1?

22   A.    Opinion No. 1 states specifically edition 3

23   of 30.

24   Q.    Correct.

25         And I'm just simply -- the common sense

1    conclusion, that if we're talking about anything

2    other than edition three of 30, Opinion No. 1 is not

3    relevant?

4                MR. SULLIVAN:  Object to the form of

5    question.  It's been asked and answered.

6                MR. ZANE:  It's been asked.

7                MR. SULLIVAN:  It's been answered.

8                You can answer one more time, Karen,

9    and then we're moving on.

10               THE WITNESS:  The insured claimed the

11   item edition of 30.  He indicated it was edition 3

12   of 30.  He only had one edition of 30, and that is

13   what was on the policy and what was being claimed as

14   a part of this loss.

15   BY MR. ZANE:

16     Q.   Okay.  Opinion No. 1 has nothing to do with

17   Exhibit No. 5 -- with edition number 5 of 30;

18   correct?

19     A.   Correct.

20     Q.   It has nothing to do with number 6 of 30;

21   correct?

22     A.   Correct.

23     Q.   Opinion No. 1 has nothing to do with number

24   7 of 30; correct?

25     A.   Correct.

KAREN MOORE  FEBRUARY 23, 2023

1    Q.   Opinion No. 1 has nothing to do with number

2    8 of 30; correct?

3    A.   Correct.

4    Q.   Opinion No. 1 has nothing to do with number

5    9 of 30; correct?

6    A.   Correct.

7    Q.   Opinion No. 1 has nothing to do with number

8    10 of 30; correct?

9    A.   Correct.

10   Q.   Opinion No. 1 has nothing to do with number

11   11 of 30; correct?

12   A.   Correct.

13   Q.   Opinion No. 1 has nothing to do with number

14   12 of 30; correct?

15   A.   Correct.

16           MR. SULLIVAN:  We'll stipulate it has

17   nothing to do with 14 all the way to 30 of 30.

18           MR. ZANE:  Thank you.

19   BY MR. ZANE:

20   Q.   It has nothing to do with artist proofs;

21   correct?

22   A.   Correct.

23   Q.   And I'm sure there's some other format

24   that's not a numbered edition.

25           It has nothing to do with any of those

KAREN MOORE  FEBRUARY 23, 2023

1    either; correct?

2      A.    Correct.

3      Q.    I wish I was an art guy.  Okay.

4            Moving to Opinion No. 2, "I am 100 percent

5    certain that the framed item depicted in the image

6    that Mr. Altschuler's attorney represented as a

7    photo of Douglas Altschuler's ex-girlfriend with one

8    of the silk screens was/is an original silk screen

9    from the Haring's Andy Mouse suite published in

10   1986."

11           Actually, I think we all agree about that

12   statement; right?  I mean, Douglas Altschuler and

13   Chubb both believe Opinion No. 2 is correct.

14           Is that your understanding.

15           MR. SULLIVAN:  I'll object.  That

16   mischaracterizes Doug's testimony.

17           But you can answer.

18           THE WITNESS:  I see what it's stating,

19   and I don't disagree with that from the knowledge

20   that he did introduce a photograph indicating that

21   it was one of the silk screens from the set of four

22   back in 1986 or '87.

23   BY MR. ZANE:

24     Q.    Okay.  Fair enough.

25           Move to Opinion No. 3.  "I have a high

KAREN MOORE  FEBRUARY 23, 2023

1   degree of confidence, having examined high-quality

2   images of tens of thousands of prints from the

3   numbered edition of 30, that the frame print in the

4   image is from that numbered edition based on the

5   form and character of the inscription in the bottom

6   margin."

7        Is that -- basically, it seems to be that

8   he's simply saying that whatever was in the picture

9   with Lisa MacCollum was a numbered edition is what

10  he seems to say.

11       Is that -- is that your takeaway from it?

12  A.   I do see that that is Mr. Chvostal's

13  opinion, that it was part of a numbered edition.

14  Q.   Okay.  And what is the significance of that

15  opinion to you?

16  A.   That he had one of the four silk screens at

17  some point of the numbered edition set of 30.

18  Q.   Okay.  And further down in Opinion 3 -- it's

19  the second paragraph from the bottom -- it's what

20  you described.  He -- he -- Chvostal quotes from

21  Altschuler's examination under oath where he says in

22  the highlighted portion on page 5, "I said to her,

23  Elaine, I thought it was 3 of 30, but I was not

24  100 percent positive.  I said I don't know whether

25  it's 3 of 30 or an AP."

KAREN MOORE  FEBRUARY 23, 2023

1    That's what you were describing.  Is that
2  fair?
3    A.  Yes.  That was the change in the information
4  he had provided initially in his recorded statement
5  versus the information he provided at the EUO.
6    Q.  In Opinion 4, Mr. Chvostal writes, "Based on
7  the insureds' own image and the statements
8  Ms. MacCollum made to Fred White reproduced in
9  Appendix 3 below, I believe that Mr. Altschuler has
10  only provided convincing evidence to the carrier
11  that he once owned a single print from Haring's
12  numbered edition of 30, the one in the picture."
13    Now, are you aware that Corcoran Gallery --
14  and if you're not aware, then that's absolutely --
15  just answer honestly.
16    Are you aware that the James Corcoran
17  Gallery has provided evidence or documentation that
18  Douglas Altschuler traded a complete set of the Andy
19  Mouse in or around 2001?
20    MR. SULLIVAN:  Form.
21    THE WITNESS:  Can you restate it?
22  BY MR. ZANE:
23    Q.  No problem.  Yeah.  That was one of my lousy
24  questions.
25    MR. ZANE:  And, Bobby, the first one of

1  this deposition.

2  BY MR. ZANE:

3    Q.    He says here that, in his opinion, he's only

4  provided evidence to Chubb that he owned a single

5  print for the numbered 30, and I interpret that to

6  mean because these prints are four silkscreens, that

7  he only one owned one, the one that was in the

8  picture with Lisa MacCollum.

9        Is that your interpretation of what he is

10  saying?

11    A.    Based on the documentation that was provided

12  throughout the claim, that was the only evidence or

13  documentation that he had owned that item from that

14  edition set.

15    Q.    But hadn't Robert Berman already told you

16  that he sold a complete set to Douglas Altschuler?

17            MR. SULLIVAN:  Object to the form.

18            THE WITNESS:  I would have to look back

19  at the documentation and when it was provided.

20  BY MR. ZANE:

21    Q.    Okay.

22    A.    I believe he provided it to Chubb, but I'm

23  not sure what information was provided and when.

24    Q.    Sure.  Okay.  And we can do that real

25  quickly.

KAREN MOORE  FEBRUARY 23, 2023

1          This was a November 8th, 2021, letter.  And

2     going to deposition 5 -- back to deposition 5,

3     August 30th, 2020, letter from Berman that was

4     entered by you on to the file on -- probably about a

5     year before their provenance, November of 2020,

6     where he says, "The item Mr. Altschuler purchased

7     was a complete set" -- I'm reading from this third

8     paragraph -- "containing four very high quality

9     silkscreens of a limited edition of 30."

10         In light of that letter, did you ask

11    Mr. Chvostal about his opinion that Douglas

12    Altschuler could have only owned one in light of

13    Roger -- Robert Berman's letter?

14    A.   The insured only provided us with the

15    documentation regarding the one print, not the full

16    set of prints that he had in his possession.  So

17    that's what I took that statement based upon, based

18    upon the information provided by Mr. Altschuler.

19    Q.   Did -- as an SIU adjuster, did you not

20    believe Robert Berman when he sold -- when he stated

21    to Chubb that he had sold the prints to Douglas

22    Altschuler?

23              MR. SULLIVAN:  Object to the form.

24              THE WITNESS:  I didn't have an opinion

25    on it.  Our investigation was still taking place.

KAREN MOORE  FEBRUARY 23, 2023

BY MR. ZANE:

Q.   Did you -- again, did you ask Mr. Chvostal about his statement that Altschuler could only have owned a partial set if -- based -- you know, in light of Robert Berman's letter?

A.   Mr. Chvostal is stating on here that based on the insured's own image and statements that Ms. MacCollum made to our investigator, that he had only provided documentation and evidence that he owned one of the four from the edition set.

Q.   Okay.  So when he says here, "I believe Mr. Altschuler has only provided convincing evidence to the carrier that he once owned a single print from Haring's numbered edition of 30," so, I mean, is it the logical interpretation that Mr. Chvostal does not find Berman's letter to be convincing?

MR. SULLIVAN:  Form and foundation.

THE WITNESS:  I don't think he's stating that he doesn't find it convincing.  He's taking in totality all of the information that was presented, and you're showing just one single part of that, so.

BY MR. ZANE:

Q.   Sure.  But they both -- they can't -- I mean, both allegations can't be right; right?  I

KAREN MOORE  FEBRUARY 23, 2023

1 mean, if Berman says, "I sold him a complete set,"

2 and Chvostal says, "He only owned one panel," they

3 can't both be correct; right?

4          MR. SULLIVAN:  Object to the form.

5          THE WITNESS:  Well, Mr. Chvostal is

6 stating that he only produced documentation showing

7 one item out of the set of four.

8 BY MR. ZANE:

9   Q.   Okay.  In Opinion No. 5, "I do not believe

10 that Mr. Altschuler purchased a second set of Andy

11 Mouse prints or any part of a set from Keith Haring

12 or any other source."

13       And he says, "I do not believe he purchased

14 it."  Does he offer any evidence?  I mean, I guess,

15 what is your opinion -- your understanding was --

16 was of the -- the reason -- Mr. Chvostal's reasoning

17 that he conveyed to you about this opinion?

18   A.   Through the investigation, we uncovered

19 documentation that supported that one set had been

20 sold, and there was no supporting documentation that

21 Mr. Altschuler ever owned a second set.

22       We tried to verify that through different

23 means throughout the claim investigation.  I believe

24 including at one point, we followed up with the

25 gallery that would have been responsible for that,

1    and we were not able to verify that a second set was

2    ever sold to Mr. Altschuler.

3        Q.   You mentioned just right there that you came

4    across evidence that a set had been sold.

5             Well, doesn't that contradict Opinion No. 4?

6                 MR. SULLIVAN:  Object to the form of

7    the question.

8                 THE WITNESS:  I think what I've stated

9    to you is in this opinion, to me, the way I read it,

10   Mr. Chvostal is stating that the insured had only

11   produced an image of one of the four and that based

12   on the information from Ms. MacCollum in addition to

13   that one image, that he had only shown us that he

14   had the one item.

15   BY MR. ZANE:

16       Q.   But you mentioned a second ago -- and I

17   wrote it down -- "a set had been sold."

18       A.   Correct.

19            So if he did have a set, then it appears

20   that possibly it would have been sold, but the only

21   thing I can take from Opinion 4 is that he's

22   speaking of that one item at that given time, and in

23   the full context of the report, it would be

24   explained further.

25       Q.   I guess, what information were you referring

KAREN MOORE  FEBRUARY 23, 2023

1  to when you said you had information that a set had

2  been sold?

3  A.  There were records on Artnet, I believe, and

4  as part of the provenance, that there had been sales

5  of edition 3 of 30 after the insured stated he

6  purchased it but prior to him presenting the claim

7  to Chubb.

8  Q.  Okay.  On page 7, you see that

9  Mr. Altschuler's accounts of his contacts with

10 Haring are consistent.

11      Do you see that?

12 A.  I do see that.

13 Q.  Okay.  Would that -- a similar question.

14 Would that tend to at least -- so Mr. Chvostal

15 counts some portions of what Mr. Altschuler has said

16 to you were consistent.  Is that fair?

17      MR. SULLIVAN:  Object to the form.

18      THE WITNESS:  It's an indication that

19 Mr. Altschuler did have contact with the artist but

20 not necessarily purchased items from the artist.  So

21 it's just indicating that he did at some point have

22 contact with him.

23 BY MR. ZANE:

24 Q.  Okay.  And, you know, the final highlighting

25 on the page -- the highlighted portion on the page

KAREN MOORE  FEBRUARY 23, 2023

1   is, "Given the complexities of later Haring life and

2   business and the complete lack of specific or

3   verifiable details in Mr. Altschuler's narrative, I

4   do not believe that the artist who was in the

5   advanced stages of terminal illness would have

6   conducted direct sales of his works to the insured."

7        You see that there?

8   A.   I do.

9   Q.   Do you see anything there except

10  Mr. Chvostal's personal opinion?

11  A.   I believe that's his professional opinion,

12  not a personal opinion, based upon the information

13  that he had obtained during the investigation with

14  regard to sales and that particular item and sales

15  by Mr. Haring and by the gallery that sold his

16  works.  So it was his professional opinion based on

17  the information that he uncovered.

18  Q.   But there's a degree of speculation there,

19  wouldn't you agree?

20        MR. SULLIVAN:  Object to the form of

21  the question.

22        THE WITNESS:  No.  I don't agree with

23  that.

24  BY MR. ZANE:

25  Q.   That's not speculation?

1          MR. SULLIVAN:  Form.

2          You can answer.

3          THE WITNESS:  I don't believe that.

4   BY MR. ZANE:

5     Q.   Okay.  I'm going to go back to depo

6   Exhibit No. 5.

7          This is something you entered on

8   December 9th, 2021.  It looks like a few weeks after

9   Chvostal's second opinion, and you're writing to

10  Dan, it seems.

11         That's Dan Jaeger, I presume?

12    A.   Correct.

13    Q.   "Lisa, Fred, and I have" -- "Lisa, Fred, and

14  I have reviewed the opinion letter from EUO counsel

15  and are in agreement with recommendation to deny as

16  outlined.  If you agree, a draft denial letter is

17  also included for review/approval."

18         First of all, which -- so it appears that

19  Mr. Rubin recommended denial, or with whom are you

20  agreeing?  Strike that.

21         With whom are you in agreement with

22  recommendation to deny?

23    A.   Lisa, Fred, and I reviewed the opinion

24  letter, as I stated in my note, from counsel, which

25  would be full summary of the claim investigation

1  that had been completed to date, including the

2  examination under oath.  And based on that and the

3  legal obligations of the policy, we did feel that a

4  denial was in order.

5    Q.  Okay.  It says, "A draft denial letter is

6  also included for review/approval."

7         Do you recall who drafted that denial

8  letter?

9    A.  We would ask counsel for a draft denial --

10 EUO counsel for a draft denial.  However, myself or

11 Lisa, who had taken over the file from me at that

12 point, would have made any changes we felt were

13 necessary or included any additional information,

14 and the letter would come from the company.

15        So it's just a draft provided by Mr. Rubin,

16 but we make, you know, changes as necessary and

17 changes to the format or what's included in the

18 letter.

19   Q.  Okay.  Do you recall that you made any

20 changes on this particular letter?

21   A.  Again, Lisa is the one that would have

22 reviewed the letter and made any changes as she was

23 the claim owner by that point, so I'm not sure if

24 she did.

25   Q.  Okay.  Do you recall -- what was the reason

1  for Lisa joining and you stepping away from the

2  claim?

3      A.   I had accepted a different position within

4  SIU at that point, so the claim investigation was

5  transferred to her.

6      Q.   Okay.  What was your initial position and

7  then your subsequent?

8      A.   SIU examiner was my initial position, and I

9  was promoted to SIU supervisor.

10     Q.   Well, congrats.

11     A.   Thank you.

12     Q.   What is the -- what is the role of an SIU

13  examiner?

14     A.   It's the person that kind of manages the

15  file as the claim owner ultimately is responsible

16  for making -- sending the coverage letter and, you

17  know, supervising the investigation in conjunction

18  with the investigator and the SIU manager and

19  supervisor.

20     Q.   Okay.  Do you know what Dan Jaeger's

21  position is?

22     A.   He's the SIU manager.

23     Q.   Okay.  We are on December 15th from Dan who

24  is sending it to you and then copying Fred White.

25  And this entry writes that, "On 12/14/21, these

KAREN MOORE   FEBRUARY 23, 2023

1  claims were discussed with senior claims leadership

2  and authority was granted to deny the claim for the

3  Keith Haring silkscreens based on violation of the

4  concealment or fraud provision of the policy."

5       Do you see that?

6  A.    I do.

7  Q.    First of all, who is senior claims

8  leadership?

9  A.    Those would be Dan's managers.

10 Q.    Okay.  And we're referring to the provision

11 of the policy, so I'll bring that up.  It's been

12 previously marked as Deposition Exhibit 1.

13      And are you familiar with this policy?

14 A.    Yes.

15 Q.    Okay.  And here we go, the concealment or

16 fraud provision.

17      And I imagine in SIU, this is a provision

18 with which you work from time to time?

19 A.    Yes.

20 Q.    Okay.  Is it more or less the same every

21 time?

22 A.    It varies by state.  The wording may change,

23 but the concept behind it is the same.

24 Q.    Okay.  And "We do not provide coverage if

25 you or any covered person has intentionally

KAREN MOORE  FEBRUARY 23, 2023

1  concealed or misrepresented any material fact

2  relating to this policy before or after a loss."

3       You see that there?  I mean, it says what it

4  says; right?

5    A.    Correct.

6    Q.    Okay.  So this is the policy upon which

7  you -- that Dan is describing as the basis to deny

8  coverage?

9    A.    Yes.

10   Q.    Okay.  I'm back to depo Exhibit 5.

11       The second from the last sentence of

12  Paragraph 1 of page 301 is "Attached is a proposed

13  letter for your review.  If you have no changes, you

14  are authorized to issue the letter to the insured's

15  attorney via email and regular mail.  No one should

16  be copied on the letter."

17       I guess he was addressing it to you, so did

18  you -- do you recall reviewing the letter?

19   A.    He addressed it to me and then subsequently

20  he realized that I was no longer the claim owner and

21  SIU examiner on the file, so he resent it to Lisa.

22   Q.    Okay.  So you ultimately did not provide the

23  letter?

24   A.    I did not, no.

25   Q.    Okay.  Going back to the top here, it's

1    being denied based on violation of the concealment

2    and fraud provision of the policy.  I guess I'll

3    take them one at a time.

4         What specifically are you referring to for

5    the violation of the concealment provision?

6    A.    There were several things that were

7    developed as part of the claim investigation.  You

8    know, it was the insured providing an appraisal for

9    an item that he couldn't have obtained if the item

10   had been sold.  It was him not disclosing to us that

11   the item had been sold prior to him claiming it.

12        I'm trying to think what else there was.

13   The information he presented to us initially in his

14   recorded statement had changed, and he provided

15   different testimony at his examination under oath,

16   so there was conflicting information, and there's

17   information that he had not shared as part of the

18   claim.

19   Q.    But he shared at his EUO?

20   A.    I'm sorry.

21   Q.    You said he had not shared at the time of

22   his claim, but he shared information at the EUO?

23   A.    There was conflicting information that he

24   had provided from the recorded statement to the EUO

25   considering he initially didn't mention that there

1  was a second set of the prints that he was claiming.

2        He didn't mention that the edition that he

3  was claiming had been sold prior to the loss

4  occurring.  He did not mention to us that -- or I

5  think he had told us that he had spoken to Dina

6  Brown specifically about obtaining the appraisal,

7  and then later changed that testimony to say he had

8  never spoken to her or that he wasn't even sure if

9  he spoke to her, and that that was, you know,

10  prepared on his behalf and submitted to Chubb, which

11  I'm not sure how you submit an appraisal for an item

12  that you no longer own.

13    Q.  It seems -- because when you mentioned about

14  the appraisal report couldn't have been obtained

15  because he didn't own 3 of -- you know, I'm assuming

16  you're referring to the fact that he's -- that you

17  say that he claims to be owning 3 of 30 and he --

18    A.  Yes.  That's the item listed on the policy.

19    Q.  If he's not -- well, if he's not claimed to

20  have owned 3 of 30 -- remember he -- as you point

21  out, that he has also stated he doesn't remember

22  what edition it is?

23    A.  Well, he changed that -- that testimony

24  throughout the course of the claim.

25    Q.  Um-hmm.

1        It seems like -- then all this is really

2  predicated upon him claiming 3 of 30.

3            MR. SULLIVAN:  Object to the form.

4  BY MR. ZANE:

5    Q.   Would you agree?

6            MR. SULLIVAN:  Form.

7            THE WITNESS:  It's on several things.

8  I mean, he's stating that he purchased a second set

9  of prints because there was the sale of the first

10 set of prints to which he couldn't have owned it, so

11 he introduced a narrative of a second set of prints,

12 if you will, which was never proven to be the case

13 and couldn't be proven to show that he even owned a

14 second set of prints.

15 BY MR. ZANE:

16   Q.   It could be proved later -- and, again,

17 I'm -- you may not be familiar with this, but the

18 Corcoran Gallery has indicated that he did own 5 of

19 30 at one point.

20       Would that undermine any of your conclusions

21 here?

22            MR. SULLIVAN:  Object to the form of

23 the question.

24            THE WITNESS:  I don't believe anyone

25 ever stated that he owned Edition 5 of 30.

KAREN MOORE  FEBRUARY 23, 2023

1  BY MR. ZANE:

2    Q.   Well, your counsel can object to how I'm

3  phrasing it perhaps, but the Corcoran Gallery has

4  provided its documentation indicating that he did.

5              MR. SULLIVAN:  Object to the form of

6  the question.

7              THE WITNESS:  That he owned -- they

8  represented that had he owned a set of an edition of

9  the Andy Mouse prints, is that what you're stating?

10 BY MR. ZANE:

11   Q.   Yes.

12             MR. SULLIVAN:  Object to the form of

13 the question and foundation.

14             You can answer.

15             THE WITNESS:  Thank you.

16             I understand that you're -- you're

17 stating he did own it, and we're stating that if he

18 did, in fact, own that set of prints as initially

19 stated, then it was sold after his purchase or

20 obtaining that item before the loss occurred, so it

21 couldn't have gone missing if he had already sold

22 it.

23 BY MR. ZANE:

24   Q.   I guess bringing back the Exhibit -- I think

25 we named it 31, the Chvostal provenance report, if

1  it's true -- and I'm representing to you that it is,

2  but you don't have to believe me -- that he -- that

3  we have evidence that he owned 5 of 30, it seems

4  that Chvostal here in the -- is simply -- is simply

5  incorrect.  I mean, they can't -- the -- well,

6  strike that.

7        Here we have a bit of -- on page 8 of

8  Exhibit 31 where John Chvostal is indicating that,

9  "I can definitely say that along with No. 3/30, the

10  insured could not have owned a complete set of the

11  following numbers during the stated period of

12  ownership from 1987 to December 2019," and the first

13  one of those is 5 of 30.

14        If the James Corcoran Gallery supplies

15  documentation that Douglas Altschuler did, in fact,

16  own 5 of 30 during that period, that calls into

17  question Mr. Chvostal's provenance report, doesn't

18  it?

19              MR. SULLIVAN:  Object to the form and

20  to foundation.

21              You can answer.

22              THE WITNESS:  He's stating a large

23  period of time here.  If the insured had obtained

24  the item initially and purchased it back in '86,

25  '87, as was discussed throughout the claim, Chvostal

1  is stating based upon the records that were located,

2  that those items had been sold prior to the loss

3  being presented to Chubb.

4            So if he had owned them, he could not

5  have owned them at the time in which he was making

6  the claim.

7  BY MR. ZANE:

8    Q.   Where does it say that in the highlighted

9  portion?

10           MR. SULLIVAN:  Object to the form.

11           THE WITNESS:  I see what it says in the

12  highlighted form.  It also states that period of

13  time from 1987 to 2019 for Edition 5 of 30, and we

14  were referring to Edition 3 of 30.

15  BY MR. ZANE:

16   Q.   We're referring to 5 of 30 now.

17           I mean, he's simply -- if it's true that the

18  Corcoran Gallery provides evidence that Douglas

19  Altschuler owned 5 of 30 as of 2001, then this is

20  simply incorrect; right?

21           MR. SULLIVAN:  Object to the form of

22  the question.  Misstates the record.

23           You can answer.

24           THE WITNESS:  Well, the insured had

25  provided to us that he owned two sets of these

KAREN MOORE  FEBRUARY 23, 2023

1   prints, one which was an edition of 30, which we

2   show had been sold prior to the claim being

3   submitted, and a second set of artist prints that no

4   documentation was ever presented for or that we

5   could prove that he owned.

6           So if he had neither set of prints in

7   his possession at the time of the claim, there would

8   be no basis in which to make a claim.

9           MR. ZANE:  I'm going to strike that as

10  entirely nonresponsive.  Move to strike that.

11          MR. SULLIVAN:  I'm making my record on

12  that.  That was completely responsive.  You can move

13  to strike it.

14  BY MR. ZANE:

15  Q.   Five of 30 -- okay.  We're not talking about

16  3 of 30.  We're not even talking about anything that

17  was claimed.

18          I'm simply saying there are two pieces of

19  evidence here which conflict, one of which is

20  Chvostal's report saying that Douglas Altschuler

21  could not have owned 5 of 30 between 1987 and 2019

22  on the one hand, and a second piece of evidence from

23  the Corcoran Gallery saying he did own it in 2001.

24          They can't both be right; right?

25          MR. SULLIVAN:  Object to the form of

KAREN MOORE   FEBRUARY 23, 2023

1    the question.

2                   You can answer.

3                   THE WITNESS:  I have agreed that he

4    could have owned one set at one point.  However,

5    that he had neither set at the time the claim was

6    made, so he couldn't have made a claim.

7                   My job is to view the claim and what is

8    being claimed, not to comment anything he may have

9    owned outside of that.

10   BY MR. ZANE:

11      Q.   But see --

12      A.   Based on our investigation, he didn't own

13   either of them at the time of the loss.

14      Q.   But it is Chvostal's job to comment on what

15   he owned or what he did not own, and he says he

16   could not have owned it, No. 5 of 30, at any point

17   during that time period, so Chvostal is wrong if the

18   Corcoran Gallery is correct; right?

19                  MR. SULLIVAN:  Object to the form and

20   foundation.

21                  You can answer.

22   BY MR. ZANE:

23      Q.   That's a "yes" or "no" question.

24      A.   I can't speak for Mr. Chvostal.

25      Q.   Well, no.  It's objectively wrong.  It's not

KAREN MOORE  FEBRUARY 23, 2023

1   a matter of opinion.

2          They can't both be right; right?

3                  MR. SULLIVAN:  Object to the form of

4   the question.  Foundation.

5                  You can answer.

6                  THE WITNESS:  Again, my -- my answer in

7   response to that is if he didn't own either of the

8   items at the time, they couldn't be claimed.

9   BY MR. ZANE:

10    Q.   Well, what does that have to do with whether

11   Chvostal is right about this statement?

12                  MR. SULLIVAN:  You can answer the

13   question, but -- go ahead.

14                  THE WITNESS:  I guess I'm not sure how

15   to answer that.

16   BY MR. ZANE:

17    Q.   Well, that much, I -- yeah.  It's with "yes"

18   or "no."  I mean, it's a simple question.

19          It's either Chvostal is right or Corcoran

20   Gallery is right because it's mutually exclusive;

21   right?

22                  MR. SULLIVAN:  Object to the form of

23   the question.  Foundation.

24                  If you want to ask her about Corcoran's

25   records, show her Corcoran's records.

```
1              MR. ZANE:  I'll have to do that.

2              MR. SULLIVAN:  I mean, she's not an art

3    expert.  Ask her about her investigation and what

4    she knows.

5              THE WITNESS:  Right.  I guess that's

6    what I'm saying.  I don't have an understanding of,

7    like -- I understand what you're asking me, but I

8    can't comment on that.  I can only comment, as

9    Mr. Sullivan is stating, on the investigation and

10   what was proven as part of our investigation.

11   BY MR. ZANE:

12     Q.  Well, taking a step back, if you ever

13   receive a report from a provenance expert and it

14   contains inaccuracies in it, how would you handle

15   that?

16              MR. SULLIVAN:  Form.  Foundation.

17              You can answer.

18              THE WITNESS:  If I discovered that

19   there was an inaccuracy, I would either review it

20   with the expert or I would talk to my manager on how

21   to handle that.

22   BY MR. ZANE:

23     Q.  Did you review Chvostal's report with John

24   Chvostal?

25              MR. SULLIVAN:  This report that you
```

KAREN MOORE  FEBRUARY 23, 2023

1  have on the screen right now?

2           MR. ZANE:  Yeah.

3           MR. SULLIVAN:  Okay.

4           THE WITNESS:  I don't know that I would

5  have reviewed it with him.  He would provide it to

6  us.  I would have reviewed it at some point and

7  presented it to my manager as part of the claim

8  investigation.

9  BY MR. ZANE:

10  Q.  Did you ask him, I guess, any question -- do

11  you recall asking any questions -- strike that.

12           Do you recall asking John Chvostal any

13  questions about his report?

14           MR. SULLIVAN:  Object to the form of

15  the question.

16           This report?

17           MR. ZANE:  I'll strike that again.

18  BY MR. ZANE:

19  Q.  Do you recall asking John Chvostal about --

20  or any questions about his report that has been

21  entered as Exhibit 31?

22           MR. SULLIVAN:  Thank you.

23           THE WITNESS:  I would not have asked

24  him any questions specifically about it.  At this

25  point, again, it was reviewed by my manager.

KAREN MOORE  FEBRUARY 23, 2023

```
1   BY MR. ZANE:

2      Q.   Okay.  So going back to the concealment

3   and -- I mean, aside from the 3 of 30 issues, any

4   other -- are there any other items you can think of

5   about -- that are violations of the concealment

6   provision?

7               MR. SULLIVAN:  Object to the form.

8   Object to foundation.

9               Beyond what she's already testified to

10  today?

11              MR. ZANE:  Right.

12              MR. SULLIVAN:  Okay.

13              THE WITNESS:  The answers I gave

14  earlier, and at this moment, nothing else is coming

15  to mind.  There may be other things that would have

16  been within the claim file but that are just not

17  coming to my mind at the moment.

18  BY MR. ZANE:

19     Q.   Okay.  Can you think of any factors that

20  caused you to deny the claim based on a violation of

21  the fraud provision of the policy?

22              MR. SULLIVAN:  Form.

23              THE WITNESS:  That was part of my

24  earlier answer.

25  ///
```

KAREN MOORE  FEBRUARY 23, 2023

BY MR. ZANE:

Q.   Okay.  So are they one and the same to you?

A.   Yes.  They go -- they go hand in hand.  So it's either something that he misrepresented or did not state to us when asked.

Q.   Okay.  I'm going to go to deposition Exhibit -- it's already 4, a December 15th denial letter.  This is a letter to me.

Is this a letter -- did you draft this, or did Lisa Darr draft it?

A.   The denial letter would have been drafted and issued by Lisa Darr, not myself.

Q.   Okay.  Did you review it before it went out?

A.   I believe I may have seen it, but I was not responsible for reviewing the content or making any changes.

Q.   And on page 4 of Exhibit 4 there -- I think it's described, "Chubb National hereby denies the silkscreens claim on the following grounds," and there's three of them.

And the first is "That the insureds have intentionally concealed or misrepresented material facts with respect to the claim in that, without limitation, they represented that they owned and had possession of the insured silkscreens at the time of

1  the alleged loss."

2        This was your understanding of the basis for

3  the denial?

4    A.   Yes.

5    Q.   Okay.  And the other two I don't necessarily

6  need to read, but they misrepresented the amount is

7  B.

8        Is that -- you agree with that?

9    A.   They misrepresented the amount given that I

10  don't know how you could appraise an item that is no

11  longer in your possession or retain a policy for an

12  item that is no longer in your possession, so yes.

13    Q.   So B is predicated upon an assumption that

14  he did not own a claim -- sorry.  Scratch that.

15        B is predicated on an assumption that he did

16  not own the silkscreens at the time of the loss.  Is

17  that fair?

18    A.   Yes.

19    Q.   Okay.  Just to nail down B again, if -- if

20  an insured values property at 1.5 million as here

21  and your own appraiser says it's worth 1 million, do

22  you consider that to be a misrepresentation?

23    A.   The misrepresentation that is noted in the

24  letter is in regard to obtaining an appraisal for an

25  item that he did not own.  You can't appraise

KAREN MOORE  FEBRUARY 23, 2023

1   something that doesn't exist.

2     Q.   Sure.

3          But if -- I mean, let's speak generally.

4   I'm trying to distinguish what a -- if it's a

5   misrepresentation regarding property if you assess

6   it for a value that -- with which Chubb disagrees?

7                 MR. SULLIVAN:  Form.  Foundation.

8                 You can answer.

9                 THE WITNESS:  It's not about -- the

10  denial was not based upon the value per the item.

11  It was based on the insured owning the item and

12  presenting an appraisal for an item that was valued

13  based on him representing ownership of the item at

14  the time the claim occurred.

15  BY MR. ZANE:

16    Q.   Okay.  So it was not -- so the fact that

17  Douglas Altschuler said this art was worth

18  1.5 million and Chvostal said it was worth

19  1 million, that plays no role in Section B there?

20    A.   No.  The misrepresentation is in regard to

21  presenting an appraisal that includes a value for an

22  item that you don't own --

23    Q.   Okay.

24    A.   -- and representing that you had an

25  appraiser provide that valuation based upon having

1  the item to obtain that.

2     Q.   So if I'm understanding you right, with B,

3  the problem is that -- is not that Doug Altschuler

4  said it was worth 1.5 million and Chvostal said it

5  was worth 1 million.  The problem was that he said

6  it was worth anything because he didn't own it.  Is

7  that fair?

8                 MR. SULLIVAN:  Form.  Asked and

9  answered.

10                You can answer again.

11                THE WITNESS:  Again, because he didn't

12 own it at the time, you can't obtain a valid

13 valuation or appraisal on the item.

14 BY MR. ZANE:

15    Q.   So what was the purpose of obtaining another

16 appraisal from Chvostal?

17                MR. SULLIVAN:  Form.  Asked and

18 answered.

19                You can answer again.

20                THE WITNESS:  We obtained that, like I

21 stated, initially because we uncovered that he no

22 longer owned the item and that the appraisal that

23 Dina had provided was not based on her seeing the

24 item or the insured having the item.

25                But as part of the claim process, you

KAREN MOORE   FEBRUARY 23, 2023

1  do need to know a value of an item that is being

2  claimed against your policy, so you know what the

3  exposure is.

4  BY MR. ZANE:

5      Q.   Okay.  So I was going to ask, who cares what

6  it's worth, but if that's to know what the exposure

7  is, okay.

8          And -- but, again, the competing appraisals

9  play no role in Number B -- letter B, to be clear?

10     A.   I feel like I've answered that.  I mean --

11     Q.   Well, if you just say "yes" or "no," then we

12  can move on.  It's a "yes" or "no" question.

13         They play no -- it plays no --

14     A.   The way you're wording it, it's not really a

15  "yes" or "no" question, so that's why I don't want

16  to answer it a "yes" or "no" way.

17     Q.   If it plays a tiny role, then yes, if it

18  does play a role.  If it plays no role whatsoever,

19  then you can say that.

20     A.   It's not about the value.  Again, it's about

21  the ownership of the item not being there to obtain

22  the appraisal at all.

23     Q.   This is not a -- sorry to cut you off.

24         This was not a -- this was -- number B is

25  not predicated upon a dispute about the value of an

KAREN MOORE  FEBRUARY 23, 2023

1    Andy Mouse art piece --

2        A.    No.

3        Q.    -- was it?

4        A.    No.

5        Q.    Okay.  I guess I'm -- and I'm -- what is the

6    distinction between A and C here?

7        A.    I mean, they go hand in hand about the

8    misrepresentations that were made and the

9    concealment of information in regard to the item

10   again.

11       Q.    Okay.  Is there any -- is it your

12   understanding that there's any difference between A

13   and C?

14       A.    Yes.  I guess A relates more to the claim

15   that was presented.  C relates to him even obtaining

16   the policy for the item and making the change on the

17   policy with regard to the value knowing he didn't

18   own the item.  So it's just covering both of those

19   bases.

20       Q.    Okay.

21             MR. ZANE:  I guess we can take a break

22   because we've really been going for a while, and I

23   really don't have too much left.

24             MR. SULLIVAN:  Is that a promise?

25             MR. ZANE:  I promise, Bobby.

1            THE VIDEOGRAPHER:  The time is -- the

2    time is 1:51 p.m.  We are going off the record,

3    ending Media No. 3.

4                (Recess taken.)

5            THE VIDEOGRAPHER:  My name is Judy

6    Thompson with Legal Video Specialists, Phoenix,

7    Arizona.  This begins Media No. 4 of the videotaped

8    deposition of Karen Moore.  The time is 2:00 o'clock

9    p.m.  We are now back on record.

10               (Whereupon, Exhibit No. 32 was marked

11   for identification.)

12   BY MR. ZANE:

13     Q.   Okay.  I will bring up a new item which, I

14   guess, is deposition Exhibit 32.  It is the

15   transcript of a recent deposition in this matter

16   which you have not seen.  It is Debbie Smith.

17           Now, are you aware that Chubb has retained a

18   claims handling expert in this matter?

19     A.   No.

20     Q.   There is really no reason why you would be,

21   but she's -- but she is a -- I'll represent to you

22   that she is testifying providing opinions, expert

23   testimony with regard to claim handling on this file

24   as part of this litigation.

25           Now, I'm just going to provide -- I can run

KAREN MOORE  FEBRUARY 23, 2023

1  through the whole thing, but I'm obviously not going

2  to do that, and I will provide just a few excerpts,

3  and I would just like to get -- just get your

4  thoughts and whether she -- her assessment of the

5  claims handling on this file accords with your own.

6        And I'm going to start on -- let's see --

7  page, let's see here, 113, right here, the

8  highlighted part.

9        And this is Dina Brown -- or Deborah Smith

10 speaking, and she's kind of paraphrasing my partner,

11 Mike Poli's question.  It says "but basically what

12 you're asking me is why would a man as affluent as

13 this insured ever consider creating insurance fraud

14 with a possibility or ramification of criminal

15 behavior.  I don't think there was a motive here."

16      Do you agree with Ms. Smith?

17          MR. SULLIVAN:  Object to the form and

18 foundation.

19          THE WITNESS:  I don't know the

20 circumstances in which she stated that or the

21 totality of that, so it's -- I can't agree or

22 disagree with her.  I don't -- I don't know.

23 BY MR. ZANE:

24   Q.  Do you think Mr. Altschuler had a motive

25 here in filing this claim?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   I think there isn't necessarily a motive per

2  se, but as part of our investigation, as I stated

3  previously, it did show that he had some liquidity

4  issues, if you will; you know, that cash on hand was

5  not of a large amount.  So even though his assets

6  were a lot, there wasn't a lot of cash on hand, and

7  there was a high amount of debt.

8        With that said, that -- that wasn't

9  necessarily my focus of the claim.  It was looking

10 at all the facts and circumstances to determine

11 coverage for the loss and not necessarily a motive.

12   Q.   Okay.  And on the top of page 115 -- I'm

13 highlighting it here -- I'll keep it highlighted

14 there -- the witness says, "I don't think he lied

15 that at one time he owned silkscreens," and then of

16 course he got interrupted by Mike Poli, and then she

17 continues to say, "I don't think he lied."

18        As part of your investigation, did you reach

19 the same conclusion?

20            MR. SULLIVAN:  Object to the form and

21 foundation.

22            You can answer.

23            THE WITNESS:  I think per the denial

24 letter that was issued and all of the information

25 that was uncovered, if he owned the silkscreens at

KAREN MOORE  FEBRUARY 23, 2023

1  one time, that he did not own them at the time in

2  which he took and submitted the claim to Chubb.

3  BY MR. ZANE:

4     Q.   Okay.

5     A.   So he represented to Chubb that he did have

6  them, and what we found was no.

7     Q.   Okay.  I'm moving to page 169, which is

8  actually page 43 of Exhibit 31 maybe, the deposition

9  exhibit.  And Mr. Poli asked Ms. Smith, "You also

10  don't see any evidence in the claims file that the

11  insured intentionally concealed or misrepresented

12  his ownership or possession of the art?  You don't

13  see any evidence like that in the claims file

14  either; correct?"

15        Bobby objects.  It says, "I don't see any

16  evidence where the insured is intentionally lying or

17  misrepresenting anything on the claim," says

18  Ms. Smith.

19        Do you agree with Ms. Smith's conclusion

20  here?

21          MR. SULLIVAN:  Object to the form of

22  the question.  Object to foundation.

23          THE WITNESS:  Respectfully, I don't

24  agree with her.  I don't think we would have come to

25  the conclusion that we did and issued the coverage

```
1    position that we did if we agreed with that.
2    BY MR. ZANE:
3       Q.   Right, yeah.
4            Because, I mean, I think the denial letter
5    and the coverage position makes clear that you do
6    believe there was potential concealment or fraud in
7    this claim; correct?
8       A.   Agreed.
9       Q.   And that was the basis for the denial in
10   part?
11                   MR. SULLIVAN:  In part.  I mean,
12   objection.  Form.
13   BY MR. ZANE:
14      Q.   And that was the basis for the denial --
15                   MR. SULLIVAN:  Form.
16   BY MR. ZANE:
17      Q.   -- Karen?
18      A.   It was outlined in the denial letter, but,
19   yes, those were some of the reasons in which the
20   claim was denied.
21      Q.   And what were the other reasons?
22      A.   The claim -- that he made misrepresentations
23   regarding the ownership.  He obtained an appraisal
24   for an item that he didn't have and submitted that,
25   representing that he did have the item and that the
```

 1  value was as submitted.  And he concealed that he

 2  had sold the item.

 3      Q.   Well, those are all part of the fraud --

 4  those are all a part of concealment or fraud;

 5  correct?

 6      A.   Yes, as stated in the denial letter.  I was

 7  representing I agreed with the denial letter.

 8      Q.   Okay.  And that was the basis for the

 9  denial, of course?

10      A.   Yes.

11      Q.   Okay.  What?

12      A.   Yes, I agree with you that that was what

13  was --

14      Q.   And I'm going to page 179.  This goofy

15  condensed format, it's kind of hard to read, but

16  it's the section on the right.

17          Again, Mr. Poli asks, "You see nothing in

18  this record and in your work on this to support the

19  idea that Mr. Altschuler intentionally

20  misrepresented the value of the art claim?  You see

21  nothing to support that; correct?"

22          Bobby objects.  And the witness, "I do not

23  see anything where I believe he intentionally

24  misrepresented."

25          Would you disagree with her again on this?

KAREN MOORE  FEBRUARY 23, 2023

1    A.   Respectfully, yes, I would.

2    Q.   Okay.  You made clear the denial was based

3  upon the fraud and concealment.

4         I guess -- I'm just about done here.  I just

5  have kind of an overall question here.

6         If the records to purchase were lost, what

7  could Douglas Altschuler have provided to you that

8  would change your mind about denying the claim?

9              MR. SULLIVAN:  Object to the form of

10  the question.

11             THE WITNESS:  I think that he could

12  have represented one set of facts the entire time

13  and not changed his testimony.  And, again, we

14  looked at all of the information that was presented

15  and the changing evidence and the fact that there

16  were sales records of the items.

17             So even if he had had the purchase

18  records from when the item was initially obtained,

19  it was sold after that but before the claim was made

20  to Chubb.  So I don't know that there's different

21  information he could have presented to dispute that

22  if that's what the records are.

23  BY MR. ZANE:

24    Q.   But you've -- as you've conceded, at least

25  at various points during this claim, he said he did

KAREN MOORE  FEBRUARY 23, 2023

1  not know if it was 3 of 30; right?

2            MR. SULLIVAN:  Object to the form of

3  the question.

4            You can answer it.

5            THE WITNESS:  I won't say I conceded

6  anything.  I stated that Mr. Altschuler had changed

7  the facts that he provided throughout the loss.  He

8  at one time stated it was Edition 3 of 30, that it

9  was an edition, that there were artist proofs.  So

10  his testimony changed throughout the course of the

11  claim.

12  BY MR. ZANE:

13    Q.  So if -- so is it fair to say that when

14  Mr. Altschuler said, "Look, I don't know if it was 3

15  of 30," that you've disregarded that statement on

16  his part?

17            MR. SULLIVAN:  Form.  Foundation.

18            You can answer.

19            THE WITNESS:  I don't think it's fair

20  to say that because, again, his testimony changed,

21  and even if he had that edition, the records show

22  that it was sold prior to the claim being submitted.

23  And there's also a lack of documentation for a

24  second set of prints to support that he had that.

25  ///

KAREN MOORE  FEBRUARY 23, 2023

```
 1   BY MR. ZANE:
 2     Q.   So it does seem that you're kind of focused
 3   on the 3 of 30, because as we've admitted, if it was
 4   1 of 30, you know, nobody has any evidence what
 5   happened to that.  I mean -- well, strike that.
 6           But, again, if he lost records of his
 7   purchase and if he, in fact, cannot remember which
 8   it was, it seems to me that you -- strike that
 9   again.  I started providing opinions.
10           If he has no record of what number it is and
11   he guessed wrong that it was 3 of 30, what
12   information after that could he provide to you to
13   support his claim?
14               MR. SULLIVAN:  Object to the form.
15   Foundation.  Misstates the record.
16               You can answer.
17               THE WITNESS:  As I stated previously,
18   the insured did represent that it was an edition of
19   30 being claimed.  He's not saying that he owned
20   several editions of 30.  He's saying that he owned
21   one edition of 30, and that was the item in which he
22   was claiming as part of this loss.  And the records
23   that we uncovered showed that that item was sold
24   prior to the claim being submitted.
25   ///
```

KAREN MOORE  FEBRUARY 23, 2023

1  BY MR. ZANE:

2    Q.   So I understand for the record that Douglas

3  Altschuler -- strike that.

4        Did you ever entertain the possibility in

5  your investigation that when Douglas Altschuler told

6  you that "I may be mistaken.  I don't recall exactly

7  what number it is," that that was truthful?

8                MR. SULLIVAN:  Object to the form.

9                You can answer.

10               THE WITNESS:  I don't believe there was

11  a way to show that that was truthful when the

12  information that we had again showed that he was

13  claiming an edition of 30, he only owned one edition

14  of 30, and that that item had been sold prior to the

15  claim.

16               So he wasn't claiming anything else

17  other than that edition of 30 in which he only owned

18  one, and it had been sold.

19  BY MR. ZANE:

20    Q.   Well, as we both -- if we both agree that at

21  one point he told you, "I don't remember clearly

22  which edition it was"; right?

23    A.   He did state that at one point, but his

24  claim was for an edition of 30.  It wasn't for

25  anything else other than an edition of 30.

KAREN MOORE  FEBRUARY 23, 2023

1   Q.   I thought in the initial claim -- I guess

2   we'll have to go back to the claim record.

3           The initial claim was simply for "edition of

4   30"?

5               MR. SULLIVAN:  Object to the form.

6               THE WITNESS:  That's what I just

7   stated.  It was for an "edition of 30," what's

8   listed on the policy.

9               So if he was -- if he changed his

10  testimony to say he was claiming something other

11  than that, that's not the item on the policy in

12  which he was presenting a claim for.

13  BY MR. ZANE:

14  Q.   Did he -- again, did he put that item -- did

15  he tell Chubb it was 3 of 30 before the loss?

16              MR. SULLIVAN:  Object to the form.

17  Foundation.

18              You can answer.

19              THE WITNESS:  He did state at some

20  point that it was an edition of 30 of which he only

21  owned one of, and that it was the specific item as

22  listed on the valuable articles policy which in part

23  stated "edition of 30."

24              So, yes, he did -- he did make the

25  claim for that item.

1  BY MR. ZANE:

2      Q.   That it was an "edition of 30," but not that

3  it was 3 of 30; right?

4              MR. SULLIVAN:  Object to the form and

5  foundation.

6              THE WITNESS:  But there's no other

7  representation that he owned another item of 30.

8  BY MR. ZANE:

9      Q.   Ever?

10              As of 2000 and -- correct that.  Did Douglas

11  Altschuler ever represent to you that as of 2018, he

12  owned two sets of the art?

13              MR. SULLIVAN:  Object to the form.

14              THE WITNESS:  Mr. Altschuler indicated

15  at some point throughout the claim that he owned one

16  set of prints that was an edition of 30, and he

17  owned a second set of prints that were artist

18  proofs, I believe they were referred to, which would

19  not have been included in the edition of 30s.

20  BY MR. ZANE:

21      Q.   We've established or we've represented to

22  you, but we've established in this that he traded

23  away one set right around 2001.

24              What information do you have -- scratch

25  that.

KAREN MOORE  FEBRUARY 23, 2023

1    When did he tell you that he -- at what

2  point did he tell Chubb that he owned two sets in

3  2018?

4             MR. SULLIVAN:  Object to the form of

5  the question.

6             You can answer.

7             THE WITNESS:  I can't tell you

8  specifically where in the claim.  I know initially

9  he stated that it was an edition of 30.  I'm not

10 sure if it was after that specifically at the EUO or

11 at some other point that he had two sets, but I know

12 he did represent that he had two sets of which only

13 one was an edition of 30, which is the item that is

14 itemized on the Chubb policy and was being claimed

15 as part of this loss.

16 BY MR. ZANE:

17   Q.  Do you recall that during the same EUO, he

18 mentioned that he had traded one of those sets and

19 he no longer owned it?

20             MR. SULLIVAN:  Object to the form.

21             THE WITNESS:  I do recall at some point

22 he represented that he had a second set and that he

23 had traded it.

24 BY MR. ZANE:

25   Q.  So why would you expect him to tell Chubb in

1  2020 that he owned two sets if he had already told

2  you he got rid of one?

3          MR. SULLIVAN:  Object to the form of

4  the question.

5          You can answer.

6          THE WITNESS:  My understanding is that

7  he told us of that second set, and that coincides

8  with what you just stated.  But, again, what was

9  listed on the policy that he was claiming was the

10  edition of 30.

11          So if -- you're stating he sold that

12  item or traded it away, then he no longer had

13  possession of it, so it couldn't be the item that's

14  represented on the policy for which he was making a

15  claim for, and there was no documentation to support

16  the second set of prints.

17  BY MR. ZANE:

18    Q.   This is really going nowhere in a big hurry.

19          What other information could -- again,

20  granted that he has lost all his records of purchase

21  and those are never coming back, is there any other

22  information he could have provided to you, any

23  documents, any information that would have prompted

24  you to accept the claim?

25          MR. SULLIVAN:  Object to the form of

KAREN MOORE  FEBRUARY 23, 2023

1  the question.  Move to strike counsel's statement.

2  Asked and answered.

3           You can answer one more time.

4  BY MR. ZANE:

5    Q.   Just to rephrase, I asked, is there any

6  additional information beyond -- I should say this:

7  Is there any additional information beyond what

8  you've already mentioned that he could have provided

9  that would have caused you to accept the claim?

10           MR. SULLIVAN:  Object to the form.

11           You can answer.

12           THE WITNESS:  As I stated previously,

13  the item in which he was claiming was an edition of

14  30.  That was the specific item that was covered on

15  the policy that a claim was being made for.

16           And what we uncovered during our

17  investigation showed that that item had been sold

18  prior to the loss.  He could not have owned that

19  item that was listed on the policy that he was

20  making a claim for at that time.

21           So, no, I don't think he can show

22  documentation to support that he had that item when

23  the records we have show that he sold it and was not

24  in possession of it to obtain coverage on the

25  policy.

KAREN MOORE  FEBRUARY 23, 2023

BY MR. ZANE:

Q.   Okay.  So as I understand that, there's really nothing Douglas Altschuler could have provided to you that would have caused -- strike that.

There's nothing -- after the records of his purchase were lost, there's nothing he could have provided to Chubb that would have caused Chubb to accept the claim?

MR. SULLIVAN:  Object to the form. Foundation.  Asked and answered.

You can answer it.  Last time.

THE WITNESS:  I have answered that question.

Again, regardless of his records of purchase or initial ownership, the records we uncovered as part of our investigation showed that he sold the item, could not have had possession or ownership of the item at the time that the policy was obtained or at the time he made the claim. Therefore, there is no documentation that he can show me if he didn't own it.

MR. ZANE:  Okay.  I think that ought to do it for today.

MR. SULLIVAN:  Thank you.  We don't

KAREN MOORE    FEBRUARY 23, 2023

1    have any questions.  We will read and sign, and I

2    will take my normal order, e-Tran.

3              THE VIDEOGRAPHER:  The time is

4    2:18 p.m.  We are ending the deposition with

5    Media No. 4.

6              (Deposition concluded at 2:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KAREN MOORE  FEBRUARY 23, 2023

```
1   STATE OF ARIZONA    )
                        ) ss.
2   COUNTY OF MARICOPA )

3           BE IT KNOWN that the foregoing proceedings
    were taken before me; that the witness before
4   testifying was duly sworn by me to testify to the
    whole truth; that the foregoing pages are a full,
5   true, and accurate record of the proceedings, all
    done to the best of my skill and ability; that the
6   proceedings were taken down by me in shorthand and
    thereafter reduced to print under my direction.

7
            I CERTIFY that I am in no way related to any
8   of the parties hereto, nor am I in any way interested
    in the outcome hereof.

9

10          [ X ] Review and signature was requested.
            [   ] Review and signature was waived.
11          [   ] Review and signature not required.

12

13          I CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206 (F)(3)
14  and ACJA 7-206 J(1)(g)(1) and (2).  Dated at,
    Phoenix, Arizona, this 2nd of March, 2023.

15

16              ALISA SMITH, AZ CR
            AZ Certified Reporter No. 50712

17

18          *    *    *    *    *

19

20          I CERTIFY that DONNA DELAVINA REPORTING, LLC
21  has complied with the ethical obligations set forth
    in ACJA 7-206 (J)(1)(g)(1) through(6).

22

23          DONNA DELAVINA REPORTING, LLC
                Registered Reporting Firm
24              Arizona RRF No. R1010

25
```

Donna DeLaVina Reporting LLC
602.230.5454

KAREN MOORE   FEBRUARY 23, 2023

| A |
|---|

**ability** 174:5
**able** 65:23, 84:12
89:18, 90:19
131:1
**absolutely** 6:11
6:23, 16:16
126:14
**accept** 62:5
80:14, 170:24
171:9, 172:9
**acceptance** 40:2
83:11
**accepted** 32:13
136:3
**Accepting** 38:12
**accords** 158:5
**account** 32:17
**accounts** 132:9
**accurate** 33:5
174:5
**accustomed** 6:11
**ACJA** 174:13
174:14, 174:21
**Acquisition** 77:18
**add** 22:18
**added** 24:5, 24:15
39:23, 81:6
86:15, 86:19
96:8
**addition** 38:19
131:12
**additional** 12:18
14:21, 14:25
25:3, 38:19
40:17, 47:17
58:6, 63:8, 63:21
64:1, 65:20
65:20, 77:12
80:4, 80:7, 93:7
93:19, 93:20
93:24, 103:25
104:21, 107:15
135:13, 171:6
171:7
**address** 51:22
**addressed** 22:24
58:6, 138:19

**addressing**
138:17
**adjuster** 9:5, 9:13
9:16, 11:24, 21:6
24:14, 31:4
46:15, 128:19
**adjusters** 69:1
**adjustment** 14:22
**admitted** 165:3
**advance** 12:13
**advanced** 133:5
**advice** 61:24
63:6, 63:7
**advised** 39:20
**affluent** 158:12
**afternoon** 5:13
**agent** 69:7
**ago** 10:4, 51:4
52:13, 131:16
**agree** 13:12
13:16, 13:21
13:25, 14:1, 14:9
14:10, 15:3, 17:5
26:10, 26:17
27:1, 30:15
35:21, 38:10
44:21, 49:1, 49:5
50:21, 51:6, 54:1
54:13, 55:14
57:20, 58:5
59:24, 67:21
68:8, 69:3, 74:17
75:20, 76:23
76:25, 82:20
83:13, 86:21
87:22, 88:9, 89:9
91:1, 97:18
110:3, 111:11
113:21, 114:16
120:1, 120:16
124:11, 133:19
133:22, 134:16
141:5, 152:8
158:16, 158:21
160:19, 160:24
162:12, 166:20
**agreed** 58:3
146:3, 161:1
161:8, 162:7

**agreeing** 134:20
**agreement** 16:13
134:15, 134:21
**ahead** 9:8, 22:7
22:8, 30:21
30:22, 50:3, 63:3
95:24, 107:8
147:13
**aide** 57:25
**AIG** 69:2, 69:9
75:9, 81:13
81:22, 82:9, 83:1
84:8
**Alisa** 1:24, 2:4
4:9, 15:13, 17:18
174:16
**allegations**
129:25
**alleged** 152:1
**allow** 52:24
**Altschuler** 1:4
4:5, 28:17, 33:21
42:10, 42:12
50:22, 54:10
55:13, 59:22
73:14, 74:10
81:12, 88:19
90:14, 95:7
97:12, 97:13
99:12, 113:2
113:9, 113:19
114:5, 114:12
116:17, 117:8
117:13, 118:9
118:25, 119:21
120:3, 120:13
124:12, 126:9
126:18, 127:16
128:6, 128:12
128:18, 128:22
129:3, 129:12
130:10, 130:21
131:2, 132:15
132:19, 143:15
144:19, 145:20
153:17, 154:3
158:24, 162:19
163:7, 164:6
164:14, 166:3

166:5, 168:11
168:14, 172:3
**Altschuler's** 48:4
84:14, 95:21
96:15, 97:18
110:11, 124:6
124:7, 125:21
132:9, 133:3
**amount** 20:25
71:25, 82:10
152:6, 152:9
159:5, 159:7
**amounts** 23:13
111:10
**analysis** 34:4
100:24, 102:10
104:22
**Andy** 21:18, 75:7
75:7, 81:5, 96:25
104:7, 108:15
116:4, 121:14
124:9, 126:18
130:10, 142:9
156:1
**Ann** 67:18, 68:9
117:11, 117:11
**answer** 6:6, 6:21
6:22, 14:17
26:20, 40:15
43:4, 45:2, 48:17
53:11, 56:6, 60:1
61:14, 62:18
63:16, 70:6, 71:6
72:14, 73:17
74:12, 75:22
76:10, 77:25
78:13, 79:23
80:17, 81:16
81:24, 82:13
83:16, 84:1, 85:7
86:2, 86:13, 87:6
87:23, 89:10
90:23, 91:14
91:25, 97:22
100:16, 101:9
102:3, 103:9
103:22, 104:10
106:12, 107:21
109:4, 110:21

112:1, 112:10
113:14, 117:19
118:14, 119:4
120:6, 121:7
122:8, 124:17
126:15, 134:2
142:14, 143:21
144:23, 146:2
146:21, 147:5
147:6, 147:12
147:15, 148:17
150:24, 153:8
154:10, 154:19
155:16, 159:22
164:4, 164:18
165:16, 166:9
167:18, 169:6
170:5, 171:3
171:11, 172:12
**answered** 56:15
77:24, 78:7, 86:1
87:5, 91:14
91:16, 103:21
105:15, 106:7
120:5, 122:5
122:7, 154:9
154:18, 155:10
171:2, 172:11
172:13
**answering** 90:5
**answers** 56:2
56:20, 150:13
**anybody** 27:24
**anymore** 29:25
**anyway** 70:24
**AP** 125:25
**apartment** 35:13
**apologize** 25:25
107:24
**apparently** 29:22
61:2
**appear** 36:1
74:19, 75:6
76:11
**appeared** 68:9
**appearing** 2:3
2:8
**appears** 30:13
34:14, 44:17

44:19, 50:20
61:6, 68:14
70:15, 75:18
83:19, 94:7
103:2, 112:6
131:19, 134:18
**Appendix** 126:9
**apply** 15:6
**appraisal** 28:5
28:10, 28:14
41:21, 42:5
43:13, 60:10
68:3, 68:16, 98:5
98:7, 98:17
98:21, 98:22
99:5, 99:7, 99:8
99:14, 99:22
99:24, 100:1
100:4, 100:5
100:10, 100:10
100:19, 100:22
101:4, 101:5
101:16, 101:17
101:21, 102:3
102:4, 102:25
103:1, 103:3
103:19, 103:24
104:18, 104:22
105:10, 105:12
105:13, 105:18
105:21, 105:23
106:1, 106:19
106:25, 107:5
107:10, 107:16
107:18, 108:2
108:3, 108:6
108:8, 108:12
112:13, 116:6
117:21, 139:8
140:6, 140:11
140:14, 152:24
153:12, 153:21
154:13, 154:16
154:22, 155:22
161:23
**appraisals** 69:25
98:13, 99:6
102:17, 103:14
155:8

**appraise** 152:10
152:25
**appraised** 59:22
106:19, 111:22
**appraiser** 43:13
60:13, 98:16
152:21, 153:25
**appreciate** 5:14
12:11, 106:3
**appreciated**
110:1, 110:2
**appreciating**
111:7, 111:8
**appropriate**
92:20
**approve** 71:13
**approximately**
30:13, 46:1
58:19, 95:7
**April** 110:7
**ARI/Artive** 22:18
23:2, 23:18
**arises** 66:1
**Arizona** 1:2, 1:14
2:5, 2:12, 2:16
4:7, 4:11, 4:13
13:3, 13:7, 39:21
43:22, 50:11
57:17, 92:12
157:7, 174:1
174:14, 174:24
**art** 20:19, 23:2
23:4, 24:19
38:25, 41:24
44:5, 54:24
55:11, 55:14
55:18, 57:16
58:18, 66:3
66:18, 66:18
66:21, 66:22
68:3, 68:10
68:11, 69:1
69:12, 75:9
77:20, 79:3
79:20, 81:12
88:21, 90:15
95:16, 96:2
96:10, 96:13
105:18, 110:12

110:14, 111:23
113:9, 113:10
113:20, 114:17
117:15, 124:3
148:2, 153:17
156:1, 160:12
162:20, 168:12
**art-type** 42:3
**article** 39:20
**articles** 20:15
21:23, 36:12
167:22
**artist** 60:21
78:16, 118:19
120:11, 123:20
132:19, 132:20
133:4, 145:3
164:9, 168:17
**artist's** 119:7
**artists** 114:8
**Artnet** 132:3
**arts** 43:15, 44:10
**artwork** 64:2
**artworks** 114:13
**aside** 48:9, 101:15
101:21, 150:3
**asked** 12:15, 52:4
52:12, 53:3, 60:6
69:21, 69:21
69:25, 77:24
79:24, 80:5, 86:1
86:4, 87:4, 97:10
97:13, 103:21
105:15, 106:10
120:5, 122:5
122:6, 149:23
151:5, 154:8
154:17, 160:9
171:2, 171:5
172:11
**asking** 6:10
16:13, 27:16
51:15, 77:2
89:17, 89:17
90:2, 90:4, 90:10
99:22, 103:4
106:5, 148:7
149:11, 149:12
149:19, 158:12

**asks** 162:17
**assess** 153:5
**assessment** 108:5
158:4
**assets** 70:18, 71:1
71:10, 71:21
159:5
**assign** 40:7, 63:13
63:17, 63:20
**assigned** 42:20
**assigning** 38:12
40:6, 43:15
44:10
**assist** 40:18, 41:1
42:21, 64:1
**assistance** 40:22
**assisting** 40:21
**assume** 77:5
93:22
**Assumes** 118:13
121:6
**assuming** 91:18
92:25, 95:16
140:15
**assumption**
152:13, 152:15
**attached** 28:16
33:21, 38:6
45:25, 68:2, 68:3
70:11, 76:2
93:14, 112:24
138:12
**attachment** 28:19
29:23, 112:20
**attending** 9:1
**attorney** 7:18
7:20, 7:24, 80:3
124:6, 138:15
**August** 24:9, 72:8
128:3
**authentic** 98:24
**Author** 20:9
**authored** 61:1
61:2
**authority** 137:2
**authorization**
52:23
**authorized**
138:14

**availability** 93:6
**available** 99:18
**Avenue** 2:15
4:13
**avow** 92:18
**aware** 99:10
108:7, 126:13
126:14, 126:16
157:17
**AZ** 1:24, 1:25
174:16, 174:16

**B**

**B1** 95:17
**back** 10:5, 30:19
34:7, 35:22, 47:4
50:13, 53:20
82:14, 82:25
92:14, 124:22
127:18, 128:2
134:5, 138:10
138:25, 142:24
143:24, 148:12
150:2, 157:9
167:2, 170:21
**background** 8:11
14:23, 28:24
29:11, 31:17
60:12, 60:19
60:22, 65:19
77:6, 78:5, 78:15
79:7, 79:10, 80:1
99:9, 99:25
100:20
**backwards** 16:6
**based** 22:18
38:10, 38:13
57:2, 68:14
75:20, 98:22
99:17, 99:19
100:5, 102:13
103:11, 107:11
109:21, 111:1
125:4, 126:6
127:11, 128:17
128:17, 129:4
129:6, 131:11
133:12, 133:16

KAREN MOORE   FEBRUARY 23, 2023

135:2, 137:3
139:1, 144:1
146:12, 150:20
153:10, 153:11
153:13, 153:25
154:23, 163:2
**bases** 156:19
**basic** 5:24, 23:7
**basically** 19:12
21:18, 56:20
125:7, 158:11
**basis** 102:5, 138:7
145:8, 152:2
161:9, 161:14
162:8
**Bates** 19:17
**battle** 18:18
**Batts** 21:2, 21:16
23:24, 41:15
43:1, 50:2
**bearing** 116:5
**beaten** 91:23
**began** 11:20
**beginning** 4:15
76:3, 83:1, 96:7
103:24
**begins** 50:11
92:12, 157:7
**behalf** 4:20, 16:15
43:13, 140:10
**behavior** 158:15
**believe** 5:7, 10:21
10:25, 11:8
11:22, 11:25
23:14, 30:9
36:20, 37:1
42:16, 50:1
64:20, 66:9
78:20, 82:21
95:2, 117:23
118:15, 119:23
124:13, 126:9
127:22, 128:20
129:11, 130:9
130:13, 130:23
132:3, 133:4
133:11, 134:3
141:24, 143:2
151:14, 161:6

162:23, 166:10
168:18
**benefit** 38:11
38:16
**Berman** 72:24
73:13, 73:13
73:13, 74:2, 74:9
74:16, 96:24
97:14, 112:22
127:15, 128:3
128:20, 130:1
**Berman's** 128:13
129:5, 129:16
**best** 174:5
**Beverly** 37:24
**beyond** 14:22
47:6, 76:22
150:9, 171:6
171:7
**big** 54:24, 88:17
89:18, 90:4
90:11, 90:25
170:18
**bit** 5:5, 42:14
67:23, 83:22
85:20, 86:20
110:2, 143:7
**black** 92:24
**blacked** 92:19
**blackout** 93:4
**blocking** 27:15
27:20
**Bobby** 6:5, 18:7
114:21, 126:25
156:25, 160:15
162:22
**bottom** 19:14
19:17, 38:9, 46:2
76:7, 97:8
108:16, 111:14
125:5, 125:19
**boundaries** 80:10
**box** 27:22, 78:20
**break** 6:20, 6:23
49:17, 49:17
49:20, 50:4, 92:3
156:21
**Break-in** 35:12
35:25

**breaks** 6:17
**briefly** 8:10
**bring** 15:10
15:14, 17:17
17:19, 32:8
32:21, 33:12
36:25, 38:2
114:20, 137:11
157:13
**bringing** 142:24
**Broening** 2:15
4:20
**brought** 121:11
**Brown** 18:22
19:4, 98:16
98:20, 99:11
99:14, 99:21
99:25, 100:7
100:10, 100:21
101:4, 101:5
101:14, 101:16
101:21, 102:4
102:19, 103:6
104:17, 104:25
105:8, 105:19
105:24, 106:13
108:3, 114:24
116:6, 140:6
158:9
**Bryant** 8:16
**bunch** 88:19
**business** 8:18
10:5, 133:2
**buy** 54:19

**C**

**calculator** 70:12
**California** 33:10
36:23, 95:14
**call** 5:15, 15:3
16:4, 16:7, 37:12
45:14, 59:13
64:23, 67:6, 93:6
94:6, 94:8
116:14
**called** 15:24
41:18, 49:8
**calls** 143:16

**car** 54:19
**card** 54:20, 71:25
**care** 10:16
**cares** 88:11
155:5
**carrier** 13:23
14:5, 39:22, 84:5
84:11, 126:10
129:13
**carriers** 33:23
34:4
**case** 4:4, 37:22
48:7, 67:4, 67:8
77:2, 95:4, 98:25
141:12
**cash** 71:9, 159:4
159:6
**cause** 37:24
100:3
**caused** 58:5
150:20, 171:9
172:4, 172:8
**celebrating** 59:8
**Central** 2:15
4:13
**certain** 20:13
91:16, 108:7
118:19, 119:13
119:21, 124:5
**certified** 1:25, 2:4
4:9, 5:3, 174:16
**CERTIFY** 174:7
174:13, 174:20
**change** 25:4
28:12, 126:3
137:22, 156:16
163:8
**changed** 118:17
139:14, 140:7
140:23, 163:13
164:6, 164:10
164:20, 167:9
**changes** 24:16
27:2, 135:12
135:16, 135:17
135:20, 135:22
138:13, 151:16
**changing** 163:15
**character** 125:5

**Charles** 61:6
61:8, 67:14
**chase** 22:21
**check** 18:11
**child** 10:17
**choice** 62:1, 62:6
80:21
**Chrysler** 34:14
**Chubb** 1:7, 4:5
4:21, 8:25, 9:1
9:15, 9:16, 11:8
11:9, 11:10
11:17, 11:20
11:24, 12:19
14:14, 16:15
17:9, 19:15
33:22, 34:3
36:13, 39:23
40:10, 43:18
59:23, 62:11
63:9, 66:19
67:19, 68:9
69:10, 73:14
74:10, 79:16
82:10, 82:19
84:4, 84:10
85:24, 86:16
86:19, 88:22
88:23, 88:24
88:25, 89:5
90:14, 90:16
90:19, 96:15
98:5, 102:5
102:25, 103:1
104:16, 113:9
113:20, 117:6
117:14, 118:2
118:3, 118:10
124:13, 127:4
127:22, 128:21
132:7, 140:10
144:3, 151:18
153:6, 157:17
160:2, 160:5
163:20, 167:15
169:2, 169:14
169:25, 172:8
172:8
**Chubb's** 15:6

27:10, 29:14
67:19, 80:20
89:4, 91:7
**Chvostal** 43:11
43:25, 44:3, 44:4
64:1, 64:8, 64:16
64:22, 65:13
65:14, 65:15
65:15, 65:25
66:17, 66:24
67:5, 67:7, 72:9
72:20, 73:12
75:18, 78:7, 97:2
97:6, 97:9, 98:4
98:10, 99:19
102:24, 103:3
103:13, 108:13
115:13, 125:20
126:6, 128:11
129:2, 129:6
129:15, 130:2
130:5, 131:10
132:14, 142:25
143:4, 143:8
143:25, 146:17
146:24, 147:11
147:19, 148:24
149:12, 149:19
153:18, 154:4
154:16
**Chvostal's** 3:11
3:12, 76:4, 76:13
80:11, 108:25
109:16, 111:9
111:22, 116:11
125:12, 130:16
133:10, 134:9
143:17, 145:20
146:14, 148:23
**cigarette** 37:24
**circle** 85:20, 86:4
**circumstances**
20:18, 108:7
158:20, 159:10
**City** 30:5
**Civil** 30:5
**claim** 9:9, 13:13
13:17, 13:20
14:21, 14:24

15:6, 15:22
15:24, 15:25
16:1, 16:25, 17:7
17:12, 19:24
23:7, 25:3, 26:25
29:19, 30:14
31:5, 32:5, 32:13
34:9, 34:12
34:13, 34:25
35:12, 35:19
36:2, 36:7, 36:21
37:2, 37:11
37:23, 38:11
38:23, 38:25
40:3, 40:3, 40:16
40:18, 40:19
41:2, 41:24
42:22, 43:2, 43:5
43:7, 44:20
44:24, 45:17
48:1, 48:14
55:17, 61:12
61:17, 61:20
61:23, 62:5
62:25, 66:1
66:15, 66:16
70:21, 71:14
71:16, 72:5, 77:1
81:9, 83:11
83:18, 83:24
84:3, 84:14
84:18, 84:20
84:24, 85:17
85:24, 86:6
87:16, 88:1, 88:3
88:5, 89:6, 89:13
89:20, 90:1
90:21, 91:2, 91:4
91:12, 91:17
94:14, 94:17
94:20, 95:1, 95:9
98:14, 98:15
100:20, 103:24
115:17, 115:19
116:25, 117:24
118:16, 119:10
119:15, 119:18
119:21, 119:24
120:10, 121:14

127:12, 130:23
132:6, 134:25
135:23, 136:2
136:4, 136:15
137:2, 138:20
139:7, 139:18
139:22, 140:24
143:25, 144:6
145:2, 145:7
145:8, 146:5
146:6, 146:7
149:7, 150:16
150:20, 151:19
151:23, 152:14
153:14, 154:25
156:14, 157:23
158:25, 159:9
160:2, 160:17
161:7, 161:20
161:22, 162:20
163:8, 163:19
163:25, 164:11
164:22, 165:13
165:24, 166:15
166:24, 167:1
167:2, 167:3
167:12, 167:25
168:15, 169:8
170:15, 170:24
171:9, 171:15
171:20, 172:9
172:20
**claimed** 23:21
24:12, 39:7
43:14, 59:17
60:23, 64:2, 78:3
99:1, 102:6
104:13, 104:15
115:24, 116:7
117:6, 119:8
120:8, 120:14
122:10, 122:13
140:19, 145:17
146:8, 147:8
155:2, 165:19
169:14
**claiming** 88:2
88:7, 116:17
116:25, 118:25

121:9, 139:11
140:1, 140:3
141:2, 165:22
166:13, 166:16
167:10, 170:9
171:13
**claims** 3:10, 13:3
13:6, 13:11
14:24, 15:7
15:10, 15:15
15:18, 15:21
16:4, 16:10
16:23, 17:2, 17:9
17:12, 19:13
19:24, 28:11
29:14, 33:22
34:3, 39:10, 40:8
45:4, 59:13
65:18, 66:3
66:18, 66:18
72:11, 105:22
137:1, 137:1
137:7, 140:17
157:18, 158:5
160:10, 160:13
**Clarifying** 77:18
**clean** 29:11
**cleaning** 119:25
**clear** 12:10, 63:22
77:7, 80:10
85:21, 90:10
118:21, 155:9
161:5, 163:2
**clearly** 54:6
112:6, 166:21
**clicked** 27:23
**client** 76:20
114:5
**closer** 39:17
**Coast** 5:14, 43:19
**coincides** 170:7
**college** 10:12
10:15, 10:19
10:24, 11:3
11:11
**come** 29:13, 44:1
52:7, 66:18
135:14, 160:24
**coming** 150:14

150:17, 170:21
**commencing** 2:2
**comment** 146:8
146:14, 148:8
148:8
**comments** 87:19
**common** 121:25
**communicated**
73:13
**communicating**
74:2, 74:8
**company** 1:8, 4:5
13:12, 13:17
83:13, 85:22
87:13, 135:14
**compelled** 105:16
**competing** 155:8
**compilation** 3:10
15:14, 19:13
59:12
**complete** 10:6
28:25, 47:16
52:23, 63:9
65:23, 77:3, 77:8
77:10, 78:8
78:25, 79:8
113:2, 116:4
126:18, 127:16
128:7, 130:1
133:2, 143:10
**completed** 33:20
34:18, 38:6, 41:6
43:13, 88:3, 93:8
94:2, 99:3
100:19, 102:11
102:11, 108:6
108:9, 109:7
135:1
**completely**
145:12
**complexities**
133:1
**complied** 174:13
174:21
**comprehensive**
55:25
**computer** 17:19
**concealed** 138:1
151:22, 160:11

162:1
**concealment**
  137:4, 137:15
  139:1, 139:5
  150:2, 150:5
  156:9, 161:6
  162:4, 163:3
**conceded** 163:24
  164:5
**concept** 15:18
  137:23
**concepts** 15:6
**concern** 32:18
**concerns** 14:20
  29:16
**concluded** 173:6
**conclusion** 31:5
  95:19, 111:9
  111:13, 122:1
  159:19, 160:19
  160:25
**conclusions** 55:4
  116:11, 141:20
**condensed** 162:15
**condition** 76:5
  109:18, 109:21
  111:2
**conduct** 61:19
**conducted** 133:6
**conference** 93:6
  93:25
**confidence** 125:1
**confirm** 18:9
  37:19, 47:17
  67:24, 90:20
  91:11, 97:17
  98:24, 103:16
**confirmed** 60:9
  81:11, 91:16
  117:11, 117:12
**confirms** 59:16
  59:22, 97:23
**conflating** 100:11
**conflict** 145:19
**conflicting** 98:18
  99:12, 139:16
  139:23
**confusion** 101:2
**congrats** 136:10

**conjunction**
  136:17
**consecutively**
  18:6
**consider** 13:23
  152:22, 158:13
**consideration**
  13:23, 14:5, 15:5
  80:19, 99:6
**considered** 23:4
**considering**
  139:25
**consistent** 132:10
  132:16
**contact** 42:17
  42:23, 132:19
  132:22
**contacts** 132:9
**containing** 113:3
  128:8
**contains** 148:14
**content** 151:15
**context** 131:23
**continuation**
  59:11
**continued** 114:5
**continues** 159:17
**contradict** 131:5
**contradicted** 58:1
  91:4
**contradiction**
  76:12
**conversation**
  67:18, 94:4
  96:24
**convey** 6:15
**conveyed** 50:21
  130:17
**conveying** 57:8
**convincing**
  126:10, 129:12
  129:16, 129:19
**convoluted** 19:1
**cool** 96:12
**cooperate** 14:2
**coordinate** 61:17
**copied** 72:12
  72:17, 138:16
**copy** 7:21, 28:4

61:7
**copying** 136:24
**Corcoran** 70:1
  97:16, 126:13
  126:16, 141:18
  142:3, 143:14
  144:18, 145:23
  146:18, 147:19
**Corcoran's**
  147:24, 147:25
**corporation** 1:8
**correct** 5:22, 16:2
  20:2, 20:4, 24:1
  24:21, 27:11
  31:17, 37:9, 47:3
  49:6, 50:23, 64:8
  64:9, 64:10
  67:16, 69:20
  69:23, 83:19
  83:24, 88:20
  89:3, 89:16
  89:23, 96:4
  102:20, 102:21
  102:22, 108:22
  109:10, 109:11
  109:14, 119:1
  120:25, 121:24
  122:18, 122:19
  122:21, 122:22
  122:24, 122:25
  123:2, 123:3
  123:5, 123:6
  123:8, 123:9
  123:11, 123:12
  123:14, 123:15
  123:21, 123:22
  124:1, 124:2
  124:13, 130:3
  131:18, 134:12
  138:5, 146:18
  160:14, 161:7
  162:5, 162:21
  168:10
**correctly** 117:22
**correlates** 39:11
**cost** 59:17
**couch** 78:20
**counsel** 2:8, 4:14
  4:16, 45:15, 61:9

106:17, 134:14
  134:24, 135:9
  135:10, 142:2
**counsel's** 48:16
  87:19, 103:8
  171:1
**Country** 34:14
**counts** 132:15
**County** 33:10
  174:2
**couple** 5:23
  54:24, 55:10
  66:13
**course** 6:25
  16:18, 32:6, 80:2
  106:17, 111:4
  140:24, 159:16
  162:9, 164:10
**courses** 12:24
**court** 1:1, 4:6, 5:3
  6:1, 7:4, 17:21
  30:5
**courtroom** 7:11
**coverage** 9:18
  13:18, 13:20
  21:21, 22:11
  23:13, 24:5
  24:16, 24:25
  25:19, 26:14
  40:19, 40:22
  47:17, 62:13
  72:6, 82:4, 82:8
  84:10, 85:9
  85:13, 85:16
  86:17, 88:2
  117:14, 117:24
  136:16, 137:24
  138:8, 159:11
  160:25, 161:5
  171:24
**coverages** 25:8
  25:13
**covered** 69:13
  103:12, 137:25
  171:14
**covering** 156:18
**covers** 39:12
**CR** 1:24, 174:16
**created** 53:23

67:12, 105:23
**creating** 39:4
  158:13
**credibility** 87:16
**credit** 45:24, 46:3
  46:8, 46:18
  47:11, 48:4, 48:4
  48:8, 48:20
  48:23, 49:4, 51:5
  51:14, 51:17
  51:20, 51:22
  51:25, 52:9, 52:9
  52:10, 52:24
  52:25, 53:3, 53:6
  53:7, 53:15
  53:21, 54:4
  54:12, 54:20
  54:22, 71:25
**criminal** 8:19
  10:6, 28:18, 29:3
  29:10, 33:6, 33:8
  158:14
**current** 42:5
  81:9
**customer** 11:19
**cut** 22:21, 35:3
  112:19, 155:23
**CV-21-00119-T...**
  1:4, 4:4
**cycle** 82:8

**D**

**daily** 66:2
**damage** 36:17
**Dan** 41:9, 41:10
  41:11, 47:24
  60:5, 60:6, 61:2
  63:24, 67:4, 67:6
  72:9, 75:16, 94:4
  94:13, 94:17
  134:10, 134:11
  136:20, 136:23
  138:7
**Dan's** 137:9
**Darr** 151:10
  151:12
**database** 23:3
  23:19, 23:21

KAREN MOORE    FEBRUARY 23, 2023

databases 29:16
date 28:16, 30:18
 35:24, 36:1
 53:20, 93:2, 94:2
 103:14, 108:17
 115:13, 135:1
dated 20:8, 21:16
 92:17, 95:5, 95:6
 174:14
dates 54:6
day 24:5, 33:17
 38:4, 45:14
days 93:1
deal 10:13
death 91:23
Debbie 157:16
Deborah 3:14
 158:9
debt 46:1, 48:19
 70:17, 71:9
 71:24, 71:25
 159:7
December 46:5
 111:17, 134:8
 136:23, 143:12
 151:7
decided 10:18
decision 31:19
 32:8, 33:12
 34:21, 35:4
 36:25, 37:5
 37:12, 37:25
 41:3, 62:13
 71:13, 72:6
decisions 63:10
deep 64:15
deeper 14:23
 24:14
Defendant 1:9
 2:13, 4:20
deficiency 105:11
Define 46:8
definitely 51:10
 58:5, 143:9
definition 78:10
degree 8:17, 10:6
 125:1, 133:18
DELAVINA
 174:20, 174:23

denial 8:8, 134:16
 134:19, 135:4
 135:5, 135:7
 135:9, 135:10
 151:7, 151:11
 152:3, 153:10
 159:23, 161:4
 161:9, 161:14
 161:18, 162:6
 162:7, 162:9
 163:2
denied 139:1
 161:20
denies 151:18
deny 62:5, 71:13
 71:17, 72:6
 134:15, 134:22
 137:2, 138:7
 150:20
denying 163:8
department 21:7
 41:14, 67:20
dependent 105:22
depends 66:15
 118:24
depicted 124:5
depo 134:5
 138:10
deposed 5:21
deposition 1:12
 2:1, 3:15, 4:2
 7:16, 50:12
 60:25, 67:9
 67:10, 74:23
 92:13, 92:16
 127:1, 128:2
 128:2, 137:12
 151:6, 157:8
 157:14, 157:15
 160:8, 173:4
 173:6
depositions 5:24
describe 14:12
 30:2, 35:8, 60:17
described 116:6
 125:20, 151:18
describes 72:21
describing 126:1
 138:7

description 3:8
 15:24, 20:22
 21:24, 22:10
 35:1, 36:2
descriptions 82:7
desk 14:22
detail 40:17
detailed 60:22
details 9:18
 40:17, 133:3
determination
 40:19, 40:22
 40:24, 62:4
 71:16, 82:4, 82:4
determine 13:20
 14:25, 24:14
 25:3, 28:25
 29:18, 31:18
 45:21, 82:5
 86:15, 86:24
 94:1, 112:13
 159:10
determined 44:6
 93:23, 94:11
 98:15, 117:5
determines 85:15
determining 87:3
developed 100:2
 139:7
developing 45:21
dictated 94:15
differed 91:3
difference 25:9
 25:11, 76:15
 156:12
different 12:14
 14:3, 14:4, 36:3
 38:15, 54:2
 83:13, 83:23
 120:19, 130:22
 136:3, 139:15
 163:20
differing 89:13
 99:15
difficult 6:19
Dina 18:22, 18:24
 19:4, 98:16
 99:10, 99:21
 99:25, 100:7

100:10, 100:21
 101:5, 101:14
 101:15, 101:21
 102:4, 102:19
 103:6, 104:17
 104:25, 105:8
 105:19, 106:13
 108:3, 114:23
 115:2, 116:6
 140:5, 154:23
 158:9
dip 64:19
direct 133:6
directed 39:25
directing 23:5
 80:22
direction 23:8
 174:6
directly 106:6
disagree 58:16
 120:17, 124:19
 158:22, 162:25
disagreed 58:10
disagrees 153:6
disappearance
 33:22, 34:3, 39:9
 45:4, 45:18
disappearance-t...
 34:8, 35:10
disclose 19:21
disclosed 19:15
disclosing 139:10
discovered
 148:18
discuss 44:17
 44:19, 93:7
 104:24
discussed 7:19
 39:13, 43:11
 60:5, 94:10
 137:1, 143:25
discussing 104:25
 105:8
discussion 44:2
 63:25
display 96:10
 96:19
dispositive 85:23
dispute 70:2

155:25, 163:21
disregarded
 164:15
distinction 156:6
distinguish 100:9
 153:4
District 1:1, 1:2
 4:6, 4:6
dive 64:15
DLV 4:10
dockets 117:9
document 70:15
 82:15, 115:13
 115:22, 116:6
documentation
 8:6, 112:24
 117:3, 126:17
 127:11, 127:13
 127:19, 128:15
 129:9, 130:6
 130:19, 130:20
 142:4, 143:15
 145:4, 164:23
 170:15, 171:22
 172:21
documented
 117:22
documents 8:4
 16:24, 19:20
 93:22, 170:23
dodged 106:13
doing 15:17, 18:5
 107:23, 115:16
dollars 109:24
DONNA 174:20
 174:23
double-check
 53:19
Doug 154:3
Doug's 124:16
Douglas 1:4, 4:4
 28:16, 33:20
 50:22, 54:10
 55:13, 59:22
 81:12, 88:18
 89:19, 90:14
 95:5, 95:7, 95:15
 95:20, 96:9
 96:11, 96:14

116:17, 117:8
117:12, 118:9
118:25, 119:21
120:2, 124:7
124:12, 126:18
127:16, 128:11
128:21, 143:15
144:18, 145:20
153:17, 163:7
166:2, 166:5
168:10, 172:3
**draft** 134:16
135:5, 135:9
135:10, 135:15
151:9, 151:10
**drafted** 135:7
151:11
**draw** 55:3, 111:8
**drawing** 31:15
**due** 121:18
**duly** 5:2, 174:4
**duplicate** 36:15
37:16, 37:17
**duty** 13:13, 13:22

### E

**e-Tran** 173:2
**E.U.O** 65:12
**earlier** 83:2
107:14, 114:11
150:14, 150:24
**early** 8:21, 10:24
10:24, 59:8
100:19
**East** 5:14
**edition** 22:1, 68:5
68:17, 68:18
69:17, 69:22
113:4, 116:5
116:15, 116:23
117:13, 117:21
118:3, 118:19
119:1, 119:6
119:14, 120:8
120:12, 120:13
120:21, 121:1
121:3, 121:9
121:10, 121:12

121:14, 121:22
122:2, 122:11
122:11, 122:12
122:17, 123:24
125:3, 125:4
125:9, 125:13
125:17, 126:12
127:14, 128:9
129:10, 129:14
132:5, 140:2
140:22, 141:25
142:8, 144:13
144:14, 145:1
164:8, 164:9
164:21, 165:18
165:21, 166:13
166:13, 166:17
166:22, 166:24
166:25, 167:3
167:7, 167:20
167:23, 168:2
168:16, 168:19
169:9, 169:13
170:10, 171:13
**editions** 165:20
**education** 8:11
**effect** 107:5
**effective** 24:7
24:9, 81:6
**eight** 109:25
**either** 31:6, 31:23
31:24, 40:4, 49:6
49:18, 50:1
69:19, 124:1
146:13, 147:7
147:19, 148:19
151:4, 160:14
**Elaine** 125:23
**email** 27:7, 29:23
33:18, 42:17
67:12, 67:24
68:6, 68:9, 68:23
72:8, 72:15
72:16, 72:24
73:6, 75:20
75:23, 93:4, 94:6
95:13, 112:18
117:10, 138:15
**emerging** 114:8

**employment** 11:7
**endeavor** 6:2
**enforcement** 58:1
**engaged** 67:5
**English** 7:5
**enroll** 10:19
**entail** 23:11
23:18
**enter** 23:20
64:20, 64:21
**entered** 17:2
47:2, 53:8, 53:13
53:16, 53:24
54:2, 54:6, 61:1
64:21, 72:11
112:17, 114:23
128:4, 134:7
149:21
**entering** 33:24
**entertain** 166:4
**entire** 84:20
92:18, 163:12
**entirely** 145:10
**entitled** 65:11
96:24
**entries** 17:8
**entry** 21:2, 21:16
22:14, 28:15
34:12, 34:16
34:20, 41:17
45:23, 50:16
57:17, 59:19
60:25, 70:10
77:5, 136:25
**EOU** 75:19
**equal** 13:22
13:24, 14:5, 15:5
**equipment** 37:3
**error** 105:20
**especially** 28:12
**essentially** 60:6
**established** 82:18
114:7, 168:21
168:22
**estimate** 111:15
**estimated** 111:18
**estimating** 9:17
**estimation** 112:2
**ethical** 174:13

174:21
**EUO** 3:13, 47:19
58:4, 58:11
65:16, 80:13
126:5, 134:14
135:10, 139:19
139:22, 139:24
169:10, 169:17
**evaluate** 47:24
51:13
**evaluated** 98:23
102:9
**evaluates** 31:11
**evaluator** 48:12
**event** 23:21
116:7
**events** 52:14, 57:5
**everybody** 47:5
**evidence** 84:21
84:24, 118:13
121:6, 121:11
126:10, 126:17
127:4, 127:12
129:9, 129:12
130:14, 131:4
143:3, 144:18
145:19, 145:22
160:10, 160:13
160:16, 163:15
165:4
**evidently** 72:22
**ex-girlfriend** 95:3
124:7
**exact** 8:21, 10:3
**exactly** 166:6
**examination** 3:4
5:11, 47:18, 57:2
57:21, 58:7
58:21, 61:9
61:16, 62:10
125:21, 135:2
139:15
**examined** 5:3
125:1
**examiner** 9:7
47:13, 136:8
136:13, 138:21
**example** 26:10
26:14, 47:8

76:20, 80:12
**excerpts** 158:2
**exchange** 68:6
117:11
**exclusive** 147:20
**Executive** 49:9
**exhibit** 3:8, 3:10
3:11, 3:12, 3:14
15:11, 17:17
18:4, 18:5, 18:20
19:9, 19:12, 21:2
24:4, 27:6, 30:1
33:7, 35:2, 38:4
41:16, 43:10
44:15, 45:13
49:8, 50:16
53:22, 55:24
56:24, 59:2
59:11, 60:25
64:22, 65:1
67:10, 67:11
68:21, 70:10
72:7, 76:3, 92:16
93:17, 96:23
98:2, 114:23
114:25, 115:6
115:9, 115:23
122:17, 134:6
137:12, 138:10
142:24, 143:8
149:21, 151:7
151:17, 157:10
157:14, 160:8
160:9
**exhibited** 29:16
**exhibits** 3:7
15:12
**exist** 153:1
**expect** 77:14
110:18, 169:25
**expensive** 24:19
24:25, 25:6
25:10, 39:14
96:12
**experience** 98:12
**expert** 43:15
44:5, 44:10
64:13, 76:19
79:2, 80:3, 99:19

KAREN MOORE   FEBRUARY 23, 2023

110:14, 148:3
148:13, 148:20
157:18, 157:22
**experts** 42:2
64:16, 66:22
66:23, 67:1, 67:3
79:12, 79:18
80:1, 111:8
**explain** 20:12
22:22, 34:2, 51:5
57:5, 60:8, 77:22
106:6, 107:22
**explained** 131:24
**explaining** 42:19
105:1
**explanation** 49:2
54:12, 91:15
**exposure** 155:3
155:6
**extent** 89:5, 89:18
90:19, 91:10
**eyes** 14:19

**F**

**F)(3** 174:13
**face** 54:11, 55:12
70:24, 71:3
**fact** 54:10, 74:16
85:21, 87:13
99:10, 138:1
140:16, 142:18
143:15, 153:16
163:15, 165:7
**factor** 31:21
31:25, 32:12
32:14, 32:21
32:22, 32:24
33:3, 33:12
34:20, 35:4
35:14, 36:19
39:8, 55:5, 71:12
71:17, 77:11
99:5
**factored** 36:24
37:5, 37:5, 37:12
37:25
**factors** 57:3
99:15, 111:2

150:19
**facts** 13:19, 57:14
77:10, 102:15
118:13, 121:6
151:23, 159:10
163:12, 164:7
**fair** 8:23, 12:3
13:14, 15:4
17:11, 27:13
29:12, 29:20
39:17, 45:10
47:23, 53:6, 53:9
62:22, 72:19
75:8, 88:4, 88:21
88:24, 89:2, 90:8
93:15, 100:12
101:25, 102:1
109:19, 115:21
118:7, 119:19
124:24, 126:2
132:16, 152:17
154:7, 164:13
164:19
**fairly** 26:17
85:21, 91:9
**falls** 24:16, 25:8
25:12
**familiar** 15:18
16:1, 137:13
141:17
**far** 27:23, 30:19
46:17, 99:16
102:18
**fashion** 61:23
**faulty** 105:24
108:4
**favor** 31:25
84:13, 87:15
90:21
**February** 1:13
2:2, 4:8, 45:24
50:16, 53:23
53:24, 56:25
**feel** 6:20, 79:10
80:24, 86:3, 87:8
135:3, 155:10
**feels** 80:11, 80:13
**fell** 35:2
**felt** 62:1, 135:12

**field** 93:7, 93:20
**figure** 37:18
78:22
**Figurski** 27:7
27:9
**file** 7:22, 8:5, 8:7
14:19, 16:25
19:24, 20:17
24:1, 28:5, 33:19
41:17, 42:10
43:10, 44:16
45:13, 45:23
47:14, 47:22
53:8, 54:6, 56:25
59:13, 59:14
63:22, 67:11
68:21, 68:23
68:25, 74:24
75:15, 75:17
81:3, 94:14
94:22, 112:25
115:17, 115:19
117:18, 117:20
117:23, 128:4
135:11, 136:15
138:21, 150:16
157:23, 158:5
160:10, 160:13
**filed** 4:6, 30:8
**filing** 28:18
158:25
**filings** 29:3, 29:10
**final** 63:11, 94:13
132:24
**finances** 88:20
90:16
**financial** 29:9
29:15, 52:3
52:23, 56:8, 56:9
56:20, 70:16
71:19
**financials** 55:9
**find** 13:18, 19:1
36:14, 82:24
86:10, 87:11
107:16, 129:16
129:19
**finding** 29:8
**finds** 48:13

**fine** 6:11, 24:19
38:25, 43:15
44:10, 49:18
66:18, 68:3
**finish** 49:16, 90:5
**finished** 81:17
**fire** 37:24
**firm** 4:14, 174:23
**first** 5:2, 5:25
20:8, 22:20
28:20, 30:4
34:12, 38:24
42:11, 43:17
44:2, 49:10, 57:4
81:5, 94:24, 95:6
95:12, 102:25
116:2, 126:25
134:18, 137:7
141:9, 143:12
151:21
**five** 47:8, 48:11
48:20, 49:2, 51:5
51:14, 51:22
51:25, 52:2
52:10, 53:21
54:12, 145:15
**flag** 56:3
**flat** 27:23
**floater** 20:15
20:20, 21:23
**focus** 159:9
**focused** 51:1
51:2, 165:2
**focusing** 77:16
**follow** 26:4, 45:21
65:22
**follow-up** 60:7
**followed** 130:24
**following** 24:4
24:18, 43:12
57:3, 143:11
151:19
**follows** 5:4
**forced** 57:17
77:4
**foregoing** 174:3
174:4
**form** 14:15, 16:12
23:12, 25:23

26:18, 40:14
40:25, 43:3, 45:1
48:15, 49:13
51:7, 51:24
52:16, 53:10
55:15, 56:4, 57:9
58:12, 59:25
61:13, 61:21
61:23, 62:16
63:1, 63:15
68:12, 69:5, 70:5
71:5, 73:15, 74:4
74:11, 74:18
75:10, 75:21
76:9, 76:24
77:23, 78:12
79:4, 79:21
80:15, 81:14
81:23, 82:12
83:14, 83:25
84:15, 84:25
85:6, 85:14
85:25, 86:12
86:22, 87:4
87:17, 89:7
89:21, 89:24
90:22, 92:23
95:22, 96:16
97:20, 100:14
101:7, 101:19
103:7, 103:20
104:8, 105:14
106:21, 106:24
107:7, 107:19
109:2, 110:13
110:20, 111:24
112:9, 113:12
113:22, 116:20
117:17, 118:5
118:12, 119:2
120:4, 121:5
122:4, 125:5
126:20, 127:17
128:23, 129:17
130:4, 131:6
132:17, 133:20
134:1, 141:3
141:6, 141:22
142:5, 142:12

KAREN MOORE   FEBRUARY 23, 2023

143:19, 144:10
144:12, 144:21
145:25, 146:19
147:3, 147:22
148:16, 149:14
150:7, 150:22
153:7, 154:8
154:17, 158:17
159:20, 160:21
161:12, 161:15
163:9, 164:2
164:17, 165:14
166:8, 167:5
167:16, 168:4
168:13, 169:4
169:20, 170:3
170:25, 171:10
172:10
**format** 55:25
70:23, 123:23
135:17, 162:15
**forms** 79:19
**forth** 174:13
174:21
**forward** 22:16
106:3
**forwarding** 67:17
**found** 96:11
105:19, 105:24
108:6, 160:6
**foundation** 14:16
16:12, 22:6
25:24, 26:19
40:14, 40:25
43:3, 48:16, 51:7
51:24, 55:15
56:5, 57:9, 58:12
61:13, 61:21
62:17, 63:1
63:15, 68:13
70:5, 71:5, 73:16
74:4, 74:11
74:18, 75:21
76:9, 77:24, 79:5
79:22, 80:16
81:15, 81:23
83:15, 85:6
86:12, 87:18
90:22, 104:9

106:21, 106:24
107:7, 109:3
110:20, 111:25
129:17, 142:13
143:20, 146:20
147:4, 147:23
148:16, 150:8
153:7, 158:18
159:21, 160:22
164:17, 165:15
167:17, 168:5
172:11
**four** 38:14, 38:20
98:3, 106:10
113:3, 124:21
125:16, 127:6
128:8, 129:10
130:7, 131:11
**Fourteen** 30:1
**fourth** 58:17
**frame** 45:6, 48:21
96:2, 125:3
**framed** 124:5
**fraud** 29:13
137:4, 137:16
139:2, 150:21
158:13, 161:6
162:3, 162:4
163:3
**Fred** 38:12, 40:7
40:7, 40:8, 40:9
41:7, 42:21
43:11, 44:2
44:16, 45:24
46:12, 46:13
47:1, 47:1, 47:20
48:5, 50:16
50:21, 51:13
52:10, 52:19
53:7, 53:21
56:25, 57:11
57:20, 60:6
68:21, 68:25
69:7, 69:21
69:24, 70:10
74:24, 75:6
75:16, 83:3
94:23, 95:4
126:8, 134:13

134:13, 134:23
136:24
**Fred's** 47:6, 48:9
**free** 80:13
**frequent** 114:12
**frequently** 5:21
**front** 45:20
**froze** 5:5
**full** 60:15, 60:22
64:15, 78:5
78:14, 79:9
79:25, 99:9
99:16, 99:25
100:4, 100:20
128:15, 131:23
134:25, 174:4
**fully** 14:2
**function** 14:13
16:3, 16:23
**further** 27:4
31:18, 32:5, 40:5
40:17, 60:12
61:25, 66:21
76:16, 77:5
99:18, 108:1
125:18, 131:24
**FYU** 75:16

## G

**gallery** 70:1
72:25, 95:17
112:22, 114:6
126:13, 126:17
130:25, 133:15
141:18, 142:3
143:14, 144:18
145:23, 146:18
147:20
**gather** 9:19
13:19, 40:17
67:19, 78:24
79:7
**gathering** 41:2
47:7, 72:22
**gathers** 47:7
47:21
**GEICO** 11:10
11:10, 11:12

11:16, 11:16
11:18
**general** 36:2
38:22, 52:3
**generally** 91:12
153:3
**genuine** 101:2
**getting** 10:8
**Gilbert** 4:10, 4:11
**girl** 12:21
**give** 14:5, 19:20
19:21, 31:5
44:17, 62:24
63:6, 63:7, 65:21
66:4, 73:22, 79:8
80:20
**given** 49:12, 57:5
78:2, 78:4
131:22, 133:1
152:9
**gives** 62:7, 81:5
**giving** 21:21
42:22, 60:22
70:17, 80:22
**glad** 62:22
**go** 5:23, 8:10
8:12, 9:8, 10:12
11:3, 15:10
17:25, 22:7, 22:8
23:20, 29:24
30:1, 30:19
30:21, 30:22
33:16, 38:3
38:24, 47:4, 47:6
50:3, 53:20
60:24, 63:3
65:10, 66:13
76:22, 82:24
82:25, 94:18
94:22, 95:10
95:24, 107:8
111:10, 112:16
121:18, 134:5
137:15, 147:13
151:3, 151:3
151:6, 156:7
167:2
**go-to** 66:25
**goes** 23:14, 67:15

**going** 6:8, 7:1
9:11, 11:5, 11:16
12:7, 16:4, 16:5
17:16, 17:16
21:15, 24:3
28:20, 29:22
29:24, 33:16
38:3, 38:17, 42:4
50:6, 55:23, 59:7
60:24, 63:25
64:19, 64:21
64:22, 65:10
67:9, 67:10
69:16, 70:9
72:22, 75:14
82:25, 86:4
88:17, 91:20
92:7, 94:22
95:10, 96:6, 98:2
106:3, 106:16
108:11, 112:16
114:19, 114:19
114:22, 115:22
116:14, 128:2
134:5, 138:25
145:9, 150:2
151:6, 155:5
156:22, 157:2
157:25, 158:1
158:6, 162:14
170:18
**good** 5:9, 5:10
5:13, 10:13
35:23, 54:12
93:5, 95:25
107:23
**goof** 17:16
**goofed** 26:12
27:21
**goofy** 162:14
**gotten** 22:3
**graduate** 8:20
**graduated** 9:24
10:20, 10:20
10:25
**graduating** 11:15
**graduation** 8:24
9:21
**granted** 137:2

KAREN MOORE    FEBRUARY 23, 2023

170:20
**Great** 7:14, 16:17
19:8, 49:21
49:21, 92:4
**ground** 5:24
**grounds** 151:19
**guess** 8:10, 8:12
12:17, 14:3
15:20, 24:22
25:16, 26:11
30:21, 31:9
32:19, 33:1, 35:8
39:2, 39:24
41:17, 44:23
46:22, 46:23
47:4, 48:9, 52:6
55:3, 62:6, 69:21
72:11, 72:12
72:20, 76:3
78:10, 83:9
83:22, 88:10
88:17, 99:4
100:9, 100:11
101:2, 101:13
101:23, 103:4
104:4, 105:7
106:2, 107:23
108:12, 115:23
121:18, 130:14
131:25, 138:17
139:2, 142:24
147:14, 148:5
149:10, 156:5
156:14, 156:21
157:14, 163:4
167:1
**guessed** 165:11
**guided** 94:18
**guidelines** 12:25
**Gurr** 41:20, 42:1
42:2, 44:6, 44:12
59:16, 59:21
60:5, 64:11
64:13, 98:6, 99:4
99:7, 99:22
99:24, 100:7
100:10, 100:18
102:9, 102:10
103:10, 103:23

104:25, 105:10
105:11, 108:4
**Gurrs** 101:3
101:4, 101:18
102:21, 103:2
103:4, 103:18
**guy** 66:25, 113:8
124:3

**H**

**habit** 17:8
**Haier** 95:16
**hammer/base**
111:17
**hand** 71:10, 71:24
100:21, 145:22
151:3, 151:3
156:7, 156:7
159:4, 159:6
**hand-selected**
19:23
**handed** 40:6
**handful** 66:6
**handle** 13:8
13:13, 61:16
148:14, 148:21
**handled** 43:22
77:1
**handles** 40:8
**handling** 13:3
13:6, 13:11, 15:7
17:7, 38:12
105:22, 157:18
157:23, 158:5
**happen** 17:2
**happened** 33:2
79:9, 114:1
165:5
**hard** 19:18
162:15
**Haring** 21:19
77:19, 95:16
96:2, 116:4
130:11, 132:10
133:1, 133:15
137:3
**Haring's** 96:25
124:9, 126:11

129:14
**Harings** 77:21
**hate** 87:7
**Hayden** 114:7
**head** 7:2, 67:2
79:14, 93:21
112:23
**health** 56:9, 57:25
**heard** 17:1, 17:3
**hearing** 32:19
**help** 80:5, 91:17
**helpful** 80:13
**hereof** 174:8
**hereto** 174:8
**Hey** 16:8, 16:11
**high** 10:10, 10:14
10:21, 11:13
11:15, 71:24
71:25, 72:1
78:18, 113:3
124:25, 128:8
159:7
**high-quality**
125:1
**highlighted** 21:17
35:1, 51:3, 54:23
56:13, 59:12
73:4, 95:12, 96:7
97:8, 125:22
132:25, 144:8
144:12, 158:8
159:13
**highlighting** 20:1
132:24, 159:13
**highly** 57:6, 57:16
**Hills** 37:24
**hire** 61:15
**history** 34:10
40:18, 46:4, 48:4
60:19, 85:9
85:12, 85:18
86:15, 86:16
86:24, 87:3, 99:2
105:17, 106:1
107:25
**home** 36:17
39:21, 54:20
57:17, 57:25
77:4, 77:21

78:19
**homeowners** 36:9
36:12
**honest** 104:3
**honestly** 120:16
126:15
**Hopefully** 5:9
**hoping** 27:14
**hours** 8:3
**house** 76:6, 76:20
**hundred** 55:10
109:25
**hurry** 170:18

**I**

**idea** 49:24, 56:8
71:18, 97:2
97:13, 162:19
**identical** 35:21
**identification**
19:10, 65:2
115:10, 157:11
**Identity** 115:24
**illness** 133:5
**image** 124:5
125:4, 126:7
129:7, 131:11
131:13
**images** 125:2
**imagine** 137:17
**immediate** 31:1
**immediately** 9:22
97:14
**important** 86:10
**in-depth** 100:4
**inaccuracies**
148:14
**inaccuracy**
148:19
**include** 9:18
62:11
**included** 134:17
135:6, 135:13
135:17, 168:19
**includes** 153:21
**including** 46:20
48:10, 111:18
130:24, 135:1

**inconsistencies**
105:25
**incorporate**
80:23
**incorrect** 143:5
144:20
**increase** 28:13
58:23, 110:11
112:7, 112:13
**increased** 24:8
25:1, 25:19
25:21, 26:11
26:15, 26:16
26:24, 39:14
58:18, 58:23
68:16
**Indiana** 1:8
**indicate** 21:9
36:6, 48:22, 49:3
51:18, 55:13
55:16, 69:9
69:18, 71:7, 72:2
87:14, 109:16
114:17, 118:16
**indicated** 21:10
57:24, 74:21
76:7, 109:20
114:12, 119:7
121:8, 122:11
141:18, 168:14
**indicates** 57:24
71:4, 71:21
73:10, 73:12
73:23
**indicating** 52:10
57:15, 69:7
76:14, 124:20
132:21, 142:4
143:8
**indication** 132:18
**indicator** 108:24
**individually**
20:21, 111:1
**ineptitude** 18:15
18:18
**influence** 31:19
**information** 9:20
22:9, 24:23
24:24, 28:22

| | | | |
|---|---|---|---|
| 29:1, 29:23, 30:4 | 47:21 | 87:12, 88:1, 88:6 | 162:19, 162:23 | 84:18, 88:3 |
| 31:15, 31:22 | **informed** 53:7 | 88:12, 90:21 | **interaction** 42:11 | 88:18, 89:4 |
| 38:21, 40:23 | 53:13 | 112:7, 158:13 | **interest** 28:21 | 90:17, 91:5, 93:7 |
| 41:2, 42:23 | **infraction** 33:9 | **insured** 13:24 | 29:2, 29:6, 29:7 | 93:20, 93:24 |
| 46:14, 47:7, 47:8 | 33:15 | 14:8, 20:25, 29:1 | 29:14, 30:6 | 94:12, 95:1 |
| 47:9, 47:22, 48:2 | **initial** 15:15 | 30:10, 34:7, 35:2 | 30:20, 30:24 | 98:14, 99:2 |
| 48:12, 48:13 | 42:17, 57:12 | 39:19, 39:22 | 31:1, 31:10, 32:2 | 100:3, 102:12 |
| 48:19, 51:12 | 105:18, 108:5 | 42:17, 43:14 | 32:11, 56:14 | 102:14, 103:13 |
| 55:5, 60:7, 60:9 | 136:6, 136:8 | 48:22, 50:25 | 78:21 | 103:25, 104:1 |
| 62:9, 62:12 | 167:1, 167:3 | 51:15, 52:4 | **interested** 12:16 | 117:4, 128:25 |
| 63:22, 64:3 | 172:16 | 52:18, 52:23 | 174:8 | 130:18, 130:23 |
| 65:21, 68:1 | **initially** 74:19 | 55:9, 56:9, 57:5 | **interesting** 76:4 | 133:13, 134:25 |
| 71:12, 74:14 | 82:19, 82:21 | 57:15, 57:24 | **interests** 13:24 | 136:4, 136:17 |
| 74:17, 76:12 | 99:8, 100:19 | 65:22, 68:10 | 14:6, 14:7 | 139:7, 146:12 |
| 76:15, 77:6 | 102:9, 105:21 | 69:2, 70:16 | **interpret** 113:8 | 148:3, 148:9 |
| 77:10, 78:24 | 107:11, 116:24 | 70:20, 70:20 | 113:11, 127:5 | 148:10, 149:8 |
| 80:7, 83:10 | 126:4, 139:13 | 73:24, 74:14 | **interpretation** | 159:2, 159:18 |
| 83:23, 84:8 | 139:25, 142:18 | 74:21, 75:1, 75:9 | 127:9, 129:15 | 166:5, 171:17 |
| 89:14, 91:2 | 143:24, 154:21 | 76:21, 78:4 | **interpreted** 109:1 | 172:17 |
| 91:10, 93:19 | 163:18, 169:8 | 81:12, 81:12 | **interrupted** | **investigations** 9:7 |
| 98:18, 99:13 | **initiated** 117:14 | 81:21, 82:6, 82:9 | 159:16 | 9:22, 12:6 |
| 99:17, 99:18 | **inland** 36:9 | 82:18, 83:12 | **interview** 50:22 | **investigative** |
| 99:20, 99:25 | **innocent** 26:9 | 85:22, 87:12 | **introduce** 124:20 | 61:20 |
| 100:2, 100:6 | 26:13, 26:17 | 89:14, 95:3 | **introduced** 59:10 | **investigator** 31:4 |
| 100:23, 102:10 | 27:2, 49:2 | 97:10, 98:19 | 141:11 | 31:13, 31:14 |
| 102:12, 102:13 | **input** 31:5, 94:16 | 104:14, 104:19 | **investigate** 61:22 | 31:16, 31:20 |
| 102:16, 103:12 | 94:19 | 105:19, 110:11 | 61:25, 90:17 | 32:1, 32:9, 33:13 |
| 103:15, 103:16 | **inquiries** 46:3 | 110:18, 110:23 | **investigating** | 36:16, 37:19 |
| 103:25, 104:6 | 46:8, 47:8, 48:3 | 113:16, 116:24 | 36:14 | 38:13, 40:2, 40:4 |
| 104:11, 104:20 | 48:11, 48:21 | 118:16, 119:7 | **investigation** | 40:11, 42:21 |
| 107:4, 107:11 | 49:3, 51:5, 51:14 | 120:8, 121:8 | 13:17, 14:22 | 43:18, 46:16 |
| 107:15, 107:17 | 51:18, 51:22 | 122:10, 128:14 | 15:1, 15:5, 16:24 | 88:25, 129:8 |
| 107:25, 108:2 | 51:25, 52:2 | 131:10, 132:5 | 25:4, 28:23, 35:5 | 136:18 |
| 118:18, 126:3 | 52:11, 53:8 | 133:6, 139:8 | 35:15, 36:25 | **investigator's** |
| 126:5, 127:23 | 53:22, 54:13 | 143:10, 143:23 | 37:6, 37:13 | 40:12 |
| 128:18, 129:20 | **inscription** 125:5 | 144:24, 151:25 | 37:20, 38:11 | **invited** 94:5 |
| 131:12, 131:25 | **inside** 95:17 | 152:20, 153:11 | 38:16, 39:3, 39:4 | **involve** 45:19 |
| 132:1, 133:12 | **instruction** 41:19 | 154:24, 158:13 | 39:6, 40:4, 41:6 | 66:3, 66:17 |
| 133:17, 135:13 | 49:12 | 160:11, 160:16 | 42:22, 43:23 | **involved** 43:6 |
| 139:13, 139:16 | **instructions** | 165:18 | 44:25, 45:9 | 48:1 |
| 139:17, 139:22 | 62:24 | **insured's** 35:13 | 45:20, 46:10 | **involving** 30:10 |
| 139:23, 156:9 | **insurance** 1:7, 4:5 | 46:3, 56:19, 73:4 | 46:17, 47:11 | 35:14, 45:16 |
| 159:24, 163:14 | 13:3, 13:12 | 129:7, 138:14 | 47:16, 47:18 | **ISO** 33:20, 34:16 |
| 163:21, 165:12 | 13:17, 14:5 | **insureds** 9:19 | 55:6, 55:17, 62:2 | 39:10, 45:11 |
| 166:12, 168:24 | 44:19, 69:8, 82:8 | 14:6, 57:1, 116:3 | 62:10, 62:14 | **issue** 116:15 |
| 170:19, 170:22 | 82:10, 83:13 | 126:7, 151:21 | 63:8, 63:14, 64:2 | 138:14 |
| 170:23, 171:6 | 85:2, 85:5, 85:9 | **intentionally** | 70:14, 72:5, 74:3 | **issued** 151:12 |
| 171:7 | 85:12, 86:6, 86:7 | 137:25, 151:22 | 77:3, 80:2, 80:6 | 159:24, 160:25 |
| **information-gat...** | 86:11, 86:17 | 160:11, 160:16 | 80:8, 80:25, 82:5 | **issues** 5:9, 56:16 |

KAREN MOORE   FEBRUARY 23, 2023

56:21, 150:3
159:4
**item** 20:21, 21:22
22:18, 23:3, 23:4
23:20, 24:5, 24:7
24:12, 24:15
24:19, 24:25
25:6, 25:7, 25:10
25:19, 25:21
26:10, 26:15
26:16, 26:24
28:14, 39:1
39:15, 41:21
42:6, 43:14
60:12, 60:16
60:19, 60:21
66:21, 68:1, 68:4
75:7, 77:4, 78:2
78:5, 78:15
78:18, 79:3, 79:9
80:1, 82:1, 82:6
84:4, 84:10, 85:2
85:5, 85:10
85:12, 85:18
86:7, 86:11
86:17, 86:25
87:3, 88:2, 88:6
98:13, 98:24
99:1, 99:11
100:21, 102:5
104:13, 104:14
104:15, 104:18
106:1, 106:20
108:1, 110:17
110:24, 111:2
112:4, 112:11
113:2, 113:16
113:25, 114:1
116:23, 117:2
117:5, 119:5
119:8, 119:9
120:7, 120:9
120:11, 120:14
122:11, 124:5
127:13, 128:6
130:7, 131:14
131:22, 133:14
139:9, 139:9
139:11, 140:11

140:18, 142:20
143:24, 152:10
152:12, 152:25
153:10, 153:11
153:12, 153:13
153:22, 154:1
154:13, 154:22
154:24, 154:24
155:1, 155:21
156:9, 156:16
156:18, 157:13
161:24, 161:25
162:2, 163:18
165:21, 165:23
166:14, 167:11
167:14, 167:21
167:25, 168:7
169:13, 170:12
170:13, 171:13
171:14, 171:17
171:19, 171:22
172:18, 172:19
**itemized** 20:21
169:14
**items** 25:14, 29:4
29:5, 75:5, 77:18
96:19, 98:17
98:20, 109:7
132:20, 144:2
147:8, 150:4
163:16

**J**

**J(1)(g)(1** 174:14
**J)(1)(g)(1** 174:21
**Jaeger** 41:9
41:10, 41:11
47:24, 60:5, 61:2
67:4, 75:16, 94:4
134:11
**Jaeger's** 67:6
136:20
**James** 70:1
126:16, 143:14
**Janet** 58:2
**January** 20:9
21:16, 22:14
24:4, 27:8, 33:17

41:17, 43:10
44:16
**Jeff** 2:10, 4:17
16:11, 26:1
49:15
**jewelry** 35:25
**job** 12:15, 13:19
107:23, 146:7
146:14
**jobs** 10:16
**Joe** 27:7, 27:9
27:14
**John** 19:5, 44:4
64:1, 64:8, 64:22
98:4, 99:7, 99:24
101:3, 101:4
102:23, 103:3
108:25, 143:8
148:23, 149:12
149:19
**Johns** 41:20, 42:1
42:2, 44:6, 44:13
59:16, 59:21
60:5, 64:11
64:13, 98:6, 99:4
99:22, 100:7
100:10, 100:19
101:18, 102:9
102:10, 102:21
103:2, 103:5
103:11, 103:18
103:23, 104:25
105:11, 105:12
108:4
**joining** 136:1
**judgments** 29:2
29:9, 30:8, 31:3
32:3
**Judy** 2:18, 4:11
50:9, 92:10
157:5
**July** 67:11, 68:20
70:10
**jump** 56:2, 110:4
110:6
**June** 24:7, 46:4
64:23, 81:8
**justice** 8:19, 10:7
jzane@pmzlaw....

2:12

**K**

**Karen** 1:12, 2:1
3:3, 4:2, 5:1, 5:14
5:15, 5:19, 14:17
15:18, 20:9
41:19, 50:12
92:13, 106:5
122:8, 157:8
161:17
**keep** 19:19, 77:20
87:8, 110:18
159:13
**Keith** 21:18
95:15, 96:1
96:25, 116:4
130:11, 137:3
**Kimberly** 21:2
21:16, 23:24
24:2, 41:15
42:20, 43:1, 50:1
**kind** 7:2, 7:3
13:9, 19:14
19:18, 66:24
106:4, 136:14
158:10, 162:15
163:5, 165:2
**know** 7:2, 7:3
9:18, 11:2, 12:14
12:24, 13:21
15:9, 16:5, 18:23
20:13, 21:3, 22:3
23:8, 23:23, 25:7
25:12, 25:15
26:23, 28:21
29:15, 29:17
30:5, 38:14, 41:7
41:13, 42:23
43:23, 46:21
46:23, 48:11
49:24, 50:20
56:8, 58:23, 60:6
62:1, 66:4, 67:2
71:9, 71:10
71:17, 72:21
75:9, 75:20, 77:1
78:16, 80:8

81:21, 87:15
88:11, 89:18
91:14, 94:15
104:3, 104:4
106:3, 108:23
109:17, 110:24
111:1, 115:1
118:2, 118:3
125:24, 129:4
132:24, 135:16
136:17, 136:20
139:8, 140:9
140:15, 149:4
152:10, 155:1
155:2, 155:6
158:19, 158:22
159:4, 163:20
164:1, 164:14
165:4, 169:8
169:11
**knowing** 45:19
68:10, 92:24
156:17
**knowledge** 16:14
100:8, 124:19
**known** 52:2
174:3
**knows** 148:4

**L**

**lack** 133:2
164:23
**language** 13:11
**large** 22:25, 23:1
23:10, 49:11
51:20, 143:22
159:5
**larger** 55:11
**launched** 90:16
**law** 57:25
**lawsuits** 29:3
**leadership** 137:1
137:8
**learn** 6:9, 27:14
**left** 27:23, 156:23
**legal** 50:10, 61:24
62:8, 63:7, 92:11
135:3, 157:6

KAREN MOORE   FEBRUARY 23, 2023

**legal-video** 4:11
4:12
**length** 84:9
**lengthy** 55:23
92:22
**letter** 8:8, 92:17
92:19, 92:23
93:2, 93:3
112:21, 113:11
113:15, 128:1
128:3, 128:10
128:13, 129:5
129:16, 134:14
134:16, 134:24
135:5, 135:8
135:14, 135:18
135:20, 135:22
136:16, 138:13
138:14, 138:16
138:18, 138:23
151:8, 151:8
151:9, 151:11
152:24, 155:9
159:24, 161:4
161:18, 162:6
162:7
**letting** 23:23
25:7, 25:12
42:23
**Lexis** 28:16
**liabilities** 71:1
**licensed** 13:8
**lie** 114:22
**lied** 159:14
159:17
**lien** 30:3, 30:4
30:6, 30:12
30:15, 30:19
30:23
**liens** 28:17, 29:2
29:9, 30:2, 30:7
31:2, 31:6, 31:19
31:24, 32:7
**life** 82:7, 133:1
**light** 73:4, 128:10
128:12, 129:5
**limit** 45:5
**limitation** 151:24
**limited** 40:22

113:4, 128:9
**line** 24:17, 25:8
25:13, 27:23
49:16, 91:21
94:24, 95:6
103:16, 107:10
112:3
**liquid** 71:9, 71:22
71:23
**liquidity** 159:3
**Lisa** 94:24, 95:20
125:9, 127:8
134:13, 134:13
134:23, 135:11
135:21, 136:1
138:21, 151:10
151:12
**list** 55:23, 56:1
64:3, 67:3
**listed** 21:22
21:24, 21:25
45:25, 46:1
48:20, 48:22
75:12, 83:17
84:4, 116:23
117:24, 119:6
119:9, 120:9
121:13, 140:18
167:8, 167:22
170:9, 171:19
**lists** 68:15
**litigation** 19:20
157:24
**little** 5:5, 7:20
24:13, 27:22
42:14, 67:23
83:22, 85:20
86:20, 110:2
**LLC** 174:20
174:23
**LLN** 22:17, 23:1
**load** 48:19, 71:24
**loans** 72:1
**located** 39:10
68:4, 78:3, 99:20
144:1
**location** 38:13
77:20
**log** 3:10, 15:10

15:15, 15:19
15:21, 16:4
16:10, 16:23
17:2, 17:9, 17:12
19:13, 19:24
22:18, 23:6
72:11
**logging** 23:6
**logical** 129:15
**long** 7:18, 8:2
10:4, 11:23, 78:4
82:6
**longer** 43:6
118:21, 138:20
140:12, 152:11
152:12, 154:22
169:19, 170:12
**look** 6:8, 14:23
18:24, 24:13
24:22, 25:2, 27:4
29:22, 30:7, 32:5
35:23, 38:18
39:17, 40:3, 40:5
44:18, 45:5
48:18, 48:19
54:21, 56:10
56:18, 58:13
58:22, 60:11
61:4, 65:11
68:22, 71:15
71:16, 72:3, 72:5
72:14, 82:14
86:14, 94:5
107:9, 115:18
127:18, 164:14
**looked** 34:6, 52:8
93:22, 108:4
163:14
**looking** 12:13
24:23, 26:22
29:5, 34:11
48:22, 54:19
55:25, 56:19
56:19, 60:15
64:15, 70:18
71:8, 71:18
71:20, 77:5
79:25, 87:11
106:5, 110:10

117:23, 159:9
**looks** 10:18
27:11, 33:8
33:18, 34:11
36:5, 36:23
37:15, 42:4
53:20, 67:12
67:17, 70:19
72:10, 95:4, 95:8
95:19, 108:17
110:23, 110:25
111:5, 112:18
134:8
**loss** 9:18, 20:16
21:11, 22:15
22:25, 23:1
23:11, 23:15
30:17, 34:25
35:10, 35:24
36:1, 37:24, 38:5
39:6, 39:7, 40:18
49:11, 57:5
57:13, 58:19
58:24, 58:25
59:18, 102:6
116:7, 117:6
118:25, 122:14
138:2, 140:3
142:20, 144:2
146:13, 152:1
152:16, 159:11
164:7, 165:22
167:15, 169:15
171:18
**losses** 34:8, 34:10
42:3, 45:19
**lost** 26:4, 163:6
165:6, 170:20
172:7
**lot** 6:9, 29:13
55:13, 55:18
55:19, 71:8, 71:9
71:21, 72:1
88:18, 159:6
159:6
**lousy** 6:9, 126:23
**lower** 25:14
**lying** 160:16

**M**

**MacCollum**
94:24, 95:20
125:9, 126:8
127:8, 129:8
131:12
**mail** 138:15
**maintained** 77:19
**major** 32:12
32:17, 32:20
33:3
**making** 6:19
40:19, 59:19
119:10, 121:14
136:16, 144:5
145:11, 151:15
156:16, 170:14
171:20
**malicious** 36:22
**man** 158:12
**management**
8:18, 23:14
**manager** 12:22
41:3, 47:14
47:25, 94:14
136:18, 136:22
148:20, 149:7
149:25
**managers** 137:9
**manages** 136:14
**manner** 13:14
**March** 59:15
174:14
**margin** 125:6
**MARICOPA**
174:2
**Marinaccio** 67:18
**marine** 36:10
**mark** 87:15
**marked** 3:7, 18:4
19:9, 65:1, 115:9
137:12, 157:10
**market** 41:20
42:5, 43:16, 44:7
44:10, 108:24
**Markey** 43:12
43:17, 43:18
**match** 34:16

35:11, 36:15
36:17, 36:21
**matches** 34:6
**material** 138:1
151:22
**matter** 45:22
62:6, 66:10, 98:6
98:7, 102:18
147:1, 157:15
157:18
**mean** 6:18, 7:3
20:20, 21:20
22:22, 24:18
24:24, 28:8
29:12, 31:12
46:15, 52:6, 52:8
59:21, 62:20
66:13, 71:8
71:24, 73:19
74:5, 78:2, 84:22
86:3, 86:20
88:14, 88:17
88:18, 94:10
106:2, 108:21
109:15, 110:22
124:12, 127:6
129:14, 129:25
130:1, 130:14
138:3, 141:8
143:5, 144:17
147:18, 148:2
150:3, 153:3
155:10, 156:7
161:4, 161:11
165:5
**meaning** 15:22
**means** 20:13
20:14, 20:15
20:21, 22:23
23:1, 104:4
130:23
**meant** 36:11
36:13
**mechanic's** 30:15
**Media** 50:7
50:11, 92:8
92:12, 157:3
157:7, 173:5
**meet** 52:19

**members** 23:14
**memory** 114:22
**mention** 60:4
139:25, 140:2
140:4
**mentioned** 8:5
29:5, 57:3, 97:10
99:21, 131:3
131:16, 140:13
169:18, 171:8
**mentioning** 38:15
**mentions** 46:2
**merits** 77:2
**met** 50:25
**middle** 69:16
**mightily** 6:2
**Mike** 43:12
43:17, 43:18
158:11, 159:16
**million** 21:18
22:15, 24:9, 39:1
46:1, 59:18, 71:2
152:20, 152:21
153:18, 153:19
154:4, 154:5
**mind** 18:10
51:22, 150:15
150:17, 163:8
**mindset** 57:11
**Mine** 91:8
**minor** 8:18, 10:6
33:9
**minute** 44:18
**minutes** 33:18
42:9
**mischaracterizes**
100:15, 107:19
124:16
**mischief** 36:22
**misrepresentation**
152:22, 152:23
153:5, 153:20
**misrepresentatio...**
105:20, 156:8
161:22
**misrepresented**
138:1, 151:4
151:22, 152:6
152:9, 160:11

162:20, 162:24
**misrepresenting**
160:17
**missing** 23:3
57:18, 142:21
**Misstates** 101:8
117:18, 144:22
165:15
**mistaken** 166:6
**moment** 73:22
150:14, 150:17
**money** 55:14
55:19, 72:3
**Monica** 36:23
37:3, 73:7, 95:14
**month** 54:25
109:13
**months** 51:4
52:13, 54:11
58:19
**Moon** 2:10, 4:18
**Moore** 1:12, 2:1
3:3, 4:2, 5:1, 5:19
20:9, 50:12
92:13, 157:8
**morning** 5:13
93:5
**mortgage** 51:3
51:19, 52:13
53:2, 54:10
71:25
**mother's** 39:21
57:17, 77:21
78:19
**motivating** 32:21
**motivation** 48:10
79:19, 79:25
**motive** 29:20
158:15, 158:24
159:1, 159:11
**mouse** 69:16
75:7, 81:5, 96:25
104:7, 108:15
116:4, 121:15
124:9, 126:19
130:11, 142:9
156:1
**mouthful** 12:8
**move** 9:22, 12:5

21:15, 22:16
24:3, 48:16, 59:2
69:16, 70:9
87:18, 88:14
91:21, 103:8
114:19, 124:25
145:10, 145:12
155:12, 171:1
**moved** 50:15
81:8
**moving** 21:1
22:13, 27:6
28:15, 30:12
68:20, 75:4
122:9, 124:4
160:7
**multiple** 33:21
34:2, 98:13
**mutually** 147:20
**mysterious** 33:22
34:3

### N

**nail** 152:19
**name** 4:14, 5:17
44:4, 50:9, 67:1
72:16, 92:10
93:14, 94:6
94:24, 94:25
95:2, 117:13
157:5
**named** 30:10
142:25
**narrative** 74:9
133:3, 141:11
**National** 1:7, 4:5
151:18
**nature** 9:20
14:24, 29:3, 29:4
78:17
**necessarily** 25:11
39:5, 70:21
71:22, 80:19
84:3, 86:23
93:13, 110:22
132:20, 152:5
159:1, 159:9
159:11

**necessary** 62:2
66:4, 112:14
135:13, 135:16
**need** 6:20, 6:23
7:1, 12:18, 39:4
65:20, 66:1
66:20, 72:2, 80:7
88:14, 106:4
152:6, 155:1
**needed** 31:18
31:20, 51:20
78:7, 93:24, 94:1
94:3, 94:11
102:14, 103:5
103:6, 106:4
**Needless** 20:3
**needs** 77:10, 93:8
**negatives** 45:25
**neither** 145:6
146:5
**net** 70:11, 70:12
70:13, 71:1
**neutrally** 118:23
**never** 72:3, 96:8
96:10, 117:2
119:17, 140:8
141:12, 170:21
**new** 12:14, 28:5
30:5, 38:13, 40:8
48:23, 49:3
88:13, 100:5
100:22, 106:1
107:3, 107:16
107:18, 112:13
157:13
**nine-year** 110:2
**nod** 7:2
**non-art** 111:8
**non-blacked**
92:23
**nonresponsive**
145:10
**Nonverbal** 83:8
**normal** 14:22
28:11, 29:11
98:25, 173:2
**North** 2:11, 2:15
4:10, 4:12
**notate** 46:16

notated 48:21
notation 16:7
  30:9, 30:25, 31:2
  40:1, 46:11
  47:10
notational 25:5
notations 15:22
  15:25
note 21:21, 22:11
  23:10, 24:11
  24:19, 27:12
  27:15, 27:16
  31:3, 31:7, 31:10
  31:11, 33:19
  41:18, 42:10
  43:10, 44:16
  45:13, 45:23
  47:23, 48:5, 48:6
  53:8, 53:21
  56:25, 59:14
  63:24, 67:11
  68:21, 68:23
  68:25, 69:6
  69:15, 74:24
  75:15, 75:15
  81:3, 93:10
  94:23, 134:24
noted 28:17
  28:18, 29:9
  32:16, 55:11
  60:14, 68:4
  111:10, 112:2
  152:23
notes 15:24, 16:1
  50:21, 53:14
  53:14, 53:23
  54:5
notice 49:11, 51:1
  105:11
notification 22:17
  23:1, 23:2, 23:11
  23:17
notifications
  22:25
notify 23:22
notifying 23:15
noting 39:6
November 108:17
  112:19, 115:13

128:1, 128:5
number 19:21
  21:22, 24:7, 49:8
  54:21, 68:10
  69:18, 81:5
  114:25, 116:5
  116:14, 116:15
  116:18, 117:13
  119:1, 119:14
  120:22, 120:24
  121:19, 122:17
  122:20, 122:23
  123:1, 123:4
  123:7, 123:10
  123:13, 155:9
  155:24, 165:10
  166:7
numbered 69:18
  123:24, 125:3
  125:4, 125:9
  125:13, 125:17
  126:12, 127:5
  129:14
numbers 19:17
  36:3, 143:11

## O

o'clock 157:8
oath 7:8, 47:19
  57:2, 57:22, 58:7
  58:21, 61:10
  61:16, 62:10
  125:21, 135:2
  139:15
Oberg 2:15, 4:20
object 6:6, 14:15
  16:12, 25:23
  26:18, 45:1
  48:15, 53:10
  56:4, 59:25
  62:16, 68:12
  73:15, 76:24
  77:23, 78:12
  79:4, 79:21
  80:15, 81:14
  83:14, 83:25
  84:15, 84:25
  85:25, 87:17

87:18, 95:22
96:16, 97:20
100:14, 101:7
101:19, 103:7
103:20, 104:8
105:14, 109:2
111:24, 112:9
113:12, 113:22
116:20, 117:17
118:5, 119:2
120:4, 121:5
122:4, 124:15
127:17, 128:23
130:4, 131:6
132:17, 133:20
141:3, 141:22
142:2, 142:5
142:12, 143:19
144:10, 144:21
145:25, 146:19
147:3, 147:22
149:14, 150:7
150:8, 158:17
159:20, 160:21
160:22, 163:9
164:2, 165:14
166:8, 167:5
167:16, 168:4
168:13, 169:4
169:20, 170:3
170:25, 171:10
172:10
objection 115:8
  118:12, 161:12
objections 87:24
objective 13:16
  14:18
objectively
  146:25
objects 160:15
  162:22
obligations 135:3
  174:13, 174:21
obtain 44:7
  48:23, 52:24
  54:20, 54:21
  101:14, 102:15
  107:16, 107:18
  112:12, 154:1

154:12, 155:21
171:24
obtained 51:17
  52:1, 52:25, 54:4
  54:10, 55:8
  60:13, 62:9
  102:12, 104:15
  105:20, 107:25
  133:13, 139:9
  140:14, 143:23
  154:20, 161:23
  163:18, 172:20
obtaining 28:9
  31:25, 60:8
  70:13, 84:7
  105:8, 105:10
  140:6, 142:20
  152:24, 154:15
  156:15
obvious 73:11
  84:13, 87:13
  91:9, 109:16
obviously 158:1
occurred 20:16
  142:20, 153:14
occurring 58:25
  85:18, 140:4
October 92:17
  93:3, 93:19
  94:23
odd 96:11
offer 130:14
offering 80:12
office 20:2
officers 58:1
oh 8:1, 10:13
  11:6, 18:3, 18:23
  26:2, 27:18, 65:6
  67:6, 72:9, 90:4
okay 5:17, 5:23
  6:7, 6:13, 6:16
  6:24, 7:18, 7:23
  8:1, 8:10, 8:15
  8:17, 9:8, 9:11
  9:21, 10:1, 10:8
  10:13, 10:18
  10:22, 11:1, 11:4
  11:6, 11:18
  11:23, 12:1, 12:5

12:9, 12:23, 13:2
13:9, 14:3, 14:11
14:18, 15:9, 16:3
16:19, 17:4, 17:7
17:11, 17:15
18:3, 18:4, 19:3
19:6, 19:8, 19:12
19:16, 20:12
20:19, 20:24
21:1, 21:5, 21:8
21:12, 21:15
22:1, 22:13
23:10, 24:3
24:18, 26:23
27:6, 27:25, 28:2
28:4, 28:6, 29:17
29:25, 30:12
31:9, 31:14
32:14, 32:19
33:1, 33:6, 33:6
33:16, 34:2
34:11, 34:20
34:23, 35:11
35:17, 35:19
36:8, 36:14
36:17, 36:21
37:2, 37:8, 37:15
37:21, 38:3, 38:9
38:24, 39:12
39:19, 40:6, 40:9
40:12, 40:21
41:5, 41:10
41:13, 41:16
41:24, 42:1, 42:4
42:9, 42:18, 43:9
43:21, 44:9
44:15, 44:23
45:8, 45:13
46:19, 49:14
50:15, 51:1
51:21, 53:6
53:19, 53:25
54:18, 54:23
55:22, 56:22
56:24, 58:17
59:21, 60:24
61:6, 61:11
63:13, 63:24
64:18, 65:7

65:10, 65:24
66:7, 66:11
66:23, 67:9
67:17, 67:23
68:8, 68:24
69:12, 69:15
69:24, 70:9
71:12, 72:7
72:19, 73:3
73:10, 73:22
74:1, 74:23, 75:4
75:14, 76:2
77:14, 79:18
80:10, 81:2, 82:3
83:4, 85:4, 86:9
89:4, 90:13
91:20, 91:25
93:1, 93:12, 94:9
96:6, 97:5, 98:10
99:21, 100:9
101:13, 101:25
102:8, 102:17
104:3, 105:7
108:11, 108:21
109:9, 109:23
111:21, 113:1
115:1, 115:8
115:16, 116:10
116:13, 118:9
118:23, 119:19
120:16, 120:20
122:16, 124:3
124:24, 125:14
125:18, 127:21
127:24, 129:11
130:9, 132:8
132:13, 132:24
134:5, 135:5
135:19, 135:25
136:6, 136:20
136:23, 137:10
137:15, 137:20
137:24, 138:6
138:10, 138:22
138:25, 145:15
149:3, 150:2
150:12, 150:19
151:2, 151:6
151:13, 152:5

152:19, 153:16
153:23, 155:5
155:7, 156:5
156:11, 156:20
157:13, 159:12
160:4, 160:7
162:8, 162:11
163:2, 172:2
172:23
**old** 44:23, 44:24
45:8
**older** 31:2
**on-the-job** 13:1
**once** 31:11, 43:5
47:7, 66:11
126:11, 129:13
**ones** 56:13
**online** 12:24
**open** 12:15
**opened** 82:10
**opening** 12:13
**opine** 79:2
**opinion** 19:5
62:7, 62:8, 91:25
98:3, 99:16
108:12, 108:25
109:16, 111:22
114:20, 118:10
118:24, 119:12
120:21, 121:21
121:22, 122:2
122:16, 122:23
123:1, 123:4
123:7, 123:10
123:13, 124:4
124:13, 124:25
125:13, 125:15
125:18, 126:6
127:3, 128:11
128:24, 130:9
130:15, 130:17
131:5, 131:9
131:21, 133:10
133:11, 133:12
133:16, 134:9
134:14, 134:23
147:1
**opinions** 3:11
108:13, 115:12

115:23, 115:25
157:22, 165:9
**order** 14:2, 51:13
52:14, 78:7, 80:5
105:5, 135:4
173:2
**original** 68:3
124:8
**ought** 172:23
**outcome** 14:2
174:8
**outlined** 134:16
161:18
**outside** 29:10
146:9
**outstanding** 93:8
**overall** 163:5
**overwhelms**
18:18
**owned** 112:11
116:3, 116:18
119:13, 119:17
120:11, 121:10
126:11, 127:4
127:7, 127:13
128:12, 129:4
129:10, 129:13
130:2, 130:21
140:20, 141:10
141:13, 141:25
142:7, 142:8
143:3, 143:10
144:4, 144:5
144:19, 144:25
145:5, 145:21
146:4, 146:9
146:15, 146:16
151:24, 154:22
159:15, 159:25
165:19, 165:20
166:13, 166:17
167:21, 168:7
168:12, 168:15
168:17, 169:2
169:19, 170:1
171:18
**owner** 135:23
136:15, 138:20
**ownership** 88:21

113:20, 143:12
153:13, 155:21
160:12, 161:23
172:16, 172:19
**owning** 97:11
140:17, 153:11
**owns** 120:3

**P**

**P.C** 2:15
**p.m** 50:13, 92:7
92:13, 157:2
157:9, 173:4
173:6
**page** 3:2, 3:8
21:1, 21:15
22:13, 24:3, 27:6
28:15, 29:24
29:25, 30:1, 33:7
33:16, 35:1
35:11, 38:3
41:16, 43:9
44:15, 45:13
45:23, 49:8
50:15, 53:20
53:22, 55:24
56:24, 59:14
60:24, 65:10
67:10, 68:4
68:20, 69:19
70:9, 70:12
70:25, 72:7
74:23, 75:14
76:3, 76:8, 77:17
81:2, 83:5, 83:5
92:17, 93:16
94:22, 95:13
96:23, 97:9, 98:2
108:14, 108:16
109:12, 109:24
111:14, 112:16
114:4, 115:22
125:22, 132:8
132:25, 132:25
138:12, 143:7
151:17, 158:7
159:12, 160:7
160:8, 162:14

**pages** 174:4
**panel** 130:2
**paragraph** 38:9
39:12, 60:4
69:17, 72:23
95:13, 96:7
113:1, 113:6
114:4, 125:19
128:8, 138:12
**paragraphs** 38:15
72:23
**paraphrasing**
158:10
**part** 13:6, 24:11
25:6, 27:20
28:11, 28:24
37:20, 40:3
40:23, 45:9
46:17, 47:11
47:18, 51:16
55:7, 62:2, 62:9
62:25, 63:7
70:21, 72:5, 74:2
76:13, 77:14
80:24, 82:5
88:10, 89:1, 89:4
94:4, 94:7, 94:11
94:25, 95:6
98:14, 99:1
100:5, 102:2
102:6, 102:14
103:15, 104:1
104:20, 104:22
105:22, 105:22
117:4, 122:14
125:13, 129:21
130:11, 132:4
139:7, 139:17
148:10, 149:7
150:23, 154:25
157:24, 158:8
159:2, 159:18
161:10, 161:11
162:3, 162:4
164:16, 165:22
167:22, 169:15
172:17
**part-time** 11:5
**partial** 129:4

KAREN MOORE   FEBRUARY 23, 2023

particular 28:21
67:4, 72:16
78:18, 84:21
84:23, 85:10
90:12, 98:15
133:14, 135:20
parties 2:3, 14:1
174:8
partner 158:10
pending 6:21
people 27:2
54:21, 105:5
percent 116:2
124:4, 125:24
percentage 32:15
perfectly 25:20
26:9, 49:2
period 11:2
110:2, 143:11
143:16, 143:23
144:12, 146:17
periods 110:5
person 60:14
113:25, 136:14
137:25
personal 16:14
17:8, 36:8, 36:9
133:10, 133:12
personally 88:23
personnel 17:9
pharmacy 11:15
Phoenix 1:14
2:12, 2:16, 4:13
50:10, 92:11
157:6, 174:14
photo 124:7
photograph
124:20
phrase 17:1
phrasing 142:3
physically 98:16
pick 117:9
picture 70:17
71:19, 79:8
88:17, 89:18
90:4, 90:11
90:25, 125:8
126:12, 127:8
piece 57:16, 60:22

75:9, 84:21
84:23, 105:18
145:22, 156:1
pieces 84:22
145:18
place 14:7, 16:25
20:16, 25:14
72:1, 128:25
placed 83:2
plaintiff 1:5, 2:9
4:3, 4:18
plaintiff's 4:15
play 32:7, 62:4
82:3, 155:9
155:13, 155:18
plays 153:19
155:13, 155:17
155:18
please 4:16, 5:17
22:16, 80:6
90:10, 93:5
plenty 84:22
PLLC 2:10
point 6:15, 6:19
13:5, 17:15, 24:2
31:18, 32:18
38:22, 42:25
44:5, 47:16, 54:5
54:7, 72:12
72:18, 72:20
75:4, 75:8, 77:7
80:6, 81:11
81:21, 88:4
89:12, 94:12
94:20, 99:9
112:6, 113:16
115:15, 118:16
125:17, 130:24
132:21, 135:12
135:23, 136:4
140:20, 141:19
146:4, 146:16
149:6, 149:25
166:21, 166:23
167:20, 168:15
169:2, 169:11
169:21
points 163:25
Poli 4:18, 159:16

160:9, 162:17
Poli's 158:11
policies 81:4, 82:1
83:18
policy 20:16
20:22, 21:22
21:24, 21:25
22:10, 24:6, 24:6
24:13, 24:13
24:15, 24:17
25:5, 25:6, 25:8
25:13, 27:2, 36:8
39:23, 69:8
69:10, 69:13
75:12, 81:5, 81:6
81:7, 81:9, 81:13
82:15, 82:21
83:1, 84:4, 84:8
85:16, 85:17
86:16, 86:19
88:6, 110:24
116:23, 117:14
119:6, 119:9
120:9, 120:10
121:13, 122:13
135:3, 137:4
137:11, 137:13
138:2, 138:6
139:2, 140:18
150:21, 152:11
155:2, 156:16
156:17, 167:8
167:11, 167:22
169:14, 170:9
170:14, 171:15
171:19, 171:25
172:19
POLL 2:10
portion 21:17
43:16, 44:11
50:24, 51:3
54:24, 71:23
73:4, 81:6, 84:17
90:2, 95:12, 96:8
97:8, 125:22
132:25, 144:9
portions 19:23
132:15
position 9:3

12:21, 91:7
136:3, 136:6
136:8, 136:21
161:1, 161:5
positive 125:24
possession 104:19
128:16, 145:7
151:25, 152:11
152:12, 160:12
170:13, 171:24
172:18
possibility 51:10
54:14, 73:6
158:14, 166:4
possible 45:22
51:8, 51:9, 66:13
76:12
possibly 29:19
36:6, 95:3
131:20
potential 29:18
57:21, 161:6
potentially 29:21
37:16, 51:19
56:2, 72:10
predicated 141:2
152:13, 152:15
155:25
preface 7:17
Preliminary 3:13
65:12
premiums 111:18
prepare 7:15
49:13, 100:1
prepared 49:25
70:19, 75:18
140:10
present 2:18, 31:8
32:3, 32:11
32:16, 32:25
57:25
presented 102:4
107:11, 108:3
129:21, 139:13
144:3, 145:4
149:7, 156:15
163:14, 163:21
presenting 132:6
153:12, 153:21

167:12
presume 92:23
134:11
presumed 38:25
39:8
pretty 5:25, 54:12
previously 59:10
69:1, 78:1, 78:15
137:12, 159:3
165:17, 171:12
primary 32:21
print 104:7, 119:7
125:3, 126:11
127:5, 128:15
129:13, 174:6
prints 74:25
108:15, 116:4
117:1, 117:4
118:20, 120:11
121:15, 125:2
127:6, 128:16
128:21, 130:11
140:1, 141:9
141:10, 141:11
141:14, 142:9
142:18, 145:1
145:3, 145:6
164:24, 168:16
168:17, 170:16
prior 11:9, 14:24
30:13, 33:21
34:2, 34:8, 34:10
34:25, 35:9
35:22, 39:9
44:19, 44:24
45:3, 53:3, 53:13
54:4, 54:11
58:19, 58:24
58:25, 67:25
68:15, 69:8, 69:9
81:4, 82:1, 83:17
83:18, 84:5, 85:5
85:16, 85:17
85:17, 88:6, 95:8
98:21, 103:24
117:6, 132:6
139:11, 140:3
144:2, 145:2
164:22, 165:24

166:14, 171:18
**probably** 11:21
  12:7, 15:23
  17:13, 29:14
  33:17, 91:22
  128:4
**problem** 6:23
  16:22, 26:6
  90:11, 126:23
  154:3, 154:5
**proceed** 22:24
  43:15, 44:9
**proceedings**
  174:3, 174:5
  174:6
**process** 6:18
  14:23, 22:15
  22:23, 28:12
  40:24, 47:19
  100:5, 105:4
  154:25
**procure** 103:1
  103:1
**produced** 19:14
  130:6, 131:11
**professional**
  133:11, 133:16
**progress** 23:9
**promise** 156:24
  156:25
**promoted** 136:9
**prompt** 13:13
  15:4
**prompted** 12:5
  101:13, 101:17
  105:12, 170:23
**proofs** 123:20
  164:9, 168:18
**property** 9:5
  9:13, 9:15, 11:23
  21:6, 36:9, 36:21
  37:23, 41:14
  111:16, 115:25
  152:20, 153:5
**property/casualty**
  34:24, 35:12
**proposed** 138:12
**prove** 145:5
**proved** 141:16

**proven** 141:12
  141:13, 148:10
**provenance** 3:11
  3:12, 60:15
  60:18, 64:2, 64:9
  64:14, 64:23
  66:21, 66:24
  66:25, 73:5, 76:8
  76:14, 76:18
  76:23, 77:3
  77:22, 78:11
  78:11, 79:2
  79:12, 79:18
  90:15, 99:2
  99:10, 99:17
  100:4, 102:13
  103:14, 104:20
  104:22, 105:17
  105:23, 106:20
  107:1, 107:4
  107:15, 107:17
  114:20, 115:12
  115:24, 128:5
  132:4, 142:25
  143:17, 148:13
**provide** 6:6
  14:20, 31:15
  41:18, 61:23
  76:19, 77:12
  80:14, 91:15
  104:18, 137:24
  138:22, 149:5
  153:25, 157:25
  158:2, 165:12
**provided** 13:2
  57:13, 70:16
  74:14, 77:6, 83:2
  89:14, 98:7, 99:7
  99:12, 100:23
  103:14, 103:18
  103:23, 108:12
  118:18, 126:4
  126:5, 126:10
  126:17, 127:4
  127:11, 127:19
  127:22, 127:23
  128:14, 128:18
  129:9, 129:12
  135:15, 139:14

139:24, 142:4
  144:25, 154:23
  163:7, 164:7
  170:22, 171:8
  172:4, 172:8
**provides** 24:6
  47:22, 64:3
  64:12, 65:15
  75:5, 144:18
**providing** 31:17
  40:23, 46:14
  47:23, 98:11
  109:6, 139:8
  157:22, 165:9
**provision** 137:4
  137:10, 137:16
  137:17, 139:2
  139:5, 150:6
  150:21
**public** 29:1
  108:14
**published** 124:9
**pulled** 52:9, 52:10
**purchase** 51:20
  54:19, 78:6
  78:16, 96:10
  117:5, 142:19
  163:6, 163:17
  165:7, 170:20
  172:7, 172:16
**purchased** 55:18
  60:20, 73:7
  73:24, 74:20
  95:17, 95:23
  96:1, 97:14
  97:15, 113:2
  113:25, 114:17
  117:2, 118:20
  128:6, 130:10
  130:13, 132:6
  132:20, 141:8
  143:24
**purchaser** 114:13
**purchases** 54:24
  54:25, 55:11
**purchasing** 114:6
**purpose** 16:10
  28:6, 28:9, 31:9
  31:12, 45:16

51:19, 60:8
  70:13, 74:1, 74:8
  74:13, 84:7, 87:2
  154:15
**put** 19:18, 118:23
  120:18, 167:14
**putting** 23:13

**Q**

**quality** 113:3
  128:8
**question** 6:5, 6:21
  6:22, 14:4, 16:20
  26:1, 26:4, 30:21
  39:24, 39:25
  44:23, 77:16
  81:18, 83:9
  83:22, 84:16
  86:5, 87:18
  87:20, 88:10
  88:14, 90:6, 90:9
  91:9, 91:13, 92:1
  96:17, 97:21
  100:11, 100:15
  101:8, 101:20
  101:22, 101:23
  102:1, 103:8
  103:21, 104:5
  104:9, 104:17
  105:15, 113:13
  113:23, 116:21
  118:13, 119:3
  120:5, 121:6
  121:17, 122:5
  131:7, 132:13
  133:21, 141:23
  142:6, 142:13
  143:17, 144:22
  146:1, 146:23
  147:4, 147:13
  147:18, 147:23
  149:10, 149:15
  155:12, 155:15
  158:11, 160:22
  163:5, 163:10
  164:3, 169:5
  170:4, 171:1
  172:14

**questioning** 49:16
  91:21
**questions** 3:13
  6:10, 33:11, 52:4
  52:21, 53:1, 56:1
  56:8, 58:6, 65:12
  65:15, 65:20
  65:22, 75:19
  75:19, 76:2
  76:19, 77:12
  77:19, 78:7, 79:7
  80:12, 80:20
  80:21, 91:16
  92:21, 126:24
  149:11, 149:13
  149:20, 149:24
  173:1
**quick** 18:12
**quickly** 6:9, 68:23
  68:23, 127:25
**quotes** 125:20

**R**

**R1010** 174:24
**ramification**
  158:14
**range** 25:15
**rate** 55:12
**re-appraised**
  110:25
**re-ask** 90:9
**reach** 31:5
  159:18
**reached** 69:7
**reaching** 41:20
**read** 9:18, 27:17
  28:3, 38:17
  48:10, 54:7, 54:9
  57:11, 131:9
  152:6, 162:15
  173:1
**reading** 52:22
  53:1, 56:23, 95:5
  128:7
**real** 18:11, 60:22
  127:24
**realized** 138:20
**really** 17:16

KAREN MOORE   FEBRUARY 23, 2023

20:13, 59:11
66:24, 71:23
104:3, 118:24
141:1, 155:14
156:22, 156:23
157:20, 170:18
172:3
**reason** 32:4
35:17, 35:18
39:5, 46:20
54:15, 57:21
58:4, 58:10
58:20, 70:2
130:16, 135:25
157:20
**reasonable** 25:21
42:7, 55:20
95:19, 110:12
110:23, 111:9
112:7
**reasoning** 46:24
130:16
**reasons** 38:15
39:16, 49:7
54:17, 54:18
54:21, 58:9
58:16, 161:19
161:21
**reassigned** 42:19
43:6
**recall** 10:3, 10:23
13:6, 36:14
93:18, 94:19
94:25, 95:2
135:7, 135:19
135:25, 138:18
149:11, 149:12
149:19, 166:6
169:17, 169:21
**recalled** 95:13
**receive** 9:12
66:16, 72:24
92:22, 148:13
**received** 9:16
45:14, 53:4
59:16, 68:3
99:23, 101:18
**receiving** 68:8
**Recess** 50:8, 92:9

157:4
**recollection** 20:10
93:18, 94:9
**recommend** 67:7
**recommendation**
47:15, 62:11
134:15, 134:22
**recommended**
67:4, 134:19
**recommending**
57:1
**record** 5:18
12:10, 19:22
33:8, 33:25
34:13, 38:18
50:6, 50:13
91:18, 92:7
92:14, 93:16
105:16, 144:22
145:11, 157:2
157:9, 162:18
165:10, 165:15
166:2, 167:2
174:5
**recorded** 21:11
39:20, 50:24
51:16, 52:19
52:20, 52:21
54:3, 55:8, 57:12
126:4, 139:14
139:24
**recording** 21:8
**records** 29:1
33:7, 104:12
109:5, 132:3
144:1, 147:25
147:25, 163:6
163:16, 163:18
163:22, 164:21
165:6, 165:22
170:20, 171:23
172:6, 172:15
172:16
**red** 56:2
**redacted** 7:21
8:5, 8:7
**reduced** 174:6
**refer** 15:20, 15:21
**reference** 44:12

**referred** 12:10
16:7, 168:18
**referring** 16:6
131:25, 137:10
139:4, 140:16
144:14, 144:16
**refi** 51:3, 53:2
**refinance** 54:11
**refinanced** 52:13
**regard** 33:6
48:14, 133:14
152:24, 153:20
156:9, 156:17
157:23
**regarding** 15:22
46:3, 57:13, 73:5
96:25, 100:20
102:12, 107:12
107:25, 115:24
128:15, 153:5
161:23
**regardless** 20:18
31:3, 54:9
172:15
**Registered**
174:23
**registry** 23:3
**regular** 138:15
**regularly** 96:19
**relate** 105:1
**related** 28:18
40:17, 99:13
104:12, 104:21
106:20, 121:1
174:7
**relates** 156:14
156:15
**relating** 105:17
138:2
**relation** 100:22
**relatively** 58:24
**relativity** 26:24
**relevance** 77:22
104:4, 118:24
**relevant** 44:24
78:2, 116:19
118:11, 120:2
121:4, 122:3
**remained** 81:7

**remains** 93:7
**remember** 8:7
8:21, 33:24
34:15, 38:7
50:18, 59:19
65:7, 68:6, 72:13
72:15, 82:15
93:9, 93:21, 98:6
98:8, 98:9
112:21, 114:11
114:24, 115:14
115:16, 117:9
117:16, 117:22
140:20, 140:21
165:7, 166:21
**REMOTE** 1:12
2:1
**remotely** 2:4
**repeat** 26:3
**repeating** 87:8
**rephrase** 6:12
74:6, 171:5
**replaced** 103:5
103:6, 103:11
**replacement**
59:17, 111:15
**replacing** 103:2
**replies** 97:15
**report** 3:12
34:18, 41:7
41:11, 45:24
45:25, 46:18
47:11, 47:12
48:8, 48:20
51:17, 52:9
52:24, 52:25
53:3, 53:15, 54:4
59:16, 60:5
62:15, 62:20
64:23, 65:11
77:8, 77:10
77:11, 77:15
78:8, 78:11
78:25, 79:19
103:5, 103:6
103:10, 111:11
115:18, 131:23
140:14, 142:25
143:17, 145:20

148:13, 148:23
148:25, 149:13
149:16, 149:20
**reported** 1:24
41:8
**reportedly**
105:19
**reporter** 1:25, 2:4
4:10, 5:3, 6:1, 7:4
17:21, 174:16
**reporting** 4:10
30:18, 174:20
174:23, 174:23
**reports** 41:9, 80:8
**represent** 4:15
157:21, 165:18
168:11, 169:12
**representation**
168:7
**representative**
11:19
**represented**
124:6, 142:8
151:24, 160:5
163:12, 168:21
169:22, 170:14
**representing** 4:17
143:1, 153:13
153:24, 161:25
162:7
**reproduced** 126:8
**request** 27:12
28:7, 35:5, 42:5
98:5, 98:12
105:12
**requested** 100:23
102:4, 174:10
**requesting** 28:4
**require** 93:20
107:17
**required** 22:25
47:18, 51:13
107:15, 174:11
**requirement** 23:4
45:18
**requires** 14:1
14:21, 14:25
20:17, 25:3
108:1

KAREN MOORE   FEBRUARY 23, 2023

**research** 66:21
99:19
**resent** 138:21
**respect** 18:15
95:21, 105:25
121:18, 151:23
**respectfully**
101:20, 160:23
163:1
**respond** 7:1, 7:5
93:5
**responded** 97:11
**responds** 68:2
**response** 83:8
102:3, 147:7
**responsible**
130:25, 136:15
151:15
**responsive**
145:12
**restate** 126:21
**results** 38:6
46:18, 48:7
**retain** 63:25, 80:2
152:11
**retained** 61:19
64:8, 88:25
105:6, 157:17
**retaining** 44:12
105:4
**return** 67:9
**review** 8:4, 8:9
17:8, 20:17
22:14, 22:23
23:8, 24:11, 25:7
31:22, 38:5, 40:2
40:16, 55:7
62:13, 63:7
68:23, 73:20
76:13, 76:14
80:23, 103:13
138:13, 148:19
148:23, 151:13
174:10, 174:10
174:11
**review/approval**
134:17, 135:6
**reviewed** 7:21
21:13, 34:17

34:18, 59:15
65:8, 65:9, 81:4
115:14, 115:20
134:14, 134:23
135:22, 149:5
149:6, 149:25
**reviewing** 28:25
34:15, 48:2
138:18, 151:15
**rid** 170:2
**right** 5:8, 5:20
10:10, 10:12
11:12, 12:2, 15:9
18:7, 18:8, 27:10
36:4, 46:25, 59:1
59:3, 59:4, 61:4
63:5, 66:12
67:15, 69:16
74:10, 77:17
82:11, 84:14
87:7, 88:24
95:11, 99:23
102:19, 102:23
109:13, 109:17
112:8, 116:19
119:14, 119:16
119:19, 119:22
120:1, 120:3
120:22, 121:2
121:4, 124:12
129:25, 129:25
130:3, 131:3
138:4, 144:20
145:24, 145:24
146:18, 147:2
147:2, 147:11
147:19, 147:20
147:21, 148:5
149:1, 150:11
154:2, 158:7
161:3, 162:16
164:1, 166:22
168:3, 168:23
**road** 4:10, 13:10
15:4
**Robert** 2:14, 4:19
72:24, 74:2, 74:8
96:24, 112:21
127:15, 128:13

128:20, 129:5
**Roger** 128:13
**role** 9:6, 9:10
9:25, 11:18, 32:8
40:9, 40:13, 43:1
47:6, 47:21
61:11, 61:20
62:4, 76:5, 80:11
80:19, 82:3
136:12, 153:19
155:9, 155:17
155:18, 155:18
**roles** 47:5
**Rolex** 35:2
**roundtable** 93:25
**rousing** 5:10
**RRF** 174:24
**rts@bowwlaw.c...**
2:17
**Rubin** 61:6, 61:8
62:4, 62:15
62:24, 63:17
63:20, 67:13
67:14, 72:8, 72:9
75:19, 92:18
93:4, 112:18
134:19, 135:15
**rules** 5:24, 13:10
15:3
**run** 29:12, 58:8
116:1, 157:25

---

### S

**sale** 108:16
109:12, 109:23
111:10, 114:2
141:9
**sales** 104:12
104:21, 107:12
108:14, 109:6
110:4, 132:4
133:6, 133:14
133:14, 163:16
**Sally** 41:13, 42:25
43:1, 44:7, 50:2
**salvage** 34:12
34:13
**Santa** 36:23, 37:3

73:7, 95:14
**satisfaction**
107:24
**satisfy** 91:17
**saw** 95:15, 112:3
**say-so** 63:11
94:13
**saying** 32:23
33:4, 99:23
100:17, 100:18
101:3, 101:11
105:7, 113:10
113:25, 118:18
119:12, 119:20
125:8, 127:10
145:18, 145:20
145:23, 148:6
165:19, 165:20
**says** 21:8, 21:17
22:1, 22:14, 24:5
33:20, 34:12
35:12, 36:8, 37:2
38:9, 38:10
41:19, 43:11
43:25, 44:9
45:25, 51:3
54:24, 58:17
67:22, 70:11
72:20, 73:21
74:24, 81:4, 93:5
94:24, 113:1
114:5, 115:23
120:3, 125:21
127:3, 128:6
129:11, 130:1
130:2, 130:13
135:5, 138:3
138:4, 144:11
146:15, 152:21
158:11, 159:14
160:15, 160:17
**schedule** 24:20
58:4, 58:20
74:25, 75:5
**scheduled** 20:22
24:8, 35:25, 57:2
**scheduling** 57:21
58:10
**school** 9:1, 9:4

9:5, 10:5, 10:10
10:15, 10:21
11:13, 11:15
**schooling** 9:14
**scope** 9:17, 57:13
76:22
**scratch** 55:4
152:14, 168:24
**screen** 17:20
19:19, 22:17
27:18, 27:19
27:20, 65:4
124:8, 149:1
**screenprints**
96:25, 98:3
**screens** 124:8
124:21, 125:16
**scroll** 35:22
42:13
**scrolled** 56:17
**scrolling** 67:23
**se** 159:2
**search** 29:13
33:20, 39:10
45:11
**second** 6:8, 14:19
18:12, 18:15
18:16, 21:1
39:12, 54:23
57:24, 60:4
72:23, 73:3
88:10, 97:11
97:12, 97:14
97:24, 98:5
100:23, 101:14
101:17, 102:3
102:21, 105:13
105:21, 114:4
117:1, 117:3
121:12, 125:19
130:10, 130:21
131:1, 131:16
134:9, 138:11
140:1, 141:8
141:11, 141:14
145:3, 145:22
164:24, 168:17
169:22, 170:7
170:16

KAREN MOORE    FEBRUARY 23, 2023

**section** 72:17
153:19, 162:16
**secure** 41:20
**see** 14:11, 17:23
19:14, 22:17
27:15, 27:18
27:19, 27:24
27:25, 28:1
28:13, 29:25
30:7, 31:10, 34:7
41:22, 46:6, 46:7
48:11, 53:19
55:1, 59:2, 59:3
59:5, 64:5, 65:4
66:3, 68:2, 68:2
69:15, 70:21
72:11, 72:16
72:17, 73:1, 73:9
73:20, 74:9, 75:2
75:3, 75:11, 80:4
81:25, 82:23
82:23, 83:7, 94:6
95:10, 108:19
110:8, 110:9
111:19, 113:5
114:9, 116:8
124:18, 125:12
132:8, 132:11
132:12, 133:7
133:9, 137:5
138:3, 144:11
146:11, 158:6
158:7, 160:10
160:13, 160:15
162:17, 162:20
162:23
**seeing** 50:18, 95:2
154:23
**seeking** 49:3
**seen** 17:13, 49:10
50:19, 54:5
60:13, 72:13
72:15, 72:18
98:16, 98:20
98:23, 99:11
112:25, 151:14
157:16
**sees** 61:24, 65:19
**selected** 19:23

**selections** 59:12
**send** 47:12, 64:3
**sending** 136:16
136:24
**senior** 10:1, 23:14
137:1, 137:7
**sense** 7:12, 43:24
112:12, 121:25
**sent** 7:22, 61:2
63:23, 67:13
**sentence** 138:11
**separate** 9:14
107:1, 107:3
**separately** 118:20
**September** 75:15
76:7, 81:3, 81:7
109:23
**series** 33:10
104:7, 115:25
**serve** 11:23
**serves** 114:22
**service** 11:19
**set** 14:19, 45:5
73:5, 73:6, 73:23
97:11, 97:12
97:14, 97:25
101:14, 101:20
116:4, 117:1
117:3, 121:12
124:21, 125:17
126:18, 127:14
127:16, 128:7
128:16, 129:4
129:10, 130:1
130:7, 130:10
130:11, 130:19
130:21, 131:1
131:4, 131:17
131:19, 132:1
140:1, 141:8
141:10, 141:11
141:14, 142:8
142:18, 143:10
145:3, 145:6
146:4, 146:5
163:12, 164:24
168:16, 168:17
168:23, 169:22
170:7, 170:16

174:13, 174:21
**sets** 108:15
144:25, 168:12
169:2, 169:11
169:12, 169:18
170:1
**seven** 34:25
109:24
**seventy** 109:25
**share** 17:19
**shared** 139:17
139:19, 139:21
139:22
**short** 35:3, 41:13
43:1, 49:17, 50:2
58:24
**Short's** 44:7
**shorthand** 4:9
174:6
**show** 34:9, 45:11
141:13, 145:2
147:25, 159:3
164:21, 166:11
171:21, 171:23
172:22
**showed** 165:23
166:12, 171:17
172:17
**showing** 18:15
85:8, 109:6
129:21, 130:6
**shown** 131:13
**shows** 71:8
**sic** 20:19, 70:25
75:16, 75:19
76:21, 99:7
99:24, 101:4
101:4, 109:25
110:11
**side** 5:6, 27:20
**side-by-side**
12:20
**sideways** 10:9
**sign** 173:1
**signature** 174:10
174:10, 174:11
**significance**
24:10, 24:24
28:22, 39:3, 46:9

48:3, 48:13, 85:4
85:13, 125:14
**significantly**
58:18
**silk** 124:8, 124:8
124:21, 125:16
**silkscreens** 113:4
127:6, 128:9
137:3, 151:19
151:25, 152:16
159:15, 159:25
**similar** 30:9
34:10, 45:4
109:7, 110:17
132:13
**similarity** 35:8
**simple** 5:25
147:18
**simply** 61:19
101:22, 106:14
106:15, 121:25
125:8, 143:4
143:4, 144:17
144:20, 145:18
167:3
**single** 126:11
127:4, 129:13
129:21
**sister** 58:2
**SIU** 12:7, 12:12
12:18, 14:12
14:13, 15:6
22:14, 22:23
23:9, 28:24
29:14, 31:4, 31:4
31:13, 31:14
31:16, 31:18
31:20, 31:25
32:8, 32:21
33:13, 35:5
35:14, 36:25
37:6, 37:12
37:18, 38:2, 38:5
38:12, 38:13
40:11, 40:12
41:3, 43:6, 61:12
66:19, 69:1
128:19, 136:4
136:8, 136:9

136:12, 136:18
136:22, 137:17
138:21
**SIU's** 20:17
62:14
**six** 11:25, 12:1
**size** 23:16, 39:6
**skill** 174:5
**skills** 12:14
**small** 71:22
**Smith** 1:24, 2:4
4:9, 157:16
158:9, 158:16
160:9, 160:18
174:16
**Smith's** 3:14
160:19
**sold** 60:20
104:14, 108:18
109:21, 109:22
110:7, 110:17
111:6, 113:8
113:10, 113:16
117:6, 127:16
128:20, 128:21
130:1, 130:20
131:2, 131:4
131:17, 131:20
132:2, 133:15
139:10, 139:11
140:3, 142:19
142:21, 144:2
145:2, 162:2
163:19, 164:22
165:23, 166:14
166:18, 170:11
171:17, 171:23
172:18
**sole** 32:4
**somebody's** 91:10
**sorry** 16:20
18:24, 25:18
26:4, 26:7, 28:8
31:14, 33:19
61:1, 63:4, 95:11
95:24, 139:20
152:14, 155:23
**sort** 7:6, 13:2
**sound** 18:7, 18:8

KAREN MOORE   FEBRUARY 23, 2023

| | | | | |
|---|---|---|---|---|
| **source** 130:12 | **standard** 56:7 | 90:20, 90:24 | 140:11 | 81:23, 82:12 |
| **speak** 5:25, 6:4 | **start** 5:10, 8:11 | 103:8, 126:7 | **submitted** 83:19 | 83:14, 83:25 |
| 7:20, 7:23, 39:9 | 11:12, 13:9, 21:8 | 129:7 | 105:18, 140:10 | 84:15, 84:25 |
| 51:9, 146:24 | 59:7, 158:6 | **states** 1:1, 4:6 | 145:3, 160:2 | 85:6, 85:14 |
| 153:3 | **started** 9:4, 10:24 | 13:5, 13:8, 34:8 | 161:24, 162:1 | 85:25, 86:12 |
| **speaking** 13:11 | 11:8, 11:9, 11:11 | 69:14, 69:20 | 164:22, 165:24 | 86:22, 87:4 |
| 16:15, 23:25 | 11:22, 165:9 | 69:24, 75:24 | **subro** 45:15 | 87:17, 87:23 |
| 91:12, 131:22 | **starts** 59:15 | 121:22, 144:12 | **subrogation** | 88:13, 89:7 |
| 158:10 | **state** 2:5, 4:14 | **stating** 78:4 | 45:16, 45:22 | 89:10, 89:21 |
| **speaks** 84:13 | 5:17, 68:17, 76:6 | 90:25, 96:18 | **subsequent** 70:12 | 89:24, 90:5 |
| **special** 9:6, 9:22 | 76:20, 79:14 | 124:18, 129:6 | 136:7 | 90:22, 91:13 |
| 12:6 | 110:15, 113:15 | 129:19, 130:6 | **subsequently** | 91:20, 92:4 |
| **specialist** 4:12 | 117:20, 137:22 | 131:10, 141:8 | 138:19 | 95:22, 95:25 |
| **Specialists** 4:12 | 151:5, 166:23 | 142:9, 142:17 | **suggest** 41:19 | 96:16, 97:20 |
| 50:10, 92:11 | 167:19, 174:1 | 142:17, 143:22 | 63:8, 70:25 | 100:14, 101:7 |
| 157:6 | **stated** 35:9, 39:16 | 144:1, 148:9 | **suggestion** 44:7 | 101:19, 101:25 |
| **specific** 12:25 | 68:16, 73:25 | 170:11 | **suggestions** 80:23 | 103:7, 103:20 |
| 13:7, 46:20 | 74:20, 75:6, 78:1 | **status** 94:2 | **suitable** 77:20 | 104:8, 105:14 |
| 46:24, 61:11 | 78:15, 78:20 | **step** 148:12 | **suite** 2:11, 2:16 | 106:7, 106:10 |
| 70:22, 75:9 | 97:24, 119:23 | **stepping** 25:25 | 113:3, 124:9 | 106:14, 106:21 |
| 111:2, 115:18 | 128:20, 131:8 | 136:1 | **Sullivan** 2:14 | 106:24, 107:7 |
| 116:13, 133:2 | 132:5, 134:24 | **steps** 42:24, 94:16 | 4:19, 4:19, 5:7 | 107:19, 109:2 |
| 167:21, 171:14 | 140:21, 141:25 | **stick** 108:11 | 14:15, 16:8 | 110:13, 110:20 |
| **specifically** 8:8 | 142:19, 143:11 | **stipulate** 123:16 | 16:11, 16:17 | 111:24, 112:9 |
| 13:4, 31:24, 32:3 | 154:21, 158:20 | **storage** 77:20 | 18:8, 18:11 | 113:12, 113:22 |
| 32:10, 48:6 | 159:2, 162:6 | **stored** 39:21, 77:4 | 18:14, 18:19 | 115:1, 115:4 |
| 57:11, 66:5 | 164:6, 164:8 | 78:6, 78:19 | 18:23, 19:2, 19:4 | 115:8, 116:20 |
| 68:17, 69:12 | 165:17, 167:7 | 78:23, 79:3 | 19:7, 19:22, 20:1 | 117:17, 118:5 |
| 69:21, 73:20 | 167:23, 169:9 | **storing** 79:20 | 20:5, 22:6, 22:8 | 118:12, 119:2 |
| 87:14, 93:13 | 170:8, 171:12 | **story** 97:18 | 25:23, 26:18 | 120:4, 121:5 |
| 121:22, 139:4 | **statement** 21:11 | **strangle** 6:2 | 40:14, 40:25 | 122:4, 122:7 |
| 140:6, 149:24 | 39:20, 50:25 | **Stratton** 8:16 | 43:3, 45:1, 48:15 | 123:16, 124:15 |
| 169:8, 169:10 | 51:16, 52:1 | **Street** 2:11 | 49:15, 49:21 | 126:20, 127:17 |
| **specified** 120:8 | 52:20, 52:20 | **strike** 25:18 | 51:7, 51:24 | 128:23, 129:17 |
| **speculation** | 52:21, 54:3, 55:8 | 26:11, 48:16 | 52:16, 53:10 | 130:4, 131:6 |
| 133:18, 133:25 | 57:12, 57:13 | 77:15, 87:18 | 55:15, 56:4, 57:9 | 132:17, 133:20 |
| **spends** 55:13 | 95:21, 96:15 | 103:8, 106:16 | 58:12, 59:6 | 134:1, 141:3 |
| **spent** 55:10 | 97:19, 114:15 | 117:8, 118:2 | 59:25, 61:13 | 141:6, 141:22 |
| 55:19 | 120:18, 124:12 | 134:20, 143:6 | 61:21, 62:16 | 142:5, 142:12 |
| **splendid** 18:3 | 126:4, 128:17 | 145:9, 145:10 | 63:1, 63:3, 63:5 | 143:19, 144:10 |
| 65:6 | 129:3, 139:14 | 145:13, 149:11 | 63:15, 68:12 | 144:21, 145:11 |
| **spoke** 7:17, 49:12 | 139:24, 147:11 | 149:17, 165:5 | 69:5, 70:5, 71:5 | 145:25, 146:19 |
| 83:1, 99:14 | 164:15, 171:1 | 165:8, 166:3 | 73:15, 74:4 | 147:3, 147:12 |
| 140:9 | **statements** 9:19 | 171:1, 172:4 | 74:11, 74:18 | 147:22, 148:2 |
| **spoken** 140:5 | 48:16, 73:5 | **styled** 4:4 | 75:10, 75:21 | 148:9, 148:16 |
| 140:8 | 88:19, 88:22 | **subject** 77:18 | 76:9, 76:24 | 148:25, 149:3 |
| **sports** 37:3 | 89:1, 89:5, 89:11 | 96:24, 98:3 | 77:23, 78:12 | 149:14, 149:22 |
| **ss** 174:1 | 89:19, 89:25 | 98:17, 111:15 | 79:4, 79:21 | 150:7, 150:12 |
| **stages** 133:5 | 90:14, 90:18 | **submit** 29:19 | 80:15, 81:14 | 150:22, 153:7 |

154:8, 154:17
156:24, 158:17
159:20, 160:21
161:11, 161:15
163:9, 164:2
164:17, 165:14
166:8, 167:5
167:16, 168:4
168:13, 169:4
169:20, 170:3
170:25, 171:10
172:10, 172:25
**summarize** 47:12
**summarizing**
48:7
**summary** 38:23
49:9, 50:25, 52:3
52:22, 53:2
53:14, 55:7
57:12, 62:8
70:11, 70:14
134:25
**supervising**
136:17
**supervisor** 9:10
12:22, 41:14
41:15, 47:13
47:25, 136:9
136:19
**supplied** 74:10
**supplies** 143:14
**support** 70:16
83:11, 83:24
84:24, 85:1
85:24, 89:6
89:19, 90:1, 91:1
91:11, 114:15
162:18, 162:21
164:24, 165:13
170:15, 171:22
**supported** 130:19
**supporting** 117:3
130:20
**supports** 73:6
73:14, 74:9, 84:3
84:3, 84:21, 86:5
86:6, 86:7, 87:25
88:1, 88:5, 88:5
**sure** 6:2, 6:25

12:9, 13:10
16:18, 18:13
27:18, 51:10
54:8, 62:22, 74:5
84:20, 90:9
93:13, 97:7
118:8, 120:16
123:23, 127:23
127:24, 129:24
135:23, 140:8
140:11, 147:14
153:2, 169:10
**Surely** 58:15
**suspect** 57:6
115:6
**suspicious** 25:20
26:9, 26:14
26:22, 26:23
86:21
**swear** 4:23, 7:9
**sworn** 5:2, 174:4
**synopsis** 38:22
**system** 19:1
23:12, 83:3
112:17

**T**

**table** 108:14
**take** 6:14, 6:17
9:17, 9:19, 18:12
18:14, 32:16
35:23, 37:5
37:11, 38:18
39:17, 49:16
49:17, 49:20
50:3, 52:19
56:12, 56:18
56:23, 62:12
65:11, 67:14
68:22, 72:14
80:18, 131:21
139:3, 156:21
173:2
**takeaway** 125:11
**taken** 2:2, 4:3
16:25, 50:8, 92:9
110:6, 135:11
157:4, 174:3

174:6
**talk** 148:20
**talked** 98:19
**talking** 90:11
106:13, 121:3
122:1, 145:15
145:16
**task** 64:11
**tasks** 63:13, 63:18
63:20
**team** 62:14
**tech** 5:8
**technician** 11:16
**technology** 18:16
**tell** 7:9, 7:18
29:24, 79:15
118:9, 167:15
169:1, 169:2
169:7, 169:25
**telling** 69:1
**tend** 132:14
**tends** 83:23
84:24, 85:1
85:23, 87:14
87:15, 89:6
89:19, 90:20
91:11, 96:14
97:17, 113:19
**tens** 125:2
**terminal** 133:5
**terms** 36:13
94:10
**territory** 43:20
**Terry** 67:15
**testified** 5:4
150:9
**testify** 174:4
**testifying** 157:22
174:4
**testimony** 100:15
101:8, 106:17
107:20, 118:18
121:10, 124:16
139:15, 140:7
140:23, 157:23
163:13, 164:10
164:20, 167:10
**Thank** 4:22, 6:24
16:17, 20:5

123:18, 136:11
142:15, 149:22
172:25
**Thanks** 49:21
49:22, 91:19
**theft** 33:21, 34:3
34:8, 35:9, 35:25
37:3, 37:8, 37:10
37:10, 38:25
39:8, 45:4, 45:18
57:16
**thefts** 39:9
**theoretical** 33:2
**theoretically**
25:17
**thereabouts** 12:2
**thing** 7:6, 27:2
72:4, 90:12
106:4, 131:21
158:1
**things** 8:9, 9:20
14:24, 16:25
17:16, 25:2, 29:3
48:25, 53:3
72:21, 78:17
90:16, 139:6
141:7, 150:15
**think** 15:23, 18:5
18:5, 26:16
55:19, 59:4
63:24, 77:1, 78:2
79:24, 91:8
91:22, 92:2
92:19, 110:23
114:22, 115:5
116:22, 124:11
129:18, 131:8
139:12, 140:5
142:24, 150:4
150:19, 151:17
158:15, 158:24
159:1, 159:14
159:17, 159:23
160:24, 161:4
163:11, 164:19
171:21, 172:23
**third** 39:19, 96:6
102:23, 109:23
113:1, 113:5

128:7
**Thirty** 115:4
**Thomas** 110:11
**Thompson** 2:18
4:11, 50:10
92:11, 157:6
**thorough** 13:13
15:4
**thought** 18:21
96:9, 96:12
97:15, 105:4
125:23, 167:1
**thoughts** 94:17
101:15, 158:4
**thousand** 55:10
109:24
**thousands** 125:2
**three** 72:22
102:17, 111:5
122:2, 151:20
**through(6** 174:21
**ticket** 33:9
**time** 5:9, 5:14, 6:3
9:2, 9:4, 9:24
10:4, 11:3, 11:7
12:22, 24:8, 27:3
38:5, 41:8, 45:5
45:6, 48:21, 50:5
50:12, 52:3
53:14, 53:16
56:10, 56:12
56:18, 57:8
57:25, 58:25
59:18, 62:13
65:13, 66:3, 78:3
86:2, 86:13, 92:6
92:13, 96:2
99:18, 99:23
102:10, 103:22
104:14, 104:15
105:16, 106:13
108:8, 108:25
109:21, 110:25
111:23, 113:25
116:7, 119:15
119:17, 119:20
119:24, 120:6
122:8, 131:22
137:18, 137:18

KAREN MOORE   FEBRUARY 23, 2023

137:21, 139:3
139:21, 143:23
144:5, 144:13
145:7, 146:5
146:13, 146:17
147:8, 151:25
152:16, 153:14
154:12, 157:1
157:2, 157:8
159:15, 160:1
160:1, 163:12
164:8, 171:3
171:20, 172:12
172:19, 172:20
173:3
**times** 54:3, 66:5
106:10, 114:18
**tiny** 155:17
**title** 27:11, 42:16
77:17
**today** 4:8, 7:16
91:19, 150:10
172:24
**told** 73:14, 73:14
86:5, 91:4, 97:24
113:20, 116:24
117:1, 118:2
118:3, 121:15
140:5, 166:5
166:21, 170:1
170:7
**top** 27:25, 67:2
79:14, 93:21
95:12, 112:23
113:5, 138:25
159:12
**total** 48:19
**totality** 31:21
62:12, 71:15
72:4, 129:20
158:21
**totally** 19:18
**Town** 34:14
**track** 19:19
**traded** 126:18
168:22, 169:18
169:23, 170:12
**traditional** 15:7
**traffic** 28:18, 33:9

33:14
**training** 9:12
9:12, 9:16, 12:17
12:18, 12:20
12:25, 13:3, 13:5
13:7
**transcript** 3:14
157:15
**transferred** 136:5
**transitioned** 9:6
9:9, 9:25, 12:12
**treating** 100:12
**tried** 107:22
130:22
**true** 5:21, 25:22
106:14, 106:15
143:1, 144:17
174:5
**truth** 7:9, 7:9
7:10, 174:4
**truthful** 29:19
166:7, 166:11
**try** 12:13, 16:5
17:17, 79:7, 84:9
**trying** 6:15, 7:4
10:23, 13:18
18:25, 26:4
71:18, 78:5
78:22, 78:24
86:24, 91:8
100:9, 107:16
139:12, 153:4
**turns** 23:22
26:15
**twice** 35:20
66:11
**two** 9:14, 11:14
39:11, 51:3
52:13, 54:11
109:15, 109:24
144:25, 145:18
152:5, 168:12
169:2, 169:11
169:12, 170:1
**type** 34:13, 36:8
39:7, 51:19
66:15, 66:15
112:4
**typical** 41:24

**typically** 6:5
64:11, 65:17
76:18, 79:2
98:12

## U

**Uh-huh** 20:6
**ultimate** 41:2
**ultimately** 80:20
94:18, 136:15
138:22
**Um-hmm** 96:21
140:25
**uncovered** 102:14
103:12, 103:15
104:1, 104:6
104:12, 104:20
107:12, 130:18
133:17, 154:21
159:25, 165:23
171:16, 172:17
**undergrad** 8:13
9:3, 9:13, 10:2
11:21
**undermine**
141:20
**understand** 5:20
6:10, 6:14, 52:15
55:24, 62:19
91:7, 101:15
105:3, 116:10
142:16, 148:7
166:2, 172:2
**understanding**
27:9, 46:13, 52:8
52:11, 57:7, 64:7
87:9, 106:23
108:21, 108:23
111:21, 124:14
130:15, 148:6
152:2, 154:2
156:12, 170:6
**Understood** 7:7
**underwriter**
27:12, 68:15
**underwriting**
27:10, 67:20
67:25, 117:12

**unfortunately**
55:22
**uniquely** 116:5
**unit** 9:7, 9:23
12:6
**United** 1:1, 4:6
**unusual** 77:12
79:10
**update** 67:25
**updated** 68:15
**use** 42:2, 44:6
66:24, 67:5, 67:7
**useful** 80:24
**usually** 52:20
53:15
**utilize** 44:5, 67:3

## V

**vacating** 12:21
**VAF** 20:13, 22:15
24:5, 24:19, 38:5
38:25, 81:6
**valid** 154:12
**valuable** 20:15
20:19, 21:23
36:11, 57:16
167:22
**valuation** 64:13
78:16, 98:22
103:16, 108:13
153:25, 154:13
**value** 20:23
21:23, 22:19
24:17, 25:7
25:15, 25:15
25:17, 25:21
26:11, 26:15
28:5, 28:13
39:14, 41:20
42:5, 43:16, 44:8
44:10, 58:18
58:22, 59:17
59:22, 60:10
60:14, 68:16
70:24, 71:3
78:19, 82:16
83:12, 98:3, 99:1
102:5, 102:15

104:7, 106:20
108:24, 109:17
110:4, 110:12
110:18, 110:25
111:15, 111:22
112:7, 112:13
153:6, 153:10
153:21, 155:1
155:20, 155:25
156:17, 162:1
162:20
**valued** 23:7
153:12
**values** 23:13, 82:7
109:6, 109:20
112:3, 152:20
**vandalism** 36:22
**varies** 137:22
**various** 10:16
79:19, 96:12
163:25
**Ventura** 33:9
**verifiable** 90:25
91:3, 133:19
**verified** 89:5
89:12, 90:1
**verifies** 113:24
**verify** 27:17, 48:6
74:14, 74:17
84:9, 84:12, 89:1
89:1, 89:19
90:17, 90:19
91:11, 96:14
99:1, 107:10
108:1, 113:19
114:1, 130:22
131:1
**verifying** 91:9
95:20
**version** 57:4
**versus** 4:5, 70:17
126:5
**Victor** 114:7
**Video** 50:10
92:11, 157:6
**videoconference**
4:3
**Videographer**
2:18, 4:1, 4:22

50:5, 50:9, 92:6
92:10, 157:1
157:5, 173:3
**videotaped** 1:12
2:1, 4:2, 50:11
92:12, 157:7
**view** 146:7
**viewed** 26:8
**violation** 137:3
139:1, 139:5
150:20
**violations** 150:5
**visited** 76:6
76:21
**visual** 27:19

**W**

**waived** 174:10
**want** 6:17, 16:11
18:9, 18:17, 27:3
28:13, 29:15
29:17, 47:4
49:15, 49:17
58:6, 60:11
91:18, 116:1
147:24, 155:15
**wanted** 12:9
99:16
**wanting** 26:23
**Warhol** 21:18
75:7
**Warhol/Haring**
74:25
**was/is** 124:8
**water** 36:17
**way** 16:5, 18:18
49:18, 51:23
52:18, 79:3
106:8, 117:23
119:5, 120:19
123:17, 131:9
155:14, 155:16
166:11, 174:7
174:8
**we've** 39:13
82:18, 111:13
156:22, 165:3
168:21, 168:21

168:22
**wearing** 35:2
**weeks** 134:8
**went** 9:17, 27:22
34:4, 34:6, 85:20
95:17, 151:13
**West** 43:19
**whatsoever** 32:8
155:18
**White** 38:12, 40:7
40:7, 41:7, 42:21
44:16, 45:24
46:13, 47:20
50:17, 50:21
51:13, 52:10
53:7, 53:21, 57:1
57:20, 60:6
68:21, 68:25
69:7, 70:11
74:24, 75:6
75:16, 83:3
94:23, 95:5
126:8, 136:24
**White's** 40:9
**willing** 91:15
**Wilson** 2:15, 4:20
**wish** 61:25, 76:16
124:3
**witness** 3:2, 4:23
5:2, 14:18, 16:19
17:24, 18:2, 22:7
22:9, 26:3, 26:21
40:16, 41:1, 43:5
45:3, 48:18, 51:8
51:25, 52:17
53:12, 55:16
56:7, 57:10
58:13, 60:2
61:15, 61:22
62:19, 63:2, 63:4
63:6, 63:17
68:14, 69:6, 70:7
71:7, 74:13
74:19, 75:11
75:23, 76:11
76:25, 78:1
78:14, 79:6
79:24, 80:18
81:17, 81:25

82:14, 83:17
84:2, 84:17, 85:1
85:8, 85:15, 86:3
86:14, 86:23
87:7, 87:25
89:11, 89:25
90:24, 95:23
96:1, 96:18
97:23, 100:17
101:10, 102:2
103:10, 103:23
104:11, 106:25
107:9, 107:22
109:5, 110:14
110:22, 112:2
112:11, 113:15
113:24, 116:22
117:20, 118:15
119:5, 120:7
121:8, 122:10
124:18, 126:21
127:18, 128:24
129:18, 130:5
131:8, 132:18
133:22, 134:3
141:7, 141:24
142:7, 142:15
143:22, 144:11
144:24, 146:3
147:6, 147:14
148:5, 148:18
149:4, 149:23
150:13, 150:23
153:9, 154:11
154:20, 158:19
159:14, 159:23
160:23, 162:22
163:11, 164:5
164:19, 165:17
166:10, 167:6
167:19, 168:6
168:14, 169:7
169:21, 170:6
171:12, 172:13
174:3
**Woods** 2:15, 4:20
**wording** 39:11
137:22, 155:14
**words** 7:2, 7:5

14:13
**work** 9:13, 12:14
15:19, 16:24
64:14, 65:18
65:23, 65:24
84:23, 90:20
95:16, 96:2
100:7, 100:21
111:9, 137:18
162:18
**worked** 10:16
11:15, 12:21
27:9, 66:5, 66:8
66:9, 79:13
79:16
**working** 8:25, 9:1
11:12, 17:12
66:14
**works** 52:18
96:10, 96:12
113:3, 114:7
133:6, 133:16
**worries** 26:2
**worth** 70:11
70:12, 70:14
71:2, 109:17
152:21, 153:17
153:18, 154:4
154:5, 154:6
155:6
**wrist** 35:3
**write** 7:4
**writes** 63:24, 95:5
97:2, 97:10
126:6, 136:25
**writing** 38:7
113:9, 134:9
**written** 97:9
**wrong** 108:23
146:17, 146:25
165:11
**wrote** 48:5, 59:15
81:3, 131:17

**Y**

**y'all** 17:23
**yeah** 7:3, 10:13
12:11, 15:23

16:1, 16:16
16:22, 18:11
18:25, 19:7, 26:2
27:21, 47:4, 59:3
81:20, 83:4, 88:9
88:15, 88:15
91:22, 92:5, 95:4
111:12, 115:3
119:25, 126:23
147:17, 149:2
161:3
**year** 8:20, 8:22
10:1, 10:3, 30:8
31:3, 66:7, 66:10
66:11, 98:11
128:5
**years** 11:14
11:25, 12:1
30:13, 30:17
34:25, 39:22
45:8, 55:18
66:14, 78:21
79:16, 83:12
83:18, 84:5, 95:8
111:5, 114:6
114:18
**Yesterday** 7:25
**yield** 18:19
**York** 30:5, 38:13
40:8
**you-all** 46:14
46:15, 59:5

**Z**

**Zane** 2:10, 2:10
3:4, 4:17, 4:17
4:18, 5:5, 5:8
5:12, 15:2, 15:12
15:16, 16:9
16:16, 16:18
16:21, 17:18
17:23, 17:25
18:3, 18:10
18:13, 18:17
18:21, 18:25
19:3, 19:6, 19:8
19:11, 19:25
20:3, 20:6, 20:7

KAREN MOORE    FEBRUARY 23, 2023

| | | | | |
|---|---|---|---|---|
| 22:12, 26:2, 26:5 | 118:1, 118:6 | 119:12, 120:21 | **1986** 30:23 | **2019** 46:5, 111:17 |
| 27:5, 40:20, 41:4 | 118:22, 119:11 | 120:22, 121:21 | 124:10, 124:22 | 143:12, 144:13 |
| 43:8, 45:7, 48:24 | 120:15, 121:16 | 121:22, 122:2 | **1987** 73:5, 73:8 | 145:21 |
| 49:19, 49:22 | 122:6, 122:15 | 122:16, 122:23 | 73:24, 74:21 | **2020** 20:9, 27:8 |
| 49:23, 50:3 | 123:18, 123:19 | 123:1, 123:4 | 95:7, 95:15 | 41:17, 43:11 |
| 50:14, 51:11 | 124:23, 126:22 | 123:7, 123:10 | 143:12, 144:13 | 44:16, 45:24 |
| 52:5, 53:5, 53:18 | 126:25, 127:2 | 123:13, 137:12 | 145:21 | 56:25, 64:24 |
| 55:21, 56:11 | 127:20, 129:1 | 138:12, 152:21 | **1993** 37:23 | 67:11, 72:8 |
| 57:19, 58:14 | 129:23, 130:8 | 153:19, 154:5 | **1995** 95:7 | 75:15, 92:18 |
| 59:5, 59:7, 59:9 | 131:15, 132:23 | 165:4 | **1996** 37:10 | 93:19, 94:23 |
| 60:3, 61:18, 62:3 | 133:24, 134:4 | **1,064,800** 111:17 | **19th** 72:8 | 104:7, 112:19 |
| 62:21, 63:12 | 141:4, 141:15 | **1.5** 21:18, 22:15 | **1st** 24:7, 81:8 | 128:3, 128:5 |
| 63:19, 64:19 | 142:1, 142:10 | 24:9, 39:1, 59:18 | | 170:1 |
| 65:3, 68:19 | 142:23, 144:7 | 152:20, 153:18 | | **2021** 115:13 |
| 69:11, 70:8 | 144:15, 145:9 | 154:4 | **2** | 128:1, 134:8 |
| 71:11, 73:18 | 145:14, 146:10 | **1:51** 157:2 | | **2023** 1:13, 2:2 |
| 74:5, 74:7, 74:15 | 146:22, 147:9 | **10** 123:8 | **2** 21:17, 34:24 | 4:8, 174:14 |
| 74:22, 75:13 | 147:16, 148:1 | **10:33** 2:3, 4:9 | 34:24, 50:11 | **205** 74:23, 83:5 |
| 76:1, 76:17 | 148:11, 148:22 | **100** 116:2, 124:4 | 92:8, 120:24 | **207,870** 109:25 |
| 77:13, 78:9, 79:1 | 149:2, 149:9 | 125:24 | 124:4, 124:13 | **20th** 64:23 |
| 79:11, 80:9, 81:1 | 149:17, 149:18 | **100,000** 20:17 | 174:14 | **21** 18:20 |
| 81:19, 82:2 | 150:1, 150:11 | 38:5, 45:19 | **2.3** 46:1 | **212** 83:5 |
| 82:17, 83:20 | 150:18, 151:1 | 54:24 | **2:00** 157:8 | **214** 75:14 |
| 84:6, 84:19, 85:3 | 153:15, 154:14 | **11** 123:11 | **2:18** 173:4, 173:6 | **216** 76:3 |
| 85:11, 85:19 | 155:4, 156:21 | **11:27** 50:6 | **20** 33:7, 33:17 | **217** 76:8 |
| 86:8, 86:18, 87:1 | 156:25, 157:12 | **11:35** 50:13 | **2000** 36:22, 37:2 | **218** 77:17 |
| 87:10, 87:21 | 158:23, 160:3 | **113** 158:7 | 168:10 | **21st** 20:9, 46:4 |
| 88:8, 88:15 | 161:2, 161:13 | **115** 3:12, 159:12 | **2000s** 8:21, 10:24 | **22** 79:16 |
| 88:16, 89:8 | 161:16, 163:23 | **11th** 50:16, 53:24 | **2001** 8:25, 11:8 | **227** 81:2 |
| 89:15, 89:22 | 164:12, 165:1 | 108:17 | 108:17, 109:9 | **22nd** 75:15 |
| 90:3, 90:7, 91:6 | 166:1, 166:19 | **12** 123:14 | 126:19, 144:19 | **23** 1:13, 2:2 |
| 91:19, 91:22 | 167:13, 168:1 | **12/14/21** 136:25 | 145:23, 168:23 | **236** 92:17 |
| 91:24, 92:2, 92:5 | 168:8, 168:20 | **12:27** 92:7 | **2005** 10:25 | **23rd** 4:8, 21:16 |
| 92:15, 96:3 | 169:16, 169:24 | **12:37** 92:13 | **2006** 28:17, 30:11 | 22:14, 81:7 |
| 96:20, 98:1 | 170:17, 171:4 | **13th** 46:5 | 30:12, 30:16 | 112:19 |
| 101:1, 101:12 | 172:1, 172:23 | **14** 30:13, 67:11 | 36:18 | **24th** 24:4, 27:8 |
| 101:23, 102:7 | **Zoom** 2:3, 4:2 | 123:17 | **2008** 35:13 | 33:17, 41:17 |
| 103:17, 104:2 | | **15** 39:22, 65:10 | **2009** 34:14 | 70:10 |
| 104:23, 106:2 | **0** | 68:20 | **2010** 109:24 | **25** 95:8 |
| 106:9, 106:12 | | **157** 3:14 | **2012** 70:1 | **250,000** 22:18 |
| 106:16, 106:18 | **05** 81:9 | **15th** 92:17, 93:3 | **2013** 34:25 | 23:7, 24:8, 75:1 |
| 106:22, 107:2 | **06** 12:2 | 93:19, 136:23 | **2014** 28:17, 30:3 | 82:19, 82:22 |
| 107:13, 108:10 | **07** 12:3 | 151:7 | 30:10, 81:7 | 83:6, 110:19 |
| 109:8, 110:16 | | **16** 30:1, 58:19 | **2015** 110:7 | 112:8 |
| 111:3, 112:5 | **1** | **1600** 2:16 | **2016** 24:7, 39:23 | **250K** 23:6 |
| 112:15, 113:18 | | **169** 160:7 | 81:8 | **25th** 81:3 |
| 114:3, 114:21 | **1** 24:4, 34:12 | **170** 74:25, 75:5 | **2017** 68:4 | **26** 18:5 |
| 115:3, 115:5 | 50:7, 59:14 | **179** 162:14 | **2018** 24:9, 46:4 | **262** 93:16 |
| 115:11, 117:7 | 118:10, 118:24 | **19** 3:10 | 116:6, 168:11 | **271** 94:22, 95:13 |
| | | | 169:3 | |

KAREN MOORE  FEBRUARY 23, 2023

**278** 96:23
**27th** 43:10
**28** 19:4
**2800** 2:15
**284** 98:2
**287** 108:14
**288** 109:12
 109:24
**289** 111:14
**28th** 44:16, 56:25
 94:23
**29** 3:10, 19:6
 19:9, 19:12, 21:2
 27:6, 30:1, 33:7
 35:2, 38:4, 41:16
 43:10, 44:15
 45:13, 49:8
 50:16, 53:22
 55:24, 56:24
 115:6
**290** 112:16
**292** 114:4
**2999** 2:11
**2nd** 24:9, 174:14

### 3

**3** 21:15, 35:11
 35:21, 68:1
 69:22, 92:12
 96:25, 97:2
 116:15, 116:16
 116:18, 118:4
 118:10, 118:17
 118:25, 119:14
 119:22, 120:3
 121:1, 121:3
 121:22, 122:11
 124:25, 125:18
 125:23, 125:25
 126:9, 132:5
 140:15, 140:17
 140:20, 141:2
 144:14, 145:16
 150:3, 157:3
 164:1, 164:8
 164:14, 165:3
 165:11, 167:15
 168:3

**3/30** 116:5
 117:13, 143:9
**30** 3:11, 22:2
 45:8, 64:22, 65:1
 68:1, 68:5, 68:10
 68:17, 69:17
 69:22, 97:1, 97:3
 113:4, 116:15
 116:16, 116:18
 116:18, 116:24
 117:21, 118:4
 118:10, 118:17
 118:25, 119:6
 119:14, 119:22
 120:3, 120:9
 120:13, 120:22
 120:24, 121:1
 121:4, 121:9
 121:10, 121:13
 121:14, 121:20
 121:23, 122:2
 122:11, 122:12
 122:12, 122:17
 122:20, 122:24
 123:2, 123:5
 123:8, 123:11
 123:14, 123:17
 123:17, 125:3
 125:17, 125:23
 125:25, 126:12
 127:5, 128:9
 129:14, 132:5
 140:17, 140:20
 141:2, 141:19
 141:25, 143:3
 143:13, 143:16
 144:13, 144:14
 144:16, 144:19
 145:1, 145:15
 145:16, 145:21
 146:16, 150:3
 164:1, 164:8
 164:15, 165:3
 165:4, 165:11
 165:19, 165:20
 165:21, 166:13
 166:14, 166:17
 166:24, 166:25
 167:4, 167:7

167:15, 167:20
 167:23, 168:2
 168:3, 168:7
 168:16, 169:9
 169:13, 170:10
 171:14
**30(b)(6** 16:15
**301** 138:12
**3033** 4:12
**30s** 168:19
**30th** 128:3
**31** 3:12, 115:6
 115:9, 115:23
 142:25, 143:8
 149:21, 160:8
**313** 4:10
**32** 3:14, 157:10
 157:14
**325** 2:11
**35** 71:2
**39** 60:24
**39,645,487** 70:25
**3rd** 59:15, 76:7

### 4

**4** 22:13, 35:21
 115:22, 121:20
 126:6, 131:5
 131:21, 151:7
 151:17, 151:17
 157:7, 173:5
**4,364,243** 71:1
**42** 33:16
**43** 35:1, 160:8
**44** 35:11
**44th** 2:11
**47** 67:10
**49** 38:3

### 5

**5** 3:4, 36:17, 46:2
 59:11, 60:25
 67:10, 67:11
 68:4, 68:21
 70:10, 72:7
 74:23, 76:3
 92:16, 93:17

96:23, 98:2
 122:17, 122:17
 125:22, 128:2
 128:2, 130:9
 134:6, 138:10
 141:18, 141:25
 143:3, 143:13
 143:16, 144:13
 144:16, 144:19
 145:21, 146:16
**5/13** 35:24
**50,000** 109:18
**50712** 1:25
 174:16
**52,500** 108:18
 109:10
**56** 41:16
**56,400** 109:13
**58** 68:20, 69:19

### 6

**6** 24:3, 36:21
 122:20
**60** 43:9
**62** 70:9
**629,000** 110:7
 110:17
**63** 70:25
**64** 44:15
**65** 3:11
**66** 45:13
**67** 45:23, 53:20
 53:22
**68** 49:8

### 7

**7** 122:24, 132:8
**72** 72:7
**7-206** 174:13
 174:14, 174:21
**73** 50:15, 55:24
**7th** 45:24, 53:23

### 8

**8** 27:6, 37:10
 115:13, 123:2

143:7
**8:07** 67:24
**836,000** 111:16
**85** 56:24
**85004** 2:16
**85018** 2:12
**86** 143:24
**87** 124:22, 143:25
**8th** 60:25, 128:1

### 9

**9** 28:15, 123:5
**96** 10:19, 10:21
**967,000** 111:6
**97** 10:19
**9th** 134:8

### /

**///** 4:24, 4:25
 64:25, 75:25
 100:25, 117:25
 150:25, 164:25
 165:25

# Exhibit 17

*Detail Incident Report for 191218168*

---

**SUPPLEMENTAL NARRATIVE:**

**Name:** Goetz,Paula

**Date:** 16:21:18 01/08/20

Supplement Dictated by J. ten Elshof #5702 on 01/08/20 at 1608 hrs.

Total Dictation Time = 4:51 mins.

On 01/08/20 at approximately 1500 hours, I was dispatched to a supplement disturbing the peace call in reference to Case #191218168, which was an open door call.

I spoke with Douglas Altschuler who stated he wanted to report some art had been stolen from his mother's residence at

6330 North Camino De Santa Valera.

Douglas stated his mother is elderly and her mind and faculties are not what they used to be.

He told me he kept a crate of art work in the living for the last 15 years and when he came to visit his mother in October of 2019, the art work was still there in the crate in the living room, but when he came back on 12/23/19 the art work was gone.

Douglas stated his mother fell and was currently in a rehab facility for the last two to three months and she was no longer in the house.

He stated the four pieces of art were called Andy Mouse, a set of four silk screen prints featuring Andy Warhol and him depicted as Mickey Mouse in a series of four different silk screen prints by the artist Keith Haring. There were a set of 30 prints and at that time he did not know which number of the series of 30 were his. He stated he was going to look for a Certificate of Authenticity and try to get the numbers. He also advised the art is insured.

He stated he purchased the art in 1987 and paid $5,000 for it, but when he purchased it in 1987 both artists were still alive, and now they are both deceased.

Douglas stated the paintings were signed by both Keith Haring and Andy Warhol.

I looked on the Internet to see if I could figure out what the value was, as Douglas was unsure of the value. From what I could observe via the Internet was a set of four, and if they are a true set of one of the original 30 silk screen printings, the value was approximately $300,000 to $400,000, which was what I saw on the Internet.

rplwdir.x9

I asked Douglas why he did not report it on 12/23/19 and he stated he meant to call law enforcement, but then went and saw his mother and was speaking to their house keeper, Virginia, unknown last name, who only speaks Spanish. He stated he was attempting to speak to her with another person at the rehab facility, who speaks both English and Spanish, to see where the crates were, but he did not get an answer.

Douglas also stated that Virginia spends time between Mexico and the United States and he has a phone number for her son, but did not have it with him while I was speaking to him, as he was walking down the streets of New York City. He told me he would get the phone number for Virginia's son who should have Virginia's contact information, again, unknown last name.

He also stated he would try and get the Certificate of Authenticity and everything else together for us.

Douglas stated Virginia has worked for his family for eleven to twelve years and he felt she was like one of the family members, and did not believe she would steal the paintings.

I asked Douglas if he had any other information for me at that time and he stated he did not. He told me if he got more information he would provide it to us.

I then contacted Sergeant T. A. Hogate #1307 of the Burglary Unit and informed her of this report and she advised she would assign a Detective to the case.

I also informed Douglas there would be a Detective assigned to the case and when he got the information he should call back and speak with the Burglary Unit to see who was assigned to this case.

NFI          Transcribed by #7472 on Wed Jan 08 16:53:39 MST 2020

**Exhibit 18**

# GURRJOHNS
est.1914

## PRE-LOSS RETAIL REPLACEMENT VALUE APPRAISAL - ISSUED FEBRUARY 28, 2020

Appraisal Report no. 27992

Value Date: December 23, 2019

NEW YORK          LONDON          LOS ANGELES          PALM BEACH          CHICAGO

CHUBB-Altschuler/ROLEX & ART 00004665

# GURR JOHNS
est.1914

### APPRAISAL CERTIFICATION

On January 27, 2020, at the request of Karen Moore of Chubb & Son, Nicole Smith, an appraiser of tangibles of the kind and character set down upon the annexed schedule who has been in the appraisal business for over 8 years, appraised from images and listings the Pre-Loss Retail Replacement Value of the tangible personal property belonging to Douglas Altschuler (Chubb no. 092020001456) previously located at 6330 Camino de Santa Valera, Tucson, Arizona.

A schedule of such property is hereto annexed.  The appraiser has relied upon the client for any vital information including, but not limited to, provenance, condition, ownership, title, etc.  The values given are for the same or comparable items.  Acceptance of this report by the client constitutes acceptance that the information included is correct and reliable and that no vital information has been withheld. The client agrees to indemnify and hold Gurr Johns, Inc. harmless from and against any and all claims, actions, damages, losses, liabilities and expenses relating to this appraisal.  The appraiser has assumed that all works are authentic.

The Retail Replacement Value is the amount it would cost to replace an item with one of similar and like quality purchased in the most appropriate marketplace in a limited amount of time.  The appraiser has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.  The Pre-Loss Retail Replacement Value is as of the date of loss, December 23, 2019.  This appraisal represents her informed opinion but is not a warranty as to authenticity.  This appraisal is based on the comparative market data approach.

The fees for this appraisal are based on time and are not contingent upon the values.  The appraiser has no present or future contemplated interest in any of the appraised articles.  This appraisal was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), 2020 - 2021.

The Pre-Loss Retail Replacement Value is ONE MILLION FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($1,500,000.00).

Nicole Smith, Appraiser

Appraisal Report No. 27992
Value Date: December 23, 2019

Page 1 of 32

CHUBB-Altschuler/ROLEX & ART 00004666

GURR JOHNS
est.1914

## SCOPE OF WORK

**Problem to Solve:** The appraiser was asked to appraise from images and listings tangible personal property previously located at 6330 Camino de Santa Valera, Tucson, Arizona and prepare a Pre-Loss Retail Replacement Value appraisal for insurance purposes. The assignment is to produce an Appraisal Report following the guidelines of the Uniform Standards of Professional Appraisal Practice (USPAP), 2020 - 2021. This appraisal will be sent to the client. This appraisal is not valid for any other purpose.

**Category of Items Examined:** Fine art.

**Client:** Karen Moore (Chubb no. 092020001456).

**Use of Appraisal:** Pre-Loss Retail Replacement Value for insurance purposes.

**User(s) of Appraisal:** This Appraisal Report can be used and relied upon by the client or their designated representatives. Any other user is considered an unintended user.

**Valuation Date of Appraisal:** The value expressed in this Appraisal Report is effective as of the date of loss, December 23, 2019.

**Ownership Interest/Art Loss Register:** The question of title was not an issue. As such, the appraiser did not perform any Art Loss Register inquiries.

**Authenticity:** Although the appraiser does not authenticate works of art, the appraiser had no reason to doubt the authenticity of the works.

**General Assignment Conditions:** This appraisal is based on information supplied for the appraiser by the client, and through research. The appraiser was given adequate time to research the items.

CHUBB-Altschuler/ROLEX & ART 00004667

GURR JOHNS
est.1914

**Specific Assignment Conditions (Assumptions):** The appraiser assumes the mediums to be as reported. A scientific analysis of the chemical compounds of the materials was not conducted, as this was not an issue relating to valuation.

**Specific Assignment Conditions (Extraordinary Assumptions):** The appraiser assumes information provided by the client to be correct. The appraiser assumes some, if not all, authorship to be authentic. The appraiser assumes these works were previously traded in an appropriate market without any unusual market stimuli affecting their sale or transaction. The appraiser assumes that the client retains full title to the works.

**Specific Assignment Conditions (Limiting Conditions):** The appraiser is not a conservator and as such did not prepare condition reports. The appraiser applied a general condition comment to some objects. "Condition" refers to what is considered generally acceptable, with ordinary wear and tear for its type, unless otherwise noted. Items may have limited condition comments.

**Examination and Method of Examination:** As noted above, this appraisal is based on information supplied for the appraiser by the client, and through research.

**Method of Research:** Research was conducted at the offices of Gurr Johns, Inc., with access to the Gurr Johns reference library and to online databases, including, but not limited to, Artnet, Askart, and 1stdibs. Additional research was conducted on the Internet using standard search engines such as Google. Appropriate galleries and auction houses were contacted for information when necessary.

**Comparables:** Comparables are not attached but are maintained in the office work files if needed.

**Confidentiality:** Specific comparable retail sales history is confidential according to the Gramm, Leach, Bliley Act* and cannot be disclosed without the client's permission. The appraiser will not disclose confidential information or assignment results to anyone other than: the client; persons specifically authorized by the client; state appraiser regulatory agencies; third parties as may be authorized by due process of law; or a duly authorized professional peer review committee except when such disclosure to a committee would violate applicable law or regulation. Appraisal assignment information will be kept by Gurr Johns, Inc. for a minimum of five (5) years after the date of issue or two (2) years after final disposition of any judicial proceedings involving the appraiser, whichever period expires last.

CHUBB-Altschuler/ROLEX & ART 00004668

GURR JOHNS
est.1914

*The Gramm, Leach, Bliley Act, passed in 1999 and fully effective in July, 2001, addressed overall financial industry reforms as well as emerging consumer privacy and security issues. Officially called the "Financial Modernization Act of 1999," it affects the technology and information system policies used by anyone engaged in providing financial services either directly or indirectly to consumers. Appraisers are specifically named as institutions required to follow the stipulations of the law.

**Approach to Value:** The appraiser named in the certification of this document employed the "market comparison" approach to arrive at the appraised Pre-Loss Retail Replacement Value. The "income" approach and the "cost" approach are not applicable to this particular appraisal.

**Market Examined:** The "market comparison" approach analyzes recent sales of comparable articles at appropriate major international and regional fine art auctions, private and public sales, shows and exhibitions, as well as prevailing prices at retail shops and galleries where the article may normally be traded. Adjustments are then made for each article, which consider age, condition, rarity, artistic merit, technical workmanship, current trends and availability of an article as compared to such recent sales.

Gurr Johns Inc.
155 East 56th Street, 6th Floor
New York, NY 10022

Tax ID: 13-3407505

Appraisal Report No. 27992
Value Date: December 23, 2019

Page 4 of 32

CHUBB-Altschuler/ROLEX & ART 00004669

<u>Pre-Loss Retail Replacement Value</u>



1. **KEITH HARING** (American, b. 1958 - d. 1990)
Andy Mouse (Suite of Four), 1986
Edition 3/30
Printed by Rupert Jasen Smith
Published by George Mulder
Signed, dated, annotated and inscribed lower right; further
signed by Andy Warhol lower left
Screenprint in colors on paper
38" x 38"

LITERATURE
Klaus Littmann, ed., Keith Haring Editions on Paper 1982 -
1990, Cantz, Stuttgart, 1993, pp. 64-65.

The cataloguing details and black and white image of the subject
work were provided by the client to the appraiser.
The additional color image illustrates another from the same
edition, sold at Sotheby's London on March 27, 2018.

Pre-Loss Retail        $1,500,000
Replacement Value:

**FINE ART**

Appraisal Report No. 27992
Value Date: December 23, 2019

Page 5 of 32

CHUBB-Altschuler/ROLEX & ART 00004670

1.    Additional Image



Grand Total                                                        Pre-Loss Retail        $1,500,000
                                                                  Replacement Value:

Grand Total is the aggregate sum of all values applied to items listed in this appraisal.

FINE ART                              Appraisal Report No. 27992                        Page 6 of 32
                                      Value Date: December 23, 2019

CHUBB-Altschuler/ROLEX & ART 00004671

# Exhibit 19

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3    _____

4    DOUGLAS ALTSCHULER,

5            Plaintiff,

6        v.                              No.

7    CHUBB NATIONAL INSURANCE COMPANY,    CV-21-00119-

8    AN INDIANA CORPORATION,              TUC-DCB

9            Defendant.

10   _____

11              VIDEOTAPED DEPOSITION OF

12                 ROBERT BERMAN

13   DATE:        Friday, April 28, 2023

14   TIME:        12:02 p.m.

15   LOCATION:    Remote Proceeding

16                Los Angeles, CA 90017

17   OFFICIATED BY: Nicholas Casas, Notary Public

18

19

20

21

22

23

24

25      Job No. CS5875476

1             A P P E A R A N C E S

2     ON BEHALF OF PLAINTIFF DOUGLAS ALTSCHULER:

3           JEFF G. ZANE, ESQUIRE (by videoconference)

4           Poli, Moon, & Zane, PLLC

5           807 S. Rock Street

6           Georgetown, TX 78626

7           jzane@pmzlaw.com

8           (512) 508-4693

9

10    ON BEHALF OF DEFENDANT CHUBB NATIONAL INSURANCE COMPANY:

11          JONATHAN Y. YU, ESQUIRE (by videoconference)

12          Broening Oberg Woods & Wilson

13          2800 N. Central Avenue, Suite 1600

14          Phoenix, AZ 85004

15          jyy@bowwlaw.com

16          (602) 271-7700

17

18    ALSO PRESENT:

19          John Topping, Videographer (by videoconference)

20

21

22

23

24

25

Page 3

1                         I N D E X

2      EXAMINATION:                                    PAGE

3            By Mr. Yu                                  5

4            By Mr. Zane                                68

5

6                        E X H I B I T S

7      NO.              DESCRIPTION                     PAGE

8      Exhibit 1        Letter From Mr. Berman

9                       Dated 8/3/2020                  51

10     Exhibit 2        Email From Jenny Ulmer

11                      Dated 8/18/2020                 55

12     Exhibit 4        Affidavit in Response to

13                      Subpoena Dated 6/29/2022        64

14                         (Exhibits attached.)

15

16     NO.              DESCRIPTION                     PAGE

17     Exhibit 3        Email from email from

18                      Mr. Berman to Mr. Chvostal      63

19                      (Exhibit retained by counsel.)

20

21

22

23

24

25

Page 4

```
 1                    P R O C E E D I N G S
 2              THE OFFICER:  Good afternoon.  My name is
 3       Nicholas Casas; I am the officer assigned by Veritext to
 4       take the record of this proceeding.  We are now on the
 5       record at 12:05 p.m. [sic].
 6                    This is the deposition of Robert Berman
 7       taken in the matter of Altschuler, Douglas vs. Chubb
 8       National Insurance Company on Friday, April 28, 2023, at
 9       Zoom.
10                    I am a notary authorized to take
11       acknowledgments and administer oaths in California.
12       Parties agree that as a deposition officer I will swear
13       in the witness remotely.
14                    Additionally, absent an objection on the
15       record before the witness is sworn, all parties and the
16       witness understand and agree that any certified
17       transcript produced from the recording of this
18       proceeding:
19                        - is intended for all uses permitted
20                          under applicable procedural and
21                          evidentiary rules and laws in the same
22                          manner as a deposition recorded by
23                          stenographic means; and
24                        - shall constitute written stipulation
25                          of such.
```

Page 5

1              This proceeding will also be recorded via

2       video technology by John Topping.

3              At this time will everyone in attendance

4       please identify yourself for the record, starting with

5       counsel.

6              MR. YU:  Jonathan Yu for Chubb National.

7              MR. ZANE:  Jeff Zane for Douglas

8       Altschuler.

9              THE OFFICER:  Thank you.  Hearing no

10      objection, I will no swear in the witness.

11             So can you please raise your right hand?

12             MR. BERMAN:  My right hand.

13             THE OFFICER:  Mr. Berman?  Thank you.

14      WHEREUPON,

15                 ROBERT BERMAN,

16      called as a witness, and having been first duly sworn to

17      tell the truth, the whole truth, and nothing but the

18      truth, was examined and testified as follows:

19             THE OFFICER:  All right.  You may now

20      proceed.

21                  EXAMINATION

22      BY MR. YU:

23         Q    Mr. Berman, good afternoon.  My name is --

24             THE VIDEOGRAPHER:  I'm sorry to

25      interrupt.  This is the videographer.  I just need to

1    interject before you get started.  The court reporter

2    said that it was 12:05.  I'm -- I'll be tracking the

3    time and I had 12:02 when he announced the time.

4                    THE OFFICER:  Okay.

5                    THE VIDEOGRAPHER:  Okay.  Thank you.

6    BY MR. YU:

7        Q    Mr. Berman, thank you for appearing today.  My

8    name is Jonathan Yu.  I am the attorney for Chubb

9    National Insurance Company.  Why don't you start off by

10   giving us your full name.

11       A    Name is Robert Berman.

12       Q    And is it okay if I call you Robert during

13   this deposition?

14       A    Yes, it is fine.

15       Q    All right, Robert.  What is your date of

16   birth?

17       A    August 4, 1948.

18       Q    All right.  And what is your current

19   residential address?

20       A    Well, the address that I use for all my -- all

21   my correspondence is 2525 Michigan Avenue, Suite A5,

22   Santa Monica, California 90404.

23       Q    Is that a residential address, Robert, or is

24   that --

25       A    It's my office.  That's what I use as my

                                                              Page 7

1    office.

2         Q    Okay.  What is your residential address, sir?

3         A    I -- okay.  Well, I -- my residential address

4    is 3937 Sumac, Sherman Oaks, California.

5         Q    All right.  Sherman Oaks is in the LA area; is

6    that right?  Is that a yes?

7         A    Yes, yes.

8         Q    Okay.  All right.  Mr. Berman, have you ever

9    been deposed before?

10        A    No.

11        Q    Okay.  Well, let's go over some quick rules

12   before we start; all right?  The first one is that you

13   are under oath.  You understand that, that requires you

14   to tell the truth to the best of your ability?

15        A    Yes.

16        Q    Okay.  Now, when you're answering a question,

17   I want -- I need you to make sure that all of your

18   answers are responses.  So in other words, use your

19   words.  Uh-uhs, uh-huhs, while I may be able to

20   understand what you mean in the deposition, do not

21   translate well for the transcript that Nicholas is

22   preparing for us; understood?

23        A    Okay.

24        Q    From time to time, Mr. Zane may object to a

25   question I ask.  He's doing that to preserve the

1    question -- objection for the record, but you're still

2    required to answer my question; clear?

3        A    Clear.

4        Q    All right.  On that note, make sure you

5    understand the call of my question before you answer it.

6    If I ask an unclear question or something you don't

7    understand, feel free to ask me to rephrase it; okay?

8        A    Okay.

9        Q    But if you answer the question, I'm going to

10   assume you understood what I'm asking; fair?

11       A    Okay.

12       Q    All right.  Everything today I'm going to ask

13   you I'm expecting is based on your personal knowledge of

14   things you know, heard, observed, perceived for

15   yourself.  I don't want you to provide me answers that

16   are -- what are essentially guesses.  Is that

17   understood?

18       A    Okay.

19       Q    All right.  And let's try not to talk over

20   each other during this deposition.  If you let me finish

21   my question, I will in turn give you the courtesy of

22   letting you finish your response; okay?

23       A    Okay.

24       Q    Finally, if you need to take a break at any

25   time, that is fine.  Just let me know.  All I ask if

1    that if there is a question pending at the time you ask

2    to take a break that you answer before we do so; okay?

3         A    Okay.

4         Q    All right.  Mr. Berman, what, if anything, did

5    you do to prepare for this deposition today?

6         A    Not much.

7         Q    All right.  Well --

8         A    I mean, I -- look, I -- I'm just here to

9    answer your questions.  I'm an art dealer, and I sell

10   art.  I care about the art that I sell.  I care about my

11   clients.  I sell art that I believe in.  I sell art that

12   I think is aesthetically good that I like, but I also

13   try to sell art that I believe will hold its value and

14   will hopefully become more valuable in the future.  And

15   that's what I do and that's what I do.

16        Q    Okay.  Did you review any documents in

17   preparation for this deposition?

18        A    I did not.

19        Q    Okay.  Did you consult an attorney in

20   preparation for this deposition?

21        A    I did not.

22        Q    Okay.  Did you talk to the plaintiff --

23        A    I did a long time ago.  When this first

24   started, I spoke to an attorney, and he said, "You have

25   to answer a subpoena if you get one."  And I did before

1   and then you didn't get back to me, and so I just got

2   this subpoena a little over a week ago and I -- since I

3   only always tell the truth, it doesn't matter, but I did

4   speak with Mr. Zane yesterday for a minute.

5        Q    Okay.  And what was the purpose -- what was

6   the context of your conversation with Mr. Zane?

7        A    It was if I was comfortable with what was

8   happening.  He told me just always say the truth.  I

9   said I always say the truth and that was the context.

10  It was very short and sweet.

11       Q    About how long was that call?

12       A    To the best of my knowledge, it was a couple

13  of minutes.

14       Q    Okay.

15            MR. ZANE:  You should just ask if we --

16       A    He apologized again to me for all the hassle

17  I'm going through, that I'm being subpoenaed, that I'm

18  doing this, you know, basically, I guess I could have

19  from the get-go said I don't want to do anything, but

20  this was a client of mine who told me a story which I

21  believe to be true, and I answered it.  And I -- and

22  I've been trying to help everybody, so that's -- that's

23  where I'm at.

24       Q    You mentioned a client of yours that told a

25  story.  What are you referring to specifically, sir?

1      A     About the reason why we're here.  About, I

2   guess, it's been two years, or I don't even know how

3   much longer ago it was, I got a call from Douglas

4   Altschuler saying, you know, "I haven't talked to you

5   for many years.  Do you remember me?"  I vaguely did.

6           He -- he then told me the fact that, you know,

7   "You sold me these suites of Andy Mouse, which I walked

8   into your gallery, and I bought," and I -- oh, why and I

9   remember, "And I had you ship them to Arizona."  And I

10  said, "I kind of, yeah, I remember that."  And I don't

11  remember much because it was 35 years ago, but it seemed

12  good.

13          And then he, you know, he proceeded to tell me

14  the story that he had the suite at his mother's house --

15  I believe it was his mother's house, and it was always

16  there, and then she passed away, and then he went to get

17  the suite and that it wasn't there and that he made an

18  insurance claim to his insurance company that it was

19  missing, and I said, "Well, I wish you well.  That's

20  terrible that, that happened," and that was the

21  conversation.

22      Q     Was the purpose of that conversation solely to

23  remind you of the transaction that you had with Mr.

24  Altschuler?

25      A     Yeah.  He wanted to, you know, talk to me.  He

1    was probably alive -- he was probably happy I was still

2    alive, and I was still in business, and that I

3    remembered the -- the transaction.  And I think he might

4    have asked me if I had records of the transaction, and a

5    transaction from 1986 I do not have any records or any

6    paperwork or, you know, there were no computers back

7    then that I was working on.  And I did not -- I actually

8    have looked in the future upon request from you and him

9    again, because I do have some archival work, but I did

10   not have any -- any paperwork of the transaction though

11   I basically remember the meeting with him and talking

12   with him and then talking with him later about another

13   artwork that he was interested in by another artist at

14   the time.

15        Q    So this first conversation that you

16   referenced, you said it happened maybe two years ago; is

17   that right?

18        A    I -- you know what, it could be three years

19   ago, but --

20        Q    Okay.

21        A    It could be -- it could be two -- but it was a

22   while ago.

23        Q    Okay.  All right.  Perhaps in the year 2020?

24        A    That's -- or maybe even longer, but yeah,

25   because 2020 was the pandemic.  This started before the

1    pandemic, I believe, so, yeah.

2        Q    And so based on that conversation with Mr.

3    Altschuler where he recounted to you the purchase that

4    he made from you in 1986 and then the subsequent loss of

5    the painting, was it your understanding that at some

6    point someone had taken or stolen the prints that he had

7    purchased from you?

8        A    It was not one print.  It was the complete

9    suite -- the complete set of four of the works by Keith

10   Haring that were signed by Keith Haring that he made in

11   homage to Andy Warhol.  So the artwork was Keith Haring.

12   It was printed by Keith Haring's printer and they really

13   quite, you know, large and quite beautiful works.  And

14   important works because the addition size was only 30,

15   and it was signed by both Keith Haring and Andy Warhol

16   who they gave homage to.

17           So Keith Haring was the hottest artist now in

18   New York, him and Basquiat and -- and Andy Warhol.  His

19   star was sort of setting a little bit at the time and

20   when they came together to do this series, I thought it

21   was fabulous and I was very happy that I went to New

22   York and was able to negotiate doing the west coast

23   vernissage and have Keith come out, came out with his

24   entourage.

25           We had a huge opening at my gallery, B1

Page 14

1    Gallery, in Santa Monica and then we went downtown.  I

2    was partnering with Richard Duardo on this and we both

3    had an opening there in downtown LA and it was reviewed

4    and written about in all the newspapers, and I sold

5    quite a lot of work and -- but I didn't sell all of it.

6            And I guess what when Douglas came, he came

7    not to the opening, but I used to be open late at

8    night -- not late at night, but I was -- I was on a

9    street called Main Street and the gallery stayed open

10   into the evenings because there was some very high-end

11   restaurants, and he told me the story, that I believe to

12   be true, that he was having dinner at a very famous

13   restaurant across the street called Chinois, and he and

14   his girlfriend came in and he knew who Keith Haring was

15   and the price -- my prices were very inexpensive, but I

16   still made money on the sale.  And he bought the work,

17   and we shipped it to Arizona.

18       Q    All right.  Let me go back to some -- a lot --

19   things that you said during that testimony.  Your

20   recollection is that you sold Mr. Altschuler a 1986 a

21   set of Andy Mouse prints from the limited edition set of

22   30; is that right?

23       A    Correct.

24       Q    Okay.  Did your gallery sell any other, I

25   guess, additions from that print?  So things like

1    printer's proofs or AP artist proofs?

2         A    I do not remember.

3         Q    Okay.  But it's your recollection that what

4    you sold --

5         A    Other prints.  No, I sold a lot.  He wasn't

6    the only one.

7         Q    Sure.

8         A    I had quite a few of them.  I sold many of the

9    prints and I sold -- I also had paintings and drawings

10   in the exhibition.  It was an exhibition of Keith Haring

11   at B1 Gallery and they -- he sent me from New York a lot

12   of works.

13        Q    Sure.  Do you remember, sir, what number

14   edition of set of prints you sold to Mr. Altschuler?

15        A    I really don't remember.

16        Q    Okay.  Do you remember what numbered sets you

17   had for sale at that time in your gallery?

18        A    I don't remember.

19        Q    Okay.  How many sets of prints did you have in

20   your gallery for sale at that time?

21        A    I really don't remember the exact number.  I'm

22   going to say I probably had five or ten sets.  Something

23   like that.

24        Q    And --

25        A    Not just that, I was also selling, you know,

1   paintings and tarps and things by Keith.

2       Q    Understood.  Now, based on that conversation

3   that you had with Mr. Altschuler, perhaps in 2020, was

4   it your impression then that he had lost the set that

5   you had sold him?

6                   MR. ZANE:  Form.

7       A    He -- he implied that he went after his mother

8   died back to her house and that where he had, had the

9   sets stored, it was not there.

10      Q    Right.  And the set you're referring to being

11  the set that you sold him; correct?

12      A    That's -- that's what he -- yeah, he implied

13  that.  Yeah.

14      Q    Okay.  Sir, do you have any knowledge of Mr.

15  Altschuler owning a second set of Keith Haring Andy

16  Mouse prints purchased sometime after the 1986 sale that

17  you had with him?

18      A    At the time that we discussed this, I did not.

19  Later on in discussions with him, he told me that he had

20  bought another set directly from Keith Haring.  He said,

21  yeah.  So he told me that in the conversation.

22      Q    When was this conversation where he told you

23  that for the first time?

24      A    Sometime after the first conversation.  I did

25  not document it or write it down.  I have no idea of the

1    dates.

2         Q    Okay.  This was a telephone conversation?

3         A    Correct.

4         Q    Okay.  And what did he tell you with respect

5    to that second sale?  The second purchase.

6         A    He said that he I guess he had some personal

7    acquaintance of Keith and he asked to buy his set and he

8    was able to buy his set.  And that's what I -- that was

9    the conversation.

10        Q    Did he tell you if it was -- what sort of --

11   whether that set he purchased from Keith was a limited

12   edition set?

13        A    If it was the Andy Mouse suites, which is what

14   we're talking about, there were 30 of them.  I don't

15   know how many artist proofs there were, but there were

16   30 signed and numbered pieces in the addition size.

17        Q    Okay.

18        A    So I -- I -- he didn't tell me anything about

19   the additions.

20        Q    Okay.  And what did he tell you with respect

21   to how he obtained this second set?

22        A    He basically -- to my memory, I'm not a

23   hundred percent sure because this is not anything I care

24   about, but he said that he had an acquaintance, he had

25   met Keith -- you know, I really don't remember exactly

 1    what he said, but -- but it was something to the -- to

 2    the idea that he had met Keith and he asked to buy his

 3    set.  That's all I remember.  I don't remember details.

 4        Q    Okay.  You wouldn't know how much he purchased

 5    the set for?

 6        A    I have no idea.

 7        Q    Or when that alleged transaction occurred?

 8        A    I have no idea, but I -- if I was to

 9    speculate, I would imagine it was after he bought my

10    set.

11        Q    Sure.  And I don't want you to speculate, sir.

12    So that's great that you told me that.  Other than Mr.

13    Altschuler telling you he purchased a second set, Mr.

14    Berman, do you have any personal knowledge, evidence, or

15    documents of the second set being owned by Mr.

16    Altschuler?

17        A    I have nothing, no.

18        Q    Okay.  Okay.  Let's go into a little bit of

19    the history of your gallery.  I understand you currently

20    run Robert Berman Gallery?

21        A    I have had Robert Berman Gallery and B1

22    Gallery since '79.  Correct.

23        Q    Okay.  And what is -- what kind of operation

24    is Robert Berman Gallery?

25        A    It is a art gallery.  I sell art.

1          Q    Okay.  And I -- you said you also owned and

2     operated B1 Gallery.  Is that still operational?

3          A    It is not.  I have not had -- I have not had

4     that gallery since probably '88 or '89.  I went all the

5     way -- I stopped B1, and I just called it Robert Berman

6     Gallery from then on.

7          Q    These were two separate galleries though.  Am

8     I right?

9          A    No, they were -- they were -- it's the same.

10    What they were -- I had -- at one time I had two

11    locations.  I had the Robert Berman Gallery and I had

12    B1, but my show for Keith was at B1 Gallery.

13         Q    Okay.  Now, in -- as part of the operation of

14    Robert Berman Gallery or B1 Gallery, do you offer

15    anything akin to appraisal services for art?

16         A    Sell them.  I'm not a -- at one time I was a

17    member of an appraisal society, but I am not an official

18    appraiser now, but I can as a gallery owner, give not

19    for insurance purposes, but for just, you know, rough

20    ideas of what things are worth, I can -- I can, you

21    know, I tell people what, you know -- I do appraisals

22    that way.  Yeah.

23         Q    Okay.  Do you have any current appraisal

24    credentials that are in good standing?

25         A    It's not a business that I am actively

1      involved in though I do own an auction house and as an

2      auction house, I do make appraisals on things.

3           Q    Do you have any current certifications for

4      appraisals?

5           A    I am not certified as an appraiser.

6           Q    Okay.  How many appraisals have you done in

7      your career?

8                     MR. ZANE:  Form.

9           A    How many written appraisals?  Is that what

10     you're asking?

11          Q    Yeah.  How many formal appraisals have you

12     conducted?

13          A    Probably in my career 40 years I probably have

14     made 50 or 100 appraisals maybe.

15          Q    Okay.  You said it's a smaller portion or a

16     very small portion of what you do at the Robert Berman

17     Gallery; is that correct?

18          A    I sell something.  I think will -- can make

19     an appraisal of something that I have sold in the past.

20     Because I know -- I follow the market.  So if people

21     say, is it worth as much as I paid for it, sometimes

22     not, sometimes more.

23          Q    Okay.  Mr. Berman, have you ever been asked to

24     appraise any of the Andy Mouse sets owned by Mr.

25     Altschuler?

1      A     I was asked by the -- by them to appraise

2   that, yes.

3      Q     And when you say "by them," who are you

4   referring to?

5      A     I believe it's Mr. Zane asked me to appraise

6   it.

7      Q     And when was that?

8      A     That was about a year and a half ago or a year

9   ago, year and a half ago.

10      Q     Okay.  And did you provide an appraisal?

11      A     I believe I did.  I -- I don't really

12   remember, but I think I did.

13      Q     Okay.

14      A     I said that the -- if -- if they were today

15   being sold in today's market --

16      Q     Today being when he asked you to do it; right?

17      A     Yeah.  In the market it would be, if they were

18   in mint condition -- condition is very important.  If

19   they were in the original box, in the original

20   condition, I believe then this would be a very valuable

21   set now because obviously Andy Warhol has died, and his

22   prices have zoomed up and Keith Haring obviously died in

23   1990 and his prices have zoomed up.  So the fact that

24   they signed this work together and they were really

25   beautiful prints, really amazingly handmade silk

Page 22

1    screens, if they were in mint condition in the original

2    box, they would be a million to a million two.

3         Q    Okay.  Did you provide this appraisal in --

4    did you --

5              MR. ZANE:  Can we -- hey, Jonathan, could

6    we go off the record really quickly?

7              MR. YU:  Sure.

8              MR. ZANE:  Okay.

9              THE WITNESS:  Do you want me to talk?

10             MR. ZANE:  No you stay on.  Yeah.

11   Jonathan, I just want to -- are we off the record?

12             THE OFFICER:  No.  Mr. Topping?

13             THE VIDEOGRAPHER:  We are going off the

14   record.  This is the end of media unit number one.

15   Time -- the time is 12:27 p.m.

16             (Off the record.)

17             THE VIDEOGRAPHER:  Okay.  Let me just

18   verify that the court reporter is ready.  Okay.  Just a

19   moment, everyone.  One moment please.  Sorry about that.

20   We are going back on the record.  This is the beginning

21   of media unit number two.  The time is 12:30 p.m.

22             MR. ZANE:  Just making a note for the

23   record that Mr. Berman was just sort of -- we spoke to

24   Mr. Berman as -- the plaintiff's counsel spoke to Mr.

25   Berman as a trial preparation expert and therefore his

Page 23

 1    opinions and we believe are non-discoverable and under

 2    the Arizona Rules 26 something, something, something --

 3    I'm looking it up right now, D, and so this entire line

 4    of questioning we're going to reserve to challenge for

 5    any use and in the trial and beyond that, but in the

 6    general interest of comedy and getting along and

 7    preserving a neutral non-party witness at this time,

 8    we're not going to bicker about it on the record and

 9    we'll let things go.  I'll let things go ahead with that

10    caveat.

11                    MR. YU:  Jeff, are you giving me the bird

12    on the Zoom?

13                    MR. ZANE:  No, sorry.  Did that come out

14    that way?  If it did, sorry.  I didn't mean all five

15    fingers --

16                    MR. YU:  No, I'm just giving you a hard

17    time.  Okay.  That objection's on the record.

18    BY MR. YU:

19        Q    Mr. Berman, we left off talking about the

20    appraisal opinion that you provided the plaintiff a year

21    and a half ago.  Other than -- what was your

22    understanding of what you were being asked to appraise?

23                    MR. ZANE:  I don't have to object to

24    every single question, do I?

25                    MR. YU:  Correct.  Yeah, no.

1              MR. ZANE:  Okay.

2              THE WITNESS:  I was being asked to

3     appraise what the complete suite in perfect condition

4     would be worth in today's market.

5     BY MR. YU:

6         Q    Okay.  Was there -- do you have any

7     understanding of what -- whether the complete suite you

8     were being asked to appraise was from a limited addition

9     set?

10        A    No, everything is the limited edition.

11    There's only one complete suite.  The suite consists of

12    four works in the box.

13        Q    Sure.

14        A    The box is actually valuable also, probably.

15    And it also has the frontis sheet which is a sheet of

16    paper describing what you're getting, what you're

17    looking at, and who printed it, and where it was

18    printed, and who the publisher was, and how -- what kind

19    of paper it's on, I believe, and I mean, I've not seen

20    this in many years, but how it was done.  And that's

21    part of the complete suite.  It is a box, and like I

22    say, I don't know how many artist proofs or if there

23    were printer's proofs.  I assume there were, but there

24    are 30 numbered pieces in the addition, and that's the

25    complete suite.  There's only --

1         Q    And I just want to make clear, when we are

2    referencing a complete suite from the limited edition

3    set, those are from the -- those are the limited

4    edition --

5         A    Same, yes.  Those are synonymous.  Those are

6    the same.

7         Q    Same thing?  Of -- those are in 30?

8         A    Thirty.  The same thing.

9         Q    Okay.  So you were asked to appraise a

10   complete suite of limited-edition Andy Mouse prints from

11   the addition of 30; correct?

12        A    Correct.

13        Q    Okay.  Did you formalize your opinions in any

14   written report or communication?

15        A    I think I did.  It might have been an email,

16   but I don't have that record now, but I did say in email

17   in my opinion, it would be worth -- probably -- if it

18   was mint condition and at a retail price in a retail

19   gallery, it would be a million -- a million to million

20   two.

21        Q    Okay.  Other than your opinion as to the value

22   of the -- and I assume you did not -- rewind.  I

23   assume -- did you examine any actual prints as part of

24   your appraisal?

25        A    No, no.  It wasn't an appraisal of a set.  It

1    was an appraisal of value if the set -- if the set was

2    given to me in -- in a -- if the set existed -- if

3    somebody came to me with the set in a box and it was not

4    opened and it was just maybe opened once and it was in

5    mint condition, perfect condition in the box, in my

6    opinion you could sell that for a million to a million

7    two or more.

8         Q    Okay.  It's a hypothetical set of prints that

9    you were appraising?  In other words, I think that was

10   the --

11        A    A hypothetical set of prints.

12        Q    What I think appraisers term that as a desk

13   appraisal.  Does that term sound familiar to you?

14        A    Okay.  I'll go along with that.

15        Q    Okay.  Well, I don't know.  You have more

16   appraisal experience than I do.  Is that a term --

17        A    I don't know.  Like I say, I'm not an

18   appraiser.  I'm an art dealer.  I'm an auctioneer and

19   that's what I am.

20        Q    Okay.  Other than your opinion as to the value

21   of this hypothetical set, what other opinions did you

22   render for the plaintiff?

23        A    I don't think I -- what do you mean?  What

24   kind of --

25        Q    What other opinions were you asked to provide

 1    other than your opinion of the value?

 2                   MR. ZANE:  I'm going to go ahead and

 3    object to that topic.  We're getting beyond the pale

 4    here.  He's not an expert.  You're asking about

 5    opinions.  It's pretty clearly -- a party may discover

 6    facts as only provided by so and so.  I mean, we're

 7    getting -- we're straying a bit from the appraisal

 8    itself.

 9                   MR. YU:  Jeff, I'm only asking about what

10    other issues you've been asking -- you've asked him as a

11    consulting expert, I guess, to touch on.

12                   MR. ZANE:  Yeah, which is non-

13    discoverable.  Yeah.

14                   MR. YU:  And your objection has been

15    noted on the record, but I thought we were going to

16    agree --

17                   MR. ZANE:  Yeah, but you don't -- yeah,

18    but -- I mean, I've given some leeway to ask all the

19    questions about that.  I mean, insurance way, I mean,

20    Robert, correct me if I'm wrong, I don't think there

21    were any, but I just want to move on from this line of

22    questioning which is, you know, I'm giving -- I'm

23    playing nice, but that doesn't mean I'm going to let you

24    go to town with every question in the world that when

25    the subject which is pretty clearly non-discoverable.

Page 28

1              MR. YU:  Okay.

2     BY MR. YU:

3          Q     Well, let me just ask this.  Other than your

4     opinion of value, were you asked to -- were you asked to

5     provide an opinion as to any other issue with respect to

6     this lawsuit?

7          A     Not really, no.  I mean, he would talk to me

8     about just art things about things like that and, you

9     know, about artists, other art questions, you know, in

10    conversation and, you know, he was just very sad that

11    he, you know, lost these works and I was sympathetic to

12    it, and I said, "I'm really sorry to hear that."  And he

13    told me that they were insured.  I might have said,

14    "Were they insured?"  And he said, "Yes."  I said,

15    "Good."  And then I know that you and then he would call

16    me back and I would know that there's a dispute

17    obviously that's why we're here and I -- and I -- I do

18    not know the details of any of this.

19              All I could do was say that to my memory, I

20    did the show and when I was called -- the one thing that

21    I probably should tell you is that early on I was called

22    by someone who said they were an adjustor for the

23    insurance company and he was questioning or whether I

24    actually did the show or not, and he said, "Well,

25    according to the estate or something blah, blah, your

```
 1    show was not a listed show."  I said, "Well, that's what
 2    they -- they can pick and choose what they list, but I
 3    can assure you that I did the show."  Keith Haring came
 4    out.  I sold the work.  I dealed with the publisher,
 5    which was Mueller, I believe, and sold works, bought
 6    works.  I probably had to buy a certain amount of work
 7    to do the show and you know, that was -- and I was a
 8    little offended that this guy was saying you didn't do
 9    the show or something.  And I said, "Well, that's
10    crazy."
11            Anyway, that -- go on and was that part of the
12    fun of dealing with the insurance company was them
13    questioning whether I actually was the one who did the
14    show.
15       Q    Mr. Berman, when you were contacted by
16    Plaintiff's attorney a year and a half ago to do
17    this -- to kind of provide your opinion of value, were
18    you aware that you were being engaged as a consulting
19    expert for him?
20                  MR. ZANE:  Form.
21       A    I mean, I -- look, I actually called another
22    dealer in this -- who deals in this venue, and I asked
23    him what he thought a complete set mint condition would
24    be.  And I was -- he told me one -- probably 1.2 or
25    more.
```

```
 1        Q    Okay.
 2        A    So I mean, I consult with somebody who deals
 3    in this.
 4        Q    Right.  My original question though, sir, was
 5    when you -- when they reached out to you a year and a
 6    half ago, were you aware that you were being engaged as
 7    a consulting expert in this case?
 8                    MR. ZANE:  Form and foundation.
 9                    THE WITNESS:  I'm sorry, what?
10                    MR. YU:  He's just making an objection
11    for the record, Mr. Berman.
12                    MR. ZANE:  Yeah, you can ignore me.
13                    THE WITNESS:  I missed that.  What?
14    BY MR. YU:
15        Q    You can go ahead and answer, he's just making
16    his objection for the record.
17                    MR. ZANE:  Yes.
18        A    Yes.
19        Q    Okay.
20        A    I was being asked to be someone who knew what
21    that would sell for in today's market.
22        Q    Right.  I understand that they were asking you
23    for your opinion on that, but you were -- did you
24    understand that you were being engaged as a consulting
25    expert in this lawsuit?
```

1           MR. ZANE:  Form and foundation.

2      A    I didn't because I'm not -- I don't do

3    this -- this is the first time I've ever done this with

4    anything like this.  I mean, I was asked to do, you

5    know, this is an old client of mine who asked me, you

6    know, what these were worth, and I was telling him what

7    I thought they were worth.

8      Q    Right.  I understand that that's what they've

9    asked you to opine on, but did you understand at that

10   point that you were being -- you were consulting as an

11   expert in this case?

12     A    I am an expert.  Well, I mean, this is what I

13   do for a living.  I mean, I'm not a certified appraiser,

14   but I am somebody who deals in this stuff.

15     Q    I understand that's your qualification, sir,

16   but did you have an understanding that were being

17   retained as a consulting expert for Mr. Altschuler in

18   this lawsuit?

19           MR. ZANE:  Form foundation.

20     A    I don't -- I don't understand.  I mean, I

21   don't know the difference between me giving an opinion

22   and being an expert because I didn't -- it's my -- I'm

23   not understanding what you're asking.  I'm sorry.

24     Q    Well, what was -- okay.  What was your --

25   let's do it this way.  Were you paid for those

1    appraisals that you did?

2        A    As it turned out, I was not paid.

3        Q    Okay.  Did you sign any engagement letter or

4    engagement contract with Plaintiff or his attorneys for

5    these opinions?

6        A    I don't believe so.  I don't believe so.

7        Q    Okay.  How many -- you said you exchanged

8    emails with the plaintiff's attorneys; is that right?

9        A    I think it was mainly phone calls.

10       Q    Okay.

11       A    Could have been an email.  I don't have -- I

12   don't have -- I don't have that.  Yeah.

13       Q    If you had exchanged emails with the attorneys

14   what email would you have used?

15       A    My personal email and I don't see -- I just

16   did a search too recently to get you just now and I

17   didn't see any emails from them.

18       Q    What is your personal email account -- or

19   email address?

20       A    robertberman@artnet.net.

21       Q    Okay, Mr. Berman.  I want to move on.  Let's

22   on move to the 19 -- I think it's a -- I think the

23   exhibit was in 1986.  Was that right?

24       A    Correct.

25       Q    What was the name of that exhibition?

1       A    The name of the exhibition was Andy Mouse.

2   I'm going to show you -- I just found -- this is the

3   poster.  This is the poster from the exhibit.

4       Q    Okay.  Thank you.  And we'll talk about that

5   poster as well.  Was this -- was the Andy Mouse exhibit

6   something that you yourself put on?

7       A    I put it on with Richard Duardo, and I was the

8   main person.  I was the one who went to New York, made

9   the deal with Keith Haring, and I put it on at my

10  gallery.  And we had a party and we moved downtown to

11  Richard's gallery.

12      Q    And who's Richard Duardo?

13      A    Richard Duardo is a very loved and important

14  artist, also a silk screen maker.  Most of his art was

15  made the same way Andy Warhol makes art using silk

16  screen process, and he was very aware of how important

17  Keith was and obviously Andy was, and he has passed

18  away, about, I'm going to say, I'm just going to guess,

19  six, seven, eight years ago, and actually, they're

20  making a movie on him now.

21      Q    Oh.  Are you part of that movie?

22      A    I have been invited to be and I'm kind of

23  waiting to be filmed, but I hope to be because he was a

24  friend, and he was a very important part of the LA art

25  scene during the '80s and '90s and early 2000s.

1      Q    Okay.  Well, tell me how the idea for this

2   Andy Mouse exhibition came about.

3      A    Well, I would be going back -- I had the

4   gallery on Main Street in Santa Monica, and I was going

5   back to New York to the East Village quite often and to

6   the galleries in the early and mid-80s.  And I, of

7   course, knew how important Keith was, and luckily, I was

8   able to get to his studio and hang out with him.

9          And he had not shown in Los Angeles, and I

10  told him that I would love to do the show and he was at

11  the time working on this series called Andy Mouse and

12  also doing like a hundred -- while you talk to him he's

13  actually drawing and painting and doing a hundred things

14  and we committed to doing the show and we had

15  correspondence.  I -- at that time I told Richard about

16  it and he was very excited and we, you know, made

17  posters and we got a lot of attention in Los Angeles.

18     Q    Did you know Keith Haring personally, sir?

19     A    Yes.  He was there.

20     Q    And what was the nature -- how deep did you

21  guys go?  What was the nature of --

22     A    I mean, I knew him as an art dealer.  This

23  here -- I'm going to show you.  This is a picture of

24  the -- of the show with Richard Duardo and Keith and me.

25  I'm in the middle there and that was from -- what you

```
 1    see behind us, the Andy Mouse series.  This is from

 2    then; from 1986.

 3         Q    Quite the jacket you're wearing in that photo.

 4         A    I liked the Hawaiian shirt with the white

 5    jacket, but we -- I knew Keith, but I didn't -- I knew

 6    him as an art dealer.

 7         Q    Keith Haring was an art dealer?

 8         A    Oh, I knew him -- I was an art dealer, he's an

 9    artist.  That's the relationship.

10         Q    Oh, understood.  Okay.  I read somewhere that

11    you might have gotten the idea to put on the exhibit

12    when you visited a gallery run by Tony Shafrazi.  Is

13    that accurate?

14         A    I was already an art dealer, meaning that as

15    what we do as art dealers, we look for what is relevant

16    to our time as art dealers.  And I guess that's good.

17    And as an art dealer, I would go to other galleries and

18    look at art.  And Tony, at the time, was one of the hip

19    art dealers.  They had great shows and was very much in

20    the cutting-edge world of the -- the art world in New

21    York, and I, of course, visited his gallery whenever I

22    would go to New York as well as Leo Castello -- Leo

23    Castelli and other galleries.

24              So but I was very aware of how important Keith

25    was by that time.  By -- so I might have -- I don't
```

1      really understand your question exactly, but I did go to

2      his gallery, and I've seen many shows there.

3          Q    And who is Tony Shafrazi?

4          A    Well, it's pronounced Shafrazi.  Tony

5      Shafrazi.

6          Q    Shafrazi.

7          A    Yeah.  He is a art dealer who early on showed

8      Keith Haring and showed a lot of other really important

9      artists from that New York School of Art -- collect

10     art -- that was happening mainly in the East Village and

11     parts of New York where the artists hung out.  So Tony

12     knew how to throw a party and he was -- he was a very

13     good art dealer.

14         Q    And explain for me because I have nothing -- I

15     have very little knowledge about the art world.  An art

16     dealer like Tony Shafrazi would he have represented Mr.

17     Haring exclusively?  In other words, if you want

18     something from Haring, you go through the art dealer?

19         A    I don't think -- it could have been that.  I'm

20     not sure if he had that or not.  It's possible.

21         Q    Okay.  At that point do you know if Mr. Haring

22     was represented by any dealer or business manager?

23         A    My dealing was directly with him, but there

24     was another dealer that was working with Tony who I was

25     talking to also, but I was dealing directly with Keith

1    and there was this one other dealer who was like a

2    partner of Tony from what I thought or saw.  And I mean,

3    remember this is 35 years ago and it was the 80s, so it

4    was a crazy time, and I don't remember exactly all the

5    detail, nuances of what happened, but I know that I was

6    dealing directly with Keith and Tony was showing him I

7    know that.

8        Q    Okay.  What stood out to you about Keith

9    Haring's work that, that kind of compelled you to have

10   an exhibit out in LA for his work?

11       A    He was the hottest young artist in New York,

12   and I want to show him in Los Angeles.  That's what

13   compelled me.

14       Q    And how long did that exhibit run?

15   Exhibition.  Sorry.

16       A    I have it on the poster.  Let me see.

17   According to this poster, it went from June 8th to July

18   3, 1986.  Andy Mouse, Keith Haring's homage to Andy

19   Warhol.

20       Q    Okay.  I have to imagine putting on an

21   exhibition like that bi-coastal, you're doing this in

22   LA, Keith is in New York, it's got to take a lot of

23   organization with multiple people.  Who from the artist

24   side did you work with to set up the exhibition?

25                   MR. ZANE:  Form.  You can answer.

1           THE WITNESS:  I worked with Keith, and I

2    worked with his dealer, his publisher Mueller.

3    BY MR. YU:

4        Q    Is Mueller the name of the publisher or an

5    individual?

6        A    It's the name of his name.  He was the one who

7    published the Andy Mouse suite.

8        Q    Okay.  Other than Mr. Haring and Mueller, did

9    you work with anyone else on -- you said he had an

10   entourage.  Did you work with anyone else on his

11   entourage to get this --

12       A    No, no.  It wasn't that formal.

13       Q    Okay.  At that point were you aware of whether

14   Mr. Haring had an assistant or a secretary?

15       A    Not really.  I mean, I might have.  I don't

16   remember.

17       Q    Okay.  And what about a business manager?  Was

18   he represented by anyone -- his business interest

19   represented by anyone other than himself?

20       A    I don't remember.

21       Q    Okay.  And in addition, my understanding is

22   this exhibition it's first to showcase Mr. Haring's

23   works, but also to offer them for sale; is that right?

24       A    That is correct.

25       Q    All right.  Other than the Andy Mouse

1    prints -- and I believe you think you had five to ten

2    complete sets of those Andy Mouse prints for sale; is

3    that right?

4        A    I don't remember exactly.  It seems that, that

5    would be logical.

6        Q    Okay.  Other than those silk screen prints,

7    did you have any other works for sale by Mr. Haring?

8        A    And then I had some drawings, and I had a tarp

9    and things like that.

10       Q    Okay.

11       A    And he brought out with him a bunch of swag --

12   well, they weren't -- you know, he brought out watches

13   and things like that which I could sell too.

14       Q    Oh, he made other products other than his

15   paintings; is that right?

16       A    He made -- he was involved with very heavy

17   marketing of things, yes.

18       Q    Okay.

19       A    Swatch made a watch with him.

20       Q    Oh, wow.  Very impressive.  Very

21   entrepreneurial.

22       A    Ironically, I have the Swatch watch right

23   here.

24       Q    Oh, gosh.  Look at that.

25       A    By Keith Haring.

1        Q     Unopened too.  How did you manage to get your

2     hands on that?

3        A     Well, he did it in front of me.  I -- you

4     know, he signed it and dated it and there you go.

5        Q     That is a piece of history in time.

6        A     We all are a piece of history in time.  Yes,

7     it was.  Yes, yes.

8                    MR. ZANE:  Amen.

9        Q     Mr. Berman, how many sets of the Andy Mouse

10    suite did you end up selling?

11       A     I really do not remember.  I tried to remember

12    that.  I do not remember.

13       Q     Okay.  Well, what would have happened

14    typically if you didn't sell a suite?  Would it go back

15    to the artist?

16       A     I bought them and to my memory, it was -- I

17    probably bought them all in advance and I sold

18    everything eventually over years.

19       Q     Okay.  And what happened to the prints after

20    the exhibition ended on July 3rd of 1986?

21       A     I continued to sell the work.

22       Q     Let's move on to the actual purchase in 1986

23    by Mr. Altschuler.  My understanding is that at some

24    point -- after the exhibition had ended, he'd walked

25    into your gallery, I think it was B1 Gallery?

1      A    Correct.

2      Q    And purchased a suite of prints from the

3   limited-edition set of 30.  What do you recall about

4   that transaction, sir?  I know it was 35 years ago.

5      A    I don't remember much other than he walked in,

6   I mean, when he tells me the story, I seem to remember

7   it and he -- I probably had a set on the wall and I

8   probably had a set, you know, a couple of sets in the

9   boxes and he knew enough, he was smart enough to buy the

10  set and that's all I remember.

11     Q    Do you know approximately when that purchase

12  would have been?  And I believe in 1987; was that the

13  year?

14     A    It could -- probably was.

15     Q    Okay.  Do you know approximately when in 1987

16  that would have occurred?

17     A    I do not have records.  I do not remember.

18     Q    Okay.  With respect to your interaction with

19  him in that transaction, was he with anyone?

20     A    He said to me that he was with his girlfriend

21  at the time and seemed logical to me.

22     Q    Okay.  When you say he said to me or when he

23  tells me these things, is your testimony with respect to

24  this transaction based solely on what Mr. Altschuler has

25  relayed to you?

1              MR. ZANE:  Form.

2       A    Well, he -- let me ask you something.  May I?

3       Q    Well, you can ask me something afterwards,

4    sir, but it's my job to ask you questions.

5       A    I want you to understand it's 35 years ago.

6       Q    Sure.

7       A    So I really don't remember exactly everything,

8    but if somebody says to me, I was there with my

9    girlfriend and remember we were there.  I go, "Yeah, I

10   think I do -- yeah, I remember that sort of."  But I

11   don't remember it like you know, something that happened

12   five minutes ago.

13      Q    Sure.  Do you have an independent recollection

14   of him coming into your gallery with his girlfriend?

15      A    Seems to make sense to me because I did sell

16   sets.  Yeah.  And everything he told me is logical.  It

17   makes sense.

18      Q    Okay.  Everything he told you makes sense, but

19   does everything that you told him, do you remember that

20   independently?

21      A    I do remember.  Can I ask you to put this

22   on -- I have an important call.  May I ask for a break

23   for a minute?

24              MR. YU:  Of course.  Let's take that that

25   five-minute break.

```
 1              MR. ZANE:  Okay.
 2              THE VIDEOGRAPHER:  We are going off the
 3    record.  This is the end of media unit number two.  The
 4    time is 1:00 p.m.
 5              (Off the record.)
 6              THE VIDEOGRAPHER:  We are going back on
 7    the record.  This is the beginning of media unit number
 8    three.  The time is 1:04 p.m.
 9    BY MR. YU:
10        Q    Mr. Berman, we left off me -- I had asked you
11    if you had an independent recollection of this sale
12    transaction outside of what Mr. Altschuler told you
13    happened.  And I want to revisit that.  So what do you
14    remember outside of what has been told to you by Mr.
15    Altschuler about the purchase?
16              MR. ZANE:  Form.
17        A    I -- in my recollection, I remember that
18    evening roughly and I do sort of remember me talking to
19    him about Keith Haring and how important he was and how
20    great the deal was and blah, blah.  I don't remember
21    everything exactly, but I do to my memory, remember him
22    and I can't tell you how much was he made me remember by
23    telling me the story, and I was like oh, yes.  I
24    remember that.
25              So I'm sure it was partial my memory and
```

1    partial him bringing me back telling me with his

2    girlfriend how, you know, the banter that happened that

3    evening.  I do remember it -- I do remember it

4    happening.  I don't remember the details.

5         Q    Okay.  Would it be fair to say you remember

6    the fact of the sale happening and as far as --

7         A    Yes, I do.

8         Q    Okay.

9         A    I wouldn't be doing this if I didn't think it

10   happened.

11        Q    Sure.  And then -- but as far as the finer

12   details of the sale, would it be fair to say that that's

13   something that you recollected after he told you about

14   it?

15        A    Well, he would be talking about how he walked

16   in after dinner with his girlfriend, and these are

17   things that of course once he told me, I remembered, but

18   I didn't remember it randomly offhand.

19        Q    Okay.  I understand.  Thank you.  Do you

20   remember how much you sold him the prints for?

21        A    I believe I sold him the set for $5,000.

22        Q    That is a steal.  Well, I guess by today's

23   standards.  Is it not?

24        A    I would recommend everybody listening to this

25   come to my gallery and buy art from me today, because I

1    still sell art with the same kind of attitude that it

2    has a very good chance to be worth a lot more in the

3    future, but that particular artist, with that

4    particular -- at that particular time because they were

5    both alive because it was not typical work by Keith.  It

6    didn't look like other things he had really done.  It

7    seemed like they weren't that valuable.  Yet, I knew

8    they were valuable, and I was able to pass on this

9    incredible deal to the people who bought either the

10    individual pieces or the complete sets.

11          In other words, I did my job very well and I'm

12    proud of it and there are a few other artists that I

13    have handled over the years that have also went up in

14    value astronomically just because of circumstances, but

15    it is probably three or four artists, five artists maybe

16    at most in my 40 year career whereas hundreds of other

17    artists have not gone up in value, but some of the

18    artists that I have shown have gone up in huge value.

19          This particular suite and this particular set,

20    because of time and how both of their careers have both

21    skyrocketed, have caused this to happen, and I wish I

22    had suites now, but I don't and -- but if I did, I'd be

23    very happy.

24        Q    It sounds like picking to showcase an artist

25    is a bit like investing in a stock and it sounds like

Page 46

1    you have stumbled upon the equivalent of Amazon pre-2000

2    stock.  Is that --

3        A    Facebook, Amazon, yes.  Exactly.

4        Q    Well, it's a testament to how good you're

5    doing with curating the art.  So --

6        A    That's why I keep doing it.

7        Q    Now, sir, do you remember what medium the

8    print was on that you sold to Mr. Altschuler?

9        A    All the medium was the same.  It's called silk

10   screens or synonymous with serigraph.

11       Q    Okay.  Is that different from an Andy Mouse

12   lithograph?

13       A    There is no such thing as an Andy Mouse

14   lithograph.

15       Q    Okay.  And how was that -- how were the prints

16   shipped?  Did he take them with him, or did you send

17   them out somewhere?

18       A    I sent them to -- to my memory, I sent them to

19   an address in Arizona.

20       Q    Okay.  And again, I'm going to push a little

21   bit on that.  Is that something that you independently

22   recall, or is that something that you recalled after Mr.

23   Altschuler reminded you?

24       A    No, I do a lot of transitions -- transactions

25   and yeah, I mean, I don't recall exactly, but once he

1    reminded me, I -- the memory came up.

2        Q    Okay.  And how would it have been shipped?

3    Like in a crate or a container?

4        A    It could have been shipped either in the

5    original box, which is a shipping box, which is actually

6    silly in a way because the box now is valuable.  At the

7    time it wasn't.

8        Q    Of course.

9        A    But now it's very valuable, but the box back

10   then was a cardboard, custom made, very strong, custom

11   shipping box.

12       Q    Okay.  Did it come in a portfolio as well?

13       A    In the box there was -- I don't think there

14   was a portfolio from my memory, but I think there were

15   different papers.

16       Q    Okay.

17       A    Oh, yeah.  There was a -- I don't remember.

18   I -- you know what, I don't remember if there was

19   another portfolio.  Might have been.  I don't remember.

20       Q    And did you ship the prints with any other

21   materials other than the prints and the box itself?

22       A    I don't think I would have.

23       Q    Okay.

24       A    I don't remember, but I'm sure I didn't.

25       Q    Would there have been like something like a

1    certificate of authenticity that went along with the

2    prints?

3        A    Well, there would have been an invoice that

4    went along and probably it was the invoice in the box.

5        Q    And this would have been an invoice that you

6    generated from B1 Gallery?

7        A    Correct.  But the suite itself had a

8    frontispiece which acted as the certificate.

9        Q    I'm sorry.  Say that again.  A frontispiece?

10       A    Frontispiece, which is a -- spells out what

11   you're getting.  It's called a frontis work.  It says

12   this is the Andy Mouse suite by Keith Haring, an homage

13   to Andy Warhol.  I'm sure it had -- I mean, I'm 99

14   percent sure it had that.

15       Q    And do you recall if this specific --

16       A    No, I can't look at it.

17       Q    Do you recall if this specific work had a

18   frontispiece that went along with it?

19       A    I believe it did, but if -- I probably

20   would -- it was probably just in the box perfectly in

21   the box.

22       Q    Okay.

23       A    I can remember it came with it.  That's all I

24   can tell you.

25       Q    And this would be something that was produced

1     by the artist not the gallery; correct?

2          A     It was produced by the publisher.

3          Q     Okay.  And remind me, who was the publisher

4     again?

5          A     Mueller.

6          Q     Mueller.  Okay.  And I know that you haven't

7     produced anything in response to the subpoena, I just

8     want to make sure you don't -- do you have any records

9     of this transaction of this sale or of the prints that

10    you sold Mr. Altschuler in 1987?

11         A     I do not.

12         Q     Okay.  And you've looked; right, sir?

13         A     I have looked extensively.

14         Q     Okay.  After that sale -- after that purchase,

15    did Mr. Altschuler ever buy a second set of Andy Mouse

16    prints from you?

17         A     He did not.

18         Q     Okay.  Did Mr. Altschuler purchase other works

19    subsequently to that sale?

20         A     I think we discussed other works.  There was

21    one artist that he mentioned that he liked.  I don't

22    really remember if he bought it or not.  The artist's

23    name was Victor Hayden.  He was the show that I did

24    after that, but I really don't remember if he bought

25    other works from me.

1          Q     Okay.  Yeah, and that's what I'm trying to

2     figure out.  Is did he buy anything else from you after

3     the Andy Mouse sale?

4          A     No, not then.  No.

5          Q     Okay.

6          A     How much longer is this going to go on?  I

7     thought this was going to be an hour.  It's already --

8          Q     Yeah.  I'm powering through it.  I would say

9     probably 45 more minutes to an hour.

10         A     Really?

11         Q     Yeah.

12         A     I have business to do, so --

13         Q     I understand, sir.  I'm going to power through

14    this as quickly as possible; okay?  I'm going to share

15    my screen with you.  This is a letter.  Do you see my

16    screen, sir?

17         A     Yes.

18         Q     Okay.  This is a letter bearing your

19    letterhead, I believe, from Robert Berman Gallery.  Is

20    that your letterhead, sir?

21         A     I believe so.

22         Q     I can zoom in if you like.

23         A     Okay.  Okay.  Can I scroll and read this?

24         Q     I'm just asking about the letterhead at this

25    point.  We'll read it together.

Page 51

1    A    Okay, fine.  It's me.

2    Q    Okay.  And just for the record, this is

3    Exhibit -- I'm going to say Exhibit 1, but I know we

4    have multiple exhibits in this case so we might have to

5    amend that later.

6                 (Exhibit 1 was marked for

7                  identification.)

8              But the Bates label is CHUBB-Altschuler 0580.

9    Sir, it appears you -- do you recall drafting a letter

10   dated August 3rd to someone regarding --

11   A    I did.  I must have, yeah.

12   Q    Okay.  It says, "My name is Robert Berman, I

13   am the owner of Robert Berman Gallery from 1979-

14   present."  That's true; right?

15   A    All true.

16   Q    All right.  "And from 1982-1989 I also owned

17   B1 Gallery."

18   A    As I just stated, yes.

19   Q    Okay.  It says, "I'm writing this letter as I

20   was recently contacted by Mr. Douglas Altschuler, a

21   client of mine from the 1980s."  Is this the call that

22   you referenced previously in 2020?

23   A    Yes, yes, yes, yes, yes.

24   Q    Okay.  "Mr. Altschuler reached out to me in

25   July and requested proof of purchase of a piece he

1    purchased from the exhibition Andy Mouse homage to Andy

2    Warhol at the cost of $5,000."

3        A    As I stated, yes.  Yes.

4        Q    Okay.  You also stated in here that what he

5    purchased was a very high-quality silk screen of a

6    limited-edition of 30.  That's consistent as well with

7    what you've testified to?

8        A    A hundred percent consistent with what we just

9    discussed.

10       Q    Okay.  And then we talked about -- and it

11   says, "To my memory, one evening Mr. Altschuler came in

12   after dining at Chinois and purchased the Andy Mouse

13   complete set."  How did -- did you -- was the fact that

14   he was dining in Chinois something that you

15   independently remembered or something that he reminded

16   you of?

17                    MR. ZANE:  Form.

18       A    Well, yeah, I don't -- I don't know.  But it

19   made sense because Chinois is a very expensive

20   restaurant, and it's the kind of restaurant that you

21   could have money to buy art with, so it all made sense.

22   Yeah.

23       Q    And sir, before we go on, what was the

24   purpose -- who did you send this letter to?

25       A    I either sent it to Mr. Zane or maybe Douglas

1    Altschuler, maybe.

2        Q    Okay.  And was the purpose -- or the intended

3    purpose of you drafting this letter?

4        A    Because this is a client of mine who bought a

5    piece of art and he's asking me to memorialize that he

6    did.

7        Q    Okay.

8        A    And I did.  I'm not getting into whether it

9    was stolen or not.  I don't know anything about that.

10   I'm not involved in that.

11       Q    Sure.

12       A    Your business.  You can figure that out.

13       Q    Right.

14       A    My business is everything in this letter seems

15   like I could have wrote this exactly a minute ago

16   because everything I just told you is exactly what's in

17   that letter though I had not read the letter until right

18   now.  But everything seems exactly right.

19       Q    Do you -- did you have an understanding when

20   you wrote this letter what it was going to be used for?

21       A    Well, look, he wants to make a case that he

22   bought this set from me, and I'm conferring it.

23       Q    Okay.  Further down it says, "Mr. Altschuler

24   continued to be a client of our gallery for the next

25   several years purchasing works by Victor Hayden and

Page 54

1    other established and emerging artists."  Does that

2    refresh your memory as to what Mr. Altschuler --

3            A    I just told you the name Victor Hayden.

4            Q    Sure.

5            A    Yes.

6            Q    I'm sorry.  Let me finish my question, sir.

7    Does that refresh your memory as to whether Mr.

8    Altschuler had subsequent purchases through your

9    gallery?

10           A    Yes, it does.  It makes sense.  It makes

11   sense.

12           Q    Okay.  And looking at that now, are you able

13   to tell me how many subsequent purchases he's made from

14   B1 Gallery?

15           A    I cannot tell you.  It's 35 years ago.  I

16   don't know.

17           Q    And then it says, "As I stated earlier, I do

18   remember Mr. Altschuler purchasing this set at a cost of

19   $5,000."  This set being the Andy Mouse purchase in

20   1985.  "I'm very sorry to hear it was stolen.  It's a

21   wonderful piece of art."  Again, your understanding when

22   you wrote was that the -- the set he purchased from you

23   was stolen; correct?

24           A    That's what he told me.

25           Q    Okay.

1    A    Everything that's in that letter is exactly

2    what I just told you.

3    Q    What did he tell you with respect to the

4    actual theft of the piece?  Other than that it was

5    stolen.

6    A    He had no idea.  He told me his mother died,

7    and then I guess the house was empty or -- I really -- I

8    don't even remember what he said, but it sounded like,

9    you know, when somebody dies their house can be easily

10   broken into or, you know -- or somebody could have taken

11   it who was involved.  I -- you know, this is a mystery.

12   I have no idea of that mystery.  It's not my bailiwick.

13   Q    Okay.  Exhibit 2.  This is CHUBB-

14   Altschuler/ROLEX Art 01345.

15                    (Exhibit 2 was marked for

16                    identification.)

17        Mr. Berman, do you recall -- this is an email

18   from someone named Jenny Ulmer.

19   A    Okay.

20   Q    John Chvostal.

21   A    Art director.  Yeah, she worked for me.

22   Q    I'm sorry.  Let me finish my question.  Who is

23   Jenny Ulmer?

24   A    She was my director of my gallery up until

25   about two years ago.

1       Q     Okay.  This email is dated August 18th of

2    2020.  She was the director of your gallery at your time

3    then?

4       A     Yeah, okay.  Yes.

5       Q     Okay.  Do you remember receiving an email from

6    your -- at -- in your -- in one of your email addresses

7    from an individual named John Chvostal asking you

8    questions about your exhibition?

9       A     Yeah.  I mean, I remember.  I don't remember

10   his name.  I know that some people have contacted me in

11   regards to this trial or whatever you're doing.

12      Q     Okay.  Do you remember asking Jenny Ulmer to

13   respond to Mr. Chvostal's email?

14      A     Probably.  She wouldn't have done this without

15   talking to me.

16      Q     Okay.  I just want to go through the answers

17   that were provided to Mr. Chvostal's questions directed

18   at you.  He asks you if the prints are from a limited-

19   edition of 30, and Jenny, I guess through you, confirmed

20   that they were and there were approximately ten sets.

21   Is that true?

22      A     Yeah.  As I mentioned earlier, between five

23   and ten sets.  That's what I told you earlier.

24      Q     They also -- he also asks if you could confirm

25   a specific edition number of a set you sold and you said

1    you couldn't because you couldn't remember, and you

2    didn't have those records.  Is that true?

3         A    Right.  I do not.  I do not.  That is correct

4    because I said earlier, correct.

5         Q    And then he asks if you continue to sell sets

6    beyond the exhibition.  You said that you did.  Also

7    consistent with what you've told us today?

8         A    Exactly correct.  Everything is consistent

9    with what I have said and there coming up the poster,

10   which I showed on my phone.

11        Q    All right.  This below

12   info@robertbermangallery.com, that's an email address

13   associated with your gallery?

14        A    Correct.

15        Q    All right.  Let's go to the -- this is -- this

16   was an attachment to the email that Jenny sent Mr.

17   Chvostal and is -- what are we looking at here?

18        A    You're looking at the poster that was made by

19   the -- by us for the exhibition and you're looking at

20   it's hand signed by Keith Haring with a date and a

21   remark which he did all in front of me at my gallery.

22        Q    The remark being K. Haring '86 and then iconic

23   dog image --

24        A    The iconic dog is the remark.  That's called a

25   remark in the art world.

Page 58

1          Q     Understood.  How many of these posters were

2     printed for the exhibition?

3          A     Not many.  Like, only 30.  Maybe 35.  And then

4     were was another poster that was also printed of a

5     radiating baby.

6          Q     Okay.  And what happened to these -- I assume

7     these were for promotional use?

8          A     Correct.  I gave them to my employees and to

9     people who bought the prints.

10         Q     Okay.

11         A     I am a very generous dealer.

12         Q     I can see that.  Did you retain a copy --

13    well, it looks like you retained a copy of the signed

14    one by Keith Haring bearing the dog -- iconic dog.

15         A     In my archive, I do have a copy, yes.

16         Q     Okay.  Do you remember if you provided one to

17    Mr. Altschuler when he purchased the prints in 1987?

18         A     I think I did because he mentioned to me once

19    that he had a copy.

20         Q     Okay.  And that would have gone into the box

21    that you shipped?

22         A     It is quite possible.

23         Q     Okay.

24         A     And probably correct.

25         Q     Now, what this doesn't depict, sir, correct,

1    is the actual print that was sold; right?  This is just

2    an ad or a poster?

3         A    Well, this is a hand screened silk screen on

4    archival paper that has been hand signed and with a

5    drawing by Keith Haring.

6         Q    Okay.  Understood.  But this is not the actual

7    silk screen set that you sold them; correct?

8         A    That is correct.

9         Q    Okay.  And then you also provided what looked

10   like clippings from the exhibition, and for reference

11   purchase, the picture of the poster is Bates label

12   01346.  I'm just going to go through these clippings

13   with you.

14        A    Yes.

15        Q    It looks like --

16        A    Yes.

17        Q    This exhibition was highly publicized and

18   highly anticipated.  Would that be fair?

19        A    Correct and it was also reviewed.  Correct.

20        Q    What were the reviews?

21        A    You're looking at them.

22        Q    Oh, what was the conclusion of the reviews?

23        A    That Keith Haring was a phenomena.

24        Q    All right.

25        A    There's a picture of me back then.  I was

Page 60

```
 1    quite a handsome kid.
 2         Q    This is 01350.  I'm looking at a picture from
 3    it looks like a magazine called Urban Explorer.
 4         A    It's from -- no, the magazine is called LA --
 5    this is the magazine right here.  It's called LA -- Los
 6    Angeles Magazine.
 7         Q    Okay.  And you are depicted in the bottom
 8    left-hand corner?  Is this it?
 9         A    That's me, yes.
10         Q    And I do see a familiar name in here as well.
11    James Corcoran.
12         A    Yes.
13         Q    Are you familiar with Mr. Corcoran?
14         A    I am.
15         Q    Have you worked with -- are you -- do you have
16    a personal relationship with Mr. Corcoran or is it a
17    business relationship?
18         A    Business.
19         Q    Okay.  And in what context do you know Mr.
20    Corcoran in a business relationship?
21         A    He's a very old established dealer in fine art
22    in Los Angeles.  Smart.  Very smart guy.  Has put on
23    some major exhibitions.  Long before I was putting on
24    major exhibitions, he'd shown some of the great artists
25    of Los Angeles and he did quite well from what I
```

1    understand.

2         Q    Do you have any knowledge of any transactions

3    that Mr. Altschuler and Mr. Corcoran participated in?

4         A    I later found out in talking with Altschuler

5    later in a conversation that he had -- from what I

6    understand, the story that I heard, and I believe it to

7    be true, there's no reason why not, but I was not

8    involved, he had purchased a suite of the prints from

9    Keith Haring and he had traded -- he told me he had

10   traded the prints for something else from Mr. Corcoran.

11        Q    Okay.  And that was relayed to you by Mr.

12   Altschuler?

13        A    Yes, that was.

14        Q    Do you remember when Mr. Altschuler told you

15   about this trade?

16        A    During the last few years.

17        Q    And why did he tell you about that?

18        A    In conversation.

19        Q    Okay.  And it's your testimony that Mr.

20   Altschuler told you he traded this set he purchased from

21   Keith Haring to Mr. Corcoran?

22        A    You know, I'm not clear on that.  I do not

23   know the story.  I don't -- I don't know what happened.

24   I don't really know the details.

25        Q    Okay.  So as you sit here today, do you know

1    what set he traded to Mr. Corcoran?

2        A    I do not.  I do not know.

3        Q    Okay.  And you weren't part of that

4    transaction, were you?

5        A    I was not.

6        Q    Okay.  Mr. Berman, do you recall being

7    contacted by an individual named Mr. Chvostal?  John

8    Chvostal on behalf of the insurance company?

9        A    Somebody called me once and he was a little

10   rude, but I don't remember his name.  Could be that.

11       Q    And what do you recall about that

12   conversation?

13       A    You know, he was saying that I didn't really

14   do the Keith Haring show or something.

15       Q    Okay.  What else do you recall talking about

16   with this individual?

17       A    The same thing I'm telling you.  Look, I did

18   the show.  I sold the art.  I remember that Mr.

19   Altschuler came and bought a set and I continue to sell

20   the art and that's what I do and that's what the

21   conversation was about.  I have no idea about the theft,

22   if there was a theft, or if there wasn't a theft.

23   That's for you to figure out.  I know nothing about

24   that.

25       Q    Sure.  So you have no testimony one way or the

1    other to corroborate the theft; is that true?

2        A    I don't understand that last question.

3        Q    You're not trying to offer any testimony one

4    way or the other about the theft -- the alleged theft of

5    the print --

6        A    How would I know about the theft?  I know -- I

7    know nothing about that.  Nothing.

8        Q    Mr. Berman this is an affidavit that you

9    provided in response to our subpoena for records dated

10   June 29, 2022.  I just want to make sure you recall

11   signing this and that's your signature on the bottom?

12       A    Yes.

13       Q    Okay.  And since you signed this, have you

14   been able to locate any other records with respect to

15   the purchase of Andy Mouse by Mr. Altschuler in 1987?

16       A    I have not.

17       Q    Okay.

18              THE OFFICER:  Was the affidavit going to

19   be an exhibit?

20              MR. YU:  Yeah.  Sorry.  Let's make that

21   Exhibit --

22              THE OFFICER:  3.

23              MR. YU:  4.

24              (Exhibit 4 was marked for

25              identification.)

Page 64

```
 1                    THE OFFICER:  Wait.  4 or --

 2                    MR. YU:  Yeah.

 3                    THE OFFICER:  Okay.

 4                    MR. YU:  And I guess Exhibit 3 would have

 5     been the email from Mr. Berman to Mr. Chvostal 01345.

 6     Just for the record.  I don't know if I marked it.

 7                    (Exhibit 3 was marked for

 8                    identification.)

 9                    THE OFFICER:  Noted.  Thank you.

10     BY MR. YU:

11         Q    Mr. Berman, do you have any -- I'm sorry.  I

12     already asked that question.

13                    MR. YU:  Give me five minutes to review

14     my notes, sir, and then I may be finished; okay?  Let's

15     take a five-minute break.

16                    THE WITNESS:  Okay.  I hope so.

17                    THE VIDEOGRAPHER:  We are going off the

18     record.  This is the end of media unit number three.

19     The time is 1:33 p.m.

20                    (Off the record.)

21                    THE VIDEOGRAPHER:  Okay.  Just a moment

22     everyone.  Let me take us on the record.  One moment

23     please.  We are going back on the record.  This is the

24     beginning of media unit number four.  The time is 1:37

25     p.m.
```

 1    BY MR. YU:

 2        Q    Mr. Berman, just a couple more questions from

 3    me.  You testified earlier that you had consulted with

 4    someone after you were asked to give your opinion of

 5    value of the hypothetical set.  Do you remember that

 6    testimony?

 7        A    Yes.

 8        Q    Okay.  Who was that person you consulted with?

 9        A    Ron -- Ron Rivkin.  It's called Revolver

10    Gallery.

11        Q    Is it Ron Rivlin of Revolver Gallery?

12        A    Yes, that's his name.  Ron Rivlin.  That's

13    right.

14        Q    And have you done work with Mr. Rivlin in the

15    past?

16        A    I have.

17        Q    Okay.  And what does he do?  Who is he?

18        A    He is an expert in -- well, he was, I think,

19    in the music business, and then probably ten years ago

20    he became aware of how collectible internationally Andy

21    Warhol was, and he was able to actively buy up all the

22    Andy Warhol that he could get ahold of and he opened a

23    gallery.

24             And he became quite knowledgeable in the

25    marketplace and his gallery was once in the same complex

1    that my gallery is and now, he's in Beverly Hills, but

2    he is a knowledgeable person who deals in works by Andy

3    Warhol and also related to Andy Warhol.  So he knows

4    very well the Andy Mouse suite and what it's worth.

5         Q    And you communicated with Mr. Rivlin, and he

6    gave -- did he give you --

7         A    I asked him his opinion what a complete suite

8    would sell for if it was in mint condition, and he gave

9    me an opinion.

10        Q    And what was his opinion?

11        A    He said at least 1,000,200.

12        Q    And when would you have consulted with him

13   approximately?

14        A    About eight months ago, I guess.  I don't

15   know.  Sometime six, eight, ten months ago.  I don't

16   know exactly, but something like that.  Within the

17   last -- within the last year.  It might -- and it might

18   have been a year ago.

19        Q    Okay.  Do you know if Mr. Rivlin has sold Andy

20   Mouse suites in the past?

21        A    I do not know.

22        Q    Okay.  And do you know someone by the name of

23   Tracy Lew?

24        A    She works for Jim Corcoran, I believe.

25        Q    Okay.

1        A    I do know her.  Yeah.

2        Q    Do you know -- have you worked with her

3    before?

4        A    I -- yeah, I mean, yeah.  She's an LA dealer.

5    We are all dealers that deal in same material somehow

6    have paths do cross, yes.

7        Q    When was the last time you crossed paths with

8    her?

9        A    15 -- 10, 15 years ago.

10        Q    Okay.  Do you know if she's still working for

11    Mr. Corcoran?

12        A    I don't know for sure, but I don't see why

13    not.

14        Q    Okay.  Do you believe she's still in LA?

15        A    I don't know for sure.  I don't know why not.

16        Q    Okay.  Have you spoken to Mr. Corcoran either

17    by phone, email, letter about this case or the Andy

18    Mouse prints that Mr. Altschuler owned?

19                  MR. ZANE:  Form.

20        A    No, I don't think I have.  No, no.

21                  MR. YU:  Sir, those are all the questions

22    I have.  Thank you.  I think Mr. Zane will have some

23    follow-up.

24    //

25    //

1                         EXAMINATION

2      BY MR. ZANE:

3          Q    Robert, I've just got a couple of quick

4      questions.  The first is that you mentioned you shipped

5      the Andy Mouse prints to Arizona.  I just want to ask

6      you if it's common or uncommon, in your opinion, for a

7      client to purchase art and send it directly into storage

8      without displaying it in their home or in a gallery?

9          A    Yes, it's -- if it's for -- if you believe

10     it's for investment purpose and not for exhibition

11     purposes, it makes sense.  Yeah.

12         Q    Okay.  What is -- how does the value change of

13     art when it's in the box from which you shipped it

14     versus you've been hanging up in your house for a while?

15         A    Like in collecting stamps or coins the most --

16     the most valuable are the most uncirculated.  So if

17     something has never been touched by a human hand, it's

18     better than being passed around.

19         Q    Then you'd agree with me it's not uncommon for

20     an art aficionado to just buy and store art?

21         A    It is not uncommon at all.

22         Q    And could you explain to me what an artist

23     proof is?

24         A    An artist proof is part of an addition run

25     that is outside of the listed addition, out of the

1    numbered addition, that in theory, in the old days, but

2    in theory, it's what the artist would keep for

3    themselves.  But in contemporary times, artist proofs

4    would be often sold and traded right away if it's

5    especially in demand and the artists themselves would

6    not keep them.

7        Q    Okay.  Do you have any knowledge or

8    recollection of whether Keith Haring kept artist proofs

9    of his work?

10       A    I have no recognition -- I have no reason to

11   know that, and I don't know why.  I mean, I would think

12   that he would, but I don't know.

13                    MR. ZANE:  Okay.  I'm done.

14                    MR. YU:  Great.  Mr. Berman, thank you.

15   I appreciate the time and good luck with your treatment,

16   sir.

17                    THE WITNESS:  Thank you.  Bye, bye.

18                    MR. ZANE:  Yes, etran.

19                    THE VIDEOGRAPHER:  And this is the

20   videographer.  I need to ask about video orders while

21   we're still on the record.  Mr. Yu, did you want your

22   video order deliver synced up to the transcript or just

23   the video by yourself?

24                    MR. YU:  What is the benefit of syncing

25   to the transcript?  I always get asked that question.

1     I'm not exactly sure.

2                    MR. ZANE:  I'm glad you asked that.

3                    THE VIDEOGRAPHER:  You're asking me what

4     the benefit is?

5                    MR. YU:  Yeah.

6                    MR. ZANE:  Can we let Mr. Berman go?  Can

7     we let Mr. Berman go, by the way?

8                    MR. YU:  Okay.  I believe -- are fine

9     with Mr. Berman --

10                    THE VIDEOGRAPHER:  I think the court

11    reporter --

12                    MR. YU:  Then we can go on and do orders

13    there.

14                    THE VIDEOGRAPHER:  Okay.  So did you want

15    your -- the video synced up to the transcript, sir?

16                    MR. YU:  Sure.

17                    THE VIDEOGRAPHER:  Okay.  And normal

18    turnaround is 15 business days or three weeks.  Is that

19    okay?

20                    MR. YU:  That's fine.

21                    THE VIDEOGRAPHER:  Okay.  And Mr. Zane,

22    were you interested in a video order at this time?

23                    MR. ZANE:  No.

24                    THE VIDEOGRAPHER:  Okay.  Does anyone

25    else need to say anything on the record while we are all

Page 71

1     still -- before we formally conclude?

2                    MR. YU:  No.

3                    MR. ZANE:  I don't think so.

4                    THE VIDEOGRAPHER:  Okay.  Hold on one

5     moment, please.  Sorry just bear with me a moment.  I

6     apologize.  Okay.  We are off the record at 1:46 p.m.

7     and this concludes today's testimony given by Robert

8     Berman.  The total number of media units used was four

9     and will be retained by Veritext Legal Solutions.

10                    (Signature reserved.)

11                    (Whereupon, at 1:46 p.m., the proceeding

12                    was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

1          CERTIFICATE OF DEPOSITION OFFICER

2          I, NICHOLAS CASAS, the officer before whom the

3    foregoing proceedings were taken, do hereby certify that

4    any witness(es) in the foregoing proceedings, prior to

5    testifying, were duly sworn; that the proceedings were

6    recorded by me and thereafter reduced to typewriting by

7    a qualified transcriptionist; that said digital audio

8    recording of said proceedings are a true and accurate

9    record to the best of my knowledge, skills, and ability;

10   that I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this was

12   taken; and, further, that I am not a relative or

13   employee of any counsel or attorney employed by the

14   parties hereto, nor financially or otherwise interested

15   in the outcome of this action.

16

17                              NICHOLAS CASAS

18                         Notary Public in and for the

19                              State of California

20

21   [X] Review of the transcript was requested.

22

23

24

25

Page 73

1                    CERTIFICATE OF TRANSCRIBER

2              I, ELLEN ELLIS, do hereby certify that this

3       transcript was prepared from the digital audio recording

4       of the foregoing proceeding, that said transcript is a

5       true and accurate record of the proceedings to the best

6       of my knowledge, skills, and ability; that I am neither

7       counsel for, related to, nor employed by any of the

8       parties to the action in which this was taken; and,

9       further, that I am not a relative or employee of any

10      counsel or attorney employed by the parties hereto, nor

11      financially or otherwise interested in the outcome of

12      this action.

13

14

15                                      ELLEN ELLIS

16

17

18

19

20

21

22

23

24

25

**Exhibit 20**

 **Private Client Group**



**H O M E O W N E R S**

American International Ins Co.
(Name of issuing company)

# New York Declarations Page

Your Declarations Page shows at a glance the coverage you have and your premium. Your Declarations Page is part of your policy. Please read your policy carefully, including your Declarations Page and any attached Endorsements, for a description of your coverage.

**Policy Number:**
HO 0002278718

**Policy Period:** 10/01/2007 - 10/01/2008
At 12:01 A.M. standard time at your mailing address shown below

**Name of Insured and Mailing Address:**
Douglas Altschuler
c/o Danube Pharmaceuticals
689 Fifth Avenue
14th Floor
New York, NY 10022

**Agency Name, Address, Phone # & Code:**
Frank Crystal & Co Inc.-NYC
Financial Square
32 Old Slip
17th Floor
New York, NY 10005
(212) 344-2444          50055

### YOU WILL BE BILLED SEPARATELY FOR ANY PREMIUM DUE.

The kind of losses that are covered and any special limits or deductibles that apply, are explained in detail in your Policy.
**Summary of Coverage by Location:**

---

**535 West 23rd St, PH2N          New York, NY 10011**

| COVERAGE | PAYMENT BASIS | COVERAGE LIMIT |
|---|---|---|
| Contents | Replacement Cost | $1,000,000 |
| Loss of Use | | Unlimited |
| Liability | | $0 |
| Medical Payments | | $0 |

Deductible applied to this location:
Standard (All Other Perils):     $5,000

Location Premium:   $4,091.00

Forms and Endorsements Attached for Location: PCHO (8/02), PCG-GLBA (03/06), PCHO-DWLL (8/02), PCHO-AENY (8/02), HNOT-NY (1/95)

---

**Total Premium:      $4,091.00**

PCHO-DEC-NY (11/06)

**ALTSCHULER 001392**

## Schedule of Items

**Endorsement Effective Date :** 10/22/08                    **Policy Number:** PCG 0002672940

| | | |
|---|---|---:|
| 185 | JOHN MCCRACKEN. ALPHA 5, 1988. STAINLESS STEEL. 20.8 X 16.4 X 5.51 | $125,000 |
| 186 | JOHN MCCRACKEN. ALPHA 6, 1988. STAINLESS STEEL. 18.9 X 14.96 X 9.84 INCHES | $125,000 |
| 187 | JOHN MCCRACKEN. IXIT, 2005. POLYESTER RESIN, FIBERGLASS & PLYWOOD. 28-1/4 X 15 X9-1/4 INCHES | $120,000 |
| 188 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 189 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $750,000 |
| 190 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 191 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 192 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 193 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 194 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 195 | CHARLES ARNOLDI UNTITLED (DIPTYCH), 1980 ACRYLIC AND FLASHE ON CANVAS 84 X 150 INCHES | $90,000 |
| 196 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 197 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 198 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 199 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 200 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,803,252

**COLLECTIBLES**

| | Item Description | Amount Insured |
|---|---|---:|
| 1 | SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 | 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 | 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 | 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 | 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 | 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 | 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 | 18 LEATHERBOUND VOLUMES. | $700 |
| 9 | 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 | 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 | 28 LEATHERBOUND VOLUMES. | $800 |
| 12 | 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 | 3 LEATHERBOUND VOLUMES. | $500 |
| 14 | 24 LEATHERBOUND VOLUMES. | $1,100 |

## Schedule of Items

**Endorsement Effective Date :** 02/06/09            **Policy Number:** PCG 0002672940

| | | |
|---|---|---|
| 185 | JOHN MCCRACKEN. ALPHA 5, 1988. STAINLESS STEEL. 20.8 X 16.4 X 5.51 | $125,000 |
| 186 | JOHN MCCRACKEN. ALPHA 6, 1988. STAINLESS STEEL. 18.9 X 14.96 X 9.84 INCHES | $125,000 |
| 187 | JOHN MCCRACKEN. IXIT, 2005. POLYESTER RESIN, FIBERGLASS & PLYWOOD. 28-1/4 X 15 X9-1/4 INCHES | $120,000 |
| 188 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 189 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 190 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 191 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 192 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 193 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 194 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 195 | CHARLES ARNOLDI UNTITLED (DIPTYCH), 1980 ACRYLIC AND FLASHE ON CANVAS 84 X 150 INCHES | $90,000 |
| 196 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 197 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 198 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 199 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 200 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,953,252

**COLLECTIBLES**

| Item Description | Amount Insured |
|---|---|
| 1 SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 18 LEATHERBOUND VOLUMES. | $700 |
| 9 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 28 LEATHERBOUND VOLUMES. | $800 |
| 12 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 3 LEATHERBOUND VOLUMES. | $500 |
| 14 24 LEATHERBOUND VOLUMES. | $1,100 |

## Schedule of Items

**Endorsement Effective Date :** 03/25/09                          **Policy Number:** PCG 0002672940

| | | |
|---|---|---|
| 185 | JOHN MCCRACKEN. ALPHA 5, 1988. STAINLESS STEEL. 20.8 X 16.4 X 5.51 | $125,000 |
| 186 | JOHN MCCRACKEN. ALPHA 6, 1988. STAINLESS STEEL. 18.9 X 14.96 X 9.84 INCHES | $125,000 |
| 187 | JOHN MCCRACKEN. IXIT, 2005. POLYESTER RESIN, FIBERGLASS & PLYWOOD. 28-1/4 X 15 X9-1/4 INCHES | $120,000 |
| 188 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 189 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 190 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 191 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 192 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 193 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 194 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 195 | CHARLES ARNOLDI UNTITLED (DIPTYCH), 1980 ACRYLIC AND FLASHE ON CANVAS 84 X 150 INCHES | $90,000 |
| 196 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 197 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 198 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 199 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 200 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,953,252

**COLLECTIBLES**

| Item Description | Amount Insured |
|---|---|
| 1 SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 18 LEATHERBOUND VOLUMES. | $700 |
| 9 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 28 LEATHERBOUND VOLUMES. | $800 |
| 12 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 3 LEATHERBOUND VOLUMES. | $500 |
| 14 24 LEATHERBOUND VOLUMES. | $1,100 |

**ALTSCHULER 001507**

## Schedule of Items

**Endorsement Effective Date :** 07/18/09                    **Policy Number:** PCG 0005596761

| | | |
|---|---|---|
| 183 | JOHN MCCRACKEN. ALPHA 5, 1988. STAINLESS STEEL. 20.8 X 16.4 X 5.51 | $125,000 |
| 184 | JOHN MCCRACKEN. ALPHA 6, 1988. STAINLESS STEEL. 18.9 X 14.96 X 9.84 INCHES | $125,000 |
| 185 | JOHN MCCRACKEN. IXIT, 2005. POLYESTER RESIN, FIBERGLASS & PLYWOOD. 28-1/4 X 15 X9-1/4 INCHES | $120,000 |
| 186 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 187 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 188 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 189 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 190 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 191 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 192 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 193 | CHARLES ARNOLDI UNTITLED (DIPTYCH), 1980 ACRYLIC AND FLASHE ON CANVAS 84 X 150 INCHES | $90,000 |
| 194 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 195 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 196 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 197 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 198 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,953,252

**COLLECTIBLES**

| Item Description | Amount Insured |
|---|---|
| 1  SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2  28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3  2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4  2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5  2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6  2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7  3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8  18 LEATHERBOUND VOLUMES. | $700 |
| 9  1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10  1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11  28 LEATHERBOUND VOLUMES. | $800 |
| 12  38 LEATHERBOUND VOLUMES. | $1,000 |
| 13  3 LEATHERBOUND VOLUMES. | $500 |
| 14  24 LEATHERBOUND VOLUMES. | $1,100 |

## Schedule of Items

**Endorsement Effective Date :** 11/01/09                                    **Policy Number:** PCG 0005596761

| | | |
|---|---|---|
| 166 | JOHN MCCRACKEN IXIT 2005 POLYESTER RESIN, FIBERGLASS & PLYWOOD 28-1/4 X 15 X 9-1/4 INCHES | $120,000 |
| 167 | PAIR OF RARE WOOD GRAIN PLASTER TABLES BY JOHN DICKINSON, AMERICAN 1970'S (BOTH ARE SIGNED JOHN DICKINSON SAN FRAN ON BOTTOMS) HAND-BLOWN GLASS CHARGER, INCALMO FROM THE "MURRINE INCATENATE" SERIES DESIGNED BY ANZOLO FUGA FOR A.V.E.M., 1959(PAGE 136 IN BOOK) | $38,000 |
| 168 | "TELEPHONE TABLE" WITH SURFACES COVERED IN IGUANA SKIN DESIGNED BY KARL SPRINGERAMERICAN 1977 (SIGNED "KARL SPRINGER 1977" ON BOTTOM | $4,250 |
| 169 | "HALF ROUND MOLDING MIRROR" COVERED IN PYTHON DESIGNED BY KARL SPRINGER, AMERICAN 1980'S | $10,000 |
| 170 | LARGE STYLIZED TORSO IN GLAZIERITE BY ROBERTO ESTEVEZ FOR KARL SPRINGER AMERICAN1980'S | $15,000 |
| 171 | "TELEPHONE TABLE" COVERED IN BROWN PONY SKIN BY KARL SPRINGER AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 172 | "TELEPHONE TABLE" COVERED IN RED PONY SKIN BY KARL SPRINGER, AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 173 | "TELEPHONE TABLE" COVERED IN ERNU FOOT DESIGNED BY KARL SPRINGER AMERICAN 1980'S | $3,900 |
| 174 | HOCKNEY | $28,000 |
| 175 | MY DINE | $10,000 |
| 186 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 187 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 188 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 189 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 190 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 191 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 192 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 194 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 195 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 196 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 197 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 198 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 199 | JOHN MCLAUGHLIN '#15-1958', 1958.  OIL ON CANVAAS 60 X 38 INCHES | $175,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,343,252

### COLLECTIBLES

| Item Description | Amount Insured |
|---|---|
| 1  SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2  28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |

**ALTSCHULER 001589**

## Schedule of Items

**Endorsement Effective Date :** 11/19/09                                        **Policy Number:** PCG 0005596761

| | | |
|---|---|---|
| 166 | JOHN MCCRACKEN IXIT 2005 POLYESTER RESIN, FIBERGLASS & PLYWOOD 28-1/4 X 15 X 9-1/4 INCHES | $120,000 |
| 167 | PAIR OF RARE WOOD GRAIN PLASTER TABLES BY JOHN DICKINSON, AMERICAN 1970'S (BOTH ARE SIGNED JOHN DICKINSON SAN FRAN ON BOTTOMS) HAND-BLOWN GLASS CHARGER, INCALMO FROM THE "MURRINE INCATENATE" SERIES DESIGNED BY ANZOLO FUGA FOR A.V.E.M., 1959(PAGE 136 IN BOOK) | $38,000 |
| 168 | "TELEPHONE TABLE" WITH SURFACES COVERED IN IGUANA SKIN DESIGNED BY KARL SPRINGERAMERICAN 1977 (SIGNED "KARL SPRINGER 1977" ON BOTTOM | $4,250 |
| 169 | "HALF ROUND MOLDING MIRROR" COVERED IN PYTHON DESIGNED BY KARL SPRINGER, AMERICAN 1980'S | $10,000 |
| 170 | LARGE STYLIZED TORSO IN GLAZIERITE BY ROBERTO ESTEVEZ FOR KARL SPRINGER AMERICAN1980'S | $15,000 |
| 171 | "TELEPHONE TABLE" COVERED IN BROWN PONY SKIN BY KARL SPRINGER AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 172 | "TELEPHONE TABLE" COVERED IN RED PONY SKIN BY KARL SPRINGER, AMERICAN 1980'S (SIGNED ON BOTTOM) | $3,400 |
| 173 | "TELEPHONE TABLE" COVERED IN ERNU FOOT DESIGNED BY KARL SPRINGER AMERICAN 1980'S | $3,900 |
| 174 | HOCKNEY | $28,000 |
| 175 | MY DINE | $10,000 |
| 186 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 187 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 188 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 189 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 190 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 191 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 192 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 194 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 195 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 196 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 197 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 198 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 199 | JOHN MCLAUGHLIN '#15-1958', 1958.  OIL ON CANVAAS 60 X 38 INCHES | $175,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,343,252

| COLLECTIBLES | |
|---|---|
| **Item Description** | **Amount Insured** |
| 1  SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2  28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |

## Schedule of Items

**Endorsement Effective Date :** 01/19/10                      **Policy Number:** PCG 0005596761

1980'S

| | | |
|---|---|---|
| 174 | HOCKNEY | $28,000 |
| 175 | MY DINE | $10,000 |
| 186 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $28,000 |
| 187 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 188 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 189 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 190 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 191 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 192 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 194 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 195 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 196 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 197 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 198 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 199 | JOHN MCLAUGHLIN '#15-1958', 1958.  OIL ON CANVAAS 60 X 38 INCHES | $175,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,343,252

**COLLECTIBLES**

| Item Description | Amount Insured |
|---|---|
| 1 SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 18 LEATHERBOUND VOLUMES. | $700 |
| 9 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 28 LEATHERBOUND VOLUMES. | $800 |
| 12 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 3 LEATHERBOUND VOLUMES. | $500 |
| 14 24 LEATHERBOUND VOLUMES. | $1,100 |
| 15 2 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $1,100 |
| 16 3 SHELVES OF ASSORTED VOLUMES. | $1,200 |

**ALTSCHULER 001480**

## Schedule of Items

**Endorsement Effective Date :** 03/16/10                          **Policy Number:** PCG 0005596761

1980'S

| | | |
|---|---|---|
| 174 | HOCKNEY | $28,000 |
| 175 | MY DINE | $10,000 |
| 186 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $35,000 |
| 187 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 188 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 189 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 190 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 191 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 192 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 194 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 195 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 196 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 197 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 198 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 199 | JOHN MCLAUGHLIN '#15-1958', 1958. OIL ON CANVAAS 60 X 38 INCHES | $175,000 |
| 200 | PETER ALEXANDER, UNTITLED (WEDGE), 1968-69, POLYESTER RESIN, 64" X 7" X 7". | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,585,252

**COLLECTIBLES**

| | Item Description | Amount Insured |
|---|---|---|
| 1 | SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 | 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 | 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 | 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 | 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 | 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 | 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 | 18 LEATHERBOUND VOLUMES. | $700 |
| 9 | 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 | 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 | 28 LEATHERBOUND VOLUMES. | $800 |
| 12 | 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 | 3 LEATHERBOUND VOLUMES. | $500 |
| 14 | 24 LEATHERBOUND VOLUMES. | $1,100 |
| 15 | 2 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $1,100 |

## Schedule of Items

**Endorsement Effective Date :** 07/18/10                    **Policy Number:** PCG 0005596761

1980'S

| | | |
|---|---|---|
| 162 | HOCKNEY | $28,000 |
| 163 | MY DINE | $10,000 |
| 164 | KEN PRICE. DESIGN FOR BILLBOARD, 1981. GRAPHITE, COLORED PENCIL, GOUACHE & WASH ONBOARD. 20 X 36 INCHES | $35,000 |
| 165 | ROBERT RAUSCHENBERG. PAGE 14, PARAGRAPH 4 (SHORT STORIES), 2000. VEGETABLE DYE TRANSFER, PIGMENT TRANSFER & ACRYLIC ON POLYLAMINATE. 85.5 X 60.5 INCHES | $900,000 |
| 166 | JIRO TAKAMATSU. SHADOW OF COCA COLA, 1976. ACRYLIC ON CANVAS. 25-3/4 X 20-7/8 INCHES | $150,000 |
| 167 | JACK PIERSON, "VALENTINE'S DAY" | $20,000 |
| 168 | CALDER GOAUCHE, "PYRAMIDS" | $75,000 |
| 169 | CALDER GOAUCHE, "THE CIRCUS" | $75,000 |
| 170 | ANDY WARHOL "ANDY MOUSE" 4 PCS | $250,000 |
| 171 | CHARLES ARNOLDI UNTITLED, 1986 ACRYLIC ON PLYWOOD 23 X 40 INCHES | $33,000 |
| 172 | LARRY BELL GLASS CUBE, 1965-66 GLASS COATED WITH SILICONE MONOXIDE AND CHROME 121/2 X 12 1/2 X 12 1/2 INCHES | $150,000 |
| 173 | VIJA CELMINS UNTITLE (OCEAN), 1970 TWO-COLOR LITHOGRAPH, EDITION #2/20 20 1/4 X 29 1/4 INCHES | $200,000 |
| 174 | KEN PRICE JELLIED, 2001 ACRYLIC ON CERAMIC 6 1/2 X 10 1/4 X 7 1/2 INCHES | $80,000 |
| 175 | FRANCIS-XAVIER LALANNE UNE BATE (GRAND DONKEY), 1985 BRONZE, EDITION #4/8 65 X 71 5/8 X 41 INCHES | $700,000 |
| 176 | JOHN MCLAUGHLIN '#15-1958', 1958.  OIL ON CANVAAS 60 X 38 INCHES | $175,000 |
| 177 | PETER ALEXANDER, UNTITLED (WEDGE), 1968-69, POLYESTER RESIN, 64" X 7" X 7". | $200,000 |

**TOTAL FINE ARTS AMOUNT COVERED**  $5,585,252

COLLECTIBLES

| | Item Description | Amount Insured |
|---|---|---|
| 1 | SERIES OF 6 ART BOOKS ON TOULOUSE LAUTREC. | $450 |
| 2 | 28 VOLUMES ON THE WORKS OF THEODORE ROOSEVELT. | $100 |
| 3 | 2 SHELVES OF ASSORTED BOOKS AND PAMPHLETS. | $150 |
| 4 | 2 SHELVES ASSORTED LEATHERBOUND FRENCH BOOKS. | $650 |
| 5 | 2 SHELVES OF LEATHERBOUND BOOKS. | $500 |
| 6 | 2 SHELVES OF LEATHERBOUND VOLUMES. | $450 |
| 7 | 3 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $600 |
| 8 | 18 LEATHERBOUND VOLUMES. | $700 |
| 9 | 1 SHELF OF LEATHERBOUND VOLUMES. | $650 |
| 10 | 1 SHELF OF LEATHERBOUND VOLUMES. | $250 |
| 11 | 28 LEATHERBOUND VOLUMES. | $800 |
| 12 | 38 LEATHERBOUND VOLUMES. | $1,000 |
| 13 | 3 LEATHERBOUND VOLUMES. | $500 |
| 14 | 24 LEATHERBOUND VOLUMES. | $1,100 |
| 15 | 2 SHELVES OF ASSORTED LEATHERBOUND VOLUMES. | $1,100 |

# Exhibit 21

Fred White - 4.3.23

# Exhibit 59

Donna DeLaVina, RPR, CR 50468

MY SEARCH CRITERIA: **Artist:** Keith Haring (AMERICAN, 1958-1990); **Media:** All;



**1    Keith Haring**

| | |
|---|---|
| Title | Andy Mouse -- new coke |
| Year | 1985 - |
| Medium | acrylic on canvas |
| Size | 119.5 x 116.7 in. / 303.5 x 296.5 cm. |
| Misc. | Signed, Inscribed |
| Description | Keith Haring (1958-1990) Andy Mouse--New Coke signed twice, titled and... |
| Sale Of | Christie's New York: Tuesday, May 13, 2008 [Lot 46] Post War And Contemporary Art Evening Sale |
| Estimate | 1,800,000 - 2,500,000 US$ |
| Sold For | 1,833,000 US$ PREMIUM |

**2    Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 1986 - |
| Medium | screenprint in colors on board |
| Size | 35.1 x 35.6 in. / 89.2 x 90.3 cm. |
| Edition | 3/30 |
| Misc. | Signed |
| Cat. Rais. | Littmann, p. 65 |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's London: Tuesday, April 1, 2008 [Lot 435] Old Master, Modern and Contemporary Prints, including Henri Matisse: Master Printmaker, Works from a Private European Collection and Andy Warhol & The Pop Generation |
| Estimate | 10,000 - 15,000 BP (19,801 - 29,702 US$) |
| Sold For | 24,500 BP (49,226 US$) PREMIUM |

**3    Keith Haring**

Not Illustrated

| | |
|---|---|
| Title | Andy Mouse |
| Medium | print |
| Size | 6.7 x 5.9 x 5.1 in. / 17 x 15 x 13 cm. |
| Misc. | Signed |
| Sale Of | Massol: Monday, December 10, 2007 [Lot 199] Tableaux modernes, Art Nouveau, Art Déco, Design |
| Estimate | 250 - 300 Euro (365 - 439 US$) |
| Sold For | 150 Euro (219 US$) HAMMER |



**4    Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 2005 - |
| Medium | vinyl |
| Size | 7.1 x 0 in. / 18 x 0 cm. |
| Edition | posthumous ed.1000 |
| Misc. | Stamped |
| Sale Of | Tajan: Wednesday, November 28, 2007 [Lot 212] Art d'après-guerre et contemporain - vente du jour |
| Estimate | 800 - 1,000 Euro (1,169 - 1,461 US$) |
| Sold For | 372 Euro (543 US$) PREMIUM |



**5    Keith Haring**

| | |
|---|---|
| Title | Andy Mouse (set of 4) |
| Year | 1986 - |
| Medium | screenprints in colors |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 6/30 |
| Misc. | Signed |
| Cat. Rais. | Littmann, 64-65 |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Mallet Japan: Friday, September 7, 2007 [Lot 325] Day Sale 070907 |
| Estimate | 10,000,000 - 15,000,000 YEN (83,906 - 125,860 US$) |
| Sold For | 28,782,500 YEN (249,718 US$) PREMIUM |



**6    Keith Haring**

| | |
|---|---|
| Title | 20th Montreux jazz festival (collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | color silkscreen |
| Size | 39.5 x 27.6 in. / 100.3 x 70.2 cm. |
| Misc. | Signed |
| Sale Of | Kapandji Morhange: Wednesday, July 4, 2007 [Lot 37] Estampes Contemporaines, Cartes Postales Anciennes, Manuscrits et Autographes |
| Estimate | 300 - 400 Euro (401 - 535 US$) |
| Sold For | 380 Euro (517 US$) HAMMER |



**7    Keith Haring**

| | |
|---|---|
| Title | Andy Mouse (collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | color screenprint |
| Size | 38.1 x 38 in. / 96.7 x 96.5 cm. |
| Edition | 15/30 |
| Misc. | Signed |
| Sale Of | Christie's Amsterdam: Thursday, December 7, 2006 [Lot 276]<br>Twentieth Century Art |
| Estimate | 20,000 - 30,000 Euro (26,666 - 40,000 US$) |
| Sold For | 40,800 Euro (54,262 US$) PREMIUM |



**8    Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 1986 - |
| Medium | color screenprint |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 25/30 |
| Misc. | Signed |
| Cat. Rais. | Littmann, P 64-5 |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Bonhams London: Monday, October 2, 2006 [Lot 582]<br>Prints |
| Estimate | 20,000 - 30,000 BP (37,735 - 56,603 US$) |
| Sold For | 21,600 BP (40,754 US$) PREMIUM |

Not Illustrated

**9    Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1986 - |
| Medium | silkscreen in colors |
| Size | 39.4 x 30.7 in. / 100 x 78 cm. |
| Misc. | Signed |
| Sale Of | Catherine Charbonneaux: Friday, June 23, 2006 [Lot 83]<br>Art Moderne et Contemporain, Art Précolombien, Art d'Asie, Art Primitif |
| Estimate | 800 - 1,000 Euro (1,013 - 1,267 US$) |
| Sold For | 800 Euro (1,013 US$) HAMMER |



10 **Keith Haring**
| | |
|---|---|
| Title | Andy mouse (collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | screenprint in colors on board |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 3/30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's New York: Saturday, April 29, 2006 [Lot 422] Prints |
| Estimate | 20,000 - 30,000 US$ |
| Sold For | 45,000 US$ PREMIUM |



11 **Keith Haring**
| | |
|---|---|
| Title | Andy mouse (collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | screenprint in colors on board |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 3/30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's New York: Saturday, April 29, 2006 [Lot 423] Prints |
| Estimate | 20,000 - 30,000 US$ |
| Sold For | 45,000 US$ PREMIUM |



12 **Keith Haring**
| | |
|---|---|
| Title | Andy Mouse (in collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | color silkscreen on card |
| Size | 36.2 x 35.8 in. / 92 x 91 cm. |
| Edition | 23/30 |
| Misc. | Signed |
| Cat. Rais. | Littmann, pg. 68 |
| Found./Pub. | G. Mulder Fine Art, pub. |
| Sale Of | Christie's London: Wednesday, March 29, 2006 [Lot 147] Old Master, Modern and Contemporary Prints |
| Estimate | 15,000 - 20,000 BP (26,041 - 34,722 US$) |
| Sold For | 28,800 BP (50,526 US$) PREMIUM |



**13** **Keith Haring**

| | |
|---|---|
| Title | Andy mouse (collab. w/Andy Warhol) |
| Year | 1986 - |
| Medium | color silkscreen on cardboard |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 15/30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's New York: Saturday, October 30, 2004 [Lot 462] Prints Incl. Property from the Collection of Rita & Daniel Fraad |
| Estimate | 12,000 - 15,000 US$ |
| Sold For | 45,000 US$ PREMIUM |



**14** **Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 1986 |
| Medium | Color Silkscreen |
| Size | 37.8 x 38 in. / 96 x 96.5 cm. |
| Edition | 15/30 |
| Misc. | Signed |
| Sale Of | Christie's Amsterdam: Tuesday, May 28, 2002 [Lot 368] Twentieth Century Art |
| Estimate | 4,500 - 5,500 Euro (4,083 - 4,990 US$) |
| Sold For | 11,950 Euro (11,095 US$) PREMIUM |



**15** **Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 1985 |
| Medium | Ink |
| Size | 23 x 23 in. / 58.4 x 58.4 cm. |
| Misc. | Signed |
| Sale Of | Sotheby's New York: Thursday, May 16, 2002 [Lot 416] Contemporary Art: Part Two (Afternoon) |
| Estimate | 10,000 - 15,000 US$ |
| Sold For | 25,095 US$ PREMIUM |



**16** **Keith Haring**

| | |
|---|---|
| Title | Andy Mouse series |
| Year | 1986 |
| Medium | Color Silkscreen |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | ed.30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Christie's Los Angeles: Wednesday, December 12, 2001 [Lot 141] Modern, Post-War and Contemporary Prints |
| Estimate | 20,000 - 30,000 US$ |
| Sold For | 56,400 US$ PREMIUM |



**17  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1985 |
| Medium | Ink |
| Size | 23 x 23 in. / 58.4 x 58.4 cm. |
| Misc. | Signed |
| Sale Of | Sotheby's New York: Thursday, November 15, 2001 [Lot 341] Contemporary Art: Part Two (Afternoon) |
| Estimate | 10,000 - 15,000 US$ |
| Sold For | 22,600 US$ PREMIUM |



**18  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1985 |
| Medium | Ink |
| Size | 23 x 23 in. / 58.4 x 58.4 cm. |
| Misc. | Signed |
| Sale Of | Sotheby's New York: Thursday, November 15, 2001 [Lot 342] Contemporary Art: Part Two (Afternoon) |
| Estimate | 10,000 - 15,000 US$ |
| Sold For | 22,600 US$ PREMIUM |



**19  Keith Haring**

| | |
|---|---|
| Title | Andy mouse |
| Year | 1986 |
| Medium | Color Silkscreen |
| Size | 38 x 38 in. / 96.4 x 96.4 cm. |
| Edition | 24/30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's New York: Saturday, November 3, 2001 [Lot 668] Prints (lots 600-821) |
| Estimate | 25,000 - 35,000 US$ |
| Sold For | 52,500 US$ PREMIUM |



**20  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1986 |
| Medium | Color Silkscreen |
| Size | 35.8 x 35.6 in. / 91 x 90.5 cm. |
| Edition | HC 3/5 aside from ed.30 |
| Misc. | Signed |
| Found./Pub. | George Mulder Fine Art, pub. |
| Sale Of | Sotheby's New York: Saturday, March 7, 1998 [Lot 556] 19th and 20th Century and Contemporary Prints including the Toulouse-Lautrec Collection - Sale 7097 |
| Estimate | 2,500 - 3,500 US$ |
| Sold For | 11,500 US$ PREMIUM |



**21  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Medium | Litho Crayon |
| Size | 22 x 16.1 in. / 56 x 41 cm. |
| Misc. | Signed |
| Sale Of | Auktionshaus Koller: Thursday, November 28, 1996 [Lot 3152] |
| | Gemaelde, Aquarelle, Zeichnungen und Skulpturen des 19. und 20. Jh. - Moderne Graphik (lots 3001-3302) |
| Estimate | 8,000 - 12,000 CHF (6,195 - 9,292 US$) |
| Sold For | BOUGHT IN |



**22  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1986 - |
| Medium | Serigraphy |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 3/30 |
| Misc. | Signed |
| Sale Of | Sotheby's Amsterdam: Tuesday, May 14, 1996 [Lot 151] |
| | Modern and Contemporary Prints |
| Estimate | 10,000 - 15,000 GLDR (5,846 - 8,769 US$) |
| Sold For | 11,800 GLDR (6,879 US$) PREMIUM |



**23  Keith Haring**

| | |
|---|---|
| Title | Untitled (from Andy Mouse) |
| Year | 1986 - |
| Medium | Serigraphy |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Edition | 14/30; George Mulder Fine Arts, pub. |
| Misc. | Signed |
| Sale Of | Christie's New York: Tuesday, November 7, 1995 [Lot 631] |
| | Contemporary Prints & Multiples |
| Estimate | 2,500 - 3,500 US$ |
| Sold For | 6,325 US$ |



**24  Keith Haring**

| | |
|---|---|
| Title | Andy Mouse |
| Year | 1986 - |
| Medium | Serigraphy |
| Size | 38 x 38 in. / 96.5 x 96.5 cm. |
| Misc. | Signed |
| Sale Of | Sotheby's New York: Saturday, May 13, 1995 [Lot 887] |
| | Contemporary Prints |
| Estimate | 5,000 - 7,000 US$ |
| Sold For | 28,750 US$ |



**25   Keith Haring**

| | |
|---|---|
| Title | ANDY MOUSE |
| Medium | Chalk |
| Size | 22 x 16.1 in. / 56 x 41 cm. |
| Misc. | Signed |
| Sale Of | Eberhart Auktionen: Friday, November 22, 1991 [Lot 95] MODERNE GRAPHIK KUNST DES 20 JH. |
| Estimate | 7,000 - 9,000 CHF (4,952 - 6,367 US$) |
| Sold For | BOUGHT IN |



**26   Keith Haring**

| | |
|---|---|
| Title | TWO DRAWIMNGS: ANDY MOUSE |
| Year | 1988 |
| Medium | Pen and Ink |
| Size | 8.5 x 8.5 in. / 21.6 x 21.6 cm. |
| Misc. | Signed |
| Sale Of | Christie's New York: Tuesday, May 8, 1990 [Lot 266] CONTEMPORARY DRAWINGS, WATERCOLORS AND COLLAGES |
| Estimate | 10,000 - 15,000 US$ |
| Sold For | 17,600 US$ |

JAMES CORCORAN GALLERY 000050

**Exhibit 22**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Douglas Altschuler,                )  No. CV-21-00119-TUC-DCB
                                   )
                                   )
            Plaintiff,             )
                                   )
v.                                 )
                                   )
Chubb National Insurance           )
Company, an Indiana                )
corporation,                       )
                                   )
                                   )
            Defendant.             )
_____)



VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF

DANIEL JAEGER

and

30(b)(6) of CHUBB NATIONAL INSURANCE COMPANY


Phoenix, Arizona
March 2, 2023
9:58 a.m.

                         DONNA DELAVINA REPORTING, LLC
                          Arizona RRF No. R1010
                          313 North Gilbert Road
PREPARED BY:                    Suite 300
                          Gilbert, Arizona 85234
Donna DeLaVina, RPR           P (602) 230-5454
Certified Reporter            F (480) 546-3721
Certificate No. 50468      www.dlvreporting.com

DANIEL JAEGER  MARCH 02, 2023

```
 1                      INDEX

 2   WITNESS                                    PAGE

 3   DANIEL JAEGER

 4        Examination by Mr. Poli                  9

 5        Examination by Mr. Sullivan            339

 6        Further Examination by Mr. Poli        341

 7

 8                     EXHIBITS

 9   No.    DESCRIPTION                         MARKED

10   33     7/4/2020 Doug Altschuler Net Worth    125
            Summary (2 pages)
11          (CHUBB-Altschuler/ROLEX & ART 00001411-
            00001412)
12
            34     9/18/2020 Email, Andy Mouse Insured   166
13          with AIG as of 2010 (9 pages)
            (CHUBB-Altschuler/ROLEX & ART 0000884-
14          0000892)

15   35     Executive Summary re Referral to      186
            SIU(CHUBB-Altschuler/ROLEX & ART
16          00002222)

17   36     1/8/2020 Pima County Police Report    187
            (3 pages)(CHUBB-Altschuler/ROLEX & ART
18          00001936-00001938)

19   37     Dina Brown Deposition Transcript      202
            (32 pages)
20
     38     1/21/2020 Claim Note re Referral to   210
21          SIU (1 page)(CHUBB-Altschuler/ROLEX &
            ART 00002441)
22
     39     SIU Examiner Guidelines - Property    213
23          SIU Examiner Best Practices Guidelines
            (7 pages)
24          (CONFIDENTIAL, TRADE SECRET AND
            SUBJECT TO PROTECTIVE ORDER)
25
```

DANIEL JAEGER  MARCH 02, 2023

| | | | |
|---|---|---|---|
| 1 | 40 | SIU Field Investigator Guidelines - Property SIU Field Investigator Best Practices Guidelines 02 (7 pages) (CONFIDENTIAL, TRADE SECRET AND SUBJECT TO PROTECTIVE ORDER) | 214 |
| 41 | | 1/23/2020 Claim Note, Edition of 30 (1 page)(CHUBB-Altschuler/ROLEX & ART 00002433) | 221 |
| 42 | | 1/24/2020 Claim Note re History of Coverage (1 page)(CHUBB-Altschuler/ ROLEX & ART 00002426) | 225 |
| 43 | | 1/24/2020 Claim Note re Edition of 30 (1 page)(CHUBB-Altschuler/ROLEX & ART 00002422) | 228 |
| 44 | | 1.24.20 Chubb Investigative Report re Doug (33 pages)(CHUBB-Altschuler/ROLEX & ART 00002389-00002421) | 238 |
| 45 | | 1/24/2020 ISO Search re Doug (7 pages)(CHUBB-Altschuler/ROLEX & ART 00002352-00002358) | 244 |
| 46 | | Inside Staff Adjuster Guidelines - ISA Best Practice Guidelines 1/1/2017 (12 pages) (CONFIDENTIAL, TRADE SECRET AND SUBJECT TO PROTECTIVE ORDER) | 267 |
| 47 | | 1/24/2020 Claim Note, Claim Reassigned To SIU (1 page)(CHUBB-Altschuler/ ROLEX & ART 00002345) | 284 |
| 48 | | 1/24/2020 Claim Note re Retention of Gurr Johns (1 page)(CHUBB-Altschuler/ ROLEX & ART 00002329) | 285 |
| 49 | | 1/27/2020 Email re Hold Off on Gurr Johns (2 pages)(CHUBB-Altschuler/ ROLEX & ART 00002309-00002310) | 294 |
| 50 | | 1.27.20 Email to Gurr Johns re Hold Off (1 page)(CHUBB-Altschuler/ ROLEX & ART 00002308) | 296 |

DANIEL JAEGER   MARCH 02, 2023

```
 1  51      2/5/2020 Recorded Statement of Doug        305
            (65 pages)
 2
    52      2/28/2020 Email, Fred White and Doug       307
 3          Altschuler, Not Certain if 3 of 30 or
            AP (4 pages)(CHUBB-Altschuler/
 4          ROLEX & ART 00002157-00002106)

 5  53      2.7.20 Claim Note re Credit Report,        316
            No Negatives (1 page)(CHUBB-Altschuler/
 6          ROLEX & ART 00002232)

 7  54      2/11/2020 Claim Note re "We don?t          320
            know the edition no." (2 pages)
 8          (CHUBB-Altschuler/ROLEX & ART
            00002208-00002209)
 9

10

11                      EXHIBITS
12
    No.     DESCRIPTION                        REFERENCED
13
    1       Insurance Policy                    48, 51,
14          (83 pages)(ALTSCHULER 000001-000083) 55, 59,
                                                 72, 73,
15                                               74, 76,
                                                104, 109,
16                                              119, 120,
                                                223, 253
17
    4       12/15/2021 Denial of Coverage Letter 101, 107,
18          (6 pages)                            108, 113,
                                                 158, 265
19
    5       Document Compilation No. 2          297
20          (301 pages)(CHUBB-Altschuler/ROLEX
            & ART 00002145-000036)
21
    13      Confirmation of Insurance          74
22          (1 page)(Crystal & Co. 000878)

23  22      Skipton Rebuttal Report            42, 44,
            (9 pages)(ALTSCHULER 001175-001183) 48
24

25
```

DANIEL JAEGER  MARCH 02, 2023

1    ITEMS REQUESTED MARKED BY MR. POLI

| PAGE | LINE | PAGE | LINE |
|------|------|------|------|
| 13 | 16 | 81 | 20 |
| 16 | 18 | 89 | 21 |
| 17 | 21 | 115 | 23 |
| 22 | 19 | 118 | 13 |
| 38 | 11 | 151 | 7 |
| 40 | 14 | 165 | 5 |
| 46 | 25 | 193 | 6 |
| 47 | 13 | 201 | 5 |
| 53 | 23 | 211 | 9 |
| 60 | 18 | 212 | 13 |
| 63 | 16 | 219 | 6 |
| 63 | 23 | 238 | 15 |
| 65 | 13 | 301 | 10 |

DANIEL JAEGER  MARCH 02, 2023

1          ITEMS REQUESTED MARKED BY MR. SULLIVAN

| PAGE | LINE | PAGE | LINE | PAGE | LINE |
|------|------|------|------|------|------|
| 153 | 25 | 222 | 24 | 294 | 13 |
| 193 | 16 | 223 | 18 | 296 | 6 |
| 195 | 12 | 231 | 23 | 298 | 15 |
| 198 | 4 | 233 | 18 | 303 | 6 |
| 214 | 24 | 236 | 13 | 327 | 4 |
| 215 | 8 | 237 | 8 | 329 | 9 |
| 216 | 19 | 238 | 8 | 331 | 10 |
| 217 | 6 | 270 | 18 | 332 | 6 |
| 217 | 12 | 279 | 6 | 332 | 25 |
| 217 | 19 | 282 | 11 | 334 | 2 |
| 218 | 4 | 282 | 23 | 335 | 10 |
| 218 | 11 | 285 | 12 | 336 | 13 |
| 218 | 18 | 292 | 20 | 337 | 3 |
| 220 | 13 | 293 | 14 | 337 | 25 |

DANIEL JAEGER   MARCH 02, 2023

```
1        THE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

2   DANIEL JAEGER and 30(b)(6) of CHUBB NATIONAL INSURANCE

3   COMPANY taken at 9:58 a.m., on March 2, 2023, via

4   Zoom videoconference from Phoenix, Arizona, before

5   DONNA DELAVINA, Certified Court Reporter No. 50468 for

6   the State of Arizona.

7                         * * * * * *

8

9   APPEARANCES:

10

        FOR PLAINTIFF:
11
            POLI, MOON & ZANE, PLLC
12          By:  Michael N. Poli, Esq.
            2999 North 44th Street
13          Suite 325
            Phoenix, Arizona 85018
14

15
        FOR DEFENDANT:
16
            BROENING OBERG WOODS & WILSON, P.C.
17          By:  Robert T. Sullivan, Esq.
            2800 North Central Avenue
18          Suite 1600
            Phoenix, Arizona 85004
19

20

21  ALSO PRESENT:

22          Judy Thompson, Videographer
            Legal Video Specialists
23          3033 North Central Avenue
            Suite 100
24          Phoenix, Arizona 85012

25
```

DANIEL JAEGER  MARCH 02, 2023

```
 1                                    Phoenix, Arizona
                                      March 2, 2023
 2                                    9:58 a.m.

 3

 4                    P R O C E E D I N G S

 5

 6          THE VIDEOGRAPHER:  This is the videotaped

 7  deposition of Dan Jaeger, individually, and as a

 8  30(b)(6) witness, by Zoom videoconference, taken by the

 9  plaintiff in Case Number CV-21-00119-TUC-DCB styled

10  Douglas Altschuler versus Chubb National Insurance

11  Company, filed in the United States District Court,

12  District of Arizona.

13          Today is March 2nd, 2023, at 9:58 a.m.

14          Donna DeLaVina is the certified shorthand

15  reporter, with DLV Reporting, 313 North Gilbert Road,

16  Gilbert, Arizona.

17          Judy Thompson is the legal video

18  specialist with Legal Video Specialists, 3033 North

19  Central Avenue, Phoenix, Arizona.

20          Counsel may state their name, firm and

21  whom they represent, beginning with the plaintiff's

22  counsel, please.

23          MR. POLI:  Michael Poli, Poli, Moon &

24  Zane, representing the plaintiff.

25          MR. SULLIVAN:  Robert Sullivan, Broening
```

DANIEL JAEGER  MARCH 02, 2023

```
 1   Oberg Woods & Wilson, on behalf of Chubb National
 2   Insurance Company.
 3              THE VIDEOGRAPHER:  Thank you.
 4              You may swear the witness.
 5
 6                   DANIEL JAEGER,
 7   called as a witness herein, having been first duly
 8   sworn by the Certified Court Reporter, was examined and
 9   testified as follows:
10
11                   EXAMINATION
12   BY MR. POLI:
13      Q.  Go ahead and state your name for the record,
14   please.
15      A.  Daniel Jaeger, J-a-e-g-e-r.
16      Q.  Have you had your deposition taken before?
17      A.  I have.
18      Q.  About how many times?
19      A.  It would be an estimate.  I would say between
20   25 and 30 times.
21      Q.  Okay.
22      A.  Maybe more or maybe less.
23      Q.  I'll cover what I think are the kind of
24   established ground rules for most depos.  You're
25   probably pretty familiar with them, given the number of
```

DANIEL JAEGER  MARCH 02, 2023

1  depos, but let's go through them just so we're on the

2  same page.

3          First, let me get my question completely

4  out before you answer it and we should both do our

5  best, and I'm sure we'll fail at different times, but

6  we should do our best to avoid talking over each other

7  so that the court reporter can get an accurate

8  transcript.  Do you understand that?

9      A.  I do.

10     Q.  Next, estimates, best recollection.  What I'm

11 here looking for is your best recollection.  If you're

12 the rare human being that has total recall or a perfect

13 memory, which would make you really, really rare, then

14 give us that.  But if you're like everyone else on the

15 planet and you may not have total recall, but you can

16 give me an estimate or paraphrase, as the case may be,

17 that's what I'm looking for, is your best recollection.

18 Do you understand that?

19     A.  I do.

20     Q.  So as an example, and you just did it, if I ask

21 how many depositions you've given over the years and

22 all you can do is give me an estimate or a range, that

23 would be your best recollection and that's what you

24 just did, right, Mr. Jaeger?

25     A.  That's correct, sir.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  If I ask about a conversation, and it would

2   rare, indeed, for most of us to be able to remember a

3   conversation from months or years ago, word for word,

4   but you can paraphrase it, or give us the gist of the

5   conversation, that would be your best recollection.  Do

6   you understand that ground rule?

7    A.  I do, sir.

8    Q.  Okay.  Next, Bobby, your attorney, may make

9   objections during the course of the deposition.  And I

10  imagine you already realize this, but he's preserving

11  his rights for the record so his objections can be

12  ruled on later by the judge -- what did I just do?

13  Dammit.  Hold on a second here.

14            Okay, sorry.  I pressed a button and

15  everything went away.

16            Anyway, he's preserving his rights for the

17  record.  When he's done with his objection, you can

18  answer the question.  The only exception would be if he

19  instructs you not to answer a question.  Do you

20  understand that?

21    A.  I do.  Thank you.

22    Q.  If you don't recall a particular question after

23  his objection, just let me know and either the court

24  reporter will read it back or I'll repeat it, okay?

25    A.  Understood.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  Next, and last but not least, the court

2  reporter has administered the oath, and to use the

3  phrase that we're all used to from television, shows or

4  movies about the law, you're sworn to tell the truth,

5  the whole truth and nothing but the truth, subject to

6  penalties for perjury.  Do you understand that ground

7  rule?

8    A.  I understand that.

9    Q.  Okay.  Let's briefly -- so you understand that

10  you're a 30(b) -- let's call it a 30(b)(6) witness

11  today, right?

12          MR. SULLIVAN:  Object to the form.

13          THE WITNESS:  I do.

14    Q.  BY MR. POLI:  I'm sorry, I couldn't hear the

15  objection.  But what was the answer?

16          MR. SULLIVAN:  Form.

17          Go ahead, Dan.

18          THE WITNESS:  Oh, I'm sorry.  I do

19  understand and I'm here to testify in the capacity as a

20  30(b)(6) witness, yes.

21    Q.  BY MR. POLI:  What is your understanding of the

22  responsibility of the 30(b)(6) witness, if you have an

23  understanding?

24    A.  My understanding is that that witness is to

25  testify for the corporation, Chubb National Insurance

DANIEL JAEGER  MARCH 02, 2023

1  Company, as to what the company's decision was relative

2  to the claim.

3      Q.  Is it your understanding that, as a 30(b)(6)

4  witness, you're actually testifying on behalf of the

5  company Chubb -- and if I refer to Chubb, I'm referring

6  to your company, Chubb National.

7          Is it your understanding, as a 30(b)(6)

8  witness, that you're actually testifying on behalf of

9  the company and it's the testimony of the company with

10  respect to the topics listed in the 30(b)(6) deposition

11  notice; is that your understanding?

12          MR. SULLIVAN:  Objection to the form.

13          You can answer.

14          THE WITNESS:  That's my understanding,

15  yes.

16          MR. POLI:  Okay.  Mark it.

17      Q.  BY MR. POLI:  So, obviously, you had to review

18  the deposition notice and look at the topics so you

19  knew what those topics were so you could come prepared,

20  correct?

21      A.  That's correct, sir.

22      Q.  Okay.  Let's next get into what you did to

23  prepare for your deposition today, Mr. Jaeger.  So tell

24  us what you did to prepare for today.

25      A.  Sure.

DANIEL JAEGER  MARCH 02, 2023

 1       Q.  And let me caution you before you start.  Do

 2   not get into any discussions with either Mr. Sullivan

 3   or any other lawyer.  I can ask you things like how

 4   long you spent talking to the lawyer, when it was, how

 5   many lawyers there were, who was there.  But don't get

 6   into the communications.  I'm sure you're familiar with

 7   the attorney-client privilege, right?

 8       A.  I am.

 9       Q.  So with that cautionary comment, tell me what

10   you did to prepare for today's deposition?

11       A.  Sure.  I did meet with Mr. Sullivan and his

12   associate, Jonathan Yu, for several hours, four or five

13   hours, over a course of two days.  I also reviewed

14   documents that Mr. Sullivan provided to me so I could

15   be prepared to answer the questions that are outlined

16   in the 30(b)(6) witness deposition notice.

17       Q.  So if you spent four to five hours meeting with

18   the two attorneys for Chubb, and then separately you

19   reviewed documents, how many hours did you spend

20   reviewing documents?

21       A.  I would say several hours, in addition to those

22   two meetings, and then several hours with counsel in

23   reviewing those documents as well.

24       Q.  Okay.  Can you give me a range -- so you've

25   given us a range for how long you spent with the

DANIEL JAEGER  MARCH 02, 2023

```
 1   lawyers over a couple of days, namely four to five

 2   hours.  How many hours on top of that did you spend

 3   reviewing documents?

 4       A.  Probably about the same, another four to five

 5   hours on my own reviewing documents.

 6       Q.  And when did this process take place?  Was it

 7   recent or when it did occur, both the meetings with

 8   lawyers and then the review of the documents?

 9            MR. SULLIVAN:  Object to form.

10            You can answer.

11            THE WITNESS:  Over the last, I would say,

12   20 days.  You know, documents were produced from

13   counsel to me so I could review them in preparation for

14   the deposition and then the review on my own of those

15   documents as well as the meeting with counsel.

16       Q.  BY MR. POLI:  All right.  So this process of

17   prep took place within -- roughly within the last

18   20 days, correct?

19       A.  That would be a rough estimate, yes.

20       Q.  Okay.  What documents did you review?  I mean,

21   did some of the document review process take place just

22   recently?  Right now, it's Thursday of this week.  Did

23   you spend time reviewing documents on Monday through

24   Wednesday of this week?

25            MR. SULLIVAN:  Object to form of the
```

DANIEL JAEGER   MARCH 02, 2023

1  question.  You can answer the second question.  I

2  instruct not to answer the first question on invasion

3  of the work product and attorney-client privilege.

4      Q.  BY MR. POLI:  Did you review documents on

5  Monday through Wednesday of this week, yes or no?

6      A.  I believe I did.  I don't know if it was Monday

7  Tuesday and Wednesday, but it was Monday through

8  Wednesday.

9      Q.  Okay.  What documents did you review?

10         MR. SULLIVAN:  Object to the question.

11  Invades the attorney-client privilege and the

12  work-product privilege and I instruct my client not to

13  answer.

14         Mr. Poli, you're welcome to show him any

15  document and ask if he reviewed them.  But we're not

16  required to divulge what we showed him.

17         MR. POLI:  That's completely

18  inappropriate, but nonetheless, we'll mark the record,

19  we'll move on and we'll take it to the judge.

20         MR. SULLIVAN:  Sounds good.

21         MR. POLI:  Yeah, and that's typically the

22  way that you do it.

23      Q.  BY MR. POLI:  So you reviewed documents over

24  the course of the last three or four days, but you're

25  going to refuse to tell me what documents you reviewed,

DANIEL JAEGER  MARCH 02, 2023

1  based on the advice of counsel; is that correct,

2  Mr. Jaeger?

3         MR. SULLIVAN:  Object to the form of the

4  question.  I instruct my client not to answer the

5  question.

6     Q.  BY MR. POLI:  Are you going to follow his

7  instructions to refuse to tell me such a simple thing

8  as what documents you reviewed over the last three or

9  four days; are you following his instruction in that

10  regard?

11         MR. SULLIVAN:  Object to the form.  You

12  can answer.

13         THE WITNESS:  I'm following my counsel's

14  advice, that's correct, sir.

15     Q.  BY MR. POLI:  Okay.  Did you review any

16  documents on your own or did you just review the

17  documents that were spoon fed to you by Mr. Sullivan?

18         MR. SULLIVAN:  Objection to the form of

19  the question.  It's a harassing question.  It's

20  inappropriate and I instruct my client not to answer.

21         MR. POLI:  Mark it.

22     Q.  BY MR. POLI:  Did you review any documents on

23  your own to get ready for today or did you only review

24  documents that were sent to you by Mr. Sullivan or his

25  compatriot, Mr. Yu?

DANIEL JAEGER  MARCH 02, 2023

1    A.  I reviewed documents that were sent to me by

2  Mr. Sullivan and that's primarily the documents that I

3  reviewed.

4    Q.  BY MR. POLI:  Well, primarily means you

5  reviewed some documents on your own; is that right?

6    A.  Not necessarily.  I think the majority of the

7  documents, if not all of them, were the documents that

8  were sent to me by counsel in an effort to be prepared

9  to answer your questions relative to the 30(b)(6)

10  witness deposition.

11    Q.  I'm still trying to understand -- initially you

12  said you primarily reviewed documents sent to you by

13  Mr. Sullivan and that would seem to indicate you

14  reviewed some documents on your own.  So let me get an

15  answer to the question one way or the other,

16  Mr. Jaeger.

17    Did you review any documents on your own

18  or did all of them come from Mr. Sullivan and his

19  compatriot, Mr. Yu?

20    A.  It's entirely possible, and I believe it is the

21  case, that I went back and looked at some of the EUO

22  transcripts that were obtained during the course of the

23  investigation.  I don't know if those documents were

24  produced to me by Mr. Sullivan or Mr. Yu or I reviewed

25  them on my own.  But that would be an example of some

DANIEL JAEGER  MARCH 02, 2023

1  of the documents that I reviewed in preparation for

2  today.

3      Q.  BY MR. POLI:  Okay.  So I'm trying to

4  understand what documents you reviewed on your own

5  without having them fed to you by Mr. Sullivan.  And so

6  far, the only thing you've mentioned would be that you

7  reviewed some of the EUO transcripts; is that right?

8              MR. SULLIVAN:  Object to the form of the

9  question.  Move to strike Counsel's statements.  You

10  can answer.

11             THE WITNESS:  Again, you mentioned before

12  that I may have a general understanding or a reference

13  to the documents and I should give you my best estimate

14  or, you know, information that I have available.  I did

15  review EUO transcripts.  I did review recorded

16  statement transcripts.  My point is that I'm not

17  recalling, at this point, if they were produced to me

18  by Mr. Sullivan or Mr. Yu or I already had them and was

19  just going back and reviewing them in preparation for

20  today.

21      Q.  BY MR. POLI:  Well, with any of these

22  questions, you can just say I don't know, if that's the

23  answer.  I'm trying to ascertain what, if any,

24  documents you reviewed on your own as compared to the

25  documents that were fed to you by Mr. Sullivan or

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Yu.  So far, you've told me about EUO transcripts

2  and recorded statement transcripts.  That's what you've

3  told us about so far, right?

4          MR. SULLIVAN:  Objection; move to strike

5  Counsel's statements.

6          You can answer.

7          THE WITNESS:  I reviewed the documents

8  that were presented by Mr. Sullivan and Mr. Yu, as well

9  as additional documents that I thought were necessary

10  in order to be prepared for today.  There may have been

11  overlap with the documents that were provided to me by

12  Mr. Sullivan and Mr. Yu.  But they may have been

13  documents that I felt were necessary in order to

14  prepare to answer the questions in the 30(b)(6) notice

15  that was sent to me.

16      Q.  BY MR. POLI:  Okay.  I'm following up on

17  something you just said, you reviewed additional

18  documents that I thought were necessary to be prepared

19  for today.  That's what you just said a moment ago,

20  right?

21      A.  That's what I said, sir.

22      Q.  Okay.  I'm trying to find out what those

23  documents were and so far --

24      A.  I can't give you -- I'm sorry.  I didn't mean

25  to interrupt you.

1    Q.  So the answer is I don't know.  You can't tell

2    us what documents are additional documents that you

3    reviewed on your own and what documents were sent to

4    you by Mr. Sullivan.  You just can't differentiate the

5    two; is that right?

6    A.  I can't give you a complete list of every

7    document that I looked at in preparation for today.

8    I've given you some general areas of the documents that

9    I looked at and that's my best recollection.

10    Q.  BY MR. POLI:  How about a partial list?  Can

11    you give me a partial list of the documents you

12    characterized as additional documents, not the ones

13    sent to you by Mr. Sullivan or Mr. Yu, as additional

14    documents that you thought it was necessary to review

15    so you could be prepared.  Can you give us a partial

16    list of those documents?

17    A.  I just gave you a partial list.  I said that I

18    reviewed EUO transcripts.  I reviewed recorded

19    statements transcripts.  I reviewed other documents

20    that were obtained during the course of the

21    investigation.  My point is, I can't tell you if those

22    documents were specifically provided to me by

23    Mr. Sullivan and Mr. Yu or those were documents that I

24    had and I reviewed on my own.  There's probably some

25    overlap between the two sets of documents.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  So that's the best testimony you can give us is

2 you can only think -- as far as a partial list of

3 documents that you thought it was necessary, on your

4 own, to review to be prepared for today, the only two

5 examples you can think of are EUO transcripts and

6 recorded statement transcripts; is that correct?

7    A.  And, again, that's documents -- there's other

8 documents that were provided to me to review in

9 preparation for today, Mr. Poli.  I've gone through

10 some of those.  There was many documents that were

11 provided to me in order to prepare for today.  You

12 asked me what documents that I reviewed that may have

13 been in addition to what was provided and I gave you a

14 general summary of those documents.  Could there be a

15 few others?  Yes.  Could there be less?  Yes.  I

16 reviewed the documents that I believe were necessary in

17 order to answer your questions pursuant to the 30(b)(6)

18 notice.

19          MR. POLI:  Okay.  Mark it, please.

20    Q.  BY MR. POLI:  What's your education post-high

21 school?

22    A.  I have a bachelor of arts degree in criminal

23 justice from the University of Delaware.  I'm also a

24 chartered property casualty underwriter and an

25 associate in claims professional designation.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  So a bachelor of arts, criminal justice,
2  University of Delaware, you said?

3    A.  That's correct.

4    Q.  What year did you graduate?

5    A.  1994.

6    Q.  Any post-graduate -- obviously, you have
7  designations within insurance, but any post-graduate
8  education, master's, Ph.D., anything like that?

9    A.  No, sir.

10    Q.  And you just mentioned -- so you're a -- what
11  did you say, you have a designation as a chartered --
12  what did you?

13    A.  A chartered property casualty underwriter,
14  CPCU.  And I also have another designation from The
15  Institutes called an associate in claims, AIC.

16    Q.  And those both come from The Institutes,
17  correct?

18    A.  That's correct, sir.

19    Q.  When did you get your CPCU?

20    A.  Can I turn around and look on my wall?  I
21  believe it was in 2001.

22    Q.  And when did you get your designation as an
23  AIC, an associate in claims?

24    A.  I believe that was either 1997 or 1998.

25    Q.  So when did your career in insurance start,

DANIEL JAEGER  MARCH 02, 2023

1  after you got out of the University of Delaware?

2      A.  Yes.

3      Q.  What was your first job out of the University

4  of Delaware?

5      A.  I was catastrophic personal injury protection

6  claim representative for State Farm indemnity company

7  of New Jersey.

8      Q.  Okay.  What was your title again, catastrophic

9  personal injury?

10     A.  Protection claim representative.

11     Q.  But you started in claims handling -- when did

12  you take that job with State Farm?

13     A.  June of 1994.

14     Q.  Have you been involved in claims handling from

15  June of '94 through the present?

16     A.  Claims handling or investigation, yes.

17     Q.  Well, I mean, when a claim comes to you at SIU,

18  does that still involve claims handling?

19     A.  Depending.  I was an investigator for many

20  years.  So, you know, as an investigator, I wasn't

21  responsible for the actual adjustment of the claim, but

22  I was involved in the claim process, either from an

23  adjuster standpoint or an investigative standpoint,

24  since June of 1994.

25     Q.  So you've been involved in one form or another

DANIEL JAEGER  MARCH 02, 2023

1  of claims handling from June of 1994 through the

2  present; is that right?

3      A.  I've been working in claims since June of 1994

4  through the present, yes.

5      Q.  That's 29 years in the field of insurance

6  claims handling; is that right?

7      A.  Yes.

8      Q.  Now, do you agree with me that the -- I take it

9  you do agree, there are certain standards, or rules of

10  the road, for proper handling of a claim, right?

11          MR. SULLIVAN:  Object to the form.

12          You can answer.

13          THE WITNESS:  Yes.  There are proper

14  standards for handling of claims, yes.

15      Q.  BY MR. POLI:  Are the standards different if a

16  claim -- well, first of all, SIU stands for special

17  investigations unit, right?

18      A.  That's correct, sir.

19      Q.  Are standards for proper claims handling

20  somehow different or suspended if a claim is

21  transferred to SIU?

22          MR. SULLIVAN:  Object to the form.

23          You can answer.

24          THE WITNESS:  I don't believe that the

25  standards change, but, you know, obviously the scope of

DANIEL JAEGER  MARCH 02, 2023

1  the investigation may change, depending on the

2  information that's available to us at the time and the

3  need for additional investigation.

4      Q.  BY MR. POLI:  Would it be fair to say that, in

5  terms of proper standards of claims handling, if you

6  lie to or deceive your insured, that would be improper;

7  would that be a normal standard?

8      A.  That's a hypothetical question.  That clearly

9  didn't happen here.  But if an insurer lied to their

10  insured, yes, I think that would be improper.

11      Q.  So, as far as general standards of claims

12  handling, and we'll get into them, if a -- if in

13  handling a claim, the insurance company representative

14  lies to or deceives the insured, that would be improper

15  under normal claims handling standards; is that right?

16              MR. SULLIVAN:  Object to the form; asked

17  and answered.

18              You can answer.

19              THE WITNESS:  Again, that's a hypothetical

20  question.  That clearly didn't happen in

21  Mr. Altschuler's claim.  But, yes, if an insurance

22  company intentionally and deliberately lied to an

23  insured, that would be improper.

24      Q.  BY MR. POLI:  Would that be true in SIU as

25  well; if the claim is being processed through SIU,

DANIEL JAEGER   MARCH 02, 2023

1  would the same standard apply, namely you shouldn't lie

2  to or deceive the insured?

3      A.  Again, a hypothetical question, that didn't

4  happen here, but the same standard would apply if the

5  claim was in SIU as if it was going through a normal

6  claims handling process.

7      Q.  Okay.  So in '94, you started with State Farm,

8  right?

9      A.  That's correct, sir.

10     Q.  And tell me exactly what you mean by a

11 catastrophic -- well, catastrophe obviously means

12 catastrophe claims.

13          Catastrophic -- what was the rest of the

14 title?

15     A.  Personal injury protection claim

16 representative.

17     Q.  Okay.  So PIP coverage?

18     A.  Yes.

19     Q.  How long did you have that job with State Farm,

20 from '94 to when?

21     A.  October of 1998.

22     Q.  Okay.  And what was your next job in insurance

23 after that?

24     A.  I continued my career with State Farm.  I was

25 transferred into a special investigations role at State

DANIEL JAEGER  MARCH 02, 2023

1  Farm and I was a special investigator.

2      Q.  So you were no longer an SIU claims handler.

3  At that point, you were an SIU investigator; is that

4  right?

5      A.  Again --

6          MR. SULLIVAN:  Object to form.

7      Q.  BY MR. POLI:  I couldn't hear you.

8      A.  I'm sorry.

9      Q.  Yeah, he's going to object all the time; so

10  you've got to give him a second to do that.  Because if

11  you're talking over -- just like you and I shouldn't

12  talk over each other, it's hard to understand what you

13  said if you and Mr. Sullivan are talking over each

14  other.  Okay, Mr. Jaeger?

15      A.  Sure, Mr. Poli.  I just want to clarify.

16      Q.  Yes.

17      A.  When I was a catastrophic personal injury

18  protection claim examiner or claim adjuster, I was

19  actually handling PIP claims.  So, you know, you know

20  what PIP is; so I don't need to get into detail with

21  you on that.  When I left that role, I was actually

22  transferred into an SIU and I was an investigator.  I

23  was no longer an adjuster.

24      Q.  And that's what I just tried to say; in 1998,

25  when you transferred into the SIU unit at State Farm,

DANIEL JAEGER  MARCH 02, 2023

1   you were no longer a claims adjuster, you were an SIU

2   investigator, correct?

3       A.  Yeah.  And I just want to clarify; I made a

4   mistake.  So it wasn't in 1998.  It was June -- it was

5   1995.

6       Q.  Okay.

7       A.  I went into SIU.  I apologize.  It was a long

8   time ago.  But 1995 and I think it was, you know,

9   sometime about 18 months after I started with State

10  Farm, I went into an SIU role.

11      Q.  Okay.  So really you were only with State Farm

12  as an actual adjuster for about 18 months --

13      A.  Yes.

14      Q.  -- and then you went into SIU --

15      A.  Yes.

16      Q.  -- at State Farm, right?

17      A.  Yes.  Yes.

18      Q.  Am I correct that you've probably been in some

19  sort of SIU capacity from '95 through the present?

20      A.  That's correct, sir.

21      Q.  Okay.  So you spent about 28 years in SIU units

22  of one sort or another, at one carrier or another; is

23  that right?

24          MR. SULLIVAN:  Object to the form; asked

25  and answered.

1        You can answer again.

2        THE WITNESS:  That's correct, sir.

3     Q.  BY MR. POLI:  Okay.  All right.  So starting in

4  '95, you were no longer an adjuster per se.  Suddenly

5  you became a so-called SIU investigator for State Farm

6  in their SIU unit, correct?

7        MR. SULLIVAN:  Object to the form.

8        You can answer.

9        THE WITNESS:  Yeah, roughly 1995 at some

10  point, I became an SIU investigator for State Farm

11  Indemnity Company of New Jersey.

12     Q.  BY MR. POLI:  And how long did you have that

13  job as an SIU investigator for State Farm, '95 to when?

14     A.  I left State Farm in 1998 and -- but prior to

15  leaving State Farm, I was transferred into an organized

16  activity unit at State Farm, which was responsible for

17  investigating organized activity, ring activity, in

18  northern New Jersey.

19     Q.  Okay.  I think I need a little explanation of

20  that.  What do you mean by an organized activity unit?

21     A.  You understand that there's certain

22  organizations that are criminal, that are organized to

23  commit insurance fraud, either through staged

24  accidents, cause accidents, runners, medical clinics,

25  lawyers, doctors.  So I was involved in investigating

DANIEL JAEGER  MARCH 02, 2023

1   those types organized activity.

2       Q.  So when did you transfer into this specialized,

3   what you call organized activity unit; when did you do

4   that with State Farm?

5       A.  I'm not sure of the exact time, but it was

6   some time between my transferring to SIU and by the

7   time I left the company.  So '97, '98, early '98.  I

8   did that for about a year before leaving State Farm.

9       Q.  And so you're looking at like really criminal

10  organizations that were trying to take advantage of

11  insurance companies or commit insurance fraud; is that

12  what you were doing in that unit?

13      A.  That's correct, sir.

14      Q.  Okay.  And this is mostly in New Jersey, I take

15  it?

16      A.  Yes, all in New Jersey.

17      Q.  Where are you based now?

18      A.  I actually -- my office that I report to is in

19  New Jersey, in Whitehouse Station, New Jersey, but I'm

20  a quasi-work-from-home employee.  So I'm in Wilmington,

21  Delaware.

22      Q.  Okay.  All right.  So you left State Farm in

23  '98, correct?

24      A.  That's correct, sir.

25      Q.  Where did you go?

DANIEL JAEGER  MARCH 02, 2023

1    A.  I went to American International Group

2  Marketing, AIGM.

3    Q.  I certainly know AIG.  What do you mean by AIG

4  Marketing?

5    A.  Yeah.  So AIG, obviously, was a very long

6  corporation who had multiple different business units.

7  They had an Affinity Insurance Company that wrote

8  primarily to like trade organizations, FOPs, teachers'

9  unions, those types of organizations.  They decided

10  they were going to mass market and expand into outside

11  of those types of Affinity organizations.  And so the

12  division that I worked for was a personal lines

13  division called AIGM, AIG Marketing.

14    Q.  I take it you were a part of the SIU unit that

15  was associated with AIG marketing, correct?

16    A.  That's correct, sir.

17    Q.  Okay.  So what was your position when you

18  joined this SIU unit at -- if I refer to AIG, we can

19  agree --

20    A.  Sure.

21    Q.  -- that they, you know -- I'm trying to

22  remember.  What does AIG stand for?

23    A.  American International Group.

24    Q.  I should know that.  I've sued them enough

25  times.

DANIEL JAEGER  MARCH 02, 2023

1          American International Group, if I refer

2    to AIG, that's what I mean, American International

3    Group, okay?

4        A.  Okay.

5        Q.  All right.  So when you joined the SIU unit at

6    AIG in 1998, what was your position?

7        A.  I was a special investigator.

8        Q.  So that continued the process of you not being

9    a claims handler, per se, but instead more focused on

10   the actual investigatory role; is that right?

11       A.  That's correct, sir.

12       Q.  Now, we established a minute ago -- and we'll

13   get into the standards of proper claims handling.  We

14   established a minute ago that the standards of proper

15   claims handling should be the same whether it's a

16   regular claim being handled by an insurance company or

17   a claim that's been transferred to SIU; is that

18   correct?

19              MR. SULLIVAN:  Objection; form; asked and

20   answered.

21              You can answer one more time.

22              THE WITNESS:  The standards remain the

23   same, but there are some carve-outs within most states

24   for claims that are being investigated by SIU.  So if

25   there's timelines that have to be met by certain claim

DANIEL JAEGER  MARCH 02, 2023

1  standards, if the claim is being investigated or it's

2  suspicious or there's an indication that it could be

3  potentially fraudulent, most states allow for

4  extensions of those deadlines.

5     Q.  BY MR. POLI:  Yeah.  And you're talking about

6  the types of deadlines that are found either in the

7  Unfair Claims Settlement Practices Act or in related

8  regulations; is that what you're referring to?

9           MR. SULLIVAN:  Object to the form.

10          You can answer.

11          THE WITNESS:  To my understanding, yes,

12  correct.

13     Q.  BY MR. POLI:  Okay.  So are there any other

14  carve-outs where, you know SIU can conduct themselves

15  differently, other than carve-outs for the time limits

16  because the investigation might not fit within those

17  otherwise applicable time limits, carve-out?

18          MR. SULLIVAN:  Object to the form.

19          You can answer.

20          THE WITNESS:  Yeah, I don't understand

21  what you mean by conduct themselves differently.  SIU

22  conducts an investigation of a claim and, you know,

23  they go through a logical process to try to verify and

24  validate a claim and determine whether or not to pay

25  it.  So that's my understanding of how the process

DANIEL JAEGER  MARCH 02, 2023

1  works.

2      Q.  BY MR. POLI:  Okay.  Well, let's follow up on

3  what you just said.  SIU goes through a process of

4  trying to -- I just used the phrase you did -- verify

5  and validate the claim, correct?

6      A.  That's correct.

7      Q.  That's the words you just used, right?

8          MR. SULLIVAN:  Object to the form; asked

9  and answered.

10         You can answer again.

11         THE WITNESS:  Those are the words I used,

12  sir.

13     Q.  BY MR. POLI:  Okay.  And if SIU is unable to --

14  if SIU has a suspicious claim, but it's unable to prove

15  out its suspicions, the claims should be paid, right?

16     A.  If SIU can't establish -- well, let's back up

17  for a second because, you know, the investigations

18  always start with a premise that we're trying to

19  provide coverage and we're trying to validate a claim

20  and submit it.  If SIU can validate that claim, the

21  claim does get paid.  If there's no evidence to

22  indicate that the claim is fraudulent or there's any

23  reason not to pay the claim, then the claim gets paid.

24  If the investigation bears out that there is evidence

25  that the claim is fraudulent, then the claim doesn't

1  get paid.  That's how it works and -- you know, from

2  practically speaking.

3      Q.  Right.  Let me go back.  You started to say if

4  SIU can't and then you stopped.  If SIU can't prove

5  that the suspicions are valid, the claim should be

6  paid; isn't that true?

7          MR. SULLIVAN:  Object to the form; asked

8  and answered.

9          You can answer one more time.

10          THE WITNESS:  If SIU determines that the

11  claim is valid, then the claim will be paid.

12      Q.  BY MR. POLI:  I'm trying to draw a dichotomy

13  between suspicions versus proof.  If a claim is

14  suspicious, if SIU cannot prove the suspicions through

15  actual proof, the claim should be paid; is that

16  correct?

17          MR. SULLIVAN:  Object to the form.

18          You can answer.

19          THE WITNESS:  If the investigation

20  determines that the suspicions don't merit or warrant a

21  denial of the claim, then the claim would be paid, yes.

22      Q.  BY MR. POLI:  There needs to be proof of fraud

23  before a claim can be denied for fraud; is that true?

24          MR. SULLIVAN:  Objection; form.

25          THE WITNESS:  Yes.  There has to be

DANIEL JAEGER  MARCH 02, 2023

1   evidence that fraud is committed before a claim can be

2   denied for fraud, yes.

3       Q.  BY MR. POLI:  Let me just write that down.

4   There has to be evidence that fraud has been committed

5   before a claim can be denied for a fraud; that's what

6   you just said, right?

7           MR. SULLIVAN:  Objection; form; asked and

8   answered.  You can answer.

9           THE WITNESS:  So we rely on --

10      Q.  BY MR. POLI:  Right now, I'm just asking -- I

11  want to make sure I wrote it down correctly because

12  it's going to get used here in this deposition.  When I

13  wrote down what you said, there has to be evidence that

14  fraud is being committed before a claim can be denied

15  for fraud.  Is that what you just said a moment ago?

16          MR. SULLIVAN:  Objection; form; asked and

17  answered.

18          You can answer again.

19          THE WITNESS:  The investigation has to

20  conclude or result that there is evidence of material

21  misrepresentation, concealment of material facts that

22  have been potentially made that would invoke the

23  concealment or fraud provision in the policy in order

24  for the claim to be denied for a fraud, yes.

25      Q.  BY MR. POLI:  For right now -- we're going to

DANIEL JAEGER  MARCH 02, 2023

1  get there.  Right now, I'm just trying to make sure I

2  wrote down what you said, Mr. Jaeger.  You said there

3  has to be evidence that fraud has been committed before

4  a claim can be denied for fraud.  Did I write down what

5  you said correctly?

6              MR. SULLIVAN:  Objection; misstates his

7  testimony.  He's answered the question.  Please ask

8  another question, Counselor.

9              MR. POLI:  No, I'm not.  Please stop the

10  coaching.

11              Mark it, please.

12      Q.  BY MR. POLI:  I want an answer to that

13  question, Mr. Jaeger.  I did my best to write down

14  verbatim what you said a minute ago and I want to make

15  clear that that's what you said.  And a minute ago,

16  what you said, using your own words, there has to be

17  evidence that fraud is being committed before a claim

18  can be denied for fraud; is that what you said,

19  Mr. Jaeger?

20              MR. SULLIVAN:  Objection.

21              To clear the record, there's been no

22  coaching.

23              Court reporter, please read back the last

24  question and answer.

25              MR. POLI:  No, we're not doing that.

DANIEL JAEGER  MARCH 02, 2023

1  We're not going back to look for spots in the record.

2  He should be able -- I'm the master of the questions.

3  You're apparently the master of crazy objections and

4  he's going to give whatever answers he is going to

5  give.  So I want an answer to the question.

6      Q.  BY MR. POLI:  Now, Mr. Jaeger, I'm going to

7  have the court reporter read the question back and I

8  would like an answer to the question so that we know

9  what your testimony is because I'm going to follow up

10  on it at various times.

11          Go ahead, Donna.

12          MR. SULLIVAN:  For the record, I disagree

13  with Counsel's characterization of my role with respect

14  to this deposition.  If the question is read back; I

15  want the answer read back as well.

16          MR. POLI:  We're reading back my last

17  question.  I've been in other depositions with you,

18  Bobby; so I know your approach.  This will end up in

19  front of the judge.  I can't control what you're going

20  to do.  You're running true to form, based on the other

21  depositions I've seen, and we'll end up in front of the

22  judge and if he thinks this is a proper way to act,

23  then I guess he'll tell us that.  But --

24          MR. SULLIVAN:  I couldn't agree with you

25  more.

DANIEL JAEGER  MARCH 02, 2023

1          MR. POLI:  Donna, read the question back,

2  please.

3          (Whereupon, the question was read.)

4          MR. SULLIVAN:  I stand by my objections.

5  It's been asked.  It's been answered.  You don't need

6  to answer it again, Dan.

7     Q.  BY MR. POLI:  Answer the question, please.

8          MR. SULLIVAN:  I instruct my client not to

9  answer the question.

10          MR. POLI:  You're instructing him not to

11  answer the question, on something that he made an

12  admission where it's the most critical issue probably

13  in the case.

14          Mark it, please, and we'll move on.

15     Q.  BY MR. POLI:  So, in other words, based on what

16  you're telling us, Mr. Jaeger, if suspicions of fraud

17  can't be proven through evidence of some kind, then the

18  claim needs to be paid, right?

19          MR. SULLIVAN:  Object to the form of the

20  question; asked and answered.

21          You can answer.

22          THE WITNESS:  Suspicions of fraud or

23  indicia of fraud is what causes us to investigate.  The

24  results of the investigation ultimately determine the

25  course of action by the insurance company.  If the

DANIEL JAEGER  MARCH 02, 2023

1  investigation bears out that the claim is legitimate

2  and payable, it's payable.  If the investigation bears

3  out that the investigation -- or the claim is

4  fraudulent or not payable, then the claim is denied.

5      Q.  BY MR. POLI:  Right.  So I'm drawing the

6  following distinction, dichotomy, whatever you want to

7  call it.

8              What you're saying is suspicions of fraud,

9  or indicia of fraud, is what causes a claim to be

10  transferred to SIU in the first place; is that right,

11  Mr. Jaeger?

12             MR. SULLIVAN:  Objection; form; asked and

13  answered.

14             You can answer it one more time.

15             THE WITNESS:  So, Mr. Poli, just to be

16  clear, you know, when a claim comes in, if there are

17  some indicators or suspicion that the claim may be

18  fraudulent, then it is possible that it would be

19  referred to SIU.  SIU would conduct an investigation

20  and make a determination in that regard.  So, yes,

21  that's how claims get into SIU.

22      Q.  BY MR. POLI:  Okay.  So that's how claims get

23  to SIU; whether you call them indicators or suspicions

24  of fraud or indicia of fraud, whatever you want to call

25  it, that's how a claim goes to SIU, correct?

DANIEL JAEGER  MARCH 02, 2023

1      MR. SULLIVAN:  Form; asked and answered.

2      You can answer again, Dan.

3      THE WITNESS:  Yeah, that would be one of

4  the ways that a claim would get into SIU, yes.

5    Q.  BY MR. POLI:  Okay.  But in contrast, you can't

6  deny coverage on a claim if all you have are indicators

7  or suspicions or indicia of fraud; you have to have

8  proof.  You have to have evidence, right?

9      MR. SULLIVAN:  Object to the form;

10  misstates his testimony.

11      You can answer.

12      THE WITNESS:  Yes.  The investigation

13  would have to conclude that there is evidence of

14  misrepresentation or concealment of material fact.

15      MR. POLI:  Pull up Exhibit 22, please.

16      Go to the bottom of the first page,

17  please.

18    Q.  BY MR. POLI:  This is a report prepared by our

19  claims handling expert, Justin Skipton.  Have you ever

20  seen this particular report?

21    A.  I don't recall, Mr. Poli.

22    Q.  Okay.  Well, anyway, let's see what he says.

23  So he has an AIC designation.  That's the same

24  designation that you told us that you have, right,

25  since the '90s?

DANIEL JAEGER  MARCH 02, 2023

1     A.  That's one of them, yes.

2     Q.  Okay.  You have other designations.  I mean, in

3  the CPCU designation, I've always understood that's a

4  pretty complex designation, again, in the world of

5  insurance; is that right, Mr. Jaeger?

6     A.  That's correct, sir.

7     Q.  Okay.  Well, anyway, let's look at what

8  Mr. Skipton says about the AIC designation.

9         He says, "The Associate" -- actually, I

10  guess he's quoting from his earlier report.  But in

11  part, it says -- I'm going to pick up where it says

12  "The associates in claims course entitled"; do you see

13  that's five lines down?

14     A.  Yes.

15     Q.  Okay.  Quote, "The Associates in claims course

16  entitled Property Claim Practices states, 'Claims are

17  paid when the SIU investigation proves that the claim

18  is legitimate or when SIU believes it cannot prove

19  fraud, even though the claim still seems suspicions.

20  From the point of view of the insured and society,

21  paying claims is preferable unless fraud can be proven.

22  Allegations of fraud are an extremely serious matter

23  and can result in criminal charges,'" unquote.

24         And in context, you can see he's quoting

25  from one of the AIC training materials.  Do you see

DANIEL JAEGER   MARCH 02, 2023

1  that?

2      A.  I'm sorry, it's just hard to read.  Is that the

3  quote, "Since theft claims are unique"?

4      Q.  No, everything I just read.  "'Claims are'"  if

5  you see --

6      A.  Oh, "'Claims are paid when the SIU

7  investigation,'" okay, I see that, yes.

8      Q.  Assuming he's accurate, which I haven't gone

9  back to look at the AIC materials -- assuming he's

10  accurate, he starts off quoting his prior report and

11  then within that, has an internal quote from the AIC

12  course entitled "Property Claims Practices."  Do you

13  see that's the context of what Exhibit 22 purports to

14  say?

15      A.  I do, sir.

16      Q.  Well, right now, I just want to know.  I mean,

17  obviously, you got your AIC designation a long time

18  ago, in the '90s.  Have you had to do anything to

19  update it, to like maintain your AIC designation?  Or

20  have you had to do any like continuing education type

21  of requirement for AIC?

22              MR. SULLIVAN:  Object to the form.

23              THE WITNESS:  Yeah, I don't have to do any

24  continuing education to maintain the designation.

25  There is a continuing education component for the CPCU

DANIEL JAEGER  MARCH 02, 2023

1  designation, to maintain a CPCU designation in good

2  standing.  AIC is a junior designation to CPCU and

3  completing the AIC designation at the time when I took

4  it, and a lot of things changed, Mr. Poli, since then.

5  They used to write exams in blue books.  Now they're

6  computer-based.

7           However, completing the AIC designation

8  waived one component of the ten-component CPCU

9  designation.  So the continuing education that I

10  receive throughout the year in various forms is

11  maintained at The Institutes in order to maintain my

12  CPCU in good standing badge.

13      Q.  BY MR. POLI:  Okay.  Well, let's focus on what

14  we're looking at.  According to Mr. Skipton, who's our

15  expert on claims handling, this AIC coursework says,

16  among other things, that a claim should be paid, quote,

17  "when SIU believes it cannot prove fraud, even though

18  the claim still seems suspicious," unquote.

19           Have you got that phrase in your mind,

20  since I just read it?

21      A.  I do, sir.

22      Q.  Do you agree that's the training that you've

23  received over the years, including when getting your

24  AIC?

25           MR. SULLIVAN:  Object to the form;

DANIEL JAEGER  MARCH 02, 2023

1    misstates his testimony.

2              You can answer.

3              THE WITNESS:  Yeah, I don't recall

4    specifically if that was in the AIC coursework when I

5    got the AIC designation.  But, generally speaking, I

6    don't disagree with that, you know.  If SIU conducts an

7    investigation, and even though there are still

8    suspicions -- but there's no evidence that rises to the

9    level of fraud, then the claim would be paid.

10   Q.  BY MR. POLI:  Okay.  So you agree with the

11   statement, based on your training and experience,

12   including 28 years in SIU, namely if SIU cannot prove

13   fraud, even though the claim still seems suspicious,

14   the claim should be paid; is that right?

15             MR. SULLIVAN:  Object to the form; asked

16   and answered.

17             You can answer, Dan.

18             THE WITNESS:  Again, Mr. Poli, if there

19   are indicators of suspicion and an investigation is

20   conducted and the investigation concludes that even

21   though there's still suspicion, there's not fraud -- or

22   provable fraud, the claim will be paid.  So to that

23   extent, I agree with you.

24             MR. POLI:  Okay, good.  Thank you.

25             Mark it, please.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  And when you say "provable

2  fraud" -- that was a phrase you just used, provable

3  fraud.  What do you mean by that phrase?

4    A.  Yep.

5    Q.  I'm following up on a phrase you just used.  If

6  it's not provable fraud, the claim should be paid.

7  That's what you just said a moment ago.  Do you recall

8  that?

9         MR. SULLIVAN:  Object to the form; asked

10  and answered.

11         Dan, you don't need to answer again.

12         MR. POLI:  I'm following up.

13         Mark it, please.

14         Boy, we are going to be going to the

15  judge.

16    Q.  BY MR. POLI:  I'm following up on something you

17  just said.  You said if there's not provable fraud, the

18  claim should be paid.  What do you mean by the phrase

19  provable fraud?

20    A.  Sure.  That the evidence educed during the

21  course of an investigation supports the position that

22  the claim is fraudulent.

23    Q.  Let me write that down.  Evidence educed during

24  the investigation supports -- what did you say,

25  supports what?

1       A.   Supports that the claim is fraudulent or that

2  there's been -- so concerning fraud, you understand

3  we're referring to the policy language, which says that

4  the provision is concealment or fraud.  And so we're

5  referring to misrepresentations intentionally made,

6  concealments intentionally made of material fact that,

7  you know, would void or exclude coverage for that loss.

8       Q.   Right.  And you're talking about the fraud or

9  concealment provision in the Chubb policy; that's what

10 you're talking about there, right?

11      A.   Concealment or fraud, yes.

12           MR. POLI:  Yeah.  Let's pull that up.  Go

13 to Exhibit -- we're done with Exhibit 22.  Let's go to

14 Exhibit 1.

15      Q.   BY MR. POLI:  And I realize we got off track on

16 your experience.  We'll get back to it.  Okay,

17 Mr. Jaeger?

18      A.   Sure.

19      Q.   Okay.  I imagine you probably would have

20 reviewed the subject insurance policy to get ready for

21 today, right, Mr. Jaeger?

22      A.   I don't know that I reviewed the subject

23 insurance policy.  I'm pretty familiar with it.  I've

24 been working for Chubb for 22 years.  You know, so as

25 far as the provisions within the Masterpiece policy and

DANIEL JAEGER  MARCH 02, 2023

1   the conditions, I'm pretty familiar with them.

2       Q.  Actually, why don't we just pick up the rest of

3   your experience real quick.  So we took it up to 1998,

4   which is when you left State Farm, and that's when you

5   joined AIG, correct?

6       A.  That's correct, sir.

7       Q.  Okay.  How long were you at AIG in a special

8   investigations unit, from '98 until when?

9       A.  November of 2001.

10      Q.  And where did you go in 2001?

11      A.  To Chubb.

12      Q.  And what was your initial -- again, obviously,

13  since you're an SIU veteran, you went over to Chubb

14  into an SIU unit, correct?

15      A.  That's correct.

16      Q.  And what was your initial position in 2001?

17      A.  I was a property special investigator for our

18  mid-Atlantic region at the time.

19      Q.  Again, you were still -- you weren't a claims

20  handler per se; within the SIU unit, you were still

21  filling that investigation role, right?

22      A.  That's correct, sir.

23      Q.  So you had that job from 2001 until when, sir?

24      A.  January of 2011.

25      Q.  What was your next job, then, at Chubb?

DANIEL JAEGER  MARCH 02, 2023

1    A.  I was promoted to the worldwide first party SIU

2  claims manager, with responsibility for the first party

3  SIU program worldwide.

4    Q.  Wow, a big job.  And what was the position

5  again, worldwide, what was it?

6    A.  Worldwide first party SIU claims manager.

7    Q.  Is that the job you still hold, I assume?

8    A.  No.  Similar, but, no.  I hold a different job

9  today.

10    Q.  So as of January 2011, you were in charge of

11  all first party SIU investigations for the entire

12  planet?

13          MR. SULLIVAN:  Object to the form.

14          You can answer.

15          THE WITNESS:  So worldwide for Chubb

16  operations.  So, yes, ultimately, you know, authority

17  would need to come through me, from our corporate

18  headquarters in Warren, New Jersey, at the time.

19    Q.  BY MR. POLI:  I mean that's a -- I mean, you

20  were the most senior SIU person within Chubb for

21  first-party claims; would that be correct?

22          MR. SULLIVAN:  Object to form.

23          THE WITNESS:  Yeah.  I mean, I had a boss,

24  obviously, who was the worldwide head of SIU in

25  recovery and then he had a boss who was the worldwide

DANIEL JAEGER    MARCH 02, 2023

1    property discipline manager.  But for first party SIU

2    claims, I was the corporate person who would be

3    responsible for that.

4        Q.  BY MR. POLI:  Okay.  All right.  So how long

5    did you have -- congratulations, that's a heavy job.

6    How long did you have that, from January '11 until

7    when?

8        A.  So you probably are aware that ACE purchased

9    Chubb in January of 2016 and at that point, they

10   reorganized the company into Chubb Overseas General,

11   which is outside North America operation, and then

12   Chubb North America.  And at that point, you know, the

13   role kind of -- the company doubled in size because of

14   the acquisition.  So I became the property SIU claims

15   manager for just North America, which is my current

16   role today.

17            MR. POLI:  Okay.  Let's go back to

18   Exhibit 1.

19       Q.  BY MR. POLI:  Okay.  Now, as you can see, since

20   you can see the insured's address and name on the front

21   page, this is the Chubb policy that is the -- that is

22   at issue in this case, correct?

23       A.  It appears to be.

24            Yes, effective date 8/1/19.  No, so that

25   would -- oh, yes, I'm sorry, 8/1/19 to 8/1/20, correct.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  And really the first question I have is -- and

2 you've already alluded to it.  This is a Chubb form, a

3 policy form that you've probably reviewed thousands of

4 times over the last 20 years?

5    A.  I've reviewed it quite a bit for, you know,

6 different states and it's our Masterpiece product that

7 we use.

8    Q.  In other words, I think what you're saying is

9 there might be variations from state to state, but the

10 coverage form, what you call your Masterpiece product,

11 is something that's used all across the country; is

12 that what you mean?

13    A.  Yeah.  And there are slight variations, from

14 state to state, as you said, based on the requirements

15 of the department of insurance within those states.

16    Q.  Okay.  But as far as the core coverage forms,

17 what you call your Masterpiece product, would it be

18 fair to say that, over the last 20-some years, you

19 reviewed that thousands of times?

20    A.  I don't know if I would say thousands, but I've

21 definitely reviewed it on numerous times.

22    Q.  It certainly would be hundreds of times over

23 last 20 years, right?

24    A.  Yeah.  I've definitely seen the policies

25 hundreds of times.  Every time, you know, a claim would

DANIEL JAEGER  MARCH 02, 2023

1  come to my attention, the policy would be in that claim

2  file or available through that claim file, so, yes.

3      Q.  I mean, at some point, after you reviewed it

4  hundreds of times -- you wouldn't review it page by

5  page.  If you need to look at it --

6      A.  That's right.

7      Q.  -- you would go and find that particular thing

8  that you need to go look at, correct?

9      A.  That's my point, sir, yes.

10      Q.  Yeah, I understand.  And I think I've

11  established the timing.  What year did you join Chubb?

12      A.  November of 2001.  I'm sorry.

13      Q.  So you've been with Chubb for 22 years?

14      A.  That's correct, sir.

15      Q.  And they've had what you refer to as this

16  Masterpiece product and we see the word "Masterpiece"

17  on the top of page 1.  They've had what you refer to as

18  this Masterpiece product, in one form or another, for

19  that entire 22 years, correct?

20              MR. SULLIVAN:  Object to the form.

21              You can answer.

22              THE WITNESS:  They have, yes.

23              MR. POLI:  Okay.  Mark it, please.

24      Q.  BY MR. POLI:  Okay.  And there is a concealment

25  or fraud provision in this Chubb form, this particular

DANIEL JAEGER  MARCH 02, 2023

1   version having been issued to my client,

2   Mr. Altschuler, correct?

3       A.   There is.

4       Q.   And, obviously, you know what I mean by -- I

5   mean, given the many depositions you've done, you know

6   what I mean by Bates numbers, where the lawyers add

7   them so we can try and find pages easily and such,

8   right?

9       A.   Sure.

10      Q.   Okay.  Well, let's look at the relevant

11  exclusion.

12              MR. POLI:  Go to Bates 73 of this

13  document, Donna.

14      Q.   BY MR. POLI:  Okay.  And you'll see, under

15  General Conditions, there's a section called

16  concealment or fraud, correct?

17      A.   That's correct.

18      Q.   That is the exclusion that was used to deny

19  coverage to Mr. Altschuler on the art claim; is that

20  right?

21              MR. SULLIVAN:  Object to the form of the

22  question.

23              You can answer.

24              THE WITNESS:  That's correct.

25      Q.   BY MR. POLI:  And that is -- I mean, you

DANIEL JAEGER  MARCH 02, 2023

1  know -- have you ever heard -- actually -- maybe you

2  haven't.

3          Have you ever heard the acronym DICE,

4  D-I-C-E, that refers to the typical contents of an

5  insurance policy?

6      A.  I'm not sure that I have.

7      Q.  It's kind of a handy way to think about it.  So

8  DICE, D would be declarations, I would be the insuring

9  agreement, C would be the conditions and E would be

10  exclusions.

11          So now you understand the acronym, right?

12     A.  I understand what you said, yes.

13     Q.  All four of those are typically found in a

14  typical insurance policy, namely declarations, an

15  insuring agreement, conditions and exclusions; those

16  are all typically part of an insurance policy, right?

17          MR. SULLIVAN:  Object to the form of the

18  question.

19          You can answer.

20          THE WITNESS:  Those would be parts of an

21  insurance policy, yes.

22     Q.  BY MR. POLI:  This concealment or fraud

23  provision that we're looking at on Bates 73 in

24  Exhibit 1, it's an exclusion from coverage, correct?

25          MR. SULLIVAN:  Object to the form of the

DANIEL JAEGER  MARCH 02, 2023

1  question.

2          THE WITNESS:  I think it's a provision

3  within the policy that allows an insurance company to

4  protect itself against fraudulent claims and, if there

5  are intentional, affirmative, willful

6  misrepresentations or concealments of material facts

7  during the course of the investigation or prior to the

8  investigation, it allows the insurance company to deny

9  the claim based on those.

10     Q.  BY MR. POLI:  Well, using that acronym, and we

11  just agreed that all insurance policies typically have

12  declarations, they typically have an insuring

13  agreement, they typically have conditions, they have

14  exclusions; we've agreed on that, right?

15          MR. SULLIVAN:  Object to the form of the

16  question.

17          You can answer.

18          THE WITNESS:  Those are parts of an

19  insurance policy, yes.

20     Q.  BY MR. POLI:  This concealment or fraud

21  provision that we're looking at on the screen, this

22  would be an exclusion that, if the carrier can prove

23  it's applicability, would allow the carrier to deny

24  coverage; have I got that right?

25          MR. SULLIVAN:  Object to the form of the

DANIEL JAEGER  MARCH 02, 2023

1  question.

2              You can answer.

3              THE WITNESS:  Yeah, I wouldn't

4  characterize it as an exclusion.  An exclusion is

5  something that, you know, a type of loss that would be

6  covered, for example.

7              In this particular case, and in many

8  cases, the loss would be covered potentially, except

9  for violation of this provision of the policy.  And I

10  think that's a different thing than an exclusion under

11  an insurance policy.

12     Q.  BY MR. POLI:  What did you just say, the loss

13  would be covered but for proving --

14     A.  A violation of this provision of the policy.

15     Q.  Okay.

16     A.  It protects an insurance company against

17  fraudulent claims.

18     Q.  So what you just said is, looking at this

19  concealment or fraud provision, you're saying the way

20  this works is the loss would be covered but for a

21  violation of this particular concealment or fraud

22  provision; is that what you said?

23              MR. SULLIVAN:  Object to the form of the

24  question.

25              You can answer

DANIEL JAEGER  MARCH 02, 2023

1          THE WITNESS:  I would say a loss could be

2    covered.  You know, it depends on the specific loss.

3    If an exclusion doesn't apply, but an insured, during

4    the course of the investigation, before or after the

5    loss, intentionally misrepresents or conceals material

6    facts from the insurance company, then this exclusion

7    could apply and be a basis for the insurance to deny

8    the claim.

9       Q.  Clearly if --

10          MR. SULLIVAN:  Wait, before you ask your

11   next question, because I don't want an objection, I

12   need to take a break.  So we'll take a five-minute

13   break.

14          MR. POLI:  Can I go for a couple more

15   minutes?  I would like to finish this line.

16          MR. SULLIVAN:  No, I'm going to go to the

17   restroom.  So, thanks.

18          MR. POLI:  Yeah, go ahead.  As always,

19   thank you.

20          THE VIDEOGRAPHER:  The time is 10:55 a.m.

21   We are going off record, ending Media Number 1.

22          (Whereupon, a brief recess ensued from

23   10:55 a.m. to 11:01 a.m.)

24          THE VIDEOGRAPHER:  My name is Judy

25   Thompson with Legal Video Specialists, Phoenix,

DANIEL JAEGER  MARCH 02, 2023

1   Arizona.  This begins Media Number 2 of the videotaped

2   deposition of Dan Jaeger.  The time is 11:01 a.m.  We

3   are now back on record.

4            MR. POLI:  Okay.  Go back to Exhibit 1 and

5   go to Bates 73, please.

6     Q.  BY MR. POLI:  Okay.  So we've been talking

7   about this concealment or fraud provision, correct,

8   Mr. Jaeger?

9     A.  That's correct, sir.

10    Q.  And before we got there, we kept talking about

11  the burden that SIU has that it's not just enough to

12  have an indicia or a suspicion of fraud, that SIU needs

13  to be able to prove fraud with evidence before it can

14  deny a claim for fraud.  Do you remember that testimony

15  a little bit ago?

16           MR. SULLIVAN:  Object to the form of the

17  question.

18           You can answer.

19           THE WITNESS:  I remember our discussion

20  about that topic.  Yes.

21    Q.  BY MR. POLI:  So, obviously, if SIU is going to

22  invoke this concealment or fraud provision to deny

23  coverage on a claim, like it did on this art claim, SIU

24  needs to be able to prove concealment or fraud.  SIU

25  needs evidence to prove this, right?

DANIEL JAEGER  MARCH 02, 2023

1          MR. SULLIVAN:  Object to the form of the

2    question.

3          You can answer.

4          THE WITNESS:  The investigation would have

5    to conclude that there was a breach of the concealment

6    or fraud provision.

7      Q.  BY MR. POLI:  In other words, another way to

8    put it is, the burden, the burden is on SIU to prove

9    the applicability of this concealment or fraud

10   provision, right?

11         MR. SULLIVAN:  Object to the form of the

12   question.

13         You can answer.

14         THE WITNESS:  The burden would be on the

15   insurance company to establish that there was a breach

16   or violation of the concealment or fraud provision,

17   correct.

18         MR. POLI:  Mark it, please.

19     Q.  BY MR. POLI:  And maybe this just seems so

20   obvious I shouldn't even ask you, but looking at

21   this -- I'm going to read part of it into the record.

22   "We do not provide coverage if you or any covered

23   person has intentionally concealed or misrepresented

24   any material fact."

25         So the critical language is "intentionally

DANIEL JAEGER  MARCH 02, 2023

1  concealed or misrepresented any material fact."  Do you

2  see that language?

3     A.  I do, sir.

4     Q.  Is it obvious that the word "intentionally" not

5  only modifies concealed, but it also modifies

6  misrepresented?

7        MR. SULLIVAN:  Object to the form;

8  foundation.

9        You can answer.

10       THE WITNESS:  I think the word speaks for

11 itself.  It means an intentional misrepresentation or

12 concealment of material fact.

13    Q.  BY MR. POLI:  Right.  In other words, the way

14 the way this concealment or fraud provision gets

15 justifiably invoked is, one, Chubb can prove there was

16 intentional concealment of a material fact or, two,

17 Chubb can prove it was intentional misrepresentation of

18 a material fact; is that right?

19       MR. SULLIVAN:  Object to the form.

20       You can answer.

21       THE WITNESS:  That would be the burden

22 that Chubb would have in this -- in a case where

23 they're invoking the concealment or fraud provision of

24 the policy, correct.

25    Q.  BY MR. POLI:  In either event, it's got to be

DANIEL JAEGER  MARCH 02, 2023

1    intentional.  That's the language that Chubb chose to

2    put in its Masterpiece product, its Masterpiece form;

3    whether it's concealment or misrepresentation of a

4    material fact, it has to be intentional on the part of

5    the covered person, correct?

6                   MR. SULLIVAN:  Object to the form of the

7    question.

8                   You can answer.

9                   THE WITNESS:  I would agree that that's

10   what the policy says.  That's what that provision says.

11   And, yes, it would need to be an intentional

12   misrepresentation or concealment of material fact.

13      Q.  BY MR. POLI:  So I mean, I suppose, if you

14   wanted to be more wordy, you could say, in this

15   provision, that the covered person has, quote,

16   intentionally concealed or intentionally

17   misrepresented.  In theory, you could put intentionally

18   before each of those words, but your point is,

19   Mr. Jaeger, it's not necessary.  Either way, whether

20   it's concealment or misrepresentation, it has to be

21   intentional.  That's what you're telling us, right?

22                   MR. SULLIVAN:  Object to the form; asked

23   and answered.

24                   You can answer one more time, Dan.

25                   THE WITNESS:  I think the policy, again,

DANIEL JAEGER  MARCH 02, 2023

1  speaks for itself, Mr. Poli.  It says "intentional

2  concealment or misrepresentation of material fact."

3     Q.  BY MR. POLI:  I don't think that really

4  answered my question.  I just want to make sure we're

5  on the same page here.

6          Whether it's concealment of a material

7  fact or misrepresentation of a material fact, it's got

8  to be intentional in order for there to be a denial of

9  coverage on this basis; is that right?

10          MR. SULLIVAN:  Object to the form.

11          You can answer.

12          THE WITNESS:  Again, I would refer you

13  back to the policy.  But, yes, that's my belief and

14  understanding, that it has to be intentional.

15          MR. POLI:  All right.  Thank you, sir.

16          Mark it.

17     Q.  BY MR. POLI:  And, again, just like you've

18  reviewed this policy form hundreds of times, would it

19  be fair to say that, over the last 22 years, you've

20  reviewed this concealment or fraud provision at least

21  hundreds of times?

22     A.  That would probably be a fair statement, yes.

23          MR. POLI:  Mark it, please.

24     Q.  BY MR. POLI:  I mean, have you ever reviewed

25  the deposition testimony of your claims handling expert

DANIEL JAEGER   MARCH 02, 2023

1  in this matter, Ms. Smith?

2      A.  I've reviewed certain excerpts of the

3  deposition testimony, yes.

4      Q.  I mean, she tried to tell us that the word

5  intentionally only applied to concealment.  So if it

6  was a nonintentional misrepresentation, that coverage

7  could be denied.  Have you reviewed that section of her

8  testimony?

9          MR. SULLIVAN:  Object to the form of the

10  question.

11          You can answer.

12          THE WITNESS:  I've reviewed certain

13  sections of her testimony relative to the

14  intentionality of a misrep or a concealment and

15  respectfully, I disagree with her.  I think that in

16  order for an insurance company to invoke this provision

17  of the policy, the misrepresentation or concealment has

18  to be intentional.

19      Q.  BY MR. POLI:  Okay.  That makes sense because

20  otherwise if this meant what Ms. Smith thinks it means,

21  if someone accidentally misrepresented a material fact,

22  just by accident, coverage could be denied; that

23  wouldn't make any sense at all, would it, Mr. Jaeger?

24          MR. SULLIVAN:  Form and foundation.

25          You can answer.

DANIEL JAEGER  MARCH 02, 2023

1           THE WITNESS:  Yeah.  You know, the

2    investigation sets out to make that determination and

3    if there is reasonable explanation for a

4    misrepresentation, then, obviously, we take that into

5    consideration.  It would have to be intentional and in

6    an effort to deceive.

7        Q.  BY MR. POLI:  I just want to write down what

8    you said.  In order to invoke this provision, the --

9    whatever, whether it's a concealment or

10   misrepresentation, would have to be intentional and in

11   an effort to deceive; is that what you just told us?

12       A.  That's what my testimony was, yes.

13           MR. POLI:  Mark it.

14       Q.  BY MR. POLI:  And you also said if there was a

15   reasonable explanation for an apparent

16   misrepresentation, you said you take that into account

17   at Chubb.  You guys would take that into account,

18   right?

19       A.  You know, we would always take into account

20   information, if there was a plausible explanation why

21   something was misstated or misrepresented to us.

22       Q.  I mean, partly, if someone is being asked to

23   recall something 30 years ago, most people's memories

24   are not so perfect they're going to recall everything

25   perfectly from 30 years ago.  Is that something that

DANIEL JAEGER  MARCH 02, 2023

1    you would recognize in your role as SIU senior manager?

2                MR. SULLIVAN:  Object to the form and the

3    foundation.

4                You can answer.

5                THE WITNESS:  Yeah.  I think that's fairly

6    debatable.  Some people have absolute recall.  Some

7    people are very sophisticated within a certain area and

8    they have great recall of things that happened 30 years

9    ago, 20 years ago, 10 years ago, what have you, and,

10   you know, it really depends on the facts and

11   circumstances surrounding it and you need to look at it

12   in totality of the information that was provided.

13      Q.  BY MR. POLI:  Well, I mean, one of the big

14   issues in this case is whether the art that got -- that

15   was stolen or is lost or gone, was Edition 3 of 30 or

16   was an AP, artist proof, correct?

17               MR. SULLIVAN:  Object to the form.

18               THE WITNESS:  Well, I don't know if that's

19   exactly correct, Mr. Poli, no.

20      Q.  BY MR. POLI:  You don't know if that's correct.

21   Are you aware that, at all times, the policy does not

22   say 3 of 30.  It just says Edition of 30.  Did you know

23   that that's what the policy says?

24               MR. SULLIVAN:  Object to the form.

25               You can answer.

DANIEL JAEGER  MARCH 02, 2023

1        THE WITNESS:  I know what the policy does

2  say and I know what the investigation revealed relative

3  to the increase of value for that item on the policy

4  and the confirmation that it was consistent to the Dina

5  Brown appraisal for Edition 3 out of 30.

6        Q.  BY MR. POLI:  Well, are you aware that Dina

7  Brown testified she was not only working off

8  information from others, it was secondhand information?

9  It went from Mr. Altschuler to her mother to Dina

10  Brown.  Did you know that?

11        A.  I was aware of that.  I'm also aware that all

12  of the information that was provided to Dina Brown's

13  mother came from Mr. Altschuler.

14        Q.  Okay.  So, obviously, you've been around long

15  enough to realize the more layers that information goes

16  through, the more chances for mistakes to be made.  Do

17  you realize that, in your role as a senior SIU guy?

18        A.  There could be mistakes, Mr. Poli.  But, you

19  know, Mr. Altschuler had an opportunity not only to

20  provide the information to Dina Brown's mother, which

21  ultimately got to Dina Brown, but he also had an

22  opportunity to review the appraisal that was produced

23  by Dina Brown to review it for accuracy, which

24  presumably he did, as he submitted it to his agent to

25  increase the value of the item scheduled on the policy.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  So are you aware that, from the beginning of
2  this claim, Mr. Altschuler told Chubb, I don't know the
3  exact edition number.  It could be 3 of 30 or it could
4  be an AP; are you aware of that or not?
5              MR. SULLIVAN:  Object to the form;
6  misstates the record.
7              THE WITNESS:  Yeah, I don't think that
8  that's accurate, Mr. Poli.  I think, you know, the
9  claim was made for Edition 3 out of 30.  The claim was
10  scoped by our service center, information was obtained,
11  the claim was referred to SIU.  And the first
12  indication we ever had about an artist proof
13  potentially being involved in this was when Fred White
14  interviewed Mr. Altschuler.
15    Q.  BY MR. POLI:  Right.  And that happened right
16  away.  That happened within a month of the claim.  I
17  mean, you do know that, right?
18              MR. SULLIVAN:  Object to the form.
19              You can answer.
20              THE WITNESS:  I believe the claim was in
21  December of 2019.  I believe Fred White's interview was
22  sometime in February.  So it was within 60 or 90 days
23  of the first notice of loss to Chubb.  But, you know,
24  that was the first indication.  A review of the police
25  reports indicates an edition out of 30, not the

DANIEL JAEGER  MARCH 02, 2023

 1  specific number.  The information that was provided

 2  from Dina Brown, indications -- or indicates Edition

 3  3 out of 30.  Mr. Altschuler made a claim for a

 4  scheduled item on his policy which he said corresponded

 5  with Edition 3 out of 30.  It was our understanding, at

 6  the time the claim was made, that it was for the theft

 7  or disappearance of Edition 3 out of 30, which was

 8  insured under the insurance policy.  It wasn't until

 9  Fred White interviewed Mr. Altschuler that this AP

10  edition came to light.

11      Q.  BY MR. POLI:  Okay.  Well, let's -- we may have

12  differing views on it, but let me define an issue.

13  I'll define this as the 3 of 30 versus AP issue.  And

14  you understand AP stands for artist proof, right?

15      A.  I understand that.

16      Q.  Okay.  So if I refer to the 3 of 30 versus AP

17  issue, I'll be referring to the question of whether or

18  not the art that's gone was edition 3 out of 30 or was,

19  in contrast, an AP, an artist proof.  You understand

20  what I mean by the defined term, right?

21              MR. SULLIVAN:  Object to the form of the

22  question.  Object to the characterization of the art

23  that is gone.

24              You can answer.

25              THE WITNESS:  Yeah.  It's more complex

DANIEL JAEGER  MARCH 02, 2023

1  than that.  I think that's the simplest recitation of

2  what occurred here.  Edition 3 out of 30 was insured.

3  That is what was insured on this policy.  We now know,

4  and the investigation revealed, that Mr. Altschuler,

5  you know, Mr. Altschuler never owned Edition 3 out of

6  30.  And, you know, then he says that he owned an

7  artist proof and, you know, I haven't seen any

8  information or documentation to support that he owned

9  an artist proof.  And I understand, through the

10  litigation, there is documentation that shows Mr.

11  Altschuler actually traded through Mr. Corcoran Edition

12  5 out of 30.

13          So what was insured under the policy was

14  never owned by Mr. Altschuler.  What was claimed to be

15  stolen from his mother and father's home in Tucson,

16  Arizona, was never owned by Mr. Altschuler and I

17  haven't seen any evidence that he owned an artist proof

18  either.

19      Q.  BY MR. POLI:  Right now I'm just trying to come

20  up with a shorthand definition of the issue.  And,

21  obviously, with a shorthand definition, there's a lot

22  more that gets implicated by that issue.  I'm just

23  coming up with a simple way to refer to the issue.  So

24  if I refer to the 3 of 30 versus AP issue, I'm

25  referring to whether this particular Andy Mouse was

DANIEL JAEGER  MARCH 02, 2023

1   Edition of 3 of 30 or alternatively, whether it was an

2   artist proof.  Do you understand what I mean by the

3   defined issue?

4            MR. SULLIVAN:  Object to the form.

5            You can answer.

6            THE WITNESS:  I understand what you're

7   defining as the issue, yes.

8     Q.  BY MR. POLI:  Got it.  Okay, good.  Let's move

9   on.

10           Now, you keep saying that what was insured

11  was Edition 3 of 30; that's what you've said multiple

12  times, right?

13    A.  That's what was insured under the policy, yes.

14    Q.  So not just insured, insured under the policy,

15  that's your phrase.  What was insured under the policy

16  was Edition 3 of 30.  That's your testimony here,

17  right, Mr. Jaeger?

18           MR. SULLIVAN:  Object to the form; asked

19  and answered.

20           You can answer again.

21           THE WITNESS:  Yeah.  So if the policy --

22    Q.  BY MR. POLI:  That should be a yes or a no.  If

23  you want to give a narrative afterwards, go ahead.  I'm

24  following up on what you said, Mr. Jaeger.  What was

25  insured under the policy was Edition 3 of 30; that's

DANIEL JAEGER  MARCH 02, 2023

1   what you said, right?

2           MR. SULLIVAN:  Object to the form.

3           Dan, did you get to answer the question?

4           THE WITNESS:  No, because it needs to be

5   clarified.  Yes, Edition 3 out of 30 was what was

6   insured under the policy.  The policy described it as

7   an Edition of 30.  But investigation into the Dina

8   Brown appraisal, and how we equated it to Edition 3 of

9   30, was from a communication between Mr. Altschuler and

10  his agent, Crystal & Company, at the time, I believe,

11  where they confirmed with him that the Dina Brown

12  appraisal, which was an appraisal for Edition 3 out of

13  30, corresponded to the scheduled item that was on his

14  policy.  That's what I just wanted to clarify.

15      Q.  BY MR. POLI:  Good.  Now let's look at the

16  policy and we're already in that document, Exhibit 1.

17          MR. POLI:  Let's go to Bates 28.

18      Q.  BY MR. POLI:  And as you just alluded to,

19  Mr. Jaeger, under Fine Arts, Item 2, the $1.5 million

20  of coverage for the Andy Warhol and Keith Haring prints

21  doesn't say 3 of 30; it just says Edition of 30,

22  correct?

23      A.  That's what I testified to and I gave you the

24  explanation as to how that individual item got

25  increased and was confirmed that it was consistent with

DANIEL JAEGER  MARCH 02, 2023

1  the Dina Brown appraisal.

2      Q.  Okay.  I just want to clear up something; the

3  policy, it's the policy that provides coverage for the

4  Andy Mouse prints, correct?

5          MR. SULLIVAN:  Object to the form.

6          You can answer.

7          THE WITNESS:  The policy does provide

8  coverage for the Andy Mouse silkscreens.  But, if you

9  recall, Mr. Altschuler increased the value of the

10 silkscreens from $250,000 to $1.5 million, based on a

11 Dina Brown appraisal for Edition 3 out of 30.

12          When the agent wasn't sure what -- if that

13 corresponded with Scheduled Item Number 2 of the

14 policy, they wrote to Mr. Altschuler and he confirmed

15 that, yes, the Dina Brown appraisal, which it appraised

16 Edition 3 out of 30, was for Scheduled Item Number 2.

17          So in our view, this scheduled item was

18 for Edition 3 out of 30 and that's what we insured

19 under the policy.

20     Q.  BY MR. POLI:  Okay.  Well, then how come, when

21 this policy renewed -- because the increase of coverage

22 was before this particular policy term that we're

23 looking at in Exhibit 1; is that right?

24     A.  I believe that there was a prior -- and I just

25 don't have the exact dates, Mr. Poli.  But I believe

DANIEL JAEGER  MARCH 02, 2023

1  that the Dina Brown appraisal was sometime in 2018.

2  I'm not sure when he actually submitted it and

3  increased the value.  I just don't have a recall of

4  that.

5      Q.  Well, I can show you.  Let's --

6      A.  That would be great, if you could do that.

7          MR. POLI:  Oh, actually, it's one of the

8  exhibits that's already marked.

9          Okay.  Go to Exhibit 13.  We're going to

10  go back to this, but go to Exhibit 13.

11      Q.  BY MR. POLI:  Okay.  So Exhibit 13, this shows

12  that the effective date of the increase in coverage was

13  August 2, 2018, correct?

14      A.  I'm sorry, I'm just struggling.  Can you make

15  it a little bit bigger?

16      Q.  Sure.

17      A.  Perfect, thank you.

18          8/2/18, yes.

19          MR. POLI:  Okay.  So now let's go back to

20  the policy.

21          And go to the first page.

22      Q.  BY MR. POLI:  Let's figure out the term of this

23  policy.

24          Okay.  So the term, this has an effective

25  date of 8/1/19, correct?

DANIEL JAEGER  MARCH 02, 2023

1    A.  That's correct, sir.

2    Q.  That means it would run from 8/1/19 to 8/1/20,

3  correct?

4    A.  That's correct, sir.

5    Q.  So this policy that brings us here today was

6  issued about a year, almost exactly a year, after the

7  coverage was increased, right?

8              MR. SULLIVAN:  Object to the form.

9              You can answer.

10             THE WITNESS:  Roughly a year, yes.

11             MR. POLI:  Okay.  Now go back to Bates 28.

12    Q.  BY MR. POLI:  Okay.  So here we are back to the

13  Andy Mouse silkscreens and if it's so important whether

14  Dina Brown made a mistake or not, whether

15  Mr. Altschuler made a mistake or not, if it's so

16  important to say 3 of 30, how come, when the policy got

17  reissued, it didn't say 3 of 30?

18             MR. SULLIVAN:  Object to the form of the

19  question.

20             You can answer.

21    Q.  BY MR. POLI:  Was that just --

22    A.  That's not really a question I can answer, as

23  to why the policy didn't get updated with the correct

24  information.  What I can tell you is that our

25  investigation revealed that that increase was a result

DANIEL JAEGER  MARCH 02, 2023

1    of the Dina Brown appraisal for Edition 3 out of 30.

2        Q.  So your position is the policy should have been

3    updated to say 3 of 30.  This is Exhibit 1.  But

4    somehow that didn't happen.  Is that your position,

5    Mr. Jaeger?

6                MR. SULLIVAN:  Object to the form of the

7    question.

8                THE WITNESS:  Yeah.  You know, that's an

9    underwriting question.  You know, all I can tell you is

10   that item that's scheduled Number 2 on the policy,

11   which was increased in August of 2018, which you just

12   showed me, that increase was based off an appraisal

13   from Dina Brown, which clearly indicates it's an

14   appraisal of Edition 3 out of 30.

15       Q.  BY MR. POLI:  Okay.  So let me explain the

16   following -- or put the following hypothetical to you,

17   based on your wealth of experience in SIU.  If

18   Mr. Altschuler told Dina Brown's mom he wasn't sure of

19   the edition, it might be 3 of 30; it might be an AP,

20   and if somehow that didn't get properly communicated to

21   Dina Brown and so she wrote down 3 of 30 and it's all

22   just a plausible mistake, nonetheless, that allows you

23   guys to deny coverage on a $1.5 million claim; is that

24   your position?

25               MR. SULLIVAN:  Object to the form of the

DANIEL JAEGER  MARCH 02, 2023

1   question.

2              You can answer.

3              THE WITNESS:  Yeah.  That is a

4   hypothetical and it's not consistent with our

5   investigation.  But if it was a situation where it was

6   just an innocent mistake and it was ultimately proven

7   out to be such, then we would evaluate that.  But

8   that's not what we uncovered in our investigation.  In

9   our investigation, through speaking with Elaine, was

10  that the information that was provided to her was

11  consistent with what Mr. Altschuler provided and that

12  information was relayed to Dina Brown.

13     Q.   BY MR. POLI:  So -- oh, I'm sorry.  I didn't

14  mean to interrupt you.  Are you done?

15     A.   No, it's fine.  Yep.

16     Q.   Okay.  So, clearly, based on your testimony, on

17  this 3 of 30 versus AP issue, if it's an innocent

18  mistake by Mr. Altschuler, if he told Dina Brown's

19  mother, I'm not sure of the edition, it could be 3 of

20  30, it could be AP, I'm not sure, and if that didn't

21  get communicated properly and then Dina Brown put it

22  down as 3 of 30, if all that's just an innocent

23  mistake, then the claim should be paid; is that right?

24              MR. SULLIVAN:  Object to the form of the

25  question.  Object to the foundation.

1              THE WITNESS:  Again, that's really a

2    hypothetical situation.  It didn't happen here.  That's

3    not the information that we were provided.  We were

4    trying to understand how Elaine got the information

5    that she ultimate passed along to Dina Brown.  And

6    based on our investigation, that information was

7    provided directly by Mr. Altschuler.  There was no

8    indication whatsoever of an artist proof or owning an

9    artist proof or the existence of an artist proof.  And

10   that information was provided to Dina Brown and that

11   was the genesis of her appraisal that resulted in the

12   increase in value on his fine arts schedule.

13       Q.  BY MR. POLI:  Well, that didn't answer my

14   question.  I mean, how many SIU investigations have you

15   handled or overseen in your, what, 28 years doing this?

16   It would be -- it would probably be tens of thousands

17   of SIU investigations, right?

18              MR. SULLIVAN:  Object to the form.

19              You can answer.

20              THE WITNESS:  I have no exact number,

21   Mr. Poli, but a lot.

22       Q.  BY MR. POLI:  A lot.  Well, it would be tens of

23   thousands, at a minimum, wouldn't it be, over 28 years?

24              MR. SULLIVAN:  Form.

25              THE WITNESS:  I think that that's probably

DANIEL JAEGER  MARCH 02, 2023

1  far more.  But...

2  Q.  BY MR. POLI:  But it's true --

3  A.  I don't think it's tens of thousands, Mr. Poli.

4  That's a pretty incredible number.  You know, at Chubb,

5  we don't investigate that many claims in our property

6  SIU annually.  So to get to tens of thousands, that

7  would be very difficult and the bulk of my career has

8  been with Chubb.

9  Q.  Well, it's certainly thousands of SIU

10  investigations, between not only the ones you've

11  handled, but all the people that report to you, right?

12  A.  I would agree, thousands, yes.

13  Q.  And so let me make sure I understand because I

14  still want to get an answer to the question and it's

15  all related to this 3 of 30 versus AP issue.

16       If all of this is just a mistake because

17  Mr. Altschuler, based on 30-year-old recollection, was

18  unsure, if all of this is just a mistake, the claim

19  should be paid, right?

20       MR. SULLIVAN:  Object to the form of the

21  question.

22       You can answer.

23       THE WITNESS:  Yeah.  Again, that's a

24  hypothetical, you know, question because I don't

25  believe that the evidence bears out that this was a

DANIEL JAEGER  MARCH 02, 2023

1  mistake, an innocent mistake.  However, you know, we

2  still are dealing with a situation where Mr. Altschuler

3  presented -- or represented to Elaine that it was

4  Edition 3 out of 30 and generated the Dina Brown

5  appraisal.  And even if there was a representation to

6  Elaine that there was a potential artist proof, in

7  addition to 3 out of 30, and she just mixed up the two,

8  and the artist proof ended up getting appraised by Dina

9  Brown, we would still have to conduct an investigation

10 to determine whether or not Mr. Altschuler owned an

11 artist proof, which we did and we have found no

12 evidence that is available to us, through

13 documentation, photographs, receipts, that he owned an

14 artist proof.  And the version of events as to how he

15 acquired the artist proof seems implausible.

16      So, you know, we did look at the artist

17 proof issue.  We looked at Edition 3 out of 30 and we

18 find that, you know, those -- neither one of those were

19 owned by him, at the time of this loss.

20 Q.  BY MR. POLI:  Okay.  I want you to itemize

21 every piece of evidence you have, because remember,

22 this is the fraud or concealment provision.  You've

23 admitted it's your burden to show that Mr. Altschuler

24 intentionally misrepresented something or intentionally

25 concealed something.  We've admitted -- you've admitted

DANIEL JAEGER  MARCH 02, 2023

1  that, right?

2          MR. SULLIVAN:  Object to the form of the

3  question.

4          You can answer.

5          THE WITNESS:  Yeah.  It's our burden to

6  establish that there's been a violation of the

7  concealment or fraud provision, correct.  I've said

8  that several times and that's the case.

9  Q.  BY MR. POLI:  I think that means the answer to

10  question is yes.  I want to be precise, Mr. Jaeger.

11          You have admitted that it is Chubb's

12  burden to prove that Mr. Altschuler intentionally

13  misrepresented something or intentionally concealed

14  something; have we established that?

15          MR. SULLIVAN:  Object to the form of the

16  question.

17          You can answer.

18          THE WITNESS:  It would be Chubb's burden

19  to prove that, yes, Mr. Poli.

20          MR. POLI:  Mark it, please.

21  Q.  BY MR. POLI:  Okay.  Now, tell me everything

22  you have to say that, on this 3 of 30 versus AP issue,

23  tell me everything you've got to prove, to meet your

24  burden, to prove that Mr. Altschuler lied about this.

25  Lied means intentionally doing something --

DANIEL JAEGER  MARCH 02, 2023

```
 1      A.  It --

 2                MR. SULLIVAN:  Object to the form.  Object

 3   to the foundation.

 4                MR. POLI:  You've got to quit

 5   interrupting, Bobby.  I wasn't done.

 6      Q.  BY MR. POLI:  Intentionally means you're

 7   intending to do something.  Tell me what proof you have

 8   that Mr. Altschuler was intentionally misrepresenting

 9   or concealing on this issue.  Tell me.

10                MR. SULLIVAN:  Are you done?

11                MR. POLI:  I am done.

12                MR. SULLIVAN:  Object to the form.  Object

13   to the foundation.

14                Dan, you can answer.

15                THE WITNESS:  Sure.  I'll do my best,

16   Mr. Poli.  It's a very broad question.  There is a lot

17   of information that was obtained during the course of

18   this investigation and, you know, what I'll do is

19   outline some of the key evidence that I believe

20   supports our position, the company's position, that the

21   claim was properly denied based on a violation of the

22   concealment or fraud provision.

23                We know, based on the investigation, that

24   at the time, Mr. Altschuler alleged that there was four

25   silkscreens stolen from his parents' house in Tucson,
```

DANIEL JAEGER  MARCH 02, 2023

1  Arizona.  Edition 3 out of 30, we know that that is

2  impossible, that he did not own Edition 3 out of 30 on

3  the date that he alleged that they were stolen.

4           We also know that, based on our

5  information and evidence that was educed during the

6  course of the investigation, that there's no evidence

7  that an artist proof was owned by Mr. Altschuler

8  either.  There is numerous inconsistencies throughout

9  the course of the investigation.  And when you look at

10 them in their totality, they rise to the level, in our

11 view, of intentional misrepresentation or concealment.

12 Mr. Altschuler changed the version of events related to

13 this loss on numerous occasions.  There was information

14 that these prints -- or silkscreens were purchased at

15 B1 Gallery for $5,000 and sent directly to Mr.

16 Altschuler's parents' home, where they remained for the

17 entirety of the time, up until the time they were

18 stolen.  And, you know, that they were never framed and

19 that they were never displayed and that they were in

20 perfect condition.

21           Those silkscreens, information indicates

22 that what was sent to Mr. Altschuler's house, if they

23 were sent there, was not Edition 3 out of 30 and in all

24 likelihood, was Edition 5 out of 30.  We know that

25 Mr. Burman sold editioned numbers of this Andy Mouse.

DANIEL JAEGER  MARCH 02, 2023

1  We also asked Mr. Altschuler to provide us with any

2  documentation, whatsoever, that he had regarding any of

3  these purported silkscreens that he owned.

4  We were not provided with any documentation to support

5  his statements that he owned an artist proof.  Our

6  research and provenance history indicated that his

7  version of events as to how he acquired the artist

8  proof from and -- or Keith Haring in Arizona in 1989,

9  was improbable, if not impossible, given that, you

10  know, Mr. Haring kept a detailed journal of all of his

11  travels and events and he was also very ill in 1989 and

12  passed away in February of 1990.

13           So the statement from Mr. Altschuler that

14  he acquired an artist proof from Mr. Haring in 1989 in

15  Phoenix, Arizona, is just not a truthful statement,

16  based on our investigation and the evidence we were

17  able to obtain.  Furthermore, we asked Mr. Altschuler

18  to produce any documentation, including photographs of

19  any of this artwork.  And he produced a photograph of a

20  picture of his ex-girlfriend, Lisa MacCollum, at the

21  Heard Museum.  And in the background, there was a

22  framed Andy Mouse silkscreen.  We can tell, through

23  analysis, that it was, in all likelihood, Edition 30.

24  We can't tell the actual edition number, whether or not

25  it was 3 or 5.  Coincidentally, it was one Andy Mouse

DANIEL JAEGER  MARCH 02, 2023

1  silkscreen that our investigation revealed had not been

2  sold on the open market, prior to the date of theft.

3          And when we questioned Mr. Altschuler, who

4  provided this to us, after his first EUO, but prior to

5  his second EUO, when we asked him about that, he denied

6  that he had any information about that silkscreen.

7  That he denied whether or not it was real, had no idea

8  if it was real or fake or how it got to the Heard

9  Museum, was completely inconsistent with our interview

10 of Lisa MacCollum, who indicated that Mr. Altschuler

11 actually wanted to ship this framed Andy Mouse to her

12 home and she didn't want it shipped to her home because

13 it was expensive.  So they had shipped to the Heard

14 Museum.  Mr. Altschuler was aware that this was his

15 Andy Mouse silkscreen and that it was sent there and

16 that it remained there for a period of time, until Lisa

17 MacCollum and Doug Altschuler took it from the Heard

18 Museum to the Altschuler residence in Tucson, Arizona,

19 where, you know, we were told from the beginning that

20 these subject silkscreens were never framed.  Well,

21 here's a framed one.  We were told they were Edition 3

22 out of 30.  Well, now they're an artist proof, where we

23 tried to research and investigate the artist proof.

24 There's no evidence that an artist proof was ever sold

25 to Mr. Altschuler.

DANIEL JAEGER  MARCH 02, 2023

1           When you look at this case in its

2  totality, I think any reasonable person would say that

3  these were intentional, material misrepresentations or

4  concealment of material facts by Mr. Altschuler prior

5  to the loss and also subsequent to the loss.

6     Q.  BY MR. POLI:  I assume you know that your

7  expert, Ms. Smith, testified that she saw no iota of

8  evidence of any intentional wrongdoing by

9  Mr. Altschuler.  Do you know that or not?

10           MR. SULLIVAN:  Objection; misstates her

11  testimony.

12           You can answer.

13           THE WITNESS:  I'm aware of certain aspects

14  of Ms. Smith's testimony.  And, again, I respectfully

15  disagree if she had that opinion.  Her testimony speaks

16  for itself.  After many, many years of doing this, as

17  you've stated numerous times, our investigation clearly

18  revealed that there was sufficient evidence of

19  Mr. Altschuler making material -- intentionally making

20  material misrepresentations and concealing material

21  facts relative to the claimed item.

22           And, you know, I think that there --

23  again, you've got to look at these cases in their

24  totality and there's so many inconsistencies, so many

25  versions of events, so many things that just really

DANIEL JAEGER  MARCH 02, 2023

1  don't make logical sense.  And, you know, the fact of

2  the matter is we insured Edition 3 out of 30 for

3  $1.5 million and there is no doubt, I think it's been

4  admitted in this litigation, that Douglas Altschuler

5  never owned Edition 3 out of 30.  His fallback version

6  of events is that he owned an artist proof and there is

7  no documentation that I have seen that indicates that

8  he actually owned that artist proof.  And, as a matter

9  of fact, the investigation strongly supports that he

10  could not have acquired that artist proof as he stated

11  he acquired it.

12         So based on all of the that, based on the

13  totality of the evidence, it's Chubb's position that

14  Mr. Altschuler intentionally misrepresented material

15  facts and intentionally concealed material information.

16  Q.  BY MR. POLI:  And your comment a minute ago was

17  something of the effect of no reasonable person could

18  reach any other conclusion.  Isn't that what you said a

19  moment ago?

20         MR. SULLIVAN:  Form; asked and answered.

21         You can answer.

22         THE WITNESS:  That is what I said and we

23  always approach these investigations from a reasonable

24  standpoint.  So if you look at the totality of the

25  evidence and, you know, keeping in mind all of the

DANIEL JAEGER  MARCH 02, 2023

1    different things that we uncovered during the

2    investigation, all of the representations that

3    Mr. Altschuler made, there really is, in my view, no

4    other conclusion that could be reached, other than

5    Mr. Altschuler breached the concealment or fraud

6    provision of the policy and made material

7    misrepresentations to us and concealed material facts

8    intentionally.

9       Q.  BY MR. POLI:  So if no reasonable person could

10   reach a contrary conclusion, how do you explain the

11   fact that Ms. Smith, who is your expert, and who has a

12   wealth of experience and spent enormous time reviewing

13   everything in the claims file, testified she saw no

14   indication of any sort that Mr. Altschuler

15   intentionally did anything wrong; how do you explain

16   that?

17              MR. SULLIVAN:  Object to the form;

18   foundation.

19              You can answer.

20              THE WITNESS:  Yeah.  Again, you know, I'm

21   here to give you the evidence and information that was

22   obtained during the course of the investigation and why

23   the company took the position that it did.  You know,

24   with all due respect to Ms. Smith, she has her opinions

25   and her testimony is what it is.  But I believe, based

DANIEL JAEGER  MARCH 02, 2023

1   on my education, training and experience and years of

2   doing this, that the evidence rises to the level of a

3   breach or violation of the concealment or fraud

4   provision, when you look at it in its totality.

5      Q.  BY MR. POLI:  Okay.  Tell me when you're done.

6   I don't want to interrupt.

7      A.  I'm done.  I'm done.  Sorry, sir.

8      Q.  Now, Ms. Smith, you read portions of her

9   testimony.  You already told us that, right?

10      A.  Correct, sir.

11      Q.  And no doubt, you read the portions of her

12   testimony where she said she saw no evidence, in her

13   review of the claims file, to indicate that

14   Mr. Altschuler intentionally did anything wrong.  Do

15   you remember that testimony in her deposition?

16          MR. SULLIVAN:  Object to the form.

17          You can answer.

18          THE WITNESS:  I do remember reading

19   excerpts of her testimony where she said that, yes,

20   sir.

21          MR. POLI:  Mark it, please.

22      Q.  BY MR. POLI:  So you've got -- I mean, this

23   whole issue, could any reasonable person -- I mean,

24   let's go back a step.

25          The conclusion you guys reached is that

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Altschuler intentionally lied.  He intentionally

2  misrepresented or he intentionally concealed this issue

3  of 3 of 30 versus AP; that's the conclusion you guys

4  reached, right?

5     A.  Well, its more than that.  Again, you have to

6  look at the totality of the evidence.  He's made

7  numerous misrepresentations.  The ones that were

8  material were relative to his ownership of 3 of 30, as

9  well as the artist proof and all of the facts and

10  circumstances surrounding the acquisition and

11  provenance of those two editions.

12          So you can't look at it in a vacuum.  You

13  have to look at it in its totality.  And I believe that

14  the evidence strongly supports, as I've stated before,

15  that Mr. Altschuler intentionally misrepresented and

16  concealed material facts.

17     Q.  Right.  And you even go further; you've

18  testified a few times in the last little bit, that in

19  your view, no reasonable person could reach a contrary

20  conclusion.  That's what you said, right, Mr. Jaeger?

21          MR. SULLIVAN:  Objection; form; asked and

22  answered.

23          The last time, Mike, he's answering that.

24          THE WITNESS:  It's my belief, when you

25  look at this, a fact finder, or someone evaluating the

DANIEL JAEGER  MARCH 02, 2023

1  evidence, would conclude, as Chubb did, that

2  Mr. Altschuler made material misrepresentations or

3  concealed material facts intentionally, in violation of

4  the concealment or fraud provision of the policy.

5     Q.  BY MR. POLI:  Well, since you've repeatedly

6  told us no reasonable person could reach a contrary

7  conclusion, I'm still wondering how do you explain your

8  expert, who's got decades of experience, who you hired

9  for this purpose, who spent God only knows how many

10  hours reviewing the entire claims file and reached a

11  contrary conclusion.  Is there an explanation for that,

12  other than you just think she's wrong?

13          MR. SULLIVAN:  Objection; misstates the

14  purpose of retaining Ms. Smith.

15          You can answer the question one last time.

16          THE WITNESS:  What I'll say is what I said

17  before, I respectfully disagree with her evaluation in

18  that aspect of the case.

19     Q.  BY MR. POLI:  Okay.  So that's -- the

20  explanation -- I mean, if we go to trial -- I mean,

21  you've probably testified in trial before, haven't you,

22  Mr. Jaeger?

23     A.  I have, sir.

24     Q.  About how many times?

25     A.  Not that many, not nearly as many as the

DANIEL JAEGER   MARCH 02, 2023

1    depositions that I've given.  So  I would have to say

2    maybe five to ten times.

3        Q.  Okay.  So if we go to trial, and we're sitting

4    there trumpeting what your chosen expert said, which is

5    diametrically the opposite of what you guys concluded,

6    your explanation to the jury will be, I respectfully

7    disagree with our chosen expert; have I got that right?

8                MR. SULLIVAN:  Object to the form.  Object

9    to the foundation.  Misstates the record.  You don't

10   have to answer that question.

11               MR. POLI:  That's completely an improper

12   instruction.

13       Q.  BY MR. POLI:  I want to understand what your

14   explanation would be at trial or to a jury.  I mean,

15   you've told us what you guys concluded and you think

16   that's the only reasonable conclusion.  But we've also

17   established that your expert reached the opposite

18   conclusion.  Have we established that, Mr. Jaeger?

19               MR. SULLIVAN:  Object to the form of the

20   question; asked and answered.

21               Then you can answer that question, one

22   last time.

23               THE WITNESS:  Can you repeat the question,

24   Mr. Poli?  I'm sorry.

25       Q.  BY MR. POLI:  Sure.  You guys concluded that,

DANIEL JAEGER  MARCH 02, 2023

```
1   on this 3 of 30 versus AP issue, Mr. Altschuler

2   intentionally concealed or intentionally misrepresented

3   material facts.  That's what you guys concluded, right?

4       A.  That was the conclusion of our investigation;

5   that's correct, sir.

6       Q.  And you've gone further than that; you said, in

7   your view, given the wealth of experience you've had on

8   these SIU matters, you think any reasonable person

9   would reach the same conclusion.  That's what you told

10  us a little while you ago, right, Mr. Jaeger?

11          MR. SULLIVAN:  Objection; form; asked and

12  answered three times.  He doesn't have to answer again.

13      Q.  BY MR. POLI:  Answer the question, please.

14          MR. SULLIVAN:  I instruct you not to

15  answer.

16          MR. POLI:  I'm about to terminate this

17  deposition and go to the judge.  You're being --

18          MR. SULLIVAN:  I'm happy to have you do

19  it.

20          MR. POLI:  Please don't interrupt me,

21  okay?

22          Your behavior is completely inappropriate.

23  You're like running roughshod over this testimony, to a

24  degree that I've rarely seen and it's wildly

25  inappropriate.  We're going to take a break.  I'm going
```

DANIEL JAEGER  MARCH 02, 2023

 1  to see if I can get the judge's office on the phone.

 2              MR. SULLIVAN:  Sounds good.

 3              THE VIDEOGRAPHER:  The time is 11:46 a.m.

 4  We are going off the record, ending Media Number 2.

 5          (Whereupon, a brief recess ensued from 11:46

 6  a.m. to 12:02 p.m.)

 7              THE VIDEOGRAPHER:  My name is Judy

 8  Thompson, with Legal Video Specialists, Phoenix,

 9  Arizona.  This begins Media Number 3 of the videotaped

10  deposition of Dan Jaeger.  The time is 12:02 p.m.  We

11  are now back on record.

12              MR. POLI:  All right.  Let the record

13  reflect that we just had a conversation, Mr. Sullivan

14  and I, with the law clerk for the judge, Greer,

15  G-r-e-e-r, Barkley, B-a-r-k-l-e-y.  And I discussed

16  with her my position is what's going on in this

17  deposition is a clear and rather blatant violation of

18  Rule 30(c)(2).  First, there have been objections that

19  are coaching or suggestive, which is contrary to that

20  rule.  But more egregiously, that rule says a person

21  may instruct a deponent not to answer, only when

22  necessary to preserve a privilege, to enforce a

23  limitation ordered by the court, or to present a motion

24  under Rule 30(d)(3)".

25              And then looking at Rule 30(d)(3), if, as

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Sullivan articulated to the law clerk, that I'm

2  somehow -- if I ask a question once or twice, I'm never

3  allowed to go back at it to do a summary, the remedy to

4  Mr. Sullivan is to terminate the deposition and file a

5  motion if he thinks he can actually meet the standard

6  of Rule 30(d)(3).

7          So based on the law clerk and her

8  suggestion the judge won't get involved in the middle

9  of this deposition, we're going to continue, but it

10  looks like -- we'll file a motion, based on what's

11  already occurred.  And if it keeps on going, it will

12  just be more examples.  I'm sure you --

13          MR. SULLIVAN:  I'm going to make my

14  record.

15          I agree we had a conversation with the law

16  clerk.  I disagree with Mr. Poli's reading of Federal

17  Rule of evidence, Rule 30(d)(3).  In particular, the

18  rule provides specifically at any time during a

19  deposition, the deponent or any party may move to

20  terminate or limit it on the ground that it is being

21  conducted in bad faith or in a manner that unreasonably

22  annoys, embarrasses or oppresses the deponent or party.

23          I believe that Mr. Poli is intentionally

24  engaging in a strategy where he asks the same questions

25  over and over again in a different form and fashion, in

DANIEL JAEGER  MARCH 02, 2023

1  order to wear down the witness, elicit different

2  answers, whenever he's not happy with the answers given

3  by the witness.  For him to ask questions that he

4  already knows the answer to, which is the last question

5  that I instructed my client not to answer to, is

6  precisely the type of questions that the court in the

7  cases acknowledge are annoying and harassing and that's

8  my position.  I'm happy to make the motion necessary,

9  but I'm moving to limit the testimony at this time.

10              MR. POLI:  Let me just point out, the law

11  clerk explicitly pointed out to you, Bobby, that I've

12  got a limited time for the deposition, X number of

13  hours, I believe it's seven hours, and as she pointed

14  out to you, if I want to use my time asking the same

15  question multiple times, that the penalty is I lose my

16  time; so that's number one.

17              Number two, clearly, Rule 30(d)(3)

18  requires you to terminate the deposition and make a

19  motion to the court if, indeed, you think you can

20  actually show that what I've done meets the standards

21  of unreasonably annoying, embarrassing or oppressing

22  the poor witness -- it's ridiculous.  You know you

23  can't meet that standard.  That's why you haven't tried

24  to terminate the deposition.

25              So anyway --

1        MR. SULLIVAN:  For the record, I believe

2   I've met the standard and I understand what the clerk

3   said; it does not waive or otherwise limit my ability

4   to protect my client from annoying or harassing

5   questions.

6        MR. POLI:  Do you disagree that that's

7   what Ms. Barkley just told us, that if I want to ask

8   the question multiple times, the limit on that is the

9   time limit for the deposition?  Do you agree that's

10  what she just told us?

11       MR. SULLIVAN:  I agree that she said that,

12  but I also maintain that it doesn't preclude me from

13  otherwise protecting my witness and complying with the

14  federal rules and their interpretation of the federal

15  rules by the Arizona District Court or the 9th Circuit.

16       MR. POLI:  All right.  This is egregious.

17  We'll continue.

18       I would like to read that last series of

19  questions back, Donna, because we're going to start

20  with me asking for an answer to the question, okay?

21       So if you're going to continue this

22  behavior, Bobby, you're going to have to keep doing it,

23  okay?

24       So go back over, Donna, pick up two or

25  three questions back and then read it into the record.

1           (Whereupon, the requested testimony was read.)

2           MR. POLI:  Okay.  Let's continue.

3      Q.  BY MR. POLI:  Mr. Jaeger, were you able to hear

4 the court reporter go over that so our recollections

5 are all refreshed?  Were you able to listen to that?

6      A.  I was, sir.

7      Q.  Okay.  So not only did you and your people

8 conclude that there was intentional misrepresentation

9 or intentional concealment by Mr. Altschuler on this

10 3 of 30 versus AP issue, you went further, in your

11 testimony; you said you don't think -- you think any

12 reasonable person would reach the same conclusion; do

13 you remember saying that, sir?

14           MR. SULLIVAN:  Object to the form.

15           You can answer, Dan.

16           THE WITNESS:  I do remember saying that.

17      Q.  BY MR. POLI:  Okay.  Now the obvious question

18 is, since we all know that your expert did reach an

19 opposite conclusion and your expert testified under

20 oath that she saw no indication of any intentional

21 wrongdoing by Mr. Altschuler, am I understanding that

22 your explanation for that is -- all of your explanation

23 for that is you respectfully disagree with your chosen

24 expert; is that right?

25           MR. SULLIVAN:  Object to the form.  You

1  can answer.

2         THE WITNESS:  I respectfully disagree with

3  that aspect of -- the intentional part of her

4  testimony, yes.

5     Q.  BY MR. POLI:  Okay.  Now, you do know that your

6  expert, Ms. Smith, has, like you, many decades of

7  experience in the insurance industry; you do know that,

8  right?

9         MR. SULLIVAN:  Objection; foundation.

10         You can answer.

11         THE WITNESS:  I'm not sure of the entirety

12  of her background, but I know that she's been in the

13  insurance industry for many years.

14     Q.  BY MR. POLI:  And just like you were at State

15  Farm, at one time, she spent decades of experience at

16  State Farm; is that generally your understanding?

17         MR. SULLIVAN:  Objection; form.

18         You can answer.

19         THE WITNESS:  My understanding is that she

20  was employed by State Farm at some point, yes.

21     Q.  BY MR. POLI:  Do you -- as someone who's

22  testified at trial, do you realize the difficulty you

23  face going to a jury, saying no reasonable person could

24  disagree with us, but your own expert disagrees with

25  you?  Do you realize the disconnect there, Mr. Jaeger?

DANIEL JAEGER  MARCH 02, 2023

1     MR. SULLIVAN:  Object to the form of the

2  question.

3     You can answer, Dan.

4     THE WITNESS:  Yeah.  Again, I believe that

5  the issue for Ms. Smith was intent and I believe that

6  the evidence educed during the course of the

7  investigation, when viewed in its totality, shows

8  intentional misrepresentation and concealment and,

9  furthermore, it shows that Mr. Altschuler insured

10  something with us that he didn't own and that there's

11  no evidence that he owned an artist proof and I believe

12  your own expert witness also stated at deposition that,

13  if Mr. Altschuler claimed an item which he never owned,

14  that would constitute fraud.

15     So I believe your expert is in agreement

16  with my position on this case, which is Mr. Altschuler

17  represented that he owned a certain item.  He insured

18  that item under his policy.  He never owned that item

19  and he made a claim for that item, which would

20  constitute fraud, which is exactly the reason that we

21  denied the claim.

22  Q.  BY MR. POLI:  Now, clearly you guys made a

23  conscious choice -- well, let me go back a step.

24     You certainly reviewed the denial of

25  coverage letter in connection with getting ready for

1   your deposition, right, Mr. Jaeger?

2       A.  I did.

3              MR. POLI:  Let's pull up Exhibit 4.

4              Okay.  Go a little below so he can see it.

5       Q.  BY MR. POLI:  Okay.  Can you -- it's only the

6   first page that we can see.  But can you identify this

7   as the denial of coverage letter, Mr. Jaeger?

8       A.  This is our coverage determination letter, yes.

9       Q.  It's denying coverage.  It's a denial of

10  coverage letter, right?

11      A.  It is a letter that disclaims coverage, yes.

12      Q.  Disclaims coverage, that's the same as saying

13  denies coverage, right?

14      A.  Again, Mr. Poli, we're just -- it's semantics.

15  We call it a coverage determination letter.  You call

16  it a denial letter.  But it offers our insured our

17  coverage position on the claim.

18      Q.  And your coverage position is that you're

19  denying coverage, right?

20      A.  Again, yes.

21      Q.  Okay.  If I refer to the denial of coverage

22  letter, I'm referring to Exhibit 4.  Do you know what I

23  mean by that?

24      A.  I do.

25      Q.  Okay.  And you agree, whatever terminology or

DANIEL JAEGER  MARCH 02, 2023

1  semantics, this denies coverage to the insured,

2  Mr. Altschuler, right?

3          MR. SULLIVAN:  Object to the form.

4          You can answer.

5          THE WITNESS:  It conveys our coverage

6  position, which is a denial of coverage, yes.

7          MR. POLI:  Okay, good.

8          Now, go down to the bottom part.

9  Q.  BY MR. POLI:  The bottom part of page 1 talks

10 about piecemeal production of incomplete information

11 and records, failure of the insureds to provide all

12 requested information, failure of Mr. Altschuler to

13 appear for his continued examination under oath until a

14 certain date, et cetera.

15         Now, you understand you could have, I

16 suppose, potentially, sought to deny coverage based on

17 lack of cooperation.  In theory, you could have done

18 that, correct?

19 A.  Probably we could have made an argument, but it

20 would not likely be successful.  I believe, under New

21 York law, and presumably Arizona law, it's substantial

22 compliance.  So he did comply with some of our

23 requests.  So, you know, a determination would have to

24 be made by a judge or a jury whether or not that

25 compliance was substantial.  However, there were

1  requests that were outstanding that were never complied

2  with.

3      Q.  Okay.  So I think -- to summarize what I think

4  you just said, Mr. Jaeger, that you intentionally

5  decided not to try and deny coverage on the base of

6  lack of cooperation because you believed that

7  Mr. Altschuler probably satisfied the substantial

8  compliance standard; is that what you just told us?

9          MR. SULLIVAN:  Object to the form of the

10  question.

11          You can answer.

12          THE WITNESS:  I believe your question was

13  that we probably could have denied it and my response

14  was, we may have been able to.  But, in our view, based

15  on the law in New York and Arizona at the time when we

16  were evaluating this, that he would have a strong

17  argument that he had substantially complied with the

18  EUO condition of the policy by producing the

19  documents -- some of the documents that we requested.

20      Q.  BY MR. POLI:  Let me see if I can put that in a

21  little more simplistic language, in case this gets

22  played for a jury.

23          Chubb intentionally chose not to deny

24  coverage for lack of cooperation because it concluded

25  that Mr. Altschuler would have had a strong argument

DANIEL JAEGER  MARCH 02, 2023

1   that he substantially cooperated; is that right?

2              MR. SULLIVAN:  Object to the form; asked

3   and answered.

4              You can answer it again.

5              THE WITNESS:  Yeah.  Mr. Poli, the letter

6   speaks for itself and there's not a noncooperation

7   basis of denial in the letter.  So the company chose

8   not to deny the claim for noncooperation.

9       Q.  BY MR. POLI:  That was a conscious choice that

10  the company, Chubb, made, right?

11      A.  That was a decision that we made, yes.

12      Q.  All right.  And the policy has other exclusions

13  besides the concealment or fraud exclusions, right?

14      A.  The policy does have other exclusions, yes.

15      Q.  And it has other conditions as well, right?

16      A.  The policy does have other conditions, yes.

17      Q.  And, for instance, it's got an insurable

18  interest requirement, correct?

19      A.  The policy does have an insurable interest

20  condition, yes.

21      Q.  And let's look at that.

22              MR. POLI:  Let's go back to Exhibit 1 and

23  go to Bates 77.

24      Q.  BY MR. POLI:  Okay.  We're on Bates 77 in

25  Exhibit 1, Insurable Interest.  Do you see that

DANIEL JAEGER  MARCH 02, 2023

1  provision?

2      A.  I do.

3      Q.  And it says, "We will not pay for any loss to

4  property in which you are or a family member does not

5  have an insurable interest at the time of the loss,"

6  unquote.

7          Did I read that correctly?

8      A.  You did.

9      Q.  And, again, just like you've read that fraud or

10  concealment provision hundreds of times over the

11  20-plus years, you've read this provision hundreds of

12  times in this standard form policy over 20-plus years,

13  right?

14      A.  I'm familiar with the provision, yes.

15      Q.  And what it means is that, if you don't

16  actually own the property that you're claiming is gone,

17  lost, then you can't recover on that property.  That's

18  all that means in layman's language, right?

19      A.  You have to have an insurable interest in the

20  property.

21      Q.  If you don't own it --

22      A.  Well, again --

23      Q.  We've got to stop -- okay.  Go ahead.  You

24  finish and then --

25      A.  I just want to -- I just want to finish.

DANIEL JAEGER   MARCH 02, 2023

1   Insurable interest is, you know, an interesting legal

2   issue.  Because of the fact that, you know, insurable

3   interests could mean -- pecuniary interest could mean

4   some sort of interest, and, you know, quite honestly,

5   you know, it is -- it is complex under the law.

6        Q.  Well, but --

7        A.  But, generally speaking, from what you are

8   stating, the general principal is that you need to have

9   an ownership, you need to own an item in order to make

10  a claim for that item.

11       Q.  Let me -- if, as you contend, Mr. Altschuler

12  did not own the Andy Mouse prints, and never owned the

13  Andy Mouse prints, the 3 of 30, then he would not have

14  an insurable interest in those prints, right?

15       A.  It's possible.

16       Q.  Well, you've been in this business for 30-some

17  years and you've been doing SIU work for most of those

18  years; isn't it obvious to you that if Mr. Altschuler

19  never owned the prints, he wouldn't have an insurable

20  interest in the prints; is that correct?

21            MR. SULLIVAN:  Object to the form.  Object

22  to the foundation.  Move to strike Counsel's

23  statements.

24            You can answer the question.

25            THE WITNESS:  If he did not have an

DANIEL JAEGER   MARCH 02, 2023

1  ownership interest, then this may be a provision in the

2  policy that would be applicable.

3     Q.  BY MR. SULLIVAN:  I mean, just like you made a

4  conscious decision not to assert lack of cooperation in

5  the denial of coverage letter, Exhibit 4, when you

6  issued that denial of coverage letter, you knew about

7  this insurable interest provision in the policy; would

8  that be true?

9        MR. SULLIVAN:  Object to the form.  Strike

10  Counsel's statements.

11        You can answer the question.

12        THE WITNESS:  Sure.  We were aware of this

13  insurable interest provision in the policy at the time

14  that we made the coverage division.

15     Q.  BY MR. POLI:  Okay.  Let's go back to Exhibit 4

16  and pin down the fact that there's nothing in here

17  about the supposed lack of an insurable interest,

18  Exhibit 4.

19        Okay.  So, now, as is common with a letter

20  like this, it cites in quotes what it thinks are the

21  well-written provisions in the policy; is that right,

22  Mr. Jaeger?

23        MR. SULLIVAN:  Object to the form.

24        You can answer.

25        THE WITNESS:  The letter speaks for itself

DANIEL JAEGER  MARCH 02, 2023

1  and it cites the provisions of the policy that were

2  relied on as a basis of the denial.

3     Q.  BY MR. POLI:  Okay.  Let me write down what you

4  said.  It cites in quotes the provisions of the policy

5  that you were relying on in denying coverage; is that

6  what you said?

7     A.  As a basis of the denial.

8     Q.  That you were relying on as the basis for the

9  denial.  I should learn how to take shorthand because

10  I'm not that fast.  As the basis for the denial.

11        Okay.  So to summarize, what you just told

12  us, Mr. Jaeger, is, as one would expect for a denial of

13  coverage letter like Exhibit 4, the letter cites to, in

14  quotes, the provisions of the policy that you, i.e.,

15  Chubb, were relying on as the basis for the denial; is

16  that right?

17        MR. SULLIVAN:  Object to the form.

18        You can answer.

19        THE WITNESS:  That's correct.

20     Q.  BY MR. POLI:  Okay.  Now, let's -- we're on

21  page 2.  Let's go down a little bit and see where it

22  starts quoting provisions.

23        Okay.  First, and you can see we're on

24  page 2, the first thing it quotes from the policy is

25  the definition of occurrence, correct?

DANIEL JAEGER  MARCH 02, 2023

1    A.  Correct.

2    Q.  Next, it quotes what's called the intentional

3  acts exclusion.  Is that what it quotes right after

4  that?

5    A.  It does.

6    Q.  And then it quotes another exclusion for

7  misappropriation, correct?

8    A.  That's correct.

9         MR. POLI:  Go to the next page.

10    Q.  BY MR. POLI:  And then it quotes the policy

11  period.  In other words, the term of the policy, from

12  when to when, correct?

13    A.  It says that the effective dates of the policy

14  are shown in the coverage summary and they begin at

15  12:01 a.m. on the date shown in the coverage summary.

16    Q.  And then it says the policy only applies to

17  occurrences, which was quoted on the prior page,

18  occurrences that take place while the policy is in

19  effect.  It says that, right?

20    A.  That's correct.

21    Q.  These were all quotations from the policy,

22  Exhibit 1, right?

23    A.  That's correct.

24    Q.  And then it -- notification, it quotes that,

25  which says you're supposed to tell us about the loss as

DANIEL JAEGER  MARCH 02, 2023

1  soon as possible, right?

2      A.  That's correct.

3      Q.  And then it gets to the provision you actually

4  relied on to deny coverage, the so-called concealment

5  or fraud provision that we've been discussing during

6  your deposition, correct?

7          MR. SULLIVAN:  Object to the form of the

8  question.

9          You can answer.

10         THE WITNESS:  It does cite that.  And

11 there's two claims that were addressed in this letter.

12 So the Rolex claim was denied for two reasons, and

13 notification was one of those reasons.  Because if you

14 recall, there was still no definitive answer as to

15 where this claim ultimately would be venued.  So we

16 included that because New York law has strict

17 notification requirements.

18     Q.  BY MR. POLI:  Well, whether it's New York law

19 or Arizona law, with respect to notification, you must

20 notify us of the loss as soon as possible.  Do you

21 agree, if you're going to use that as a basis for

22 denial of coverage, you've got to show prejudice from

23 the delayed notice?  Do you agree?

24         MR. SULLIVAN:  Object to the form;

25 foundation.

DANIEL JAEGER  MARCH 02, 2023

```
 1              You can answer.

 2              THE WITNESS:  No, I disagree.

 3    Q.  BY MR. POLI:  Okay.  So you think if there's a

 4    month, a few months of delay in telling you about a

 5    loss, even if you're not prejudiced at all by that

 6    passage of time, you can still deny coverage on that

 7    basis.  Is that your position, based on your many

 8    decades of experience at SIU with Chubb?

 9              MR. SULLIVAN:  Object to the form and

10    foundation.

11              You can answer.

12              THE WITNESS:  Under New York law, yes.

13    Q.  BY MR. POLI:  How about under Arizona law?

14              MR. SULLIVAN:  Form; foundation.

15              THE WITNESS:  My understanding is that in

16    Arizona, you actually have to show prejudice.

17    Q.  BY MR. POLI:  Okay.  So in Arizona, you would

18    have to show prejudice.  In New York, it's your view

19    that you shouldn't have to show prejudice, correct?

20              MR. SULLIVAN:  Object to the form; asked

21    and answered.

22              You can answer again.

23              THE WITNESS:  It's not only my view, but

24    it is the law in New York.

25    Q.  BY MR. POLI:  How about from the viewpoint of
```

DANIEL JAEGER  MARCH 02, 2023

1  just being fair and appropriate to your insured?  If

2  there's been a few months of delay but no prejudice to

3  Chubb, do you really think it's appropriate to deny

4  coverage on that basis, based on your many decades of

5  experience, Mr. Jaeger?

6           MR. SULLIVAN:  Object to the form and

7  foundation.

8           You can answer, Dan.

9           THE WITNESS:  Yeah.  We apply the facts of

10 loss and the policy conditions and we strictly apply

11 them.

12     Q.  BY MR. POLI:  I don't really think that

13 answered my question.  I was asking you about your many

14 decades of experience, as far as just what's fair and

15 appropriate.  If there's been a few months of delay,

16 with zero prejudice to Chubb, do you really think

17 that's fair or appropriate to deny coverage, yes or no?

18 Or maybe you don't have an opinion.

19           MR. SULLIVAN:  Form; foundation.  Move to

20 strike Counsel's statements.

21           You can answer.

22           THE WITNESS:  It depends on the totality

23 of the circumstances and the facts of the loss.  In

24 some instances, it may be appropriate and in some

25 instances, there may be reasonable excuses for the

DANIEL JAEGER  MARCH 02, 2023

1  delay in reporting.  And the carrier always reserves

2  the right to waive that as a defense.

3      Q.  BY MR. POLI:  Okay.  Well, anyway, to continue,

4  as far as what's quoted, after quoting the concealment

5  or fraud provision, it then quotes a section on your

6  duties after a loss; that's on the third page of the

7  denial of coverage letter, Exhibit 4, right?

8      A.  Yeah.

9          MR. POLI:  And then go down below a little

10  bit.

11      Q.  BY MR. POLI:  And then the things it quotes are

12  the examination under oath, the so-called EUO

13  provision, correct?

14      A.  That's correct.

15      Q.  And then the final thing that's quoted is the

16  provision about legal action against us, correct?

17      A.  That's correct.

18      Q.  And if we go to the next page, you'll see

19  that's all that's ever quoted, right?

20      A.  Those are the policy provisions that were

21  quoted in the letter; that is correct.

22      Q.  BY MR. POLI:  So that insurable interest

23  provision, that you knew about before issuing this

24  denial of coverage letter, is not referenced or quoted

25  in the denial of coverage letter; is that correct?

1          MR. SULLIVAN:  Object to form.

2          You can answer.

3          THE WITNESS:  That's correct.

4     Q.  BY MR. POLI:  And you said you quoted, in the

5  letter, all of the provisions that you were relying on

6  as the basis for the denial; that's what you told us,

7  right?

8          MR. SULLIVAN:  Object to the form; asked

9  and answered.

10          You can answer again.

11          THE WITNESS:  These were the policy

12  provisions that were relied upon for the basis of the

13  denial at that time, yes.

14     Q.  BY MR. POLI:  So, obviously, then, Mr. Jaeger,

15  the insurable interest provision, i.e., did

16  Mr. Altschuler own or ever own that art, the insurable

17  interest provision was not being relied on by Chubb

18  when denying coverage; is that right?

19          MR. SULLIVAN:  Object to the form;

20  foundation.

21          You can answer.

22          THE WITNESS:  It was not relied upon by

23  Chubb at the time that this letter was issued, no.

24     Q.  BY MR. POLI:  I couldn't totally hear you.  It

25  was not relied upon; is that what you said?

DANIEL JAEGER  MARCH 02, 2023

1    A.  That's correct, sure.  Yes, it was not relied

2  upon.

3    Q.  And again, just like the cooperation clause,

4  where you made a decision not to put it into the denial

5  of coverage letter, there was a conscious decision made

6  by Chubb, and by you, I assume, not to put the

7  insurable interest provision in that letter as well,

8  correct?

9            MR. SULLIVAN:  Object to the form.

10            You can answer.

11            THE WITNESS:  At the time that this letter

12  was issued, we did not include that provision of the

13  policy.

14    Q.  BY MR. POLI:  I asked a slightly different

15  question.  Just like you made a conscious decision not

16  to put in the cooperation issue in the denial of

17  coverage letter, Chubb also made a conscious decision

18  not to put the insurable interests provision into that

19  letter; is that right?

20            MR. SULLIVAN:  Form.

21            THE WITNESS:  That would be correct.  We

22  could have included it and we chose not to.

23            MR. POLI:  Okay.  Mark it, please.

24            Go to the next page.  No, actually, go

25  further down on this page.  I'm sorry.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  So you put three grounds of fraud

2    or concealment out there as far as the art claim,

3    correct?

4    A.  That's correct.

5    Q.  And the second ground was that Mr. -- I'm going

6    to put it in simple language.  Mr. Altschuler

7    misrepresented the amount of the art claim.  That's

8    what it says, right?

9    A.  He misrepresented the amount of the silkscreens

10    claim because he represented an amount for an item he

11    never owned.

12    Q.  Oh, so, in other words, I was wondering whether

13    this dealt with the -- because your -- well, your first

14    expert, your first art expert, said that the

15    silkscreens were worth $1.5 million, right?

16    A.  Our first expert confirmed that it was their

17    opinion that $1.5 million was the appropriate value for

18    the silkscreens, yes.

19    Q.  And then you, right after that, abandoned that

20    expert and went to your second art expert, right?

21              MR. SULLIVAN:  Objection; form;

22    foundation.

23              You can answer.

24              THE WITNESS:  Yeah, I completely disagree

25    with that statement.  We didn't abandon the first

DANIEL JAEGER  MARCH 02, 2023

1  expert.  We brought in another expert who had, in our

2  view, significant experience with provenance

3  investigations, so we could gain assistance in

4  determining the provenance of the claimed art by

5  Mr. Altschuler.

6      Q.  And your second expert came up with a much

7  lower value for the art, namely a little over

8  $1 million, right?

9      A.  As part of his overall provenance

10  investigation, he completed his own evaluation of what

11  the artwork, as his investigation revealed, would be

12  worth based on the condition of the claimed 3 out of 30

13  edition.  However, it really didn't matter, if the

14  claim -- and we weren't relying on that number or even

15  the first expert's number.  If the claim was valid and

16  payable, it would have been payable at the

17  $1.5 million, which was the scheduled amount, even if

18  an expert came up with a number that was lower than

19  that.

20      Q.  Right.  Because that's what the policy

21  provides, right, Mr. Jaeger?

22      A.  Yes.

23      Q.  So, in other words -- and, actually, the policy

24  provides that if 1.5 was low, the policy provides that

25  Mr. Altschuler could have recovered up to 150% of that

DANIEL JAEGER  MARCH 02, 2023

1  number, right?

2      A.  That would be correct, as long as his total

3  schedule, which it did, exceeded the $1.5 million.

4      Q.  So if Mr. Altschuler was as smart and devious

5  as you think he is, then all he really had to do was

6  insure the art for $1 million and if it was worth

7  $1.5 million, he could recover $1.5 million, under the

8  expressed language of the policy; is that right?

9              MR. SULLIVAN:  Object; form; foundation.

10              You don't need to answer the question.

11              MR. POLI:  Oh, that's another instruction

12  not to answer.

13              Mark it.

14              You're instructing him not to answer

15  questions?

16              MR. SULLIVAN:  You placed into his state

17  of mind that Dan Jaeger considered your client devious.

18  There's been no testimony to that effect.  You know it.

19  You're making an argument and trying to get him to

20  answer the questions.  Inappropriate questions,

21  harassing, in violation of our rules of procedure.

22      Q.  BY MR. POLI:  Mr. Jaeger, clearly, throughout

23  your testimony, you've repeatedly told us that you and

24  your team concluded that Mr. Altschuler intentionally

25  lied about the art claim.  That's what you've told us,

DANIEL JAEGER  MARCH 02, 2023

1  to put it in simple layman's language, right?

2            MR. SULLIVAN:  Form; asked and answered.

3            You can answer it again, Dan.

4            THE WITNESS:  That's the position the

5  company has taken, yes.

6      Q.  BY MR. POLI:  Okay.  So under your theory that

7  he's doing these bad things, if you really took the

8  time to figure out and read the policy, if he had just

9  insured that art for $1 million and paid the premium

10  for $1 million of coverage, he would have actually had

11  coverage up to $1.5 million; have I got that right?

12            MR. SULLIVAN:  Form and foundation.

13            You can answer.

14            THE WITNESS:  So, just to make sure that I

15  have your question correct.  You're saying that if he

16  insured it for 1 million, he could potentially get

17  coverage up to 1.5, if he had a current appraisal that

18  showed it was worth 1.5?

19      Q.  Yeah.

20      A.  That's correct.

21      Q.  And let's go back -- let's just make clear that

22  that's right in the policy.

23            MR. POLI:  Let's go to Exhibit 1,

24  Bates 49.

25            THE WITNESS:  I'm not disagreeing with

DANIEL JAEGER  MARCH 02, 2023

 1  you, Mr. Poli.  Although, I'm happy to look at it.
 2  But, you know, there is VAE coverage, under the
 3  Masterpiece contract, that allows you to recover 150 of
 4  the scheduled item, as long as you have additional
 5  scheduled items that exceed that VAE amount of 150%.
 6  I'm not disagreeing with you there.
 7      Q.  Well, I realize you're agreeing with me.  Let's
 8  just look at the language so a jury can see it, if we
 9  need them to.
10          MR. POLI:  Exhibit 1, Bates 49.
11          It's further up, towards the top.
12          THE COURT REPORTER:  I'm sorry, I thought
13  I went to 49.
14          MR. POLI:  Okay, down a little bit.
15          Okay.  There you go.
16      Q.  BY MR. POLI:  Total loss.  It's under the total
17  loss provision.
18          Basically, the insured can get up to 150%
19  of the amount of the itemized coverage for that
20  article, correct?
21          MR. SULLIVAN:  Object to the form; asked
22  and answered.
23          You can answer again.
24          THE WITNESS:  Yeah.  I think I've answered
25  that.  That's correct, yes.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  And the cap on it would be

2  defined on the bottom of this page, where it talks

3  about maximum amount of coverage.  For any given item

4  that's scheduled, such as the Andy Mouse art, the

5  insured could get 150% of the amount of itemized

6  coverage, up to the maximum amount of that category of

7  valuable articles, correct?

8            MR. SULLIVAN:  Object to form.

9            You can answer.

10            THE WITNESS:  I believe that's what I

11  stated earlier, yes.

12    Q.  BY MR. POLI:  Okay.  Then we are on the same

13  page.  Let's just pin down what that is.

14            As far as the maximum, let's go to

15  Bates 25.

16            Okay.  So this is kind of a summary of the

17  different categories of itemized coverage, correct?

18            THE WITNESS:  I'm sorry.  Can you make it

19  a little bit bigger?  I'm sorry.

20            That's good.  Thank you.

21            Yes.

22    Q.  BY MR. POLI:  So the single biggest risk that

23  is insured in this policy is art, correct?

24            MR. SULLIVAN:  Object to the form.

25            You can answer.

DANIEL JAEGER  MARCH 02, 2023

1          THE WITNESS:  Yes.  Fine arts, yes.

2      Q.  BY MR. POLI:  And the total amount of the

3  itemized coverage or scheduled coverage for all the

4  different fine art, as set forth here, is $5,586,000,

5  right?

6      A.  That's what it says, yes.

7      Q.  And the $1.5 million of coverage for the Andy

8  Mouse prints is part of that $5,586,000, correct?

9      A.  That's correct.

10     Q.  Okay.  So I'm sure that, when you got your CPCU

11 designation and your AIC designation -- and I'm sure

12 that somewhere along the way, in your many decades of

13 experience in SIU, you received training on the

14 importance of establishing motive, the word "motive."

15 You've received training on that, right?

16         MR. SULLIVAN:  Form.  You can answer.

17         THE WITNESS:  I understand what motive is

18 and I understand it within the context of different

19 types of insurance frauds.

20     Q.  BY MR. POLI:  And just like in a criminal

21 context, where you -- where the prosecutor often shows

22 what the motive of someone was to commit a crime, in

23 your world, where you're deciding whether to deny

24 coverage to someone, in this case for a million and a

25 half dollars, you want to look at the motive.  Why

DANIEL JAEGER  MARCH 02, 2023

1  would a person have a motive to commit insurance fraud?

2  You want look at that as well, right?

3          MR. SULLIVAN:  Object to the form.

4          You can answer.

5          THE WITNESS:  We will evaluate potential

6  motives.  But I don't know that it's legally required

7  that we establish a motive in order to deny a claim for

8  insurance fraud.

9          THE COURT REPORTER:  Deny what?  Wait,

10  what was the --

11          THE WITNESS:  A claim for insurance fraud.

12      Q.  BY MR. POLI:  Okay.  So let me make sure I

13  understand what you just said.  You'll look at motive,

14  but even if you cannot establish a motive, that's

15  still -- in your view, it's still appropriate to deny

16  an insurance claim for fraud?

17      A.  I don't think that's exactly what I said.  I

18  said we will evaluate potential motives.  Motives can

19  vary greatly, for many different reasons.  Sometimes

20  motives are very clear and apparent.  Sometimes motives

21  are as simple as greed or desire.  Sometimes motive is

22  illiquidity or liquidity issues.  You know, they run

23  the gamut.  What I told you is that I don't believe

24  that it's necessary to prove motive, when the facts and

25  evidence prove a breach of the concealment of fraud

DANIEL JAEGER  MARCH 02, 2023

1  provision.

2     Q.  Well, one approach is to prove motive.  The

3  other approach is to prove the incentives for someone

4  not to do something like you're claiming they did.  Now

5  let's talk about Mr. Altschuler.

6     A.  Uh-huh.

7     Q.  He's got like a net worth of around

8  $39 million -- or 35 million, I'm sorry.  Do you

9  remember that document?

10          MR. SULLIVAN:  Objection.  Move to strike

11  Counsel's statements.  Foundation; form.

12          You can answer.

13          THE WITNESS:  I do remember that statement

14  and there are some questions as to the veracity of that

15  statement.  Especially as to Mr. Altschuler's access to

16  some of his assets and the liquidity issues that he may

17  have.

18          But he did produce a document that shows

19  that he has, I think it was, a net worth of 30-some

20  million dollars.  You can put the document up in front

21  of me and we can go through it.  However, you know,

22  over the years, I've seen very wealthy people do things

23  that, you know, they're done for nothing more than they

24  want more or they're greedy or they want someone else

25  to pay for something that they want.  Motives vary

DANIEL JAEGER  MARCH 02, 2023

1  significantly and, you know, sometimes they're very

2  apparent.  Sometimes they're not.

3          MR. POLI:  Well, let's look at the net

4  worth documents, since that's where we are.  So I

5  believe the next exhibit number will be 33; is that

6  right?

7          THE COURT REPORTER:  Yes.

8          MR. POLI:  Okay.  Pull up the document

9  7/24/20, Doug Altschuler net worth summary.

10          Okay.  Go to the second page, please.

11          MR. POLI:  Okay.  This will be Exhibit 33,

12  I believe.

13          That's right, Donna?

14          THE COURT REPORTER:  Yes.

15          THE WITNESS:  Okay.  Mr. Poli, could you

16  just make it a little bigger?  I'm sorry.

17          MR. POLI:  Yes.  Yes.

18          Make it bigger, Donna.

19      (Whereupon, Deposition Exhibit Number 33 was

20  marked for identification.)

21      Q.  BY MR. POLI:  Is this the document you were

22  thinking?

23      A.  Yeah.  This was a document that was produced by

24  Mr. Altschuler, which I believe he testified was put

25  together from -- by an accountant or some financial

DANIEL JAEGER  MARCH 02, 2023

1   person.

2       Q.  Okay.  Did you ever prove in any way that this

3   was false or misleading?

4               MR. SULLIVAN:  Object to the form.

5               THE WITNESS:  When you say prove that it

6   was false or misleading, I do believe, based on, you

7   know, his testimony and other information, that it does

8   not necessarily represent money that he has ready

9   access to.  You know, for example, the NuPulseCV,

10  $18 million, which is a big chunk of the overall net

11  worth, I believe is contained -- or maintained, I

12  should say, in a Schwab account; that's controlled by

13  NuPulseCV and doesn't necessarily represent money

14  that's accessible to Mr. Altschuler.

15              Also on here, one of the things that

16  jumped out at me, you know, in evaluating his net worth

17  statement, was the amount of credit card debt that was

18  reflected on this statement.  There seems to be a

19  tremendous amount of credit card debt for someone as

20  purportedly as wealthy as Mr. Altschuler to incur those

21  high interest rates of credit cards -- and the other

22  piece of this is there's some significant real estate

23  holdings, as you can see on this net worth calculator.

24  But there's also some significant liabilities against

25  those real estate holdings.

DANIEL JAEGER  MARCH 02, 2023

1          So there's some debt there.  Also the

2     jewelry and the artwork and the antiques, those are,

3     you know, not necessarily liquid items.  Those are

4     items that would have to be sold and these, I think,

5     because the artwork number is pretty consistent with

6     the policy you just showed me, is actually an insured

7     value, which might not necessarily be market value.

8     And then, of course, you have to sell it, you know, in

9     order to realize the money from that asset, which takes

10    time.

11          And, overall, the checking account, for

12    example, as well, it is a substantial amount of money

13    for almost any person.  But given Mr. Altschuler's

14    monthly expenses and -- that's not a that significant

15    number for him.  Again, that's a tremendous amount of

16    money for any -- most normal people.  And then the life

17    insurance, the cash value, you know, I don't know what

18    the face value of that is, you know, and I don't know

19    that he would want to give up the face value for the

20    cash value.  I guess he can theoretically take a loan

21    against it if he wanted to, if the insurance company

22    offered that.

23          And, you know, the other thing to keep in

24    mind about some of these significant real estate

25    holdings is my understanding, from his testimony, that

DANIEL JAEGER  MARCH 02, 2023

1  he's really not the owner of any of these properties.
2  That they're actually all in trust for his wife or his
3  son.  So in order to -- you know, theoretically if he
4  wanted to get a home equity line of credit to access
5  cash, he would have to have the trust be involved in
6  that and then involve his wife and, you know, she would
7  have to be agreeable to doing something like that.
8          So I'm not sitting here telling you that
9  any of this information is necessarily false.  But what
10  I'm telling you is that it does give the appearance of
11  someone who has significant assets, but may have some
12  liquidity issues.
13    Q.  BY MR. POLI:  There's a lot to unpack there; so
14  let's try and do that.
15          First of all, what this document does, it
16  doesn't talk about liquidity, it talks about the amount
17  of assets, the amount of liabilities and if you
18  subtract the latter from the former, you get a net
19  worth.  That's what this document does, right?
20          MR. SULLIVAN:  Object to the form and
21  foundation.
22          You can answer.
23          THE WITNESS:  That's what it purports to
24  do.  I'm just giving you my assessment of the document.
25    Q.  BY MR. POLI:  Sure.  Well, let's -- we can get

DANIEL JAEGER  MARCH 02, 2023

1  to your assessment in a minute.  But right now, I would

2  like to talk about what the document does.  It sets

3  forth a bunch of numbers that add up to a certain asset

4  number of 39 million and change, correct?

5          MR. SULLIVAN:  Object to the form and

6  foundation.

7          You can answer.

8          THE WITNESS:  That's what the document

9  says, yes, sir.

10     Q.  BY MR. POLI:  And then on the other column, it

11  sets forth a bunch of liabilities that add up to around

12  $4.3 million, right?

13          MR. SULLIVAN:  Object to the form and

14  foundation.

15          You can answer.

16          THE WITNESS:  That's what the document

17  says.

18     Q.  BY MR. POLI:  And so, as with any net worth

19  type of document or income statement -- or actually

20  asset liability type of statement, not income

21  statement.

22          As with any similar document, if you take

23  the assets and you deduct the smaller liabilities, you

24  get a net worth, right?

25          MR. SULLIVAN:  Object to the form;

DANIEL JAEGER  MARCH 02, 2023

1  foundation.  Move to strike Counsel's statements.  You

2  can answer.

3         THE WITNESS:  That's how a net worth

4  statement, assets minus liabilities, would work, to my

5  knowledge.

6     Q.  BY MR. POLI:  And the net worth number here, if

7  you take the assets and subtract the liabilities, it's

8  in the upper right.  It's 35 million and change, right?

9         MR. SULLIVAN:  Object to the form and

10  foundation.

11         THE WITNESS:  Yeah.  I think that's the

12  number that I referenced, not the 39 million.

13     Q.  BY MR. POLI:  Right.  39 million would be the

14  total assets; you then deduct the liabilities and you

15  end up with a so-called net worth of -- somewhat in

16  excess of $35 million, correct?

17         MR. SULLIVAN:  Object to the form and

18  foundation.

19         You can answer.

20         THE WITNESS:  That's what the document

21  says, sir, yes.

22     Q.  BY MR. POLI:  So the home that's listed at

23  $2.6 million, that's the condo in Manhattan that

24  Mr. Altschuler and his wife and young son live at,

25  right?

DANIEL JAEGER  MARCH 02, 2023

```
 1              MR. SULLIVAN:  Object to the form and
 2    foundation.
 3              You can answer.
 4              THE WITNESS:  Yeah.  I'm not exactly sure
 5    about that.  It could be his East Hampton home.  I
 6    don't know if that --
 7       Q.  BY MR. POLI:  I believe the home that's at 2.6
 8    is the condo in Manhattan and then there is real estate
 9    other than the home at $3.1 million.  That would be the
10    home out in the Hamptons, correct?
11              MR. SULLIVAN:  Form and foundation.
12              You can answer.
13              THE WITNESS:  Yeah.  If that's your
14    representation, Mr. Poli, I have no reason to doubt
15    what you're saying.  I know he owns two homes, one in
16    the city and one in the Hamptons.  So if those two
17    numbers represent those two homes, I have no reason to
18    disagree with you.
19       Q.  BY MR. POLI:  Well, let's just pin this down.
20    You're back East.  You're maybe not right near New
21    York, but you're in the northeast area or nearby New
22    York, correct?
23       A.  I'm in the area, yes.
24       Q.  I mean, people in Arizona may or may not
25    understand this, but the people that have homes in the
```

DANIEL JAEGER  MARCH 02, 2023

1  Hamptons, that's a pretty elite slice of the New York

2  City community; wouldn't that be true?

3          MR. SULLIVAN:  Object to the form and

4  foundation.

5          You can answer.

6          THE WITNESS:  I would say that is

7  definitely an upscale area.  But how someone acquired a

8  home or got a home or when they acquired that home, I

9  can't really comment on that.  Some people have had

10  homes in the Hamptons for 50 years.  Some people just

11  bought them and spent millions and millions of dollars.

12  But it is an affluent area that New York City residents

13  usually will vacation or have second homes.

14      Q.  BY MR. POLI:  Well, in any event, which one is

15  which, we could debate, whether the 2.6 is the --

16      A.  I don't know.

17      Q.  -- one in Manhattan or it's the one out in the

18  Hamptons.  And whether the 3.1 million is, vice versa,

19  the one out in the Hamptons, you do know that

20  Mr. Altschuler and his wife and son have the condo that

21  they live in in Manhattan and then a separate home out

22  in the Hamptons.  You do understand that and you knew

23  that when you were making your decisions, right?

24          MR. SULLIVAN:  Object to the form.  Object

25  to the foundation.  Move to strike Counsel's

DANIEL JAEGER  MARCH 02, 2023

1  statements.

2           You can answer.

3           THE WITNESS:  I was aware of the fact that

4  they had two homes.  As I stated, I wasn't aware if the

5  home at the top was the condo in New York and at the

6  bottom, I wasn't sure if that's the Hampton home or

7  that was some other piece of real estate.  I do see the

8  two numbers that you represented to me -- that those

9  represent the Hampton home and the New York home -- the

10  New York City home.

11           I also do see, on the right side, that

12  there's significant financial obligations for both of

13  those homes.  So when you look at the home

14  specifically, there is significant value, but there's

15  also significant debt on them as well.

16    Q.  BY MR. POLI:  Now let's go back to motive.

17           If someone with a net worth of

18  $35 million, even if some of it's illiquid -- if

19  someone commits a $1.5 million insurance fraud, as

20  someone who's been doing SIU work for many, many

21  decades, that person could go to prison for a long

22  time, right?

23    A.  For someone who's been doing this work for a

24  long time, is there a possibility, as remote as it may

25  be, that they would go to prison -- because, as you

1   probably know, insurance fraud isn't often prosecuted,

2   there is a possibility that that could happen, but the

3   likelihood is probably relatively slim.

4       Q.  So tell me the motive.  If I'm

5   Mr. Altschuler -- and by the way, you also saw his

6   testimony that they, he and his wife, have

7   approximately a million dollars a year in income that

8   they pay taxes on.  Do you remember that testimony?

9           MR. SULLIVAN:  Object to the form.

10          You can answer.

11          THE WITNESS:  Yeah, I actually remember

12  seeing, I believe, a tax return and, you know,

13  Mr. Altschuler's income was, you know, somewhat

14  nominal.  I think it was, you know, related primarily

15  to Social Security income and maybe trust income from a

16  family trust.  She was the wage earner in the family.

17  And so the majority of the income -- and this was in

18  2019, 2020.  I don't know about '21 or '22, obviously.

19          But the majority of the income that was

20  coming into the family was from her income, not his.

21  And, you know, it was very clear that they keep a lot

22  of things separate.  For example, my recollection is

23  she was not aware of all of his credit card debt when

24  we examined her under oath.  That was a surprise to

25  her.  And, you know, again, liquidity might be an issue

DANIEL JAEGER  MARCH 02, 2023

1   for him and maybe it's not for her.  Maybe they don't

2   share income.  You're asking for potential motives; it

3   is a potential motive that he needed money and he

4   needed liquidity.  He has assets, but he needed

5   liquidity.

6       Q.  BY MR. POLI:  Now, if you find such a motive,

7   wouldn't you put that in your denial of coverage

8   letter?

9       A.  Not necessarily.  Again, I don't believe in

10  a -- in an insurer -- a breach of the concealment or

11  fraud provision, under this type of claim, that we

12  necessarily have to prove motive, unlike an arson case

13  or an intentional act case, where we're asserting that

14  someone, you know, intentionally burned down their home

15  where we have to prove the arson triangle of, you know,

16  method, means and opportunity, you know -- or motive,

17  means and opportunity, excuse me.

18            Here, you know, motive, again, can run the

19  gamut.  And, you know, I've been doing this a long time

20  and I have seen very wealthy people do things that, you

21  know, the layperson would say, why in the world would

22  they ever do that?  But it doesn't change the fact that

23  they did it and it doesn't change the fact that they

24  committed fraud.  It just might not be for any apparent

25  reason.  They may not need to do it.  They just do it

DANIEL JAEGER  MARCH 02, 2023

1  for greed or they do it for someone else, to pay for

2  something that they want or so that they can acquire

3  something that they don't have.  There's so many

4  varying motives that, you know, it's hard to

5  necessarily pinpoint.

6          We do try to evaluate that as part of our

7  investigation, as we did here.  And, again, I don't

8  disagree with you that this statement says that he has

9  $35 million in estimated net worth.  It's surprising to

10  me, based on my experience, that he would carry

11  $425,000 in credit card debt, if he had available cash

12  to resolve that.  Clearly, the $1.5 million, if he was

13  paid for this claim, would be enough to extinguish that

14  debt and provide greater liquidity.

15  Q.  Let's pin down the credit card because I think

16  you probably -- you (audio distortion) to the details

17  of this claim.

18          He maintains a small balance on a regular

19  credit card, not Amex.  And then he runs big bills

20  every month through Amex and pays them off every month.

21  That's what you guys eventually found out when you got

22  the Amex statements, right?

23  A.  Yeah.  We were talking about this statement

24  here, Mr. Poli.  And, again, we were -- you put this in

25  front of me and you asked me to evaluate this.  I was

1  giving you my assessment.

2      Q.  Let's pin down what you found out about the

3  credit cards, which is different than what you just

4  told us.

5          You guys pushed to actually get the credit

6  card statements from Mr. Altschuler; isn't that right?

7          MR. SULLIVAN:  Dan, were you done

8  answering the question?

9          THE WITNESS:  I don't even remember where

10  I left off.

11      Q.  BY MR. POLI:  You actually got the credit card

12  statements, right?

13      A.  We did.

14      Q.  And what you found out, just like

15  Mr. Altschuler told you, is he had large amounts billed

16  every month on Amex -- in fact, he has a Black Amex

17  card.  Is that something you figured out somewhere

18  along the way?

19      A.  He may.  I don't know.

20      Q.  Do you realize how hard it is to get a Black

21  Amex card, Mr. Jaeger?

22          MR. SULLIVAN:  Form and foundation.

23          THE WITNESS:  I'm not familiar with the

24  requirements of the Black Amex card, Mr. Poli.

25      Q.  BY MR. POLI:  Well, what you found out is that

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Altschuler, through his Amex card, would charge

2  large amounts on that Amex card every month and would

3  pay them every month.  Isn't that what you found out?

4      A.  I believe that the investigation revealed,

5  based on the statements that he provided, and I don't

6  know if they were complete, that he was paying off his

7  Amex bill and he was carrying a credit card with debt

8  ranging, on a monthly balance, of anywhere between 30-

9  and 35,000 or 40,000, somewhere in that range.  Still,

10 an unusual thing for someone to do with the net worth

11 purported that he had.

12     Q.  All right.  So let's see -- so, if anything,

13 this net worth calculator -- based on what you

14 eventually found, when you got the credit card

15 statements, the net worth calculator undervalues his

16 net worth because it includes too much for credit card

17 debt.  There may have been that much debt on a given

18 day, but he paid it off every month.  Isn't that what

19 you concluded?

20         MR. SULLIVAN:  Objection; form;

21 foundation.  Move to strike Counsel's statements.

22         You can answer.

23         THE WITNESS:  Yeah.  Mr. Altschuler

24 provided this to us.  It says what it says and, as we

25 asked for additional documentation, and based on what

DANIEL JAEGER  MARCH 02, 2023

1  he provided, my recollection is that Amex bill was paid

2  off on a monthly basis.

3        I don't know that, as of the time of

4  this -- why he would put that he owes $425,000, if

5  that's debt.  You know, maybe he was considering that

6  short-term debt and he was going to pay it off in

7  August of 2020; that's possible.

8        But what my recollection is is that, based

9  on those statements that he provided, is that he was

10  paying off his Amex credit card debt, but he was

11  carrying a balance, either on a Visa or MasterCard.  I

12  think there was some confusion as to what card it was,

13  of 30- to $35,000 a month.

14  Q.  BY MR. POLI:  Okay.  So let's pin down the

15  motive issue.  If I understand correctly, you never

16  came up with a motive for this apparently rich guy,

17  with a condo in Manhattan and a house in the Hamptons,

18  to commit insurance fraud to the tune $1.5 million and

19  risk going to prison, other than, gee, sometimes rich

20  people do weird things.  Is that pretty much a summary

21  of your testimony?

22        MR. SULLIVAN:  Object to the form.  Object

23  to the foundation.  Move to strike Counsel's

24  statements.

25        You can answer.

DANIEL JAEGER  MARCH 02, 2023

1          THE WITNESS:  I don't believe that that's

2   what I said.  You were asking me what potential motive

3   there could be.  And as I explained to you, it could be

4   as simple as greed.  It could be as simple as, you

5   know, he thought that he could make this claim, that it

6   would be paid relatively quickly and that he would get

7   $1.5 million that he wasn't entitled to.  It could have

8   been as simple as that.

9          And, you know, you would agree with me,

10  Mr. Poli, that rich people commit fraud too.  You know,

11  it's not exclusive to lower income people or middle

12  income people.  We look at the motive.  Here, the

13  motive is either liquidity or it's greed or just he

14  wanted the money.  And, you know, I don't believe that

15  we have to prove motive in order to be successful in

16  our defense of this case.  But those would be my

17  answers as to what the potential motives for

18  Mr. Altschuler to do what he did in this instance.

19  Q.  BY MR. POLI:  Well, you asked me whether I

20  agree with you.  Just to be clear, I think it would be

21  insane to have this guy's lifestyle and have this net

22  worth, have a condo in Manhattan, have a house in the

23  Hamptons, and take a risk on ruining your entire life

24  with a seven-year-old and go to prison for 20 years or

25  whatever.  There's no rational reason to do that.

DANIEL JAEGER  MARCH 02, 2023

1   Would you agree with me, Mr. Jaeger?

2              MR. SULLIVAN:  Object to the form of the

3   question.  Move to strike Counsel's testimony.

4              You can answer.

5              THE WITNESS:  All I can tell you is, in my

6   experience, I've seen many wealthy people that would

7   have no apparent reason to commit insurance fraud

8   commit insurance fraud.

9   Q.  BY MR. POLI:  Okay.  Let's apply a filter of

10  rationality to something.  I mean, any given person,

11  even if they're rich, can do stupid stuff.  But let's

12  apply a filter of rational behavior to this.  Adam

13  Smith is a so-called rational man in the economic

14  world.  You would agree with me that, based on what you

15  know about Mr. Altschuler, if he's a rational actor,

16  he's not going to commit $1.5 million of insurance

17  fraud and risk ruining his life, with a wife and

18  seven-year-old, and going to prison for 10 or 20 years.

19  If he's rational, you would agree, there's no motive

20  there, right?

21             MR. SULLIVAN:  Object to the form.  Object

22  to the foundation.  Object to Mr. Poli's

23  characterization of Adam Smith and his notion of wealth

24  of nations.

25             You can answer the question.

DANIEL JAEGER  MARCH 02, 2023

1           THE WITNESS:  Again, all I can tell you,

2   Mr. Poli, is that in my experience, I've seen people

3   who have made decisions that wouldn't appear to be, you

4   know, something that they needed to do out of

5   desperation.  You know, and so I can't get into

6   Mr. Altschuler's head, what he thought was rational or

7   irrational or why he did what he did.  All I can do is

8   evaluate the evidence that's in front of me and draw

9   conclusions as to whether or not I believe -- or the

10  company believes that there was a breach of the

11  concealment or fraud provision of the policy, which I

12  think the evidence supports.  Why he did it, you know,

13  that's very difficult to pin down because there's so

14  many varying reasons as to why people do what they do

15  and why they commit insurance fraud.

16     Q.  BY MR. POLI:  Okay.  Well, there's two aspects

17  to motive.  One is a motive to do something and the

18  other, which we've alluded to, is the motive not to do

19  something.  Let's take the ladder first.  It's what

20  I've been alluding to.

21           If you're a guy with this kind of net

22  worth and this kind of lifestyle, the motive not to do

23  $1.5 million of insurance fraud is you might want to

24  not ruin your life and go to prison; that would be the

25  motive not to do something, right, Mr. Jaeger?

1          MR. SULLIVAN:  Object to the form.  Object

2  to the foundation.  Move to strike Counsel's

3  statements.

4          You can answer.

5          THE WITNESS:  Potentially.  But there

6  could be a calculation that the risk is worth the

7  reward, based on the likelihood of getting caught and,

8  even if you do get caught, the likelihood of being

9  prosecuted.  So I'm sure there is some, you know,

10  deliberation.  Even among people who on -- you know, on

11  it's face, appear to have a lot of money -- of whether

12  or not it's worth the risk.  And what I can tell you,

13  Mr. Poli, from experience, is that there are more

14  people that are well-off that take that risk than you

15  probably want to believe.

16    Q.  BY MR. POLI:  Well, you're certainly testing my

17  credibility because I don't believe it for a second.

18          But, in any event -- so we've talked about

19  the motive not to do something.  Now I want to pin down

20  what motive for Mr. Altschuler to do this would be.

21  And I've heard two things.  One, it just would boil

22  down to pure greed.  That's one thing you've told us

23  about, right?

24    A.  That could be a potential motive, yes.

25    Q.  And the other motive is liquidity, that maybe

DANIEL JAEGER  MARCH 02, 2023

1  you've got a $35 million net worth, but it's not cash

2  in the bank.  It's not liquid.  That's the only other

3  motive I've heard you articulate as a possibility here;

4  is that right?

5          MR. SULLIVAN:  Object to the form.  Object

6  to the foundation.  Move to strike Counsel's

7  statements.

8          You can answer.

9          THE WITNESS:  Yeah.  I believe I mentioned

10  liquidity.  It could also be a desire to, you know,

11  obtain something that you don't have.  You know, maybe

12  he wanted a different piece of art, but didn't have the

13  money to purchase it.  Maybe he wanted, you know,

14  something else and needed the cash to be able to buy it

15  and wasn't liquid enough to be able to do it.

16          I mean, again, you know, the motives could

17  be, you know -- they vary.  And all I can tell you is

18  that, based on my experience in dealing with, you know,

19  many wealthy people over the years, that there have

20  been people that are as wealthy or wealthier than

21  Mr. Altschuler who have committed insurance fraud.

22  And, you know, it wasn't a situation that you would

23  hear about typically, of desperation.  You know,

24  burning your car because it's going to be repossessed

25  and you want the insurance money or, you know, your

Page 145

DANIEL JAEGER  MARCH 02, 2023

1  home is going to be foreclosed on; so you need to burn

2  it down or you can't pay your monthly bills.

3         I mean, all I can tell you is that there

4  can be varying motives.  And why people do things,

5  that's in their head.  You know, it's hard to always

6  pinpoint.  And, you know, I think, in these instances,

7  that's why you're not required to prove motive.

8         MR. SULLIVAN:  All right.  A good breaking

9  time, Mike?

10         MR. POLI:  Yeah.

11         MR. SULLIVAN:  Great.  How about we do 15

12  minutes so I can go get a little PowerBar and some

13  water and make a call.

14         MR. POLI:  That's fine.

15         MR. SULLIVAN:  Great.

16         THE VIDEOGRAPHER:  The time is 1:05 p.m.

17  We are going off the record, ending Media Number 3.

18         (Whereupon, a brief recess ensued from

19  1:05 p.m. to 1:24 p.m.)

20         THE VIDEOGRAPHER:  My name is Judy

21  Thompson, with Legal Video Specialists, Phoenix,

22  Arizona.  This begins Media Number 4 of the videotaped

23  deposition of Dan Jaeger.  The time is 1:24 p.m.  We

24  are now back on record.

25     Q.  BY MR. POLI:  Okay.  Mr. Jaeger, when we took a

DANIEL JAEGER  MARCH 02, 2023

1  break, we were still talking about motive and I wrote

2  down what you said.  You said, that's in someone's

3  head.  It's hard to pin down.  Do you remember saying

4  that before we took the break?

5      A.  I believe that was my testimony, Mr. Poli, yes.

6      Q.  Okay.  And we talked about two types of motive,

7  a motive to do something like $1.5 million insurance

8  fraud and a motive not to do something such as

9  $1.5 million insurance fraud.  Do you remember we

10  talked about sides of --

11      A.  You mentioned that.  You mentioned that, yes.

12      Q.  Well, let's pin down the motive to do

13  something.  The motive to commit, in this case, a

14  $1.5 million insurance fraud.

15          I think your testimony, if I understand it

16  correctly, is you never concluded that Mr. Altschuler

17  had such a motive, but, as you say, it is not necessary

18  for you to prove motive to deny coverage based on the

19  fraud or concealment provision; is that right?

20          MR. SULLIVAN:  Object to the form.  Object

21  to the foundation.  Move to strike Counsel's previous

22  statements.

23          You can answer the question.

24          THE WITNESS:  Yeah.  I think what I

25  testified to is that there is some indicia of liquidity

DANIEL JAEGER  MARCH 02, 2023

 1  issues; that could be a potential motive.  And the

 2  motive could be as simple as just he wanted something

 3  that he didn't have, meaning money.  You know, and both

 4  of those are plausible motives in this case.

 5     Q.  BY MR. POLI:  Yeah.  But you just referred to

 6  them as indicia.  And remember way back early in the

 7  depo, we put a distinction between indicia, or

 8  sometimes called red flags or suspicions, on the one

 9  hand, versus proof or evidence on the other hand.  Do

10  you remember that discussion early in your deposition,

11  Mr. Jaeger?

12              MR. SULLIVAN:  Object to form of the

13  question.

14              You can answer.

15              THE WITNESS:  I do.  You're talking about

16  two separate issues, though.

17              You know, again, I don't believe we have

18  to prove or establish motive, why Mr. Altschuler

19  committed insurance fraud.  And I'm telling you, based

20  on our investigation, that those could be the reasons

21  why he did it.

22              As far as red flag indicators and indicia

23  of fraud, those would be a basis to begin an

24  investigation.  And then you would have to look at the

25  results of the investigation to determine whether or

DANIEL JAEGER  MARCH 02, 2023

1   not they rise to the level of a breach of the

2   concealment or fraud provision of the policy.

3       Q.  BY MR. POLI:  Okay.  Motive to do something

4   like this.  Did you and your team ever prove, or, as

5   you put it, establish a motive for Mr. Altschuler to

6   commit a $1.5 million insurance fraud?  Did you ever

7   prove or establish that here?

8               MR. SULLIVAN:  Object to the form.  Object

9   to foundation.

10              You can answer.

11              THE WITNESS:  Yeah.  It's very difficult

12   to prove, Mr. Poli, greed.  And so, you know, it's very

13   difficult to prove greed because there's no apparent

14   reason, other than they're greedy.

15              So, you know, when we look at that as

16   potential motive, we know it exists and we know it's a

17   reason for people to commit insurance fraud.  But on

18   paper, can you necessarily prove greed?  It's

19   challenging.  It's challenging.  But it exists and --

20   it really does.  And so, you know, I would have to say

21   that, you know, that's a virtually -- you know, it's

22   very challenging to prove greed, unless there's an

23   admission, which rarely there is.

24       Q.  BY MR. POLI:  I think what you were getting

25   ready to say, it's virtually impossible to prove that

DANIEL JAEGER  MARCH 02, 2023

1  unless someone admits it?

2         MR. SULLIVAN:  Object to the form.  Object

3  to the foundation.

4         Is there a question?

5         MR. POLI:  Yeah.  I'm predicting what I

6  think he was getting ready to say before he stopped

7  himself.

8    Q.  BY MR. POLI:  Were you just getting ready to

9  say that it's virtually impossible to prove greed as a

10  motive, unless someone admits it; is that what you were

11  getting ready to say?

12    A.  I stopped myself because I didn't want to say

13  impossible.  What I'm saying is it's very difficult to

14  prove greed, to get into someone's head as to why they

15  would commit insurance fraud, absent some apparent

16  reason.

17    Q.  Okay.  So in this case, then, the answer to the

18  question I posed to you a minute ago, because I want to

19  get an answer to it, in this case, as far as a motive

20  for Mr. Altschuler to commit a $1.5 million dollar

21  insurance fraud, because of the difficulties of proving

22  something as subjective as greed, you were never

23  able -- you and your team were never able to prove or

24  establish that Mr. Altschuler had a motive to commit a

25  $1.5 million insurance fraud.  Have we established that

DANIEL JAEGER  MARCH 02, 2023

1   through your testimony now?

2              MR. SULLIVAN:  Object to the form;

3   foundation; asked and answered.

4              Dan, you can answer one more time.

5              THE WITNESS:  Again, you know, proving

6   that he's greedy is challenging because that's

7   something only he would know.  And, you know, without

8   an admission from him that I did something as a result

9   of greed, it's a challenging motive to prove.  But I'll

10  say it again.  I've said it like four times; I don't

11  believe, in this particular case, you need to establish

12  the motivations for Mr. Altschuler to have committed

13  insurance fraud.  I'm giving you what could be

14  potential reasons for why he did what he did.

15  Q.  BY MR. POLI:  Okay.  I know you've told us

16  multiple times you don't think you have to prove a

17  motive in order to deny coverage on this claim based on

18  the fraud or concealment provision.  I realize you've

19  said that.  I'm just trying to pin down what I think

20  you're telling me.

21             What I think you're saying is, because of

22  the inherent difficulty of proving greed on the part of

23  someone, unless they make an admission, in this case,

24  you and your team were unable to prove or, as you put

25  it, establish that there was a motive for

1    Mr. Altschuler to commit a $1.5 million insurance

2    fraud; is that right?

3               MR. SULLIVAN:  Object to the form.  Object

4    to the foundation.  Misstates his testimony.

5               You can answer.

6               MR. POLI:  Please stop coaching.

7               Mark it, by the way.  He's not supposed --

8               MR. SULLIVAN:  Please do mark it.

9               MR. POLI:  He's not supposed to do

10   objections that imply the answer you should give.  So

11   we're going to mark that because that will be another

12   point in this transcript to bring to the attention of

13   the judge.

14               Okay.  Let me start over and hopefully

15   there won't be another coaching objection.

16               MR. SULLIVAN:  I'm going to make my record

17   on it.  You specifically stated what he had testified

18   to and improperly characterized his testimony.  And

19   either you're doing it intentionally or it's inartful,

20   but it's improper.

21               MR. POLI:  It's called cross-examination,

22   Bobby.  And when you say, asked and answered, you're

23   implying to the witness that he should repeatedly give

24   an answer he's given before; you're thereby implying or

25   suggesting an answer and it's inappropriate.  And I

DANIEL JAEGER  MARCH 02, 2023

 1  assume you've been doing this long enough that you know

 2  it's inappropriate.  And I'm going to take it to a

 3  motion to the judge.  You seemed to have backed off

 4  since the break and since talking to the law clerk; you

 5  seemed to have somewhat backed off on the instructions

 6  not to answer.  But even so, the suggestive answers and

 7  coaching objections are wrong.

 8              MR. SULLIVAN:  I'm objecting to asked and

 9  answered because I'm going to enforce my time

10  limitation and I'm going to utilize searching this to

11  find the basis for my objections and your repeated

12  harassing questions.  That's my record on it.  You can

13  make your record --

14              MR. POLI:  I've got seven hours and I'm

15  not going past seven hours.

16              MR. SULLIVAN:  Great.

17              MR. POLI:  So regardless, all these

18  objections, we'll take it to the judge.  And I mean,

19  I'll see what Judge Bury thinks about this because I

20  think it's widely inappropriate and you're obviously an

21  experienced litigator; so you know better.

22              MR. SULLIVAN:  As are you and you do it

23  well.

24              MR. POLI:  Yeah, whatever, we'll take it

25  up.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  All right.  Let's go back over

2  this.

3         We've been talking about motive.  There's

4  motive to do something and there's motive not to do

5  something.  We've established those are two sides of

6  the same coin, right, Mr. Jaeger?

7         MR. SULLIVAN:  Form; asked and answered.

8         THE WITNESS:  There are two different

9  bases to either take action or not take action.

10   Q.  BY MR. POLI:  Okay.  Now right now, I'm talking

11  about the motive to do something.  In this instance,

12  the motive that Mr. Altschuler would have to commit a

13  $1.5 million insurance fraud, given his net worth,

14  given his lifestyle, given the, you know, family

15  situation, it's whatever, given everything you know.

16  As far as a motive to do this, if I understand

17  correctly, you're saying that, because of the inherent

18  difficulties of establishing a motive to do something

19  as intangible as being greedy, unless someone makes an

20  admission, which they didn't here, you guys were unable

21  to prove motive, motive to commit this $1.5 million

22  alleged fraud; is that right?

23         MR. SULLIVAN:  Object to the form and

24  foundation.

25         Mark the question.

DANIEL JAEGER  MARCH 02, 2023

```
1              You can answer.

2              THE WITNESS:  What I've said is -- I've

3    given the plausible reasons as to what his motivations

4    may be.  Do I know specifically why Mr. Altschuler

5    decided to do what he did?  No, I don't and I don't

6    think we have to prove that.

7       Q.  BY MR. POLI:  Plausible reasons don't equal

8    proof.  They don't equal evidence; is that right?

9              MR. SULLIVAN:  Object to the form.

10             You can answer.

11             THE WITNESS:  They could be.  When you

12   look at the totality of the circumstances and the

13   evidence, it could be plausible and one could conclude

14   that that was the motivation for doing something.

15      Q.  BY MR. POLI:  Is that what you've concluded?  I

16   want to know one way or the other.  Did you conclude

17   that Mr. Altschuler, given everything you knew about

18   him, net worth and such and similar things, did you

19   conclude he had a motive to commit a $1.5 million

20   insurance fraud, yes or no?

21             MR. SULLIVAN:  Object to the form;

22   foundation.

23             You can answer.

24             THE WITNESS:  Yeah.  The motive for him to

25   have done this would have either been liquidity or
```

DANIEL JAEGER  MARCH 02, 2023

1  greed.

2     Q.  BY MR. POLI:  Again, I want to know, did you

3  conclude that he had a motive to do this?  You

4  concluded he committed a $1.5 million insurance fraud.

5  Did you conclude there was a motive for him to do that?

6              MR. SULLIVAN:  Object to the form; asked

7  and answered.  He just answered it.

8              MR. POLI:  No, he didn't.  I've asked it

9  multiple times and I can't get an answer.  I've gotten

10 answers about, oh, gee, it's so hard to prove that

11 unless someone makes an admission and all this.

12    Q.  BY MR. POLI:  I just want an answer,

13 Mr. Jaeger.  Did you --

14             MR. SULLIVAN:  Do you want me to tell you

15 what he just testified to, the answer to your question?

16             MR. POLI:  Limit your objections to form,

17 like you're supposed to, and if you don't do that, it

18 will be in front of the judge.  I don't want all these

19 coaching and speaking objections.  So, no, I don't want

20 you to give me another narrative.

21    Q.  BY MR. POLI:  So, Mr. Jaeger --

22             MR. SULLIVAN:  For the record -- for

23 record, I've given no narrative.  He just answered the

24 question directly.  He can answer it again.

25             MR. POLI:  You're doing it again.  And,

DANIEL JAEGER  MARCH 02, 2023

1  obviously, I can't control you.  So you're going to do

2  what you're going to do and that's why it's going to

3  end up in front of the judge.  So --

4          MR. SULLIVAN:  I think it's that your

5  questions are harassing, inappropriate, in violation of

6  federal law.

7          MR. POLI:  Then you should terminate this

8  deposition and file a motion.  And you, obviously,

9  don't believe that because you know better than to do

10  that.  So let's continue.

11          MR. SULLIVAN:  I disagree with your

12  position, but we can go on.

13    Q.  BY MR. POLI:  Mr. Jaeger, I'm talking about the

14  motive for Mr. Altschuler to allegedly commit a

15  $1.5 million insurance fraud, given his net worth and

16  given his lifestyle and everything else you know.  Did

17  you conclude that he had motive to do that?

18          MR. SULLIVAN:  Object to the form;

19  foundation.

20          You can answer, Dan.

21          THE WITNESS:  Based on the evidence that

22  we have, the apparent motive is either liquidity or

23  greed.

24    Q.  BY MR. POLI:  So you did conclude that he had a

25  motive, either liquidity or greed; is that right?

DANIEL JAEGER  MARCH 02, 2023

1           MR. SULLIVAN:  Form.

2           You can answer.

3           THE WITNESS:  There was some motivation,

4  Mr. Poli, for Mr. Altschuler to do what he did and it

5  was either liquidity or greed, based on --

6      Q.  BY MR. POLI:  Okay --

7      A.  Hold on.  Just let me finish, please.  Based on

8  the information that we have to date.

9      Q.  So, I mean, your testimony has been how hard it

10  is to prove such a thing.  So what you concluded here,

11  before you denied coverage, is that Mr. Altschuler had

12  a motive to commit a $1.5 million insurance fraud,

13  based on either liquidity or greed or both; is that

14  right?

15           MR. SULLIVAN:  Object to the form; asked

16  and answered.

17           You can answer again.

18           THE WITNESS:  Mr. Poli, based on the

19  evidence, those would be the two motives that we are

20  aware of that would be the basis for Mr. Altschuler to

21  commit insurance fraud, yes.

22           MR. SULLIVAN:  And if you ask him that

23  question again, I will terminate the deposition.

24           MR. POLI:  You do what you want.  I'm done

25  with you, okay?  You're going --

DANIEL JAEGER  MARCH 02, 2023

1          MR. SULLIVAN:  Okay.

2          MR. POLI:  -- to behave as you want.  I

3    can't control you.  Go ahead.  I mean, just act the way

4    you want and we'll take it up.

5        Q.  BY MR. POLI:  So the point is, none of that's

6    in your denial of coverage letter, Exhibit 4; is that

7    right, Mr. Jaeger?

8        A.  That is not spelled out in the denial -- denial

9    letter, excuse me, and nor do I believe it has to be.

10        Q.  Would you normally -- if you think there's a

11    motive for someone to commit a seven-figure fraud,

12    would you normally put that in a denial of coverage

13    letter?

14        A.  Not necessarily, no.

15        Q.  Well, sometimes you do; sometimes you don't?

16        A.  It depends.  For example, if it was an arson

17    case and we were laying out motive, means and

18    opportunity, which we're required to prove in order to

19    disclaim coverage for an intentional act, we may go

20    into more detail as to what the motive is for the

21    individual to have set their house on fire.  But in a

22    particular case like this where we're declining

23    coverage -- or denying coverage based on a breach of

24    the concealment or fraud provision, it's not necessary,

25    in my view, to place in the letter what the insured's

DANIEL JAEGER  MARCH 02, 2023

1  motivations were for misrepresenting and concealing

2  intentionally material facts.

3      Q.  Now, let's talk about the flip side of motive,

4  the motive to not commit a $1.5 million insurance

5  fraud.  And the obvious motive not to do such a thing

6  here is that someone's got a really great lifestyle

7  with a lot of money and a wonderful existence with

8  their family and they could go to prison.  Did you

9  consider that issue or not?

10          MR. SULLIVAN:  Object to the form;

11  foundation.

12          You can answer.

13          THE WITNESS:  What we considered is the

14  facts and evidence that were educed during the course

15  of the investigation and whether or not there was proof

16  and evidence that Mr. Altschuler made intentional

17  misrepresentations and concealments of material fact.

18          We applied the evidence obtained in the

19  investigation against the policy and concluded that

20  Mr. Altschuler intentionally misrepresented and

21  concealed material facts relative to the ownership and

22  procurement of the silkscreens.  That's what we did.

23      Q.  BY MR. POLI:  Okay.  That didn't answer my

24  question; so we're going to have to go back over it

25  until you answer it one way or the other.  The obvious

DANIEL JAEGER   MARCH 02, 2023

1   motive for Mr. Altschuler not to commit a $1.5 million

2   insurance fraud is he's got an incredibly great

3   lifestyle and he could go to prison for 10 or 20 years.

4   Did you consider that issue or not?

5           MR. SULLIVAN:  Object to the form;

6   foundation.

7           You can answer.

8           THE WITNESS:  Yeah.  Mr. Poli, I -- you

9   know, these representations that Mr. Altschuler has

10  this fantastic lifestyle and everything is great and

11  hunky-dory, you know, we -- I don't know where you're

12  getting that from and maybe that's truth, maybe you've,

13  you know, had those discussions with your client.  I

14  have no idea.  What we were looking at is what were the

15  facts and the evidence that were obtained in the

16  investigation?  And, like I said, you know, people will

17  do things for varying reasons and some people are

18  willing to take that risk knowing that the likelihood

19  of them being caught, first of all, by the insurance

20  company is not that great.  And then even if they do

21  get caught, the chances of them actually being

22  prosecuted and serving jail time is slim to none.

23          If you look at the insurance fraud cases,

24  across this country, the ones that have been reported

25  to law enforcement or reported to departments of

DANIEL JAEGER  MARCH 02, 2023

1   insurance with law enforcement responsibilities, very

2   few, if any, actually get prosecuted.  Only the most

3   egregious.

4           So, you know, did we look at his lifestyle

5   and why he would, you know, not commit insurance fraud?

6   Not really.  We looked at the evidence that was, you

7   know, obtained in the investigation.  We applied it

8   against the policy.  And, you know, we determined he

9   made intentional misrepresentations and concealed

10  material facts.  That's how it was evaluated.

11      Q.  BY MR. POLI:  That was a long narrative, but

12  towards the end, I think you said the words not really.

13  Is that what you just said a minute ago, sir?

14      A.  I don't know, Mr. Poli.

15      Q.  I'm talking about 20 seconds ago.  Do you

16  remember saying "not really"?

17      A.  Not really, I don't.  But you can have it read

18  it back.  I'm sorry.

19      Q.  Earlier --

20      A.  I'm sorry.  I apologize.

21      Q.  I just want to get an answer because so far --

22  until you're almost done with that very long narrative,

23  I don't think you're answering it, but I think you did.

24          So with respect to what I'm understanding

25  you to say, Mr. Jaeger, with respect to the obvious

DANIEL JAEGER  MARCH 02, 2023

1  motive for Mr. Altschuler not to commit a $1.5 million

2  insurance fraud because he could go to prison, you said

3  you did not really look at that; is that right?

4            MR. SULLIVAN:  Object to the form.  Move

5  to strike Counsel's characterization of my client's

6  testimony.

7            You can answer.

8            THE WITNESS:  What I said is that we

9  didn't look at why he would or would not necessarily

10  commit insurance fraud.  We looked at motive and, you

11  know, we always do.  And we looked at the facts and the

12  evidence and we evaluated it as we always do and we

13  drew conclusions based on those facts and in evidence,

14  in context of the insurance policy.

15            So that's how we evaluate it, Mr. Poli.

16  That's the answer that I have for you.

17      Q.  BY MR. POLI:  Okay.  So I'm going to, again,

18  parrot back to you what I wrote down that you just

19  said.  We did not look at why he would or would not

20  commit insurance fraud.  Is that what you just said a

21  moment ago?

22            MR. SULLIVAN:  Object to the form.

23            You can answer.

24      Q.  BY MR. POLI:  If it is -- if you're good with

25  that testimony, then we'll move on to another topic?

DANIEL JAEGER  MARCH 02, 2023

```
1    A.  No.  No --
2             MR. SULLIVAN:  Object to the form.
3             You can answer.
4             THE WITNESS:  So -- and, again, it's
5    just --
6       Q.  BY MR. POLI:  I'm not done with my question.
7    So we've got to quit talking over each other.
8             MR. SULLIVAN:  Well, Mike, the problem is
9    you're cutting out; so we can't tell you're actually
10   asking the question.  I'm sorry, but your mic's not
11   working.
12            MR. POLI:  Well, I don't know if that's
13   true or not, maybe it is.  Anyway --
14            MR. SULLIVAN:  No maybe.  Ask the court
15   reporter, that's what's happening to me.
16            MR. POLI:  Am I cutting out, Donna?
17            THE COURT REPORTER:  Well, I think that if
18   someone starts to talk, we can't hear you.
19            MR. POLI:  So the only reason I'm cutting
20   out is someone else interjects.
21            MR. SULLIVAN:  Or you're talking over
22   them.
23      Q.  BY MR. POLI:  Well, anyway, I think what you
24   just told me, because I wrote it down -- that's why we
25   have a transcript, Mr. Jaeger.  If this is the accurate
```

DANIEL JAEGER  MARCH 02, 2023

1  testimony you're going to give, then we'll move on to

2  another topic.

3           I think what you just told me is that in

4  this instance, we did not look at why Mr. Altschuler

5  would or would not commit insurance fraud; is that what

6  you said a minute ago?

7  A.  Yeah, and let me --

8           MR. SULLIVAN:  Object to the form.

9           THE WITNESS:  Yeah, let me clarify.

10  Because we've just been over this for 15 minutes now

11  and I've testified to the question numerous times.  I

12  think I said earlier, and throughout my testimony,

13  Mr. Poli, that we always evaluate potential motives for

14  committing insurance fraud and that's something that we

15  look at and it's part of our analysis and our

16  evaluation.  As far as why he would not commit

17  insurance fraud, we don't necessarily evaluate, that

18  because we evaluate the evidence that's obtained in the

19  investigation.  And if that evidence rises to the level

20  of intentional misrepresentation or concealment, we

21  apply that to the policy and we don't focus on the

22  motive.

23           It's great to understand motive.  We would

24  like to understand motive.  Sometimes we do understand

25  motive and it's very well-documented and easily

DANIEL JAEGER  MARCH 02, 2023

1  understandable and sometimes it's not.  And we evaluate

2  in the investigation, the evidence that's obtained and

3  we apply it to the policy and we make an informed

4  decision as to liability under the contract.

5              MR. POLI:  Okay.  So mark that.

6      Q.  BY MR. POLI:  Do you realize -- did you

7  evaluate the timing, that Mr. Altschuler was insuring

8  these Andy Mouse prints from at least 2010?  Did you

9  evaluate that factor?

10             MR. SULLIVAN:  Object to the form.

11             THE WITNESS:  Yeah, we tried to get as

12  much information as we could about the insurance

13  relative to the Andy Mouse prints and go back as far as

14  we could and understand completely all the insurance

15  that he had around his -- you know, these prints.

16             I will tell you, just from experience,

17  Mr. Poli, that it is not unusual for someone with a

18  schedule the size of Mr. Altschuler, which, as you

19  probably know, because you've looked at all of this,

20  the schedule was significantly greater at the time and

21  then it was reduced and things were added and removed,

22  that people forget to remove things and, you know, take

23  things off and they continue to insure items for years

24  that they may not even own any longer.  So we did look

25  at that, yes, we did.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  And you concluded, and I'll show
2  you a document in a moment, that Mr. Altschuler had
3  these Andy Mouse prints insured going all the way back
4  to 2010 with AIG.  You reached that conclusion, right?
5    A.  I believe that 2010 was around the same time
6  frame.  It might have even been earlier.
7    Q.  Yeah, it might have been.
8    A.  Yeah, I'm not sure.  We didn't get the policies
9  for Mr. Altschuler going all the way back to
10  acquisition or, you know, purported acquisition of the
11  silkscreens.  And, you know, we never saw that there
12  was ever two sets of silkscreens on any policy and we
13  never saw anything ever related to an artist proof
14  either.  So I -- you know, that was part of our
15  analysis.  We looked at that stuff and we considered
16  it.
17        MR. POLI:  Pull up the next document,
18  which will be Exhibit 34, 9/18/20 e-mail, Andy Mouse
19  insured with AIG as of 2010.
20        THE COURT REPORTER:  Say the date again.
21        MR. POLI:  9/18/20.
22        THE COURT REPORTER:  Oh, 9/18.  Got it.
23        MR. POLI:  Thanks.
24        (Whereupon, Deposition Exhibit Number 34 was
25  marked for identification.)

DANIEL JAEGER  MARCH 02, 2023

1      Q.  BY MR. POLI:  Okay.  I assume you've probably

2   seen this document.  It's one of the file notes, claims

3   notes.  The author is your investigator, Fred White.

4   And, you know, basically he parrots an e-mail from, I

5   guess, a company called Alliant Private Client, which

6   is related to AIG.  And you'll see, "we were able to

7   find for this client, which includes the 2010-2011

8   renewal through AIG, which was the last term before it

9   was moved to Chubb."  And he refers to Item 170.

10              Have you seen this document before,

11   Mr. Jaeger?

12              MR. SULLIVAN:  Object to the form.

13              You can answer.

14              THE WITNESS:  Yeah.  I have a vague

15   recollection of seeing it, Mr. Poli.

16              MR. POLI:  Now, let's look at the Item

17   170, which is the Andy Mouse prints.

18              Go to -- it's the next-to-the-last page.

19   It should be Bates 891.

20              There you go.  Right above there a little

21   bit.

22      Q.  BY MR. POLI:  And you'll see it doesn't even

23   say Edition of 30.  It just says Andy Mouse -- Andy

24   Warhol, Andy Mouse, four pieces, $250,000.

25              Do you see that?

DANIEL JAEGER   MARCH 02, 2023

```
1        A.   I do.

2        Q.   Okay.  So I assume you realize, Mr. Jaeger,

3   these are the same prints you don't think he ever

4   owned.  So that would mean that if he's insuring these

5   prints back in 2010, this was a fraud that he had to

6   plan for 10-plus years in order to spring it on Chubb.

7   Do you realize that factor?  That --

8               MR. SULLIVAN:  Object to the form;

9   foundation.

10              You can answer.

11              THE WITNESS:  Yeah.  I disagree with that,

12  as I explained earlier.  One, I believe that there was

13  an appraisal from a guy named James Corcoran and I

14  think that may have been around 2008 and there may have

15  been some subsequent appraisals where it labels it

16  Edition 30.  And I don't know what AIG did, as far as

17  how they labeled things on their policy, the detail

18  that they got into.

19              What I do know is that in 2018,

20  Mr. Altschuler increased the value of his scheduled

21  artwork, for Edition 3 out of 30, on his policy with

22  Chubb and that's the investigation that we undertook to

23  determine whether or not, at that time of the loss in

24  2019, he actually owned Edition 3 out of 30.  And I

25  don't think there's any refuting the fact, as we sit
```

DANIEL JAEGER  MARCH 02, 2023

1    here today, that he did not.  And I think that's been

2    confirmed in the litigation and it's been confirmed in

3    our investigation.  And so he didn't own what he

4    insured under the Chubb policy, which he increased to

5    $1.5 million.

6        Q.  BY MR. POLI:  So this is -- I mean, he bought

7    one set at a gallery in Santa Monica in '87 and sold

8    it, according to everything he represented, traded it

9    for some other art, around 2000.  Do you remember that?

10                MR. SULLIVAN:  Object to the form;

11   foundation.

12                You can answer.

13       Q.  BY MR. POLI:  Do you remember those details

14   were uncovered in the investigation?

15       A.  So I will say this, I don't know if it was 2000

16   or 2002.  I think if there's an e-mail or some

17   documentation from James Corcoran Gallery that

18   documents that -- but I will tell you, Mr. Poli, that

19   was never produced to us during the claim

20   investigation.  And, in fact, when we interviewed

21   Mr. Corcoran, he denied ever trading any Andy Mouse

22   artwork for Mr. Altschuler.

23                But if you show me the document, I would

24   be happy to look at it.  I just don't know the year, if

25   it's 2000 or 2002.

DANIEL JAEGER  MARCH 02, 2023

1    Q.   If Mr. Altschuler is insuring a set of Andy

2    Mouse prints in 2010 that he never owned, then this

3    fraud would have to have started at least in 2010, so

4    that it could be consummated 10 years later.  Isn't

5    that --

6              MR. SULLIVAN:  Object to the form and

7    foundation.

8              You can answer.

9              THE WITNESS:  Yeah, I don't know that it

10   would have to be consummated or they even thought about

11   it until 2018.  It could be as simple as that it

12   remained on his policy.  He didn't realize it.  He

13   realized it and he sought an appraisal for something

14   that he knew he didn't have any longer and he increased

15   the value and made a claim for it, saying it was

16   stolen.

17             Again, Mr. Poli, all I can tell you --

18   this is an AIG policy.  It's not a Chubb policy.  You

19   know, I can tell you what he insured with Chubb and

20   what he represented that he owned to increase the

21   value.  I don't know that, in 2010, if he continued to

22   insure something he didn't own, that it wasn't just an

23   oversight.  Look at the number of items on here.

24   Q.  BY MR. POLI:  So, in other words, your

25   supposedly plausible scenario is that the Andy Mouse

DANIEL JAEGER  MARCH 02, 2023

1  set that he bought in '87 and sold around 2000 or 2002,

2  somehow he left it on his policies for 10 years and

3  then woke up and said, oh, my God, it's still on here.

4  So I'm going to increase the value and commit a

5  $1.5 million insurance fraud a year and a half after I

6  increase the value; is that your scenario?

7           MR. SULLIVAN:  Object to the form.

8           You can answer.

9           THE WITNESS:  My scenario is that,

10  regardless of what he did with AIG, we evaluated what

11  he did with Chubb.  And what we know is that he

12  increased the value on an item that he did not own.  He

13  did not own Edition 3 out of 30, agreed?  I mean, he

14  didn't own it.  So how could you increase the value on

15  something that you don't own?  And he provided the

16  information to increase the value, to get the appraisal

17  from Dina Brown.

18           Not only -- not only, Mr. Poli, did he

19  provide the edition number to Dina Brown's mother, he

20  also gave the provenance on it, that he had purchased

21  it in Santa Monica and that, you know, from, I think,

22  B1 Gallery.  But, you know, I think Dina Brown put B2

23  Gallery, but you get the point.  He gave provenance

24  information, as to what he owned and what he was

25  seeking an appraisal for, from Dina Brown.  And that's

DANIEL JAEGER  MARCH 02, 2023

 1  what he insured with us.  And it's definitively

 2  conclusive that he didn't own Edition 3 out of 30.

 3    Q.  BY MR. POLI:  Are you done?  Because most of

 4  your answers aren't responsive.  But let's go with the

 5  answer you just gave.  Let's say hypothetically that an

 6  insured just makes a mistake because they don't know

 7  whether they have 3 of 30 or an AP.  And then somehow,

 8  someone like Chubb, or like your unit, seizes on that

 9  mistake, to deny coverage they've been paying for for

10  years; is that appropriate?

11            MR. SULLIVAN:  Object to the form.

12            You don't have to answer the question.

13    Q.  BY MR. POLI:  Is that appropriate?

14            MR. SULLIVAN:  Object to the form of the

15  question.

16            You can answer, Dan.

17            THE WITNESS:  Sure.  That's a

18  hypothetical, Mr. -- you know -- Poli.  That didn't

19  happen here.  You know, the first version of events, as

20  you well know, was that this was a theft of Edition 3

21  out of 30.  By the time that SIU got involved and

22  interviewed Mr. Altschuler, it became, well, it might

23  have been an artist proof.  So we evaluated that

24  information.  You know.  You've seen the investigation.

25  We did a provenance history on the artist proof.  We

1   were able to track down the majority of them, I

2   believe.

3               But the fact of the matter is we couldn't

4   substantiate, and neither could Mr. Altschuler, that he

5   ever owned an artist proof and that he ever purchased

6   it from Keith Haring.  So under your theory, it's just

7   an innocent mistake.  But under our position, he didn't

8   own either one of them.  The only one that he owned

9   that he can prove, to some degree, that he owned was

10  the one he traded to Jim Corcoran in 2000 or 2002.

11      Q.  BY MR. POLI:  Right.  So now, since we've now

12  established that the earlier set of Andy Mouse that he

13  traded away in 2000 or 2002 -- we're looking at an AIG

14  policy covering a different set of Andy Mouse in 2010.

15  If this is a set he never owned, then that means he

16  paid insurance on this nonexistent set from 2010 to

17  '11, to '12, to '13, to '14, to '15, to '16, to '17, to

18  '18.  He then increased it and then paid it in 2019.

19  And then at the beginning of 2020, he submitted a false

20  and fraudulent claim.  That's your theory, right?

21              MR. SULLIVAN:  Object to the form.  You

22  can answer.

23              THE WITNESS:  So what I would say is I

24  don't know why he continued to insure it.  You know,

25  that's something for him to answer.  What I will tell

DANIEL JAEGER  MARCH 02, 2023

1  you is I believe that there's a -- and I might be off,

2  that there's 2008, 2010, appraisal that was done based

3  on, you know, information that was provided by Corcoran

4  and I believe it does say Edition 30 on that and that

5  was what Mr. Altschuler was saying that he owned.

6         We now know that when that appraisal was

7  done, and that, again, was information Mr. Altschuler

8  provided to his art person, Mr. Corcoran, that he could

9  have not owned 3 of 30 or an Edition of 30 because he

10 traded the artwork in or he didn't own it to begin

11 with.

12 Q.  BY MR. POLI:  I'll define another issue.  I'll

13 call this the implausible timing issue.  And by that, I

14 mean that this seven Andy Mouse prints that you're

15 contending that Mr. Altschuler never owned, we've now

16 looked at a document that would mean he was insuring

17 that set of Andy Mouse prints in 2010, '11, '12, '13,

18 '14, '15, '16, '17, '18 and '19, and then he makes a

19 supposedly fraudulently $1.5 million insurance claim on

20 those prints in 2020, at the beginning of 2020.  I'll

21 call that the implausible timing issue.

22        Did you consider that timing issue, in

23 your analysis, Mr. Jaeger, yes or no?

24        MR. SULLIVAN:  Object to the form.  Object

25 to the foundation.

DANIEL JAEGER  MARCH 02, 2023

```
1              You can answer.

2              THE WITNESS:  Sure.  We considered all of

3    the information that we obtained during the course of

4    the investigation.  We also considered the information

5    that was provided to us during the investigation for

6    the item that was being claimed.

7              But I will tell you this, Mr. Poli.  It is

8    not unusual for someone to have a large schedule of

9    artwork, collectibles, jewelry and to have sold

10   something or traded something and failed to remove it

11   from a policy and then, years later, make a claim for

12   that item.  People who are honest and truthful, when

13   confronted with evidence, would usually say, oh, yeah,

14   that's right, I actually sold that.  I should have

15   removed that from my policy a long time ago.  But would

16   it surprise me if Mr. Altschuler, with such a large

17   schedule, you know, had sold or traded something, but

18   continued to insure it for years?  No, it wouldn't

19   really surprise me.  I don't necessarily know that Mr.

20   Altschuler contemplated committing insurance fraud

21   until he saw it -- an updated appraisal in 2018 for an

22   item that he knew he didn't own.

23             And, you know, that's the facts that we

24   evaluated.  You know, whether or not the information

25   and the representations of -- that were provided to us
```

DANIEL JAEGER  MARCH 02, 2023

1  in connection with the claim from 2019 were truthful

2  and honest.  And our conclusion was, as I've testified

3  for hours now, that the evidence supports that

4  Mr. Altschuler intentionally concealed and

5  misrepresented material facts related to the Edition 3

6  out of 30 which he claimed under his policy and he

7  never owned.

8     Q.  BY MR. POLI:  This is one of those rare cases

9  where your expert witness is going to be our star

10 witness.  Do you realize that, Mr. Jaeger?

11          MR. SULLIVAN:  Object to the form.

12          THE WITNESS:  And your expert witness

13 might be ours.  So --

14    Q.  BY MR. POLI:  I doubt that because I don't

15 think that's accurate.

16          All right.  So I was asking -- what I

17 defined is the timing issue or the implausible timing

18 issue.  You're saying this idea that Mr. Altschuler

19 paid for insurance on this nonexistent set of Andy

20 Mouse prints for 10-plus years so that he could then

21 seek to commit a $1.5 million insurance fraud in 2020,

22 you're saying that is something you considered; is that

23 right, your team considered that?

24          MR. SULLIVAN:  Object to the form.  You

25 can answer.

DANIEL JAEGER   MARCH 02, 2023

1          THE WITNESS:  We were aware, based on the

2    information that you've seen in our file, that

3    Mr. Altschuler had previously insured what he said were

4    Andy Warhol -- and that's another thing, like, you

5    know, this says Andy Warhol Andy Mouse.  We know it's

6    not Andy Warhol.  We know it's Keith Haring.  But we

7    were aware of appraisals that were used to justify

8    values on schedules with both AIG and Chubb.  And we

9    were aware of what those appraisals said.  And all of

10   that was considered in our over evaluation of

11   Mr. Altschuler's claim.

12       Q.  BY MR. POLI:  Okay.  Next, I'll define another

13   term.  I'll call it the stupidity issue.

14          So apparently Mr. Altschuler is a smart

15   enough guy to have built -- help build and run, as a

16   CEO, these biotech companies.  And, obviously, he's

17   really into art.  I mean, you've referred to the large

18   schedule of art, not only in the AIG policy, but also

19   in the Chubb policy.  Do you remember talking about how

20   much art he has?

21       A.  Yeah.  I mean, I don't know if the schedule

22   with Chubb was as extensive as the one with AIG.  But I

23   know that it was at least $5.5 million at the time of

24   the loss, as far as total value.

25       Q.  All right.  So you've got a guy who seems to be

DANIEL JAEGER  MARCH 02, 2023

1  reasonably smart and he also seems to really be into

2  art and without much effort, either he or someone he

3  hires could pretty easily determine that various pieces

4  of 3 out of 30 had been sold on the marketplace.  I

5  mean, your expert figured that out pretty quickly,

6  right?

7      A.  Yes.  And so did Dina Brown.  She just made an

8  extraordinary assumption that he reassembled the four

9  pieces and that's why she moved forward with the

10  appraisal.

11      Q.  So that leads to the stupidity issue, the idea

12  that this -- obviously, a guy who's helped build

13  multiple biotech companies, who somehow assembled a $35

14  million net worth, who's got all this art and seems to

15  be really into art, he's going to commit this fraud

16  without either himself or hiring someone to go prove

17  that -- to go check, hey, has any of the 3 of 30

18  Edition been sold, because he would have quickly

19  realized it had been sold.

20          MR. SULLIVAN:  Object to the form.  Object

21  the foundation.  Move to strike Counsel's testimony.

22          You can answer.

23          MR. POLI:  I'm not finished, Bobby.  Let

24  me finish my question, please, before you interrupt.

25      Q.  BY MR. POLI:  I'll call that the stupidity

DANIEL JAEGER  MARCH 02, 2023

1  issue, okay?  That someone who's seemingly this bright,

2  who's going to commit a $1.5 million insurance fraud

3  and maybe go to prison for 10 or 20 years, is so stupid

4  that they don't hire Dina Brown or someone like her to

5  say, has anyone sold 3 of 30.  Do you know what I mean?

6  Do you understand how I've defined the stupidity issue?

7       MR. SULLIVAN:  Are you done asking the

8  question?

9       MR. POLI:  I'm done.

10       MR. SULLIVAN:  Okay.  Object to the form.

11  Object to the foundation.  Move to strike Counsel's

12  statements and testimony.

13       Dan, you can answer.

14       THE WITNESS:  I'll do my best.

15       So if I understand your --

16  Q.  BY MR. POLI:  Wait, I don't want another

17  narrative.  I'm just asking if you understand the

18  defined term.  Do you understand the defined term?

19  A.  Of stupidity?

20  Q.  No.  I've defined an issued in this case, the

21  stupidity issue means that someone who's apparently

22  bright enough to build these biotech companies and run

23  them as the CEO, someone who's assembled a $35 million

24  net worth, someone who's bought all this art is so

25  stupid that they don't hire Dina Brown or someone like

DANIEL JAEGER  MARCH 02, 2023

1  her to check to see whether any portions of the 3 of 30

2  Edition have been sold on the market.  I've defined

3  that as the stupidity issue.

4          Do you understand how I've defined the

5  term, yes or no?

6          MR. SULLIVAN:  Object to the form;

7  foundation.

8          You can answer.

9          THE WITNESS:  I understand what you're

10  saying.

11     Q.  BY MR. POLI:  Okay.  Is it something you

12  considered or is it just something that never occurred

13  to you until just now?  Which is it?

14     A.  It's something that we considered, but we also

15  considered the implausibility of someone who buys an

16  artist proof directly from the artist a year before the

17  artist dies and has absolutely no documentation to

18  support that purchase, not a photograph, not a receipt,

19  not someone like Dina Brown, who can actually inspect

20  it.  The fact that someone would forget to tell someone

21  that they're seeking an appraisal from that, oh, by the

22  way, Elaine, I acquired a set of prints from Keith

23  Haring directly in 1989 in Phoenix, Arizona, and, you

24  know, it's -- I got it right before the poor man passed

25  away from a horrible disease and that's what I want an

DANIEL JAEGER   MARCH 02, 2023

1   appraisal for.

2           So, yeah, we did think that there's

3   possibility that, you know, he would think about that.

4   But I'll tell you, Mr. Poli, a lot of people don't

5   think about it until after a claim is submitted and

6   then I do think Mr. Altschuler absolutely considered

7   that fact and I think after he submitted a claim for

8   Edition 3 out of 30, he realized that Chubb doing an

9   investigation, because he now knows the claim is in,

10  SIU would look into the provenance of Edition 3 out of

11  30 and be able to find that 3 out of 30, at least three

12  of them, had been sold on the open market.  And I think

13  that's what caused him to create this story about the

14  purchase of an artist proof from Keith Haring that,

15  you know, as a sophisticated art collector, he knows

16  that it would be much more difficult for anyone

17  conducting a provenance history to, you know, run down

18  that provenance.  And, you know -- and I think he

19  created that.

20          And I don't think -- you know, someone

21  like Mr. Altschuler, especially someone who values art

22  the way he does and is as sophisticated as he is, would

23  not put any credence into the fact that he had bought

24  an artist proof from the same edition run that he had

25  previously owned and traded to Corcoran and not taken

DANIEL JAEGER   MARCH 02, 2023

1  any steps whatsoever to document that fact, knowing --

2  because he knows that provenance is important, he knows

3  that condition is important, and obtaining -- you know,

4  obtaining an artist proof is something that a lot of

5  people do.  They're exchanged in a third-party market

6  all the time.  But obtaining an artist proof directly

7  from the artist within a year of his passing -- so I

8  don't know, do I call that stupidity?  Maybe that's

9  stupidity as well.  People do different things for

10 different reasons.  All I can tell you is that the

11 claim was presented to us as 3 out of 30.  We did our

12 research.  It was referred to SIU.  We go to interview

13 him and now, it may be 3 out of 30.  It may be an

14 artist proof.  Okay, Mr. Altschuler, you know, what

15 documentation do you have to show that you purchased an

16 artist proof?  I don't have anything.  Okay, so Chubb,

17 we'll do our own investigation.  We'll try to verify

18 and validate what Mr. Altschuler is telling us.

19           And we hire an expert to go and do a deep

20 dive into provenance because, you know, maybe there's a

21 record in Keith Haring's journal that shows that he was

22 in Phoenix, Arizona, in 1989 and he sold an artist

23 proof to Mr. Altschuler.  That would have been

24 something we absolutely would have considered, but

25 there's no evidence of it.  So, I don't know, based on

DANIEL JAEGER  MARCH 02, 2023

1  your stupidity theory, you know, it goes both ways.

2  So, yeah, maybe he didn't think we were good at what we

3  do and he could get away with very it quickly.  Maybe

4  he realized he couldn't after it got into SIU.  Maybe

5  he changed his story and created a second set that

6  never existed and he never had.

7          So all I can tell you is what we insured,

8  he never owned.  And what he purports to have owned,

9  this artist proof, there's no proof whatsoever of it.

10  That's the conclusion of the investigation.  And based

11  on that, we believe he violated the concealment or

12  fraud provision of the policy, given his

13  representations.

14      Q.  Do you have -- I'm sorry, I didn't want to

15  interrupt your very lengthy narrative.  Are you done?

16      A.  I am done.

17      Q.  Okay.  Do you have a receipt from 1989 for

18  everything you purchased in 1989?

19      A.  Well, I do keep a lot of receipts, Mr. Poli.

20  But I will tell you if I had purchased, for the sum of

21  $10,000 --

22      Q.  I asked you a simple question.  Do you have

23  every receipt from 1989 for everything you purchased in

24  1989?  That should be a yes or no.

25      A.  Well, could we qualify it this way, though,

DANIEL JAEGER  MARCH 02, 2023

1  because in 1989, I was in a junior in high school, so,

2  no, I don't have every receipt for everything that I

3  had from 1989.  But let's just say from the date I got

4  married and from the date I started working, I keep

5  most significant receipts for purchases.  And my point

6  was, if I was a sophisticated art collector, like

7  Mr. Altschuler -- I mean, we've looked at his schedule.

8  We see what he owns and the value of it.  You're darn

9  right I would keep documentation from the purchase from

10 Keith Haring of silkscreens.  You're pretty -- you

11 could be pretty confident that I would keep

12 documentation from the purchase, even from the Santa

13 Monica Gallery, the B1 Gallery.  And, by the way, there

14 was supposedly a receipt, right?  A paper receipt that

15 was part of the impetus for him to go out and get the

16 Dina Brown appraisal to begin with.  We've never seen

17 that receipt either.

18          So, yeah, I would keep receipts for

19 valuable things.

20     Q.  BY MR. POLI:  So the way -- I mean, you've

21 handled thousands of SIU claims.  The way you guys

22 handled this is consistent with the way you would

23 normally handle an SIU claim.  Have I got that right,

24 Mr. Jaeger?

25     A.  For a claim involving the theft or

DANIEL JAEGER  MARCH 02, 2023

1  disappearance of art -- I mean, we handle, you know,

2  different types of claims.  But, yeah, we start with a

3  basic set of facts and we try to verify and validate

4  it.  And if we can, the vast majority of the claims we

5  investigate, we pay.

6      Q.  That's not even the question, Mr. Jaeger, and

7  at some point, we're going to run short on time.  So I

8  would appreciate if you would answer the question.

9          The way you handled this art claim is the

10  way you've handled, in your thousands of other SIU

11  claims, is the way you would handle any other art

12  claim; is that right, Mr. Jaeger?

13          MR. SULLIVAN:  Objection; form;

14  foundation.  In my record, he is answering your

15  questions.

16          You can answer.

17          MR. POLI:  No, he's not.

18      Q.  BY MR. POLI:  But go ahead.

19      A.  The only thing I can say, Mr. Poli, is that

20  under these set of circumstances, where we determine

21  that it was necessary to move forward with examination

22  under oath and conduct the additional investigation

23  that we conducted, it would be consistent with other

24  claims similar to this one.

25      Q.  Does that mean the answer is, yes?  Because

DANIEL JAEGER  MARCH 02, 2023

```
 1   it's very hard to get a yes or no.  I don't think I've
 2   gotten one yet today.
 3            Is the way you handled this art claim
 4   consistent with the way you've handled other art claims
 5   over your thousands of SIU claims; is that right, yes
 6   or no?
 7            MR. SULLIVAN:  Object to the form.
 8            THE WITNESS:  Yes.  Other art claims
 9   similar to this.  My point is we've investigated other
10   art claims that we have not done it the exact same way.
11            MR. POLI:  Well, again, I don't have an
12   answer.  So we'll just move on.
13            Let's go through -- let's next pull up
14   executive summary -- yeah, I forget what I called it to
15   you.  I think I sent it to you called executive
16   summary.  So it will be 35.
17         (Whereupon, Deposition Exhibit Number 35 was
18   marked for identification.)
19      Q.  BY MR. POLI:  Okay.  Have you seen this
20   document before?  It's from your file.
21      A.  I have.
22            MR. SULLIVAN:  I just want to make the
23   record clear that the highlighting in all of these
24   documents is done by plaintiff's counsel.
25            MR. POLI:  That's right, it is.
```

DANIEL JAEGER  MARCH 02, 2023

1        I think I mixed up my documents.

2      Q.  BY MR. POLI:  Okay.  So what this establishes,

3   this claim was reported, the suspected break-in was

4   12/23/19, but this claim was reported on January 18th

5   of 2020, correct?

6      A.  That's what this document indicates, yes.

7      Q.  This was referred --- this claim was

8   transferred to SIU within three days; isn't that right?

9      A.  That sounds about right, yes.

10           MR. POLI:  So was this Exhibit 35, Donna?

11           THE COURT REPORTER:  Yes.

12      Q.  BY MR. POLI:  Is that normal that a claim would

13   go to SIU, the so-called special investigations unit,

14   within three days?

15           MR. SULLIVAN:  Object to the form and

16   foundation.  You can answer.

17           THE WITNESS:  It's not unusual under these

18   set of circumstances, where the loss has been scoped.

19   We have an initial set of facts.  Those facts are

20   evaluated and it's determined early on that the claim

21   needs additional investigation because of those facts.

22           MR. POLI:  Let's next pull up what I sent

23   you, 1/8/20 Pima County Police Report.

24        (Whereupon, Deposition Exhibit Number 36 was

25   marked for identification.)

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  Okay.  Now what you keep

2  repeatedly saying, Mr. Jaeger, is Mr. Altschuler got

3  down the road, saying it was 3 of 30, and then woke up

4  and said, oh, I better not say that.  It might be -- I

5  better say it's an artist proof.  I'm paraphrasing,

6  but, you know, you keep giving that testimony, right?

7    A.  I'm saying that that's what appears to have

8  occurred based on the evidence that we evaluated.

9    Q.  And I think you did agree, if all this is

10  just -- I mean, it's a hypothetical -- but if all of

11  this is just you and your team seizing on a mistake by

12  someone with a 30-year-old recollection, if that's

13  really what a jury decides has happened here, you would

14  agree that's improper, right?

15          MR. SULLIVAN:  Object to the form and

16  foundation.

17          You can answer.

18          THE WITNESS:  Yeah, I think we evaluated

19  whether or not it was an innocent mistake and we

20  concluded that it wasn't, that this was intentional

21  misrepresentation.

22    Q.  BY MR. POLI:  You probably didn't answer my --

23    A.  Hold on.  Well, let me -- I just want to

24  finish.

25    Q.  You can go on with your narrative, but I'm just

DANIEL JAEGER  MARCH 02, 2023

1  going to go back to my question.  So if you want to

2  answer it, great.  If not, I'll go back to it.  Go

3  ahead, sir.

4      A.  I'm sorry, I don't know what you heard from me,

5  being cut off.  So can you repeat the question and I'll

6  be happy to start again.

7      Q.  When you go into these narratives, it's great

8  if you'll at least answer the question in the

9  narrative.  But if you just ignore the question, then

10  I've got to go back to it and it takes time,

11  Mr. Jaeger.

12          So I'm going back to my question.  I think

13  we've agreed that if all what's going here is just

14  Chubb and your unit and your team seizing on an

15  innocent mistake by a guy, based on his 30-year-old

16  recollection, if that's what is really going on here,

17  you would agree that's improper; is that right?

18          MR. SULLIVAN:  Object to the form.  Object

19  to foundation.  Object to the mischaracterization and

20  improper characterization of my client's prior answers.

21          Dan, you can answer.

22          THE WITNESS:  That's a hypothetical.  That

23  didn't happen here.  We evaluated all the evidence.

24  Our conclusion was based on the facts and evidence.

25  However, if it was simply an innocent mistake, we never

DANIEL JAEGER  MARCH 02, 2023

1    would have denied the claim.

2        Q.  BY MR. POLI:  Yeah.  And if it wasn't an

3    innocent mistake and if you guys treated the insured as

4    guilty until proven innocent and just took that

5    approach, that would be improper, right?

6            MR. SULLIVAN:  Object to the form.

7            You can answer.

8            THE WITNESS:  Again, that's hypothetical.

9    That didn't happen here.  We never went into this

10   investigation guilty until proven innocent.  We went

11   into the investigation to evaluate the claim that was

12   presented.  And, hopefully, hopefully, to verify and

13   validate it so it could be paid.  Unfortunately, the

14   evidence educed in the investigation supported that Mr.

15   Altschuler was submitting a fraudulent claim and breach

16   of concealment or fraud provision of the policy.

17       Q.  BY MR. POLI:  And your testimony, Mr. Jaeger,

18   has been the first time that expressed uncertainty as

19   to whether the prints were 3 of 30, was 60 days into

20   the claim or something.  Do you remember you giving

21   that testimony, Mr. Jaeger?

22           MR. SULLIVAN:  Object to the form of the

23   question.

24           You can answer.

25           THE WITNESS:  That's my first recollection

DANIEL JAEGER  MARCH 02, 2023

1  that he brought up the artist proof, was during the

2  recorded interview with Fred White.

3      Q.  BY MR. POLI:  But do you realize -- have you

4  seen this document?  Do you realize in the very, very

5  first phone call that Mr. Altschuler had with the Pima

6  County Sheriff's Department, he candidly said he wasn't

7  sure what edition number he had?  Did you know that?

8              MR. SULLIVAN:  Object to the form of the

9  question.

10             You can answer.

11             THE WITNESS:  Yeah, the report speaks for

12  itself.  But what edition number is different than an

13  artist proof.

14      Q.  BY MR. POLI:  Sir, let's look at -- so you did

15  know that.  Let's look at page 2.

16             Okay.  Do you realize this is the very

17  first time Mr. Altschuler has had a conversation with

18  the sheriff's office, on January 8th, 2020?  Did you

19  realize that?

20      A.  I've read the report.  I know what it says.

21      Q.  But you've seen this document before, right,

22  Mr. Jaeger?

23      A.  I've seen this document before, yes.

24      Q.  How come you didn't mention this when you were

25  saying the first time he expressed uncertainty about

DANIEL JAEGER  MARCH 02, 2023

1  which edition he had was 60 days in?  You knew --

2          MR. SULLIVAN:  Object to the form of the

3  question.

4      Q.  BY MR. POLI:  Were you consciously trying to

5  mislead when you failed to mention what you knew about

6  this document, Exhibit -- whatever it is -- Exhibit 36?

7          MR. SULLIVAN:  Object to the form of the

8  question.

9          Dan, you don't have to answer that

10  question.

11      Q.  BY MR. POLI:  Mr. Jaeger, did you know about

12  this document, this highlighted language, when you told

13  us, oh, it was 30 -- 60 days in before Mr. Altschuler

14  suddenly said I'm not sure of the edition number.  Did

15  you know about this?

16          MR. SULLIVAN:  Object to the form of the

17  question.  Misstates his testimony.

18          You can answer.

19          THE WITNESS:  Yeah.  Mr. Poli, with all

20  due respect, that does misstate my testimony.  What I

21  said --

22      Q.  BY MR. POLI:  That's why he's not supposed to

23  give coaching objections because he coaches you and

24  that's --

25          MR. SULLIVAN:  And you're not supposed to

1    misstate his testimony.  You're not supposed to

2    misrepresent the records or the documentation either

3    and you know you have.

4              MR. POLI:  Stop interrupting me because

5    I'm not going to let you do it.

6              So that's a classic example.  Mark that

7    record.

8              He says, you know, that you've -- my

9    inconsistence; asked and answered.  And you said, oh,

10   gee, misstates my testimony, that's a coaching

11   objection.  All right --

12             MR. SULLIVAN:  And my record is that

13   you're misstating the actual documents and the actual

14   testimony in an inappropriate manner, in violation of

15   our rules of procedure.

16             And mark that.

17             MR. POLI:  That's why we have a judge.

18             MR. SULLIVAN:  I agree.

19     Q.  BY MR. POLI:  So do you remember taking that

20   testimony that it was 60 days in and then suddenly

21   Mr. Altschuler expressed some uncertainty as to whether

22   it was 3 of 30 or it was something else; do you

23   remember giving all that testimony?

24     A.  Mr. Poli, again, with all due respect, what I

25   testified to is that he had always said that it was

DANIEL JAEGER  MARCH 02, 2023

1  Edition of 30.  And what he insured with us was an

2  Edition 3 out of 30.  What I also said was the first

3  mention of an artist proof, which is not a numbered

4  edition out of the set, was in the statement he gave to

5  Fred White.  That was my testimony.

6      Q.  So when you gave that testimony, you knew about

7  this police report, before the claim was ever

8  submitted, where Mr. Altschuler told the police that he

9  did not know which set of the prints he -- had been --

10 had disappeared or been stolen.  Do you remember --

11          MR. SULLIVAN:  Object to --

12     Q.  BY MR. POLI:  -- when you gave that testimony,

13 Mr. Jaeger?

14          MR. SULLIVAN:  Object to the form of the

15 question.  Object to the foundation.

16          You can answer.

17          THE WITNESS:  We reviewed this police

18 report when it was received from the police department

19 and if you read it, it says he doesn't know which

20 edition out of 30.  It does not say that, oh, I may

21 have had edition out of 30, I may have an artist proof.

22 It may be the ones I bought from B1 Gallery.  It may be

23 the ones that I bought supposedly from Keith Haring.

24 It doesn't say that.  And, in fact, I believe the

25 police report goes on to describe where he did, which

DANIEL JAEGER  MARCH 02, 2023

1  you haven't highlighted, where he did buy it, what he
2  was representing to the police that he owned, which was
3  a 1987 set, not the artist proof, the 1987 set that he
4  purchased from B1 Gallery for $5,000 and --
5      Q.  So it's your testimony, before you knew that,
6  from the very beginning, when Mr. Altschuler spoke with
7  the police, he expressed uncertainty as to which set of
8  Andy Mouse prints had been stolen.  Did you know that
9  when you gave your prior testimony, Mr. Jaeger?
10              MR. SULLIVAN:  Objection; form.
11  Objection; foundation.
12              Mark it.
13              You can answer.
14              THE WITNESS:  I think my testimony has
15  been pretty consistent throughout, Mr. Poli.
16      Q.  BY MR. POLI:  Well, that will be for the jury.
17  I asked a different --
18      A.  Yeah.  Yeah.  So -- so --
19      Q.  Sir, let me get that question out.  When you
20  gave that testimony about, oh, gee, it was 60 days in
21  before Mr. Altschuler suddenly expressed uncertainty as
22  to which set of Andy Mouse prints had been stolen or
23  had disappeared, you knew about this police report,
24  where, in his first conversation with the police, he
25  expressed uncertainty as to which prints had been

1    stolen.  Did you know that when you gave that

2    testimony?

3            MR. SULLIVAN:  Object to the form.  Object

4    to the foundation.  Misstates the document.

5            You can answer.

6            THE WITNESS:  Again, Mr. Poli, we were

7    aware of this police report.  There is no mention

8    anywhere in this police report of an artist proof.

9    What he says is he's not sure of what number out of 30

10   was the edition that he was alleging that was stolen.

11   And, in fact, he does give additional provenance that

12   would suggest, based on our investigation and the

13   documents that had been received, that it was the

14   numbered edition that he bought from B1 gallery for

15   $5,000 in 1986 or '87.

16           So, yeah, we were not aware, until we

17   interviewed Mr. Altschuler in February of 2020, of

18   anything having to do with an artist proof purchased

19   from Keith Haring.

20       Q.  BY MR. POLI:  And he raised the uncertainty

21   about which set had been stolen in the very first

22   interview conducted by Fred White; isn't that true?

23           MR. SULLIVAN:  Objection; form;

24   foundation.

25           You can answer.

```
 1            THE WITNESS:  Yeah.  So as I stated
 2   before --
 3       Q.  BY MR. POLI:  It's a yes or no.  Is it possible
 4   to get maybe one or two questions with a yes or no
 5   answer?
 6            MR. SULLIVAN:  You know, if you ask a
 7   question that warrants a yes or no answer, he can give
 8   it.  But you're not going to harass him into answering
 9   the way you want him to answer.
10            Dan, answer the way you think is
11   appropriate.
12       Q.  BY MR. POLI:  But do you realize, Mr. Jaeger,
13   that some questions potentially could be answered with
14   a simple yes or no; is that something you're aware of?
15            MR. SULLIVAN:  Objection.
16            You don't need to answer that, Dan.
17       Q.  BY MR. POLI:  Do you know some questions can be
18   answered with a yes or no?
19            MR. SULLIVAN:  You don't need to answer
20   that, Dan.
21       Q.  BY MR. POLI:  I'm allowed to ask questions.  Do
22   you know, Mr. Jaeger, that, during a course of a
23   deposition like this, some questions could reasonably
24   be answered with a yes or no?
25            MR. SULLIVAN:  Objection.  You can answer
```

DANIEL JAEGER  MARCH 02, 2023

1    questions that are relevant to the claim.

2               You don't need to answer the question.

3               You can take it to the judge.

4               Mark it.

5               MR. POLI:  So you're instructing him not

6    to answer again; is that right, Bobby?

7               MR. SULLIVAN:  That's right.  That's

8    right.

9               MR. POLI:  Then we'll go on.  That will be

10   another example.  Because he hasn't answered a question

11   with a yes or no, that I can think of, this entire day.

12   So I think it's appropriate to see if he knows that he

13   could answer some questions with a yes or no.  And

14   you're instructing --

15              MR. SULLIVAN:  I'll stipulate, on behalf

16   of my client, that if we get a nonargumentative,

17   nonloaded question that doesn't misstate the testimony,

18   we may be able to answer it yes or no.

19              MR. POLI:  So you're instructing him not

20   to answer the question that I've posed; is that right,

21   Bobby?

22              MR. SULLIVAN:  Again, I've stipulated for

23   the record, the answer is, yes, with those conditions

24   I've outlined.  We'll take a break.  Thank you.

25       Q.  BY MR. POLI:  Mr. Jaeger, we've spent a long

DANIEL JAEGER  MARCH 02, 2023

1  time today with a whole bunch of questions.  Do you

2  realize that, in the course of a deposition like this,

3  some questions could reasonably be answered with a

4  simple yes or no?  Do you realize that, sir?

5          MR. SULLIVAN:  Go ahead and answer, Dan,

6  and then we'll take a break.

7          THE WITNESS:  Yes, I do understand that,

8  Mr. Poli.  But I'm trying to give you the reasoning

9  behind the answer as well.

10     Q.  BY MR. POLI:  Well, if I want to ask a

11  follow-up question so that I get the reasoning behind

12  the yes or no, that would be a follow-up question.  But

13  you do -- I mean, you're obviously a bright guy.

14  You've been deposed, what, 25, 30 times; is that what

15  you said?

16     A.  Something like that, yes.

17     Q.  So you do understand that, in the course of a

18  deposition like that, it's pretty reasonable that a

19  whole bunch of questions could be answered with a yes

20  or no and that if there's follow-up, it could be

21  explained at that time.  You do understand that, right,

22  sir?

23          MR. SULLIVAN:  Objection; asked and

24  answered.  I raised a stipulation on it.  He's answered

25  the question.  We're taking a break.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  Answer the question, please,

2    before we take a break.

3            MR. SULLIVAN:  Don't answer the question,

4    Dan.

5            MR. POLI:  Now you're instructing him not

6    to answer again.  You know, that's fine, we'll take it

7    to the judge.  Let's take a break.

8            THE VIDEOGRAPHER:  The time is 2:30 p.m.

9    We are going off the record, ending Media Number 4.

10           (Whereupon, a brief recess ensued from 2:30

11   p.m. to 2:37 p.m.)

12           THE VIDEOGRAPHER:  My name is Judy

13   Thompson, with Legal Video Specialists, Phoenix,

14   Arizona.  This begins Media Number 5 of the videotaped

15   deposition of Dan Jaeger.  The time is 2:37 p.m.  We

16   are now back on record.

17   Q.  BY MR. POLI:  So would it be fair to say,

18   Mr. Jaeger, that you're putting an awful lot of your

19   reliance on the Dina Brown appraisal that refers to the

20   prints as 3 of 30, correct?

21           MR. SULLIVAN:  Object to the form.

22           You can answer.

23           THE WITNESS:  Well, we're relying on it as

24   far as that was the basis for the increase of value on

25   the insurance policy and that was the reason that it

DANIEL JAEGER  MARCH 02, 2023

1   was increased, yes.

2       Q.  BY MR. POLI:  So the answer is, yes; is that

3   right?

4       A.  Yes.

5           MR. POLI:  Okay.  Mark it, please.

6       Q.  BY MR. POLI:  If it turns out that what Dina

7   Brown testified to recently is the 3 of 30 was just an

8   assumption by her, that would really undercut your

9   conclusions, right, Mr. Jaeger?

10          MR. SULLIVAN:  Object to the form.

11          THE WITNESS:  If Dina Brown testified that

12  that was an assumption and she wasn't provided that

13  information from her mother, who got it from

14  Mr. Altschuler, that would be information that would be

15  completely inconsistent with our interviews of her.

16          MR. POLI:  Good, let's look at it.

17          Let's pull up the next document.  It will

18  be -- I only sent it to you this morning, Donna, so

19  hopefully you can locate it -- Dina Brown deposition

20  transcript.

21          THE COURT REPORTER:  Yes, I should have

22  it.

23          MR. POLI:  I sent it early this morning.

24          THE COURT REPORTER:  Yeah, yeah.  No, I

25  should have it.

DANIEL JAEGER  MARCH 02, 2023

```
 1              MR. POLI:  Well, that will be 37, right?

 2              THE COURT REPORTER:  Yes, it will be.

 3         (Whereupon, Deposition Exhibit Number 37 was

 4    marked for identification.)

 5              MR. POLI:  Okay.  Go to -- use the

 6    subsidiary page numbers in the mini -- go to page 78,

 7    please.  Or maybe 21 would be easier.

 8              THE COURT REPORTER:  Okay.

 9              MR. POLI:  Sorry.

10              THE COURT REPORTER:  I was trying to do

11    the math in my head.

12              MR. POLI:  Yeah, not easy.  Go to the

13    bottom of page 78.

14         Q.  BY MR. POLI:  All right.  So here's your lawyer

15    Mr. Yu asking her questions quite recently.  And you'll

16    see it picks up at line 19 on page 78.  Do you see

17    that, sir?

18         A.  Can you make it a little bigger, Mr. Poli?

19         Q.  Yeah.  Well, I can't, but Donna will.

20              THE COURT REPORTER:  Is that better?

21              Mr. POLI:  Can you see it?

22              THE WITNESS:  One more.  One more.  One

23    more increase.

24              THE COURT REPORTER:  Yep.

25              THE WITNESS:  Okay.
```

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  All right.  So page 78, line 19,

2  your lawyer asks the question.

3         "Okay.  What about the numbered set that

4      the print came from?  Your report identifies it as

5      3 of 30.  Is that an assumption that you made -- is

6      that an assumption that you made that could

7      constitute a limiting condition?

8         "Answer:  It's an assumption."

9      I mean, she's saying she simply assumed that it

10  was 3 of 30.  You didn't know that until just right

11  now, did you, Mr. Jaeger?

12         MR. SULLIVAN:  Objection; misstates the

13  deposition.

14         You can answer.

15         THE WITNESS:  I would prefer to read the

16  entire transcript to see what she actually said.  What

17  I can tell you is that, in our interviews with

18  Ms. Brown, and actually according to her obligations as

19  an appraiser, she would have to list that I have no

20  idea what edition number this is.  And, you know, I

21  don't even know she can issue an appraisal for an item

22  where she doesn't know what it is or what it's

23  represented to be.

24         So, you know, I need to look at this

25  transcript.  I don't believe I've read this.  But, you

DANIEL JAEGER  MARCH 02, 2023

1    know, I can tell you, during the investigation, she

2    was -- she was adamant that the information was

3    provided from Mr. Altschuler to her mother, that

4    ultimately got provided to her and that, you know, she

5    wrote an appraisal for Edition 3 out of 30 and that she

6    was aware, during her research, three of the four

7    silkscreens had been sold on the open market before the

8    appraisal was being issued.  And that she made an

9    extraordinary assumption as to the fact Mr. Altschuler

10   somehow was able to reassemble the collection of four.

11            So, you know, I would have to read this in

12   context, Mr. Poli.  But it would surprise me if she

13   said, I had no idea if it was 3 of 30 or some other

14   edition out of 30 and I wrote an appraisal for 3 out of

15   30 that I knew would be submitted to an insurance

16   company, or possibly be submitted to a insurance

17   company, to increase the value of a scheduled item.

18       Q.  BY MR. POLI:  It's probably hard to remember

19   after that narrative.  The question was the testimony

20   we read into the record a moment ago, you never knew

21   about that testimony until just now, until you just

22   read it; is that right?

23            MR. SULLIVAN:  Object to the form of the

24   question.

25            I just want to make the record, I wasn't

DANIEL JAEGER  MARCH 02, 2023

1   provided a copy of this deposition transcript, nor any

2   of the exhibits prior to the deposition today.

3            So go ahead.

4       Q.  BY MR. POLI:  Answer the question, sir.  Or if

5   you want to give another five-minute narrative, I guess

6   you do that.  But is the answer the first time you saw

7   this testimony is just now?

8            MR. SULLIVAN:  Move to strike Counsel's

9   characterization of my client's answers.

10           You can go ahead.

11           THE WITNESS:  I think I just said that I

12   have not seen this transcript before.

13      Q.  BY MR. POLI:  Okay.  Thanks for that simple

14   answer.

15           And you said that, oh, gee, she knew when

16   she did the appraisal that some pieces had already been

17   sold in the open market.  Do you realize that's not

18   consistent with her testimony under oath?

19           MR. SULLIVAN:  To the extent Mr. Poli

20   continues to make comments that are snide after my

21   client's answers or characterizing my client's answers,

22   I will terminate the deposition.

23           You can answer the question.

24           THE WITNESS:  What I'm aware of is what

25   she told us during the course of the claim

DANIEL JAEGER  MARCH 02, 2023

```
 1   investigation.
 2              MR. POLI:  Well, let's look at page 90 and
 3   the overall page number, Donna, is 26.
 4              Okay.  To page 99.  I'm sorry.
 5      Q.  BY MR. POLI:  All right.  Here's what she said,
 6   she did not -- line 10, can you read it okay?  Or do
 7   you want us to expand it?
 8      A.  I can read it.
 9      Q.  Okay.  Line 10 through 14, page 99.
10              "So it's incorrect.  First, it's
11   incorrect.  I did not consult Artnet during the course
12   of researching the appraisal.  I do recall speaking
13   with someone and looking at Artnet at that time."
14              And we can look at more, but the first
15   time she looked Artnet to realize some portions of
16   3 of 30 had been sold in the market was after your guy,
17   Mr. Chvostal, called her.  You didn't know that, did
18   you?
19              MR. SULLIVAN:  Object to form.
20              THE WITNESS:  I could be a little off on
21   the timing, Mr. Poli.  But I do know that, at some
22   point, she looked at Artnet.  And I thought -- and
23   maybe I'm mistaken, that she was aware of the fact that
24   three of the four were sold at auction.  And, you know,
25   perhaps she researched it after that phone call, but
```

DANIEL JAEGER  MARCH 02, 2023

1  she was aware of it at some point.  I thought it was

2  prior to the estimate or appraisal being issued.

3    Q.  BY MR. POLI:  And that goes back into the whole

4  stupidity issue.  I mean, if it's that easy to find out

5  that portions of 3 of 30 had already been sold in the

6  market, Dina Brown could have figured it out, anyone

7  like Dina Brown could have figured it out, maybe

8  Mr. Altschuler could have figured it out.  So

9  Mr. Altschuler has to be pretty darn stupid to try and

10  pull off this $1.5 million fraud; wouldn't you agree?

11          MR. SULLIVAN:  Object to the form and

12  foundation.

13          You can answer.

14          THE WITNESS:  Again, I don't know if he

15  thought it would easily be identified.  But if you go

16  to page 101 -- and, again, I would have liked the

17  ability to have reviewed this in advance.  But if you

18  go to 101, on line 3, it said -- the question is:

19          "You go on to say you referenced Artnet

20      records for two of the prints sold separately at

21      Sotheby's auction in 2006.

22          "Do you recall reviewing the results of

23      Artnet indicating that two pieces from that set,

24      3 of 30, were auctioned at Sotheby's in 2006?

25          "Yes."

DANIEL JAEGER  MARCH 02, 2023

1            You know, so again, you're taking parts of
2    this.  I haven't had an opportunity to review it.  That
3    seems consistent with what I was aware of.
4            And then, "It goes on to say that" -- this
5        a question -- "'Ms. Brown commented that the
6        records were odd, given that they implied that the
7        set she appraised in 2018 was not completed in the
8        past...'"
9            "That's  consistent with what you told me,
10       right, Dina, you assumed given the results that the
11       prints were somehow reassembled and collected
12       together before you appraised them, right?
13       "Correct."
14    Q.  BY MR. POLI:  You know, I don't really want to
15    be rude, but you're not even answering a question
16    that's posed to you, Mr. Jaeger.  You're just going off
17    on one of these narratives.  If there's a question
18    that's asked, you can -- I can't stop you from
19    answering it directly or answering it with some crazy
20    narrative, but there's not even a question posed to you
21    right now.  Do you realize that, Mr. Jaeger?
22            MR. SULLIVAN:  Objection.  I believe my
23    client was answering the question.  But if you want to
24    reask it or if you want to move on, that's fine.
25    Q.  BY MR. POLI:  Mr. Jaeger, I pointed out that

DANIEL JAEGER  MARCH 02, 2023

1    contrary to you saying that she knew when she did her

2    appraisal that pieces had been sold, if you look at

3    page 99, at lines 10 through 14, she says that's not

4    correct.  Do you see that?

5        A.  I do see that and I do see page 101 as well.

6        Q.  I didn't ask you about page 101.  I didn't ask

7    you --

8        A.  I know you're not asking me.  But you're asking

9    me questions about a transcript that I've never

10   reviewed and never seen and you're speaking --

11       Q.  This isn't working because I ask a question.

12   You never give a yes or no answer and then you start,

13   at this point, launching into narratives that aren't

14   even remotely responsive to the questions that I'm

15   posing.  The question I asked was following up on what

16   you said, that before she ever did her appraisal, she

17   knew that some of the pieces in 3 of 30 had been sold

18   on the market; that's what you testified to, right?

19            MR. SULLIVAN:  Object to the form.  Object

20   to the characterization of my client's testimony.

21            You can answer.

22            THE WITNESS:  It was my understanding

23   that, at the time she was preparing her appraisal, that

24   she was aware that at least two, if not three of the

25   items, had been sold on Artnet and if that's incorrect,

DANIEL JAEGER  MARCH 02, 2023

1  then that's incorrect.

2           That's my recollection, as we sit here

3  today, of what she knew.  And it seems to be supported

4  by the testimony on 101 -- on page 101 of this

5  transcript.

6           MR. POLI:  Okay.  Let's get to the next

7  document.  It will be 38, 1/21/20 claim note re

8  referral to SIU.

9           THE COURT REPORTER:  What was the date

10  again?

11          MR. POLI:  1/21/20.

12          (Whereupon, Deposition Exhibit Number 38 was

13  marked for identification.)

14     Q.  BY MR. POLI:  Okay.  Here's a claims note.

15  Have you seen this, about referring this file to SIU

16  almost immediately?

17     A.  I've seen that note before, yes.

18     Q.  And this confirms the fact -- and remember, the

19  claim didn't get submitted.  According to the executive

20  summary that we just looked at, the claim didn't even

21  get submitted until January 18th.  Do you remember

22  that?

23     A.  I do.

24     Q.  So the claim got transferred to SIU within

25  three days.  Have we got that right?

DANIEL JAEGER  MARCH 02, 2023

1    A.  If that's what the dates reflect, it seems

2  right to me, yeah.

3    Q.  Well, do we need to go back and look at the

4  claims summary?  The claim was submitted on the 18th

5  and it was transferred -- according to this document,

6  Exhibit 38 was transferred to SIU within three days.

7  Have we got that established now?

8    A.  Sure.

9         MR. POLI:  Okay.  Mark it, please.

10    Q.  BY MR. POLI:  Have you ever heard the concept

11  that once a claim goes to SIU, the insured is treated

12  as guilty until proven innocent?  Have you ever run

13  into that idea, even if you don't you agree with it?

14    A.  Not in my experience within SIU.

15    Q.  If that's the approach taken, if an SIU team

16  like yours treats an insured as guilty until proven

17  innocent, that would be improper, right?

18         MR. SULLIVAN:  Object to the form;

19  foundation.

20         You can answer.

21         THE WITNESS:  Yeah.  Mr. Poli, that's a

22  hypothetical question.  That did not happen in this

23  case.  We treated Mr. Altschuler fairly and we

24  evaluated the facts and evidence.  And if, as you

25  stated, an SIU, you know, treated someone guilty until

DANIEL JAEGER  MARCH 02, 2023

1  proven innocent; that would be inappropriate, but that
2  did not happen here.
3      Q.  BY MR. POLI:  Right.  It would be
4  inappropriate.  It would violate standard principles of
5  claims handling if an SIU team like yours takes an
6  approach where an insured is guilty until proven
7  innocent, that would be inappropriate, right?
8              MR. SULLIVAN:  Object to the form.
9              You can answer.
10              THE WITNESS:  Yes, under your
11  hypothetical, which did not happen here, that would be
12  inappropriate.
13              MR. POLI:  Mark it, please.
14      Q.  BY MR. POLI:  And your standards at Chubb
15  require you, even as SIU investigators, to treat the
16  insured with impartiality; is that right?
17      A.  We always treat insureds with impartiality,
18  yes.
19      Q.  And the standards actually require you do that;
20  is that correct?
21              MR. SULLIVAN:  Form; foundation.
22              You can answer.
23              THE WITNESS:  We always -- I don't know if
24  it's required.  I would imagine that it is.  But we
25  always would treat an insured with impartiality, go in

DANIEL JAEGER  MARCH 02, 2023

1  with open eyes and open mind and, you know, follow the

2  facts to logical conclusions.

3         MR. POLI:  Okay.  Well, let's pull up next

4  39, SIU Examiner Guidelines.

5         (Whereupon, Deposition Exhibit Number 39 was

6  marked for identification.)

7     Q.  BY MR. POLI:  Right at the top of the first

8  page of this Exhibit 39, it talks about -- and, first

9  of all, you can see these are best practices for SIU

10  examiners, correct?

11    A.  That's correct.

12    Q.  An examiner, that's an adjuster, correct?

13    A.  Yes.

14    Q.  Because once it goes to SIU, the claim, to the

15  extent it's being adjusted, is being adjusted by an

16  adjuster within the SIU group, correct?

17    A.  At Chubb, yes.

18    Q.  Okay.  And what this clearly says, under best

19  practices, the SIU examiner is supposed to approach the

20  claim -- it uses the word "impartially."  Do you see

21  that at the very top of the page?

22    A.  Yes, and we always do.  Can I just clarify one

23  thing that I said?  When a claim gets referred to SIU,

24  it's not always handled by an SIU examiner.  But in

25  this particular case, with jewelry -- I mean with fine

DANIEL JAEGER  MARCH 02, 2023

1    art, excuse me, it would be handled by an SIU examiner.

2                    MR. POLI:  And let's go to the next

3    document, which will be SIU Field Investigator

4    Guidelines.

5                    (Whereupon, Deposition Exhibit Number 40 was

6    marked for identification.)

7        Q.  BY MR. POLI:  Okay.  And it's got similar

8    language.  Now, the field investigators would be the

9    kind of job that you had for many, many years, where

10   you're actually not the adjuster, you're an actual

11   investigator for Chubb, right?

12       A.  That would be correct.

13       Q.  And, again, it makes it clear that the

14   obligation, internally within Chubb, is to approach the

15   insured -- and, again, it uses the same word,

16   "impartially."  Do you see that?

17       A.  I do and I would agree with that.

18       Q.  Okay.  And, again, going back to the idea, if

19   it's determined that, in this instance, you treated

20   Mr. Altschuler as if he was guilty until proven

21   innocent, you would be the first to agree that would be

22   improper, correct?

23                    MR. SULLIVAN:  Object to the form.

24                    Mark it.

25                    THE WITNESS:  That's a hypothetical.  It

DANIEL JAEGER  MARCH 02, 2023

1  didn't happen here.  But if we went into the

2  investigation with that mindset, that would be

3  inappropriate.

4      Q.  BY MR. POLI:  And it would not only be

5  inappropriate, it would be a violation of Chubb's own

6  internal guidelines that we just looked at, right?

7          MR. SULLIVAN:  Objection; form.

8          Mark it.

9          THE WITNESS:  It would be inconsistent

10  with the guidelines that are in front of us in the

11  hypothetical that you're giving.  But, again, that

12  didn't happen here.

13      Q.  BY MR. POLI:  And, third, if it's determined,

14  by a jury or whatever, that that's what happened here,

15  it would not only be improper, it would not only be a

16  violation of the guidelines, it would be contrary to

17  the standards of proper claims handling that you've

18  been trained on over the decades, correct?

19          MR. SULLIVAN:  Objection; form.

20          You can answer.

21          THE WITNESS:  Again, under your

22  hypothetical, which didn't happen here, if that was

23  what occurred, then that would be inappropriate.

24      Q.  BY MR. POLI:  It would be a violation -- I

25  asked a somewhat different question, sir.  It would be

DANIEL JAEGER  MARCH 02, 2023

1  a violation of the proper claims handling standards

2  that you've been trained on over the years, right,

3  Mr. Jaeger?

4            MR. SULLIVAN:  Form.

5            THE WITNESS:  Yeah.  That would be

6  inconsistent, under that hypothetical, with the claim

7  best practices that are listed here.

8       Q.  BY MR. POLI:  Again, try and listen to my

9  question.  It may be just an oversight.  I already

10  asked you about the best practices.  I'm not --

11      A.  You said -- I'm sorry.

12      Q.  I'm now talking about proper standards of

13  claims handling.  If an SIU team, like yours, treats

14  Mr. Altschuler like he's guilty until proven innocent,

15  it would be a violation of the proper claims handling

16  standards that you've been trained on over the years;

17  is that right?

18            MR. SULLIVAN:  Objection; form.

19            Mark it.

20            THE WITNESS:  Under that hypothetical,

21  yes, you would be correct.  That would be a violation

22  of the standards that we've been trained on over the

23  years.

24      Q.  BY MR. POLI:  All right.  Let's talk about the

25  standard.  Sometimes we might call them rules of the

DANIEL JAEGER  MARCH 02, 2023

 1  road in terms of proper handling of claims.  You've

 2  received -- you've been an adjuster for -- let me go

 3  back to my notes.  You've been in the insurance

 4  industry for 29 years, right?

 5          MR. SULLIVAN:  Form.

 6          Mark it.

 7          THE WITNESS:  Approximately, yes.

 8      Q.  BY MR. POLI:  And 28 of those years, you've

 9  been working, in one capacity or another, for SIU, the

10  special investigations unit, right?

11          MR. SULLIVAN:  Form.

12          Mark it.

13          THE WITNESS:  Approximately.

14      Q.  BY MR. POLI:  Okay.  And you established that

15  proper standards of claims handling that apply to a

16  normal claim apply equally to a claim that's been

17  transferred to SIU, correct?

18          MR. SULLIVAN:  Form.

19          Mark it.

20          THE WITNESS:  That's correct.  Although,

21  there could be additional, you know, time frames

22  regarding, you know, decision-making.

23      Q.  BY MR. POLI:  But apart from the time frames,

24  apart from that, as far as the duties that are owed to

25  an insured, I think we've established they're the same,

 1  whether it's a regular claim or a so-called SIU claim,

 2  correct?

 3              MR. SULLIVAN:  Form.

 4              Mark it.

 5              THE WITNESS:  I would agree that the same

 6  duties would be owed, yes.

 7     Q.  BY MR. POLI:  And one of those duties is to

 8  conduct a prompt, thorough and fair -- a fair claims

 9  investigation, correct?

10              MR. SULLIVAN:  Form.

11              Mark it.

12              THE WITNESS:  That happened here and, yes,

13  that would be one of the duties owed.

14     Q.  BY MR. POLI:  Another duty, as we just looked

15  at, is to conduct an impartial claims investigation,

16  correct?

17              MR. SULLIVAN:  Form.

18              Mark it.

19              THE WITNESS:  That happened here.  And,

20  yes, that would be a duty of...

21     Q.  BY MR. POLI:  And there's a duty of good faith

22  and fair dealing that you're familiar with, not only in

23  New York or Arizona, but all through the country,

24  correct?

25              MR. SULLIVAN:  Form and foundation.

DANIEL JAEGER  MARCH 02, 2023

```
1              You can answer.
2              THE WITNESS:  Yes, that would be correct.
3    Q.  BY MR. POLI:  And part of that is the duty of
4  honesty and candor that's owed to the insured, correct?
5              THE WITNESS:  Yes, that would be correct.
6              MR. POLI:  Mark it, please.
7    Q.  BY MR. POLI:  And there's a duty that's often
8  discussed in claims handling is if it's a close call,
9  the benefit of the doubt goes to the insured.  That's
10  something you've been trained on over the years, right?
11              MR. SULLIVAN:  Objection; form;
12  foundation.
13              You can answer.
14              THE WITNESS:  Yeah.  Mr. Poli, if there
15  was a close call, which was not the case here, yes, we
16  would have given the benefit of the doubt to the
17  insured.
18    Q.  BY MR. POLI:  And that's why, early in this
19  deposition, when we discussed it, you agreed with the
20  language in my expert's rebuttal report, which I
21  believe came from the AIC coursework, that if
22  suspicions cannot be proven with hard evidence, even if
23  the suspicions still remain, the SIU team is supposed
24  to pay the claim; would you agree with that?
25              MR. SULLIVAN:  Form.
```

1          THE WITNESS:  I would agree that, if the

2   suspicions can't be established through either direct

3   or circumstantial evidence, that the claim would be

4   paid.

5     Q.  BY MR. POLI:  Which is a -- an example of the

6   fact that if there's a benefit -- if it's unclear what

7   to do.  If there's uncertainty, the benefit of the

8   doubt -- if it's a close call, that's another way to

9   put it.  If it's a close call, the benefit of the doubt

10  goes to the insured.  That's what you've been trained

11  on over 29 years; is that right?

12          MR. SULLIVAN:  Form.

13          Mark it.

14          THE WITNESS:  Mr. Poli, I will say that if

15  the evidence doesn't rise to the level of a situation

16  where the claim should be denied, the claim will be

17  paid.

18    Q.  BY MR. POLI:  Another way to put it, if the

19  evidence does not rise to the level of proving

20  intentional misrepresentation or intentional

21  concealment, then the way you've been trained, for

22  29 years, is the claim should be paid; is that right?

23          MR. SULLIVAN:  Form.

24          THE WITNESS:  Based on that statement,

25  yes, that would be accurate.

DANIEL JAEGER  MARCH 02, 2023

1           MR. POLI:  Okay.  The next document will
2  be 1/23/20 claim note, Edition of 30.
3           (Whereupon, Deposition Exhibit Number 41 was
4  marked for identification.)
5      Q.  BY MR. POLI:  Okay.  So this is basically five
6  days into the claim, correct?
7      A.  Yeah.  1/18 was the first notice of loss?
8      Q.  That's right.
9      A.  So, yes.
10     Q.  That's what the executive summary says.
11     A.  Yes.
12     Q.  And this is two days after it got to the SIU
13  group that you run, right?
14     A.  Kimberly Batts is not in our SIU group.  She, I
15  believe, was in the VAC unit at that time.  So this is
16  a note by her.  But I don't know if -- I would have to
17  see that other date.  And I'm not trying to be
18  difficult, I just -- there might have been a referral
19  sent to SIU and we were reviewing it and she was still
20  involved in the claim or we may have already had it by
21  this point and she put this note in the claim file.
22  I'm just not sure.
23          MR. POLI:  Let's look at -- go back and
24  show him Exhibit 35.
25          THE WITNESS:  Please.  That's all.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  Reported date 1/18/20.  Is that

2  the date you wanted to refresh your recollection on?

3    A.  Yes, sir.  Thank you.

4    Q.  All right.  So do you realize that, from the

5  very beginning of the claim, rather than saying, hey,

6  it's 3 of 30.  It's 3 of 30.  It's 3 of 30, constant

7  references are to the same thing the policy says,

8  Edition of 30.  Do you realize that or not?

9             MR. SULLIVAN:  Object to the form.

10             THE WITNESS:  I do realize that, but

11  that's not, you know, a review of the entire set of

12  facts.  You know, the Dina Brown appraisal, which was

13  in our underwriting file, which was used to increase

14  the value to $1.5 million, specifically referenced

15  Edition 3 out of 30.  We know what the policy says.

16    Q.  BY MR. POLI:  This is totally nonresponsive.  I

17  can't control you and I certainly can't control Bobby.

18  I just asked, do you realize, since you're obviously,

19  you know, very up to speed on all the aspects of this

20  claim, do you realize that all of the early references

21  in the claims file, none of them say 3 of 30, they all

22  just say Edition of 30?  Do you know that or not?

23             MR. SULLIVAN:  Object to the form.

24             Mark it.

25             THE WITNESS:  Mr. Poli, all they're

DANIEL JAEGER  MARCH 02, 2023

1   referring to is how the item was listed on the policy.

2       Q.  BY MR. POLI:  It's just a yes or a no,

3   Mr. Jaeger.  Maybe it's hard to give a yes or a no.

4           Do you realize -- we're going to look at

5   them.  Do you realize all the early references in your

6   unit, and in this claim, none of them say 3 of 30, they

7   just say Edition of 30; do you realize that?

8       A.  I don't realize that without seeing all of the

9   documents.  But I'll tell you, it would not surprise me

10  because of the fact that that's how it was described on

11  the policy.

12      Q.  Right.  And you keep wanting to go to the Dina

13  Brown document.  But the point, is after the Dina Brown

14  appraisal and after the increase in coverage, a new

15  policy got issued that we've marked as Exhibit 1,

16  right?

17          MR. SULLIVAN:  Object to form.

18          Mark it.

19          THE WITNESS:  Yes.  I don't know the

20  exhibit number, but I know I've seen it.  You put it up

21  here.

22      Q.  BY MR. POLI:  I'll avow to you it's Exhibit 1.

23      A.  Okay.

24      Q.  And Exhibit 1 does not refer to 3 of 30.  It

25  just says Edition of 30; isn't that right?

DANIEL JAEGER  MARCH 02, 2023

1          MR. SULLIVAN:  Objection; form.

2          You can answer.

3          THE WITNESS:  That is correct.

4     Q.  BY MR. POLI:  And so that's why, when we go

5  through your claims file and we see all these

6  references from people in your SIU unit, they don't say

7  3 of 30.  They just say the same thing the policy says,

8  which is Edition of 30; is that right, Mr. Jaeger?

9          MR. SULLIVAN:  Objection; form.

10          THE WITNESS:  Again, I would have to go

11  through all the notes, but I would imagine that, at

12  some point, that starts to change, based on the

13  additional information that we had when we were

14  evaluating the documentation that was submitted to

15  increase the value.  So the policy absolutely said

16  Edition of 30.  And then, as we did more investigation,

17  to try to understand why the item was increased to $1.5

18  million, we reviewed the Dina Brown appraisal, which

19  said Edition 3 out of 30 and the investigation was

20  moving forward based on the fact that Mr. Altschuler

21  said, through representations to his agent, that the

22  increase in value to the item that was scheduled on the

23  policy was for Edition 3 out of 30.

24          MR. POLI:  Okay.  Let's continue to go

25  through these documents.  Next is 1/24/20, claim note

1   re history of coverage.

2        (Whereupon, Deposition Exhibit Number 42 was

3   marked for identification.)

4        Q.  BY MR. POLI:  So here's another claim note.  I

5   bet you've seen this.  Right, Mr. Jaeger?

6        A.  I'm sure I've seen it.

7        Q.  And Karen Moore, she was part of your SIU

8   group, right?

9        A.  That's correct.

10       Q.  But by now, she's obviously, in the context

11  here, reviewed the increase in coverage, based on the

12  Dina Brown appraisal, right?

13       A.  Well, no, not necessarily.  She realizes, and

14  documents in the file, that there was a recent increase

15  in value to the scheduled item.  And then part of the

16  investigation would be in to what basis was that item

17  increased in value.  So on 1/24/2020, and at the time,

18  Karen was the SIU examiner, she would have noted that

19  and that would have been something that she put in the

20  file.

21            Now, the -- what we were trying to do is

22  find out what caused that item to be increased in value

23  and that led us to the next step, which was obtaining

24  the Dina Brown appraisal.

25       Q.  And you can see, right above the highlighting,

DANIEL JAEGER  MARCH 02, 2023

1   again, your subordinate, Ms. Moore, she doesn't say

2   3 of 30, even though she's now realized there was an

3   increase in coverage to $1.5 million.  She, again, just

4   says the same thing the policy says, Edition of 30.  Do

5   you see that?

6       A.  I do see that.  But on 1/24/2020, she was

7   noting the increase of coverage.  She wouldn't have

8   known at that point what was the --

9       Q.  Sir, I'm not going to speculate about what she

10  knew or didn't know.  I'm just asking a pretty simple

11  question that you're not being responsive to.  This

12  note does not refer to 3 of 30, it just refers to

13  Edition of 30; is that right?

14          MR. SULLIVAN:  Objection; mischaracterizes

15  my client's answer.

16          You can answer the question, Dan.

17          THE WITNESS:  That's what this note says,

18  Mr. Poli, and I'm trying to explain why.

19      Q.  BY MR. POLI:  Sir, if I want you to explain

20  why, I will ask that question.  But I'm just asking,

21  all it says is Edition of 30.  It does not say 3 of 30;

22  is that right, Mr. Jaeger?

23      A.  That's what it says, sir.

24      Q.  All right.  Thank you.  It will go a lot faster

25  if you just answer the question.  Not everything has to

DANIEL JAEGER  MARCH 02, 2023

1   be answered in a narrative, Mr. Jaeger.

2            MR. POLI:  Then next exhibit will --

3            MR. SULLIVAN:  I'm going to object.  If

4   you make that comment again, we're going to terminate

5   the deposition.

6            MR. POLI:  You go ahead.  I'm done.  I

7   mean, I really don't care.  At this point, this is

8   clearly going to go in front of the judge --

9            MR. SULLIVAN:  I agree.

10           MR. POLI:  I will be shocked if he blesses

11  your behavior.  But I'm not the judge, that's up --

12           MR. SULLIVAN:  Or yours.

13           MR. POLI:  This is called

14  cross-examination of a difficult witness.  So that's

15  the way this process works.  And, obviously --

16  whatever, I'm not going to comment anymore.

17           All right.  The next document, 1/24/20

18  claim e-mail re Edition of 30.

19           And this is -- I'm sorry, I shouldn't be

20  talking.

21           THE COURT REPORTER:  43.

22           MR. POLI:  Yes, I was just going to say

23  this is 43.

24           THE COURT REPORTER:  Let me just mark it

25  so we don't get lost.

DANIEL JAEGER  MARCH 02, 2023

1      MR. POLI:  I know.  It's easy to get lost

2  with this many documents.

3      (Whereupon, Deposition Exhibit Number 43 was

4  marked for identification.)

5      Q.  BY MR. POLI:  Okay.  So here we have a paper

6  trail where she's asking -- Karen Moore, again.  This

7  is your subordinate, right, Mr. Jaeger?

8      A.  That's correct.

9      Q.  She's asking -- she's asking for the appraisal.

10  In context, that would be the Dina Brown appraisal,

11  right?

12      A.  That's correct.

13      Q.  And, again, just like all the other documents,

14  she doesn't say 3 of 30.  She just says Edition of 30

15  because that's what the policy says, right?

16      MR. SULLIVAN:  Object to the form.

17      THE WITNESS:  That's correct because she

18  wasn't aware of the appraisal yet.

19      Q.  BY MR. POLI:  So I'm assuming as soon as she

20  got the appraisal, she would suddenly, voila, we're now

21  going to call this 3 of 30.  Is that what she would do?

22      MR. SULLIVAN:  Form; foundation.

23      THE WITNESS:  The appraisal says it's 3 of

24  30.

25      Q.  BY MR. POLI:  Well, did she suddenly -- I mean,

DANIEL JAEGER  MARCH 02, 2023

1   did you guys like switch gears in a moment, as soon as

2   you saw that appraisal, and say, wow, we got a gotcha.

3   It's got to be 3 of 30 or otherwise no coverage.  Is

4   that what happened?

5           MR. SULLIVAN:  Object to the form.

6           THE WITNESS:  Yeah.  Mr. Poli, that is,

7   you know, inconsistent with everything that occurred

8   here.  There is no gotcha moment.  We were trying to

9   understand why the item increased to $1.5 million from

10  $250,000.  Part of that was getting the appraisal.

11  When we reviewed the appraisal, we evaluated it and we

12  saw that the appraisal was for Item 3 out of 30 and

13  that was what we understood at that time Mr. Altschuler

14  was claiming he owned and was stolen.

15      Q.  BY MR. POLI:  Let's just pin down -- you know

16  what I mean by a gotcha moment; you know what that

17  would mean in layman's language, right, sir?

18          MR. SULLIVAN:  Objection --

19          THE WITNESS:  I would.

20      Q.  BY MR. POLI:  Yeah.  Tell me what you

21  understand a gotcha moment to be.  How would you

22  characterize that in layman's language?

23      A.  A situation where you know something turns out

24  to be different than what it appears and we say,

25  gotcha.  But that is not what happened here.  It's not

DANIEL JAEGER  MARCH 02, 2023

1   even close to what happened here.

2          This is on January 24th of 2020.  We were

3   just trying to establish what the basis of the increase

4   in value was based on.  And, you know, so there is no

5   gotcha moment.  We were just trying to understand it,

6   as we should have, you know, in order to properly

7   investigate it.

8      Q.  Okay.  Let me follow up on something that I

9   think would probably be consistent with your prior

10  testimony, but now I'm using a different terminology.

11  I'm using the terminology gotcha moment.  If a jury

12  determines that, on this 3 of 30 versus AP issue, that

13  essentially your team used that as a gotcha moment, if

14  you will, if the jury determines that's what happened,

15  you would agree that would be wildly inappropriate, in

16  terms of claims handling standards, right?

17         MR. SULLIVAN:  Object; form; foundation.

18         You can answer.

19         THE WITNESS:  That's a complete

20  hypothetical and, you know, that's not consistent with

21  what happened here and I would be surprised if a jury

22  concluded that.

23     Q.  BY MR. POLI:  Well, I never know what a jury is

24  going to do.  But if a jury did conclude that, if a

25  jury concluded that, on this 3 of 30 versus AP issue,

DANIEL JAEGER  MARCH 02, 2023

1  you guys saw a gotcha moment and took advantage of it,

2  that would be wildly inappropriate, based on proper

3  claims handling standards; is that right?

4                 MR. SULLIVAN:  Objection; form;

5  foundation.

6                 You can answer.

7                 THE WITNESS:  Again, it's a complete

8  hypothetical.  There was no gotcha moment and there was

9  no effort on our part in any way to have a gotcha

10  moment.  We were just trying to evaluate the facts and

11  understand, on January 24th, within a week of the claim

12  being submitted, what was the basis for the increase in

13  value.

14     Q.  BY MR. POLI:  I don't think that answered my

15  question; so I'll try again.

16                 If that's what happened here, if you and

17  your team seized on a so-called gotcha moment, the way

18  you've defined it, that would be wildly inappropriate,

19  based on proper claims handling standards; is that

20  correct?

21                 MR. SULLIVAN:  Object to the form;

22  foundation.

23                 Mark it.

24                 You can answer.

25                 THE WITNESS:  Under your hypothetical, if

DANIEL JAEGER  MARCH 02, 2023

1   our team seized purely on a gotcha moment in order to

2   not pay Mr. Altschuler, then, yes, that would be

3   inappropriate.  But it did not happen here.  It's not

4   even remotely close to the facts and circumstances of

5   this investigation.

6       Q.  BY MR. POLI:  Well, let's play that out.

7           And it's a hypothetical and I know you

8   reject it, but let's play that out.  And just to be

9   clear, that's what we're going to contend at trial,

10  okay, Mr. Jaeger?

11      A.  I'm sure you are.

12      Q.  Okay.  There's a legal standard out there that

13  you may have run into and it's a little bit buzz-wordy,

14  but I think it's pretty clearly understood, if we break

15  it apart.  And the standard is conscious disregard of a

16  substantial risk of significant injury to others, okay?

17  Did you follow that phrase while I used it, conscious

18  disregard of a substantial risk of significant injury

19  to others?  Do you have that phrase in mind?

20      A.  I heard what you said, yes.

21      Q.  Okay.  And let's pick it apart.  Conscious

22  disregard, all that means is you're intentionally or

23  consciously disregarding something.

24          MR. SULLIVAN:  Object to the --

25      Q.  BY MR. POLI:  Substantial risk means, like what

DANIEL JAEGER  MARCH 02, 2023

```
 1   it says, pretty straightforward language.  And
 2   significant injury could be not paying someone $1.5
 3   million.  So do you got those words in mind?
 4       A.  I understand what you're --
 5             MR. SULLIVAN:  Object to the form of the
 6   question.  Object to the --
 7       Q.  BY MR. POLI:  Here's my question --
 8             MR. SULLIVAN:  Wait.  It's not his
 9   testimony, that's my point.
10       Q.  BY MR. POLI:  Here's my question.  It's playing
11   out further on this hypothetical about seizing unfairly
12   on a gotcha moment and you agreed a moment ago, if
13   hypothetically what your team has done here is seized
14   on a gotcha moment, on this 3 of 30 versus AP issue,
15   you would agree that would be wildly inappropriate, if
16   that's what happened; you would agree with that, right?
17             MR. SULLIVAN:  Objection; form.
18             Mark it.
19             THE WITNESS:  Again, under your
20   hypothetical, if that's what we seized on and that's
21   all we evaluated, that would be inappropriate.
22       Q.  BY MR. POLI:  Okay.  So let me take that
23   hypothetical, that I know you reject, let me take that
24   hypothetical one step further.
25             If -- if it turns out that's what your
```

DANIEL JAEGER  MARCH 02, 2023

1   team did here, was seized on that gotcha moment, it

2   would also fit that standard I just mentioned a moment

3   ago, namely a conscious disregard of a substantial risk

4   of significant injury to others; would you agree?

5           MR. SULLIVAN:  Objection; form and

6   foundation.

7           You can answer.

8           THE WITNESS:  Again, on your -- you know,

9   your hypothetical, which there's absolutely no

10  evidence, in my view, of, would there -- that gotcha

11  moment that you're referring to.  Be a conscious

12  disregard resulting in serious injury; is that the

13  question?

14      Q.  Not just disregard of substantial risk --

15      A.  Of substantial risk, resulting in serious

16  injury, is that what the question was?

17      Q.  No.  Disregard of a substantial risk of serious

18  injury.  Playing this hypothetical out, if it's

19  determined that that's what happened here, you know,

20  jumping on that gotcha moment, that would meet that

21  standard, wouldn't it?

22          MR. SULLIVAN:  Objection; form and

23  foundation.

24          You can answer.

25          THE WITNESS:  Yeah.  I'm not really sure

DANIEL JAEGER  MARCH 02, 2023

1  how to answer that, Mr. Poli.  It seems to be a legal

2  standard.  You know, all I can tell you is that that is

3  a hypothetical that you're putting forth that I

4  disagree with and it didn't happen here.  Whether or

5  not it meets that legal standard, under your

6  hypothetical, maybe.  But, you know, that's not for me

7  to decide.

8      Q.  BY MR. POLI:  Yeah, it's for the jury.

9           Just to be clear, it's a legal standard

10  for an award of punitive damages; that's what it's a

11  legal standard for.

12           So let me put it this way.  If it turns

13  out that a jury determines that what you guys did here

14  was attempt to take advantage of a so-called gotcha

15  moment, you would fully expect that you would be

16  exposed to punitive damages here, based on your wealth

17  of experience; is that right?

18           MR. SULLIVAN:  Objection; form and

19  foundation.

20           You can answer, Dan.

21           THE WITNESS:  Yeah, it's a hypothetical.

22  And, again, I don't believe there's any gotcha moment

23  whatsoever in the investigation of this claim.  And I

24  don't believe that the company is exposed to extra

25  contractual damages or punitive damages.  However, you

DANIEL JAEGER  MARCH 02, 2023

1    know, that's for a jury to decide.

2        Q.  BY MR. POLI:  Right.  In other words, I know

3    you categorically reject the idea that you guys took

4    advantage of a so-called gotcha moment.  But if it's

5    determined that you did, as someone who's written a

6    whole bunch of reports in your career, you would

7    probably write up a report that says, we've got

8    exposure, if that's determined.  That's what you would

9    write, isn't it?

10               MR. SULLIVAN:  Objection; form;

11   foundation.

12               You can answer it.

13               Oh, and mark it.

14               THE WITNESS:  So if there was an

15   evaluation done, and I don't know that this would

16   necessarily be done by me, you know, but if that

17   evaluation occurred and, you know, there was some

18   belief that there truly was exposure to those types of

19   damages, based on the investigation, then we would make

20   the appropriate people aware of that.

21       Q.  BY MR. POLI:  Well, I guess I'm still trying to

22   get a concrete answer.  I've explained that the

23   standard I gave you is the standard for punitive

24   damages.  If it's determined by a jury that what you

25   guys did here was take advantage of a so-called gotcha

DANIEL JAEGER  MARCH 02, 2023

1  moment, as someone who's been doing this for 29 years,

2  and as someone who's one of the most senior people at

3  SIU in this entire organization, you would expect that

4  there is some potential exposure there for punitive

5  damages; isn't that true?

6          MR. SULLIVAN:  Objection; form;

7  foundation.

8          Mark it.

9          THE WITNESS:  So I'm just trying to unpack

10  your question a little bit because you're saying, on

11  one hand, the jury has already concluded that there was

12  a gotcha moment and, therefore, they would have

13  determined that, as a result of that behavior or

14  actions, there was -- there should be punitive damages.

15          On the other hand, you're asking me

16  whether or not, if we believe that our actions could

17  result in punitive damages, that would we alert the

18  appropriate people within the company.  So that's why

19  I'm a little confused as to what you're asking.  Has a

20  jury already determined it, Mr. Poli?

21    Q.  BY MR. POLI:  Let me try and clear up your

22  confusion.  Forget referring it to people.  We'll deal

23  with that at another time.

24          It's a hypothetical.  You reject the idea

25  that you jumped on a gotcha moment.  But if the jury

DANIEL JAEGER  MARCH 02, 2023

1  determines that that's what you and your team did, you

2  tried to take advantage of a gotcha moment, if a jury

3  determines that, as someone with your wealth of

4  experience, you would anticipate potential exposure for

5  punitive damages; is that true or not?

6            MR. SULLIVAN:  Objection; form;

7  foundation.

8            Mark it.

9            THE WITNESS:  Yeah.  Under your

10  hypothetical, which I completely disagree with, if a

11  jury makes that determination, then, of course, we

12  would, you know, expect that there could be exposure to

13  punitive damages.  But the jury needs to make that

14  determination first.

15            MR. POLI:  Okay.  Mark it, please.

16            Okay.  The next document will be 1/24/20

17  Chubb investigative report re Doug.

18            (Whereupon, Deposition Exhibit Number 44 was

19  marked for identification.)

20       Q.  BY MR. POLI:  Okay.  This is -- I guess it's a

21  Lexis report and it looks into all kinds of things by

22  someone.

23            MR. POLI:  Go to the next page.

24       Q.  BY MR. POLI:  And it's a so-called

25  comprehensive report.  Do you see that?

DANIEL JAEGER  MARCH 02, 2023

1    A.  Yes.

2    Q.  And I guess this must be just something you

3  guys do.  It looks at criminal issues.  It looks at

4  sexual offenses.  It looks at work history, every

5  possible address, associates, relatives, neighbors.  I

6  mean, this is a document that you've seen in your work

7  on this file, right, Mr. Jaeger?

8         MR. SULLIVAN:  Objection; form.

9         You can answer.

10         THE WITNESS:  I don't know if I recall

11  specifically seeing it on this file.  But this is a

12  comprehensive background check that we will use, based

13  on public records.

14    Q.  BY MR. POLI:  Yeah.  I mean, a layman might be

15  surprised that their insurance company is doing this,

16  but this is pretty standard operating procedure for you

17  and your SIU team; is that right, Mr. Jaeger?

18    A.  And, yes, we do run these reports.  And also, I

19  would say, for most SIUs throughout the country.

20    Q.  Okay.  So to the extent a lay juror is shocked

21  by this, that's just the way it goes.

22         MR. POLI:  Go to the first page.

23         Strike that.  Let me start over.

24    Q.  BY MR. POLI:  The first page, it says, at the

25  top, "One criminal filing noted.  Same is traffic

DANIEL JAEGER  MARCH 02, 2023

1    related."

2              Again, is your team normally in the habit

3    of treating a minor traffic offense as a criminal

4    violation?

5        A.  Well, I don't think that we treated it as a

6    criminal violation.  Evidently, whoever the law

7    enforcement agency was that, you know, made that stop

8    or for whatever it was, called it criminal.  That's how

9    it's noted in the report.  But we're using this report

10   under, you know, these circumstances to look for, you

11   know, information related to crimes such as fraud,

12   securities fraud, any things like that, bankruptcies,

13   liens, judgments.  The reports are comprehensive and

14   they cover a bunch of different things.  But, you know,

15   we're really looking for certain information, you know,

16   as we're conducting it and submitting it.

17       Q.  Yeah, you're looking for some indicia of prior

18   instances of fraud.  That's what you're looking for,

19   right?

20       A.  Yeah, this -- just to be clear, this wouldn't

21   really deal with claims fraud.  This is more fraud

22   related to a criminal act potentially or a bankruptcy

23   or a lien or a judgment.  And, you know, lots of people

24   have liens or judgments and they're released and, you

25   know, it's a nonissue.  So we look at that information

DANIEL JAEGER  MARCH 02, 2023

1  during the time frame that, you know, the claim is

2  being submitted.

3      Q.  So the point of this, according to your

4  testimony, the point of this so-called comprehensive

5  report is you're looking for prior instances of fraud

6  or criminal behavior, right?

7              MR. SULLIVAN:  Objection.

8              THE WITNESS:  Or ruling it out, that there

9  is none.

10     Q.  BY MR. POLI:  And in this case, you ruled it

11 out.  You found no fraud and you found no criminal

12 behavior on the part of Mr. Altschuler; is that right?

13     A.  That's what the note reflects and that would

14 be, you know, typical of many of the ones that we run.

15             MR. POLI:  So let's go to Bates 2400 or

16 page 11, either way.  11 is probably easier.

17             Towards the bottom of the page.  Further

18 down.  Maybe I'm on the wrong --

19             THE COURT REPORTER:  That is the bottom.

20 What Bates number?  Oh, it's the next page.

21             MR. POLI:  Oh, I know.  Because the first

22 page really didn't have a page number.  Okay, I got it.

23     Q.  BY MR. POLI:  So here's the big criminal issue.

24 And it doesn't list it as a criminal traffic violation.

25 It says traffic or minor infraction and then it says

1   "traffic/minor infraction."  And that's the supposed

2   criminal record for Mr. Altschuler.  Am I reading that

3   right?

4          MR. SULLIVAN:  Object to the form.

5          You can answer.

6          THE WITNESS:  Yeah.  I think what Karen

7   was saying, it was under criminal records and it was a

8   traffic violation.  And that's -- you know, you can ask

9   her as to why she titled it that way.  But it really

10  wasn't relevant and material to our investigation.  It

11  was a -- just documentation of what that heading found.

12     Q.  BY MR. POLI:  You also, as standard operating

13  procedure, when some insured gets transferred to your

14  team, you look for sexual offenses; that's what you

15  normally do, too?

16     A.  We don't necessarily look for sexual offenses,

17  but that could be part of this report.  Again, you

18  know, we're running this report as it pertains to the

19  actual claim that's being presented and I think I

20  explained, you know, in claims for artwork or other

21  property, we're looking primarily for bankruptcies,

22  liens, judgments; if there's a criminal record for,

23  say, securities fraud or some fraud-related crime, we

24  would want to know about that.  Traffic stops and

25  incidents like that, sexual offense, is a heading and

DANIEL JAEGER  MARCH 02, 2023

1    it's a public record in some states that will come

2    back, some it won't.

3              Not all of this is available in every

4    state.  So, you know, this is what the database comes

5    back.  But it doesn't necessarily mean that it's

6    relevant and material to what we're doing on that

7    pending investigation.

8              I'm just going to turn my light on, if you

9    don't mind.  It's getting dark here.

10      Q.  Sure.

11              MR. SULLIVAN:  Mike, how long do you got?

12    Should we take another break?

13              MR. POLI:  Sure.  What's our time on

14    record?

15              THE VIDEOGRAPHER:  We are on record, 4

16    hours, 46 minutes.

17              MR. POLI:  Okay.  I think I'll go the

18    seven.  So let's take a break.

19              MR. SULLIVAN:  All right.

20              THE VIDEOGRAPHER:  The time is 3:31 p.m.

21    We are going off the record, ending Media Number 5.

22        (Whereupon, a brief recess ensued from

23    3:31 p.m. to 3:41 p.m.)

24              THE VIDEOGRAPHER:  My name is Judy

25    Thompson, with Legal Video Specialists, Phoenix,

DANIEL JAEGER  MARCH 02, 2023

1  Arizona.  This begins Media Number 6 of the videotaped

2  deposition of Dan Jaeger.  The time is 3:41 p.m.  We

3  are now back on record.

4              MR. POLI:  Let's go to the next document,

5  Donna, and it will be 1/24/20 ISO search re Doug.

6              THE COURT REPORTER:  That's 1/24/20?

7              MR. POLI:  Yes, ISO search.

8              THE COURT REPORTER:  Oh, yeah.

9              And I have Exhibit 45?

10             MR. POLI:  Yes.  This will 45.

11         (Whereupon, Deposition Exhibit Number 45 was

12  marked for identification.)

13     Q.  BY MR. POLI:  Okay.  So this is another

14  document from your SIU file.  This is something I

15  assume you've seen, this ISO search?

16     A.  I'm sure I've seen it.  I don't have a specific

17  recollection of this one.

18     Q.  And ISO stands for Insurance Services Office,

19  right?

20     A.  It's my understanding, correct.

21     Q.  And what it is -- it's a way for all the

22  different insurance companies to share information with

23  each other, among other things, so that you can find

24  all the other claims that some insured has asserted

25  with a whole bunch of other companies, other than your

DANIEL JAEGER  MARCH 02, 2023

1    own; is that right?

2            MR. SULLIVAN:  Object to the form.

3            You can answer.

4            THE WITNESS:  As long as the company is a

5    member of ISO and they report and it is an all claims

6    database.

7        Q.  BY MR. POLI:  Right.  And so what you were

8    doing here is you go back really far, all the way back

9    into the '90s, and look for every other insurance claim

10   that's ever been submitted by Mr. Altschuler; that's

11   what you're doing here, right?

12       A.  We're looking for prior claims that were

13   submitted by Mr. Altschuler or subsequent claims.

14       Q.  And this is, again, just like that search we

15   just looked at, where you're looking for criminal

16   offenses and sexual offenses and everyone they've ever

17   known.  Just like that's standard operating procedure,

18   this is pretty standard operating procedure for your

19   SIU team; is that right, Mr. Jaeger?

20           MR. SULLIVAN:  Objection; form.

21           You can answer.

22           THE WITNESS:  Yeah, I disagree with your

23   characterization of what we're looking for in a

24   LexisNexis search.  But this is a database that's

25   available to us to look for prior claims and subsequent

DANIEL JAEGER  MARCH 02, 2023

1    claims.

2        Q.  BY MR. POLI:  Well, you can't disagree with

3    what's in the Lexis search.  We just looked at it.  It

4    looks at criminal history, right?

5        A.  It does in some states, if it's available.

6        Q.  And we also looked at it.  We looked for sexual

7    offenses, right?

8        A.  It does look for sexual offenses.  But as I

9    told you, that's really not necessarily material to

10   what we're looking for from that database.  It's

11   comprehensive report; so it comes back with all of that

12   information, but we're looking for certain aspects of

13   the report.

14       Q.  Okay.  So the search we just looked at, that is

15   through Lexis that looks for criminal history, sexual

16   offenses, all kinds of contacts, judgments, neighbors,

17   that's all standard operating procedure for an SIU

18   unit, like yourself, right?

19       A.  It is a report that we will typically run on

20   claims that are being investigated by SIU, correct.

21       Q.  And now this exhibit, Exhibit 45, it's a

22   so-called ISO search.  This is also standard operating

23   procedure for an SIU team like yours, right?

24       A.  It's standard operating procedure for a SIU

25   team like mine.  But it's standard operating procedure

DANIEL JAEGER  MARCH 02, 2023

1  for any claims team.  They will run these reports,

2  usually automatically, and get a report back so they

3  can view it, even if the claim is not in SIU.

4       Q.  And they're not always accurate.  I mean, you

5  do understand that.  There's a lot of mistakes in these

6  kinds of reports, right?

7            MR. SULLIVAN:  Objection; form and

8  foundation.

9            You can answer.

10            THE WITNESS:  Yeah, the information is

11  utilized and, obviously, it would have to be verified.

12       Q.  BY MR. POLI:  Let's look at the last page.  And

13  here's what the last page says, "Reasonable procedures

14  have been adopted to maximize the accuracy of this

15  report.  Independent investigation should be performed

16  to evaluate the relevant data provided.  2020 Insurance

17  Services Office, Inc."

18            Do you see that?

19       A.  I do see that.

20       Q.  These reports, just like the Lexis reports,

21  they've got mistakes on them that are pretty common,

22  right?

23            MR. SULLIVAN:  Object to the form and

24  foundation.

25            You can answer.

DANIEL JAEGER  MARCH 02, 2023

```
1            THE WITNESS:  The reports will sometimes
2   have mistakes and that's why the information needs to
3   be independently verified, if it's going to be -- if
4   it's relevant and material to the investigation of the
5   subject claim.
6            MR. POLI:  Okay.  Go to the second page of
7   this document.
8       Q.  BY MR. POLI:  All right.  So this is
9   supposedly -- Mr. Altschuler, at one point, owned a
10  2009 Chrysler Town & Country and got in a collision.
11  That's what this says, right?
12      A.  That's what it indicates.  But, to be honest
13  with you, we wouldn't even -- it wouldn't be relevant
14  to what we were doing.
15      Q.  Well, you realize your investigator, Fred
16  White, asked him about this.  You know that, right?
17      A.  He may have asked him about it, but it really
18  wouldn't be relevant to the subject artwork.
19      Q.  And the involved party, salvage buyer in
20  Juarez.  That's Juarez, Mexico; is that right?
21            MR. SULLIVAN:  Form and foundation.
22      Q.  BY MR. POLI:  Is that what this says?
23      A.  I assume it's Juarez.  I don't know what "CH"
24  stands for.
25      Q.  Well, anyway, are you aware that after Mr. Fred
```

DANIEL JAEGER  MARCH 02, 2023

1  White, your subordinate, asked Mr. Altschuler about

2  this, he's like I've never owned a Chrysler Town &

3  Country?

4      A.  I am aware of that, from reading the transcript

5  and then I think Mr. White moved on.

6      Q.  Okay.  Well, it may not be relevant, but it was

7  relevant enough that Mr. White felt the need to quiz

8  your insured about it; is that right?

9          MR. SULLIVAN:  Objection; form.

10          THE WITNESS:  I think that is a part of a

11  comprehensive investigation.  We'll ask about prior

12  claims and when Mr. Altschuler said, that's not me.  I

13  have no knowledge of that and I didn't own a Town &

14  Country, Mr. White moved on and it never was brought up

15  again because it wasn't relevant to the investigation

16  of the silkscreens.

17      Q.  BY MR. POLI:  So your standard operating

18  procedure, in an SIU team like yours, is, something

19  comes up, it seemingly is completely irrelevant, but

20  you'll still quiz the insured about it; is that right?

21          MR. SULLIVAN:  Object to the form.

22          THE WITNESS:  Yeah.  Mr. Poli, we will

23  conduct a thorough and comprehensive investigation and

24  part of that is prior claim history.  Mr. White was

25  just asking about a claim that showed up on ISO.

DANIEL JAEGER  MARCH 02, 2023

1   Mr. Altschuler provided information indicating it

2   wasn't him and Mr. White moved on to the next aspect of

3   his investigation or his questioning.

4            MR. POLI:  Well, I think that means the

5   answer is yes, but I'll just move on because I don't

6   know if I have the patience.

7            Go to the bottom of this page, please.

8            MR. SULLIVAN:  Object to the

9   characterization of the answer.

10            You can go on.

11            MR. POLI:  Just to be clear, my

12   characterization is it's really hard getting a yes or a

13   no answer to a simple question.  But it's probably not

14   worth the fight.

15   Q.  BY MR. POLI:  So that's what I'm referring to,

16   okay?  Just so you know, Mr. Jaeger.  I would argue --

17            MR. SULLIVAN:  And just so you know, for

18   the record, it's your argumentative nature of the

19   questions.

20            MR. POLI:  Stop interrupting me while I'm

21   talking.

22   Q.  BY MR. POLI:  Just so you're aware, Mr. Jaeger,

23   when and if this case goes to trial, I will try and do

24   my best to play clips of this to show how incredibly

25   nonresponsive to questions you are, to argue to a jury

DANIEL JAEGER  MARCH 02, 2023

1  that that's an intentional strategy.  So I don't want

2  to hide the ball from you; that's where I coming from.

3  And when I --

4           MR. SULLIVAN:  And just so we're clear for

5  the record, we'll make sure we play the entire question

6  asked by you in the appropriate manner, so that we have

7  a proper record --

8           MR. POLI:  I'm not done talking --

9           MR. SULLIVAN:  -- that's completely

10  accurate with respect to the argumentative nature --

11           MR. POLI:  I'm not done talking.  I'm not

12  done --

13           MR. SULLIVAN:  -- and the inappropriate

14  questions.

15           MR. POLI:  I'm not done talking.  So

16  please don't interrupt me.

17           MR. SULLIVAN:  Also, I didn't mean to.

18     Q.  BY MR. POLI:  So I want you to be fully aware

19  that that's an issue that's going to be presented to a

20  jury, when and if this case sees the light of a jury

21  trial.

22           So go ahead, Bobby, say whatever you want,

23  man.

24           MR. SULLIVAN:  I already made my record.

25           MR. POLI:  Okay.  Well, I couldn't hear

DANIEL JAEGER  MARCH 02, 2023

```
 1   it.

 2             MR. SULLIVAN:  I couldn't hear yours.  So

 3   I don't know which one was made.

 4             MR. POLI:  Maybe that's a good reason not

 5   to interrupt me.

 6        Q.  BY MR. POLI:  Okay.  So now we're down to the

 7   bottom of the second page.  Now, obviously, you've

 8   looked at the scheduled jewelry and the scheduled art.

 9   Mr. Altschuler not only had a lot of art, he had a lot

10   of watches, including Rolex watches; isn't that true?

11             MR. SULLIVAN:  Objection; form and

12   foundation.

13             You can answer.

14             THE WITNESS:  The policy speaks for itself

15   as to what watches he had.  But my recollection is that

16   there were Rolex watches on his policy, yes.

17        Q.  MR. POLI:  Mr. Altschuler, based on your

18   schedule, as well as what you saw on the AIG schedule,

19   had a lot of watches, right?

20             MR. SULLIVAN:  Form and foundation.

21             You can answer.

22             THE WITNESS:  Yeah.  I just don't remember

23   the exact number, Mr. Poli.  And, you know, I don't

24   know what your definition of a lot is.  Could he have

25   had 10?  Yes.  Is that a lot?  Maybe not.  It's more
```

DANIEL JAEGER   MARCH 02, 2023

1  than I have.  But, you know, I just don't know what

2  your definition of a lot is.

3         Mr. POLI:  Well, let's see if we can clear

4  that.  We don't want to push it past what you're

5  comfortable with.

6         Let's go to Exhibit 1.

7         So let's go to Bates 25.  That's the

8  Valuable Articles.  And then go to 27.

9  Q.  BY MR. POLI:  Okay.  So let's just look at the

10  watches.  You've got a Rolex that's valued at over

11  $36,000.  You've got another Rolex that's valued at

12  another $36,000.  Another Rolex that's valued at

13  $35,000.  A vintage Rolex that's valued at $15,000.  A

14  Rolex Daytona that's valued at $85,000.  And then

15  another Rolex Daytona --

16         MR. POLI:  Go to the next page.

17  Q.  BY MR. POLI:  And then I guess that's valued at

18  $50,000.  And then a Rolex Zenith that's valued at

19  $15,000.  And then another Rolex Daytona that's only

20  valued at $22,500.  Do you see all those?

21  A.  I do.

22  Q.  You know, one thing that would be really

23  interesting -- did you do anything -- I mean, your

24  theory is that Mr. Altschuler was insuring something

25  that he didn't own.  Did you do anything to go through

1  any of these other scheduled items and say, hey,

2  Mr. Altschuler, would you please prove to us that you

3  owned these.  Did you do that?  I don't see anything in

4  the claims file like that.

5            MR. SULLIVAN:  Objection; form;

6  foundation.

7            You can answer.

8            THE WITNESS:  Mr. Poli, we evaluate the

9  claim that's being presented and that is what the

10 investigation was into.  We don't go, as a claim

11 department, and independently verify all the other

12 items that are on the schedule.  We evaluate the claim

13 that's being presented to us and that's what the

14 investigation centered on.

15    Q.  BY MR. POLI:  Okay.  I just want to make sure.

16 I'm not only asking about all of these expensive

17 watches, I'm also asking about all this expensive art.

18 I mean, again, we've got a 150,000 piece of art, a

19 $1.5 million piece of art that we're here on today, a

20 $250,000 piece of art, $200,000 piece of art, 45,000,

21 150,000, 25,000, 150,000, $200,000.  You're tracking

22 down the page as we go, right, Mr. Jaeger?

23    A.  The page isn't moving, but, yes, I'm looking at

24 the numbers and the scheduled items.

25    Q.  Let's see what continues from there.

DANIEL JAEGER  MARCH 02, 2023

1    Okay.  Go to the top.  So the item that

2  starts on the prior page is $400,000 for art and a

3  million dollars for an art piece, 100,000, 150,000,

4  50,000, $100,000.  Here's a cheapy, $4,000, another

5  4,000, another 4,000, another 4,000 and then a 900,000

6  item and $200,000 item.  I'm not sure if that's all.

7  Let's go to the next page.

8    I guess that's it.

9    So it just seems that if I -- not that I

10  know anything about SIU, but if I'm thinking that

11  Mr. Altschuler just faked owning one of these expensive

12  scheduled items, I kind of want to know whether he

13  faked owning any of the other expensive items.  But

14  that's not something you ever looked into, is it?

15    MR. SULLIVAN:  Objection; form;

16  foundation.

17    You can answer.

18    THE WITNESS:  Yeah.  That's not typically

19  something that we would look into.  What I will tell

20  you is that if we make determination that a claim is

21  fraudulent, we will move to try to get off the risk and

22  not insure that person anymore.  My understanding is,

23  before we were able to complete our investigation,

24  Mr. Altschuler canceled his policy with us and moved

25  his business.  So at the time that we made the final

DANIEL JAEGER  MARCH 02, 2023

1  determination that the claim was fraudulent and there

2  have been intentional misrepresentations and

3  concealments, there would be no reason for us to

4  investigate, nor we would in claims generally, but

5  there would be no reason for us to investigate the

6  veracity and authenticity of this list because he was

7  no longer our customer.

8       Q.  BY MR. POLI:  Okay.  Maybe I'm missing it,

9  Mr. Jaeger, because you're way more knowledgeable about

10  this SIU process than me.  If you looked into these

11  other items and found that he couldn't prove on one of

12  these other items that he ever even owned it, that he

13  didn't own it -- like let's take the million dollar --

14  I'm probably going to mispronounce this, the million

15  dollar Francois-Xavierlalanne Une Bate Grand

16  Donkey.  So it sounds like a really expensive donkey.

17  Bronze Edition 4 of 8.  Let's take that.

18            If you said, hey, Mr. Altschuler, we want

19  you to prove to us you own that million-dollar piece of

20  art and if he didn't own it, then you've got

21  dispositive proof of fraud; wouldn't that be obvious to

22  you?

23            MR. SULLIVAN:  Objection; from.

24            MR. POLI:  Mr. Altschuler wasn't claiming

25  Item Number 11, the Francois, whatever.  I can't

DANIEL JAEGER  MARCH 02, 2023

1  pronounce it either.  But he wasn't claiming that item.
2  There was no reason for us to look into his ownership
3  of that item.  He -- let me finish, Mr. Poli, please.
4      Q.  BY MR. POLI:  -- I don't think you're clearly
5  understanding, I guess, what I'm asking.  But go ahead,
6  tell me when you're done.
7      A.  Yeah.  So there would be no reason for us to
8  investigate his ownership of that item.  He represented
9  that he owned it.  We take what our customers say as
10 being truthful.  If they present a claim for a specific
11 item, we conduct an investigation to establish that
12 they actually own what they're claiming and that's what
13 happened here.
14          But I can tell you that, in the years that
15 I've been doing this work, you know, when we have a
16 claim for a scheduled item, we don't go back and look
17 at every item that's insured under that policy to try
18 to do a provenance investigation on items that have not
19 been claimed.  Just I haven't seen it done.
20     Q.  Again, I may be just too stupid and simplistic,
21 but it seems to me that if you picked one of these
22 items, take the million-dollar item that's on this
23 page, and if he didn't really own it, then you've
24 really proven your fraud case.  That's never occurred
25 to you and you've been doing this, what, 29 years;

DANIEL JAEGER  MARCH 02, 2023

1  that's never occurred to you?

2         MR. SULLIVAN:  Form; foundation.

3         You can answer.

4         THE WITNESS:  Yeah, I completely disagree

5  with you that it proves that the claim for Edition 3

6  out of 30, the Andy Mouse prints, would be fraudulent,

7  if we were able to establish another item on the

8  schedule wasn't owned by him.  They're two separate and

9  distinct items.  If, in your hypothetical, which,

10 again, this is something that I've never seen done.

11 And, you know, we haven't done it, at least to my

12 knowledge -- and we did this investigation that you say

13 that we should have done, which is investigate this --

14 and we're using scheduled Item Number 11, for your

15 example, and we establish that he didn't own it, that

16 wouldn't establish that he didn't own Edition 3 out of

17 30, the item that's being claimed.  It would be just be

18 an item that we would have to follow up with him and

19 potentially remove or an underwriter would say, because

20 of that, we don't want to insure him anymore.

21    Q.  BY MR. POLI:  Boy, you're going to tell the

22 jury that you never look into -- I mean, in a situation

23 like this, where someone's claiming a $1.5 million

24 insurance claim on something you don't think they ever

25 owned -- let's see if we can summarize this.

DANIEL JAEGER  MARCH 02, 2023

1      So clearly you denied coverage on this

2  $1.5 million Andy Mouse set because you not only don't

3  think he owned it when the supposed loss occurred, you

4  don't think he ever owned it.  Have we established

5  that, I think, in your testimony?

6          MR. SULLIVAN:  Objection to form.

7          THE WITNESS:  I don't think that that's

8  consistent with my testimony.  On the date of loss, I

9  don't believe the evidence indicates that he owned the

10 Andy Mouse prints or silkscreens.  There is evidence

11 that suggests, and confirmation from a gallery owner,

12 that, at one point, he owned Edition 5 out of 30 and

13 that he traded that --

14     Q.  BY MR. POLI:  You're going into a narrative

15 that's not responsive.

16     A.  It is responsive, Mr. Poli, because you just

17 stated something that is completely --

18     Q.  -- because I can't control what you're going to

19 do.  But I'll move to strike.  But go ahead, do what

20 you want.

21     A.  You just stated something that's completely

22 inconsistent with my testimony.  And now when I'm

23 trying to say that it's inconsistent and explain it,

24 you're telling me I'm not responsive to your question.

25          So I could tell you this.  We made a

DANIEL JAEGER  MARCH 02, 2023

1  decision to deny this claim on, I believe,

2  December 15th of 2021.  That's when the decision was

3  made, or roughly thereabouts, maybe a day before the

4  letter went out.  That's when the final determination

5  was made.

6          By that time, Mr. Altschuler wasn't our

7  customer anymore.  So why would we go back and look at

8  a schedule of his for a policy that's no longer in

9  existence?

10     Q.  By the way, I know -- so you denied the claim

11  almost -- not quite, but almost two years after the

12  claim was submitted, right?

13     A.  Approximately, yes.

14     Q.  And there was never a reservation of rights

15  letter issued before that; am I right about that?

16     A.  I think there was constant reservation of

17  rights in our communications from our attorney.  And

18  also, I don't know that we necessarily have to reserve

19  our right to assert a fraud defense.  I don't know that

20  there was any determination that fraud had occurred

21  until we completed the investigation.  So --

22     Q.  But I'm asking a different question.  I'm used

23  to seeing when you've got a coverage issue -- maybe I'm

24  too simplistic again -- but what I see carriers do is

25  they promptly issue a so-called reservation of rights

DANIEL JAEGER  MARCH 02, 2023

1    letter.  You know what a reservation of rights letter

2    is, right?

3            MR. SULLIVAN:  Objection; form.  Move to

4    strike Counsel's statements.

5            You can answer.

6    Q.  BY MR. POLI:  Do you know what a reservation of

7    rights letter is?

8    A.  I understand what a reservation of rights

9    letter is, Mr. Poli.  I'm just confused as to what you

10   believe we should have been reserving our rights for

11   here.

12   Q.  Why is a reservation of rights letter listed --

13   or that gets issued by a carrier?

14           MR. SULLIVAN:  Form.

15           THE WITNESS:  I'm sorry, repeat that.  I

16   just didn't hear you.

17   Q.  BY MR. POLI:  Why is reservation of rights

18   letter issued by a carrier?

19           MR. SULLIVAN:  Form.

20           THE WITNESS:  I'm sorry, you cut out.  I

21   just couldn't hear you.

22   Q.  BY MR. POLI:  Why is a reservation -- I mean,

23   based on your wealth of experience, Mr. Jaeger, why

24   does a carrier like Chubb issue a reservation of rights

25   letter?

DANIEL JAEGER  MARCH 02, 2023

```
1              MR. SULLIVAN:  Form.

2              THE WITNESS:  A reservation of rights

3   letter is issued when there is an ongoing investigation

4   and there's a known coverage issue.  And the company

5   reserves its rights and it doesn't waive any of those

6   rights as the investigation is ongoing.

7      Q.  BY MR. POLI:  All right.  So it's issued, among

8   other reasons, to avoid a waiver, right?

9              MR. SULLIVAN:  Form and foundation.

10             You can answer.

11             THE WITNESS:  In some instances, yes,

12  waiver, that's probably the primary reason.  But

13  reservation of rights letters are typically not issued

14  in instances of potential fraud because there is no

15  determination that fraud had been committed until we

16  completed our investigation.  And I don't know that

17  we're required to reserve our rights for fraud.

18             You know, if there was another coverage

19  issue, you know, then there would be a discussion as to

20  whether or not we needed to issue a reservation of

21  rights.

22     Q.  BY MR. POLI:  Okay.  Let me see if I can

23  summarize what you said.  First of all, you're familiar

24  with what a reservation of rights letter is, right?

25     A.  Correct.
```

DANIEL JAEGER  MARCH 02, 2023

1     Q.   And based on your experience, your

2   understanding is a reservation of rights letter is

3   issuing during an ongoing investigation to preserve the

4   rights of the insurance company with respect to any

5   coverage issues, correct?

6                MR. SULLIVAN:  Form; foundation.  You can

7   answer.

8                THE WITNESS:  Generally speaking, yes,

9   correct.

10     Q.   BY MR. POLI:  And in part, it's issued to avoid

11   any possible waiver of the insurance company's rights

12   with respect to such a coverage issue, right?

13     A.   Generally speaking --

14                MR. SULLIVAN:  Form.

15                THE WITNESS:  Generally speaking, correct.

16     Q.   BY MR. POLI:  You're telling us that it's

17   typically not done by you, in your unit, your SIU unit,

18   when you're investigating instances of potential fraud;

19   is that right?

20     A.   That is correct.  We typically will not issue a

21   reservation of rights letter advising or reserving our

22   rights to deny the claim for breach of the concealment

23   or fraud provision because we haven't made a

24   determination that concealment or fraud has occurred.

25                And, furthermore, I'm not aware that we

DANIEL JAEGER  MARCH 02, 2023

```
 1   would need to do that.  I just haven't seen an ROR
 2   issued in the years that I have been doing this
 3   specifically for potential breach of the concealment or
 4   fraud provision.
 5       Q.  Okay.  And you just used the shorthand,
 6   reservation of rights letters are often called ROR
 7   letters, right?
 8       A.  Yeah, I apologize.  I --
 9       Q.  No, that's fine.  Let's use that.
10           And here, Chubb did not issue a
11   reservation of rights letter to Mr. Altschuler; is that
12   correct?
13           MR. SULLIVAN:  Form; foundation.
14           You can answer.
15           THE WITNESS:  Yeah.  I would have to check
16   the file.  But I know -- I don't believe that we issued
17   an ROR letter on the silkscreen claim, no.
18       Q.  BY MR. POLI:  And in contrast, I think you did
19   issue an ROR letter on the watch claim because of the
20   late submission or the alleged late submission; is that
21   right?
22       A.  Yes, that's correct --
23           MR. SULLIVAN:  Object to the form.
24           You can answer.
25           THE WITNESS:  That would be correct
```

DANIEL JAEGER  MARCH 02, 2023

1  because that would be a known coverage issue that we

2  were continuing to investigate and reserving rights.

3    Q.  BY MR. POLI:  So since there was no ROR letter

4  issued by Chubb on the art claim, really the written

5  notice that Mr. Altschuler would have received on the

6  coverage issues associated with the art claim would

7  have been the denial of coverage letter that we've

8  marked as Deposition Exhibit 4 and that's about just a

9  little less than two years after the claim was

10  submitted; is that right?

11         MR. SULLIVAN:  Objection; form;

12  foundation.

13         You can answer.

14         THE WITNESS:  Yeah, that would be the

15  letter that advised Mr. Altschuler that we're denying

16  the claim.  But there was numerous communications from

17  our counsel that reserved rights under the policy.

18    Q.  BY MR. POLI:  Your lawyer did not issue a

19  so-called reservation of rights letter; is that

20  correct?

21         MR. SULLIVAN:  Form and foundation.

22         You can answer.

23         THE WITNESS:  Yeah.  Our lawyer

24  communicated to Mr. Altschuler and then ultimately to

25  Mr. Altschuler's attorney.  And in those

DANIEL JAEGER  MARCH 02, 2023

```
 1  communications, it was clearly indicated that the
 2  company was reserving all rights under the policy.
 3           MR. POLI:  So let's mark the next exhibit
 4  as SIU field investigation -- I'm sorry.  I'm sorry.
 5           SIU Field Investigator Guidelines.  I
 6  thought I marked this already.  Maybe I didn't.
 7           THE COURT REPORTER:  Yeah, I think you
 8  did.
 9           MR. POLI:  Was it 40?
10           THE COURT REPORTER:  Hold on, I just
11  closed 40 by accident.
12           MR. POLI:  I think I just missed it.  I
13  think the SIU Field Investigator Guidelines should be
14  Exhibit 40; is that right?
15           THE COURT REPORTER:  Yes, SIU -- yes, here
16  it is.  Let me just fix the --
17           MR. POLI:  I got you off track.
18           46, the next exhibit, will be the ISA Best
19  Practice Guidelines.
20           THE COURT REPORTER:  Say the first part.
21  I missed --
22           MR. POLI:  ISA.
23           THE COURT REPORTER:  Oh, okay.
24           So that will be 46?
25           MR. POLI:  I'm showing that's correct.
```

DANIEL JAEGER  MARCH 02, 2023

1      (Whereupon, Deposition Exhibit Number 46 was

2   marked for identification.)

3      Q.  BY MR. POLI:  Okay.  Now, these -- we got some

4   guidelines.  Obviously, I've shown you two of them so

5   far.  This is the third set of guidelines sent to us

6   recently for Chubb.  I mean, you must be -- given your

7   high ranking within Chubb, you must be familiar with

8   this set of guidelines for -- and I believe ISA would

9   be inside adjusters.  Are you familiar with these

10   guidelines?

11      A.  I'm somewhat familiar with them, but this is an

12   area of the company that I don't manage.

13          MR. POLI:  Okay.  Well, let's go to

14   page 5.  And go towards the bottom of the page.

15      Q.  BY MR. POLI:  It says, "Reservations of

16   Rights/Coverage Position Letters."

17          And the second bullet point says,

18   "Reservations of Rights and/or Coverage position

19   letters need to be communicated in accordance with the

20   governing state guidelines and no later than five

21   business days beyond recognition that a potential

22   coverage exclusion or breach of a policy condition

23   exists."

24          I mean, obviously, this is an internal

25   guideline of your company, Chubb, right?

DANIEL JAEGER  MARCH 02, 2023

1    A.  It's an ISA Best Practices Guideline, yes.

2    Q.  I mean, it certainly would indicate that,

3  within five days of first thinking that maybe Mr.

4  Altschuler didn't really own the Andy Mouse prints, a

5  reservation of rights letter, a so-called ROR letter,

6  should have been issued.  That's what this says, right?

7            MR. SULLIVAN:  Object to the form.

8            THE WITNESS:  Not necessarily.  So, first

9  of all, we didn't make that determination until the

10 completion of the investigation, where we evaluated all

11 of the evidence that what he told us about his

12 ownership of the Andy Mouse silkscreens was not

13 truthful and honest.  And, again, this is talking

14 about, you know, coverage -- potential coverage

15 exclusions that we're aware of.  It's not really

16 discussing breach of the concealment or fraud

17 provision.  Again, I haven't seen reservation of rights

18 letters being issued based on potential breaches of the

19 concealment or fraud provision because that analysis

20 isn't done until the investigation is complete and all

21 of the evidence could be evaluated.

22    Q.  BY MR. POLI:  Sir, given your wealth of

23 experience, you realize that ROR letters aren't issued

24 when a coverage investigation is completed; they're

25 issued early on so there's no waiver and then the

DANIEL JAEGER  MARCH 02, 2023

1  coverage investigation proceeds.  Is that something

2  you're aware of, given your 29 years of experience?

3            MR. SULLIVAN:  Objection; form;

4  foundation.

5            You can answer.

6            THE WITNESS:  Yeah, I understand what

7  you're saying.  And I would agree with you that an ROR

8  is issued when a coverage issue is known.  What I'm

9  trying to explain to you is, one, you know, no analysis

10 was done as to whether or not there was a violation of

11 the concealment or fraud provision until the end.  Two,

12 I don't believe that we need to send an ROR relative to

13 the concealment or fraud provision.  And, three, I

14 don't believe that fraud could be waived.

15            So, you know, I just -- we don't, as a

16 normal practice, when we're investigating a claim, send

17 out ROR letters for potential breaches of the

18 concealment or fraud provision.  We do for other

19 coverage issues, as we're investigating, but not

20 concealment or fraud.

21    Q.  BY MR. POLI:  So if someone's three months late

22 on a relatively small watch claim, you'll issue an ROR

23 letter, like you did here, but if you suspect someone

24 of a $1.5 million insurance fraud on the art, here, you

25 will not issue an ROR letter.  Have I understood that

DANIEL JAEGER  MARCH 02, 2023

1    correctly?

2              MR. SULLIVAN:  Object to the form;

3    foundation.

4              You can answer.

5              THE WITNESS:  If we are aware of a

6    potential coverage exclusion, as I stated before, we

7    will issue an ROR letter.  If it involves potential

8    concealment or fraud or misrepresentation, you know,

9    our investigation is ongoing, no determination has been

10   made and we don't issue RORs relative to potential

11   breaches of the concealment or fraud provision and we

12   don't believe that that's a waivable issue.

13      Q.  MR. POLI:  I guess that's up to a court to

14   decide.  But, clearly, when you denied coverage for the

15   art claim, you did so based on the fraud or concealment

16   provision; we've established that, right?

17             MR. SULLIVAN:  Form.

18             Mark it.

19             THE WITNESS:  Correct, a concealment or

20   fraud provision.

21      Q.  BY MR. POLI:  And clearly we've also

22   established that is a coverage exclusion in the policy.

23   If you can prove, and it's your obligation to prove it,

24   but if you can prove fraud or concealment, that is an

25   exclusion from coverage, right?

DANIEL JAEGER  MARCH 02, 2023

```
 1              MR. SULLIVAN:  Form.

 2              THE WITNESS:  I mean, I considered it a

 3   provision of the policy in which, if the insured

 4   violates that provision, there's no coverage for the

 5   loss.

 6              MR. POLI:  Okay.  Let's take a quick

 7   break.  Jeff Zane is working on a summary judgment

 8   motion.  I would like to make sure he adds a paragraph

 9   about this.  If we could take a quick five-minute

10   break.

11              THE VIDEOGRAPHER:  The time is 4:16 p.m.

12   We are going off the record, ending Media Number 6.

13         (Whereupon, a brief recess ensued from

14   4:16 p.m. to 4:31 p.m.)

15              THE VIDEOGRAPHER:  My name is Judy

16   Thompson, with Legal Video Specialists, Phoenix,

17   Arizona.  This begins Media Number 7 of the videotaped

18   deposition of Dan Jaeger.  The time is 4:31 p.m.  We

19   are now back on record.

20              MR. POLI:  Donna, let's go back to

21   Exhibit 40 for a minute.

22              Go to the second page.

23    Q.  BY MR. POLI:  Okay.  It talks about ISO reports

24   and I should know what a PILR is, but I can't remember.

25   What's a "PILR"?
```

DANIEL JAEGER   MARCH 02, 2023

1    A.   That was an indexing bureau, similar to ISO.

2  It really doesn't get utilized anymore and probably,

3  with the most up to date best practices guidelines,

4  would be removed.

5         MR. POLI:  Let's go to -- it's not really

6  got page numbers.  Go to the third page from the

7  bottom.  I guess 4.

8         THE COURT REPORTER:  Yes.  Oh, did you

9  need it lower?

10         MR. POLI:  Go to the top.  Maybe I'm --

11         THE COURT REPORTER:  Or it's at the next

12  page?

13         MR. POLI:  The next page, I think.

14         All right.  You're there.

15    Q.   BY MR. POLI:  Okay.  It says, quote, and I'm

16  looking at the fourth bullet from the top, "The SIU

17  investigator should ensure cases are reported to State

18  Departments of Insurance and" -- and this is part of

19  the section called Disposition.  So if the conclusion

20  is that the insured has committed fraud, what's

21  supposed to happen is "The SIU investigator should

22  ensure cases are reported to the State Departments of

23  Insurance and/or local or federal law enforcement where

24  warranted."

25         Did that happen here?  Since you're the

DANIEL JAEGER  MARCH 02, 2023

1  head of the unit.

2      A.  Actually, it did not.  And, you know, typically

3  when we make a determination that fraud has been

4  committed, we will refer a claim to the law enforcement

5  agency or department of insurance that's responsible

6  for enforcement.  But in this particular case, it did

7  not happen.

8      Q.  I mean, it seems like, if you have the courage

9  of your convictions and you concluded that

10  Mr. Altschuler is a fraudster, that would be the

11  logical next step, pursuant to these guidelines, you

12  report them to the department of insurance and you

13  report them to federal and local law enforcement;

14  that's what you should do, right?

15          MR. SULLIVAN:  Object to form and

16  foundation.

17          You can answer.

18          THE WITNESS:  Yes, I would say the

19  department of insurance, if they have the oversight

20  over insurance fraud in the state, as well as -- you

21  know, for example, in Pennsylvania, the Attorney

22  General's Office has oversight for insurance fraud in

23  the state.  And this claim should be have been

24  reported.  It wasn't.  It was an oversight and, you

25  know, that it wasn't done.  And, you know, you can

DANIEL JAEGER  MARCH 02, 2023

1    speak to Fred White as to why it wasn't done.  It

2    should have been done and it was simply an oversight.

3    There was no reason why we should not have reported it.

4        Q.  BY MR. POLI:  Well, I mean, one implication is

5    that it was such a dubious argument for fraud that,

6    although you're comfortable denying coverage, you

7    weren't comfortable reporting him to law enforcement.

8    That would be one arguable inference from the

9    undisputed fact that it didn't get reported, even

10   though that's what you normally do.  Do you understand

11   that inference?

12               MR. SULLIVAN:  Objection; form and

13   foundation.

14               You can answer.

15               THE WITNESS:  Yeah.  I understand that

16   inference, although I completely disagree with it.  I'm

17   telling you it was an oversight and, you know, we can

18   -- we could report it now.  We just haven't.  And also

19   there was some confusion as to where the case would

20   actually be venued as well.  Was it New York?  Was it

21   Arizona?

22               But, again, it was just an oversight.  It

23   had nothing do with the denial of the claim and the

24   evidence that supported the denial.

25       Q.  BY MR. POLI:  Well, I mean, whether it's

DANIEL JAEGER   MARCH 02, 2023

1   Arizona or New York, there's an FBI office if you want

2   to report a $1.5 million fraud, correct?

3      A.   We don't typically report to the FBI, unless

4   there's some basis to do so.  We typically would report

5   to a department of insurance or a law enforcement

6   agency within that state that oversees enforcement of

7   insurance fraud.

8      Q.   So, for instance, if you followed your typical

9   procedure in Arizona, who would you report it to, the

10  Attorney General's Office or a local prosecutor?  Who

11  would you report it to?

12          MR. SULLIVAN:  Object to the form and

13  foundation.

14          THE WITNESS:  Yeah.  I would have to look

15  into the reporting requirements in the state of

16  Arizona.  I don't have them off the top of my head.

17          In New York, it would be the Department of

18  Insurance and Banking, I believe, and it would be the

19  Fraud Bureau.

20     Q.   BY MR. POLI:  Okay.  So let's see if we can

21  summarize this.

22          Your normal routine, at your SIU unit that

23  you run, is where you concluded that an insured has

24  committed fraud.  You report it not only to the

25  department of insurance that's applicable, but also to

DANIEL JAEGER  MARCH 02, 2023

 1  local law enforcement, correct?

 2      A.  No, that's not correct.  What I said is we

 3  would typically report it to the department of

 4  insurance if they have oversight for enforcement of

 5  insurance fraud or if there was a local agency that had

 6  enforcement.  And I gave you an example, Pennsylvania,

 7  the Attorney General's office of Pennsylvania is

 8  responsible for insurance fraud enforcement and accepts

 9  referrals from insurance companies.  That's my

10  testimony.

11      Q.  Okay.  So I guess, to alter what I understand

12  you're saying, when you've concluded that someone has

13  committed fraud, you would typically report it to the

14  department of insurance or whatever local law

15  enforcement agency that is most appropriate; is that

16  your testimony?

17              MR. SULLIVAN:  Object to the form.

18              THE WITNESS:  Yeah.  Whatever the

19  requirement is in that state.

20      Q.  BY MR. POLI:  Two, if a fraud, in your view,

21  has been attempted to the tune of $1.5 million, that's

22  a big enough number that you would always normally

23  report that to either the department of insurance or

24  the applicable law enforcement agency, correct?

25              MR. SULLIVAN:  Object to the form.

DANIEL JAEGER  MARCH 02, 2023

```
1            You can answer.
2            THE WITNESS:  It really doesn't matter as
3   to the amount of the claim.  It's the basis of the
4   denial and as I stated, yes, we would normally refer
5   them, if required to do so within that state, and this
6   was an oversight.
7            And, you know, Mr. Poli, we're happy to do
8   it.  You know, there was no reason that it wasn't done,
9   other than just an oversight.  If you're suggesting,
10  we'll be happy to refer it now.
11     Q.  BY MR. POLI:  Good, I'll do an amendment to the
12  complaint.  But go ahead, you do what you want and I'll
13  do what I want.
14     A.  I'm just saying, there was no reason we didn't
15  refer it, other than oversight.  Oversights do happen.
16     Q.  If you want to go back and do that now, there
17  will be an amendment to the complaint, I assure you.
18            All right.  So let's see if we can
19  summarize this.  So you don't report it based on the
20  amount; you report it based on the -- and I'm talking
21  about reporting a supposed fraud to the department
22  insurance or local law enforcement, you do it on the
23  basis -- on the basis of why the claim was denied,
24  right?
25     A.  That's correct.
```

DANIEL JAEGER  MARCH 02, 2023

1   Q.  How about this.  Let's say -- I mean, you've
2   described that sometimes you have stronger denials than
3   others.  You described how sometimes -- how hard it is
4   to prove greed unless someone just gets scared and
5   admits it.  Do you remember how you described that?
6   A.  Yeah.  I don't necessarily know that if -- what
7   we were discussing there goes to the strength of the
8   denial, based on the breach of concealment or fraud
9   provision.  We were talking about one element of
10  motive.  But, you know, it's a complete -- as you would
11  think, evaluation of the case by law enforcement.
12  They'll evaluate how strong they think the denial is
13  and whether or not charges should be brought.  But, you
14  know, that's not our decision.
15  Q.  So do you report or not report sometimes?  Is
16  one variable how strong you think the denial is, I take
17  it?
18  A.  No.  We report based on whether or not the
19  claim was denied, in our evaluation, for concealment or
20  misrepresentation.  And if it was, we provide a
21  referral to the department and they do their own
22  independent evaluation as to what they think the
23  strength or weaknesses of the case are.
24  Q.  So if someone -- if you get the proverbial
25  confession from someone, like, oh, my God, you caught

1  me.  I admit I did it, are you more likely to report

2  that to law enforcement than if you don't have that

3  kind of strong evidence?

4          MR. SULLIVAN:  Objection; form;

5  foundation.

6          Mark it.

7          No, as I've testified.  If the basis of

8  the denial was fraud-related that would be reported.

9      Q.  BY MR. POLI:  Okay.

10      A.  And if that included, as part of the

11  investigation, a confession, then that would be

12  included in the materials that were sent or the

13  referral.

14      Q.  Okay.  And so here, how did this oversight

15  occur?  I mean, this denial was the end of 2021, right?

16      A.  That's when the claim was denied.

17      Q.  Well, that's, you know, a year and, what is it,

18  three or four months?

19      A.  Correct.

20      Q.  So how did the oversight occur for, what, 15,

21  16 months; how did this oversight occur where, despite

22  the best practices requirement, it never got reported?

23  How did that occur, if you know?

24          MR. SULLIVAN:  Object to the form.

25          Go ahead.

DANIEL JAEGER  MARCH 02, 2023

1          THE WITNESS:  So this is a best practices

2    requirement of the field investigator.  You know, it

3    was my belief that Fred White would have reported this

4    upon the denial of the claim and he did not.

5          And he told me it was an oversight and

6    that he should have reported it and he didn't.  And

7    that's all I know about why it wasn't reported.

8    Q.  BY MR. POLI:  When did you have this

9    conversation with Fred White before this deposition

10   where he reported to you, hey, I never reported this to

11   law enforcement or the department of insurance and it

12   was an oversight; when did you have this conversation

13   with Fred White?

14   A.  I spoke to him not too long ago, just to ask

15   him if there was a referral made to law enforcement as

16   per our guidelines and per our normal operating

17   procedure and he told me that he would review it and he

18   got back to me and said he did not refer it to law

19   enforcement.  It was an oversight on his part.

20   Q.  Well, what did he say?  Was he going to do

21   something or not?  Is it too late?

22   A.  No.  As I told you, I don't think it's too

23   late.  Although, at this point, we had no intention of

24   referring it now.

25   Q.  Okay.  So that reason you would refer it now is

DANIEL JAEGER  MARCH 02, 2023

 1  more punitive because I raised the issue; is that

 2  right?

 3          MR. SULLIVAN:  Objection; form.

 4      Q.  BY MR. POLI:  Well, I take it -- that's what

 5  I'm hearing from you, Mr. Jaeger, you had no intention

 6  of referring it.  But now that I've raised the issue,

 7  you're going to take a punitive action against

 8  Mr. Altschuler, is that really what you're telling me?

 9          MR. SULLIVAN:  Objection; form;

10  foundation.  And please let him answer your question

11  before just asking another one without him answering

12  it.

13          THE WITNESS:  No.  That's --

14      Q.  BY MR. POLI:  It wasn't mentioned in the

15  report, but now apparently you're rethinking that; am I

16  understanding it, Mr. Jaeger?

17          MR. SULLIVAN:  Objection; form.  The same

18  request.

19          THE WITNESS:  No.  I am not rethinking

20  that position.  You were somehow accusing us of not

21  following our own guidelines and somehow that that was,

22  you know, nefarious in some way.  And what I was

23  telling you is if you really wanted us to report it,

24  based on the oversight that we didn't report it in

25  December of 2021, we can do that.  And that's when you

DANIEL JAEGER   MARCH 02, 2023

1   told me you would amend the complaint and allege

2   something else against the company.  And that was the

3   discussion that we had.

4       Q.  BY MR. POLI:  Okay.  So what you just said a

5   minute ago is, until this issue came up in this

6   deposition, Chubb had no intention of reporting

7   Mr. Altschuler to the department of insurance or local

8   law enforcement for alleged fraud; is that right?

9               MR. SULLIVAN:  Object to the form.

10              You can answer.

11              And mark it.

12              THE WITNESS:  No.  What I believe I said

13  is that I've learned that it wasn't reported to law

14  enforcement.  It should have been reported to law

15  enforcement.  And at this date and time, we are not

16  going to refer it.  That's my view on it.

17      Q.  BY MR. POLI:  Okay.  So I take it if you change

18  your mind, that would be based on some sort of punitive

19  action against Mr. Altschuler because I've had the

20  temerity to raise this issue; is that right?

21              MR. SULLIVAN:  Objection; form;

22  foundation.

23              Mark it.

24              THE WITNESS:  Yeah.  I disagree with your

25  characterization of some sort of punitive action

DANIEL JAEGER  MARCH 02, 2023

1  against Mr. Altschuler.  I was simply saying that if

2  you believed that we did something inappropriate and

3  didn't follow our own guidelines and you wanted us to

4  refer it, we would be happy to do so.  But we have no

5  intention of doing that, at this point.

6  　　　Q.  BY MR. POLI:  Just to be clear, I'm not asking

7  you to do something that I think would violate or be

8  inappropriate, okay?  You do whatever you're going to

9  do.  But I'm certainly not asking you to do that.

10  　　　　　　How about the NICB, that stands for --

11  what is that, National -- or is it NCIB?  I always get

12  that mixed up.  Is it NICB?

13  　　　A.  NICB.

14  　　　　　　MR. SULLIVAN:  Objection; form.  Move to

15  strike Counsel's statements.

16  　　　　　　You can answer.

17  　　　Q.  BY MR. POLI:  What is it, NICB or NCIB?

18  　　　A.  NICB.

19  　　　Q.  What's that stand for again?

20  　　　A.  National Insurance Crime Bureau.

21  　　　Q.  Did you report Mr. Altschuler's alleged fraud

22  to NICB?

23  　　　A.  I don't know the answer to that question.  That

24  would be something that Fred White would have to

25  answer.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  If you did, would that be -- because I didn't

2  see it anywhere in the claims file.  If you actually

3  did report this purported fraud by Mr. Altschuler to

4  the NICB, would that be in the claims file, you would

5  expect, somewhere?

6    A.  It should be, sir.  And usually that's done in

7  conjunction with a referral to the state department of

8  insurance.  I would be happy to get back to you with a

9  definitive answer.  I just don't know off the top of my

10 head and Fred White would know that.

11   Q.  All right.  Well, he's being deposed soon.

12       MR. POLI:  The next exhibit --

13   Q.  BY MR. POLI:  Is Michael Canavan -- I'm

14 probably mispronouncing it -- is he one of your

15 subordinates?

16   A.  He is not.

17   Q.  Is he part of the regular claims unit?

18   A.  He is the manager of the claims service

19 center's property unit.

20       MR. POLI:  Well, let's mark this just to

21 be consistent.

22       So the next one will be 1/24/20 claim

23 note, claim reassigned to SIU.  1/24/20.

24       (Whereupon, Deposition Exhibit Number 47 was

25 marked for identification.)

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  We don't have to spend long on

2   this.  But this, again, reaffirms the fact, it says,

3   "claim being reassigned to SIU."  This is 1/24/20.  So

4   I guess it went to SIU on the 21st, three days after

5   the claim came in, and this is three days after that,

6   correct?

7    A.  Yes.

8    Q.  Okay.  Again, all it does is reaffirm that the

9   claim went to SIU, the Altschuler claim went to SIU,

10  almost immediately, correct?

11              MR. SULLIVAN:  Form.

12              Mark it.

13              THE WITNESS:  It went to SIU within

14  several days of being received, yes.

15   Q.  BY MR. POLI:  About three days, right?

16   A.  Three is more than a couple, several, yes.

17   Q.  Okay.  Three days.

18              MR. POLI:  All right.  The next document,

19  1/24/20 claim note, retention of Gurr Johns.

20        (Whereupon, Deposition Exhibit Number 48 was

21  marked for identification.)

22   Q.  BY MR. POLI:  I assume this is a claim note

23  you've seen somewhere in the prior years working on

24  this claim?

25   A.  Yes, I have seen this.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  I mean, given your lofty position within Chubb,

2  I mean, you don't get involved in the day-to-day

3  processing of all SIU claims, do you, Mr. Jaeger?

4            MR. SULLIVAN:  Objection; form.

5            THE WITNESS:  I don't get involved in the

6  day-to-day supervision of all SIU claims, but I do

7  follow quite a few of them.

8    Q.  BY MR. POLI:  I mean, this claim seems to have

9  you pretty involved on a day-to-day basis, with respect

10  to dealing with this claim.  Would you agree with that?

11    A.  I am definitely more involved with this claim.

12  However, it could be because of the potential exposure.

13    Q.  In other words, are you more involved with a

14  claim like this because $1.5 million is a fairly

15  significant exposure issue?

16    A.  Typically, if I am involved in a claim and I am

17  following it, it will be a more significant exposure.

18    Q.  A higher dollar?

19    A.  That's what that means, yes, higher dollar.

20    Q.  I'm just trying to get it back to layman's

21  language.  Okay.  So this one, early on -- is Sally

22  Short one of your subordinates?

23    A.  She is not.

24    Q.  So she's part of the regular claims unit or

25  where is she?

DANIEL JAEGER  MARCH 02, 2023

1    A.  She is the supervisor of our VAC unit that

2  handles our larger fine arts and jewelry losses.

3    Q.  And what's VAC stand for?

4    A.  Valuable article of contents.

5    Q.  So that would include the watches and the art

6  and that sort of thing on Mr. Altschuler's policy,

7  correct?

8    A.  It's typically scheduled items or blanket

9  coverage.

10    Q.  Gurr Johns is an art expert that you guys use

11  pretty routinely, correct?

12    A.  I don't know how routinely they were used.  We,

13  in SIU, have not used them that often.

14    Q.  Okay.  You use Chvostal.  How do I say it?  Is

15  it Chvostal?

16    A.  It's Chvostal.

17    Q.  Chvostal, sorry.  So it's a soft sound at the

18  beginning.  So you don't use Gurr Johns.  In SIU, you

19  use Mr. Chvostal, right?

20    A.  Not necessarily.  We use varying art experts,

21  as necessary.  It could be Gurr Johns.  It could be

22  others.  It could be Chvostal.  We don't use John

23  Chvostal that often, maybe a few times a year.  So I

24  don't know if you consider that often or not.

25    Q.  Well, a few times a year for how many years?

DANIEL JAEGER  MARCH 02, 2023

1  10 years?  20 years? 30 years?  What?

2              MR. SULLIVAN:  Form.

3              THE WITNESS:  Yeah I'm not sure when we

4  first started a relationship with John as an

5  independent art expert.  He -- I think we first met him

6  when he worked for a company called Enservio and then

7  he branched off on his own and started his own art

8  advisory and we've been working with him since that

9  time.

10      Q.  So when was he with this -- is it Enservia?

11      A.  Enservio.  And I don't have the dates,

12  Mr. Poli, off the top of my head.

13      Q.  Give me your best estimate.  I mean, this,

14  obviously, is a relationship that isn't a year or two

15  old.  Are we talking 10 years plus?  More?

16              MR. SULLIVAN:  Form.

17              THE WITNESS:  I would say it's probably

18  less than 10.  But I can't give you an exact number.

19      Q.  BY MR. POLI:  Can you give me a range, 8 to 10?

20  8 to 12?  What?

21      A.  Five to 10.

22      Q.  Five to 10 years.  And that's when he's on his

23  own.  But before that, you guys knew him and --

24      A.  No, no, that's total.  That's total.

25      Q.  Okay --

DANIEL JAEGER  MARCH 02, 2023

1     A.  And you know my -- I'm sorry

2     Q.  How much money did you spend on Chvostal in

3  this matter?  Because he seems pretty darn active.

4               MR. SULLIVAN:  Objection; form;

5  foundation.

6               You can answer.

7               THE WITNESS:  I don't know.

8     Q.  BY MR. POLI:  Can you give me a ballpark?  I

9  mean, is it tens of thousands of dollars?

10              MR. SULLIVAN:  Form; foundation.

11              You can answer.

12              THE WITNESS:  Yeah, I don't know the

13  answer to that question.  I wasn't asked to prepare for

14  that, you know.  I just don't have that number.

15    Q.  BY MR. POLI:  You do know that he was -- I

16  mean, you've gone through this claims file.  He's doing

17  interviews that you would normally think Fred White

18  would do.  You do know that, right?

19              MR. SULLIVAN:  Objection; form and

20  foundation.

21              You can answer.

22              THE WITNESS:  Yeah.  I don't necessarily

23  agree with you, Mr. Poli, on your opinion as to who

24  should conduct what interviews on behalf of Chubb as

25  we're investigating a claim.  You know, the art world

DANIEL JAEGER  MARCH 02, 2023

1  is an interesting world and sometimes people who are

2  within that world have better communication skills with

3  each other.  And, you know, John is an expert in

4  provenance and was in L.A. for, you know, a period of

5  time.

6          He had, you know, to my knowledge,

7  encountered Elaine in other cases.  I don't believe he

8  knew Dina.  But, you know, it was our assessment that

9  he would be most appropriate to talk to those people

10  within that world to ascertain information.

11    Q.  BY MR. POLI:  Is it your contention -- I mean,

12  you do know that Mr. Chvostal has been identified as a

13  supposed expert for Chubb in this case; you do realize

14  that, right?

15          MR. SULLIVAN:  Object to the form.

16          You can answer.

17          THE WITNESS:  I am aware of that.

18    Q.  BY MR. POLI:  And you do know that experts in a

19  case aren't supposed to be advocates.  They're supposed

20  to be neutral.  They're not supposed to be advocates

21  for whatever side happens to hire them.  You do know

22  that, right?

23          MR. SULLIVAN:  Object to the form of the

24  question.

25          You can answer.

DANIEL JAEGER  MARCH 02, 2023

1          THE WITNESS:  Yeah.  I don't believe

2     Mr. Chvostal was an advocate, one way or the other.

3     Mr. Chvostal was hired by us to obtain information so

4     we could make an informed decision about liability

5     under the contract.  And him interviewing people and

6     obtaining information doesn't make him an advocate.  It

7     just makes him a conveyor of that information.

8          Q.  BY MR. POLI:  I mean, have you seen the

9     document where he prepares detailed EUO questions for

10    your lawyer to ask Mr. Altschuler during the EUO; have

11    you seen that document?

12         A.  I have seen that document and I still don't

13    understand how that equates to an advocate.  It's an

14    expert that we brought in to assist us with an

15    investigation in the provenance to provide expert

16    information and questions that Mr. Ruben could ask

17    Mr. Altschuler so we could get to the bottom of the

18    investigation and what happened and what was going on

19    with these editions and this artist proof.

20         Q.  BY MR. POLI:  So are you in the habit, within

21    your SIU team, of using a supposedly neutral expert

22    like Mr. Chvostal to conduct factual investigations and

23    factual interviews; is that something you do at least

24    somewhat often?

25              MR. SULLIVAN:  Object to the form and

DANIEL JAEGER  MARCH 02, 2023

1  foundation.

2           You can answer, Dan.

3           THE WITNESS:  We will bring in an expert

4  in different capacities.  We will do it in business

5  income losses.  We'll bring in a forensic accountant

6  who will, you know, prepare an RFI to be sent to the

7  insured to deal with a business income loss.  We'll

8  bring in building consultants, who are experts in

9  building, to deal with actual reconstruction costs and

10  we will bring in our experts to assist us with

11  questions, that they need to formulate an opinion as to

12  provenance to make sure that we can be comprehensive in

13  our questioning.  So, yes, that is not unusual in the

14  property line of business.

15  Q.  BY MR. POLI:  So what you said before is,

16  within your SIU team, you don't normally use Gurr

17  Johns.  Instead you use Chvostal; did I remember your

18  testimony correct, from a few minutes ago?

19           MR. SULLIVAN:  Object to the form.

20           Mark it.

21           THE WITNESS:  Yeah.  I don't know if -- I

22  think you said that you normally use Gurr Johns and you

23  didn't here or you used Chvostal or something to that

24  effect.  And I'm saying that, have we used Gurr Johns

25  on an SIU case?  On occasion, yes.  Do we normally use

DANIEL JAEGER  MARCH 02, 2023

1  him?  I wouldn't say normally.

2              You know, so that's all I'm trying to say.

3  We use a variety of experts.  Sometimes we'll use Gurr

4  Johns.  Sometimes we'll use Chvostal.  Sometimes we'll

5  need a little bit more detail than we can get from, you

6  know, one expert and we'll go to another expert to get

7  that detail.  That's simply what happened here.

8      Q.  BY MR. POLI:  Okay.  So if you don't

9  normally -- and I'm talking about your SIU team.  If

10  you don't normally use Gurr Johns, would it be fair to

11  say that Chvostal is one of the art experts that you

12  routinely use in SIU?

13              MR. SULLIVAN:  Objection; form.

14              Mark it.

15              THE WITNESS:  Yeah.  Mr. Poli, all I can

16  tell you is that we have used Chvostal.  We have used

17  Gurr Johns.  We've used other experts over the years.

18  It just depends on, you know, the loss that we're

19  dealing with.  This particular case, I believe that

20  Gurr Johns was referred by Sally Short to Karen, as a

21  potential expert to use.  So we went to them.  And, you

22  know, that -- it's as simple as that.  There's no --

23  you know, nothing more than that to the whole

24  situation.

25              MR. POLI:  Next document, 1/27/20 e-mail,

DANIEL JAEGER  MARCH 02, 2023

1   hold off on Gurr Johns.

2         (Whereupon, Deposition Exhibit Number 49 was

3   marked for identification.)

4      Q.  BY MR. POLI:  I assume you've seen this e-mail

5   before, right, Mr. Jaeger?

6      A.  I don't recall it, Mr. Poli.  But I'm sure I've

7   seen it.

8            MR. POLI:  Okay.  Let's go to the bottom

9   of this page, please.

10     Q.  BY MR. POLI:  Now, Karen Moore is one of your

11  subordinates, right?

12           MR. SULLIVAN:  Objection; form.

13           Mark it.

14           THE WITNESS:  Karen Moore, at the time,

15  was an SIU examiner, reporting to George Clark, who

16  reported to me.  So subordinate, is that what you would

17  define as a subordinate?

18     Q.  BY MR. POLI:  Yeah.  She may not be a direct

19  report, but she's within your area of --

20     A.  Yes.  Yes, Mr. Poli.

21     Q.  And so Mr. Clark, what's his position?

22     A.  At the time, he was an SIU supervisor.

23     Q.  And he was a direct report to you?

24     A.  He was.

25     Q.  And so it looks like your direct report,

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Clark, Karen Moore brings up the fact that -- now,

2  Fred White is also one of your subordinates.  He's not

3  a direct report, but he's also part of your SIU team,

4  right?

5       A.  Right.  I'm sorry, Fred White?

6       Q.  Yes.

7       A.  Yeah.  Fred White is, yes.

8       Q.  Okay.  So this earlier e-mail says that -- and

9  it's from Moore, saying, I forwarded this to Gurr Johns

10  to assist with current market value.

11           So the whole point, what was the allegedly

12  missing set of prints worth, that's what the objective

13  was for hiring Gurr Johns, right?

14       A.  At that time, yes.

15       Q.  And what Ms. Moore points out is, one of your

16  other subordinates, Fred White, is working with Markey

17  to have John Chvostal assigned.  Who's Markey?

18       A.  Mike Markey is an investigator in California.

19       Q.  He's part of your SIU team?

20       A.  Yes, he is.

21       Q.  Okay.  And what your direct report says,

22  Mr. Clark, is, "Hold off until we see whether Chvostal

23  is going to accept."

24           So at that point, there was kind of a hold

25  on hiring Gurr Johns; is that right?

DANIEL JAEGER  MARCH 02, 2023

1     A.   What is apparent from these e-mails?

2     Q.   Yeah.   That's apparent from these e-mails; is

3 that right?

4     A.   Yes.

5          MR. SULLIVAN:   Objection to form.

6          Mark it.

7          MR. POLI:   And let's look at the next

8 document, which is 1/27/20 e-mail to Gurr Johns re hold

9 off.

10          THE COURT REPORTER:   Is that what we're

11 looking at?   Oh, no.

12          MR. POLI:   No, it's a different one.

13          THE COURT REPORTER:   Okay.   I got it.

14          (Whereupon, Deposition Exhibit Number 50 was

15 marked for identification.)

16          MR. POLI:   1/27/20.

17          Here it is.

18     Q.   BY MR. POLI:   And this is an e-mail from Karen

19 Moore to Gurr Johns, that's who this Jessica Wessel or

20 Wessie or whatever it is.   Wessel, W-e-s-s-e-l, she's

21 with Gurr Johns, correct?

22     A.   To my understanding, yes.

23     Q.   Okay.   So it's basically consistent with the

24 earlier e-mail exchange between Mr. Clark and

25 Ms. Moore, this is telling Gurr Johns, hey, hold off.

DANIEL JAEGER  MARCH 02, 2023

1  We might not give this project to you, correct?

2              MR. SULLIVAN:  Object to form.

3              THE WITNESS:  That's what the e-mails

4  indicate, yes.

5              MR. POLI:  Okay.  And let's look at

6  Exhibit 5.

7     Q.  BY MR. POLI:  You've seen this claim note

8  3/3/20.  So Gurr Johns came -- you said they were hired

9  initially to come up with a value for the Andy Mouse

10  prints, right?

11     A.  That was the initial assignment and that was in

12  January of 2020.

13     Q.  And this e-mail confirms that, when you got the

14  report from Gurr Johns, in fact, they confirmed the

15  value of the Andy Mouse prints as being $1,500,000 at

16  the time of the loss.  That's what this says, right?

17              MR. SULLIVAN:  Objection; form.

18              You can answer.

19              THE WITNESS:  The reports speaks for

20  itself and I think that this was a confirmation of the

21  value based on the condition that was expressed for the

22  silkscreens in the Dina Brown appraisal.

23     Q.  BY MR. POLI:  Is this why you decided to

24  replace Gurr Johns with Chvostal, the expert that your

25  SIU team uses more often?

DANIEL JAEGER  MARCH 02, 2023

```
1              MR. SULLIVAN:  Form; foundation.

2              THE WITNESS:  Absolutely not.

3      Q.  BY MR. POLI:  Absolutely not.  I mean --

4      A.  Absolutely not.  And so --

5      Q.  -- with me -- okay.

6      A.  I'm sorry.  Go ahead, ask your question.

7      Q.  Expert shopping?

8      A.  Absolutely not expert shopping.

9      Q.  Okay.  You would agree with me that, if a jury

10  looks at this -- well, first of all, we know that,

11  later on, Chvostal, the expert that your team normally

12  uses more often, came in with a much lower value of

13  about a million dollars, right?

14              MR. SULLIVAN:  Form.

15              Mark it.

16              THE WITNESS:  I am aware of

17  Mr. Chvostal -- or Dr. Chvostal's opinion as to the

18  value of Edition 3 out of 30 based on the condition,

19  the actual condition of the silkscreens.

20              But as I explained earlier, it had really

21  nothing to do with what was potentially payable under

22  the policy.  You know, as I explained, if the

23  silkscreens are worth 800,000 and it was a payable loss

24  and we insured it for $1.5 million, we would pay the

25  1.5 million.
```

DANIEL JAEGER  MARCH 02, 2023

1            Gurr Johns was originally brought in, as

2    you know, in January of 2020 to determine the

3    replacement value of the silkscreens as reported to us

4    and they came up with a number that was similar to Dina

5    Brown's appraisal.  And part of the reason that we

6    would even do that is to determine whether or not

7    there's any potential VAE exposure.

8            So, you know, that would be the reason

9    that we would do that because it's a scheduled item.

10   If the claim is payable, we pay the scheduled amount.

11   However, there could be VAE exposure; so we would use

12   an independent expert to tell us, well, you may have a

13   VAE exposure if this came back at 1.7 of $200,000

14   potentially.

15           So that's -- there is no expert shopping.

16   And, in fact, it's all good.  I'm not going to tell you

17   anymore.  You'll ask me the questions.

18      Q.  BY MR. POLI:  Are you done with your narrative

19   now?  Okay.

20      A.  It's not narrative --

21           MR. SULLIVAN:  Move to strike Counsel's

22   statement.  You ask your next question.

23      Q.  BY MR. POLI:  Well, we can call it whatever you

24   want to call it.  It's an awfully long answer.  So it

25   is what it is.  Sometimes, they say, people talk more

DANIEL JAEGER  MARCH 02, 2023

1   when they're defensive.  I don't know.

2              Anyway --

3              MR. SULLIVAN:  Move to strike Counsel's

4   statements.  They're inappropriate.  You can ask your

5   next question.

6              MR. POLI:  There haven't been very many

7   yes or no answers.

8              MR. SULLIVAN:  I don't care, Mike.  You

9   can ask your next question.

10             MR. POLI:  Okay.  I don't have the

11  patience to argue with Bobby.

12     Q.  BY MR. POLI:  The bottom line, Mr. Jaeger, is.

13  If a jury looks at this and concludes that you engaged

14  in expert shopping -- you got rid of the expert that

15  came in at 1.5 so you could get another expert that

16  comes in way lower, at two-thirds of that number, if

17  that is what is determined that you did, that would not

18  only be improper, under accepted claims handling

19  standards, it would be wildly improper; would you

20  agree?

21             MR. SULLIVAN:  Objection; form;

22  argumentative.

23             You don't have to answer that question.

24             MR. POLI:  Well, unless you're instructing

25  him not to, he's going to answer it.

DANIEL JAEGER  MARCH 02, 2023

1            MR. SULLIVAN:  I'm instructing him not to.

2            MR. POLI:  So you're instructing him not

3    to?

4            MR. SULLIVAN:  Yes.  I'm instructing him

5    not to answer that question, as worded.

6            MR. POLI:  All right.  Well, we'll try

7    again.

8       Q.  BY MR. POLI:  You've understood -- as soon as I

9    mentioned the term expert shopping --

10           MR. POLI:  By the way, mark that so we can

11   find all the times that you tell him not to answer

12   questions.

13      Q.  BY MR. POLI:  As soon as I mentioned expert

14   shopping, you knew what it meant, right?

15           MR. SULLIVAN:  Objection; form.

16           THE WITNESS:  I understand what expert

17   shopping is, Mr. Poli.

18      Q.  BY MR. POLI:  I don't want to put words in your

19   mouth, Mr. Jaeger.  Tell me, in a layman's type of

20   explanation, what is expert shopping that maybe a

21   carrier might be accused of engaging in?  What is

22   expert shopping?

23           MR. SULLIVAN:  Objection; form.

24           You can answer.

25           THE WITNESS:  Expert shopping is when you

DANIEL JAEGER  MARCH 02, 2023

1  have an opinion from one expert and you're not happy

2  with that opinion and then you go out and get another

3  expert that provides you with the opinion that you're

4  happy with.  That didn't happen here.  It's not even

5  close.

6      Q.  BY MR. POLI:  All right, good.  So now we've

7  got a definition of expert shopping.

8          If it's determined that, with Gurr Johns

9  and Chvostal, what you and your team did here was

10  expert shopping, would you agree that that would be

11  improper under accepted claims handling standards?

12          MR. SULLIVAN:  Objection; form;

13  foundation.  You can answer.

14          THE WITNESS:  It's a hypothetical.  It

15  didn't happen here.  Anyone reviewing the facts and the

16  reasoning for the involvement of Chvostal, in the

17  chronology of events, which we haven't talked about,

18  would not consider this expert shopping because

19  Chvostal's appraisal was immaterial to the amount that

20  would be paid if the claim was payable.

21      Q.  BY MR. POLI:  Sir, listen to my question.  Yes,

22  it's a hypothetical and I realize you reject it.

23          But based on your decades of experience,

24  if it's determined that what you and your team did here

25  was expert shopping, as you've defined it, when you

DANIEL JAEGER  MARCH 02, 2023

1  went from Gurr Johns to Chvostal, that would be

2  improper, under accepted claims handling standards; is

3  that correct?

4           MR. SULLIVAN:  Objection; form;

5  foundation.

6           Mark it.

7           THE WITNESS:  Again, Mr. Poli, it's a

8  hypothetical.  Under your hypothetical, if it was

9  determined that we were expert shopping and that expert

10  shopping was material to some aspect of the claim, then

11  that would be violation of normal standard claim

12  handling procedures.  But that didn't happen here, not

13  even close.

14     Q.  BY MR. POLI:  And, of course, when you hired

15  Gurr Johns, you didn't know what number they would come

16  in with, correct?

17     A.  We had no idea what number they would come in

18  with.

19     Q.  They could come in with $1.8 million or

20  $1.9 million, and under policy, you would have had to

21  pay that amount, correct?

22           MR. SULLIVAN:  Objection; form;

23  foundation.

24           You can answer.

25           THE WITNESS:  If Mr. Altschuler requested

DANIEL JAEGER   MARCH 02, 2023

1   VAC -- or VAE coverage and went out and got his own

2   current market estimate after that loss and that came

3   in at 1.8, as you suggested, then that would have to be

4   considered under the terms and conditions of the policy

5   and the coverage.

6        Q.  BY MR. POLI:  Boy.  Does that mean the answer

7   is yes?

8            MR. SULLIVAN:  Objection to the form.

9            THE WITNESS:  No.  No.  The Gurr Johns

10   report was requested in an effort to determine whether

11   or not the value of the scheduled item was accurate.

12   And if it was not and it ended up being more, then we

13   would have identified VAE exposure.

14            We would have told Mr. Altschuler that if

15   he chooses, he can go out and get a current market

16   evaluation of the claimed items, and if he wants,

17   submit it to us, if it's over and above the scheduled

18   amount.

19            And if it was, then we would consider that

20   additional amount under the VAE coverage of the policy.

21            MR. POLI:  The next document that we'll

22   mark is 2/5/20 recorded statement of Doug.

23            THE COURT REPORTER:  2/25?

24            MR. POLI:  2/5/20.

25            THE COURT REPORTER:  Oh, 2/5/20.

DANIEL JAEGER  MARCH 02, 2023

1           (Whereupon, Deposition Exhibit Number 51 was

2   marked for identification.)

3       Q.  BY MR. POLI:  Okay.  You've -- you talked about

4   reviewing transcripts of recorded statements and EUOs

5   of Mr. Altschuler.  Do you remember that?

6       A.  I do.

7       Q.  This is a recorded statement, a transcript of a

8   recorded statement, taken by Fred White that you've

9   reviewed to get ready for today; is that right?

10      A.  I have reviewed this, yes.

11      Q.  When did you review it recently?

12      A.  Within the past couple of weeks.  I mean, I

13  read it as the investigation was ongoing and before a

14  claim decision was made.  But I reviewed it to

15  refamiliarize myself with it prior to today.

16      Q.  And it's pretty long.  Let's see, how many

17  pages is it?  It's 65 pages of transcript, correct?

18      A.  That's what the transcript indicates, yes.

19      Q.  And literally, never once in here does your

20  subordinate Mr. White ask a question about what you say

21  was so critical, which is, was this 3 of 30 or was it

22  Edition of 30 or was it something else; he never once

23  asks a question about that, does he?

24           MR. SULLIVAN:  Object to the form;

25  foundation.

1          You can answer.

2          THE WITNESS:  Yeah.  I believe he does ask

3  about the edition.  My recollection is, you know, that

4  was, you know, the understanding at the time.  And this

5  is where the artist proof comes up.  And, you know, I

6  would have to review the entire statement to be able

7  fully answer that.  The document speaks for itself.

8      Q.  BY MR. POLI:  Well, I didn't find it.  I mean,

9  can you point me -- I don't know how good your memory

10  is, Mr. Jaeger.  Can you put me to a page or reference

11  in here where your subordinate, Mr. White, says, hey,

12  was this 3 of 30 or was it some other Edition of 30 or

13  was it something else?  Do you remember a page where

14  that comes up?

15          MR. SULLIVAN:  Object to the form and

16  foundation.

17          You can answer.

18          THE WITNESS:  Yeah, I would have to review

19  the entire transcript to be able to answer that.

20          Mr. POLI:  Okay.  Well, we're not going to

21  take the time on that right now.

22          Let's go to the document where it really

23  does come up.

24          The next document would be 2/28/20 e-mail,

25  Fred White and Doug Altschuler, not certain if 3 of 30

DANIEL JAEGER  MARCH 02, 2023

```
 1  or AP.  That's a longwinded description.

 2          2/28/20.

 3          (Whereupon, Deposition Exhibit Number 52 was

 4  marked for identification.)

 5     Q.  BY Mr. POLI:  You've seen this e-mail, right?

 6             MR. SULLIVAN:  Object to the form.

 7     Q.  BY MR. POLI:  Have you seen this before?

 8     A.  I'm looking at it, Mr. Poli.  I'm trying to

 9  read it.

10     Q.  Well, it's like a lot of e-mails.  The bottom

11  part of the e-mail has earlier communications.

12             MR. POLI:  Go to the third page.

13             Actually, go to the last page.

14     Q.  BY MR. POLI:  Okay.  So it's from Mr. White.

15  It's to Mr. Altschuler.  Let's get the substance of

16  this prior e-mail.  So it begins on the prior page.

17  The bottom of the prior page.

18     A.  Could you go -- I'm sorry, Mr. Poli, I saw

19  something that was interesting.  Could you go up a

20  little bit more so I could just review the document.

21     Q.  Well, we're going to go in sequence.

22     A.  Okay.

23     Q.  So, first, there's an e-mail from Mr. White to

24  Doug Altschuler that starts on the bottom of the third

25  page and it's dated February 11, 2020.  Do you see
```

DANIEL JAEGER  MARCH 02, 2023

1  that?

2      A.  Yes.

3      Q.  And it says, "Thank you for taking the time to

4  meet with me last week."  And we just looked at the

5  recorded statement, which was dated February 5, 2020.

6  Do you remember we looked at that a moment ago?

7      A.  Yes.

8      Q.  Okay.  So here's your subordinate, Mr. White,

9  following up on things, okay?  He wants a number for

10  Virginia, a number for Sylvia.

11          MR. POLI:  Go to the next page, please.

12      Q.  BY MR. POLI:  He wants to know --

13          MR. POLI:  The bottom.  Go the other way.

14          The top of that page.

15      Q.  BY MR. POLI:  He wants to know if the art was

16  insured with another carrier prior to this policy.  He

17  wants any invoice for the Dina Brown appraisal, a

18  credit report.  And then he says, quote -- and this is

19  the first time this issue has come up, that I've seen.

20  Quote, "Of the 1 to 30 editions of the set of four

21  prints, can you tell me which edition is the subject of

22  this claim," unquote.

23          Do you see where I just read that in the

24  e-mail from your subordinate, Mr. White?

25          MR. SULLIVAN:  Objection; form.  Move to

DANIEL JAEGER  MARCH 02, 2023

1   strike Counsel's statement.

2               You can answer.

3               THE WITNESS:  I see that.

4       Q.  BY MR. POLI:  Am I correct, Mr. Jaeger, based

5   on your detailed review of this claim, this is the very

6   first time this issue, what I've been calling the 3 of

7   30 versus AP issue, this is the very first time this

8   has ever been raised in the claim on this -- the date

9   of this e-mail, which is 2/11/20, about a month into

10  the claim, right?

11              MR. SULLIVAN:  Objection; form.

12              You can answer.

13              THE WITNESS:  Yeah.  So my recollection,

14  from reviewing the documents, is that we weren't sure

15  what he was claiming for the Edition of 30.  We know

16  what he insured.  And if you go up in this document, I

17  think he responds to this e-mail and provides Fred with

18  some information.

19      Q.  BY MR. POLI:  Yeah.  I asked you a different

20  question.  Am I correct that in this e-mail from Fred

21  White, which is dated February 11, so it's just a month

22  into the claim, this is the first time anyone has

23  raised the 1 of 30 versus AP issue with Mr. Altschuler;

24  is that right?

25      A.  I think it's the first time we became aware of

DANIEL JAEGER  MARCH 02, 2023

1  it, Mr. Poli.

2      Q.  Is this the first time it was raised --

3      A.  I mean, I don't know if it's the first time.  I

4  don't know without reading the transcript on

5  February 5th, specifically what Fred talked about with

6  him, but I'm pretty sure, in that transcript, he

7  mentions the AP.  We know that the policy says Edition

8  of 30.  And I think Fred is trying to understand what

9  Edition of 30 are you saying is the subject of this

10 claim and then he tells us.  So this would be the first

11 time, yes.

12     Q.  You realize Mr. White never would have raised

13 the AP in the recorded statement because he didn't even

14 know what AP means.  You know that now, right,

15 Mr. Jaeger?

16             MR. SULLIVAN:  Objection; form.

17             You can answer.

18             THE WITNESS:  Yeah.  I do understand that

19 Fred didn't know what AP meant.  But Fred documents

20 facts, reports back to his supervisor, reports back to

21 me and we absolutely know what AP means.  So --

22     Q.  BY MR. POLI:  So he doesn't know what an AP is,

23 he's unlikely to ask a question about something he

24 doesn't know about when taking a recorded statement

25 that we've marked as Exhibit 51; is that right?

 1             MR. SULLIVAN:  Dan, were you done

 2   answering the question?

 3             THE WITNESS:  I'm done.

 4             MR. SULLIVAN:  All right.

 5     Q.  BY MR. POLI:  Can you answer the question?  If

 6   Fred doesn't even know what an AP is, he's unlikely to

 7   raise a question like that in a recorded statement; is

 8   that obvious?

 9             MR. SULLIVAN:  Form.

10             THE WITNESS:  A question like what,

11   Mr. Poli?

12     Q.  BY MR. POLI:  If he doesn't even know what an

13   AP is, he's unlikely to ask Mr. Altschuler, hey, was

14   this art an AP?  He doesn't even know what it is; isn't

15   that obvious?

16             MR. SULLIVAN:  Form.

17             THE WITNESS:  Well, it's not that obvious

18   because it's Mr. Altschuler who suggested that it was

19   an AP, not an Edition of 30.

20     Q.  BY MR. POLI:  Okay.  Let's go to the next page

21   and see -- we see the question by subordinate, "Of the

22   1 to 30 editions... which edition is the subject of

23   this claim?"

24             Now, let's see what the answer by

25   Mr. Altschuler is, which is three days later.

DANIEL JAEGER  MARCH 02, 2023

 1    A.  Okay.

 2    Q.  Two days later.  I'm sorry, two days later.

 3         MR. POLI:  Okay.  And we can go to the

 4  prior page, but I don't think it's necessary.

 5    Q.  BY MR. POLI:  The response by Mr. Altschuler is

 6  an e-mail of February 13th, so two days after the

 7  February 11th e-mail from Mr. White.  And here's how he

 8  answers the questions.

 9         "I believe the edition which is subject to

10  claim is 3 of 30" -- "3/30.  It may have also been an

11  AP."

12         Now, that's what -- as soon as this issue

13  comes up, the first time it comes up, that's what your

14  insured Mr. Altschuler says, right, Mr. Jaeger?

15         MR. SULLIVAN:  Objection; form;

16  foundation.  You can answer.

17         THE WITNESS:  At that time, that's what

18  Mr. Altschuler said.  And as I've stated, we insured

19  Edition 3 out of 30.  We didn't insure an AP.  And

20  that's what was the basis of our investigation moving

21  forward; what was actually insured, did he own it and

22  what was being claimed?

23    Q.  Okay.  Let's look at the next page and see the

24  response by your subordinate, Mr. White, the next day,

25  February 14, Valentine's Day.

DANIEL JAEGER  MARCH 02, 2023

1              Okay.  Here's what he says in his e-mail.

2    And you've seen this e-mail string before today, right,

3    Mr. Jaeger?

4         A.  I think so, yes.

5         Q.  Okay.  Here's what Mr. White says.  First, he

6    quotes from -- he quotes from Mr. Altschuler's e-mail.

7    He says, quote, "I believe the edition which is subject

8    to the claim is 3/30.  It may have also been an AP,"

9    unquote, which is quoting from Mr. Altschuler.  And

10   then he says -- this is from Mr. White, "I do not know

11   what an AP is."  That's what your subordinate says,

12   right?

13        A.  That's what he says, yes.

14        Q.  And then the very same day, about less than an

15   hour later, the response by Mr. Altschuler.  First he

16   says who the prior carrier is, that he thinks it's AIG.

17   That's what he says, right?

18        A.  That's what he says.

19        Q.  And he says AP is artist proof, right?

20        A.  That's what he says.

21        Q.  So, you know, it goes back to the whole gotcha

22   thing, okay?  Which you admit, if this is your team

23   trying to grab onto this gotcha and screw your insured,

24   that's not just inappropriate, it's wildly

25   inappropriate.  It looks here, Mr. Jaeger, like the

DANIEL JAEGER  MARCH 02, 2023

1  very first time this 3 of 30 versus AP issue comes up,

2  your insured is candid in disclosing he's not sure.

3  That's what this e-mail reveals; is that right?

4              MR. SULLIVAN:  Object to the form and

5  foundation.  You can answer.

6              THE WITNESS:  Yeah.  Again, it's a

7  hypothetical.  There was no gotcha moment.  We're

8  trying to understand what was owned and what was being

9  claimed and conducted an investigation into that claim.

10  That's all that was occurring here, Mr. Poli.  I don't

11  know of any other way to describe it to you.  You know,

12  there was no gotcha moment.

13    A.  Well, as far as someone who's got your wealth

14  of experience, and you realize, since I'm going to go

15  to court and accuse you guys of grabbing onto a gotcha

16  moment improperly, this e-mail -- you do understand,

17  Mr. Jaeger, this e-mail supports that scenario?  You do

18  understand that, right, Mr. Jaeger?

19              MR. SULLIVAN:  Objection; form;

20  foundation.

21              You can answer.

22              THE WITNESS:  I understand that's your

23  opinion and that will be your argument.  But I

24  completely disagree with it and don't believe there's

25  any validity to it.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  And the reason it supports that

2    gotcha theory is that it looks like the very first time

3    this issue of 3 of 30 versus AP got raised, the very

4    first time Mr. Altschuler was asked about it, he

5    immediately said, I don't know.  It could be 3 of 30.

6    It could be an AP.  That's why it supports the gotcha

7    theory, right?

8              MR. SULLIVAN:  Objection; form;

9    foundation.  Move to strike Counsel's statements.  You

10   can answer.

11             THE WITNESS:  Again, I completely

12   disagree.  I don't believe it's a gotcha moment.  I

13   believe it's an information seeking effort by us to

14   determine what was being claimed and was it insured by

15   the policy and did Mr. Altschuler own it.  No gotcha

16   moment.

17   Q.  BY MR. POLI:  Well, I'm trying to ask why this

18   would support the gotcha theory.  The reason it

19   supports the gotcha theory is that this e-mail,

20   Exhibit 52, appears to support the idea that the very

21   first time the 3 of 30 versus AP issue was raised with

22   your insured, he immediately said, I'm not certain.  It

23   could be 3 of 30.  It could be an AP.

24             That's why it supports the gotcha theory.

25   Right, sir?

1          MR. SULLIVAN:  Objection; form;

2    foundation.  Move to strike Counsel's statements.  You

3    can answer.

4          THE WITNESS:  Again, I disagree with you.

5    I don't believe it supports a gotcha moment at all.

6    What I believe it supports is our efforts to understand

7    what Mr. Altschuler was actually claiming was stolen

8    from his mother's home.

9          And, you know, I think that when people

10   hear, you know, what we were doing and why we were

11   doing it and the different items that were being

12   presented to us, different editions, the artist proof,

13   representations, I think that they will completely

14   understand that this had nothing do with a gotcha

15   moment.  It doesn't support a gotcha moment, despite

16   the fact that I know you'll make those arguments.  I

17   don't believe there's any validity to it.

18          MR. POLI:  Okay.  All right.  So you

19   disagree.

20          Next document, 2/7/20 claim note re credit

21   report, no negatives.

22          (Whereupon, Deposition Exhibit Number 53 was

23   marked for identification.)

24     Q.  BY MR. POLI:  Okay.  So this is a file note I

25   imagine you've seen; is that right?

DANIEL JAEGER  MARCH 02, 2023

1    A.  I don't have a specific recollection of it,

2  Mr. Poli.  But it seems like a note that would be put

3  in by an investigator after running a credit report,

4  with the insured's authorization.

5    Q.  And just like it's normal to run one of those

6  Lexis reports, where it checks into all kinds of

7  things, including sexual offenses and criminal

8  offenses -- you said that's standard operating

9  procedure, right?

10   A.  Again.  To, you know, restate my testimony, we

11  run Lexis reports and it comes back with different

12  categories of public information and we review the

13  information within that report that we believe is

14  relevant to the claim that we're handling or

15  investigating.

16   Q.  And we talked -- we didn't talk much about it,

17  but we looked at the ISO search where you get

18  information from all the other insurance companies

19  about any claims.  That's standard operating procedure

20  for your SIU team as well, right, Mr. Jaeger?

21       MR. SULLIVAN:  Object to form.

22       THE WITNESS:  An ISO report is not only

23  run by the SIU team, but also the claims team.  It's a

24  very standard report, pretty much used by all insurance

25  companies who are members of ISO.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  And then it's also standard

2  operating procedure to run a credit report on an

3  insured, as part of the work done by your SIU team,

4  right?

5    A.  We do request credit reports and we can only

6  run them after we have a signed authorization.  It's

7  not a public record; so we need an authorization to

8  obtain it.  So it's different from Lexis and ISO.  And

9  actually ISO is not public either.  You have to be a

10  member of ISO.  And, actually, Lexis, you have to be

11  affiliated with them as well.  But this report,

12  specifically, is run with the signed authorization of

13  Mr. Altschuler.

14    Q.  Okay.  And the point is, Mr. Altschuler

15  cooperated.  You asked him to sign off on Chubb getting

16  his credit report and he signed off on allowing that,

17  right?

18       MR. SULLIVAN:  Object to form.

19       THE WITNESS:  He did.  He did.

20    Q.  BY MR. POLI:  He also supplied his tax returns

21  to you, right?

22    A.  Eventually, yes.

23    Q.  And he also supplied his credit card

24  statements, including Amex statements, to you, right?

25       MR. SULLIVAN:  Objection; form.

DANIEL JAEGER  MARCH 02, 2023

1          You can answer.

2          THE WITNESS:  Eventually he -- and I don't

3  know if he provided them all, but he did provide credit

4  card statements.

5     Q.  BY MR. POLI:  So anyway, the reason you're

6  looking for negatives is if someone is under financial

7  pressure, hey, maybe that's a motive to commit

8  insurance fraud.  That's why you're looking for

9  negatives, so to speak, on a credit report; is that

10 right?

11          MR. SULLIVAN:  Objection; form;

12 foundation.

13          You can answer.

14          THE WITNESS:  And not -- in part, but not

15 necessarily in entirety.  We look for various things on

16 a credit report.  We look at outstanding debt.  We look

17 at payment history.  We look at revolving credit,

18 whether or not it's maxed out, in addition to whether

19 or not someone has been charged off or if they're

20 delinquent or they're in collections.

21          So we look at, you know, various things

22 off the credit report.

23          MR. POLI:  The next document, 2/11/20

24 claim note re "we don't know the edition number."

25 2/11/20.

DANIEL JAEGER  MARCH 02, 2023

1        (Whereupon, Deposition Exhibit Number 54 was

2   marked for identification.)

3     Q.  BY MR. POLI:  Okay.  Exhibit 54, one of your

4   subordinates, Karen Moore.  And this was, you know,

5   2/11/20.  So it's a month into the claim.  Around the

6   same time that Mr. Altschuler said, I don't know if

7   it's 3 of 30 or AP, the same time frame, right?

8             MR. SULLIVAN:  Objection; form.

9             You can answer.

10            THE WITNESS:  Yes.

11    Q.  BY MR. POLI:  In fact, it's the same day.  I

12   mean, the e-mail from Mr. White saying what edition

13   number is it and then two days later, on the 13th, from

14   Mr. Altschuler saying, it might 3 of 30 or it might be

15   an AP.  This is exactly in the same time frame, right?

16    A.  It is in the same time frame, yes.

17    Q.  Okay.  And I mean, there's all this testimony

18   you've given, Mr. Jaeger, about how, hey, we didn't

19   insure just any ol' Andy Mouse.  We insured 3 of 30.

20   That's what we insured.  We insured 3 of 30.  And if

21   you can't prove you own 3 of 30, then there's no

22   coverage.  Do you remember giving all that testimony?

23            MR. SULLIVAN:  Objection; form;

24   foundation.

25            You can answer, Dan.

DANIEL JAEGER  MARCH 02, 2023

1        THE WITNESS:  I do recall testifying that

2  that's what we insured, based on Mr. Altschuler's

3  representations to his agent that the Dina Brown

4  appraisal corresponded to Item Number 2 on his policy.

5  And that's what we insured.  And, you know, this artist

6  proof, again, that's referenced, there's no proof of

7  it's existence in Mr. Altschuler's possession.

8     Q.  BY MR. POLI:  Isn't it obvious that you only

9  insured 3 of 30?  Here we are well over a month into

10  the claim and what your subordinate says is, quote, "We

11  don't know the edition number of the missing set of

12  prints.  We'll try to get that from our insured,"

13  unquote.  I guess she just -- maybe you knew that you

14  only insured 3 of 30, but somehow she didn't.  Is that

15  the explanation?

16        MR. SULLIVAN:  Objection; form;

17  foundation.

18        THE WITNESS:  Yeah.  This is within two

19  months of the investigation and we're trying to

20  understand what Mr. Altschuler actually had, based on

21  what he was telling us.  Did he have Edition 3 out of

22  30, which is what he insured on his policy, or did he

23  have an artist proof?  Did he have proof that he had

24  either one of them?  That's what we were trying to find

25  out.  As the investigation moved forward and we got

DANIEL JAEGER  MARCH 02, 2023

1  more information, then we became more aware of what was

2  occurring.

3         This is -- you know, a claim was submitted

4  in January.  This is less than 30 days.  We're still

5  gathering information, at this point.

6  Q.  BY MR. POLI:  Let me make sure I understand

7  something.  It's going to be another hypothetical for

8  you, Mr. Jaeger, based on your wealth of experience.

9  Let's say that Mr. Altschuler had ironclad proof.  He

10  had pictures.  He had witnesses that saw it.  He had

11  just a plethora of evidence that what he had in that

12  home in Tucson was an AP set and then it's gone.

13         If you were presented with

14  incontrovertible proof that what got stolen from the

15  Tucson home was an AP set, would you have denied this

16  coverage because, hey, we didn't insure an AP set, we

17  insured 3 of 30; would you have denied coverage?

18         MR. SULLIVAN:  Object to the form and

19  foundation.

20         You can answer.

21         THE WITNESS:  That is a complete

22  hypothetical because there is no evidence that the AP

23  set existed.  What I can tell you is that if there was

24  ironclad evidence that the AP set existed and there was

25  evidence that it was actually stolen, we would need to

DANIEL JAEGER  MARCH 02, 2023

1  evaluate that from a coverage position under the

2  policy.  I --

3      Q.  BY MR. POLI:  Do you --

4      A.  So I can't tell you, as we sit here today,

5  whether or not we would have or would not have because

6  we have no evidence that it did.  But we would have

7  evaluated that, Mr. Poli.  We would have taken that

8  into consideration.  We would have evaluated it.  We

9  would have talked to our coverage experts internally

10 and made a decision on what to do.  But the claim was

11 denied, as you know, because there was material

12 misrepresentations and concealments.  And so --

13     Q.  Don't -- because I don't believe that for a

14 moment, at all.  So try not to say what I think because

15 I think that's ridiculous.  But, okay.

16         So do you understand that if you had these

17 Andy Mouse -- if you had a set of Andy Mouse that was a

18 complete set of 3 of 30 or 5 of 30 or 10 of 30 and if

19 it was in excellent condition and, if in contrast, you

20 had another set that was an AP set in excellent

21 condition, they would each have the same value.  You

22 know that, right?

23         MR. SULLIVAN:  Objection; form;

24 foundation.

25         THE WITNESS:  Again, hypothetical.  Was it

DANIEL JAEGER  MARCH 02, 2023

1  framed?  Not framed?  Displayed?  Not displayed?  You

2  know, you're giving me a hypothetical and under a set

3  of facts that don't exist.

4      Q.  BY MR. POLI:  I'm going to give you -- it's a

5  hypothetical, sir, and you've got a ton of experience

6  to answer hypotheticals.  So it's a hypothetical.  So

7  I'll add to it.

8          MR. SULLIVAN:  He's not required to accept

9  your hypothetical.  But go ahead.

10          MR. POLI:  Let me finish my question and

11  don't interrupt me.

12      Q.  BY MR. POLI:  You've got a numbered set that is

13  always -- it's never been framed and it's always been

14  in the case or the carton or whatever they call it.

15  And whether it's 3 of 30 or 5 of 30, 10 of 30,

16  whatever, it's a numbered set.  And because it's always

17  been in the carton, it's in excellent condition.  And

18  then in contrast, you've got an AP set of the same

19  prints that's always been in the carton or case and

20  it's also in excellent condition.

21          Do you realize that it would have the same

22  value, the same similar value, do you realize that?

23          MR. SULLIVAN:  Object to the form;

24  foundation.

25          You can answer, Dan.

DANIEL JAEGER  MARCH 02, 2023

1        THE WITNESS:  Yeah.  Under your

2   hypothetical, with all things being equal, there is a

3   very good likelihood that they would have very similar

4   values.

5        Q.  BY MR. POLI:  Okay --

6        A.  However -- however, you know, the provenance of

7   Mr. Altschuler's AP, coming directly from Keith Haring,

8   may have actually increased the value.  But, yeah, I

9   don't disagree with your premise, Mr. Poli.

10       Q.  Okay.  So, if anything, if Mr. Altschuler

11  really got an AP set directly from Keith Haring six or

12  eight months before he died, that might have more

13  value?

14            MR. SULLIVAN:  Form; foundation.

15            You can answer.

16            THE WITNESS:  It may.  That would need to

17  be something that was researched.  But no one knew

18  about the AP.

19       Q.  BY MR. POLI:  All right.  Let's -- this is --

20  again, it's a variation on a gotcha move.  So I want to

21  understand because you've gone to great lengths -- and

22  we're about ready to wrap this up, Mr. Jaeger.  I know

23  it's been a long day.  You've gone to great lengths to

24  say, hey, we insured 3 of 30 and if you didn't have 3

25  of 30, we're not going to cover it.  I've heard that

DANIEL JAEGER  MARCH 02, 2023

1  quite a bit today.  Is that what I've heard from you?

2          MR. SULLIVAN:  Objection; form;

3  foundation.  Move to strike Counsel's statements.

4          You can answer.

5          THE WITNESS:  Yeah, I've gone to great

6  lengths to say that that's what we insured and he

7  didn't own it.  And that's been proven and established

8  that he didn't own 3 of 30.

9      Q.  BY MR. POLI:  And now --

10     A.  With respect -- please let me finish, Mr. Poli.

11     Q.  Sure.

12     A.  With respect to the AP, there's no evidence he

13  had an AP.  So no evidence he owned that either.  So --

14  at the time of the loss.  So --

15     Q.  I'm not done with my hypothetical, Mr. Jaeger.

16  And I've already alluded to it, but I don't think I got

17  an answer.

18          If Mr. Altschuler had incontrovertible

19  proof that what he had in that carton or case in Tucson

20  was an AP set, and if he could prove beyond any

21  question in your mind that he had an AP set in Tucson

22  and that's what got taken or stolen, would you really

23  deny coverage on the basis that, hey, we only insured

24  3 of 30.  We did not insure an AP set.  Would you

25  really do that?  Because that seems like a major gotcha

DANIEL JAEGER  MARCH 02, 2023

1  move.

2          MR. SULLIVAN:  Objection; form;

3  foundation.

4          Mark it.

5          You can answer.

6  Q.  BY MR. POLI:  Yeah.  I just --

7  A.  Yeah.  It's a --

8          MR. SULLIVAN:  Let him answer the

9  question.

10  Q.  BY MR. POLI:  Answer the question.

11  A.  Okay.  It's a hypothetical.  And if we were

12  presented with that evidence, which we never have been

13  and I don't know that it exists because I assume we

14  would have seen it if it did, then we would have

15  evaluated that from a coverage standpoint and made a

16  determination of whether or not, based on the evidence

17  and based on what was being claimed, if it was covered

18  and it -- you know, that would be something that we

19  would need to consider.  But we were never presented

20  with any of that evidence, never.

21  Q.  Well, you were presented with evidence that you

22  found disputed.  So I'm simply saying --

23  A.  No --

24  Q.  Let me finish my question, please.

25          I'm taking a variation.  So Mr. Altschuler

DANIEL JAEGER  MARCH 02, 2023

1  certainly said, hey, I think I could have had an AP

2  set.  I just know I got it from Keith Haring.  And I

3  suppose the idea of getting an AP set -- AP stands for

4  artist proof, right?

5      A.  AP does stand for artist proof.

6      Q.  I suppose if you ran into a guy like Haring and

7  he had a set to sell, the ones he might have to sell

8  would be AP sets because that's what -- they're his.

9  Those are the ones that go to him.  That's what an AP

10  set is, right, sir?

11          MR. SULLIVAN:  Objection; form.

12          THE WITNESS:  I can't comment on what he

13  would have.  You know, does the artist get proofs when

14  these editions are printed?  Yes.  What he does or who

15  sells them for him or, you know, any of the other

16  information about -- from Mr. Altschuler about this

17  alleged purchase, you know, it seems to be refuted by

18  facts.

19      Q.  BY MR. POLI:  So given your contention that not

20  only would an AP set and a numbered set have similar

21  value, if Mr. Altschuler really got the AP set from --

22  directly from Mr. Haring like a year before he died, it

23  might have a higher value.

24          Here's the question.  If you knew, from

25  proof that satisfied you, beyond any question, that

DANIEL JAEGER  MARCH 02, 2023

1  what Mr. Altschuler had was not a numbered set, it was

2  really an AP set with the same or even higher value,

3  would you really have denied coverage because you would

4  have said, hey, we only insured 3 of 30.  We don't care

5  what else you had, whether it was 5 of 30 or 10 of 30

6  or an AP set of equal value, we're not going to pay you

7  for that.  Would you have really done that?

8            MR. SULLIVAN:  From; foundation.

9            Mark it.

10            You can answer.

11            THE WITNESS:  Again, Mr. Poli, I don't

12  know that we would.  I don't know that we wouldn't.  It

13  would be something we would need to evaluate, based on

14  actual proof that AP set existed and that

15  Mr. Altschuler possessed it on the date of loss and if

16  there was irrefutable proof of that, then that

17  certainly would have been taken into consideration in

18  our overall coverage evaluation.

19    Q.  BY MR. POLI:  So, in other words, if I

20  understand you correctly, you're not sure what you

21  would have done.  But even if it was proven to you,

22  beyond any reasonable doubt, that what Mr. Altschuler

23  had was an AP set of equal or higher value, you might

24  still have denied coverage on the idea that, hey, we

25  only insured 3 of 30, nothing else; am I understanding

DANIEL JAEGER  MARCH 02, 2023

1  you correctly?

2           MR. SULLIVAN:  Objection; form;

3  foundation.

4           THE WITNESS:  I hope this is the last time

5  that you'll ask me this question because I think I've

6  answered it three or four times.

7      Q.  BY MR. POLI:  Answer it as best as you can --

8      A.  What I'm --

9      Q.  Answer --

10     A.  Mr. Poli --

11     Q.  -- and then we'll go back.

12     A.  Okay.  Can I answer?

13     Q.  Well, you said you hope it's the last time.  If

14  you give me an actual straightforward answer, it will

15  be the last time.  But if it's another one of these

16  narratives that doesn't respond, then it's not the last

17  time.

18           MR. SULLIVAN:  Objection.  Move to strike

19  Counsel's statements and characterization of my

20  client's testimony.

21           You can answer, Dan.

22           THE WITNESS:  Yeah.  What I told you is

23  that if that information was available to us, we would

24  evaluate internally and make a determination of whether

25  or not that was a payable claim under the policy.

DANIEL JAEGER  MARCH 02, 2023

1    Q.  BY MR. POLI:  So, as you sit here today, you

2    don't know, if you were given incontrovertible proof

3    that Mr. Altschuler had an AP set of equal or higher

4    value, you don't know whether you would have paid the

5    claim because you might still have taken the position,

6    hey, we only insured 3 of 30 and nothing else.  Am I

7    understanding you correctly?

8                MR. SULLIVAN:  Objection; form;

9    foundation.

10               Mark it.

11               You can answer.

12               THE WITNESS:  Yeah, we did only insure 3

13   out of 30, based on the representations that were made.

14   And that would be a question internally for our

15   coverage people to make a decision of whether or not

16   that would be a payable claim under the policy and we

17   would evaluate that and we would discuss that with our

18   coverage experts internally to determine how we would

19   resolve that.

20               And that's the best answer I can give you,

21   especially in light of the fact that none of that

22   evidence was presented to us during the claim

23   investigation.  And I haven't seen any of it in

24   litigation.

25   Q.  And in that circumstance, maybe you would pay

1  the claim and maybe you wouldn't.  That's your

2  testimony, as you sit here today, as the most senior

3  person in SIU in North America; is that right?

4           MR. SULLIVAN:  Objection; form;

5  foundation.

6           Mark it.

7           THE WITNESS:  My answer to you is that we

8  would evaluate it and discuss internally whether or not

9  that would be a loss that we would cover under those

10  circumstances.

11           However, again, we weren't presented with

12  any of that evidence; so it didn't become an issue.

13      Q.  BY MR. POLI:  That should -- I mean, going with

14  this gotcha theme, if you actually think you could

15  potentially deny coverage on the claim because someone

16  made a mistake on the Dina Brown appraisal, even though

17  if they had -- if under this scenario, if it's proven

18  to you incontrovertibly that he had an AP set of equal

19  or greater value, if you really think you could still

20  deny coverage, that seems like a major gotcha move,

21  doesn't it?

22           MR. SULLIVAN:  Objection; form;

23  foundation.  Move to strike Counsel's statements.

24           You can answer.

25           And mark it.

1          THE WITNESS:  Again, it is no gotcha

2    moment.  You know, if we wanted a true gotcha moment

3    when we learned of the AP, we could have triggered and

4    denied the claim at that point because it wasn't 3 out

5    of 30.  We didn't do that.  We continued our

6    investigation.  We wanted to hear from our insured and

7    wanted to avail ourselves of all information available

8    before making the coverage determination.

9          So there was no gotcha moment.  We

10   continued our investigation.  We asked Mr. Altschuler

11   for any and all documentation he had relative to an

12   Edition Number 3 out of 30, the artist proof, anything

13   he owned, you know, relative to these Andy Mouse -- or

14   any documentation relative to the Andy Mouse, Keith

15   Haring silkscreens.  And then at the end, we would

16   evaluate all that and provide him with our coverage

17   determination, which is what we did.

18        Q.  BY MR. POLI:  If you're not looking for gotcha

19   moments, I would assume, under that hypothetical

20   scenario, where it's proven to you that what he had was

21   an AP set of equal or greater value and he's been

22   paying premiums for such a set, I would assume the

23   immediate answer would be, yeah, we'd pay that.  But

24   that's not your answer today, is it?

25          MR. SULLIVAN:  Objection; form;

DANIEL JAEGER  MARCH 02, 2023

1  foundation.

2          Mark it.

3          You can answer, Dan.

4          THE WITNESS:  Again, you know, not being

5  presented with that evidence and actually nothing even

6  close to that, if we were presented, under your

7  hypothetical, with evidence, irrefutable, that he owned

8  an AP set and that AP set was actually in his mother's

9  home and that the facts and circumstances around the

10  theft could be corroborated, what I'm saying is we

11  would take that information, we would go back to our

12  coverage experts and we would evaluate that.  And if

13  the claim was payable, we would pay the claim.  There

14  was no reason for a gotcha moment, Mr. Poli.  There was

15  no reason whatsoever for it.  We were conducting an

16  investigation to determine whether or not there was

17  liability owed under the contract.

18          MR. SULLIVAN:  Can we get a time count,

19  please.

20          THE VIDEOGRAPHER:  Six hours, 41 minutes.

21          MR. SULLIVAN:  Thank you.

22          THE VIDEOGRAPHER:  You're welcome.

23     Q.  BY MR. POLI:  Up until now, I thought your

24  testimony has been -- under that scenario, where it's

25  proven, beyond any question in your mind, that what

DANIEL JAEGER  MARCH 02, 2023

1  Mr. Altschuler had was an AP set of equal or greater

2  value -- up until now, your testimony has been maybe

3  we'd pay it; maybe we wouldn't.  We would have to

4  evaluate it because we might still deny it on the idea

5  that, hey, we only insured 3 of 30.  Have I understand

6  your testimony; you would have to evaluate it and make

7  a decision?

8              MR. SULLIVAN:  Objection; form;

9  foundation.  Move to strike Counsel's statements.

10              Mark it.

11              You can answer.

12              THE WITNESS:  Again, I've said this

13  several times and I'll repeat myself.  If there was,

14  under your hypothetical, irrefutable evidence that

15  there was an AP proof, or artist proof edition, owned

16  by Mr. Altschuler and that it was irrefutable, meaning

17  there was proof, documentation, photographs, evidence,

18  what have you, and that it was in his mother's house

19  and the facts and circumstances of the theft could be

20  corroborated, we would take that back, that

21  information, back to our coverage experts, who deal

22  with coverage under the Masterpiece contract and under

23  scheduled items, and we would provide that evidence and

24  information to them and they would tell us whether or

25  not that would be a covered loss, under the policy, and

DANIEL JAEGER  MARCH 02, 2023

1   that's how we would evaluate it.  And if it was

2   covered, we absolutely would pay it.  And if it wasn't,

3   then we would advise Mr. Altschuler that it wasn't

4   covered.

5       Q.  BY MR. POLI:  But even in that circumstance, if

6   you wanted to, based on your premise that you only

7   insured 3 of 30, even if it was absolutely proven that

8   what he lost was an AP set of equal or greater value,

9   under your theory, you could still deny coverage.  Have

10  I understood you correctly?

11          MR. SULLIVAN:  Objection; form;

12  foundation.

13          Mark it.

14          Answer again, Dan.

15          THE WITNESS:  Yeah, again, potentially.

16  But that would be something that we would need to

17  consider and evaluate internally and make a decision

18  how we were going to offer our coverage position to

19  Mr. Altschuler, under that hypothetical.

20      Q.  BY MR. POLI:  So on that idea -- and we're

21  about done.  Even under that hypothetical, an AP set of

22  equal or greater value, proven beyond any question to

23  you, potentially, you would still deny coverage under

24  the idea that, hey, we only insured 3 of 30; that's

25  your testimony that you just gave, right?

DANIEL JAEGER  MARCH 02, 2023

1          MR. SULLIVAN:  Objection; form; misstates

2     his testimony.

3          Mark it.

4          You can answer, Dan.

5          THE WITNESS:  That's not my testimony,

6     Mr. Poli, and you know that because I've said it three

7     times.  I said that we would evaluate the facts and

8     circumstances and evidence of Mr. Altschuler insuring

9     an edition of the 3 of 30, based on the Dina Brown

10    appraisal, and that he actually was now claiming that

11    he owned an artist proof and we would take that

12    information back to our coverage experts and we would

13    ask them for their assessment of whether or not that

14    would be covered under the policy, as it was scheduled

15    and insured by Mr. Altschuler.

16    Q.  BY MR. POLI:  Well, I thought, and this is why

17    we have a record, sir, I thought you just said that

18    even in that circumstance, an artist proof of equal or

19    greater value, incontrovertible proof, even in that

20    circumstance, you could still potentially deny coverage

21    on the idea that, hey, we only insured 3 of 30.  Is

22    that what you said a minute ago, on the record?

23          MR. SULLIVAN:  Objection; form.

24    Objection; foundation.

25          Mark it.

```
 1              Dan, you can answer again.

 2              THE WITNESS:  Again, Mr. Poli, you know,

 3   if that information was available to us, and it was

 4   irrefutable, that he owned an artist proof versus the

 5   Edition 3 out of 30, which he insured on the policy,

 6   that information would be taken back to our coverage

 7   experts and they would evaluate it and they would

 8   advise whether or not that was a payable claim or a

 9   nonpayable claim.  And we would advise Mr. Altschuler

10   accordingly.

11              You know, that's how that would be

12   evaluated, but since there was no evidence or proof of

13   an AP, and there was certainly not a 3 out of 30 owned

14   by Mr. Altschuler on the date of loss, or the 5 out of

15   30, which we now know, then, you know, we would have

16   evaluated all the information that we had and made a

17   coverage decision.  But we did, based on what we knew

18   and what was represented to us.

19              Mr. POLI:  All right.  I think that's been

20   wildly nonresponsive for 10 minutes.  I'm done.  We'll

21   play clips to the jury and let them decide on your

22   credibility.  Thanks for your time, sir.

23              THE WITNESS:  Thank you.

24              MR. SULLIVAN:  I move to strike Counsel's

25   characterization of my client's answers.
```

 1              I just have a couple of questions.

 2

 3                      EXAMINATION

 4    BY MR. SULLIVAN:

 5       Q.   When Mr. Poli was showing you portions of

 6    Ms. Brown's deposition and you wanted to refer to other

 7    pages, did he let you?

 8       A.   He did not.

 9       Q.   When he asked you questions about examinations

10    under oath, did he present you with Arizona law or

11    allow you to review the entire claim file, like you

12    requested?

13       A.   He did not.

14       Q.   All right.  With respect to the deposition

15    testimony of Debbie Smith, did he show you the actual

16    testimony?

17       A.   He did not.

18       Q.   Did he tell you that she was hired, not as an

19    SIU person, but just as a claims handler?

20       A.   A claims handler or a claims --

21       Q.   A claims handler expert?

22       A.   I don't know if he stated it in that way.  But

23    that's my understanding of what her retention was for.

24       Q.   Did you understand that there's a special

25    definition of a term for extraordinary assumptions

1  relating to appraisals of artwork?

2      A.  I do.

3      Q.  So if Mr. Poli just threw the term "assume"

4  with respect to the testimony of Dina Brown, would that

5  be taken out of context in terms of the art world and

6  appraisals?

7              MR. POLI:  Object to form.

8              THE WITNESS:  My understanding is that

9  Dina Brown made extraordinary assumptions when

10  preparing her appraisal as to the condition of the

11  artwork.  There might have been some others in there.

12  I just -- it's getting late, Mr. Sullivan, and I'm just

13  trying to remember.  But I do believe that there was

14  some extraordinary assumptions made.

15      Q.  BY MR. SULLIVAN:  Would you agree with me,

16  regardless of any assumptions, the appraisal has

17  affirmative representations, both in terms of the set

18  3 of 30 and the provenance, in terms of its

19  acquisition?

20              MR. POLI:  Object; form.

21              THE WITNESS:  Yes.  The appraisal does

22  speak to the edition number, out of 30 as well as the

23  provenance that was presented to her.

24      Q.  BY MR. SULLIVAN:  And to your knowledge, did

25  anyone other than Mr. Altschuler provide that

DANIEL JAEGER  MARCH 02, 2023

1  information, whether it be directly to Dina Brown or

2  her mother?

3      A.  Not to my --

4              MR. POLI:  Object; form and foundation.

5              You've got to give me a chance to do my

6  objection, Mr. Jaeger.

7              Form and foundation.

8              THE WITNESS:  Not to my knowledge, no.

9              MR. SULLIVAN:  Great.  No further

10 questions.  We'll read and sign.

11             MR. POLI:  I've got a few questions.

12

13                  FURTHER EXAMINATION

14 BY MR. POLI:

15     Q.  Okay.  So he says I should have given you a

16 chance to review the entire claims file while I'm

17 asking you questions today.  Do you remember that

18 question a moment ago, Mr. Jaeger?

19     A.  I do.

20     Q.  How long -- assuming technically I could give

21 you the entire claims file to review, what would that

22 take 5, 10 hours?

23     A.  Possibly.  It's a pretty large claim file.

24     Q.  So the question is ludicrous, the idea that I'm

25 supposed to -- on a seven-hour deposition, I'm supposed

DANIEL JAEGER  MARCH 02, 2023

1    to consume five to ten hours for you to review the

2    entire claims file so you can answer a question; do you

3    understand that's kind of a ridiculous question, Mr.

4    Jaeger?

5                MR. SULLIVAN:  Mike, I'll stipulate that I

6    shouldn't have asked that question.  That he couldn't

7    have possibly done that during your depo.

8                MR. POLI:  That's a different question.

9        Q.  BY MR. POLI:  Do you understand that that is an

10   absurd question, Mr. Jaeger, yes or no?

11               MR. SULLIVAN:  Go ahead, you can answer

12   it, Dan.

13               THE WITNESS:  Yeah.  I think the claims

14   file itself is pretty much unreviewable in a seven-hour

15   deposition.  But a 30-page transcript may have been

16   doable, Dina Brown.

17       Q.  BY MR. POLI:  Debbie Smith, I didn't put the

18   transcript in front of you, that's the question that

19   was asked.  You had read the most critical portions of

20   that transcript before you walked in here today, right,

21   Mr. Jaeger?

22               MR. SULLIVAN:  Form and foundation.  You

23   can answer.

24               MR. SULLIVAN:  Yeah.  I read excerpts of

25   it which were the basis of your questions today.

1    Q.  BY MR. POLI:  Right.  You knew, before you ever

2    came here, that, contrary to your testimony and

3    contrary to Chubb's position, she found not an iota of

4    evidence to indicate that Mr. Altschuler acted in a

5    fraudulent manner.  I mean, you knew that before you

6    walked in here today, right?

7              MR. SULLIVAN:  Form; foundation.

8              THE WITNESS:  I read her testimony and we

9    discussed it in great detail.

10   Q.  BY MR. POLI:  And you read her testimony to the

11   effect of what I just described, right, Mr. Jaeger?

12             MR. SULLIVAN:  Form; foundation.  Move to

13   strike Counsel's statement.

14             You can answer.

15             THE WITNESS:  Yeah.  I was able to address

16   your questions.  Her testimony speaks for itself.  I

17   don't have any qualms with the way that you, you know,

18   characterized it, as far as her opinions, with that

19   respect.

20   Q.  BY MR. POLI:  I mean, I accurately -- based on

21   your review of a portion of her testimony, I accurately

22   summarized her testimony when I was questioning you

23   about Ms. Smith, didn't I?

24             MR. SULLIVAN:  Form; foundation.

25             You can answer.

DANIEL JAEGER  MARCH 02, 2023

1            THE WITNESS:  Yeah, relative to

2    intentional concealments and misrepresentations.

3       Q.  BY MR. POLI:  And to be more precise, she

4    didn't find any evidence of that in her review of this

5    giant claims file, right?

6            MR. SULLIVAN:  Objection; form;

7    foundation.

8            You can answer.

9            THE WITNESS:  I don't know if she didn't

10   find any evidence.  I didn't read her entire

11   transcript.  I know that there was testimony about

12   intentionality and, you know, relative to the

13   concealment or fraud provision.

14      Q.  BY MR. POLI:  She even said something -- I

15   don't have it in front of me, but like I don't think

16   anyone here thinks he committed fraud.  Do you remember

17   that part of her testimony, Mr. Jaeger?

18           MR. SULLIVAN:  Objection; form;

19   foundation.

20           You can answer.

21           THE WITNESS:  Yeah, I don't, Mr. Poli.

22      Q.  BY MR. POLI:  I mean, and this idea that

23   somehow she's just a claims handling expert and not an

24   SIU expert, you've told us the standards of claims

25   handling are the same; other than maybe some time

DANIEL JAEGER  MARCH 02, 2023

1   limitations, the same claims handling standards should

2   apply to both the regular claims handler and an SIU

3   claims handler, right?

4           MR. SULLIVAN:  Form and foundation.

5           You can answer.

6           THE WITNESS:  I don't believe there's

7   different standards for different departments within

8   claims, as far as property and handling property

9   claims.  I think the same standards would apply.

10      Q.  BY MR. POLI:  Whether you like it or not,

11  Ms. Smith is your designated expert on claims handling

12  standards.  That's her role in this case, right,

13  Mr. Jaeger?

14      A.  That's what she was retained for, yes.

15      Q.  And she gave the testimony, that I accurately

16  described to you, which you had read in a portion of

17  her transcript before you came into this depo, right,

18  Mr. Jaeger?

19          MR. SULLIVAN:  Form; foundation; asked and

20  answered.

21          You can answer again.

22          THE WITNESS:  Yeah.  I read the -- I read

23  certain excerpts of her testimony and I have no reason

24  to believe that you didn't accurately convey or

25  describe what she testified to.

DANIEL JAEGER  MARCH 02, 2023

1              MR. POLI:  Okay.  It's been a long day.

2  Have a good evening.  I'm sorry we kept you so late.

3              THE WITNESS:  Thank you.  Have a good one.

4              MR. SULLIVAN:  And we'll read and sign.

5              THE VIDEOGRAPHER:  The time is 6:03 p.m.

6  We are ending the deposition with Media Number 7.

7              MR. SULLIVAN:  We'll read and sign.

8          (Whereupon, the videotaped videoconference

9  deposition was concluded at 6:03 p.m.)

10                    *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIEL JAEGER  MARCH 02, 2023

1

2

3

4

5

6

7           I, the undersigned, declare that I have

8  read the foregoing transcript of the testimony taken

9  March 2, 2023, and I declare, under penalty of perjury,

10  that the foregoing is a true and correct transcript of

11  my testimony contained therein.

12

13           EXECUTED this _____ day of

14  _____, 2023.

15

16

17           _____

18                     DANIEL JAEGER

19

20

21

22

23

24

25

```
 1   STATE OF ARIZONA         ) SS.
                              )
 2   COUNTY OF MARICOPA       )

 3

 4        BE IT KNOWN that the foregoing proceedings
     were taken before me, DONNA DELAVINA, Certified
 5   Reporter No. 50468; that the witness before testifying
     was duly sworn by me to testify to the whole truth;
 6   that the foregoing 347 pages are a full, true and
     accurate record of the proceedings, all done to the
 7   best of my skill and ability; that the proceedings were
     taken down by me in shorthand and thereafter reduced to
 8   print under my direction.

 9        [X]  Review and signature was requested.

10        [ ]  Review and signature was waived.

11        [ ]  Review and signature not required.

12        I CERTIFY that I am in no way related to any
     of the parties thereto nor am I in any way interested
13   in the outcome hereof.

14        I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.  DATED
15   at Phoenix, Arizona, this 4th day of April, 2023.

16

17                _____
                  Donna DeLaVina, RPR
18                Certified Reporter
                  Certificate No. 50468

19

20            *    *    *    *    *    *

21        I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206.

23

24                _____
                  Donna DeLaVina, RPR, Owner
25                Donna DeLaVina Reporting, LLC
                  Arizona RRF No. R1010
```

Donna DeLaVina Reporting LLC
602.230.5454

DANIEL JAEGER   MARCH 02, 2023

| A | | | | |
|---|---|---|---|---|
| **abandon** 116:25 | **accurate** 10:7 | 292:9, 298:19 | **advantage** 31:10 | 79:12, 95:15 |
| **abandoned** | 44:8, 44:10, 68:8 | 329:14, 330:14 | 231:1, 235:14 | 97:9, 97:11 |
| 116:19 | 163:25, 176:15 | 339:15 | 236:4, 236:25 | 101:25, 110:21 |
| **ability** 97:3 | 220:25, 247:4 | **Adam** 141:12 | 238:2 | 110:23, 140:9 |
| 207:17, 348:7 | 251:10, 304:11 | 141:23 | **advice** 17:1 | 140:20, 141:1 |
| **able** 11:2, 39:2 | 348:6 | **adamant** 204:2 | 17:14 | 141:14, 141:19 |
| 59:13, 59:24 | **accurately** 343:20 | **add** 54:6, 129:3 | **advise** 336:3 | 188:9, 188:14 |
| 84:17, 98:3, 98:5 | 343:21, 345:15 | 129:11, 324:7 | 338:8, 338:9 | 189:17, 193:18 |
| 103:14, 144:14 | 345:24 | **added** 165:21 | **advised** 265:15 | 207:10, 211:13 |
| 144:15, 149:23 | **accuse** 314:15 | **addition** 14:21 | **advising** 263:21 | 214:17, 214:21 |
| 149:23, 167:6 | **accused** 301:21 | 22:13, 80:7 | **advisory** 288:8 | 218:5, 219:24 |
| 173:1, 181:11 | **accusing** 281:20 | 319:18 | **advocate** 291:2 | 220:1, 227:9 |
| 198:18, 204:10 | **ACE** 51:8 | **additional** 20:9 | 291:6, 291:13 | 230:15, 233:15 |
| 255:23, 258:7 | **ACJA** 348:14 | 20:17, 21:2 | **advocates** 290:19 | 233:16, 234:4 |
| 306:6, 306:19 | 348:21 | 21:12, 21:13 | 290:20 | 269:7, 286:10 |
| 343:15 | **acknowledge** | 26:3, 120:4 | **affiliated** 318:11 | 289:23, 298:9 |
| **absent** 149:15 | 96:7 | 138:25, 185:22 | **Affinity** 32:7 | 300:20, 302:10 |
| **absolute** 66:6 | **acquire** 136:2 | 187:21, 196:11 | 32:11 | 340:15 |
| **absolutely** 180:17 | **acquired** 80:15 | 217:21, 224:13 | **affirmative** 56:5 | **agreeable** 128:7 |
| 181:6, 182:24 | 84:7, 84:14 | 304:20 | 340:17 | **agreed** 56:11 |
| 224:15, 234:9 | 87:10, 87:11 | **address** 51:20 | **affluent** 132:12 | 56:14, 171:13 |
| 298:2, 298:3 | 132:7, 132:8 | 239:5, 343:15 | **agency** 240:7 | 189:13, 219:19 |
| 298:4, 298:8 | 180:22 | **addressed** 110:11 | 273:5, 275:6 | 233:12 |
| 310:21, 336:2 | **acquisition** 51:14 | 271:8 | 276:5, 276:15 | **agreeing** 120:7 |
| 336:7 | 90:10, 166:10 | **adds** 271:8 | 276:24 | **agreement** 55:9 |
| **absurd** 342:10 | 166:10, 340:19 | **adjusted** 213:15 | **agent** 67:24 | 55:15, 56:13 |
| **accept** 295:23 | **acronym** 55:3 | 213:15 | 72:10, 73:12 | 100:15 |
| 324:8 | 55:11, 56:10 | **adjuster** 3:14 | 224:21, 321:3 | **ahead** 9:13, 12:17 |
| **accepted** 300:18 | **act** 34:7, 39:22 | 24:23, 28:18 | **ago** 11:3, 20:19 | 39:11, 58:18 |
| 302:11, 303:2 | 135:13, 158:3 | 28:23, 29:1 | 29:8, 33:12 | 71:23, 105:23 |
| **accepts** 276:8 | 158:19, 240:22 | 29:12, 30:4 | 33:14, 37:15 | 158:3, 185:18 |
| **access** 124:15 | **acted** 343:4 | 213:12, 213:16 | 38:14, 38:15 | 189:3, 199:5 |
| 126:9, 128:4 | **action** 40:25 | 214:10, 217:2 | 44:18, 47:7 | 205:3, 205:10 |
| **accessible** 126:14 | 113:16, 153:9 | **adjusters** 267:9 | 59:15, 65:23 | 227:6, 251:22 |
| **accident** 64:22 | 153:9, 281:7 | **adjustment** 24:21 | 65:25, 66:9, 66:9 | 257:5, 259:19 |
| 266:11 | 282:19, 282:25 | **administered** | 66:9, 87:16 | 277:12, 279:25 |
| **accidentally** | **actions** 237:14 | 12:2 | 87:19, 93:10 | 298:6, 324:9 |
| 64:21 | 237:16 | **admission** 40:12 | 149:18, 161:13 | 342:11 |
| **accidents** 30:24 | **active** 289:3 | 148:23, 150:8 | 161:15, 162:21 | **AIC** 23:15, 23:23 |
| 30:24 | **activity** 30:16 | 150:23, 153:20 | 164:6, 175:15 | 42:23, 43:8 |
| **account** 65:16 | 30:17, 30:17 | 155:11 | 204:20, 233:12 | 43:25, 44:9 |
| 65:17, 65:19 | 30:20, 31:1, 31:3 | **admit** 279:1 | 234:3, 280:14 | 44:11, 44:17 |
| 126:12, 127:11 | **actor** 141:15 | 313:22 | 282:5, 292:18 | 44:19, 44:21 |
| **accountant** | **acts** 109:3 | **admits** 149:1 | 308:6, 337:22 | 45:2, 45:3, 45:7 |
| 125:25, 292:5 | **actual** 24:21 | 149:10, 278:5 | 341:18 | 45:15, 45:24 |
| **accuracy** 67:23 | 29:12, 33:10 | **admitted** 80:23 | **agree** 25:8, 25:9 | 46:4, 46:5 |
| 247:14 | 36:15, 84:24 | 80:25, 80:25 | 32:19, 39:24 | 122:11, 219:21 |
| | 193:13, 193:13 | 81:11, 87:4 | 45:22, 46:10 | **AIG** 2:13, 32:3 |
| | 214:10, 242:19 | **adopted** 247:14 | 46:23, 62:9 | 32:3, 32:5, 32:13 |
| | | **advance** 207:17 | | |

32:15, 32:18
32:22, 33:2, 33:6
49:5, 49:7, 166:4
166:19, 167:6
167:8, 168:16
170:18, 171:10
173:13, 177:8
177:18, 177:22
252:18, 313:16
**AIGM** 32:2
32:13
**alert** 237:17
**Allegations** 43:22
**allege** 282:1
**alleged** 82:24
83:3, 153:22
264:20, 282:8
283:21, 328:17
**allegedly** 156:14
295:11
**alleging** 196:10
**Alliant** 167:5
**allow** 34:3, 56:23
339:11
**allowed** 95:3
197:21
**allowing** 318:16
**allows** 56:3, 56:8
76:22, 120:3
**alluded** 52:2
72:18, 142:18
326:16
**alluding** 142:20
**alter** 276:11
**alternatively** 71:1
**Altschuler** 1:4
2:10, 4:3, 8:10
54:2, 54:19, 67:9
67:13, 67:19
68:2, 68:14, 69:3
69:9, 70:4, 70:5
70:11, 70:14
70:16, 72:9, 73:9
73:14, 75:15
76:18, 77:11
77:18, 78:7
79:17, 80:2
80:10, 80:23
81:12, 81:24

82:8, 82:24, 83:7
83:12, 84:1
84:13, 84:17
85:3, 85:10
85:14, 85:17
85:18, 85:25
86:4, 86:9, 86:19
87:4, 87:14, 88:3
88:5, 88:14
89:14, 90:1
90:15, 91:2, 93:1
98:9, 98:21
100:9, 100:13
100:16, 102:2
102:12, 103:7
103:25, 106:11
106:18, 114:16
116:6, 117:5
117:25, 118:4
118:24, 124:5
125:9, 125:24
126:14, 126:20
130:24, 132:20
134:5, 137:6
137:15, 138:1
138:23, 140:18
141:15, 143:20
144:21, 146:16
147:18, 148:5
149:20, 149:24
150:12, 151:1
153:12, 154:4
154:17, 156:14
157:4, 157:11
157:20, 159:16
159:20, 160:1
160:9, 162:1
164:4, 165:7
165:18, 166:2
166:9, 168:20
169:22, 170:1
172:22, 173:4
174:5, 174:7
174:15, 175:16
175:20, 176:4
176:18, 177:3
177:14, 181:6
181:21, 182:14
182:18, 182:23

184:7, 188:2
190:15, 191:5
191:17, 192:13
193:21, 194:8
195:6, 195:21
196:17, 201:14
204:3, 204:9
207:8, 207:9
211:23, 214:20
216:14, 224:20
229:13, 232:2
241:12, 242:2
245:10, 245:13
248:9, 249:1
249:12, 250:1
252:9, 252:17
253:24, 254:2
255:11, 255:24
256:18, 256:24
260:6, 264:11
265:5, 265:15
265:24, 268:4
273:10, 281:8
282:7, 282:19
283:1, 284:3
285:9, 291:10
291:17, 303:25
304:14, 305:5
306:25, 307:15
307:24, 309:23
311:13, 311:18
311:25, 312:5
312:14, 312:18
313:9, 313:15
315:4, 315:15
316:7, 318:13
318:14, 320:6
320:14, 321:20
322:9, 325:10
326:18, 327:25
328:16, 328:21
329:1, 329:15
329:22, 331:3
333:10, 335:1
335:16, 336:3
336:19, 337:8
337:15, 338:9
338:14, 340:25
343:4

**Altschuler's**
26:21, 83:16
83:22, 124:15
127:13, 134:13
142:6, 177:11
265:25, 283:21
287:6, 313:6
321:2, 321:7
325:7
**amend** 282:1
**amendment**
277:11, 277:17
**America** 51:11
51:12, 51:15
332:3
**American** 32:1
32:23, 33:1, 33:2
**Amex** 136:19
136:20, 136:22
137:16, 137:16
137:21, 137:24
138:1, 138:2
138:7, 139:1
139:10, 318:24
**amount** 116:7
116:9, 116:10
117:17, 120:5
120:19, 121:3
121:5, 121:6
122:2, 126:17
126:19, 127:12
127:15, 128:16
128:17, 277:3
277:20, 299:10
302:19, 303:21
304:18, 304:20
**amounts** 137:15
138:2
**analysis** 84:23
164:15, 166:15
174:23, 268:19
269:9
**and/or** 267:18
272:23
**Andy** 2:12, 70:25
72:20, 73:4, 73:8
75:13, 83:25
84:22, 84:25
85:11, 85:15

106:12, 106:13
121:4, 122:7
165:8, 165:13
166:3, 166:18
167:17, 167:23
167:23, 167:24
169:21, 170:1
170:25, 173:12
173:14, 174:14
174:17, 176:19
177:4, 177:5
177:5, 177:6
195:8, 195:22
258:6, 259:2
259:10, 268:4
268:12, 297:9
297:15, 320:19
323:17, 323:17
333:13, 333:14
**annoying** 96:7
96:21, 97:4
**annoys** 95:22
**annually** 79:6
**answer** 10:4
11:18, 11:19
12:15, 13:13
14:15, 15:10
16:1, 16:2, 16:13
17:4, 17:12
17:20, 18:9
18:15, 19:10
19:23, 20:6
20:14, 21:1
22:17, 25:12
25:23, 26:18
30:1, 30:8, 33:21
34:10, 34:19
35:10, 36:9
36:18, 37:8
37:18, 38:12
38:24, 39:5, 39:8
39:15, 40:6, 40:7
40:9, 40:11
40:21, 41:14
42:2, 42:11, 46:2
46:17, 47:11
50:14, 53:21
54:23, 55:19
56:17, 57:2

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 57:25, 59:18 | 151:5, 151:10 | 231:6, 231:24 | 336:14, 337:4 | 299:17 |
| 60:3, 60:13, 61:9 | 151:24, 151:25 | 234:7, 234:24 | 338:1, 342:2 | **anyway** 11:16 |
| 61:20, 62:8 | 152:6, 154:1 | 235:1, 235:20 | 342:11, 342:23 | 42:22, 43:7 |
| 62:24, 63:11 | 154:10, 154:23 | 236:12, 236:22 | 343:14, 343:25 | 96:25, 113:3 |
| 64:11, 64:25 | 155:9, 155:12 | 239:9, 242:5 | 344:8, 344:20 | 163:13, 163:23 |
| 66:4, 66:25 | 155:15, 155:24 | 245:3, 245:21 | 345:5, 345:21 | 248:25, 300:2 |
| 68:19, 69:24 | 156:20, 157:2 | 247:9, 247:25 | **answered** 26:17 | 319:5 |
| 71:5, 71:20, 72:3 | 157:17, 159:12 | 250:5, 250:9 | 29:25, 33:20 | **AP** 4:3, 66:16 |
| 73:6, 75:9, 75:20 | 159:23, 159:25 | 250:13, 252:13 | 35:9, 36:8, 37:8 | 68:4, 69:9, 69:13 |
| 75:22, 77:2 | 160:7, 161:21 | 252:21, 254:7 | 37:17, 38:7, 40:5 | 69:14, 69:16 |
| 78:13, 78:19 | 162:7, 162:16 | 255:17, 258:3 | 40:20, 41:13 | 69:19, 70:24 |
| 79:14, 79:22 | 162:23, 163:3 | 261:5, 262:10 | 42:1, 46:16 | 76:19, 77:17 |
| 81:4, 81:9, 81:17 | 167:13, 168:10 | 263:7, 264:14 | 47:10, 62:23 | 77:20, 79:15 |
| 82:14, 86:12 | 169:12, 170:8 | 264:24, 265:13 | 63:4, 71:19 | 81:22, 90:3, 93:1 |
| 87:21, 88:19 | 171:8, 172:5 | 265:22, 269:5 | 87:20, 90:22 | 98:10, 172:7 |
| 89:17, 91:15 | 172:12, 172:16 | 270:4, 273:17 | 92:20, 93:12 | 230:12, 230:25 |
| 92:10, 92:21 | 173:22, 173:25 | 274:14, 277:1 | 104:3, 111:21 | 233:14, 307:1 |
| 93:12, 93:13 | 175:1, 176:25 | 281:10, 282:10 | 112:13, 114:9 | 309:7, 309:23 |
| 93:15, 94:21 | 178:22, 179:13 | 283:16, 283:23 | 119:2, 120:22 | 310:7, 310:13 |
| 96:4, 96:5, 97:20 | 180:8, 185:8 | 283:25, 284:9 | 120:24, 150:3 | 310:14, 310:19 |
| 98:15, 99:1 | 185:16, 185:25 | 289:6, 289:11 | 151:22, 152:9 | 310:21, 310:22 |
| 99:10, 99:18 | 186:12, 187:16 | 289:13, 289:21 | 153:7, 155:7 | 311:6, 311:13 |
| 100:3, 102:4 | 188:17, 188:22 | 290:16, 290:25 | 155:7, 155:23 | 311:14, 311:19 |
| 103:11, 104:4 | 189:2, 189:8 | 292:2, 297:18 | 157:16, 193:9 | 312:11, 312:19 |
| 106:24, 107:11 | 189:21, 190:7 | 299:24, 300:23 | 197:13, 197:18 | 313:8, 313:11 |
| 107:24, 108:18 | 190:24, 191:10 | 300:25, 301:5 | 197:24, 198:10 | 313:19, 314:1 |
| 110:9, 110:14 | 192:9, 192:18 | 301:11, 301:24 | 199:3, 199:19 | 315:3, 315:6 |
| 111:1, 111:11 | 194:16, 195:13 | 302:13, 303:24 | 199:24, 199:24 | 315:21, 315:23 |
| 111:22, 112:8 | 196:5, 196:25 | 304:6, 306:1 | 227:1, 231:14 | 320:7, 320:15 |
| 112:21, 114:2 | 197:5, 197:7 | 306:7, 306:17 | 330:6, 345:20 | 322:12, 322:15 |
| 114:10, 114:21 | 197:9, 197:10 | 306:19, 309:2 | **answering** 90:23 | 322:16, 322:22 |
| 115:10, 116:23 | 197:16, 197:19 | 309:12, 310:17 | 137:8, 161:23 | 322:24, 323:20 |
| 118:10, 118:12 | 197:25, 198:2 | 311:5, 311:24 | 185:14, 197:8 | 324:18, 325:7 |
| 118:14, 118:20 | 198:6, 198:13 | 312:16, 314:5 | 208:15, 208:19 | 325:11, 325:18 |
| 119:3, 119:13 | 198:18, 198:20 | 314:21, 315:10 | 208:19, 208:23 | 326:12, 326:13 |
| 120:23, 121:9 | 198:23, 199:5 | 316:3, 319:1 | 281:11, 311:2 | 326:20, 326:21 |
| 121:25, 122:16 | 199:9, 200:1 | 319:13, 320:9 | **answers** 39:4 | 326:24, 328:1 |
| 123:4, 124:12 | 200:3, 200:6 | 320:25, 322:20 | 96:2, 96:2 | 328:3, 328:3 |
| 128:22, 129:7 | 200:22, 201:2 | 324:6, 324:25 | 140:17, 152:6 | 328:5, 328:8 |
| 129:15, 130:2 | 203:8, 203:14 | 325:15, 326:4 | 155:10, 172:4 | 328:9, 328:20 |
| 130:19, 131:3 | 205:4, 205:6 | 326:17, 327:5 | 189:20, 205:9 | 328:21, 329:2 |
| 131:12, 132:5 | 205:14, 205:23 | 327:8, 327:10 | 205:21, 205:21 | 329:6, 329:14 |
| 133:2, 134:10 | 207:13, 209:12 | 329:10, 330:7 | 300:7, 312:8 | 329:23, 331:3 |
| 138:22, 139:25 | 209:21, 211:20 | 330:9, 330:12 | 338:25 | 332:18, 333:3 |
| 141:4, 141:25 | 212:9, 212:22 | 330:14, 330:21 | **anticipate** 238:4 | 333:21, 334:8 |
| 143:4, 144:8 | 215:20, 219:1 | 331:11, 331:20 | **antiques** 127:2 | 334:8, 335:1 |
| 146:23, 147:14 | 219:13, 224:2 | 332:7, 332:24 | **anymore** 227:16 | 335:15, 336:8 |
| 148:10, 149:17 | 226:15, 226:16 | 333:23, 333:24 | 255:22, 258:20 | 336:21, 338:13 |
| 149:19, 150:4 | 226:25, 230:18 | 334:3, 335:11 | 260:7, 272:2 | **apart** 217:23 |

DANIEL JAEGER   MARCH 02, 2023

**217**:24, **232**:15
**232**:21
**apologize** 29:7
161:20, 264:8
**apparent** 65:15
123:20, 125:2
135:24, 141:7
148:13, 149:15
156:22, 296:1
296:2
**apparently** 39:3
139:16, 177:14
179:21, 281:15
**appear** 102:13
142:3, 143:11
**appearance**
128:10
**APPEARANCES**
7:9
**appears** 51:23
188:7, 229:24
315:20
**applicability**
56:23, 60:9
**applicable** 34:17
107:2, 275:25
276:24
**applied** 64:5
159:18, 161:7
**applies** 109:16
**apply** 27:1, 27:4
58:3, 58:7, 112:9
112:10, 141:9
141:12, 164:21
165:3, 217:15
217:16, 345:2
345:9
**appraisal** 67:5
67:22, 72:8
72:12, 72:12
73:1, 73:11
73:15, 74:1, 76:1
76:12, 76:14
78:11, 80:5
119:17, 168:13
170:13, 171:16
171:25, 174:2
174:6, 175:21
178:10, 180:21

181:1, 184:16
200:19, 203:21
204:5, 204:8
204:14, 205:16
206:12, 207:2
209:2, 209:16
209:23, 222:12
223:14, 224:18
225:12, 225:24
228:9, 228:10
228:18, 228:20
228:23, 229:2
229:10, 229:11
229:12, 297:22
299:5, 302:19
308:17, 321:4
332:16, 337:10
340:10, 340:16
340:21
**appraisals** 168:15
177:7, 177:9
340:1, 340:6
**appraised** 73:15
80:8, 208:7
208:12
**appraiser** 203:19
**appreciate** 185:8
**approach** 39:18
87:23, 124:2
124:3, 190:5
211:15, 212:6
213:19, 214:14
**appropriate**
112:1, 112:3
112:15, 112:17
112:24, 116:17
123:15, 172:10
172:13, 197:11
198:12, 236:20
237:18, 251:6
276:15, 290:9
**approximately**
134:7, 217:7
217:13, 260:13
**April** 348:15
**area** 66:7, 131:21
131:23, 132:7
132:12, 267:12
294:19

**areas** 21:8
**arguable** 274:8
**argue** 250:16
250:25, 300:11
**argument** 102:19
103:17, 103:25
118:19, 274:5
314:23
**argumentative**
250:18, 251:10
300:22
**arguments**
316:16
**Arizona** 1:2, 1:17
1:22, 1:23, 7:4
7:6, 7:13, 7:18
7:24, 8:1, 8:12
8:16, 8:19, 59:1
70:16, 83:1, 84:8
84:15, 85:18
94:9, 97:15
102:21, 103:15
110:19, 111:13
111:16, 111:17
131:24, 145:22
180:23, 182:22
200:14, 218:23
244:1, 271:17
274:21, 275:1
275:9, 275:16
339:10, 348:1
348:15, 348:25
**arson** 135:12
135:15, 158:16
**art** 2:11, 2:13
2:15, 2:17, 2:21
3:5, 3:7, 3:9, 3:11
3:13, 3:18, 3:20
3:22, 3:24, 4:4
4:6, 4:8, 4:20
54:19, 59:23
66:14, 69:18
69:22, 114:16
116:2, 116:7
116:14, 116:20
117:4, 117:7
118:6, 118:25
119:9, 121:4
121:23, 122:4

144:12, 169:9
174:8, 177:17
177:18, 177:20
178:2, 178:14
178:15, 179:24
181:15, 181:21
184:6, 185:1
185:9, 185:11
186:3, 186:4
186:8, 186:10
214:1, 252:8
252:9, 254:17
254:18, 254:19
254:20, 254:20
255:2, 255:3
256:20, 265:4
265:6, 269:24
270:15, 287:5
287:10, 287:20
288:5, 288:7
289:25, 293:11
308:15, 311:14
340:5
**article** 120:20
287:4
**articles** 121:7
253:8
**articulate** 144:3
**articulated** 95:1
**artist** 66:16
68:12, 69:14
69:19, 70:7, 70:9
70:17, 71:2, 78:8
78:9, 78:9, 80:6
80:8, 80:11
80:14, 80:15
80:16, 83:7, 84:5
84:7, 84:14
85:22, 85:23
85:24, 87:6, 87:8
87:10, 90:9
100:11, 166:13
172:23, 172:25
173:5, 180:16
180:16, 180:17
181:14, 181:24
182:4, 182:6
182:7, 182:14
182:16, 182:22

183:9, 188:5
191:1, 191:13
194:3, 194:21
195:3, 196:8
196:18, 291:19
306:5, 313:19
316:12, 321:5
321:23, 328:4
328:5, 328:13
333:12, 335:15
337:11, 337:18
338:4
**Artnet** 206:11
206:13, 206:15
206:22, 207:19
207:23, 209:25
**arts** 22:22, 23:1
72:19, 78:12
122:1, 287:2
**artwork** 84:19
117:11, 127:2
127:5, 168:21
169:22, 174:10
175:9, 242:20
248:18, 340:1
340:11
**ascertain** 19:23
290:10
**asked** 22:12
26:16, 29:24
33:19, 35:8, 36:7
37:7, 37:16, 40:5
40:20, 41:12
42:1, 46:15, 47:9
62:22, 65:22
71:18, 84:1
84:17, 85:5
87:20, 90:21
92:20, 93:11
104:2, 111:20
114:8, 115:14
119:2, 120:21
136:25, 138:25
140:19, 150:3
151:22, 152:8
153:7, 155:6
155:8, 157:15
183:22, 193:9
195:17, 199:23

DANIEL JAEGER   MARCH 02, 2023

208:18, 209:15
215:25, 216:10
222:18, 248:16
248:17, 249:1
251:6, 289:13
309:19, 315:4
318:15, 333:10
339:9, 342:6
342:19, 345:19
**asking** 37:10
96:14, 97:20
112:13, 135:2
140:2, 163:10
176:16, 179:7
179:17, 202:15
209:8, 209:8
226:10, 226:20
228:6, 228:9
228:9, 237:15
237:19, 249:25
254:16, 254:17
257:5, 260:22
281:11, 283:6
283:9, 341:17
**asks** 95:24, 203:2
305:23
**aspect** 91:18, 99:3
250:2, 303:10
**aspects** 86:13
142:16, 222:19
246:12
**assembled** 178:13
179:23
**assert** 107:4
260:19
**asserted** 244:24
**asserting** 135:13
**assessment**
128:24, 129:1
137:1, 290:8
337:13
**asset** 127:9, 129:3
129:20
**assets** 124:16
128:11, 128:17
129:23, 130:4
130:7, 130:14
135:4
**assigned** 295:17

**assignment**
297:11
**assist** 291:14
292:10, 295:10
**assistance** 117:3
**associate** 14:12
22:25, 23:15
23:23, 43:9
**associated** 32:15
265:6
**associates** 43:12
43:15, 239:5
**assume** 50:7, 86:6
115:6, 152:1
167:1, 168:2
244:15, 248:23
285:22, 294:4
327:13, 333:19
333:22, 340:3
**assumed** 203:9
208:10
**assuming** 44:8
44:9, 228:19
341:20
**assumption** 178:8
201:8, 201:12
203:5, 203:6
203:8, 204:9
**assumptions**
339:25, 340:9
340:14, 340:16
**assure** 277:17
**attempt** 235:14
**attempted** 276:21
**attention** 53:1
151:12
**attorney** 11:8
260:17, 265:25
273:21, 275:10
276:7
**attorney-client**
14:7, 16:3, 16:11
**attorneys** 14:18
**auction** 206:24
207:21
**auctioned** 207:24
**audio** 136:16
**August** 74:13
76:11, 139:7

**authenticity**
256:6
**author** 167:3
**authority** 50:16
**authorization**
317:4, 318:6
318:7, 318:12
**automatically**
247:2
**avail** 333:7
**available** 19:14
26:2, 53:2, 80:12
136:11, 243:3
245:25, 246:5
330:23, 333:7
338:3
**Avenue** 7:17
7:23, 8:19
**avoid** 10:6, 262:8
263:10
**avow** 223:22
**award** 235:10
**aware** 51:8, 66:21
67:6, 67:11
67:11, 68:1, 68:4
85:14, 86:13
107:12, 133:3
133:4, 134:23
157:20, 177:1
177:7, 177:9
196:7, 196:16
197:14, 204:6
205:24, 206:23
207:1, 208:3
209:24, 228:18
236:20, 248:25
249:4, 250:22
251:18, 263:25
268:15, 269:2
270:5, 290:17
298:16, 309:25
322:1
**awful** 200:18
**awfully** 299:24

## B

**B-a-r-k-l-e-y**
94:15

**B1** 83:15, 171:22
184:13, 194:22
195:4, 196:14
**B2** 171:22
**bachelor** 22:22
23:1
**back** 11:24, 18:21
19:19, 35:16
36:3, 38:23, 39:1
39:7, 39:14
39:15, 39:16
40:1, 44:9, 48:16
51:17, 59:3, 59:4
63:13, 74:10
74:19, 75:11
75:12, 89:24
94:11, 95:3
97:19, 97:24
97:25, 100:23
104:22, 107:15
119:21, 131:20
133:16, 145:24
147:6, 153:1
159:24, 161:18
162:18, 165:13
166:3, 166:9
168:5, 189:1
189:2, 189:10
189:12, 200:16
207:3, 211:3
214:18, 217:3
221:23, 243:2
243:5, 243:3
245:8, 245:8
246:11, 247:2
257:16, 260:7
271:19, 271:20
277:16, 280:18
284:8, 286:20
299:13, 310:20
310:20, 313:21
317:11, 330:11
334:11, 335:20
335:21, 337:12
338:6
**backed** 152:3
152:5
**background**
84:21, 99:12

239:12
**bad** 95:21, 119:7
**badge** 45:12
**balance** 136:18
138:8, 139:11
**ball** 251:2
**ballpark** 289:8
**bank** 144:2
**Banking** 275:18
**bankruptcies**
240:12, 242:21
**bankruptcy**
240:22
**Barkley** 94:15
97:7
**base** 103:5
**based** 17:1, 31:17
39:20, 40:15
46:11, 52:14
56:9, 73:10
76:12, 76:17
77:16, 78:6
79:17, 82:21
82:23, 83:4
84:16, 87:12
87:12, 88:25
95:7, 95:10
102:16, 103:14
111:7, 112:4
117:12, 126:6
136:10, 138:5
138:13, 138:25
139:8, 141:14
143:7, 144:18
146:18, 147:19
150:17, 156:21
157:5, 157:7
157:13, 157:18
158:23, 162:13
174:2, 177:1
182:25, 183:10
188:8, 189:15
189:24, 196:12
220:24, 224:12
224:20, 225:11
230:4, 231:2
231:19, 235:16
236:19, 239:12
252:17, 261:23

DANIEL JAEGER    MARCH 02, 2023

263:1, 268:18
270:15, 277:19
277:20, 278:8
278:18, 281:24
282:18, 297:21
298:18, 302:23
309:4, 321:2
321:20, 322:8
327:16, 327:17
329:13, 331:13
336:6, 337:9
338:17, 343:20
**bases** 153:9
**basic** 185:3
**basically** 120:18
167:4, 221:5
296:23
**basis** 58:7, 63:9
104:7, 108:2
108:7, 108:8
108:10, 108:15
110:21, 111:7
112:4, 114:6
114:12, 139:2
147:23, 152:11
157:20, 200:24
225:16, 230:3
231:12, 275:4
277:3, 277:23
277:23, 279:7
286:9, 312:20
326:23, 342:25
**Bate** 256:15
**Bates** 54:6, 54:12
55:23, 59:5
72:17, 75:11
104:23, 104:24
119:24, 120:10
121:15, 167:19
241:15, 241:20
253:7
**Batts** 221:14
**bears** 35:24, 41:1
41:2, 79:25
**beginning** 8:21
68:1, 85:19
173:19, 174:20
195:6, 222:5
287:18

**begins** 59:1, 94:9
145:22, 200:14
244:1, 271:17
307:16
**behalf** 9:1, 13:4
13:8, 198:15
289:24
**behave** 158:2
**behavior** 93:22
97:22, 141:12
227:11, 237:13
241:6, 241:12
**belief** 63:13
90:24, 236:18
280:3
**believe** 16:6
18:20, 22:16
23:21, 23:24
25:24, 68:20
68:21, 72:10
73:24, 73:25
79:25, 82:19
88:25, 90:13
95:23, 96:13
97:1, 100:4
100:5, 100:11
100:15, 102:20
103:12, 121:10
123:23, 125:5
125:12, 125:24
126:6, 126:11
131:7, 134:12
135:9, 138:4
140:1, 140:14
142:9, 143:15
143:17, 144:9
146:5, 147:17
150:11, 156:9
158:9, 166:5
168:12, 173:2
174:1, 174:4
183:11, 194:24
203:25, 208:22
219:21, 221:15
235:22, 235:24
237:16, 259:9
260:1, 261:10
264:16, 267:8
269:12, 269:14

270:12, 275:18
282:12, 290:7
291:1, 293:19
306:2, 312:9
313:7, 314:24
315:12, 315:13
316:5, 316:6
316:17, 317:13
323:13, 340:13
345:6, 345:24
**believed** 103:6
283:2
**believes** 43:18
45:17, 142:10
**benefit** 219:9
219:16, 220:6
220:7, 220:9
**best** 2:23, 3:1
3:15, 10:5, 10:6
10:10, 10:11
10:17, 10:23
11:5, 19:13, 21:9
22:1, 38:13
82:15, 179:14
213:9, 213:18
216:7, 216:10
250:24, 266:18
268:1, 272:3
279:22, 280:1
288:13, 330:7
331:20, 348:7
**bet** 225:5
**better** 152:21
156:9, 188:4
188:5, 202:20
290:2
**beyond** 267:21
326:20, 328:25
329:22, 334:25
336:22
**big** 50:4, 66:13
126:10, 136:19
241:23, 276:22
**bigger** 74:15
121:19, 125:16
125:18, 202:18
**biggest** 121:22
**bill** 138:7, 139:1
**billed** 137:15

**bills** 136:19
145:2
**biotech** 177:16
178:13, 179:22
**bit** 52:5, 59:15
74:15, 90:18
108:21, 113:10
120:14, 121:19
167:21, 232:13
237:10, 293:5
307:20, 326:1
**Black** 137:16
137:20, 137:24
**blanket** 287:8
**blatant** 94:17
**blesses** 227:10
**blue** 45:5
**Bobby** 11:8
39:18, 82:5
96:11, 97:22
151:22, 178:23
198:6, 198:21
222:17, 251:22
300:11
**boil** 143:21
**books** 45:5
**boss** 50:23, 50:25
**bottom** 42:16
102:8, 102:9
121:2, 133:6
202:13, 241:17
241:19, 250:7
252:7, 267:14
272:7, 291:17
294:8, 300:12
307:10, 307:17
307:24, 308:13
**bought** 132:11
169:6, 171:1
179:24, 181:23
194:22, 194:23
196:14
**Boy** 47:14, 258:21
304:6
**branched** 288:7
**breach** 60:5
60:15, 89:3
123:25, 135:10
142:10, 148:1

158:23, 190:15
263:22, 264:3
267:22, 268:16
278:8
**breached** 88:5
**breaches** 268:18
269:17, 270:11
**break** 58:12
58:13, 93:25
146:1, 146:4
152:4, 198:24
199:6, 199:25
200:2, 200:7
232:14, 243:12
243:18, 271:7
271:10
**break-in** 187:3
**breaking** 145:8
**brief** 58:22, 94:5
145:18, 200:10
243:22, 271:13
**briefly** 12:9
**bright** 179:1
179:22, 199:13
**bring** 151:12
292:3, 292:5
292:8, 292:10
**brings** 75:5
295:1
**broad** 82:16
**Broening** 7:16
8:25
**Bronze** 256:17
**brought** 117:1
191:1, 249:14
278:13, 291:14
299:1
**Brown** 2:19, 67:5
67:7, 67:10
67:21, 67:23
69:2, 72:8, 72:11
73:1, 73:11
73:15, 74:1
75:14, 76:1
76:13, 76:21
77:12, 77:21
78:5, 78:10, 80:4
80:9, 171:17
171:22, 171:25

DANIEL JAEGER   MARCH 02, 2023

178:7, 179:4
179:25, 180:19
184:16, 200:19
201:7, 201:11
201:19, 203:18
207:6, 207:7
208:5, 222:12
223:13, 223:13
224:18, 225:12
225:24, 228:10
297:22, 308:17
321:3, 332:16
337:9, 340:4
340:9, 341:1
342:16
**Brown's** 67:12
67:20, 76:18
77:18, 171:19
299:5, 339:6
**build** 177:15
178:12, 179:22
**building** 292:8
292:9
**built** 177:15
**bulk** 79:7
**bullet** 267:17
272:16
**bunch** 129:3
129:11, 199:1
199:19, 236:6
240:14, 244:25
**burden** 59:11
60:8, 60:8, 60:14
61:21, 80:23
81:5, 81:12
81:18, 81:24
**bureau** 272:1
275:19, 283:20
**Burman** 83:25
**burn** 145:1
**burned** 135:14
**burning** 144:24
**Bury** 152:19
**business** 32:6
106:16, 255:25
267:21, 292:4
292:7, 292:14
**button** 11:14
**buy** 144:14, 195:1

**buyer** 248:19
**buys** 180:15
**buzz-wordy**
232:13

**C**

**calculation** 143:6
**calculator** 126:23
138:13, 138:15
**California** 295:18
**call** 12:10, 31:3
41:7, 41:23
41:24, 52:10
52:17, 101:15
101:15, 145:13
174:13, 174:21
177:13, 178:25
182:8, 191:5
206:25, 216:25
219:8, 219:15
220:8, 220:9
228:21, 299:23
299:24, 324:14
**called** 9:7, 23:15
32:13, 54:15
109:2, 147:8
151:21, 167:5
186:14, 186:15
206:17, 227:13
240:8, 264:6
272:19, 288:6
**calling** 309:6
**Canavan** 284:13
**canceled** 255:24
**candid** 314:2
**candidly** 191:6
**candor** 219:4
**cap** 121:1
**capacities** 292:4
**capacity** 12:19
29:19, 217:9
**car** 144:24
**card** 126:17
126:19, 134:23
136:11, 136:15
136:19, 137:6
137:11, 137:17
137:21, 137:24

138:1, 138:2
138:7, 138:14
138:16, 139:10
139:12, 318:23
319:4
**cards** 126:21
137:3
**care** 227:7, 300:8
329:4
**career** 23:25
27:24, 79:7
236:6
**carrier** 29:22
56:22, 56:23
113:1, 261:13
261:18, 261:24
301:21, 308:16
313:16
**carriers** 260:24
**carry** 136:10
**carrying** 138:7
139:11
**carton** 324:14
324:17, 324:19
326:19
**carve-out** 34:17
**carve-outs** 33:23
34:14, 34:15
**case** 8:9, 10:16
18:21, 40:13
51:22, 57:7
61:22, 66:14
81:8, 86:1, 91:18
100:16, 103:21
122:24, 135:12
135:13, 140:16
146:13, 147:4
149:17, 149:19
150:11, 150:23
158:17, 158:22
179:20, 211:23
213:25, 219:15
241:10, 250:23
251:20, 257:24
273:6, 274:19
278:11, 278:23
290:13, 290:19
292:25, 293:19
324:14, 324:19

326:19, 345:12
**cases** 57:8, 86:23
96:7, 160:23
176:8, 272:17
272:22, 290:7
**cash** 127:17
127:20, 128:5
136:11, 144:1
144:14
**casualty** 22:24
23:13
**catastrophe**
27:11, 27:12
**catastrophic** 24:5
24:8, 27:11
27:13, 28:17
**categorically**
236:3
**categories** 121:17
317:12
**category** 121:6
**caught** 143:7
143:8, 160:19
160:21, 278:25
**cause** 30:24
**caused** 181:13
225:22
**causes** 40:23
41:9
**caution** 14:1
**cautionary** 14:9
**center** 68:10
**center's** 284:19
**centered** 254:14
**Central** 7:17
7:23, 8:19
**CEO** 177:16
179:23
**certain** 4:3, 25:9
30:21, 33:25
64:2, 64:12, 66:7
86:13, 100:17
102:14, 129:3
240:15, 246:12
306:25, 315:22
345:23
**certainly** 32:3
52:22, 79:9
100:24, 143:16

222:17, 268:2
283:9, 328:1
329:17, 338:13
**Certificate** 1:25
348:18
**certified** 1:24, 7:5
8:14, 9:8, 348:4
348:17
**CERTIFY**
348:12, 348:14
348:21
**cetera** 102:14
**CH** 248:23
**challenging**
148:19, 148:19
148:22, 150:6
150:9
**chance** 341:5
341:16
**chances** 67:16
160:21
**change** 25:25
26:1, 129:4
130:8, 135:22
135:23, 224:12
282:17
**changed** 45:4
83:12, 183:5
**characterization**
39:13, 69:22
141:23, 162:5
189:20, 205:9
209:20, 245:23
250:9, 250:12
282:25, 330:19
338:25
**characterize** 57:4
229:22
**characterized**
21:12, 151:18
343:18
**characterizing**
205:21
**charge** 50:10
138:1
**charged** 319:19
**charges** 43:23
278:13
**chartered** 22:24

DANIEL JAEGER   MARCH 02, 2023

23:11, 23:13
cheapy 255:4
check 178:17
  180:1, 239:12
  264:15
checking 127:11
checks 317:6
choice 100:23
  104:9
chooses 304:15
chose 62:1
  103:23, 104:7
  115:22
chosen 92:4, 92:7
  98:23
chronology
  302:17
Chrysler 248:10
  249:2
Chubb 1:7, 1:16
  3:10, 7:2, 8:10
  9:1, 12:25, 13:5
  13:5, 13:6, 14:18
  48:9, 48:24
  49:11, 49:13
  49:25, 50:15
  50:20, 51:9
  51:10, 51:12
  51:21, 52:2
  53:11, 53:13
  53:25, 61:15
  61:17, 61:22
  62:1, 65:17, 68:2
  68:23, 79:4, 79:8
  91:1, 103:23
  104:10, 108:15
  111:8, 112:3
  112:16, 114:17
  114:23, 115:6
  115:17, 167:9
  168:6, 168:22
  169:4, 170:18
  170:19, 171:11
  172:8, 177:8
  177:19, 177:22
  181:8, 182:16
  189:14, 212:14
  213:17, 214:11
  214:14, 238:17

261:24, 264:10
265:4, 267:6
267:7, 267:25
282:6, 286:1
289:24, 290:13
318:15
Chubb's 81:11
  81:18, 87:13
  215:5, 343:3
CHUBB-Altschu...
  2:11, 2:13, 4:8
  33:25, 34:1
  34:22, 34:24
  35:5, 35:14
  35:19, 35:20
  35:21, 35:22
  35:23, 35:23
  35:25, 35:25
  36:5, 36:11
  36:11, 36:13
  36:15, 36:21
  36:21, 36:23
  37:1, 37:5, 37:14
  37:24, 38:4
  38:17, 40:18
  41:1, 41:3, 41:4
  41:9, 41:16
  41:17, 41:25
  42:4, 42:6, 43:16
  43:17, 43:19
  45:16, 45:18
  46:9, 46:13
  46:14, 46:22
  47:6, 47:18
  47:22, 48:1
  52:25, 53:1, 53:2
  54:19, 56:9, 58:8
  59:14, 59:23
  59:23, 68:2, 68:9
  68:9, 68:11
  68:16, 68:20
  69:3, 69:6, 76:23
  77:23, 79:18
  82:21, 100:19
  100:21, 101:17
  104:8, 106:10
  110:12, 110:15
  116:2, 116:7
  116:10, 117:14
  117:15, 118:25

123:7, 123:11
123:16, 135:11
136:13, 136:17
140:5, 150:17
169:19, 170:15
173:20, 174:19
175:11, 176:1
177:11, 181:5
181:7, 181:9
182:11, 184:23
184:25, 185:9
185:12, 186:3
187:3, 187:4
187:7, 187:12
187:20, 190:1
190:11, 190:15
190:20, 194:7
198:1, 205:25
210:7, 210:19
210:20, 210:24
211:4, 211:11
213:14, 213:20
213:23, 216:6
217:16, 217:16
218:1, 218:1
219:24, 220:3
220:16, 220:16
220:22, 221:2
221:6, 221:20
221:21, 222:5
222:20, 223:6
224:25, 225:4
227:18, 231:11
235:23, 241:1
242:19, 245:9
247:3, 248:5
249:24, 249:25
254:9, 254:10
254:12, 255:20
256:1, 257:10
257:16, 258:5
258:24, 260:1
260:10, 260:12
263:22, 264:17
264:19, 265:4
265:6, 265:9
265:16, 269:16
269:22, 270:15
273:4, 273:23

274:23, 277:3
277:23, 278:19
279:16, 280:4
284:22, 284:23
285:3, 285:5
285:9, 285:9
285:19, 285:22
285:24, 286:8
286:10, 286:11
286:14, 286:16
289:25, 297:7
299:10, 302:20
303:10, 303:11
305:14, 308:22
309:5, 309:8
309:10, 309:22
310:10, 311:23
312:10, 313:8
314:9, 316:20
317:14, 319:24
320:5, 321:10
322:3, 323:10
330:25, 331:5
331:16, 331:22
332:1, 332:15
333:4, 334:13
334:13, 338:8
338:9, 339:11
341:23
claimed 70:14
  86:21, 100:13
  117:4, 117:12
  175:6, 176:6
  257:19, 258:17
  304:16, 312:22
  314:9, 315:14
  327:17
claiming 105:16
  124:4, 229:14
  256:24, 257:1
  257:12, 258:23
  309:15, 316:7
  337:10
claims 22:25
  23:15, 23:23
  24:11, 24:14
  24:16, 24:18
  25:1, 25:3, 25:6
  25:14, 25:19

Chvostal 206:17
  287:14, 287:15
  287:16, 287:17
  287:19, 287:22
  287:23, 289:2
  290:12, 291:2
  291:3, 291:22
  292:17, 292:23
  293:4, 293:11
  293:16, 295:17
  295:22, 297:24
  298:11, 298:17
  302:9, 302:16
  303:1
Chvostal's 298:17
  302:19
Circuit 97:15
circumstance
  331:25, 336:5
  337:18, 337:20
circumstances
  66:11, 90:10
  112:23, 154:12
  185:20, 187:18
  232:4, 240:10
  332:10, 334:9
  335:19, 337:8
circumstantial
  220:3
cite 110:10
cites 107:20
  108:1, 108:4
  108:13
city 131:16, 132:1
  132:12, 133:10
claim 2:20, 3:4
  3:6, 3:8, 3:17

3:17, 3:19, 4:5
4:7, 13:2, 24:6
24:10, 24:17
24:21, 24:22
25:10, 25:16
25:20, 26:13
26:21, 26:25
27:5, 27:15
28:18, 28:18
33:16, 33:17

DANIEL JAEGER  MARCH 02, 2023

26:5, 26:11
26:15, 27:6
27:12, 28:2
28:19, 29:1, 33:9
33:13, 33:15
33:24, 34:7
35:15, 41:21
41:22, 42:19
43:12, 43:15
43:16, 43:21
44:3, 44:4, 44:6
44:12, 45:15
49:19, 50:2, 50:6
50:21, 51:2
51:14, 56:4
57:17, 63:25
79:5, 88:13
89:13, 91:10
110:11, 167:2
184:21, 185:2
185:4, 185:11
185:24, 186:4
186:5, 186:8
186:10, 210:14
211:4, 212:5
215:17, 216:1
216:13, 216:15
217:1, 217:15
218:8, 218:15
219:8, 222:21
224:5, 230:16
231:3, 231:19
240:21, 242:20
244:24, 245:5
245:12, 245:13
245:25, 246:1
246:20, 247:1
249:12, 254:4
256:4, 284:2
284:4, 284:17
284:18, 286:3
286:6, 286:24
289:16, 300:18
302:11, 303:2
317:19, 317:23
339:19, 339:20
339:20, 339:21
341:16, 341:21
342:2, 342:13

344:5, 344:23
344:24, 345:1
345:2, 345:3
345:8, 345:9
345:11
**clarified** 72:5
**clarify** 28:15
29:3, 72:14
164:9, 213:22
**Clark** 294:15
294:21, 295:1
295:22, 296:24
**classic** 193:6
**clause** 115:3
**clear** 38:15, 38:21
41:16, 73:2
94:17, 119:21
123:20, 134:21
140:20, 186:23
214:13, 232:9
235:9, 237:21
240:20, 250:11
251:4, 253:3
283:6
**clearly** 26:8
26:20, 58:9
76:13, 77:16
86:17, 96:17
100:22, 118:22
136:12, 213:18
227:8, 232:14
257:4, 259:1
266:1, 270:14
270:21
**clerk** 94:14, 95:1
95:7, 95:16
96:11, 97:2
152:4
**client** 16:12, 17:4
17:20, 40:8, 54:1
96:5, 97:4
118:17, 160:13
167:5, 167:7
198:16, 208:23
**client's** 162:5
189:20, 205:9
205:21, 205:21
209:20, 226:15
330:20, 338:25

**clinics** 30:24
**clips** 250:24
338:21
**close** 219:8
219:15, 220:8
220:9, 230:1
232:4, 302:5
303:13, 334:6
**closed** 266:11
**coaches** 192:23
**coaching** 38:10
38:22, 94:19
151:6, 151:15
152:7, 155:19
192:23, 193:10
**coin** 153:6
**Coincidentally**
84:25
**collected** 208:11
**collectibles** 175:9
**collection** 204:10
**collections** 319:20
**collector** 181:15
184:6
**collision** 248:10
**column** 129:10
**come** 13:19
18:18, 23:16
50:17, 53:1
70:19, 73:20
75:16, 191:24
243:1, 297:9
303:15, 303:17
303:19, 306:23
308:19
**comes** 24:17
41:16, 243:4
246:11, 249:19
300:16, 306:5
306:14, 312:13
312:13, 314:1
317:11
**comfortable**
253:5, 274:6
274:7
**coming** 70:23
134:20, 251:2
325:7
**comment** 14:9

87:16, 132:9
227:4, 227:16
328:12
**commented** 208:5
**comments** 205:20
**commit** 30:23
31:11, 122:22
123:1, 139:18
140:10, 141:7
141:8, 141:16
142:15, 146:13
148:6, 148:17
149:15, 149:20
149:24, 151:1
153:12, 153:21
154:19, 156:14
157:12, 157:21
158:11, 159:4
160:1, 161:5
162:1, 162:10
162:20, 164:5
164:16, 171:4
176:21, 178:15
179:2, 319:7
**commits** 133:19
**committed** 37:1
37:4, 37:14, 38:3
38:17, 135:24
144:21, 147:19
150:12, 155:4
262:15, 272:20
273:4, 275:24
276:13, 344:16
**committing**
164:14, 175:20
**common** 107:19
247:21
**communicated**
76:20, 77:21
265:24, 267:19
**communication**
72:9, 290:2
**communications**
14:6, 260:17
265:16, 266:1
307:11
**community** 132:2
**companies** 31:11
177:16, 178:13

179:22, 244:22
244:25, 276:9
317:18, 317:25
**company** 1:8
1:16, 7:3, 8:11
9:2, 13:1, 13:5
13:6, 13:9, 13:9
24:6, 26:13
26:22, 30:11
31:7, 32:7, 33:16
40:25, 51:10
51:13, 56:3, 56:8
57:16, 58:6
60:15, 64:16
72:10, 88:23
104:7, 104:10
119:5, 127:21
142:10, 160:20
167:5, 204:16
204:17, 235:24
237:18, 239:15
245:4, 262:4
263:4, 266:2
267:12, 267:25
282:2, 288:6
**company's** 13:1
82:20, 263:11
**compared** 19:24
**compatriot** 17:25
18:19
**Compilation** 4:19
**complaint** 277:12
277:17, 282:1
**complete** 21:6
138:6, 230:19
231:7, 255:23
268:20, 278:10
322:21, 323:18
**completed** 117:10
208:7, 260:21
262:16, 268:24
**completely** 10:3
16:17, 85:9
92:11, 93:22
116:24, 165:14
201:15, 238:10
249:19, 251:9
258:4, 259:17
259:21, 274:16

DANIEL JAEGER   MARCH 02, 2023

314:24, 315:11 316:13
completing 45:3 45:7
completion 268:10
complex 43:4 69:25, 106:5
compliance 102:22, 102:25 103:8
complied 103:1 103:17, 348:14 348:21
comply 102:22
complying 97:13
component 44:25 45:8
comprehensive 238:25, 239:12 240:13, 241:4 246:11, 249:11 249:23, 292:12
computer-based 45:6
concealed 60:23 61:1, 61:5, 62:16 80:25, 81:13 87:15, 88:7, 90:2 90:16, 91:3, 93:2 159:21, 161:9 176:4
concealing 82:9 86:20, 159:1
concealment 37:21, 37:23 42:14, 48:4, 48:9 48:11, 53:24 54:16, 55:22 56:20, 57:19 57:21, 59:7 59:22, 59:24 60:5, 60:9, 60:16 61:12, 61:14 61:16, 61:23 62:3, 62:12 62:20, 63:2, 63:6 63:20, 64:5 64:14, 64:17

65:9, 80:22, 81:7 82:22, 83:11 86:4, 88:5, 89:3 91:4, 98:9, 100:8 104:13, 105:10 110:4, 113:4 116:2, 123:25 135:10, 142:11 146:19, 148:2 150:18, 158:24 164:20, 183:11 190:16, 220:21 263:22, 263:24 264:3, 268:16 268:19, 269:11 269:13, 269:18 269:20, 270:8 270:11, 270:15 270:19, 270:24 278:8, 278:19 344:13
concealments 48:6, 56:6 159:17, 256:3 323:12, 344:2
conceals 58:5
concept 211:10
concerning 48:2
conclude 37:20 42:13, 60:5, 91:1 98:8, 154:13 154:16, 154:19 155:3, 155:5 156:17, 156:24 230:24
concluded 92:5 92:15, 92:25 93:3, 103:24 118:24, 138:19 146:16, 154:15 155:4, 157:10 159:19, 166:1 188:20, 230:22 230:25, 237:11 273:9, 275:23 276:12, 346:9
concludes 46:20 300:13
conclusion 87:18

88:4, 88:10 89:25, 90:3 90:20, 91:7 91:11, 92:16 92:18, 93:4, 93:9 98:12, 98:19 166:4, 176:2 183:10, 189:24 272:19
conclusions 142:9 162:13, 201:9 213:2
conclusive 172:2
concrete 236:22
condition 83:20 103:18, 104:20 117:12, 182:3 203:7, 267:22 297:21, 298:18 298:19, 323:19 323:21, 324:17 324:20, 340:10
conditions 49:1 54:15, 55:9 55:15, 56:13 104:15, 104:16 112:10, 198:23 304:4
condo 130:23 131:8, 132:20 133:5, 139:17 140:22
conduct 34:14 34:21, 41:19 80:9, 185:22 218:8, 218:15 249:23, 257:11 289:24, 291:22
conducted 46:20 95:21, 185:23 196:22, 314:9
conducting 181:17, 240:16 334:15
conducts 34:22 46:6
confession 278:25 279:11
confident 184:11

CONFIDENTIAL 2:24, 3:3, 3:16
confirmation 4:21, 67:4 259:11, 297:20
confirmed 72:11 72:25, 73:14 116:16, 169:2 169:2, 297:14
confirms 210:18 297:13
confronted 175:13
confused 237:19 261:9
confusion 139:12 237:22, 274:19
congratulations 51:5
conjunction 284:7
connection 100:25, 176:1
conscious 100:23 104:9, 107:4 115:5, 115:15 115:17, 232:15 232:17, 232:21 234:3, 234:11
consciously 192:4 232:23
consider 159:9 160:4, 174:22 287:24, 302:18 304:19, 327:19 336:17
consideration 65:5, 323:8 329:17
considered 118:17, 159:13 166:15, 175:2 175:4, 176:22 176:23, 177:10 180:12, 180:14 180:15, 181:6 182:24, 271:2 304:4
considering 139:5

consistent 67:4 72:25, 77:4 77:11, 127:5 184:22, 185:23 186:4, 195:15 205:18, 208:3 208:9, 230:9 230:20, 259:8 284:21, 296:23
constant 222:6 260:16
constitute 100:14 100:20, 203:7
consult 206:11
consultants 292:8
consume 342:1
consummated 170:4, 170:10
contacts 246:16
contained 126:11 347:11
contemplated 175:20
contend 106:11 232:9
contending 174:15
contention 290:11, 328:19
contents 55:4 287:4
context 43:24 44:13, 122:18 122:21, 162:14 204:12, 225:10 228:10, 340:5
continue 95:9 97:17, 97:21 98:2, 113:3 156:10, 165:23 224:24
continued 27:24 33:8, 102:13 170:21, 173:24 175:18, 333:5 333:10
continues 205:20 254:25
continuing 44:20

DANIEL JAEGER   MARCH 02, 2023

44:24, 44:25
45:9, 265:2
**contract** 120:3
165:4, 291:5
334:17, 335:22
**contractual**
235:25
**contrary** 88:10
90:19, 91:6
91:11, 94:19
209:1, 215:16
343:2, 343:3
**contrast** 42:5
69:19, 264:18
323:19, 324:18
**control** 39:19
156:1, 158:3
222:17, 222:17
259:18
**controlled** 126:12
**conversation** 11:1
11:3, 11:5, 94:13
95:15, 191:17
195:24, 280:9
280:12
**convey** 345:24
**conveyor** 291:7
**conveys** 102:5
**convictions** 273:9
**cooperated** 104:1
318:15
**cooperation**
102:17, 103:6
103:24, 107:4
115:3, 115:16
**copy** 205:1
**Corcoran** 70:11
168:13, 169:17
169:21, 173:10
174:3, 174:8
181:25
**core** 52:16
**corporate** 50:17
51:2
**corporation** 1:8
12:25, 32:6
**correct** 10:25
13:20, 13:21
15:18, 17:1

17:14, 22:6, 23:3
23:17, 23:18
25:18, 27:9, 29:2
29:18, 29:20
30:2, 30:6, 31:13
31:23, 31:24
32:15, 32:16
33:11, 33:18
34:12, 35:5, 35:6
36:16, 41:25
43:6, 49:5, 49:6
49:14, 49:15
49:22, 50:21
51:22, 51:25
53:8, 53:14
53:19, 54:2
54:16, 54:17
54:24, 55:24
59:7, 59:9, 60:17
61:24, 62:5
66:16, 66:19
66:20, 72:22
73:4, 74:13
74:25, 75:1, 75:3
75:4, 75:23, 81:7
89:10, 93:5
102:18, 104:18
106:20, 108:19
108:25, 109:1
109:7, 109:8
109:12, 109:20
109:23, 110:2
110:6, 111:19
113:13, 113:14
113:16, 113:17
113:21, 113:25
114:3, 115:1
115:8, 115:21
116:3, 116:4
118:2, 119:15
119:20, 120:20
120:25, 121:7
121:17, 121:23
122:8, 122:9
129:4, 130:16
131:10, 131:22
187:5, 200:20
208:13, 209:4
212:20, 213:10

213:11, 213:12
213:16, 214:12
214:22, 215:18
216:21, 217:17
217:20, 218:2
218:9, 218:16
218:24, 219:2
219:4, 219:5
221:6, 224:3
225:9, 228:8
228:12, 228:17
231:20, 244:20
246:20, 262:25
263:5, 263:9
263:15, 263:20
264:12, 264:22
264:25, 265:20
266:25, 270:19
275:2, 276:1
276:2, 276:24
277:25, 279:19
285:6, 285:10
287:7, 287:11
292:18, 296:21
297:1, 303:3
303:16, 303:21
305:17, 309:4
309:20, 347:10
**correctly** 37:11
38:5, 105:7
139:15, 146:16
153:17, 270:1
329:20, 330:1
331:7, 336:10
**corresponded**
69:4, 72:13
73:13, 321:4
**corroborated**
334:10, 335:20
**costs** 292:9
**counsel** 8:20, 8:22
14:22, 15:13
15:15, 17:1, 18:8
186:24, 265:17
**counsel's** 17:13
19:9, 20:5, 39:13
106:22, 107:10
112:20, 124:11
130:1, 132:25

138:21, 139:23
141:3, 143:2
144:6, 146:21
162:5, 178:21
179:11, 205:8
261:4, 283:15
299:21, 300:3
309:1, 315:9
316:2, 326:3
330:19, 332:23
335:9, 338:24
343:13
**Counselor** 38:8
**count** 334:18
**country** 52:11
160:24, 218:23
239:19, 248:10
249:3, 249:14
**County** 2:17
187:23, 191:6
348:2
**couple** 15:1
58:14, 285:16
305:12, 339:1
**courage** 273:8
**course** 11:9
14:13, 16:24
18:22, 21:20
40:25, 43:12
43:15, 44:12
47:21, 56:7, 58:4
82:17, 83:6, 83:9
88:22, 100:6
127:8, 159:14
175:3, 197:22
199:2, 199:17
205:25, 206:11
238:11, 303:14
**coursework**
45:15, 46:4
219:21
**court** 1:1, 7:5
8:11, 9:8, 10:7
11:23, 12:1
38:23, 39:7
94:23, 96:6
96:19, 97:15
98:4, 120:12
123:9, 125:7

125:14, 163:14
163:17, 166:20
166:22, 187:11
201:21, 201:24
202:2, 202:8
202:10, 202:20
202:24, 210:9
227:21, 227:24
241:19, 244:6
244:8, 266:7
266:10, 266:15
266:20, 266:23
270:13, 272:8
272:11, 296:10
296:13, 304:23
304:25, 314:15
**cover** 9:23
240:14, 325:25
332:9
**coverage** 3:7
4:17, 27:17
35:19, 42:6, 48:7
52:10, 52:16
54:19, 55:24
56:24, 59:23
60:22, 63:9, 64:6
64:22, 72:20
73:3, 73:8, 73:21
74:12, 75:7
76:23, 100:25
101:7, 101:8
101:9, 101:10
101:11, 101:12
101:13, 101:15
101:17, 101:21
101:19, 101:21
102:1, 102:5
102:6, 102:16
103:5, 103:24
107:5, 107:6
107:14, 108:5
108:13, 109:14
109:15, 110:4
110:22, 111:6
112:4, 112:17
113:7, 113:24
113:25, 114:18
115:5, 115:17
119:10, 119:11

DANIEL JAEGER   MARCH 02, 2023

119:17, 120:2
120:19, 121:3
121:6, 121:17
122:3, 122:3
122:7, 122:24
135:7, 146:18
150:17, 157:11
158:6, 158:12
158:19, 158:23
158:23, 172:9
223:14, 225:1
225:11, 226:3
226:7, 229:3
259:1, 260:23
262:4, 262:18
263:5, 263:12
265:1, 265:6
265:7, 267:18
267:22, 268:14
268:14, 268:24
269:1, 269:8
269:19, 270:6
270:14, 270:22
270:25, 271:4
274:6, 287:9
304:1, 304:5
304:20, 320:22
322:16, 322:17
323:1, 323:9
326:23, 327:15
329:3, 329:18
329:24, 331:15
331:18, 332:15
332:20, 333:8
333:16, 334:12
335:21, 335:22
336:9, 336:18
336:23, 337:12
337:20, 338:6
338:17
**covered** 57:6
57:8, 57:13
57:20, 58:2
60:22, 62:5
62:15, 327:17
335:25, 336:2
336:4, 337:14
**covering** 173:14
**CPCU** 23:14

23:19, 43:3
44:25, 45:1, 45:2
45:8, 45:12
122:10
**crazy** 39:3
208:19
**create** 181:13
**created** 181:19
183:5
**credence** 181:23
**credibility** 143:17
338:22
**credit** 4:5, 126:17
126:19, 126:21
128:4, 134:23
136:11, 136:15
136:19, 137:3
137:5, 137:11
138:7, 138:14
138:16, 139:10
308:18, 316:20
317:3, 318:2
318:5, 318:16
318:23, 319:3
319:9, 319:16
319:17, 319:22
**crime** 122:22
242:23, 283:20
**crimes** 240:11
**criminal** 22:22
23:1, 30:22, 31:9
43:23, 122:20
239:3, 239:25
240:3, 240:6
240:8, 240:22
241:6, 241:11
241:23, 241:24
242:2, 242:7
242:22, 245:15
246:4, 246:15
317:7
**critical** 40:12
60:25, 305:21
342:19
**cross-examination**
151:21, 227:14
**Crystal** 72:10
**current** 51:15
119:17, 295:10

304:2, 304:15
**customer** 256:7
260:7
**customers** 257:9
**cut** 189:5, 261:20
**cutting** 163:9
163:16, 163:19
**CV-21-00119-T...**
1:4, 8:9

### D

**D-I-C-E** 55:4
**damages** 235:10
235:16, 235:25
235:25, 236:19
236:24, 237:5
237:14, 237:17
238:5, 238:13
**Dammit** 11:13
**Dan** 8:7, 12:17
40:6, 42:2, 46:17
47:11, 59:2
62:24, 72:3
82:14, 94:10
98:15, 100:3
112:8, 118:17
119:3, 137:7
145:23, 150:4
156:20, 172:16
179:13, 189:21
192:9, 197:10
197:16, 197:20
199:5, 200:4
200:15, 226:16
235:20, 244:2
271:18, 292:2
311:1, 320:25
324:25, 330:21
334:3, 336:14
337:4, 338:1
342:12
**Daniel** 1:14, 2:3
7:2, 9:6, 9:15
347:17
**dark** 243:9
**darn** 184:8, 207:9
289:3
**data** 247:16

**database** 243:4
245:6, 245:24
246:10
**date** 51:24, 74:12
74:25, 83:3, 85:2
102:14, 109:15
157:8, 166:20
184:3, 184:4
210:9, 221:17
222:1, 222:2
259:8, 272:3
282:15, 309:8
329:15, 338:14
**dated** 307:25
308:5, 309:21
348:14
**dates** 73:25
109:13, 211:1
288:11
**day** 138:18
198:11, 260:3
312:24, 312:25
313:14, 320:11
325:23, 346:1
347:13, 348:15
**day-to-day** 286:2
286:6, 286:9
**days** 14:13, 15:1
15:12, 15:18
16:24, 17:9
68:22, 187:8
187:14, 190:19
192:1, 192:13
193:20, 195:20
210:25, 211:6
221:6, 221:12
267:21, 268:3
285:4, 285:5
285:14, 285:15
285:17, 311:25
312:2, 312:2
312:6, 320:13
322:4
**Daytona** 253:14
253:15, 253:19
**deadlines** 34:4
34:6
**deal** 237:22
240:21, 292:7

292:9, 335:21
**dealing** 80:2
144:18, 218:22
286:10, 293:19
**dealt** 116:13
**debatable** 66:6
**debate** 132:15
**Debbie** 339:15
342:17
**debt** 126:17
126:19, 127:1
133:15, 134:23
136:11, 136:14
138:7, 138:17
138:17, 139:5
139:6, 139:10
319:16
**decades** 91:8
99:6, 99:15
111:8, 112:4
112:14, 122:12
133:21, 215:18
302:23
**deceive** 26:6, 27:2
65:6, 65:11
**deceives** 26:14
**December** 68:21
260:2, 281:25
**decide** 235:7
236:1, 270:14
338:21
**decided** 32:9
103:5, 154:5
297:23
**decides** 188:13
**deciding** 122:23
**decision** 13:1
104:11, 107:4
115:4, 115:5
115:15, 115:17
165:4, 260:1
260:2, 278:14
291:4, 305:14
323:10, 331:15
335:7, 336:17
338:17
**decision-making**
217:22
**decisions** 132:23

DANIEL JAEGER    MARCH 02, 2023

142:3
**declarations** 55:8
55:14, 56:12
**declare** 347:7
347:9
**declining** 158:22
**deduct** 129:23
130:14
**deep** 182:19
**Defendant** 1:10
7:15
**defense** 113:2
140:16, 260:19
**defensive** 300:1
**define** 69:12
69:13, 174:12
177:12, 294:17
**defined** 69:20
71:3, 121:2
176:17, 179:6
179:18, 179:18
179:20, 180:2
180:4, 231:18
302:25
**defining** 71:7
**definitely** 52:21
52:24, 132:7
286:11
**definition** 70:20
70:21, 108:25
252:24, 253:2
302:7, 339:25
**definitive** 110:14
284:9
**definitively** 172:1
**degree** 22:22
93:24, 173:9
**DeLaVina** 1:21
1:24, 7:5, 8:14
348:4, 348:17
348:21, 348:24
348:24
**Delaware** 22:23
23:2, 24:1, 24:4
31:21
**delay** 111:4
112:2, 112:15
113:1
**delayed** 110:23

**deliberately**
26:22
**deliberation**
143:10
**delinquent**
319:20
**denial** 4:17, 36:21
63:8, 100:24
101:7, 101:9
101:16, 101:21
102:6, 104:7
107:5, 107:6
108:2, 108:7
108:9, 108:10
108:12, 108:15
110:22, 113:7
113:24, 113:25
114:6, 114:13
115:4, 115:16
135:7, 158:6
158:8, 158:8
158:12, 265:7
274:23, 274:24
277:4, 278:8
278:12, 278:16
279:8, 279:15
280:4
**denials** 278:2
**denied** 36:23
37:2, 37:5, 37:14
37:24, 38:4
38:18, 41:4, 64:7
64:22, 82:21
85:5, 85:7
100:21, 103:13
110:12, 157:11
169:21, 190:1
220:16, 259:1
260:10, 270:14
277:23, 278:19
279:16, 322:15
322:17, 323:11
329:3, 329:24
333:4
**denies** 101:13
102:1
**deny** 42:6, 54:18
56:8, 56:23, 58:7
59:14, 59:22

76:23, 102:16
103:5, 103:23
104:8, 110:4
111:6, 112:3
112:17, 122:23
123:7, 123:9
123:15, 146:18
150:17, 172:9
260:1, 263:22
326:23, 332:15
332:20, 335:4
336:9, 336:23
337:20
**denying** 101:9
101:19, 108:5
114:18, 158:23
265:15, 274:6
**department**
52:15, 191:6
194:18, 254:11
273:5, 273:12
273:19, 275:5
275:17, 275:25
276:3, 276:14
276:23, 277:21
278:21, 280:11
282:7, 284:7
**departments**
160:25, 272:18
272:22, 345:7
**depending** 24:19
26:1
**depends** 58:2
66:10, 112:22
158:16, 293:18
**depo** 147:7, 342:7
345:17
**deponent** 94:21
95:19, 95:22
**depos** 9:24, 10:1
**deposed** 199:14
284:11
**deposition** 1:12
2:19, 7:1, 8:7
9:16, 11:9, 13:10
13:18, 13:23
14:10, 14:16
15:14, 18:10
37:12, 39:14

59:2, 63:25, 64:3
89:15, 93:17
94:10, 94:17
95:4, 95:9, 95:19
96:12, 96:18
96:24, 97:9
100:12, 101:1
110:6, 125:19
145:23, 147:10
156:8, 157:23
166:24, 186:17
187:24, 197:23
199:2, 199:18
200:15, 201:19
202:3, 203:13
205:1, 205:2
205:22, 210:12
213:5, 214:5
219:19, 221:3
225:2, 227:5
228:3, 238:18
244:2, 244:11
265:8, 267:1
271:18, 280:9
282:6, 284:24
285:20, 294:2
296:14, 305:1
307:3, 316:22
320:1, 339:6
339:14, 341:25
342:15, 346:6
346:9
**depositions** 10:21
39:17, 39:21
54:5, 92:1
**describe** 194:25
314:11, 345:25
**described** 72:6
223:10, 278:2
278:3, 278:5
343:11, 345:16
**description** 2:9
4:12, 307:1
**designated**
345:11
**designation** 22:25
23:11, 23:14
23:22, 42:23
42:24, 43:3, 43:4

43:8, 44:17
44:19, 44:24
45:1, 45:1, 45:2
45:3, 45:7, 45:9
46:5, 122:11
122:11
**designations** 23:7
43:2
**desire** 123:21
144:10
**desperation**
142:5, 144:23
**despite** 279:21
316:15
**detail** 28:20
158:20, 168:17
293:5, 293:7
343:9
**detailed** 84:10
291:9, 309:5
**details** 136:16
169:13
**determination**
41:20, 65:2
101:8, 101:15
102:23, 238:11
238:14, 255:20
256:1, 260:4
260:20, 262:15
263:24, 268:9
270:9, 273:3
327:16, 330:24
333:8, 333:17
**determine** 34:24
40:24, 80:10
147:25, 168:23
178:3, 185:20
299:2, 299:6
304:10, 315:14
331:18, 334:16
**determined** 161:8
187:20, 214:19
215:13, 234:19
236:5, 236:8
236:24, 237:13
237:20, 300:17
302:8, 302:24
303:9
**determines** 36:10

DANIEL JAEGER   MARCH 02, 2023

36:20, 230:12
230:14, 235:13
238:1, 238:3
**determining**
117:4
**devious** 118:4
118:17
**diametrically**
92:5
**DICE** 55:3, 55:8
**dichotomy** 36:12
41:6
**died** 325:12
328:22
**dies** 180:17
**different** 10:5
25:15, 25:20
32:6, 50:8, 52:6
57:10, 88:1
95:25, 96:1
115:14, 121:17
122:4, 122:18
123:19, 137:3
144:12, 153:8
173:14, 182:9
182:10, 185:2
191:12, 195:17
215:25, 229:24
230:10, 240:14
244:22, 260:22
292:4, 296:12
309:19, 316:11
316:12, 317:11
318:8, 342:8
345:7, 345:7
**differentiate** 21:4
**differently** 34:15
34:21
**differing** 69:12
**difficult** 79:7
142:13, 148:11
148:13, 149:13
181:16, 221:18
227:14
**difficulties**
149:21, 153:18
**difficulty** 99:22
150:22
**Dina** 2:19, 67:4

67:6, 67:9, 67:12
67:20, 67:21
67:23, 69:2, 72:7
72:11, 73:1
73:11, 73:15
74:1, 75:14, 76:1
76:13, 76:18
76:21, 77:12
77:18, 77:21
78:5, 78:10, 80:4
80:8, 171:17
171:19, 171:22
171:25, 178:7
179:4, 179:25
180:19, 184:16
200:19, 201:6
201:11, 201:19
207:6, 207:7
208:10, 222:12
223:12, 223:13
224:18, 225:12
225:24, 228:10
290:8, 297:22
299:4, 308:17
321:3, 332:16
337:9, 340:4
340:9, 341:1
342:16
**direct** 220:2
294:18, 294:23
294:25, 295:3
295:21
**direction** 348:8
**directly** 78:7
83:15, 155:24
180:16, 180:23
182:6, 208:19
325:7, 325:11
328:22, 341:1
**disagree** 39:12
46:6, 64:15
86:15, 91:17
92:7, 95:16, 97:6
98:23, 99:2
99:24, 111:2
116:24, 131:18
136:8, 156:11
168:11, 235:4
238:10, 245:22

246:2, 258:4
274:16, 282:24
314:24, 315:12
316:4, 316:19
325:9
**disagreeing**
119:25, 120:6
**disagrees** 99:24
**disappearance**
69:7, 185:1
**disappeared**
194:10, 195:23
**discipline** 51:1
**disclaim** 158:19
**disclaims** 101:11
101:12
**disclosing** 314:2
**disconnect** 99:25
**discuss** 331:17
332:8
**discussed** 94:15
219:8, 219:19
343:9
**discussing** 110:5
268:16, 278:7
**discussion** 59:19
147:10, 262:19
282:3
**discussions** 14:2
160:13
**disease** 180:25
**displayed** 83:19
324:1, 324:1
**Disposition**
272:19
**dispositive**
256:21
**disputed** 327:22
**disregard** 232:15
232:18, 232:22
234:3, 234:12
234:14, 234:17
**disregarding**
232:23
**distinct** 258:9
**distinction** 41:6
147:7
**distortion** 136:16
**District** 1:1, 1:2

8:11, 8:12, 97:15
**dive** 182:20
**division** 32:12
32:13, 107:14
**divulge** 16:16
**DLV** 8:15
**doable** 342:16
**doctors** 30:25
**document** 4:19
15:21, 16:15
21:7, 54:13
72:16, 124:9
124:18, 124:20
125:8, 125:21
125:23, 128:15
128:19, 128:24
129:2, 129:8
129:16, 129:19
129:22, 130:20
166:2, 166:17
167:2, 167:10
169:23, 174:16
182:1, 186:20
187:6, 191:4
191:21, 191:23
192:6, 192:12
196:4, 201:17
210:7, 211:5
214:3, 221:1
223:13, 227:17
238:16, 239:6
244:4, 244:14
248:7, 285:18
291:9, 291:11
291:12, 293:25
296:8, 304:21
306:7, 306:22
306:24, 307:20
309:16, 316:20
319:23
**documentation**
70:8, 70:10
80:13, 84:2, 84:4
84:18, 87:7
138:25, 169:17
180:17, 182:15
184:9, 184:12
193:2, 224:14
242:11, 333:11

333:14, 335:17
**documents** 14:14
14:19, 14:20
14:23, 15:3, 15:5
15:8, 15:12
15:15, 15:20
15:23, 16:4, 16:9
16:23, 16:25
17:8, 17:16
17:17, 17:22
17:24, 18:1, 18:2
18:5, 18:7, 18:7
18:12, 18:14
18:17, 18:23
19:1, 19:4, 19:13
19:24, 19:25
20:7, 20:9, 20:11
20:13, 20:18
20:23, 21:2, 21:2
21:3, 21:8, 21:11
21:12, 21:14
21:16, 21:19
21:22, 21:23
21:25, 22:3, 22:7
22:8, 22:10
22:12, 22:14
22:16, 103:19
103:19, 125:4
169:18, 186:24
187:1, 193:13
196:13, 223:9
224:25, 225:14
228:2, 228:13
309:14, 310:19
**doing** 31:12
38:25, 78:15
81:25, 86:16
89:2, 97:22
106:17, 119:7
128:7, 133:20
133:23, 135:19
151:19, 152:1
154:14, 155:25
181:8, 237:1
239:15, 243:6
245:8, 245:11
248:14, 257:15
257:25, 264:2
283:5, 289:16

DANIEL JAEGER   MARCH 02, 2023

316:10, 316:11
**dollar** 149:20
256:13, 256:15
286:18, 286:19
**dollars** 122:25
124:20, 132:11
134:7, 255:3
289:9, 298:13
**donkey** 256:16
256:16
**Donna** 1:21, 1:24
7:5, 8:14, 39:11
40:1, 54:13
97:19, 97:24
125:13, 125:18
163:16, 187:10
201:18, 202:19
206:3, 244:5
271:20, 348:4
348:17, 348:21
348:24, 348:24
**don?t** 4:7
**doubled** 51:13
**doubt** 87:3, 89:11
131:14, 176:14
219:9, 219:16
220:8, 220:9
329:22
**Doug** 2:10, 3:11
3:12, 4:1, 4:2
85:17, 125:9
238:17, 244:5
304:22, 306:25
307:24
**Douglas** 1:4, 8:10
87:4
**Dr** 298:17
**draw** 36:12
142:8
**drawing** 41:5
**drew** 162:13
**dubious** 274:5
**due** 88:24, 192:20
193:24
**duly** 9:7, 348:5
**duties** 113:6
217:24, 218:6
218:7, 218:13
**duty** 218:14

218:20, 218:21
219:3, 219:7

**E**

**e-mail** 166:18
167:4, 169:16
227:18, 293:25
294:4, 295:8
296:8, 296:18
296:24, 297:13
306:24, 307:5
307:11, 307:16
307:23, 308:24
309:9, 309:17
309:20, 312:6
312:7, 313:1
313:2, 313:6
314:3, 314:16
314:17, 315:19
320:12
**e-mails** 296:1
296:2, 297:3
307:10
**earlier** 43:10
121:11, 161:19
164:12, 166:6
168:12, 173:12
295:8, 296:24
298:20, 307:11
**early** 31:7, 147:6
147:10, 187:20
201:23, 219:18
222:20, 223:5
268:25, 286:21
**earner** 134:6
**easier** 202:7
241:16
**easily** 54:7
164:25, 178:3
207:15
**East** 131:5
131:20
**easy** 202:12
207:4, 228:1
**economic** 141:13
**edition** 3:4, 3:8
4:7, 66:15, 66:22
67:5, 68:3, 68:9

68:25, 69:2, 69:5
69:7, 69:10
69:18, 70:2, 70:5
70:11, 71:1
71:11, 71:16
71:25, 72:5, 72:7
72:8, 72:12
72:21, 73:11
73:16, 73:18
76:1, 76:14
76:19, 77:19
80:4, 80:17, 83:1
83:2, 83:23
83:24, 84:23
84:24, 85:21
87:2, 87:5
117:13, 167:23
168:16, 168:21
168:24, 171:13
171:19, 172:2
172:20, 174:4
174:9, 176:5
178:18, 180:2
181:8, 181:10
181:24, 191:7
191:12, 192:1
192:14, 194:1
194:2, 194:4
194:20, 194:21
196:10, 196:14
203:20, 204:5
204:14, 221:2
222:8, 222:15
222:22, 223:7
223:25, 224:8
224:16, 224:19
224:23, 226:4
226:13, 226:21
227:18, 228:14
256:17, 258:5
258:16, 259:12
298:18, 305:22
306:3, 306:12
308:21, 309:15
310:7, 310:9
311:19, 311:22
312:9, 312:19
313:7, 319:24
320:12, 321:11

321:21, 333:12
335:15, 337:9
338:5, 340:22
**editioned** 83:25
**editions** 90:11
291:19, 308:20
311:22, 316:12
328:14
**education** 22:20
23:8, 44:20
44:24, 44:25
45:9, 89:1
**educed** 47:20
47:23, 83:5
100:6, 159:14
190:14
**effect** 87:17
109:19, 118:18
292:24, 343:11
**effective** 51:24
74:12, 74:24
109:13
**effort** 18:8, 65:6
65:11, 178:2
231:9, 304:10
315:13
**efforts** 316:6
**egregious** 97:16
161:3
**egregiously** 94:20
**eight** 325:12
**either** 11:23, 14:2
23:24, 24:22
30:23, 34:6
61:25, 62:19
70:18, 83:8
139:11, 140:13
151:19, 153:9
154:25, 156:22
156:25, 157:5
157:13, 166:14
173:8, 178:2
178:16, 184:17
193:2, 220:2
241:16, 257:1
276:23, 318:9
321:24, 326:13
**Elaine** 77:9, 78:4
80:3, 80:6

180:22, 290:7
**element** 278:9
**elicit** 96:1
**elite** 132:1
**Email** 2:12, 3:21
3:23, 4:2
**embarrasses**
95:22
**embarrassing**
96:21
**employed** 99:20
**employee** 31:20
**encountered**
290:7
**ended** 80:8
304:12
**enforce** 94:22
152:9
**enforcement**
160:25, 161:1
240:7, 272:23
273:4, 273:6
273:13, 274:7
275:5, 275:6
276:1, 276:4
276:6, 276:8
276:15, 276:24
277:22, 278:11
279:2, 280:11
280:15, 280:19
282:8, 282:14
282:15
**engaged** 300:13
**engaging** 95:24
301:21
**enormous** 88:12
**Enservia** 288:10
**Enservio** 288:6
288:11
**ensued** 58:22
94:5, 145:18
200:10, 243:22
271:13
**ensure** 272:17
272:22
**entire** 50:11
53:19, 91:10
140:23, 198:11
203:16, 222:11

DANIEL JAEGER   MARCH 02, 2023

237:3, 251:5
306:6, 306:19
339:11, 341:16
341:21, 342:2
344:10
entirely 18:20
entirety 83:17
99:11, 319:15
entitled 43:12
43:16, 44:12
140:7
equal 154:7
154:8, 325:2
329:6, 329:23
331:3, 332:18
333:21, 335:1
336:8, 336:22
337:18
equally 217:16
equated 72:8
equates 291:13
equity 128:4
especially 124:15
181:21, 331:21
Esq 7:12, 7:17
essentially 230:13
establish 35:16
60:15, 81:6
123:7, 123:14
147:18, 148:5
148:7, 149:24
150:11, 150:25
230:3, 257:11
258:7, 258:15
258:16
established 9:24
33:12, 33:14
53:11, 81:14
92:17, 92:18
149:25, 153:5
173:12, 211:7
217:14, 217:25
220:2, 259:4
270:16, 270:22
326:7
establishes 187:2
establishing
122:14, 153:18
estate 126:22

126:25, 127:24
131:8, 133:7
estimate 9:19
10:16, 10:22
15:19, 19:13
207:2, 288:13
304:2
estimated 136:9
estimates 10:10
et 102:14
ethical 348:14
348:21
EUO 18:21, 19:7
19:15, 20:1
21:18, 22:5, 85:4
85:5, 103:18
113:12, 291:9
291:10
EUOs 305:4
evaluate 77:7
123:5, 123:18
136:6, 136:25
142:8, 162:15
164:13, 164:17
164:18, 165:1
165:7, 165:9
190:11, 231:10
247:16, 254:8
254:12, 278:12
323:1, 329:13
330:24, 331:17
332:8, 333:16
334:12, 335:4
335:6, 336:1
336:17, 337:7
338:7
evaluated 161:10
162:12, 171:10
172:23, 175:24
187:20, 188:8
188:18, 189:23
211:24, 229:11
233:21, 268:10
268:21, 323:7
323:8, 327:15
338:12, 338:16
evaluating 90:25
103:16, 126:16
224:14

evaluation 91:17
117:10, 164:16
177:10, 236:15
236:17, 278:11
278:19, 278:22
304:16, 329:18
evening 346:2
event 61:25
132:14, 143:18
events 80:14
83:12, 84:7
84:11, 86:25
87:6, 172:19
302:17
eventually 136:21
138:14, 318:22
319:2
evidence 35:21
35:24, 37:1, 37:4
37:13, 37:20
38:3, 38:17
40:17, 42:8
42:13, 46:8
47:20, 47:23
59:13, 59:25
70:17, 79:25
80:12, 80:21
82:19, 83:5, 83:6
84:16, 85:24
86:8, 86:18
87:13, 87:25
88:21, 89:2
89:12, 90:6
90:14, 91:1
95:17, 100:6
100:11, 123:25
142:8, 142:12
147:9, 154:8
154:13, 156:21
157:19, 159:14
159:16, 159:18
160:15, 161:6
162:12, 162:13
164:18, 164:19
165:2, 175:13
176:3, 182:25
188:8, 189:23
189:24, 190:14
211:24, 219:22

220:3, 220:15
220:19, 234:10
259:9, 259:10
268:11, 268:21
274:24, 279:3
322:11, 322:22
322:24, 322:25
323:6, 326:12
326:13, 327:12
327:16, 327:20
327:21, 331:22
332:12, 334:5
334:7, 335:14
335:17, 335:23
337:8, 338:12
343:4, 344:4
344:10
Evidently 240:6
ex-girlfriend
84:20
exact 31:5, 68:3
73:25, 78:20
186:10, 252:23
288:18
exactly 27:10
66:19, 75:6
100:20, 123:17
131:4, 320:15
examination 2:4
2:5, 2:6, 9:11
102:13, 113:12
185:21, 339:3
341:13
examinations
339:9
examined 9:8
134:24
examiner 2:22
2:23, 28:18
213:4, 213:12
213:19, 213:24
214:1, 225:18
294:15
examiners 213:10
example 10:20
18:25, 57:6
126:9, 127:12
134:22, 158:16
193:6, 198:10

220:5, 258:15
273:21, 276:6
examples 22:5
95:12
exams 45:5
exceed 120:5
exceeded 118:3
excellent 323:19
323:20, 324:17
324:20
exception 11:18
excerpts 64:2
89:19, 342:24
345:23
excess 130:16
exchange 296:24
exchanged 182:5
exclude 48:7
exclusion 54:11
54:18, 55:24
56:22, 57:4, 57:4
57:10, 58:3, 58:6
109:3, 109:6
267:22, 270:6
270:22, 270:25
exclusions 55:10
55:15, 56:14
104:12, 104:13
104:14, 268:15
exclusive 140:11
excuse 135:17
158:9, 214:1
excuses 112:25
EXECUTED
347:13
executive 2:15
186:14, 186:15
210:19, 221:10
exhibit 42:15
44:13, 48:13
48:13, 48:14
51:18, 55:24
59:4, 72:16
73:23, 74:9
74:10, 74:11
76:3, 101:3
101:22, 104:22
104:25, 107:5
107:15, 107:18

108:13, 109:22
113:7, 119:23
120:10, 125:5
125:11, 125:19
158:6, 166:18
166:24, 186:17
187:10, 187:24
192:6, 192:6
202:3, 210:12
211:6, 213:5
213:8, 214:5
221:3, 221:24
223:15, 223:20
223:22, 223:24
225:2, 227:2
228:3, 238:18
244:9, 244:11
246:21, 246:21
253:6, 265:8
266:3, 266:14
266:18, 267:1
271:21, 284:12
284:24, 285:20
294:2, 296:14
297:6, 305:1
307:3, 310:25
315:20, 316:22
320:1, 320:3
**exhibits** 2:8, 4:11
74:8, 205:2
**exist** 324:3
**existed** 183:6
322:23, 322:24
329:14
**existence** 78:9
159:7, 260:9
321:7
**exists** 148:16
148:19, 267:23
327:13
**expand** 32:10
206:7
**expect** 108:12
235:15, 237:3
238:12, 284:5
**expenses** 127:14
**expensive** 85:13
254:16, 254:17
255:11, 255:13

256:16
**experience** 46:11
48:16, 49:3
76:17, 88:12
89:1, 91:8, 93:7
99:7, 99:15
111:8, 112:5
112:14, 117:2
122:13, 136:10
141:6, 142:2
143:13, 144:18
165:16, 211:14
235:17, 238:4
261:23, 263:1
268:23, 269:2
302:23, 314:14
322:8, 324:5
**experienced**
152:21
**expert** 42:19
45:15, 63:25
86:7, 88:11, 91:8
92:4, 92:7, 92:17
98:18, 98:19
98:24, 99:6
99:24, 100:12
100:15, 116:14
116:14, 116:16
116:20, 116:20
117:1, 117:1
117:6, 117:18
176:9, 176:12
178:5, 182:19
287:10, 288:5
290:3, 290:13
291:14, 291:15
291:21, 292:3
293:6, 293:6
293:21, 297:24
298:7, 298:8
298:11, 299:12
299:15, 300:14
300:14, 300:15
301:9, 301:13
301:16, 301:20
301:22, 301:25
302:1, 302:3
302:7, 302:10
302:18, 302:25

303:9, 303:9
339:21, 344:23
344:24, 345:11
**expert's** 117:15
219:20
**experts** 287:20
290:18, 292:8
292:10, 293:3
293:11, 293:17
323:9, 331:18
334:12, 335:21
337:12, 338:7
**explain** 76:15
88:10, 88:15
91:7, 226:18
226:19, 259:23
269:9
**explained** 140:3
168:12, 199:21
236:22, 242:20
298:20, 298:22
**explanation**
30:19, 65:3
65:15, 65:20
72:24, 91:11
91:20, 92:6
92:14, 98:22
98:22, 301:20
321:15
**explicitly** 96:11
**exposed** 235:16
235:24
**exposure** 236:8
236:18, 237:4
238:4, 238:12
286:12, 286:15
286:17, 299:7
299:11, 299:13
304:13
**expressed** 118:8
190:18, 191:25
193:21, 195:7
195:21, 195:25
297:21
**extensions** 34:4
**extensive** 177:22
**extent** 46:23
205:19, 213:15
239:20

**extinguish** 136:13
**extra** 235:24
**extraordinary**
178:8, 204:9
339:25, 340:9
340:14
**extremely** 43:22
**eyes** 213:1

**F**

**face** 99:23
127:18, 127:19
143:11
**fact** 42:14, 48:6
60:24, 61:1
61:12, 61:16
61:18, 62:4
62:12, 63:2, 63:7
63:7, 64:21, 87:1
87:9, 88:11
90:25, 106:2
107:16, 133:3
135:22, 135:23
137:16, 159:17
168:25, 169:20
173:3, 180:20
181:7, 181:23
182:1, 194:24
196:11, 204:9
206:23, 210:18
220:6, 223:10
224:20, 274:9
285:2, 295:1
297:14, 299:16
316:16, 320:11
331:21
**factor** 165:9
168:7
**facts** 37:21, 56:6
58:6, 66:10, 86:4
86:21, 87:15
88:7, 90:9, 90:16
91:3, 93:3, 112:9
112:23, 123:24
159:2, 159:14
159:21, 160:15
161:10, 162:11
162:13, 175:23

176:5, 185:3
187:19, 187:19
187:21, 189:24
211:24, 213:2
222:12, 231:10
232:4, 302:15
310:20, 324:3
328:18, 334:9
335:19, 337:7
**factual** 291:22
291:23
**fail** 10:5
**failed** 175:10
192:5
**failure** 102:11
102:12
**fair** 26:4, 52:18
63:19, 63:22
112:1, 112:14
112:17, 200:17
218:8, 218:8
218:22, 293:10
**fairly** 66:5
211:23, 286:14
**faith** 95:21
218:21
**fake** 85:8
**faked** 255:11
255:13
**fallback** 87:5
**false** 126:3, 126:6
128:9, 173:19
**familiar** 9:25
14:6, 48:23, 49:1
105:14, 137:23
218:22, 262:23
267:7, 267:9
267:11
**family** 105:4
134:16, 134:16
134:20, 153:14
159:8
**fantastic** 160:10
**far** 19:6, 20:1
20:3, 20:23, 22:2
26:11, 48:25
52:16, 79:1
112:14, 113:4
116:2, 121:14

DANIEL JAEGER   MARCH 02, 2023

147:22, 149:19
153:16, 161:21
164:16, 165:13
168:16, 177:24
200:24, 217:24
245:8, 267:5
314:13, 343:18
345:8
**Farm** 24:6, 24:12
27:7, 27:19
27:24, 28:1
28:25, 29:10
29:11, 29:16
30:5, 30:10
30:13, 30:14
30:15, 30:16
31:4, 31:8, 31:22
49:4, 99:15
99:16, 99:20
**fashion** 95:25
**fast** 108:10
**faster** 226:24
**father's** 70:15
**FBI** 275:1, 275:3
**February** 68:22
84:12, 196:17
307:25, 308:5
309:21, 310:5
312:6, 312:7
312:25
**fed** 17:17, 19:5
19:25
**federal** 95:16
97:14, 97:14
156:6, 272:23
273:13
**felt** 20:13, 249:7
**field** 3:1, 3:1, 25:5
214:3, 214:8
266:4, 266:5
266:13, 280:2
**fight** 250:14
**figure** 74:22
119:8
**figured** 137:17
178:5, 207:6
207:7, 207:8
**file** 53:2, 53:2
88:13, 89:13

91:10, 95:4
95:10, 156:8
167:2, 177:2
186:20, 210:15
221:21, 222:13
222:21, 224:5
225:14, 225:20
239:7, 239:11
244:14, 254:4
264:16, 284:2
284:4, 289:16
316:24, 339:11
341:16, 341:21
341:23, 342:2
342:14, 344:5
**filed** 8:11
**filing** 239:25
**filling** 49:21
**filter** 141:9
141:12
**final** 113:15
255:25, 260:4
**financial** 125:25
133:12, 319:6
**find** 20:22, 53:7
54:7, 80:18
135:6, 152:11
167:7, 181:11
207:4, 225:22
244:23, 301:11
306:8, 321:24
344:4, 344:10
**finder** 90:25
**fine** 72:19, 77:15
78:12, 122:1
122:4, 145:14
200:6, 208:24
213:25, 264:9
287:2
**finish** 58:15
105:24, 105:25
157:7, 178:24
188:24, 257:3
324:10, 326:10
327:24
**finished** 178:23
**fire** 158:21
**firm** 8:20
**first** 9:7, 10:3

16:2, 24:3, 25:16
41:10, 42:16
50:1, 50:2, 50:6
50:11, 51:1, 52:1
68:11, 68:23
68:24, 74:21
85:4, 94:18
101:6, 108:23
108:24, 116:13
116:14, 116:16
116:25, 117:15
128:15, 142:19
160:19, 172:19
190:18, 190:25
191:5, 191:17
191:25, 194:2
195:24, 196:21
205:6, 206:10
206:14, 213:7
213:8, 214:21
221:7, 238:14
239:22, 239:24
241:21, 262:23
266:20, 268:3
268:8, 288:4
288:5, 298:10
307:23, 308:19
309:6, 309:7
309:22, 309:25
310:2, 310:3
310:10, 312:13
313:5, 313:15
314:1, 315:2
315:4, 315:21
**first-party** 50:21
**fit** 34:16, 234:2
**five** 14:12, 14:17
15:1, 15:4, 43:13
92:2, 221:5
267:20, 268:3
288:21, 288:22
342:1
**five-minute** 58:12
205:5, 271:9
**fix** 266:16
**flag** 147:22
**flags** 147:8
**flip** 159:3
**focus** 45:13

164:21
**focused** 33:9
**follow** 17:6, 35:2
39:9, 213:1
230:8, 232:17
258:18, 283:3
286:7
**follow-up** 199:11
199:12, 199:20
**followed** 275:8
**following** 17:9
17:13, 20:16
41:6, 47:5, 47:12
47:16, 71:24
76:16, 76:16
209:15, 281:21
286:17, 308:9
**follows** 9:9
**FOPs** 32:8
**foreclosed** 145:1
**foregoing** 347:8
347:10, 348:4
348:6
**forensic** 292:5
**forget** 165:22
180:20, 186:14
237:22
**form** 12:12, 12:16
13:12, 15:9
15:25, 17:3
17:11, 17:18
19:8, 24:25
25:11, 25:22
26:16, 28:6
29:24, 30:7
33:19, 34:9
34:18, 35:8, 36:7
36:17, 36:24
37:7, 37:16
39:20, 40:19
41:12, 42:1, 42:9
44:22, 45:25
46:15, 47:9
50:13, 50:22
52:2, 52:3, 52:10
53:18, 53:20
53:25, 54:21
55:17, 55:25
56:15, 56:25

57:23, 59:16
60:1, 60:11, 61:7
61:19, 62:2, 62:6
62:22, 63:10
63:18, 64:9
64:24, 66:2
66:17, 66:24
68:5, 68:18
69:21, 71:4
71:18, 72:2, 73:5
75:8, 75:18, 76:6
76:25, 77:24
78:18, 78:24
79:20, 81:2
81:15, 82:2
82:12, 87:20
88:17, 89:16
90:21, 92:8
92:19, 93:11
95:25, 98:14
98:25, 99:17
100:1, 102:3
103:9, 104:2
105:12, 106:21
107:9, 107:23
108:17, 110:7
110:24, 111:9
111:14, 111:20
112:6, 112:19
114:1, 114:8
114:19, 115:9
115:20, 116:21
118:9, 119:2
119:12, 120:21
121:8, 121:24
122:16, 123:3
124:11, 126:4
128:20, 129:5
129:13, 129:25
130:9, 130:17
131:1, 131:11
132:3, 132:24
134:9, 137:22
138:20, 139:22
141:2, 141:21
143:1, 144:5
146:20, 147:12
148:8, 149:2
150:2, 151:3

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 153:7, 153:23 | 252:11, 252:20 | 341:4, 341:7 | 174:25, 178:21 | 82:24, 150:10 |
| 154:9, 154:21 | 254:5, 255:15 | 342:22, 343:7 | 179:11, 180:7 | 167:24, 178:8 |
| 155:6, 155:16 | 258:2, 259:6 | 343:12, 343:24 | 185:14, 187:16 | 204:6, 204:10 |
| 156:18, 157:1 | 261:3, 261:14 | 344:6, 344:18 | 188:16, 189:19 | 206:24, 279:18 |
| 157:15, 159:10 | 261:19, 262:1 | 345:4, 345:19 | 194:15, 195:11 | 308:20, 330:6 |
| 160:5, 162:4 | 262:9, 263:6 | **former** 128:18 | 196:4, 196:24 | **fourth** 272:16 |
| 162:22, 163:2 | 263:14, 264:13 | **forms** 45:10 | 207:12, 211:19 | **frame** 166:6 |
| 164:8, 165:10 | 264:23, 265:11 | 52:16 | 212:21, 218:25 | 241:1, 320:7 |
| 167:12, 168:8 | 265:21, 268:7 | **formulate** 292:11 | 219:12, 228:22 | 320:15, 320:16 |
| 169:10, 170:6 | 269:3, 270:2 | **forth** 122:4, 129:3 | 230:17, 231:5 | **framed** 83:18 |
| 171:7, 172:11 | 270:17, 271:1 | 129:11, 235:3 | 231:22, 234:6 | 84:22, 85:11 |
| 172:14, 173:21 | 273:15, 274:12 | 348:14, 348:21 | 234:23, 235:19 | 85:20, 85:21 |
| 174:24, 176:11 | 275:12, 276:17 | **forward** 178:9 | 236:11, 237:7 | 324:1, 324:1 |
| 176:24, 178:20 | 276:25, 279:4 | 185:21, 224:20 | 238:7, 247:8 | 324:13 |
| 179:10, 180:6 | 279:24, 281:3 | 312:21, 321:25 | 247:24, 248:21 | **frames** 217:21 |
| 185:13, 186:7 | 281:9, 281:17 | **forwarded** 295:9 | 252:12, 252:20 | 217:23 |
| 187:15, 188:15 | 282:9, 282:21 | **found** 34:6, 55:13 | 254:6, 255:16 | **Francois** 256:25 |
| 189:18, 190:6 | 283:14, 285:11 | 80:11, 136:21 | 258:2, 262:9 | **Francois-Xavierl...** |
| 190:22, 191:8 | 286:4, 288:2 | 137:2, 137:14 | 263:6, 264:13 | 256:15 |
| 192:2, 192:7 | 288:16, 289:4 | 137:25, 138:3 | 265:12, 265:21 | **fraud** 30:23 |
| 192:16, 194:14 | 289:10, 289:19 | 138:14, 241:11 | 269:4, 270:3 | 31:11, 36:22 |
| 195:10, 196:3 | 290:15, 290:23 | 241:11, 242:11 | 273:16, 274:13 | 36:23, 37:1, 37:2 |
| 196:23, 200:21 | 291:25, 292:19 | 256:11, 327:22 | 275:13, 279:5 | 37:4, 37:5, 37:14 |
| 201:10, 204:23 | 293:13, 294:12 | 343:3 | 281:10, 282:22 | 37:15, 37:23 |
| 206:19, 207:11 | 296:5, 297:2 | **foundation** 61:8 | 289:5, 289:10 | 37:24, 38:3, 38:4 |
| 209:19, 211:18 | 297:17, 298:1 | 64:24, 66:3 | 289:20, 292:1 | 38:17, 38:18 |
| 212:8, 212:21 | 298:14, 300:21 | 77:25, 82:3 | 298:1, 302:13 | 40:16, 40:22 |
| 214:23, 215:7 | 301:15, 301:23 | 82:13, 88:18 | 303:5, 303:23 | 40:23, 41:8, 41:9 |
| 215:19, 216:4 | 302:12, 303:4 | 92:9, 99:9 | 305:25, 306:16 | 41:24, 41:24 |
| 216:18, 217:5 | 303:22, 304:8 | 106:22, 110:25 | 312:16, 314:5 | 42:7, 43:19 |
| 217:11, 217:18 | 305:24, 306:15 | 111:10, 111:14 | 314:20, 315:9 | 43:21, 43:22 |
| 218:3, 218:10 | 307:6, 308:25 | 112:7, 112:19 | 316:2, 319:12 | 45:17, 46:9 |
| 218:17, 218:25 | 309:11, 310:16 | 114:20, 116:22 | 320:24, 321:17 | 46:13, 46:21 |
| 219:11, 219:25 | 311:9, 311:16 | 118:9, 119:12 | 322:19, 323:24 | 46:22, 47:2, 47:3 |
| 220:12, 220:23 | 312:15, 314:4 | 124:11, 128:21 | 324:24, 325:14 | 47:6, 47:17 |
| 222:9, 222:23 | 314:19, 315:8 | 129:6, 129:14 | 326:3, 327:3 | 47:19, 48:2, 48:4 |
| 223:17, 224:1 | 316:1, 317:21 | 130:1, 130:10 | 329:8, 330:3 | 48:8, 48:11 |
| 224:9, 228:16 | 318:18, 318:25 | 130:18, 131:2 | 331:9, 332:5 | 53:25, 54:16 |
| 228:22, 229:5 | 319:11, 320:8 | 131:11, 132:4 | 332:23, 334:1 | 55:22, 56:20 |
| 230:17, 231:4 | 320:23, 321:16 | 132:25, 137:22 | 335:9, 336:12 | 57:19, 57:21 |
| 231:21, 233:5 | 322:18, 323:23 | 138:21, 139:23 | 337:24, 341:4 | 59:7, 59:12 |
| 233:17, 234:5 | 324:23, 325:14 | 141:22, 143:2 | 341:7, 342:22 | 59:13, 59:14 |
| 234:22, 235:18 | 326:2, 327:2 | 144:6, 146:21 | 343:7, 343:12 | 59:22, 59:24 |
| 236:10, 237:6 | 328:11, 330:2 | 148:9, 149:3 | 343:24, 344:7 | 60:6, 60:9, 60:16 |
| 238:6, 239:8 | 331:8, 332:4 | 150:3, 151:4 | 344:19, 345:4 | 61:14, 61:23 |
| 242:4, 245:2 | 332:22, 333:25 | 153:24, 154:22 | 345:19 | 63:20, 80:22 |
| 245:20, 247:7 | 335:8, 336:11 | 156:19, 159:11 | **four** 14:12, 14:17 | 81:7, 82:22, 88:5 |
| 247:23, 248:21 | 337:1, 337:23 | 160:6, 168:9 | 15:1, 15:4, 16:24 | 89:3, 91:4 |
| 249:9, 249:21 | 340:7, 340:20 | 169:11, 170:7 | 17:9, 55:13 | 100:14, 100:20 |

DANIEL JAEGER    MARCH 02, 2023

104:13, 105:9
110:5, 113:5
116:1, 123:1
123:8, 123:11
123:16, 123:25
133:19, 134:1
135:11, 135:24
139:18, 140:10
141:7, 141:8
141:17, 142:11
142:15, 142:23
144:21, 146:8
146:9, 146:14
146:19, 147:19
147:23, 148:2
148:6, 148:17
149:15, 149:21
149:25, 150:13
150:18, 151:2
153:13, 153:22
154:20, 155:4
156:15, 157:12
157:21, 158:11
158:24, 159:5
160:2, 160:23
161:5, 162:2
162:10, 162:20
164:5, 164:14
164:17, 168:5
170:3, 171:5
175:20, 176:21
178:15, 179:2
183:12, 190:16
207:10, 240:11
240:12, 240:18
240:21, 240:21
241:5, 241:11
242:23, 256:21
257:24, 260:19
260:20, 262:14
262:15, 262:17
263:18, 263:23
263:24, 264:4
268:16, 268:19
269:11, 269:13
269:14, 269:18
269:20, 269:24
270:8, 270:11
270:15, 270:20

270:24, 272:20
273:3, 273:20
273:22, 274:5
275:2, 275:7
275:19, 275:24
276:5, 276:8
276:13, 276:20
277:21, 278:8
282:8, 283:21
284:3, 319:8
344:13, 344:16
**fraud-related**
242:23, 279:8
**frauds** 122:19
**fraudster** 273:10
**fraudulent** 34:3
35:22, 35:25
41:4, 41:18
47:22, 48:1, 56:4
57:17, 173:20
190:15, 255:21
256:1, 258:6
343:5
**fraudulently**
174:19
**Fred** 4:2, 68:13
68:21, 69:9
167:3, 191:2
194:5, 196:22
248:15, 248:25
274:1, 280:3
280:9, 280:13
283:24, 284:10
289:17, 295:2
295:5, 295:7
295:16, 305:8
306:25, 309:17
309:20, 310:5
310:8, 310:19
310:19, 311:6
**front** 39:19, 39:21
51:20, 124:20
136:25, 142:8
155:18, 156:3
215:10, 227:8
342:18, 344:15
**full** 348:6
**fully** 235:15
251:18, 306:7

**further** 2:6, 90:17
93:6, 98:10
115:25, 120:11
233:11, 233:24
241:17, 341:9
341:13, 348:14
**furthermore**
84:17, 100:9
263:25

## G

**G-r-e-e-r** 94:15
**gain** 117:3
**gallery** 83:15
169:7, 169:17
171:22, 171:23
184:13, 184:13
194:22, 195:4
196:14, 259:11
**gamut** 123:23
135:19
**gathering** 322:5
**gears** 229:1
**gee** 139:19
155:10, 193:10
195:20, 205:15
**general** 19:12
21:8, 22:14
26:11, 51:10
54:15, 106:8
**General's** 273:22
275:10, 276:7
**generally** 46:5
99:16, 106:7
256:4, 263:8
263:13, 263:15
**generated** 80:4
**genesis** 78:11
**George** 294:15
**getting** 45:23
80:8, 100:25
143:7, 148:24
149:6, 149:8
149:11, 160:12
229:10, 243:9
250:12, 318:15
328:3, 340:12
**giant** 344:5

**Gilbert** 1:22, 1:23
8:15, 8:16
**gist** 11:4
**give** 10:14, 10:16
10:22, 11:4
14:24, 19:13
20:24, 21:6
21:11, 21:15
22:1, 28:10, 39:4
39:5, 71:23
88:21, 127:19
128:10, 151:10
151:23, 155:20
164:1, 192:23
196:11, 197:7
199:8, 205:5
209:12, 223:3
288:13, 288:18
288:19, 289:8
297:1, 324:4
330:14, 331:20
341:5, 341:20
**given** 9:25, 10:21
14:25, 21:8, 54:5
84:9, 92:1, 93:7
96:2, 121:3
127:13, 138:17
141:10, 151:24
153:13, 153:14
153:14, 153:15
154:3, 154:17
155:23, 156:15
156:16, 183:12
208:6, 208:10
219:16, 267:6
268:22, 269:2
286:1, 320:18
328:19, 331:2
341:15
**giving** 128:24
137:1, 150:13
188:6, 190:20
193:23, 215:11
320:22, 324:2
**go** 9:13, 10:1
12:17, 31:25
34:23, 36:3
39:11, 42:16
48:12, 48:13

49:10, 51:17
53:7, 53:8, 54:12
58:14, 58:16
58:18, 59:4, 59:5
71:23, 72:17
74:9, 74:10
74:10, 74:19
74:21, 75:11
89:24, 90:17
91:20, 92:3
93:17, 95:3
97:24, 98:4
100:23, 101:4
102:8, 104:22
104:23, 105:23
107:15, 108:21
109:9, 113:9
113:18, 115:24
115:24, 119:21
119:23, 120:15
121:14, 124:21
125:10, 133:16
133:21, 133:25
140:24, 142:24
145:12, 153:1
156:12, 158:3
158:19, 159:8
159:24, 160:3
162:2, 165:13
167:18, 167:20
172:4, 178:16
178:17, 179:3
182:12, 182:19
184:15, 185:18
186:13, 187:13
188:25, 189:1
189:2, 189:2
189:7, 189:10
198:9, 199:5
202:5, 202:6
202:12, 205:3
205:10, 207:15
207:18, 207:19
211:3, 212:25
214:2, 217:2
221:23, 223:12
224:4, 224:10
224:24, 226:24
227:6, 227:8

DANIEL JAEGER   MARCH 02, 2023

238:23, 239:22
241:15, 243:17
244:4, 245:8
248:6, 250:7
250:10, 251:22
253:6, 253:7
253:8, 253:16
253:25, 254:10
254:22, 255:1
255:7, 257:5
257:16, 259:19
260:7, 267:13
267:14, 271:20
271:22, 272:5
272:6, 272:10
277:12, 277:16
279:25, 293:6
294:8, 298:6
302:2, 304:15
306:22, 307:12
307:13, 307:18
307:19, 307:21
308:11, 308:13
309:16, 311:20
312:3, 314:14
324:9, 328:9
330:11, 334:11
342:11
**God** 91:9, 171:3
278:25
**goes** 35:3, 41:25
67:15, 183:1
194:25, 207:3
208:4, 211:11
213:14, 219:9
220:10, 239:21
250:23, 278:7
313:21
**going** 16:25, 17:6
19:19, 27:5, 28:9
32:10, 37:12
37:25, 39:1, 39:4
39:4, 39:6, 39:9
39:19, 43:11
47:14, 47:14
58:16, 58:21
59:21, 60:21
65:24, 74:9
93:25, 93:25

94:4, 94:16, 95:9
95:11, 95:13
97:19, 97:21
97:22, 99:23
110:21, 116:5
139:6, 139:19
141:16, 141:18
144:24, 145:1
145:17, 151:11
151:16, 152:2
152:9, 152:10
152:15, 156:1
156:2, 156:2
157:25, 159:24
162:17, 164:1
166:3, 166:9
171:4, 176:9
178:15, 179:2
185:7, 189:1
189:12, 189:13
189:16, 193:5
197:8, 200:9
208:16, 214:18
223:4, 226:9
227:3, 227:4
227:8, 227:16
227:22, 228:21
230:24, 232:9
243:8, 243:21
248:3, 251:19
256:14, 258:21
259:14, 259:18
271:12, 280:20
281:7, 282:16
283:8, 291:18
295:23, 299:16
300:25, 306:20
307:21, 314:14
322:7, 324:4
325:25, 329:6
332:13, 336:18
**good** 16:20, 45:1
45:12, 46:24
71:8, 72:15, 94:2
102:7, 121:20
145:8, 162:24
183:2, 201:16
218:21, 252:4
277:11, 299:16

302:6, 306:9
325:3, 346:2
346:3
**gotcha** 229:2
229:8, 229:16
229:21, 229:25
230:5, 230:11
230:13, 231:1
231:8, 231:9
231:17, 232:1
233:12, 233:14
234:1, 234:10
234:20, 235:14
235:22, 236:4
236:25, 237:12
237:25, 238:2
313:21, 313:23
314:7, 314:12
314:15, 315:2
315:6, 315:12
315:15, 315:18
315:19, 315:24
316:5, 316:14
316:15, 325:20
326:25, 332:14
332:20, 333:1
333:2, 333:9
333:18, 334:14
**gotten** 155:9
186:2
**governing** 267:20
**grab** 313:23
**grabbing** 314:15
**graduate** 23:4
**Grand** 256:15
**great** 66:8, 74:6
145:11, 145:15
152:16, 159:6
160:2, 160:10
160:20, 164:23
189:2, 189:7
325:21, 325:23
326:5, 341:9
343:9
**greater** 136:14
165:20, 332:19
333:21, 335:1
336:8, 336:22
337:19

**greatly** 123:19
**greed** 123:21
136:1, 140:4
140:13, 143:22
148:12, 148:13
148:18, 148:22
149:9, 149:14
149:22, 150:9
150:22, 155:1
156:23, 156:25
157:5, 157:13
278:4
**greedy** 124:24
148:14, 150:6
153:19
**Greer** 94:14
**ground** 9:24, 11:6
12:6, 95:20
116:5
**grounds** 116:1
**group** 32:1, 32:23
33:1, 33:3
213:16, 221:13
221:14, 225:8
**guess** 39:23
43:10, 127:20
167:5, 205:5
236:21, 238:20
239:2, 253:17
255:8, 257:5
270:13, 272:7
276:11, 285:4
321:13
**guideline** 267:25
268:1
**guidelines** 2:22
2:23, 3:1, 3:2
3:14, 3:15, 213:4
214:4, 215:6
215:10, 215:16
266:5, 266:13
266:19, 267:4
267:5, 267:8
267:10, 267:20
272:3, 273:11
280:16, 281:21
283:3
**guilty** 190:4
190:10, 211:12

211:16, 211:25
212:6, 214:20
216:14
**Gurr** 3:20, 3:22
3:23, 285:19
287:10, 287:18
287:21, 292:16
292:22, 292:24
293:3, 293:10
293:17, 293:20
294:1, 295:9
295:13, 295:25
296:8, 296:19
296:21, 296:25
297:8, 297:14
297:24, 299:1
302:8, 303:1
303:15, 304:9
**guy** 67:17, 139:16
142:21, 168:13
177:15, 177:25
178:12, 189:15
199:13, 206:16
328:6
**guy's** 140:21
**guys** 65:17, 76:23
89:25, 90:3, 92:5
92:15, 92:25
93:3, 100:22
136:21, 137:5
153:20, 184:21
190:3, 229:1
231:1, 235:13
236:3, 236:25
239:3, 287:10
288:23, 314:15

## H

**habit** 240:2
291:20
**half** 122:25, 171:5
**Hampton** 131:5
133:6, 133:9
**Hamptons** 131:10
131:16, 132:1
132:10, 132:18
132:19, 132:22
139:17, 140:23

DANIEL JAEGER  MARCH 02, 2023

**hand** 147:9, 147:9
237:11, 237:15
**handle** 184:23
185:1, 185:11
**handled** 33:16
78:15, 79:11
184:21, 184:22
185:9, 185:10
186:3, 186:4
213:24, 214:1
**handler** 28:2
33:9, 49:20
339:19, 339:20
339:21, 345:2
345:3
**handles** 287:2
**handling** 24:11
24:14, 24:16
24:18, 25:1, 25:6
25:10, 25:14
25:19, 26:5
26:12, 26:13
26:15, 27:6
28:19, 33:13
33:15, 42:19
45:15, 63:25
212:5, 215:17
216:1, 216:13
216:15, 217:1
217:15, 219:8
230:16, 231:3
231:19, 300:18
302:11, 303:2
303:12, 317:14
344:23, 344:25
345:1, 345:8
345:11
**handy** 55:7
**happen** 26:9
26:20, 27:4, 76:4
78:2, 134:2
172:19, 189:23
190:9, 211:22
212:2, 212:11
215:1, 215:12
215:22, 232:3
235:4, 272:21
272:25, 273:7
277:15, 302:4

302:15, 303:12
**happened** 66:8
68:15, 68:16
188:13, 215:14
218:12, 218:19
229:4, 229:25
230:1, 230:14
230:21, 231:16
233:16, 234:19
257:13, 291:18
293:7
**happening**
163:15
**happens** 290:21
**happy** 93:18, 96:2
96:8, 120:1
169:24, 189:6
277:7, 277:10
283:4, 284:8
302:1, 302:4
**harass** 197:8
**harassing** 17:19
96:7, 97:4
118:21, 152:12
156:5
**hard** 28:12, 44:2
136:4, 137:20
145:5, 146:3
155:10, 157:9
186:1, 204:18
219:22, 223:3
250:12, 278:3
**Haring** 72:20
84:8, 84:10
84:14, 173:6
177:6, 180:23
181:14, 184:10
194:23, 196:19
325:7, 325:11
328:2, 328:6
328:22, 333:15
**Haring's** 182:21
**he'll** 39:23
**head** 50:24, 142:6
145:5, 146:3
149:14, 202:11
273:1, 275:16
284:10, 288:12
**heading** 242:11

242:25
**headquarters**
50:18
**hear** 12:14, 28:7
98:3, 114:24
144:23, 163:18
251:25, 252:2
261:16, 261:21
316:10, 333:6
**heard** 55:1, 55:3
84:21, 85:8
85:13, 85:17
143:21, 144:3
189:4, 211:10
232:20, 325:25
326:1
**hearing** 281:5
**heavy** 51:5
**help** 177:15
**helped** 178:12
**hereof** 348:13
**hey** 178:17, 222:5
254:1, 256:18
280:10, 296:25
306:11, 311:13
319:7, 320:18
322:16, 325:24
326:23, 328:1
329:4, 329:24
331:6, 335:5
336:24, 337:21
**hide** 251:2
**high** 126:21
184:1, 267:7
**higher** 286:18
286:19, 328:23
329:2, 329:23
331:3
**highlighted**
192:12, 195:1
**highlighting**
186:23, 225:25
**hire** 179:4
179:25, 182:19
290:21
**hired** 91:8, 291:3
297:8, 303:14
339:18
**hires** 178:3

**hiring** 178:16
295:13, 295:25
**history** 3:6, 84:6
172:25, 181:17
225:1, 239:4
246:4, 246:15
249:24, 319:17
**hold** 3:21, 3:24
11:13, 50:7, 50:8
157:7, 188:23
266:10, 294:1
295:22, 295:24
296:8, 296:25
**holdings** 126:23
126:25, 127:25
**home** 70:15
83:16, 85:12
85:12, 128:4
130:22, 131:5
131:7, 131:9
131:10, 132:8
132:8, 132:8
132:21, 133:5
133:6, 133:9
133:9, 133:10
133:13, 135:14
145:1, 316:8
322:12, 322:15
334:9
**homes** 131:15
131:17, 131:25
132:10, 132:13
133:4, 133:13
**honest** 175:12
176:2, 248:12
268:13
**honestly** 106:4
**honesty** 219:4
**hope** 330:4
330:13
**hopefully** 151:14
190:12, 190:12
201:19
**horrible** 180:25
**hour** 313:15
**hours** 14:12
14:13, 14:17
14:19, 14:21
14:22, 15:2, 15:2

15:5, 91:10
96:13, 96:13
152:14, 152:15
176:3, 243:16
334:20, 341:22
342:1
**house** 82:25
83:22, 139:17
140:22, 158:21
335:18
**human** 10:12
**hundreds** 52:22
52:25, 53:4
63:18, 63:21
105:10, 105:11
**hunky-dory**
160:11
**hypothetical** 26:8
26:19, 27:3
76:16, 77:4, 78:2
79:24, 172:18
188:10, 189:22
190:8, 211:22
212:11, 214:25
215:11, 215:22
216:6, 216:20
230:20, 231:8
231:25, 232:7
233:11, 233:20
233:23, 233:24
234:9, 234:18
235:3, 235:6
235:21, 237:24
238:10, 258:9
302:14, 302:22
303:8, 303:8
314:7, 322:7
322:22, 323:25
324:2, 324:5
324:6, 324:9
325:2, 326:15
327:11, 333:19
334:7, 335:14
336:19, 336:21
**hypothetically**
172:5, 233:13
**hypotheticals**
324:6

DANIEL JAEGER    MARCH 02, 2023

| I | | | | |
|---|---|---|---|---|
| | 180:15 | **include** 115:12 | 230:3, 231:12 | **individual** 72:24 |
| **idea** 85:7, 160:14 | **implausible** 80:15 | 287:5 | **increased** 72:25 | 158:21 |
| 176:18, 178:11 | 174:13, 174:21 | **included** 110:16 | 73:9, 74:3, 75:7 | **individually** 8:7 |
| 203:20, 204:13 | 176:17 | 115:22, 279:10 | 76:11, 168:20 | **industry** 99:7 |
| 211:13, 214:18 | **implicated** 70:22 | 279:12 | 169:4, 170:14 | 99:13, 217:4 |
| 236:3, 237:24 | **implication** 274:4 | **includes** 138:16 | 171:12, 173:18 | **inference** 274:8 |
| 303:17, 315:20 | **implied** 208:6 | 167:7 | 201:1, 224:17 | 274:11, 274:16 |
| 328:3, 329:24 | **imply** 151:10 | **including** 45:23 | 225:17, 225:22 | **information** |
| 335:4, 336:20 | **implying** 151:23 | 46:12, 84:18 | 229:9, 325:8 | 19:14, 26:2 |
| 336:24, 337:21 | 151:24 | 252:10, 317:7 | **incredible** 79:4 | 65:20, 66:12 |
| 341:24, 344:22 | **importance** | 318:24 | **incredibly** 160:2 | 67:8, 67:8, 67:12 |
| **identification** | 122:14 | **income** 129:19 | 250:24 | 67:15, 67:20 |
| 125:20, 166:25 | **important** 75:13 | 129:20, 134:7 | **incur** 126:20 | 68:10, 69:1, 70:8 |
| 186:18, 187:25 | 75:16, 182:2 | 134:13, 134:15 | **indemnity** 24:6 | 75:24, 77:10 |
| 202:4, 210:13 | 182:3 | 134:15, 134:17 | 30:11 | 77:12, 78:3, 78:4 |
| 213:6, 214:6 | **impossible** 83:2 | 134:19, 134:20 | **independent** | 78:6, 78:10 |
| 221:4, 225:3 | 84:9, 148:25 | 135:2, 140:11 | 247:15, 278:22 | 82:17, 83:5 |
| 228:4, 238:19 | 149:9, 149:13 | 140:12, 292:5 | 288:5, 299:12 | 83:13, 83:21 |
| 244:12, 267:2 | **improbable** 84:9 | 292:7 | **independently** | 85:6, 87:15 |
| 284:25, 285:21 | **improper** 26:6 | **incomplete** | 248:3, 254:11 | 88:21, 102:10 |
| 294:3, 296:15 | 26:10, 26:14 | 102:10 | **INDEX** 2:1 | 102:12, 126:7 |
| 305:2, 307:4 | 26:23, 92:11 | **inconsistence** | **indexing** 272:1 | 128:9, 157:8 |
| 316:23, 320:2 | 151:20, 188:14 | 193:9 | **Indiana** 1:8 | 165:12, 171:16 |
| **identified** 207:15 | 189:17, 189:20 | **inconsistencies** | **indicate** 18:13 | 171:24, 172:24 |
| 290:12, 304:13 | 190:5, 211:17 | 83:8, 86:24 | 35:22, 89:13 | 174:3, 174:7 |
| **identifies** 203:4 | 214:22, 215:15 | **inconsistent** 85:9 | 268:2, 297:4 | 175:3, 175:4 |
| **identify** 101:6 | 300:18, 300:19 | 201:15, 215:9 | 343:4 | 175:24, 177:2 |
| **ignore** 189:9 | 302:11, 303:2 | 216:6, 229:7 | **indicated** 84:6 | 201:13, 201:14 |
| **illiquid** 133:18 | **improperly** | 259:22, 259:23 | 85:10, 266:1 | 204:2, 224:13 |
| **illiquidity** 123:22 | 151:18, 314:16 | **incontrovertible** | **indicates** 68:25 | 240:11, 240:15 |
| **imagine** 11:10 | **inappropriate** | 322:14, 326:18 | 69:2, 76:13 | 240:25, 244:22 |
| 48:19, 212:24 | 16:18, 17:20 | 331:2, 337:19 | 83:21, 87:7 | 246:12, 247:10 |
| 224:11, 316:25 | 93:22, 93:25 | **incontrovertibly** | 187:6, 248:12 | 248:2, 250:1 |
| **immaterial** | 118:20, 151:25 | 332:18 | 259:9, 305:18 | 290:10, 291:3 |
| 302:19 | 152:2, 152:20 | **incorrect** 206:10 | **indicating** 207:23 | 291:6, 291:7 |
| **immediate** | 156:5, 193:14 | 206:11, 209:25 | 250:1 | 291:16, 309:18 |
| 333:23 | 212:1, 212:4 | 210:1 | **indication** 34:2 | 315:13, 317:12 |
| **immediately** | 212:7, 212:12 | **increase** 67:3 | 68:12, 68:24 | 317:13, 317:18 |
| 210:16, 285:10 | 215:3, 215:5 | 67:25, 73:21 | 78:8, 88:14 | 322:1, 322:5 |
| 315:5, 315:22 | 215:23, 230:15 | 74:12, 75:25 | 98:20 | 328:16, 330:23 |
| **impartial** 218:15 | 231:2, 231:18 | 76:12, 78:12 | **indications** 69:2 | 333:7, 334:11 |
| **impartiality** | 232:3, 233:15 | 170:20, 171:4 | **indicators** 41:17 | 335:21, 335:24 |
| 212:16, 212:17 | 233:21, 251:13 | 171:6, 171:14 | 41:23, 42:6 | 337:12, 338:3 |
| 212:25 | 283:2, 283:8 | 171:16, 200:24 | 46:19, 147:22 | 338:6, 338:16 |
| **impartially** | 300:4, 313:24 | 202:23, 204:17 | **indicia** 40:23 | 341:1 |
| 213:20, 214:16 | 313:25 | 222:13, 223:14 | 41:9, 41:24, 42:7 | **informed** 165:3 |
| **impetus** 184:15 | **inartful** 151:19 | 224:15, 224:22 | 59:12, 146:25 | 291:4 |
| **implausibility** | **incentives** 124:3 | 225:11, 225:14 | 147:6, 147:7 | **infraction** 241:25 |
| | **incidents** 242:25 | 226:3, 226:7 | 147:22, 240:17 | 242:1 |

**inherent** 150:22
153:17
**initial** 49:12
49:16, 187:19
297:11
**initially** 18:11
297:9
**injury** 24:5, 24:9
27:15, 28:17
232:16, 232:18
233:2, 234:4
234:12, 234:16
234:18
**innocent** 77:6
77:17, 77:22
80:1, 173:7
188:19, 189:15
189:25, 190:3
190:4, 190:10
211:12, 211:17
212:1, 212:7
214:21, 216:14
**insane** 140:21
**inside** 3:14, 267:9
**inspect** 180:19
**instance** 104:17
140:18, 153:11
164:4, 214:19
275:8
**instances** 112:24
112:25, 145:6
240:18, 241:5
262:11, 262:14
263:18
**Institutes** 23:15
23:16, 45:11
**instruct** 16:2
16:12, 17:4
17:20, 40:8
93:14, 94:21
**instructed** 96:5
**instructing** 40:10
118:14, 198:5
198:14, 198:19
200:5, 300:24
301:1, 301:2
301:4
**instruction** 17:9
92:12, 118:11

**instructions** 17:7
152:5
**instructs** 11:19
**insurable** 104:17
104:19, 104:25
105:5, 105:19
106:1, 106:2
106:14, 106:19
107:7, 107:13
107:17, 113:22
114:15, 114:16
115:7, 115:18
**insurance** 1:7
1:16, 4:13, 4:21
7:2, 8:10, 9:2
12:25, 23:7
23:25, 25:5
26:13, 26:21
27:22, 30:23
31:11, 31:11
32:7, 33:16
40:25, 43:5
48:20, 48:23
52:15, 55:5
55:14, 55:16
55:21, 56:3, 56:8
56:11, 56:19
57:11, 57:16
58:6, 58:7, 60:15
64:16, 69:8, 99:7
99:13, 122:19
123:1, 123:8
123:11, 123:16
127:17, 127:21
133:19, 134:1
139:18, 141:7
141:8, 141:16
142:15, 142:23
144:21, 144:25
146:7, 146:9
146:14, 147:19
148:6, 148:17
149:15, 149:21
149:25, 150:13
151:1, 153:13
154:20, 155:4
156:15, 157:12
157:21, 159:4
160:2, 160:19

160:23, 161:1
161:5, 162:2
162:10, 162:14
162:20, 164:5
164:14, 164:17
165:12, 165:14
171:5, 173:16
174:19, 175:20
176:19, 176:21
179:2, 200:25
204:15, 204:16
217:3, 239:15
244:18, 244:22
245:9, 247:16
258:24, 263:4
263:11, 269:24
272:18, 272:23
273:5, 273:12
273:19, 273:20
273:22, 275:5
275:7, 275:18
275:25, 276:4
276:5, 276:8
276:9, 276:14
276:23, 277:22
280:11, 282:7
283:20, 284:8
317:18, 317:24
319:8
**insure** 118:6
165:23, 170:22
173:24, 175:18
255:22, 258:20
312:19, 320:19
322:16, 326:24
331:12
**insured** 2:12
26:6, 26:10
26:14, 26:23
27:2, 43:20, 58:3
69:8, 70:2, 70:3
70:13, 71:10
71:13, 71:14
71:14, 71:15
71:25, 72:6
73:18, 87:2
100:9, 100:17
101:16, 102:1
112:1, 119:9

119:16, 120:18
121:5, 121:23
127:6, 166:3
166:19, 169:4
170:19, 172:1
172:6, 177:3
183:7, 190:3
194:1, 211:11
211:16, 212:6
212:16, 212:25
214:15, 217:25
219:4, 219:9
219:17, 220:10
242:13, 244:24
249:8, 249:20
257:17, 271:3
272:20, 275:23
292:7, 298:24
308:16, 309:16
312:14, 312:18
312:21, 313:23
314:2, 315:14
315:22, 318:3
320:19, 320:20
320:20, 321:2
321:5, 321:9
321:12, 321:14
321:22, 322:17
325:24, 326:6
326:23, 329:4
329:25, 331:6
333:6, 335:5
336:7, 336:24
337:15, 337:21
338:5
**insured's** 51:20
158:25, 317:4
**insureds** 102:11
212:17
**insurer** 26:9
135:10
**insuring** 55:8
55:15, 56:12
165:7, 168:4
170:1, 174:16
253:24, 337:8
**intangible** 153:19
**intending** 82:7
**intent** 100:5

**intention** 280:23
281:5, 282:6
283:5
**intentional** 56:5
61:11, 61:16
61:17, 62:1, 62:4
62:11, 62:21
63:1, 63:8, 63:14
64:18, 65:5
65:10, 83:11
86:3, 86:8, 98:8
98:9, 98:20, 99:3
100:8, 109:2
135:13, 158:19
159:16, 161:9
164:20, 188:20
220:20, 220:20
251:1, 256:2
344:2
**intentionality**
64:14, 344:12
**intentionally**
26:22, 48:5, 48:6
58:5, 60:23
60:25, 61:4
62:16, 62:16
62:17, 64:5
80:24, 80:24
81:12, 81:13
81:25, 82:6, 82:8
86:19, 87:14
87:15, 88:8
88:15, 89:14
90:1, 90:1, 90:2
90:15, 91:3, 93:2
93:2, 95:23
103:4, 103:23
118:24, 135:14
151:19, 159:2
159:20, 176:4
232:22
**interest** 104:18
104:19, 104:25
105:5, 105:19
106:1, 106:3
106:4, 106:14
106:20, 107:1
107:7, 107:13
107:17, 113:22

DANIEL JAEGER   MARCH 02, 2023

114:15, 114:17
115:7, 126:21
**interested** 348:12
**interesting** 106:1
253:23, 290:1
307:19
**interests** 106:3
115:18
**interjects** 163:20
**internal** 44:11
215:6, 267:24
**internally** 214:14
323:9, 330:24
331:14, 331:18
332:8, 336:17
**International**
32:1, 32:23, 33:1
33:2
**interpretation**
97:14
**interrupt** 20:25
77:14, 89:6
93:20, 178:24
183:15, 251:16
252:5, 324:11
**interrupting** 82:5
193:4, 250:20
**interview** 68:21
85:9, 182:12
191:2, 196:22
**interviewed**
68:14, 69:9
169:20, 172:22
196:17
**interviewing**
291:5
**interviews** 201:15
203:17, 289:17
289:24, 291:23
**Invades** 16:11
**invasion** 16:2
**investigate** 40:23
79:5, 85:23
185:5, 230:7
256:4, 256:5
257:8, 258:13
265:2
**investigated**
33:24, 34:1

186:9, 246:20
**investigating**
30:17, 30:25
263:18, 269:16
269:19, 289:25
317:15
**investigation**
18:23, 21:21
24:16, 26:1, 26:3
34:16, 34:22
35:24, 36:19
37:19, 40:24
41:1, 41:2, 41:3
41:19, 42:12
43:17, 44:7, 46:7
46:19, 46:20
47:21, 47:24
49:21, 56:7, 56:8
58:4, 60:4, 65:2
67:2, 70:4, 72:7
75:25, 77:5, 77:8
77:9, 78:6, 80:9
82:18, 82:23
83:6, 83:9, 84:16
85:1, 86:17, 87:9
88:2, 88:22, 93:4
100:7, 117:10
117:11, 136:7
138:4, 147:20
147:24, 147:25
159:15, 159:19
160:16, 161:7
164:19, 165:2
168:22, 169:3
169:14, 169:20
172:24, 175:4
175:5, 181:9
182:17, 183:10
185:22, 187:21
190:10, 190:11
190:14, 196:12
204:1, 206:1
215:2, 218:9
218:15, 224:16
224:19, 225:16
232:5, 235:23
236:19, 242:10
243:7, 247:15
248:4, 249:11

249:15, 249:23
250:3, 254:10
254:14, 255:23
257:11, 257:18
258:12, 260:21
262:3, 262:6
262:16, 263:3
266:4, 268:10
268:20, 268:24
269:1, 270:9
279:11, 291:15
291:18, 305:13
312:20, 314:9
321:19, 321:25
331:23, 333:6
333:10, 334:16
**investigations**
25:17, 27:25
35:17, 49:8
50:11, 78:14
78:17, 79:10
87:23, 117:3
187:13, 217:10
291:22
**investigative** 3:10
24:23, 238:17
**investigator** 3:1
3:1, 24:19, 24:20
28:1, 28:3, 28:22
29:2, 30:5, 30:10
30:13, 33:7
49:17, 167:3
214:3, 214:11
248:15, 266:5
266:13, 272:17
272:21, 280:2
295:18, 317:3
**investigators**
212:15, 214:8
**investigatory**
33:10
**invoice** 308:17
**invoke** 37:22
59:22, 64:16
65:8
**invoked** 61:15
**invoking** 61:23
**involve** 24:18
128:6

**involved** 24:14
24:22, 24:25
30:25, 68:13
95:8, 128:5
172:21, 221:20
248:19, 286:2
286:5, 286:9
286:11, 286:13
286:16
**involvement**
302:16
**involves** 270:7
**involving** 184:25
**iota** 86:7, 343:3
**ironclad** 322:9
322:24
**irrational** 142:7
**irrefutable**
329:16, 334:7
335:14, 335:16
338:4
**irrelevant** 249:19
**ISA** 3:15, 266:18
266:22, 267:8
268:1
**ISO** 3:12, 244:5
244:7, 244:15
244:18, 245:5
246:22, 249:25
271:23, 272:1
317:17, 317:22
317:25, 318:8
318:9, 318:10
**issue** 40:12, 51:22
69:12, 69:13
69:17, 70:20
70:22, 70:23
70:24, 71:3, 71:7
77:17, 79:15
80:17, 81:22
82:9, 89:23, 90:2
93:1, 98:10
100:5, 106:2
115:16, 134:25
139:15, 159:9
160:4, 174:12
174:13, 174:21
174:22, 176:17
176:18, 177:13

178:11, 179:1
179:6, 179:21
180:3, 203:21
207:4, 230:12
230:25, 233:14
241:23, 251:19
260:23, 260:25
261:24, 262:4
262:19, 262:20
263:12, 263:20
264:10, 264:19
265:1, 265:18
269:8, 269:22
269:25, 270:7
270:10, 270:12
281:1, 281:6
282:5, 282:20
286:15, 308:19
309:6, 309:7
309:23, 312:12
314:1, 315:3
315:21, 332:12
**issued** 54:1, 75:6
107:6, 114:23
115:12, 179:20
204:8, 207:2
223:15, 260:15
261:13, 261:18
262:3, 262:7
262:13, 263:10
264:2, 264:16
265:4, 268:6
268:18, 268:23
268:25, 269:8
**issues** 66:14
123:22, 124:16
128:12, 147:1
147:16, 239:3
263:5, 265:6
269:19
**issuing** 113:23
263:3
**item** 67:3, 67:25
69:4, 72:13
72:19, 72:24
73:13, 73:16
73:17, 76:10
86:21, 100:13
100:17, 100:18

DANIEL JAEGER   MARCH 02, 2023

100:18, 100:19
106:9, 106:10
116:10, 120:4
121:3, 167:9
167:16, 171:12
175:6, 175:12
175:22, 203:21
204:17, 223:1
224:17, 224:22
225:15, 225:16
225:22, 229:9
229:12, 255:1
255:6, 255:6
256:25, 257:1
257:3, 257:8
257:11, 257:16
257:17, 257:22
258:7, 258:14
258:17, 258:18
299:9, 304:11
321:4
**itemize** 80:20
**itemized** 120:19
121:5, 121:17
122:3
**items** 5:1, 6:1
120:5, 127:3
127:4, 165:23
170:23, 209:25
254:1, 254:12
254:24, 255:12
255:13, 256:11
256:12, 257:18
257:22, 258:9
287:8, 304:16
316:11, 335:23

**J**

**J-a-e-g-e-r** 9:15
**Jaeger** 1:14, 2:3
7:2, 8:7, 9:6, 9:15
10:24, 13:23
17:2, 18:16
28:14, 38:2
38:13, 38:19
39:6, 40:16
41:11, 43:5
48:17, 48:21

59:2, 59:8, 62:19
64:23, 71:17
71:24, 72:19
76:5, 81:10
90:20, 91:22
92:18, 93:10
94:10, 98:3
99:25, 101:1
101:7, 103:4
107:22, 108:12
112:5, 114:14
117:21, 118:17
118:22, 137:21
141:1, 142:25
145:23, 145:25
147:11, 153:6
155:13, 155:21
156:13, 158:7
161:25, 163:25
167:11, 168:2
174:23, 176:10
184:24, 185:6
185:12, 188:2
189:11, 190:17
190:21, 191:22
192:11, 194:13
195:9, 197:12
197:22, 198:25
200:15, 200:18
201:9, 203:11
208:16, 208:21
208:25, 216:3
223:3, 224:8
225:5, 226:22
227:1, 228:7
232:10, 239:7
239:17, 244:2
245:19, 250:16
250:22, 254:22
256:9, 261:23
271:18, 281:5
281:16, 286:3
294:5, 300:12
301:19, 306:10
309:4, 310:15
312:14, 313:3
313:25, 314:17
314:18, 317:20
320:18, 322:8

325:22, 326:15
341:6, 341:18
342:4, 342:10
342:21, 343:11
344:17, 345:13
345:18, 347:17
**jail** 160:22
**James** 168:13
169:17
**January** 49:24
50:10, 51:6, 51:9
187:4, 191:18
210:21, 230:2
231:11, 297:12
299:2, 322:4
**Jeff** 271:7
**Jersey** 24:7
30:11, 30:18
31:14, 31:16
31:19, 31:19
50:18
**Jessica** 296:19
**jewelry** 127:2
175:9, 213:25
252:8, 287:2
**Jim** 173:10
**job** 24:3, 24:12
27:19, 27:22
30:13, 49:23
49:25, 50:4, 50:7
50:8, 51:5, 214:9
**John** 287:22
288:4, 290:3
295:17
**Johns** 3:20, 3:22
3:23, 285:19
287:10, 287:18
287:21, 292:17
292:22, 292:24
293:4, 293:10
293:17, 293:20
294:1, 295:9
295:13, 295:25
296:8, 296:19
296:21, 296:25
297:8, 297:14
297:24, 299:1
302:8, 303:1
303:15, 304:9

**join** 53:11
**joined** 32:18, 33:5
49:5
**Jonathan** 14:12
**journal** 84:10
182:21
**Juarez** 248:20
248:20, 248:23
**judge** 11:12
16:19, 39:19
39:22, 47:15
93:17, 94:14
95:8, 102:24
151:13, 152:3
152:18, 152:19
155:18, 156:3
193:17, 198:3
200:7, 227:8
227:11
**judge's** 94:1
**judgment** 240:23
271:7
**judgments**
240:13, 240:24
242:22, 246:16
**Judy** 7:22, 8:17
58:24, 94:7
145:20, 200:12
243:24, 271:15
**jumped** 126:16
237:25
**jumping** 234:20
**June** 24:13, 24:15
24:24, 25:1, 25:3
29:4
**junior** 45:2, 184:1
**juror** 239:20
**jury** 92:6, 92:14
99:23, 102:24
103:22, 120:8
188:13, 195:16
215:14, 230:11
230:14, 230:21
230:23, 230:24
230:25, 235:8
235:13, 236:1
236:24, 237:11
237:20, 237:25
238:2, 238:11

238:13, 250:25
251:20, 251:20
258:22, 298:9
300:13, 338:21
**justice** 22:23
23:1
**justifiably** 61:15
**justify** 177:7
**Justin** 42:19

**K**

**Karen** 225:7
225:18, 228:6
242:6, 293:20
294:10, 294:14
295:1, 296:18
320:4
**keep** 71:10, 97:22
127:23, 134:21
183:19, 184:4
184:9, 184:11
184:18, 188:1
188:6, 223:12
**keeping** 87:25
**keeps** 95:11
**Keith** 72:20, 84:8
173:6, 177:6
180:22, 181:14
182:21, 184:10
194:23, 196:19
325:7, 325:11
328:2, 333:14
**kept** 59:10, 84:10
346:2
**key** 82:19
**Kimberly** 221:14
**kind** 9:23, 40:17
51:13, 55:7
121:16, 142:21
142:22, 214:9
255:12, 279:3
295:24, 342:3
**kinds** 238:21
246:16, 247:6
317:6
**knew** 13:19
107:6, 113:23
132:22, 154:17

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 170:14, 175:22 | 106:4, 106:5 | 165:15, 165:19 | 229:16, 229:23 | 292:21, 293:2 |
| 192:1, 192:5 | 118:18, 120:2 | 165:22, 166:10 | 230:4, 230:6 | 293:6, 293:18 |
| 194:6, 195:5 | 123:6, 123:22 | 166:11, 166:14 | 230:20, 230:23 | 293:22, 293:23 |
| 195:23, 204:15 | 124:21, 124:23 | 167:4, 168:16 | 232:7, 233:23 | 298:10, 298:22 |
| 204:20, 205:15 | 125:1, 126:7 | 168:19, 169:15 | 234:8, 234:19 | 299:2, 299:8 |
| 209:1, 209:17 | 126:9, 126:16 | 169:24, 170:9 | 235:2, 235:6 | 300:1, 303:15 |
| 210:3, 226:10 | 127:3, 127:8 | 170:19, 170:21 | 236:1, 236:2 | 306:3, 306:4 |
| 288:23, 290:8 | 127:17, 127:17 | 171:11, 171:21 | 236:15, 236:16 | 306:5, 306:9 |
| 301:14, 321:13 | 127:18, 127:18 | 171:22, 172:6 | 236:17, 238:12 | 308:12, 308:15 |
| 325:17, 328:24 | 127:23, 128:3 | 172:18, 172:19 | 239:10, 240:7 | 309:15, 310:3 |
| 338:17, 343:1 | 128:6, 131:6 | 172:20, 172:24 | 240:10, 240:11 | 310:4, 310:7 |
| 343:5 | 131:15, 132:16 | 173:24, 173:24 | 240:14, 240:15 | 310:14, 310:14 |
| **know** 4:7, 11:23 | 132:19, 134:1 | 174:3, 174:6 | 240:23, 240:25 | 310:19, 310:21 |
| 15:12, 16:6 | 134:12, 134:13 | 175:17, 175:19 | 241:1, 241:14 | 310:22, 310:24 |
| 18:23, 19:14 | 134:14, 134:18 | 175:23, 175:24 | 241:21, 242:8 | 311:6, 311:12 |
| 19:22, 21:1 | 134:21, 134:25 | 177:5, 177:5 | 242:18, 242:20 | 311:14, 313:10 |
| 24:20, 25:25 | 135:14, 135:15 | 177:6, 177:21 | 242:24, 243:4 | 313:21, 314:11 |
| 28:19, 28:19 | 135:16, 135:18 | 177:23, 179:5 | 248:16, 248:23 | 314:11, 315:5 |
| 29:8, 32:3, 32:21 | 135:19, 135:21 | 180:24, 181:3 | 250:6, 250:16 | 316:9, 316:10 |
| 32:24, 34:14 | 136:4, 137:19 | 181:15, 181:17 | 250:17, 252:3 | 316:16, 317:10 |
| 34:22, 35:17 | 138:6, 139:3 | 181:18, 181:20 | 252:23, 252:24 | 319:3, 319:21 |
| 36:1, 39:8, 39:18 | 139:5, 140:5 | 182:3, 182:8 | 253:1, 253:1 | 319:24, 320:4 |
| 41:16, 44:16 | 140:9, 140:10 | 182:14, 182:20 | 253:22, 255:10 | 320:6, 321:5 |
| 46:6, 48:7, 48:22 | 140:14, 141:15 | 182:25, 183:1 | 255:12, 257:15 | 321:11, 322:3 |
| 48:24, 50:16 | 142:4, 142:5 | 185:1, 188:6 | 258:11, 260:10 | 323:11, 323:22 |
| 51:12, 52:5 | 142:12, 143:9 | 189:4, 191:7 | 260:18, 260:19 | 324:2, 325:6 |
| 52:20, 52:25 | 143:10, 144:10 | 191:15, 191:20 | 261:1, 261:6 | 325:22, 327:13 |
| 54:4, 54:5, 55:1 | 144:11, 144:13 | 192:11, 192:15 | 262:6, 262:18 | 327:18, 328:2 |
| 57:5, 58:2, 65:1 | 144:16, 144:17 | 193:3, 193:8 | 262:19, 264:16 | 328:13, 328:15 |
| 65:19, 66:10 | 144:18, 144:22 | 194:9, 194:19 | 268:14, 269:9 | 328:17, 329:12 |
| 66:18, 66:20 | 144:23, 144:25 | 195:8, 196:1 | 269:15, 270:8 | 329:12, 331:2 |
| 66:22, 67:1, 67:2 | 145:5, 145:6 | 197:6, 197:17 | 271:24, 273:2 | 331:4, 333:2 |
| 67:10, 67:19 | 147:3, 147:17 | 197:22, 200:6 | 273:21, 273:25 | 333:13, 334:4 |
| 68:2, 68:8, 68:17 | 148:12, 148:15 | 203:10, 203:20 | 273:25, 274:17 | 337:6, 338:2 |
| 68:23, 70:3, 70:5 | 148:16, 148:16 | 203:21, 203:22 | 277:7, 277:8 | 338:11, 338:15 |
| 70:6, 70:7, 76:8 | 148:20, 148:21 | 203:24, 204:1 | 278:6, 278:10 | 338:15, 339:22 |
| 76:9, 79:4, 79:24 | 148:21, 150:5 | 204:4, 204:11 | 278:14, 279:17 | 343:17, 344:9 |
| 80:1, 80:16 | 150:7, 150:7 | 206:17, 206:21 | 279:23, 280:2 | 344:11, 344:12 |
| 80:18, 82:18 | 150:15, 152:1 | 206:24, 207:14 | 280:7, 281:22 | **knowing** 160:18 |
| 82:23, 83:1, 83:4 | 152:21, 153:14 | 208:1, 208:14 | 283:23, 284:9 | 182:1 |
| 83:18, 83:24 | 153:15, 154:4 | 209:8, 211:25 | 284:10, 287:12 | **knowledge** 130:5 |
| 84:10, 85:19 | 154:16, 155:2 | 212:23, 213:1 | 287:24, 289:1 | 249:13, 258:12 |
| 86:6, 86:9, 86:22 | 156:9, 156:16 | 217:21, 217:22 | 289:7, 289:12 | 290:6, 340:24 |
| 87:1, 87:25 | 160:9, 160:11 | 221:16, 222:11 | 289:14, 289:15 | 341:8 |
| 88:20, 88:23 | 160:11, 160:13 | 222:12, 222:15 | 289:18, 289:25 | **knowledgeable** |
| 96:22, 98:18 | 160:16, 161:4 | 222:19, 222:22 | 290:3, 290:4 | 256:9 |
| 99:5, 99:7, 99:12 | 161:5, 161:7 | 223:19, 223:20 | 290:6, 290:8 | **known** 226:8 |
| 101:22, 102:23 | 161:8, 161:14 | 226:10, 228:1 | 290:12, 290:18 | 245:17, 262:4 |
| 106:1, 106:2 | 162:11, 163:12 | 229:7, 229:15 | 290:21, 292:6 | 265:1, 269:8 |

DANIEL JAEGER   MARCH 02, 2023

348:4
knows 91:9, 96:4
  181:9, 181:15
  182:2, 182:2
  198:12

**L**

L.A 290:4
labeled 168:17
labels 168:15
lack 102:17
  103:6, 103:24
  107:4, 107:17
ladder 142:19
language 48:3
  60:25, 61:2, 62:1
  103:21, 105:18
  116:6, 118:8
  119:1, 120:8
  192:12, 214:8
  219:20, 229:17
  229:22, 233:1
  286:21
large 137:15
  138:2, 175:8
  175:16, 177:17
  341:23
larger 287:2
late 264:20
  264:20, 269:21
  280:21, 280:23
  340:12, 346:2
launching 209:13
law 12:4, 94:14
  95:1, 95:7, 95:15
  96:10, 102:21
  102:21, 103:15
  106:5, 110:16
  110:18, 110:19
  111:12, 111:13
  111:24, 152:4
  156:6, 160:25
  161:1, 240:6
  272:23, 273:4
  273:13, 274:7
  275:5, 276:1
  276:14, 276:24
  277:22, 278:11

279:2, 280:11
280:15, 280:18
282:8, 282:13
282:14, 339:10
lawyer 14:3, 14:4
  202:14, 203:2
  265:18, 265:23
  291:10
lawyers 14:5
  15:1, 15:8, 30:25
  54:6
lay 239:20
layers 67:15
laying 158:17
layman 239:14
layman's 105:18
  119:1, 229:17
  229:22, 286:20
  301:19
layperson 135:21
leads 178:11
learn 108:9
learned 282:13
  333:3
leaving 30:15
  31:8
led 225:23
left 28:21, 30:14
  31:7, 31:22, 49:4
  137:10, 171:2
legal 7:22, 8:17
  8:18, 58:25, 94:8
  106:1, 113:16
  145:21, 200:13
  232:12, 235:1
  235:5, 235:9
  235:11, 243:25
  271:16
legally 123:6
legitimate 41:1
  43:18
lengths 325:21
  325:23, 326:6
lengthy 183:15
letter 4:17
  100:25, 101:7
  101:8, 101:10
  101:11, 101:15
  101:16, 101:22

104:5, 104:7
107:5, 107:6
107:19, 107:25
108:13, 108:13
110:11, 113:7
113:21, 113:24
113:25, 114:5
114:23, 115:5
115:7, 115:11
115:17, 115:19
135:8, 158:6
158:9, 158:13
158:25, 260:4
260:15, 261:1
261:1, 261:7
261:9, 261:12
261:18, 261:25
262:3, 262:24
263:2, 263:21
264:11, 264:17
264:19, 265:3
265:7, 265:15
265:19, 268:5
268:5, 269:23
269:25, 270:7
letters 262:13
  264:6, 264:7
  267:16, 267:19
  268:18, 268:23
  269:17
level 46:9, 83:10
  89:2, 148:1
  164:19, 220:15
  220:19
Lexis 238:21
  246:3, 246:15
  247:20, 317:6
  317:11, 318:8
  318:10
LexisNexis
  245:24
liabilities 126:24
  128:17, 129:11
  129:23, 130:4
  130:7, 130:14
liability 129:20
  165:4, 291:4
  334:17
lie 26:6, 27:1

lied 26:9, 26:22
  81:24, 81:25
  90:1, 118:25
lien 240:23
liens 240:13
  240:24, 242:22
lies 26:14
life 127:16
  140:23, 141:17
  142:24
lifestyle 140:21
  142:22, 153:14
  156:16, 159:6
  160:3, 160:10
  161:4
light 69:10, 243:8
  251:20, 331:21
liked 207:16
likelihood 83:24
  84:23, 134:3
  143:7, 143:8
  160:18, 325:3
limit 95:20, 96:9
  97:3, 97:8, 97:9
  155:16
limitation 94:23
  152:10
limitations 345:1
limited 96:12
limiting 203:7
limits 34:15
  34:17
line 5:2, 5:2, 6:2
  6:2, 6:2, 58:15
  128:4, 202:16
  203:1, 206:6
  206:9, 207:18
  292:14, 300:12
lines 32:12, 43:13
  209:3
liquid 127:3
  144:2, 144:15
liquidity 123:22
  124:16, 128:12
  128:16, 134:25
  135:4, 135:5
  136:14, 140:13
  143:25, 144:10
  146:25, 154:25

156:22, 156:25
157:5, 157:13
Lisa 84:20, 85:10
  85:16
list 21:6, 21:10
  21:11, 21:16
  21:17, 22:2
  203:19, 241:24
  256:6
listed 13:10
  130:22, 216:7
  223:1, 261:12
listen 98:5, 216:8
  302:21
literally 305:19
litigation 70:10
  87:4, 169:2
  331:24
litigator 152:21
little 30:19, 59:15
  74:15, 90:18
  93:10, 101:4
  103:21, 108:21
  113:9, 117:7
  120:14, 121:19
  125:16, 145:12
  167:20, 202:18
  206:20, 232:13
  237:10, 237:19
  265:9, 293:5
  307:20
live 130:24
  132:21
LLC 1:21, 348:21
  348:24
loan 127:20
local 272:23
  273:13, 275:10
  276:1, 276:5
  276:14, 277:22
  282:7
locate 201:19
lofty 286:1
logical 34:23
  87:1, 213:2
  273:11
long 14:4, 14:25
  27:19, 29:7
  30:12, 32:5

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 44:17, 49:7, 51:4 | 275:14, 296:7 | 105:5, 109:25 | 332:20 | 266:3, 270:18 |
| 51:6, 67:14 | 297:5, 312:23 | 110:20, 111:5 | **majority** 18:6 | 279:6, 282:11 |
| 118:2, 120:4 | 319:15, 319:16 | 112:10, 112:23 | 134:17, 134:19 | 282:23, 284:20 |
| 133:21, 133:24 | 319:16, 319:17 | 113:6, 120:16 | 173:1, 185:4 | 285:12, 292:20 |
| 135:19, 152:1 | 319:21 | 120:17, 168:23 | **making** 86:19 | 293:14, 294:13 |
| 161:11, 161:22 | **looked** 18:21 | 177:24, 187:18 | 86:19, 118:19 | 296:6, 298:15 |
| 175:15, 198:25 | 21:7, 21:9, 80:17 | 221:7, 259:3 | 132:23, 333:8 | 301:10, 303:6 |
| 243:11, 245:4 | 161:6, 162:10 | 259:8, 271:5 | **man** 141:13 | 304:22, 327:4 |
| 280:14, 285:1 | 162:11, 165:19 | 292:7, 293:18 | 180:24, 251:23 | 329:9, 331:10 |
| 299:24, 305:16 | 166:15, 174:16 | 297:16, 298:23 | **manage** 267:12 | 332:6, 332:25 |
| 325:23, 341:20 | 184:7, 206:15 | 304:2, 326:14 | **manager** 50:2 | 334:2, 335:10 |
| 346:1 | 206:22, 210:20 | 329:15, 332:9 | 50:6, 51:1, 51:15 | 336:13, 337:3 |
| **longer** 28:2 | 215:6, 218:14 | 335:25, 338:14 | 66:1, 284:18 | 337:25 |
| 28:23, 29:1, 30:4 | 245:15, 246:3 | **losses** 287:2 | **Manhattan** | **marked** 2:9, 5:1 |
| 165:24, 170:14 | 246:6, 246:6 | 292:5 | 130:23, 131:8 | 6:1, 74:8, 125:20 |
| 256:7, 260:8 | 246:14, 252:8 | **lost** 66:15, 105:17 | 132:17, 132:21 | 166:25, 186:18 |
| **longwinded** 307:1 | 255:14, 256:10 | 227:25, 228:1 | 139:17, 140:22 | 187:25, 202:4 |
| **look** 13:18, 23:20 | 308:4, 308:6 | 336:8 | **manner** 95:21 | 210:13, 213:6 |
| 39:1, 43:7, 44:9 | 317:17 | **lot** 45:4, 70:21 | 193:14, 251:6 | 214:6, 221:4 |
| 53:5, 53:8, 54:10 | **looking** 10:11 | 78:21, 78:22 | 343:5 | 223:15, 225:3 |
| 66:11, 72:15 | 10:17, 31:9 | 82:16, 128:13 | **March** 1:18, 7:3 | 228:4, 238:19 |
| 80:16, 83:9, 86:1 | 45:14, 55:23 | 134:21, 143:11 | 8:1, 8:13, 347:9 | 244:12, 265:8 |
| 86:23, 87:24 | 56:21, 57:18 | 159:7, 181:4 | **MARICOPA** | 266:6, 267:2 |
| 89:4, 90:6, 90:12 | 60:20, 73:23 | 182:4, 183:19 | 348:2 | 284:25, 285:21 |
| 90:13, 90:25 | 94:25, 160:14 | 200:18, 226:24 | **mark** 13:16 | 294:3, 296:15 |
| 104:21, 120:1 | 173:13, 206:13 | 247:5, 252:9 | 16:18, 17:21 | 305:2, 307:4 |
| 120:8, 122:25 | 240:15, 240:17 | 252:9, 252:19 | 22:19, 38:11 | 310:25, 316:23 |
| 123:2, 123:13 | 240:18, 241:5 | 252:24, 252:25 | 40:14, 46:25 | 320:2 |
| 125:3, 133:13 | 242:21, 245:12 | 253:2, 307:10 | 47:13, 53:23 | **market** 32:10 |
| 140:12, 147:24 | 245:15, 245:23 | **lots** 240:23 | 60:18, 63:16 | 85:2, 127:7 |
| 148:15, 154:12 | 246:10, 246:12 | **low** 117:24 | 63:23, 65:13 | 180:2, 181:12 |
| 160:23, 161:4 | 254:23, 272:16 | **lower** 117:7 | 81:20, 89:21 | 182:5, 204:7 |
| 162:3, 162:9 | 296:11, 307:8 | 117:18, 140:11 | 115:23, 118:13 | 205:17, 206:16 |
| 162:19, 164:4 | 319:6, 319:8 | 272:9, 298:12 | 151:7, 151:8 | 207:6, 209:18 |
| 164:15, 165:24 | 333:18 | 300:16 | 151:11, 153:25 | 295:10, 304:2 |
| 167:16, 169:24 | **looks** 95:10 | **ludicrous** 341:24 | 165:5, 193:6 | 304:15 |
| 170:23, 181:10 | 238:21, 239:3 | | 193:16, 195:12 | **marketing** 32:2 |
| 191:14, 191:15 | 239:3, 239:4 | **M** | 198:4, 201:5 | 32:4, 32:13 |
| 201:16, 203:24 | 246:4, 246:15 | | 211:9, 212:13 | 32:15 |
| 206:2, 206:14 | 294:25, 298:10 | **MacCollum** | 214:24, 215:8 | **marketplace** |
| 209:2, 211:3 | 300:13, 313:25 | 84:20, 85:10 | 216:19, 217:6 | 178:4 |
| 221:23, 223:4 | 315:2 | 85:17 | 217:12, 217:19 | **Markey** 295:16 |
| 240:10, 240:25 | **lose** 96:15 | **maintain** 44:19 | 218:4, 218:11 | 295:17, 295:18 |
| 242:14, 242:16 | **loss** 48:7, 57:5 | 44:24, 45:1 | 218:18, 219:6 | **married** 184:4 |
| 245:9, 245:25 | 57:8, 57:12 | 45:11, 97:12 | 220:13, 222:24 | **mass** 32:10 |
| 246:8, 247:12 | 57:20, 58:1, 58:2 | **maintained** 45:11 | 223:18, 227:24 | **master** 39:2, 39:3 |
| 253:9, 255:19 | 58:5, 68:23 | 126:11 | 231:23, 233:18 | **master's** 23:8 |
| 257:2, 257:16 | 80:19, 83:13 | **maintains** 136:18 | 236:13, 237:8 | **MasterCard** |
| 258:22, 260:7 | 86:5, 86:5, 105:3 | **major** 326:25 | 238:8, 238:15 | 139:11 |

DANIEL JAEGER   MARCH 02, 2023

**Masterpiece**
48:25, 52:6
52:10, 52:17
53:16, 53:16
53:18, 62:2, 62:2
120:3, 335:22
**material** 37:20
37:21, 42:14
48:6, 56:6, 58:5
60:24, 61:1
61:12, 61:16
61:18, 62:4
62:12, 63:2, 63:6
63:7, 64:21, 86:3
86:4, 86:19
86:20, 86:20
87:14, 87:15
88:6, 88:7, 90:8
90:16, 91:2, 91:3
93:3, 159:2
159:17, 159:21
161:10, 176:5
242:10, 243:6
246:9, 248:4
303:10, 323:11
**materials** 43:25
44:9, 279:12
**math** 202:11
**matter** 43:22
64:1, 87:2, 87:8
117:13, 173:3
277:2, 289:3
**matters** 93:8
**maxed** 319:18
**maximize** 247:14
**maximum** 121:3
121:6, 121:14
**mean** 15:20
20:24, 24:17
27:10, 30:20
32:3, 33:2, 34:21
43:2, 44:16, 47:3
47:18, 50:19
50:19, 50:23
52:12, 53:3, 54:4
54:5, 54:6, 54:25
62:13, 63:24
64:4, 65:22
66:13, 68:17

69:20, 71:2
77:14, 78:14
89:22, 89:23
91:20, 91:20
92:14, 101:23
106:3, 106:3
107:3, 131:24
141:10, 144:16
145:3, 152:18
157:9, 158:3
168:4, 169:6
171:13, 174:14
174:16, 177:17
177:21, 178:5
179:5, 184:7
184:20, 185:1
185:25, 188:10
199:13, 203:9
207:4, 213:25
227:7, 228:25
229:16, 229:17
239:6, 239:14
243:5, 247:4
251:17, 253:23
254:18, 258:22
261:22, 267:6
267:24, 268:2
271:2, 273:8
274:4, 274:25
278:1, 279:15
286:1, 286:2
286:8, 288:13
289:9, 289:16
290:11, 291:8
298:3, 304:6
305:12, 306:8
310:3, 320:12
320:17, 332:13
343:5, 343:20
344:22
**meaning** 147:3
335:16
**means** 18:4
27:11, 61:11
64:20, 75:2, 81:9
81:25, 82:6
105:15, 105:18
135:16, 135:17
158:17, 173:15

179:21, 232:22
232:25, 250:4
286:19, 310:14
310:21
**meant** 64:20
301:14, 310:19
**Media** 58:21
59:1, 94:4, 94:9
145:17, 145:22
200:9, 200:14
243:21, 244:1
271:12, 271:17
346:6
**medical** 30:24
**meet** 14:11, 81:23
95:5, 96:23
234:20, 308:4
**meeting** 14:17
15:15
**meetings** 14:22
15:7
**meets** 96:20
235:5
**member** 105:4
245:5, 318:10
**members** 317:25
**memories** 65:23
**memory** 10:13
306:9
**mention** 191:24
192:5, 194:3
196:7
**mentioned** 19:6
19:11, 23:10
144:9, 146:11
146:11, 234:2
281:14, 301:9
301:13
**mentions** 310:7
**merit** 36:20
**met** 33:25, 97:2
288:5
**method** 135:16
**Mexico** 248:20
**mic's** 163:10
**Michael** 7:12
8:23, 284:13
**mid-Atlantic**
49:18

**middle** 95:8
140:11
**Mike** 90:23
145:9, 163:8
243:11, 295:18
300:8, 342:5
**million** 72:19
73:10, 76:23
87:3, 116:15
116:17, 117:8
117:17, 118:3
118:6, 118:7
118:7, 119:9
119:10, 119:11
119:16, 122:7
122:24, 124:8
124:8, 124:20
126:10, 129:4
129:12, 130:8
130:12, 130:13
130:16, 130:23
131:9, 132:18
133:18, 133:19
134:7, 136:9
136:12, 139:18
140:7, 141:16
142:23, 144:1
146:7, 146:9
146:14, 148:6
149:20, 149:25
151:1, 153:13
153:21, 154:19
155:4, 156:15
157:12, 159:4
160:1, 162:1
169:5, 171:5
174:19, 176:21
177:23, 178:14
179:2, 179:23
207:10, 222:14
224:18, 226:3
229:9, 233:3
254:19, 255:3
256:13, 256:14
258:23, 259:2
269:24, 275:2
276:21, 286:14
298:13, 298:24
298:25, 303:19

303:20
**million-dollar**
256:19, 257:22
**millions** 132:11
132:11
**mind** 45:19
87:25, 118:17
127:24, 213:1
232:19, 233:3
243:9, 282:18
326:21, 334:25
**mindset** 215:2
**mine** 246:25
**mini** 202:6
**minimum** 78:23
**minor** 240:3
241:25
**minus** 130:4
**minute** 33:12
33:14, 38:14
38:15, 87:16
129:1, 149:18
161:13, 164:6
271:21, 282:5
337:22
**minutes** 58:15
145:12, 164:10
243:16, 292:18
334:20, 338:20
**misappropriation**
109:7
**mischaracterizat...**
189:19
**mischaracterizes**
226:14
**mislead** 192:5
**misleading** 126:3
126:6
**mispronounce**
256:14
**mispronouncing**
284:14
**misrep** 64:14
**misrepresent**
193:2
**misrepresentation**
37:21, 42:14
61:11, 61:17
62:3, 62:12

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 62:20, 63:2, 63:7 | 190:3, 332:16 | 136:20, 137:16 | 139:15, 139:16 | 106:12, 106:13 |
| 64:6, 64:17, 65:4 | **mistaken** 206:23 | 138:2, 138:3 | 140:2, 140:12 | 121:4, 122:8 |
| 65:10, 65:16 | **mistakes** 67:16 | 138:18, 139:13 | 140:13, 140:15 | 165:8, 165:13 |
| 83:11, 98:8 | 67:18, 247:5 | 309:9, 309:21 | 141:19, 142:17 | 166:3, 166:18 |
| 100:8, 164:20 | 247:21, 248:2 | 320:5, 321:9 | 142:17, 142:18 | 167:17, 167:23 |
| 188:21, 220:20 | **mixed** 80:7, 187:1 | **monthly** 127:14 | 142:22, 142:25 | 167:24, 169:21 |
| 270:8, 278:20 | 283:12 | 138:8, 139:2 | 143:19, 143:20 | 170:2, 170:25 |
| **misrepresentatio...** | **modifies** 61:5 | 145:2 | 143:24, 143:25 | 173:12, 173:14 |
| 48:5, 56:6, 86:3 | 61:5 | **months** 11:3, 29:9 | 144:3, 145:7 | 174:14, 174:17 |
| 86:20, 88:7, 90:7 | **mom** 76:18 | 29:12, 111:4 | 146:1, 146:6 | 176:20, 177:5 |
| 91:2, 159:17 | **moment** 20:19 | 112:2, 112:15 | 146:7, 146:8 | 195:8, 195:22 |
| 161:9, 256:2 | 37:15, 47:7 | 269:21, 279:18 | 146:12, 146:13 | 258:6, 259:2 |
| 323:12, 344:2 | 87:19, 162:21 | 279:21, 321:19 | 146:17, 146:18 | 259:10, 268:4 |
| **misrepresented** | 166:2, 204:20 | 325:12 | 147:1, 147:2 | 268:12, 297:9 |
| 60:23, 61:1, 61:6 | 229:1, 229:8 | **Moon** 7:11, 8:23 | 147:18, 148:3 | 297:15, 320:19 |
| 62:17, 64:21 | 229:16, 229:21 | **Moore** 225:7 | 148:5, 148:16 | 323:17, 323:17 |
| 65:21, 80:24 | 230:5, 230:11 | 226:1, 228:6 | 149:10, 149:19 | 333:13, 333:14 |
| 81:13, 87:14 | 230:13, 231:1 | 294:10, 294:14 | 149:24, 150:9 | **mouth** 301:19 |
| 90:2, 90:15, 93:2 | 231:8, 231:10 | 295:1, 295:9 | 150:17, 150:25 | **move** 16:19, 19:9 |
| 116:7, 116:9 | 231:17, 232:1 | 295:15, 296:19 | 153:3, 153:4 | 20:4, 40:14, 71:8 |
| 159:20, 176:5 | 233:12, 233:12 | 296:25, 320:4 | 153:4, 153:11 | 95:19, 106:22 |
| **misrepresenting** | 233:14, 234:1 | **morning** 201:18 | 153:12, 153:16 | 112:19, 124:10 |
| 82:8, 159:1 | 234:2, 234:11 | 201:23 | 153:18, 153:21 | 130:1, 132:25 |
| **misrepresents** | 234:20, 235:15 | **mother** 67:9 | 153:21, 154:19 | 138:21, 139:23 |
| 58:5 | 235:22, 236:4 | 67:13, 67:20 | 154:24, 155:3 | 141:3, 143:2 |
| **missed** 266:12 | 237:1, 237:12 | 70:15, 77:19 | 155:5, 156:14 | 144:6, 146:21 |
| 266:21 | 237:25, 238:2 | 171:19, 201:13 | 156:17, 156:22 | 162:4, 162:25 |
| **missing** 256:8 | 308:6, 314:7 | 204:3, 341:2 | 156:25, 157:12 | 164:1, 178:21 |
| 295:12, 321:11 | 314:12, 314:16 | **mother's** 316:8 | 158:11, 158:17 | 179:11, 185:21 |
| **misstate** 192:20 | 315:12, 315:16 | 334:8, 335:18 | 158:20, 159:3 | 186:12, 205:8 |
| 193:1, 198:17 | 316:5, 316:15 | **motion** 94:23 | 159:4, 159:5 | 208:24, 250:5 |
| **misstated** 65:21 | 316:15, 323:14 | 95:5, 95:10, 96:8 | 160:1, 162:1 | 255:21, 259:19 |
| **misstates** 38:6 | 333:2, 333:2 | 96:19, 152:3 | 162:10, 164:22 | 261:3, 283:14 |
| 42:10, 46:1, 68:6 | 333:9, 334:14 | 156:8, 271:8 | 164:23, 164:24 | 299:21, 300:3 |
| 86:10, 91:13 | 341:18 | **motivation** | 164:25, 278:10 | 308:25, 315:9 |
| 92:9, 151:4 | **moments** 333:19 | 154:14, 157:3 | 319:7 | 316:2, 325:20 |
| 192:17, 193:10 | **Monday** 15:23 | **motivations** | **motives** 123:6 | 326:3, 327:1 |
| 196:4, 203:12 | 16:5, 16:6, 16:7 | 150:12, 154:3 | 123:18, 123:18 | 330:18, 332:20 |
| 337:1 | **money** 126:8 | 159:1 | 123:20, 123:20 | 332:23, 335:9 |
| **misstating** 193:13 | 126:13, 127:9 | **motive** 122:14 | 124:25, 135:2 | 338:24, 343:12 |
| **mistake** 29:4 | 127:12, 127:16 | 122:14, 122:17 | 136:4, 140:17 | **moved** 167:9 |
| 75:14, 75:15 | 135:3, 140:14 | 122:22, 122:25 | 144:16, 145:4 | 178:9, 249:5 |
| 76:22, 77:6 | 143:11, 144:13 | 123:1, 123:7 | 147:4, 157:19 | 249:14, 250:2 |
| 77:18, 77:23 | 144:25, 147:3 | 123:13, 123:14 | 164:13 | 255:24, 321:25 |
| 79:16, 79:18 | 159:7, 289:2 | 123:21, 123:24 | **Mouse** 2:12 | **movies** 12:4 |
| 80:1, 80:1, 172:6 | **Monica** 169:7 | 124:2, 133:16 | 70:25, 73:4, 73:8 | **moving** 96:9 |
| 172:9, 173:7 | 171:21, 184:13 | 134:4, 135:3 | 75:13, 83:25 | 224:20, 254:23 |
| 188:11, 188:19 | **month** 68:16 | 135:6, 135:12 | 84:22, 84:25 | 312:20 |
| 189:15, 189:25 | 111:4, 136:20 | 135:16, 135:18 | 85:11, 85:15 | **multiple** 32:6 |

DANIEL JAEGER   MARCH 02, 2023

71:11, 96:15
97:8, 150:16
155:9, 178:13
**Museum** 84:21
85:9, 85:14
85:18

**N**

**name** 8:20, 9:13
51:20, 58:24
94:7, 145:20
200:12, 243:24
271:15
**named** 168:13
**narrative** 71:23
155:20, 155:23
161:11, 161:22
179:17, 183:15
188:25, 189:9
204:19, 205:5
208:20, 227:1
259:14, 299:18
299:20
**narratives** 189:7
208:17, 209:13
330:16
**National** 1:7, 1:16
7:2, 8:10, 9:1
12:25, 13:6
283:11, 283:20
**nations** 141:24
**nature** 250:18
251:10
**NCIB** 283:11
283:17
**near** 131:20
**nearby** 131:21
**nearly** 91:25
**necessarily** 18:6
126:8, 126:13
127:3, 127:7
128:9, 135:9
135:12, 136:5
148:18, 158:14
162:9, 164:17
175:19, 225:13
236:16, 242:16
243:5, 246:9

260:18, 268:8
278:6, 287:20
289:22, 319:15
**necessary** 20:9
20:13, 20:18
21:14, 22:3
22:16, 62:19
94:22, 96:8
123:24, 146:17
158:24, 185:21
287:21, 312:4
**need** 26:3, 28:20
30:19, 40:5
47:11, 50:17
53:5, 53:8, 58:12
62:11, 66:11
106:8, 106:9
118:10, 120:9
135:25, 145:1
150:11, 197:16
197:19, 198:2
203:24, 211:3
249:7, 264:1
267:19, 269:12
272:9, 292:11
293:5, 318:7
322:25, 325:16
327:19, 329:13
336:16
**needed** 135:3
135:4, 135:4
142:4, 144:14
262:20
**needs** 36:22
40:18, 59:12
59:24, 59:25
72:4, 187:21
238:13, 248:2
**nefarious** 281:22
**negatives** 4:5
316:21, 319:6
319:9
**neighbors** 239:5
246:16
**neither** 80:18
173:4
**net** 2:10, 124:7
124:19, 125:3
125:9, 126:10

126:16, 126:23
128:18, 129:18
129:24, 130:3
130:6, 130:15
133:17, 136:9
138:10, 138:13
138:15, 138:16
140:21, 142:21
144:1, 153:13
154:18, 156:15
178:14, 179:24
**neutral** 290:20
291:21
**never** 70:5, 70:14
70:16, 83:18
83:19, 85:20
87:5, 95:2
100:13, 100:18
103:1, 106:12
106:19, 116:11
139:15, 146:16
149:22, 149:23
166:11, 166:13
169:19, 170:2
173:15, 174:15
176:7, 180:12
183:6, 183:6
183:8, 184:16
189:25, 190:9
204:20, 209:9
209:10, 209:12
230:23, 249:2
249:14, 257:24
258:1, 258:10
258:22, 260:14
279:22, 280:10
305:19, 305:22
310:12, 324:13
327:12, 327:19
327:20
**new** 24:7, 30:11
30:18, 31:14
31:16, 31:19
31:19, 50:18
102:20, 103:15
110:16, 110:18
111:12, 111:18
111:24, 131:20
131:21, 132:1

132:12, 133:5
133:9, 133:10
218:23, 223:14
274:20, 275:1
275:17
**next-to-the-last**
167:18
**NICB** 283:10
283:12, 283:13
283:17, 283:18
283:22, 284:4
**nominal** 134:14
**nonargumentative**
198:16
**noncooperation**
104:6, 104:8
**nonexistent**
173:16, 176:19
**nonintentional**
64:6
**nonissue** 240:25
**nonloaded** 198:17
**nonpayable** 338:9
**nonresponsive**
222:16, 250:25
338:20
**normal** 26:7
26:15, 27:5
127:16, 187:12
217:16, 269:16
275:22, 280:16
303:11, 317:5
**normally** 158:10
158:12, 184:23
240:2, 242:15
274:10, 276:22
277:4, 289:17
292:16, 292:22
292:25, 293:1
293:9, 293:10
298:11
**North** 1:22, 7:12
7:17, 7:23, 8:15
8:18, 51:11
51:12, 51:15
332:3
**northeast** 131:21
**northern** 30:18
**note** 2:20, 3:4, 3:6

3:8, 3:17, 3:19
4:5, 4:7, 210:7
210:14, 210:17
221:2, 221:16
221:21, 224:25
225:4, 226:12
226:17, 241:13
284:23, 285:19
285:22, 297:7
316:20, 316:24
317:2, 319:24
**noted** 225:18
239:25, 240:9
**notes** 167:2
167:3, 217:3
224:11
**notice** 13:11
13:18, 14:16
20:14, 22:18
68:23, 110:23
221:7, 265:5
**notification**
109:24, 110:13
110:17, 110:19
**notify** 110:20
**noting** 226:7
**notion** 141:23
**November** 49:9
53:12
**number** 8:9, 9:25
58:21, 59:1, 68:3
69:1, 73:13
73:16, 76:10
78:20, 79:4
84:24, 94:4, 94:9
96:12, 96:16
96:17, 117:14
117:15, 117:18
118:1, 125:5
125:19, 127:5
127:15, 129:4
130:6, 130:12
145:17, 145:22
166:24, 170:23
171:19, 186:17
187:24, 191:7
191:12, 192:14
196:9, 200:9
200:14, 202:3

DANIEL JAEGER   MARCH 02, 2023

203:20, 206:3
210:12, 213:5
214:5, 221:3
223:20, 225:2
228:3, 238:18
241:20, 241:22
243:21, 244:1
244:11, 252:23
256:25, 258:14
267:1, 271:12
271:17, 276:22
284:24, 285:20
288:18, 289:14
294:2, 296:14
299:4, 300:16
303:15, 303:17
305:1, 307:3
308:9, 308:10
316:22, 319:24
320:1, 320:13
321:4, 321:11
333:12, 340:22
346:6
**numbered** 194:3
196:14, 203:3
324:12, 324:16
328:20, 329:1
**numbers** 54:6
83:25, 129:3
131:17, 133:8
202:6, 254:24
272:6
**numerous** 52:21
83:8, 83:13
86:17, 90:7
164:11, 265:16
**NuPulseCV**
126:9, 126:13

### O

**oath** 12:2, 98:20
102:13, 113:12
134:24, 185:22
205:18, 339:10
**Oberg** 7:16, 9:1
**object** 12:12, 15:9
15:25, 16:10
17:3, 17:11, 19:8

25:11, 25:22
26:16, 28:6, 28:9
29:24, 30:7, 34:9
34:18, 35:8, 36:7
36:17, 40:19
42:9, 44:22
45:25, 46:15
47:9, 50:13
50:22, 53:20
54:21, 55:17
55:25, 56:15
56:25, 57:23
59:16, 60:1
60:11, 61:7
61:19, 62:6
62:22, 63:10
64:9, 66:2, 66:17
66:24, 68:5
68:18, 69:21
69:22, 71:4
71:18, 72:2, 73:5
75:8, 75:18, 76:6
76:25, 77:24
77:25, 78:18
79:20, 81:2
81:15, 82:2, 82:2
82:12, 82:12
88:17, 89:16
92:8, 92:8, 92:19
98:14, 98:25
100:1, 102:3
103:9, 104:2
106:21, 106:21
107:9, 107:23
108:17, 110:7
110:24, 111:9
111:20, 112:6
114:1, 114:8
114:19, 115:9
118:9, 120:21
121:8, 121:24
123:3, 126:4
128:20, 129:5
129:13, 129:25
130:9, 130:17
131:1, 132:3
132:24, 132:24
134:9, 139:22
139:22, 141:2

141:21, 141:21
141:22, 143:1
143:1, 144:5
144:5, 146:20
146:20, 147:12
148:8, 148:8
149:2, 149:2
150:2, 151:3
151:3, 153:23
154:9, 154:21
155:6, 156:18
157:15, 159:10
160:5, 162:4
162:22, 163:2
164:8, 165:10
167:12, 168:8
169:10, 170:6
171:7, 172:11
172:14, 173:21
174:24, 174:24
176:11, 176:24
178:20, 178:20
179:10, 179:11
180:6, 186:7
187:15, 188:15
189:18, 189:18
189:19, 190:6
190:22, 191:8
192:2, 192:7
192:16, 194:11
194:14, 194:15
196:3, 196:3
200:21, 201:10
204:23, 206:19
207:11, 209:19
209:19, 211:18
212:8, 214:23
222:9, 222:23
223:17, 227:3
228:16, 229:5
230:17, 231:21
232:24, 233:5
233:6, 242:4
245:2, 247:23
249:21, 250:8
264:23, 268:7
270:2, 273:15
275:12, 276:17
276:25, 279:24

282:9, 290:15
290:23, 291:25
292:19, 297:2
305:24, 306:15
307:6, 314:4
317:21, 318:18
322:18, 324:23
340:7, 340:20
341:4
**objecting** 152:8
**objection** 11:17
11:23, 12:15
13:12, 17:18
20:4, 33:19
36:24, 37:7
37:16, 38:6
38:20, 41:12
58:11, 86:10
90:21, 91:13
93:11, 99:9
99:17, 116:21
124:10, 138:20
151:15, 185:13
193:11, 195:10
195:11, 196:23
197:15, 197:25
199:23, 203:12
208:22, 215:7
215:19, 216:18
219:11, 224:1
224:9, 226:14
229:18, 231:4
233:17, 234:5
234:22, 235:18
236:10, 237:6
238:6, 239:8
241:7, 245:20
247:7, 249:9
252:11, 254:5
255:15, 256:23
259:6, 261:3
265:11, 269:3
274:12, 279:4
281:3, 281:9
281:17, 282:21
283:14, 286:4
289:4, 289:19
293:13, 294:12
296:5, 297:17

300:21, 301:15
301:23, 302:12
303:4, 303:22
304:8, 308:25
309:11, 310:16
312:15, 314:19
315:8, 316:1
318:25, 319:11
320:8, 320:23
321:16, 323:23
326:2, 327:2
328:11, 330:2
330:18, 331:8
332:4, 332:22
333:25, 335:8
336:11, 337:1
337:23, 337:24
341:6, 344:6
344:18
**objections** 11:9
11:11, 39:3, 40:4
94:18, 151:10
152:7, 152:11
152:18, 155:16
155:19, 192:23
**objective** 295:12
**obligation** 214:14
270:23
**obligations**
133:12, 203:18
348:14, 348:21
**obtain** 84:17
144:11, 291:3
318:8
**obtained** 18:22
21:20, 68:10
82:17, 88:22
159:18, 160:15
161:7, 164:18
165:2, 175:3
**obtaining** 182:3
182:4, 182:6
225:23, 291:6
**obvious** 60:20
61:4, 98:17
106:18, 159:5
159:25, 161:25
256:21, 311:8
311:15, 311:17

321:8
obviously 13:17
23:6, 25:25
27:11, 32:5
44:17, 49:12
50:24, 54:4
59:21, 65:4
67:14, 70:21
114:14, 134:18
152:20, 156:1
156:8, 177:16
178:12, 199:13
222:18, 225:10
227:15, 247:11
252:7, 267:4
267:24, 288:14
occasion 292:25
occasions 83:13
occur 15:7
279:15, 279:20
279:21, 279:23
occurred 70:2
95:11, 180:12
188:8, 215:23
229:7, 236:17
257:24, 258:1
259:3, 260:20
263:24
occurrence
108:25
occurrences
109:17, 109:18
occurring 314:10
322:2
October 27:21
odd 208:6
offense 240:3
242:25
offenses 239:4
242:14, 242:16
245:16, 245:16
246:7, 246:8
246:16, 317:7
317:8
offer 336:18
offered 127:22
offers 101:16
office 31:18, 94:1
191:18, 244:18

247:17, 273:22
275:1, 275:10
276:7
oh 12:18, 44:6
51:25, 74:7
77:13, 116:12
118:11, 155:10
166:22, 171:3
175:13, 180:21
188:4, 192:13
193:9, 194:20
195:20, 205:15
236:13, 241:20
241:21, 244:8
266:23, 272:8
278:25, 296:11
304:25
okay 9:21, 11:8
11:14, 11:24
12:9, 13:16
13:22, 14:24
15:20, 16:9
17:15, 19:3
20:16, 20:22
22:19, 24:8, 27:7
27:17, 27:22
28:14, 29:6
29:11, 29:21
30:3, 30:19
31:14, 31:22
32:17, 33:3, 33:4
34:13, 35:2
35:13, 41:22
42:5, 42:22, 43:2
43:7, 43:15, 44:7
45:13, 46:10
46:24, 48:16
48:19, 49:7, 51:4
51:17, 51:19
52:16, 53:23
53:24, 54:10
54:14, 57:15
59:4, 59:6, 64:19
67:14, 69:11
69:16, 71:8, 73:2
73:20, 74:9
74:11, 74:19
74:24, 75:11
75:12, 76:15

77:16, 80:20
81:21, 89:5
91:19, 92:3
93:21, 97:20
97:23, 98:2, 98:7
98:17, 99:5
101:4, 101:5
101:21, 101:25
102:7, 103:3
104:24, 105:23
107:15, 107:19
108:3, 108:11
108:20, 108:23
111:3, 111:17
113:3, 115:23
119:6, 120:14
120:15, 121:12
121:16, 122:10
123:12, 125:8
125:10, 125:11
125:15, 126:2
139:14, 141:9
142:16, 145:25
146:6, 148:3
149:17, 150:15
151:14, 153:10
157:6, 157:25
158:1, 159:23
162:17, 165:5
167:1, 168:2
177:12, 179:1
179:10, 180:11
182:14, 182:16
183:17, 186:19
187:2, 188:1
191:16, 201:5
202:5, 202:8
202:25, 203:3
205:13, 206:4
206:6, 206:9
210:6, 210:14
211:9, 213:3
213:18, 214:7
214:18, 217:14
221:1, 221:5
223:23, 224:24
228:5, 230:8
232:10, 232:12
232:16, 232:21

233:22, 238:15
238:16, 238:20
239:20, 241:22
243:17, 244:13
246:14, 248:6
249:6, 250:16
251:25, 252:6
253:9, 254:15
255:1, 256:8
262:22, 264:5
266:23, 267:3
267:13, 271:6
271:23, 272:15
275:20, 276:11
279:9, 279:14
280:25, 282:4
282:17, 283:8
285:8, 285:17
286:21, 287:14
288:25, 293:8
294:8, 295:8
295:21, 296:13
296:23, 297:5
298:5, 298:9
299:19, 300:10
305:3, 306:20
307:14, 307:22
308:8, 308:9
311:20, 312:1
312:3, 312:23
313:1, 313:5
313:22, 316:18
316:24, 318:14
320:3, 320:17
323:15, 325:5
325:10, 327:11
330:12, 341:15
346:1
ol 320:19
old 288:15
once 95:2, 211:11
213:14, 305:19
305:22
ones 21:12, 79:10
90:7, 160:24
194:22, 194:23
241:14, 328:7
328:9
ongoing 262:3

262:6, 263:3
270:9, 305:13
open 85:2, 181:12
204:7, 205:17
213:1, 213:1
operating 239:16
242:12, 245:17
245:18, 246:17
246:22, 246:24
246:25, 249:17
280:16, 317:8
317:19, 318:2
operation 51:11
operations 50:16
opinion 86:15
112:18, 116:17
289:23, 292:11
298:17, 302:1
302:2, 302:3
314:23
opinions 88:24
343:18
opportunity
67:19, 67:22
135:16, 135:17
158:18, 208:2
opposite 92:5
92:17, 98:19
oppresses 95:22
oppressing 96:21
order 2:24, 3:3
3:16, 20:10
20:13, 22:11
22:17, 37:23
45:11, 63:8
64:16, 65:8, 96:1
106:9, 123:7
127:9, 128:3
140:15, 150:17
158:18, 168:6
230:6, 232:1
ordered 94:23
organization
237:3
organizations
30:22, 31:10
32:8, 32:9, 32:11
organized 30:15
30:17, 30:20

| | | | | |
|---|---|---|---|---|
| 30:22, 31:1, 31:3 | 174:9, 174:15 | 125:10, 167:18 | **paid** 35:15, 35:21 | **particular** 11:22 |
| **originally** 299:1 | 176:7, 181:25 | 191:15, 202:6 | 35:23, 36:1, 36:6 | 42:20, 53:7 |
| **outcome** 348:13 | 183:8, 183:8 | 202:6, 202:13 | 36:11, 36:15 | 53:25, 57:7 |
| **outline** 82:19 | 195:2, 229:14 | 202:16, 203:1 | 36:21, 40:18 | 57:21, 70:25 |
| **outlined** 14:15 | 248:9, 249:2 | 206:2, 206:3 | 43:17, 44:6 | 73:22, 95:17 |
| 198:24 | 254:3, 256:12 | 206:4, 206:9 | 45:16, 46:9 | 150:11, 158:22 |
| **outside** 32:10 | 257:9, 258:8 | 207:16, 209:3 | 46:14, 46:22 | 213:25, 273:6 |
| 51:11 | 258:25, 259:3 | 209:5, 209:6 | 47:6, 47:18 | 293:19 |
| **outstanding** | 259:4, 259:9 | 210:4, 213:8 | 77:23, 79:19 | **parties** 348:12 |
| 103:1, 319:16 | 259:12, 314:8 | 213:21, 238:23 | 119:9, 136:13 | **partly** 65:22 |
| **overall** 117:9 | 326:13, 333:13 | 239:22, 239:24 | 138:18, 139:1 | **parts** 55:20 |
| 126:10, 127:11 | 334:7, 335:15 | 241:16, 241:17 | 140:6, 173:16 | 56:18, 208:1 |
| 206:3, 329:18 | 337:11, 338:4 | 241:20, 241:22 | 173:18, 176:19 | **party** 50:1, 50:2 |
| **overlap** 20:11 | 338:13 | 241:22, 247:12 | 190:13, 220:4 | 50:6, 50:11, 51:1 |
| 21:25 | **owner** 128:1 | 247:13, 248:6 | 220:17, 220:22 | 95:19, 95:22 |
| **Overseas** 51:10 | 259:11, 348:24 | 250:7, 252:7 | 302:20, 331:4 | 248:19 |
| **overseen** 78:15 | **ownership** 90:8 | 253:16, 254:22 | **paper** 148:18 | **passage** 111:6 |
| **oversees** 275:6 | 106:9, 107:1 | 254:23, 255:2 | 184:14, 228:5 | **passed** 78:5 |
| **oversight** 170:23 | 159:21, 257:2 | 255:7, 257:23 | **paragraph** 271:8 | 84:12, 180:24 |
| 216:9, 273:19 | 257:8, 268:12 | 267:14, 267:14 | **paraphrase** 10:16 | **passing** 182:7 |
| 273:22, 273:24 | **owning** 78:8 | 271:22, 272:6 | 11:4 | **patience** 250:6 |
| 274:2, 274:17 | 255:11, 255:13 | 272:6, 272:12 | **paraphrasing** | 300:11 |
| 274:22, 276:4 | **owns** 131:15 | 272:13, 294:9 | 188:5 | **pay** 34:24, 35:23 |
| 277:6, 277:9 | 184:8 | 306:10, 306:13 | **parents** 82:25 | 105:3, 124:25 |
| 277:15, 279:14 | | 307:12, 307:13 | 83:16 | 134:8, 136:1 |
| 279:20, 279:21 | | 307:16, 307:17 | **parrot** 162:18 | 138:3, 139:6 |
| 280:5, 280:12 | **P** | 307:25, 308:11 | **parrots** 167:4 | 145:2, 185:5 |
| 280:19, 281:24 | | 308:14, 311:20 | **part** 32:14, 43:11 | 219:24, 232:2 |
| **Oversights** | **P.C** 7:16 | 312:4, 312:23 | 55:16, 60:21 | 298:24, 299:10 |
| 277:15 | **p.m** 94:6, 94:10 | **page)(CHUBB-...** | 62:4, 99:3, 102:8 | 303:21, 329:6 |
| **owed** 217:24 | 145:16, 145:19 | 3:7, 3:18, 3:20 | 102:9, 117:9 | 331:25, 333:23 |
| 218:6, 218:13 | 145:19, 145:23 | 3:24, 4:5 | 122:8, 136:6 | 334:13, 335:3 |
| 219:4, 334:17 | 200:8, 200:11 | **page)(CHUBB-...** | 150:22, 164:15 | 336:2 |
| **owes** 139:4 | 200:11, 200:15 | 2:21, 3:5, 3:9 | 166:14, 184:15 | **payable** 41:2 |
| **owned** 70:5, 70:6 | 243:20, 243:23 | **page)(Crystal** | 219:3, 225:7 | 41:2, 41:4 |
| 70:8, 70:14 | 243:23, 244:2 | 4:22 | 225:15, 229:10 | 117:16, 117:16 |
| 70:16, 70:17 | 271:11, 271:14 | **pages** 2:10, 2:13 | 231:9, 241:12 | 298:21, 298:23 |
| 80:10, 80:13 | 271:14, 271:18 | 2:19, 2:23, 3:2 | 242:17, 249:10 | 299:10, 302:20 |
| 80:19, 83:7, 84:3 | 346:5, 346:9 | 3:15, 4:1, 4:7 | 249:24, 263:10 | 330:25, 331:16 |
| 84:5, 87:5, 87:6 | **page** 2:2, 5:2, 5:2 | 4:18, 54:7 | 266:20, 272:18 | 334:13, 338:8 |
| 87:8, 100:11 | 6:2, 6:2, 6:2, 10:2 | 305:17, 305:17 | 279:10, 280:19 | **paying** 43:21 |
| 100:13, 100:17 | 42:16, 51:21 | 339:7, 348:6 | 284:17, 286:24 | 138:6, 139:10 |
| 100:18, 106:12 | 53:4, 53:5, 53:17 | **pages)(ALTSCH...** | 295:3, 295:19 | 172:9, 233:2 |
| 106:19, 116:11 | 63:5, 74:21 | 4:14, 4:23 | 299:5, 307:11 | 333:22 |
| 168:4, 168:24 | 101:6, 102:9 | **pages)(CHUBB-...** | 318:3, 319:14 | **payment** 319:17 |
| 170:2, 170:20 | 108:21, 108:24 | 3:22, 4:3 | 344:17 | **pays** 136:20 |
| 171:24, 173:5 | 109:9, 109:17 | **pages)(CHUBB-...** | **partial** 21:10 | **pecuniary** 106:3 |
| 173:8, 173:9 | 113:6, 113:18 | 2:17, 3:11, 3:13 | 21:11, 21:15 | **penalties** 12:6 |
| 173:15, 174:5 | 115:24, 115:25 | 4:20 | 21:17, 22:2 | **penalty** 96:15 |
| | 121:2, 121:13 | | | |

347:9
**pending** 243:7
**Pennsylvania**
273:21, 276:6
276:7
**people** 66:6, 66:7
79:11, 98:7
124:22, 127:16
131:24, 131:25
132:9, 132:10
135:20, 139:20
140:10, 140:11
140:12, 141:6
142:2, 142:14
143:10, 143:14
144:19, 144:20
145:4, 148:17
160:16, 160:17
165:22, 175:12
181:4, 182:5
182:9, 224:6
236:20, 237:2
237:18, 237:22
240:23, 290:1
290:9, 291:5
299:25, 316:9
331:15
**people's** 65:23
**perfect** 10:12
65:24, 74:17
83:20
**perfectly** 65:25
**performed**
247:15
**period** 85:16
109:11, 290:4
**perjury** 12:6
347:9
**person** 50:20
51:2, 60:23, 62:5
62:15, 86:2
87:17, 88:9
89:23, 90:19
91:6, 93:8, 94:20
98:12, 99:23
123:1, 126:1
127:13, 133:21
141:10, 174:8
255:22, 332:3

339:19
**personal** 24:5
24:9, 27:15
28:17, 32:12
**pertains** 242:18
**Ph.D** 23:8
**Phoenix** 1:17, 7:4
7:13, 7:18, 7:24
8:1, 8:19, 58:25
84:15, 94:8
145:21, 180:23
182:22, 200:13
243:25, 271:16
348:15
**phone** 94:1, 191:5
206:25
**photograph**
84:19, 180:18
**photographs**
80:13, 84:18
335:17
**phrase** 12:3, 35:4
45:19, 47:2, 47:3
47:5, 47:18
71:15, 232:17
232:19
**pick** 43:11, 49:2
97:24, 232:21
**picked** 257:21
**picks** 202:16
**picture** 84:20
**pictures** 322:10
**piece** 80:21
126:22, 133:7
144:12, 254:18
254:19, 254:20
254:20, 255:3
256:19
**piecemeal** 102:10
**pieces** 167:24
178:3, 178:9
205:16, 207:23
209:2, 209:17
**PILR** 271:24
271:25
**Pima** 2:17
187:23, 191:5
**pin** 107:16
121:13, 131:19

136:15, 137:2
139:14, 142:13
143:19, 146:3
146:12, 150:19
229:15
**pinpoint** 136:5
145:6
**PIP** 27:17, 28:19
28:20
**place** 15:6, 15:17
15:21, 41:10
109:18, 158:25
**placed** 118:16
**plaintiff** 1:5, 7:10
8:9, 8:24
**plaintiff's** 8:21
186:24
**plan** 168:6
**planet** 10:15
50:12
**plausible** 65:20
76:22, 147:4
154:3, 154:7
154:13, 170:25
**play** 232:6, 232:8
250:24, 251:5
338:21
**played** 103:22
**playing** 233:10
234:18
**please** 8:22, 9:14
22:19, 38:7, 38:9
38:11, 38:23
40:2, 40:7, 40:14
42:15, 42:17
46:25, 47:13
53:23, 59:5
60:18, 63:23
81:20, 89:21
93:13, 93:20
115:23, 125:10
151:6, 151:8
157:7, 178:24
200:1, 201:5
202:7, 211:9
212:13, 219:6
221:25, 238:15
250:7, 251:16
254:2, 257:3

281:10, 294:9
308:11, 326:10
327:24, 334:19
**plethora** 322:11
**PLLC** 7:11
**plus** 288:15
**point** 19:16
19:17, 21:21
28:3, 30:10
43:20, 51:9
51:12, 53:3, 53:9
62:18, 96:10
99:20, 151:12
158:5, 171:23
184:5, 185:7
186:9, 206:22
207:1, 209:13
221:21, 223:13
224:12, 226:8
227:7, 233:9
241:3, 241:4
248:9, 259:12
267:17, 280:23
283:5, 295:11
295:24, 306:9
318:14, 322:5
333:4
**pointed** 96:11
96:13, 208:25
**points** 295:15
**Poli** 2:4, 2:6, 5:1
7:11, 7:12, 8:23
8:23, 8:23, 9:12
12:14, 12:21
13:16, 13:17
15:16, 16:4
16:14, 16:17
16:21, 16:23
17:6, 17:15
17:21, 17:22
18:4, 19:3, 19:21
20:16, 21:10
22:9, 22:19
22:20, 25:15
26:4, 26:24, 28:7
28:15, 30:3
30:12, 34:5
34:13, 35:2
35:13, 36:12

36:22, 37:3
37:10, 37:25
38:9, 38:12
38:25, 39:6
39:16, 40:1, 40:7
40:10, 40:15
41:5, 41:15
41:22, 42:5
42:15, 42:18
42:21, 45:4
45:13, 46:10
46:18, 46:24
47:1, 47:12
47:16, 48:12
48:15, 50:19
51:4, 51:17
51:19, 53:23
53:24, 54:12
54:14, 54:25
55:22, 56:10
56:20, 57:12
58:14, 58:18
59:4, 59:6, 59:21
60:7, 60:18
60:19, 61:13
61:25, 62:13
63:1, 63:3, 63:15
63:17, 63:23
63:24, 64:19
65:7, 65:13
65:14, 66:13
66:19, 66:20
67:6, 67:18, 68:8
68:15, 69:11
70:19, 71:8
71:22, 72:15
72:17, 72:18
73:20, 73:25
74:7, 74:11
74:19, 74:22
75:11, 75:12
75:21, 76:15
77:13, 78:13
78:21, 78:22
79:2, 79:3, 80:20
81:9, 81:19
81:20, 81:21
82:4, 82:6, 82:11
82:16, 86:6

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 87:16, 88:9, 89:5 | 143:16, 145:10 | 191:3, 191:14 | 227:6, 227:10 | 269:21, 270:13 |
| 89:21, 89:22 | 145:14, 145:25 | 192:4, 192:11 | 227:13, 227:22 | 270:21, 271:6 |
| 91:5, 91:19 | 146:5, 147:5 | 192:19, 192:22 | 228:1, 228:5 | 271:20, 271:23 |
| 92:11, 92:13 | 148:3, 148:12 | 193:4, 193:17 | 228:19, 228:25 | 272:5, 272:10 |
| 92:24, 92:25 | 148:24, 149:5 | 193:19, 193:24 | 229:6, 229:15 | 272:13, 272:15 |
| 93:13, 93:16 | 149:8, 150:15 | 194:12, 195:15 | 229:20, 230:23 | 274:4, 274:25 |
| 93:20, 94:12 | 151:6, 151:9 | 195:16, 196:6 | 231:14, 232:6 | 275:20, 276:20 |
| 95:23, 96:10 | 151:21, 152:14 | 196:20, 197:3 | 232:25, 233:7 | 277:7, 277:11 |
| 97:6, 97:16, 98:2 | 152:17, 152:24 | 197:12, 197:17 | 233:10, 233:22 | 279:9, 280:8 |
| 98:3, 98:17, 99:5 | 153:1, 153:10 | 197:21, 198:5 | 235:1, 235:8 | 281:4, 281:14 |
| 99:14, 99:21 | 154:7, 154:15 | 198:9, 198:19 | 236:2, 236:21 | 282:4, 282:17 |
| 100:22, 101:3 | 155:2, 155:8 | 198:25, 199:8 | 237:20, 237:21 | 283:6, 283:17 |
| 101:5, 101:14 | 155:12, 155:16 | 199:10, 200:1 | 238:15, 238:20 | 284:12, 284:13 |
| 102:7, 102:9 | 155:21, 155:25 | 200:5, 200:17 | 238:23, 238:24 | 284:20, 285:1 |
| 103:20, 104:5 | 156:7, 156:13 | 201:2, 201:5 | 239:14, 239:22 | 285:15, 285:18 |
| 104:9, 104:22 | 156:24, 157:4 | 201:6, 201:16 | 239:24, 241:10 | 285:22, 286:8 |
| 104:24, 107:15 | 157:6, 157:18 | 201:23, 202:1 | 241:15, 241:21 | 288:12, 288:19 |
| 108:3, 108:20 | 157:24, 158:2 | 202:5, 202:9 | 241:23, 242:12 | 289:8, 289:15 |
| 109:9, 109:10 | 158:5, 159:23 | 202:12, 202:14 | 243:13, 243:17 | 289:23, 290:11 |
| 110:18, 111:3 | 160:8, 161:11 | 202:18, 202:21 | 244:4, 244:7 | 290:18, 291:8 |
| 111:13, 111:17 | 161:14, 162:15 | 203:1, 204:12 | 244:10, 244:13 | 291:20, 292:15 |
| 111:25, 112:12 | 162:17, 162:24 | 204:18, 205:4 | 245:7, 246:2 | 293:8, 293:15 |
| 113:3, 113:9 | 163:6, 163:12 | 205:13, 205:19 | 247:12, 248:6 | 293:25, 294:4 |
| 113:11, 113:22 | 163:16, 163:19 | 206:2, 206:5 | 248:8, 248:22 | 294:6, 294:8 |
| 114:4, 114:14 | 163:23, 164:13 | 206:21, 207:3 | 249:17, 249:22 | 294:10, 294:18 |
| 114:24, 115:14 | 165:5, 165:6 | 208:14, 208:25 | 250:4, 250:11 | 294:20, 296:7 |
| 115:23, 116:1 | 165:17, 166:1 | 210:6, 210:11 | 250:15, 250:20 | 296:12, 296:16 |
| 118:11, 118:22 | 166:17, 166:21 | 210:14, 211:9 | 250:22, 251:8 | 296:18, 297:5 |
| 119:6, 119:23 | 166:23, 167:1 | 211:10, 211:21 | 251:11, 251:15 | 297:7, 297:23 |
| 120:1, 120:10 | 167:15, 167:16 | 212:3, 212:13 | 251:18, 251:25 | 298:3, 299:18 |
| 120:14, 120:16 | 167:22, 169:6 | 212:14, 213:3 | 252:4, 252:6 | 299:23, 300:6 |
| 121:1, 121:12 | 169:13, 169:18 | 213:7, 214:2 | 252:17, 252:23 | 300:10, 300:12 |
| 121:22, 122:2 | 170:17, 170:24 | 214:7, 215:4 | 253:3, 253:9 | 300:24, 301:2 |
| 122:20, 123:12 | 171:18, 172:3 | 215:13, 215:24 | 253:16, 253:17 | 301:6, 301:8 |
| 125:3, 125:8 | 172:13, 172:18 | 216:8, 216:24 | 254:8, 254:15 | 301:10, 301:13 |
| 125:11, 125:15 | 173:11, 174:12 | 217:8, 217:14 | 256:8, 256:24 | 301:17, 301:18 |
| 125:17, 125:21 | 175:7, 176:8 | 217:23, 218:7 | 257:3, 257:4 | 302:6, 302:21 |
| 128:13, 128:25 | 176:14, 177:12 | 218:14, 218:21 | 258:21, 259:14 | 303:7, 303:14 |
| 129:10, 129:18 | 178:23, 178:25 | 219:3, 219:6 | 259:16, 261:6 | 304:6, 304:21 |
| 130:6, 130:13 | 179:9, 179:16 | 219:7, 219:14 | 261:9, 261:17 | 304:24, 305:3 |
| 130:22, 131:7 | 180:11, 181:4 | 219:18, 220:5 | 261:22, 262:7 | 306:8, 306:20 |
| 131:14, 131:19 | 183:19, 184:20 | 220:14, 220:18 | 262:22, 263:10 | 307:5, 307:7 |
| 132:14, 133:16 | 185:17, 185:18 | 221:1, 221:5 | 263:16, 264:18 | 307:8, 307:12 |
| 135:6, 136:24 | 185:19, 186:11 | 221:23, 222:1 | 265:3, 265:18 | 307:14, 307:18 |
| 137:11, 137:24 | 186:19, 186:25 | 222:16, 222:25 | 266:3, 266:9 | 308:11, 308:12 |
| 137:25, 139:14 | 187:2, 187:10 | 223:2, 223:22 | 266:12, 266:17 | 308:13, 308:15 |
| 140:10, 140:19 | 187:12, 187:22 | 224:4, 224:24 | 266:22, 266:25 | 309:4, 309:19 |
| 141:9, 142:2 | 188:1, 188:22 | 225:4, 226:18 | 267:3, 267:13 | 310:1, 310:22 |
| 142:16, 143:13 | 190:2, 190:17 | 226:19, 227:2 | 267:15, 268:22 | 311:5, 311:11 |

DANIEL JAEGER   MARCH 02, 2023

311:12, 311:20
312:3, 312:5
314:10, 315:1
315:17, 316:18
316:24, 317:2
318:1, 318:20
319:5, 319:23
320:3, 320:11
321:8, 322:6
323:3, 323:7
324:4, 324:10
324:12, 325:5
325:9, 325:19
326:9, 326:10
327:6, 327:10
328:19, 329:11
329:19, 330:7
330:10, 331:1
332:13, 333:18
334:14, 334:23
336:5, 336:20
337:6, 337:16
338:2, 338:19
339:5, 340:3
340:7, 340:20
341:4, 341:11
341:14, 342:8
342:9, 342:17
343:1, 343:10
343:20, 344:3
344:14, 344:21
344:22, 345:10
346:1
**Poli's** 95:16
141:22
**police** 2:17, 68:24
187:23, 194:7
194:8, 194:17
194:18, 194:25
195:2, 195:7
195:23, 195:24
196:7, 196:8
**policies** 52:24
56:11, 166:8
171:2
**policy** 4:13, 37:23
48:3, 48:9, 48:20
48:23, 48:25
51:21, 52:3, 53:1

55:5, 55:14
55:16, 55:21
56:3, 56:19, 57:9
57:11, 57:14
61:24, 62:10
62:25, 63:13
63:18, 64:17
66:21, 66:23
67:1, 67:3, 67:25
69:4, 69:8, 70:3
70:13, 71:13
71:14, 71:15
71:21, 71:25
72:6, 72:6, 72:14
72:16, 73:3, 73:3
73:7, 73:14
73:19, 73:21
73:22, 74:20
74:23, 75:5
75:16, 75:23
76:2, 76:10, 88:6
91:4, 100:18
103:18, 104:12
104:14, 104:16
104:19, 105:12
107:2, 107:7
107:13, 107:21
108:1, 108:4
108:14, 108:24
109:10, 109:11
109:13, 109:16
109:18, 109:21
112:10, 113:20
114:11, 115:13
117:20, 117:23
117:24, 118:8
119:8, 119:22
121:23, 127:6
142:11, 148:2
159:19, 161:8
162:14, 164:21
165:3, 166:12
168:17, 168:21
169:4, 170:12
170:18, 170:18
173:14, 175:11
175:15, 176:6
177:18, 177:19
183:12, 190:16

200:25, 222:7
222:15, 223:1
223:11, 223:15
224:7, 224:15
224:23, 226:4
228:15, 252:14
252:16, 255:24
257:17, 260:8
265:17, 266:2
267:22, 270:22
271:3, 287:6
298:22, 303:20
304:4, 304:20
308:16, 310:7
315:15, 321:4
321:22, 323:2
330:25, 331:16
335:25, 337:14
338:5
**poor** 96:22
180:24
**portion** 343:21
345:16
**portions** 89:8
89:11, 180:1
206:15, 207:5
339:5, 342:19
**posed** 149:18
198:20, 208:16
208:20
**posing** 209:15
**position** 32:17
33:6, 47:21
49:16, 50:4, 76:2
76:4, 76:24
82:20, 82:20
87:13, 88:23
94:16, 96:8
100:16, 101:17
101:18, 102:6
111:7, 119:4
156:12, 173:7
267:16, 267:18
281:20, 286:1
294:21, 323:1
331:5, 336:18
343:3
**possessed** 329:15
**possession** 321:7

**possibility** 133:24
134:2, 144:3
181:3
**possible** 18:20
41:18, 106:15
110:1, 110:20
139:7, 197:3
239:5, 263:11
**possibly** 204:16
341:23, 342:7
**post-graduate**
23:6, 23:7
**post-high** 22:20
**potential** 80:6
123:5, 123:18
135:2, 135:3
140:2, 140:17
143:24, 147:1
148:16, 150:14
164:13, 237:4
238:4, 262:14
263:18, 264:3
267:21, 268:14
268:18, 269:17
270:6, 270:7
270:10, 286:12
293:21, 299:7
**potentially** 34:3
37:22, 57:8
68:13, 102:16
119:16, 143:5
197:13, 240:22
258:19, 298:21
299:14, 332:15
336:15, 336:23
337:20
**PowerBar** 145:12
**practically** 36:2
**practice** 3:15
266:19, 269:16
**practices** 2:23
3:2, 34:7, 43:16
44:12, 213:9
213:19, 216:7
216:10, 268:1
272:3, 279:22
280:1
**precise** 81:10
344:3

**precisely** 96:6
**preclude** 97:12
**predicting** 149:5
**prefer** 203:15
**preferable** 43:21
**prejudice** 110:22
111:16, 111:18
111:19, 112:2
112:16
**prejudiced** 111:5
**premise** 35:18
325:9, 336:6
**premium** 119:9
**premiums** 333:22
**prep** 15:17
**preparation**
15:13, 19:1
19:19, 21:7, 22:9
**prepare** 13:23
13:24, 14:10
20:14, 22:11
289:13, 292:6
**prepared** 1:23
13:19, 14:15
18:8, 20:10
20:18, 21:15
22:4, 42:18
**prepares** 291:9
**preparing** 209:23
340:10
**present** 7:21
24:15, 25:2, 25:4
29:19, 94:23
257:10, 339:10
**presented** 20:8
80:3, 182:11
190:12, 242:19
251:19, 254:9
254:13, 316:12
322:13, 327:12
327:19, 327:21
331:22, 332:11
334:5, 334:6
340:23
**preserve** 94:22
263:3
**preserving** 11:10
11:16
**pressed** 11:14

DANIEL JAEGER   MARCH 02, 2023

pressure 319:7
presumably
  67:24, 102:21
pretty 9:25, 43:4
  48:23, 49:1, 79:4
  127:5, 132:1
  139:20, 178:3
  178:5, 184:10
  184:11, 195:15
  199:18, 207:9
  226:10, 232:14
  233:1, 239:16
  245:18, 247:21
  286:9, 287:11
  289:3, 305:16
  310:6, 317:24
  341:23, 342:14
previous 146:21
previously 177:3
  181:25
primarily 18:2
  18:4, 18:12, 32:8
  134:14, 242:21
primary 262:12
principal 106:8
principles 212:4
print 203:4, 348:8
printed 328:14
prints 72:20, 73:4
  83:14, 106:12
  106:13, 106:14
  106:19, 106:20
  122:8, 165:8
  165:13, 165:15
  166:3, 167:17
  168:3, 168:5
  170:2, 174:14
  174:17, 174:20
  176:20, 180:22
  190:19, 194:9
  195:8, 195:22
  195:25, 200:20
  207:20, 208:11
  258:6, 259:10
  268:4, 295:12
  297:10, 297:15
  308:21, 321:12
  324:19
prior 30:14

44:10, 56:7
73:24, 85:2, 85:4
86:4, 109:17
189:20, 195:9
205:2, 207:2
230:9, 240:17
241:5, 245:12
245:25, 249:11
249:24, 255:2
285:23, 305:15
307:16, 307:16
307:17, 308:16
312:4, 313:16
prison 133:21
133:25, 139:19
140:24, 141:18
142:24, 159:8
160:3, 162:2
179:3
Private 167:5
privilege 14:7
16:3, 16:11
16:12, 94:22
probably 9:25
15:4, 21:24
29:18, 40:12
48:19, 51:8, 52:3
63:22, 78:16
78:25, 91:21
102:19, 103:7
103:13, 134:1
134:3, 136:16
143:15, 165:19
167:1, 188:22
204:18, 230:9
236:7, 241:16
250:13, 256:14
262:12, 272:2
284:14, 288:17
problem 163:8
procedure 118:21
193:15, 239:16
242:13, 245:17
245:18, 246:17
246:23, 246:24
246:25, 249:18
275:9, 280:17
317:9, 317:19
318:2

procedures
247:13, 303:12
proceedings
348:4, 348:6
348:7
proceeds 269:1
process 15:6
15:16, 15:21
24:22, 27:6, 33:8
34:23, 34:25
35:3, 227:15
256:10
processed 26:25
processing 286:3
procurement
159:22
produce 84:18
124:18
produced 15:12
18:24, 19:17
67:22, 84:19
125:23, 169:19
producing 103:18
product 16:3
52:6, 52:10
52:17, 53:16
53:18, 62:2
production
102:10
professional
22:25
program 50:3
project 297:1
promoted 50:1
prompt 218:8
promptly 260:25
pronounce 257:1
proof 36:13
36:15, 36:22
42:8, 66:16
68:12, 69:14
69:19, 70:7, 70:9
70:17, 71:2, 78:8
78:9, 78:9, 80:6
80:8, 80:11
80:14, 80:15
80:17, 82:7, 83:7
84:5, 84:8, 84:14
85:22, 85:23

85:24, 87:6, 87:8
87:10, 90:9
100:11, 147:9
154:8, 159:15
166:13, 172:23
172:25, 173:5
180:16, 181:14
181:24, 182:4
182:6, 182:14
182:16, 182:23
183:9, 183:9
188:5, 191:1
191:13, 194:3
194:21, 195:3
196:8, 196:18
256:21, 291:19
306:5, 313:19
316:12, 321:6
321:6, 321:23
321:23, 322:9
322:14, 326:19
328:4, 328:5
328:25, 329:14
329:16, 331:2
333:12, 335:15
335:15, 335:17
337:11, 337:18
337:19, 338:4
338:12
proofs 328:13
proper 25:10
25:13, 25:19
26:5, 33:13
33:14, 39:22
215:17, 216:1
216:12, 216:15
217:1, 217:15
231:2, 231:19
251:7
properly 76:20
77:21, 82:21
230:6
properties 128:1
property 2:22
3:1, 22:24, 23:13
43:16, 44:12
49:17, 51:1
51:14, 79:5
105:4, 105:16

105:17, 105:20
242:21, 284:19
292:14, 345:8
345:8
prosecuted 134:1
143:9, 160:22
161:2
prosecutor
122:21, 275:10
protect 56:4, 97:4
protecting 97:13
protection 24:5
24:10, 27:15
28:18
PROTECTIVE
2:24, 3:3, 3:16
protects 57:16
provable 46:22
47:1, 47:2, 47:6
47:17, 47:19
prove 35:14, 36:4
36:14, 43:18
45:17, 46:12
56:22, 59:13
59:24, 59:25
60:8, 61:15
61:17, 81:12
81:19, 81:23
81:24, 123:24
123:25, 124:2
124:3, 126:2
126:5, 135:12
135:15, 140:15
145:7, 146:18
147:18, 148:4
148:7, 148:12
148:13, 148:18
148:22, 148:25
149:9, 149:14
149:23, 150:9
150:16, 150:24
153:21, 154:6
155:10, 157:10
158:18, 173:9
178:16, 254:2
256:11, 256:19
270:23, 270:23
270:24, 278:4
320:21, 326:20

DANIEL JAEGER   MARCH 02, 2023

**proven** 40:17
43:21, 77:6
190:4, 190:10
211:12, 211:16
212:1, 212:6
214:20, 216:14
219:22, 257:24
326:7, 329:21
332:17, 333:20
334:25, 336:7
336:22
**provenance** 84:6
90:11, 117:2
117:4, 117:9
171:20, 171:23
172:25, 181:10
181:17, 181:18
182:2, 182:20
196:11, 257:18
290:4, 291:15
292:12, 325:6
340:18, 340:23
**proverbial**
278:24
**proves** 43:17
258:5
**provide** 35:19
60:22, 67:20
73:7, 84:1
102:11, 136:14
171:19, 278:20
291:15, 319:3
333:16, 335:23
340:25
**provided** 14:14
20:11, 21:22
22:8, 22:11
22:13, 66:12
67:12, 69:1
77:10, 77:11
78:3, 78:7, 78:10
84:4, 85:4, 138:5
138:24, 139:1
139:9, 171:15
174:3, 174:8
175:5, 175:25
201:12, 204:3
204:4, 205:1
247:16, 250:1

319:3
**provides** 73:3
95:18, 117:21
117:24, 117:24
302:3, 309:17
**proving** 57:13
149:21, 150:5
150:22, 220:19
**provision** 37:23
48:4, 48:9, 53:25
55:23, 56:2
56:21, 57:9
57:14, 57:19
57:22, 59:7
59:22, 60:6
60:10, 60:16
61:14, 61:23
62:10, 62:15
63:20, 64:16
65:8, 80:22, 81:7
82:22, 88:6, 89:4
91:4, 105:1
105:10, 105:11
105:14, 107:1
107:7, 107:13
110:3, 110:5
113:5, 113:13
113:16, 113:23
114:15, 114:17
115:7, 115:12
115:18, 120:17
124:1, 135:11
142:11, 146:19
148:2, 150:18
158:24, 183:12
190:16, 263:23
264:4, 268:17
268:19, 269:11
269:13, 269:18
270:11, 270:16
270:20, 271:3
271:4, 278:9
344:13
**provisions** 48:25
107:21, 108:1
108:4, 108:14
108:22, 113:20
114:5, 114:12
**public** 239:13

243:1, 317:12
318:7, 318:9
**pull** 42:15, 48:12
101:3, 125:8
166:17, 186:13
187:22, 201:17
207:10, 213:3
**punitive** 235:10
235:16, 235:25
236:23, 237:4
237:14, 237:17
238:5, 238:13
281:1, 281:7
282:18, 282:25
**purchase** 144:13
180:18, 181:14
184:9, 184:12
328:17
**purchased** 51:8
83:14, 171:20
173:5, 182:15
183:18, 183:20
183:23, 195:4
196:18
**purchases** 184:5
**pure** 143:22
**purely** 232:1
**purported** 84:3
138:11, 166:10
284:3
**purportedly**
126:20
**purports** 44:13
128:23, 183:8
**purpose** 91:9
91:14
**pursuant** 22:17
273:11
**push** 253:4
**pushed** 137:5
**put** 60:8, 62:2
62:17, 76:16
77:21, 103:20
115:4, 115:6
115:16, 115:18
116:1, 116:6
119:1, 124:20
125:24, 135:7
136:24, 139:4

147:7, 148:5
150:24, 158:12
171:22, 181:23
220:9, 220:18
221:21, 223:20
225:19, 235:12
301:18, 306:10
317:2, 342:17
**putting** 200:18
235:3

## Q

**qualify** 183:25
**qualms** 343:17
**quasi-work-fro...**
31:20
**question** 10:3
11:18, 11:19
11:22, 16:1, 16:1
16:2, 16:10, 17:4
17:5, 17:19
17:19, 18:15
19:9, 26:8, 26:20
27:3, 38:7, 38:8
38:13, 38:24
39:5, 39:7, 39:8
39:14, 39:17
40:1, 40:3, 40:7
40:9, 40:11
40:20, 52:1
54:22, 55:18
56:1, 56:16, 57:1
57:24, 58:11
59:17, 60:2
60:12, 62:7, 63:4
64:10, 69:17
69:22, 72:3
75:19, 75:22
76:7, 76:9, 77:1
77:25, 78:14
79:14, 79:21
79:24, 81:3
81:10, 81:16
82:16, 91:15
92:10, 92:20
92:21, 92:23
93:13, 95:2, 96:4
96:15, 97:8

97:20, 98:17
100:2, 103:10
103:12, 106:24
107:11, 110:8
112:13, 115:15
118:10, 119:15
137:8, 141:3
141:25, 146:23
147:13, 149:4
149:18, 153:25
155:15, 155:24
157:23, 159:24
163:6, 163:10
164:11, 172:12
172:15, 178:24
179:8, 183:22
185:6, 185:8
189:1, 189:5
189:8, 189:9
189:12, 190:23
191:9, 192:3
192:8, 192:10
192:17, 194:15
195:19, 197:7
198:2, 198:10
198:17, 198:20
199:11, 199:12
199:25, 200:1
200:3, 203:2
204:19, 204:24
205:4, 205:23
207:18, 208:5
208:15, 208:17
208:20, 208:23
209:11, 209:15
211:22, 215:25
216:9, 226:11
226:16, 226:20
226:25, 231:15
233:6, 233:7
233:10, 234:13
234:16, 237:10
250:13, 251:5
259:24, 260:22
281:10, 283:23
289:13, 290:24
298:6, 299:22
300:5, 300:9
300:23, 301:5

DANIEL JAEGER  MARCH 02, 2023

302:21, 305:20
305:23, 309:20
310:23, 311:2
311:5, 311:7
311:10, 311:21
324:10, 326:21
327:9, 327:10
327:24, 328:24
328:25, 330:5
331:14, 334:25
336:22, 341:18
341:24, 342:2
342:3, 342:6
342:8, 342:10
342:18
**questioned** 85:3
**questioning** 250:3
292:13, 343:22
**questions** 14:15
18:9, 19:22
20:14, 22:17
39:2, 95:24, 96:3
96:6, 97:5, 97:19
97:25, 118:15
118:20, 118:20
124:14, 152:12
156:5, 185:15
197:4, 197:13
197:17, 197:21
197:23, 198:1
198:13, 199:1
199:3, 199:19
202:15, 209:9
209:14, 250:19
250:25, 251:14
291:9, 291:16
292:11, 299:17
301:12, 312:8
339:1, 339:9
341:10, 341:11
341:17, 342:25
343:16
**quick** 49:3, 271:6
271:9
**quickly** 140:6
178:5, 178:18
183:3
**quit** 82:4, 163:7
**quite** 52:5, 106:4

202:15, 260:11
286:7, 326:1
**quiz** 249:7
249:20
**quotations**
109:21
**quote** 43:15, 44:3
44:11, 45:16
62:15, 272:15
308:18, 308:20
313:7, 321:10
**quoted** 109:17
113:4, 113:15
113:19, 113:21
113:24, 114:4
**quotes** 107:20
108:4, 108:14
108:24, 109:2
109:3, 109:6
109:10, 109:24
113:5, 113:11
313:6, 313:6
**quoting** 43:10
43:24, 44:10
108:22, 113:4
313:9

**R**

**R1010** 1:22
348:25
**raise** 282:20
311:7
**raised** 196:20
199:24, 281:1
281:6, 309:8
309:23, 310:2
310:12, 315:3
315:21
**ran** 328:6
**range** 10:22
14:24, 14:25
138:9, 288:19
**ranging** 138:8
**ranking** 267:7
**rare** 10:12, 10:13
11:2, 176:8
**rarely** 93:24
148:23

**rates** 126:21
**rational** 140:25
141:12, 141:13
141:15, 141:19
142:6
**rationality**
141:10
**reach** 87:18
88:10, 90:19
91:6, 93:9, 98:12
98:18
**reached** 88:4
89:25, 90:4
91:10, 92:17
166:4
**read** 11:24, 38:23
39:7, 39:14
39:15, 40:1, 40:3
44:2, 44:4, 45:20
60:21, 89:8
89:11, 97:18
97:25, 98:1
105:7, 105:9
105:11, 119:8
161:17, 191:20
194:19, 203:15
203:25, 204:11
204:20, 204:22
206:6, 206:8
305:13, 307:9
308:23, 341:10
342:19, 342:24
343:8, 343:10
344:10, 345:16
345:22, 345:22
346:4, 346:7
347:8
**reading** 39:16
89:18, 95:16
242:2, 249:4
310:4
**ready** 17:23
48:20, 100:25
126:8, 148:25
149:6, 149:8
149:11, 305:9
325:22
**reaffirm** 285:8
**reaffirms** 285:2

**real** 49:3, 85:7
85:8, 126:22
126:25, 127:24
131:8, 133:7
**realize** 11:10
48:15, 67:15
67:17, 99:22
99:25, 120:7
127:9, 137:20
150:18, 165:6
168:2, 168:7
170:12, 176:10
191:3, 191:4
191:16, 191:19
197:12, 199:2
199:4, 205:17
206:15, 208:21
222:4, 222:8
222:10, 222:18
222:20, 223:4
223:5, 223:7
223:8, 248:15
268:23, 290:13
302:22, 310:12
314:14, 324:21
324:22
**realized** 170:13
178:19, 181:8
183:4, 226:2
**realizes** 225:13
**really** 10:13
10:13, 29:11
31:9, 52:1, 63:3
66:10, 75:22
78:1, 86:25, 88:3
112:3, 112:12
112:16, 117:13
118:5, 119:7
128:1, 132:9
148:20, 159:6
161:6, 161:12
161:16, 161:17
162:3, 175:19
177:17, 178:1
178:15, 188:13
189:16, 201:8
208:14, 227:7
234:25, 240:15
240:21, 241:22

242:9, 245:8
246:9, 248:17
250:12, 253:22
256:16, 257:23
257:24, 265:4
268:4, 268:15
272:2, 272:5
277:2, 281:8
281:23, 298:20
306:22, 325:11
326:22, 326:25
328:21, 329:2
329:3, 329:7
332:19
**reask** 208:24
**reason** 35:23
100:20, 131:14
131:17, 135:25
140:25, 141:7
148:14, 148:17
149:16, 163:19
200:25, 252:4
256:3, 256:5
257:2, 257:7
262:12, 274:3
277:8, 277:14
280:25, 299:5
299:8, 315:1
315:18, 319:5
334:14, 334:15
345:23
**reasonable** 65:3
65:15, 86:2
87:17, 87:23
88:9, 89:23
90:19, 91:6
92:16, 93:8
98:12, 99:23
112:25, 199:18
247:13, 329:22
**reasonably** 178:1
197:23, 199:3
**reasoning** 199:8
199:11, 302:16
**reasons** 110:12
110:13, 123:19
142:14, 147:20
150:14, 154:3
154:7, 160:17

DANIEL JAEGER   MARCH 02, 2023

182:10, 262:8
reassemble
  204:10
reassembled
  178:8, 208:11
reassigned 3:17
  284:23, 285:3
rebuttal 4:23
  219:20
recall 10:12
  10:15, 11:22
  42:21, 46:3, 47:7
  65:23, 65:24
  66:6, 66:8, 73:9
  74:3, 110:14
  206:12, 207:22
  239:10, 294:6
  321:1
recalling 19:17
receipt 180:18
  183:17, 183:23
  184:2, 184:14
  184:14, 184:17
receipts 80:13
  183:19, 184:5
  184:18
receive 45:10
received 45:23
  122:13, 122:15
  194:18, 196:13
  217:2, 265:5
  285:14
recess 58:22, 94:5
  145:18, 200:10
  243:22, 271:13
recitation 70:1
recognition
  267:21
recognize 66:1
recollection 10:10
  10:11, 10:17
  10:23, 11:5, 21:9
  79:17, 134:22
  139:1, 139:8
  167:15, 188:12
  189:16, 190:25
  210:2, 222:2
  244:17, 252:15
  306:3, 309:13

317:1
recollections 98:4
reconstruction
  292:9
record 9:13
  11:11, 11:17
  16:18, 38:21
  39:1, 39:12
  58:21, 59:3
  60:21, 68:6, 92:9
  94:4, 94:11
  94:12, 95:14
  97:1, 97:25
  145:17, 145:24
  151:16, 152:12
  152:13, 155:22
  155:23, 182:21
  185:14, 186:23
  193:7, 193:12
  198:23, 200:9
  200:16, 204:20
  204:25, 242:2
  242:22, 243:1
  243:14, 243:15
  243:21, 244:3
  250:18, 251:5
  251:7, 251:24
  271:12, 271:19
  318:7, 337:17
  337:22, 348:6
recorded 4:1
  19:15, 20:2
  21:18, 22:6
  191:2, 304:22
  305:4, 305:7
  305:8, 308:5
  310:13, 310:24
  311:7
records 102:11
  193:2, 207:20
  208:6, 239:13
  242:7
recover 105:17
  118:7, 120:3
recovered 117:25
recovery 50:25
red 147:8, 147:22
reduced 165:21
  348:7

refamiliarize
  305:15
refer 13:5, 32:18
  33:1, 53:15
  53:17, 63:12
  69:16, 70:23
  70:24, 101:21
  223:24, 226:12
  273:4, 277:4
  277:10, 277:15
  280:18, 280:25
  282:16, 283:4
  339:6
reference 19:12
  306:10
referenced 4:12
  113:24, 130:12
  207:19, 222:14
  321:6
references 222:7
  222:20, 223:5
  224:6
referral 2:15
  2:20, 210:8
  221:18, 278:21
  279:13, 280:15
  284:7
referrals 276:9
referred 41:19
  68:11, 147:5
  177:17, 182:12
  187:7, 213:23
  293:20
referring 13:5
  34:8, 48:3, 48:5
  69:17, 70:25
  101:22, 210:15
  223:1, 234:11
  237:22, 250:15
  280:24, 281:6
refers 55:4, 167:9
  200:19, 226:12
reflect 94:13
  211:1
reflected 126:18
reflects 241:13
refresh 222:2
refreshed 98:5
refuse 16:25, 17:7

refuted 328:17
refuting 168:25
regard 17:10
  41:20
regarding 84:2
  217:22
regardless 152:17
  171:10, 340:16
region 49:18
regular 33:16
  136:18, 218:1
  284:17, 286:24
  345:2
regulations 34:8
reissued 75:17
reject 232:8
  233:23, 236:3
  237:24, 302:22
related 34:7
  79:15, 83:12
  134:14, 166:13
  167:6, 176:5
  240:1, 240:11
  240:22, 348:12
relating 340:1
relationship
  288:4, 288:14
relative 13:1
  18:9, 64:13, 67:2
  86:21, 90:8
  159:21, 165:13
  269:12, 270:10
  333:11, 333:13
  333:14, 344:1
  344:12
relatively 134:3
  140:6, 269:22
relatives 239:5
relayed 77:12
released 240:24
relevant 54:10
  198:1, 242:10
  243:6, 247:16
  248:4, 248:13
  248:18, 249:6
  249:7, 249:15
  317:14
reliance 200:19
relied 108:2

110:4, 114:12
  114:17, 114:22
  114:25, 115:1
rely 37:9
relying 108:5
  108:8, 108:15
  114:5, 117:14
  200:23
remain 33:22
  219:23
remained 83:16
  85:16, 170:12
remedy 95:3
remember 11:2
  32:22, 59:14
  59:19, 80:21
  89:15, 89:18
  98:13, 98:16
  124:9, 124:13
  134:8, 134:11
  137:9, 146:3
  146:9, 147:6
  147:10, 161:16
  169:9, 169:13
  177:19, 190:20
  193:19, 193:23
  194:10, 204:18
  210:18, 210:21
  252:22, 271:24
  278:5, 292:17
  305:5, 306:13
  308:6, 320:22
  340:13, 341:17
  344:16
remote 133:24
remotely 209:14
  232:4
remove 165:22
  175:10, 258:19
removed 165:21
  175:15, 272:4
renewal 167:8
renewed 73:21
reorganized
  51:10
repeat 11:24
  92:23, 189:5
  261:15, 335:13
repeated 152:11

DANIEL JAEGER    MARCH 02, 2023

**repeatedly** 91:5
118:23, 151:23
188:2
**replace** 297:24
**replacement**
299:3
**report** 2:17, 3:10
4:5, 4:23, 31:18
42:18, 42:20
43:10, 44:10
79:11, 187:23
191:11, 191:20
194:7, 194:18
194:25, 195:23
196:7, 196:8
203:4, 219:20
236:7, 238:17
238:21, 238:25
240:9, 240:9
241:5, 242:17
242:18, 245:5
246:11, 246:13
246:19, 247:2
247:15, 273:12
273:13, 274:18
275:2, 275:3
275:4, 275:9
275:11, 275:24
276:3, 276:13
276:23, 277:19
277:20, 278:15
278:15, 278:18
279:1, 281:15
281:23, 281:24
283:21, 284:3
294:19, 294:23
294:25, 295:3
295:21, 297:14
304:10, 308:18
316:21, 317:3
317:13, 317:22
317:24, 318:2
318:11, 318:16
319:9, 319:16
319:22
**reported** 160:24
160:25, 187:3
187:4, 222:1
272:17, 272:22

273:24, 274:3
274:9, 279:8
279:22, 280:3
280:6, 280:7
280:10, 280:10
282:13, 282:14
294:16, 299:3
**reporter** 1:24, 7:5
8:15, 9:8, 10:7
11:24, 12:2
38:23, 39:7, 98:4
120:12, 123:9
125:7, 125:14
163:15, 163:17
166:20, 166:22
187:11, 201:21
201:24, 202:2
202:8, 202:10
202:20, 202:24
210:9, 227:21
227:24, 241:19
244:6, 244:8
266:7, 266:10
266:15, 266:20
266:23, 272:8
272:11, 296:10
296:13, 304:23
304:25, 348:5
348:17
**reporting** 1:21
8:15, 113:1
274:7, 275:15
277:21, 282:6
294:15, 348:21
348:24
**reports** 68:25
236:6, 239:18
240:13, 247:1
247:6, 247:20
247:20, 248:1
271:23, 297:19
310:20, 310:20
317:6, 317:11
318:5
**repossessed**
144:24
**represent** 8:21
126:8, 126:13
131:17, 133:9

**representation**
80:5, 131:14
**representations**
88:2, 160:9
175:25, 183:13
224:21, 316:13
321:3, 331:13
340:17
**representative**
24:6, 24:10
26:13, 27:16
**represented** 80:3
100:17, 116:10
133:8, 169:8
170:20, 203:23
257:8, 338:18
**representing** 8:24
195:2
**request** 281:18
318:5
**requested** 5:1, 6:1
98:1, 102:12
103:19, 303:25
304:10, 339:12
348:9
**requests** 102:23
103:1
**require** 212:15
212:19
**required** 16:16
123:6, 145:7
158:18, 212:24
262:17, 277:5
324:8, 348:11
**requirement**
44:21, 104:18
276:19, 279:22
280:2
**requirements**
52:14, 110:17
137:24, 275:15
**requires** 96:18
**research** 84:6
85:23, 182:12
204:6
**researched**
206:25, 325:17
**researching**
206:12

**reservation**
260:14, 260:16
260:25, 261:1
261:6, 261:8
261:12, 261:17
261:22, 261:24
262:2, 262:13
262:20, 262:24
263:2, 263:21
264:6, 264:11
265:19, 268:5
268:17
**Reservations**
267:15, 267:18
**reserve** 260:18
262:17
**reserved** 265:17
**reserves** 113:1
262:5
**reserving** 261:10
263:21, 265:2
266:2
**residence** 85:18
**residents** 132:12
**resolve** 136:12
331:19
**respect** 13:10
39:13, 88:24
110:19, 161:24
161:25, 192:20
193:24, 251:10
263:4, 263:12
286:9, 326:10
326:12, 339:14
340:4, 343:19
**respectfully**
64:15, 86:14
91:17, 92:6
98:23, 99:2
**respond** 330:16
**responds** 309:17
**response** 103:13
312:5, 312:24
313:15
**responsibilities**
161:1
**responsibility**
12:22, 50:2
**responsible** 24:21

30:16, 51:3
273:5, 276:8
**responsive** 172:4
209:14, 226:11
259:15, 259:16
259:24
**rest** 27:13, 49:2
**restate** 317:10
**restroom** 58:17
**result** 37:20
43:23, 75:25
150:8, 237:13
237:17
**resulted** 78:11
**resulting** 234:12
234:15
**results** 40:24
147:25, 207:22
208:10
**retained** 345:14
**retaining** 91:14
**retention** 3:19
285:19, 339:23
**rethinking**
281:15, 281:19
**return** 134:12
**returns** 318:20
**revealed** 67:2
70:4, 75:25, 85:1
86:18, 117:11
138:4
**reveals** 314:3
**review** 13:17
15:8, 15:13
15:14, 15:20
15:21, 16:4, 16:9
17:15, 17:16
17:22, 17:23
18:17, 19:15
19:15, 21:14
22:4, 22:8, 53:4
67:22, 67:23
68:24, 89:13
208:2, 222:11
280:17, 305:11
306:6, 306:18
307:20, 309:5
317:12, 339:11
341:16, 341:21

DANIEL JAEGER   MARCH 02, 2023

342:1, 343:21
344:4, 348:9
348:10, 348:11
**reviewed** 14:13
14:19, 16:15
16:23, 16:25
17:8, 18:1, 18:3
18:5, 18:12
18:14, 18:24
19:1, 19:4, 19:7
19:24, 20:7
20:17, 21:3
21:18, 21:18
21:19, 21:24
22:12, 22:16
48:20, 48:22
52:3, 52:5, 52:19
52:21, 53:3
63:18, 63:20
63:24, 64:2, 64:7
64:12, 100:24
194:17, 207:17
209:10, 224:18
225:11, 229:11
305:9, 305:10
305:14
**reviewing** 14:20
14:23, 15:3, 15:5
15:23, 19:19
88:12, 91:10
207:22, 221:19
302:15, 305:4
309:14
**revolving** 319:17
**reward** 143:7
**RFI** 292:6
**rich** 139:16
139:19, 140:10
141:11
**rid** 300:14
**ridiculous** 96:22
323:15, 342:3
**right** 10:24, 12:11
14:7, 15:16
15:22, 18:5, 19:7
20:3, 20:20, 21:5
25:2, 25:6, 25:10
25:17, 26:15
27:8, 28:4, 29:16

29:23, 30:3
31:22, 33:5
33:10, 35:7
35:15, 36:3, 37:6
37:10, 37:25
38:1, 40:18, 41:5
41:10, 42:8
42:24, 43:5
44:16, 46:14
48:8, 48:10
48:21, 49:21
51:4, 52:23, 53:6
54:8, 54:20
55:11, 55:16
56:14, 56:24
59:25, 60:10
61:13, 61:18
62:21, 63:9
65:15, 65:18
68:15, 68:15
68:17, 69:14
69:20, 70:19
71:12, 71:17
72:1, 73:23, 75:7
77:23, 78:17
79:11, 79:19
81:1, 89:9, 90:4
90:17, 90:20
92:7, 93:3, 93:10
94:12, 97:16
98:24, 99:8
101:1, 101:10
101:13, 101:19
102:2, 104:1
104:10, 104:12
104:13, 104:15
105:13, 105:18
106:14, 107:21
108:16, 109:3
109:19, 109:22
110:1, 113:2
113:7, 113:19
114:7, 114:18
115:19, 116:8
116:15, 116:19
116:20, 117:8
117:20, 117:21
118:1, 118:8
119:1, 119:11

119:22, 122:5
122:15, 123:2
125:6, 125:13
128:19, 129:1
129:12, 129:24
130:8, 130:8
130:13, 130:25
131:20, 132:23
133:11, 133:22
136:22, 137:6
137:12, 138:12
141:20, 142:25
143:23, 144:4
145:8, 146:19
151:2, 153:1
153:6, 153:10
153:22, 154:8
156:25, 157:14
158:7, 162:3
166:4, 167:20
173:11, 173:20
175:14, 176:16
176:23, 177:25
178:6, 180:24
184:9, 184:14
184:23, 185:12
186:5, 186:25
187:8, 187:9
188:6, 188:14
189:17, 190:5
191:21, 193:11
198:6, 198:7
198:8, 198:20
199:21, 201:3
201:9, 202:1
202:14, 203:1
203:10, 204:22
206:5, 208:10
208:12, 208:21
209:18, 210:25
211:2, 211:17
212:3, 212:7
212:16, 213:7
214:11, 215:6
216:2, 216:17
216:24, 217:4
217:10, 219:10
220:11, 220:22
221:8, 221:13

222:4, 223:12
223:16, 223:25
224:8, 225:5
225:8, 225:12
225:25, 226:13
226:22, 226:24
227:17, 228:7
228:11, 228:15
229:17, 230:16
231:3, 233:16
235:17, 236:2
239:7, 239:17
240:19, 241:6
241:12, 242:3
243:19, 244:19
245:1, 245:7
245:11, 245:19
246:4, 246:7
246:18, 246:23
247:6, 247:22
248:8, 248:11
248:16, 248:20
249:8, 249:20
252:19, 254:22
260:12, 260:15
260:19, 261:2
262:7, 262:8
262:24, 263:12
263:19, 264:7
264:21, 265:10
266:14, 267:25
268:6, 270:16
270:25, 272:14
273:14, 277:18
277:24, 279:15
281:2, 282:8
282:20, 284:11
285:15, 285:18
287:19, 289:18
290:14, 290:22
294:5, 294:11
295:4, 295:5
295:13, 295:25
296:3, 297:10
297:16, 298:13
301:6, 301:14
302:6, 305:9
306:21, 307:5
309:10, 309:24

310:14, 310:25
311:4, 312:14
313:2, 313:12
313:17, 313:19
314:3, 314:18
315:7, 315:25
316:18, 316:25
317:9, 317:20
318:4, 318:17
318:21, 318:24
319:10, 320:7
320:15, 323:22
325:19, 328:4
328:10, 332:3
336:25, 338:19
339:14, 342:20
343:1, 343:6
343:11, 344:5
345:3, 345:12
345:17
**rights** 11:11
11:16, 260:14
260:17, 260:25
261:1, 261:7
261:8, 261:10
261:12, 261:17
261:24, 262:2
262:5, 262:6
262:13, 262:17
262:21, 262:24
263:2, 263:4
263:11, 263:21
263:22, 264:6
264:11, 265:2
265:17, 265:19
266:2, 267:18
268:5, 268:17
**Rights/Coverage**
267:16
**ring** 30:17
**rise** 83:10, 148:1
220:15, 220:19
**rises** 46:8, 89:2
164:19
**risk** 121:22
139:19, 140:23
141:17, 143:6
143:12, 143:14
160:18, 232:16

DANIEL JAEGER    MARCH 02, 2023

232:18, 232:25
234:3, 234:14
234:15, 234:17
255:21
**road** 1:22, 8:15
25:10, 188:3
217:1
**Robert** 7:17, 8:25
**role** 27:25, 28:21
29:10, 33:10
39:13, 49:21
51:13, 51:16
66:1, 67:17
345:12
**Rolex** 3:7, 3:18
3:20, 3:22, 3:24
4:4, 4:6, 110:12
252:10, 252:16
253:10, 253:11
253:12, 253:13
253:14, 253:15
253:18, 253:19
**ROR** 264:1
264:6, 264:17
264:19, 265:3
268:5, 268:23
269:7, 269:12
269:17, 269:22
269:25, 270:7
**RORs** 270:10
**rough** 15:19
**roughly** 15:17
30:9, 75:10
260:3
**roughshod** 93:23
**routine** 275:22
**routinely** 287:11
287:12, 293:12
**RPR** 1:24, 348:17
348:24
**RRF** 1:22, 348:25
**Ruben** 291:16
**rude** 208:15
**ruin** 142:24
**ruining** 140:23
141:17
**rule** 11:6, 12:7
94:18, 94:20
94:20, 94:24

94:25, 95:6
95:17, 95:17
95:18, 96:17
**ruled** 11:12
241:10
**rules** 9:24, 25:9
97:14, 97:15
118:21, 193:15
216:25
**ruling** 241:8
**run** 75:2, 123:22
135:18, 177:15
179:22, 181:17
181:24, 185:7
211:12, 221:13
232:13, 239:18
241:14, 246:19
247:1, 275:23
317:5, 317:11
317:23, 318:2
318:6, 318:12
**runners** 30:24
**running** 39:20
93:23, 242:18
317:3
**runs** 136:19

**S**

**Sally** 286:21
293:20
**salvage** 248:19
**Santa** 169:7
171:21, 184:12
**satisfied** 103:7
328:25
**saw** 86:7, 88:13
89:12, 98:20
134:5, 166:11
166:13, 175:21
205:6, 229:2
229:12, 231:1
252:18, 307:18
322:10
**saying** 41:8, 52:8
57:19, 71:10
98:13, 98:16
99:23, 101:12
119:15, 131:15

146:3, 149:13
150:21, 153:17
161:16, 170:15
174:5, 176:18
176:22, 180:10
188:2, 188:3
188:7, 191:25
203:9, 209:1
222:5, 237:10
242:7, 269:7
276:12, 277:14
283:1, 292:24
295:9, 310:9
320:12, 320:14
327:22, 334:10
**says** 42:22, 43:8
43:9, 43:11
43:11, 45:15
48:3, 62:10
62:10, 63:1
66:22, 66:23
70:6, 72:21
94:20, 105:3
109:13, 109:16
109:19, 109:25
116:8, 122:6
129:9, 129:17
130:21, 136:8
138:24, 138:24
167:23, 177:5
191:20, 193:8
194:19, 196:9
209:3, 213:18
221:10, 222:7
222:15, 223:25
224:7, 226:4
226:4, 226:17
226:21, 226:23
228:14, 228:15
228:23, 233:1
236:7, 239:24
241:25, 241:25
247:13, 248:11
248:22, 267:15
267:17, 268:6
272:15, 285:2
295:8, 295:21
297:16, 306:11
308:3, 308:18

310:7, 312:14
313:1, 313:5
313:7, 313:10
313:11, 313:13
313:16, 313:17
313:18, 313:19
313:20, 321:10
341:15
**scared** 278:4
**scenario** 170:25
171:6, 171:9
314:17, 332:17
333:20, 334:24
**schedule** 78:12
118:3, 165:18
165:20, 175:8
175:17, 177:18
177:21, 184:7
252:18, 252:18
254:12, 258:8
260:8
**scheduled** 67:25
69:4, 72:13
73:13, 73:16
73:17, 76:10
117:17, 120:4
120:5, 121:4
122:3, 168:20
204:17, 224:22
225:15, 252:8
252:8, 254:1
254:24, 255:12
257:16, 258:14
287:8, 299:9
299:10, 304:11
304:17, 335:23
337:14
**schedules** 177:8
**school** 22:21
184:1
**Schwab** 126:12
**scope** 25:25
**scoped** 68:10
187:18
**screen** 56:21
**screw** 313:23
**se** 30:4, 33:9
49:20
**search** 3:12

244:5, 244:7
244:15, 245:14
245:24, 246:3
246:14, 246:22
317:17
**searching** 152:10
**second** 11:13
16:1, 28:10
35:17, 85:5
116:5, 116:20
117:6, 125:10
132:13, 143:17
183:5, 248:6
252:7, 267:17
271:22
**secondhand** 67:8
**seconds** 161:15
**SECRET** 2:24
3:3, 3:16
**section** 54:15
64:7, 113:5
272:19
**sections** 64:13
**securities** 240:12
242:23
**Security** 134:15
**see** 42:22, 43:12
43:24, 43:25
44:5, 44:7, 44:13
51:19, 51:20
53:16, 54:14
61:2, 94:1, 101:4
101:6, 103:20
104:25, 108:21
108:23, 113:18
120:8, 126:23
133:7, 133:11
138:12, 152:19
167:6, 167:22
167:25, 180:1
184:8, 198:12
202:16, 202:16
202:21, 203:16
209:4, 209:5
209:5, 213:9
213:20, 214:16
221:17, 224:5
225:25, 226:5
226:6, 238:25

DANIEL JAEGER   MARCH 02, 2023

247:18, 247:19
253:3, 253:20
254:3, 254:25
258:25, 260:24
262:22, 275:20
277:18, 284:2
295:22, 305:16
307:25, 308:23
309:3, 311:21
311:21, 311:24
312:23
seeing 134:12
167:15, 223:8
239:11, 260:23
seek 176:21
seeking 171:25
180:21, 315:13
seemingly 179:1
249:19
seen 39:21, 42:20
52:24, 70:7
70:17, 87:7
93:24, 124:22
135:20, 141:6
142:2, 167:2
167:10, 172:24
177:2, 184:16
186:19, 191:4
191:21, 191:23
205:12, 209:10
210:15, 210:17
223:20, 225:5
225:6, 239:6
244:15, 244:16
257:19, 258:10
264:1, 268:17
285:23, 285:25
291:8, 291:11
291:12, 294:4
294:7, 297:7
307:5, 307:7
308:19, 313:2
316:25, 327:14
331:23
sees 251:20
seized 231:17
232:1, 233:13
233:20, 234:1
seizes 172:8

seizing 188:11
189:14, 233:11
sell 127:8, 328:7
328:7
sells 328:15
semantics 101:14
102:1
send 269:12
269:16
senior 50:20, 66:1
67:17, 237:2
332:2
sense 64:19
64:23, 87:1
sent 17:24, 18:1
18:8, 18:12
20:15, 21:3
21:13, 83:15
83:22, 83:23
85:15, 186:15
187:22, 201:18
201:23, 221:19
267:5, 279:12
292:6
separate 132:21
134:22, 147:16
258:8
separately 14:18
207:20
sequence 307:21
series 97:18
serious 43:22
234:12, 234:15
234:17
service 68:10
284:18
Services 244:18
247:17
serving 160:22
set 122:4, 158:21
169:7, 170:1
171:1, 173:12
173:14, 173:15
173:16, 174:17
176:19, 180:22
183:5, 185:3
185:20, 187:18
187:19, 194:4
194:9, 195:3

195:3, 195:7
195:22, 196:21
203:3, 207:23
208:7, 222:11
259:2, 267:5
267:8, 295:12
308:20, 321:11
322:12, 322:15
322:16, 322:23
322:24, 323:17
323:18, 323:20
323:20, 324:2
324:12, 324:16
324:18, 325:11
326:20, 326:21
326:24, 328:2
328:3, 328:7
328:10, 328:20
328:20, 328:21
329:1, 329:2
329:6, 329:14
329:23, 331:3
332:18, 333:21
333:22, 334:8
334:8, 335:1
336:8, 336:21
340:17, 348:14
348:21
sets 21:25, 65:2
129:2, 129:11
166:12, 328:8
Settlement 34:7
seven 96:13
152:14, 152:15
174:14, 243:18
seven-figure
158:11
seven-hour
341:25, 342:14
seven-year-old
140:24, 141:18
sexual 239:4
242:14, 242:16
242:25, 245:16
246:6, 246:8
246:15, 317:7
share 135:2
244:22
sheriff's 191:6

191:18
ship 85:11
shipped 85:12
85:13
shocked 227:10
239:20
shopping 298:7
298:8, 299:15
300:14, 301:9
301:14, 301:17
301:20, 301:22
301:25, 302:7
302:10, 302:18
302:25, 303:9
303:10
short 185:7
286:22, 293:20
short-term 139:6
shorthand 8:14
70:20, 70:21
108:9, 264:5
348:7
show 16:14, 74:5
80:23, 96:20
110:22, 111:16
111:18, 111:19
166:1, 169:23
182:15, 221:24
250:24, 339:15
showed 16:16
76:12, 119:18
127:6, 249:25
showing 266:25
339:5
shown 109:14
109:15, 267:4
shows 12:3, 70:10
74:11, 100:7
100:9, 122:21
124:18, 182:21
side 133:11, 159:3
290:21
sides 146:10
153:5
sign 318:15
341:10, 346:4
346:7
signature 348:9
348:10, 348:11

signed 318:6
318:12, 318:16
significant 117:2
126:22, 126:24
127:14, 127:24
128:11, 133:12
133:14, 133:15
184:5, 232:16
232:18, 233:2
234:4, 286:15
286:17
significantly
125:1, 165:20
silkscreen 84:22
85:1, 85:6, 85:15
264:17
silkscreens 73:8
73:10, 75:13
82:25, 83:14
83:21, 84:3
85:20, 116:9
116:15, 116:18
159:22, 166:11
166:12, 184:10
204:7, 249:16
259:10, 268:12
297:22, 298:19
298:23, 299:3
333:15
similar 50:8
129:22, 154:18
185:24, 186:9
214:7, 272:1
299:4, 324:22
325:3, 328:20
simple 17:7
70:23, 116:6
119:1, 123:21
140:4, 140:4
140:8, 147:2
170:11, 183:22
197:14, 199:4
205:13, 226:10
250:13, 293:22
simplest 70:1
simplistic 103:21
257:20, 260:24
simply 189:25
203:9, 274:2

DANIEL JAEGER   MARCH 02, 2023

283:1, 293:7
327:22
**single** 121:22
**sir** 10:25, 11:7
13:21, 17:14
20:21, 23:9
23:18, 25:18
27:9, 29:20, 30:2
31:13, 31:24
32:16, 33:11
35:12, 43:6
44:15, 45:21
49:6, 49:22
49:23, 53:9
53:14, 59:9, 61:3
63:15, 75:1, 75:4
89:7, 89:10
89:20, 91:23
93:5, 98:6, 98:13
129:9, 130:21
161:13, 189:3
191:14, 195:19
199:4, 199:22
202:17, 205:4
215:25, 222:3
226:9, 226:19
226:23, 229:17
268:22, 284:6
302:21, 315:25
324:5, 328:10
337:17, 338:22
**sit** 168:25, 210:2
323:4, 331:1
332:2
**sitting** 92:3, 128:8
**situation** 77:5
78:2, 80:2
144:22, 153:15
220:15, 229:23
258:22, 293:24
**SIU** 2:21, 2:22
2:23, 3:1, 3:1
3:18, 24:17
25:16, 25:21
26:24, 26:25
27:5, 28:2, 28:3
28:22, 28:25
29:1, 29:7, 29:10
29:14, 29:19

29:21, 30:5, 30:6
30:10, 30:13
31:6, 32:14
32:18, 33:5
33:17, 33:24
34:14, 34:21
35:3, 35:13
35:14, 35:16
35:20, 36:4, 36:4
36:10, 36:14
41:10, 41:19
41:19, 41:21
41:23, 41:25
42:4, 43:17
43:18, 44:6
45:17, 46:6
46:12, 46:12
49:13, 49:14
49:20, 50:1, 50:3
50:6, 50:11
50:20, 50:24
51:1, 51:14
59:11, 59:12
59:21, 59:23
59:24, 60:8, 66:1
67:17, 68:11
76:17, 78:14
78:17, 79:6, 79:9
93:8, 106:17
111:8, 122:13
133:20, 172:21
181:10, 182:12
183:4, 184:21
184:23, 185:10
186:5, 187:8
187:13, 210:8
210:15, 210:24
211:6, 211:11
211:14, 211:15
211:25, 212:5
212:15, 213:4
213:9, 213:14
213:16, 213:19
213:23, 213:24
214:1, 214:3
216:13, 217:9
217:17, 218:1
219:23, 221:12
221:14, 221:19

224:6, 225:7
225:18, 237:3
239:17, 244:14
245:19, 246:17
246:20, 246:23
246:24, 247:3
249:18, 255:10
256:10, 263:17
266:4, 266:5
266:13, 266:15
272:16, 272:21
275:22, 284:23
285:3, 285:4
285:9, 285:9
285:13, 286:3
286:6, 287:13
287:18, 291:21
292:16, 292:25
293:9, 293:12
294:15, 294:22
295:3, 295:19
297:25, 317:20
317:23, 318:3
332:3, 339:19
344:24, 345:2
**SIU(CHUBB-Alt...**
2:15
**SIUs** 239:19
**six** 325:11, 334:20
**size** 51:13, 165:18
**skill** 348:7
**skills** 290:2
**Skipton** 4:23
42:19, 43:8
45:14
**slice** 132:1
**slight** 52:13
**slightly** 115:14
**slim** 134:3
160:22
**small** 136:18
269:22
**smaller** 129:23
**smart** 118:4
177:14, 178:1
**Smith** 64:1, 64:20
86:7, 88:11
88:24, 89:8
91:14, 99:6

100:5, 141:13
141:23, 339:15
342:17, 343:23
345:11
**Smith's** 86:14
**snide** 205:20
**so-called** 30:5
110:4, 113:12
130:15, 141:13
187:13, 218:1
231:17, 235:14
236:4, 236:25
238:24, 241:4
246:22, 260:25
265:19, 268:5
**Social** 134:15
**society** 43:20
**soft** 287:17
**sold** 83:25, 85:2
85:24, 127:4
169:7, 171:1
175:9, 175:14
175:17, 178:4
178:18, 178:19
179:5, 180:2
181:12, 182:22
204:7, 205:17
206:16, 206:24
207:5, 207:20
209:2, 209:17
209:25
**someone's** 146:2
149:14, 159:6
258:23, 269:21
**somewhat** 130:15
134:13, 152:5
215:25, 267:11
291:24
**son** 128:3, 130:24
132:20
**soon** 110:1
110:20, 228:19
229:1, 284:11
301:8, 301:13
312:12
**sophisticated**
66:7, 181:15
181:22, 184:6
**sorry** 11:14

12:14, 12:18
20:24, 28:8, 44:2
51:25, 53:12
74:14, 77:13
89:7, 92:24
115:25, 120:12
121:18, 121:19
124:8, 125:16
161:18, 161:20
163:10, 183:14
189:4, 202:9
206:4, 216:11
227:19, 261:15
261:20, 266:4
266:4, 287:17
289:1, 295:5
298:6, 307:18
312:2, 346:2
**sort** 29:19, 29:22
88:14, 106:4
282:18, 282:25
287:6
**Sotheby's** 207:21
207:24
**sought** 102:16
170:13
**sound** 287:17
**sounds** 16:20
94:2, 187:9
256:16
**speak** 274:1
319:9, 340:22
**speaking** 36:2
46:5, 77:9, 106:7
155:19, 206:12
209:10, 263:8
263:13, 263:15
**speaks** 61:10
63:1, 86:15
104:6, 107:25
191:11, 252:14
297:19, 306:7
343:16
**special** 25:16
27:25, 28:1, 33:7
49:7, 49:17
187:13, 217:10
339:24
**specialist** 8:18

DANIEL JAEGER   MARCH 02, 2023

**Specialists** 7:22
8:18, 58:25, 94:8
145:21, 200:13
243:25, 271:16
**specialized** 31:2
**specific** 58:2, 69:1
244:16, 257:10
317:1
**specifically** 21:22
46:4, 95:18
133:14, 151:17
154:4, 222:14
239:11, 264:3
310:5, 318:12
**speculate** 226:9
**speed** 222:19
**spelled** 158:8
**spend** 14:19, 15:2
15:23, 285:1
289:2
**spent** 14:4, 14:17
14:25, 29:21
88:12, 91:9
99:15, 132:11
198:25
**spoke** 195:6
280:14
**spoon** 17:17
**spots** 39:1
**spring** 168:6
**SS** 348:1
**Staff** 3:14
**staged** 30:23
**stand** 32:22, 40:4
283:19, 287:3
328:5
**standard** 26:7
27:1, 27:4, 95:5
96:23, 97:2
103:8, 105:12
212:4, 216:25
232:12, 232:15
234:2, 234:21
235:2, 235:5
235:9, 235:11
236:23, 236:23
239:16, 242:12
245:17, 245:18
246:17, 246:22

246:24, 246:25
249:17, 303:11
317:8, 317:19
317:24, 318:1
**standards** 25:9
25:14, 25:15
25:19, 25:25
26:5, 26:11
26:15, 33:13
33:14, 33:22
34:1, 96:20
212:14, 212:19
215:17, 216:1
216:12, 216:16
216:22, 217:15
230:16, 231:3
231:19, 300:19
302:11, 303:2
344:24, 345:1
345:7, 345:9
345:12
**standing** 45:2
45:12
**standpoint** 24:23
24:23, 87:24
327:15
**stands** 25:16
69:14, 244:18
248:24, 283:10
328:3
**star** 176:9
**start** 14:1, 23:25
35:18, 97:19
151:14, 185:2
189:6, 209:12
239:23
**started** 24:11
27:7, 29:9, 36:3
170:3, 184:4
288:4, 288:7
**starting** 30:3
**starts** 44:10
108:22, 163:18
224:12, 255:2
307:24
**state** 7:6, 8:20
9:13, 24:6, 24:12
27:7, 27:19
27:24, 27:25

28:25, 29:9
29:11, 29:16
30:5, 30:10
30:13, 30:14
30:15, 30:16
31:4, 31:8, 31:22
49:4, 52:9, 52:9
52:14, 52:14
99:14, 99:16
99:20, 118:16
243:4, 267:20
272:17, 272:22
273:20, 273:23
275:6, 275:15
276:19, 277:5
284:7, 348:1
**stated** 86:17
87:10, 90:14
100:12, 121:11
133:4, 151:17
197:1, 211:25
259:17, 259:21
270:6, 277:4
312:18, 339:22
**statement** 4:1
19:16, 20:2, 22:6
46:11, 63:22
84:13, 84:15
116:25, 124:13
124:15, 126:17
126:18, 129:19
129:20, 129:21
130:4, 136:8
136:23, 194:4
220:24, 299:22
304:22, 305:7
305:8, 306:6
308:5, 309:1
310:13, 310:24
311:7, 343:13
**statements** 19:9
20:5, 21:19, 84:5
106:23, 107:10
112:20, 124:11
130:1, 133:1
136:22, 137:6
137:12, 138:5
138:15, 138:21
139:9, 139:24

143:3, 144:7
146:22, 179:12
261:4, 283:15
300:4, 305:4
315:9, 316:2
318:24, 318:24
319:4, 326:3
330:19, 332:23
335:9
**states** 1:1, 8:11
33:23, 34:3
43:16, 52:6
52:15, 243:1
246:5
**stating** 106:8
**Station** 31:19
**step** 89:24
100:23, 225:23
233:24, 273:11
**steps** 182:1
**stipulate** 198:15
342:5
**stipulated** 198:22
**stipulation**
199:24
**stolen** 66:15
70:15, 82:25
83:3, 83:18
170:16, 194:10
195:8, 195:22
196:1, 196:10
196:21, 229:14
316:7, 322:14
322:25, 326:22
**stop** 38:9, 105:23
151:6, 193:4
208:18, 240:7
250:20
**stopped** 36:4
149:6, 149:12
**stops** 242:24
**story** 181:13
183:5
**straightforward**
233:1, 330:14
**strategy** 95:24
251:1
**Street** 7:12
**strength** 278:7

278:23
**strict** 110:16
**strictly** 112:10
**strike** 19:9, 20:4
106:22, 107:9
112:20, 124:10
130:1, 132:25
138:21, 139:23
141:3, 143:2
144:6, 146:21
162:5, 178:21
179:11, 205:8
239:23, 259:19
261:4, 283:15
299:21, 300:3
309:1, 315:9
316:2, 326:3
330:18, 332:23
335:9, 338:24
343:13
**string** 313:2
**strong** 103:16
103:25, 278:12
278:16, 279:3
**stronger** 278:2
**strongly** 87:9
90:14
**struggling** 74:14
**stuff** 141:11
166:15
**stupid** 141:11
179:3, 179:25
207:9, 257:20
**stupidity** 177:13
178:11, 178:25
179:6, 179:19
179:21, 180:3
182:8, 182:9
183:1, 207:4
**styled** 8:9
**subject** 2:24, 3:3
3:16, 12:5, 48:20
48:22, 85:20
248:5, 248:18
308:21, 310:9
311:22, 312:9
313:7
**subjective** 149:22
**submission**

DANIEL JAEGER   MARCH 02, 2023

264:20, 264:20
submit 35:20
304:17
submitted 67:24
74:2, 173:19
181:5, 181:7
194:8, 204:15
204:16, 210:19
210:21, 211:4
224:14, 231:12
241:2, 245:10
245:13, 260:12
265:10, 322:3
submitting
190:15, 240:16
subordinate
226:1, 228:7
249:1, 294:16
294:17, 305:20
306:11, 308:8
308:24, 311:21
312:24, 313:11
321:10
subordinates
284:15, 286:22
294:11, 295:2
295:16, 320:4
subsequent 86:5
168:15, 245:13
245:25
subsidiary 202:6
substance 307:15
substantial
102:21, 102:25
103:7, 127:12
232:16, 232:18
232:25, 234:3
234:14, 234:15
234:17
substantially
103:17, 104:1
substantiate
173:4
subtract 128:18
130:7
successful 102:20
140:15
suddenly 30:4
192:14, 193:20

195:21, 228:20
228:25
sued 32:24
sufficient 86:18
suggest 196:12
suggested 304:3
311:18
suggesting 151:25
277:9
suggestion 95:8
suggestive 94:19
152:6
suggests 259:11
Suite 1:23, 7:13
7:18, 7:23
Sullivan 2:5, 6:1
7:17, 8:25, 8:25
12:12, 12:16
13:12, 14:2
14:11, 14:14
15:9, 15:25
16:10, 16:20
17:3, 17:11
17:17, 17:18
17:24, 18:2
18:13, 18:18
18:24, 19:5, 19:8
19:18, 19:25
20:4, 20:8, 20:12
21:4, 21:13
21:23, 25:11
25:22, 26:16
28:6, 28:13
29:24, 30:7
33:19, 34:9
34:18, 35:8, 36:7
36:17, 36:24
37:7, 37:16, 38:6
38:20, 39:12
39:24, 40:4, 40:8
40:19, 41:12
42:1, 42:9, 44:22
45:25, 46:15
47:9, 50:13
50:22, 53:20
54:21, 55:17
55:25, 56:15
56:25, 57:23
58:10, 58:16

59:16, 60:1
60:11, 61:7
61:19, 62:6
62:22, 63:10
64:9, 64:24, 66:2
66:17, 66:24
68:5, 68:18
69:21, 71:4
71:18, 72:2, 73:5
75:8, 75:18, 76:6
76:25, 77:24
78:18, 78:24
79:20, 81:2
81:15, 82:2
82:10, 82:12
86:10, 87:20
88:17, 89:16
90:21, 91:13
92:8, 92:19
93:11, 93:14
93:18, 94:2
94:13, 95:1, 95:4
95:13, 97:1
97:11, 98:14
98:25, 99:9
99:17, 100:1
102:3, 103:9
104:2, 106:21
107:3, 107:9
107:23, 108:17
110:7, 110:24
111:9, 111:14
111:20, 112:6
112:19, 114:1
114:8, 114:19
115:9, 115:20
116:21, 118:9
118:16, 119:2
119:12, 120:21
121:8, 121:24
122:16, 123:3
124:10, 126:4
128:20, 129:5
129:13, 129:25
130:9, 130:17
131:1, 131:11
132:3, 132:24
134:9, 137:7
137:22, 138:20

139:22, 141:2
141:21, 143:1
144:5, 145:8
145:11, 145:15
146:20, 147:12
148:8, 149:2
150:2, 151:3
151:8, 151:16
152:8, 152:16
152:22, 153:7
153:23, 154:9
154:21, 155:6
155:14, 155:22
156:4, 156:11
156:18, 157:1
157:15, 157:22
158:1, 159:10
160:5, 162:4
162:22, 163:2
163:8, 163:14
163:21, 164:8
165:10, 167:12
168:8, 169:10
170:6, 171:7
172:11, 172:14
173:21, 174:24
176:11, 176:24
178:20, 179:7
179:10, 180:6
185:13, 186:7
186:22, 187:15
188:15, 189:18
190:6, 190:22
191:8, 192:2
192:7, 192:16
192:25, 193:12
193:18, 194:11
194:14, 195:10
196:3, 196:23
197:6, 197:15
197:19, 197:25
198:7, 198:15
198:22, 199:5
199:23, 200:3
200:21, 201:10
203:12, 204:23
205:8, 205:19
206:19, 207:11
208:22, 209:19

211:18, 212:8
212:21, 214:23
215:7, 215:19
216:4, 216:18
217:5, 217:11
217:18, 218:3
218:10, 218:17
218:25, 219:11
219:25, 220:12
220:23, 222:9
222:23, 223:17
224:1, 224:9
226:14, 227:3
227:9, 227:12
228:16, 228:22
229:5, 229:18
230:17, 231:4
231:21, 232:24
233:5, 233:8
233:17, 234:5
234:22, 235:18
236:10, 237:6
238:6, 239:8
241:7, 242:4
243:11, 243:19
245:2, 245:20
247:7, 247:23
248:21, 249:9
249:21, 250:8
250:17, 251:4
251:9, 251:13
251:17, 251:24
252:2, 252:11
252:20, 254:5
255:15, 256:23
258:2, 259:6
261:3, 261:14
261:19, 262:1
262:9, 263:6
263:14, 264:13
264:23, 265:11
265:21, 268:7
269:3, 270:2
270:17, 271:1
273:15, 274:12
275:12, 276:17
276:25, 279:4
279:24, 281:3
281:9, 281:17

282:9, 282:21
283:14, 285:11
286:4, 288:2
288:16, 289:4
289:10, 289:19
290:15, 290:23
291:25, 292:19
293:13, 294:12
296:5, 297:2
297:17, 298:1
298:14, 299:21
300:3, 300:8
300:21, 301:1
301:4, 301:15
301:23, 302:12
303:4, 303:22
304:8, 305:24
306:15, 307:6
308:25, 309:11
310:16, 311:1
311:4, 311:9
311:16, 312:15
314:4, 314:19
315:8, 316:1
317:21, 318:18
318:25, 319:11
320:8, 320:23
321:16, 322:18
323:23, 324:8
324:23, 325:14
326:2, 327:2
327:8, 328:11
329:8, 330:2
330:18, 331:8
332:4, 332:22
333:25, 334:18
334:21, 335:8
336:11, 337:1
337:23, 338:24
339:4, 340:12
340:15, 340:24
341:9, 342:5
342:11, 342:22
342:24, 343:7
343:12, 343:24
344:6, 344:18
345:4, 345:19
346:4, 346:7
**sum** 183:20

**summarize** 103:3
108:11, 258:25
262:23, 275:21
277:19
**summarized**
343:22
**summary** 2:10
2:15, 22:14, 95:3
109:14, 109:15
121:16, 125:9
139:20, 186:14
186:16, 210:20
211:4, 221:10
271:7
**supervision** 286:6
**supervisor** 287:1
294:22, 310:20
**supplied** 318:20
318:23
**support** 70:8
84:4, 180:18
315:18, 315:20
316:15
**supported** 190:14
210:3, 274:24
**supports** 47:21
47:24, 47:25
48:1, 82:20, 87:9
90:14, 142:12
176:3, 314:17
315:1, 315:6
315:19, 315:24
316:5, 316:6
**suppose** 62:13
102:16, 328:3
328:6
**supposed** 107:17
109:25, 151:7
151:9, 155:17
192:22, 192:25
193:1, 213:19
219:23, 242:1
259:3, 272:21
277:21, 290:13
290:19, 290:19
290:20, 341:25
341:25
**supposedly**
170:25, 174:19

184:14, 194:23
248:9, 291:21
**sure** 10:5, 13:25
14:6, 14:11
28:15, 31:5
32:20, 37:11
38:1, 47:20
48:18, 54:9, 55:6
63:4, 73:12, 74:2
74:16, 76:18
77:19, 77:20
79:13, 82:15
92:25, 95:12
99:11, 107:12
115:1, 119:14
122:10, 122:11
123:12, 128:25
131:4, 133:6
143:9, 166:8
172:17, 175:2
191:7, 192:14
196:9, 211:8
221:22, 225:6
232:11, 234:25
243:10, 243:13
244:16, 251:5
254:15, 255:6
271:8, 288:3
292:12, 294:6
309:14, 310:6
314:2, 322:6
326:11, 329:20
**surprise** 134:24
175:16, 175:19
204:12, 223:9
**surprised** 230:21
239:15
**surprising** 136:9
**surrounding**
66:11, 90:10
**suspect** 269:23
**suspected** 187:3
**suspended** 25:20
**suspicion** 41:17
46:19, 46:21
59:12
**suspicions** 35:15
36:5, 36:13
36:14, 36:20

40:16, 40:22
41:8, 41:23, 42:7
43:19, 46:8
147:8, 219:22
219:23, 220:2
**suspicious** 34:2
35:14, 36:14
45:18, 46:13
**swear** 9:4
**switch** 229:1
**sworn** 9:8, 12:4
348:5
**Sylvia** 308:10

## T

**take** 15:6, 15:21
16:19, 24:12
25:8, 31:10
31:14, 32:14
58:12, 58:12
65:4, 65:16
65:17, 65:19
93:25, 108:9
109:18, 127:20
129:22, 130:7
140:23, 142:19
143:14, 152:2
152:18, 152:24
153:9, 153:9
158:4, 160:18
165:22, 198:3
198:24, 199:6
200:2, 200:6
200:7, 233:22
233:23, 235:14
236:25, 238:2
243:12, 243:18
256:13, 256:17
257:9, 257:22
271:6, 271:9
278:16, 281:4
281:7, 282:17
306:21, 334:11
335:20, 337:11
341:22
**taken** 7:3, 8:8
9:16, 119:5
181:25, 211:15

305:8, 323:7
326:22, 329:17
331:5, 338:6
340:5, 347:8
348:4, 348:7
**takes** 127:9
189:10, 212:5
**talk** 28:12, 124:5
128:16, 129:2
159:3, 163:18
216:24, 290:9
299:25, 317:16
**talked** 143:18
146:6, 146:10
302:17, 305:3
310:5, 317:16
323:9
**talking** 10:6, 14:4
28:11, 28:13
34:5, 48:8, 48:10
59:6, 59:10
136:23, 146:1
147:15, 152:4
153:3, 153:10
156:13, 161:15
163:7, 163:21
177:19, 216:12
227:20, 250:21
251:8, 251:11
251:15, 268:13
277:20, 278:9
288:15, 293:9
**talks** 102:9, 121:2
128:16, 213:8
271:23
**tax** 134:12
318:20
**taxes** 134:8
**teachers** 32:8
**team** 118:24
148:4, 149:23
150:24, 176:23
188:11, 189:14
211:15, 212:5
216:13, 219:23
230:13, 231:17
232:1, 233:13
234:1, 238:1
239:17, 240:2

DANIEL JAEGER   MARCH 02, 2023

242:14, 245:19
246:23, 246:25
247:1, 249:18
291:21, 292:16
293:9, 295:3
295:19, 297:25
298:11, 302:9
302:24, 313:22
317:20, 317:23
317:23, 318:3
**technically**
341:20
**television** 12:3
**tell** 12:4, 13:23
14:9, 16:25, 17:7
21:1, 21:21
27:10, 39:23
64:4, 75:24, 76:9
81:21, 81:23
82:7, 82:9, 84:22
84:24, 89:5
109:25, 134:4
141:5, 142:1
143:12, 144:17
145:3, 155:14
163:9, 165:16
169:18, 170:17
170:19, 173:25
175:7, 180:20
181:4, 182:10
183:7, 183:20
203:17, 204:1
223:9, 229:20
235:2, 255:19
257:6, 257:14
258:21, 259:25
293:16, 299:12
299:16, 301:11
301:19, 308:21
322:23, 323:4
335:24, 339:18
**telling** 40:16
62:21, 111:4
128:8, 128:10
147:19, 150:20
182:18, 259:24
263:16, 274:17
281:8, 281:23
296:25, 321:21

**tells** 310:10
**temerity** 282:20
**ten** 92:2, 342:1
**ten-component**
45:8
**tens** 78:16, 78:22
79:3, 79:6, 289:9
**term** 69:20, 73:22
74:22, 74:24
109:11, 167:8
177:13, 179:18
179:18, 180:5
301:9, 339:25
340:3
**terminate** 93:16
95:4, 95:20
96:18, 96:24
156:7, 157:23
205:22, 227:4
**terminology**
101:25, 230:10
230:11
**terms** 26:5, 217:1
230:16, 304:4
340:5, 340:17
340:18
**testified** 9:9, 67:7
72:23, 86:7
88:13, 90:18
91:21, 98:19
99:22, 125:24
146:25, 151:17
155:15, 164:11
176:2, 193:25
201:7, 201:11
209:18, 279:7
345:25
**testify** 12:19
12:25, 348:5
**testifying** 13:4
13:8, 321:1
348:5
**testimony** 13:9
22:1, 38:7, 39:9
42:10, 46:1
59:14, 63:25
64:3, 64:8, 64:13
65:12, 71:16
77:16, 86:11

86:14, 86:15
88:25, 89:9
89:12, 89:15
89:19, 93:23
96:9, 98:1, 98:11
99:4, 118:18
118:23, 126:7
127:25, 134:6
134:8, 139:21
141:3, 146:5
146:15, 150:1
151:4, 151:18
157:9, 162:6
162:25, 164:1
164:12, 178:21
179:12, 188:6
190:17, 190:21
192:17, 192:20
193:1, 193:10
193:14, 193:20
193:23, 194:5
194:6, 194:12
195:5, 195:9
195:14, 195:20
196:2, 198:17
204:19, 204:21
205:7, 205:18
209:20, 210:4
230:10, 233:9
241:4, 259:5
259:8, 259:22
276:10, 276:16
292:18, 317:10
320:17, 320:22
330:20, 332:2
334:24, 335:2
335:6, 336:25
337:2, 337:5
339:15, 339:16
340:4, 343:2
343:8, 343:10
343:16, 343:21
343:22, 344:11
344:17, 345:15
345:23, 347:8
347:11
**testing** 143:16
**thank** 9:3, 11:21
46:24, 58:19

63:15, 74:17
121:20, 198:24
222:3, 226:24
308:3, 334:21
338:23, 346:3
**thanks** 58:17
166:23, 205:13
338:22
**theft** 44:3, 69:6
85:2, 172:20
184:25, 334:10
335:19
**theme** 332:14
**theoretically**
127:20, 128:3
**theory** 62:17
102:17, 119:6
173:6, 173:20
183:1, 253:24
315:2, 315:7
315:18, 315:19
315:24, 336:9
**thereabouts**
260:3
**thereto** 348:12
**thing** 17:7, 19:6
53:7, 57:10
108:24, 113:15
127:23, 138:10
143:22, 157:10
159:5, 177:4
185:19, 213:23
222:7, 224:7
226:4, 253:22
287:6, 313:22
**things** 14:3, 45:4
45:16, 66:8
86:25, 88:1
113:11, 119:7
124:22, 126:15
134:22, 135:20
139:20, 143:21
145:4, 154:18
160:17, 165:21
165:22, 165:23
168:17, 182:9
184:19, 238:21
240:12, 240:14
244:23, 308:9

317:7, 319:15
319:21, 325:2
**think** 9:23, 18:6
22:2, 22:5, 26:10
29:8, 30:19, 52:8
53:10, 55:7, 56:2
57:10, 61:10
62:25, 63:3
64:15, 66:5, 68:7
68:8, 70:1, 78:25
79:3, 81:9, 86:2
86:22, 87:3
91:12, 92:15
93:8, 96:19
98:11, 98:11
103:3, 103:3
111:3, 112:3
112:12, 112:16
118:5, 120:24
123:17, 124:19
127:4, 130:11
134:14, 136:15
139:12, 140:20
142:12, 145:6
146:15, 146:24
148:24, 149:6
150:16, 150:19
150:21, 152:20
154:6, 156:4
158:10, 161:12
161:23, 161:23
163:17, 163:23
164:3, 164:12
168:3, 168:14
168:25, 169:1
169:16, 171:21
171:22, 176:15
181:2, 181:3
181:5, 181:6
181:7, 181:12
181:18, 181:20
183:2, 186:1
186:15, 187:1
188:9, 188:18
189:12, 195:14
197:10, 198:11
198:12, 205:11
217:25, 230:9
231:14, 232:14

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| 240:5, 242:6 | **thousands** 52:3 | 165:20, 166:5 | 105:12, 150:10 | 330:22, 344:24 |
| 242:19, 243:17 | 52:19, 52:20 | 168:23, 172:21 | 150:16, 155:9 | **ton** 324:5 |
| 249:5, 249:10 | 78:16, 78:23 | 175:15, 177:23 | 164:11, 199:14 | **top** 15:2, 53:17 |
| 250:4, 257:4 | 79:3, 79:6, 79:9 | 182:6, 185:7 | 287:23, 287:25 | 120:11, 133:5 |
| 258:24, 259:3 | 79:12, 184:21 | 189:10, 190:18 | 301:11, 330:6 | 213:7, 213:21 |
| 259:4, 259:5 | 185:10, 186:5 | 191:17, 191:25 | 335:13, 337:7 | 239:25, 255:1 |
| 259:7, 260:16 | 289:9 | 199:1, 199:21 | **timing** 53:11 | 272:10, 272:16 |
| 264:18, 266:7 | **three** 16:24, 17:8 | 200:8, 200:15 | 165:7, 174:13 | 275:16, 284:9 |
| 266:12, 266:13 | 93:12, 97:25 | 205:6, 206:13 | 174:21, 174:22 | 288:12, 308:14 |
| 272:13, 278:11 | 116:1, 181:11 | 206:15, 209:23 | 176:17, 176:17 | **topic** 59:20 |
| 278:12, 278:16 | 187:8, 187:14 | 217:21, 217:23 | 206:21 | 162:25, 164:2 |
| 278:22, 280:22 | 204:6, 206:24 | 221:15, 225:17 | **title** 24:8, 27:14 | **topics** 13:10 |
| 283:7, 288:5 | 209:24, 210:25 | 229:13, 237:23 | **titled** 242:9 | 13:18, 13:19 |
| 289:17, 292:22 | 211:6, 269:13 | 241:1, 243:13 | **today** 8:13, 12:11 | **total** 10:12, 10:15 |
| 297:20, 309:17 | 269:21, 279:18 | 243:20, 244:2 | 13:23, 13:24 | 118:2, 120:16 |
| 309:25, 310:8 | 285:4, 285:5 | 255:25, 260:6 | 17:23, 19:2 | 120:16, 122:2 |
| 312:4, 313:4 | 285:15, 285:16 | 271:11, 271:18 | 19:20, 20:10 | 130:14, 177:24 |
| 316:9, 316:13 | 285:17, 311:25 | 282:15, 288:9 | 20:19, 21:7, 22:4 | 288:24, 288:24 |
| 323:14, 323:15 | 330:6, 337:6 | 290:5, 294:14 | 22:9, 22:11 | **totality** 66:12 |
| 326:16, 328:1 | **threw** 340:3 | 294:22, 295:14 | 48:21, 50:9 | 83:10, 86:2 |
| 330:5, 332:14 | **Thursday** 15:22 | 297:16, 306:4 | 51:16, 75:5 | 86:24, 87:13 |
| 332:19, 338:19 | **time** 15:23, 26:2 | 306:21, 308:3 | 169:1, 186:2 | 87:24, 89:4, 90:6 |
| 342:13, 344:15 | 28:9, 29:8, 31:5 | 308:19, 309:6 | 199:1, 205:2 | 90:13, 100:7 |
| 345:9 | 31:6, 31:7, 33:21 | 309:7, 309:22 | 210:3, 254:19 | 112:22, 154:12 |
| **thinking** 125:22 | 34:15, 34:17 | 309:25, 310:2 | 305:9, 305:15 | **totally** 114:24 |
| 255:10, 268:3 | 36:9, 41:14 | 310:3, 310:11 | 313:2, 323:4 | 222:16 |
| **thinks** 39:22 | 44:17, 45:3 | 312:13, 312:17 | 326:1, 331:1 | **Town** 248:10 |
| 64:20, 95:5 | 49:18, 50:18 | 314:1, 315:2 | 332:2, 333:24 | 249:2, 249:13 |
| 107:20, 152:19 | 52:25, 58:20 | 315:4, 315:21 | 341:17, 342:20 | **track** 48:15 |
| 313:16, 344:16 | 59:2, 62:24, 69:6 | 320:6, 320:7 | 342:25, 343:6 | 173:1, 266:17 |
| **third** 113:6 | 72:10, 80:19 | 320:15, 320:16 | **today's** 14:10 | **tracking** 254:21 |
| 215:13, 267:5 | 82:24, 83:17 | 326:14, 330:4 | **told** 20:1, 20:3 | **trade** 2:24, 3:3 |
| 272:6, 307:12 | 83:17, 85:16 | 330:13, 330:15 | 42:24, 65:11 | 3:16, 32:8 |
| 307:24 | 88:12, 90:23 | 330:17, 334:18 | 68:2, 76:18 | **traded** 70:11 |
| **third-party** 182:5 | 91:15, 92:22 | 338:22, 344:25 | 77:18, 85:19 | 169:8, 173:10 |
| **Thompson** 7:22 | 94:3, 94:10 | 346:5 | 85:21, 89:9, 91:6 | 173:13, 174:10 |
| 8:17, 58:25, 94:8 | 95:18, 96:9 | **timelines** 33:25 | 92:15, 93:9, 97:7 | 175:10, 175:17 |
| 145:21, 200:13 | 96:12, 96:14 | **times** 9:18, 9:20 | 97:10, 103:8 | 181:25, 259:13 |
| 243:25, 271:16 | 96:16, 97:9 | 10:5, 32:25 | 108:11, 114:6 | **trading** 169:21 |
| **thorough** 218:8 | 99:15, 103:15 | 39:10, 52:4 | 118:23, 118:25 | **traffic** 239:25 |
| 249:23 | 105:5, 107:13 | 52:19, 52:21 | 123:23, 137:4 | 240:3, 241:24 |
| **thought** 20:9 | 111:6, 114:13 | 52:22, 52:25 | 137:15, 143:22 | 241:25, 242:8 |
| 20:18, 21:14 | 114:23, 115:11 | 53:4, 63:18 | 150:15, 163:24 | 242:24 |
| 22:3, 120:12 | 119:8, 127:10 | 63:21, 66:21 | 164:3, 192:12 | **traffic/minor** |
| 140:5, 142:6 | 133:22, 133:24 | 71:12, 81:8 | 194:8, 205:25 | 242:1 |
| 170:10, 206:22 | 135:19, 139:3 | 86:17, 90:18 | 208:9, 246:9 | **trail** 228:6 |
| 207:1, 207:15 | 145:9, 145:16 | 91:24, 92:2 | 268:11, 280:5 | **trained** 215:18 |
| 266:6, 334:23 | 145:23, 150:4 | 93:12, 96:15 | 280:17, 280:22 | 216:2, 216:16 |
| 337:16, 337:17 | 152:9, 160:22 | 97:8, 105:10 | 282:1, 304:14 | 216:22, 219:10 |

220:10, 220:21
**training** 43:25
45:22, 46:11
89:1, 122:13
122:15
**transcript** 2:19
10:8, 151:12
163:25, 201:20
203:16, 203:25
205:1, 205:12
209:9, 210:5
249:4, 305:7
305:17, 305:18
306:19, 310:4
310:6, 342:15
342:18, 342:20
344:11, 345:17
347:8, 347:10
**transcripts** 18:22
19:7, 19:15
19:16, 20:1, 20:2
21:18, 21:19
22:5, 22:6, 305:4
**transfer** 31:2
**transferred** 25:21
27:25, 28:22
28:25, 30:15
33:17, 41:10
187:8, 210:24
211:5, 211:6
217:17, 242:13
**transferring** 31:6
**travels** 84:11
**treat** 212:15
212:17, 212:25
**treated** 190:3
211:11, 211:23
211:25, 214:19
240:5
**treating** 240:3
**treats** 211:16
216:13
**tremendous**
126:19, 127:15
**trial** 91:20, 91:21
92:3, 92:14
99:22, 232:9
250:23, 251:21
**triangle** 135:15

**tried** 28:24, 64:4
85:23, 96:23
165:11, 238:2
**triggered** 333:3
**true** 26:24, 36:6
36:23, 39:20
79:2, 107:8
132:2, 163:13
196:22, 237:5
238:5, 252:10
333:2, 347:10
348:6
**truly** 236:18
**trumpeting** 92:4
**trust** 128:2, 128:5
134:15, 134:16
**truth** 12:4, 12:5
12:5, 160:12
348:5
**truthful** 84:15
175:12, 176:1
257:10, 268:13
**try** 34:23, 54:7
103:5, 128:14
136:6, 182:17
185:3, 207:9
216:8, 224:17
231:15, 237:21
250:23, 255:21
257:17, 301:6
321:12, 323:14
**trying** 18:11, 19:3
19:23, 20:22
31:10, 32:21
35:4, 35:18
35:19, 36:12
38:1, 70:19, 78:4
118:19, 150:19
192:4, 199:8
202:10, 221:17
225:21, 226:18
229:8, 230:3
230:5, 231:10
236:21, 237:9
259:23, 269:9
286:20, 293:2
307:8, 310:8
313:23, 314:8
315:17, 321:19

321:24, 340:13
**Tucson** 70:15
82:25, 85:18
322:12, 322:15
326:19, 326:21
**Tuesday** 16:7
**tune** 139:18
276:21
**turn** 23:20, 243:8
**turns** 201:6
229:23, 233:25
235:12
**twice** 95:2
**two** 14:13, 14:18
14:22, 21:5
21:25, 22:4
61:16, 80:7
90:11, 96:17
97:24, 110:11
110:12, 131:15
131:16, 131:17
133:4, 133:8
142:16, 143:21
146:6, 147:16
153:5, 153:8
157:19, 166:12
197:4, 207:20
207:23, 209:24
221:12, 258:8
260:11, 265:9
267:4, 269:11
276:20, 288:14
312:2, 312:2
312:6, 320:13
321:18
**two-thirds** 300:16
**type** 44:20, 57:5
96:6, 129:19
129:20, 135:11
301:19
**types** 31:1, 32:9
32:11, 34:6
122:19, 146:6
185:2, 236:18
**typical** 55:4
55:14, 241:14
275:8
**typically** 16:21
55:13, 55:16

56:11, 56:12
56:13, 144:23
246:19, 255:18
262:13, 263:17
263:20, 273:2
275:3, 275:4
276:3, 276:13
286:16, 287:8

---

## U

**Uh-huh** 124:6
**ultimate** 78:5
**ultimately** 40:24
50:16, 67:21
77:6, 110:15
204:4, 265:24
**unable** 35:13
35:14, 150:24
153:20
**uncertainty**
190:18, 191:25
193:21, 195:7
195:21, 195:25
196:20, 220:7
**unclear** 220:6
**uncovered** 77:8
88:1, 169:14
**undercut** 201:8
**undersigned**
347:7
**understand** 10:8
10:18, 11:6
11:20, 12:6, 12:8
12:9, 12:19
18:11, 19:4
28:12, 30:21
34:20, 48:2
53:10, 55:11
55:12, 69:14
69:15, 69:19
70:9, 71:2, 71:6
78:4, 79:13
92:13, 97:2
102:15, 122:17
122:18, 123:13
131:25, 132:22
139:15, 146:15
153:16, 164:23

164:24, 164:24
165:14, 179:6
179:15, 179:17
179:18, 180:4
180:9, 199:7
199:17, 199:21
224:17, 229:9
229:21, 230:5
231:11, 233:4
247:5, 261:8
269:6, 274:10
274:15, 276:11
291:13, 301:16
310:8, 310:18
314:8, 314:16
314:18, 314:22
316:6, 316:14
321:20, 322:6
323:16, 325:21
329:20, 335:5
339:24, 342:3
342:9
**understandable**
165:1
**understanding**
12:21, 12:23
12:24, 13:3, 13:7
13:11, 13:14
19:12, 34:11
34:25, 63:14
69:5, 98:21
99:16, 99:19
111:15, 127:25
161:24, 209:22
244:20, 255:22
257:5, 263:2
281:16, 296:22
306:4, 329:25
331:7, 339:23
340:8
**understood** 11:25
43:3, 229:13
232:14, 269:25
301:8, 336:10
**undertook** 168:22
**undervalues**
138:15
**underwriter**
22:24, 23:13

DANIEL JAEGER    MARCH 02, 2023

258:19
**underwriting**
76:9, 222:13
**undisputed** 274:9
**Une** 256:15
**Unfair** 34:7
**unfairly** 233:11
**Unfortunately**
190:13
**unions** 32:9
**unique** 44:3
**unit** 25:17, 28:25
30:6, 30:16
30:20, 31:3
31:12, 32:14
32:18, 33:5, 49:8
49:14, 49:20
172:8, 187:13
189:14, 217:10
221:15, 223:6
224:6, 246:18
263:17, 263:17
273:1, 275:22
284:17, 284:19
286:24, 287:1
**United** 1:1, 8:11
**units** 29:21, 32:6
**University** 22:23
23:2, 24:1, 24:3
**unpack** 128:13
237:9
**unquote** 43:23
45:18, 105:6
308:22, 313:9
321:13
**unreasonably**
95:21, 96:21
**unreviewable**
342:14
**unsure** 79:18
**unusual** 138:10
165:17, 175:8
187:17, 292:13
**update** 44:19
**updated** 75:23
76:3, 175:21
**upper** 130:8
**upscale** 132:7
**use** 12:2, 52:7

96:14, 110:21
202:5, 239:12
264:9, 287:10
287:14, 287:18
287:19, 287:20
287:22, 292:16
292:17, 292:22
292:25, 293:3
293:3, 293:4
293:10, 293:12
293:21, 299:11
**uses** 213:20
214:15, 297:25
298:12
**usually** 132:13
175:13, 247:2
284:6
**utilize** 152:10
**utilized** 247:11
272:2

## V

**VAC** 221:15
287:1, 287:3
304:1
**vacation** 132:13
**vacuum** 90:12
**VAE** 120:2, 120:5
299:7, 299:11
299:13, 304:1
304:13, 304:20
**vague** 167:14
**Valentine's**
312:25
**valid** 36:5, 36:11
117:15
**validate** 34:24
35:5, 35:19
35:20, 182:18
185:3, 190:13
**validity** 314:25
316:17
**valuable** 121:7
184:19, 253:8
287:4
**value** 67:3, 67:25
73:9, 74:3, 78:12
116:17, 117:7

127:7, 127:7
127:17, 127:18
127:19, 127:20
133:14, 168:20
170:15, 170:21
171:4, 171:6
171:12, 171:14
171:16, 177:24
184:8, 200:24
204:17, 222:14
224:15, 224:22
225:15, 225:17
225:22, 230:4
231:13, 295:10
297:9, 297:15
297:21, 298:12
298:18, 299:3
304:11, 323:21
324:22, 324:22
325:8, 325:13
328:21, 328:23
329:2, 329:6
329:23, 331:4
332:19, 333:21
335:2, 336:8
336:22, 337:19
**valued** 253:10
253:11, 253:12
253:13, 253:14
253:17, 253:18
253:20
**values** 177:8
181:21, 325:4
**variable** 278:16
**variation** 325:20
327:25
**variations** 52:9
52:13
**variety** 293:3
**various** 39:10
45:10, 178:3
319:15, 319:21
**vary** 123:19
124:25, 144:17
**varying** 136:4
142:14, 145:4
160:17, 287:20
**vast** 185:4
**venued** 110:15

274:20
**veracity** 124:14
256:6
**verbatim** 38:14
**verified** 247:11
248:3
**verify** 34:23, 35:4
182:17, 185:3
190:12, 254:11
**versa** 132:18
**version** 54:1
80:14, 83:12
84:7, 87:5
172:19
**versions** 86:25
**versus** 8:10
36:13, 69:13
69:16, 70:24
77:17, 79:15
81:22, 90:3, 93:1
98:10, 147:9
230:12, 230:25
233:14, 309:7
309:23, 314:1
315:3, 315:21
338:4
**veteran** 49:13
**vice** 132:18
**video** 7:22, 8:17
8:18, 58:25, 94:8
145:21, 200:13
243:25, 271:16
**videoconference**
1:12, 7:1, 7:4, 8:8
346:8
**Videographer**
7:22, 8:6, 9:3
58:20, 58:24
94:3, 94:7
145:16, 145:20
200:8, 200:12
243:15, 243:20
243:24, 271:11
271:15, 334:20
334:22, 346:5
**videotaped** 1:12
7:1, 8:6, 59:1
94:9, 145:22
200:14, 244:1

271:17, 346:8
**view** 43:20, 73:17
83:11, 88:3
90:19, 93:7
103:14, 111:18
111:23, 117:2
123:15, 158:25
234:10, 247:3
276:20, 282:16
**viewed** 100:7
**viewpoint** 111:25
**views** 69:12
**vintage** 253:13
**violate** 212:4
283:7
**violated** 183:11
**violates** 271:4
**violation** 57:9
57:14, 57:21
60:16, 81:6
82:21, 89:3, 91:3
94:17, 118:21
156:5, 193:14
215:5, 215:16
215:24, 216:1
216:15, 216:21
240:4, 240:6
241:24, 242:8
269:10, 303:11
**Virginia** 308:10
**virtually** 148:21
148:25, 149:9
**Visa** 139:11
**void** 48:7
**voila** 228:20

## W

**W-e-s-s-e-l**
296:20
**wage** 134:16
**Wait** 58:10, 123:9
179:16, 233:8
**waivable** 270:12
**waive** 97:3, 113:2
262:5
**waived** 45:8
269:14, 348:10
**waiver** 262:8

DANIEL JAEGER   MARCH 02, 2023

262:12, 263:11
268:25
**walked** 342:20
343:6
**wall** 23:20
**want** 28:15, 29:3
37:11, 38:12
38:14, 39:5
39:15, 41:6
41:24, 44:16
58:11, 63:4, 65:7
71:23, 73:2
79:14, 80:20
81:10, 85:12
89:6, 92:13
96:14, 97:7
105:25, 105:25
122:25, 123:2
124:24, 124:24
124:25, 127:19
136:2, 142:23
143:15, 143:19
144:25, 149:12
149:18, 154:16
155:2, 155:12
155:14, 155:18
155:19, 157:24
158:2, 158:4
161:21, 179:16
180:25, 183:14
186:22, 188:23
189:1, 197:9
199:10, 204:25
205:5, 206:7
208:14, 208:23
208:24, 226:19
242:24, 251:1
251:18, 251:22
253:4, 254:15
255:12, 256:18
258:20, 259:20
275:1, 277:12
277:13, 277:16
299:24, 301:18
325:20
**wanted** 62:14
72:14, 85:11
127:21, 128:4
140:14, 144:12

144:13, 147:2
222:2, 281:23
283:3, 333:2
333:6, 333:7
336:6, 339:6
**wanting** 223:12
**wants** 304:16
308:9, 308:12
308:15, 308:17
**Warhol** 72:20
167:24, 177:4
177:5, 177:6
**warrant** 36:20
**warranted**
272:24
**warrants** 197:7
**Warren** 50:18
**watch** 264:19
269:22
**watches** 252:10
252:10, 252:15
252:16, 252:19
253:10, 254:17
287:5
**water** 145:13
**way** 16:22, 18:15
39:22, 55:7
57:19, 60:7
61:13, 61:14
62:19, 70:23
122:12, 126:2
134:5, 137:18
147:6, 151:7
154:16, 158:3
159:25, 166:3
166:9, 180:22
181:22, 183:25
184:13, 184:20
184:21, 184:22
185:9, 185:10
185:11, 186:3
186:4, 186:10
197:9, 197:10
220:8, 220:18
220:21, 227:15
231:9, 231:17
235:12, 239:21
241:16, 242:9
244:21, 245:8

256:9, 260:10
281:22, 291:2
300:16, 301:10
308:13, 314:11
339:22, 343:17
348:12, 348:12
**ways** 42:4, 183:1
**we've** 56:14, 59:6
80:25, 92:16
105:23, 110:5
142:18, 143:18
153:3, 153:5
163:7, 164:10
173:11, 174:15
184:7, 184:16
186:9, 189:13
198:25, 216:22
217:25, 223:15
236:7, 254:18
265:7, 270:16
270:21, 288:8
293:17, 302:6
310:25
**weaknesses**
278:23
**wealth** 76:17
88:12, 93:7
141:23, 235:16
238:3, 261:23
268:22, 314:13
322:8
**wealthier** 144:20
**wealthy** 124:22
126:20, 135:20
141:6, 144:19
144:20
**wear** 96:1
**Wednesday** 15:24
16:5, 16:7, 16:8
**week** 15:22, 15:24
16:5, 231:11
308:4
**weeks** 305:12
**weird** 139:20
**welcome** 16:14
334:22
**well-documented**
164:25
**well-off** 143:14

**well-written**
107:21
**went** 11:15, 18:21
29:7, 29:10
29:14, 32:1
49:13, 67:9
98:10, 116:20
120:13, 190:9
190:10, 215:1
260:4, 285:4
285:9, 285:9
285:13, 293:21
303:1, 304:1
**Wessel** 296:19
296:20
**Wessie** 296:20
**whatsoever** 78:8
84:2, 182:1
183:9, 235:23
334:15
**White** 4:2, 68:13
69:9, 167:3
191:2, 194:5
196:22, 248:16
249:1, 249:5
249:7, 249:14
249:24, 250:2
274:1, 280:3
280:9, 280:13
283:24, 284:10
289:17, 295:2
295:5, 295:7
295:16, 305:8
305:20, 306:11
306:25, 307:14
307:23, 308:8
308:24, 309:21
310:12, 312:7
312:24, 313:5
313:10, 320:12
**White's** 68:21
**Whitehouse**
31:19
**widely** 152:20
**wife** 128:2, 128:6
130:24, 132:20
134:6, 141:17
**wildly** 93:24
230:15, 231:2

231:18, 233:15
300:19, 313:24
338:20
**willful** 56:5
**willing** 160:18
**Wilmington**
31:20
**Wilson** 7:16, 9:1
9:4, 9:7, 12:10
12:13, 12:18
12:20, 12:22
12:24, 13:4, 13:8
13:14, 14:16
15:11, 17:13
18:10, 19:11
20:7, 25:13
25:24, 26:19
30:2, 30:9, 33:22
34:11, 34:20
35:11, 36:10
36:19, 36:25
37:9, 37:19
40:22, 41:15
42:3, 42:12
44:23, 46:3
46:18, 50:15
50:23, 53:22
54:24, 55:20
56:2, 56:18, 57:3
58:1, 59:19, 60:4
60:14, 61:10
61:21, 62:9
62:25, 63:12
64:12, 65:1, 66:5
66:18, 67:1, 68:7
68:20, 69:25
71:6, 71:21, 72:4
73:7, 75:10, 76:8
77:3, 78:1, 78:20
78:25, 79:23
81:5, 81:18
82:15, 86:13
87:22, 88:20
89:18, 90:24
91:16, 92:23
96:1, 96:3, 96:22
97:13, 98:16
99:2, 99:11

DANIEL JAEGER    MARCH 02, 2023

99:19, 100:4
100:12, 102:5
103:12, 104:5
106:25, 107:12
107:25, 108:19
110:10, 111:2
111:12, 111:15
111:23, 112:9
112:22, 114:3
114:11, 114:22
115:11, 115:21
116:24, 119:4
119:14, 119:25
120:24, 121:10
121:18, 122:1
122:17, 123:5
123:11, 124:13
125:15, 126:5
128:23, 129:8
129:16, 130:3
130:11, 130:20
131:4, 131:13
132:6, 133:3
134:11, 137:9
137:23, 138:23
140:1, 141:5
142:1, 143:5
144:9, 146:24
147:15, 148:11
150:5, 151:23
153:8, 154:2
154:11, 154:24
156:21, 157:3
157:18, 159:13
160:8, 162:8
163:4, 164:9
165:11, 167:14
168:11, 170:9
171:9, 172:17
173:23, 175:2
176:9, 176:10
176:12, 176:12
177:1, 179:14
180:9, 186:8
187:17, 188:18
189:22, 190:8
190:25, 191:11
192:19, 194:17
195:14, 196:6

197:1, 199:7
200:23, 201:11
202:22, 202:25
203:15, 205:11
205:24, 206:20
207:14, 209:22
211:21, 212:10
212:23, 214:25
215:9, 215:21
216:5, 216:20
217:7, 217:13
217:20, 218:5
218:12, 218:19
219:2, 219:5
219:14, 220:1
220:14, 220:24
221:25, 222:10
222:25, 223:19
224:3, 224:10
226:17, 227:14
228:17, 228:23
229:6, 229:19
230:19, 231:7
231:25, 233:19
234:8, 234:25
235:21, 236:14
237:9, 238:9
239:10, 241:8
242:6, 245:4
245:22, 247:10
248:1, 249:10
249:22, 252:14
252:22, 254:8
255:18, 258:4
259:7, 261:15
261:20, 262:2
262:11, 263:8
263:15, 264:15
264:25, 265:14
265:23, 268:8
269:6, 270:5
270:19, 271:2
273:18, 274:15
275:14, 276:18
277:2, 280:1
281:13, 281:19
282:12, 282:24
285:13, 286:5
288:3, 288:17

289:7, 289:12
289:22, 290:17
291:1, 292:3
292:21, 293:15
294:14, 297:3
297:19, 298:2
298:16, 301:16
301:25, 302:14
303:7, 303:25
304:9, 306:2
306:18, 309:3
309:13, 310:18
311:3, 311:10
311:17, 312:17
314:6, 314:22
315:11, 316:4
317:22, 318:19
319:2, 319:14
320:10, 321:1
321:18, 322:21
323:25, 325:1
325:16, 326:5
328:12, 329:11
330:4, 330:22
331:12, 332:7
333:1, 334:4
335:12, 336:15
337:5, 338:2
338:23, 340:8
340:21, 341:8
342:13, 343:8
343:15, 344:1
344:9, 344:21
345:6, 345:22
346:3, 348:5
**witnesses** 322:10
**woke** 171:3
188:3
**wonderful** 159:7
**wondering** 91:7
116:12
**Woods** 7:16, 9:1
**word** 11:3, 11:3
53:16, 61:4
61:10, 64:4
122:14, 213:20
214:15
**worded** 301:5
**words** 35:7, 35:11

38:16, 40:15
52:8, 60:7, 61:13
62:18, 109:11
116:12, 117:23
161:12, 170:24
233:3, 236:2
286:13, 301:18
329:19
**wordy** 62:14
**work** 16:3
106:17, 130:4
133:20, 133:23
239:4, 239:6
257:15, 318:3
**work-product**
16:12
**worked** 32:12
288:6
**working** 25:3
48:24, 67:7
163:11, 184:4
209:11, 217:9
271:7, 285:23
288:8, 295:16
**works** 35:1, 36:1
57:20, 227:15
**world** 43:4
122:23, 135:21
141:14, 289:25
290:1, 290:2
290:10, 340:5
**worldwide** 50:1
50:3, 50:5, 50:6
50:15, 50:24
50:25
**worth** 2:10
116:15, 117:12
118:6, 119:18
124:7, 124:19
125:4, 125:9
126:11, 126:16
126:23, 128:19
129:18, 129:24
130:3, 130:6
130:15, 133:17
136:9, 138:10
138:13, 138:15
138:16, 140:22
142:22, 143:6

143:12, 144:1
153:13, 154:18
156:15, 178:14
179:24, 250:14
295:12, 298:23
**wow** 50:4, 229:2
**wrap** 325:22
**write** 37:3, 38:4
38:13, 45:5
47:23, 65:7
108:3, 236:7
236:9
**written** 236:5
265:4
**wrong** 88:15
89:14, 91:12
152:7, 241:18
**wrongdoing** 86:8
98:21
**wrote** 32:7, 37:11
37:13, 38:2
73:14, 76:21
146:1, 162:18
163:24, 204:5
204:14
**www.dlvreporti...**
1:25

### Y

**yeah** 16:21, 28:9
29:3, 30:9, 32:5
34:5, 34:20, 42:3
44:23, 46:3
48:12, 50:23
52:13, 52:24
53:10, 57:3
58:18, 65:1, 66:5
68:7, 69:25
71:21, 76:8, 77:3
79:23, 81:5
88:20, 100:4
104:5, 112:9
113:8, 116:24
119:19, 120:24
125:23, 130:11
131:4, 131:13
134:11, 136:23
138:23, 144:9

DANIEL JAEGER   MARCH 02, 2023

145:10, 146:24
147:5, 148:11
149:5, 152:24
154:24, 160:8
164:7, 164:9
165:11, 166:7
166:8, 167:14
168:11, 170:9
175:13, 177:21
181:2, 183:2
184:18, 185:2
186:14, 188:18
190:2, 191:11
192:19, 195:18
195:18, 196:16
197:1, 201:24
201:24, 202:12
202:19, 211:2
211:21, 216:5
219:14, 221:7
229:6, 229:20
234:25, 235:8
235:21, 238:9
239:14, 240:17
240:20, 242:6
244:8, 245:22
247:10, 249:22
252:22, 255:18
257:7, 258:4
264:8, 264:15
265:14, 265:23
266:7, 269:6
274:15, 275:14
276:18, 278:6
282:24, 288:3
289:12, 289:22
291:1, 292:21
293:15, 294:18
295:7, 296:2
306:2, 306:18
309:13, 309:19
310:18, 314:6
321:18, 325:1
325:8, 326:5
327:6, 327:7
330:22, 331:12
333:23, 336:15
342:13, 342:24
343:15, 344:1

344:21, 345:22
**year** 23:4, 31:8
45:10, 53:11
75:6, 75:6, 75:10
134:7, 169:24
171:5, 180:16
182:7, 279:17
287:23, 287:25
288:14, 328:22
**years** 10:21, 11:3
24:20, 25:5
29:21, 45:23
46:12, 48:24
52:4, 52:18
52:23, 53:13
53:19, 63:19
65:23, 65:25
66:8, 66:9, 66:9
78:15, 78:23
86:16, 89:1
99:13, 105:11
105:12, 106:17
106:18, 124:22
132:10, 140:24
141:18, 144:19
160:3, 165:23
168:6, 170:4
171:2, 172:10
175:11, 175:18
176:20, 179:3
214:9, 216:2
216:16, 216:23
217:4, 217:8
219:10, 220:11
220:22, 237:1
257:14, 257:25
260:11, 264:2
265:9, 269:2
285:23, 287:25
288:1, 288:1
288:1, 288:15
288:22, 293:17
**Yep** 47:4, 77:15
202:24
**York** 102:21
103:15, 110:16
110:18, 111:12
111:18, 111:24
131:21, 131:22

132:1, 132:12
133:5, 133:9
133:10, 218:23
274:20, 275:1
275:17
**young** 130:24
**Yu** 14:12, 17:25
18:19, 18:24
19:18, 20:1, 20:8
20:12, 21:13
21:23, 202:15

**Z**

**Zane** 7:11, 8:24
271:7
**Zenith** 253:18
**zero** 112:16
**Zoom** 7:4, 8:8

**0**

000001-000083
4:14
**00001411** 2:11
**00001412** 2:11
**00001936-00001...**
2:18
**00002145-000036**
4:20
**00002157-00002...**
4:4
**00002208-00002...**
4:8
**00002222** 2:16
**00002232** 4:6
**00002308** 3:24
**00002309-00002...**
3:22
**00002329** 3:20
**00002345** 3:18
**00002352-00002...**
3:13
**00002389-00002...**
3:11
**00002422** 3:9
**00002426** 3:7
**00002433** 3:5
**00002441** 2:21

**0000884** 2:13
**0000892** 2:14
**000878** 4:22
**001175-001183**
4:23
**02** 3:2

**1**

**1** 2:21, 3:5, 3:7
3:9, 3:18, 3:20
3:24, 4:5, 4:13
4:22, 48:14
51:18, 53:17
55:24, 58:21
59:4, 72:16
73:23, 76:3
102:9, 104:22
104:25, 109:22
117:8, 118:6
119:9, 119:10
119:16, 119:23
120:10, 223:15
223:22, 223:24
253:6, 308:20
309:23, 311:22
**1,500,000** 297:15
**1.24.20** 3:10
**1.27.20** 3:23
**1.5** 72:19, 73:10
76:23, 87:3
116:15, 116:17
117:17, 117:24
118:3, 118:7
118:7, 119:11
119:17, 119:18
122:7, 133:19
136:12, 139:18
140:7, 141:16
142:23, 146:7
146:9, 146:14
148:6, 149:20
149:25, 151:1
153:13, 153:21
154:19, 155:4
156:15, 157:12
159:4, 160:1
162:1, 169:5
171:5, 174:19

176:21, 179:2
207:10, 222:14
224:17, 226:3
229:9, 233:2
254:19, 258:23
259:2, 269:24
275:2, 276:21
286:14, 298:24
298:25, 300:15
**1.7** 299:13
**1.8** 303:19, 304:3
**1.9** 303:20
**1/1/2017** 3:15
**1/18** 221:7
**1/18/20** 222:1
**1/21/20** 210:7
210:11
**1/21/2020** 2:20
**1/23/20** 221:2
**1/23/2020** 3:4
**1/24/20** 224:25
227:17, 238:16
244:5, 244:6
284:22, 284:23
285:3, 285:19
**1/24/2020** 3:6, 3:8
3:12, 3:17, 3:19
225:17, 226:6
**1/27/20** 293:25
296:8, 296:16
**1/27/2020** 3:21
**1/8/20** 187:23
**1/8/2020** 2:17
**1:05** 145:16
145:19
**1:24** 145:19
145:23
**10** 5:15, 6:9, 6:13
66:9, 141:18
160:3, 170:4
171:2, 179:3
206:6, 206:9
209:3, 252:25
288:1, 288:15
288:18, 288:19
288:21, 288:22
323:18, 324:15
329:5, 338:20
341:22

DANIEL JAEGER   MARCH 02, 2023

**10,000** 183:21
**10:55** 58:20
  58:23
**100** 7:23
**100,000** 255:3
  255:4
**101** 4:17, 207:16
  207:18, 209:5
  209:6, 210:4
  210:4
**104** 4:15
**107** 4:17
**108** 4:18
**109** 4:15
**10-plus** 168:6
  176:20
**11** 5:7, 6:12, 6:14
  51:6, 173:17
  174:17, 241:16
  241:16, 256:25
  258:14, 307:25
  309:21
**11:01** 58:23, 59:2
**11:46** 94:3, 94:5
**113** 4:18
**115** 5:5
**118** 5:6
**119** 4:16
**11th** 312:7
**12** 3:15, 6:5, 6:11
  6:14, 173:17
  174:17, 288:20
**12/15/2021** 4:17
**12/23/19** 187:4
**12:01** 109:15
**12:02** 94:6, 94:10
**120** 4:16
**125** 2:10
**13** 4:21, 5:3, 5:6
  5:10, 5:12, 5:15
  6:3, 6:7, 6:14
  6:16, 74:9, 74:10
  74:11, 173:17
  174:17
**13th** 312:6
  320:13
**14** 5:8, 6:16
  173:17, 174:18
  206:9, 209:3

312:25
**15** 5:14, 6:5
  145:11, 164:10
  173:17, 174:18
  279:20
**15,000** 253:13
  253:19
**150** 117:25, 120:3
  120:5, 120:18
  121:5
**150,000** 254:18
  254:21, 254:21
  255:3
**151** 5:7
**153** 6:3
**158** 4:18
**15th** 260:2
**16** 5:3, 5:4, 5:13
  6:4, 173:17
  174:18, 279:21
**1600** 7:18
**165** 5:8
**166** 2:12
**17** 5:5, 173:17
  174:18
**170** 167:9, 167:17
**18** 5:4, 5:12, 6:4
  6:6, 6:10, 6:15
  29:9, 29:12
  126:10, 173:18
  174:18
**186** 2:15
**187** 2:17
**18th** 187:4
  210:21, 211:4
**19** 5:6, 6:9, 6:12
  174:18, 202:16
  203:1
**193** 5:9, 6:4
**195** 6:5
**198** 6:6
**1986** 196:15
**1987** 195:3, 195:3
**1989** 84:8, 84:11
  84:14, 180:23
  182:22, 183:17
  183:18, 183:23
  183:24, 184:1
  184:3

**1990** 84:12
**1994** 23:5, 24:13
  24:24, 25:1, 25:3
**1995** 29:5, 29:8
  30:9
**1997** 23:24
**1998** 23:24, 27:21
  28:24, 29:4
  30:14, 33:6, 49:3

---

## 2

**2** 1:18, 2:10, 3:22
  4:7, 4:19, 6:12
  7:3, 8:1, 59:1
  72:19, 73:13
  73:16, 74:13
  76:10, 94:4
  108:21, 108:24
  191:15, 321:4
  347:9
**2.6** 130:23, 131:7
  132:15
**2.7.20** 4:5
**2/11/20** 309:9
  319:23, 319:25
  320:5
**2/11/2020** 4:7
**2/25** 304:23
**2/28/20** 306:24
  307:2
**2/28/2020** 4:2
**2/5/20** 304:22
  304:24, 304:25
**2/5/2020** 4:1
**2/7/20** 316:20
**2:30** 200:8
  200:10
**2:37** 200:11
  200:15
**20** 5:3, 6:15
  15:12, 15:18
  52:4, 52:23, 66:9
  140:24, 141:18
  160:3, 161:15
  179:3, 288:1
**200,000** 254:20
  254:21, 255:6
  299:13

**2000** 169:9
  169:15, 169:25
  171:1, 173:10
  173:13
**2001** 23:21, 49:9
  49:10, 49:16
  49:23, 53:12
**2002** 169:16
  169:25, 171:1
  173:10, 173:13
**2006** 207:21
  207:24
**2008** 168:14
  174:2
**2009** 248:10
**201** 5:10
**2010** 2:13, 165:8
  166:4, 166:5
  166:19, 168:5
  170:2, 170:3
  170:21, 173:14
  173:16, 174:2
  174:17
**2010-2011** 167:7
**2011** 49:24, 50:10
**2016** 51:9
**2018** 74:1, 74:13
  76:11, 168:19
  170:11, 175:21
  208:7
**2019** 68:21
  134:18, 168:24
  173:18, 176:1
**202** 2:19
**2020** 134:18
  139:7, 173:19
  174:20, 174:20
  176:21, 187:5
  191:18, 196:17
  230:2, 247:16
  297:12, 299:2
  307:25, 308:5
**2021** 260:2
  279:15, 281:25
**2023** 1:18, 7:3
  8:1, 8:13, 347:9
  347:14, 348:15
**20-plus** 105:11
  105:12

**20-some** 52:18
**21** 5:4, 5:5
  134:18, 202:7
**210** 2:20
**211** 5:11
**212** 5:12
**213** 2:22
**214** 3:1, 6:7
**215** 6:8
**216** 6:9
**217** 6:10, 6:11
  6:12
**218** 6:13, 6:14
  6:15
**219** 5:13
**21st** 285:4
**22** 4:23, 5:6
  42:15, 44:13
  48:13, 48:24
  53:13, 53:19
  63:19, 134:18
**22,500** 253:20
**220** 6:16
**221** 3:4
**222** 6:3
**223** 4:16, 6:4
**225** 3:6
**228** 3:8
**23** 5:5, 5:11, 5:14
  6:5, 6:13
**230-5454** 1:24
**231** 6:5
**233** 6:6
**236** 6:7
**237** 6:8
**238** 3:10, 5:14
  6:9
**24** 6:3, 6:7
**2400** 241:15
**244** 3:12
**24th** 230:2
  231:11
**25** 5:9, 6:3, 6:11
  6:16, 9:20
  121:15, 199:14
  253:7
**25,000** 254:21
**250,000** 73:10
  167:24, 229:10

DANIEL JAEGER   MARCH 02, 2023

254:20
**253** 4:16
**26** 206:3
**265** 4:18
**267** 3:14
**27** 253:8
**270** 6:10
**279** 6:11
**28** 29:21, 46:12
72:17, 75:11
78:15, 78:23
217:8
**2800** 7:17
**282** 6:12, 6:13
**284** 3:17
**285** 3:19, 6:14
**29** 25:5, 217:4
220:11, 220:22
237:1, 257:25
269:2
**292** 6:15
**293** 6:16
**294** 3:21, 6:3
**296** 3:23, 6:4
**297** 4:19
**298** 6:5
**2999** 7:12
**2nd** 8:13

**3**

**3** 2:17, 4:3, 6:15
66:15, 66:22
67:5, 68:3, 68:9
69:3, 69:5, 69:7
69:13, 69:16
69:18, 70:2, 70:5
70:24, 71:1
71:11, 71:16
71:25, 72:5, 72:8
72:12, 72:21
73:11, 73:16
73:18, 75:16
75:17, 76:1, 76:3
76:14, 76:19
76:21, 77:17
77:19, 77:22
79:15, 80:4, 80:7
80:17, 81:22

83:1, 83:2, 83:23
84:25, 85:21
87:2, 87:5, 90:3
90:8, 93:1, 94:9
98:10, 106:13
117:12, 145:17
168:21, 168:24
171:13, 172:2
172:7, 172:20
174:9, 176:5
178:4, 178:17
179:5, 180:1
181:8, 181:10
181:11, 182:11
182:13, 188:3
190:19, 193:22
194:2, 200:20
201:7, 203:5
203:10, 204:5
204:13, 204:14
206:16, 207:5
207:18, 207:24
209:17, 222:6
222:6, 222:6
222:15, 222:21
223:6, 223:24
224:7, 224:19
224:23, 226:2
226:12, 226:21
228:14, 228:21
228:23, 229:3
229:12, 230:12
230:25, 233:14
258:5, 258:16
298:18, 305:21
306:12, 306:25
309:6, 312:10
312:19, 314:1
315:3, 315:5
315:21, 315:23
320:7, 320:14
320:19, 320:20
320:21, 321:9
321:14, 321:21
322:17, 323:18
324:15, 325:24
325:24, 326:8
326:24, 329:4
329:25, 331:6

331:12, 333:4
333:12, 335:5
336:7, 336:24
337:9, 337:21
338:5, 338:13
340:18
**3.1** 131:9, 132:18
**3/3/20** 297:8
**3/30** 312:10
313:8
**3:31** 243:20
243:23
**3:41** 243:23
244:2
**30** 3:4, 3:8, 4:3
9:20, 65:23
65:25, 66:8
66:15, 66:22
66:22, 67:5, 68:3
68:9, 68:25, 69:3
69:5, 69:7, 69:13
69:16, 69:18
70:2, 70:6, 70:12
70:24, 71:1
71:11, 71:16
71:25, 72:5, 72:7
72:9, 72:13
72:21, 72:21
73:11, 73:16
73:18, 75:16
75:17, 76:1, 76:3
76:14, 76:19
76:21, 77:17
77:20, 77:22
79:15, 80:4, 80:7
80:17, 81:22
83:1, 83:2, 83:23
83:24, 84:23
85:22, 87:2, 87:5
90:3, 90:8, 93:1
98:10, 106:13
117:12, 138:8
139:13, 167:23
168:16, 168:21
168:24, 171:13
172:2, 172:7
172:21, 174:4
174:9, 174:9
176:6, 178:4

178:17, 179:5
180:1, 181:8
181:11, 181:11
182:11, 182:13
188:3, 190:19
192:13, 193:22
194:1, 194:2
194:20, 194:21
196:9, 199:14
200:20, 201:7
203:5, 203:10
204:5, 204:13
204:14, 204:15
206:16, 207:5
207:24, 209:17
221:2, 222:6
222:6, 222:6
222:8, 222:15
222:21, 222:22
223:6, 223:7
223:24, 223:25
224:7, 224:8
224:16, 224:19
224:23, 226:2
226:4, 226:12
226:13, 226:21
226:21, 227:18
228:14, 228:14
228:21, 228:24
229:3, 229:12
230:12, 230:25
233:14, 258:6
258:17, 259:12
288:1, 298:18
305:21, 305:22
306:12, 306:12
306:25, 308:20
309:7, 309:15
309:23, 310:8
310:9, 311:19
311:22, 312:10
312:19, 314:1
315:3, 315:5
315:21, 315:23
320:7, 320:14
320:19, 320:20
320:21, 321:9
321:14, 321:22
322:4, 322:17

323:18, 323:18
323:18, 324:15
324:15, 324:15
325:24, 325:25
326:8, 326:24
329:4, 329:5
329:5, 329:25
331:6, 331:13
333:5, 333:12
335:5, 336:7
336:24, 337:9
337:21, 338:5
338:13, 338:15
340:18, 340:22
**30(b** 12:10
**30(b)(6** 1:16, 7:2
8:8, 12:10, 12:20
12:22, 13:3, 13:7
13:10, 14:16
18:9, 20:14
22:17
**30(c)(2** 94:18
**30(d)(3** 94:24
94:25, 95:6
95:17, 96:17
**300** 1:23
**301** 4:20, 5:15
**303** 6:6
**3033** 7:23, 8:18
**305** 4:1
**307** 4:2
**30-page** 342:15
**30-some** 106:16
124:19
**30-year-old** 79:17
188:12, 189:15
**313** 1:22, 8:15
**316** 4:5
**32** 2:19
**320** 4:7
**325** 7:13
**327** 6:7
**329** 6:8
**33** 2:10, 3:11
125:5, 125:11
125:19
**331** 6:9
**332** 6:10, 6:11
**334** 6:12

DANIEL JAEGER   MARCH 02, 2023

| | | | | |
|---|---|---|---|---|
| **335** 6:13 | 271:18 | **50** 3:23, 132:10 | **77** 104:23, 104:24 | **99** 206:4, 206:9 |
| **336** 6:14 | **40** 3:1, 5:8, 214:5 | 296:14 | **78** 202:6, 202:13 | 209:3 |
| **337** 6:15, 6:16 | 266:9, 266:11 | **50,000** 253:18 | 202:16, 203:1 | **9th** 97:15 |
| **339** 2:5 | 266:14, 271:21 | 255:4 | | |

**34** 2:12, 166:18
166:24
**341** 2:6
**347** 348:6
**35** 2:15, 124:8
130:8, 130:16
133:18, 136:9
144:1, 178:13
179:23, 186:16
186:17, 187:10
221:24
**35,000** 138:9
139:13, 253:13
**36** 2:17, 187:24
192:6
**36,000** 253:11
253:12
**37** 2:19, 202:1
202:3
**38** 2:20, 5:7
210:7, 210:12
211:6
**39** 2:22, 124:8
129:4, 130:12
130:13, 213:4
213:5, 213:8

**4**

**4** 4:3, 4:17, 6:6
6:7, 6:13, 101:3
101:22, 107:5
107:15, 107:18
108:13, 113:7
145:22, 158:6
200:9, 243:15
256:17, 265:8
272:7
**4,000** 255:4
255:5, 255:5
255:5
**4.3** 129:12
**4:16** 271:11
271:14
**4:31** 271:14

**40,000** 138:9
**400,000** 255:2
**41** 3:4, 221:3
334:20
**42** 3:6, 4:23
225:2
**425,000** 136:11
139:4
**43** 3:8, 227:21
227:23, 228:3
**44** 3:10, 4:23
238:18
**44th** 7:12
**45** 3:12, 244:9
244:10, 244:11
246:21
**45,000** 254:20
**46** 3:14, 5:9
243:16, 266:18
266:24, 267:1
**47** 3:17, 5:10
284:24
**48** 3:19, 4:13
4:23, 285:20
**480** 1:24
**49** 3:21, 119:24
120:10, 120:13
294:2
**4th** 348:15

**5**

**5** 4:19, 5:8, 5:10
70:12, 83:24
84:25, 200:14
243:21, 259:12
267:14, 297:6
308:5, 323:18
324:15, 329:5
338:14, 341:22
**5,000** 83:15
195:4, 196:15
**5,586,000** 122:4
122:8
**5.5** 177:23

**50,468** 1:25, 7:5
348:5, 348:18
**51** 4:1, 4:13
305:1, 310:25
**52** 4:2, 307:3
315:20
**53** 4:5, 5:11
316:22
**54** 4:7, 320:1
320:3
**546-3721** 1:24
**55** 4:14
**59** 4:14
**5th** 310:5

**6**

**6** 4:18, 5:9, 5:13
6:4, 6:6, 6:10
6:10, 6:11, 244:1
271:12
**6:03** 346:5, 346:9
**60** 5:12, 68:22
190:19, 192:1
192:13, 193:20
195:20
**602** 1:24
**63** 5:13, 5:14
**65** 4:1, 5:15
305:17

**7**

**7** 2:23, 3:2, 3:13
5:7, 271:17
346:6
**7/24/20** 125:9
**7/4/2020** 2:10
**72** 4:14
**7-206** 348:14
348:22
**73** 4:14, 54:12
55:23, 59:5
**74** 4:15, 4:21
**76** 4:15

**8**

**8** 6:8, 6:8, 6:9
256:17, 288:19
288:20
**8/1/19** 51:24
51:25, 74:25
75:2
**8/1/20** 51:25, 75:2
**8/2/18** 74:18
**800,000** 298:23
**81** 5:3
**83** 4:14
**85,000** 253:14
**85004** 7:18
**85012** 7:24
**85018** 7:13
**85234** 1:23
**87** 169:7, 171:1
196:15
**89** 5:4
**891** 167:19
**8th** 191:18

**9**

**9** 2:4, 2:13, 4:23
5:11, 6:8
**9/18** 166:22
**9/18/20** 166:18
166:21
**9/18/2020** 2:12
**9:58** 1:18, 7:3, 8:2
8:13
**90** 68:22, 206:2
**900,000** 255:5
**90s** 42:25, 44:18
245:9
**94** 24:15, 27:7
27:20
**95** 29:19, 30:4
30:13
**97** 31:7
**98** 31:7, 31:7
31:23, 49:8